**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 18-10512 (CSS) |
| Zohar III, Corp., *et al.*, | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF LYNN TILTON**
**IN SUPPORT OF CHAPTER 11 PETITIONS**

# TABLE OF CONTENTS

I.   INTRODUCTION..................................................................................... 3

II.  MY ROLE AS OWNER AND DIRECTOR OF THE ZOHAR FUNDS......................... 7

III. OVERVIEW OF THE ZOHAR FUNDS AND MY ENTERPRISE. .............................. 8

A.   MY FIRST FUNDS – FORMATION OF THE ARKS..............................................................8
B.   STRUCTURE OF SUBSEQUENT FUNDS – CREATION OF THE ZOHAR FUNDS.........................10
C.   THE ZOHAR FUNDS' NOTEHOLDERS.........................................................................14
D.   OWNERSHIP OF THE ZOHAR FUNDS' PREFERENCE SHARES. ..........................................16

IV.  THE PORTFOLIO COMPANIES ARE EXTREMELY SUCCESSFUL. .................. 19

A.   REINVENTING AN AMERICAN ICON – MD HELICOPTERS................................................20
B.   A CALIFORNIA SUCCESS STORY – STILA COSMETICS ....................................................22
C.   THE CROWN JEWELS OF MICHIGAN'S AUTO SUPPLIERS – DURA AND GAS .......................23

V.   THE ZOHAR FUNDS' PREFERENCE SHARES ARE "IN THE MONEY." ........... 26

VI.  THE VALUE OF THE ZOHAR FUNDS IS LOCKED AND  CANNOT BE
MONETIZED EXCEPT THROUGH THE BANKRUPTCY PROCESS. ........................... 28

D.   MBIA HAS PRESENTED OBSTACLES TO MY PRIOR ATTEMPTS TO RESTRUCTURE THE ZOHAR FUNDS. ........30
E.   ZOHAR I BANKRUPTCY LITIGATION. .........................................................................33
F.   ZOHAR I COLLATERAL AUCTION. .............................................................................34
G.   MBIA'S EXPOSURE RELATED TO ZOHAR I AND ZOHAR II...........................................35

VII. MBIA APPOINTS AMZM AS THE NEW COLLATERAL MANAGER. .................. 36

A.   PATRIARCH RESIGNS AS COLLATERAL MANAGER AND WORKS TO TRANSITION THE ZOHAR FUNDS. ...........36
B.   MBIA AND AMZM'S LITIGATION CAMPAIGN HAS CAST A CLOUD OVER THE ZOHAR FUNDS AND THE
PORTFOLIO COMPANIES RENDERING THEM ENTIRELY UNABLE TO MONETIZE ASSETS AND MAXIMIZE VALUE FOR
ALL STAKEHOLDERS. ....................................................................................................37
C.   MBIA AND AMZM HAVE MADE NO EFFORT TO MONETIZE THE ZOHAR FUNDS' ASSETS OR MAXIMIZE
THEIR VALUE IN THE INTEREST OF ALL THE ZOHAR FUNDS' STAKEHOLDERS ........................40

IX.  THE PURPOSE OF THIS BANKRUPTCY PROCEEDING IS TO ACCESS THE
SIGNIFICANT VALUE LOCKED IN THE ZOHAR FUNDS' ASSETS AND MONETIZE
THEM FOR THE BENEFIT OF ALL STAKEHOLDERS. .............................................. 42

X.   CONCLUSION..................................................................................... 44

I, Lynn Tilton, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

## I.    Introduction

1.    I am the sole director and owner of each of Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1, Limited ("Zohar II"), Zohar III, Limited ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds"), each of which are Cayman Islands entities.  I own the Zohar Funds through entities I own (directly or indirectly)—Octaluna, LLC ("Octaluna I"), Octaluna II, LLC ("Octaluna II"), and Octaluna III, LLC ("Octaluna III," and collectively, the "Octaluna Entities")—that hold all of the preference shares of the Zohar Funds.[1]  Through my ownership of the Zohar Funds, I am also the indirect owner of Zohar CDO 2003-1, Corp. ("Zohar I Corp."), Zohar II 2005-1, Corp. ("Zohar II Corp.") and Zohar III, Corp. ("Zohar III Corp."), and together with Zohar I Corp. and Zohar II Corp., the "Zohar Corps"), each of which are Delaware corporations.  The Zohar Funds and the Zohar Corps (the "Debtors") are collectively the debtors and debtors-in-possession in the above-captioned cases (the "Chapter 11 Cases").[2]  I am also the Zohar Funds' creator and founder, and I own, through my wholly owned entities, the Class A-3 and B notes in Zohar I, and the Class B Notes in Zohar II and Zohar III, respectively.

2.    The Zohar Funds are innovative distressed debt collateralized loan obligations ("CLOs").  The Zohar Funds raised capital by issuing notes to noteholders who were, in

---

[1]    Specifically, Octaluna I holds the preference shares of Zohar I, Octaluna II holds the preference shares of Zohar II, and Octaluna III holds the preference shares of Zohar III.

[2]    The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

exchange, entitled to interest payments over time, plus return of their principal at the maturity date.

3.      The Zohar Funds' assets are primarily loans to distressed companies (the "Portfolio Companies").  The Zohar Funds originated loans to the Portfolio Companies and also sometimes purchased distressed loans on the secondary market at a discount.  These loans were originated primarily to undervalued, iconic American brands in need of capital and a sound management strategy, both of which were necessary to rescue the businesses and restore value, creating and preserving jobs in America.  These brands are comprised primarily of domestic manufacturing companies that produce goods "made in the U.S.A.," including MD Helicopters, a defense contractor that manufactures and distributes helicopters and other military hardware to the U.S. and foreign militaries.  I obtained control over the Portfolio Companies, implemented a long-term turnaround plan to create value and, in many cases, executed on such strategies, resulting in highly successful and exceedingly valuable companies from assets that would have otherwise been liquidated.

4.      In addition, the Zohar Funds hold "equity upside" interests in the Portfolio Companies.  What this means is that, while I and my affiliates own all or almost all of the equity in the Portfolio Companies, I directed that upon a sale of the Portfolio Companies, certain percentages of the net proceeds would flow through the Zohar Funds' waterfall.  Those proceeds flow through the waterfall to make outstanding principal and interest payments on the notes before any residual value flows to me, personally, as the Zohar Funds' owner, due to my ultimate ownership (through various entities I own and control) of the Zohar Funds' preference shares.

5.      I am actively involved in the management of the Portfolio Companies, often acting as CEO and as a board member or manager of the companies (in most cases, the sole

board member or manager).  My active involvement empowers me to best use my experience and expertise in turning around distressed companies: to direct strategies and lead the rebuilding and revitalization of the Portfolio Companies.  In fact, I am the Manager and/or Director of approximately 60 of these Portfolio Companies and CEO of several of the most successful.  My platform is one of the largest woman-owned businesses in the United States and comprises Portfolio Companies headquartered across the United States and employing more than 50,000 people around the world.  Despite these varied positions and the substantial time and effort expended in connection therewith, I earn no salary as CEO or Manager of any Portfolio Company, except at MD Helicopters where I am paid as the CEO.

6.       The Zohar Funds' assets, including the cash flows of principal and interest that flow from the loans, and the cash flow from the monetization of  "equity upside" interests in the Portfolio Companies, have tremendous value.  In fact, they are worth billions of dollars—far in excess of the amount owed to the Zohar Funds' noteholders (collectively, the "Noteholders").  Nevertheless, Zohar I and Zohar II have already defaulted, and Zohar III will likely default on loans maturing in March 2019, absent intervention from this Court.  This substantial value is locked up in the Portfolio Companies and cannot be monetized for the benefit of all stakeholders as a consequence to the cloud of uncertainty and litigation tactics pursued by the Zohar Funds' new Collateral Manager, Alvarez & Marsal Zohar Management ("AMZM"), at the direction of Zohar I and Zohar II's controlling creditor, MBIA Insurance Corporation ("MBIA"), and Zohar III's controlling class.  Indeed, these litigations have directly interfered with my recent efforts to sell at least one Portfolio Company and to obtain financing for several others.  I understand from my negotiations with potential buyers and lenders that though they are more than willing to

engage in sale and refinancing transactions, they will only do so absent the ligation risk and with certainty that assets and equity will be delivered to them free and clear with no ongoing risk.

7.      Accordingly, in my capacity as the sole director of each of the Zohar Funds, and after having been advised on relevant matters, I determined it was in the best interest of the Zohar Funds and all the stakeholders to voluntarily file these Chapter 11 Cases to permit the bankruptcy court to oversee an orderly process of unlocking the value in the Zohar Funds through sales and refinancings of the Portfolio Companies.  Only through this process will Noteholders be made whole, and will the residual value in the Portfolio Companies inure to me as the Zohar Funds' preference shareholder.

8.      The Portfolio Companies themselves, however, will not be debtors in bankruptcy cases, as the selected companies to be monetized are no longer distressed but, rather, have seen their fortunes reversed, and both their value and buyer base would be significantly diminished if they were to be sold through a Chapter 11 process.

9.      The Zohar Funds were placed into bankruptcy in order that Noteholders and all other stakeholders can finally access the full value of the cash flows from Portfolio Companies sales or refinancings.  This value is locked as a result of protracted litigations.  I have hired a Chief Restructuring Officer, Marc Kirschner, to serve as an independent party to assist in further developing and executing on a plan to monetize the Zohar Funds' interests, as set forth in Mr. Kirschner's declaration.

