## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | ) | |
| | ) | Case No. 18-10512 (CSS) |
| Debtors. | ) | |
| | ) | Joint Administration Requested |

## DECLARATION OF MARC S. KIRSCHNER
## IN SUPPORT OF CHAPTER 11 PETITIONS

I, Marc S. Kirschner, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

## PROFESSIONAL BACKGROUND AND ROLE AS CRO

1.      I am the independent Chief Restructuring Officer of Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1, Limited ("Zohar II"), Zohar III, Limited ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds"), Zohar CDO 2003-1, Corp. ("Zohar I Corp."), Zohar II 2005-1, Corp. ("Zohar II Corp.") and Zohar III, Corp. ("Zohar III Corp.," and together with Zohar I Corp. and Zohar II Corp., the "Zohar Corps," and collectively with the Zohar Funds, the "Debtors"), the debtors and debtors-in-possession in the above-captioned cases (the "Chapter 11 Cases").  I was appointed to the position of Debtors' Chief Restructuring Officer on March 11, 2018.[2]

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2] To my knowledge, neither I nor my firm, Goldin Associates, LLC ("Goldin"), has any prior or current relationship with the Debtors or any of their affiliates other than my instant position and the support functions provided by personnel of Goldin.  I was only recently introduced to the Debtors' director, Ms. Lynn Tilton, in connection with the Debtors' search for a Chief Restructuring Officer.  The Debtors, subject to Court authorization, will compensate Goldin at the firm's standard hourly rates, and Goldin is not subject to any other agreements with respect to this engagement.  The full terms of our retention will be set forth in conjunction with a request to authorize such retention.

2.      I have been a bankruptcy and restructuring attorney, court-appointed trustee, financial advisor, and investment manager for distressed companies for almost 50 years.   I started practicing in the bankruptcy and reorganization arena even before the modern Bankruptcy Code became effective in 1979.   In the ensuing decades, I have been an active participant in the industry's development.

3.      I am currently a Senior Managing Director of Goldin, a financial advisory and consulting firm that specializes in contentious, challenging, and/or distressed situations.   Earlier in my career, I founded and led (from 1987 through January 2001) the bankruptcy reorganization group in the New York office of the global law firm, Jones Day, Reavis & Pogue (now called Jones Day).   I was also a Member of the Jones Day firm-wide Executive Committee during various periods.

4.      After retiring from Jones Day, from January 2001 to January 2006, I served as a Managing Director and senior investment professional of Resurgence Asset Management ("Resurgence"), an investment advisor registered with the Securities and Exchange Commission under the Investment Advisors Act of 1940, as amended.   Resurgence invested in distressed securities with a view to gaining effective control over, or exerting significant influence in, the reorganization process.   At Resurgence, I analyzed the legal issues surrounding the investments we considered, developed the firm's legal strategy for each investment, and then performed a primary role managing our investments through the reorganization process.   I also served as the Chief Operating Officer, General Counsel, member of the Executive Committee, and Chair of the Pricing Committee of Resurgence.   Additionally, I managed and led the legal affairs of its affiliate, First Commercial Credit Corporation, a provider of credit protection to vendors providing goods and services to companies in financial distress.   Purchasing and prosecuting

claims against debtors, on the one hand, and objecting to the claims we believed were inflated, on the other hand, were major components of our investment strategies.

5.      From April 10, 2006, through December 26, 2006, I was the Chapter 11 Trustee for Refco Capital Markets, Ltd. ("RCM"), the unregulated securities broker, and largest unit, of the Refco companies.  Refco was the largest global financial services company bankruptcy after Drexel Burnham Lambert and before Lehman Brothers.  As Chapter 11 Trustee, I spearheaded the settlement of complex internecine disputes among RCM's securities and foreign exchange customers as a building block to the global Refco settlement and plan.  I later negotiated the economic terms of RCM's global settlement.  Many participants in the Refco cases recognize the central role I played in bringing to a conclusion in record time one of the largest Chapter 11 cases in history.  I also believe RCM is one of the largest cases in history for which a Chapter 11 Trustee was appointed.  I am currently the post-effective date Plan Administrator for RCM and Litigation Trustee for the Refco Litigation Trust and Refco Private Actions Trust.

