## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| Zohar III, Corp., *et al.*,[1] | ) Chapter 11 |
| | ) |
| | ) Case No. 18-10512 (CSS) |
| Debtors. | ) |
| | ) Joint Administration Requested |
| | ) |
| | ) **Hearing Date: To be determined** |
| | ) **Objection Deadline: To be determined** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 105(a) AND 365(a) OF THE BANKRUPTCY CODE, (A) AUTHORIZING THE DEBTORS TO REJECT THE COLLATERAL MANAGEMENT AGREEMENTS WITH ALVAREZ & MARSAL ZOHAR MANAGEMENT, LLC, *NUNC PRO TUNC* TO THE PETITION DATE, (B) GRANTING RELIEF WITH RESPECT TO THE CESSATION AND TRANSITION OF SERVICES UNDER THE COLLATERAL MANAGEMENT AGREEMENTS, AND (C) GRANTING RELATED RELIEF**

Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II 2005-1, Limited ("Zohar II"), Zohar III, Limited ("Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds"), Zohar CDO 2003-1, Corp. ("Zohar I Corp."), Zohar II 2005-1, Corp. ("Zohar II Corp.") and Zohar III, Corp. ("Zohar III Corp.," and together with Zohar I Corp. and Zohar II Corp., the "Zohar Corps," and collectively with the Zohar Funds, the "Debtors"), the debtors and debtors in possession in the above-captioned cases, hereby submit this motion (this "Motion") for the entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), pursuant to sections 105(a) and 365(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors to reject the Collateral Management

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

Agreements (as defined below), *nunc pro tunc* to the Petition Date (as defined below), (ii) directing Alvarez & Marsal Zohar Management, LLC ("AMZM"), in its capacity as the respective collateral manager under each Collateral Management Agreement (in each instance a "Collateral Manager"), to (A) cease exercising any rights with respect to property of the Debtors or their estates under the respective Collateral Management Agreement, (B) return all of the Debtors' books and records to the Debtors, and (C) execute and deliver all instruments and documents, and take such other actions as may be necessary or appropriate, as requested by the Debtors, to implement and effectuate the relief requested in this Motion, and (iii) granting such other and further relief that is necessary.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

The Collateral Management Agreements conflict with the express terms and purposes of fundamental sections of the Bankruptcy Code, as well as a fundamental goal of the Chapter 11 process—maximizing the value of the estate's assets for the benefit of all stakeholders. Accordingly, these Agreements should be rejected so that the Debtors can maximize value in these Chapter 11 cases, and to avoid any question about the Debtors' ability to discharge their fiduciary duties to the estate in doing so.  Specifically, the Collateral Management Agreements provide that the Collateral Managers purport to have the power to, among other things, determine the "restructuring, exchange, holding, and disposition" of the respective Zohar Funds' property,[3] as well as to "make determinations with respect to the exercise or enforcement of any and all rights … or remedies in connection with the [Zohar Funds' property] and participating in the

---

[2]  Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meaning given to such terms below.

[3]  *See* § 2.2(a) of each Collateral Management Agreement.

committees (official or otherwise) or other groups formed by creditors of a Debt Issuer."[4]  Such provisions plainly conflict with sections of the Bankruptcy Code that:  (i) prevent third parties from exercising control over property of the Debtors, *see* 11 U.S.C. § 362(a)(3) - (6); (ii) require the turn-over of property of the estate to the Debtors as debtors in possession, *see* 11  U.S.C. §§ 541-543; and (iii) vest the Debtors, as debtors in possession, with authority to maintain the property of their respective estates and operate their respective businesses post-petition, *see* 11 U.S.C. §§ 1107, 1108, & 1115.[5]

In addition to their fundamental conflicts with the Bankruptcy Code, the Collateral Management Agreements are antithetical to one of the central tenets of the Bankruptcy Code— maximizing the value of the estate for the benefit of all stakeholders. Under the respective Indentures, the Collateral Managers consult with and take direction from the Controlling Party or Controlling Class, which represents only the senior-most tranches of each Debtor's note issuance, and the Collateral Managers are only obligated to maximize value for the benefit of the Zohar Funds' noteholders.  The Collateral Manager, therefore, is not obligated to act in the interest of other stakeholders in the Debtors' estates and does not consult with junior tranches of debt or the residual equity holders in the Zohar Funds' structure.  Given the mandates of the Collateral Management Agreements, allowing the Collateral Managers to retain control (or even colorable authority) over any, not to mention the entirety, of the Debtors' assets would frustrate the purposes of the Bankruptcy Code generally and these Chapter 11 cases specifically, which are to maximize the value of the Debtors' estates for the benefit of all stakeholders.

