# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*, | ) Case No. 18-10512 (CSS) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |
| | ) **Requested Hearing Date**: |
| | ) **March 26, 2018, or as soon thereafter as** |
| | ) **counsel may be heard** |
| | ) **Requested Objection Deadline**: |
| | ) **5:00 p.m. EDT five business days prior to** |
| | ) **the hearing** |

## MOTION OF THE ZOHAR FUNDS, ACTING THROUGH THEIR COLLATERAL MANAGER, FOR RELIEF FROM THE AUTOMATIC STAY TO COMPLETE APPEAL

Zohar II 2005-1, Limited, and Zohar III, Limited (together, the "Zohar Funds"),[2]

acting through their collateral manager, hereby submit this motion (the "Motion") pursuant to

Section 362(d) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules") for relief from the automatic

stay so that the fully-briefed appeal entitled *FSAR Holdings, Inc., et al. v. Zohar II 2005-1, Ltd.*,

---

[1]     The Debtors and the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2]     Zohar CDO 2003-1, Limited and Zohar CDO 2003-1, Corp. (collectively "Zohar I") do not bring this motion because they are not parties to the action for which the Zohar Funds seek to lift the stay, although the Delaware Appeal will impact Zohar I. For example, Zohar I sold all of its assets in a public auction to MBIA. Tilton claims that those assets did not include equity in the portfolio companies owned by Zohar I on the erroneous premise that this equity was not collateral of Zohar I. Tilton made that same argument to the Court of Chancery with respect to the Zohar Funds, which that Court rejected. The Delaware Appeal will resolve this issue.

C.A. No. 6, 2018, currently pending in the Supreme Court of the State of Delaware (the "<u>Delaware Appeal</u>" or the "<u>Appeal</u>") may proceed to argument and decision.[3]

The Zohar Funds bring this Motion because the soon-to-be-finalized Delaware Appeal addresses fundamental issues of the parties' ownership and right to vote shares of portfolio companies the Delaware Court of Chancery ruled were owned by the Zohar Funds. Allowing the Appeal to proceed will promote judicial economy and the expeditious and economical resolution of these fundamental issues, which resolution is necessary to fully maximize the value of the Debtors' assets.  Lynn Tilton, the sole director and preference shareholder of the Debtors who caused the filing of these chapter 11 cases, claims that she is the controlling owner of the portfolio companies.  Despite this assertion, Tilton asserts that the issue of the owner of the equity in the portfolio companies is "meaningless in the context of this proceeding" (Tilton Decl. ¶ 98).[4]   But this is plainly not true—no debtor can monetize assets without knowing what assets it owns.  Should a sales process begin for the portfolio companies, voting rights will be critical to a buyer.  Tilton admitted this at the trial in the Court of Chancery. Cascio Tr. Aff.[5] Ex. I at 754 ("[A]ny buyer of the equity in these companies would insist as a condition to buying that the voting rights that [she] held in [her] hands be included as part of the sale.").  Tilton now states the exact opposite while using the automatic stay to attempt to escape the Delaware Appeal.

---

[3]     Argument before the Delaware Supreme Court was scheduled for March 21, 2018, but was canceled by that Court upon the Debtors filing a notice of these chapter 11 cases.  The Zohar Funds expect and believe that the Delaware Supreme Court will promptly schedule and hold oral argument upon the stay being lifted as requested in this Motion.

[4]     The *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* (D.I. 5) is cited herein as "Tilton Decl."; the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* (D.I. 6) is cited herein as "Kirschner Decl."

[5]     "Cascio Tr. Aff." refers to the Transmittal Affidavit of Megan Ward Cascio filed herewith.

Tilton previously told the Delaware Supreme Court that the Delaware Appeal needed to be decided expeditiously, because "even with a stay [of the trial court's judgment] in place, "a cloud of uncertainty remains.  It will only be remedied with a final resolution of this dispute."  Cascio Tr. Aff. Ex. A at 5.  Plainly, the fully-briefed Delaware Appeal is the most efficient means to resolve this essential ownership question.[6]

Tilton obtained the stay of the Court of Chancery's judgment by telling the Delaware Courts that an expedited "final resolution" was necessary.  With the Delaware Supreme Court now poised to provide that expedited "final resolution," Tilton now asserts that the Delaware Appeal itself is part of the "cloud of uncertainty" preventing the portfolio companies from being monetized or financed and instead seeks to relitigate the issues on Appeal in this Court.  Tilton Decl. ¶¶ 6, 99, 127–28; Kirschner Decl. ¶ 14.  The timing of Tilton causing this bankruptcy filing—it comes after "several months" of planning and coordination by Tilton and her counsel (Tilton Decl. ¶¶ 140–41) and a year before the relevant obligations become due (*id. ¶¶* 144–45), but just ten days before *en banc* argument was scheduled to occur before the Delaware Supreme Court in the Delaware Appeal—is plainly designed to derail the Delaware Appeal.  These chapter 11 filings were designed by Tilton, in her capacity as sole director of the Debtors, to give ***her and non-debtor affiliates*** the benefit of the imposition of the automatic stay to the detriment of the very entities the automatic stay is designed to protect—***the Debtors***.[7]

---

[6]    While the Delaware Appeal involves three portfolio companies, many of the issues it raises, such as whether the Funds can own equity, whether the equity is collateral subject to the Trustee's lien for the benefit of senior creditors and whether it was intended that Tilton have permanent control of equity ownership of the Funds, are equally applicable to all of the portfolio companies.

