## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III Corp., *et al.*,[1] | Case No. 18-10512 (CSS) |
| Debtors. | Jointly Administered |

## MOTION OF MBIA INSURANCE CORPORATION
## AND ZOHAR III CONTROLLING CLASS
## TO DISMISS THE CHAPTER 11 CASES OR,
## IF NOT DISMISSED, TO APPOINT A TRUSTEE

---

[1]    The Debtors, and, where applicable, the last four digits of their taxpayer identification numbers, are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  They are also referred to herein, collectively, as the "Zohar Funds."

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 5

FACTUAL BACKGROUND .......................................................................................... 6

RELIEF REQUESTED .................................................................................................. 34

POINT I – THE CHAPTER 11 CASES SHOULD BE DISMISSED ......................... 34

POINT II – APPOINTMENT OF A TRUSTEE IS REQUIRED
UNDER SECTIONS 1104(A)(1) AND (A)(2) OF THE BANKRUPTCY CODE...................... 49

There Is "Cause" To Appoint A Trustee Under Section 1104(a)(1) ............................................ 50

    A.    The Debtors' Abject Failure To Protect Valuable Estate Assets Mandates
        Appointment Of A Trustee............................................................................... 53

    B.    The Debtors' Governance Is Rife With Conflicts That Prevent It From Fulfilling
        Its Fiduciary Duties ......................................................................................... 56

    C.    The Deep Acrimony Between The Debtors And Their Creditors Constitutes
        Cause For A Trustee......................................................................................... 59

    D.    The Numerous Prepetition, Questionable Business Transactions Involving
        Tilton And The Zohar Funds Mandate A Trustee....................................... 60

Appointment Of A Trustee Is Also In The Interests Of The Estates Under
Section 1104(A)(2) .................................................................................................. 62

    A.    The Trustworthiness Of The Debtors............................................................ 63

    B.    The Debtors' Past And Present Performance And Prospects For Rehabilitation......... 65

    C.    The Lack Of Confidence Of Creditors .......................................................... 66

    D.    The Benefits Of Appointing A Trustee Are Outweighed By The Costs...................... 67

    E.    Kirschner's Retention As CRO Does Not Eliminate Need For Trustee ...................... 68

CONCLUSION........................................................................................................... 70

## TABLE OF AUTHORITIES

**CASES:**

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
    526 U.S. 434 (1999)..................................................................................................36

Bepco, L.P v. 15373 Mem'l Corp. (In re 15375 Mem'l Corp.),
    400 B.R. 420 (D. Del. 2009), aff'd, 589 F.3d 605 (3d Cir. 2009) .................................65

Carolin Corp. v. Miller,
    886 F.2d 693 (4th Cir. 1989) .....................................................................................47

C-TC-9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship),
    113 F.3d 1304 (2d Cir. 1997)....................................................................................41

CFTC v. Weintraub,
    471 U.S. 343 (1985)............................................................................................53, 56

Grogan v. Garner,
    498 U.S. 279 (1991)..................................................................................................50

Hotel Assocs. v. Tr. of Cent. St. SE & SW Areas Pension Fund (In re Hotel Assocs.),
    3 B.R. 343 (Bankr. E.D. Pa. 1980) ............................................................................63

In re 234-6 W. 22nd St. Corp.,
    214 B.R. 751 (Bankr. S.D.N.Y. 1997)....................................................................47, 49

In re 15375 Mem'l Corp. v. Bepco, L.P. (In re 15375 Mem'l Corp.)
    589 F.3d 605 (3d Cir. 2009)................................................................................. passim

In re AdBrite Corp.,
    290 B.R. 209 (Bankr. S.D.N.Y. 2003) ........................................................................53

In re Am. Prop. Corp.,
    44 B.R. 180 (Bankr. M.D. Fla. 1984) .........................................................................48

In re Ancona,
    No. 14-10532, 2016 WL 786896 (Bankr. S.D.N.Y. Nov. 30, 2016).......................48

In re Bellevue Place Assocs.,
    171 B.R. 615 (Bankr. N.D. Ill. 1994) .....................................................................51, 52

In re BLX Grp., Inc.,
    419 B.R. 457 (Bankr. D. Mont. 2009) ........................................................................68

**PAGE(S)**

In re Bowman,
    181 B.R. 836 (Bankr. D. Md. 1995) ................................................................53

In re Cardinal Indus., Inc.,
    109 B.R. 755 (Bankr. S.D. Ohio 1990)...........................................................67

In re China Fishery Grp. Ltd. (Cayman),
    No. 16-11895, 2016 WL 6875903 (Bankr. S.D.N.Y. Oct. 28, 2016) ...............57, 65

In re Cloudeeva, Inc.,
    No. 14-24874, 2014 WL 6461514 (D.N.J. Nov. 18, 2014) ......................................52

In re Colo.-Ute Elec. Ass'n,
    120 B.R. 164 (Bankr. D. Colo. 1990) ...............................................................59

In re CS Mining, LLC,
    574 B.R. 259 (Bankr. D. Utah 2017) ...............................................................69

In re DCNC N.C. I, LLC,
    407 B.R. 651 (Bankr. E.D. Pa. 2009), aff'd,
    Nos. 09-3775, -3776, 2009 WL 3856498 (E.D. Pa. Nov. 13, 2009) ......................37

In re Dewey Com. Invs., L.P.,
    503 B.R. 643 (Bankr. E.D. Pa. 2013) ...............................................................42

In re Energy Fut. Holdings Corp.,
    561 B.R. 630 (Bankr. D. Del. 2016) .............................................................35, 37

In re Euro-Am. Lodging Corp.,
    365 B.R. 421 (Bankr. S.D.N.Y. 2007) ..........................................................62, 63

In re Eurospark Indus.,
    424 B.R. 621 (Bankr. E.D.N.Y. 2010) ...............................................................53

In re FSJ Imports, LLC,
    No. 12-22402, 2012 WL 2994957 (Bankr. D.N.J. July 23, 2012)..........................43

In re Grasso,
    490 B.R. 500 (Bankr. E.D. Pa. 2013) ...............................................................52

In re Hoyle,
    No. 10-01484-TLM, 2013 WL 210254 (Bankr. D. Idaho Jan. 17, 2013)...............48

In re Humphreys Pest Control Franchises, Inc.,
    40 B.R. 174 (Bankr. E.D. Pa. 1984) ............................................................. 56-57

**PAGE(S)**

In re Ionosphere Clubs, Inc.,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990)..................................................................53, 62, 63, 66

In re JER/Jameson Mezz Borrower II, LLC,
    461 B.R. 293 (Bankr. D. Del. 2011) .......................................................................36, 44, 46

In re L.S. Good & Co.,
    8 B.R. 312 (Bankr. N.D. W. Va. 1980)................................................................................64

In re Madison Mgmt. Grp., Inc.,
    137 B.R. 275 (Bankr. N.D. Ill. 1992) .................................................................................68

In re Marvel Entm't Grp., Inc.,
    140 F.3d 463 (3d Cir. 1998)..................................................................................... *passim*

In re McCorhill Publ'g Inc.,
    73 B.R. 1013 (Bankr. S.D.N.Y. 1987).................................................................................57

In re Microwave Prods. of Am.,
    102 B.R. 666 (Bankr. W.D. Tenn. 1989).............................................................................68

In re New Towne Dev., LLC,
    404 B.R. 140 (Bankr. M.D. La. 2009) ................................................................................51

In re Northtown Realty Co., L.P.,
    215 B.R. 906 (Bankr. E.D.N.Y. 1998)................................................................................48

In re Patman Drilling Int'l, Inc.,
    No. 07-34622-SGJ, 2008 WL 724086 (N.D. Tex. Mar. 14, 2008)........................................57

In re Phila. Rittenhouse Dev'r, L.P.,
    No. BR 10-31201 SR, 2011 WL 13043475 (Bankr. E.D. Pa. May 25, 2011).............37, 43, 48

In re Pied Piper Casuals, Inc.,
    40 B.R. 723 (Bankr. S.D.N.Y. 1984).............................................................................53, 66

In re PRS Ins. Grp., Inc.,
    274 B.R. 381 (Bankr. D. Del. 2001) ..................................................................................57

In re Rent-A-Wreck of Am., Inc.,
    580 B.R. 364 (Bankr. D. Del. 2018) ..................................................................................37

In re SGL Carbon Corp.,
    200 F.3d 154 (3d Cir. 1999)................................................................................35, 36, 43

In re Sharon Steel Corp.,
    86 B.R. 455 (Bankr. W.D. Pa. 1988), aff'd, 871 F.2d 1217 (3d Cir. 1989) ...........................52

**PAGE(S)**

In re Sharon Steel Corp.,
871 F.2d 1217 (3d Cir. 1989)..................................................................51, 61, 62, 68

In re SunCruz Casinos, LLC,
298 B.R. 821 (Bankr. S.D. Fla. 2003)...............................................................57

In re Sydicom Corp.,
268 B.R. 26 (Bankr. S.D.N.Y. 2001)................................................................41

In re Tahkenitch Tree Farm P'ship,
156 B.R. 525 (Bankr. E.D. La. 1993)................................................................51

In re V. Savino Oil & Heating Co.,
99 B.R. 518 (Bankr. E.D.N.Y. 1989)................................................................51

In re Whetten,
473 B.R. 380 (Bankr. D. Colo. 2012)................................................................48

Little Creek Dev. Co. v. Commw. Mortg. Co. (In re Little Creek Dev. Co.),
779 F.2d 1068 (5th Cir. 1986) ...................................................................35, 41

Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd.
(In re Morningstar Marketplace),
544 B.R. 297 (Bankr. M.D. Pa. 2016) ...............................................................63

Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.),
4 B.R. 635 (Bankr. E.D.N.Y. 1980)................................................................52

NMSBPCSLDHB, L.P. v. Integrated Telecom Exp., Inc.
(In re Integrated Telecom Exp., Inc.),
384 F.3d 108 (3d Cir. 2004)................................................................ *passim*

Official Comm. of Asbestos Claimants v. G-I Holdings Inc. (In re G-I Holdings Inc.),
385 F.3d 313 (3d Cir. 2004)...............................................................35, 36, 37, 40

Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp.
(In re W.R. Grace & Co.),
285 B.R. 148 (Bankr. D. Del. 2002) .................................................................50

Okla. Ref. Co. v. Blaik (In re Okla. Ref. Co.),
838 F.2d 1133 (10th Cir. 1988) .................................................................50, 60

Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n,
No. 16 Civ. 7128, 2017 WL 3822603 (S.D.N.Y. Aug. 28, 2017) ...........................................65

MBIA Insurance Corporation ("MBIA") and the Zohar III Controlling Class (together, the "Secured Creditors")[2] hereby submit this *Motion To Dismiss The Chapter 11 Cases, Pursuant To Section 1112(b) Of Title 11 Of The United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Or, If Not Dismissed, For Appointment Of A Trustee Pursuant To Section 1104(a) Of The Bankruptcy Code* (the "Motion").  In support of its motion, the Secured Creditors respectfully represent to the Court as follows:

## PRELIMINARY STATEMENT

The Secured Creditors move to dismiss these chapter 11 cases because they were filed in bad faith.  The petitions serve no valid bankruptcy purpose and, instead, were filed solely as a litigation tactic by Lynn Tilton in a transparent and admitted attempt to avoid her day of reckoning as a defendant in multiple pending litigations brought against her by the Debtors, acting through their duly-appointed and independent current collateral manager.  Since 2016, when Tilton resigned as the Debtors' collateral manager, the Debtors have been seeking to recover assets misappropriated by Tilton.  Now Tilton is seeking to depose her successor, which the Secured Creditors properly appointed, in order to insulate herself from consequences for her past misconduct.  Tilton abused both the collateral manager position and numerous other self-appointed roles that she continues to maintain—some of them maintained against the interests and instructions of the Debtors.

Indeed, even at the outset of these cases, Tilton has demonstrated her shameless self-dealing, her blatant disregard for the contract and property rights of the Secured Creditors and her flouting of the bankruptcy process itself.  Specifically, the Zohar Funds are collateralized

---

[2]   The Zohar III Controlling Class and MBIA seek the same relief for essentially the same reasons and therefore submit this motion jointly in the interest of judicial economy.  There are certain facts asserted herein, however, that may be known to one but not the other.

loan obligation ("CLO") transactions, whose assets consist of loans to companies, equity interests in those companies and cash. The cash, generally, derives from periodic interest payments from the borrowers of the Zohar loans. All of the Zohar assets are subject to a lien held by an Indenture Trustee for the benefit of the Secured Creditors. These assets are the Collateral securing the claims of the Secured Creditors. As such, the borrower interest payments are required to be deposited in accounts managed by the Trustee. The party presently responsible for ensuring the proper deposit of the interest payments into the Trustee accounts is Patriarch Partners Agency Services ("PPAS"), a Tilton-owned entity that she installed as lender agent during her tenure as collateral manager for the Debtors.

On March 8, 2018, only days before the petition filings—and without notice to the Trustee or the Secured Creditors—PPAS began diverting borrower interest payments to newly-opened Debtor bank accounts instead of depositing these funds in the Trustee accounts. Incredibly, the last diversion appears to have occurred on March 12, 2018—the day after the petitions were filed. Moreover, there has been no motion to this Court concerning the Debtors' use of cash collateral. Instead, these actions were only disclosed in response to an inquiry by the Trustee regarding the sources the Debtors are using to fund the expenses for these cases. The diverted funds—totaling over $4 million—were wired to accounts for the Debtors' proposed counsel and Chief Restructuring Officer ("CRO"), Marc S. Kirschner. This diversion of the Secured Creditors cash collateral is only the latest example of Tilton's bad faith and improper self-dealing and reinforces why the Secured Creditors' Motion should be granted.

If that were not enough, in Declarations submitted in these bankruptcy cases, both Tilton and her hand-picked CRO, effectively admit that the purpose of the bankruptcy filing was to halt litigation claims belonging to the Debtors against her just when the Debtors were on the verge of

vindicating their ownership and control over property that Tilton has already been found by the Delaware Court of Chancery to have misappropriated. And both Tilton and Kirschner make clear their intention to use the bankruptcy process to abandon the Debtors' extensive litigation claims against Tilton, even though those claims are among the Debtors' principal assets and potentially worth hundreds of millions of dollars if not well over a billion dollars. Amazingly, Kirschner made this crucial determination—the sole beneficiary of which is Tilton—in a single day, without the benefit of any knowledge or information about Tilton's conduct or the basis for the claims belonging to the Debtors.

Tilton's irreconcilable conflicts of interests and the bad faith nature of her bankruptcy filing are further demonstrated by the Debtors' first day filings. The only first day motions filed by the Debtors were a motion to reject the contract of the current collateral manager—the only independent party seeking to vindicate the Debtors' rights and claims against Tilton and a motion to impose a protocol that would strip the Secured Creditors of their rights to robust information about the Debtors and their assets otherwise protected under the Bankruptcy Code. In that regard, Tilton claims that many of the most valuable assets of the Debtors belong instead to her, and she claims those assets are not subject to the Trustee's lien and are beyond the supervision of this Court. Tilton then asks the Court to terminate the Debtors' current collateral manager and eliminate the entity pursuing the rights of the Debtors against Tilton. Tilton would replace the collateral manager with her hand-picked CRO who has no familiarity with the Debtors nor any clear authority or function, either in respect of the Debtors themselves or the companies, known as the "Portfolio Companies," whose equity ownership is in dispute and which comprise the Debtors' most valuable assets. Further, instead of proposing an open and honest process for the Debtors, Tilton's first day filings also seek to conceal from the Secured Creditors important

information about the Debtors and the Portfolio Companies. Through these bankruptcy cases, Tilton thus seeks to dispossess the Debtors further, freeze out the Secured Creditors and avoid accountability to this Court, as well as the numerous other courts that either have or are in a position to hold her responsible for her wrongdoing.

There can be no proper bankruptcy purpose for these particular Debtors. They have no operations and employees of their own. They are structured by contract to be governed entirely by their collateral manager and an Indenture Trustee. And all their assets—including the cash that Tilton diverted to fund her proposed professionals—are pledged to the Trustee and are subject to a lien for the benefit of the Secured Creditors.

If the bankruptcy proceeds, however, the appointment of a trustee over the Debtors' estates is essential. Cause exists for such an appointment: Tilton will not protect the Funds' property, as their assets principally consist of assets she has attempted to misappropriate and litigation claims for damages and equitable relief against her; Tilton has incurable conflicts of interests that prevent her from exercising her fiduciary duties on behalf of the Debtors whose interests are directly adverse to hers; Tilton has a history of favoring her own interests as an insider to the detriment of the interests of the Debtors and their creditors—in these cases, for all practical purposes, MBIA and the Zohar III noteholders; and the parties have a litigious and acrimonious history. For similar reasons, appointment of a trustee would be in the best interests of the parties, even if cause for a trustee is not found to exist.

As a consequence of Tilton's control and management of the Zohar Funds, two of the Zohar Funds defaulted upon maturity and the third Fund is expected to default when its notes come due in April 2019. As a result of Tilton's management, Zohar I had effectively zero cash to pay over $450 million of principal on notes that matured in November 2015. Instead, MBIA,

4

acting as financial guarantor, paid $150 million to the insured noteholders. In January 2017, Zohar II similarly defaulted on nearly $800 million of principal on maturing notes—with next to no cash available—and again MBIA stepped in and made the senior noteholders whole. The final Zohar Fund, Zohar III — which has no financial guaranty insurer — has already defaulted on interest payments to its investors and was on a course to default on principal payments when its notes mature in April 2019. The investors in Zohar III are owed almost a billion dollars and their recovery depends upon Tilton being held to account and not allowed to continue to misappropriate Debtor assets behind a smokescreen of obfuscation and delay.

