## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (CSS) |
| Debtor. | Jointly Administered |
| | **Ref. Docket No. 56** |

## OBJECTION OF LYNN TILTON AND THE PATRIARCH/OCTALUNA ENTITIES TO THE MOTION OF MBIA AND THE ZOHAR III CONTROLLING CLASS TO DISMISS THESE CHAPTER 11 CASES OR, ALTERNATIVELY, TO APPOINT A TRUSTEE

Lynn Tilton; Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC; Octaluna, LLC; Octaluna II, LLC; and Octaluna III, LLC (collectively, "Patriarch") hereby submit this objection (the "Objection")[2] to the *Motion of MBIA Insurance Corporation and the Zohar III Controlling Class to Dismiss the Chapter 11 Cases or, If Not Dismissed, to Appoint a Trustee* [D.I. 56] (the "Motion"),[3] filed on March 26, 2018 by MBIA Insurance Corporation ("MBIA") and the Zohar III Controlling Class (together with MBIA, the "Secured Creditors"). In support of this Objection, Patriarch respectfully represents as follows:

### PRELIMINARY STATEMENT

Ms. Tilton, as the Debtors' sole director, caused the Zohar Funds to commence these voluntary Chapter 11 cases because only through this bankruptcy will the Zohar Funds be able to

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2]  Patriarch reaffirms the reservation of rights in its *Notice of Appearance and Request for Service of Papers* [D.I. 25] regarding, among other things, this Court's jurisdiction over certain disputes involving Patriarch and/or Patriarch's right to a jury trial. Patriarch intends to separately respond to the *United States Trustee's Motion for the Appointment of a Trustee, or in the Alternative, For the Appointment of an Examiner* [D.I. 132].

[3]  Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Motion.

free themselves from the endless cycle of value-destroying litigation pursued by MBIA, the Zohar III Controlling Class, and their hand-picked collateral manager, AMZM.  Only through this bankruptcy—automatically staying the pending litigation wars and putting in place a monetization process, overseen by an independent Chief Restructuring Officer of impeccable reputation, to maximize value, monetize the Zohar Funds' assets, and then distribute Debtor-related cash flows generated by Portfolio Company sales through a "waterfall" that prioritizes paying off noteholders—can all stakeholders enjoy a full return on their investments.

Ms. Tilton hoped that MBIA and the Zohar III Controlling Class would understand that the filing of these bankruptcy cases is the most economically rational and eminently reasonable way to achieve collaboration and cooperation for the benefit of all stakeholders, and therefore that she would never have to file any submissions with this Court in her personal capacity.  But now, regrettably, she is compelled to do so, given the vexatious allegations made against her personally in the Motion—allegations that have already been rejected by court after court, yet are repeated by the Secured Creditors here.  Ms. Tilton wants nothing more than to lay down arms, declare a cease fire, and get on with the process of monetizing assets she believes, if properly sold, will generate much more value than necessary to pay off all of the Zohar Funds' obligations.  As the Zohar Funds' director, Ms. Tilton continues to believe these bankruptcy cases are the best and only means to make all stakeholders whole.  She also hopes that with Marc Kirchner as the CRO—whose independence and authority is to be memorialized in monetization procedures that the Debtors will file for this Court's approval—the Court and all other parties to these bankruptcies will come to appreciate that this is the best path to ensure that all of the Zohar Funds' stakeholders will be repaid in full.

Unfortunately, the Secured Creditors have to date failed to embrace this opportunity to proceed with these cases in a cooperative and value-maximizing manner.  Instead, they have responded by filing the Motion requesting dismissal of these Chapter 11 cases or, in the alternative, appointment of a Chapter 11 trustee.  Dismissal will result only in the Secured Creditors, freed from the automatic stay, resuming their litigation campaign and slugging it out in contentious, costly and time-consuming lawsuits that, even in the unlikely event that they are successful in the long run, would hurt Portfolio Company value and lead to likely defaults under the Zohar/Portfolio Loan Documents (as defined below), and potentially to fire sales of Portfolio Companies, inuring only to the benefit of the Secured Creditors.  Appointment of a Chapter 11 trustee will only slow and impair the efforts of the Debtors and the CRO to sell the Debtors' interests in the Portfolio Companies or refinance the Debtors' loans to the companies, which is bad for all stakeholders, including the Secured Creditors.  In pursuing this tactic, the Secured Creditors have opted to pursue an all-out litigation war, leaving Ms. Tilton no choice but to submit this separate objection to respond to the most egregious of the personal attacks made against her in their 70-page screed.[4]

The Secured Creditors claim that Ms. Tilton has "pillage[d]" the Zohar Funds, and they repeatedly accuse her of "theft," "fraud," "misappropriation," "divert[ing] funds," "misconduct," "malfeasance," and "shameless self-dealing."  Motion, pp. 1–2 & ¶¶ 21, 22, 53, 54, 57, 61, 71, 78, 91, 95, 108.  But they cite not a shred of evidence to support their specious claims.  Instead, the Secured Creditors recycle baseless allegations asserted against Ms. Tilton and rejected by courts in prior actions.  Yet the Secured Creditors unabashedly now present those same

---

[4]  In light of the Court's request that the parties avoid excessive litigation and page increases, Ms. Tilton respectfully incorporates and joins the legal arguments made by the Debtors in their objection to the Secured Creditors' Motion—and focuses instead herein on setting the record straight with respect to accusations of misconduct made against her by the Secured Creditors—in an effort to more efficiently present the opposition to the Secured Creditors' Motion.

allegations as if they should be credited here.  *See, e.g.*, *id.* at ¶¶ 10, 21, 25, 26, 29, 31, 108.

They should not.  These allegations are false, defamatory, and unworthy of this Court's

consideration.

Indeed, the Secured Creditors' Motion consists largely of the same allegations that the

SEC rebuffed after a three-week trial, following a seven-year investigation of Ms. Tilton and

affiliated Patriarch entities (the "SEC Proceeding").  The SEC Proceeding resulted in a complete

dismissal of all charges against Ms. Tilton and those Patriarch entities.[5]  In a 57-page opinion,

the SEC administrative law judge made detailed findings dismissing as "unproven" substantially

every one of the allegations of wrongdoing made by the SEC and now repeated by the Secured

Creditors here.  *In re Lynn Tilton*, Initial Decision, SEC Exchange Act Release No. 1182 (the

"SEC Decision"), 2017 WL 4297256, at * 49 (ALJ Sept. 27, 2017).  For example, the Secured

Creditors parrot the SEC's allegations that Ms. Tilton and Patriarch "report[ed] misleading

values for the assets held by the Funds and thus collecting unearned management fees and other

payments" and also "breach[ed] fiduciary duties by failing to disclose a conflict of interest

arising from Lynn Tilton's undisclosed approach to categorization of assets."  *Id.* at *2.  But the

SEC Decision, in dismissing all charges, found that the deal documents and trustee reports

provided to all noteholders "disclosed the fee arrangement" and the "[f]ees paid," disclosed Ms.

Tilton's and Patriarch's "approach" to "categorization of the assets," and "disclosed [the]

inherent conflict of interest in that [Ms. Tilton and Patriarch] valued the Funds' assets,

categorized the loans, could amend the terms of the loans, and were to receive fees dependent on

their own valuation of the assets."  *Id.* at **12, 13, 23.  And contrary to the Secured Creditors'

attempt to cabin the import of the SEC Decision, that lengthy decision following a three-week

---

[5]  The Patriarch entities that were respondents in the SEC Proceeding included:  Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; and Patriarch Partners XV, LLC.  For avoidance of confusion, this Objection refers to such respondents as "Patriarch."

bench trial was a full rejection on the merits of the very charges the Secured Creditors assert

here—an especially telling vindication for Ms. Tilton in an SEC administrative proceeding in

which the SEC typically prevails 90 percent of the time before its own in-house administrative

law judges.[6]

Inexplicably, the Secured Creditors also repeatedly cite the unproven allegations of an

S.D.N.Y. RICO complaint they authorized filing against Ms. Tilton and a number of her entities

in support of their misguided accusations that Ms. Tilton "abused her positions as a fiduciary,"

misappropriated Zohar Fund assets, engaged in "rampant mismanagement and self-dealing," and

otherwise acted inappropriately, *see, e.g.*, Motion, ¶¶ 21, 25–26, 50, even though the claims

against Ms. Tilton and her entities in that case were *dismissed in full*. *See Zohar CDO 2003-1,*

*Ltd. v. Patriarch Partners LLC*, 2017 WL 6628609, *17 (S.D.N.Y. Dec. 29, 2017). There was

no appeal of the RICO dismissal, and no similar state law claims have been pursued since then.

The Secured Creditors' unsupported and patently false accusations do not end there.

They include:

- That Ms. Tilton stole $300 million from the Zohar Funds through the diversion of the proceeds from the sale of a company—HVEASI Holding BV ("HVEASI")— when public records conclusively show the Zohar Funds *did not own* the company. *Compare* Motion, ¶ 50, *with* Dkt. No. 1038 (Order) at 1, *In re High Voltage Eng'g Corp.*, Case No. 05-10787 (JNF) (D. Mass. Bankr. July 25, 2005) (indicating that Ms. Tilton's Ark II entity—not any Zohar Fund—owned the company).

- That Ms. Tilton has misused in various respects Patriarch Partners Agency Services ("PPAS"), the loan administration entity owned by Ms. Tilton that administers the Debtors' loans, when there was ongoing prepetition litigation involving PPAS in which AMZM attempted to seek emergency relief based on the same or similar allegations, and was twice denied by federal judges.[7]

---

[6]   *See* Jean Eaglesham, SEC Wins With In-House Judges, THE WALL STREET JOURNAL (May 6, 2015), available at https://www.wsj.com/articles/sec-wins-with-in-house-judges-1430965803.

