## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (CSS) |
|  | ) |
|  | ) Jointly Administered |
| Debtors. | ) |
|  | ) **Ref. Docket Nos. 56, 132** |

## DEBTORS' OBJECTION TO (I) THE MOTION OF MBIA INSURANCE CORPORATION AND ZOHAR III CONTROLLING CLASS TO DISMISS THE CHAPTER 11 CASES OR, IF NOT DISMISSED, TO APPOINT A TRUSTEE AND (II) THE UNITED STATES TRUSTEE'S MOTION FOR THE APPOINTMENT OF A TRUSTEE, OR IN THE ALTERNATIVE, FOR THE APPOINTMENT OF AN EXAMINER

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") hereby submit this objection (the "Objection") to (i) the *Motion of MBIA Insurance Corporation and Zohar III Controlling Class to Dismiss the Chapter 11 Cases or, if Not Dismissed, to Appoint a Trustee* [Docket No. 56] (the "Dismissal/Trustee Motion") filed by MBIA Insurance Corporation and the Zohar III Controlling Class (collectively, the "Secured Creditors") and (ii) the *United States Trustee's Motion for the Appointment of a Trustee, or in the Alternative, for the Appointment of an Examiner* [Docket No. 132] (the "Trustee/Examiner Motion" and, together with the Dismissal/Trustee Motion, the "Motions")[2] filed by Andrew R. Vara, the Acting United States Trustee for Region 3 (the "U.S. Trustee" and, together with the Secured Creditors, the "Movants"). In support of this Objection, the Debtors respectfully represent as follows:

---

[1]   The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2]   Terms not defined herein shall have the meanings ascribed in the Motions, the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* [Docket No. 6] (the "Kirschner Declaration") or the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [Docket No. 5] (the "Tilton Declaration"), as applicable.

## PRELIMINARY STATEMENT

1.     The Debtors expressly commenced these cases to (i) stop any and all pending litigation and (ii) reserve all parties' claims pending monetization of the Debtors' assets, in order to (iii) monetize the Debtors' assets in a manner that maximizes value for all stakeholders.  In filing the Dismissal/Trustee Motion, full of the same specious allegations that court after court has already rejected,[3] the Secured Creditors have demonstrated the very harm sought to be avoided by the filing—litigation at all costs, without regard to the impact on the Portfolio Companies or the value of the Debtors' assets.  The automatic stay is critical to the goals of Chapter 11, generally, and these cases, in particular, as it affords the Debtors a breathing spell to maximize recoveries for creditors and equity holders.  Yet the Dismissal/Trustee Motion seeks to precipitously end this proceeding and resume the litigation wars that are so detrimental to the Debtors' estates.  The Secured Creditors' litigation-at-all-cost response thus proves the Debtors' point—without the benefit of the stay and a ruling by this Court that the litigations must cease, the Debtors will slip ineluctably back into the litigation morass, and value will be paralyzed, and ultimately decimated if the Portfolio Companies cannot repay or refinance the Zohar Fund debt.

2.     Critically, while Ms. Tilton is the sole shareholder and director of the Debtors, she is also a significant economic stakeholder.  Through her entities, Ms. Tilton's holdings include $150 million in Class B notes in Zohar I, $200 million in Class B notes in Zohar II, and $196 million in Class B notes in Zohar III.[4]  She has personally invested approximately $218.5 million into the Zohar Funds: $5.1 million in Zohar I, $50 million in Zohar II, and $60 million in Zohar

---

[3]  Indeed, the court granted Ms. Tilton's motion to dismiss AMZM's RICO cause of action and related state-law claims.  *See, e.g.*, Tilton Decl. ¶ 130.  Similarly, Ms. Tilton was fully vindicated by an SEC Administrative Law Judge following a three-week trial in which the SEC alleged many of the same things that the Secured Creditors now do.  *See, e.g.*, Tilton Decl. ¶ 101.  These allegations were rejected there and should be rejected here.

[4]  Tilton Decl. ¶¶ 41–42.

III, respectively, to own all of the preference shares of each of the Zohar Funds, and further invested $103.4 million to own the $286 million in A-3 Notes in Zohar I.[5]  In addition, Ms. Tilton has invested in and loaned more than $440 million to the various Portfolio Companies.[6] As a result, Ms. Tilton has a greater incentive to maximize value than any other stakeholder.

3.      To defeat this attempt to dismiss these Chapter 11 cases, the Debtors need only demonstrate that they filed bankruptcy for a proper purpose and not merely as a litigation tactic. Both criteria are easily met here.  The Debtors filed because the bankruptcy court provides the only forum for the Debtors to maximize the value of their assets for the benefit of all stakeholders.  And, in fact, these bankruptcy cases were expressly filed (i) to stay, rather than perpetuate, the pending litigations across multiple jurisdictions that threaten to destroy value, (ii) to promptly allow for the sale of the major Portfolio Companies, or the refinancing of their Zohar debt, to maximize value for all creditor and equity interests, and (iii) to provide robust reporting and transparency to representatives of the Secured Creditors, while at the same time protecting the litigation claims of such creditors.

4.      Appointment of a Chapter 11 trustee requires the Movants to demonstrate, by clear and convincing evidence, that a trustee would be in the interest of <u>all</u> of the Debtors' stakeholders or that the conduct of the Debtors' current management is improper.  They cannot demonstrate either, let alone by clear and convincing evidence.  The Debtors have enlisted the aid of a capable, experienced, independent CRO to oversee, and ensure the integrity of, an open and transparent asset monetization process designed to maximize value and protect the interests of all stakeholders.  As the U.S. Trustee has recognized, Mr. Kirschner is, in fact, "well-qualified

---

[5]  Tilton Decl. ¶ 31.

[6]  Tilton Decl. ¶ 31.

01:23063937.10

and independent"[7]—precisely the kind of person worthy of selection as a Chapter 11 trustee. The Secured Creditors do not question Mr. Kirschner's experience or skills, nor could they because many of the professionals and investors here have excellent, long-standing relationships with Mr. Kirschner and Goldin Associates, which has a deserved reputation for objectivity and integrity and has often been appointed for important fiduciary assignments. In fact, appointment of Chapter 11 trustee here would prove highly counterproductive. Under the current proposed Monetization Procedures, Ms. Tilton has specifically agreed to set aside the competing claims to control of the equity in the Portfolio Companies, vote any rights or claims in favor of a "Best Offer," and take other actions necessary to effectuate a transaction. Absent a consensual process with Mr. Kirschner's participation, Ms. Tilton cannot reasonably be expected to make these concessions. As such, the appointment of a Chapter 11 trustee will undoubtedly reverse this progress, the substantial efforts towards a consensual Monetization Process will be lost, and any efforts by a Chapter 11 trustee to monetize the Debtors' assets will have to start from scratch.

5.    The Secured Creditors' contention that Mr. Kirschner lacks independence is wrong—Mr. Kirschner cannot be terminated by Ms. Tilton without court approval.[8] The assertions that Mr. Kirschner intends to "abandon" litigation claims against Ms. Tilton,[9] "conceal from the Secured Creditors important information about the Debtors and Portfolio Companies,"[10] and allow Ms. Tilton to continue to "act as the gate-keeper of any monetization efforts and information without supervision and jurisdiction of this Court"[11] could not be further from the

---

[7]  Trustee/Examiner Mot. ¶ 32.

[8]  The Debtors' current proposed monetization procedures (the "Monetization Procedures"), which has the support of Ms. Tilton personally and her affiliated entities, is attached hereto as Exhibit 1, although the Debtors continue to refine those procedures in consultation with the Secured Creditors.

[9]  Dismissal/Trustee Mot. at 3, 34 n.11.

[10]  Dismissal/Trustee Mot. at 3–4.

[11]  Dismissal/Trustee Mot. ¶ 103.

truth.  All litigation claims will be preserved by mutual tolling agreements, the Debtors have filed a motion to establish robust financial reporting, and the Monetization Procedures will be guided and overseen by Rob Kost of Goldin who has 30 years of significant investment-banking experience, and who will report to the creditors' financial advisors and ultimately seek Court approval of the sales of Debtors' interests in the Portfolio Companies.  No one can seriously contend that some unknown trustee could surpass the expertise and experience of Ms. Tilton, who has an unparalleled knowledge of the Portfolio Companies and brought them back from the brink of demise, and Mr. Kirschner, a respected bankruptcy specialist and principal at the preeminent Goldin firm, in maximizing the Debtors' assets to satisfy all Noteholders' claims. The Portfolio Companies are not liquid market assets but rather dynamic companies with tens of thousands of employees, intellectual property, important customers, and vendors.   The monetization process is complex and sensitive, requiring an intimate understanding of the people and products of each Portfolio Company.

6.      Accordingly, the Motions here amount to little more than a litigation reflex, obstructionism driven by entrenched positions.   These Motions are precisely the sort of counterproductive squabbling that destroys value and that the Debtors filed these Chapter 11 cases to stop.  The Motions should thus be denied.

## BACKGROUND

### I.    Ms. Tilton's Creation of the Zohar Funds

7.      Ms. Tilton is the creator, founder, director, and indirect owner of each of the Zohar Funds and, through her ownership of the Zohar Funds, the indirect owner of the Zohar Corps.  Ms. Tilton also holds, through other wholly owned entities, the Class A-3 and B notes in Zohar I and the Class B Notes in Zohar II and Zohar III, respectively.

8.     The Zohar Funds are the result of Ms. Tilton's creation of a ground-breaking model for investing in a portfolio of distressed loans, through collateralized loan obligations ("CLOs"), that would use borrowed funds from investors to purchase a portfolio of distressed loans at a discount and, through active management and restructuring, repay noteholder investors their principal plus interest, with residual value flowing to Ms. Tilton.

9.     In November of 2003, Ms. Tilton was granted a business method patent, Patent No. US 6,654,727 B2 (Method of Securitizing a Portfolio of at Least 30% Distressed Commercial Loans) for the CLO investment model that she created and that is the basis for the Zohar Funds' model.   Her investment method was described favorably by an administrative law judge ("ALJ") of the Securities and Exchange Commission (the "SEC"):

> Tilton developed a method of evaluating distressed loans—analyzing the potential cash flows and other factors; and determining on that basis whether to purchase, and an appropriate price for, each loan to make up a portfolio of varied loans that would generate sufficient cash flows to pay expenses, including interest and principal to investors in a vehicle that would hold the portfolio.   A portion of the pool had to have a high likelihood of paying interest on a consistent basis, in order to pay investors; . . . if all the loans were non-performing at the start, there would be no interest coming in to pay investors, while if all were higher quality, there would not be enough potential for profit because she would have to pay too much for them. . . . Tilton obtained equity and became active in management of the Portfolio Companies.   Since some of the Portfolio Companies were bound to fail, it was necessary for some to succeed in order to mitigate the risk of loss.[12]

## II.    Allegations Against Ms. Tilton

10.     AMZM and the Secured Creditors have instigated six lawsuits against Ms. Tilton and her affiliated entities in just the last two years.[13]   This litigation has cast a cloud over the

---

[12]  Tilton Decl. ¶ 19; *see also Tilton*, 2017 WL 4297256, at *21 (S.E.C. Sept. 27, 2017).

