IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 18-10512 (CSS)<br><br>Jointly Administered<br><br>**Hearing Date: May 18, 2018 at 4:00 p.m. (ET)**<br>**Obj. Deadline: May 11, 2018 at 4:00 p.m. (ET)**<br>**(Proposed)** |

**DEBTORS' MOTION, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR AN ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS**

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") hereby submit this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the settlement agreement (the "Settlement Agreement")[2] by and between (i) the Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA Insurance Corp. ("MBIA"), and (v) Halcyon Capital Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD (collectively, the "Zohar III Controlling Class"

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2] Capitalized terms not herein defined shall have the meanings ascribed to them in the Settlement Agreement.

[3] The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

01:23154853.13

and, together with the Debtors, Lynn Tilton, the Patriarch Stakeholders, and MBIA, the "Parties"). In support of this Motion, the Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT**

1. The Debtors filed these Chapter 11 cases to obtain a breathing spell from the several contentious pending litigations and to create a process to monetize the Debtors' assets through sales or refinancings of the Debtors' interests in the Portfolio Companies, and unlock and maximize value for the benefit of all the Debtors' stakeholders. The settlement reached by the Parties provides the framework for the Debtors to do just that, despite the contentious start to these cases.

2. Remarkably, and against all odds, with the herculean efforts of Judge Kevin Gross as judicially appointed mediator (the "Mediator") and following round-the-clock mediation sessions, the Parties have settled and resolved certain of their disputes, eliminated the need for a trial on the *Motion of MBIA Insurance Corporation and Zohar III Controlling Class to Dismiss the Chapter 11 Cases or, if Not Dismissed, to Appoint a Trustee* [Docket No. 56] (the "Dismissal/Trustee Motion") and the other Litigated Contested Matters (as defined below), and created a framework through which the Debtors (through a newly appointed independent director and CRO) and Ms. Tilton can embark on a path to monetize (through sales or refinancings) assets of the Portfolio Companies for the benefit of all stakeholders. During the period created through this framework, the resolution of preexisting disputes—which had carried over to these Chapter 11 cases—will be stayed. This framework is, in large part, memorialized in the Settlement Agreement and is described more fully below.

3. The Parties represent nearly all of the economic stakeholders in the Chapter 11 Cases and the primary pre-bankruptcy litigants. As recognized by the Court at the status

conference held in these cases on April 23, 2018, the level of participation in the mediation/settlement process by the Parties—after years of intense litigation—to the path set forth in the Settlement Agreement speaks volumes. Specifically, the Court acknowledged:

> I believe from communications I received from Judge Gross, who served as the mediator, that the matter has settled. I congratulate the parties for their hard work in doing that.

*See* Transcript of 4-23-18 Status Conference at 3:14-17. The Debtors respectfully request that the Court enter an order approving the Settlement Agreement.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Local Rule 9013-1(f), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The statutory and legal predicates for the relief sought herein are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

**A. General Background**

7. On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). No official committees have been appointed pursuant to section 1102 of the Bankruptcy Code.

01:23154853.13                                3

8.  The Debtors were placed into bankruptcy to obtain a breathing spell from the several contentious pending litigations and to create a process to monetize the Debtors' assets through sales or refinancings of the Debtors' interests in the Portfolio Companies, and maximize value for the benefit of all of the Debtors' stakeholders. Those litigations, brought both by and against the Debtors, involve at least 12 separate cases, raise numerous complex legal issues, and involve virtually all Zohar Funds stakeholders.

9.  General information about the Debtors and the events leading up to the Petition Date, including descriptions of the relevant prepetition lawsuits, can be found in the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* [Docket No. 6] (the "Kirschner Declaration"), the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [Docket No. 5], each filed on March 12, 2018, and the Dismissal/Trustee Motion.

**B. The Parties' Disputes**

10.  On March 12, 2018, the Debtors filed a motion to reject the collateral management agreements with Alvarez & Marsal Zohar Management, LLC ("AMZM") effective as of the Petition Date [Docket No. 8] (the "Rejection Motion"). On March 27, 2018, objections to the Rejection Motion were filed by AMZM [Docket No. 86], MBIA [Docket No. 89], the Zohar III Controlling Class [Docket No. 92], and U.S. Bank National Association, as indenture trustee ("U.S. Bank") [Docket No. 93]. On April 12, 2018, the Debtors filed their omnibus reply in support of the Rejection Motion [Docket No. 173].

