## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (CSS) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Hearing Date: November 13, 2018 at 11:00 a.m. (ET)** |
| | ) **Objection Deadline: November 6, 2018 at 4:00 p.m. (ET)** |
| | ) |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER IN AID OF IMPLEMENTATION OF THE GLOBAL SETTLEMENT AGREEMENT APPROVED IN THESE CASES  ESTABLISHING CERTAIN PROCEDURES FOR THE INDEPENDENT DIRECTORS' APPROVAL OF MONETIZATION TRANSACTIONS AND RELATED RELIEF

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") hereby submit this motion (the "Motion"), pursuant to (i) section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), (ii) rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) this Court's *Order Approving and Authorizing the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* (the "Settlement Order") [Docket No. 266], and (iv) the Settlement Agreement[2] (as defined in the Settlement Order) [Docket No. 266,

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement or the *Debtors' Motion, Pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, for an Order Approving and Authorizing the Settlement Agreement* [Docket No. 222], as applicable.

Exh. A],[3] for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Proposed Order</u>") authorizing the Debtors, in aid of the ongoing Monetization Process (as defined below), to (i) implement certain procedures to obtain Court approval of a Portfolio Company Transaction (as defined below) with respect to the Debtors' interests in such transaction, and (ii) confirm the Independent Director's authority to act on behalf of the Debtors to exercise any and all of the Debtors' rights in connection with authorization, approval and closing of such transaction.  In support of the Motion, the Debtors respectfully state as follows:

## <u>PRELIMINARY STATEMENT</u>[4]

1.      The bedrock of these cases and the key to unlocking the value of the Debtors' estates are the Settlement Agreement.  But it is no ordinary settlement; it is a restructuring support agreement like no other.  Under the Settlement Agreement, operating companies that are not in bankruptcy or a part of these restructurings – the Portfolio Companies – will be monetized through non-Court-supervised private M&A processes.  As described below, these transactions can take a variety of forms from equity sales, to asset sales, to refinancings, but they all will have one thing in common – they are not auction and sale processes like those routinely employed in Chapter 11 cases.  For purposes of these Bankruptcy Cases, there will be no stalking horses; there will be no Court-approved bidding procedures; there will be no Bankruptcy Court supervised auctions.  In accordance with the Settlement Agreement, there will only be a decision by the Independent Director that a monetization event is in the best interest of the Debtors' and

---

[3] A copy of the Settlement Order and Settlement Agreement is annexed hereto as <u>Exhibit 1</u>.

[4] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them below.

their estates and stakeholders, which decision-making authority has already been vested in Mr. Farnan (the Independent Director) through the Settlement Agreement.

2.      The relief requested herein and the procedures set forth below provide for the mechanism through which this decision making will be exercised and made known to the Debtors' stakeholders through these Bankruptcy Cases – necessary disclosures to be sure.  This relief will confirm and clarify to parties-in-interest and potential market participants that the Independent Director has been vested with the necessary authority to approve transactions realized through these private, non-Court supervised M&A processes.  The Debtors further believe that the relief requested herein will assist potential acquirers in that M&A process to understand and be assured of the Debtors', the Independent Director's and, indeed, this Court's role in that process.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are section 105(a) of the Bankruptcy Code, Bankruptcy Rule 9019, the Settlement Order and, among others, paragraphs 5, 8, 10 and 12 of the Settlement Agreement.

102950217.19

## BACKGROUND

4.      The Debtors are collateralized loan obligation funds (or "CLOs"), which are special purpose vehicles that issue notes to investors in exchange for cash.  Under the Debtors' specific CLO structure, their primary assets are the senior secured loans they have made to[5] and the various equity or LLC interests[6] they hold record title to in the Group A Portfolio Companies and the Group B Portfolio Companies (together, the "Portfolio Companies").

5.      On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

6.      Shortly after the commencement of these cases, various parties-in-interest, including the Debtors, MBIA, U.S. Bank, the U.S. Trustee, the Zohar III Controlling Class and the Patriarch Stakeholders, engaged in litigation including a contested collateral management agreement rejection motion, motion for relief from the automatic stay and two (2) motions to dismiss the cases or appoint a chapter 11 trustee (the "Litigated Contested Matters").

7.      On April 5, 2018, the Court appointed Judge Kevin Gross to mediate the parties' various disputes on April 16, 2018, the day before the trial on the Litigated Contested Matters was scheduled to begin [Docket No. 143].  The negotiations were complex, arms-length, and hard-fought, but ultimately successful.  As the result of the arduous good-faith, in-person mediation efforts overseen by the Mediator, the parties agreed to a comprehensive resolution of the Litigated Contested Matters, the terms of which are embodied in the Settlement Agreement.

---

[5] As defined on Exhibit B, "Zohar Portfolio Company Debt."

[6] As defined on Exhibit B, the "Zohar Interests."  Together, the Zohar Portfolio Company Debt and the Zohar Interests are referred to herein as the "PC Assets."

8.     The Settlement Agreement is a significant achievement, following four full-day mediation sessions and weeks of additional negotiations.  The Settlement Agreement creates a platform where years of hotly contested litigation are put to the side and a monetization process will be implemented that will maximize the value of the Debtors' interests for the benefit of all stakeholders, which was heretofore unachievable.  On May 21, 2018, the Court entered the Settlement Order approving the Settlement Agreement.

