## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 18-10512 (CSS) |
| Zohar III, Corp., *et al.*,[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) **Hearing Date: November 19, 2018 at 10:00 a.m. (ET)** |
| | ) **Obj. Deadline: November 12, 2018 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 363 AND 503(b) OF THE
BANKRUPTCY CODE, FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
APPOINTMENT OF ANKURA TRUST COMPANY, LLC AS NEW AGENT UNDER
THE COURT-APPROVED SETTLEMENT AGREEMENT BY AND BETWEEN THE
DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA
INSURANCE CORP., AND THE ZOHAR III CONTROLLING
CLASS AND (II) GRANTING RELATED RELIEF**

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-

captioned Chapter 11 cases (collectively, the "Debtors") hereby submit this motion

(the "Motion"), pursuant to sections 105(a), 363 and 503(b) of title 11 of the United States Code,

11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), this Court's *Order Approving and Authorizing*

*the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders,*

*MBIA Insurance Corp., and the Zohar III Controlling Class* (the "Settlement Order") [Docket

No. 266], and the Settlement Agreement[2] (as defined in the Settlement Order) [Docket No. 266,

Ex. A], for entry of an order, substantially in the form attached hereto as Exhibit B

(the "Proposed Order") (i) appointing Ankura Trust Company, LLC ("Ankura") as New Agent

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Unless otherwise specifically indicated in this Motion, capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Motion (as defined below) or the Settlement Agreement, as applicable.

under the Settlement Agreement; and (ii) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief sought herein are sections 105(a), 363 and 503(b) of the Bankruptcy Code, the Settlement Order, and paragraph 6 of the Settlement Agreement.

## BACKGROUND

### A.      The Debtors

4.      The Debtors are collateralized loan obligation funds (or "CLOs"), which are special purpose vehicles that issue notes to investors in exchange for cash.  A CLO uses such cash to invest in loans or acquire other assets that, in turn, generate cash flows to pay back the CLO's investors over time with interest.  Under the Debtors' specific CLO structure, their primary assets are the senior secured loans they have made to and the various equity or LLC

interests they hold in the Group A Portfolio Companies and the Group B Portfolio Companies (together, the "Portfolio Companies").

5.     The Debtors are lenders to the Portfolio Companies under individual credit agreements between some or all of the Zohar Funds and the respective Portfolio Companies (each a "Credit Agreement" and, collectively, the "Credit Agreements"). Patriarch Partners Agency Services ("PPAS"), an affiliate of Ms. Lynn Tilton, currently serves as the administrative agent for the Debtors and the other lenders, as applicable, under the Credit Agreements. As agent under the Credit Agreements PPAS receives certain fees for, among other things, disbursing and servicing the loans on behalf of the lenders, collecting and distributing interest payments, and enforcing the lenders' various rights *vis a vis* the borrowers under the documents.

**B.     The Debtors' Bankruptcy Filings**

6.     On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 cases are being jointly administered, for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).

7.     General information about the Debtors and the events leading up to the Petition Date can be found in the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* [Docket No. 6] and the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [Docket No. 5], each filed on March 12, 2018.

**C.     The Litigated Contested Matters**

8.     Shortly after the commencement of these cases, various parties-in-interest, including the Debtors, MBIA, the Zohar III Controlling Class and the Patriarch Stakeholders, engaged in litigation including a contested collateral management agreement rejection motion,

motion for relief from the automatic stay, and two (2) motions to dismiss these cases or appoint a Chapter 11 trustee (the "Litigated Contested Matters").

9.      On or about March 28 and April 4, 2018, the Court scheduled a two-day trial for April 17–18, 2018 (the "Trial"), to adjudicate the Litigated Contested Matters [Docket Nos. 108, 110, 138].  On April 5, 2018, the Court appointed Judge Kevin Gross to mediate the Parties' various disputes on April 16, 2018, the day before the Trial was scheduled to begin [Docket No. 143].  The Parties thereafter engaged in expedited discovery, including extensive document production and four separate day-long depositions, and devoted significant effort towards preparing for the Trial, while simultaneously preparing for the mediation.

**D.      The Mediation and Settlement**

10.      Following four full-day mediation sessions and weeks of additional negotiations, on April 30, 2018, the Debtors filed a settlement motion [Docket No. 222] (the "Settlement Motion"), seeking approval of a comprehensive resolution of the numerous Litigated Contested Matters[3] between and among the parties to the Settlement Agreement.  The Settlement Agreement creates a platform where years of hotly contested litigation are put to the side and a monetization process will be implemented that aims to maximize the value of the Debtors' assets for the benefit of all stakeholders.

11.      On May 21, 2018, the Court entered the Settlement Order approving the Settlement Agreement.

---

[3]  A detailed description of the various then-pending Litigated Contested Matters is set forth in paragraphs 10-18 of the Settlement Motion.