10.      I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to provide an overview of the Debtors' business and these Chapter 11 Cases.  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors'

operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I have obtained this information in the course of my ownership and management of the Debtors.  To the extent that any information provided herein is materially inaccurate, we will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.[3]

11.     To familiarize the Court with the Debtors, and the Chapter 11 Cases, this First Day Declaration provides a summary overview of the Debtors and the Chapter 11 Cases.

## II.     My Role as Owner and Director of the Zohar Funds.

12.     I am the owner and director of each of the Debtors.

13.     In particular, as explained in greater detail below, I own the Zohar Funds through my ownership, directly or indirectly, of the entities that own all of the Zohar Funds' preference shares.  Those entities are the Octaluna Entities.

14.     I am the sole director of each of the Zohar Funds.  Specifically, on January 25, 2017, pursuant to the Amended and Restated Articles of Association of the Zohar

---

[3]   The parties to these bankruptcy cases are currently involved in several litigations over the issue of who has proper ownership and control over the Portfolio Companies.  Certain facts set forth in this declaration that are relevant to those litigations may be in dispute.  However, as further described in Section IV of this Declaration, the results of these litigations are not relevant for purposes of executing a bankruptcy plan for the Zohar Funds because they do not impact the distribution of cash—through the Zohar Funds' payment waterfall--of any proceeds and residual value from the monetization of the Portfolio Companies.  The litigations also do not affect the parties' reserved rights, upon the monetization of the Portfolio Companies, to dispute the manner in which sale proceeds and residual value are distributed.

Funds, the Octaluna Entities removed the incumbent directors of Zohar I, Zohar II, and Zohar III, respectively, and appointed me as the sole director.

15.     I am also the founder and creator of each of the Zohar Funds.  In particular, as discussed in greater detail below, I created the Zohar Funds as CLO funds to invest in and originate loans to distressed companies.

16.     From the Zohar Funds' inception until March 2016, my wholly-owned entities— Patriarch VIII, LLC, Patriarch XIV, LLC, and Patriarch XV, LLC (collectively, "Patriarch")— served as the Zohar Funds' Collateral Managers.  Patriarch is a vertically-integrated investment enterprise owned and managed by me.  It focuses on the acquisition and invigoration of undervalued, iconic American brands where time, capital, and sound strategy can rescue a business and restore value, creating and preserving jobs in America and across the globe. Pursuant to an agreement with MBIA, as described below, Patriarch resigned as Collateral Manager of the Zohar Funds effective March 2016 to focus on managing and leading the Portfolio Companies, and effectuating turnaround strategies that will ultimately generate maximum value for all of their respective stakeholders.  Shortly thereafter, AMZM was appointed Collateral Manager of the Zohar Funds by Zohar I II's controlling creditor, MBIA.[4]

### III.     Overview of the Zohar Funds and My Enterprise.

**A.     My First Funds – Formation of the Arks.**

17.     After nineteen years of experience on Wall Street, I founded Patriarch Partners in 2000 to develop innovative solutions for financial institutions with large portfolios suffering

---

[4]  As of January 20, 2017, AMZM's role as Collateral Manager of Zohar I was terminated.  As discussed in greater detail below, the collateral of Zohar I was liquidated in its entirety at auction and the proceeds of that auction were distributed by U.S. Bank, the Trustee of the Zohar Funds on January 20, 2017.  In light of the liquidation of all of the Zohar I collateral and distribution of the proceeds therefrom, pursuant to Section 5.1 of Collateral Management Agreement among Zohar I and AMZM, dated March 3, 2016 (the "Zohar I CMA"), the Zohar I CMA has terminated.  Accordingly, subject to Sections 5.5 and 5.6 of the Zohar I CMA, all of AMZM's rights, duties, and obligations under the Zohar I CMA terminated on January 20, 2017.

under the burden of nonperforming and distressed loans that were causing them accounting and regulatory issues.

18.     I created a ground-breaking model for investing in a portfolio of distressed loans, through a CLO, that would use borrowed funds from investors to purchase a portfolio of distressed loans at a discount and, through active management and restructuring, repay noteholder investors their principal plus interest, with residual value flowing to me and my partners.

19.     In November of 2003, I was granted a business method patent, Patent No. US 6,654,727 B2 (Method of Securitizing a Portfolio of at Least 30% Distressed Commercial Loans) for the CLO investment model I created and is the basis for the Zohar Funds' model.  My investment method—that I utilized with respect to the Zohar Funds—was described by an administrative law judge of the Securities and Exchange Commission (the "SEC"):

> Having become interested in distressed assets, Tilton developed a method of evaluating distressed loans – analyzing the potential cash flows and other factors; and determining on that basis whether to purchase, and an appropriate price for, each loan to make up a portfolio of varied loans that would generate sufficient cash flows to pay expenses, including interest and principal to investors in a vehicle that would hold the portfolio.  A portion of the pool had to have a high likelihood of paying interest on a consistent basis, in order to pay investors; as Tilton explained, if all the loans were non-performing at the start, there would be no interest coming in to pay investors, while if all were higher quality, there would not be enough potential for profit because she would have to pay too much for them…Tilton obtained equity and became active in management of the Portfolio Companies.  Since some of the Portfolio Companies were bound to fail, it was necessary for some to succeed in order to mitigate the risk of loss.

20.     I initially created two CLO issuers in 2000 and 2001, respectively called Ark I CLO 2000-1 Ltd ("Ark I") and Ark II CLO 2001-1 Ltd ("Ark II"), each of which is a Cayman Islands company (collectively, the "Arks"), based on this innovative investment strategy.  The

Arks were widely recognized as successful transactions, and the Arks repaid their noteholders well ahead of their respective maturity dates.

21.     My fund strategy involved my active management and control of the Portfolio Companies, unlike many CLOs, which passively invest in debt.  As a result, at the closing table for Ark I, the rating agency (S&P) objected that, unlike most other CLO funds, my fund would be engaged in U.S. trade or business for U.S. tax purposes, which would subject it to unquantifiable tax liabilities such that the rating agency was not willing to rate the deal.

22.     In order to obtain an investment grade rating from S&P, which was necessary for the closing of the transaction, I formed a separate entity that actively managed Ark I's assets, allowing Ark I to remain a passive income vehicle that was not subject to U.S. trade or business taxes.

**B.      Structure of Subsequent Funds – Creation of the Zohar Funds.**

23.     The successes of the Arks, and Ark II in particular, which MBIA had insured, prompted MBIA to reach out to me to request priority on any similar transactions in the future. In 2002, facing a potential insurance liability shortfall of $200-300 million on a set of unrelated CDOs, MBIA sought my help.

24.     Patriarch became the replacement Collateral Manager for MBIA's seven failing CDOs ("MBIA Funds"), and I created a new CLO called Zohar I, modeled after the Ark investment strategy and structure, to help remediate MBIA's shortfall.

25.     The ratings agencies had the same concern for Zohar I with respect to tax and other liabilities as they did for the Arks.  As a result, Zohar I was structured, like the Arks, as a disregarded entity with a U.S. taxpayer (Octaluna I, the sole preference shareholder of Zohar I) serving as the owner of the Zohar Funds and the active manager of Octaluna I's assets.

26.     This structure was the essential element of closing the deal, so that Zohar I would not be subject to U.S. tax liability.

27.     After Zohar I closed, prices for distressed loans increased, and I felt that I would no longer be able to ramp up Zohar I by purchasing distressed loans from the secondary market alone.

28.     Instead, I proposed a revised strategy to MBIA:  Zohar I would continue to purchase distressed senior secured loans, but the primary strategy would be for Zohar I to originate loans to distressed Portfolio Companies, side-by-side with my personal investment vehicles investing in the Portfolio Companies, so that I could gain control over the distressed companies and implement a long-term turnaround strategy to create value.

29.     MBIA chose to proceed with the revised investment strategy, and the governing documents were amended accordingly.

30.     After Zohar I had deployed and invested the majority of its capital, I created two more entities to increase purchasing power and to extend additional loans to Portfolio Companies.  Zohar II and Zohar III were formed in 2005 and 2007, respectively, to loan side-by-side with Zohar I and my personal investment vehicles, and to pursue the same investment strategy.

31.     I have personally invested approximately $218.5 million into the Zohar Funds: $5.1 million in Zohar I, $50 million in Zohar II, and $60 million in Zohar III, respectively, to own the preference shares of each of the Zohar Funds, and $103.4 million to own the A-3 Notes in Zohar I.  In addition, I have invested in and loaned more than $440 million to the various Portfolio Companies.

32.     As noted above, each of the Zohar Funds raised capital by selling notes and preference shares, which entitled Noteholders to interest payments and a return of principal at the maturity date.  Noteholders have no right to receive any payment beyond interest payments and a return of their principal at maturity.

33.     The fundamental investment strategy of the Zohar Funds differed markedly from traditional CLOs.  Most CLOs involve highly rated performing bank loans.  The Zohar Funds held primarily distressed loans purchased from the secondary market and loans originated at high interest rates by the Zohar Funds, themselves, to distressed companies.