6.      I am also currently the Litigation Trustee for the Tribune Litigation Trust and the Trustee for the Millennium Health Corporate Claims Trust and Lenders Claims Trust, which are before the court in this jurisdiction.

7.      As litigation trustee or liquidation trustee, I have undertaken intensive, wide-ranging factual investigations and commenced litigation against third parties to recoup, in the aggregate, in excess of $15 billion of losses resulting from fraud and management misconduct on behalf of creditors.  These lawsuits have involved securities law violations, common law fraud, breach of fiduciary duty, malpractice, fraudulent conveyance, misappropriation of assets, preferential transfers, and related causes of action.  Defendants have included major financial

institutions, private equity firms, professional firms, equity holders, members of management and members of boards of directors.

8.      I have held roles in many of the significant "mega" bankruptcy cases, starting with the first major case under the Bankruptcy Code, Mansfield Tire and Rubber Co.  I have also played  significant roles in the bankruptcy cases of: Drexel Burnham Lambert Group (at the time, by far the largest global financial services bankruptcy case in history); Federated Department Stores; Macy's Department Stores; Resorts International; Coleco Industries Inc. (maker of the once-popular Cabbage Patch Kids); Anchor Glass Container Company; ICO Global Communications; the New York Daily News (part of the Maxwell Newspapers precedent setting cross-border cases); Shea & Gould (a major New York City Law Firm); Washington Group International; and Sterling Chemicals, among others.

9.      I have represented debtors, creditors' committees, and claimants prosecuting their claims against debtor entities and served as bankruptcy trustee opposing large asserted claims against various debtors' estates.  I represented Hughes Space and Satellite Company, which held more than $1 billion of claims against ICO Global Communication and, on behalf of the Drexel World-Wide Bank Committee, litigated objections to claims of holders of $300 million of debt and was part of a small team that negotiated Drexel's plan.  In the Coleco Industries case, I developed a successful products liability claims resolution process.  In the Physician's Resources Group bankruptcy, I negotiated the approach to resolve hundreds of millions of dollars of physicians' claims in a structured claims resolution process; and in the Hillsborough Holdings (Walter Industries) case, I participated in the resolution of complex asbestos claims.

10.      I have significant experience related to the exercise of fiduciary duties and proper corporate governance and regularly act as a fiduciary and in various oversight roles.  I served on

the audit committee of a large publicly traded company, Spectrum Brands, from 2010 to 2013 and I served as the sole independent director of First Equity Card Corporation during its out-of-court restructuring.  I also participated as part of a team from Goldin acting as Monitor for Ocwen Financial Services ("Ocwen") appointed by the New York Department of Financial Services.

11.     I graduated from Dartmouth College in 1964, A.B., with distinction in economics, and from the University of Michigan Law School, J.D. *cum laude*, in 1967.  In 1994, I was inducted to the America College of Bankruptcy in its fifth class.

12.     I will be assisted in my role as Chief Restructuring Officer by a team of highly-skilled and experienced restructuring professionals at Goldin.  Robert S. Kost, a Managing Director at Goldin, has nearly 30 years of experience as an investment banker, with particular expertise in corporate restructuring, including mergers and acquisitions, and other capital markets transactions.  He is particularly adept at developing sales processes to monetize assets in an efficient, transparent, and value-maximizing manner.  Mr. Kost has been a Partner and Managing Director at Lazard Freres & Co., Gleacher & Co., and Millstein & Co.  Robin Chiu, also a Managing Director at Goldin, has led many of the firm's recent debtor advisory matters. She currently serves as Chief Restructuring Officer of Ezra Holdings, a multi-national holding company with restructuring proceedings in both the U.S. and Singapore.  In addition to her restructuring work, she constructed and oversaw the rigorous reporting implemented by Goldin as the Monitor of Ocwen.

## PRELIMINARY STATEMENT[3]

13.     The Debtors are embroiled in multiple, multi-jurisdictional litigations that threaten their ability to maximize the substantial value of their assets.  The Debtors believe these Chapter 11 Cases will assist them in maximizing that value by (i) removing the cloud of litigation, (ii) establishing a path forward towards value maximization and realization, and (iii) facilitating accurate, independent, and transparent reporting.