---

[4]  *See* § 2.2(c) of each Collateral Management Agreement.

[5]  Additionally, AMZM commenced a number of actions on behalf of the Zohar Funds prior to the Petition Date. These matters are stayed by virtue of section 362 of the Bankruptcy Code.  Following the Petition Date, the Zohar Funds, and not AMZM, is the sole party with standing to exercise the rights of the Zohar Funds in these actions.

A sound business purpose also supports the rejection of the Collateral Management Agreements. At the Debtors' inception, each Zohar Fund's collateral manager was expected to be an active manager of the respective Zohar Fund's collateral, including by extending new loans or providing incremental funding to existing borrowers and engaging in negotiations regarding the capital structure of the Portfolio Companies.[6] There is minimal (if any) need for those services from AMZM, as the Collateral Managers, going forward. The reinvestment period for Zohar I, Zohar II and Zohar III expired in 2008, 2010, and 2012, respectively. Thus, the current Collateral Managers did not acquire assets or originate loans. At this point, the only role for the Collateral Manager is participation in monetization, which will be assumed and absorbed by the Chief Restructuring Officer. A number of the Portfolio Companies are in the process of marketing their assets for sale and/or refinancing and are, or will be, in the process of retaining their own investment bankers for that purpose. The management and governing bodies of those Portfolio Companies will negotiate with buyers or lenders and ultimately present a sale or refinancing transaction for approval to the Portfolio Companies' governing bodies and, where necessary, its equity holders and secured lenders. Where the Debtors' interests are involved, the Debtors' Chief Restructuring Officer and his team can adequately evaluate these options and will make an appropriate case to the Debtors' stakeholders and (where necessary) the Court for approval of the proposed transaction.[7] Moreover, the Chief Restructuring Officer will oversee a Reporting Protocol pursuant to which stakeholders and the Court will be apprised of, among other things, the status of the Debtors' assets and the sale or refinancing process at the Portfolio

---

[6] None of the Portfolio Companies are debtors in these Chapter 11 cases.

Companies.  In light of this, the Collateral Managers will be superfluous—and would burden the Debtors and their estates with a substantial and unnecessary expense.

Lastly, the Debtors submit that rejection of the Collateral Management Agreements will remove impediments to the sale and refinancing process contemplated for the Portfolio Companies.  Extensive pre-petition litigation has been waged over whether actions that the prior collateral managers (the Patriarch Collateral Managers) and AMZM, as the current Collateral Managers, took on behalf of the Zohar Funds were valid.  The cloud cast by these disputes has hampered pre-petition efforts to market and sell or refinance the Portfolio Companies.  While the Debtors believe that the clear statutory framework of the Bankruptcy Code should remove these issues, any lingering confusion, uncertainty or unease of potential buyers or lenders regarding the authority of the Collateral Managers will be resolved by granting the relief requested herein— rejecting the Collateral Management Agreements and directing AMZM to stand-down as Collateral Manager.

Accordingly, the Collateral Management Agreements should be rejected and the related relief requested herein should be granted.

## **JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the

---

[7] The Debtors are preparing a process with respect to the marketing and sale or refinance of the Debtors' assets and will apprise the Court and the Debtors' stakeholders of the proposed process in short order.

Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The predicates for the relief sought herein are sections 105(a) and 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006.

## BACKGROUND

### A.     General Background

4.      On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Contemporaneously with the filing of this Motion, the Debtors moved for joint administration of their Chapter 11 cases, for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).

5.      No request for the appointment of a trustee or examiner has been made in these Chapter 11 cases, and no official committees have been appointed pursuant to section 1102 of the Bankruptcy Code.