[7]    To be clear, Tilton admits that she and her selected advisors conceived of a strategy to file bankruptcy for the express purpose of staying litigation the ***Zohar Funds had brought against her and her affiliates***.  Tilton is the sole director of the Debtors and purports to control (and own) the portfolio companies that the Delaware Court of Chancery previously found are in fact owned by the Zohar Funds.  And Tilton seeks to evaluate, negotiate, pursue or settle claims the Debtors

Moreover, this is not the first time that Tilton has attempted to misuse the courts to remain in control of the portfolio companies.  She previously filed an improper involuntary petition against Zohar CDO 2003-1, LLC[8] (Cascio Tr. Aff. Ex. B), which she subsequently withdrew as the Court was hearing evidence on whether the filing was in bad faith.  She also attempted (without success) to stay the action that underlies the Delaware Appeal and to sever the Zohar Funds' claims of ownership of equity in the portfolio companies from that action. (Cascio Tr. Aff. Exs. C and D).  Indeed, having obtained a stay of the Delaware judgment based upon a promise to expedite the Delaware Appeal, Tilton is estopped from now claiming that the Appeal should not proceed.  Estoppel aside, allowing the Delaware Appeal to proceed promotes judicial economy and the expeditious and economical resolution of litigation, and is the swiftest and most economical manner to settle issues concerning ownership and rights to manage the portfolio companies—certainty that will benefit all parties and the chapter 11 process. Accordingly, the automatic stay should be lifted immediately to permit the argument in the Delaware Appeal and to allow the Delaware Supreme Court to decide the Appeal.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).  Venue is proper in this District pursuant to 28 U.S.C. § § 1408 and 1409.

---

hold, including claims against her and her affiliates.  The Debtors have no independent board members.  Leaving until another day whether there should be a bankruptcy pending for what is essentially a two-party dispute, it must be clear that no bankruptcy can continue with Tilton and her selected advisors directing the Debtors from above and defending against the Debtors from below.

[8]      *See In re Zohar CDO 2003-1, Corp.*, Case No. 15-23681 (RDD) (Bankr. S.D.N.Y.).

**RELIEF REQUESTED**

2.    The Zohar Funds seek relief from the automatic stay for the limited purpose of permitting the fully-briefed Delaware Appeal to proceed to oral argument and decision by the Delaware Supreme Court.

**BACKGROUND**

3.    The Zohar Funds are collateralized loan obligations that, by contract, are managed by their collateral managers.  Until March 2016, entities affiliated with Tilton (Patriarch XIV, LLC and Patriarch XV, LLC, collectively the "Patriarch Entities"), served as collateral managers for Zohar II and Zohar III, respectively.  Effective March 3, 2016, the Patriarch Entities resigned as collateral managers and Alvarez & Marsal Zohar Management LLC ("AMZM") was appointed as successor collateral manager by the senior creditors entitled under the transaction documents to do so.

4.    Since the appointment of AMZM as collateral manager, Tilton has contended that (i) she—rather than the Zohar Funds on which behalf Tilton purports to have filed bankruptcy—is the "beneficial owner" of the equity in the portfolio companies to which the Zohar Funds loaned money and, in most cases, acquired equity ownership of the portfolio companies, (ii) the Zohar Funds owned only "limited" "upside equity interests" in the portfolio companies, and (iii) in any event, when Tilton's entities were serving as collateral managers for the Zohar Funds, she caused those entities to issue irrevocable proxies on behalf of the Zohar Funds, or to amend LLC agreements, to grant entities controlled by Tilton the right to vote the Zohar Funds' interests in the portfolio companies associated with ownership of those companies, regardless of whether she or the Zohar Funds is the actual beneficial owner of the equity.

5.    On November 23, 2016, the Zohar Funds, acting through AMZM as collateral manager, delivered written consents to replace board members at three Delaware

corporation portfolio companies (FSAR Holdings, Inc., Glenoit Universal Ltd. and UI Acquisition Holding Co.). When Tilton refused to recognize the validity of those written consents, AMZM, as collateral manager, caused the Zohar Funds to file an action in the Delaware Court of Chancery pursuant to 8 *Del. C.* § 225 seeking a declaration that the Zohar Funds had removed Tilton from the boards of each of the entities, had properly elected new directors of each of the entities at issue, and that the Zohar Funds' nominees were properly elected to the boards of those companies (the "Section 225 Action").

6.     Tilton opposed the relief sought by the Zohar Funds, and caused the portfolio companies also to oppose that relief. In doing so, Tilton asserted the same arguments that she asserts in her affidavit filed in the present chapter 11 cases—including that (i) entities controlled by Tilton retained the voting rights attendant to the portfolio company equity in which the Zohar Funds have supposedly "limited" interests, (ii) to memorialize that purported arrangement, she listed the Zohar Funds as "record holders" of the equity, but that Tilton was always intended to have beneficial ownership and voting rights, (iii) the Tilton-controlled Octaluna entities' agreement to hold the preference shares for the Funds and to act as the Funds' taxpayer somehow evidences the parties' intent that the Octaluna entities would own, hold and control the assets of the Zohar Funds, and (iv) the equity in the portfolio companies is not "Collateral" as defined in the Indentures for the Zohar Funds.