Therefore, and for the reasons discussed below, these cases should be dismissed, and, if not dismissed, a trustee should be appointed.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Local Rule 9013-1(f), movants consent to the entry of a final order by the Court in connection with this motion to the extent it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 1112(b) and 1104(a) of the Bankruptcy Code.

# FACTUAL BACKGROUND[3]

## The Parties

### *The Zohar Funds*

4.      The Zohar Funds were formed by Tilton and her affiliates.  Tilton Decl. ¶ 1[4].  Zohar CDO 2003-1, Ltd. and Zohar CDO 2003-1 Corp. (collectively, "Zohar I") were formed in 2003.  Kirschner Decl. ¶ 27.  Zohar II 2005-1, Ltd. and Zohar II 2005-1 Corp. (collectively, "Zohar II") were formed in 2005.  Id. ¶ 28.  Zohar III Ltd. and Zohar III Corp. (collectively, "Zohar III," and together with Zohar I and Zohar II, the "Zohar Funds" or "Debtors") were formed in 2007.  Id. ¶ 29.  The Zohar Funds are shell companies structured as special-purpose vehicles.  Id. ¶ 26.  Because securitized transactions, such as the Zohar Funds, depend on regular payments being made pursuant to the governing agreements, they are considered "bankruptcy-remote" vehicles.  Indeed, the transaction contracts prohibit noteholders from filing involuntary bankruptcy petitions.  Hoff Ex.[5] 8 (Zohar II Indenture) at 213 (§ 13.4) ("The Holders of Notes agree not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy").

5.      Pursuant to their respective trust Indentures, the Zohar Funds' each granted a lien on all of their property (the "Collateral")[6] to U.S. Bank, as Trustee, which holds a

---

[3]   We note that much of the evidence concerning the factual background to the Motion consists of documents and testimony that were obtained in litigations and are subject to confidentiality orders in those litigations or are otherwise subject to confidentiality restrictions, and thus cannot be submitted here at this time.

[4]   The *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* (D.I. 5) is cited herein as "Tilton Decl."; the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* (D.I. 6) is cited herein as "Kirschner Decl."

[5]   Hoff Ex. refers to exhibits attached to the Affidavit of Jonathan M. Hoff filed herewith.

[6]   Each of the Zohar Funds is comprised of three special purpose entities—(1) an Issuer, an exempted company organized under the law of the Cayman Islands; (2) a Co-Issuer, a

continuing security interest and lien on behalf of the senior noteholders and MBIA. Kirschner

Decl. ¶ 34. U.S. Bank is responsible for collecting and distributing cash related to the Collateral.

Id. The Zohar Funds' Collateral includes loans to and equity interests in an overlapping group of

companies — the "Portfolio Companies." The Zohar Funds' collateral managers are responsible

for managing the Collateral to ensure timely payment of the notes on or prior to their legal

maturities. Id. ¶ 35. Upon Zohar I's and Zohar II's maturities in November 2015 and January

2017, those funds each defaulted on the principal payments owed to their noteholders. Tilton

Decl. ¶ 114, 118. The uninsured Zohar III notes are scheduled to mature, and are expected to

default, in April 2019. Id. ¶ 6.

### *MBIA Insurance Corp.*

6.      MBIA is a monoline insurance company that served as the "Credit

Enhancer" to Zohar I and Zohar II through the issuance of financial guaranty insurance policies

(the "Policies") for the benefit of the holders of the Zohar I Class A-1 and Class A-2 Notes (the

"Zohar I Policy") and the Zohar II Class A-1, Class A-2 and Class A-3 Notes (the "Zohar II

Policy"). Hoff Ex. 4 (Zohar I Policy); Hoff Ex. 11 (Zohar II Policy). The Policies guaranteed

that scheduled interest and principal would be paid to the insured noteholders by MBIA if Zohar

I or Zohar II defaulted. MBIA paid approximately $149 million in claims on the Zohar I Policy

in November 2015 and approximately $770 million in claims on the Zohar II Policy in January

2017, upon the respective defaults by Zohar I and Zohar II. Tilton Decl. ¶¶ 114, 118. MBIA

was the winning bidder in a public auction of the Zohar I Collateral conducted pursuant to

---

corporation organized under Delaware law and (3) a Subsidiary LLC, organized under Delaware
law. Hoff Ex. 8 (Zohar II Indenture) at 1. The Issuer and Subsidiary owned and pledged their
assets to the Trustee for the benefit and security of the Secured Creditors. Id. The Co-Issuer did
not own any assets and was required to turn over any assets obtained to the Issuer. Id. Thus, all
of the assets owned by each of the Zohar Funds were pledged to the Trustee for the benefit and
security of the Secured Creditors and, for ease of reference, these special purpose entities for
each of the Zohar Funds are referred to collectively herein.

procedures approved by a federal court. Id. ¶ 116. MBIA now beneficially owns the various assets previously held as Collateral by Zohar I. Hoff Ex. 23 (April 19, 2017 Del. 225 Action Trial Tr.) at 23:7-14. MBIA has unreimbursed claims in excess of $770 million against Zohar II. Tilton Decl. ¶ 46..

***Zohar III Controlling Class***

7.    The Zohar III Controlling Class consists of various private investors who hold more than 50 percent of the aggregate outstanding amount of the Class A-1 Notes issued by Zohar III. The Zohar III Controlling Class is entitled to exercise various rights under the Zohar III Indenture, including directing a liquidation of the Collateral upon a default. Kirschner Decl. ¶¶ 36-37.

***Alvarez & Marsal Zohar Management, LLC***

8.    Since March 2016, the Zohar Funds have retained Alvarez & Marsal Zohar Management, LLC ("AMZM") as their collateral managers pursuant to collateral management agreements (the "AMZM CMAs"). Kirschner Decl. ¶ 33; Hoff Ex. 5 (Zohar I AMZM CMA); Hoff Ex. 12 (Zohar II AMZM CMA); Hoff Ex. 16 (Zohar III AMZM CMA). Pursuant to their rights under the Indentures, MBIA selected AMZM as collateral manager for Zohar I and Zohar II and the Zohar III Controlling Class selected AMZM as collateral manager for Zohar III. Id. ¶¶ 36-37.

***Lynn Tilton And Her Patriarch Affiliates***

9.    Lynn Tilton is the founder and Chief Executive Officer of Patriarch Partners, LLC and is the principal owner and sole manager of numerous other Patriarch affiliates (collectively, "Patriarch"). Tilton Decl. ¶¶ 16-17, 37, 60. Using her position as collateral manager for the Zohar Funds, Tilton also appointed herself the sole managing member or board member for almost all of the Portfolio Companies, companies who borrowed money from the

8

Zohar Funds and in which the Zohar Funds own equity interests (in most cases, the Zohar Funds own all or majority of the Portfolio Company equity). Tilton Decl. ¶ 64. Through various affiliates, Tilton holds the Preference Shares in each of the Zohar Funds. On or about January 25, 2017, Tilton, acting as holder of the Preference Shares, removed the disinterested, independent directors of the Debtors and replaced them with herself as the sole director for each of the Zohar Funds. Tilton Decl. ¶ 14. Tilton also owns the Class A-3 notes in Zohar I.

10. Three Patriarch affiliates served as collateral managers for the Zohar Funds (the "Patriarch Managers") until their resignation in March 2016. Kirschner Decl. ¶ 33. Patriarch Partners VIII, LLC was the collateral manager for Zohar I. Id. Patriarch Partners XIV, LLC was the collateral manager for Zohar II. Id. Patriarch Partners XV, LLC was the collateral manager for Zohar III. Id. The rights and duties of the Patriarch Managers as collateral managers were set forth in Collateral Management Agreements (the "Patriarch CMAs"). Kirschner Decl. ¶ 35. The Funds paid the Patriarch Managers approximately $600 million in management fees over the life of the Zohar Funds. Hoff Ex. 21 (RICO Compl.) ¶ 65.

11. Patriarch Partners Agency Services, LLC—PPAS—is the Patriarch affiliate Tilton appointed as administrative agent to the Zohar Funds under each of the credit agreements with the Portfolio Companies. Kirschner Decl. ¶ 31. Tilton, acting as a fiduciary on behalf of the Zohar Funds through the Patriarch Managers, purported to make PPAS's agency appointment "irrevocable." Hoff Ex. 22 (PPAS Action Answer & Countercls.) ¶¶ 32-33. As agent, PPAS receives fees from the Zohar Funds and is responsible for receiving and distributing loan interest payments made by the Portfolio Companies to the applicable Indenture Trustee. As described above, Tilton appears to have diverted funds — which were Collateral for the Trustee's lien, and should have been distributed by PPAS to the Trustee for the benefit of the Secured Creditors —

9

to retain the Debtors' professionals in these chapter 11 cases. Hoff Ex. 19 (March 21, 2018 email correspondence between R. Bartley (Young Conway) and Jonathan Edwards (Alston Bird)).

12.    Patriarch Partners Management Group, LLC ("PPMG") is yet another Patriarch affiliate that charges fees to the Portfolio Companies in exchange for providing so-called managerial services. Tilton Decl. ¶ 60. PPMG generally charges each of the Portfolio Companies between $20,000 and $100,000 per month for its services. Hoff Ex. 18 (Delaware 225 Opinion) at 40, n.171. Sitting on both sides of the transactions, Tilton caused both PPMG and the Portfolio Companies to substantially increase PPMG's monthly fees shortly before the Patriarch Managers' resignations. Id.

**The Transaction Documents Organize The Zohar Funds**

13.    From the beginning, the Debtors were organized to facilitate a structure governed by a series of contracts. For each of the Zohar Funds, these contracts include a trust Indenture, a Collateral Management Agreement, the notes and Preference Shares issued to investors, a Preference Share Paying Agency Agreement, and — in the case of Zohar I and Zohar II — an Insurance Agreement and a Policy issued by MBIA (collectively, the "Transaction Documents").[7] The Transaction Documents incorporate and reference one another to form a comprehensive organizational plan for the Zohar Funds. All rights and responsibilities of every party to the Zohar Funds were set out in the Transaction Documents, including their rights and remedies in the event of any default or a liquidation. Kirschner Decl. ¶ 30-37.

---

[7]    The Transaction Documents for each of the Zohar Funds are substantially the same. For convenience, where statements applicable to all of the Zohar Funds are made, citations are to the Zohar II Transaction Documents. Equivalent Transaction Documents for Zohar I are submitted herewith as Hoff Exs. 1 – 6, for Zohar II as Hoff Exs. 8 – 13 and for Zohar III as Hoff Exs. 14 – 17.

14.    Pursuant to their respective Indentures, each of the Zohar Funds issued notes for sale to investors. Kirschner Decl. ¶ 31. In the granting clauses of the Indentures, the Zohar Funds also pledged to the Trustee, U.S. Bank, all of their assets as Collateral for the notes. Hoff Ex. 8 (Zohar II Indenture) at 1 (Granting Clauses). The Indentures defined the pledged Collateral in the broadest possible terms to include all "property of any type or nature owned by" the Zohar Funds. Id. The Indentures give the Secured Parties, namely the senior noteholders and MBIA (for Zohar I and Zohar II), a continuing security interest in and lien on the Collateral, intended to ensure that it is not used for any purpose other than for their benefit. Id. The Indentures set forth the order and priority in which the cash proceeds of the Funds would be distributed, including repayment of the noteholders or to reimburse MBIA for claims paid under the Policies (the "Waterfalls" or "Priority of Payments"). Id. at 189-95 (§ 11.1). The Indentures contemplated that prior to the stated maturity, the Collateral would mature or be monetized to generate sufficient proceeds to repay the notes. Id. at 208-210 (§ 12.2). Upon any payment default by the Zohar Funds, the Indentures give the Controlling Party or Controlling Class the right to direct that the Collateral be sold to generate proceeds to repay the notes or reimburse MBIA as the Credit Enhancer, as the case may be. Id. at 110 (§ 5.4). Thus, the senior noteholders' and MBIA's security interests in the Collateral—and the right to cause the sale of the Collateral upon a payment default—is not only critical to the noteholders and MBIA, but is inherent in the basic structure of the Zohar Funds.

15.    If Zohar I or Zohar II defaulted on a payment obligation, MBIA, as financial guarantor, would make the payments for the benefit of certain classes of the senior secured noteholders. Upon such a Policy payment, MBIA became subrogated to all the rights of the noteholders, and independently would be entitled to reimbursement of its Policy payment ahead

of any further principal payments to noteholders in the Waterfalls. Hoff Ex. 8 (Zohar II Indenture) at 191, 193 (§ 11.1(a)(i)(G) and (a)(ii)(B)). In exchange for its insurance obligations, MBIA was designated as the Credit Enhancer and Controlling Party under the Zohar I and Zohar II Indentures. MBIA did not insure Zohar III, and Zohar III's Controlling Class are the holders of a majority of the senior class of notes in that CLO.

16.    As a result of the comprehensive Transaction Documents, the Debtors were nominal entities only. Kirschner Decl. ¶ 26; Tilton Decl. ¶ 52. The Debtors have no management, no employees and no operations of their own. Their directors have no governance functions. Instead, all operations of the Zohar Funds were delegated to the collateral manager or the Trustee. Hoff Ex. 8 (Zohar II Indenture) at 214 (§ 14.1); Hoff Ex. 9 (Zohar II Patriarch XIV CMA) at 8 (§ 2.5); Hoff Ex. 12 (Zohar II AMZM CMA) at 7 (§ 2.5).

17.    The Trustee's responsibilities are limited to ministerial tasks such as receiving and disbursing funds, circulating reports prepared by the collateral manager and following instructions when the Controlling Parties exercise certain rights under the Indentures.

18.    Under a collateral management agreement, each of the Zohar Funds delegated to a collateral manager (from the inception of the funds until March 2016, the three Patriarch Managers, and AMZM since that time) all other functions of their operations, including the selection and management of all assets—including litigation claims. Kirschner Decl. ¶ 35. Upon the Patriarch Managers' voluntary resignations in 2016, the Indentures gave the Controlling Party or Controlling Class of each Fund the right to appoint a successor collateral manager, which in each case was AMZM. The collateral management agreements and the Zohar Funds' rights thereunder are expressly included in the Collateral subject to the Trustee's lien and are property for the benefit of the secured parties. Hoff Ex. 8 (Zohar II Indenture) at 214 (§

14.1).

19.     Tilton caused the Zohar Funds to raise approximately $2.5 billion through the issuance of notes to investors.  Using the note proceeds, Tilton caused the Zohar Funds to make loans to the Portfolio Companies.  In many instances, in connection with the loans, the Zohar Funds also acquired substantial equity positions in the Portfolio Companies.  All of these loans to and equity interests in the Portfolio Companies were pledged as Collateral pursuant to the Indentures, for the benefit of the noteholders and MBIA (in the case of Zohar I and Zohar II). Hoff Ex. 8 (Zohar II Indenture) at 1 (Granting Clauses); Hoff Ex. 18 (Del. 225 Action Opinion) at 71 (" 'Collateral' necessarily — by definition — includes any and all equity securities in which the Zohar Funds have or acquire an ownership interest").

20.     In addition to notes, the Zohar Funds issued certain Preference Shares, which in each case were acquired by Tilton through certain affiliate entities.  The Preference Shares are not common equity, but are effectively voting preferred stock having solely contractual rights under Preference Share Paying Agency Agreements.  Hoff Ex. 13 (Zohar II Preference Share Paying Agency Agreement).  Under these agreements and the Indenture, the holder of the Preference Shares is not "owner" of funds entitled to control its management and operations.  The Preference Shares entitle Tilton's affiliates only to limited dividends that have already been paid to the contractual maximum (Tilton Decl. ¶ 48) and thereafter only to payment following liquidation of the Zohar Funds' Collateral and available for distribution pursuant to the Waterfalls after payment in full to noteholders and MBIA; they are not entitled to any of the Zohar Funds' non-cash assets.  Hoff Ex. 13 (Zohar II Preference Share Paying Agency Agreement) at 11-14 (§ 2.6).  The Preference Shares do not hold any ownership or reversionary interest in any of the Zohar Funds' non-cash assets, and are in all circumstances subordinate in

payment to the Secured Creditors. _Id._

**Tilton Caused The Zohar Defaults Through Misconduct, Self-Dealing And Conflicts Of Interest**

21.    After creating the Zohar Funds, Tilton abused her positions as a fiduciary under the Transaction Documents, which caused Zohar I and Zohar II to default and put Zohar III on an inevitable course toward default when its notes mature 12 months from now. _See_ Hoff Ex. 21 (RICO Compl.) ¶ 4. Tilton was both the collateral manager for the Funds and held the most junior interest in the Funds. But Tilton created improper conflicts of interest in connection with her other roles in the operation of the Zohar Funds by abusing those conflicting roles to pillage assets belonging to the Debtors.