[7]   Ex. 1 (*Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-I, Ltd.*, 16 Civ. 4488 (S.D.N.Y. Oct. 19, 2017) (Crotty, J. ) (written order denying temporary restraining order) [Docket No. 146]); Ex. 2 (*Patriarch*

- That Ms. Tilton "has already been found by the Delaware Court of Chancery to have misappropriated" Zohar Funds property (specifically, ownership and control of three Portfolio Companies), Motion, p. 3, even though there was no claim asserted against Ms. Tilton for misappropriation in *Zohar II 2005-1, Limited v. FSAR Holdings, Inc.*, No. 12946-VCS (Del. Ch.) (the "Delaware 225 Action"), and the decision in that case did not find any inequitable conduct—despite AMZM's unsubstantiated accusations—and instead resolved the case on contract interpretation grounds now on appeal.

- That Ms. Tilton recently "improperly attempt[ed] to impose potential tax liability on the Zohar Funds for any gains in the liquidation or monetization of the Collateral," Motion, ¶ 34, when in fact Ms. Tilton continues to bear responsibility for tax liabilities associated with the Zohar Funds' and the Portfolio Companies' operations and transactions, and recently personally paid approximately $167 million in taxes as a result.

- That Ms. Tilton has "mismanage[d]" the Portfolio Companies—purportedly evidenced by the closure of a small number of companies and ensuing litigation, Motion, ¶¶ 52–53—ignoring both the fact that numerous Portfolio Companies have been successfully turned around, with just the top-performing companies valued at far in excess of all Zohar Funds debts (*see infra* ¶¶ 6, 7), and the fact that the SEC Decision already rejected a similar charge because the "[t]he investors knew that the Funds' business model was to lend to a number of distressed companies with the idea that, while some would succeed, enabling the Funds' investors to be paid, others would fail," 2017 WL 4297256, at *45.

- That Ms. Tilton "deliberately manipulated the OC Test," which measured the performance of the loans issued to Portfolio Companies, Motion, ¶ 31, even though the SEC ALJ expressly found this *very same allegation* to be without merit, concluding—in a section of the opinion titled "Categorization of Assets and OC Ratio Test"—that Ms. Tilton's valuation methodologies and use of the OC Test were fully "disclosed" to the Funds' "sophisticated, institutional investors," including the Secured Creditors, *SEC Decision*, 2017 WL 4297256, at **15, 40, 45–46.

- That Ms. Tilton's Patriarch entities "refused" to produce documents to AMZM after resigning as collateral manager, and have "continued to drag their heels on the turnover of documents" to AMZM, Motion, ¶¶ 41–42, when in fact the Patriarch entities produced over 100,000 core books and records immediately after resigning, and have since produced over a million pages of documents to AMZM, which continues to make ever-evolving demands for additional

---

*Partners Agency Services, LLC*, 16 Civ. 4488 (S.D.N.Y. Nov. 14, 2017) (Marrero, J.) (decision and order denying temporary restraining order and preliminary injunction) [Docket No. 154]). All references to "Ex. __" in this Objection are to the Declaration of Mary Beth Maloney filed in support of this Objection, filed contemporaneously herewith.

documents while failing to prepare any trustee reports or fulfill other collateral manager duties of its own, including production of documents to the CRO.

- That the events leading up to the bankruptcy filing—such as the appointment of Mr. Kirschner as CRO—and Debtors' first-day filings, are evidence of misconduct, Motion, ¶¶ 54–61, when those filings and actions have all been motivated solely by Ms. Tilton's desire to put aside past disputes in order to establish an orderly and productive process for monetization of the Zohar Funds' assets for the benefit of all stakeholders, which monetization has been stymied by the parties' various litigation.

These and other unsupported, disproven, and dismissed accusations cannot support the extraordinary relief sought in the Secured Creditors' Motion.

Likewise, the Secured Creditors' attempt to present these bankruptcy filings as being intended to vest improper litigation advantages in Ms. Tilton simply belies reality. *See, e.g.*, Motion, ¶ 94 (calling this bankruptcy a "desperate attempt to avoid final adjudication" in the Delaware 225 Action). By causing the filing of these Chapter 11 cases, Ms. Tilton voluntarily ceded numerous litigation advantages for the benefit of all Zohar Funds stakeholders. As to the Delaware 225 Action, Ms. Tilton had not only a strong interest in an expeditious resolution of that appeal, but also a substantial likelihood of success. Indeed, the Court of Chancery granted Ms. Tilton a stay pending appeal because she had raised "serious legal questions . . . worthy of consideration by [the Delaware] Supreme Court," *Zohar II, 2005-1, Ltd. v. FSAR Holdings, Inc.*, 2017 WL 6761234, at *1 (Del. Ch. Dec. 29, 2017) (Am. Order & J.), and the Delaware Supreme Court itself upheld that stay. When the Debtors initiated these proceedings, Ms. Tilton had already completed briefing of her meritorious appeal. But rather than risk a costly remand and re-litigation of the proceedings, Ms. Tilton was willing to put aside and stay her claims so that she and the Debtors could shift their focus to maximizing value for all Zohar Fund stakeholders. Moreover, any contention that the bankruptcy filings were intended to give Ms. Tilton personal litigation advantages is belied by the fact that her pending affirmative claims against the Zohar

Funds and the Secured Creditors in various litigations have also been stayed as a result of these bankruptcy filings. These Chapter 11 cases are no ploy; as Ms. Tilton candidly stated, they are an effort to tap the significant value locked in the Portfolio Companies by the cloud of litigation to ensure that all stakeholders receive their due.

Indeed, the Portfolio Companies (and the Zohar Funds' interests therein) are worth far more than the Zohar Funds' outstanding debts, as evidenced by numerous valuations prepared by independent financial analysts Moelis & Company and Carl Marks Advisors at Patriarch's request, by PJT Partners for MBIA, and by Ms. Tilton for the SEC trial (based on Patriarch's internal valuations). Each of these analyses, including those from independent sources and those commissioned by adverse parties, finds that the value of the Portfolio Companies far exceeds the debt owed to Secured Creditors—by *billions* of dollars according to some calculations—as MBIA has conceded in public SEC filings.[8]  When these Companies are monetized, the Zohar Funds' record percentage interests in them will entitle them to that percentage of the net proceeds of any Portfolio Company sale. Those proceeds, which will run through the Zohar Fund waterfalls, will result in payment in full for all Secured Creditors. Ms. Tilton directed the Debtors to initiate these proceedings because they are the best vehicle to unlock the Portfolio Companies' value, and because bankruptcy will forestall further bleeding of the Zohar Funds' resources in the various litigations.

Finally, the Secured Creditors' attacks on the Debtors' CRO, Mr. Kirschner, are simply false. Mr. Kirschner did not agree to relinquish any claims against Ms. Tilton, but believes that

---

[8]  *See, e.g.*, Ex. 3 (MBIA Form 8-K, Jan. 10, 2017) at p. 4 ("Based on the estimated value of the Collateral in relation to the amount of the Senior Insured Notes and the Subordinated Insured Notes, the Company expects that the recoveries from the Collateral will be sufficient to enable the payment in full of the Subordinated Insured Notes."); Ex. 4 (MBIA Form 8-K, Nov. 28, 2016) (attaching Houlihan Lokey presentation, concluding at slide 3/12 that the value of just the top 11 portfolio companies would provide "sufficient asset coverage" to MBIA); *see also infra* ¶¶ 6, 7 (discussing valuations and additional MBIA filings with the SEC).

the parties' costly litigation must be put on hold through the automatic bankruptcy stay to allow

proper monetization of the Portfolio Companies.  First Day Kirschner Declaration [D.I. 6], ¶ 14.

Indeed, Ms. Tilton has agreed to toll applicable statutes of limitations and agreed that Mr.

Kirschner cannot be terminated absent Court order.  Mr. Kirschner's credentials are

unimpeachable, and he is more than qualified to serve as an independent CRO in this matter.  If

the monetization process does not result in full repayment of the Secured Creditors, whatever

claims they or the Debtors have against Ms. Tilton (including any defenses) may be litigated

after the monetization process has run its course.

Not only do the Secured Creditors get the facts wrong, they also distort Third Circuit law,

as fully explained in the Debtors' objections.  Contrary to what the Secured Creditors claim, the

Third Circuit has unambiguously found that the commencement of a Chapter 11 case for the

purpose of conducting an orderly sale or liquidation that is designed to maximize value is in

"good faith."  *In re Integrated Telecom Exp., Inc.*, 384 F.3d 108, 120 n.4 (3d Cir. 2004).

Bankruptcy courts in the circuit have concurred.  In *Zais Investment Grade Ltd. VII*, 455 B.R.

839 (Bankr. D.N.J. 2011), for instance, the court expressly held that the bankruptcy of a CDO

with a structure similar to the Zohar Funds was in good faith, where that bankruptcy was

commenced for the purpose of selling the fund's collateral over restrictions in the indenture and

in-fighting among stakeholders.