[13]  For example, AMZM's decision to withhold fees for collateral-management services provided by an affiliate of Ms. Tilton caused U.S. Bank to bring an interpleader action in New York state court.  AMZM also brought several suits against Ms. Tilton or her affiliates in the Delaware Chancery Court, including an action to compel Patriarch to turn over collateral-management books and records.  AMZM also sought to terminate Patriarch Partners Agency Services ("PPAS"), the loan administration entity owned by Ms. Tilton that collects and

Portfolio Companies and impeded Ms. Tilton's ability to monetize or maximize the value of those companies for the benefit of all stakeholders. Many of the allegations made against Ms. Tilton in these various litigations are the same unsupported allegations urged here.

11.    Among other things, AMZM, at the behest of MBIA, filed a now-dismissed RICO case against Ms. Tilton in the United State District Court for the Southern District of New York and brought a Section 225 proceeding in Delaware Chancery Court, seeking to enforce written consents purporting to replace Ms. Tilton as director of three Portfolio Companies with employees of AMZM and MBIA. Even though the District Court considering the RICO action rejected the attempt to tar Ms. Tilton as a "racketeer" and fraudster, granting her motion to dismiss, that suit was damaging to the Portfolio Companies given Ms. Tilton's roles as the Manager, Director, and/or CEO of those companies.

12.    The SEC instituted an administrative proceeding against Ms. Tilton and certain of her affiliated entities, alleging that they had collected unearned management fees, defrauded Noteholders, and breached fiduciary duties by failing to disclose alleged conflicts of interest and issuing misleading financial statement. Following a three-week trial, the SEC Administrative Law Judge fully vindicated Ms. Tilton, and the proceeding was dismissed in its entirety.[14]

## III.    Retention of the CRO and Commencement of These Chapter 11 Cases

13.    In advance of these Chapter 11 cases, the Debtors—in consultation with Young Conaway—made several important decisions that they hoped would signal to the

---

disburses Portfolio Company loan payments. This attempted termination resulted in litigation in which AMZM twice attempted to seek emergency relief against PPAS. Both attempts were denied.

[14]   The Secured Creditors attempt to discredit this vindication by arguing that it is not binding on them and that the SEC Administrative Law Judge found only that the claims were not proven. *See* Dismissal/Trustee Mot. at 19 n.9. This proves too much. Even after Ms. Tilton was fully vindicated in the SEC matter, the Secured Creditors outright refuse to acknowledge the SEC findings that they were getting exactly what they bargained for.

Secured Creditors that the Debtors seek to achieve a consensual and transparent monetization process that will pay Secured Creditors' claims in full.

14.    The first was the appointment of a credible, independent, and highly reputable Chief Restructuring Officer—Marc Kirschner.  Mr. Kirschner has been a bankruptcy and restructuring attorney, court-appointed Chapter 11 trustee, litigation trustee, financial advisor, and investment manager for distressed companies for almost 50 years.  Mr. Kirschner is currently a Senior Managing Director of Goldin, a financial advisory and consulting firm that specializes in contentious, challenging, and distressed situations. Earlier in his career, Mr. Kirschner founded and led the bankruptcy reorganization group at the New York office of the law firm that became Jones Day.

15.    Mr. Kirschner served as Chapter 11 trustee for Refco Capital Markets, Ltd. ("RCM").  Refco was the largest global financial services company bankruptcy after Drexel Burnham Lambert and before Lehman Brothers.  As Chapter 11 trustee, Mr. Kirschner spearheaded the settlement of complex internecine disputes among RCM's securities and foreign exchange customers as a building block to the global Refco settlement and plan, and he was the principal architect of Refco's plan.  It is the Debtors' understanding that RCM is one of the largest cases in history for which a Chapter 11 trustee was appointed.

16.    Mr. Kirschner has also served as litigation trustee or liquidation trustee on several occasions.  In those capacities, he has undertaken intensive, wide-ranging factual investigations and commenced litigation to recoup, in the aggregate, in excess of $15 billion of losses resulting from fraud and management misconduct on behalf of creditors.

17.    Mr. Kirschner will be assisted in his role as Chief Restructuring Officer by a team of highly skilled and experienced restructuring professionals at Goldin.  Robert S.

Kost, a Managing Director at Goldin, with nearly 30 years of experience as an investment banker, has particular expertise in corporate restructuring, including mergers and acquisitions, and other capital markets transactions. He was formerly a Partner/Managing Director at Lazard and a founding member of its restructuring group in 1999. Another Goldin Managing Director, Robin Chiu, has significant restructuring experience and will handle all financial reporting to the U.S. Trustee, the Secured Creditors, and the Court. Messrs. Kirschner and Kost and Ms. Chiu, none of whom had any prior connection with the Debtors, Ms. Tilton, Patriarch Partners, or any of their respective affiliates, will provide an independent voice here, reporting to the Secured Creditors, the U.S. Trustee, and the Court, and will work collaboratively with all stakeholders to build consensus.

18.    A second decision made by the Debtors to signal their desire to work with their stakeholders towards a consensual and transparent process to maximize value was the decision to eschew any relief at the outset of these cases that would be forced on the Secured Creditors. The Debtors, for instance, did not seek any first-day relief and informed the secured parties that cash collateral would not be used absent consent or a court order.

19.    Third, the Debtors proposed what they and their advisors expected would be received as an open and transparent information-sharing protocol. As the Debtors have told the Secured Creditors, this motion was meant as an underline invitation to begin discussions and solicit constructive input regarding the information needed by the Secured Creditors to find comfort with the monetization process that the Debtors have commenced, while respecting the confidentiality that must be afforded to closely-held private companies engaged in sales and refinancing processes. It was the Debtors' professional advisors who suggested the information protocol in the first place, from a desire to enhance access to information, not

restrict it.  Despite the Secured Creditors' perception of the Debtors' intentions regarding the information protocol, it was clearly intended to bring the parties together and mark progress towards a shared goal of realizing maximum value for the Debtors' assets.

20.     Fourth, the Debtors immediately set to crafting a comprehensive asset monetization process, making clear to the Secured Creditors from the outset that the goals here are the monetization of the Debtors' assets and the payment of claims according to the bargained-for priority in the Indentures.  The Debtors continue to develop the attached Monetization Procedures (discussed in more detail below) with input from the Secured Creditors and hope to present a final, consensual version for Court approval soon.  The Monetization Procedures provide the CRO with an independent ability to bring any value-maximizing proposal to the Court for approval—even over the objection of Ms. Tilton.

21.     Fifth, the Debtors have made every attempt to comply with their reporting obligations, repeatedly requesting documents and other financial information maintained by AMZM as prepetition collateral manager.  Yet when Mr. Kirschner personally telephoned AMZM to enlist its cooperation and obtain the requested information, AMZM flatly and stridently refused.  To date, AMZM has provided only a listing of potential holders of secured claims against the Debtors, which appeared to be purposefully incomplete.

22.     Finally, immediately after the first-day hearing, the Debtors arranged and conducted various in-person meetings or conference calls with the Secured Creditors and their professionals to discuss how these cases would proceed, including the financial-reporting protocol, the Monetization Procedures, and cash-collateral and governance issues. This dialogue has continued to the present day, leading to an agreement to mediate disputes, and will continue in good faith notwithstanding the relief sought in the Motions.

IV.    **The Dismissal/Trustee Motion**

23.    The Dismissal/Trustee Motion contains nearly 30 pages of background "facts," demonstrating that, for the Secured Creditors, litigation takes precedence over the preservation and enhancement of value.  Dismissal of these cases will inure only to the benefit of the Secured Creditors, who, unlike the Debtors, do not owe a fiduciary duty to the estates and who will seek to put the assets through foreclosure sales that, by their very nature, do not maximize the value for the benefit of the estates, but rather grant the Secured Creditors a windfall by allowing them to credit bid and obtain estate assets at a discount.  Throwing the Debtors out of the equitable confines of bankruptcy and returning the parties to their respective "corners" to continue litigation of myriad claims in multiple forums, across many jurisdictions will destroy value at a time when the market conditions are ripe for maximizing value, after more than a decade of effort to restructure and rebuild the Portfolio Companies.  As Mr. Kirschner, has astutely stated "the fighting must end," and it should (and can) end in this Court.[15]

V.    **The Monetization Process**

24.    The goal of the Monetization Procedures is to maximize the value of the Debtors' assets, pay in full the allowed claims against the Debtors (giving effect to the Zohar Waterfall and any orders of the Court), and to maximize the residual value for the Debtors' preference shareholders in accordance with the terms of the Zohar Waterfalls, while also reserving any litigation claims and providing robust reporting and transparency to all parties.  With the oversight of the CRO, and ultimate supervision by the Court, the monetization process will involve marketing for sale the equity or assets of certain Portfolio Companies and/or refinancing Portfolio Company Zohar debt.

---

[15]  Kirschner Declaration, ¶ 14.

01:23063937.10

25.     In consultation with the CRO and the Debtors' professional advisors, Ms. Tilton has classified the Portfolio Companies into two tiers.  The Tier 1 Portfolio Companies represent those Portfolio Companies that are ready for market in the near term with a greater likelihood to attract a robust market of buyers, and a higher likelihood to provide the greatest return on the Debtors' interests, either through an asset sale, an equity sale, or a refinancing.  The Tier 2 Portfolio Companies represent those Portfolio Companies for which marketing should be deferred until some portion of the marketing of the Tier 1 Portfolio Companies is complete.  Ms. Tilton reasonably believes that, given current market conditions, all noteholders will be repaid in full through the sales or refinancing of all or some of the Portfolio Companies in Tier 1.