11.  On March 14, 2018, AMZM filed a motion for relief from stay to pursue the 225 Action on appeal before the Delaware Supreme Court [Docket No. 21] (the "Lift Stay Motion"). AMZM's Lift Stay Motion was joined by the Zohar III Controlling Class [Docket No. 67] and MBIA [Docket No. 88]. On March 29, 2018, the Debtors filed their objection to the Lift Stay

Motion [Docket No. 111], and on April 12, 2018, AMZM filed its reply in support of the Lift Stay Motion [Docket No. 172].

12. On March 26, 2018, MBIA and the Zohar III Controlling Class filed the Dismissal/Trustee Motion. On April 3, 2018, the United States Trustee for Region 3 (the "U.S. Trustee") filed a motion for appointment of a Chapter 11 trustee or, alternatively, appointment of an examiner [Docket No. 132] (the "Trustee/Examiner Motion").

13. On April 10, 2018, the Debtors filed an omnibus objection to the Dismissal Trustee Motion and the Trustee/Examiner Motion [Docket No. 165]. Lynn Tilton and certain of her affiliated Patriarch entities filed an objection to the Dismissal/Trustee Motion on April 10, 2018 [Docket No. 163] and an objection to the Trustee/Examiner Motion on April 12, 2018 [Docket No. 176]. On April 15, 2018, MBIA and the Zohar III Controlling Class filed a reply in support of the Dismissal/Trustee Motion [Docket No. 182].[4]

14. On or about March 28 and April 4, 2018, the Court scheduled a two-day trial for April 17–18, 2018 (the "Trial"), to adjudicate the Litigated Contested Matters [Docket Nos. 108, 110, 138].

15. On April 5, 2018, the Court appointed Judge Kevin Gross to mediate the Parties' various disputes on April 16, 2018, the day before the Trial was scheduled to begin [Docket No. 143].

16. The Parties thereafter engaged in expedited discovery, including extensive document production and four separate day-long depositions, and devoted significant effort towards preparing for the Trial while simultaneously making preparations for a good-faith mediation effort before the Mediator.

---

[4] The filings described in paragraphs 7–10 above are referred to herein as the "Litigated Contested Matters."

01:23154853.13                                5

17. After the scheduled mediation session before the Mediator, which continued well into the night, the Parties agreed to adjourn the first day of the Trial to continue their in-person mediation efforts. *See* Docket No. 194. After a second day-long mediation session before the Mediator, which again continued well into the night, the Parties agreed to further adjourn the Trial to continue pursuing mediation. *See* Docket No. 196. Given that the Parties' mediation efforts were ongoing, but offered no assurances of success, the Court rescheduled the Trial for April 25 and 27, 2018. *See* Docket No. 204. After the initial Trial date was rescheduled, the Parties thereafter engaged in good-faith, in-person mediation sessions over the course of two additional full days, including a session that started on Wednesday, April 18, 2018 and continued into Thursday morning.

18. All told, the Parties mediated their various disputes virtually around the clock for four straight days. The negotiations were complex, arms-length, and hard-fought, but ultimately successful. As the result of the arduous good-faith, in-person mediation efforts overseen by the Mediator, the Parties agreed to a comprehensive resolution of the Litigated Contested Matters, the terms of which are embodied in the Settlement Agreement attached to the Proposed Order as Exhibit 1.