9.     On May 21, 2018, the Court entered an order consistent with the Settlement Order appointing Joseph J. Farnan, Jr. as the Debtors' Independent Director.  *See* Docket Nos. 266 & 267.  Pursuant to the Settlement Agreement, Mr. Farnan is "fully charged with the governance of the Zohar Funds under applicable Cayman or Delaware law."  Settlement Agreement, at ¶ 7. Also in accordance with the Settlement Agreement, Mr. Michael Katzenstein was appointed as the Debtors' Chief Restructuring Officer (the "CRO") and Mr. Robert S. Kost was appointed as the Debtors' Chief Monetization Officer (the "CMO").  *See* Docket Nos. 297 & 283.

### THE GLOBAL SETTLEMENT

10.     The Debtors' primary assets are the PC Assets.  The primary purposes of the Court-approved Settlement Agreement are to implement a litigation stay among all stakeholders and to allow the Independent Director, the CRO and Ms. Lynn Tilton to jointly conduct a process by which the PC Assets will be monetized (sold or refinanced) and to maximize the value of the Debtors' estates for the benefit of all stakeholders.  In furtherance of that goal, paragraph 10 of the Settlement Agreement authorized the Independent Director and CRO, on behalf of the Debtors, and Ms. Lynn Tilton, on behalf of the Portfolio Companies, to monetize the PC Assets and "select transactions to complete."  Settlement Agreement, at ¶ 10.  Specifically, paragraph 10 of the Settlement Agreement provides:

> With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio Companies and the Group B Portfolio Companies. . . . Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete.  Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales.  Each shall have full and complete information regarding the Monetization Process and sources and uses of funds in any transaction consummated as part of the Monetization Process.  Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers.

*Id.* at ¶ 10.

11.     Paragraph 12 of the Settlement Agreement also provides that Ms. Lynn "Tilton and the CRO shall work jointly as outlined herein ***to monetize the Group A Portfolio Companies*** until such time as the (i) parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date."  *Id.* at ¶ 12.  Paragraph 8 of the Settlement Agreement further requires the "Independent Director…[to] retain a CRO to participate in the process ***to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing….***"  *Id.* at ¶ 8.[7]

12.     Finally, the Settlement Order "authorized and empowered [the Debtors] to take any and all actions necessary to carry out, effectuate or otherwise enforce the terms, conditions, and provisions of the Settlement Agreement."  Settlement Order, at ¶ 7.

## **RELIEF REQUESTED**

13.     As noted above, the Portfolio Companies are not debtors in these Chapter 11 cases.  They do not seek or require bankruptcy court approval of any transaction to monetize

---

[7] The process through which the Group A Portfolio Companies will be sold or refinanced is defined in the Settlement Agreement as the "Monetization Process."

their assets.   To the extent the Debtors need to exercise any consent rights for a Portfolio Company, and release estate claims with respect to the Monetization Process (whether as a holder of a record interest or as creditor of the Portfolio Company), given the process set forth in the Settlement Agreement, the Debtors seek, through the proposed Procedures, the Court's confirmation of the Independent Director's  authority to exercise those rights and, as any buyer will likely require, approval of an appropriate Transaction Order (as defined below) authorizing the completion of any PC Asset sale.

14.    To avoid any uncertainty in the marketplace about whether any Portfolio Company Transaction (as defined below) must be subject to a typical Court-approved and supervised auction more common of a stalking horse section 363 process, the Debtors seek an order of this Court to provide certainty in the integrity of the non-bankruptcy process.  No such auction process is required in this case.[8]

15.    Accordingly, by this Motion, the Debtors seek entry of an order pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rule 9019, the Settlement Order and paragraphs 5, 8, 10 and 12 of the Settlement Agreement, in further aid of the Settlement Agreement authorizing the Debtors to (i) implement the procedures outlined in the Proposed Order to obtain such an order (the "Procedures"), and (ii) confirm the Independent Director's previously granted rights to approve and close any Portfolio Company Transaction on behalf of the Debtors.

---

[8] Fundamentally, the Bankruptcy Code does not require or promulgate what constitutes appropriate post-filing marketing process or mandate that an auction under the supervision of the court even be held. While it is common for debtors to seek the court's imprimatur on bidding procedures, nothing in the Bankruptcy Code requires this.  So long as a debtor can establish that a process was conducted to achieve the best result for the estate, a proposed transaction can and should be approved under the Bankruptcy Code.

16.     In order to facilitate the Monetization Process and the relief requested herein, the Debtors are working with the Other Stakeholders and the Patriarch Stakeholders, as applicable, to provide their consent, upon the closing of a Portfolio Company Transaction, to release any liens, claims and encumbrances with respect to any related Zohar Interests or Zohar Portfolio Company Debt, provided that the Proposed Transaction Order (as defined below) with respect to such Portfolio Company Transaction must provide that any and all such liens, claims and encumbrances attach to the Debtors' share of the proceeds of such Portfolio Company Transaction with the same validity and priority as those being released (*i.e.* the liens, claims, and encumbrances granted to secure the Notes issued by the Debtors under the Indentures). Moreover, the proposed Transaction Order (as defined below) will provide that any PC Assets sold in accordance with the Procedures will be free and clear of any such liens, claims or encumbrances, along with any possible liens, claims and encumbrances of other third parties and the Debtors will demonstrate compliance with the Bankruptcy Code in connection with presentation of any Transaction Order.