**E.     The Appointment of the Independent Director, Chief Restructuring Officer and Chief Monetization Officer**

12.     On May 21, 2018, the Court entered an order, consistent with the Settlement Order, appointing Joseph J. Farnan, Jr. as the Debtors' Independent Director and granting certain related relief on an interim basis pending Court consideration and approval of the Independent Director's service agreement (the "Service Agreement") and indemnification agreement (the "Indemnification Agreement"). *See* Docket Nos. 266 & 267.  On June 26, 2018, the Court entered an order approving the Service Agreement and Indemnification Agreement on a final basis. *See* Docket No. 345.  Pursuant to the Settlement Agreement, Mr. Farnan is "fully charged with the governance of the Zohar Funds under applicable Cayman or Delaware law."  Settlement Agreement, at ¶ 7.

13.     In accordance with the Settlement Agreement, on May 25, 2018, the Debtors filed a motion to retain Mr. Michael Katzenstein as the Debtors' newly appointed chief restructuring officer (the "CRO") and to retain certain professionals from FTI Consulting Inc. to assist him in carrying out his duties as the CRO. *See* Docket No. 279.  On June 11, 2018, the Court entered an order approving the retention of Mr. Katzenstein as the Debtors' CRO. *See* Docket No. 297.  Further, in accordance with the Settlement Agreement, on May 25, 2018, the Debtors filed a motion to retain Mr. Robert S. Kost as the Debtors' Chief Monetization Officer (the "CMO") and to otherwise amend the Debtors' prior retention of Goldin Associates, LLC. *See* Docket No. 280.  On May 29, 2018, the Court entered an order approving the retention of Mr. Kost as the Debtors' CMO. *See* Docket No. 283.

**F.     Selection of Ankura as New Agent Under the Settlement Agreement**

14.     Pursuant to paragraph 6 of the Settlement Agreement PPAS is to be replaced in its capacity as agent under the Credit Agreements, as it pertains to services provided on behalf of

the Debtors in their capacities as lenders to the Portfolio Companies, by an independent administrative agent (the "New Agent") appointed by the Independent Director and the CRO. The New Agent shall report only to the Independent Director, the CRO, and the Indenture Trustee under the Indentures, U.S. Bank.  Paragraph 6 of the Settlement Agreement provides, in pertinent part, as follows:

> The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and  subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent . . .

15.    In accordance with the foregoing, the Independent Director and CRO, in consultation with U.S. Bank, MBIA, and the Zohar III Controlling Class, solicited proposals for the role of New Agent from a total of four (4) experienced and well-respected firms.  After conducting multiple rounds of interviews and reviewing all materials submitted by such firms in connection with their respective proposals, the Independent Director and CRO selected Ankura for the role of New Agent based upon, among other things, the significant experience and expertise of Ankura's professionals and their competitive proposed pricing structure. Ankura specializes in providing independent, conflict-free loan administrative agent, indenture trustee, and creditor representative services, with a particular focus in stressed and distressed situations. With deep expertise in this segment of the market, Ankura's professionals include former

01:23612597.4

6

principal investors, lenders, and trust professionals, who have actively participated in many of the highest-profile bankruptcies and out-of-court restructurings in recent history.[4]

16.         The specific terms of Ankura's engagement as New Agent are reflected in that certain letter agreement (the "New Agent Agreement"), a copy of which is attached hereto as Exhibit A.[5]   Contemporaneously herewith, Ankura has filed a motion for an order directing that the fee schedule relating to Ankura's services as the New Agent (which is attached as Exhibit B to the New Agent Agreement) (the "Fee Schedule") be maintained under seal.  For the reasons stated in Ankura's motion, the Debtors support the filing and maintenance of the Fee Schedule under seal.  Accordingly, the Fee Schedule has been redacted in its entirety from the version of this Motion filed publicly on the Court's docket.

17.         The salient terms of the New Agent Agreement[6] are as follows:

a.         **Services:**  The New Agent shall perform the services and duties set forth in the respective Credit Agreements, as modified and limited by the Settlement Agreement (the "New Agent Matters"), as well as such services as may otherwise be agreed in writing by the Independent Director or CRO, on the one hand, and the New Agent, on the other hand, from time to time.

b.         **Co-Agent:**  The New Agent acknowledges that the existing agent, PPAS, may be designated as a co-agent under some of the Credit Agreements for all purposes (and only such purposes) related to the Patriarch Stakeholders and any other third parties.  Notwithstanding the designation of PPAS as a co-agent with the New Agent under any Credit Agreement, the New Agent shall have the exclusive authority and right to act, or refrain from acting, with respect to any and all New Agent Matters under the Credit Agreements, as modified and limited by the Settlement Agreement, in each case, without having to obtain the consent or direction of PPAS

---

[4] For these reasons, Ankura has also been selected for the role of replacement collateral manager under the Indentures. To the extent a definitive agreement is reached with respect to the terms of such appointment, the Debtors will supplement this Motion to additionally seek approval to appoint Ankura as replacement collateral manager.