34.     Given the nature of the Zohar Funds' investment—loans to distressed companies—the Noteholders and MBIA never expected that every Portfolio Company would repay its loans in full.  Instead, the strategy for interest payment and eventual note repayment was premised on the following expectations: (1) Portfolio Companies would pay high interest on loans the Zohar Funds originated; (2) distressed loans purchased on the secondary market would repay the Zohar Funds in excess of the price the Zohar Funds paid for the loan; and (3) the Zohar Funds would have an equity upside interest in the net proceeds from sales of the Portfolio Companies.

35.     Because of these unique features, the Zohar Funds' success was predicated both on me having the authority (as Collateral Manager) to control the terms of repayment on the loans as well as the power (as equity owner of the Portfolio Companies) to direct the rebuilding of the Portfolio Companies, serving as company director and often as an officer, working with management to create value for the Portfolio Companies for all stakeholders.

36.     That I took on multiple, active roles in the Zohar Funds enterprise was an essential factor for MBIA when it invested.

37.     I am the principal and owner of several affiliated Patriarch entities, including Patriarch VIII, Patriarch XIV, and Patriarch XV, that, as noted above, served as Collateral Managers of the Zohar Funds.  I, or entities owned by me, also served as administrative agent for the lenders, Zohar Funds' equity owner, and owner and manager of the Portfolio Companies. This allowed me, for example, to renegotiate loan terms to prevent a Portfolio Company default. These multiple roles—which were fully disclosed and any conflicts arising out of them waived— ultimately benefited the Noteholders (as well as the Portfolio Companies) by ensuring that the Portfolio Companies continued to pay their debts to the greatest extent possible, even when faced with short-term liquidity shortfalls.

38.     I had broad authority as Collateral Manager to control the repayment terms of the Portfolio Companies and typically acquired a controlling interest in Portfolio Company equity, allowing me to revive and rebuild the Companies.  My equity stake in both the Zohar Funds and the Portfolio Companies gave me a deep and broad personal interest in their success.

39.     Although I retained the voting rights attendant to that Portfolio Company equity and bore the tax and other liabilities inherent to that equity, I also granted the Zohar Funds a limited interest in a sale of that equity as well.  Specifically, as noted above, I decided that each Fund would receive the first dollars of net proceeds from any sale of the Portfolio Companies for its respective interest up to the amount needed to pay all outstanding interest and principal on its notes.  The equity upside interests were granted to the Zohar Funds to ensure that Noteholders would be fully repaid even if some distressed Portfolio Companies were unable to repay their loans (as expected).

40.     To memorialize this arrangement, I listed the Zohar Funds as the record holders of the Portfolio Company equity.  The Zohar Funds' governing documents established a waterfall

through which Portfolio Company sales proceeds (as well as interest and principal payments made to the Zohar Funds) flow: the proceeds run through the Zohar Funds waterfall, paying Noteholders principal and interest due and paying the Zohar Funds' expenses. Only after the Noteholders are paid in full do the residual proceeds inure to me as the sole Zohar Funds preference shareholder.

## C.    The Zohar Funds' Noteholders.

41.    The Zohar Funds' Notes are secured and were issued primarily in two classes—Class A (with each Class A tranche having subclasses of notes) and Class B. The Class A subclasses have an interclass priority waterfall and have differing applicable principal amounts, interest rates, commitment fees, and other varying features. The Class B Notes are all held by the Octaluna Entities (and therefore indirectly by me) and, while also secured, are subordinate in right of payment to the Class A Notes. All of the Debtors' obligations under the Zohar Funds' Notes are non-recourse.

42.    A summary of the Zohar Funds' Note issuances and outstanding debt is as follows:

| Zohar I Notes Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $150 million | 2003 | 11/20/15 | $0.00 |
| Class A-2 | $32 million | 2003 | 11/20/15 | $0.00 |
| Class A-3a | $297.5 million | 2003 | 11/20/15 | $234 million |
| Class A-3b | $52.5 million | 2003 | 11/20/15 | $52.5 million |
| **Total Class A:** | **$532 million** | | | **Total: $286.5 million** |
| Class B | $150 million | 2003 | 11/20/15 | $150 million |

| Zohar II Notes Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $250 million | 2005 | 1/20/17 | $190 million |
| Class A-2 | $550 million | 2005 | 1/20/17 | $418 million |
| Class A-3 | $200 million | 2005 | 1/20/17 | $152 million |
| **Total Class A:** | **$1 billion** | | | **Total: $760 million** |
| Class B | $200 million | 2005 | 1/20/20 | $200 million |

| Zohar III Notes Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1R | $200 million | 2007 | 4/15/19 | $136 million |
| Class A-1T | $150 million | 2007 | 4/15/19 | $102 million |
| Class A-1D | $350 million | 2007 | 4/15/19 | $237.5 million |
| Class A-2 | $200 million | 2007 | 4/15/19 | $200 million |
| Class A-3 | $116 million | 2007 | 4/15/19 | $116 million |
| **Total Class A:** | **$1.016 billion** | | | **Total: $791 million** |
| Class B | $196 million | | 4/15/19 | $196 million |

43.     The Zohar Funds' Notes are held by highly sophisticated, institutional investors. "The terms of the Zohar indentures and accompanying note forms and certificates show that the notes were primarily intended for Qualified Institutional Buyers and Qualified Purchasers and include strict restrictions on the transfer of the notes."[5]  I am advised that the Securities Act Rule 144A defines a "Qualified Institutional Buyer" as a list of specified entities that "acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity…"  I am also advised that a "Qualified Purchaser" is defined in Section 2(a)(51) of the Investment Company Act of 1940 to include "(i) any natural person…who owns not less than $5,000,000 in investments, (ii) any company that owns not less than $5,000,000 in investments and that is [family-]owned, (iii) [certain kinds of trusts]; or (iv) any person, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments."

44.     Of the $532 million in original Zohar I Notes, $350 million was raised from Barclays Bank and the remaining $182 million was raised from Natixis Global Asset Management and MBIA.  The Zohar I Notes were also "wrapped" by MBIA, as credit enhancer. In its capacity as credit enhancer, MBIA insured Zohar I's obligations under the Zohar I Notes

---

[5]     *In re Lynn Tilton*, Initial Decision, SEC Exchange Act Release No. 1182, 2017 WL 4297256, at *9 (ALJ Sept. 27, 2017).

by providing a financial guarantee to certain classes of holders of Zohar I Notes to pay its interest and principal in full, if Zohar I could not meet its repayment obligations.  Under the applicable insurance contracts, upon the payment of claims following a default under the Zohar I Notes, MBIA is fully subrogated to the rights of the applicable Class A Zohar Funds Noteholders.

45.     On the Zohar I deal, Barclays notes—the Series A-3 notes—were separately insured by MBIA apart from the insurance provided to the other Zohar I Noteholders (though that insurance was later separately commuted).  As discussed more fully below, in 2015, Barclays Bank sold its position in Zohar I to my wholly-owned entity, Patriarch XV, LLC ("Patriarch XV") for approximately $103 million and received an undisclosed payment from MBIA on account of its wrap obligations.  Patriarch XV currently holds all of the Class A Zohar I Notes (although MBIA purported to extinguish those rights through an auction that is now the subject of ongoing litigation in the U.S. District Court for the Southern District of New York).

46.     MBIA has also wrapped the Zohar II Notes.  After Zohar II defaulted on the Zohar II Notes on January 20, 2017, MBIA was required to pay the then-holders of the Zohar II Notes approximately $770 million.  MBIA currently holds all of the Class A Zohar II Notes.

47.     To the best of my knowledge, the holders of the Zohar III Notes comprise a small group of approximately 15[6] Noteholders and, like the holders of the other Zohar Funds Notes, are highly sophisticated, institutional investors.

**D.      Ownership of the Zohar Funds' Preference Shares.**

---

[6] There are approximately 25 Class A Zohar III Noteholders, but a number of them are affiliated entities.

48.     I am the ultimate owner of the Zohar Funds because I own, directly or indirectly, the entities that own the preference shares of the Zohar Funds.  As preference shareholder, I receive the residual value in the Zohar Funds after the Zohar Funds notes are repaid.  Prior to repayment of the notes, I was entitled only to a capped amount of dividends which I received several years ago.

49.     As described above, when I formed Zohar I, I formed an entity called Octaluna, I to, among other things, serve as the U.S. taxpayer owner for Zohar I and owner of the Zohar I preference shares.  (I sometimes refer to the Octaluna Entities as "blocker affiliates.")  For the later funds we formed similar entities: for Zohar II, Octaluna II and for Zohar III, Octaluna III, respectively.

50.     The Octaluna Entities were created to own, hold, and control the assets of the Zohar Funds, and to bear the tax consequences, good or bad, from that ownership.  In each case, the Octaluna Entities are the beneficial owners of the assets held by the Zohar Funds, and I am the ultimate owner of the Octaluna Entities.

51.     In particular, each of the Octaluna Entities holds the preference shares of the relevant Zohar Funds.  These are the Zohar Funds' only outstanding shares.  The Octaluna Entities also own all of the Class B notes issued by the Zohar Funds.

52.     The Zohar Funds were, until 2016, classified as disregarded entities for U.S. federal tax purposes.  The Zohar Funds are passive income vehicles which receive only the cash flow from the Zohar Funds' assets.