14.     Removing the Cloud of Litigation.  Until filing these Chapter 11 Cases, the Debtors and their stakeholders have been mired in years of contentious, expensive, disruptive, and time-consuming litigation across the United States.  But to what end?  As the various stakeholders have further entrenched themselves, the mutually desired outcome of maximizing value for all stakeholders' interests has been jeopardized.  Litigation appears to have taken precedence over the preservation, enhancement and monetization of asset value.  I have been informed that the litigation has cast a cloud over the "Portfolio Companies," which are companies to whom the Debtors' have made secured loans and whose value the Debtors' will look to unlock in order to repay their stakeholders.  This cloud of uncertainty has resulted in several of these Portfolio Companies facing difficulty in obtaining the financing necessary to maximize their value.  Additionally, I understand that the Debtors' ability to monetize their investments is impaired by the litigation quagmire.  The sheer complexity and volume of litigation appears to have already scared away potential buyers and financiers of the Portfolio Companies.  For the Debtors to achieve success, the fighting must end.  The Debtors have filed these cases to find equilibrium and directional bearing, end the distracting and expensive litigation, and work with stakeholders under this Court's supervision to maximize value for all

---

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them below.

stakeholders.  Without the protection of this Court, the Debtors will continue adrift, the litigation

will have no end, and value will continue to deteriorate to the detriment of all stakeholders.

15.     <u>Path to Value Maximization and Realization</u>.  The Debtors – as lenders to dozens

of Portfolio Companies, owners of certain limited interests[4] and record holders of certain equity

interests in many of these same Portfolio Companies – will offer, in short order and subject to

Court approval, a proposal to the stakeholders with respect to the design and implementation of a

Court-approved process by which certain of the Portfolio Companies will be marketed and sold

or refinanced, with the proceeds being used to repay outstanding loans and as a return on any

equity interests (be they record or beneficial interests).  Pursuant to this process, certain Portfolio

Companies will be identified for sale or refinancing, independent investment bankers will be

retained at the portfolio company level, and a fulsome marketing and sale process will be

conducted.  The Debtors will work with their stakeholders to agree upon a reporting and

oversight protocol designed to protect the interests of the various stakeholders, while also

ensuring the confidentiality of the sale process, which is critical to maximizing the recovery.  To

the extent any of the foregoing sales involve assets of the estate, they will be subject to the

approval of the Court.

16.     The Debtors and their professional advisors believe that the first step towards the

goal of maximizing value for all stakeholders is the filing of these Chapter 11 Cases.  It is the

Debtors' hope that all stakeholders will share the same vision and adopt the process and path we

propose.  It is my hope that all the stakeholders will work with me and the Debtors (and their

other advisors) to develop an agreed upon process that can be collectively pursued.  It is time to

lay down all swords and to set aside the ugly litigation that has marred all restructuring efforts to

---

[4] Such limited interests include "Equity Kickers" and "Equity Workout Securities," as defined in the Zohar Funds' Indentures.

date.  To stray from this proposed path will mean only more litigation and less value for all stakeholders.

17.    <u>Accurate, Independent, and Transparent Reporting</u>.   With the filing of these Chapter 11 Cases, the Debtors sit under the bright lights of transparency.  I believe that a fair and robust flow of information and disclosures is essential to instilling trust among the parties, retrenching litigation and hostility, and enabling the parties to move toward their common goal – maximizing value and prompt repayment of creditors.   In the spirit of building trust and confidence, the Debtors are committed to providing a meaningful level of detailed and transparent disclosures.

18.    My team at Goldin and I have worked with the Debtors and their legal team to develop an extensive reporting protocol and today have taken the unusual step of submitting such protocol to the Court for its consideration.   Within the comprehensive information sharing protocol, stakeholders will have access to significant information concerning the Debtors and their assets.[5]  This reporting protocol includes both (i) confidential reporting available only to parties contractually agreeing to court-approved confidentiality provisions, and (ii) public information filed in the Chapter 11 Cases (beyond the disclosures already required of the Debtors).   This information sharing protocol – which the Debtors will work with their stakeholders to refine – is intended to ensure a full, open, and transparent process, while, at the same time, ensuring that information that could impair value or disclose market information affecting selling price is kept confidential.