6.      General information about the Debtors and the events leading up to the Petition Date can be found in the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* [Docket No. 6] (the "Kirschner Declaration") and the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [Docket No. 5] (the "Tilton Declaration"), each filed on March 12, 2018.[8]

### B.     The CLO Funds, the Zohar Indentures, and Collateral Management Agreements

7.      Each of the Zohar Funds is a collateralized loan obligation fund (a "CLO") organized under the laws of the Cayman Islands.  Broadly speaking, a CLO is a special purpose vehicle that issues notes to investors in exchange for cash; that cash is predominantly used to

---

[8] Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Kirschner and Tilton Declarations.

invest in loans, which, in turn, generate cash to pay back the CLO's lenders over time with interest. The operation of the CLO and the various rights and obligations of the parties are typically governed by a comprehensive indenture and certain related agreements. Under a typical CLO structure, a CLO fund also contracts with a "collateral manager" to, among other things, monitor and manage assets for the benefit of the CLO fund and its stakeholders in exchange for fees. The Zohar Funds were actively managed and, consequently, their collateral managers were also charged with selecting assets in which to invest. As of March 2016, when AMZM became the Collateral Manager of each of the Zohar Funds, those activities were no longer necessary because the reinvestment period for all Funds had ended.

8.      As discussed more fully in the Kirschner and Tilton Declarations, the three Zohar Funds are each party to an indenture and certain related agreements, including their respective Collateral Management Agreements (defined below). The Zohar Funds' indentures include covenants regarding (a) acquiring, managing and disposing of the Zohar Funds' assets (*e.g.,* cash flows from loan receivables and cash flows from refinancing or sales of Portfolio Companies), (b) issuing the Zohar Notes and Zohar Preference Shares in accordance with the Zohar Funds' indentures and/or applicable entity governance documents, (c) pledging the Zohar Funds' assets as collateral securing their obligations under the respective Zohar Notes, and (d) other activities incidental to accomplishing (a) through (c).

9.      As set forth more fully in the Kirschner and Tilton Declarations, until March 2016, certain affiliates of Patriarch Partners, LLC—namely, Patriarch VIII, Patriarch XIV, and Patriarch XV (collectively, the "Patriarch Collateral Managers")—were the collateral managers of Zohar I, Zohar II and Zohar III, respectively, under the then-applicable collateral management

agreements. The Patriarch Collateral Managers[9] voluntarily resigned as collateral managers in February of 2016, effective on March 3, 2016, when AMZM was engaged as the replacement Collateral Managers pursuant to new collateral management agreements executed on that date, by and among each of the separate Zohar Funds (and their respective non-debtor Zohar LLC affiliates) and AMZM (collectively, the "Collateral Management Agreements").

10.     Section 14.1 of each of the Zohar Funds' indentures provides that the Zohar Funds (and their respective non-debtor Zohar LLC affiliates) assigned their "right, title and interest" in the respective Collateral Management Agreements to the Indenture Trustee as part of the collateral securing the Notes. Section 14.2 of the indentures, however, provides for the respective Zohar Fund and its respective non-debtor Zohar LLC affiliates to retain their obligations under the Collateral Management Agreements and expressly provides that such obligations cannot be imposed on the Trustees under the indentures.[10]

11.     At the time of formation of the Zohar Funds, their collateral managers were engaged in the active management of the Zohar Funds' investment portfolios, including by: buying and selling the assets that would be held by the Zohar Funds; monitoring the Portfolio Companies to assist them in repaying the Zohar loans; extending credit or providing incremental funding to existing borrowers, as necessary and appropriate; and engaging in negotiations regarding the capital structure of any of the Portfolio Companies to which the Zohar Funds

---

[9] The Patriarch Collateral Managers are controlled by Lynn Tilton, who is the sole director and the indirect controlling shareholder of the Debtors.

[10] Consistent with this, section 5.6 of each of the Collateral Management Agreements provides that certain provisions, including, but not limited to, those related to the Zohar Funds' and their non-debtor affiliates' obligations with respect to payment of AMZM's fees for services provided under the Collateral Management Agreements, and to indemnify AMZM in its capacity as Collateral Manager, and AMZM's obligation to maintain confidentiality, survived assignment.

lent.[11]  As of March 2016, when AMZM became of the Collateral Manager, those activities were no longer necessary because the reinvestment period for all Funds had ended.

**C.      Compensation under the Collateral Management Agreements**

12.      The Collateral Managers are entitled to receive as compensation: (a) a "Base Fee" calculated as the product of time spent performing its duties under the Collateral Management Agreements multiplied by its standard hourly rates; (b) reimbursement from the Zohar Funds for all costs and expenses incurred in connection with the Collateral Management Agreements, including, but not limited to, expenses incurred to employ outside attorneys, accounts, and consultants and other professionals; and (c) potentially, certain incentive fees and any other unspecified amounts as may be approved in writing by the Controlling Party.  *See, generally*, Collateral Management Agreements at section 4.1 & 4.2.  Additional amounts may become payable to the Collateral Managers as well.