7.     The Section 225 Action was expedited because Delaware law recognizes the need for a prompt determination of the ownership and governance issues raised in that action. In April and May 2017, Vice Chancellor Slights heard six days of trial testimony, including nearly three full days of testimony by Tilton, concerning the issues in that case. The parties

offered over 1,750 exhibits into evidence, and submitted over 370 pages of post-trial briefing and

participated in a lengthy post-trial argument.

   8. On November 30, 2017, Vice Chancellor Slights issued a 96-page opinion

in which he systematically considered, and rejected, each of Tilton's claims. Cascio Tr. Aff. Ex.

E. Nonetheless, Tilton has continued to make those claims, including that she owns the equity in

the portfolio companies issued in the names of the Zohar Funds, to this Court. For example:

- While Tilton claims repeatedly that she transferred only "limited upside interests" to the Funds and at all times remained the "beneficial owner" of the equity of the portfolio companies, the Court of Chancery found "that the Zohar Funds are the beneficial owners of the Portfolio Companies' equity." *Zohar II 2005-1 Limited et al. v. FSAR Holdings, Inc. et al.*, 2017 WL 5956877, at *3 (Del. Ch. Nov. 30, 2017) ("*Section 225 Opinion*").

- While Tilton claims "[t]he portfolio company upside interests are not "collateral" (Tilton Decl. ¶ 117), Vice Chancellor Slights found in the Section 225 Action that "[t]here can be no doubt that the Portfolio Companies' shares are collateral." *Section 225 Opinion*, 2017 WL 5956877, at *22.

- While Tilton claims that "[t]he Octaluna Entities were created to own, hold, and control the assets of the Zohar Funds, and to bear the tax consequences, good or bad, from that ownership" and that "[i]n each case, the Octaluna Entities are the beneficial owners of the assets held by the Zohar Funds, and I am the ultimate owner of the Octaluna Entities" (Tilton Decl. ¶ 50), the Court found that "[t]he transactional documents . . . clearly show that the Zohar Funds acquired the Portfolio Companies' equity. Tilton has ***no documentary or other admissible evidence to counter these contemporaneous deal documents***. In fact, she has acknowledged the Zohar Funds' ownership in several documents she herself has executed." *Section 225 Opinion*, 2017 WL 5956877, at *33 (emphasis added).

- Vice Chancellor Slights also found that documents written by Tilton contradicted her ownership claims, and that "Tilton's admission that the Zohar Funds own this equity, provided on a clear day in her own hand, does, however, make her litigation position here, and the sworn testimony offered to support it, ***less credible***." *Id.* at *33, n. 316. Vice Chancellor Slights further found that "[t]here are numerous other documents, including others signed by Tilton, which show the Zohar Funds own the disputed equity. Tilton's attempts to explain this evidence away ***are not credible***. Her argument regarding her 'gift' of equity upside to the Zohar Funds ***is likewise not credible***, particularly because ***her argument is based on extrinsic testimonial***

*evidence and not supported by a single contemporaneous document evidencing such a conveyance*." *Id*. at \*34, n. 317 (internal citations omitted) (emphasis added).

- Vice Chancellor Slights found in the Section 225 Action that while it was anticipated that Tilton would have an "active role" in managing the portfolio companies by controlling the Funds' collateral managers (*Section 225 Opinion*, 2017 WL 5956877, at \*14), it was always contemplated that collateral managers could be removed and that removal would threaten Tilton's control. *Id*. at \*16 ("[In the fall of 2015] Tilton no doubt saw troubled waters ahead. MBIA would soon be positioned to remove Patriarch Partners XIV as collateral manager for Zohar II. Absent some other lever, the removal of the Patriarch Managers as collateral managers would jeopardize Tilton's control over the Zohar Funds and their portfolio companies and potentially threaten her interests as preference shareholder (through Octaluna II and Octaluna III). . . . Her solution: construct the other lever—the Proxies."). In so ruling, the Court rejected Tilton's incredible statements that "the Zohar Funds' success was predicated both on [her] having the authority (as Collateral Manager) to control the terms of repayment on the loans as well as the power (as equity owner of the Portfolio Companies) to direct the rebuilding of the Portfolio Companies, serving as company director and often as an officer, working with management to create value for the Portfolio Companies for all stakeholders" (Tilton Decl. ¶ 35). [9]

9.    While these holdings apply specifically to equity in the three companies at issue in the Section 225 Opinion, many of them—including whether the Zohar Funds can own equity, whether equity interests owned by the Funds are collateral, and whether the Funds' structure contemplated or required that Tilton have control—are common to all of the portfolio companies. Thus, final resolution of these claims in the Delaware Appeal will resolve and simplify many of the contested claims concerning ownership of the portfolio companies.

---

[9]    The Section 225 Opinion also contradicts many other claims that Tilton asserts in her declaration filed in these chapter 11 cases. For example, the Section 225 Opinion specifically contradicts Tilton's claim that the Administrative Law Judge in the SEC proceeding made findings that Tilton owns the equity of the Portfolio Companies. Tilton Decl. ¶ 129. Vice Chancellor Slights disagreed, noting that the SEC ALJ's ruling stated its findings were "for the purpose of this administrative proceeding" only, that the ALJ's decision "did not turn on whether the Zohar Funds own equity in their portfolio companies," and that for these (and other) reasons, the ALJ's findings were not entitled to preclusive effect. *Section 225 Opinion*, 2017 WL 59556877, at \*36–39. The Zohar Funds will not address all of Tilton's other false statements here, but reserve the right to do so as needed in future pleadings.