22.    Common to Tilton's conduct on behalf of the Funds is Tilton's attempted misappropriation of all the Funds' equity ownership in the Portfolio Companies, an entire asset category belonging to the Debtors and constituting Collateral for the benefit of the Zohar Funds' secured creditors. Tilton has represented that these equity interests are the most valuable assets of the Zohar Funds. It is undisputed that the Zohar Funds are the record holders of equity in the Portfolio Companies, in the form of shares in Portfolio Companies organized as corporations and membership interests in the Portfolio Companies organized as LLCs. Tilton Decl. ¶¶ 40, 95. Tilton has insisted, however, contrary to all objective evidence, that the Zohar Funds do not own the equity and instead own so-called "upside equity interests" stripped of any voting rights or right to current economic benefits, and instead only offer the Zohar Funds an unspecified economic interest if Tilton, in her sole discretion, chooses to sell the Portfolio Company in question. Tilton Decl. ¶ 97. Tilton has maintained her claim to "ownership" of the Portfolio Companies' equity despite the absence of any documents memorializing her purported ownership. Tilton has conceded that there are no contemporaneous documents reflecting any

"equity upside interest" arrangements or their terms. Hoff Ex. 18 (Del. 225 Action Opinion) at 68 ("No additional testimony or other extrinsic evidence would change the fact that Tilton conceded on the witness stand numerous times that no contemporaneous documents support her contention that either she or the Octaluna entities ever received record or beneficial ownership of the disputed shares."). Rather, the documentary evidence—stock certificates, LLC agreements and amendments, share transfer agreements, settlement and debt restructuring agreements, and asset purchase agreements—uniformly identify the Zohar Funds, not Tilton or her affiliates, as the acquirers and owners of the Portfolio Company equity. After a full trial, the Delaware Court of Chancery rejected Tilton's claims. A significant goal of these bankruptcy cases is to prevent that Court's decision from becoming a final judgment that would collaterally estop Tilton from asserting such ownership claims in the future.

23.    The Zohar Funds, operating through their collateral manager, are entitled to the full powers of controlling shareholders, including to select the management of the Portfolio Companies through their voting right, and the right to sell control or otherwise monetize their controlling stake in a Portfolio Company. Hoff Ex. 18 (Del. 225 Action Opinion) at 95 ("The Zohar Funds had the authority to vote the disputed shares, and they properly did so through AMZM."). Tilton, however insists that the Portfolio Company equity is hers alone, and that she is entitled to choose the Portfolio Companies' board and management, pocket any current dividends that she directs them to issue and sell the Portfolio Companies only when it suits her whim. Tilton Decl. ¶¶ 4, 95. Tilton, in fact, claims the Debtors' equity interests are not Collateral and cannot be monetized by the sale of the interests. Tilton Decl. ¶ 117, a claim rejected by the Delaware Court of Chancery. Hoff Ex. 18 (Del. 225 Action Opinion) at 56 ("There can be no doubt that the Portfolio Companies' share are 'Collateral.'").

15

24.    Prior to the Zohar Funds' note payment defaults and Tilton's forced disclosure of the Funds' books and records to an independent fiduciary, AMZM, Tilton acted as collateral manager through the Patriarch Managers. Tilton Decl. ¶ 16. As collateral manager, Tilton voted the equity of the Portfolio Companies on behalf of the Zohar Funds. Tilton used that voting power to install herself as the sole managing member (in the case of LLCs) or sole director (in the case of corporations) of the Portfolio Companies. Tilton Decl. ¶¶ 64, 69, 84. Tilton also named herself as CEO of numerous Portfolio Companies (Id.), so that she was personally running both the Portfolio Companies, their principal lenders (the Zohar Funds) and the agent for the Funds (PPAS) as lenders under the credit agreements. Tilton Decl. ¶¶ 59-60.

25.    Wearing the dual hats of both collateral manager for the Zohar Funds and sole managing member or director of the Portfolio Companies, Tilton sat on both sides of transactions between the Zohar Funds as lenders and Portfolio Companies as borrowers, as a fiduciary for each, unilaterally deciding the terms of the loans serving as Collateral for the benefit of the Secured Creditors. Hoff Ex. 21 (RICO Compl.) ¶¶ 75-77. Tilton waived payment defaults by the Portfolio Companies, amended loans to remove financial covenants that protected the Zohar Funds' investment and rolled unpaid interest into new principal. Id.

26.    Tilton also extended the maturity of the Portfolio Company loans beyond the maturity dates for the Zohar Funds' own notes. The maturity extensions – in most cases executed shortly before Zohar I defaulted in November 2015 – made certain that the Zohar Funds would default on their notes because the loans would not be repaid until after the notes came due. Hoff Ex. 21 (RICO Compl.) ¶ 69. Such extension was in plain violation of the Zohar Funds' Indentures, which only permitted the funds to acquire loans that matured before the Zohar Funds' notes. At the same time as the maturity extensions in late 2015, Tilton – again,

16

acting on all sides of the transactions and expecting to imminently lose her collateral manager role – caused the Zohar Funds to enter into subordination agreements, so that any debt that the Portfolio Companies owed the Zohar Funds would be junior to obligations that the Portfolio Companies owed to Tilton's affiliate entities. Id. ¶ 73. This was done without consultation with the Trustee or the Secured Creditors. This subordination had no benefit to the Portfolio Companies or to the Zohar Funds, but transferred significant value from the Zohar Funds to Tilton.

27.    In her role as collateral manager, Tilton had a contractual and fiduciary obligation to sufficiently liquidate the Collateral so that the Zohar Funds could pay their notes when they matured, without (for Zohar I and Zohar II) resorting to a claim on MBIA's Policies. However, Tilton left next to no cash on hand when the Zohar I and Zohar II notes matured, despite twelve years in which to monetize the Zohar Funds' assets. Instead, Tilton spuriously claimed throughout her tenure that any sale of the Portfolio Companies' equity would result in "fire sale" conditions or otherwise raise an inadequate price. Tilton Decl. ¶ 104. This decision was evidently clouded by Tilton's self-interest, such that the senior creditors were denied any payment at all, except those insured noteholders who were paid by MBIA under its Policies, while Tilton would prolong her control of the Portfolio Companies.

28.    Through her control over both the Zohar Funds and their Portfolio Companies, Tilton further compounded her conflicts by injecting her affiliate, PPAS, as administrative agent under each of the credit agreements, standing between the Zohar Funds and the Portfolio Companies. As described above, Tilton purported to act on behalf of all participants to the credit agreements – the Zohar Funds, PPAS and the Portfolio Companies – and make PPAS an "irrevocable" agent with exclusive power to declare a default, exercise

17

remedies or permit transfer of the loans.  Tilton has used PPAS to impede the management of the Zohar Funds since she resigned as collateral manager in March 2016.  Hoff Ex. 22 (PPAS Answer & Countercls.) ¶¶ 38 – 42.

29.    Tilton further claims to have exclusive rights through PPAS to access financial and other information pertaining to the Portfolio Companies that she refuses to share with PPAS's own principals—the Zohar Funds—or their collateral manager, AMZM.  In November 2015, Tilton, again as a fiduciary acting on behalf of the Zohar Funds, granted PPAS — meaning herself — the exclusive right to prohibit the Zohar Funds from (1) exercising remedies for defaults by the Portfolio Company borrowers under the credit agreements and (2) even selling or transferring the loan Collateral to third parties without her consent.  Hoff Ex. 21 (RICO Compl.) ¶ 75.

30.    In the Fall of 2015, again on the eve of the Zohar I default and with the termination of the Patriarch Managers in the near future, Tilton also purported to transfer to her own entities the right to vote or transfer control of the equity of the Portfolio Companies owned by the Zohar Funds.  Hoff Ex. 18 (Del. 225 Action Opinion) at 39-42.  These transfers took the form of purportedly irrevocable proxies, amendments to LLC agreements and amendments to stockholder agreements.  Neither the Zohar Funds nor the noteholders received any consideration in return for their purported forfeiture of critical ownership rights in the Portfolio Companies.[8]

31.    Over the life of the Zohar Funds, the Patriarch Managers were paid exorbitant collateral management fees — over *$600 million* in total — which otherwise would have been cash available for the Zohar Funds to pay their note obligations.  Hoff Ex. 21 (RICO Compl.) ¶ 65.  Under the Indentures, the Patriarch Managers' continued tenure as collateral

---

[8] The Secured Creditors believe that these actions by Tilton constitute actual or constructive fraudulent transfers of rights belonging to the Zohar Funds.

managers and the size of their fees were contingent on whether the loan Collateral held sufficient value to cover the Zohar Funds' notes. This coverage was measured by a covenant in the Indentures called the "Overcollateralization Test" ("OC Test"), which measured the financial health of the CLO by comparing the value of the Zohar Funds' loan assets to the amount of their debt owed to noteholders. If the Zohar Funds failed the OC Test, the fees paid to the Patriarch Managers would be substantially reduced and the Controlling Party would have the ability to take control of the Collateral under the Indenture. To avoid giving up fees and to avoid giving MBIA and the noteholders that power, Tilton deliberately manipulated the OC Test. Starting by at least 2009, Tilton was falsely reporting to MBIA and the noteholders that the OC Test was passing when in fact it should have been failing. Hoff Ex. 21 (RICO Compl.) ¶¶ 58-65. Tilton and the Patriarch Managers manipulated the OC Test by treating certain loans as if they were performing, although they should have been steeply discounted for the OC Test because the borrower Portfolio Company had defaulted or gone into bankruptcy, or because the loans were in restructuring. Tilton was thus able to prolong her control over the Funds and to extract millions of dollars in unearned management fees while impairing the secured creditors' protection.[9]

32.    Since the Patriarch Managers resigned in March 2016, Tilton has continued to use her remaining positions in connection with the Zohar Funds to engage in further self-dealing and to obstruct the Zohar Funds' new collateral manager from maximizing the value

---

[9]    Tilton no doubt will claim that she was exonerated with respect to the OC Ratio by SEC enforcement proceedings, which concluded in September 2017. Tilton Decl. ¶ 101. In reality, the SEC proceeding only found that the SEC had not proven its case under the Investment Advisers Act, not that Tilton had fully complied with all contractual and fiduciary obligations owed to the Zohar Funds. In any event, the Zohar Funds and the Secured Creditors were not parties to the SEC enforcement proceedings and no collateral estoppel or other binding effect attaches from its outcome. See Hoff Ex. 18 (Del. 225 Action Opinion, Doc. No. 796) at 86-95 (rejecting issue preclusion "Tilton seeks to bind the Zohar Funds to the [SEC's] Initial Decision when neither fund had a 'full and fair opportunity' to litigate the issue").

of the Collateral.    First, the Patriarch Managers refused to comply with their continuing contractual obligations under their collateral management agreements to turn over to their successor all books and records of the Zohar Funds.  Hoff Ex. 20 (Books & Records Opinion) at 14-20.  After providing AMZM with a limited production of loan agreements and amendments already in the Zohar Funds' possession, Tilton declared the production complete, and refused to provide the most critical information that AMZM had requested and needed, such as a complete list of Collateral, documentation related to the Zohar Funds' loans and equity interests, and up-to-date financial reports for each of the Portfolio Companies.

33.    Shortly before the Patriarch Managers resigned, Tilton caused the maximum amount of loans to be drawn down from the Zohar Funds to PPAS, in effect maxing out the Portfolio Companies' credit cards.  But, in fact, the Portfolio Companies did not receive or even request these funds.  Instead, Tilton proceeded to retain these funds at PPAS, and used them to extend loans to the Portfolio Companies as she deemed necessary.  Any repayments on these loans were again retained at PPAS and never repaid to the Zohar Funds.  In essence, Tilton set up PPAS as a "shadow" collateral manager, making loans without the consent or even the knowledge of AMZM, and without ever paying interest or principal back to the Zohar Funds. Hoff Ex. 22 (PPAS Answer & Countercls.) ¶¶ 51-55.

34.    Even Tilton's role as an investor in the Zohar Funds has been turned against the Funds' interests.  Pursuant to the Preference Share Sales Agreement, Tilton's affiliates that hold the Preference Shares are the taxpayer for the Funds.  Tilton Decl. ¶ 49.  The Funds themselves were deliberately structured by the Transaction Documents to have no U.S. tax liability.  Tilton filed tax returns connected with the Zohar Funds from 2003 through 2016, taking tens or hundreds of millions of dollars of tax losses resulting from the activity of the

Zohar Funds as write offs on her personal tax returns. In 2016, however, and in violation of her contractual obligations, as sole director of the Zohar Funds Tilton sent notice to the IRS that the Zohar Funds would be taxable entities going forward. Tilton Decl. ¶ 52. Thus, Tilton enjoyed the benefit of the Zohar Funds' tax losses for 14 years, only to improperly attempt to impose potential tax liability on the Zohar Funds for any gains in the liquidation or monetization of the Collateral.

**The Zohar Defaults And Litigation**

35.    Tilton controlled the Zohar Funds without significant input from the other stakeholders until 2013, when she concluded that Zohar I, and probably Zohar II, would likely default when their notes matured. Tilton began discussions with MBIA and the Zohar I noteholders, requesting that they agree to extend the maturity of Zohar I's notes, from November 2015 to January 2017, when Zohar II's notes were to mature. Tilton Decl. ¶¶ 103-04. Tilton claimed that she could monetize the Portfolio Companies with the added 14 months and avoid defaults and resulting MBIA Policy payments. However, no agreement was ever reached on such an extension. Among other reasons, Tilton consistently refused to provide MBIA and the noteholders with adequate financial information concerning the Portfolio Companies that she claimed she would monetize. Tilton also refused to agree to any schedule for monetizing assets toward incremental repayment before the note maturity date.

36.    Indeed, Tilton took no action to monetize the assets of Zohar I before its November 2015 maturity, claiming even as early as 2012 that to sell the Collateral would only yield "fire sale" prices. Tilton Decl. ¶ 103-04. Consequently, there was no significant cash in Zohar I when its notes matured. When the notes matured in November 2015, MBIA paid $149 million under the Zohar I Policy, making whole the senior insured noteholders.

*The Zohar I Involuntary Bankruptcy*

37.    Following Zohar I's default, MBIA became entitled under the Indenture to direct a liquidation of Zohar I's Collateral.  In a transparent effort to thwart MBIA's contractual rights, Tilton, acting as a noteholder, purported to commence an involuntary bankruptcy proceeding against Zohar I in the United States Bankruptcy Court for the Southern District of New York (the "Involuntary Bankruptcy").  Zohar I, through its prior independent directors, moved to dismiss the proceeding because the Indenture expressly prohibited any noteholder from filing an involuntary bankruptcy petition and because the petition was filed in bad faith.

38.    Tilton's bad faith was evidenced by Tilton's restructuring plan.  Tilton's attempted cram-down plan lacked any details for the sale of assets and merely rested on Tilton's unsubstantiated assertion that if Tilton were allowed to control the liquidation, creditors would somehow be repaid by 2019 – not January 2017, as Tilton had asserted before the default.  Hoff Ex. 24 (Involuntary Bankruptcy Transcript) at 39:22–40:1.[10]  Tilton did not identify any assets that she would commit to sell, set no schedule or timeframe for monetization of the Collateral, and provided no material terms of any contemplated transactions.  As it had been before default, MBIA's priority remained identifying a schedule or timetable for monetization so that MBIA and the other secured creditors of the Zohar Funds might have some assurance of when they would be repaid.  But Tilton insisted that her affiliates enjoy complete and exclusive discretion and control, and refused to give MBIA such a monetization timetable or provide any essential information needed to assess the value of the Collateral.

39.    The lack of any plan or assurance for creditors was further illustrated at an

---

[10] In her first day declaration, Tilton misstates the terms of her Zohar I plan for reorganization by stating that it provided for the repayment within two years, rather than in excess of three years.  Tilton Decl. ¶ 110.

evidentiary hearing before the Honorable Robert D. Drain of the Bankruptcy Court on February 1, 2016. MBIA's financial advisor testified that he lacked the access to management and the relevant information needed to evaluate Zohar I's Collateral. Based on this testimony, Judge Drain stopped the hearing. After meeting with the parties in chambers, Judge Drain announced on the record that the parties would meet and negotiate to replace the Patriarch Managers with mutually agreeable successor collateral managers for all three of the Zohar Funds, not just Zohar I. Hoff Ex. 24 (Involuntary Bankruptcy Transcript) at 128:1–129:7. Judge Drain stated that Tilton would be required to provide the successor collateral manager and MBIA with adequate financial information about the Zohar Collateral and the Portfolio Companies. Id. The parties met once, but on February 5, 2016, Tilton unilaterally provided notice that the Patriarch Managers would resign effective March 2, 2016, and subsequently withdrew the involuntary petition against Zohar I. In re Zohar CDO 2003-1, Ltd., Case No. 15-23680, Dkt. No. 44 (Bankr. S.D.N.Y. Feb. 6, 2015).

### The Zohar I Auction Litigation

40.     After Tilton withdrew the involuntary petition, MBIA exercised its right under the Indenture and directed the liquidation of the Zohar I Collateral. A public auction of the Collateral was initially scheduled by the Trustee to take place on September 15, 2016. In response, Tilton, through her affiliated entities, obtained a temporary restraining order in the District Court of the Southern District of New York. After an evidentiary hearing, however, the court denied Tilton's preliminary injunction motion, vacated the temporary restraining order and ordered the auction be completed pursuant to procedures approved by the court. Tilton Decl. ¶ 115. In the auction, MBIA made the highest bid for the entire Collateral of Zohar I. Under the Indenture, Tilton held a "last look" right to match the winning bid, but declined to exercise that right and Zohar I's Collateral was sold to MBIA. MBIA is now the beneficial owner of the

Zohar I Collateral. Tilton however has used PPAS's purported veto power over any transfer of legal title to loan interests to prevent the transfer of the Zohar I loans to MBIA. Tilton also claims to personally own the Portfolio Company equity that Zohar I clearly owned and sold to MBIA through the auction, but which are subject to alleged transfer limitations imposed by Tilton. Tilton Decl. ¶ 117.