Further, the Secured Creditors have not satisfied their high burden in establishing cause

for the appointment of a Chapter 11 trustee.  *First*, the Secured Creditors' baseless and

unproductive mudslinging—based predominantly on meritless allegations in fully-dismissed

complaints—cannot possibly constitute "cause" for the appointment of a trustee and should be

rejected.  *Second*, the Secured Creditors cannot manufacture "cause" under the guise of

"acrimony" between the parties when the entire purpose of these bankruptcy filings—as evidenced by the measured manner in which the Debtors and their counsel have conducted the proceedings thus far—is to put aside any previous acrimony so the parties can focus on maximizing and monetizing the value of the Debtors' assets. *Third*, the appointment of a trustee with no experience with or knowledge of the Portfolio Companies is not "in the interests" of the estate or all stakeholders, 11 U.S.C. § 1104(a)(2), as it would simply interrupt the sale process that Ms. Tilton and the CRO are implementing, which seeks to satisfy the claims of all noteholders in full. Under Ms. Tilton's stewardship, many of the Portfolio Companies have been transformed from distressed to highly valuable companies; there can be no doubt that maximum value will be realized in the monetization process only if Ms. Tilton plays the role proposed by the Debtors in their proposed asset monetization procedures.

Ms. Tilton had hoped the parties would focus on monetization of the Debtors' assets for their mutual benefit, instead of dredging up old, unhelpful, disproven and unsupported accusations of wrongdoing. She continues to believe that is the appropriate course, and is committed to staying above the fray. But in light of the weighty, false accusations hurled against her in the Motion, she had no choice but to set the record straight in an even-handed and measured way, while continuing to focus on the task at hand—maximization of asset value— with the hope that the Motion represents, in tone and content, a brief and unfortunate detour on the road to recovery of value for the benefit of all stakeholders. Ultimately, once the Motion's invective is set aside, it is clear that there is simply no basis on which to dismiss these proceedings or appoint a trustee. For all of these reasons, the Motion should be denied in full.

## OBJECTIONS

### A.  These Chapter 11 Cases Were Designed to Maximize and Unlock the Value of the Debtors' Assets, Which Far Exceeds the Value of Their Debts.

1.      The Zohar Funds' assets are primarily loans to, and record equity interests in, distressed Portfolio Companies.[9]  As discussed below, these assets are worth far more than the Zohar Funds' debts, but their value cannot be unlocked except through these Chapter 11 cases.

2.      The Zohar Funds originated loans to the Portfolio Companies and also sometimes purchased distressed loans on the secondary market at a discount.  These loans were originated primarily to undervalued, iconic American brands, such as MD Helicopters, Stila Cosmetics, Dura Automotive, Rand McNally and Oasis Water, in need of capital and a sound management strategy, both of which were necessary to rescue the businesses and restore value, creating and preserving jobs in America.  These brands are comprised primarily of domestic manufacturing companies that produce goods "made in the U.S.A."  First Day Tilton Declaration [D.I. 5], ¶¶ 3, 59–65.  Ms. Tilton holds active leadership positions at the companies—often as the CEO and as a board member or manager (in most cases, as the sole board member or manager)—and implemented a long-term turnaround plan to create value.  *Id*. at ¶¶ 3, 64.

3.      Ms. Tilton's execution on such strategies in many cases resulted in the creation of thriving, exceedingly valuable companies from assets that would have otherwise been liquidated.  *Id*. at ¶¶ 3, 65.  For example, Ms. Tilton engaged in successful, years-long turnaround efforts as

---

[9]   Ms. Tilton and the Debtors dispute whether the Zohar Funds hold only "equity upside" interests in the Portfolio Company shares registered in their names—meaning that the Funds have a right to receive the net proceeds of Portfolio Company sales until all Zohar Funds noteholders are paid in full, while Ms. Tilton retains beneficial ownership and control of the companies—or whether the Funds are the record and beneficial owners of the equity.  As discussed in detail elsewhere, there is no practical difference between these positions for the purposes of monetization of the Debtors' assets in this proceeding, because either way Ms. Tilton and the Debtors agree that the net proceeds of the sales of Portfolio Companies attributable to the Zohar Funds will be used to pay off noteholders (regardless of the nature of the Zohar Funds' interests), and that Ms. Tilton (as the ultimate preference shareholder of the Zohar Funds) has a right to receive any remaining proceeds after noteholders are paid in full.

CEO and manager or director of helicopter manufacturer MD Helicopters, cosmetics and personal care products maker Stila Cosmetics, and auto suppliers Dura Buyer, LLC, Dura Automotive Systems, LLC, and Global Automotive Systems, LLC, the details of which are set out in the First Day Tilton Declaration at paragraphs 66–90.  Under Ms. Tilton's active involvement, the Portfolio Companies provide more than 50,000 jobs, primarily for American workers, in a number of industries.  *Id*. at ¶ 65.

4.      The Chancery Court decision in the Delaware 225 Action acknowledges the testimony of multiple Portfolio Company executives that "Tilton was (and is) a very capable managing director" who consistently pushes Portfolio Companies to improve their growth, sales, and profitability, in order to improve "valuation for the compan[ies]." *Zohar II 2005-1, Limited v. FSAR Holdings, Inc., 2017 WL 5956877*, at *14 (Del. Ch. Nov. 30, 2017).  Thus, as the Honorable Robert D. Drain, U.S. Bankruptcy Judge, made clear on the record in connection with the Zohar I involuntary proceeding, Ms. Tilton "remain[ing] in her positions with the underlying portfolio companies . . . appears to be a good thing."  Ex. 7 (Transcript, *In re Zohar CDO 2003-1, Ltd.*, No. 15-23680 (Bankr. S.D.N.Y. Feb. 1, 2016)) at 128:3–25.

5.      Based on Ms. Tilton's unflagging efforts, the Portfolio Companies are worth billions of dollars.  Indeed, undisputed evidence demonstrates that the value of the Companies well surpasses the debt the Zohar Funds owe their stakeholders, and the Zohar Funds' percentage interests in that value far exceed any debt owed to Secured Creditors.  The Zohar Funds suffer not from insolvency but from illiquidity, and if value can be unlocked, all stakeholders can be made whole, with significant residual value remaining for Ms. Tilton as the ultimate owner of the Debtors' preference shares.

6.      Undisputed evidence introduced in the Delaware 225 Action from multiple sources over the past several years all reached the same conclusion—namely, that the preference shares, payable only after noteholders, are "in the money."  These analyses include valuations—mathematical calculations of value using portfolio company EBITDA and comparable company multiples—prepared by reputable independent financial analysts Moelis & Company and Carl Marks Advisors at Patriarch's request in 2014 and 2016; calculations prepared by PJT Partners at the behest of its long-time client MBIA in March 2017, and obtained in discovery that MBIA was compelled to produce by New York court order on the eve of the Delaware 225 Action trial; and Patriarch's own internal value calculations regularly updated on spreadsheets over several years and then introduced into evidence at Ms. Tilton's SEC trial in October 2016.[10]

7.      Neither AMZM nor the Secured Creditors have ever disputed these valuations on their merits, and they do not dispute that value here.  Moreover, MBIA has admitted in public filings that the Portfolio Companies are worth far more than what is owed to MBIA and other Fund creditors.  *See, e.g.*, Ex. 6 (MBIA Inc. Form 10-K for the fiscal year ended December 31, 2017) at p. 22 ("MBIA Insurance Corporation believes there will be sufficient recoveries on the Zohar Collateral to both repay amounts due under the Facility and to substantially reimburse it for the Zohar Claims Payments, . . . [but] there can be no assurance . . . .").[11]

---

[10]   The valuation materials referenced in this paragraph are subject to protective orders in the applicable proceedings, and therefore are not being filed on the public docket.  Patriarch will confer with the Debtors, the Secured Creditors, and AMZM regarding their use at the hearing on April 17 and 18.

[11]   *See also, e.g.*, Ex. 3 (MBIA Form 8-K, Jan. 10, 2017) at p. 4; Ex. 5 (MBIA Form 10-Q, Aug. 8, 2016) at p. 57 ("MBIA Corp. believes that the primary source of such reimbursement [for insurance payment made with regard to Zohar II notes] will come from liquidation of the Zohar II Collateral."); Ex. 4 (MBIA Form 8-K, Nov. 28, 2016) at pp. 10–21 (attaching Houlihan Lokey presentation concluding that the value of just the top 11 portfolio companies would provide "sufficient asset coverage" to MBIA); Ex. 8 (225 Avitabile Dep.) at 54:13–56:13, 96:12–98:22 (admitting that MBIA has used the PJT Partners analyses to "estimate potential recovery values" for MBIA's financial statements).  Only relevant excerpts of the cited public MBIA 10-K and 10-Q filings with the SEC are being submitted so as not to burden the Court with voluminous public filings.  The full versions of all cited public filings with the SEC are available at sec.gov.

8.      None of the parties dispute that there is value in these estates.  None of the parties dispute that the litigation cloud that has hung over them and the Portfolio Companies has destroyed value and tempered any buyers from pursuing any of such companies—indeed, buyers and bankers have refused to participate in previous sales processes due to the parties' litigation. Bankruptcy proceedings provide the best avenue to dispel that cloud and to unlock the value that *all parties* concede exists.  And most importantly: none of the parties dispute that the Zohar Funds are entitled to recover value when the Portfolio Companies are sold.  When the Portfolio Companies are sold, their loans to the Zohar Funds can be repaid, and the net proceeds of those sales attributable to the Debtors' interests will flow through the waterfall in the Indentures, repaying *all stakeholders in full*.

9.      Ms. Tilton, in consultation with the CRO, has already started the process of meeting with investment bankers and preparing the Portfolio Companies for sale or refinancing. Rather than delaying that value maximization process with needless motion practice, the Secured Creditors should encourage it in a collaborative fashion—as Ms. Tilton has done—and allow for the CRO and Ms. Tilton to continue their asset monetization efforts.