26.     Ms. Tilton, as the sole director or managing member at each of the Portfolio Companies, (i) has authorized the pursuit of "one or more Portfolio Company Transactions until such time as the Debtors' claims are paid in full and (ii) will support a Portfolio Company Transaction, subject to receiving a Best Offer."[16]  The Monetization Procedures explicitly empower the CRO to seek Court approval of a Best Offer over Ms. Tilton's objection if, in his own informed business judgment, the Best Offer is in the best interests of the estates.

27.     Upon agreement or Court approval of a Best Offer, Ms. Tilton will (i) vote any rights she has or claims in the applicable Zohar interests in favor of each Best Offer, (ii) vote any applicable non-Debtor interests she controls in favor of each Best Offer, (iii) put all proceeds from Zohar Interests (as defined in the Monetization Process) through the Indenture waterfall, despite any competing claims to voting and control rights, and (iv) take any other action necessary to effectuate the Portfolio Company transaction in favor of each Best Offer.

---

[16] A "<u>Best Offer</u>" will be a written, negotiated, and executable offer that (i) Ms. Tilton, in consultation with the CRO and consistent with her duties as Debtors' director and as a director, member, or manager of the Portfolio Companies, determines is in the best interest of the Debtors and the respective Portfolio Company, or (ii) the CRO, in his own informed business judgment, believes is in the Debtors' best interests.

28.     The CRO has designated Mr. Kost to work directly with Ms. Tilton and the investment banks retained by each Portfolio Company.  Mr. Kost and the CRO will (i) work with Ms. Tilton on the process relative to each Portfolio Company to ensure it is managed in a manner that maximizes the value for the Debtors, (ii) verify the flow of funds for any sale or refinancing of interests or debt for the Portfolio Companies, to confirm that there is no dispute that the Debtors are receiving the appropriate proceeds based on their interests, and (iii) regularly involve and report to the Secured Creditors and the Court.

29.     The first Tier 1 Portfolio Companies have commenced interviews and engagements with those investment bankers best qualified to work with each Portfolio Company to maximize value.  Ms. Tilton expects to have six investment bankers engaged in the near term, and six more by the end of May.  Mr. Kost has also participated in a number of meetings with these bankers to discuss the monetization processes at the Portfolio Companies and the clarity needed at the Zohar Funds-level for that process to succeed.[17]

## VI.     Reporting and Oversight

30.     Messrs. Kirschner and Kost have committed to monitor the monetization processes to ensure that each asset monetization process is conducted in the best interests of the estates.  Their oversight will include (a) a review and understanding of the asset monetization process for each Portfolio Company; (b) a review of marketing materials and other information provided to interested parties; and (c) direct communication with the investment banks in the various asset monetization processes.  Messrs. Kirschner and Kost will report weekly, stay in regular communication with stakeholders, and provide periodic confidential progress reports to

---

[17]   Thus, the current situation is a far cry from the picture the Secured Creditors paint of the involuntary filing against Zohar I in 2015, in which there were not "any details for the sale of assets" and "no schedule or timeframe for monetization" and in which Ms. Tilton insisted on "complete and exclusive discretion and control" and refused "to provide . . . any essential information."  Dismissal/Trustee Mot. ¶ 38.  Here, by contrast, the accusation that Ms. Tilton does not actually want to monetize the Debtors' assets is simply not credible.  Dismissal/Trustee Mot. ¶ 79.

parties executing an NDA.  Moreover, once Messrs. Kirschner and Kost have identified a Best

Offer, they will provide detailed information regarding the transaction, the process that led to it,

and Mr. Kirschner's reasons for supporting the transaction, as described in more detail below.

## VII.    Postpetition Efforts

31.    Since filing these cases, the Debtors have acted in good faith to achieve their

shared goals with the Secured Creditors.  As noted above, the Debtors, among other things,

have not forced any first-day relief, indicated their desire to negotiate consensual cash-

collateral usage, met with principals of the Noteholders and MBIA, promptly set up an all-

hands settlement conference, worked to conduct limited discovery without needless

squabbling, and willingly agreed with the Secured Creditors to pursue mediation in good

faith to resolve their concerns.  Accordingly, the Debtors, acting under the direction of Mr.

Kirschner and Ms. Tilton, have been completely honest and upfront throughout these cases

and have attempted to listen to and cooperate with the Secured Creditors and to address

their concerns, while avoiding, to the greatest extent possible, the unnecessary, value-

destroying litigation that prompted these cases in the first place.

## ARGUMENT

### I.    The Requests for Dismissal of These Chapter 11 Cases Should Be Denied.

32.    While a lack of good faith may constitute "cause" for dismissal under section

1112(b)(4) of the Bankruptcy Code, dismissal of a bankruptcy petition for lack of good faith

should be done "only sparingly and with great caution."[18]  The requests for dismissal of these

---

[18]  *See, e.g., In re Gen. Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989)); *In re G.S. Distrib., Inc.*, 331 B.R. 552, 566 (Bankr. S.D.N.Y 2005).

Chapter 11 cases must be denied because the Debtors have met their burden of demonstrating that the invocation of the bankruptcy laws was entirely proper under the circumstances.[19]

### A.  The Chapter 11 Cases Were Filed in Good Faith.

33.     Though couched in terms of the debtor's subjective intent, the "good faith" filing requirement "encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings . . . . to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws."[20]  The "good faith" inquiry, therefore, is "based more on an objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor."[21]  In assessing a debtor's good faith, the Court must consider "the totality of facts and circumstances" to determine where the bankruptcy petition falls "along the spectrum ranging from the clearly acceptable to the patently abusive."[22]

34.     The essential element for a "good faith" bankruptcy filing in the Third Circuit is that the bankruptcy petition must "serve[] a valid bankruptcy purpose."[23]  Beyond this affirmative requirement, the Third Circuit has recognized that a bankruptcy filed "merely to obtain tactical litigation advantage" is not within the legitimate scope of the bankruptcy laws.[24] At bottom, "the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended."[25]

---

[19]  *See, e.g.*, *In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir. 1999); *cf. In re Zais Inv, Grade Ltd. VII*, 455 B.R. 839, 848–49 (Bankr. D.N.J. 2011) (debtor's good faith not at issue absent a *prima facie* case for bad faith).

[20]  *SGL Carbon*, 200 F.3d at 165.

[21]  *In re 15375 Memorial Corp.*, 589 F.3d 605, 618 n.8 (3d Cir. 2009).

[22]  *Id.* at 618.

[23]  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 120 (3d Cir. 2004).

[24]  *15375 Memorial*, 589 F.3d 605; *SGL Carbon*, 200 F.3d at 165.

[25]  *In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339, 345 (Bankr. D. Del. 1998), *aff'd*, 324 F.3d 197 (3d Cir. 2003); *see also SGL Carbon*, 200 F.3d at 165.

35.    Accordingly, so long as the Debtors filed for a "valid bankruptcy purpose" and not "merely to obtain tactical litigation advantage," their petitions were in good faith.  These elements are easily met here.

**(a) The Debtors filed for valid bankruptcy purposes.**

36.    The basic purposes of Chapter 11 are (i) "preserving going concerns," and (ii) "maximizing property available to satisfy creditors."[26]  There is no merit to the Secured Creditors' contention that CLOs such as the Zohar Funds cannot, by their very nature, restructure or otherwise state a valid bankruptcy purpose.[27]  As represented to the Court at the hearing on March 13, 2018, while the Debtors are, in fact, holding companies, the cash to satisfy the Debtors' creditors (and return value to equity holders) will come from monetization of the Debtors' interests in the operating Portfolio Companies—and the ability to unlock that value has been negatively impacted by the extensive and costly prepetition litigation.  Nevertheless, holding companies frequently reorganize notwithstanding that their only "business" is to hold assets.[28]  Here, the Debtors have filed bankruptcy (i) to remove the cloud cast by multiple, multi-jurisdictional litigations that threaten their ability to maximize the substantial value of their assets and (ii) to implement an independent, transparent monetization process designed to maximize value for all stakeholders.[29]

---

[26]    *Integrated Telecom*, 384 F.3d at 119; *In re Energy Future Holdings Corp.*, 561 B.R. 630, 639–40 (Bankr. D. Del. 2016) ("A party filing for Chapter 11 bankruptcy may prove that its petition served a valid bankruptcy purpose by showing that the petition preserved a going concern or maximized the value of the debtor's estate.").

[27]    *See, e.g.*, *Zais Inv, Grade*, 455 B.R. at 842, 846, 848–49 (holding that a Cayman Islands CDO was eligible to be a Chapter 11 debtor and that maximizing value for collateral securities was a valid bankruptcy purpose).

[28]    *See, e.g.*, *In re Chassix Holdings, Inc.*, 533 B.R. 64, 74–75 (Bankr. S.D.N.Y. 2015) ("The filing of Holdings' Chapter 11 petition, and the inclusion of Holdings in the joint Chapter 11 Plan, serves the purposes and objectives of the Bankruptcy Code and the interests of Holdings and its creditors, and the 'good faith' objections . . . are without merit.").

[29]    *Cf. In re Crown Village Farm, LLC*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) ("The Court's inquiry turns to whether the petition serves a valid bankruptcy purpose.  The answer is a resounding 'yes.' . . .  A proper purpose includes maximizing the value of a debtor's sole asset . . . .").

37.     With no support whatsoever, the Secured Creditors claim that "the goal in filing these cases is not to increase the value of the estates."[30]   The Secured Creditors focus solely on the Debtors' stated desire to obtain the benefits of the automatic stay,[31] ignoring that halting litigation is simply a necessary component of the Debtors' larger goal for these Chapter 11 cases—monetizing their assets in a value-maximizing way.   The Secured Creditors, in an attempt to mischaracterize the purpose of the Chapter 11 proceedings, cite the Third Circuit's *Memorial* decision for the proposition that "the creation of a central forum to adjudicate claims against the Debtors is not enough to satisfy the good faith inquiry—the Debtors must show that bankruptcy has some hope of maximizing the value of the Debtors' estates."[32]   But of course, as the Debtors and their advisors have repeated throughout these cases, the Debtors are not asking the Court to "adjudicate claims" against them.   Rather, the Debtors are asking the Court to oversee a monetization process designed to maximize the value of estate assets for the benefit of all stakeholders—a purpose that the Third Circuit expressly validated in *Memorial*—and to preserve all litigation rights against Ms. Tilton and Patriarch.[33]   In *Memorial*, the bankruptcy filing did not allow the debtors to maximize value because there was no way to increase the value of the insurance proceeds at issue.   Instead, the filing diminished value due to the costs of administering the estates.   Here, by contrast, (a) bankruptcy will increase and unlock the value by enabling a monetization process to occur free from the overhang of litigation, and (b) the costs of these proceedings

---

[30]  Dismissal/Trustee Mot. ¶ 75.