**C. The Settlement Agreement**

19. The material terms of the binding Settlement Agreement are as follows:[5]

    i. The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other

---

[5] The following is a summary of the Settlement Agreement and is qualified in its entirety by reference to the Settlement Agreement, the terms of which control. The Parties acknowledge that the Settlement Agreement was drafted using best efforts during the Mediation and that disputes regarding the Settlement Agreement (and terms therein) will be addressed by the Mediator or, if necessary, by the Court.

        than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

ii.      Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors, .

iii.     Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

iv.     

v.      [redacted]

vi.     The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month

                    Extended Window, as applicable, the New Agent shall have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

    vii.    If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

    viii.    The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "***Monetization Process***"). 

    ix.    Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended

|     |     |
| --- | --- |
| | Window. During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position. |
| x. | With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. ███████ ███████████████████████████████████████ ███████████████████████████████████████ Each shall have full and complete information regarding the Monetization Process ████████████████████████ ███████████████████████████████████████. Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers ██ ████. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies. |
| xi. | Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute. |
| xii. | Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date. |
| xiii. | At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies ███████████████████████████████ ███████████████████████████████████████. |
| xiv. | The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to |

the Monetization Process involving any Group A Portfolio Company.

xv. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. ███████████████████████████████████████████████████████████████ All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

xvi. 

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

xvii. The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In the event of any dispute among the parties with respect to use of cash collateral, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

xviii. Any (A) claim asserted by the Patriarch Stakeholders ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and (B) equity interest asserted by the Patriarch Stakeholders ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ shall be deemed due and payable through the closing of any monetization event ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the

---

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window . Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

    xix.    All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

    xx.    Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution.

xxi. 

xxii. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

xxiii. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

xxiv. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties involved in the dispute, and heard at the Mediator's earliest availability. Any application shall be in writing and served by email on the other parties.

xxv. 

xxvi.     The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release). If the parties cannot jointly agree, then the Mediator shall resolve any disputes. The parties shall also agree to standard non-disparagement terms.

xxvii.    The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

xxviii.   The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement. Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

xxix.     For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

xxx.      The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties. The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.[6]

**RELIEF REQUESTED**

20.    By this Motion, the Debtors request entry of an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) approving the Settlement Agreement

---

[6] Although paragraph 30 of the Settlement Agreement states that the terms of the settlement will be further memorialized in a confidential stipulation, the Debtors submit that the Settlement Agreement, coupled with the Proposed Order annexed hereto as **Exhibit A**, sufficiently memorializes the Parties' agreement and no further documentation is required.

attached as <u>Exhibit 1</u> to the Proposed Order and (ii) authorizing the Debtors to take any and all actions necessary to effectuate the Settlement Agreement.

## BASIS FOR RELIEF REQUESTED

21. Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor).

22. The decision to approve a settlement "is within the sound discretion of the bankruptcy court." *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986) (cited with approval in *Martin*). The bankruptcy court should not substitute its judgment for that of the debtor. *See Neshaminy Office Bldg. Assocs.*, 62 B.R. at 803. The bankruptcy court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *see also World Health Alts.*, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best

possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." (internal citations and quotations omitted)).

23. The resolutions embodied in the Settlement Agreement are reasonable and in the best interests of the Debtors and all of their stakeholders. The Settlement Agreement provides for a fair and practical resolution of the Litigated Contested Matters which, if litigated, could consume a substantial portion of the Debtors' time and resources, continue to cost millions of dollars, and would continue to cast a cloud over efforts to monetize the Debtors interests in the Portfolio Companies through sales or refinancings. The Settlement Agreement was the product of significant discussions and negotiations between the Parties, and the agreement embodied therein falls well above the lowest point in the range of reasonableness. In addition, as discussed below, the applicable *Martin* factors weigh in favor of approving the Settlement Agreement.

### A. The Probability of Success in Litigation

24. The result of the litigation of matters resolved by the Settlement Agreement is uncertain. The litigation would be complicated and fact-intensive, and no litigation result is assured. Absent the Settlement Agreement, disputes related to the matters resolved by the Settlement Agreement would be litigated either before the Court or, if the automatic stay was lifted, in numerous other proceedings and jurisdictions—and, potentially, on appeal—with no guarantees of a more favorable outcome for the Debtors. And whichever party ultimately prevailed on the Litigated Contested Matters, the result would likely be suboptimal. Moreover, dismissal of these cases would send the Parties back to the litigation these cases were filed to stop. Appointment of a trustee would delay and/or hinder progress already made in connection with the refinancing of, or sale of, the Debtors' interests in the Portfolio Companies, and undo the concessions Ms. Tilton and the Patriarch Stakeholders have made in that regard in