**A.     Types of Portfolio Company Transactions**

17.     In order to achieve the greatest flexibility to generate the maximum value, the Debtors anticipate that the Portfolio Companies (which, themselves, are not in bankruptcy) will implement any of the transactions (or possible combination of transactions) set forth on Exhibit B hereto (as defined on Exhibit B, a "Portfolio Company Transaction").

**B.     The Monetization Process.**

18.     This Monetization Process is underway.  Eight Portfolio Companies have retained investment bankers, and the investment bankers have been working with those Portfolio Companies to prepare solicitation materials and to formulate marketing strategies that will

maximize interest in, and obtain the highest and best prices for, the Portfolio Companies through a Portfolio Company Transaction as described herein.  Five Portfolio Companies have circulated preliminary solicitation materials with potential buyers and/or financiers, and the expectation is that this number will increase as the efforts continue to monetize the Portfolio Companies pursuant to the Settlement Agreement.

19.    The Monetization Process being undertaken is designed to realize the highest and best value for the Portfolio Companies.  The processes being undertaken are and will be extremely thorough, well planned and coordinated with the oversight of highly qualified and seasoned investment bankers.  They are and will be multi-stage processes whose phases include or will include NDA negotiation, initial due diligence, preparation and distribution of teasers, preparation and distribution of confidential information memoranda (or "CIMs"), management presentations, initial indications of interest, due diligence electronic data room preparation, formulation and negotiation of competitive offers and, finally, selection and documentation of a highest and/or best offer by the Independent Director, CRO and Ms. Tilton.  Once this exhaustive process is completed, the Independent Director, CRO and Ms. Tilton will, in accordance with the Settlement Agreement, select a buyer for a sale, or a financing party with respect to any refinancing, whose respective offer will be fully documented on a final and unconditional basis subject only to the approval process described herein.

20.    At such time, an offer will constitute a Binding Portfolio Company Transaction with only 2 remaining steps – approval in accordance with the Procedures and a closing in accordance with its terms.  There will be no separate auction process in connection with these Chapter 11 cases.  Such a process is unnecessary due to the substantial and exhaustive marketing process that will be undertaken as described above (and as will be fully documented in any

Transaction Declaration (as defined below)).  Through this process, the Debtors and Ms. Tilton seek to achieve the highest and best offers for the PC Assets and believe the best way to accomplish this goal is to run a thorough and fully-vetted marketing process at the Portfolio Company level (as contemplated in the Settlement Agreement) and – importantly – give participants in that process the assurance that once their offer is accepted, fully documented and ready to close, the only remaining step is for this Court to place its imprimatur on such a deal in accordance with the pre-ordained procedures described herein.  In other words, if market participants suspect their bids will be "shopped" or further subjected to a section 363 bankruptcy marketing process in these cases, their confidence in that process – and willingness to put their maximum consideration on the table during the marketing process run by Ms. Tilton and the CRO – may be suppressed.

21.    As a result, the Debtors, pursuant to the Procedures proposed herein, seek an order of this Court authorizing them to seek confirmation of the results of the Monetization Process without engaging in any auction process under Bankruptcy Code section 363.

22.    As will be discussed in more detail below, the relief requested herein will facilitate the success of the Monetization Process and the consummation of the Settlement Agreement.

**B.    Determination of Portfolio Company Transactions and Related Procedures.**

23.    As set forth more fully in the Settlement Agreement, the Independent Director and the CRO, on behalf of the Debtors, and Ms. Lynn Tilton, on behalf of the Portfolio Companies, are conducting the Monetization Process. This includes jointly prioritizing sales, overseeing the bidding process and selecting which Portfolio Company Transactions to authorize, approve and close. *See* Settlement Agreement, at ¶ 10.

24.     At such time that the Independent Director and CRO, on behalf of the Debtors' interests, and Ms. Lynn Tilton, on behalf of the respective Portfolio Company, have jointly determined to pursue a specific Portfolio Company Transaction and such Portfolio Company Transaction is binding on all parties, subject to entry of a Transaction Order pursuant to the Procedures, and otherwise final, unconditional and fully prepared to be consummated (in the discretion of the Independent Director and CRO, on behalf of the Debtors, and Ms. Tilton, on behalf of the respective Portfolio Company) (each, a "<u>Binding Portfolio Company Transaction</u>"), the procedures described in the Proposed Order (the "<u>Procedures</u>") shall apply and be implemented.

## C.     <u>Form of Transaction Order</u>

25.     While the PC Assets are not being marketed pursuant to the typical Chapter 11, Court-approved bidding and auction process, the Portfolio Company Transactions may, in fact, include the use or sale of estate assets and, as such, any committed buyer may require the protections afforded to a buyer under section 363 of the Bankruptcy Code.  Accordingly the Debtors expect that any Transaction Order (to the extent required of a buyer) will contain standard section 363 buyer protections that will necessarily be supported by an evidentiary record as described more fully in the Procedures.