[5] The copy of the New Agent Agreement attached hereto as Exhibit A is in substantially final form.  The Debtors intend to file a revised New Agent Agreement with the Court once it is in execution form.

[6] The summary of the New Agent Agreement contained herein is qualified in its entirety by the terms of the New Agent Agreement.  In the event of any inconsistency between such summary and the terms of the New Agent Agreement, the terms of the New Agent Agreement shall control.  Capitalized terms used in this paragraph 17 that are not otherwise defined herein shall have the meanings ascribed to them in the New Agent Agreement.

or any other co-agent designated under such Credit Agreements and without any duty or liability to such co-agents or the lenders for whom such co-agents act.

   b. **Fees and Expenses:** As described more fully in the New Agent Agreement, the New Agent shall be entitled to the following as compensation for its services: (i) payment of an acceptance fee by the Debtors upon entry of an order of the Court approving the New Agent's appointment; (ii) annual fees and any applicable hourly administration fees, which shall be paid in accordance with the Fee Schedule; (iii) reimbursement of its expenses, costs and fees in accordance with the Credit Agreements, including reasonable fees and expenses of legal counsel; (iv) all reasonable and documented costs of legal counsel to the New Agent in connection with negotiating, documenting and executing the New Agent Agreement, including obtaining the Court's approval of the same; and (v) indemnification from each borrower, as set forth in the New Agent Agreement and in accordance with the terms of the Credit Agreements.

   c. **Non-Payment:** To the extent that any borrower under a Credit Agreement fails to timely pay or reimburse the New Agent for fees, expenses, costs or indemnities owed to the New Agent or any other Indemnified Party under such Credit Agreement, including, without limitation, the fees, expenses and costs of any professionals employed in furtherance thereof (in each case, to extent arising on or after the Court's approval of this Letter Agreement), the Debtors that are lenders under such Credit Agreement shall pay or reimburse the New Agent such amounts on behalf of the relevant borrower under such Credit Agreement on a pro rata basis (based on the ratio of outstanding indebtedness owed by such borrower to a Debtor-lender over the outstanding indebtedness owed by such borrower to all Debtor-lenders); provided, that ZII Corp. and the Zohar II Debtors shall be responsible for any and all obligations owed by ZI Corp. or the Zohar I Debtors under this paragraph; provided, further, that any unpaid fees (but not any indemnity obligations) of the New Agent with respect to any A-2 Credit Agreement shall be payable as provided in the Fee Schedule to the New Agent Agreement (and not as provided in this paragraph).

   d. **Additional Reimbursement and Indemnification Obligations:** If the New Agent is requested in writing by the Independent Director or CRO to perform any services or to take any action that are not covered by provisions of an applicable Credit Agreement (a "Debtor Directed Matter"), the fees and expenses (to the extent not payable by an underlying borrower) for such Debtor Directed Matter shall be paid directly by the Debtors pursuant to the allocation procedure described in paragraph 17.f. immediately below (the "Default Allocation Procedure") within 30 days of being invoiced for such services or in accordance with any applicable procedures in these Chapter 11 cases, provided, however, that the New Agent shall not be obligated to perform (and the Independent Director and the CRO shall not direct it to perform) any Debtor Directed Matter that is prohibited by the Settlement Agreement while it remains in force and effect. If the New Agent becomes subject to any litigation or other proceeding brought by another party related to a Debtor Directed Matter for which indemnity is not available to it under a Credit Agreement (an "Uncovered Matter"), then the New Agent shall be entitled to indemnification from the Debtors pursuant to the Default Allocation Procedure with respect to such Uncovered Matter; provided, that such indemnity shall not be available to the extent determined by a final order of a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of the New Agent.

f.     **Allocation of Financial Obligations:**    To the extent not otherwise expressly specified in the New Agent Agreement, any obligation of the Debtors to pay any amounts under such agreement, including the fees, expenses, costs or indemnities described therein, shall be allocated to each Debtor based on the amount of the then outstanding Paid in Full amount applicable to such Debtor; provided, that ZII Corp. and the Zohar II Debtors shall be responsible for any and all obligations owed by ZI Corp. or the Zohar I Debtors under the New Agent Agreement.