53.     The preference shares (i.e., the equity) of each Zohar Fund are wholly owned by the corresponding Octaluna Entities, which are themselves owned by other entities ultimately owned by me.  Through my personal investment vehicles, I paid a total of $5.1 million in cash

and assets in exchange for the preference shares in Zohar I.  Similarly, through my personal investment vehicles, I paid a total of $50 million in cash and assets in exchange for the preference shares in Zohar II.  For Zohar III, I paid in total $60 million in cash in exchange for the preferences shares held by Octaluna III.

54.     By virtue of this ownership structure, I, or entities ultimately owned by me, have been allocated more than 99% of the income, gain, and loss of all of the entities which are held by the Octaluna Entities.

55.     Accordingly, entities I own have historically reported all income of the Zohar Funds, as well as income generated by the debt and equity investments in the Portfolio Companies.  Prior to 2016, all such income flowed up by way of a series of pass-through entities to my personal tax return.  Any resulting tax liability was borne by me personally.

56.     During that time, the IRS had always treated me as the tax owner of the entire enterprise structure—which includes the Portfolio Companies, Zohar Funds, Octaluna Entities, and other entities.  When my tax returns were prepared for the 2016 and prior tax years, my tax return preparer allocated Portfolio Company income and loss up to me, and ultimately reported all of the income and loss of the Portfolio Companies organized as limited liability companies (defined below) on my personal tax return.

57.     Since the inception of the Zohar Funds, I had reported taxable income in respect of interest income and capital gains.  Additionally, if a Portfolio Company were sold, I was ultimately responsible for reporting, and for any tax liability in connection with, any resulting capital gains or income.

58.     Beginning in 2016, however, the Zohar Funds elected to be taxed as corporations for U.S. federal tax purposes and therefore were no longer treated as pass-through entities.  Since

that time, entities wholly owned by me have been allocated Portfolio Company income and loss,

and are subject to U.S. federal tax .  Additionally, these entities are responsible for reporting, and

for any tax liability in connection with, any resulting capital gains or income from the sale of a

Portfolio Company.

###### IV.      The Portfolio Companies are Extremely Successful.

59.      The Portfolio Companies today comprise twenty-five (25) operating business

platforms across a broad spectrum of industries including automotive and aerospace, fashion,

technology, manufacturing, industrial and home goods.  Many of the Portfolio Companies are

storied American brands such as MD Helicopters, Stila Cosmetics, Rand McNally, Oasis Water,

Dura Automotive, Universal Instruments and Dana Fragrances.  I have played a very active role

in the management, strategic direction and rebuilding of each and every Portfolio Company from

the day I negotiated their respective acquisitions.  For those Portfolio Companies in which I

serve as CEO, I am deeply involved in their day-to-day management.

60.      In addition to the active management role played by me, Patriarch affiliates,

Patriarch Partners Management Group ("PPMG") and Patriarch Partners Agency Services

("PPAS"), provide operational management consulting and agency services to the Portfolio

Companies.

61.      In addition, entities I directly or indirectly own, separate from the Zohar Funds,

have invested more than $440 million in the Portfolio Companies.

62.      Prior to the Zohar Funds' investment, the Portfolio Companies were often deeply

distressed and typically had no positive cash-flow as they were often purchased out of

bankruptcy and foreclosure sales, and sometimes were merely assets not operating.  These

Portfolio Companies were generally unable to obtain funding from any source other than from

the Zohar Funds or my personal investment vehicles.

63.    The Zohar Funds and my personal investment vehicles were often the sole lenders to the Portfolio Companies, which allowed me to control the terms of the loans without having to address the competing interests of other lenders.  I, and entities owned or controlled by me, often owned all or almost all of the equity in the Portfolio Companies.

64.    I was, and continue to be, actively involved in the management of the Portfolio Companies, often acting as CEO and as a board member or manager of the Companies (in most cases, the sole board member or manager).  This active involvement allows me to design and direct the strategies for revitalization of the Portfolio Companies, which was a key selling point for the Zohar Funds' investors.

65.    Under my active involvement, many of the Portfolio Companies have thrived and currently provide more than 50,000 jobs, primarily for American workers, in a number of industries.  A few examples of my success stories are described below, but the list of Portfolio Company successes detailed below is by no means exhaustive.

A.    **Reinventing an American Icon – MD Helicopters**

66.    MD Helicopters' U.S. roots date back more than 60 years to 1955, when the Hughes Tool Company, Aircraft Division (part of Hughes Aircraft, which was established by famed businessman and aviator, Howard Hughes) first developed "light helicopters."  In 1984, Hughes sold its successful helicopter business to McDonnell Douglas, which opened the Company's Mesa, Arizona facility at Falcon Field.  In 1997, McDonnell Douglas merged with Boeing to become the Boeing Company.  In 1999, Boeing sold some of McDonnell Douglas's commercial helicopter lines to MD Helicopter Holdings Inc., an indirect subsidiary of the Dutch company, RDM Holding Inc.

67.    Until I purchased MD Helicopters, the Company's ability to continue operations was in serious question.  In late 2001, the Company began experiencing production delays

related to two groups of highly specialized helicopters.  These production delays created a situation where the Company was forced to borrow money to account for slower revenue generation.  In fact, because of the production delays and the increased debt, by 2005, the Company had incurred substantial operating losses, was in default on a credit facility and other loans extended by Wachovia Finance Corporation, and indebted to Boeing Capital Corporation, Textron and others.  Wachovia was under no further obligation to make loans, nor were they willing to extend any other financial accommodations to the Company.  MD Helicopters was facing financial crisis and imminent liquidation of its assets.

68.     In July 2005, acting through my Octaluna Entities and Patriarch affiliates, I acquired MD Helicopters to restructure, recapitalize, and save this iconic American brand.  Since then, I have invested more than $82 million of my personal funds into MD Helicopters.

69.     In order to effectuate the turnaround and revitalize the Company, I was appointed as MD Helicopters' sole director in 2005, and also assumed the role of Chief Executive Officer in late 2006.  Under my leadership, MD Helicopters has flourished.

70.     In 2005, MD Helicopters employed around 150 people in Arizona.  Today it employs nearly three times that number, more than 500, at its Mesa headquarters alone, and has plans to hire an additional 150 employees over the course of 2018.

71.     Over the past 12 years, MD revenue has grown ten-fold with more than 60% revenue growth projected for 2018.  MD Helicopters has been reestablished as a premier U.S. defense contractor providing military aircraft, both training and armed helicopters to the U.S. military as well as to foreign military forces around the world.  The Company has also been awarded and successfully managed numerous contractor logistics support ("CLS") contracts in support of U.S. and foreign military installations.

72.    Today, MD Helicopters has more than 2,500 aircraft in service around the world, with customers and fleet users including U.S. Special Operations, Afghan Air Force, Saudi Arabia National Guard, Jordanian Special Forces, Korean Armed Forces, Japanese Self Defense Forces, Houston Police, Columbus Police, Finnish Armed Forces, and many others.  MD Helicopters is known for producing safe, versatile, responsive, and reliable aircraft that are able to fly "hot and high."

73.    In recognition of its revitalization, MD Helicopters has received numerous aviation and law enforcement awards, and now boasts an "aircraft on ground" or AOG rate among the lowest in the industry and a flight readiness rate among the highest in the industry.

74.    This turnaround is due to my tireless work in executing growth strategies for MD Helicopters.  My strategies have proven extraordinarily successful.  MD Helicopters is now a thriving Company with a bright future: indeed, the United States Army recently awarded MD Helicopters a $1.4 billion contract for 150 armed aircraft, adding two named aircraft to its fleet.

**B.    A California Success Story – Stila Cosmetics**

75.    For over 20 years, Stila has created innovative, artistry-proven cosmetics and other personal care products.  Stila was created by celebrity makeup artist Jeanine Lobell in 1994. The cosmetics line was bought by Estee Lauder in 1999, only to be accounted for as a "discontinued operation" and then sold to Sun Capital Partners in 2006.  By 2009, however, Stila had defaulted on a loan and its creditors forced it into an involuntary bankruptcy, where Wachovia Corp. and CIT Group took the Company over from Sun Capital Partners through a foreclosure sale. Prior to my acquisition, Stila's predecessor company was just days away from going under for good—all employees had been placed on furlough; the company's website was taken down "for routine maintenance," with a note that previously placed orders might be canceled; and calls to the Company's Glendale, California headquarters were going unanswered.

76.     In 2009, I created Stila Styles, LLC, to acquire substantially all of the assets of Stila Corp., Stila International, Inc., and its affiliates, Stila UK Limited, and Stila Holding Corp. At the same time, the Company entered into a credit agreement with Zohar III, which issued a $7 million senior secured term loan and a $5 million revolving credit loan.  All of the loans to Zohar III have now been repaid.  In addition, a preferred equity interest which was provided to Zohar III for a zero purchase price in the amount of $3.5 million has also been paid in full.

77.     Under my stewardship, Stila has been completely transformed into a highly successful California business.  The Company is again recognized as an innovation leader, spearheading much of the color cosmetics industry in creating new product categories, elegant packaging design  and consistently evolving its products.  The Company redesigned its distribution, adding significant international revenues, strengthening the brand, and consolidated its sourcing partners to form strong relationships.  The Company also implemented a new inventory management system to ensure on-time launches and in-stock levels above 99%.  As a result, the Company is now operating at a significant profit, employs more than 75 workers in 3 locations, and enjoys double digit revenue growth.