19.    Realizing the need for a new and independent voice, the Debtors have engaged me as their independent Chief Restructuring Officer.   As an officer of the Debtors, I will

---

[5] The Debtors' books and records are held and controlled by the current Collateral Manager and the Trustee.  A period of time will be required for the Debtors' professionals to obtain such records and identify and verify the information proposed to be included in the monthly reporting.

faithfully discharge my fiduciary duties and my focus will be on working _with_, not _against_, the Debtors' creditors and other stakeholders in guiding the Debtors on a path that will protect the interests of all stakeholders.   Given the long and tumultuous history between various stakeholders and the hotly contested nature of the legal battles, my role will likely be challenging.   As the Debtors' new Chief Restructuring Officer, I will offer all stakeholders transparency and will devote my utmost efforts towards consensus building.   I am, therefore, hopeful that my appointment will be seen by all stakeholders as the Debtors intended – a commitment to ending the morass of litigation and establishing an acceptable process that will maximize the value of the Portfolio Companies (while protecting the tens of thousands of American jobs they represent) in order to provide the maximum recoveries and returns to all stakeholders.

## THE DEBTORS' BANKRUPTCY FILING

20.     On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions commencing these Chapter 11 Cases in this Court under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to preserve and maximize the value of their Chapter 11 estates.   The Debtors will continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrent herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

21.     I submit this declaration (the "First Day Declaration") in support of the Debtors' Chapter 11 petitions.   Except as otherwise indicated, all statements in this First Day Declaration are based upon: personal knowledge obtained since my selection as Chief Restructuring Officer; information supplied or verified by the Debtors or current consultants familiar with the Debtors'

business operations; my review of certain of the Debtors' business records as well as other relevant documents; information prepared or supplied by the Debtors' consultants and legal and financial professional advisors; pleadings or judicial decisions in various pending or now-concluded litigation; or my opinion based upon my experience. I have also reviewed the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* ("Tilton Declaration"), filed contemporaneously herewith, and interviewed Ms. Lynn Tilton on several occasions.

## MS. TILTON

22.      Ms. Tilton is the sole director for each of the Debtors and is the Chief Executive Officer and sole principal and owner of Patriarch Partners, LLC ("Patriarch"), a private investment firm she founded in 2000.  I am advised that since founding Patriarch, through affiliated investment funds, Ms. Tilton has held ownership in and restructured more than 240 companies with combined revenues in excess of $100 billion, representing more than 700,000 American jobs.  I understand that Patriarch focuses on the acquisition of undervalued American brands where time, capital, and sound strategy can rescue a business and restore value, creating and preserving jobs in America and across the globe.  Patriarch's stated objective is rebuilding America one company at a time, one job at a time, and Ms. Tilton's platform is one of the largest woman-owned businesses in the country.  The Debtors' history is more completely set forth in the Tilton Declaration.

## THE ZOHAR FUNDS' CORPORATE OVERVIEW

23.      Zohar I is the sole shareholder of Zohar I Corp., a Delaware corporation, and the sole member of non-Debtor Zohar CDO 2003-1, LLC ("Zohar I LLC"), a Delaware limited liability company.  Non-debtor Octaluna, LLC ("Octaluna I") – which is indirectly owned and controlled by Ms. Tilton through intermediate entities – holds 100% of the preference shares of Zohar I.  Zohar II is the sole shareholder of Zohar II Corp., a Delaware corporation, and the sole

member of non-Debtor Zohar II 2005-1, LLC ("Zohar II LLC"), a Delaware limited liability company.  Non-debtor Octaluna II, LLC ("Octaluna II") – which is indirectly owned and controlled by Ms. Tilton through intermediate entities – holds 100% of the preference shares of Zohar II.  Zohar III is the sole shareholder of Zohar III Corp., a Delaware corporation, and the sole member of non-Debtor Zohar III, LLC ("Zohar III LLC", and together with Zohar I LLC and Zohar II LLC, the "Zohar LLCs"), a Delaware limited liability company.  Non-debtor Octaluna III, LLC ("Octaluna III", and together with Octaluna I and Octaluna II, the "Octaluna Entities") – which is indirectly owned and controlled by Ms. Tilton through intermediate entities – holds 100% of the preference shares of Zohar III.