**D.      The Current Status of the Portfolio Companies, the Zohar Funds' Activities, and the Proposed Reporting Protocol**

13.      As of the date hereof, because the reinvestment period has long ended, there is no cash in the Zohar Funds to invest in new or existing loans, and the primary focus at all levels is the maximization of value.  Certain of the Portfolio Companies, individually, are in the process of marketing their assets or refinancing.  As such, the only remaining function of the Collateral Managers appears to be monitoring the Debtors' investments for the benefit of the noteholders under the Indenture.  Yet the Zohar Funds continue to incur substantial fees to the Collateral Managers under the Collateral Management Agreements.

---

[11] *See, generally,* § 2.2 of each Collateral Management Agreement.

14.     The Debtors have recently appointed a Chief Restructuring Officer who, with his team, will provide both (a) oversight of this Portfolio Company–level marketing and refinancing processes on behalf of the Debtors and the Debtors' stakeholders, commensurate with the Debtors' interests in the Portfolio Companies, and (b) report to the Court and other stakeholders regarding the conduct of this process.  In fact, the Debtors are filing a motion to approve a proposed "Reporting Protocol" under which this reporting and information sharing will be accomplished.

## RELIEF REQUESTED

15.     By this Motion, the Debtors request the Court to enter the Proposed Order, (i) authorizing the Debtors' rejection of the Collateral Management Agreements, *nunc pro tunc* to the Petition Date, (ii) directing AMZM to (A) cease exercising any rights with respect to property of the Debtors or their estates under the respective Collateral Management Agreement, (B) return all of the Debtors' books and records to the Debtors, and (C) execute and deliver all instruments and documents, and take such other actions as may be necessary or appropriate, as requested by the Debtors, to implement and effectuate the relief granted by the Proposed Order and (iii) granting such other and further relief that is necessary.

## BASIS FOR RELIEF

**A.      The Debtors Have Exercised Sound Business Judgment in Determining to Reject the Collateral Management Agreements.**

16.     An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Enter. Energy Corp. v. United States (In re Columbia Gas Sys.)*, 50 F.3d 233, 239 (3d Cir. 1995) (*quoting Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)); *In*

*re Safety-Kleen Corp.*, 410 B.R. 164, 167 (Bankr. D. Del. 2009).  As noted above, material obligations of both the Debtors and AMZM exist under the Collateral Management Agreements and, therefore, the contracts are executory and may be rejected.

17.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).   "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

18.    The standard applied to determine whether the rejection of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 BR 815 (unpaginated) (Bankr. D. Del. Oct. 27, 2009) (A debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.,* 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

19.    Generally, courts defer to a debtor in possession's business judgment to reject an executory contract or lease.  *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42-43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757

(Bankr. S.D.N.Y. 1994); *see, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

20.     Here, the Debtors' determination to reject the Collateral Management Agreements is supported by a sound business purpose.  As noted above, the services provided by AMZM under the Collateral Management Agreements are not necessary in these Chapter 11 cases.  A number of the Portfolio Companies (none of which are Debtors) are in the process of marketing their assets for sale or in the process of investigating refinancing options, and they will retain their own investment bankers.  The management and governing bodies of those Portfolio Companies will negotiate with buyers and ultimately present any negotiated sale transaction to obtain any necessary approvals.  In the Chapter 11 cases, the Debtors' Chief Restructuring Officer will manage the process of evaluating these transactions on behalf of the Debtors and will report to the Court and the Debtors' stakeholders regarding the transactions as they develop, in accordance with the Reporting Protocol the Debtors intend to submit to this Court for approval.  The Chief Restructuring Officer will also seek any approvals from this Court that may be necessary if the Debtors are required to consent to or approve any transaction at the Portfolio Company–level.

21.     Retaining the Collateral Managers during the Chapter 11 cases would also burden the estate with the costs of the professionals at AMZM that are providing the services as Collateral Managers (and other amounts that may be payable to them).  The work done by AMZM would be wholly, if not entirely, redundant in form and substance to the work that the

Chief Restructuring Officer and his team will be performing in discharging their duties as estate fiduciaries and the work that will be done in the underlying sale process that will be conducted at the Portfolio Companies.   One of the basic questions in assessing whether a sound business purpose supports the rejection of a contract is whether rejection will free the estate of burdensome obligations. *See Orion Pictures*, 4 F.3d at 1098.   Given the redundancy in the services that AMZM would be performing, compensating AMZM from the proceeds of the Zohar Funds assets would be an unnecessary and burdensome obligation on the estate.[12]  This is particularly so in light of the fact that the services AMZM contracted to provide conflict with the provisions and purposes of the Bankruptcy Code, as discussed below and, under the facts and circumstances, would seemingly be provided solely to satisfy the conditions under the Zohar Funds' pre-petition indentures.