10.      On the basis of the Section 225 Opinion, Vice Chancellor Slights also ruled that the Zohar Funds, through their collateral manager, were entitled to vote the shares in the portfolio companies owned by the Zohar Funds, and that the Zohar Funds' nominees were properly elected to the boards of directors of each of the portfolio companies at issue in the Section 225 Action.

11.      On December 1, 2017, Tilton and the defendant portfolio companies moved to stay the Court of Chancery's judgment pending appeal so that they could remain in control of the portfolio companies during the pendency of the Delaware Appeal.  Seeking the stay, Defendants argued that the "uncertainty [regarding] the composition of the companies' boards of directors constitutes irreparable harm" and that "*[u]ntil the Supreme Court resolves once and for all the challenging legal issues present in this case, the uncertainty will remain and the status quo should be preserved*."  *See* Cascio Tr. Aff. Ex. F at 8 (emphasis added); *see also* Cascio Tr. Aff. Ex. G at ¶ 5 ("Defendants want the appeal to be expedited because they want the cloud of uncertainty surrounding ownership and control of the Defendant Companies lifted."); *id.* at ¶ 10 ("Defendants want the *cloud of uncertainty* lifted from these Companies more than anyone, and they want it done quickly.") (emphasis added).  In order to obtain the stay pending appeal that they sought (and were ultimately granted), Defendants promised to seek expedition of the appeal in the Delaware Supreme Court.  Cascio Tr. Aff. Ex. F at ¶ 3.  The Court of Chancery expressly relied on Tilton's promise to expedite the Delaware appeal and granted her motion to stay pending appeal.  Cascio Tr. Aff. Ex. H at 3, n.6 ("I note that Defendants have represented to the Court that they intend to 'seek expedited review by the Supreme Court [pursuant to Del. S. Ct. R. 25 (e)]' and offered that representation as a basis for the Court to 'stay judgment and preserve the status quo as a matter of fairness and equity.' ***The***

***Court relied upon this representation, in part, in granting the Motion for a Stay of Judgment
Pending Appeal and to Maintain the Status Quo Orders***.") (internal citation omitted) (emphasis
added).  And, Tilton and the portfolio company defendants, which Tilton currently controls, told
the Delaware Supreme Court that "even with a stay [of the trial court's judgment] in place, a
cloud of uncertainty remains.  It will only be remedied with a final resolution of this dispute."
Cascio Tr. Aff. Ex. A at 5.

        12.    Notwithstanding her prior representations to the Delaware Court of
Chancery and the Delaware Supreme Court, Tilton now remarkably claims that the "cloud of
litigation" requires that the Delaware Appeal not proceed—the ***exact opposite*** of what she told
the Delaware courts when she sought and obtained a stay pending the Delaware Appeal.  Tilton
now contends that bankruptcy is necessary to remove "the cloud of litigation" that is supposedly
preventing the monetization of the portfolio companies or even their obtaining necessary
financing, and that permitting the Delaware Appeal to proceed will contribute to this "cloud of
litigation" that she decried.  Tilton Decl. ¶¶ 6, 99, 127-134; *see also* Kirschner Decl. ¶ 14.  This
is obviously untrue—the Delaware Appeal was expedited (at Tilton's and the portfolio
companies defendants' request) and briefing was completed on an expedited based on March 5,
2018.  Prior to Tilton causing this bankruptcy filing, oral argument in the Delaware Appeal was
scheduled for March 21, 2018, after which the Appeal would have been decided on an expedited
basis.  Obviously, resolving the issues raised in the Delaware Appeal will remove much of the
"cloud of litigation," benefit the administration of these chapter 11 cases and can only assist in
resolution of the parties' various underlying disputes.

## **ARGUMENT**

13.    Section 362(d)(1) of the Bankruptcy Code provides as follows:

(d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest: . . .

14.    "Cause" is not defined by the Bankruptcy Code.  Consequently, a bankruptcy court must decide on a case-by-case basis what constitutes "cause" to lift the automatic stay.  *In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991)); *In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993).  The legislative history of Section 362 states that "cause may be established by a single factor such as a desire to permit an action to proceed . . . in another tribunal, or lack of any connection with or interference with the pending bankruptcy case." *Rexene Products Co.*, 141 B.R. at 576 (citing H.R. REP. No. 95-595, at 343–44 (1977)) (internal citations omitted).  Generally, however, in balancing the interests of the debtor and the movant, courts consider three factors: (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probable success on the merits if the stay is lifted.  *See Rexene Products Co.*, 141 B.R. at 576; *see also In re Continental Airlines*, 152 B.R. at 424; *In re Peregrine Sys., Inc.*, 2005 WL 2401955, at *3 (D. Del. Sept. 29, 2005) (internal citation omitted); *In re Unidigital Inc.*, No. 00-3806 (MFW), 2000 WL 33712306, at *1 (Bankr. D. Del. Dec. 8, 2000) (internal citation omitted); *In re Integrated Health Servs., Inc.*, No. 00-389 (MFW), 2000 WL 33712483, at *1 (Bankr. D. Del. Aug. 11, 2000) (internal citation omitted).