***The Books And Records Action***

41.    Following the Patriarch Managers' resignation as collateral managers for the Zohar Funds as of March 2, 2016, AMZM was appointed by MBIA and the Zohar III Controlling Class pursuant to the terms of the Indentures and Patriarch CMAs as the replacement collateral manager for all three Zohar Funds. As referenced earlier, AMZM requested that the outgoing Patriarch Managers provide AMZM with the Zohar Funds' books and records, as required by the Patriarch CMAs. Tilton refused to do so.

42.    As a result of the Patriarch Managers' deficient turnover of records, AMZM initiated a lawsuit in April 2016 in the Delaware Court of Chancery (the "Books and Records Action"). AMZM sought documents from the Patriarch Managers that would allow AMZM to determine what assets the Zohar Funds own and what rights they have in respect of those assets. After a trial on the merits, on October 26, 2016, the Delaware Court of Chancery ruled that the Patriarch Managers had materially breached the Patriarch CMAs by failing to turn over books and records to the Zohar Funds and ordered immediate production of those documents. *See* Hoff Ex. 20 (Books & Records Opinion) at 50-51. The Patriarch Managers appealed, and, on June 19, 2017, the Delaware Supreme Court affirmed the Zohar Funds' rights to their own documents. See Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC, 2016 WL 6248461 (Del. Ch. Oct. 26, 2016), aff'd, 165 A.3d 2088 (Del. 2017). The Patriarch Managers have since continued to drag their heels on the turnover of documents, which continues to be

supervised by a Special Master appointed by the Court of Chancery.

43.    In the Books and Records Action, Tilton and Patriarch first made the convoluted assertion that the Zohar Funds' equity interests instead belonged to Tilton and entities under her control.  Contradicting the face of the stock certificates and LLC agreements, Tilton claimed she had simply "gifted" to the Zohar Funds the "upside interest" in that equity—without explaining what that meant—and insisting that she retained actual ownership of the equity.    Vice Chancellor Slights described Tilton's explanation of her purported equity ownership as "at best, confusing and, at worst, codswallop."  Hoff Ex. 20 (Books and Records Opinion) at 39 n.128.

### The Zohar II Default

44.    Zohar II defaulted when its notes matured in January 2017.  The Zohar II payment default resulted from the same misconduct by Tilton and Patriarch that had caused the Zohar I default, as described above, including self-dealing, extension of loan maturities beyond the note maturity date, failure to timely sell Collateral and, in addition, obstruction of AMZM's efforts.  Upon the default, MBIA paid $770 million in claims on its Policy so that the Class A-1, A-2, and A-3 noteholders were paid in full.  Tilton Decl. ¶ 46.  MBIA as a result is the owner of those notes and is entitled under the Indenture to reimbursement for its Policy payment before any funds go through the Zohar II waterfall to Tilton's interests.  Id.

### The Delaware 225 Action

45.    In November 2016, Zohar II and Zohar III, through their authorized collateral manager AMZM, commenced an expedited special proceeding in Delaware Court of Chancery pursuant to Delaware Corporation Law § 225 (the "Delaware 225 Action"), seeking a determination that the Zohar Funds own the equity of three Portfolio Companies, and that the Zohar Funds, not Tilton or her affiliates, have the power to name those companies' boards of

directors. As described above, the Zohar Funds were the record shareholders of the Portfolio Companies, but Tilton claimed to own the shares and had further signed over to herself purportedly irrevocable proxies giving her permanent voting control. Vice Chancellor Slights held a six-day trial in which Tilton personally testified for nearly three days. Approximately 1,500 exhibits were submitted. In November 2017, Vice Chancellor Slights issued a well-reasoned 96-page opinion, finding that the Zohar Funds were the legal and beneficial owners of the disputed shares and that Tilton's self-dealing purportedly irrevocable proxies were invalid. Zohar II 2005-1 Ltd. v. FSAR Holdings, Inc., 2017 WL 5956877 (Del. Ch. Nov. 30, 2017).

46.    Tilton sought a stay of judgment, so that pending appeal she could remain the sole director of each of the three Portfolio Companies at issue. The stay was granted, and on December 29, 2017, Vice Chancellor Slights expressly "acknowledge[d] [the Court's] reliance upon Tilton's representation that she would seek an expedited appeal." Hoff Ex. 25 (Order in Del. 225 Action Staying Judgment) at 1 n.1. By that time however, Tilton was already planning to bring these bankruptcy cases and impede the appeal. Tilton Decl. ¶ 140 ("Several months prior to this filing, I began contemplating a plan and marketing process for monetizing the Portfolio Companies"). Expedition was granted, and the appeal was fully briefed by March 2018. Tilton caused the Zohar Funds to commence these bankruptcy cases nine days before oral argument of the appeal was to occur.

### The LLC Consent And MD-Vulcan Actions

47.    In November 2017, the Zohar Funds filed two further actions in the Delaware Court of Chancery, both of a similar nature to the Delaware 225 Action. One of these actions sought a determination of the rights of ownership and right to manage 11 Portfolio Companies that are organized as Delaware LLCs (the "LLC Action"), while the other action addressed the ownership and control of two more Portfolio Companies (the "MD-Vulcan

Action"). Both the LLC Action and the MD-Vulcan Action asserted that the facts concerning the ownership and control of these Portfolio Companies were substantially identical to the facts litigated in the Delaware 225 Action. Hoff Ex. 27 (LLC Action Complaint) ¶ 3; Hoff Ex. 28 (MD-Vulcan Action Compl.) ¶ 6.

48.     In a desperate attempt to avoid adjudication in the Court of Chancery, where outcome of the Delaware 225 Action would clearly be repeated, Tilton removed the LLC Action and the MD-Vulcan Action to federal court on frivolous grounds, which the Zohar Funds, through AMZM, opposed. Tilton agreed to stipulate that the two cases would be treated identically. Hoff Ex. 29 (MD-Vulcan Stipulation). A federal magistrate judge ruled and recommended to the district court judge that the LLC Action be remanded and fee shifting be imposed against Tilton for making the meritless removal. Hoff Ex. 26 (Magistrate's Report & Recommendation in LLC Action) at 27. That recommendation was pending before the district judge when the instant bankruptcy proceeding was commenced, but both the LLC Action and the MD-Vulcan Action are now stayed as a result of these bankruptcy cases.

**The PPAS Action**

49.     As described above, PPAS purports to remain the administrative agent to the Zohar Funds and to hold exclusive powers in managing the credit agreements that govern the loan Collateral. On June 14, 2016, AMZM, on behalf of the Zohar Funds, terminated PPAS as the Zohar Funds' Administrative Agent for cause, after PPAS refused for months to fulfill its obligations under the credit agreements by refusing the Zohar Funds' instructions to demand information from the Portfolio Companies. Hoff Ex. 22 (PPAS Action Answer & Countercls.) ¶ 46-47. AMZM then appointed Alvarez & Marsal Zohar Agency Services ("AMZAS") as Administrative Agent. On June 15, 2016, PPAS filed suit in the Southern District of New York (the "PPAS Action") for declaratory judgment that PPAS was granted an "irrevocable" agency

under the credit agreements and cannot be terminated as Administrative Agent. The Zohar

Funds, AMZM and AMZAS counterclaimed for a contrary declaratory judgment that the agency

was not "irrevocable" and for damages related to PPAS's withholding of critical documents and

continued collection of fees. The action was in discovery when the instant bankruptcy

proceeding was commenced.

***The RICO Action***

      50.     In January 2017, the Zohar Funds initiated an action in the U.S. District

Court for the Southern District of New York, asserting state law claims for breach of fiduciary

duty, breach of contract, conversion, and unjust enrichment, as well as a federal RICO claim,

against Tilton, Patriarch and other affiliated entities. Hoff Ex. 21 (Compl. in Zohar CDO 2003-

1, Ltd. v. Patriarch Partners, LLC, 17 Civ. 0307-WHP (S.D.N.Y.), the "RICO Action"). These

claims were based on Tilton's and Patriarch's rampant mismanagement and self-dealing while

they controlled the Zohar Funds, and alleged that Tilton and Patriarch schemed to strip the funds

of their equity Collateral and associated rights. In one alleged instance where Tilton caused the

sale of a Portfolio Company, HVEASI Holding BV, that Tilton had previously represented was

owned 100% by Zohar II, none of the $300 million sale proceeds were received by the Funds.

Id. ¶ 51. The defendants to that action moved to dismiss, arguing that the RICO claim was

subject to a statutory exception excluding claims relating to the sale of securities, and that

without the RICO claim the federal court lacked subject matter jurisdiction. Judge Pauley

granted that motion in October 2017 and declined to exercise supplemental jurisdiction over the

state-law claims. Before the motion to dismiss was granted, however, Tilton changed her

strategy and asked the court to retain jurisdiction, filing an answer with counterclaims against the

Zohar Funds and third-party claims against AMZM, MBIA, certain current and former Zohar III

noteholders, and U.S. Bank as Trustee. The Court on its own initiative raised questions about its

jurisdiction and the propriety of joining the third-party defendants. The Zohar Funds had requested that the Court reinstate their state law claims against Tilton for breach of fiduciary duty, breach of contract, conversion and unjust enrichment in the event that Judge Pauley elects to retain jurisdiction. Briefing on the jurisdictional issues was scheduled but not completed at the time the instant bankruptcy proceeding was commenced.

### *The Impending Zohar III Principal Default*

51.    Zohar III's scheduled maturity date is April 2019. With an initial investment by noteholders of $1 billion, Zohar III owes an outstanding balance of almost $800 million. As with Zohar I and Zohar II, the Patriarch Managers' extensions of loan maturities in violation of the Patriarch CMA and the Indenture makes it impossible for Zohar III to collect sufficient repayment on those loans to repay its noteholders upon maturity. Zohar III is expected to default on its note payment obligation in 12 months. Indeed, the poor performance of Zohar III renders it likely that an even earlier interest payment default may occur. The instant bankruptcy filing was itself an event of default under the Zohar III Indenture. Hoff Ex. 14 (Zohar III Indenture) at 101 (§ 5.1(g)).

### Tilton's Flagrant Mismanagement Of The Portfolio Companies

52.    Tilton's mismanagement of the Portfolio Companies has led to closures at an alarming rate. Since 2016, at least 14 Portfolio Companies have ceased or significantly diminished operations. For example, Tilton filed bankruptcy for one Portfolio Company, TransCare, a New York City ambulance operator, leaving between 1,200 and 1,700 employees out of work and unpaid. In the case of another Portfolio Company, Duro Textiles, a textile manufacturer, Tilton declined a buyout and decided instead to close, leaving 150 people without jobs and debts owed to the EPA and to employee retirement and health funds. Tilton shut down another Portfolio Company, NetVersant, a network infrastructure provider, with two large

contracts and $5 million in receivables outstanding after losing judgments that it had shortchanged employee pension funds. Tilton shut down yet another Portfolio Company, Remco Maintenance, a building restoration and maintenance company, after failing to make payroll and owing benefits payments to local unions. Tilton also closed the Cambodia operations of another Portfolio Company, Galey & Lord, previously one of the largest U.S. denim producers, after a worker strike over missing pay, and Tilton shuttered Galey & Lord's North Carolina and South Carolina plants, which employed nearly 400 workers.

53.    Tilton's management of these Portfolio Companies has resulted in numerous litigations. Tilton and Patriarch entities have been sued in connection with Duro, Remco and TransCare for violating the WARN Act, which requires failing employers to give employees advance notice before ceasing operations and causing mass layoffs. The bankruptcy trustee of TransCare has sued Tilton for breach of fiduciary duty as its sole director. Hoff Ex. 30 (TransCare Trustee's Compl.) ¶¶ 3-7. The trustee alleges that as TransCare was financially struggling, Tilton refused TransCare's executives pleas for her to recapitalize or sell the company to potential purchasers. Instead, the trustee alleges, Tilton forced TransCare to borrow excessively from Tilton's affiliates, and to repay principal and interest on those loans rather than pay vendors and payrolls (let alone pay the Zohar Funds on their loans). The trustee further alleges that on the day Tilton filed TransCare's bankruptcy, she also purported to have Patriarch entities foreclose on TransCare's most profitable units and transfer them to new companies controlled by her, free from any debt or equity interest of the Zohar Funds. Id. ¶¶ 72-96. The TransCare trustee alleges specific evidence that Tilton plotted this fraudulent transfer as early as February 2016, when the Patriarch Managers were still in control of the Zohar Funds and when Tilton plainly owed the Zohar Funds fiduciary duties. Id. ¶ 90-94.

**Recent Events Precipitating Tilton's Bankruptcy Filing**

54.    In preparation for her surprise filing of these chapter 11 petitions, Tilton funneled through Zohar III, Corp. to her proposed bankruptcy professionals millions of dollars of Portfolio Company loan interest payments that Tilton should have paid directly to the Trustee for the benefit of the Zohar III noteholders.  As set forth above, cash interest payments on account of the loans made to Portfolio Companies are the Secured Creditors' Collateral.  On March 8, 2018, however, through PPAS, Tilton diverted Portfolio Company loan payments owed to Zohar III into one of three new bank accounts purportedly created in the names of the Zohar Funds.  Hoff Ex. 19 (March 21, 2018 email correspondence between R. Bartley (Young Conway) and Jonathan Edwards (Alston Bird)).  Tilton was without authority to create these accounts or to divert the cash collateral to anyone other than the Trustee.

55.    Without approval or discussion with any other Zohar stakeholder regarding retention of bankruptcy professionals or even filing a bankruptcy, Tilton used the Portfolio Companies' loan payments to retain counsel purportedly on behalf of the Debtors.  On March 8 and 9, 2018, Tilton paid Young Conway over $1 million from the accounts she created in the name of Zohar III, Corp. using cash collateral that PPAS received from the Portfolio Companies and failed to turn over to the Trustee.  Hoff Ex. 19 (March 21, 2018 email correspondence between R. Bartley (Young Conway) and Jonathan Edwards (Alston Bird)).  Similarly, Tilton also diverted cash collateral in an amount of $625,000 to pay Goldin & Associates, apparently to retain Kirschner to purport to act as Chief Restructuring Officer in the name of the Zohar Funds.  Id.  On March 11, 2018, at Tilton's direction, counsel filed the instant bankruptcy petitions, purportedly on behalf of the Debtors.  After the petitions were filed, Tilton diverted an additional amount in excess of $1.5 million in Portfolio Company interest payments that is Zohar III's cash collateral subject to the Trustee's lien for the benefit of the Zohar III

31

secured creditors.

56.     Tilton's funding and commencement of these chapter 11 cases alone demonstrates the blatant disregard that Tilton has for the integrity of the CLO structure, the Debtors' estates and the secured creditors' rights to cash collateral subject to the Trustee's lien, let alone the Bankruptcy Code.

57.     Shortly after filing the petitions, Tilton made multiple other significant filings in these bankruptcy cases and other pending litigations.  In addition to her and Kirschner's Declarations, Tilton filed two "first-day" motions in these bankruptcy cases seeking to reject the AMZM CMAs and to establish a reporting protocol modifying her duties for disclosures under the Bankruptcy Rules (the "Reporting Motion").   These motions only underscore that these bankruptcy cases are a sham and obvious litigation tactic.  Unlike a typical chapter 11 debtor, Debtors did not file motions seeking to pay vendors or other motions needed to address the financial exigencies of the Debtors.    The Reporting Motion, in particular, is a transparent attempt by Tilton to erect new barriers for creditors of the Zohar Funds—for all practical purposes, MBIA for Zohar I and Zohar II and the Zohar III noteholders— to obtain basic financial information about their Collateral, and to shield Tilton's misconduct from judicial review.

58.     On March 12, 2018, Tilton filed notices of commencement of the bankruptcy cases and automatic stay in the PPAS Action, the RICO Action, the MD-Vulcan Action, the Delaware LLC Action and the Delaware 225 Action.  Significantly, Tilton sought to stay all proceedings in all of these cases—not merely claims brought by Tilton against the Funds, but also causes of action brought by the Debtors as claimants to vindicate their own rights.

59.     Tilton commenced these bankruptcy cases just as her litigation strategy

was faltering.  Tilton's claim to own the Portfolio Company equity in three Portfolio Companies was rejected by the Delaware Court of Chancery and her appeal was fully briefed, little more than one week from oral argument before the Delaware Supreme Court.  Affirmance would collaterally estop Tilton from asserting most of her "ownership" theories.  Moreover, Tilton's attempts to remove the LLC Action and MD-Vulcan Action had failed, making almost certain that the Delaware Court of Chancery would soon vindicate the Zohar Funds' outright ownership of the equity in 13 additional Portfolio Companies on the same grounds applicable to the Delaware 225 Action.