**B.      The Motion In Effect Seeks to Continue a Wasteful and Destructive Litigation Path That Will Inure Only to the Secured Creditors' Benefit.**

10.      Ms. Tilton, as sole director and owner of the Zohar Funds, began analyzing a potential Chapter 11 filing for the Zohar Funds because the extensive prepetition litigation has undermined attempts by the Zohar Funds and Ms. Tilton to sell or refinance their interests in the Portfolio Companies.

11.      The very purpose of these Chapter 11 proceedings is to maximize value through an organized and transparent sale process.  The value the Debtors seek to realize through these cases has proven to be wholly unrealizable outside of bankruptcy—for the past few years

AMZM (acting on behalf of the Zohar Funds, but not to their benefit), has declined to work constructively toward a consensual process to liquidate the Zohar Funds' interest in the Portfolio Companies, but rather elected to create a cloud of litigation that, absent bankruptcy, could continue for years.  The Debtors' Chapter 11 filings have provided a break from this litigation, and have created a unique forum for the Debtors to monetize their interests in the Portfolio Companies.  Maximizing value is a valid bankruptcy purpose, and the Debtors should be permitted to proceed with maximizing value for *all stakeholders*, including MBIA and the Controlling Zohar III Noteholders.  *See, e.g.*, *Crown Village Farm, LLC v. Arl, L.L.C. (In re Crown Village Farm, LLC)*, 415 B.R. 86, 92 (Bankr. D. Del. 2009) ("[T]he courts in this Circuit have made clear that even where the debtors are not attempting to preserve [a] going concern, for example when a liquidation plan will be filed, they can still satisfy the good faith requirement.").

12.     The Secured Creditors' propose no alternative; their proposed path forward guarantees years of continued litigation and loss to all stakeholders.  Upon dismissal, the Secured Creditors and AMZM would surely continue to implement their scorched earth litigation strategy, which appears aimed at obtaining control of the Portfolio Companies in order to retain all of the value in the companies for the Secured Creditors alone, to the detriment of other stakeholders, including the Octaluna entities' Class B notes and preference shares in the Zohar Funds.  In contrast, the Debtors and Patriarch are proposing a process of monetization for the benefit of all stakeholders, in which such disputes need not be resolved in order to monetize the Debtors' assets, thereby alleviating the need to incur millions of additional dollars in legal expenses.  Dismissing these Chapter 11 cases would cause resumption of the litigation and the incurrence of what are likely to be substantial legal fees for all sides.

13.     Indeed, the "ownership question" will not be timely resolved in these various litigations pending across the country.  The appeal in the Delaware 225 Action, even if the court were to uphold the opinion, will resolve the question only as to three portfolio companies.  Other pending litigation, including cases filed in Delaware Chancery Court as well as other state courts, will take months—if not years—to resolve.  In the meantime, the portfolio companies will remain in stasis, unable to be sold or to refinance their debt.

14.     And that appears to be the Secured Creditors' play.  The portfolio companies have debt due to the Debtors that matures early next year.  If the Secured Creditors can continue to litigate and delay resolution of these questions, they will attempt to foreclose on the Portfolio Companies' loans and then purport to auction the Zohar Funds' assets.  Unlike these Chapter 11 cases, which have been filed to complete an organized and transparent sale process to maximize value, dismissal of these Chapter 11 cases will destroy value, but may deliver the Secured Creditors a windfall if they credit bid at foreclosure sales, as MBIA did with Zohar I.  *E.g., In re Adobe Trucking, Inc.*, 551 F. App'x 167, 171–72 (5th Cir. 2014) ("[P]roperty offered at a foreclosure sale frequently produces a price substantially less than market value and New York courts consistently decline to disturb a foreclosure sale except where the price alone is so inadequate as to shock the court's conscience.").

15.     In reality, Ms. Tilton, working with the Debtors, their stakeholders and the independent CRO will be best able to maximize value through a process overseen by the Court.

16.     Ms. Tilton decided to appoint a Chief Restructuring Officer in order to provide the Debtors an independent decision maker and to provide transparency to the process.  She considered the qualifications of approximately a dozen financial advisors with experience serving as chief restructuring officer for distressed companies.  After interviews with a number

of these candidates, the Debtors engaged Marc Kirschner, a Senior Managing Director of Goldin Associates LLC ("Goldin"), based on his substantial and impressive experience as an attorney and financial advisor for distressed companies, as CRO of the Debtors.  Prior to interviewing Mr. Kirschner for the position of CRO of the Debtors, Ms. Tilton had no prior connection or relationship with Mr. Kirschner or Goldin.

17.     Since his appointment, Ms. Tilton has worked continuously with Mr. Kirschner and Robert Kost, a Managing Director at Goldin, to develop a process for the orderly marketing and monetization of the Debtors' interests in the Portfolio Companies.  The Debtors have developed a proposed monetization process, as detailed in the Debtors' brief and attached thereto.  The Debtors' proposed monetization process provides all stakeholders transparency into the monetization of the Debtors' assets and outlines the CRO's role and ensures his independence.

18.     The proposed monetization process will allow the Debtors to promptly and efficiently liquidate their interests in the Portfolio Companies and pay off noteholders, while also providing transparency to the Court and the applicable stakeholders.  Notably, the Secured Creditors do not seriously contend otherwise.  Nor could they:  as discussed above, MBIA's own public filings with the SEC make clear that even they believe that the value of the Debtors' interests in the Portfolio Companies exceeds their outstanding liabilities.

19.     A trustee, by contrast, will only serve to chill the process and delay the fulfillment of all stakeholders' needs.  Ms. Tilton and Goldin have already made meaningful progress in connection with marketing and selling certain interests in the Portfolio Companies, and Mr. Kirschner and Goldin have already spent a significant amount of time becoming familiar with the Debtors' complicated structures and assets, the relevant stakeholders and their interests, and key

Portfolio Companies.  Inserting a new party to monitor or participate in the sale process will interfere, and potentially unwind, the steps already taken, causing unnecessary delay, and will result in confusion in the market as to who buyers should be negotiating with.  Further, willing buyers may have less confidence in a sale process in which a Chapter 11 trustee attempts to insert himself or herself, with no knowledge of the assets, contradicting and potentially undermining the substantial experience and knowledge that Ms. Tilton, working closely with Mr. Kirschner and Goldin, has with respect to the Portfolio Companies' assets and businesses.

20.     That the Secured Creditors seek the appointment of a trustee, in the alternative to dismissal—and the ad hominem arguments they advance in seeking it—further demonstrates that they are not focused on maximization of value and monetization for the benefit of all stakeholders, and instead seek to transform these proceedings into the kind of value-destroying litigation campaign directed at Ms. Tilton personally that they had engaged in prepetition.  As a result, the appointment of trustee may very well—at the behest of the Secured Creditors or otherwise—result in needless litigation that effectively handcuffs sale efforts.  Moreover, because Portfolio Companies are not themselves in bankruptcy, a trustee will not be able to sell the companies without first engaging in time-consuming and expensive litigation regarding the scope of the Debtors' rights, and Portfolio Company ownership and control issues, that need not be resolved under the monetization process proposed by the Debtors and the CRO.

21.     In sum, these bankruptcy petitions and the Debtors' and Ms. Tilton's post-petition activity have been designed to maximize value for all stakeholders.  The Court should decline to forestall that process by granting the Motion.

**C.      The Motion Relies Entirely On Disproven and Unsupported Allegations in Alleging that these Chapter 11 Cases were Filed in "Bad Faith."**

22.      The Secured Creditors levy significant charges against Ms. Tilton—calling her a fraudster and a thief among other falsehoods.  But their slander is nothing new.  Rather, the Motion provides a "greatest-hits" litany of all the speculative and meritless charges they and their ilk have levied against Ms. Tilton for years.  But what the Motion disingenuously fails to explain is that Ms. Tilton has beaten these charges in the only tribunals that considered their merits and that the majority of courts to which the Secured Creditors have advanced these accusations have not given them the time of day.  *See, e.g.*, *Zohar II 2005-1, Limited, Inc.*, 2017 WL 5956877, at *23 n.228 (bypassing in a one-sentence footnote allegations of self-dealing and theft).  This Court should deny them the same.  If anything, the Secured Creditors should be admonished for continuing to beat this tired, false drum.

**1.      The SEC Has Already Rejected Many Of The Secured Creditors' Allegations.**

23.      Many of the allegations in the Secured Creditors' Motion raise issues that were at the heart of an SEC investigation and trial against Ms. Tilton and Patriarch relating to the Zohar Funds, after which the SEC ALJ dismissed all counts against all respondents.  *SEC Decision*, 2017 WL 4297256, at *49 ("It is concluded that the violations alleged in the OIP are unproven.  Thus, this proceeding will be dismissed."); *see also* Annex A (comparing allegations in the Secured Creditors' motion to dismiss with the issues decided in the SEC Decision).  This conclusion was reached after a 14-day trial, during which "[t]he Division of Enforcement called nine witnesses, including three expert witnesses, from whom evidence was taken, and

Respondents called nine witnesses, including six expert witnesses.  Respondent Tilton testified for three and one half days."  *Id.* at *2.[12]

24.     A central part of the Secured Creditors' Motion is the allegation that Ms. Tilton engaged in self-dealing due to improper use of the overcollateralization test.  Motion, ¶ 31.  At the time that Patriarch served as the Zohar Funds collateral manager, Patriarch, as collateral manager, used this test—which impacted the collateral manager's fees—to categorize the performance of loans.  According to the Secured Creditors, Ms. Tilton surreptitiously and arbitrarily applied this test to avoid any impact that loans performing less successfully might have on her collateral management fees.  *See id.*

25.     This is the *very same charge the SEC levied on the Secured Creditors' behalf in the SEC Proceeding.*  In fact, it was a *central facet* of the SEC's case against Ms. Tilton—the prime vehicle through which the SEC attempted to prove that she committed fraud.  But the SEC ALJ found it manifestly "unproven," a decision now adopted by the Commission itself.  *See SEC Decision*, 2017 WL 4297256, at *40, *45–46 ("[I]t is concluded that Respondents' approach was disclosed in the trustee reports, which disclosed adequate information to determine that Category 4/Collateral Investments included loans that did not make full stated interest payments.").