[31]   The Secured Creditors claim it is "noteworthy" that Ms. Tilton did not invoke the automatic stay "in her New York state litigation against MBIA . . . in which she seeks $100 million in damages . . . ."  Dismissal/Trustee Mot. at 60 n.20.  If the point there is to criticize Ms. Tilton for not improperly invoking the stay, she is guilty as charged.  Had she attempted to do so, the Secured Creditors would undoubtedly have argued it was an improper extension of the stay.  No matter the position Ms. Tilton takes, the Secured Creditors reflexively take the opposite.

[32]  Dismissal/Trustee Mot. ¶ 73.

[33]  Of course, the estates will also benefit from having a single forum resolve claims related to their assets.

will be significantly less than the collateral-management fees and litigation costs that the Debtors had been incurring prior to bankruptcy, and significantly less than the costs of a Chapter 11 trustee and an entirely new set of professional advisors.[34]  The Secured Creditors' reliance on *JER/Jameson* is similarly unavailing, as any resemblance to that case here is superficial at best. Judge Walrath dismissed that case because the debtors there, like the debtors in *Memorial*, were unable to propose a sale process that would realize more value in bankruptcy than outside of it.[35]

38.    Here, the Debtors' Monetization Procedures are designed to maximize the value received for the Debtors' assets.  Messrs. Kirschner and Kost, who will oversee the process for the sale of the Debtors' interests in the Portfolio Companies (or refinancing of the Zohar debt), are independent from the Patriarch Entities and Ms. Tilton and have full autonomy to represent the Debtors' interests in the sale process.[36]  "Where a Portfolio Company Transaction has been deemed the Best Offer, it <u>will be</u> submitted to the Court for approval . . . ."  And a "Best Offer" includes any "written, negotiated, and executable offer for the Debtor's interests or assets that <u>the CRO, in his own informed business judgment, believes is in the Debtor's best interests</u>."  If Ms. Tilton disagrees with the CRO's determination that an offer is a "Best Offer," her only remedy is to make her case to the Court, the same as any other party.  Critically, Mr. Kirschner cannot be terminated as CRO absent an order of the Court.  In fact, the Monetization Procedures are explicit that Ms. Tilton, as the sole director or managing member at each of the Portfolio Companies, (i) has authorized the pursuit of "one or more Portfolio Company Transactions . . .

---

[34]    The Secured Creditors are therefore incorrect that the cost of a Chapter 11 trustee would be "minimal." Dismissal/Trustee Mot. ¶ 117.

[35]    *See In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 303–04 (Bankr. D. Del. 2011) ("[T]he sale process contemplated in the bankruptcy case must be designed to realize some value that would not be available outside of bankruptcy.  Here there is no evidence that the bankruptcy case will do that. . . .  Further, there is no evidence that a sale of the Mezz II asset in bankruptcy will be more cost effective than a sale under the UCC procedures (which has already been commenced).").

[36]    Monetization Procedures at 7.

01:23063937.10

until such time as the Debtors' claims are paid in full, (ii) will support a Portfolio Company Transaction, subject to receiving a Best Offer," and (iii) will direct all Zohar Interests be distributed under the waterfall.

39.     The Debtors' Monetization Procedures are also designed to provide transparency to the Debtors' stakeholders and to encourage their engagement and involvement throughout the monetization process.   Messrs. Kirschner and Kost have committed to "monitor the sales processes on behalf of the Debtors . . . to ensure that each Zohar asset monetization process is conducted in the best interests of the Debtors' estates."  The Monetization Procedures obligate Messrs. Kirschner and Kost to provide weekly reporting to US Bank, MBIA, and the Zohar III Controlling Class, as applicable, regarding the status of the various sales processes and to communicate with US Bank, MBIA, and the Zohar III Controlling Class regarding their comments, questions, or concerns.   The Monetization Procedures further provide that parties subject to an NDA will receive periodic confidential progress reports regarding the sales processes in a form and at level of detail to be agreed by the parties.

40.     Moreover, once Messrs. Kirschner and Kost have identified a Best Offer, Messrs. Kirschner and Kost will provide, at a minimum, the following detailed information to the professionals retained by US Bank, MBIA, the Zohar III Controlling Class, or the Patriarch Entities, as applicable: all information proposed to be disclosed in the Debtors' Proposed Reporting Protocol; summary of marketing materials and length of marketing period, summary of information provided to potential bidders, number of bids received, price and material terms of each bid; and the CRO's analysis of the Best Offer and the rationale for selecting it.   After Messrs. Kirschner's and Kost's consultation with these stakeholders, the Debtors will provide notice of the Portfolio Company Transaction to all other parties in interest in these cases.   This

further notice will provide a declaration from Mr. Kirschner or Mr. Kost attesting to, among other things, the material terms of the sale process, the reasons for Mr. Kirschner's selection of the Best Offer, any information bearing on the conduct of the sale process that would be relevant to the Court's consideration of the Portfolio Company Transaction, and the itemization of the proceeds to be paid under the Zohar Waterfall.  Accordingly, the Reporting and Oversight provisions set forth in the Monetization Procedures will offer assurance to all parties in interest in these cases that Mr. Kirschner is bringing his independent judgment to bear on maximizing the value of the Debtors' assets for the benefit of all stakeholders.[37]

41.    There are three main ways in which implementation of the Monetization Procedures in these Chapter 11 cases allows the Debtors to capture value that they could not hope to obtain outside bankruptcy.[38]  First, the Debtors' Monetization Procedures will provide potential buyers or financiers of the Portfolio Companies with a level of certainty and finality regarding the Debtors' authority over their assets that is unavailable outside of bankruptcy.[39] Here, the Debtors and Ms. Tilton have agreed to a monetization process overseen by the Court. Outside of bankruptcy, however, the uncertainty surrounding authority over the Debtors' assets continues.  Accordingly, the Monetization Procedures moot the need for any litigation regarding

---

[37]  The Secured Creditors' contention that the Debtors seek to "severely limit" the information that parties receive is entirely unfounded.  *See* Dismissal/Trustee Mot. ¶ 84.  The Debtors designed the Monetization Procedures to provide as much information as possible consistent with their duty not to disclose information that would impair value. The Debtors even proposed a reporting protocol on the Petition Date in an effort to provide transparency. Any inability to comply with reporting requirements is attributable to AMZM's refusal to provide the Debtors' financial information, despite repeated requests.  The Debtors have been in contact with the U.S. Trustee regarding the required reporting and have made a good-faith effort to provide the required information when and as able.

[38]  *Energy Future Holdings*, 561 B.R. at 639–40 ("To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy." (quotation omitted)).

[39]  *See, e.g.*, *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997) ("[A bankruptcy sale process] maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property."); *In re Stadium Mgmt. Corp.*, 895 F.2d 845, 847 (1st Cir. 1990) ("The finality and reliability of the judicial sales enhance the value of the assets sold in bankruptcy."); *In re Sax*, 796 F.2d 994, 998 (7th Cir. 1986) ("Finality is important because it minimizes the chance that purchasers will be dragged into endless rounds of litigation to determine who has what rights in the property.").

"control" and will maximize the value of the Debtors' assets by removing the uncertainty surrounding the Debtors' authority over their assets and by providing potential buyers and financiers with finality that only bankruptcy can afford.

42.    Second, implementing the Monetization Procedures in these Chapter 11 cases will allow the Debtors to realize value that would be unavailable otherwise because § 363(f) authorizes the Debtors to sell their assets free and clear of any other party's interest or to make such other decisions as are necessary regarding the sale or refinancing of a non-debtor entity. This Court has itself made clear that the ability to seek relief under § 363(f) "'maximizes the value of the assets that are sold.'"[40]  The ability to maximize value by seeking relief to sell the Debtors' interests in the Portfolio Companies under § 363 of the Bankruptcy Code is unavailable to the Debtors outside of these Chapter 11 cases.

43.    Third, the Monetization Procedures maximize value because the cost and convenience of conducting the monetization of the Debtors' assets in bankruptcy, with the benefit of an independent CRO and Court oversight, but without unnecessary and burdensome litigation costs financed by payment of substantial collateral-management fees, weigh in favor of this single forum.  Indeed, "one of the core purposes of bankruptcy 'effectuated by Sections 362 and 105 of the Code' is to 'allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'"[41]  To be sure, the Debtors could seek a resolution of ownership and corporate-governance issues for the many Portfolio Companies one company and one jurisdiction at a time, but wasting the parties' time and money on so many litigations

---

[40]  *In re NE Opco, Inc.*, 513 B.R. 871, 876 (Bankr. D. Del. 2014) (quoting *Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011)).

[41]  *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999) (quoting *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir. 1990)).

destroys value, risks inconsistent results, and indisputably chills potential buyers' or financiers' interest in pursuing a transaction for the Portfolio Companies that could maximize value for the benefit all of the Debtors' stakeholders.   Monetizing the Debtors' assets in these Chapter 11 cases thus maximizes the value of those assets because this Court is the only court that can resolve all disputes over estate property, obviating the need for seriatim, value-destroying determinations regarding ownership and control of each Portfolio Company and the cost and distraction of multi-jurisdictional litigations.[42]

**(b) The Debtors' bankruptcy filing is not a mere litigation tactic.**

44.     The Debtors did not commence these bankruptcy proceedings as a tactic to obtain the upper hand in pending litigation.   Quite the contrary, the bankruptcy filing was intended to eliminate the cost and distraction caused by such litigation, while preserving all parties' rights.  Indeed, Ms. Tilton's willingness to set aside the issue of beneficial ownership of the Portfolio Companies so that estate assets can be monetized in and of itself proves that these cases are not a litigation tactic.   Because the Debtors and Ms. Tilton have agreed to a monetization process overseen by the Court, the Monetization Procedures offer a solution to the parties' disputes that

---

[42] In addition, Chapter 11 maximizes the value of the Debtors' assets in at least two other ways that are not strictly related to the Monetization Procedures themselves.  First, § 108 allows the Debtors to capture value that would otherwise be lost through the running of the statutes of limitations applicable to estate causes of action, if any.  The Secured Creditors themselves implicitly acknowledge that § 108 confers value by expressly reserving any rights and remedies available under that section of the Bankruptcy Code.  As discussed in more detail herein, the Debtors' independent CRO can evaluate any claims of the estate, and intends to do so, consistent with the Debtors' fiduciary duty to the estates, in the unlikely event that the Noteholders' claims are not fully satisfied under the Monetization Procedures.   Second, § 365 will allow the Debtors to maximize the value for their assets for the benefit of all stakeholders by rejecting CMAs that obligate the Debtors to pay substantial fees even though the Debtors, through their CRO, can monetize their assets themselves, at less cost to the estates, under the Monetization Procedures.  Further, under the CMAs, AMZM is directed only to "maximize the repayment of noteholders," which is antithetical to the Debtors' goal for these Chapter 11 cases of maximizing value for the benefit of all stakeholders. See § 2.2(p) of the respective Collateral Management Agreements.   The Debtors' proposed restructuring of contractual obligations is an essential purpose of the Bankruptcy Code.  *See, e.g.*, *PPI Enters.*, 324 F.3d at 211 (rejection of lease and capping of landlord's rejection claim was use of Code for "exactly its intended purpose"); *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015) (using the rights and protections offered by the Bankruptcy Code, including those under § 365, to reorganize financial affairs, are valid reorganization purposes supporting finding of good faith).  Once AMZM provides the Debtors' books and records, the Debtors will not have any information gaps for the time period AMZM was collateral manager.

does not require seriatim determinations regarding ownership of each Portfolio Company. This process is more efficient and economically rational than proceeding through piecemeal litigation.