the Settlement Agreement. And if the Debtors prevailed in the Litigated Contested Matters, there would still be no assurances that all stakeholders would be able to reach agreement on a consensual sales/refinancing monetization process, which is vital to the success of these Chapter 11 cases. The Settlement Agreement not only resolves the Litigated Contested Matters, but it also results in the avoidance of further litigation between the Parties and establishes a dispute resolution mechanism overseen by the Mediator that provides an avenue to avoid burdensome, costly, and time-consuming motion practice before the Court.

25. In contrast to the uncertainty and inherent risk in litigating these matters, and the unavoidable expenditures related thereto, the Settlement Agreement eliminates the need for such disputes and allows the value of the Portfolio Companies to be maximized for the benefit of all stakeholders. This outcome is <u>well above the lowest point in the range of reasonableness</u>. Accordingly, the Settlement Agreement meets the first factor of the *Martin* test.

### B. The Likely Difficulties in Collection

26. The Debtors do not believe that collection of any judgment that could be obtained is a significant issue animating the Settlement Agreement. This factor is thus neutral or not applicable.

### C. The Complexity of Litigation Involved and the Expense, Inconvenience, and Delay Necessarily Attending It

27. The Settlement Agreement satisfies the third factor in *Martin*'s four-factor test because, in the absence of a consensual resolution of the Litigated Contested Matters, the Chapter 11 cases would be burdened by additional inconvenience, expense, and potential delays—effects that would be borne by the Debtors and all of their stakeholders. The present disputes between the Parties are fact-intensive and, absent a settlement, would require the Parties and the Court to proceed with the multi-day evidentiary hearing previously scheduled and

additional post-trial briefing. Litigating these disputes to completion would be a complex, lengthy, expensive, and burdensome process—a process that the Settlement Agreement resolves in full. Moreover, the Settlement Agreement provides for a mechanism to bring future disputes to the Mediator, and that mechanism should reduce (and could potentially eliminate) litigation before this Court, which would be burdensome, costly, and potentially value-destructive. Accordingly, the third factor of *Martin*'s four-factor test is satisfied and weighs in favor of the Court approving the Settlement Agreement.

### D. Paramount Interests of Creditors

28. The Settlement Agreement serves the paramount interest of the Debtors' creditors as it provides a mechanism to monetize or refinance the Debtors' assets, and maximize value for the benefit of all stakeholders. Indeed, representatives of the Debtors' most significant creditors participated in formulating and agreed to the terms of the Settlement Agreement. Moreover, obviating litigation of the disputes covered by the Settlement Agreement will allow the Debtors and their professionals to focus on working collaboratively with the Debtors' creditors to maximize value for the benefit of all stakeholders. Accordingly, the Debtors submit that the final factor is also met.

29. Finally, the Settlement Agreement and the transactions contemplated therein are a sound exercise of the Debtors' business judgment. The Settlement Agreement is the product of extensive arms'-length negotiations between the Parties and their respective representatives and represents a comprehensive resolution of the Parties' disputes. In light of the above, the resolution of these disputes embodied in the Settlement Agreement (i) is fair and equitable; (ii) represents a compromise that rests well above the lowest point in the range of reasonableness; (iii) avoids the expense, delay, inconvenience, and uncertainty that would attend any litigation of

the Parties' issues; and (iv) advances the paramount interests of creditors. Therefore, the Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved by the Court.

## **NOTICE**

30. The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) counsel to the Patriarch Entities; (v) counsel to AMZM; (vi) counsel to U.S. Bank, as indenture trustee; (vii) counsel to MBIA; (viii) counsel to the Zohar III Controlling Class; and (ix) all parties that, as of the filing of this Motion, have requested notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto, (i) authorizing the Debtors to enter into and perform in accordance with the Settlement Agreement and approving the terms thereof and (ii) granting such other and further relief as the Court deems just and proper.

Dated: April 30, 2018  
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Michael R. Nestor
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4421)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel to the Debtors*
*and Debtors in Possession*