<u>BASIS FOR RELIEF REQUESTED</u>

26.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code," and that "[n]o provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules ....".  11 U.S.C. § 105(a).  Further, bankruptcy courts retain "jurisdiction to

interpret and enforce settlements and the accompanying orders approving settlements." *See In re Baseline Sports, Inc.,* 393 B.R. 105, 118–19 (Bankr. E.D. Va. 2008); *accord In re Lazy Days' RV Center, Inc.*, 724 F.3d 418, 423 (3d Cir. 2013); *In re Patriot Coal Corp.*, 539 B.R. 812, 818–19 (Bankr. E.D. Mo. 2015). Although "there are some significant limits to a bankruptcy court's ability to use section 105(a) of the Code . . . [it] plainly may be used 'to enforce and implement' earlier orders." *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008); *See Also In re Ames Dep't Stores, Inc.*, 317 B.R. 260, 273–74 (Bankr. S.D.N.Y. 2004).

27.     The requested relief is critical to the Debtors' efforts to maximize the value of their estates through the monetization process and to the successful implementation of the Settlement Agreement, and, therefore, should be approved under, *inter alia*, section 105(a) of the Bankruptcy Code.

28.     The Monetization Process and the joint authority granted to the Debtors' Independent Director and CRO, on the one hand, and Ms. Lynn Tilton, on the other, is critical to the success of these cases and the implementation of the exhaustively negotiated Settlement Agreement. While that process is currently under way, the Debtors and the other parties to the Settlement Agreement must make clear to the marketplace that, at the appropriate time, the Independent Director has been vested with full and complete corporate governance authority to deliver at closing any and all rights, benefits, and economic interests associated with any and all of the Debtors' interests in the Portfolio Companies without the need for a typical section 363 auction. Any lack of clarity that the Independent Director has the full and complete authority to consummate the private sale M&A processes being conducted at the Portfolio Company level on behalf of the Debtors  (without the need for a typical 363 process) could significantly impact the marketability of the Debtors' interests in the Portfolio Companies, the interest of potential buyers

and/or the willingness of market participants to put forth their highest and best offers for a Portfolio Company Transaction.

29.    While the binding terms of the Settlement Agreement are well known to and understood by this Court, the Mediator and the stakeholders in these cases, any faulty impressions or misunderstandings in the marketplace regarding the Monetization Process necessitates the relief requested herein.  For the Debtors and their stakeholders to fully capitalize on the monumental achievements embodied in the Settlement Agreement and thereby maximize the value of the Debtors' interests in the Portfolio Companies, the Independent Directors' role, the authority conferred upon him by the Settlement Agreement and how and when that authority can and will be exercised – without the need of further auction – must be made perfectly clear. That perfect clarity must include an order that dissipates any market confusion over whether these Portfolio Companies, or Debtors' interests in same, are subject to any traditional section 363 sale processes that would require an auction or other overbid process—they are not.

30.    As noted above, the Monetization Process is currently under way and monetization events with respect to the Debtors' interests in the Portfolio Companies are expected to occur in the coming months.  While the Portfolio Companies are not subject to a traditional Bankruptcy Code section 363 sale (because the Portfolio Companies are, themselves, not in bankruptcy), the Debtors believe that a transparent process is required that sets forth and confirms the Independent Director's corporate governance authority to exercise the Debtors' consent rights, release the Debtors' liens or otherwise consent to and, in fact, consummate a Portfolio Company Transaction.  The proposed Procedures achieve that end while at the same time affording adequate notice, due process and an opportunity to be heard.

31.     The Debtors submit that the relief requested herein is in furtherance of the Court-approved Settlement Agreement, is in their best interests, as well as those of their estates and all stakeholders, and will result in efficiencies that will maximize the recoveries for the Debtors' stakeholders.

## NOTICE

32.     The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) counsel to the Patriarch Stakeholders; (iii) counsel to U.S. Bank, as indenture trustee; (iv) counsel to MBIA; (v) counsel to the Zohar III Controlling Class; and (vi) all parties that, as of the filing of this Motion, have requested notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors request entry of the Proposed Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: October 23, 2018
   Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Joseph Barry*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*

<u>Exhibit 1</u>

Settlement Order and Settlement Agreement

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Docket Ref. Nos. 222 & 223** |

## ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order,

pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the

Settlement Agreement (attached hereto as **Exhibit 1**) entered into by and between (i) the

Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA, and (v) Halcyon Capital

Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF

Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD

(collectively, the "Zohar III Noteholders" and, together with the Debtors, Lynn Tilton, the

Patriarch Stakeholders, and MBIA, the "Parties"), as more fully described in the Motion; and it

appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware, dated as of February 29, 2012; and it appearing that venue of these

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Settlement Agreement, as applicable.

[3] The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and

the Court may enter a final order on the Motion consistent with Article III of the U.S.

Constitution; and this Court having determined that the relief requested in the Motion is in the

best interests of the Debtors, their estates, creditors, and other parties in interest; and this Court

having found that the relief requested in the Motion is justified by the facts and circumstances;

and it appearing that proper and adequate notice of the Motion has been given and that, except as

otherwise ordered herein, no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, is

approved in its entirety pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule

9019, and is binding on all parties-in-interest in these Chapter 11 cases, including, but not limited

to, the Parties, any new Collateral Manager or New Agent appointed under the terms of the

Settlement Agreement, the Independent Director, the CRO, U.S. Bank, the Other Stakeholders,

the Patriarch Stakeholders, the Committee, and any subsequent holder of any secured notes

issued by any of the Debtors (including, with respect to any of the foregoing, any agents,

successors, or assigns); provided, however, with respect to the Zohar III Controlling Class only,

no Party shall be required to disclose the terms of the Settlement Agreement to any successor,

assign or transferee, nor shall it be liable for any successor's, assign's or transferee 's breach of

the Settlement Agreement;  provided, further however, that the first sentence of paragraph 30 of

the Settlement Agreement shall be null and void solely to the extent it contemplates a separate "confidential stipulation."