## RELIEF REQUESTED

18.     By this Motion, the Debtors request entry of an order pursuant to sections 105(a), 363 and 503(b) of the Bankruptcy Code, the Settlement Order, and paragraph 6 of the Settlement Agreement, in further aid of the Settlement Agreement, approving the appointment of Ankura as New Agent and authorizing the Debtors to make any payments that are required to be made to Ankura or any Indemnified Parties under the terms of the New Agent Agreement.

## BASIS FOR RELIEF REQUESTED

19.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code," and that "[n]o provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules ....". 11 U.S.C. § 105(a). Although "there are some significant limits to a bankruptcy court's ability to use section 105(a) of the Code . . . [it] plainly may be used 'to enforce and implement' earlier orders." *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008); *See Also In re Ames Dep't Stores, Inc.*, 317 B.R. 260, 273–74 (Bankr. S.D.N.Y. 2004) ("This Court, like most bankruptcy courts, invokes section 105(a) with restraint, and never inconsistently with, or to circumvent, other provisions of the Code. But it is manifestly proper, in this Court's view, to invoke section 105(a) 'to enforce or implement' the Court's earlier orders . . .").

01:23612597.4

20.    Further section 363(b) of the Bankruptcy Code provides in part that a debtor-in-possession "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved.  *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1983)); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Gulf States, Steel, Inc.*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to debtor's conduct").

21.    The Debtors respectfully submit that the retention of Ankura as a new, independent agent under the Credit Agreements is not only required under paragraph 6 of the Settlement Agreement, but also reflects a sound exercise of their business judgment.  The appointment of Ankura as independent New Agent for the Debtors under the Credit Agreements will promote an effective and efficient joint monetization process and assist the Independent Director and the CRO in effectively discharging their fiduciary duties to the Debtors' estates in connection therewith.    Ankura's professionals include former principal investors, lenders, and trust professionals who have actively participated in many of the highest-profile restructurings in

recent history.   Accordingly, Ankura possesses extensive experience and expertise for this engagement.

22.     Moreover, the selection of Ankura, specifically, as New Agent and the payment of any fees, expenses, indemnities, and other amounts associated therewith represents a sound exercise of the Debtors' business judgment and should be approved.   As discussed above, the Independent Director and the CRO solicited proposals from four (4) capable and experienced firms for the role of New Agent, conducting multiple rounds of interviews, reviewing pitch materials and pricing proposals, and consulting at each stage with their various stakeholders. Thereafter, with much deliberation, the Independent Director and the CRO selected Ankura based upon their significant experience and expertise and competitive pricing structure.

23.     As required by the Settlement Agreement, Ankura will replace PPAS under the terms and conditions of the Debtors' pre-existing Credit Agreements and in accordance with the Settlement Agreement (except to the extent that PPAS shall act as a co-agent with Ankura under certain of the Credit Agreements for purposes related to the Patriarch Stakeholders and other third parties).   Under the Credit Agreements, the Portfolio Companies will be obligated to pay Ankura's fees and expenses in the first instance.   To the extent that the Debtors are required to advance, backstop or pay any fees, expenses or indemnities in accordance with the New Agent Agreement, the Debtors' rights to seek reimbursement from the applicable Portfolio Company, including in connection with a Monetization Event (as defined in the New Agent Agreement), are preserved.   Lastly, the fees and expenses payable to Ankura in relation to the negotiation, documentation and execution of the New Agent Agreement, as well as the fees, expenses and indemnities payable by the Debtors as part of their "backstop" under the New Agent Agreement, were necessary to secure Ankura's engagement as the New Agent, which was required under the

Settlement Agreement and will benefit the Debtors and their creditors, for the reasons set forth above.

24.     For these same reasons, the Debtors also submit that the fees, expenses and indemnities payable by the Debtors under the New Agent Agreement constitute "actual, necessary costs and expenses of preserving the estate"—justifying an award of administrative expense status with respect to such amounts under section 503(b) of the Bankruptcy Code.  11 U.S.C. § 503(b)(1)(A).  Specifically, the appointment of Ankura as independent New Agent under the Credit Agreements will, as mentioned, promote an effective and efficient joint monetization process with respect to the Debtors' primary assets in these Chapter 11 cases—the senior secured loans they have made to and the various equity or LLC interests they hold in the Portfolio Companies.   In this way, the fees, expenses and indemnities payable by the Debtors under the New Agent Agreement are necessary to preserve the value of the Debtors' estates.

25.     Accordingly, the Debtors respectfully submit that the relief requested herein is in the best interests of their estates and creditors, and should be approved.

### NOTICE

26.     The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) counsel to the Patriarch Stakeholders; (iii) counsel to U.S. Bank, as indenture trustee; (iv) counsel to MBIA; (v) counsel to the Zohar III Controlling Class; and (vi) all parties that, as of the filing of this Motion, have requested notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors request entry of the Proposed Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: October 29, 2018      YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

*/s/ Shane M. Reil*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*