78.     The Company's tremendous success is a direct result of my hands-on guidance and expertise in my role as the CEO.  This success is also due in no small measure to my personal investments in the Company, which currently includes financing totaling approximately $14 million.  Stila is now on firm footing, highly profitable and has a solid upward trajectory for future growth.

## C.     The Crown Jewels of Michigan's Auto Suppliers – Dura and GAS

79.     I am the manager, CEO, and owner of Dura Buyer, LLC  ("Dura Buyer"), Dura Automotive Systems, LLC ("Dura Auto") (collectively, "Dura"), and Global Automotive Systems, LLC ("GAS").

80.     For more than a decade under my stewardship, these once-distressed companies have risen again as Tier 1 suppliers to Michigan's legacy automotive companies, as well as the international automotive base.  Like the industry they serve, these companies have had their struggles.  They were on the brink of collapse and liquidation when I stepped in as manager and owner, and since then I have done everything to save them.

81.     I spent years working tirelessly to bring these automotive companies back from the brink of extinction, including infusing them with more than $32 million of my own personal funds.

82.     In addition, I invested "sweat equity"—putting in time in Michigan, and across the globe, boots on the ground—to bring the companies back to life, seeing them through the 2008 financial crisis and the harsh years that followed, and transforming them into profitable, woman-owned businesses that are the jewels in the crown of Michigan's automotive industry.

83.     GAS was formed by me in 2005, as a platform to acquire and consolidate certain assets and operations, including poor performing metal bending, rollforming and stamping suppliers.  I began by acquiring out of bankruptcy the assets of a trio of Michigan companies—Jacobs Industries, Metalforming Technologies, and Trim Trends—and consolidating them into GAS.  The Zohar Funds and Ark Investment Partners II, L.P. (an entity I wholly own), initially committed to extend term and revolving loans of over $115 million to GAS and its related entities.

84.     The foundational documents for GAS direct that I will act as the sole Manager of GAS, and I further assumed the position of Chief Executive Officer in October 2012.

85.     Since its inception in 2005, and under my control and leadership, GAS has transformed into a high technology manufacturing platform.  I have structured GAS's operations

24

in a manner that has made the Company profitable and recognized as a top supplier in its market. GAS has also been able to leverage collaborative partnerships within my network of Portfolio Companies, which has not only reduced costs but allowed GAS to utilize real-time data collection to efficiently monitor and improve each step in its manufacturing process.

86.     Dura Automotive, together with its affiliated entities, is a leading independent designer and manufacturer of driver control systems, advanced driving systems, infotainment systems, lightweight metal structures, electrical vehicle battery trays, seating control systems, glass systems, engineered assemblies, structural door modules and exterior trim systems for the global automotive industry.  Dura Automotive, through predecessors, dates back more than 100 years.

87.     After years of borrowing to fund its acquisition strategy, Dura Automotive had a 12:1 debt to EBITDA ratio before it filed for Chapter 11 bankruptcy protection on October 30, 2006.  Although it emerged from bankruptcy protection in June 2008, the restructured entity could not withstand the economic and financial downturn that began in late 2008.  The Company, in fact, was just days away from liquidation, owing in excess of $30 million to its customers, as well as hundreds of millions to its creditors, when, in October of 2009, I stepped in.

88.     I formed Dura Buyer on or about November 10, 2009 to own a controlling interest in Dura Automotive.  Dura Automotive then entered into both U.S. and European credit agreements with Zohar II and Zohar III in January 2010, with commitments totaling across the agreements of $ 105.9 million.  Dura Buyer ultimately came to own and control a 73% interest in Dura Automotive, through the purchase of preferred securities in the amount of $20 million.

89.    Since I took control, GAS and Dura have been transformed.  They now operate in 36 locations in 15 different countries.  As of January 1, 2017, they had approximately 12,000 employees, and annual sales of approximately $1.5 billion, generating substantial positive EBIDTA.  This is a far cry from the companies' financial state of significant losses and broken customer relationships that were existing before I created GAS and Dura Buyer and took control.

90.    As a result of my transformation of the Portfolio Companies I have received a number of awards from industry publications and groups.  Just a few examples: in 2010, Automotive News named me one of the 100 Leading Women in the automotive industry.  In 2011, I was inducted into the Living Legends of Aviation Hall of Fame and named Entrepreneur of the Year; the first female in history to receive that distinction.  In 2012, in my capacity as the CEO of Dura Automotive, the Women's Business Enterprise Council – Great Lakes presented me with the Role Model & Mentor of the Year Award.  I was also subject of a Barbara Walters 20/20 interview discussing my mission of saving American jobs and a special Made in America segment with Diane Sawyer on ABC's World News Tonight.  CNBC and its viewers also named me one of the 100 Most Influential Names in Business over the last 25 years.

**V.    The Zohar Funds' Preference Shares Are "In The Money."**

91.    There is significant value in the Portfolio Companies in excess of the liabilities of the Debtors.

92.    As I testified in late 2016, in a proceeding brought by the Securities & Exchange Commission (the charges were dismissed in full on the merits after trial), Patriarch has performed financial analyses to value the Portfolio Companies that demonstrates that even a select group of top-performing Portfolio Companies is worth billions of dollars.

93.    Other stakeholders recognize the same value.  For example, according to one MBIA valuation of a selection of 11 Portfolio Companies—comprising a small subset of the total

number of Portfolio Companies in the Zohar Funds, for Zohar I and II only—that subset of Portfolio Companies have a combined value, for the benefit of Zohar I and II only, ranging between $952 million and $1.484 billion, which is far in excess of the amount MBIA claims as the controlling creditor.

94.    Documents MBIA produced in discovery in an action initiated by AMZM in the Delaware Court of Chancery (the "Section 225 Action") regarding the ownership and control of three Portfolio Companies, demonstrated further that MBIA believes the Zohar Funds preference shares are "in the money"—namely, that upon the sale of these Portfolio Companies, there would be residual value to holders of the Zohar Funds preference shareholder after the Noteholders have been paid in full from proceeds of such Portfolio Company sales.  As the preference shareholder of the Zohar Funds, any residual value would then flow to me, by the terms of the payment waterfall.

95.    As noted above, when creating the Zohar Funds, I recorded Portfolio Company equity in the Zohar Funds' name for the purpose of granting the Zohar Funds an "equity upside" interest.  This interest provides that the net proceeds from any Portfolio Company sale run through the Zohar Funds' waterfall, thereby protecting Noteholders by paying them with such proceeds first until their note obligations are satisfied in full before paying any residual proceeds to me as the Zohar Funds' preference shareholder.

96.    Whether I, through the Octaluna Entities, or the Zohar Funds own the equity in the Portfolio Companies has no impact on the structural framework of this payment waterfall.  In other words, regardless of who owns the Portfolio Companies, the net proceeds from any Portfolio Company sale would first go towards payment in full to the Noteholders  through the payment waterfall, with any residual proceeds flowing to me.  Therefore, the outcome of the

ongoing litigations filed in other jurisdictions will not impact the distribution of funds upon the sales or refinancings of Portfolio Companies during this bankruptcy proceeding. Nonetheless, as further described below, the ongoing litigations have hindered the ability of the Zohar Funds to maximize the value of the Portfolio Companies.

**VI.    The Value of the Zohar Funds is Locked and
Cannot be Monetized Except Through the Bankruptcy Process.**

97.    The current Collateral Manager for the Zohar Funds, AMZM, at the direction of MBIA and the Zohar III controlling class of noteholders ("Zohar III Noteholders"), and on behalf of the Zohar Funds, and I (and various entities I own) are engaged in protracted litigations spanning a number of actions across federal and state jurisdictions. AMZM, MBIA and the Zohar III Noteholders alleged that the Zohar Funds are the beneficial owners of the Portfolio Company equity interests recorded in the Zohar Funds' names. But, as noted above, the Zohar Funds were never structured to own equity in the Portfolio Companies; the Octaluna Entities are and always have been the beneficial owners of the equity in the Portfolio Companies.

98.    As noted above, this dispute over who has beneficial ownership of the equity in the Portfolio Companies, however, is meaningless in the context of this proceeding. At such time as the Portfolio Companies are sold or refinanced, the net cash proceeds from that activity will flow through the waterfall to repay the Noteholders in full, first, before any funds inure to the benefit of the preference shares.

99.    Nonetheless, the consequence of the protracted litigations over ownership has cast a cloud of uncertainty over the Zohar Funds, making it unfeasible for the Portfolio Companies to refinance their existing debt facilities or for me, on behalf of the Portfolio Companies, to consummate any sale transaction. Indeed, I have been told that bankers will not market these transactions, and that buyers will not complete the due diligence to acquire them, if there is any

chance that a closing of the transaction will meet obstacles posed by the ongoing and various

litigation matters.  Further, the Portfolio Companies have consistently met roadblocks in efforts

to refinance their loans due to risk committees that will not permit lending due to litigation risk.

The ongoing litigations have effectively locked the value of the Portfolio Companies, rendering

it virtually impossible to monetize the Zohar Funds' assets for the benefit of all stakeholders.