*[Remainder of this page intentionally left blank]*

24.    This general corporate structure is depicted as follows for the three (3) Zohar Funds:



25.    The Octaluna Entities hold a residual equity interest in the Zohar Funds and have a right to receive any excess cash the corresponding Zohar Fund receives and/or retains after all of its note obligations (as discussed more fully below) are paid in full.[6]

## THE CLO STRUCTURE

26.    The Zohar Funds are collateralized loan obligation funds – or CLOs – organized under the laws of the Cayman Islands.  A CLO is a special purpose vehicle that issues notes to

---

[6] The preference shares of Zohar I, Zohar II and Zohar II are referred to herein as the "Zohar I Preference Shares," the "Zohar II Preference Shares," and the "Zohar III Preference Shares," respectively, and they are collectively referred to as the "Zohar Preference Shares."

investors in exchange for cash. The CLO uses the cash to invest in loans or other assets in which it holds record title that, in turn, generate cash flows to pay back the CLO's investors over time with interest. Under a typical CLO structure, a collateral manager decides what loans or other assets to acquire on behalf of the CLO fund. In addition to investing in loans receivable, the Zohar Funds obtained certain limited interests and are also record holders of certain Portfolio Company equity and receive cash flows from the net proceeds from sales of those companies.

27.    Zohar I was formed in 2003 as a CLO fund and issued approximately $532 million in principal amount of notes (the "Zohar I Notes") with a maturity of November 2015. Zohar I Corp. is a co-obligor on the Zohar I Notes and non-Debtor Zohar I LLC has pledged any assets it owns or may acquire as collateral for the Zohar I Note obligations.

28.    Zohar II was formed in 2005 as a CLO fund and issued approximately $1 billion in principal amount of notes (the "Zohar II Notes") with a maturity of January 2017. Zohar II Corp. is a co-obligor on the Zohar II Notes and non-Debtor Zohar II LLC has pledged any assets it owns or may acquire as collateral for the Zohar II Note obligations.

29.    Zohar III was formed in 2007 as a CLO fund and issued approximately $1 billion in principal amount of notes (the "Zohar III Notes," and together with the Zohar I Notes and the Zohar II Notes, the "Zohar Notes") with a maturity of April 2019. Zohar III Corp. is a co-obligor on the Zohar III Notes and non-Debtor Zohar III LLC has pledged any assets it owns or may acquire as collateral for the Zohar III Note obligations.

# THE DEAL DOCUMENTS[7]

30.    As described more fully in the Tilton Declaration, the Zohar Notes are governed by various respective governing documents including, but not limited to, an indenture and a Collateral Management Agreement.  Specifically,

(a) the Zohar I Notes (i) are governed by that certain Indenture dated as of November 13, 2003 (as supplemented from time-to-time, the "Zohar I Indenture") by and among Zohar I, Zohar I Corp., Zohar I LLC (collectively, the "Zohar I Entities"), MBIA Insurance Corporation, as credit enhancer ("MBIA"), CDC Financial Products, Inc., as Class A-1 Note Agent (the "Zohar I Agent") and U.S. Bank National Association, as trustee (the "Zohar I Trustee"); and (ii) were formerly subject to that certain Collateral Management Agreement dated as of November 13, 2003 by and among the Zohar I, Zohar I Corp. and Patriarch Partners VIII, LLC ("Patriarch VIII") (the "Zohar I CMA");

(b) the Zohar II Notes (i) are governed by that certain Indenture dated as of January 12, 2005 (as supplemented from time-to-time, the "Zohar II Indenture") by and among Zohar II, Zohar II Corp., Zohar II LLC (collectively, the "Zohar II Entities"), MBIA, as credit enhancer, IXIS Financial Products, Inc., as Class A-1 and A-3 Note Agent (the "Zohar II Agent") and LaSalle Bank National Association, as trustee (the "Zohar II Trustee"); and (ii) were formerly subject to that certain Collateral Management Agreement dated as of January 12, 2005 by and among Zohar II, Zohar II Corp. and Patriarch Partners XIV, LLC ("Patriarch XIV") (the "Zohar II CMA"); and