**B.      Allowing AMZM to Continue to Exercise Rights under the Collateral Management Agreements Would Conflict with the Provisions and Purposes of the Bankruptcy Code.**

        22.      Once a Chapter 11 case is commenced, the debtor, as debtor in possession, is vested with authority to maintain its respective estate's property and operate its respective business post-petition, *see* 11 U.S.C. §§ 1107, 1108, & 1115.  Further, the commencement of a Chapter 11 case, among other things, results in the following statutory impositions against third-parties that dealt with a debtor prior to the commencement of the case, among others: (i) a prohibition on exercising control over property of the estate, *see* 11 U.S.C. § 362(a)(3); (ii) a prohibition on the creation, perfection or enforcement of any lien against property of the estate, *id* § 362(a)(4); (iii) a prohibition on the creation, perfection, or enforcement against property of

---

[12]   The Chief Restructuring Officer and his team will be compensated by the Debtors.  Further, since much of the residual equity value in the Portfolio Companies inures to the benefit of the Zohar Funds and their stakeholders, the costs and expenses of the marketing processes at the Portfolio Company-level are borne (albeit indirectly) by the Zohar Funds and their stakeholders.

the debtor of any lien that secures a pre-petition claim, *id* § 362(a)(5); (iv) a prohibition on the collection, assessment or recovery of a claim against the debtor that arose prepetition, *id* § 362(a)(6); and (v) a requirement for the turn-over of property of the estate to the debtor in possession, *see id.* §§ 541-543.  If AMZM were to fulfill the services specified in the Collateral Management Agreements on a post-petition basis: *first*, the Debtors would be deprived of their rights to act as a debtor in possession under Chapter 11 of the Bankruptcy Code, and *second*, AMZM would be in violation of the statutory protections granted to the Debtors, their estates, and their property set forth in Chapters 3 and 5 of the Bankruptcy Code.  Accordingly, the Collateral Management Agreements are antithetical to the framework of Chapter 11 and must be rejected.

23.    Further, under the Collateral Management Agreements, contrary to the Debtors' goal to maximize value for all stakeholders, AMZM is directed only to "maximize the repayment of noteholders,"[13] and further, is obligated to consult only with the "Controlling Party" or "Controlling Class"—which consists of, or represents the interests of, only a subset of the noteholders—in carrying out certain critical functions under the Collateral Management Agreements.

24.    AMZM's duties under the Collateral Management Agreements are, thus, contrary to a fundamental purpose of the Bankruptcy Code—the maximization of estate value for the benefit of *all* stakeholders—and the policies and principles underlying specific provisions, such as §§ 363 and 365, that facilitate value maximization.  *See In re Caesars Entm't Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 495259, at *5 (Bankr. D. Del. Feb. 2, 2015) ("[T]he overarching goal of chapter 11 [is] to maximize the value of the Debtors' estates for the benefit

---

[13] *See* § 2.2(p) of the respective Collateral Management Agreements.

of all stakeholders. . .") (quoting *In re Patriot Coal Corp.*, 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012)); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992), *citing In re Atlanta Packaging Prods.*, Inc., 99 B.R. 124, 130 (Bankr. N.D.Ga. 1988) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to [section 363 sales] is to obtain the highest price or greatest overall benefit possible for the estate."); *see also In re Fin. News Network, Inc.*, 126 B.R. 152, 157 (Bankr. S.D.N.Y. 1991), *aff'd sub nom.* 980 F.2d 165, 169 (2d Cir.1992) ("A trustee maximizes value for creditors by selecting the "highest and best bid, and thereby protecting the interests of [the debtor], its creditors, and its equity holders."); *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky.), *aff'd*, 233 B.R. 739 (W.D. Ky. 1998) ("It is beyond dispute that a Chapter 11 DIP owes a fiduciary duty to all of the creditors and other interest holders of its bankruptcy estate to maximize the value of the bankruptcy estate.").