15. Additionally, courts in this district often look to the "policies" underlying granting relief from stay as set out in *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1287 (2d Cir. 1990), including, among others, the following: (1) whether relief would result in a partial or complete resolution of the issues; (2) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (3) whether litigation in another forum would prejudice the interests of other creditors; (4) the interests of judicial economy and the expeditious and economical resolution of litigation; (5) whether the parties are ready for trial in the other proceeding; and (6) impact of the stay on the parties and the balance of the harms. *In re The Fairchild Corp.*, No. 09-10899 (CSS), 2009 WL 4546581, at *7 n.43 (Bankr. D. Del. Dec. 1, 2009) (citing *Sonnax* and *In re SCO Group, Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007)).

16. Here, consideration of the factors and policies described above weighs in favor of granting the Zohar Funds relief from the automatic stay to complete the Delaware Appeal.

A.      Lifting the Stay Will Not Prejudice the Debtors.

17. The first factor supports the relief requested herein because neither the Debtors nor the bankruptcy estates will suffer any prejudice at all, much less "great prejudice," if this Court grants relief from the automatic stay. *See Rexene Products Co.*, 141 B.R. at 576 (noting that the standard for showing prejudice is particularly high, requiring the debtor to show "great prejudice" either to itself or to the estate). This Court has previously held that when a debtor does not need to avail itself of the benefits provided by the automatic stay to successfully reorganize, it is less likely that "great prejudice" has occurred. *See In re Tribune Co.*, 418 B.R. 116, 127 (Bankr. D. Del. 2009) (holding that the purpose of the automatic stay is "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the

depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor").

18.     Here, lifting the stay to allow resolution of the Delaware Appeal will not impair the Zohar Funds' ability to reorganize; to the contrary, only by clarifying many of the parties' disputed rights and assets will the Funds ever be able to reorganize.  Indeed, this is exactly what Tilton previously represented to both the Delaware Court of Chancery and the Delaware Supreme Court.  *See* ¶ 11, *supra*.  Having obtained relief (a stay pending appeal, and expedition of the appeal) on the basis of these assertions, Tilton is now judicially estopped from taking the contrary positon.  As the Third Circuit has held, "[j]udicial estoppel is a 'judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that [he or she] has previously asserted in the same or in a previous proceeding."  *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 272 (3d Cir. 2012); *Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 855, 858 (3d Cir. 1996).  The doctrine is designed to prevent litigants from "playing fast and loose with the courts."  *Scarano v. Central R. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953).  "The doctrine exists to 'protect the integrity of the judicial process and to prohibit parties from deliberately changing positons according to the exigencies of the moment.'"  *Macfarlan*, 675 F.3d at 272 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).  That is precisely what Tilton is doing here.

19.     The Debtors may incur some modest costs in completing the Delaware Appeal but any costs are minimal when compared with the costs incurred to date in litigating the Section 225 Action and its Appeal, or the costs that would be required if the parties were required to start anew and relitigate those issues in these chapter 11 cases.  The parties have

spent millions of dollars litigating the Section 225 Action and fully briefing the Delaware Appeal.  All that remains for the parties to do in the Delaware Appeal is to present argument.

20.     That the Debtors may incur modest litigation costs resolving the Delaware Appeal does not constitute the prejudice necessary to deny the Motion.  For example, the Court of Appeals for the Third Circuit has declared that litigation expenses do not constitute an injury sufficient to justify enjoining litigation against a debtor.  *See In re Davis*, 691 F.2d 176, 178 (3d Cir. 1982).  Here, of course, the modest costs will be incurred in a case brought ***by the Debtors*** against Tilton, who has now put the Debtors into bankruptcy for the express purpose of avoiding final resolution of the Debtors' rights.  In any event, "[c]ourts have generally not ascribed much significance to the fact that a Debtor will have to participate in litigation."  *In re Winterland*, 101 B.R. 547, 549 (Bankr. C.D. Ill. 1988) (citing *In re Bock Laundry Mach. Co.*, 37 B.R. 564, 567 (Bankr. N.D. Ohio 1984)); *see also In re Rabin*, 53 B.R. 529, 532 (Bankr. D.N.J. 1985); *In re UNR Indus., Inc.*, 54 B.R. 266, 269 (Bankr. N.D. Ill. 1985).  Thus, there is no cognizable "great prejudice" that will befall the Debtors' estates if the Motion is granted.