60.    The bankruptcy filings, however, provided Tilton with the hope of avoiding the outcome of those cases and others brought to challenge her pre-petition misconduct.  Tilton also filed the chapter 11 petitions in search for a new forum and opportunity to relitigate the findings by Vice Chancellor Slights in the Delaware 225 Action trial.  Indeed, in their Declarations in these bankruptcy cases, Tilton and Kirschner admit outright that the bankruptcy petitions were filed to stop the litigation brought by the Debtors' collateral manager, in the name of the Debtors, against Tilton.  Tilton—as the sole director on the boards of the Debtors—has no intention of pursuing any claims on behalf of the Zohar Funds against herself, and presents her litigation position to the Court as truth, even though it is directly contrary to the findings of the Delaware Court of Chancery after a full trial, extensive post-trial briefing and a lengthy post-trial argument.  Tilton Decl. ¶¶ 97-100 (denying the Zohar Funds own the Portfolio Company equity and that she owes damages to the Funds).  Kirschner, as the new purported CRO, has predetermined that "the fighting must end" — and must end with the Debtors acquiescing to Tilton's positions.  Kirschner Decl. ¶ 14.  Indeed, throughout his affidavit, Kirschner makes clear that he would have the Debtors abandon assets and rights they have *already won* at trial against

Tilton. Id. ¶¶ 15, 26. Kirschner has no knowledge or information about the Zohar Funds or their claims and has made no inquiries in that regard.[11] But he blindly accepts Tilton's position that Debtors own only "certain limited interests" in Portfolio Company equity (Id.), although the Delaware Court of Chancery has already rejected Tilton's equity ownership arguments on the grounds that they are contrary to the plain meaning of the Transaction Documents, "not credible" and unsupported by the evidence submitted in a six-day trial. Hoff Ex. 18 (225 Action Opinion) at 84 n.317.

61.    Tilton's use of bankruptcy as a tactic to avoid litigation makes abundantly clear that the Court is faced with a two-party dispute between Tilton, on the one hand, and the Secured Creditors on the other. The Zohar Funds have no significant creditors other than MBIA (for Zohar I and Zohar II) and the senior noteholders in Zohar III, and those senior parties are unified in their support for AMZM in its efforts to marshal the assets of the Zohar Funds and to hold Tilton to account for malfeasance that runs into ten figures.

**RELIEF REQUESTED**

62.    The Secured Creditors hereby move to dismiss the Chapter 11 cases filed by each of the Debtors. In the event that their motion to dismiss is denied, the Secured Creditors respectfully seek an order appointing a Chapter 11 trustee with respect to each of the Debtors' estates pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code. As set forth below, ample justification exists in these cases for the appointment of a trustee.

**POINT I – THE CHAPTER 11 CASES SHOULD BE DISMISSED**

63.    Section 1112 of the Bankruptcy Code provides that, barring certain

---

[11]  Tilton purported to appoint Kirschner as CRO on March 11, 2018, the same day these bankruptcy cases were filed. Kirschner Decl. ¶ 1. On March 12, 2018, less than 24 hours after he was engaged, Kirschner swore his Declaration advocating that the Debtors abandon their litigation claims against Tilton.

exceptions:

> [o]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate.

See 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) of the Bankruptcy Code contains a nonexclusive list of factors that may constitute "cause" for dismissal of a Chapter 11 case, including where there is "[an] absence of a reasonable likelihood of rehabilitation," "gross mismanagement of the estate" and "inability to effectuate substantial consummation of a confirmed plan."[12] 11 U.S.C. § 1112(b)(4)(A), (B), (M).

64.    In addition, in the Third Circuit, "'[c]hapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith.'" In re Energy Fut. Holdings Corp., 561 B.R. 630, 639 (Bankr. D. Del. 2016) (quoting In re 15375 Mem'l Corp. v. Bepco, L.P. (In re 15375 Mem'l Corp.) ("Memorial") 589 F.3d 605, 618 (3d Cir. 2009); Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2001) ("The debtor bears the burden of establishing good faith.").

65.    The purpose of requiring the debtor to demonstrate good faith is to "legitimize the delay and costs imposed upon parties to a bankruptcy" and deter those with unclean hands from abusing the equitable tools available in a bankruptcy process for the ulterior purpose of "delay[ing] creditors without benefiting them in any way . . . ." In re SGL Carbon Corp., 200 F.3d 154, 161-62, 165-66 (3d Cir. 1999) (quoting Little Creek Dev. Co. v. Commw. Mortg. Co. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986)). "At its most

---

[12]  See H.R. Rep. No. 95-595 (1977), at 406, reprinted in 1978 U.S.S.C.A.N. 5963, 6362 ("The list [contained in § 1112(b)] is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate results in individual cases.").

fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purpose of bankruptcy." NMSBPCSLDHB, L.P. v. Integrated Telecom Exp., Inc. (In re Integrated Telecom Exp., Inc.), 384 F.3d 108, 119 (3d Cir. 2004).

66.    "Whether the good faith requirement has been satisfied is a fact intensive inquiry in which the court must examine the totality of facts and circumstances and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" Memorial, 589 F.3d at 618 n.8 (quoting In re Integrated Telecom, 384 F.3d at 118) (citation omitted).    As noted below, a debtor's subjective good faith is necessary for a good faith filing, however "[t]he term 'good faith' is somewhat misleading."    Though it suggests that the debtor's subjective intent is determinative, this is not the case.    Instead, the 'good faith' filing requirement encompasses several, distinct equitable limitations that courts have placed on chapter 11 filings.    Courts have implied such limitations to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws. Memorial, 589 F.3d at 618 n.8 (quoting In re SGL Carbon, 200 F.3d at 165).

67.    Although the Third Circuit has recognized that "'no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith,'" two factors which are "particularly relevant" in assessing the good faith basis of a petition are "(1) whether the petition serves a valid bankruptcy purpose, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." Memorial, 589 F.3d at 618 n.8 (quoting In re Integrated Telecom, 384 F.3d at 119-20).    The Supreme Court has identified two of the fundamental purposes of chapter 11 as (i) "preserving going concerns" and (ii) "maximizing property available to satisfy creditors." In re Integrated Telecom, 384 F.3d at 119 (quoting Bank of Am.

Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999)).

68.    In addition, in ruling on motions to dismiss for bad faith, courts in the Third Circuit have considered factors such as whether the "'[d]ebtor filed solely to create [the] automatic stay'" as well as the "'[s]ubjective intent of the debtor.'" In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 299 (Bankr. D. Del. 2011) (quoting the list of factors from Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners, L.P.), 272 B.R. 554, 557 (D. Del. 2002), infra, and noting that no single factor is determinative); In re Phila. Rittenhouse Dev'r, L.P., No. BR 10-31201 SR, 2011 WL 13043475, at *8 (Bankr. E.D. Pa. May 25, 2011) ("'A debtor's subjective good faith is necessary, but not sufficient to avoid dismissal for lack of good faith.'") (quoting In re DCNC N.C. I, LLC, 407 B.R. 651, 661 (Bankr. E.D. Pa. 2009), aff'd, Nos. 09-3775-3776, 2009 WL 3856498 (E.D. Pa. Nov. 13, 2009). The good faith inquiry is "'particularly sensitive' where the 'petition seeks to distribute value directly from a creditor to a company's shareholders.'" In re Rent-A-Wreck of Am., Inc., 580 B.R. 364, 383 (Bankr. D. Del. 2018) (quoting In re Integrated Telecom, 384 F.3d at 129).

69.    Further, seeking the "'protection of the automatic stay is not per se a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing. A perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one.'" In re Energy Fut. Holdings, 561 B.R. at 640 n.32 (quoting In re Integrated Telecom, 384 F.3d at 128); accord Memorial 589 F.3d at 620. In fact, filing a bankruptcy petition solely for the benefit of the automatic stay is a "classic" bad faith petition. See In re Integrated Telecom, 384 F.3d at 128 ("[I]f there is a 'classic' bad faith petition, it may be one in which the petitioner's only goal is to use the automatic stay provision to avoid posting an appeal bond in another court.").

70.    In <u>Memorial</u>, the Third Circuit held that the debtors did not file their petitions in good faith because their primary goals were to minimize litigation liabilities for the parent organization, and not to preserve their bankruptcy estates. See <u>Memorial</u>, 589 F.3d at 615-16, 624-25. The Third Circuit, overturning the bankruptcy court and affirming the district court, held that the bankruptcy court "failed to consider in its good faith analysis: *the Debtors' representative was primarily concerned with protecting the [corporate parent and affiliates], not the Debtors.*" <u>Id.</u> at 624 (emphasis in original). Additionally, the Third Circuit found that because the "Debtors' representative" who authorized the voluntary petition was also an officer of multiple affiliated entities, he had "mixed allegiances [that] prevented him from adequately protecting the Debtors' interests." <u>Id.</u> Finally, the Third Circuit noted that because "neither [debtor] had any real assets to preserve besides various insurance policies" the bankruptcy petitions evidence no real possibility to maximize value of the debtors' estates. <u>Id.</u> at 625. Consequently, the Third Circuit held that the bankruptcy petitions were not filed in good faith and affirmed the district court's ruling to dismiss the bankruptcy cases. <u>Id.</u> at 625.

71.    Here, Tilton commenced these bankruptcy cases in bad faith as yet another part of her scheme to gain a tactical advantage in her bilateral disputes with the Zohar Secured Creditors. Tilton, by her own admissions, filed these cases to invoke the automatic stay under the Bankruptcy Code and stop the multiple pending litigations being pursued by the Debtors against her. In so doing, Tilton seeks to use the automatic stay to prevent the Zohar Funds from recovering assets wrongfully taken from them by Tilton. For example, by staying the litigation brought in Delaware Court of Chancery by the Zohar Funds through AMZM — the Delaware 225 Action, the LLC Action and the MD-Vulcan Action — Tilton prevents courts from finally adjudicating that the Funds own valuable equity in the Portfolio Companies and control any

process for monetizing those assets.  Tilton also has attempted to stay post-judgment proceedings in the Delaware Books and Records Action that would likely result in disclosure of records that would further reveal her misconduct and self-dealing in managing the Funds, the Portfolio Companies, the loan agent for the Zohar Funds—all for her own personal benefit rather than for the Funds and their other creditors.  Tilton also stayed multiple cases pending in the Southern District of New York — the PPAS Action and the RICO Action — involving claims by the Zohar Funds seeking to oust her from positions of control over the Funds and to recover damages for fraud and her theft of Zohar equity distributions, interest payments and ill-gotten fees.  Put simply, these Chapter 11 cases are Tilton's "Hail Mary" attempt at escaping multiple adverse decisions, resetting the landscape and attempting to gain the upper hand in a new forum.  Thus, these cases do not further any legitimate bankruptcy purpose or reorganization.

72.    The Zohar Funds, by their very nature, lack the capacity to be reorganized. They are nothing like a typical debtor.  Rather, the Funds are static pool investment vehicles, intended to exist for only a limited time.  Their sole purpose was to raise funds through the sale of notes, to invest those funds in assets meeting prescribed criteria, and then to repay those notes in a timely fashion.  To that end, the Transaction Documents of these CLOs provide that their loan assets mature prior to the maturity date of the notes, and that the notes be repaid in full and on time.  MBIA and the senior noteholders, however, bore the credit risk that the Zohar Funds' assets might be insufficient to pay the notes on the maturity date.  In specific contemplation of that possibility, the parties expressly agreed that the assets would be managed by the collateral manager pursuant to the collateral management agreement and that losses would be distributed among the investors pursuant to the Indentures.  Central to the parties' agreement was that the disposition of assets would be quick, certain and under the control of the senior creditors.

Tilton's emphasis on delaying monetization in order to maximize any eventual recoveries — to benefit herself as residual investor at the risk and delay to senior creditors — is incompatible with the Zohar Funds' very reason for being.

73.    Tilton now claims that she acts on behalf of the Debtors to seek the Court's intervention to remove the "cloud of uncertainty" created by litigation pending in multiple jurisdictions and bring the parties' disputes here for an orderly distribution of their assets. Tilton Decl. ¶ 132. Tilton's gambit, however, for an orderly distribution of assets is not, on its own, a valid bankruptcy purpose. See Memorial, 589 F.3d at 622 (quoting In re Integrated Telecom, Inc., 384 F.3d at 126) ("'the creation of a central forum to adjudicate claims against the Debtors is not enough to satisfy the good faith inquiry-the Debtors must show that bankruptcy has some 'hope of maximizing the value of the Debtors' estates'") (citation omitted). This is especially true here, where Tilton is plainly seeking bankruptcy relief to stay pending and likely adverse decisions against her—including, for example, the Delaware 225 Action that was previously scheduled for argument before the Delaware Supreme Court on March 21, 2018 following the Zohar Funds' success against Tilton at the trial court.

74.    The Debtors have no employees or traditional business operations to reorganize. Their only significant creditors are the noteholders and MBIA, as insurer standing in the shoes of Zohar I and Zohar II noteholders to whom MBIA made payments pursuant to its financial guaranty insurance policies. The transaction documents demonstrate that the Zohar Funds, as is typical with bankruptcy-remote securitization vehicles, were not created and are not designed to operate for any purpose other than to manage holdings and make distributions. Indeed, Section 7.12 of the Indentures expressly provides that the Issuers for the Funds—the very entities on whose behalf Tilton as the sole director purports to have filed bankruptcy—

"shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and such other activities which are necessary, suitable or convenient to accomplish the foregoing or are incidental or connected therewith." Hoff Ex. 8 (Zohar II Indenture) at 141-142 (§ 7.12). The Zohar Funds are supposed to either liquidate their assets to pay off their debts or sell their remaining assets for the best price that could reasonably be obtained, even if the assets were not sufficient to pay the notes in full on the maturity dates. Id. at 87 (§ 2.6(i)) (the Zohar notes have recourse only to the Collateral) In either event, the Zohar Funds are, simply stated, supposed to disappear. Thus, there is no legitimate reorganization objective with respect to the Funds, per se. See Memorial, 589 F.3d at 264 n.13 (quoting In re Little Creek Dev., 779 F.2d at 1073) (filings that lack good faith "'generally involve companies that have no employees . . . little or no cash flow, and no available sources of income to sustain a plan of reorganization.'") (citation omitted); see also C-TC-9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship), 113 F.3d 1304, 131-1 (2d Cir. 1997) (upholding a bad faith dismissal on bases including that debtor had "little or no cash flow" "no employees" and the debtor having few unsecured creditors with small claims in relation to secured creditor.); In re Sydicom Corp., 268 B.R. 26, 54 (Bankr. S.D.N.Y. 2001) (finding cause for bad-faith dismissal because debtor was dissolved corporation that had "no business" and was "no more than a shell, used for its shareholders' private purposes" where the important factor of a business to reorganize was missing).

75.     These filings also do not further any legitimate bankruptcy purpose because the goal in filing these cases is not to increase the value of the estates. To the contrary—and ironically— these cases were filed as a last ditch effort to derail pending litigations brought by the Funds against Tilton to rightfully return valuable estate assets from Tilton to the Funds

and their creditors, such as the Delaware 225 Action appeal, the LLC Action, the MD-Vulcan Action, the RICO Action and counterclaims in the PPAS Action. Unlike most legitimate debtors seeking bankruptcy relief, here Tilton is not pursuing claims and causes of actions on behalf of the estate to enlarge the pool of estate assets. Instead, as she attempted in filing the Involuntary Bankruptcy for Zohar I, Tilton is once again manipulating the bankruptcy process and misusing her role as sole director of the Debtors to invoke the automatic stay and block the Debtors' own efforts to recoup, through litigation, funds or other assets taken from them by Tilton herself.[13] In re Dewey Com. Inv'rs, L.P., 503 B.R. 643, 656 (Bankr. E.D. Pa. 2013) (Case dismissed for bad faith where debtor attempted to use the automatic stay to "frustrate the Movant's efforts to realize the benefits of its bargain," noting that if the Debtor believed that the Movant was not entitled to the Debtor's performance under the agreement at issue they were free to advance that case in a court of general jurisdiction.); Memorial, 589 F.3d at 622 (mere fact that Bankruptcy Court provides a forum to adjudicate a dispute is not a benefit of being in bankruptcy since the same adjudication can occur in state court); In re Primestone Inv. Partners L.P., 272 B.R. at 558 (Bankruptcy Court did not abuse its discretion in finding that debtor "was adequately protected by its bargained for contractual rights under state law and that it would be inappropriate to arm [debtor] with the powers of Chapter 11 to disadvantage its sole secured creditor.").

76.     Tilton's timing in filing these cases makes her improper purpose particularly clear. Tilton filed the chapter 11 petitions just nine days prior to the Delaware Supreme Court's much anticipated oral argument in the Delaware 225 Action. Tilton obtained a stay of the Delaware Court of Chancery's judgment based on her express representation that she

---

[13]   Tilton may also be attempting to improperly use the bankruptcy stay to "run out the clock" on the various estate claims against her. In that regard, the Secured Creditors' reserve all rights and remedies including pursuant to Section 108 of the Bankruptcy Code.

would seek an expedited appeal. Hoff Ex. 25 (Order in Del. 225 Action Staying Judgment) at 1 n.1. Having agreed to hear and decide the case on an expedited basis, a Delaware Supreme Court decision affirming Vice Chancellor Slights' trial court opinion would finally adjudicate the Debtors' ownership of valuable equity in certain specific Portfolio Companies and estop Tilton from asserting several of her arguments supporting her claims of equity ownership as to all of the Portfolio Companies—arguments on which she heavily relies in her papers filed in this Court. Only now Tilton admits that in fact she was contemplating these bankruptcy cases prior to her representations to the Delaware courts, and which bankruptcy has impeded that very appeal. Tilton Decl. ¶ 140. (Tilton had been contemplating taking control of the monetization of Zohar Collateral "several months prior to this filing").