26.     Other claims made by the Secured Creditors in their Motion were rejected specifically by the SEC ALJ.  The Secured Creditors allege, as evidence of wrongdoing, that (i) Patriarch, as collateral manager, agreed to amend the credit documents governing the Zohar Funds' loans to the Portfolio Companies (collectively, the "Zohar/Portfolio Loan Documents") to

---

[12]    At the same time as the SEC Proceeding, one of the Portfolio Companies for which Ms. Tilton is the sole director and Chief Executive Officer, MD Helicopters, was bidding with the federal government to supply military goods and service orders with a potential value exceeding $1.4 billion.  In light of national security concerns inherent in the transaction, the federal government thoroughly reviewed the facts and allegations raised in the SEC Proceeding.  The federal government awarded MD Helicopters, under the control of Ms. Tilton, a contract to purchase approximately 150 military aircraft and support services over a 5-year term.

extend the terms beyond when the Zohar Fund noteholders' notes matured; and (ii) certain of the

Portfolio Companies have ceased operations and/or filed for bankruptcy.  Motion, ¶¶ 26, 52.

27.    As to the amendments, the SEC ALJ expressly found that the deal documents for

the Zohar Funds include multiple acknowledgments and disclosures about the fact that the

collateral securing the Class A notes would include loans to distressed entities, and that by their

nature, the applicable agreements may be subject to extensive amendment.  *SEC Decision*, 2017

WL 4297256, at *17–18.  Specifically, Section 7.7(a) of the Indentures provides:

> The Zohar Obligors (or the Collateral Manager on behalf of such Person)
> may, ***without the consent of the Holders of any Notes or the Credit
> Enhancer, enter into any amendment, forbearance or waiver of or
> supplement to any Underlying Instrument included in the Collateral***, so
> long as such amendment, forbearance, waiver or supplement does not
> contravene the provisions of any Transaction Document or contravene any
> applicable law or regulation.  For the avoidance of doubt and
> notwithstanding anything else contained herein, the parties hereto
> acknowledge and agree that ***the Collateral Debt Obligations will consist
> of stressed and distressed loans that may be the subject of extensive
> amendment, workout, restructuring and/or other negotiations*** and, as a
> consequence thereof, the ***Issuer or the Zohar Subsidiary may receive by
> way of amendments, modifications, exchanges and/or supplements to
> such Collateral Debt Obligations, Equity Kickers, Equity Workout
> Securities and/or the relevant Underlying Instruments (i) interests in
> loans, debt securities, letters of credit or leases that do not satisfy the
> provisions of the definition of "Collateral Debt Obligation" and/or the
> Eligibility Criteria and/or (ii) Equity Workout Securities***.

*SEC Decision*, 2017 WL 4297256, at *17–18 (emphasis added).

28.    With respect to the suggestion that the closing of a handful of Portfolio

Companies, and resulting litigation, is evidence of Ms. Tilton's "mismanagement" of the

companies, Motion, ¶¶ 52–53, the SEC Decision found that "[t]he investors knew that the Funds'

business model was to lend to a number of distressed companies with the idea that, while some

would succeed, enabling the Funds' investors to be paid, others would fail,"  2017 WL 4297256,

at *45.

29.    The SEC ALJ similarly recognized the substantial disclosures in the Zohar Funds'

offering memoranda regarding the risks associated with the Zohar Funds' distressed investments:

> The April 4, 2007, Zohar III offering memorandum warned that the
> collateral "is expected to include a material amount of stressed and
> distressed loans that may be the subject of extensive amendment, workout,
> restructuring and other negotiations" and, as a result, the Fund "may …
> receive interests in loans, debt securities, letters of credit or leases that do
> not satisfy the provisions of the definition of 'Collateral Investment' and
> the Eligibility Criteria referred to herein." ***It further warned that the
> Fund "may originate or purchase loans … of … companies that are
> experiencing significant financial or business difficulties, including …
> bankruptcy." Such investments "involve a substantial degree of risk.
> Any one or all of [them] … may be unsuccessful or not show any return
> for a considerable period of time … [and the Fund] may lose its entire
> investment***."

*SEC Decision*, 2017 WL 4297256, at *18 (emphasis added) (citations omitted). That some

Portfolio Companies closed is the inevitable consequence of this fully disclosed strategy, not of

misconduct. Nor are unrelated, unproven "alleg[ations]," Motion, ¶ 53, made in resulting

litigation between third-parties and Ms. Tilton or her Patriarch entities, of any probative value.

30.    Consistent with the deal documents and the distressed nature of the Portfolio

Companies, Patriarch, at times, determined that it was in the interest of the Zohar Funds to

amend certain Zohar/Portfolio Loan Documents by modifying payment terms. Such debt relief

was essential to the long-term success of certain Portfolio Companies, which ultimately

benefited the Zohar Funds, both by way of strengthening the chances of long-term income

streams from performing loan payments, and increasing the value of the Portfolio Companies.

Given that the Zohar Funds were the record stockholders or members of many of these Portfolio

Companies, and similarly had outstanding debt obligations for these companies, providing

modest debt relief under the Zohar/Portfolio Loan Companies ultimately increased the value of

Debtors' interests (either debt or equity upside) in the Portfolio Companies, with proceeds

therefrom being available to noteholders pursuant to the Indentures' waterfall. There is no

allegation, much less proof, that the Portfolio Companies would have been able to pay more to the Zohar Funds if the amendments had not been made.  In light of the SEC Decision, any claims of misconduct arising out of these tired charges simply must be rejected.[13]

31.    The Secured Creditors' related charges of conflict of interest and supposed self-dealing have also been fully litigated, expressly decided, and definitively rejected in the SEC Proceeding.  The SEC ALJ *expressly found* that the deal documents disclosed fully all potential conflicts of interest, *e.g.*, *SEC Decision*, 2017 WL 4297256, at *20, to the Zohar Funds' "sophisticated, institutional investors," *id.* at *30.  Likewise, the Secured Creditors assert that Ms. Tilton self-dealt due to improper use of the overcollateralization test—but that was a *central facet* of the SEC's case against Ms. Tilton, and the SEC ALJ found it manifestly "unproven."  *Id.* at *40; *compare* Motion, ¶ 31, *with SEC Decision*, 2017 WL 4297256, at *40, *45–46 ("[I]t is concluded that Respondents' approach was disclosed in the trustee reports, which disclosed adequate information to determine that Category 4/Collateral Investments included loans that did not make a full stated interest payments.").  In short, the SEC Decision addresses and dismisses each of the factual allegations the Secured Creditors seek to re-levy to support their Motion.  The issues actually and necessarily decided in the SEC Proceeding decisively preclude resting on these allegations as a basis here.

---

[13]    In fact, the Secured Creditors should be collaterally estopped from relitigating the charges the SEC ALJ dismissed.  Collateral estoppel applies where, as here, "[t]he issue sought to be precluded is the same as that decided in the prior action," it was "actually litigated," finally determined, and "essential to the prior judgment." *In re Cowan*, 337 B.R. 512, 530 (Bankr. W.D. Pa. 2006) (citing *Temple Univ. v. White*, 941 F.2d 201, 212 (3d Cir. 1991); *Delaware River Port Auth. v. Fraternal Order of the Police*, 290 F.3d 567, 573 n.10 (3d Cir. 2002)).  Collateral estoppel may be asserted against "a party" in the prior action or one who was "in privity with a party to the prior action" (as the Secured Creditors were with the SEC) so long as that party (or the party in privity) had a "full and fair opportunity to litigate the issue in question." *Id*.  Privity exists *inter alia* where a non-party was "adequately represented by someone with the same interests who [wa]s a party to the suit," where a "substantive legal relationship" exists between the non-party and the party, or where a non-party assumed control over the prior litigation. *Taylor v. Sturgell*, 553 U.S. 880, 894–95 (2008).  Each of these prongs is met here, making it unfair to let the Secured Creditors "relitigate" issues effectively "already decided against [them]" in the SEC Decision. *In re Washington Mut., Inc.*, 2010 WL 3238903, at *9 (Bankr. D. Del. Aug. 13, 2010) (citing *In re City of N.Y.*, 2007 WL 509797, at *15 (N.Y. Sup. Ct. Feb. 15, 2007)).