45.    Any contention that the Debtors filed bankruptcy to avoid a decision adverse to Ms. Tilton in connection with the 225 Action is misguided. First, that contention overlooks Ms. Tilton's willingness to set aside the issue of beneficial ownership of the Portfolio Companies to permit monetization here. Second, the argument presupposes that AMZM, purporting to act for the Debtors, would have prevailed before the Delaware Supreme Court. But the Delaware Supreme Court may have reversed, transferring assets away from the Debtors to the estates' detriment. And even if that court had affirmed, the actual interpretation and implementation of the judgment may occasion yet more complex litigation with the outcome uncertain. Third, there is no reason to think that a decision from the Delaware Supreme Court was imminent solely because oral argument was upcoming. Indeed, filing bankruptcy nine days before argument is completely arbitrary in relation to the appeal, demonstrating that the appeal was irrelevant to the filing. As the Secured Creditors themselves argue, Ms. Tilton was contemplating monetization of the Portfolio Companies in a value-maximizing way "several months prior to" the Petition Date.[43] Moreover, Ms. Tilton's declaration in these Chapter 11 cases, and the fact that she saw fit to appeal the Chancery decision in the first place, makes clear her belief that she would prevail before the Delaware Supreme Court. Finally, the 225 Action concerned only three Delaware corporations with no outstanding debt, which are not representative of the other Portfolio Companies. There is thus no basis for the Secured Creditors' contention that the

---

[43]  *See* Dismissal/Trustee Mot. ¶¶ 46, 76.

Debtors' bankruptcy filing was driven by a desire on the part of Ms. Tilton to avoid resolution of the 225 Action.[44]

46.     The Debtors acknowledge that the Movants have made a number of inflammatory allegations of prepetition misconduct by Ms. Tilton and, further, that the estates may have a number of potentially significant causes of action against her.  The Movants' repeated contention that the Debtors have abandoned, or otherwise declined to pursue, any such actions is unsupported in the Dismissal/Trustee Motion and is simply not true—the Debtors have unequivocally stated that any and all claims of all parties will be expressly preserved.  To that end, the Monetization Procedures explicitly require Ms. Tilton and the Debtors to "agree in writing to toll for one year, subject to extension by mutual written agreement, the running of any statute of limitations applicable to any claims they may have against each other."[45] Nevertheless, Mr. Kirschner, as the Debtors' independent CRO, has the ability to investigate and pursue any claims of the estate and, consistent with the Debtors' fiduciary duty to the estates, will either do so himself or assign the claims to a litigation trust under a plan, if the Noteholders' claims are not fully satisfied under the Monetization Procedures.   As described in the Monetization Procedures, the Debtors' hope, given current market conditions, is that all noteholders will be repaid in full through the sales or refinancing of Portfolio Companies in Tier 1.  Once the Noteholders' claims are satisfied, the Debtors' only remaining stakeholders would be Ms. Tilton and her affiliated entities.  Accordingly, the Debtors' approach for these cases is to

---

[44]  *See, e.g.*, Dismissal/Trustee Mot. ¶ 94.  The Secured Creditors similarly provide no reason to think that the Debtors filed bankruptcy merely to allow Ms. Tilton to avoid adverse rulings in the various other pending litigations. The only support they offer for this proposition in the Dismissal/Trustee Motion is the fact that the Secured Creditors (or AMZM) had alleged prepetition misconduct in complaints filed in other actions.  *See generally* Dismissal/Trustee Mot. ¶ 10, 21, 25, 26, 29, 31, 50, 53 (citing complaints).  But there is no basis for concluding that any adverse judgments against Ms. Tilton were likely to occur soon, or at all.  Indeed, Ms. Tilton was, for example, fully vindicated in the administrative proceeding brought by the SEC.  *See, e.g.*, Tilton Decl. ¶ 101.

[45]  Monetization Procedures at 1, 5.

focus first on the monetization of their assets, which all stakeholders agree should occur, rather than continue with the cost and uncertainty of the litigation these cases were filed to avoid, unless and until there is some indication that pursuit of estate claims would not be superfluous and would in fact benefit the estates.[46]  In the interim, the Debtors have preserved the right to pursue estate claims when and as may be necessary to fulfill their fiduciary duties to the estates.

47.    Accordingly, there is no basis for concluding that the Debtors filed bankruptcy in bad faith merely to obtain a tactical litigation advantage.[47]

**B. No Cause for Dismissal Exists Under § 1112(b).**

48.    Without letting this Objection devolve into a point-for-point rebuttal of the Secured Creditors' erroneous and spurious contentions, none of their other arguments establish that the Debtors filed bankruptcy for anything but a proper purpose.[48]  For example, contrary to the Secured Creditors' supposition, "the bare fact that the debtor desires to obtain the benefits of the automatic stay cannot by itself support a finding of bad faith."[49]  Instead, the relevant inquiry is "whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended."[50]  Thus, to constitute bad faith, "the debtor must intend to obtain the benefit of the automatic stay for an improper purpose, such as merely to frustrate the rights of creditors rather than to reorganize or have an orderly liquidation."[51]

---

[46]   Indeed, expending estate resources on the litigation of estate claims without having a clear idea of whether those actions could possibly maximize the value available for all of the Debtors' stakeholders would itself be inconsistent with the Debtors' fiduciary duties.  In addition, continuing litigation will only chill the monetization process and, in turn, prevent the Debtors from maximizing value for all stakeholders.

[47]   *Cf. In re Derma Pen, LLC*, 2014 WL 7269762, at *9 (Bankr. D. Del. Dec. 19, 2014) ("The bankruptcy filing is an improper attempt by the Debtor to re-start the contract and trademark battle with the Movants in a new court.").

[48]   *Cf. Zais Inv, Grade*, 455 B.R. at 848–49 (debtor's good faith not at issue absent a *prima facie* case for bad faith).

[49]   *In re Four Wells Ltd.*, 2016 WL 1445393, at *14 (B.A.P. 6th Cir. Apr. 12, 2016) (quoting Collier).

[50]   *PPI Enters.*, 324 F.3d at 211.

[51]   *Id.* (quoting Collier).

49.     As set forth in more detail above, the Debtors filed bankruptcy not merely to stay the numerous contentious actions in various jurisdictions but to allow the Debtors to maximize the value of their assets by monetizing them without the cloud cast by multiple, multi-jurisdictional litigations pending prepetition.  This is one of the "core purposes" of bankruptcy.[52]

50.     Similarly, the timing of a debtor's bankruptcy petition is not in and of itself determinative as to bad faith.[53]  The *Sandusky Permanent* case is instructive here.  In that case, the district court had appointed a receiver prepetition to manage the shopping center owned by the debtor.  The receiver scheduled a foreclosure sale, but on the eve of that sale, the debtor filed Chapter 11 bankruptcy, arguing that the foreclosure sale was insufficient and would fail to maximize value of the shopping center.  The U.S. Trustee and the debtors' lender each sought to dismiss the bankruptcy as a bad-faith filing.  The bankruptcy court denied the motions, explaining that "[c]ommencing this Chapter 11 case in order to preserve the going concern or maximize the value of the Debtor's estate serves a valid bankruptcy purpose, even though filed on the eve of a foreclosure sale."[54]  According to the court, "it was not unreasonable for Debtor to seek a different forum and different procedures to promote maximization of exposure and value of the Property while still protecting the interests of all parties."[55]  The court thus could not conclude "that Debtor's bankruptcy petition was filed in bad faith for a purpose outside the legitimate scope of the Bankruptcy Code."[56]  This reasoning applies equally here.  All the Secured Creditors point to for their contention that the timing of the bankruptcy filings suggests

---

[52] *U.S. Lines*, 197 F.3d at 640.

[53] *See In re BCC Sandusky Permanent LLC*, 2017 WL 2470864 (Bankr. N.D. Ohio June 7, 2017).

[54] *Id.* at *12.

[55] *Id.*

[56] *Id.*

bad faith is the imminence of the oral argument before the Delaware Supreme Court—but of course this overlooks that it was Ms. Tilton herself who expedited that appeal.

51.     The Secured Creditors' contention that the Zohar Funds cannot have a proper bankruptcy purpose because they are "not like a typical debtor" and "lack the capacity to be reorganized" is also without merit.  The Bankruptcy Code is clear that the Zohar Funds are no less entitled to avail themselves of Chapter 11 than any other debtor would be.[57]  And as the Third Circuit held in *Integrated Telecom,* even if a debtor is "going out of business and therefore has no going concern value to preserve in Chapter 11 through reorganization or liquidation under the Bankruptcy Code," the petition can still serve a fundamental purpose of Chapter 11 if the filing "might reasonably [maximize] the value of the bankruptcy estate."[58]

52.     The Secured Creditors' arguments about Ms. Tilton's use of cash collateral similarly do not demonstrate cause for dismissal here.  Ms. Tilton determined that a bankruptcy filing was necessary and caused Zohar III to facilitate a bankruptcy filing that was in the best interests of Zohar III (and, in fact, all the Debtors) and all its (and the other Debtors') stakeholders.  Ms. Tilton exercised her corporate authority as the sole director of Zohar III to direct it to exercise its authority over its own assets (i.e., the interest proceeds of loans it made).  Nothing in the grant of authority to AMZM as collateral manager divested Zohar III of its own inherent corporate authority to do so,[59] and no party has contended that Zohar III relinquished *ownership* over the loans or their proceeds or that Zohar III lacked the corporate authority to exercise control over *its own* assets.  To the extent that use of those

---

[57] *See* 11 U.S.C. § 109; *see also Zais Inv. Grade*, 455 B.R. at 842, 846, 848–49 (Bankr. D.N.J. 2011) (holding that a Cayman Islands CDO was eligible to be a Chapter 11 debtor and that maximizing value for collateral securities was a valid bankruptcy purpose).