3.      A prospective purchaser or seller of debt issued or guaranteed by the Zohar III, Corp. or Zohar III, Limited may obtain a copy of the terms of the Settlement Agreement from the CRO, only after executing a standard NDA consistent with the practice in the District of Delaware for the sole and limited purpose of evaluating a potential purchase of such debt, provided however, that such terms shall not include Exhibits to the Settlement Agreement. Without limiting the binding effect of the Settlement Agreement provided for under Paragraph 2 of this Order, in the event a potential purchaser of debt becomes a holder of Zohar III Claims, such NDA shall bind the entity requesting access to the terms of the Settlement Agreement, any individual representing any such entity in such a request, and any individual who is granted access to the terms of the Settlement Agreement on behalf of any such entity.

4.      Notwithstanding anything in the Order to the contrary, nothing contained in this Order is or shall be deemed to be an act by the Trustee to consent to or vote for or accept or adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding.  (All capitalized terms used in the prior sentence have the meaning ascribed to them in the applicable indenture between the Debtors and U.S. Bank.)

5.      Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Blank Rome LLP.

6.      Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Alvarez & Marsal Zohar

Management LLC ("AMZM"), provided, however, that paragraph 16 of the Settlement

Agreement provides that AMZM shall be terminated.

      7.     The Debtors are authorized and empowered to take any and all actions necessary

to carry out, effectuate, or otherwise enforce the terms, conditions, and provisions of the

Settlement Agreement.

      8.     This Court shall retain jurisdiction to hear any and all disputes arising out of the

interpretation or enforcement of this Order.

Dated: May **21**, 2018
        Wilmington, Delaware

                                      Christopher S. Sontchi
                                      United States Bankruptcy Judge

## Exhibit 1

**Settlement Agreement**

**Mediation Term Sheet**
**(In re: Zohar III Corp.,** *et al.,* **Case No. 18-10512 (CSS))**

*15 Month Window* – The period that expires 15 months from the date hereof.

*18 Month Extended Window* – If each of MBIA and the Zohar III Claims receive 50% of their respective Paid in Full amount within the 15 Month Window, the 15 Month Window shall be deemed to be extended by 3 months and shall be hereafter referred to herein as the 18 Month Extended Window.

*Bankruptcy Court* – The United States Bankruptcy Court for the District of Delaware, which is presiding over the Chapter 11 cases of the Debtors.

*Debtors* – The debtors in the Chapter 11 cases captioned: In re: Zohar III Corp., *et al.,* Case No. 18-10512 (CSS).

*Designated Tax Director* - the limited role Tilton shall have on behalf of the Debtors as described in paragraph 2 below.

*Full Payment Date* – The date on which the parties or the classes of noteholders on Exhibit A are Paid in Full.

*Independent Director* – the director appointed by the Mediator. The Independent Director (a) shall be unaffiliated with any party and (b) shall have played no role in connection with and held no claim against or interest in any of the Debtors.

*Indentures* – (1) The Indenture among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1 Corporation, Zohar CDO 2003-1, LLC, and MBIA Insurance Corporation, CDC Financial Products, Inc., and U.S. Bank National Association, dated November 13, 2003; (2) The Indenture among Zohar II 2005-1, Limited, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc., and LaSalle Bank National Association, dated January 12, 2005; and (3) The Indenture among Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., and LaSalle Bank National Association, dated April 6, 2007.

*MBIA* – MBIA Insurance Corp.

*Mediator* – The Honorable Kevin Gross, and if Judge Gross resigns as mediator Judge Sontchi will appoint a replacement mediator.

*Other Stakeholders* – (a) US Bank and MBIA, when not referring to Zohar III, (b) US Bank and the Controlling Class representative when solely referring to Zohar III, and (c) US Bank, MBIA and the Zohar III Controlling Class when referring to Zohar III and either or both of Zohar I and Zohar II.

*Paid in Full* – The amount owed to the parties  and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be updated monthly to reflect accrued and unpaid interest and fees allowable under the Indentures.[1]

*Patriarch Stakeholder* – Entities included in Exhibit B.

*Group A Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit C.

*Group B Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit D.[2]

*Tilton* – Ms. Lynn Tilton.

<u>*U.S. Bank*</u> – U.S. Bank National Association, solely in its capacity as Trustee under the Indentures, and not in its individual capacity.

*Zohar III Noteholders* – those entities or the classes of noteholders listed on the schedule attached hereto as Exhibit E.