100.    It should also be noted that, in various pleadings, filings, and testimony

throughout these actions, MBIA and AMZM have repeatedly accused me of wrongdoing and

impugned my character.  I have vehemently denied these false allegations.  Despite the

environment of baseless accusations they systematically create, neither MBIA, AMZM, nor

anyone else, has ever presented any evidence at any trial or evidentiary hearing to support their

allegations, and no court has ever credited any such allegations.  Moreover, in relentlessly

attacking me, MBIA and AMZM have ignored their own fiduciary duties as controlling creditor

and Collateral Manager, respectively, in their unwavering quest to seize control of the Portfolio

Companies, regardless of what damage it causes to them.

101.    Indeed, I was fully vindicated by an SEC Administrative Law Judge ("ALJ")

following a three-week trial in an administrative proceeding instituted against me, Patriarch and

the Patriarch Collateral Managers (collectively, the "Patriarch Respondents") (the "SEC

Action").  In that proceeding, the SEC alleged that the Patriarch Respondents collected unearned

management fees and other payments based on inflated values of the Portfolio Companies,

defrauded Noteholders, and breached fiduciary duties to them and the Zohar Funds by failing to

disclose certain alleged conflicts of interest and by issuing misleading financial statements

pertaining to the impairment and value of certain of the Zohar Funds' assets.  During the course

of the SEC's seven (7) year investigation, MBIA witnesses cooperated with the SEC and were

prepared to testify at trial in the SEC's case in chief (though in the end no MBIA witnesses were called).  Following a 14-day trial—which included eighteen witnesses (of which nine were experts) and three and one-half days of testimony from me—Administrative Law Judge Carol Fox Foelak concluded that the SEC had failed to prove any of its allegations and, therefore, dismissed all charges.  But again, these allegations are irrelevant to this proceeding.  I mention this only so that these continued allegations do not cloud the focal argument and need for appealing to this court of equity.  I seek, in this Court, only a mechanism to maximize value for all of the Zohar Funds' stakeholders and to protect the Portfolio Company constituents and monetize their considerable value.

102.    My strategy for the Zohar Funds has always been to build value and monetize that value by selling the Portfolio Companies or refinancing their debt, and to execute in a manner that will maximize the value to the benefit of all Zohar Funds' stakeholders.  Indeed, I already have monetized billions of dollars of assets across the Zohar Funds and have always planned to sell these remaining Portfolio Companies.  I have expressed this strategy of monetization and intention to the Zohar Funds' stakeholders on many occasions over the years.  But, as described in further detail below, the current litigious environment has made it very difficult to sell or refinance the Portfolio Companies, while maximizing their value.

**D.    MBIA Has Presented Obstacles to My Prior Attempts to Restructure the Zohar Funds.**

103.    I began exploring, in 2011 and 2012, restructuring options that would avert a default of Zohar I on its maturity date.  By the terms of the Zohar I indenture, the consent of all Noteholders is required in order to change the maturity date or otherwise effectuate any amendment  that would affect the payment, timing or amount of principal and interest due on the Zohar I notes.

104.    I believed that an extension of the Zohar I maturity date would have been in the best interest of all the Noteholders because it would have prevented a situation where I would be forced to sell the Zohar I collateral under "fire sale" conditions in order to stave off Zohar I's default.  Such a sale would have resulted in proceeds far less than the Portfolio Companies' true value and would have significantly impaired the future cash flows and recoveries for Zohar II and Zohar III, both of which had overlapping collateral and were not yet facing a maturity.  The triggering of potential defaults and the impairment of future value in Zohar II and III, I believed could have been avoided by aligning the Zohar I and Zohar II maturities, while also providing more time for the parties to negotiate a global restructuring of all of the Zohar Funds, and to allow monetization of the assets in an orderly fashion to maximize value for all Zohar stakeholders.

105.    I believed so strongly in the need for such restructure, which would have provided me sufficient time to sell the Portfolio Companies in an orderly manner, that on March 26, 2015, merely 8 months before the maturity date of Zohar I,  I purchased the A-3 notes in Zohar I from a noteholder who refused to consent to any extension or restructure.  I "took them out" and paid for 35 cents on the dollar, paying a total of $103,919,863.34.  At the time, I believed MBIA's representations that my purchase of the notes would facilitate the proposed restructure, because it would remove the only other party, other than MBIA and my entities, whose consent would be necessary to effectuate an extension of the Zohar I maturity date.  I remain the current holder of the A-3 notes in Zohar I.

106.    As the Collateral Manager of the Zohar Funds, I was required by the terms of the Zohar I Indenture to begin selling the Zohar I collateral in May 2015, six months prior to the Zohar I maturity date.  The Indenture also provided that the proceeds of such a sale would be

distributed to the Class A-1, A-2 and A-3 Noteholders pari passu.  Because the Class A-3 Notes had by far the larger balance, I would have received roughly twice the distribution of the notes insured by MBIA—approximately 66 percent of every dollar distributed to the Zohar I Noteholders following such a collateral sale.  But if Zohar I matured, my interests would be subordinated to MBIA's, as the Class A-3 Notes are subordinated to the Class A-1 and Class A-2 Notes.

107.    Prior to May 2015, MBIA informed me that it did not want me to sell the Zohar I collateral, and asked if I would be would be willing to amend the Indenture to remove this requirement so that the parties would have more time to negotiate and complete a restructuring. My goal has always been to maximize the value of Zohar Funds' assets for all the stakeholders. I therefore agreed to amend the Indenture even though my Class A-3 interests entitled me at the time to a substantially higher payout than MBIA would receive, because an extension of the maturity date was in the best interest of all stakeholders of all three Zohar Funds.  I also believed the statements that MBIA made to me and statements they made publicly on their earnings calls that they, too, believed that working with Patriarch towards a global restructure of the Zohar Funds was in the best interest of the stakeholders.

108.    As MBIA requested, I agreed to not sell the Zohar I collateral in May 2015.  I kept my end of the bargain, but MBIA did not live true to its promises to me at the time:  it never agreed to an extension of the Zohar I maturity date, and it never agreed to a global restructuring of the Zohar Funds.  Thus, following Zohar I's default, MBIA gained a "preference" on all payments to Zohar I Noteholders resulting from the sale of the Zohar I collateral, thereby putting itself in a senior position to me as the holder of the A-3 Notes, a seniority position that it did not hold at the time that I had planned to sell the Zohar I collateral.

E.     **Zohar I Bankruptcy Litigation.**

109.     On November 22, 2015, I caused Patriarch XV to file involuntary Chapter 11 bankruptcy petitions (the "Involuntary Bankruptcies") against the Zohar I Entities (the "Involuntary Debtors") in the United States Bankruptcy Court for the Southern District of New York and immediately moved to terminate the Involuntary Debtors' exclusive period to propose and solicit a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.  I filed the involuntary petitions because, after the failed restructuring negotiations with MBIA, I reluctantly concluded that the only way to protect Zohar I's asset value and maximize the value of the Portfolio Companies, in an orderly sales process, was to cause Patriarch XV to file involuntary petitions against the Zohar Funds.

110.     My clear and stated intention in filing the Involuntary Bankruptcies was to propose a Chapter 11 plan of reorganization for Zohar I, to sell certain of the Portfolio Companies in an investment banker led sales processes and to pay MBIA in full, interest and principal, over the course of two years.  And although Zohar I would enter into new CMAs with Patriarch VIII, all management fees would be deferred and all principal and interest due on the Class A-3 Notes, owned by my wholly owned entities, would have received no cash, neither principal nor interest, until the holders of Classes A-1 and A-2 of the Zohar I Notes were paid in full.  Zohar I (acting through its Cayman Island directors) and MBIA vehemently opposed the Involuntary Bankruptcies and sought—once again—to undermine my efforts at an orderly restructuring of Zohar I that would maximize value for the benefit of all stakeholders.

111.     By order dated March 28, 2016, Judge Robert Drain dismissed the Involuntary Cases.  The dismissal was based upon my notice of withdrawal and on an agreement—among the parties—to appoint an independent Collateral Manager for the Zohar Funds, upon my voluntary resignation.  As Judge Drain noted on the record, I agreed to do so on the "understanding" of the

parties that the new Collateral Manager would be "acceptable" and that "a proper process [was]

laid out [that was] mutually acceptable to the parties for dealing with the underlying [Zohar I

collateral] and the realization of appropriate value for those loans." Judge Drain also

acknowledged that all parties, including MBIA, agreed that, should I resign as Collateral

Manager, I would "remain in [my] positions with the underlying portfolio companies," which

was "a good thing."

112.    Nevertheless, as discussed below, after I resigned as the Zohar Funds' Collateral

Manager, MBIA (acting through AMZM and the Zohar Funds) failed to live up to its end of the

agreement, and has sought to remove me from my position as Director of numerous Portfolio

Companies.

**F.    Zohar I Collateral Auction.**

113.    As insurer of the Class A-1 and Class A-2 Notes, MBIA is designated as the

"Credit Enhancer" under the Indenture. As Credit Enhancer, MBIA also qualifies as the

"Controlling Party," unless and until the occurrence of a limited set of circumstances as set forth

in the Indenture. After a default, the Controlling Party has the power to direct the Trustee to sell

or foreclose upon the Zohar I collateral to the extent permitted by applicable law and/or not in

conflict with any rule of law.

114.    Zohar I defaulted on November 20, 2015. In June 2016, MBIA directed U.S.

Bank ("Trustee"), the Trustee for the Zohar Funds, to auction the Zohar I collateral. At MBIA's

recommendation, the sales notice defined the "collateral" to be auctioned to purportedly include

valuable equity in the Portfolio Companies that I beneficially own, many of which have strict

transfer restrictions, and to include various other commercially unreasonable terms.