(c)  the Zohar III Notes (i) are governed by that certain Indenture dated as of April 6, 2007 (as supplemented from time-to-time, the "Zohar III Indenture," and together with the Zohar I Indenture and the Zohar II Indenture, the "Zohar Indentures") by and among Zohar III, Zohar III Corp., Zohar III LLC (collectively, the "Zohar III Entities"), Natixis Financial Products Inc., as Class A-1R and A-1D Note Agent (the "Zohar III Agent") and LaSalle Bank National Association, as trustee (the "Zohar III Trustee," and collectively with the Zohar I and Zohar II Trustee, the "Indenture Trustees"); and (ii) were formerly subject to that certain Collateral Management Agreement dated as of April 6, 2007 by and among Zohar II, Zohar II Corp. and Patriarch Partners XV, LLC ("Patriarch XV") (the "Zohar III CMA," and together with the Zohar I CMA and the Zohar II CMA, the "Zohar CMAs").

31.    The general mechanics of the Zohar Fund deals, as I understand them, are as follows:  The Zohar Fund would raise its investment capital through a note issuance and the sale of preference shares with the applicable Zohar Indenture and Zohar CMA largely governing the

---

[7] The following description summarizes the relevant deal documents.  Such documents speak for themselves and this summary is not intended to replace, supersede or otherwise modify the terms of such documents.  No parties' rights with respect to these documents shall be affected by the statements contained herein.

relationship among the various stakeholders.  The Patriarch Collateral Manager (as defined herein) would determine what assets to acquire and would manage those cash flows.[8]  Patriarch Partners Agency Services LLC ("PPAS") – the administrative agent under the credit agreements between the borrowers, Zohar Funds and other lenders, and which is owned and controlled by Ms. Tilton – would issue invoices to the Portfolio Companies on account of debt payments due. PPAS would collect payments from the Portfolio Companies and remit them to the applicable Indenture Trustee, who, in turn, would distribute them as governed by the applicable Zohar Indenture (*i.e.*, in accordance with the "waterfall" described below).

*[Remainder of this page intentionally left blank]*

---

[8] Because the reinvestment period in Zohar I, II and III expired in 2008, 2010, and 2012, respectively, the current Collateral Manager does not acquire assets or originate loans.

32.     The below diagram generally depicts the relationship among the various stakeholders upon issuance of the Zohar Notes: [9]



[9] For a more detailed description of the Zohar Funds, their formation, and funding, see the Tilton Declaration. Certain roles of the Collateral Manager may have changed with the passage of time or the changes in circumstances described herein.

01:22953711.17

16

33.     Until March 3, 2016, Patriarch's affiliates, Patriarch Partners VIII, LLC ("Patriarch VIII"), Patriarch Partners XIV, LLC ("Patriarch XIV") and Patriarch XV, LLC ("Patriarch XV," and together with Patriarch VIII and Patriarch XIV, the "Patriarch Collateral Managers"), were the collateral managers of Debtors Zohar I, Zohar II and Zohar III, respectively.  The Patriarch Collateral Managers voluntarily resigned as collateral managers in February 2016.   Their resignations became effective when Alvarez & Marsal Zohar Management, LLC ("AMZM") was appointed replacement collateral manager pursuant to new Collateral Management Agreements executed on March 3, 2016 (collectively, the "AMZM CMAs").