25.    Section 105(a) of the Bankruptcy Code provides that:  "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).   Courts have held that section 105(a) "supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code" and  "gives the court general equitable powers ... insofar as those powers are applied in a manner consistent with the Code." *In re Vaso Active Pharm., Inc.*, 514 B.R. 416, 421 (Bankr. D. Del. 2014); *see also In re Joubert*, 411 F.3d 452, 455 (3d Cir. 2005) ("§ 105(a) is a powerful, versatile tool, but that . . . empowers bankruptcy courts and district courts sitting in bankruptcy to fashion orders in furtherance of Bankruptcy Code provisions.").  The Proposed Order directs that AMZM (A) cease exercising any rights with respect to property of the Debtors or their estates under the respective Collateral Management

Agreement, (B) return all of the Debtors' books and records to the Debtors, and (C) execute and deliver all instruments and documents, and take such other actions as may be necessary or appropriate, as requested by the Debtors, to implement and effectuate the relief requested in this Motion. As outlined above, AMZM's continued performance as a Collateral Manager is in derogation of a number of the provisions, and a fundamental purpose, of the Bankruptcy Code. Accordingly, section 105(a) of the Bankruptcy Code vests this Court with the authority to grant this relief, which is both consistent with and necessary to carry out the purposes of the Bankruptcy Code.

**C.      *Nunc Pro Tunc* Rejection of the Collateral Management Agreements is Appropriate.**

26.      It is well-established that "[a] bankruptcy court may 'when principles of equity so dictate … approve [a motion] retroactive to the motion filing date' …. The power to grant relief retroactively is derived from the bankruptcy's equitable powers to insure a fair outcome." *In re TW, Inc.*, 2004 WL 115521 at *2 (D. Del. 2004). "An order granting relief *nunc pro tunc* is not a remedy that should be given as a matter of course, but only after a balancing of the equities in a particular case." *Id.*

27.      The facts in these Chapter 11 cases and the balance of the equities favor the Debtors' rejection of the Collateral Management Agreements *nunc pro tunc* to the Petition Date. As noted above, under the facts and circumstances of these Chapter 11 cases, AMZM can provide no real value to the Debtors' estates by continuing to perform under the Collateral Management Agreements. The immediate rejection of the Collateral Management Agreements as of the Petition Date will avoid accruing unnecessary fees and expenses payable to the Collateral Managers. In addition, rejection of the Collateral Management Agreements and the related relief requested in this Motion is necessary to advance the fundamental policies of the

Bankruptcy Code.  This includes both vesting control over the Debtors' assets fully in the Debtors, and promoting the maximization of value for the benefit of all of the Debtors' stakeholders, as opposed to the advancement of the parochial interests of particular constituencies.

28.     Moreover, AMZM will not be unduly prejudiced if the Collateral Management Agreements are rejected effective as of the Petition Date because:  (a) the Debtors are advising AMZM of the relief requested in this Motion contemporaneous with its filing; and (b) AMZM's compensation is, generally speaking, on a time and expense basis and AMZM can control whether it incurs (or does not incur) additional fees that will not be paid if the Court approves the requested rejection of the Collateral Management Agreements *nunc pro tunc* to the Petition Date.

29.     In light of the foregoing facts and circumstances, the Debtors respectfully submit that granting rejection of the Collateral Management Agreements and the related relief requested herein, under sections 105(a) and 365(a) of the Bankruptcy Code, *nunc pro tunc* to the Petition Date, is supported by a sound exercise of business judgment, necessary, prudent and in the best interests of the Debtors' estates and stakeholders, and consistent with the fundamental policies and principles underlying the Bankruptcy Code.  Accordingly, entry of the Proposed Order is appropriate.

## NOTICE

30.     Notice of this Motion has been or will be provided to: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) counsel to the Patriarch Entities; (v) counsel to U.S. Bank, as indenture trustee; (vi) counsel to Alvarez Marsal Zohar Management, LLC; (vii) counsel to MBIA Insurance Company; and (viii) counsel to certain holders of notes issued by Zohar III, Limited.  In light of

the nature of the relief requested herein, the Debtors submit that no other or further notice is

necessary.

WHEREFORE, the Debtors request entry of the Proposed Order, granting the

relief requested herein and such other and further relief as is just and proper.

Dated: March 12, 2018        YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

*/s/ Michael R. Nestor*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No.. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4421)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Counsel to the Debtors*