B.     Balancing the Hardships Weighs in Favor of Lifting the Stay.

21.     A balancing of the hardships typically requires the Court to weigh the hardship that the debtor will suffer if an appeal proceeds against the hardship to the movant if the stay remains in place and thus prevents the appeal from proceeding.  Here, however, there is no balancing, as all parties will be benefitted from receiving a decision from the Delaware Supreme Court in the Delaware Appeal.  Indeed, as Tilton and the defendant portfolio companies previously advised the Delaware courts, the "cloud of uncertainty" stemming from the competing claims surrounding ownership and control of the defendant portfolio companies is

causing irreparable harm to Tilton and the companies, and an expedited decision by the Delaware Supreme Court will alleviate that harm. *See* ¶ 11, *supra.*[10]

22.    Mr. Kirschner asserts in his declaration in support of the Chapter 11 Petitions that "the fighting must end" (¶ 14), and Tilton has argued that "whether I, through the Octaluna entities, or the Zohar Funds own the equity in the Portfolio Companies has no impact on the structural framework of the payment waterfall." Tilton Decl. ¶ 96. The suggestion is that adjudication of the issues in the Delaware Appeal is unnecessary to value maximization because "the waterfall" can always be resolved after the marketing process. The Debtors confuse or purposefully obfuscate what is at issue in the Delaware Appeal, which is a determination of who actually owns and has the right to control the equity of the portfolio companies that the Zohar Funds paid for and that is registered in their names. Resolving this threshold issue will plainly facilitate, and indeed is necessary for, any effective effort to monetize those assets.

23.    Tilton claims that she, through the Octaluna entities, owns the voting equity in the portfolio companies owned by the Zohar Funds (and by Zohar I). Mr. Kirschner states in his declaration that he intends to make "a proposal to the stakeholders with respect to the design and implementation of a court-approved process by which certain of the Portfolio Companies will be marketed and sold or refinanced" (¶ 15) and that "independent investment bankers will be retained at the portfolio company level, in a fulsome marketing and sale process will be conducted." *Id.* Tilton, however claims that she is the owner of those companies and that that equity is not an asset of the debtors. This Court's ability to supervise the disposition of those assets clearly depends on the resolution of the ownership dispute. Tilton also has admitted

---

[10]    The Zohar Funds, acting through their collateral manager, agreed with that assertion, and therefore endorsed Tilton's and the Portfolio Companies' request for expedition of the Delaware Appeal.

under oath "any buyer of the equity in these companies would insist as a condition to buying that the voting rights that [Tilton] held in [her] hands be included as part of the sale."  Cascio Tr. Aff. Ex. I at 754.  This is consistent with the cases that recognize that the presence or absence of voting rights can significantly affect valuation.  *E.g.*, *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 189435, at *3–4 (Del. Ch. Apr. 16, 1996) (noting, after a sale of stock without voting rights, that "it would be hard to contend that the company could not have gotten a higher price for shares with voting rights").

24.    Accordingly, absent a determination of the matters at issue on the Delaware Appeal, there can be no effective marketing or sale of any of the interests at stake.  Put simply, until ownership of the equity and the voting rights are determined, any plan presented to maximize value cannot be effectuated, as the Debtors can only sell what they own and not what others, who are not parties to this action, claim to own (regardless of Tilton's claims that the proceeds of the sales of assets whose ownership is in dispute will somehow go through a "waterfall," which does not determine what assets belong to the estate).[11]

25.    Even if Tilton is not the owner of the portfolio companies, she otherwise claims to be the beneficiary of irrevocable proxies she caused to be granted to her entities on the eve of her replacement as collateral manager.  The Delaware Court of Chancery held that these

---

[11]    Nor would it be any comfort for Tilton to say that she will agree to transfer her alleged interests simultaneously with any sale conducted through this bankruptcy proceeding, for two reasons.  First, Tilton claims that the Octaluna entities own the voting interests.  Absent an affirmance in the Delaware Appeal, Tilton will claim that the Octalunas' approval for any particular sale would be required, which would give them, at best, a veto right over any such sale, and at worse, an ability to extract value to permit a sale to occur.  Second, neither Tilton nor her proposed chief restructuring officer has addressed how any consideration received as a result of "monetizing" equity interests would be divided between the Zohar Funds and Tilton's entities, the latter of which, notwithstanding Vice Chancellor Slights' Section 225 Opinion, Tilton claims to own the equity of the portfolio companies held in the name of the Zohar Funds.  Obviously, the equitable allocation of proceeds would depend upon the rights of each party, which is the very issue that the Delaware Appeal is poised to finally determine.

purported irrevocable proxies are legally invalid (*Section 225 Opinion*, 2017 WL5956877, at

*19–23) and this is an issue that is squarely before the Delaware Supreme Court in the Delaware

Appeal.  The Delaware Supreme Court has an interest in deciding issues of the validity of the

irrevocable proxies under 8 *Del. C* § 212(e) (issues which Tilton has called "novel" (*see* Cascio

Tr. Aff. Ex. F at ¶ 1; Cascio Tr. Aff. Ex. A at ¶ 2)) and the resolution, pursuant to 8 *Del. C.* §

225, of disputed control over Delaware corporations not parties to this bankruptcy proceeding.

*See Armstrong v. Pomerance*, 423 A.2d 174, 177 (Del. 1980) ("While courts of other

jurisdictions may apply and enforce existing Delaware law, the development of Delaware law is

quite properly the duty and responsibility of the Delaware Courts."); *see also Diedenhofen-*

*Lennartz v. Diedenhofen*, 931 A.2d 439, 451 (Del. Ch. 2007) ("The Delaware courts have long

asserted that this state has a compelling interest in the efficient and consistent application of its

laws governing business entities.  For that reason, our courts have been far less willing to defer

to tribunals in other states when unsettled issues of Delaware law are at stake."); *In re Topps Co.*

*S'holders Litig.*, 924 A.2d 951, 964 (Del. Ch. 2007) ("Delaware courts are better positioned to

provide a reliable answer about Delaware corporate law in emerging areas . . . . That is especially

so because appeals from this court go directly to the Delaware Supreme Court, the definitive

authority on our common law of corporations, which regulates much of the internal affairs of

Delaware corporations."); *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 1985 WL

21129, at *2 (Del. Ch. Oct. 9, 1985) ("[N]ovel and substantial issues of Delaware corporate law .