77.      The timing of Tilton's filing alone is sufficient evidence of her improper litigation tactics and grounds for dismissal. See In re Searchmetrics, Inc., 17-11032 (Hrg. Tr. June 29, 2017) (Bankr. D. Del.) (dismissing case that was filed in bad faith because the bankruptcy was primarily a two party dispute and the debtor filed primarily to have the bankruptcy court hear a state court action); Memorial, 589 F.3d at 625 (quoting In re SGL Carbon, 200 F.3d at 165) (because "'[f]iling a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws . . . . Where the timing of the [f]iling of a Chapter 11 petition is such that there can be no doubt that the *primary*, if not *sole*, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.'") (emphasis added). In re Phila. Rittenhouse, 2011 WL 13043475, at *9 (bankruptcy filing just before state court order to appoint a receiver was "clearest possible example of a litigation tactic," "highly probative of the Debtor's subjective intent," and "suggestive of bad faith."); In re FSJ Imports, LLC, No. 12-22402, 2012 WL 2994957, at *8

(Bankr. D.N.J. July 23, 2012) (dismissing cases filed to gain tactical litigation advantage as not in good faith); In re Pitcairn Props. Holdings, Inc., No. 10-12764-CSS, Sept. 3, 2010 Hr'g Tr. at 106:5-109:16 (Bankr. D. Del.), Dkt. No. 30 (lifting automatic stay, remanding case back to Chancery Court and dismissing case that was filed as litigation tactic on eve of argument in front of vice chancellor where key issue of corporate governance in two party dispute was to be decided.).

78.     The facts here support an outcome similar to that in Memorial.  The Court should not allow Tilton, purporting to act on behalf of the Debtors while wearing multiple hats (sole director of each Debtor, former collateral manager with continuing obligations to the Debtors, lender's agent for the Debtors, preference shareholder, Portfolio Company officer and director and rival lender to the same Portfolio Companies) to continue to engage in self-dealing and hopelessly conflicted transactions to perpetrate her fraudulent schemes and self-enrichment. Critically, it is impossible for Tilton to establish that these bankruptcy cases maximize the value of the Zohar Funds' assets.  To do so, Tilton would need to establish that there is "some value that otherwise would be lost outside of bankruptcy."  Memorial, 589 F.3d at 619 (quoting In re Integrated Telecom, 384 F.3d at 120); In re JER/Jameson, 461 B.R. at 303 (case dismissed in part because debtors could propose no sale process that could realize more value in bankruptcy than out of bankruptcy, and noting further that the bankruptcy process was actually eroding value by incurring substantial administrative expenses).  Given Tilton's litigation objectives in filing these cases—stopping the appeal of the Delaware 225 Action, the remand of the LLC Action and MD-Vulcan Action, and continued proceedings for damages and equitable relief in the PPAS Action and RICO Action—and the very nature of these CLOs, it cannot be said that the bankruptcy cases are maximizing estate property or "creat[ing] or preserv[ing] some value

that otherwise would be lost-not merely distributed to a different stakeholder-outside of bankruptcy." In re Integrated Telecom, 384 F.3d at 129.

79.     For example, Tilton argued at the first day hearing and in response to the AMZM's motion to lift the automatic stay that the issue of whether she or the Zohar Funds owns the equity in the Portfolio Companies that is in dispute in multiple pending litigations is of no consequence because she and her CRO will monetize the equity in the Portfolio Companies for the benefit of the Secured Creditors for Zohar II and Zohar III. See D.I. 26 at 3 (citing Mar. 13, 2018 Hr'g Tr. 11:2-3, 41:11-12). That argument, however, is disingenuous and without merit for several reasons.[14] First, Tilton's current claims of wanting to monetize assets is not credible given her refusal to do so while acting as collateral manager for many years, and managing the Zohar Funds as well as the Portfolio Companies themselves. *See supra* ¶ 35. Second, the present dispute between Tilton and the Zohar Funds regarding the ownership of the equity interests significantly impacts the monetization process because the true owner will control, among other aspects of any sale of Portfolio Company assets, the timing and prices of such a sale, whether any sale will actually occur and the distribution of proceeds from any such sale. Indeed, here, Tilton contends that, notwithstanding the Delaware Court of Chancery's opinion to the contrary, the equity interests owned by the Zohar Funds are not Collateral (i.e., the equity is

---

[14]   Tilton's assertion that resolution as to the ownership of equity is not needed to go forward with the sale process in bankruptcy fails for an additional reason with respect to Zohar I. All the assets of Zohar I were already sold to MBIA in an auction in December 2016. If Vice Chancellor Slights' rationale in the Delaware 225 Action is applied to Zohar I and those assets included record and beneficial ownership of the equity interests in the Zohar I Portfolio Companies, then MBIA receives any proceeds from the sale of those Portfolio Company assets. Tilton's Declaration illustrates the significance of the parties' dispute by asserting— notwithstanding Vice Chancellor's ruling to the contrary—that the former Zohar I "Portfolio Company equity upside interests are not collateral" and that "when the Portfolio Companies are sold, the cash from the sale of the equity interests will flow . . . first to the A-3 Noteholder [Tilton]." Tilton Decl. ¶ 117. Zohar I, however, purported to sell itemized equity and any other assets to MBIA.

not property of the estate) and cannot be sold without Tilton's consent. Tilton Decl. ¶ 117.

Third, there is no reason to believe that a third party that might otherwise be interested in

acquiring certain Portfolio Company assets with clean title would be willing to acquire such

assets at market prices without the full rights, title and interest in the equity that would be

established once the issue of beneficial ownership is adjudicated.

80.     Instructively, the Delaware bankruptcy court dismissed with prejudice

another factually comparable case for being "outside the legitimate scope of the bankruptcy

laws." In re JER/Jameson, 461 B.R. at 298. Relying on In re Primestone, 272 B.R. 554, 557

(D. Del. 2002), the bankruptcy court in JER/Jameson, found that nearly all of the "Primestone

factors" indicating when a bankruptcy filing is a bad faith filing were present. See id., 461 B.R.

at 298-304. The Primestone factors indicative of a bad faith bankruptcy filing are as follows:

> a. Single asset case; b. Few unsecured creditors; c. No ongoing
> business or employees; d. Petition filed on eve of foreclosure; e.
> Two party dispute which can be resolved in pending state court
> action; f. No cash or income; g. No pressure from non-moving
> creditors; h. Previous bankruptcy petition; i. Prepetition conduct
> was improper; j. No possibility of reorganization; k. Debtor formed
> immediately prepetition; l. Debtor filed solely to create automatic
> stay; and m. Subjective intent of the debtor.

In re Primestone, 272 B.R. at 554, 557. Thus, the Jameson court determined that debtors filed

the bankruptcy cases in bad faith and without a valid bankruptcy purpose in part because the

debtors were each special purpose vehicles with limited assets, employees, and unsecured

creditors and the bankruptcy was filed to prevent a foreclosure involving a dispute between two

non-debtor parties. Id.

81.     Similar to Jameson, almost all of the Primestone factors are present here.

The debtors are special purpose entities with no ongoing business or employees; there are few, if

any, unsecured creditors; and there is no pressure from non-moving creditors.

46

82.     Significantly, it is clear that these cases involve a bilateral dispute between Tilton and the Zohar Creditors—MBIA for Zohar I and Zohar II, and the noteholders of Zohar III—where the petition was filed by a non-independent director, Tilton, to invoke the automatic stay on the eve of final adjudication by the Delaware Supreme Court and to prevent the Zohar Funds' authorized collateral manager, AMZM, from pursuing damages and equitable relief from Tilton for diverting to herself of hundreds of millions of dollars belonging to the Zohar Funds and otherwise breaching her duties to the Zohar Funds.  These filings were made to advance Tilton's own pecuniary interests, which are at direct odds with the Debtors' interests.  If Tilton's scheme were to be permitted, there would be no one to pursue these claims against her on behalf of the Debtors.

83.     As an additional Primestone factor, there was also a previous bankruptcy petition—the Involuntary Bankruptcy brought by Tilton in the Southern District of New York—evidencing Tilton's willingness to manipulate the bankruptcy process where she believes it is helpful to advance her personal interests.  The Involuntary Bankruptcy vividly illustrates Tilton's bad faith.   Tilton filed the Involuntary Bankruptcies in breach of her express contractual obligations as noteholder.  Tilton offered a restructuring plan with no details, no timetable for monetization of Collateral and no protections for the secured creditors.  Tilton promptly retreated from the Involuntary Bankruptcy when that forum did not rubber-stamp her proposal, and instead raised the prospect that Tilton would need to cooperate with the secured creditors and provide the creditors and the court with transparency.  The present bankruptcy petitions make clear that Tilton's priorities remain the maintenance of secrecy against the secured creditors and her

unfettered control of the Portfolio Companies to the detriment of the Debtors and the secured creditors.[15]

84.     Tilton's Reporting Motion, which seeks to severely limit information that parties receive in these cases, provides further evidence of Tilton's bad faith. The information to be provided to the creditors does not include the basic information required under Bankruptcy Rule 2015.3 or Official Form 426.   Courts have recognized that financial reporting is the "life-blood of the Chapter 11 process." See In re Whetten, 473 B.R. 380, 383 (Bankr. D. Colo. 2012). Consequently, the failure to comply with these reporting requirements can, by itself, be sufficient cause to dismiss a case under section 1112.   See id. at 383-84 (dismissing case where periodic reports failed to disclose pertinent tax and accounts receivable information); In re Hoyle, No. 10-01484-TLM, 2013 WL 210254, at *10-11 (Bankr. D. Idaho Jan. 17, 2013) (dismissing case where periodic reports, including Bankruptcy Rule 2015.3 reports, were incomplete and failed to disclose payment of pre-and post-petition debts, as well as equity draws).  The Reporting Motion

---

[15]   Although the "single-asset case" Primestone factor is not present here, these cases are strikingly similar to single asset real estate cases that have been dismissed because they were filed to improperly use the bankruptcy process to engage in risk free speculation, particularly given Tilton's true motivations for filing for bankruptcy—stopping the litigations against her and holding hostage the Zohar Funds' Collateral.  See In re 234-6 W. 22nd St. 13 Corp., 214 B.R. 751, 759, 760 (Bankr. S.D.N.Y. 1997) (holding that automatic stay should be lifted with respect to foreclosure proceedings where the debtor's bankruptcy case was filed in bad faith to hold collateral hostage); see also Carolin Corp. v. Miller, 886 F.2d 693, 696 (4th Cir.1989) (holding that petition of a single-asset real estate debtor was filed in bad-faith where it sought to "pervert the bankruptcy process by using the system to maximize an investment opportunity and minimize investors' risk at the expense of the secured creditor" without any "legitimate purpose of reorganization."); In re Northtown Realty Co., L.P., 215 B.R. 906, 916 (Bankr. E.D.N.Y. 1998) (holding that Chapter 11 petition was filed in bad-faith where it sought to "'manipulate the Bankruptcy Code to thwart the legitimate rights of secured creditors to realize on their claim.'") (citations omitted)); In re Am. Prop. Corp., 44 B.R. 180, 182 (Bankr. M.D. Fla. 1984) ("Clearly, bad faith is shown if the purpose of a [petitioner] is to hold a single asset 'hostage' in order to speculate that such asset may increase in value in order to recover its original investment . . ."); In re Phila. Rittenhouse, 2011 WL 13043475, at *9 (single asset real estate where debtor sought to liquidate over time under its own control was both subjective and objective bad faith).

is more evidence of bad faith, because the Debtors, at Tilton's direction, are seeking to shield a broad array of pertinent information from creditors of the Zohar Funds.[16]

85.    Tilton's motives in this regard was previewed in connection with the Books and Records Action. The Delaware Court of Chancery determined that Tilton breached her contractual obligations in refusing to turn over the Funds' books and records to the successor collateral managers, and, thereafter, the Zohar Funds discovered massive wrongdoing that precipitated multiple new litigations alleging improper pre-petition conduct by Tilton. History is repeating itself.

86.    As the holder of the Preference Shares of the Zohar Funds—which are similar to preferred stock in a corporation—Tilton has commenced these cases to forestall the Secured Creditors from exercising their rights to realize upon the Collateral in the presumed hope that the value of the Collateral will improve over time, thereby improving the value of the underlying portfolio companies—although her true motive is control and not the sale of these Portfolio Companies—this is precisely the type of risk-free speculation at the peril of creditors and should not be encouraged or countenanced. See In re 234-6 W. 22nd, 214 B.R. at 760. ("A court must vigilantly protect the integrity of the judicial process and the interests of secured creditors to ensure that reorganization is being sought and that the debtor is not simply gambling with the creditor's money."). There is no legitimate bankruptcy purpose served by these cases— they should be dismissed.

---

[16] Courts have also recognized that a debtor's failure to comply with Bankruptcy Rule 2015.3 constitutes grounds to appoint a trustee under section 1104 of the Bankruptcy Code. See In re Ancona, Case No. 14-10532, 2016 WL 786896, at *11 (Bankr. S.D.N.Y. Nov. 30, 2016) ("[T]he Debtor's failure to file the periodic reports required under Bankruptcy Rule 2015.3, which manifests a lack of disclosure and inadequate reporting, further supports the appointment of a trustee.").

## POINT II – APPOINTMENT OF A TRUSTEE IS REQUIRED
## UNDER SECTIONS 1104(A)(1) AND (A)(2) OF THE BANKRUPTCY CODE

87.    If the case is not dismissed, the appointment of a disinterested trustee is

required here under both sections 1104(a)(1) and (a)(2) of the Bankruptcy Code.    Section

1104(a) provides, in pertinent part, that prior to confirmation of a plan and on request of a party

in interest, a bankruptcy court *shall* order the appointment of a trustee:

> (1) <u>for cause</u>, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> (2) <u>if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate</u>, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §§ 1104(a)(1)-(a)(2) (emphasis added).    A moving party has the burden to establish

the need for the appointment of a trustee by clear and convincing evidence.    See <u>Official Comm.</u>

<u>of Asbestos Claimants v. G-I Holdings Inc. (In re G-I Holdings Inc.)</u>, 385 F.3d 313, 320-21 (3d

Cir. 2004).[17]

### There Is "Cause" To Appoint A Trustee Under Section 1104(a)(1)

88.    Where the court finds either that cause exists or that appointment is in the

interest of the estate, an order for the appointment of a trustee is mandatory.    <u>Official Comm. of</u>

<u>Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)</u>, 285 B.R. 148,

---

[17]    In <u>Grogan v. Garner</u>, 498 U.S. 279 (1991) the Supreme Court stated that the "preponderance of the evidence" standard is presumed to be applicable in civil actions between private litigants unless "'particularly important individual interests or rights are at stake'" and that it was "'unpersuaded by the argument that the clear-and-convincing standard is required to effectuate the 'fresh start' policy of the Bankruptcy Code.'" <u>Id.</u> at 286 (citation omitted).    Although the Third Circuit follows the clear and convincing standard with respect to appointment of a trustee, case law following <u>Grogan</u> has questioned whether that standard is appropriate.    See <u>Tradex</u> <u>Corp. v. Morse</u>, 339 B.R. 823, 829-32 (D. Mass. 2006).

158 (Bankr. D. Del. 2002); see also Okla. Ref. Co. v. Blaik (In re Okla. Ref. Co.), 838 F.2d

1133, 1136 (10th Cir. 1988) ("Once the court has found that cause exists under § 1104, it has no

discretion, but must appoint a trustee.").

89.    Section 1104(a)(1) sets forth a nonexclusive list of factual predicates that

support a finding of "cause" for the appointment of a trustee, including "fraud, dishonesty,

incompetence, or gross mismanagement of the affairs of the debtor by current management."

11 U.S.C. § 1104(a)(1); In re Marvel Entm't Grp., Inc., 140 F.3d 463, 472 (3d Cir. 1998) (stating

that "the language of § 1104(a)(1) does not promulgate an exclusive list of causes for which a

trustee must be appointed . . . ."); In re V. Savino Oil & Heating Co., 99 B.R. 518, 525 (Bankr.

E.D.N.Y. 1989).  As a result, Section 1104(a)(1)'s "or similar cause" language encompasses a

wide range of conduct and requires courts to determine that cause for a trustee exists on an

individual case-by-case basis.  In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989); see

also In re New Towne Dev., LLC, 404 B.R. 140, 149 (Bankr. M.D. La. 2009); In re Bellevue

Place Assocs., 171 B.R. 615, 623-24 (Bankr. N.D. Ill. 1994) (Debtor's inability to exercise its

fiduciary responsibilities under an agreement with one creditor constitutes cause,

notwithstanding the lack of fraud, dishonesty, incompetence, or gross mismanagement); In re

Tahkenitch Tree Farm P'ship, 156 B.R. 525, 527 (Bankr. E.D. La. 1993) (Conflict between

general partners of debtor constitutes sufficient cause even though proponent of trustee motion

did not prove fraud, dishonesty, incompetence, or gross mismanagement).

90.    Actions by debtors previously found to constitute cause under section

1104(a)(1) include (i) the failure to pursue estate causes of action or to protect estate property,

(ii) material conflicts of interest that interfere with the debtor's ability to fulfill its fiduciary

duties, (iii) the lack of evenhandedness in dealing with insiders or affiliates versus the treatment

51

of creditors and (iv) significant acrimony between the debtor and its creditors.  See In re Marvel Entm't, 140 F.3d at 474-75 (district court appropriately appointed a trustee because "the level of acrimony found to exist" between creditors and debtors "certainly makes the appointment of a trustee in the best interests of the parties and the estate"); Wilmington Tr. Co. v. Aardvark, Inc. (In re Aardvark, Inc.), No. 96-858, 1997 WL 129346, at *4 (D. Del. Mar. 4, 1997) (reversing bankruptcy court decision not to appoint trustee where there was "evidence of a potential conflict of interest"); In re Grasso, 490 B.R. 500, 517-18 (Bankr. E.D. Pa. 2013) (finding a conflict of interest where estate possessed potential claims against debtor's wife, and that such conflict constituted cause for appointment of trustee); In re Sharon Steel Corp., 86 B.R. 455, 465 (Bankr. W.D. Pa. 1988) (holding that management's conflict of interest warranted appointment of trustee), aff'd, 871 F.2d 1217 (3d Cir. 1989).