32.    MBIA colluded with the SEC in bringing that enforcement action against Ms.

Tilton, even entering into an agreement to share her confidential information with the SEC to aid

the SEC in prosecuting the Secured Creditors' rights.  *See id.* at *40 ("It appears that the

Division agreed to share certain documents with MBIA," which may well have been a breach of

legal or ethical rules.).[14]

### 2.    The Motion's Other Allegations Are Largely Repeated From A Complaint That Was Dismissed In Full.

33.    The Secured Creditors further accuse Ms. Tilton of "pillag[ing]" the funds, of

"theft," "fraud," "misappropriation," "divert[ing] funds," "misconduct," "malfeasance," and

"shameless self-dealing."  Motion, pp. 1–2 & ¶¶ 21, 22, 53, 54, 57, 61, 71, 78, 91, 95, 108.  But

the Secured Creditors' Motion cites not a shred of evidence to support these spurious claims, and

the Secured Creditors—claiming that only limited discovery was necessary for the hearing on the

Motion—make no attempt to prove them up with actual evidence.  Rather, the Secured Creditors

repeatedly cite AMZM's old RICO Complaint in support of their accusations that Ms. Tilton

"abused her positions as a fiduciary," misappropriated Zohar Fund assets, engaged in "rampant

mismanagement and self-dealing," and otherwise acted inappropriately, *see, e.g.*, *id.* at ¶¶ 21,

25–26, 50, even though the claims against Ms. Tilton and her Patriarch entities in that case have

been *dismissed in full.  See Zohar CDO 2003-1, Ltd. v. Patriarch Partners LLC*, 2017 WL

6628609, *17 (S.D.N.Y. Dec. 29, 2017).  These and other disproven and dismissed claims cannot

support the extraordinary relief sought in the Secured Creditors' Motion.  That the Secured

---

[14]    MBIA's involvement in the SEC case was not the first time MBIA made meritless allegations against Ms. Tilton.  In 2009, in a case the Secured Creditors ignore entirely, MBIA sued two Tilton-controlled entities for purportedly violating the Zohar I indenture by failing to convey Zohar I Class B notes to MBIA.  *MBIA Ins. Corp. v. Patriarch Partners VIII*, LLC, 950 F. Supp. 2d 568, 618 (S.D.N.Y. 2013).  MBIA sought $120 million in damages.  After four years of litigation and a lengthy bench trial, MBIA's claims were dismissed in their entirety, *id*. at 621, based in significant part on the testimony of Ms. Tilton, who the court described as "vigorous, authoritative, informed" and "credible," with a "recollection of events [that] was clear and unshaken," *id*. at 612.

Creditors present discredited allegations as if they were fact shows the dearth of evidence they have uncovered in support of their claims—even after *years* of levying such charges against Ms. Tilton and repeated opportunities to depose and cross-examine her.  *See, e.g.*, Motion, ¶¶ 10, 21, 25, 26, 29, 31, 108.  Not one court that has heard purported evidence on these allegations of wrongdoing has ever found them supported.[15]

34.     For example, according to the Secured Creditors (parroting an allegation made in AMZM's now-dismissed RICO Action), "Tilton caused the sale of a Portfolio Company, HVEASI Holding BV, that Tilton had previously represented was owned 100% by Zohar II, [and] none of the $300 million sale proceeds were received by the Funds."  Motion, ¶ 50.  AMZM's allegation was based solely on an internal Patriarch document that, due to a typographical error, incorrectly identified one of the Zohar Funds as a record owner of HVEASI, when the Zohar Funds were simply a secured lender to the company.  In connection with these false assertions, Ms. Tilton sent a Rule 11 letter to AMZM's counsel—including because Ms. Tilton had previously testified about the typographical error, all governance documents reflect that HVEASI was wholly owned by Ms. Tilton or her affiliates (specifically, Ark II CLO 2001-1), and the Zohar Funds never held any ownership interest in that entity.  Public documents confirm that HVEASI's parent, Nicole Corporation, transferred all of HVEASI's shares to Ms. Tilton's Ark II entity, not to Zohar II.  *See* Dkt. No. 1038 (Order) at 1, *In re High Voltage Eng'g Corp.*, Case No. 05-10787 (JNF) (D. Mass. Bankr. July 25, 2005).  The RICO Action was dismissed in December 2017, and, tellingly, AMZM did not appeal that decision, nor did it pursue these allegations in later-filed state court actions.

---

[15]    As discussed below in more detail, for example, AMZM asserted in the Delaware 225 Action, and submitted supposed evidence, that the PPMG contracts amounted to improper self-dealing, yet the court did not reach any such conclusion.

D. **The Secured Creditors' Other Allegations Of Wrongdoing Are Wrong And Entirely Unsupported.**

35.    Despite Ms. Tilton's record of dedication to the Debtors and the Portfolio Companies, her success in turning around many of the Portfolio Companies, and the dismissal in full of both the SEC's fraud charges and AMZM's RICO suit, the Secured Creditors persist in their pursuit of endless litigation with yet other unfounded accusations against Ms. Tilton. They do so using unfortunately mean-spirited, invective-strewn characterizations that are in essence variations on previously disproven allegations. Ms. Tilton denies these allegations entirely and responds here to certain of the most egregious inaccuracies.

1. **Amending The Terms of the Loans to the Portfolio Companies Was Necessary Because These Distressed Entities Were Not Able to Repay the Subordination of Zohar Notes.**

36.    The Secured Creditors assert that "[Ms.] Tilton—again, acting on all sides of the transactions and expecting to imminently lose her collateral manager role—caused the Zohar Funds to enter into subordination agreements, so that any debt that the Portfolio Companies owed the Zohar Funds would be junior to obligations that the Portfolio Companies owed to Tilton's affiliate entities." Motion, ¶ 26. This is again a blatant mischaracterization of the facts.

37.    As Ms. Tilton will testify, at various points in time, certain Portfolio Companies encountered liquidity issues. Their options in obtaining financing were limited: the Zohar Funds reinvestment period had ended such that the Zohar Funds could not extend further financing, and most recently the cloud of litigation created by AMZM's litigate-at-all-costs strategy rendered them—and continues to render them—unable to obtain financing from third party banks. As a result, and where and when necessary to preserve the value of the Portfolio Companies, Ms. Tilton made additional loans to the Portfolio Companies through her personal investment vehicles. These loans were made on the commercially-common term "last in, first out." These

loans, made in a very few instances, after reinvestment ended and when no other funding sources were available, have priority in payment over existing term debt, regardless of whether such existing term debt was owed by the Zohar Funds or an affiliate of Ms. Tilton.  Generally, these new money loans were relatively small compared to existing term debt, and were advanced on a strictly as-needed basis.  These extensions of new indebtedness by Ms. Tilton were aimed at preserving value of the Portfolio Companies and the Zohar Funds' collateral by averting liquidity crises and liquidation, not impairing any noteholders' interests.

### 2.     Ms. Tilton's Position as the Funds' Taxpayer is Not a "Benefit."

38.     The Secured Creditors charge that "Tilton enjoyed the benefit of the Zohar Funds' tax losses for 14 years, only to improperly attempt to impose potential tax liability on the Zohar Funds for any gains in the liquidation or monetization of the Collateral."  Motion, ¶ 34.  This allegation is false, and could not be further from the truth.  Before AMZM took over collateral manager responsibilities, the Zohar Funds were structured so that tax items—including income, gain, and loss—flowed up to Ms. Tilton.  For years, Ms. Tilton paid state taxes on behalf of the Portfolio Companies well in excess of $10 million.  At the same time, it was certain that she would be responsible for the payment of federal taxes at the time of the sale of Portfolio Companies.  But when AMZM refused to provide Ms. Tilton information regarding those tax items, Ms. Tilton was left with no choice but to elect for the Zohar Funds to be treated as corporations going forward (the "Check-the-Box Election").  However, following the Check-the-Box Election, tax ownership of the Zohar Funds remains in the hands of entities controlled by Ms. Tilton, and for which she ultimately bears the economic burden of all tax liabilities. Accordingly, the assertion that Ms. Tilton has used the Zohar Funds solely to benefit from their tax losses is ludicrous, not least because Ms. Tilton paid approximately $167 million in federal taxes for tax year 2016 as a result of the Check-the-Box Elections.

3. **There was no Finding of Wrongdoing with Respect to the Proxies and Amendments to the LLC Agreements.**

39.     In 2017, the Delaware Court of Chancery entered a ruling in the Delaware 225 Action that irrevocable proxies granted by the Debtors to Ms. Tilton were not enforceable as to three of the Portfolio Companies.  *Zohar II 2005-1 Ltd. V. FSAR Holdings, Inc.*, 2017 WL 5956877 (Del Ch. Nov. 30, 2017).  However, contrary to the Secured Creditors' mischaracterization of that decision, the Court of Chancery did not find any wrongdoing on the part of Ms. Tilton or Patriarch in connection with such proxies.  Instead, the decision was made strictly on contract interpretation grounds.  The trial court's decision is subject to a pending appeal to the Delaware Supreme Court, which has been stayed so that the Debtors can focus their energy and resources to marketing and selling the Portfolio Companies, as discussed further below.

4. **Ms. Tilton's Affiliated Companies Provide Services to the Zohar Funds and the Portfolio Companies, and Charge Reasonable Rates.**

40.     The Secured Creditors further take issue with certain fees charged by Patriarch as former collateral manager of the Zohar Funds, PPAS as administrative agent under the Zohar/Portfolio Loan Documents, and Patriarch Partners Management Group, LLC ("PPMG") for providing operational and managerial services to the Portfolio Companies.  Motion, ¶¶ 10–12, 31.  These are again recycled allegations previously made in various contexts, including by the SEC in its administrative proceeding, and by AMZM in the RICO Action and the Delaware 225 Action.  The SEC Decision dismissed all charges, including those related to alleged "unearned management fees and other payments," finding, for example, that the deal documents and trustee reports provided to all noteholders—including the Secured Creditors—"disclosed the fee arrangement" and the "[f]ees paid."  2017 WL 4297256, at *2.  The RICO Action was dismissed in full.  And even in the decision in the Delaware 225 Action that found against Ms.