[58] *Integrated Telecom,* 384 F.3d at 120.

[59] *See generally* CMA, Art. II; Indenture, Granting Clauses at 2–3.

funds was contrary to the Indentures, the Secured Creditors may have a straightforward breach-of-contract claim, but this is no different than any other entity in financial difficulty determining that its best interest lies in using use corporate funds to prepare for bankruptcy rather than pay its creditors.[60]   In *Indian Motocycle*, for instance, the court determining that the debtor's unauthorized transfer of the lender's cash collateral in order to retain Chapter 11 counsel violated the "Regulatory Agreement" incorporated by reference in the loan document, but the court nevertheless denied the lender's motion to compel the debtor to repay the funds.[61]

53.    Finally, the Secured Creditors' invocation of the *Primestone* factors is inapplicable here.[62]   Those considerations are meant only to serve the broader inquiry into whether the debtor sought to achieve an objective outside the legitimate scope of the Bankruptcy Code.[63]   Thus, even were the *Primestone* factors appropriate here, they "cannot simply be mechanically tallied."[64]   In any event, the Debtors' bankruptcy filings were entirely proper under *Primestone*.   Among other things, the Debtors were not formed immediately prepetition and did not file on the eve of foreclosure.   The Debtors have cash and income.   This is not a single-asset

---

[60]   *See Indian Motocycle Assocs. III Ltd. P'ship v. Mass. Hous. Fin. Agency*, 66 F.3d 1246, 1247 (1st Cir. 1995).

[61]   *See also In re Westwood Plaza Apartments, Ltd.*, 154 B.R. 916, 923 (Bankr. E.D. Tex. 1993) (on similar facts to *Indian Motocycle*, the court held that debtor was entitled to use HUD's cash collateral to pay its Chapter 11 counsel's fees); *cf. In re Placid Oil Co.*, 80 B.R. 824, 831 (Bankr. N.D. Tex. 1987) (remedying a prepetition misuse of cash collateral by (i) granting a replacement lien on other collateral until the secured party was made whole and (ii) restricting the debtor's use of certain non-collateral funds absent further order of the court).

[62]   Delaware bankruptcy courts have only applied the *Primestone* factors in the context of single-asset debtors, which the Secured Creditors concede is not the case here.   Dismissal/Trustee Mot. at 48 n.15; *see also In re PEM Thistle Landing Tic 23, LLC*, No. 13-13273(KG), 2014 WL 1319183 (Bankr. D. Del. Apr. 2, 2014) (single-asset real estate case); *JER/Jameson*, 461 B.R. at 298 (single-asset case); *Crown Vill. Farm*, 415 B.R. at 92 (single-asset real estate case).   *Primestone* thus does not deserve much weight here.

[63]   *SGL Carbon*, 200 F.3d at 165 (explaining that courts consider "the totality of facts and circumstances support a finding of good faith" and will seek to deter those filings "that seek to achieve objectives outside the legitimate scope of the bankruptcy laws"); *cf. Crown Vill. Farm*, 415 B.R. at 92 (describing the *Primestone* considerations as simply "relevant evidentiary factors that courts should review prior to determining whether a case should be dismissed" under the Third Circuit's bankruptcy-purpose-and-litigation-tactic analysis).

[64]   *Four Wells*, 2016 WL 1445393, at *14.

case, and considering the Debtors' circumstances "holistically,"[65] the Portfolio Companies operate 25 separate businesses and employ more than 50,000 people.[66]  The Secured Creditors' reliance on their cherry-picked *Primestone* factors thus does not demonstrate bad faith.  Simply put, "without any other evidence suggesting that Debtors sought to abuse the Chapter 11 process, or that Debtors actually abused the bankruptcy process in prosecuting their Chapter 11 cases, the presence of these few factors alone cannot give rise to a finding of bad faith."[67]

54.    In sum, when considering the spectrum of good-faith and bad-faith filings, the Debtors' Chapter 11 filings do not fall in or near the range of "patently abusive."[68]  The totality of the facts and circumstances here do not support a determination of bad faith.

## II.    Appointment of a Chapter 11 Trustee Is Not Warranted.

55.    The appointment of a Chapter 11 trustee is an extraordinary remedy.[69]  "It is settled that appointment of a trustee should be the exception, rather than the rule."[70]  Likewise, appointment of a trustee "must be considered a last resort"; if there is any other option that will permit a bankruptcy proceeding to go forward, a motion to appoint a trustee must be denied.[71]  The preference for retention of current management is even stronger where, as here, the debtors

---

[65]  *See Energy Future Holdings*, 561 B.R. at 641.

[66]  These cases therefore do not involve a simple two-party dispute that can be resolved in a pending state court action.  And even if they did, "[p]etitions in bankruptcy arising out of a two-party dispute do not per se constitute a bad-faith filing by the debtors."  *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 616 (B.A.P. 9th Cir. 2014). Rather, "[c]ourts that find bad faith based on two-party disputes do so where it is an apparent two-party dispute *that can be resolved outside of the Bankruptcy Court's jurisdiction.*"  *Id.* (emphasis in original).  As noted above, the Debtors commenced Chapter 11 proceedings here precisely because the bankruptcy court offered the only forum that could offer a comprehensive resolution of all of the parties' disputes regarding estate property.

[67]  *Four Wells*, 2016 WL 1445393, at *14.

[68]  *Northshore Mainland Servs.*, 537 B.R. at 203.

[69]  S*ee Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003).

[70]  *In re Sharon Steel Com.*, 871 F.2d 1217, 1225 (3d Cir. 1989).

[71]  *See Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

01:23063937.10

are part of a larger closely held enterprise,[72] and Ms. Tilton is involved at every single critical operating level of most of the Portfolio Companies.  Given the strong presumption against granting this extraordinary relief, "the party asking for the appointment of a trustee bears the burden of persuasion by clear and convincing evidence.  This burden does not shrink or shift."[73]

56.    Appointment of Chapter 11 trustee here would in fact be counterproductive. Ms. Tilton has agreed to set aside the issue of beneficial ownership of the Portfolio Companies and to vote her interests in favor of a Best Offer as part of the consensual process overseen by Mr. Kirschner to monetize the Debtors' assets.  However, a Chapter 11 trustee would not simply step into Mr. Kirschner's shoes and obtain the benefit of the agreements he reached with Ms. Tilton.  There are no assurances that a Chapter 11 trustee would be able to maximize the value of Debtors' assets, as he could be compelled to restart the very litigation these cases seek to end.

**A.  The Debtors' Current Management Does Not Warrant a Chapter 11 Trustee.**

57.    "When considering whether to appoint a trustee for cause, a court's focus is on the debtor's current management, not the misdeeds of past management."[74]  This is so even if the new management is selected by the former management accused of misconduct.[75]  "Speculation

---

[72]  *See, e.g., In re LHC, LLC*, 497 B.R. 281, 296 (Bankr. N.D. Ill. 2013); *In re C4 Solutions, Inc.* 289 B.R. 354, 370 (Bankr. C.D. Ill. 2003).

[73]  *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 320 (3d Cir. 2004).  The U.S. Trustee's suggestion that the Court should apply a preponderance-of-the-evidence standard is contrary to binding precedent from the Third Circuit.  *See, e.g., G-I Holdings*, 385 F.3d at 320; *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998); *Sharon Steel*, 871 F.2d at 1226.  The addition of subsection (e) to § 1104, requiring the U.S. Trustee to seek appointment of a Chapter 11 trustee under certain circumstances, does not affect the burden of proof required for such an appointment, and the U.S. Trustee does not even attempt to explain how it could.  Indeed, even the Massachusetts case that the U.S. Trustee cites as support for the preponderance-of-the-evidence standard is explicit that "the Third Circuit requires that the party moving for appointment of a trustee must prove the need for a trustee under either subsection of § 1104(a) by clear and convincing evidence."  *Tradex Corp. v. Morse*, 339 B.R. 823, 827 (D. Mass. 2006) (internal quotation marks omitted).

[74]  *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007); *see also In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[O]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct."); Collier on Bankruptcy¶ 1104.02 (Alan Resnick & Henry Sommer eds., 16th ed.).

[75]  *1031 Tax Grp.*, 374 B.R. at 86; Collier ¶ 1104.02.  Interestingly, the only specific support the Secured Creditors offer for what they call "questionable business practices" and Ms. Tilton's purported "neglect" of "creditors'

that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case . . . ."[76]

58.    Recognizing her varied capacities and the appeal of an independent third party committed to maximizing value, prior to commencing these cases, Ms. Tilton installed Mr. Kirschner as independent CRO to oversee, among other things, the monetization of estate assets. Mr. Kirschner's credentials are unassailable.[77]    And as set forth in more detail above, the Monetization Procedures have been designed to protect the integrity of the monetization process and, to the extent necessary, preserve any estate causes of action.[78]

59.    In similar circumstances, courts have recognized that a debtor's retention of a chief restructuring officer ameliorates the concerns that would otherwise support the imposition of a Chapter 11 trustee.[79]  The Secured Creditors' claim that "[t]he appointment of Kirschner as CRO . . . does nothing to mitigate Tilton's conflicts of interest" is contrary to instructive

---

interests in favor of her own" are the RICO complaint and its answer and counterclaims filed in the PPAS litigation. Dismissal/Trustee Mot. ¶ 108.  Thus, the only specific support the Secured Creditors offer for their spurious claims comes from matters in which Ms. Tilton prevailed.  Surely an allegation that is unproven, dismissed, or overcome on the merits cannot provide the basis for the appointment of a Chapter 11 trustee.  *Cf. Tilton*, 2017 WL 4297256, at *44 (dismissing action and holding that Ms. Tilton "did not conceal – omit to state – material information such as the amount of interest actually being paid and the interest rate and principal on the Portfolio Companies' loans").

[76]  *Sletteland*, 260 B.R. at 672.