*Zohar III Claims* – Claims under the Zohar III Indenture $[X]

*Zohar Funds* – collectively, Zohar CDO 2003-1, Limited; Zohar CDO 2003-1 Corporation; nondebtor Zohar CDO 2003-1, LLC; Zohar II 2005-1, Limited; Zohar II 2005-1, Corp.; nondebtor Zohar II 2005-1, LLC; Zohar III, Limited; Zohar III, Corp.; and nondebtor Zohar III, LLC)

**<u>Terms</u>**

---

[1]   This footnote is intended to cover MBIA's claims. Other than the Policy Payment in the amount of $148,951,585 with respect to Zohar I and the Policy Payment of $770,109,326 with respect to Zohar II reflected on Exhibit A, the calculation of which amounts are not subject to challenge by Tilton; all other rights reserved. MBIA will consult in good faith with Tilton regarding the other amounts and calculations specified in Exhibit A.  If the parties are unable to agree on those other amounts, the matter shall be referred to the Mediator. If the Mediator is unable to resolve the dispute, the matter shall be brought to the Bankruptcy Court for resolution. Any equity interest owed to MBIA or Zohar I, as applicable, will be escrowed until the expiration of the 15 Month Window; all parties' rights reserved. Any proceeds from the sale or repayment of Zohar I loans (but not the equity interest) shall be paid directly to MBIA.

[2]   Group B Portfolio Companies will exclude the Group A Portfolio Companies.

1. The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

2. Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors, the Group B Portfolio Companies, and Group A Portfolio Companies) solely for the purpose of exercising (and having no other rights or authority) to (a) manage the tax liability and reporting of the Debtors and the Group B Portfolio Companies, (b) manage the tax reporting of the Group A Portfolio Companies and (c) with respect to the Group B Portfolio Companies, manage any event causing cancellation of debt income (forgiveness of debt, liquidation, unwind, or foreclosure) including to manage the timing of sale of the Group B Portfolio Companies, forgiveness of debt and realizing gains and losses (the "Designated Tax Director"). In that capacity, Tilton shall continue to bear the tax liability associated with ownership of the Debtors, the Group B Portfolio Companies, and the Group A Portfolio Companies, including with respect to any Group A Portfolio Company transactions.

3. Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

4. [TBD: CRO and LT will develop reasonable process milestones related to hiring bankers, ....]

5. The Group A Portfolio Companies will be sold without regard to Tilton's personal tax liability.

6. The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall

01:23191627.1

have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

7.  If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

8.  The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "*Monetization Process*"). The CRO shall (a) replace the current CRO, (b) be unaffiliated with any party, and (c) have played no role in connection with and held no claim against or interest in any of the Debtors; provided, however, that Rob Kost may be considered for any role in the monetization process, by the CRO. The Independent Director and CRO each will execute a standard NDA consistent with the practice in the District of Delaware.

9.  Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended Window. During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

10. With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio

01:23191627.1

Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete. Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales. Each shall have full and complete information regarding the Monetization Process and sources and uses of funds in any transaction consummated as part of the Monetization Process. Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

11. Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

12. Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

13. At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies; provided, however, that the resolution of any dispute regarding the escrow referenced in footnote 1 shall not be barred as of the Full Payment Date by the provisions of this paragraph.

14. The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

15. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. The committee shall be comprised of 3 representatives. The members and their respective advisors shall execute standard NDAs consistent with the practice in the District of Delaware. The reasonable fees and expenses of the Committee and its advisors shall be set forth in a budget to be approved by the CRO and shall

be paid by the estates. All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

16. AMZM and any of its affiliates (collectively, "AMZM") shall not be a member of or advisor to the Committee, and, except herein, AMZM shall not be paid or reimbursed by the estates or the Portfolio Companies for any fees or expenses with respect to the Monetization Process or any other purpose; provided, however, that (a) AMZM shall be terminated as Collateral Manager, and MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. Subject to the approval of the CRO, AMZM may be reimbursed for reasonable transition costs solely incurred in the transmitting of information to the new collateral manager. [TBD: Side agreement b/w cro and CM ensuring reasonable fees which will be escrowed to escrow CM fees due under the indenture ]

17. The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. In order to facilitate this negotiation, the Zohar Funds will provide customary bankruptcy case budgets, including anticipated sources and uses of cash (including payments from the Group A Portfolio Companies). It is understood and agreed the Zohar Funds shall not utilize any cash they are holding pending an agreed order. In the event of any dispute among the parties with respect to use of cash collateral, in

the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

18. Any (A) claim asserted by the Patriarch Stakeholders that is supported by written documentation showing the claim (a) was funded to a Group A Portfolio Company by a Patriarch Stakeholder (in the case of funded debt claim), or (b) represents a fee or other claim arising from a deferral of payment or any management and/or administrative fee owed to a Patriarch Stakeholder[3] and (B) equity interest asserted by the Patriarch Stakeholders is supported by written documentation, then such claim and equity interest, as applicable, shall be deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity unless the applicable credit agreement provides otherwise.[4] In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window (provided the Full Payment Date does not occur on or before such date), but no such claim shall be brought during the 18 Month Window or used to block the closing of any pending transaction in the Monetization Process. The Patriarch Stakeholders will promptly provide any information reasonably requested by the CRO to verify the existence of the funding and documentation described above (provided that the CRO may share the foregoing information with Other Stakeholders (subject to the execution of an NDA approved by the Mediator) as required in the CRO's reasonable discretion. With respect to the claims in (A) above, the payments to the Patriarch Stakeholders that shall be made without further analysis or challenge shall be capped at $250 million, with any amounts in excess to be held in escrow until Full Payment Date. Tilton represents that none of the claims in (A) currently prime the secured claims of the Other Stakeholders in the Group A Portfolio Companies, other than ABLs in ████████████. Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

19. All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies

---

[3]   Management and/or administrative fees as noted here are defined in a separate agreement entered between the parties concurrent with this agreement.