115.    Through entities I control, I brought an action for injunctive relief to block the

auction. I was successful in obtaining a temporary restraining order to stop the auction, and

certain auction terms were amended as a result of the litigation to address some, but not all, of

my objections.  After originally granting a TRO enjoining the auction process, the Court

eventually permitted the Zohar I auction to proceed, as substantially modified from what was

originally proposed.

116.    The Zohar I collateral was put to auction on December 21, 2016.  MBIA prevailed

with a winning no-cash credit bid of approximately $150 million, meaning that no money was

paid into the fund or distributed through the "waterfall" for the benefit of the holder of the A-3

notes.  Thus, following the auction, I received no payment on the A-3 notes.

117.    The Portfolio Company equity upside interests are not collateral and have strict

transfer restrictions.  Therefore, it is anticipated that when the Portfolio Companies are sold, the

cash from the sale of the equity interests will flow, as originally intended, through the  Zohar I

waterfall for the benefit first to the A-3 Noteholder and then for the benefit of the preference

shareholder.[7]

**G.    MBIA's Exposure Related To Zohar I and Zohar II.**

118.    By late 2016, MBIA's exposure on Zohar II totaled approximately $ 775.6

million.  Upon Zohar II's default in January 2017, MBIA was obligated to pay this amount of

outstanding principal payments and accrued interest to the Zohar II Noteholders.

119.    In a November 2016 SEC filing, MBIA revealed its plans to pay its policy on its

$775.6 million insurance exposure on Zohar II by selling its UK operation and raising $328.25

million from third parties by, among other things, pledging MBIA's purported "right, title and

---

[7]    There remains pending litigation in the U.S. District Court for the Southern District of New York where I am
seeking damages over the auction results and declaratory relief defining the limited scope of the "collateral" at
issue there.

interest in the Zohar I Collateral and the Zohar II Collateral." That financing facility bears a 14 percent rate of interest.

## VII.    MBIA Appoints AMZM as the New Collateral Manager.

**A.    Patriarch Resigns as Collateral Manager and Works to Transition the Zohar Funds.**

120.    After I and my Patriarch entities voluntarily resigned as the Collateral Manager to the Zohar Funds on February 5, 2016, AMZM was appointed as the successor  Collateral Manager at MBIA's direction.  AMZM is a subsidiary of Alvarez and Marsal ("A&M").  Neither entity had ever served as a Collateral Manager to a CDO or CLO before the Zohar Funds.

121.    Patriarch and I immediately began working with AMZM to ensure a smooth transition.  Patriarch's employees produced books and records for AMZM's review, and they trained AMZM's employees how to run the Zohar Funds.  Patriarch gave AMZM nearly 100,000 pages of documents, including the Portfolio Companies' latest financial information, the underlying security documents for all collateral debt obligations listed in the trustee's report, credit documents (along with associated schedules and amendments), Portfolio Company litigation documents, and reports issued by the trustee.  Patriarch also offered to provide AMZM with confidential, proprietary documents if AMZM entered into a standard confidentiality agreement.  AMZM refused to sign a confidentiality agreement.

122.    To ensure my availability during the transition process, I cancelled all business-related travel plans, contacted the Portfolio Companies to encourage them to work cooperatively with AMZM, and even offered to personally take AMZM on a tour of the Companies.

123.    AMZM was not satisfied with the documents we provided.  Their demands for documents began to escalate and they imposed unreasonable and arbitrary deadlines (not provided for in the CMA).

124.     Even while pushing back against unreasonable demands and deadlines, Patriarch remained committed to ensuring that AMZM had the information necessary to manage the Zohar Funds.

125.     On April 20, 2016, AMZM, on behalf of the Zohar Funds, ordered the Zohar Funds' trustee to withhold from Patriarch accrued collateral management fees that were owed for services Patriarch rendered to the Zohar Funds prior to Patriarch's resignation as Collateral Manager.  Even though AMZM refused to authorize the Zohar Funds to pay Patriarch its accrued management fees, Patriarch never stopped gathering documents and continued to provide documents and information in response to AMZM's demands.

126.     Two days after withholding Patriarch's fees, and just seven weeks after AMZM had been appointed Collateral Manager, the Zohar Funds (through AMZM) sued Patriarch, claiming that Patriarch had breached the parties' three CMAs by failing to turn over books and records in addition to the nearly 100,000 pages of documents already produced.  After a short trial, the Delaware Court of Chancery decided that Patriarch had breached the CMAs.  Patriarch has since produced more than 1,000,000 pages of documents, under the supervision of a court-appointed Special Master, and the little that remains at issue is largely ministerial in nature.

**B.      MBIA and AMZM's Litigation Campaign Has Cast a Cloud Over the Zohar Funds and the Portfolio Companies Rendering Them Entirely Unable to Monetize Assets and Maximize Value for All Stakeholders.**

127.     AMZM and MBIA have engaged in a litigation campaign that has harmed the Zohar Funds and the Portfolio Companies.   Since MBIA hired AMZM as Collateral Manager, AMZM has focused its energies on pursuing litigation in order to seize control and ownership of

the Portfolio Companies. All in, MBIA and AMZM have instigated at least six (6) lawsuits against me and my entities since AMZM was appointed Collateral Manager in March 2016.[8]

128.    The litigation overhang has cast a cloud over the Portfolio Companies that has impeded my ability to monetize or maximize the value of the Companies through refinancing or sale—which will satisfy all outstanding obligations to Noteholders, with residual value flowing to me.

129.    For example, in November 2016, MBIA approved AMZM's execution of Written Consents to install AMZM and MBIA's own personnel as directors of three Portfolio Companies, Glenoit Universal LTD, FSAR Holdings, Inc. (PDP), and UI Acquisition Holding Co., claiming that the equity in those Companies is wholly and beneficially owned by the Zohar Funds. MBIA then approved the filing of a "test case" lawsuit in November 2016 against me and these three Portfolio Companies in the Delaware Court of Chancery to gain control over these Companies.[9] Contrary to findings of an SEC Administrative Law Judge that the design and

---

[8]    *U.S. Bank N.A. v. Patriarch Partners XIV*, LLC, No. 652173/2016 (N.Y. Sup. Ct.) (Trustee and AMZM brought an Interpleader action in New York State Court with respect to AMZM's decision to withhold collateral management fees from Patriarch); *Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, No. 12247-VCS (Del. Ch. Ct.) (Zohar Funds filed suit against Patriarch in Delaware Chancery Court to compel Patriarch to turn over to AMZM collateral management books and records); *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1*, Ltd., No. 16-cv-4488 (S.D.N.Y.) (PPAS filed suit against the Zohar Funds and Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS") for breach of contract, resulting from the Zohar Funds' termination of PPAS as administrative agent. AMZM and the Zohar Funds brought counterclaims seeking a declaratory judgment that the Zohar Funds' removal of PPAS as administrative agent was lawful and that AMZAS (or one of the Zohar Funds, as the case may be) currently serve as administrative agent); *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. 12946-VCS (Del. Ch. Ct.) (Zohar Funds brought a Section 225 proceeding in Delaware Chancery Court seeking to enforce written consents purportedly removing me as director of three Portfolio Companies, and replacing me with employees of AMZM and MBIA); *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-307 (S.D.N.Y.) (Zohar Funds brought RICO action against Patriarch and the Octaluna Entities alleging, among other claims, that the Zohar Funds are the equity owners of the Portfolio Companies, and that Patriarch breached its Collateral Management Agreements and fiduciary duties by allegedly failing to obtain for the Zohar Funds all equity interests to which they were entitled); *Zohar CDO 2003-1, Limited v. Croscill Home LLC et al.*, 1:17-cv-01797-JFB-SRF (D. Del.) (the Zohar Funds filed suit in Delaware Chancery Court against certain Portfolio Companies seeking to remove me as the manager of these companies).

[9]    After a six-day trial, the Chancery Court entered an opinion in favor of the Zohar Funds based on its interpretation of the series of contracts memorializing the creation of the Zohar Funds, contrary to the SEC

structure of the Zohar Funds showed that I owned the equity of the Portfolio Companies, the Delaware Chancery Court ruled against me as to my ownership of three aforementioned Portfolio Companies.  The court, however, stayed its order while it is on appeal to the Delaware Supreme Court.

130.    MBIA also approved AMZM's filing of a now-dismissed RICO case against me in the Southern District of New York, seeking a court ruling that the Zohar Funds own certain equity in the Portfolio Companies.  The court granted my motion to dismiss the RICO and the supplemental state law claims on December 29, 2017.  In that lawsuit, AMZM, acting at the behest of MBIA, which admittedly reviewed and approved of the RICO suit before its filing, unsuccessfully sought to tar me as a "racketeer" and fraudster, which was damaging not only to me personally, but to the Portfolio Companies, given my roles as the Manager, Director, and/or CEO of those Companies.