34.     I understand that each of the Zohar Indentures contains substantially similar provisions, as do the Zohar CMAs.[10]  The Zohar Indentures provide that the Zohar Funds may engage generally in (a) acquiring, managing and monetizing of the Zohar Funds' assets (*e.g.*, the loan receivables), (b) issuing the Zohar Notes and Zohar Preference Shares in accordance with the Zohar Indentures and/or applicable entity governance documents, (c) pledging its assets as collateral securing its obligations under its respective Zohar Notes, and (d) other activities incidental to accomplish (a) through (c).  Also under the Zohar Indentures, once the Zohar Funds raise the investment capital by issuing the Zohar Notes and Preference Shares, the Collateral Manager is charged with deciding in which assets to invest.  The applicable Indenture Trustee is granted a lien for the security and benefit of the Zohar Noteholders and periodically collects payments on the Zohar Notes to be distributed in accordance with a "waterfall" set forth in each Zohar Indenture.  This "waterfall" prioritizes the distribution of funds as: (1) for the applicable Zohar Fund's operational costs; (2) to the Collateral Manager for its senior collateral

---

[10] The discussion of the Collateral Management Agreements in the following section refers to the Zohar CMAs rather than the AMZM CMAs. Concurrent with this filing, the Debtors are filing a motion to reject the AMZM CMAs.

management fee; (3) interest payments to the holders of the Zohar Class A Notes; (4) payments

to a Preference Share account subject to a cap; (5) to the Collateral Manager for a subordinated

collateral management fee; (6) to an account to purchase or originate additional loans during an

applicable reinvestment period; and (7) to principal payments to noteholders in order of priority,

and then (8) any remainder to common  and preference shareholders.

35.    The Zohar CMAs specify the investment management functions of the Collateral

Manager and, in turn, entitle the collateral manager to a quarterly senior Collateral Manager fee

and a subordinated collateral management fee calculated by a formula tied to the value of the

collateral.  The Collateral Manager is charged with (in each case in accordance with the terms set

forth in the applicable Zohar Indenture): (a) determining the assets in which the applicable Zohar

Fund should invest (prior to the end of the applicable reinvestment period); (b) negotiating and

effectuating sales; (c) monitoring and supervising the collateral; and (d) interfacing with

stakeholders concerning the collateral, defaults under the applicable Zohar Indenture, and other

matters.

36.    The Zohar I Indenture and Zohar II Indenture designate MBIA as the "Controlling

Party" in its capacity as credit enhancer.  The Controlling Party under the Zohar I Indenture and

Zohar II Indenture can remove and replace the Collateral Manager for cause and direct the

indenture trustee to sell the collateral; however, the Controlling Party may only take such actions

under certain circumstances, such as if a default has occurred and is ongoing.  The Controlling

Party also has the right to direct the applicable Zohar Fund with respect to preservation of the

collateral and has consent rights over successor Collateral Manager appointments, sale of certain

collateral and entry into any supplemental indentures.

37.    Rather than a "Controlling Party," the Zohar III Indenture appoints a "Controlling Class" designated as 25% or more of the Zohar III Class A Notes.  The Controlling Class under the Zohar III Indenture has largely the same contractual rights as the Controlling Party under the Zohar I and II Indentures.

## ZOHAR STAKEHOLDERS BECOME MIRED IN LITIGATION

38.    Beginning in as early as 2009, the Debtors and various Zohar stakeholders became mired in complex, protracted, multi-jurisdictional litigation, much of which is currently pending.  These costly lawsuits include, but are not limited to: (a) *MBIA Insurance Corporation v. Patriarch Partners VIII, LLC*, 09 Civ. 3255 (RWS) (S.D.N.Y.); (b) *MBIA Insurance Corporation v. Patriarch Partners XIV, LLC,* Case No. 6467-VCL (Del. Ch. Ct.); (c) *Patriarch Partners XIV, LLC v. MBIA Insurance Corporation,* Case No. 651271/2011 (N.Y. Supreme Court); (d) *In re Zohar CDO 2003-1, Limited*, Case No. 15-23680 (RDD) (Bankr. S.D.N.Y.); (e) *In re Zohar CDO 2003-1, Corp.*, Case No. 15-23681 (RDD) (Bankr. S.D.N.Y.); (f) *In re Zohar CDO 2003-1, LLC*, Case No. 15-23682 (RDD) (Bankr. S.D.N.Y.); (g) *In the Matter of Lynn Tilton, et al.*, Securities and Exchange Commission Admin. Proc. File No. 3-16462; (h) *Zohar II 2005-1, Limited, et al. v. FSAR Holdings, Inc., et al.*, C.A. No.12946-VCS (Del. Ch. Ct.); (i) *Zohar CDO 2003-1, Limited v. Croscill Home LLC et al.*, 1:17-cv-01797-JFB-SRF (D. Del.); (j) *U.S. Bank N.A. v. Patriarch Partners XIV, LLC*, No. 652173/2016 (N.Y. Sup. Ct.); (k) *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-307 (S.D.N.Y.); (l) *Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, No. 12247-VCS (Del. Ch. Ct.); (m) *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd.*, No. 16-cv-4488 (S.D.N.Y.); (n) *Tilton v. Zohar CDO 2003-1, Ltd.*, No. CV-2017-013549 (Ariz. Sup. Ct.); (o) *Tilton v. Zohar III, Ltd.*, No. BC683129 (Cal. Sup. Ct.); (p) *Tilton v. Zohar CDO 2003-1 Ltd.*, No. 17-016240-CB (Mich. Cir.