. . are best resolved in a Delaware court.").

        26.    Resolution of this issue will also help to determine what assets the Zohar

Funds have available to sell, as the purported irrevocable proxies negatively impact the value the

Zohar Funds could obtain from a sale of equity that includes economic interests without voting

rights.  That is, no buyer will be willing to pay maximum value for stock if it does not know whether it will be able to vote the shares to control the company or effect change to its board of directors or if those voting rights are controlled—by proxy or alleged beneficial ownership—by a person other than the seller.  Thus, resolution of this issue is critically important in any attempt to monetize the Funds' assets or restructure them.

27.    Nor will Tilton be prejudiced in any way if the Delaware Appeal is permitted to proceed.  The Appeal is fully briefed and ready for argument.  Tilton claims that she is correct and will prevail in the Appeal.  If that is true, she should welcome the opportunity for vindication, and clarification of her supposed rights.

28.    Thus, there are no "equities" to "balance."  It is in the interests of all parties for the Delaware Appeal to be decided to obtain prompt resolution of the "cloud" that Tilton previously told the Delaware courts had to be removed by swift resolution of the Delaware Appeal.

C.    The Zohar Funds Have a Reasonable Likelihood of Prevailing on the Merits.

29.    The third and final factor, the probability of success on the merits, also supports granting relief from the automatic stay.  The Section 225 Opinion is likely to be affirmed.  The 96-page Opinion is a well-reasoned, rigorous application of the law and the facts.  Under these circumstances, Tilton cannot credibly argue to this Court that the Zohar Funds do not have a reasonable likelihood of success on the merits of the appeal.

30.    However, even if Tilton did challenge the Zohar Funds' likelihood of success, the showing required to satisfy this third prong of the test is very slight.  *See Rexene Products Co.*, 141 B.R. at 578 (stating that the required showing of probability of success on the merits is "very slight"); *see also In re Continental Airlines*, 152 B.R. at 426 (the third factor

involving likelihood of success on the merits can be satisfied with a showing of even a "slight probability of success on the merits."). Indeed, "[t]he third prong of the test is less significant than the first two, especially if there is insufficient evidence for the court to determine the likelihood of the creditor's success." *In re Jenkins*, No. 03-60548, 2004 WL 768574, at *3 (Bankr. S.D. Ga. Mar. 30, 2004) (citation omitted). Moreover, it is unnecessary that all factors be found in favor of a party requesting relief from the stay before the stay may be lifted. *See In re Love*, No. 00-83615, 2001 WL 34076354, at *9 (Bankr. C.D. Ill. Mar. 9, 2001). The factors "are not independent elements of a three part test, each of which must be satisfied in order for the movant to prevail." *Id.* Instead, the factors are "guideposts that a bankruptcy court should follow and apply in light of all of the facts and circumstances surrounding the motion." *Id.* Therefore, "[i]f one or even two of the factors militate against stay relief, the Court could still grant relief in light of all of the facts and circumstances." *Id.*

### D. The *Sonnax* Policies Support Lifting the Automatic Stay.

31. Additionally, the relief requested is supported by the general policies underlying the automatic stay that courts consider when deciding whether to grant a motion to lift the stay. These policies, which have been outlined by the United States Court of Appeals for the Second Circuit, are:

> 1) whether relief would result in a partial or complete resolution of the issues; 2) lack of any connection with or interference with the bankruptcy case; 3) whether the other proceeding involves the debtor as a fiduciary; 4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; 5) whether the debtor's insurer has assumed full responsibility for defending it; 6) whether the action primarily involves third parties; 7) whether litigation in another forum would prejudice the interests of other creditors; 8) whether the judgment claim arising from the other action is subject to equitable subordination; 9) whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor; 10) the interests of judicial economy and the expeditious and

19

economical resolution of litigation; 11) whether the parties are
ready for trial in the other proceeding; and 12) impact of the stay
on the parties and the balance of the harms.

*In re SCO Group, Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007) (citing *Sonnax*, 907 F.2d at

1287).

32.     The policies relevant here all support granting relief from stay:

- Policy #1 ("whether relief would result in a partial or complete resolution of the issues"):
  Relief from stay would result in a complete and necessary resolution of the issue of
  ownership of the portfolio companies, as recognized by Tilton in seeking an expedited
  Appeal.

- Policy #2 ("lack of any connection with or interference with the bankruptcy case"): The
  resolution of the Appeal will not interfere with these chapter 11 cases, but will provide
  the Debtors and potential acquirers much needed certainty if the Debtors are to pursue
  monetizing their interests in the portfolio companies.