91.    The court may consider both pre-petition and post-petition misconduct of the current management when making the determination that "cause" exists under section 1104(a)(1).  Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.), 4 B.R. 635, 644-45 (Bankr. E.D.N.Y. 1980).  However, even if such malfeasance is not found, the court still has "enjoy[ed] wide discretion" to appoint a trustee under subsection (a)(2).  In re Cloudeeva, Inc., No. 14-24874, 2014 WL 6461514, at *6 (D.N.J. Nov. 18, 2014); In re Bellevue Place, 171 B.R. at 623.

92.    The Debtors' cases are rife with cause for a trustee, as enunciated in the foregoing authorities.  Any one of the misdeeds and conflicts already present in these cases would be sufficient to support the appointment of a trustee – and here, all are present.  There are substantial reasons to doubt the ability of the Debtors' current fiduciaries to independently exercise their corporate governance duties for the benefit of these estates, without having their

52

judgment clouded by the inherent conflicts of interest between and among Tilton, her various affiliates and the Zohar Funds. The lack of independence on the part of the Debtors' board and the newly-appointed CRO, coupled with the long history of questionable, litigious and secretive transactions undertaken by Tilton—the subject of numerous pending ancillary litigations—and the acrimony between Tilton and her creditors, disqualify her from managing and overseeing these cases for the benefit of the Debtors' non-insider creditors. For the reasons set forth herein, "cause" exists in abundance for the appointment of a trustee in these cases.

A. **The Debtors' Abject Failure To Protect Valuable Estate Assets Mandates Appointment Of A Trustee**

93.      Every Chapter 11 debtor, as well as its officers and its directors, owes fiduciary duties to the estate, including the obligations "'to protect and conserve property in its possession for the benefit of creditors'" and "'to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.'" In re Marvel Entm't, 140 F.3d at 471, 474 (citations omitted); In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990). Those duties encompass treating "all parties, not merely the shareholders, fairly." In re AdBrite Corp., 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (quoting CFTC v. Weintraub, 471 U.S. 343, 355-56 (1985)); see also In re Eurospark Indus., 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) (noting fiduciary duties include "'a duty of care to protect the assets'") (citation omitted); In re Bowman, 181 B.R. 836, 843 (Bankr. D. Md. 1995) (noting debtor's fiduciary duties include a "duty of care to protect the assets"). If the job of the debtor in possession is to "'get the creditors paid,'" the debtor in possession's fiduciary duties must include the duty to protect and preserve estate property to facilitate that payment. In re Ionosphere Clubs, 113 B.R. at 169 (quoting In re Pied Piper Casuals, Inc., 40 B.R. 723, 727 (Bankr. S.D.N.Y. 1984)).

94.      As evidenced by her self-dealing and misconduct described herein, Tilton

has failed to protect the assets of the Debtors' estate. Among other things, Tilton has elected not to pursue the causes of action against her belonging to the estate and, moreover, has in fact attempted at every opportunity to thwart the Debtors' valuable litigation claims to further her own competing interests. As also described in the Zohar Funds' Motion For Relief From The Automatic Stay To Complete Appeal, Tilton contends that she—and not the Debtors on which behalf she now purports to act—is the true owner of equity in the Portfolio Companies acquired by the Zohar Funds and that she caused the Funds to execute irrevocable proxies or LLC agreements transferring to her own affiliated entities the Funds' rights to vote and control the Portfolio Companies. In determining that the Zohar Funds acquired, own and control the equity in the Portfolio Companies in the Delaware 225 Action, the Delaware Court of Chancery rejected arguments by Tilton that, if successful, would have devalued the Debtors' estate and impeded the Debtors' ability to successfully repay their creditors. Indeed, Tilton's current bankruptcy filing is but a desperate attempt to avoid final adjudication of these equity ownership issues in the Zohar Funds' favor in Delaware State Courts—a final determination that would surely benefit the Debtors' estate by confirming the rights, interests and assets available for monetization, and concurrently severely restrict Tilton's ability to continue to misuse the Debtors' assets to further her own self-interests.

95.     Tilton's attempt to prevent the Zohar Funds from confirming their equity ownership in the Portfolio Companies at issue in the Delaware 225 Action is one example among many of Tilton refusing to protect the Debtors' assets and, rather, actively obstructing the Zohar Funds from vindicating their rights after years of Tilton's mismanagement and fraudulent self-dealing. The Zohar Funds have filed two additional actions that Tilton is currently opposing—both seeking declarations as to their equity ownership of thirteen Portfolio Companies based on

54

the reasoning adopted by Vice Chancellor Slights in the Delaware 225 Action. The Zohar Funds have obtained a judgment against Tilton in her capacity as former collateral manager for breaching contractual duties to turn over books and records to the Zohar Funds, and are currently litigating multiple disputes with Tilton regarding her non-compliance with Vice Chancellor Slights' Order and Judgment in that case, as well as her non-compliance with the Special Master's recommendations regarding the Books and Records Order and Judgment. The Zohar Funds are also pursuing claims in United States District Court for the Southern District of New York against Tilton for declaratory relief and to recover damages incurred as a result of her diversion of loan interest payments, management and agency fees, equity distributions and other rights, interests and assets from the Zohar Funds to herself.

96.    Through these various litigations the Zohar Funds seek valuable substantive relief in the form of damages and declarations regarding both economic and non-economic rights and interests. In these cases, Tilton has been determined or is alleged to have deprived the Zohar Funds' of their rightful assets for her own use and benefit. Tilton's contractual breaches, self-interested "irrevocable" proxies and other alleged self-dealing and fraud demonstrate that Tilton in her capacity as the Debtors' sole director cannot be relied upon to protect and preserve estate property. As the Debtors' litigation adversary, Tilton is right now impeding the Zohar Funds' ability to recover assets for the benefit of their creditors.

97.    Moreover, the Zohar Funds may have future litigations claims that themselves are valuable that could be threatened if Tilton and her hand-picked CRO are permitted to control the Debtors without the oversight of a trustee. For example, if past is prologue, additional facts are likely to be discovered during litigation, public filings and other resources demonstrating that, in addition to diverting assets from the Zohar Funds, Tilton was

also taking for herself assets from the Portfolio Companies. Such information could provide the Debtors with claims against Tilton in their capacity as shareholders and members of the Portfolio Companies. Tilton's and the CRO's admitted refusal to pursue claims against Tilton and protect estate assets makes clear that they will not investigate and pursue newly discovered estate causes of action against Tilton—which are extremely likely given her multiple roles in this structure—and protect and monetize those litigation claim assets. No creditor should have any doubt whether estate fiduciaries will ensure the debtors' rights to assets will be vindicated and vigorously pursued. Where such doubt exists, as it certainly does here, a trustee should be appointed.

**B.   The Debtors' Governance Is Rife With Conflicts That Prevent It From Fulfilling Its Fiduciary Duties**

98.    Where a debtor suffers from material conflicts of interest that prevent it from discharging its duties, an independent trustee should be appointed. See <u>In re Marvel Entm't</u>, 140 F.3d at 473. A Chapter 11 debtor-in-possession, which acts as a fiduciary of the bankrupt estate, must be an honest broker. See <u>Weintraub</u>, 471 U.S. at 355 ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (citation omitted).

99.    In <u>In re Humphreys Pest Control Franchises, Inc.</u>, 40 B.R. 174 (Bankr. E.D. Pa. 1984), the court appointed a trustee where, in addition to questionable transfers of the debtor's assets, the officers and principals of the debtor were the same as those of the parent corporation.[18] The court noted that "an obvious conflict of interest exists in the management of

---

[18]   Although the court in <u>Humphreys</u> technically appointed the trustee pursuant to section 1104(a)(2), the court indicated that appointment would also have been appropriate under section

the two . . . corporations because the officers and principals of the parent corporation are the same individuals as the officers and principals of the debtor." Id. at 177.  As a result of such conflict, the court appointed a trustee, stating that "[a]s a disinterested party, the trustee can monitor the relationship between the debtor and its parent corporation, establish controls over the transfer of cash assets, and insure that the assets of the estate are not being depleted.  To allow current management to remain in control of the debtor's operations could otherwise work a serious harm to creditors."  Id.; see also In re Patman Drilling Int'l, Inc., No. 07-34622-SGJ, 2008 WL 724086, at *6 (N.D. Tex. Mar. 14, 2008) (holding that trustee appointment was appropriate due to management's conflicts of interest, and creditors' lack of confidence); In re McCorhill Publ'g Inc., 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (noting that where there are questionable intercompany financial transfers and the principals of the debtor occupy conflicting positions in the various transferee companies, cause exists to appoint a Chapter 11 trustee); cf. In re China Fishery Grp. Ltd. (Cayman), No. 16-11895, 2016 WL 6875903, at *20 (Bankr. S.D.N.Y. Oct. 28, 2016) (holding that appointment of independent party to review intercompany balances "without the conflicts of interest that plague[d] current management" was warranted).

100.    Here, as the Debtors' sole director, Tilton suffers from inherent conflicts of interest that indisputably prevent her from executing her fiduciary duties to the Debtors and their creditors.  See In re SunCruz Casinos, LLC, 298 B.R. 821, 832 (Bankr. S.D. Fla. 2003) (noting that where an owner wears "so many hats" that it is impossible for it to carry out fiduciary duties of a debtor in possession, cause exists to appoint a Chapter 11 trustee).  Tilton herself has a direct, adverse economic interest in multiple litigations brought by the Zohar Funds that, if successful, would enhance the value of the Debtors' estate for the benefit of creditors.

1104(a)(1) if the creditors' committee had requested that relief.  Id. at 177.

Tilton's refusal to pursue and protect valuable estate assets—including the Delaware 225 Action and other litigation claims—in order to protect her own individual interests further demonstrates that her proposed governance structure for the Debtors would result in a hopelessly conflicted fiduciary.  The squandering of the Debtors' assets for the personal benefit of insiders further evidences Tilton's "gross mismanagement" and mandates appointment of a chapter 11 trustee. See, e.g, In re PRS Ins. Grp., Inc., 274 B.R. 381, 387 (Bankr. D. Del. 2001) (citation omitted).

101.    Tilton's actions in diverting cash as previously described in connection with these bankruptcy filings further illustrates the need for an independent trustee.

102.    Tilton's request for this Court to reject the Zohar Funds' management agreements with AMZM aptly illustrates Tilton's irreconcilable conflicts that disqualify her proposed governance for the Debtors.  The AMZM CMAs and the Issuers' interests thereunder are collateral of the Debtors' estate held for the benefit of the creditors.  One of those benefits is the right to install by contract a creditor-selected manager of the Funds, currently AMZM, with the authority to take actions in their name, including to vindicate their rights in other collateral and maximize the value of that collateral.  Since Tilton's resignation as the Funds' collateral manager, AMZM has made significant efforts to determine what rights and assets the Zohar Funds' have, gain control and maximize value of that collateral, including by bringing actions against Tilton for her mismanagement and other misconduct.  The Delaware 225 Action is a prime example.  Tilton's day one request to reject the AMZM CMAs in these bankruptcy proceedings serves no legitimate purpose and is nothing but a brazen attempt by Tilton to deprive the estate of a manager not beholden to or subject to her control and that is currently engaged in multiple litigations that would benefit the Debtors at Tilton's expense.  Rejection of the AMZM CMAs would severely hamstring the estate's ability to protect its assets and pursue

claims that would increase its ability to pay its creditors, and would only benefit Tilton by eliminating the only independent representative acting for the benefit of the Debtors.

103.    The appointment of Kirschner as CRO is not an effective replacement for AMZM as collateral manager because it does nothing to mitigate Tilton's conflicts of interest. The Debtors' filing of the Alvarez Rejection Motion without independently communicating with the Controlling Party of Zohar II or the Controlling Class of Zohar III to obtain their views as to the significance of the Alvarez CMAs raises serious doubts about Tilton's motives and Kirschner's independence.  Kirschner's Declaration raises further doubts about his independence from Tilton.  For example, he makes clear in his Declaration—submitted just one day after his retention—that he intends to allow Tilton to continue to control the Portfolio Companies and act as the gate-keeper of any monetization efforts and information without the supervision and jurisdiction of this Court as a result of Tilton's assertion that the Portfolio Companies are not assets of the Debtors.[19]  Kirschner Decl. ¶¶ 15, 26.  Kirschner also has adopted Tilton's position before even meeting with the Zohar creditors.

### C.    The Deep Acrimony Between The Debtors And Their Creditors Constitutes Cause For A Trustee

104.    "Acrimony" or a deep seeded conflict between a debtor and its creditors also can give rise to the level of cause required under section 1104(a)(1) to warrant the appointment of a trustee.  In re Marvel Entm't, 140 F.3d at 472.  See also In re Colo.-Ute Elec. Ass'n, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (trustee appointed where creditors "sincerely

---

[19]    Further, given that his purported appointment as CRO took place the day prior to Tilton's commencement of these proceedings, there can have been no assessment by the CRO regarding the potential impact that rejection of the Alvarez CMAs could have on the estate or its creditors. Given the lack of time between the CRO's appointment and the filing of Debtors' motion to reject the Alvarez CMAs one day later, the CRO could not have performed any legitimate analysis of any potential claims against the estate that could arise from the proposed rejection of the Alvarez CMAs.

and justifiably" lacked confidence in the debtor-in-possession's management); cf. Petit v. New Eng. Mortg. Servs., Inc., 182 B.R. 64, 70 (D. Me. 1995) ("Courts have also concluded that deep-seeded conflict and animosity between a debtor and its creditors provides a basis for the appointment of a trustee.").

105.    The long-running saga of Tilton and the Zohar Funds has been characterized by an unusual level of acrimony.    Litigation between Tilton and MBIA commenced years prior to the Zohar Funds' default concerning certain uninsured junior notes that Tilton acquired and the amount of information that Tilton disclosed to MBIA under the Transaction Documents.  Kirschner Decl. ¶ 38(a)-(c).  In the lead up to Zohar I's default in November 2015 Tilton commenced litigation against MBIA that remains pending in New York state court[20] and improperly filed involuntary petitions placing Zohar I into bankruptcy in violation of the express contractual provisions prohibiting such bankruptcy filings.  Following Tilton's resignation as collateral manager, her breach of her obligations to provide AMZM with the Zohar Funds' books and records and their subsequent disclosure and discovery of the extent of Tilton's self-dealing and misconduct during her tenure as collateral manager, the pace of litigation has only increased.  Appointment of a trustee, however, would help alleviate the creditors' concerns and eliminate existing acrimony by likely opening up the prospect of dealing with a true "honest broker" in these cases.  See In re Marvel Entm't, 140 F.3d at 473 (approving

---

[20]    Tilton claims that she filed the petitions to invoke the automatic stay in litigation where the Zohar Funds have claims against her or where MBIA has the ability to assert counterclaims against her for the ostensible purpose of stopping the litigations to enable a sales process to occur. It is noteworthy, however, that she did not do so in her New York state litigation against MBIA and its parent MBIA Inc. (the "Westchester Action"), in which she seeks $100 million in damages and falsely alleges that MBIA made, and then breached, an oral promise that MBIA would extend the maturity date of the Zohar I Class A notes in exchange for Tilton's heavily discounted acquisition of the A-3 subclass of those notes, which have a face value of $350 million.

trustee appointment on acrimony grounds where parties seemed "unable to reach a consensus").

**D.    The Numerous Prepetition, Questionable Business Transactions Involving Tilton And The Zohar Funds Mandate A Trustee**

106.    Questionable business transactions between and among companies affiliated with a debtor are grounds for appointment of a chapter 11 trustee under both sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code. "[A] history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require." In re Okla. Ref., 838 F.2d at 1136; Tradex, 339 B.R. at 835. Further, the general presumption against appointing a trustee is premised on the expectation that current management can be relied upon to carry out the fiduciary responsibilities of a trustee. In re Marvel Entm't, 140 F.3d at 474. Where there are so many suspect prepetition transactions and acts involving an insider, as there are here, current management cannot fulfill those duties.

107.    In In re Sharon Steel, the United States Court of Appeals for the Third Circuit affirmed the appointment of a trustee under both sections 1104(a)(1) and (a)(2) noting that the bankruptcy court had determined that numerous transfers made by the debtor on the eve of bankruptcy to other companies under common control were possibly recoverable as preferences or fraudulent transfers. 871 F.2d at 1221-22. Notably, the Third Circuit held that because the debtors shared common management with the transferees, it had "grave questions" about current management's ability to fulfill its fiduciary duties and the fitness of management to continue running the debtors. Id. at 1228. The Third Circuit further held that even though the debtors had appointed a new chief operating officer in an attempt to demonstrate independence, too many "major problems" remained and that "[c]orrective measures that are too few too late" could not defeat the need for a trustee. Id. at 1228-29.