Tilton with respect to three portfolio companies on contract interpretation grounds, the court did

not make any finding of wrongdoing with respect to fees, despite AMZM's allegations that she

had improperly raised fees and engaged in self-dealing, and overcharged for PPMG's and

PPAS's services.  *Cf. Zohar II 2005-1, Limited*, 2017 WL 5956877, at *15 (noting without

disapproval that "Tilton also provided a suite of fee-based consulting and agency services to the

Zohar Funds' portfolio companies through (separate) entities she controlled," namely PPMG and

PPAS).

41.    Patriarch CMA Fees.  As noted above, the SEC dismissed on the merits all

allegations regarding Ms. Tilton's collateral manager fees.  While Ms. Tilton did indeed receive

approximately $598 million in fees under the Patriarch CMAs (and is owed approximately $26

million more, a portion of which has been improperly withheld by AMZM), for services

rendered over a period of thirteen years, those fees were not simply pocketed by Ms. Tilton.

They were invested back in the Zohar Funds and the Portfolio Companies, used to pay expenses

for collateral management operations (*e.g.*, rent, salaries, and employee benefits for on average

fifty senior professionals, and supplies), and a substantial sum went to the IRS.  Further,

Patriarch's fees, collected during the exceedingly busy years in which the Zohar Funds were

actively investing in Portfolio Companies, are comparable to the tens of millions dollars in fees

Patriarch understands were collected by AMZM over the last couple years, during which time

AMZM essentially did nothing but litigate.

42.    PPAS Fees.  The Secured Creditors do not really take issue with the amount of

PPAS's fees, or the fact that any loan administrator would charge such fees.  Nor do they

challenge that PPAS is, in fact, the administrative agent under the Zohar/Portfolio Loan

Documents (though AMZM tried to take that business for itself).  In transactions of this nature, it

is entirely customary for administrative or collateral agents to charge a fee, and all fees charged by PPAS are consistent with the market. This is not evidence of bad faith or misdeeds; this is simply evidence of Ms. Tilton respecting the corporate form.

43. PPMG Fees. PPMG provides day-to-day operational, financial, strategic, legal, and human resources services to the portfolio companies. These services are instrumental to rehabilitating the companies that comprise the Zohar Funds' portfolios, and portfolio company executives testified in the Delaware 225 Action to being "satisfied" with the services provided.[16] According to the Secured Creditors' Motion, "Tilton caused both PPMG and the Portfolio Companies to substantially increase PPMG's monthly fees shortly before the Patriarch Managers' resignations." ¶ 12. In support of this contention, the Secured Creditors cite to the decision in the Delaware 225 Action, in which the Chancery Court cited a single instance in which PPMG had increased its fees. As background, PPMG began charging the Portfolio Companies for its services in 2006 and 2007, and those fees were between $10,000 and $25,000 per month depending on the size of the company. Fees were never re-set or increased once set, even though such fees were well below market for the services provided. However, for newly acquired Portfolio Companies, PPMG charged monthly fees up to $100,000. While such fees were still below market, they better reflected the value of the services being provided. In 2015, PPMG also determined to increase fees for some of the older Portfolio Companies, in order to bring these fees closer to (although still below) market. The rates PPMG charges Portfolio Companies are a good value for the services provided.[17]

---

[16]  Ex. 10 (Harrington Dep.) at 141:18–24.

[17]  See, e.g., Ex. 9 (Delaware 225 Action Trial Tr.) at 1095:1–17 (even after fees were raised they were "way below market"); Ex. 10 (Harrington Dep.) at 141:18–24 (CEO of portfolio company Hussey Copper testifying that he is "satisfied with the services provided").

44.    Ms. Tilton has, moreover, willingly forgone management and similar fees in numerous instances for the sake of maximizing the portfolio companies' long-term value.[18]   The accrued and deferred fees include approximately $54 million in fees owed to PPMG, almost $9 million owed to PPAS, and $26.4 million in collateral management fees.   These fees, if paid timely, would have diluted the Portfolio Companies' liquidity, but at Ms. Tilton's direction were deferred so the Portfolio Companies could more effectively implement the turnaround of their respective businesses.[19]

### 5.    PPAS Transactions were Appropriate.

45.    The Secured Creditors further levy accusations against Ms. Tilton through the role of PPAS as administrative agent under the loans from the Zohar Funds to the Portfolio Companies.   For example, the Secured Creditors accuse Ms. Tilton of "set[ting] up PPAS as a 'shadow' collateral manager, making loans without the consent or even the knowledge of AMZM, and without ever paying interest or principal back to the Zohar Funds."   Motion, ¶ 33.  In fact, certain Portfolio Companies did draw on revolving loans, many of those draws were in fact approved by AMZM once they assumed the role of collateral manager (and prior to that had been approved by the Patriarch entities serving as collateral manager), and PPAS held the drawn funds in a PPAS account on behalf of the Portfolio Companies, consistent with the terms of the relevant Zohar/Portfolio Loan Documents.   The Portfolio Companies recorded the full drawn amounts on their balance sheets, had control over the drawn funds, and were charged interest on the drawn amounts.   In short, once drawn PPAS was holding Portfolio Company money, and not Zohar Fund money.   The Portfolio Companies could have deposited that money with any bank,

---

[18]   *See* Ex. 9 (Delaware 225 Action Trial Tr.) at 1093:12–1094:12 ("[I]f they did not have the ability to pay without causing damage to the company, then we accrued those fees."); *id.* at 1099:8–16 (explaining that Ms. Tilton would frequently decline to collect fees because "the best interest of [a distressed] company is not to use that valuable cash right now to pay PPMG").

[19]   *See supra* note 18.

but instead kept it at PPAS.  As a result, no harm remotely befell the Zohar Funds.  Indeed, the

draws ensured that the Portfolio Companies retained needed liquidity that had been pledged

under the Zohar Funds' credit documents.

46.      This, again, is just a repeat of prior allegations that were levied by AMZM in

*Patriarch Partners Agency Services. v. Zohar CDO 2003-1, Ltd.*, 16 Civ. 4488 (S.D.N.Y. 2016)

(the "PPAS Action").  AMZM in fact sought emergency injunctive relief in the PPAS Action to

prevent transfers of funds related to those alleged in the Motion, and that application was flatly

rejected by two federal district court judges.

47.      And finally, the Secured Creditors have taken issue with the use of an interest

payment made by a Portfolio Company on its loan from the Zohar Funds.  Motion, ¶ 11.  PPAS,

as administrative agent, collected that payment and distributed it to an account established by the

Debtors to fund their bankruptcy administrative costs.  As explained in the Debtors' opposition

to the Motion, this act was in line with the terms of the applicable deal documents, and cannot be

said to have harmed the Debtors' estates.  Such funds will not be used absent a separate order of

the Court, and they have enabled the Debtors to pursue these Chapter 11 cases and free

themselves of the crushing costs of prepetition litigation.

**E.      The Motion's Allegations of a Bad Faith Filing to Obtain a Tactical Advantage in Litigation are Without Factual Basis and are Incorrect.**

48.      The Secured Creditors assert that Ms. Tilton put the Debtors into bankruptcy "in

bad faith as yet another part of her scheme to gain a tactical advantage in her bilateral disputes

with the Zohar Secured Creditors."  Motion, ¶ 71.  Specifically, the Secured Creditors claim that

Ms. Tilton "commenced these bankruptcy cases just as her litigation strategy was faltering," *id*.

at ¶ 59, for the sole purpose of "halt[ing] litigation claims belonging to the Debtors against [Ms.

Tilton]," *id*. at pp. 2–3.  According to the Secured Creditors, the Debtors' bad faith with respect

to these Chapter 11 cases is evidenced itself by the fact that the Petition Date was nine (9) days prior to oral argument in front of the Delaware Supreme Court in connection with the Delaware 225 Action. *Id.* at ¶ 76. These assertions are incorrect.

49. *First*, as explained above, the purpose of these Chapter 11 cases is to maximize the value of the Debtors' assets through an organized sale process. The fact that a component of this plan involves utilization of the automatic stay is entirely consistent with a good faith filing. *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 201, 211 (3d Cir. 2003) (finding that a Chapter 11 petition filed on the "eve" of a damages trial was in good faith where the purpose was to complete an orderly liquidation of the debtor's assets); *In re S. Canaan Cellular Invs., LLC*, 420 B.R. 625, 632 (E.D. Pa. 2009) (holding that filing a Chapter 11 petition to forestall litigation by a judgment creditor that would jeopardize recoveries for other creditors and for equity was "within the 'acceptable spectrum' of reasons justifying a valid bankruptcy filing").

50. *Second*, the stay of the Delaware 225 Action appeal works to Ms. Tilton's personal detriment, not to her benefit. The stay keeps in place an adverse decision below in the Debtors' favor and prevents Ms. Tilton from seeking a favorable reversal in the Delaware 225 Action appeal. Ms. Tilton expected to prevail on appeal, in light of the fact that Vice Chancellor Slights found, in staying his own decision in the case, that she had "presented serious legal questions" regarding his decision, including "novel" issues "worthy of consideration" by the Delaware Supreme Court. Amended Order, *Zohar II 2005-1 Ltd. v. FSAR Holdings, Inc.*, 2017 WL 6761234, at *1 (Del. Ch. Dec. 29, 2017). The Delaware Supreme Court upheld that stay pending appeal over AMZM's objection, suggesting that it too viewed Ms. Tilton's appeal to have presented serious questions on the merits. In other words, Ms. Tilton did not "commence these bankruptcy cases nine days before oral argument of the appeal" to avoid a decision in the

appeal, Motion, ¶ 46, but rather so the parties could focus on monetization of the Portfolio

Companies for the benefit of the Debtors and all stakeholders—despite the fact that she is well-

positioned to prevail in the Delaware 225 Action.