[77]  *See, e.g.*, Trustee/Examiner Mot. ¶ 32 (describing Mr. Kirschner as "well-qualified and independent.").

[78]  The contention that the Debtors' CRO is incapable of investigating any alleged prepetition misconduct is not true and, even if it were, is not a basis to appoint a Chapter 11 trustee.  *See, e.g., Cybergenics*, 330 F.3d at 577 ("[A]ppointing a trustee is too drastic a step to constitute a serious alternative to allowing derivative suits . . . .").

[79]  *See, e.g., In re Shotwell Landfill, Inc.*, 2014 WL 43777321, at *8 (E.D.N.C. 2014) (denying motion to appoint trustee after CRO was appointed even though management retained authority to operate business); *In re Tanglewood Farms, Inc.*, 2011 WL 606820, at *2 (Bankr. E.D.N.C. Feb. 10, 2011) (denying motion for appointment of a trustee in part because "the broad powers given" to the CRO "insure[d] that current operations [were] in compliance with chapter 11"); *In re Appleridge Ret. Cmty., Inc.*, 422 B.R. 383, 393 (Bankr. W.D.N.Y. 2010) (noting that the court had denied a motion to appoint a trustee because, among other reasons "a Chief Restructuring Officer was involved in the management of the Debtor"); *cf. 1031 Tax Grp.*, 48 B.R. at 89–90 (declining to appoint a trustee where "organizational changes have confirmed what has been true since the outset of these cases, namely that Okun has effectively insulated current management from his management authority and control").

decisional law.[80]  In *Blue Stone*, the U.S. Trustee filed an emergency motion to appoint a Chapter 11 trustee or, alternatively, an examiner, alleging that the debtors' principal ("DeMaria") had diverted corporate assets for his own use prepetition and had failed to disclose a number of potential self-interested transactions that demanded further investigation.  Prior to the hearing on the trustee motion, the debtors filed a motion to appoint a Chief Restructuring Officer ("Oscher") to, among other things, oversee and monitor the liquidation of the debtors' assets.  The U.S. Trustee and two secured creditors opposed Oscher's retention as CRO, arguing "that Mr. Oscher would be controlled or directed by Mr. DeMaria and that Mr. DeMaria would be able to hide assets or documents from Mr. Oscher."  The court rejected these arguments.  The record reflected that DeMaria had agreed to cede control to Oscher, who was disinterested and had substantial experience with the bankruptcy process.  Therefore, any contention that Oscher was not, or could not be, independent or that he would be unable to perform as effectively as a Chapter 11 trustee were "not credible and border[ed] on being frivolous."  As the court explained, "[n]o party in interest was able to articulate any credible difference between the skill set of a Chapter 11 trustee and the skill set that Mr. Oscher would bring to the table as a CRO."[81]

60.    Here, the Movants do not challenge—nor could they—Mr. Kirschner's competence to oversee the monetization of the Debtors' assets or these cases more generally.  Even the U.S. Trustee agrees that Mr. Kirschner is "well-qualified and independent."[82]  Instead, the Movants raise concerns that Ms. Tilton, as the Debtors' equity holder and sole director, could

---

[80]  Dismissal/Trustee Mot. ¶ 108.  *But see In re Blue Stone Real Estate, Const. & Dev. Corp.*, 392 B.R. 897, 901 (Bankr. M.D. Fla. 2008).

[81]  Mr. Oscher successfully navigated the *Blue Stone* debtors to plan confirmation less than a year later.  *See* Order Approving Consolidated Debtors' First Amended Disclosure Statement and Confirming Consolidated Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code, *In re Blue Stone Real Estate, Const. & Dev. Corp.*, No. 08-05299 (Bankr. M.D. Fla. Apr. 18, 2009).

[82]  Trustee/Examiner Mot. ¶ 32.

01:23063937.10

unduly influence Mr. Kirschner.[83]   But as discussed above, the Debtors have vested Messrs. Kirschner and Kost with substantial oversight over the monetization of their assets and given them decision-making rights with respect to that process that buttress their independence in these cases.   Among other things, Mr. Kirschner, working with Mr. Kost, has independent authority to determine whether an offer for the Debtors' assets is a "Best Offer," and any such Best Offer "will be submitted to the Court for approval . . . ."   Even if Ms. Tilton disagrees with their judgment, the Monetization Procedures clearly prohibit her from firing Mr. Kirschner or otherwise preventing him from seeking Court approval of the proposed transaction.

61.     Appointment of a Chapter 11 trustee would, therefore, necessarily require the conclusion that Mr. Kirschner is subject to undue influence, in spite of his extensive and unblemished professional career and experience (as conceded by the Movants), and will be unable to monetize the Portfolio Companies sufficient to satisfy the Noteholders' claims whereas some unknown person picked by the U.S. Trustee would be able to do so.[84]

62.     The enmity between the Secured Creditors and Ms. Tilton does not demonstrate by clear and convincing evidence that the extraordinary remedy of appointing a Chapter 11 trustee is required here.   In the first place, Ms. Tilton authorized the commencement of these cases to end the acrimony, not exacerbate it.   As set forth in in her first-day declaration, Ms. Tilton is convinced that the value of the Portfolio Companies can be maximized only if "swords are down and litigation stayed."[85]   Additionally, the monetization of the Debtors' assets will be overseen by Mr. Kirschner, who was not involved in the prepetition disputes between the

---

[83]   *See, e.g.*, Dismissal/Trustee Mot. ¶ 122 (arguing for a Chapter 11 trustee because "the record is utterly devoid of evidence that Kirschner has the authority or ability to manage the estate independent of Tilton's influence").

[84]   *Cf. Blue Stone Real Estate*, 392 B.R. at 902 ("No party in interest was able to articulate any credible difference between the skill set of a Chapter 11 trustee and the skill set that Mr. Oscher would bring to the table as a CRO.").

[85]   Tilton Decl. ¶ 145.

Secured Creditors and Ms. Tilton, and was only introduced to Ms. Tilton by phone when she interviewed him one week before the petitions were filed.  None of the Movants have alleged that they lack regard for Mr. Kirschner's skills, experience, and high integrity, and, in any event, "[m]anagement should not be replaced just because it is not liked."[86]

63.    The Secured Creditors' contention that "Kirschner made no efforts to understand the creditors' positions regarding the bankruptcy filing" is absolutely not true.  Mr. Kirschner and his team worked tirelessly from their retention on March 7th, through the filing on March 11th to understand the applicable agreements and the creditors' claims from the numerous prepetition litigations, and were in fact very instrumental in devising the ultimate strategy for these cases.  Shortly after the filings, Messrs. Kirschner and Kost initiated meetings with major creditor constituencies to get their input and to further understand the positions and concerns of the various parties.  Mr. Kirschner and his team participated in person in an "all hands" meeting with counsel for the Secured Creditors, U.S. Bank, and Ms. Tilton, and have told these stakeholders Mr. Kirschner is available to discuss these cases by phone or in person at any time.

64.    In any event, mere acrimony between stakeholders is not cause to appoint a Chapter 11 trustee in and of itself.[87]  Indeed, if mere acrimony were sufficient, appointment of a Chapter 11 would be warranted in virtually every Chapter 11 bankruptcy, encouraging a party who seeks appointment of a trustee to actually manufacture acrimony.[88]

---

[86] *In re Sundale, Ltd.*, 400 B.R. 890, 910 (Bankr. S.D. Fla. 2009).

[87]  *Marvel*, 140 F.3d at 473 (holding "that there is no per se rule by which mere conflicts or acrimony between debtor and creditor mandate the appointment of a trustee"); *Sundale*, 400 B.R. 909 ("Neither loss of confidence, however reasonable, [n]or acrimony, however bitter, necessarily results in appointment of a trustee.").

[88] *Marvel*, 140 F.3d at 472–73 (explaining that a court "may find cause to appoint a trustee for 'acrimony' only . . . when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or . . . when the parties begin working at cross-purposes" (quotation marks omitted)).

65.     The extreme acrimony that supported appointment of a Chapter 11 trustee in *Marvel* is very different from that here.  In that case, a shareholder group that seized control over management of the debtor in an adversarial manner postpetition did not instill confidence that it would negotiate fairly with the lenders who had opposed the takeover or that reorganization would occur effectively.  That case is a far cry from the situation here in which the Debtors have (i) enlisted an independent third party, unaffiliated with the prepetition rancor, to communicate and negotiate with the Movants, (ii) adopted Monetization Procedures designed to ensure that the process is transparent and that value is maximized for the benefit of all stakeholders, and (iii) demonstrated progress towards shared goals by agreeing to mediation with the Secured Creditors.  There is thus no basis to contend that any enmity towards Ms. Tilton would prevent the Debtors from discharging their fiduciary duty to maximize the value of estate assets.[89]

### B.  A trustee would not be in the best interest of all stakeholders.

66.     The Secured Creditors' argument for appointment of a Chapter 11 trustee under § 1104(a)(2) of the Bankruptcy Code is fundamentally flawed.  That section permits a court to appoint a trustee only "if such appointment is in the interests of creditors, <u>any equity security holders</u>, and other interests of the estate . . . ."[90]  Accordingly, under § 1104(a)(2), "a creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests."[91]  Indeed, the statute specifically uses the word "and" in identifying the constituents whose interests a court must respect:  "Use of the word 'and' suggests that creditors cannot on their own obtain the appointment of a trustee under the

---

[89]  *Cf. G-I Holdings*, 385 F.3d at 321 (affirming judgment that the debtor "would be able to discharge its fiduciary obligations" even if there was "unquestionably considerable acrimony" between the debtor and its creditors).

[90]  11 U.S.C. § 1104(a)(2) (emphasis added).

[91]  *Sletteland*, 260 B.R. at 672.

provision in order to disenfranchise equity security holders or other interests."[92]   Rather, the party seeking a Chapter 11 trustee under § 1104(a)(2) "must show that the appointment is in the interests of all those with a stake in the estate," including the debtor and its equity holders.[93]

67.    Appointment of a Chapter 11 trustee would in fact not be in the interest of all of the Debtors' stakeholders.  While Ms. Tilton is the sole shareholder and director of the Debtors, she is also a significant stakeholder and, indeed, has a greater incentive to maximize value than any other stakeholder.  Through her entities, she holds the Class A-3 notes in Zohar I (which are junior to outstanding MBIA claims), the Class B notes in the Zohar Funds with a total value of approximately $546 million, and all of the preference shares (i.e., the equity) of the Zohar Funds.  Ms. Tilton or her affiliates also served as administrative agent for the lenders and manager of the Portfolio Companies.  Ms. Tilton has significant operational roles at most Portfolio Companies.  The Secured Creditors' ultimate goal of removing Ms. Tilton from her roles at the Portfolio Companies would be disruptive to the monetization process and necessarily impair value.  Replacing management at the operational level would push the monetization process back by months, if not years.  A Chapter 11 trustee might even conclude that trying to replace Ms. Tilton would be expensive and counterproductive, requiring the trustee to retain a number of specialists or crisis managers in different industries.  This transition would disrupt the underlying Portfolio Companies and destroy value.  The litigations upon which the Noteholders are so focused would certainly be a secondary consideration given any trustee's primary duty of maximizing value for creditors and equity holders.  By contrast, the oversight proposed under the Monetization

---

[92] *Id.* (quoting Collier).