[4]   Tilton to provide a good faith estimate on company by company basis for each of the Group A Portfolio Companies on an aggregate basis, in each case reflecting the aggregate amount she expects will be covered by this paragraph 17.

shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

20. Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution. Notwithstanding the foregoing, the Group A Portfolio Companies and the Group B Portfolio Companies can distribute payments as designated by the Designated Tax Director for the payment of their state and federal income taxes.

21. The Group A Portfolio Companies shall share with employees of MBIA (who sign NDAs as described in Paragraph 15 herein) financial statements and backup reasonably requested in writing by MBIA. Any information provided to MBIA shall only be shared in the following way: someone employed by MBIA can view the documents in the New York offices of Gibson Dunn but may not take copies or pictures of any documents or share any information in those documents, except with the CRO. In the event of any dispute among the parties with respect to the reasonableness of that request, such dispute shall be finally decided by the Mediator.

22. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

23. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

24. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties

involved in the dispute, and heard at the Mediator's earliest availability.  Any application shall be in writing and served by email on the other parties.

25. Upon the expiration of the 15 Month Window, the Independent Director/CRO may take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise, including, but not limited to, seeking relief from the Bankruptcy Court to lift the automatic stay, taking action to remove Tilton as a director or manager of the Group A Portfolio Companies or the Group B Portfolio Companies, or dismissing or converting the cases to chapter 7 cases. Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.

26. The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release).  If the parties cannot jointly agree, then the Mediator shall resolve any disputes.  The parties shall also agree to standard non-disparagement terms.

27. The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

28. The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement.  Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator.  If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

29. For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

30. The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties.  The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.

[INSERT SIGNATURE BLOCKS]

01:23191627.1

EXHIBIT A

Case 18-10512-CSS Doc 2001 Filed 10/22/18 Page 32 of 39

## ZOHAR I

| | | |
|---|---|---|
| Amounts paid on Nov. 20, 2015 under the Policy | 148,951,585 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 8,249,532 | Insurance Agreement § 4.03 |
| SUBTOTAL | 157,201,117 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 7,718,876 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 7,531,990 | |
| Financial, investment and non-legal advisors | 186,886 | |
| **TOTAL ZOHAR I CLAIM** | **164,919,993*** | |

## ZOHAR II

| | | |
|---|---|---|
| 1/20/2017 Policy Payment | 770,109,326 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 27,080,207 | Insurance Agreement § 4.03 |
| SUBTOTAL | 797,189,533 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 14,851,685 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 10,641,048 | |
| Financial, investment and non-legal advisors | 4,210,637 | |
| **TOTAL ZOHAR II CLAIM** | **812,041,218*** | |

| | |
|---|---|
| **ZOHAR PAID IN FULL AMOUNT** | **$976,961,211** |

*Assumptions:
All amounts are "as of" April 18, 2018 and will change pending Full Payment Date, including to reflect interest accrued and other
Credit Enhancement Liabilities which MBIA has not yet paid
Portfolio Company Zohar I loan interest payments will continue to be paid directly to MBIA
Zohar II claim amount does not reflect Portfolio Company loan interest payments which MBIA is entitled to receive, but have not
yet been distributed to MBIA.

MBIA is not seeking reimbursement for costs, expenses or interest payments made in connection with MZ Funding loan

# EXHIBIT A

## [ZOHAR III CLAIMS]

**Disclaimer:** The Zohar III Claims as forth in this Exhibit A have not been verified by the Collateral Manager since January 2016 as required by the Indentures and Management Agreement, and therefore, U.S. Bank makes no representation as to accuracy of the Zohar III Claims as set forth below, which claims and interest accruals may be modified or otherwise revised or verified when the new Collateral Manager is designated in accordance with the Mediation Term Sheet. Once the Collateral Manager is appointed, that person or entity, after consultation with U.S. Bank, will be responsible for updating the amounts herein to reflect unpaid principal, accrued and unpaid interest, and other fees, expenses, and other amounts allowable under the Indentures. Notwithstanding anything to the contrary in this Exhibit A or in the Mediation Term Sheet, nothing shall modify, alter, or otherwise change the Priority of Payments set forth in the Indentures, and U.S. Bank's rights, remedies, and objections to any such modification, alteration, or other change thereto are fully reserved. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Mediation Term Sheet to which this Exhibit A is attached or in the Indentures.