131.    The Funds also purported to terminate Patriarch Partners Agency Services ("PPAS"), the loan administration entity that administers the Zohar Funds' loans and collects and disburses Portfolio Company loan payments.  This attempted termination resulted in litigation in which the Funds are named parties.  In that litigation, AMZM twice attempted to seek emergency relief against PPAS from the federal courts, and both attempts were immediately rejected.[10]

---

ALJ's finding during the SEC Action that I am the equity owners of the Portfolio Companies. The court's judgment is currently stayed pending an expedited appeal in the Delaware Supreme Court.  In agreeing to stay its decision, the Delaware Chancery Court recognized that appeal was warranted because it was a close case and that there were substantial "novel" issues at play in the action.

[10]    *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1*, Ltd., No. 16-cv-4488 (S.D.N.Y.) (PPAS filed suit against the Zohar Funds and Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS") for breach of contract, resulting from the Zohar Funds' termination of PPAS as administrative agent.  AMZM and the Zohar Funds brought counterclaims seeking a declaratory judgment that the Zohar Funds' removal of PPAS as administrative agent was lawful and that AMZAS (or one of the Zohar Funds, as the case may be) currently serve as administrative agent).

132.    On November 13, 2017, I and several of my controlled entities initiated three state court actions seeking, on an expedited basis, declaratory judgments regarding the beneficial ownership of various Portfolio Companies where I am CEO.[11]  I filed these actions because the cloud created by AMZM and MBIA's litigation strategy had finally reached a point where it has seriously hindered the Portfolio Companies' ability to negotiate with lenders, including with regard to their Asset Backed Lending ("ABL") facilities.

133.    On November 16, 2017, and January 12, 2018, and admittedly in response to the declaratory judgments actions I filed, the Zohar Funds filed lawsuits in the Delaware Chancery Court regarding ownership of 13 Portfolio Companies[12] (collectively with the 11 Companies, the "11 Companies Defendants").

134.    The allegations in these and other lawsuits brought by AMZM at the behest of MBIA harm the value of every Portfolio Company, which value AMZM is supposed to preserve and maximize.  These litigations have created a cloud of uncertainty over the Portfolio Companies, has had a chilling effect on  potential buyers and made it difficult to monetize the companies.

**C.    MBIA and AMZM Have Made No Effort to Monetize the Zohar Funds' Assets or Maximize Their Value in the Interest of All the Zohar Funds' Stakeholders**

135.    At the same time, AMZM has failed to perform the duties of a Collateral Manager.  AMZM has prepared only intermittent reports to Noteholders containing insufficient information, despite its obligation to provide particular financial and other reports do so on a

---

[11]  *Tilton v. Zohar* CDO 2003-1, Ltd., No. CV-2017-013549 (Ariz. Sup. Ct.) (the "MD Action"), *Tilton v. Zohar III*, Ltd., No. BC683129 (Cal. Sup. Ct.) (the "Stila Action"), and *Tilton v. Zohar CDO 2003-1 Ltd.*, No. 17-016240-CB (Mich. Cir. Ct.) (the "Dura/GAS Action").

[12]  The Portfolio Companies include Croscill Home LLC, f/k/a Croscill Acquisition, LLC, Denali Acquisition LLC, Dura Buyer, LLC, Global Automotive Systems, LLC, Gorham Paper And Tissue, LLC., Jewel of Jane LLC,  LVD Acquisition, LLC, d/b/a Oasis International, RM Acquisition, LLC,  Snelling Holdings, LLC, Stila Styles, LLC, IMG Holdings, Inc., MD Helicopters, Inc. and Vulcan Engineering, Inc.

monthly and quarterly basis under the Zohar Funds' Indentures.  AMZM has not taken any

action to request funding for the Portfolio Companies, including those that have defaulted on

their watch.  And AMZM has not independently valued the Zohar Funds' collateral, even though

Patriarch produced over 1 million pages of documents to them in the "books and records"

lawsuit, including Portfolio Company financial statements.  In fact, it now appears that AMZM

has made no effort to use the information it obtained from my extensive production of books and

records to learn anything about the Portfolio Companies or  to develop any strategy towards

maximizing their value for the benefit of the Zohar Funds' stakeholders.

136.    In April 2016, after 13 months as Collateral Manager, AMZM's Ms. LaPuma

admitted that AMZM does not have a strategy to maximize the value of each Portfolio Company.

Ms. LaPuma also admitted that the replacement boards of directors for the Portfolio Companies,

whose members were selected by AMZM, and consisted largely of AMZM and MBIA

personnel, had not prepared strategic plans for the Portfolio Companies.  Indeed, AMZM's

purported replacement directors and replacement managers include MBIA officers and

employees who have no experience in the Portfolio Companies' respective industries and lack

any knowledge or even a basic familiarity with the Portfolio Companies' businesses and

operations.

137.    Worse, it appears that AMZM is acting purely in the interest of MBIA and not in

the interest of other Zohar Funds stakeholders.  For example, when asked whether AMZM, as the

Collateral Manager for the Zohar Funds, had a duty to take into account my interests as a

preference shareholder, Ms. LaPuma testified: "It depends," meaning "sometimes yes,

sometimes no."  She explained that although AMZM had intended to "take into consideration all

stakeholders' rights" when it first assumed its role as Collateral Manager, this was not the case

after Zohar II defaulted, at which time AMZM's "role and consideration . . . shifted some."

Thus, while AMZM is now willing to "take [the preference shareholder's interest] into

consideration," it ultimately "[has] obligations to make good on the debt due to the

[Noteholders]."  AMZM's belief that it has a duty to act in the best interest of the Noteholders

alone is further supported by the language of its Collateral Management Agreements.  Although

those Agreements expressly provide that AMZM's duty is to the Noteholders, they make no

mention of any duty owed to the Zohar Funds' preference shareholder.

138.    AMZM has been paid approximately $30 million in collateral management fees in

its first year as the new Collateral Manager, even though they have not actually managed the

loans held by the Zohar Funds.

### IX.    The Purpose of this Bankruptcy Proceeding Is To Access the Significant Value Locked in the Zohar Funds' Assets and Monetize Them for the Benefit of All Stakeholders.

139.    The Zohar Funds were placed into bankruptcy in order that its Noteholders and all

other stakeholders can finally access the full value of the cash flows from Portfolio Companies

sales or refinancings, which has been locked, for many years, as a result of the ongoing

litigations with MBIA and AMZM.

140.    Several months prior to this filing, I began contemplating a plan and marketing

process for monetizing the Portfolio Companies in a manner that would maximize their

respective values for the benefit of all Zohar Funds' stakeholders.

141.    I have hired a Chief Restructuring Officer, Marc Kirschner, to serve as an

independent party to assist me in further developing and executing on that  plan for the

monetization of the Portfolio Companies.  I have consulted with Mr. Kirschner to formulate a

plan to execute that monetization process, which is described in Mr. Kirschner's declaration.

142.     Portfolio Companies have already interviewed and, in some instances, have already chosen financial advisors in respect of these contemplated transactions.

143.     While confidentiality over this process is paramount in preserving the Portfolio Companies' value, I am committed to working with the CRO and have authorized and directed the CRO to develop a plan for periodic public and confidential reporting that will provide an appropriate measure of transparency into this process for the Court and all stakeholders without jeopardizing value.

144.     Many of the Portfolio Companies face near-term maturities on loans due to the Zohar Funds, certain of my personal investment funds, and third party lenders on or about March 2019.  In order to avert: (1) defaults on these loans; (2) the risks of bankruptcy or foreclosure and (3) the loss of major customer contracts, I, as the director or manager of each Portfolio Company, along with my management teams at the respective Portfolio Companies have commenced the interview and engagement process to hire investment bankers at the Portfolio Companies to pursue both refinancing and sale of company alternatives.  In doing so, we have learned that the litigation risk surrounding the Zohar Funds and the Portfolio Companies will foster a chilling effect on bank lenders and buyers.  It is, in large part, the reason the Debtors are here in this court of equity to ask for the time and protection to maximize value for all of the Zohar Funds' stakeholders and to best protect all stakeholders at the Portfolio Companies, including employees, customers and vendors.

145.     Seventeen business platforms have been targeted for near-term refinancing and or Portfolio Company sales efforts.  Of these seventeen, thirteen have lender commitments that come due in the March 2019 time frame. For each of these thirteen Portfolio Companies, multiple investment bankers have been interviewed.  In total, to date, 30 investment banking

firms and more than 100 bankers have made presentation to me, my Patriarch team and the

management teams at the Portfolio Companies.  Two separate investment banks have been

chosen to lead the sales process on two Portfolio Companies.  It is expected that at least 6

separate firms will be engaged by the end of March and the next 6 by the end of April.  Although

it would not have been my preference to market more than a dozen Portfolio Companies,

simultaneously, so to avoid any connotation of a fire sale of these highly valuable companies, I

am convinced that provided swords are down and litigation stayed, that the value of these

Portfolio Companies can, nevertheless, be maximized if we move on all fronts with great speed,

due to the (1) buoyancy of the stock market; (2) a low interest rate environment and (3) the

dearth of companies for sale.  However, in order to protect the Portfolio Companies from

deterioration of value and to capitalize on a sellers' market, we must move with urgency for time

is never a friend when there is a deal to be done.

## X.  Conclusion.

In conclusion, for the reasons explained here and in each First Day Pleading, I

respectfully request that each First Day Pleading be granted in its entirety, together with such

other and further relief as the Court deems just and proper.  Pursuant to 28 U.S.C. § 1746 I

declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge,

information, and belief.

Dated: March 11, 2018

_____
Lynn Tilton

44