Ct.); and (q) *Zohar CDO 2003-1, Limited v. Octaluna LLC*, 18-cv-108 (D. Del.). Further

description of these lawsuits is set forth in the Tilton Declaration.[11]

## THE DEBTORS' DESPERATE NEED TO REORGANIZE

39.     While certain of the Debtors' stakeholders may see the commencement of these

Chapter 11 Cases as just another lawsuit in the non-stop litigation that has hampered any serious

restructuring efforts, nothing could be further from the truth.  By commencing these Chapter 11

Cases, the Debtors intend for the automatic stay to offer the "breathing spell" that is axiomatic

with every bankruptcy filing to quell the hotbed of litigation.  Now that all of the Debtors' assets

are under the supervision of this Court and pending litigation is stayed, the stakeholders can

work to find common ground on a path forward.  The Debtors are in desperate need of more

consensus building and less value destruction.  These Chapter 11 Cases present an opportunity

for transparency, collaboration, a new and independent voice and the oversight of a sophisticated

business court which I hope will foster an environment where the litigation can be set aside to

determine if a consensual process can be achieved.

40.     Working with the stakeholders, the Debtors intend to implement a transparent

reorganization and sale process that will create an environment by which the value of the

Debtors' assets can be maximized and realized in an orderly manner.  The sheer complexity and

extent of litigation appears to have already chilled potential buyers and financiers of the Portfolio

Companies.  The Debtors believe the various stakeholders – MBIA, the remaining Zohar Notes

holders, the Patriarch parties, the Octaluna Entities, and Ms. Tilton herself – all share the same

goal – maximizing the value of the Debtors' assets for all stakeholders, in a timely manner, and,

importantly, saving tens of  thousands of American jobs at the Portfolio Companies.

---

[11] The litigations referenced in items (a) through (g) and (j) have concluded, been stayed in favor of another
proceeding, or are otherwise inactive.

41.     Absent a comprehensive process involving all of the Debtors' stakeholders, which this bankruptcy will provide, there is no end in sight for the various litigations involving the Debtors and their stakeholders.  The Debtors, their stakeholders and various parties in interest are mired in litigation involving no less than nine (9) active, pending cases across seven (7) jurisdictions involving dozens of parties.  For entities so desperate for a solution that maximizes the value of the Debtors' assets, this environment is untenable and presents the Debtors with two choices – continuing to squander value while fighting with and among the various stakeholders through multi-party, multi-jurisdictional warfare, or bringing the parties to one forum where the Debtors' hope for a global solution to can be achieved through a value-maximizing, timely, transparent monetization strategy.

42.     The first step toward the Debtors' goal of comprehensive peace is my appointment – an objective, independent voice unburdened by the history of hostility involving the parties and with extensive experience in the complexities of the bankruptcy process and with an unblemished reputation for integrity

43.     The Debtors did not file these Chapter 11 Cases lightly.  But too much value is being destroyed. The time has come to put down the slings and arrows. <u>The destruction of value must end today</u>. With this Court's help, we shall all hang together, for without it, we, most assuredly, will all hang separately.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: March 12, 2018

*/s/ Marc S. Kirschner*
Marc S. Kirschner
Chief Restructuring Officer