- Policy #4 ("whether a specialized tribunal with the necessary expertise has been
  established to hear the cause of action"): The Delaware Court of Chancery, and Delaware
  Supreme Court as its reviewing court, are specialized tribunals with jurisdiction under the
  State of Delaware's Constitution and Section 225 of the DGCL, 8 *Del. C.* § 225, and have
  the necessary and unparalleled expertise in the issues in the Section 225 Action.  For
  example, Section 225 provides that the Court of Chancery may hear and determine
  disputes under that Section, 8 *Del. C.* 225, and the Delaware Supreme Court has
  exclusive jurisdiction "to receive appeals from the Court of Chancery and to determine
  finally all matters of appeal in the interlocutory or final decrees and other proceedings in
  chancery."  Del. Const. art. IV, § 11(4).  Indeed, the Delaware Supreme Court has
  recognized that it "is not possible for a second-filed action at common law in another
  jurisdiction to be the mirror image of a statutory section 225 action filed first in
  Delaware." *Box v. Box*, 697 A.2d 395 (Del. 1997).

- Policy #7 ("whether litigation in another forum would prejudice the interests of other
  creditors"): As set forth above, no party will be prejudiced by proceeding with oral
  argument and decision on the Appeal, and all parties will benefit from the certainty and
  finality that only can be provided through the Appeal.

- Policy #10 ("the interests of judicial economy and the expeditious and economical
  resolution of litigation"): The interests of judicial economy strongly support lifting the
  stay to allow the Delaware Supreme Court to decide the Appeal.  There is no dispute that
  the issues in the Section 225 Action must be decided as soon as possible in order to lift
  the alleged "cloud of uncertainty" over ownership of the portfolio companies.  Tilton and
  the portfolio company defendants obtained expedition of the Delaware Appeal on the
  express basis of the critical importance of obtaining a final decision.  Allowing the

Delaware Appeal to proceed in the Delaware Supreme Court is indisputably the most expeditious and economical resolution of these issues, as the Appeal is fully briefed and all that remains to done by the parties is oral argument.

In stark contrast, deciding anew in these chapter 11 cases the issues presented in the Delaware Appeal is antithetical to judicial economy and expeditious and economical resolution of litigation.  As mentioned above, the Court of Chancery heard six days of trial testimony, including nearly three full days of testimony by Tilton.  The parties offered over 1,750 exhibits into evidence, and submitted over 370 pages of post-trial briefing and participated in a lengthy post-trial argument.  Thereafter, the Court of Chancery issued an exhaustive 96-page opinion with detailed factual findings and legal conclusions.  If the Delaware Appeal is not allowed to proceed, all of this work and expense would need to be recreated by the parties and this Court, not to mention the possibility of up to three layers of review (the district court, the Third Circuit, and the U.S. Supreme Court).

It is hard to image a course of action more contrary to the notion of judicial economy.  Even in less compelling circumstances, such as when parties have engaged in extensive pre-trial work or litigation, courts in this district and elsewhere have recognized that the paramount interest of judicial economy favors granting relief from stay.  *See, e.g.*, *SCO Group, Inc.*, 395 B.R. at 860 ("Of particular importance to the Court [in lifting the stay] are the specialized knowledge that the District Court has developed in presiding over the Lawsuit for four years, the interests of judicial economy and the expeditious and economical resolution of litigation and, as stated earlier, the fact that the parties are ready for trial.").  Moreover, courts have held that judicial economy is a paramount factor, and that the decision to lift stay may be based on this ground alone.  *See, e.g.*, *In re Kemble*, 776 F.2d 802, 807 (9th Cir. 1985) ("Many cases have held that a district court may properly consider the factor of judicial economy in deciding whether to lift an automatic stay . . . The decision to lift the stay could be upheld on this ground alone.")

- Policy #11 ("whether the parties are ready for trial in the other proceeding"): As described above, the Appeal has been fully briefed and the parties were days away from oral argument.

- Policy #12 ("impact of the stay on the parties and the balance of the harms"): As described above, lifting the stay will provide certainty that all parties have conceded is necessary, and the balance of the harms, to the extent pertinent, favors granting relief from stay.

E.     Request for Waiver of 14-Day Stay under Federal Rule of Bankruptcy Procedure 4001(a)(3).

33.     The Zohar Funds request that the Court waive the 14-day stay requirement of Bankruptcy Rule 4001(a)(3) so that the Delaware Supreme Court may schedule and hold argument without delay.

## NOTICE

34.     The Zohar Funds will provide notice of this Motion by overnight delivery, hand delivery, and/or email to: (a) the U.S. Trustee; (b) counsel for the Debtors; (c) counsel to any official committee; and (d) any other parties required by Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Zohar Funds respectfully submit that no further notice is necessary.

WHEREFORE, for all the foregoing reasons, the Zohar Funds respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A** (i) granting the Zohar Funds immediate relief from the automatic stay so that the Delaware Appeal can proceed to argument and decision and (ii) granting all such other and further relief which is just and proper under the circumstances.

Dated: March 14, 2018
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
Robert J. Dehney (#3578)
Megan Ward Cascio (#3785)
Matthew B. Harvey (#5186)
Lauren Neal  Bennett (#5940)
Thomas P. Will (#6086)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
Tel. (302) 658-9200

Fax (302) 658-3989

-and-

Michael Carlinsky
Jonathan Pickhardt
Benjamin Finestone
Ellison Ward Merkel
Blair Adams
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
Tel. (212) 849-7000
Fax (212) 849-7100

*Counsel to the Zohar Funds acting through their collateral manager*