108.    As currently configured, the Debtors' governance is exactly the same as

the governance of the Portfolio Company obligors.    This directly calls into question the willingness of the Zohar Funds' governance to enforce the Zohar Funds' rights as lenders—and equity holders—vis à vis the Portfolio Companies.  Unsurprisingly given these incentives, Tilton has neglected creditors' interests in favor of her own.  For example, as has been asserted in multiple pending litigations Tilton seeks to stop through these chapter 11 cases, as collateral manager, Tilton abandoned her duties to manage the Zohar Funds' assets on behalf of and for the benefit of the Zohar Funds and their creditors, and instead modified the loans made by the Funds to such extent that creditors could not be repaid.  Hoff Ex. 21 (RICO Compl.) ) ¶ 69; Hoff Ex. 22 (PPAS Answer & Countercls.) ¶¶ 30, 43-45.  Tilton also continues her mission to misappropriate the Zohar Funds' equity interests in the Portfolio Companies, and cash distributions relating to such equity, for her own benefit and control, which she used to extract exorbitant fees from both the Zohar Funds and the Portfolio Companies themselves.  Id.  On the eve of filing these cases, Tilton diverted funds from the Trustee to a newly formed bank account to fund her hand-picked CRO's and counsel's retainers.  Hoff Ex. 19 (March 21, 2018 email correspondence between R. Bartley (Young Conway) and Jonathan Edwards (Alston Bird)).    Finally, Tilton's Alvarez Contract Rejection Motion only further serves to emphasize Tilton's conflicts of interests in seeking to govern the Debtors' estate and true motivations in bringing these proceedings.  There is thus ample "cause" warranting the appointment of a trustee.

### Appointment Of A Trustee Is Also In The Interests Of The Estates Under Section 1104(A)(2)

109.    The overwhelming facts described herein provide ample justification for the appointment of a trustee under section 1104(a)(2) in the interests of these estates, their creditors, and equity security holders.  Even if a bankruptcy court does not find that "cause" exists to appoint a trustee under section 1104(a)(1), the court may still appoint a trustee if it is in

the "interests of the creditors . . . and other interests of the estate" pursuant to section 1104(a)(2).

11 U.S.C. § 1104(a)(2); In re Sharon Steel, 871 F.2d at 1226 ("Subsection (a)(2) allows

appointment of a trustee when no 'cause' exists."); In re Euro-Am. Lodging Corp., 365 B.R. 421,

428 (Bankr. S.D.N.Y. 2007) ("Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of

fault; the court may appoint a trustee even if no 'cause' exists.") (citation omitted); In re

Ionosphere, 113 B.R. at 168 (stating that section 1104(a)(2) "allows the appointment of a trustee

even when no 'cause' exists."). Section 1104(a)(2) thus provides a more flexible standard for

appointment and gives the court discretion to appoint a trustee "'when to do so would serve the

parties' and estate's interests.'" In re Marvel Entm't, 140 F.3d at 474 (citation omitted); In re

Sharon Steel, 871 F.2d at 1226; In re Ionosphere, 113 B.R. at 168.

110.    In determining whether a trustee should be appointed under section

1104(a)(2), courts "look to the practical realities and necessities." In re Ionosphere, 113 B.R. at

168; see also Hotel Assocs. v. Tr. of Cent. St. SE & SW Areas Pension Fund (In re Hotel

Assocs.), 3 B.R. at 343, 345 (Bankr. E.D. Pa. 1980). Accordingly, the standard for appointment

of a trustee under section 1104(a)(2) is flexible. See 124 Cong. Rec. H11,102 (daily ed. Sept. 28,

1978); 124 Cong. Rec. S17,419 (daily ed. Oct. 6, 1978). Courts often consider the following

factors, all of which weigh heavily in favor of a trustee:  (i) trustworthiness of the Debtors, (ii)

the Debtors' past and present performance and prospects for rehabilitation, (iii) the confidence –

or lack thereof – of the business community and of creditors in present management and (iv) the

benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace), 544

B.R. 297, 304 (Bankr. M.D. Pa. 2016); In re Ionosphere, 113 B.R. at 168 (citations omitted); In

re Euro-Am., 365 B.R. at 427.  As set forth below, each of these factors substantiate the

appointment of a trustee for the Zohar CLOs. Moreover, the Debtors' retention of Kirschner as CRO does not eliminate the need for a trustee but merely emphasizes the importance for genuine independence and neutral oversight here.

## A.     The Trustworthiness Of The Debtors

111.    The appointment of a trustee under section 1104(a)(2) is justified where the loyalty of the debtor's management is substantially called into question by its many competing business interests favoring the debtor's management and equity holders, thereby causing its creditors to lose confidence in management's abilities to reach a successful reorganization. See Smith v. Concord Coal Corp. (In re Concord Coal Corp.), 11 B.R. 552, 554 (Bankr. S.D. W. Va. 1981); see also In re L.S. Good & Co., 8 B.R. 312, 315 (Bankr. N.D. W. Va. 1980) (appointing trustee under section 1104(a)(2) where "[t]he magnitude of the number of inter-company transactions places current management of [the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]"). Tilton is not able to serve as a fiduciary here to consider the creditors' interests. She has attempted to thwart the estate's ownership of assets by filing these cases to stay ultimate resolution in the Delaware 225 Action. Indeed, Tilton affirmatively represented to the Delaware Supreme Court that she actively wanted an expedited appeal and resolution of the Delaware 225 Action. Hoff Ex. 31 (Def's Opposition to Plaintiffs' Motion for Limited Reargument in the Del. 225 Action) at 3 (Tilton's affiliates "want the appeal to be expedited because they want the cloud of uncertainty surrounding ownership and control of the Defendant Companies lifted"), 7 (Tilton's affiliates "want the cloud of uncertainty lifted from these Companies more than anyone, and they want it done quickly). Now, Tilton contends the equity ownership issues have no relevance, and she

admittedly has filed these chapter 11 cases to stay the Delaware 225 Action and other pre-petition litigations. Such inconsistent and unreliable actions do not engender trust on the part of creditors or any other party.

112.    Similarly, Tilton's hand-selected CRO has determined, within 24 hours of his retention, that such estate assets also should not be pursued. It is clear the Debtors, through this governance structure, cannot be trusted to act in pursuit of their fiduciary duties but instead, will pursue the personal interests of Tilton and her affiliates. Thus, a trustee under section 1104(a)(2) is warranted.[21]

### B.    The Debtors' Past And Present Performance And Prospects For Rehabilitation

113.    The Debtors have no prospects for rehabilitation, because they are all static investment pools with no employees and no business. See Bepco, L.P v. 15373 Mem'l Corp. (In re 15375 Mem'l Corp.), 400 B.R. 420, 425-28 (D. Del. 2009) (holding that case was not filed in "good faith" and should therefore be dismissed because there was no business to reorganize and filing the bankruptcy was merely a litigation tactic), aff'd, 589 F.3d 605 (3d Cir. 2009); see also China Fishery, 2016 WL 6875903, at *18 (appointing a Chapter 11 trustee and noting that prospects of reorganization are dim partly due to the fact that debtors were mostly "holding companies or dormant operating companies . . . with no meaningful business to reorganize"). As a result of Tilton's actions while acting as the former collateral manager, two of the three Debtors (Zohar I and Zohar II) defaulted on their maturity dates and have failed to pay their note obligations. Further, prior to Tilton's improper involuntary bankruptcy proceeding against Zohar I in November 2015, Tilton had not monetized any significant Portfolio

---

[21]    The Secured Creditors note that despite the fact that the Kirschner needed only 24 hours to determine causes of action belonging to the estate need not be pursued, it took him over a week to have any discussions with the Secured Creditors.

Companies, such that none of the Zohar Funds had received material returns — if any — on their equity interests or their alleged "equity upside." Zohar I is not able to reorganize for the additional reason that all of its assets were sold pursuant to a public auction held in December 2016 in accordance with the opinion of Judge Jed S. Rakoff of the United States District Court of the Southern District of New York. See Patriarch Partners XV, LLC v. U.S. Bank Nat'l Ass'n, No. 16 Civ. 7128, 2017 WL 3822603 (S.D.N.Y. Aug. 28, 2017). Given the Debtors' past performance under Tilton, and the fact that there is nothing to reorganize in these vehicles, this factor supports the appointment of an independent trustee to objectively and efficiently ensure that noteholders are promptly paid. See In re Ionosphere, 113 B.R. at 169 (quoting In re Pied Piper, 40 B.R. at 727) (noting the job of the debtor is to "get the creditors paid"). Moreover, Tilton remains in control of the Portfolio Companies and has complete discretion over the disposition of those entities—unless of course the ownership issue is resolved in favor of the Debtors.

## C.    The Lack Of Confidence Of Creditors

114.    It is beyond dispute that the Debtors' corporate governance, as structured, does not have the confidence of creditors. This distrust is well-founded given the acrimonious history between Tilton and the Zohar Funds' creditors. It was Tilton's resignation as collateral manager and subsequent forced disclosure by the Delaware Court of Chancery of books and records belonging to the Zohar Funds that revealed new information of Tilton's self-dealing and diversion of assets from the Zohar Funds for her own benefit. Multiple complaints and counter-claims have been filed (and may yet be filed) between Tilton and the Zohar Funds, for the benefit of their creditors, as a result of this wrongdoing.

115.    Similarly, Tilton's list of pending litigations brought against her by other non-Zohar creditors grows as well. Employees for multiple Portfolio Companies such as

TransCare, Duro, Remco and American LaFrance have sued Tilton for improper terminations of the employees of those Portfolio Companies in violation of the Worker Adjustment and Retraining Notification Act. On March 29, 2017, the United States National Labor Relations Board sued Tilton, Patriarch Partners and certain other of their affiliates to enforce a subpoena in connection with an investigation into whether Tilton and Patriarch Partners engaged in certain unfair labor practices at TransCare, including the failure to pay wages to para-transit drivers responsible for transporting disabled passengers in handicapped-accessible vehicles. The chapter 7 trustee of TransCare has also filed claims against Tilton for corporate waste and breaches of fiduciary duties owed to that company. The United States Court of Appeals for the Eleventh Circuit recently restored a whistleblower lawsuit against Tilton relating to her attempts to secure federal defense contracts for one of the Zohar portfolio companies.

116.    Further, the actions by the Debtors and their CRO on the first days of these bankruptcy cases make clear that they will not pursue valuable estate litigation rights and to reject a significant contract – all obviously in pursuit of Tilton's personal interests - only further erode trust or creditor confidence. Where such an extreme lack of confidence by creditors is justified, the only solution is the appointment of a trustee. See In re Cardinal Indus., Inc., 109 B.R. 755, 766-767 (Bankr. S.D. Ohio 1990) (appointing trustee where debtors' self-dealing and breach of fiduciary duties resulted in a serious erosion of trust and confidence by creditors and where benefits of potential claims against insiders of estate outweighed any cost of appointing a trustee). The lack of creditor confidence in current governance at the Debtors thus weighs heavily in support of a trustee.

**D.    The Benefits Of Appointing A Trustee Are Outweighed By The Costs**

117.    The costs and burdens of appointing a trustee in these cases are likely to be minimal compared to the benefits. The cases have only recently been filed, the Debtors'

67

capital structure is relatively simple with a small number of creditors and there is no ongoing business to consider. Further, the Debtors' proposed CRO has only very recently been appointed and is only in the formative stages of gathering information and becoming familiar with the Zohar Funds. Thus, there will be minimal negative impact from the appointment of an independent fiduciary. In comparison, the benefits of appointing a trustee here are substantial. First, an independent trustee can ensure all of the Debtors' assets are timely preserved. Second, such a trustee also could work to untangle and objectively assess the myriad of relationships Tilton has to the Zohar Funds and their assets. Once properly preserved and collected, an independent trustee could sell the Funds' assets efficiently and effectively, without the overhang of Tilton and her litigious reputation. See In re BLX Grp., Inc., 419 B.R. 457, 472 (Bankr. D. Mont. 2009) (noting that it was in the best interests of creditors for an independent trustee to manage estate assets before they were sold). Third, and finally, appointing a trustee will have the benefit of ensuring that any estate causes of action, including any involving Tilton or any of her affiliates, will be thoroughly and objectively assessed and pursued. See In re Madison Mgmt. Grp., Inc., 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992) (holding that it was in the best interests to appoint an independent trustee to investigate causes of action partly due to the potential of impropriety). Clearly, the benefits of an independent, objective trustee for these cases far outweigh any potential costs.

### E.    Kirschner's Retention As CRO Does Not Eliminate Need For Trustee

118.    Tilton's retention of Kirschner as CRO for the Debtors does nothing to counterbalance the factors above, all of which demonstrate that it is in all parties' (except Tilton's) interests to appoint a trustee. Although CRO appointments may be considered as part of determining whether to appoint a trustee, a management change just days prior to filing and clearly designed to fend off a request for is insufficient. See In re Microwave Prods. of Am., 102

B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (holding that a Chapter 11 trustee should be appointed, noting that: (1) the debtor hired the management company too late; and (2) that the management company could be removed by the debtor at any time).  See also In re Sharon Steel, 871 F.2d at 1226-28 (holding that hiring a new chief operating officer was insufficient in light of various other problems that remained an issue with the management of the debtor).  Unfortunately, the proffered CRO in these cases is not truly independent from Tilton and cannot be free from her influence and her own substantial conflicts as director.  The substantial and disabling conflicts of interest in the Debtors' proposed governance structure cry out for the appointment of a trustee.

119.    A neutral fiduciary is essential to, among other things, properly administer the Debtors' assets and negotiate a chapter 11 plan (including, if any, proposed third-party releases of Tilton and her affiliates).  See In re CS Mining, LLC, 574 B.R. 259, 279-80 (Bankr. D. Utah 2017) (refusing to accord business judgment deference to a CRO and denying settlement because CRO's judgment was tainted by influence of interested directors and therefore not exercised in good faith).  Tilton's last-minute choice to retain Kirschner as CRO and the Debtors' filings and limited disclosures to date regarding their relationship only further emphasize the need for an independent trustee in these cases.

120.    Kirschner's actions and conclusions reached since being hand-selected by Tilton to act as CRO demonstrate that he is not a sufficiently independent or objective professional who can be relied on to faithfully execute his fiduciary duties owed to the Zohar Funds rather than to pursue the personal interests of Tilton and her affiliates.  Kirschner's willingness less than 24 hours after his retention as CRO to parrot Tilton's claims that she—and not the Zohar Funds—owns equity in the Portfolio Companies provides significant cause for concern.  Indeed, the CRO made his erroneous assessment regarding Tilton's claims of equity

ownership notwithstanding the post-trial determinations by an unimpeachably impartial party, Vice Chancellor Slights, that the Zohar Funds in fact own the equity. No truly independent estate fiduciary could make the complex and significant assessment that Kirschner purported to make in such a period of time.

121.    Similarly, Kirschner's approval of the Debtors' filing of the Alvarez Rejection Motion without independently communicating with the Controlling Party of Zohar II or the Controlling Class of Zohar III to obtain their views as to the significance of the Alvarez Contract raises serious doubts about Kirschner's independence from Tilton. Kirschner concedes that there has been a "long and tumultuous history between various stakeholders" of the Funds and acknowledges "the hotly contested nature of the legal battles" involving these CLOs. Kirschner Decl. ¶ 19. Significantly, however, Kirschner made no efforts to understand the creditors' positions regarding the bankruptcy filing, Tilton's claims of equity ownership or Tilton's request to reject the AMZM management agreement.

122.    Tilton's unilateral appointment of Kirschner as CRO also does nothing to mitigate the conflicts of interest that arise from Tilton's governance of the Debtors as their sole director. Indeed, the record is utterly devoid of evidence that Kirschner has the authority or ability to manage the estate independent of Tilton's influence. The board resolutions accompanying the petitions to commence these chapter 11 cases are entirely unclear as to the extent of Kirschner's autonomy and duties with respect to the Debtors, let alone the Portfolio Companies. The ambiguity regarding this issue alone gives rise to significant concerns regarding Kirschner's independence on the fundamental question at the heart of these bankruptcy proceedings—will the estate's assets be monetized subject to a plan that does not promote Tilton's interests above those of the senior creditors. Because the Debtors' proposed corporate

governance structure is not adequate, a trustee is necessary to protect estate assets.

## **CONCLUSION**

WHEREFORE, the Secured Creditors respectfully request that the Court dismiss the Debtors' Chapter 11 cases, and, if not dismissed, order that an independent trustee be appointed to manage the debtors' bankruptcy estates.

[*Signature Page Immediately Follows*]

71

Dated:      March 26, 2018
            Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

By: /s/ Laura Davis Jones
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

-and-

CADWALADER, WICKERSHAM & TAFT LLP
Gregory M. Petrick, Esq.
Jonathan M. Hoff, Esq.
Ingrid Bagby, Esq.

200 Liberty Street
New York, New York 10281
Telephone: (212) 504.6000
Facsimile: (212) 504.6666
Email: gregory.petrick@cwt.com
        jonathan.hoff@cwt.com
        ingrid.bagby@cwt.com

*Attorneys for MBIA Insurance Corporation*

-and-

ARNOLD & PORTER KAYE SCHOLER LLP
Brian J. Lohan
Ginger Clements
70 West Madison Street, Suite 4200
Chicago, IL 60602-4321
Telephone:  (312) 583-2403
Email:  brian.lohan@arnoldporter.com

James D. Herschlein
Jeffrey A. Fuisz
Erik Walsh
Steven Fruchter
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8655
Email: james.herschlein@arnoldporter.com

-and-

WOMBLE BOND DICKINSON (US) LLP
Matthew P. Ward (Del. Bar No. 4471)
Morgan L. Patterson (Del. Bar No. 5388)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: matthew.ward@wbd-us.com
Email: morgan.patterson@wbd-us.com

*Counsel to the Controlling Class of Zohar III
Noteholders*