51.     *Third*, the Secured Creditors dramatically overstate the importance of the

Delaware 225 Action to resolving ownership and control questions as to all of the Portfolio

Companies.  In the *Debtors' Objection to Alvarez & Marsal Zohar Management, LLC's Motion*

*for Relief from the Automatic Stay* [D.I. 111] (the "Debtors' Stay Relief Objection"), the Debtors

explain that the Delaware 225 Action only implicates three Portfolio Companies, which are

Delaware corporations, whereas the issues of ownership and control for almost all of the

remaining Portfolio Companies are governed by limited liability company agreements and other

states' corporation laws, and involve entirely different relevant facts as to how any applicable

stock or membership interests were obtained or created.  Debtors' Stay Relief Objection, p. 4 n.9.

Nor did the Court of Chancery invalidate the irrevocable proxies in that case for "self-dealing,"

Motion, ¶ 45, or find that Ms. Tilton had "misappropriated" Fund property.  Rather, the case was

resolved solely (and incorrectly) on contract grounds.  *See, e.g.*, *Zohar II 2005-1, Limited v.*

*FSAR Holdings, Inc.*, 2017 WL 5956877, at *23 n.228 (Del. Ch. Nov. 30, 2017) (bypassing in a

one-sentence footnote allegations of self-dealing and theft).  And much of the litigation pending

between Patriarch and AMZM, purporting to act on behalf of the Debtors, including the

Delaware 225 Action, is no longer relevant in light of the Debtors' Chapter 11 case.  Ms. Tilton

has agreed that sale proceeds attributable to the Zohar Funds' record interests in the Portfolio

Companies will flow through the Indentures' waterfall, regardless of the disputes at issue in the Delaware 225 Action or the other lawsuits implicating ownership.[20]

52.    *Fourth*, contrary to the Secured Creditors' repeated assertions, the status of other litigation stayed by the filing of these Chapter 11 cases does not suggest that they were filed to gain a litigation advantage.  In fact, the litigation status supports just the opposite.  Ms. Tilton has affirmative claims against the Debtors and Secured Creditors in a number of cases that were stayed by the filing of the Chapter 11 cases.  The S.D.N.Y. dismissed the baseless claims against Ms. Tilton and Patriarch in the RICO Action (parroted in the Secured Creditors' Motion), but Ms. Tilton's counterclaims against the Zohar Funds and third-party claims against the Secured Creditors are still pending there.  In other words, the only live claims that remain in the RICO Action are Ms. Tilton's, yet she caused the suit to be stayed because the ongoing litigation is not beneficial for the Debtors.  Ms. Tilton also has pending counterclaims and third-party claims against AMZM and MBIA in the Delaware 225 Action that were stayed.  And she has filed a number of lawsuits against the Zohar Funds in state courts (to determine the ownership and control of certain portfolio companies).  While one of the lawsuits was dismissed prior to the filing of the Chapter 11 cases, she caused the remaining suits to be stayed, further undermining Secured Creditors' theory that Ms. Tilton filed these Chapter 11 cases to halt claims against her. AMZM's Delaware lawsuits, the LLC Action and the MD/Vulcan Action, were filed *after* Ms. Tilton filed her affirmative state court claims.  Ms. Tilton removed those Delaware lawsuits and has objected to (i.e., appealed) the report and recommendation to remand those suits to Delaware Court of Chancery.  The stay deprives Ms. Tilton of a potentially favorable decision overturning the report and recommendation on a removal question of first impression.  Not only do the

---

[20]    Further, the calendar of upcoming hearings and deadlines in the litigation between AMZM and Patriarch was very full, to the point that the Secured Creditors could have asserted that these Chapter 11 cases were filed to avoid upcoming litigation deadlines or appearances regardless of the actual date filed.

Secured Creditors fail to disclose even the existence of some of these suits, but they fail to acknowledge that Ms. Tilton's decision to file for bankruptcy does not inure to her personal litigation advantage, as it has stayed a number of cases in which she was prosecuting affirmative claims, or anticipated favorable outcomes in pending appeals. Nor was her litigation strategy "faltering"; to the contrary, she had already prevailed in full against the SEC and in having the claims against her in the RICO Action dismissed, and anticipated prevailing in the Delaware 225 Action appeal and elsewhere.

53. Finally, contrary to the Secured Creditors' assertion that "both Tilton and Mr. Kirschner make clear their intention to use the bankruptcy process to abandon the Debtors' extensive litigation claims against Tilton," Motion at p. 3 & ¶ 60, neither Patriarch nor the Debtors have requested any relief in these Chapter 11 cases that affects the Secured Creditors' or the Zohar Funds' purported claims against Ms. Tilton or Patriarch. To the contrary, the Debtors' have made clear that, while they seek to maximize value through an orderly sale process, their intention is "to preserve all parties' rights, relative to [any stayed] claims, while that [sale] process is playing itself out." Ex. 11 (Mar. 13, 2018 Hr'g Tr.) at 7:17–18. Indeed, Ms. Tilton has agreed to toll applicable statutes of limitations in order to preserve all parties' claims. If noteholders are paid in full through the liquidation of the Zohar Funds' assets, the expense and burden of litigating alleged claims against insiders will become unnecessary. Pursuing such litigation now will reduce the value realized from the Portfolio Companies and generate millions of dollars in fees.

F. **The Motion Provides No Evidence That A Trustee Could Provide A Better Return Than The CRO.**

54. The Secured Creditors argue that the "benefits" of appointment of a Chapter 11 trustee would outweigh the costs, suggesting that the Trustee could create more value than the

CRO.  Motion, ¶ 117.  These arguments ignore the benefits that all stakeholders will realize once the Secured Creditors cease litigating over control of these Chapter 11 cases.

55.  *First*, Ms. Tilton and her colleagues with Patriarch Partners have been intimately involved in the Zohar Funds' investments and interests in the Portfolio Companies' since the funds' inception.  Ms. Tilton is the sole director and CEO of many of these Portfolio Companies, and has the institutional knowledge of these entities that is critical in order to maintain their operations, and to coordinate and manage the marketing and sale process contemplated under the Collateral Monetization Procedures, which would lead to full recovery for all stakeholders. AMZM, in contrast, has proposed no plan whatsoever other than to re-activate destructive trench warfare litigation that will make it nearly impossible to sell the Portfolio Companies or refinance the Zohar Fund debt, and will continue to drain the value of the Debtors' assets.

56.  *Second*, the Secured Creditors assert that a Chapter 11 Trustee will benefit stakeholders by "assess[ing] the myriad of relationships Tilton has to the Zohar Funds and their assets," and "ensuring that any estate causes of action, including any involving Tilton or any of her affiliates, will be thoroughly and objectively assessed and pursued."  Motion, ¶ 117.[21]  But as discussed above, neither the Debtors nor Patriarch are taking any action to waive or otherwise impact any claims that the Debtors' may have against Patriarch.  If noteholders are paid in full from an orderly sale process, there is no reason for a costly and time-consuming trustee investigation.  If they are not paid in full, an investigation could then be conducted, without adversely impacting the value realized from the Portfolio Companies.

---

[21]   For the reasons explained in this Objection, Patriarch's actions with respect to the Zohar Funds and the Portfolio Companies have all been consistent with Patriarch's respective rights, obligations, and duties under the deal documents for the Zohar Funds and applicable law.  This is the conclusion the SEC ALJ reached after three weeks of trial and a review of the actual evidence and testimony involving these actions.

57.     *Third*, Ms. Tilton and Goldin have already made substantial and meaningful progress in connection with marketing and selling certain interests in the Portfolio Companies, and Mr. Kirschner and Goldin have already spent a significant amount of time becoming familiar with the Debtors' complicated structures and assets, the relevant stakeholders and their interests, and key Portfolio Companies.  Specifically, Ms. Tilton and Goldin, together or individually, have interviewed more than fourteen investment bankers, and have selected six of them to market certain of the Portfolio Companies for sale.  Inserting a new party in the form of a trustee will unwind the steps already taken, causing unnecessary delay, and will result in confusion in the market.

58.     In short, the Secured Creditors have not satisfied their heavy burden of proving that appointment of a Chapter 11 Trustee is in the best interests of all stakeholders.  The appointment of the Chapter 11 Trustee would, in fact, hinder the Debtors' marketing and sale process, and likely result in the destruction of value for stakeholders.  For all of the reasons set forth above, the Court should deny the Secured Creditors' request for appointment of a Chapter 11 trustee.

## CONCLUSION

59.     For the reasons set forth herein, the Court should deny the Secured Creditors' Motion in its entirety.

Dated:   April 10, 2018

**COLE SCHOTZ P.C.**

By:     */s/ Norman L. Pernick*
       Norman L. Pernick (No. 2290)
       Patrick J. Reilley (No. 4451)
       500 Delaware Avenue, Suite 1410
       Wilmington, DE  19801
       Telephone: (302) 652-3131
       Facsimile: (302) 652-3117
       npernick@coleschotz.com
       preilley@coleschotz.com

       – and –

**GIBSON, DUNN & CRUTCHER LLP**
Robert Klyman, Esquire
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7562
Facsimile: (213) 229-6562
rklyman@gibsondunn.com

Monica K. Loseman, Esquire
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

Randy M. Mastro, Esquire
Mary Beth Maloney, Esquire
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-2315
Facsimile: (212) 351-6315
rmastro@gibsondunn.com
mmaloney@gibsondunn.com

*Counsel to Lynn Tilton; Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC; Octaluna, LLC; Octaluna II, LLC; and Octaluna III, LLC*