[93] *Id.*; *see also LHC*, 497 B.R. at 309–10 ("The Court finds that § 1104(a)(2) must be read in the conjunctive, and that the appointment of a trustee must be in the interests of equity security holders as well as creditors."); Collier ¶ 1104.02 ("[I]t is important to remember that the "interests" standard requires a finding that appointment of a trustee would be in the interest of essentially all interested constituencies."); *cf. Sharon Steel*, 871 F.2d at 1226.

Procedures will address any concerns about Ms. Tilton's actions at the Portfolio Companies, while avoiding the disruption that her removal would occasion.

68.    The Secured Creditors do not make any attempt to explain how appointment of a Chapter 11 trustee would be in the interests of Debtors' equity security holders or other parties in interest here.  The Secured Creditors in fact go so far as to omit the reference to the interests of equity holders in quoting  § 1104(a)(2).[94]  The reason for this is plain:  "when equity security holders or other ownership interests properly and in good faith support the debtor's current management, it will be difficult to obtain an order for the appointment of a trustee under the 'interests standard,' as such an appointment will presumably not be in the interest of equity."[95]

69.    Even if the Court were permitted to disregard the interests of other stakeholders, appointment of a Trustee would not be warranted under § 1102(a)(2).  The Secured Creditors do not identify a single Delaware case that has adopted the four-factor test they pluck from *In re Ionosphere*.  But even the Secured Creditors' preferred standard does not support appointment of a trustee here.  First, the retention of a capable, experienced, independent CRO and the adoption of the Monetization Procedures ameliorate any concerns about the Debtors' trustworthiness.[96]  Indeed, the Reporting and Oversight provisions set forth in the Monetization Procedures offer assurance to all parties in interest that Mr. Kirschner is bringing his independent judgment to bear on maximizing the value of the Debtors' assets for the benefit of all stakeholders.

70.    Second, it is far too premature for the Secured Creditors to cast aspersions on the Debtors' performance in monetizing their assets.  It is a fundamental principle governing Chapter

---

[94]  *See* Dismissal/Trustee Mot. ¶ 109.

[95]  *LHC*, 497 B.R. at 309 (quoting Collier).

[96]  *Cf. In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y.) (declining to appoint a Chapter 11 trustee when trustworthiness was "not an issue" in light of new management), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).

11 cases that a debtor must be afforded an opportunity for a fresh start.[97]  Here, the Movants'
request for appointment of a trustee comes just two weeks after the Debtors filed their petitions
and before the Debtors have had a full opportunity to get the monetization process off the
ground.[98]  The Debtors have, however, made rapid progress in retaining investment bankers and
commencing the monetization process postpetition—which could not have been accomplished
prepetition given the uncertainty created by the maelstrom of litigation.

71.    Third, a "loss of confidence, however reasonable," does not "necessarily result[]
in appointment of a trustee."[99]  Moreover, "[l]ack of confidence must be more than a personal
dislike for management and should relate to the objectives of the case."[100]  Here, Mr. Kirschner's
experience and independence, and his obligation to maximize that value of estate assets under
the Monetization Procedures for the benefit of all stakeholders, should instill confidence as it
relates to the objectives of these cases.[101]

72.    Finally, there is simply no benefit to appointing a trustee here, which is "the most
important" consideration.[102]  Appointment of a Chapter 11 trustee would impose significant
additional costs on the estates, as a trustee would receive a commission on distributions and
bring in a new team of advisors, lawyers, and other professionals.  Mr. Kirschner is capable

---

[97]  *See, e.g.*, *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 240–41 (4th Cir. 1987).

[98]  *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("[C]reditors' frustration with
the lack of a successful resolution to the [sale process] *after almost two years* is understandable." (emphasis added)).

[99]  *Sundale*, at 909.

[100]  *Morningstar Marketplace*, 544 B.R. at 305.

[101]  Even if the Secured Creditors had some cognizable basis for losing faith in current management, the "business
community" has not.  *Cf.* 225 Action Trial Tr. 436:19–437:12 (CFO of Universal Instruments, testifying that "[Ms.
Tilton's] mantra has always (and I mean ALWAYS been 'do what's right for the company and the shareholders'");
*id.* at 1738:16–18 (CEO of Performance Designed Products LLC, testifying that he understood Ms. Tilton to always
be working in the best interests of the company).  Even during the SEC proceeding, Ms. Tilton successfully obtained
a government contract worth approximately $1.5 billion for MD Helicopters, Inc.  Thus, any lost confidence here is
limited to the handful of parties that undeniably have an axe to grind with Ms. Tilton.

[102]  *Adelphia Commc'ns*, 336 B.R. at 659.

and experienced, and the Monetization Procedures ensure his independence in overseeing, and ensuring the integrity of, the monetization of estate assets for the benefit of all stakeholders.[103] Mr. Kirschner is as "well-qualified and independent" as any Chapter 11 trustee would be and has obtained Ms. Tilton's agreement to set aside the beneficial-ownership dispute and vote her interests in favor of a Best Offer.[104]  None of the Movants claim that Ms. Tilton, who personally restructured each of the Portfolio Companies, and Mr. Kirschner cannot monetize the Portfolio Companies sufficient to satisfy the Noteholders' claims whereas some unknown trustee could. Nor could they legitimately make that claim, let alone prove it by clear and convincing evidence. The Movants' request for appointment of a Chapter 11 trustee must therefore be denied.

## III.    The U.S. Trustee's Request for an Examiner Should Be Denied.

73.    The U.S. Trustee's request for an examiner under section 1104(c)(1) fails for largely the same reasons as the request for a Chapter 11 trustee under the analogous language of § 1104(a)(2).  That is, a party seeking an examiner under § 1104(c)(1) must show that the appointment would be in the interests of all those with a stake in the estate, including the debtor and its equity holders.[105]  The U.S. Trustee cannot do so here.

74.    Moreover, there is no factual basis for the U.S. Trustee's request for an examiner.[106]  However, the U.S. Trustee's request for an examiner is based merely on the fact that MBIA and AMZM have alleged misconduct and self-dealing in various other litigations

---

[103] *Cf. Blue Stone Real Estate*, 392 B.R. at 902 ("No party in interest was able to articulate any credible difference between the skill set of a Chapter 11 trustee and the skill set that Mr. Oscher would bring to the table as a CRO.").

[104] Trustee/Examiner Mot. ¶ 32; *see also* Kirschner Decl. ¶ 5.

[105] *See, e.g., In re Gliatech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004) ("An appointment under § 1104(c)(l) must . . . be in the interests of everyone with a stake in the case, including creditors, equity security holders, and other interests of the estate."); *Sletteland*, 260 B.R. at 672 (same); Collier ¶ 1104.03 ("A party seeking the appointment of an examiner must be able to show that such an appointment will be beneficial to the various constituencies.").  Appointment of an examiner is not mandatory.  *E.g., In re Spansion, Inc.*, 426 B.R. 114, 126–28 (Bankr. D. Del. 2010); *see also In re Residential Capital, LLC*, 474 B.R. 112, 121 (Bankr. S.D.N.Y. 2012).

[106] *GliaTech*, 305 B.R. at 836 ("A request to appoint an examiner must be substantiated with factual support. . . . ").

against Ms. Tilton.[107]   Unproven accusations made in other lawsuits do not provide sufficient "factual support" for the U.S. Trustee's request for an examiner here.[108]

75.     Indeed, bankruptcy courts in Delaware and elsewhere have recognized that an examiner is inappropriate where the debtor has already been "investigated to death" by a governmental agency.[109]  Here, the U.S. Trustee's request for an examiner overlooks the fact that the SEC conducted its own seven-year investigation, and after a three-week trial, Ms. Tilton was found to have not engaged in any of the alleged wrongdoing that is being recycled in the pending Motions.

76.     Finally, appointment of an examiner to investigate estate causes of action is entirely premature.  Given current market conditions, the Debtors are hopeful that all noteholders will be repaid in full through the sales or refinancing of Portfolio Companies in Tier 1.  Once the Noteholders' claims are satisfied, the Debtors' only remaining stakeholders would be Ms. Tilton and her affiliated entities.  The cost of an examiner's investigation thus should not be incurred unless and until there is some indication that pursuit of estate claims would not be superfluous but would some actual benefit to the estates.  As set forth in the Monetization Procedures, any and all claims that the Debtors may have against Ms. Tilton are adequately preserved in the unlikely event that pursuit of those claims becomes necessary to satisfy the Noteholders' claims. Accordingly, the request for an examiner should be denied.

---

[107]   *See* Trustee/Examiner Mot. ¶¶ 10–16.

[108]   *Cf. In re Lenihan.* 4 B.R. 209, 210–12 (Bankr. R.I. 1980) (allegations of fraud and theft by debtor, unsupported by evidence, did not justify appointment of examiner); *In re Bel Air Assocs.*, 4 B.R. 168, 173–74 (Bankr. W.D. Okla. 1980) ("mere naked allegations," without supporting evidence, did not justify appointing examiner).

[109]   *See, e.g.*, *Residential Capital*, 474 B.R. at 121 ("The appointment of an examiner would be inappropriate if . . . an appropriate and thorough investigation has already been conducted (or is nearly complete) by . . . a governmental agency."); *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012) (quoting *ResCap*); Hr'g Tr. at 98:12–100:21, *In re Wash. Mut. Inc.*, No. 08-12229 (Bankr. D. Del. May 5, 2010) (no examiner when debtor had been "investigated to death").

## **CONCLUSION**

WHEREFORE, for the reasons discussed herein, the Debtors respectfully request that the

Court deny the Motions.

Dated: April 10, 2018
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Joseph M. Barry*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4421)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel to the Debtors and Debtors in Possession*