The following does not include interest accruing after 5/18/18. The following schedule excludes certain categories and amounts that must be paid prior to principal and interest owing to the Holders of the notes, including, without limitation, certain fees, expenses, reserves, and other amounts, which are set forth in the Priority of Payments of each Indenture (that have accrued or may accrue in the future):

| Issue Name | Issue Date | Maturity Date | Issue Amount | Original Par Amount | Current Balance | Prepetition Accrued Interest** | Addt'l Accrued Interest Thru 5/18/18*** | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| Class A-1R | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 135,767,116.30 | $ 686,522.34 | $ 586,182.09 | $ 137,039,820.73 |
| Class A-1T | 4/11/2007 | 4/15/2019 | $ 150,000,000.00 | $ 150,000,000.00 | $ 101,825,337.23 | $ 509,743.92 | $ 436,203.28 | $ 102,771,284.43 |
| Class A-1D | 4/11/2007 | 4/15/2019 | $ 350,000,000.00 | $ 350,000,000.00 | $ 237,592,453.54 | $ 1,189,402.47 | $ 1,017,807.66 | $ 239,799,663.77 |
| Class A-2 | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 200,000,000.00 | $ 1,087,156.78 | $ 914,108.70 | $ 202,001,265.48 |
| Class A-3 | 4/11/2007 | 4/15/2019 | $ 116,000,000.00 | $ 116,000,000.00 | $ 116,000,000.00 | $ 689,195.38 | $ 569,346.03 | $ 117,258,541.41 |

**This is the accrued interest that wasn't paid because of the $4,637,241.39 deposit of interest outside the collection account before the petition date
***The "Addt'l Accrued Interest Thru 5/18/18" column capitalizes the "Prepetition Accrued Interest" into the Current Balance and then Accrues Interest Thereon through 5/18/18

EXHIBIT B

**Exhibit B: Patriarch Stakeholders**

• Ark Entities (including Ark Angels, LLC; Ark Angels II, LLC; Ark Angels III, LLC; Ark Angels VIII, LLC; Ark Investment Partners II, LP; Ark II CLO 2001-1, Ltd.)
• LD Investments, LLC
• Lynn Tilton
• Octaluna LLC Entities (including Octaluna LLC; Octaluna II, LLC; Octaluna III, LLC)
• Patriarch Partners Entities (including Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners, XIV, LLC; Patriarch Partners XV, LLC)
• Patriarch Partners Management Group, LLC (PPMG)
• Patriarch Partners Agency Services, LLC (PPAS)
• Zohar Holdings, LLC

Case 18-10512-CSS   Doc 481   Filed 10/23/18   Page 35 of 39

EXHIBIT C

**Group A Portfolio Companies**

**[REDACTED]**

01:23191627.1

EXHIBIT D

**Group B Portfolio Companies**

**[REDACTED]**

EXHIBIT E

[To be provided]

EXHIBIT F

## The Zohar Funds, Lynn Tilton, MBIA, and the Zohar III Noteholders
## Announce Resolution to
## Stay Litigation, Refinance and Monetize Zohar Assets

NEW YORK – April [XX], 2018 –Zohar CDO 2003-1, Zohar CDO 2003-1 Corp., Zohar II 2005-1, Limited, Zohar II 2005-1 Corp., Zohar III, Limited, and Zohar III, Corp. (collectively, the "Zohar Funds"), Lynn Tilton, MBIA Insurance Corporation, a wholly owned subsidiary of MBIA Inc. (NYSE: MBI), and the Zohar III Controlling Class of Noteholders jointly announce today that the parties have mutually resolved the motions pending in federal Bankruptcy Court in the District of Delaware relating to the Zohar Funds, and have agreed to a deal that will include a stay of all pending litigation between the parties. This agreement is intended to facilitate the refinancing and monetization of assets of the Zohar Funds to the benefit of all stakeholders, and the parties have agreed to work in a mutually cooperative process in support of such refinancing and monetization.

As part of the agreement, an Independent Director will be appointed to govern the Zohar Funds, along with a Chief Restructuring Officer, who together with Ms. Tilton as director and manager of each Portfolio Company, will jointly implement the refinancing and monetization process. During the process, Ms. Tilton will remain in her current roles at the Portfolio Companies, all litigation between the parties will be stayed for a minimum of 15 months, and the bankruptcy cases will proceed without the appointment of a Trustee.

Ms. Tilton stated, "This agreement is a meaningful and important step towards allowing the Zohar Funds to monetize and refinance their assets in order to pay off all creditor claims in full. It is in the best interest of all stakeholders that we lay down our swords and stop the years of damaging litigation in order to maximize value for all of the Funds' stakeholders."

Anthony McKiernan, Chairman of MBIA Insurance Corporation, stated that "MBIA is pleased that the parties have been able to come to a consensual agreement that will put in place a process to enable MBIA to recover on the significant amounts it has paid its policyholders."

Marc Kirschner of Goldin Associates, Chief Restructuring Officer of the Zohar Funds, added, "The resolution of the hotly contested litigation in the bankruptcy cases is in the best interests of the Zohar Funds and their stakeholders as it will pave the way for the Zohar Funds to maximize the value of their assets for the benefit of all. The mediated result was the culmination of significant negotiations and the Zohar Funds are deeply appreciative of the efforts of the mediator, Judge Kevin Gross, for facilitating a settlement of the pending matters, which was no simple task."

Today's agreement will have no immediate effect on the operations of the Portfolio

Companies to whom the Zohar Funds have made senior secured loans.  The Portfolio Companies will continue to operate their businesses in the ordinary course as they are not parties to these bankruptcy cases.

**MEDIA CONTACTS:**

<u>FOR LYNN TILTON</u>
**Brunswick Group**
Alex Yankus
212-333-3810
<u>ayankus@brunswickgroup.com</u>

**MBIA**
Greg Diamond, 914-765-3190
Investor and Media Relations
<u>greg.diamond@mbia.com</u>