## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket No. 356, 365** |
| | ) | |

### PATRIARCH'S OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE USE OF CASH COLLATERAL

Patriarch Partners XV, LLC, Octaluna, LLC, Octaluna II, LLC, and Octaluna III, LLC

(collectively, the "Patriarch Secured Parties"), Patriarch Partners, LLC, Patriarch Partners VIII,

LLC, and Patriarch Partners XIV, LLC (together with the Patriarch Secured Parties, "Patriarch"),

by and through their counsel, hereby submit this objection (the "Objection") to the *Debtors'*

*Motion for Entry of an Order Authorizing the Use of Cash Collateral* [D.I. 356] (the "Motion")[2]

and the proposed *Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 507, and Bankruptcy Rules*

*2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate*

*Protection to Prepetition Secured Parties; (III) Providing Superpriority Administrative Expense*

*Status; (IV) Modifying Automatic Stay; and (V) Granting Related Relief* (the "Proposed Order").[3]

In support of this Objection, Patriarch respectfully represents the following:

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I", and together with Zohar II and Zohar III, the "Zohar Funds"). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion or Settlement Agreement, as applicable.

[3] The Debtors filed a proposed form of cash collateral order [D.I. 365] on July 12, 2018. Since that date, the Debtors provided Patriarch with a modified form of order, and have advised that such order should be treated as the Proposed Order until advised otherwise. As a result, Patriarch files this Objection to the last Proposed Order

*(Cont'd on next page)*

**PRELIMINARY STATEMENT**

1.        On May 21, 2018, this Court entered an order [D.I. 266] (the "Settlement Order")

approving the Settlement Agreement among the Debtors, MBIA, the Zohar III Controlling Class,

and the Patriarch Stakeholders.  The Settlement Agreement constituted a significant milestone in

these Chapter 11 cases, and for fifteen months (with one three-month extension, as applicable)

put an end to any and all litigation among the key stakeholders in these cases, while preserving

all of their respective rights in the event the monetization events and debt payments described in

the Settlement Agreement do not timely come to pass.  The Settlement Agreement is premised

on the foregoing cardinal principles of "laying down of arms" and "preservation of all rights and

claims."  Through the Proposed Order, MBIA and the Zohar III Controlling Class (collectively,

the "MBIA/ZIII Creditors", and together with U.S. Bank, the "Other Stakeholder Creditors")

have attempted to renegotiate essential terms of the Settlement Agreement by imposing on the

Debtors terms and conditions for use of cash collateral that vitiate these cardinal principles and

other essential elements of the Settlement Agreement, as well as a prior order of this Court

holding in abeyance the allocation of the Independent Directors' fees.  For example:

- Under the Proposed Order, the Debtors purport to stipulate that the Other Stakeholder Creditors' claims and liens are allowed, valid, and enforceable, without challenge. *See* Proposed Order, ¶ 4.  These stipulations purport to be binding on all parties in interest (including Patriarch) upon entry of the Proposed Order, and the Debtors retain only a narrow right to challenge the validity and perfection of the Other Stakeholder Creditors' liens. *Id.* at ¶ 27.  By cutting off the Debtors' and other party in interests' right to challenge the Other Stakeholder Creditors' claims and liens, or asserting certain actions related thereto, the Proposed Order violates the stay contemplated under the Settlement Agreement, which stay was to include "appropriate protections so there is no prejudice to any party . . . ." Settlement Agreement, ¶ 15.

---

*(Cont'd from previous page)*

provided by the Debtors, but reserves the right to further supplement or modify this Objection to the extent the Proposed Order is further revised prior to the hearing on November 13.

- The Proposed Order's waiver of challenge rights against the Other Stakeholder Creditors' claim contains an undisclosed $148 million windfall to MBIA that violates the Settlement Agreement. MBIA credit bid that amount in a pre-petition foreclosure with respect to Zohar I. Instead of reducing its claim by $148 million, MBIA has added that amount to its "Paid in Full" amount under the Settlement Agreement. By forcing the Debtors to stipulate to any waiver of claims against MBIA—except for perfection and validity of liens—MBIA seeks this Court's approval of this undisclosed double-counting and the denial of a later challenge by Patriarch.

- The Proposed Order materially impairs the Debtors' and Patriarch's ability to satisfy certain milestones under the Settlement Agreement. Under the Settlement Agreement, if the MBIA/ZIII Creditors are paid 50% of the Paid in Full amounts (as set forth in the Settlement Agreement) by August 21, 2019, then the stay under the Settlement Agreement shall be extended an additional three months so that remaining Portfolio Companies can be monetized to pay off the MBIA/ZIII Creditors in full. Settlement Agreement, ¶ 29. However, the Proposed Order modifies the flow of funds under the Indentures, such that the Debtors will reserve potentially tens of millions of dollars primarily for Debtor and creditor professional fees (excluding Patriarch) before making payments to the MBIA/ZIII Creditors, thereby delaying satisfaction of the Paid in Full amounts. *See* Proposed Order, ¶ 9.

- The Proposed Order substantially expands the MBA/ZIII Creditors' access to confidential information beyond the narrow information rights that were negotiated under the Settlement Agreement. *Id.* at ¶ 12(d). The Proposed Order should not be used to modify the terms of the Settlement Agreement with respect to the MBIA/ZIII Creditors' limited right to access confidential information regarding the Portfolio Companies.

These terms and conditions alone suffice as a basis for this Court to deny the Motion.

2.      The Proposed Order must be denied for another independent reason. In a gross abuse of leverage, the MBIA/ZIII Creditors have forced the Debtors to exclude from the protections of the Proposed Order the more than $822 million in secured claims held by the Patriarch Secured Parties against the Debtors (the "Patriarch Secured Claims"). The Patriarch Secured Claims share the same collateral and liens under the Indentures pledged to secure the claims of the MBIA/ZIII Creditors, subject only to certain waterfall-payment subordination provisions contained in the Indentures. As a result, the Patriarch Secured Parties are entitled to at least the same adequate protection bargained for by the Senior Secured Creditors (to the extent

3

such protection remains consistent with the Settlement Agreement).  By this omission, the

Debtors cannot satisfy their burden to prove that the Patriarch Secured Parties, which are secured

creditors with an interest in the Debtors' cash collateral, are adequately protected.  In fact,

undisputed evidence admitted in prepetition litigation, ███████████████████████

████████████████████, demonstrates that the Patriarch Secured Claims are or should be

"in the money," and therefore entitled to adequate protection.  Accordingly, if this Court

determines that the Other Stakeholders are entitled to additional adequate protection, any cash

collateral order must provide the Patriarch Secured Parties with adequate protection on par with

what is provided to the Other Stakeholder Creditors, such as (a) payment of postpetition

attorneys' fees and interest, (b) rights to review and comment on the Budget, (c) adequate

protection claims and liens, and (d) other advisory rights that are routine for secured creditors in

this district.  In fact, the Proposed Order and Initial Budget (as defined below) contemplates the

payment as adequate protection to the Other Stakeholder Creditors of almost $10 million in

professional fees incurred <u>both</u> pre-petition and post-petition by the Other Stakeholder Creditors

through only September 2018, without any corresponding professional fee payment as adequate

protection to or the right to review and comment on the reasonableness of those fees by the

Patriarch Secured Parties.  For these reasons and as set forth in more detail below, the Motion

and the Proposed Order must be denied.

      3.      Finally, this Court should deny the Proposed Order because it impermissibly

seeks to provide the MBIA/ZIII Creditors with full waivers of the estate's right to surcharge their

collateral under Bankruptcy Code section 506(c) and of any party's right to assert the "equities

of the case" doctrine under Bankruptcy Code section 552(b).  In doing so, the MBIA/ZIII

Creditors attempt to unwind this Court's prior ruling to preserve the parties' disputes as to

whether the Independent Director's "Incentive Fee" should be allocated to the MBIA/ZIII

Creditors' Paid in Full amount. As a condition to Patriarch agreeing to the Independent Director

having the right to payment of an Incentive Fee, all parties agreed on the record that any dispute

as to the allocation of such fee should be preserved. The MBIA/ZIII Creditors now appear to be

trying to unwind that agreement by seeking full waivers under sections 506(c) and 552(b). The

Debtors' estates are incurring substantial additional fees and costs as a result of the MBIA/ZIII

Creditors' demands under the Settlement Agreement (including, for example, new agent fees,

costs of a new committee, and the costs of the CRO and CMO). Any cash collateral order

approved by this Court should preserve any dispute as to the allocation of such fees and costs.

4.      In short, while Patriarch does not object to a cash collateral order to fund the

reasonable fees and expenses of these Chapter 11 cases, Patriarch respectfully requests that the

Court deny the Motion and the Proposed Order. The Proposed Order currently before the Court

violates the Settlement Agreement, provides a hidden material windfall to MBIA that was not

disclosed to this Court, ignores the Patriarch Secured Parties' rights to adequate protection, and

grants the Other Stakeholder Creditors rights that are unwarranted under the facts of these

Chapter 11 cases. To aid the Court's review of these issues, Patriarch has attached hereto as

Exhibit A a redline reflecting proposed changes to the Proposed Order, and as Exhibit B a

detailed list of issues with the Proposed Order. Patriarch's proposed form of order preserves all

parties' rights, adheres to the terms of the Settlement Agreement, and should be approved over

the Proposed Order.

## BACKGROUND INFORMATION

**A.**     **The Patriarch Secured Parties Are Substantial Secured Creditors in These Chapter 11 Cases.**

5.     The Zohar Funds are innovative collateralized loan obligation funds, whose assets are primarily loans to distressed companies (the "Portfolio Companies"). The Zohar Funds raised capital by issuing notes (collectively, the "Notes") to noteholders who were, in exchange, entitled to interest payments over time, plus return of their principal at the maturity date. The Notes are secured, and were issued in two classes—Class A (with each Class A tranche having subclasses of notes) and Class B.

6.     A summary of the Zohar Funds' Note issuances and outstanding debt is as follows:

| Zohar I Note Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $150 million | 2003 | 11/20/15 | $0.00 |
| Class A-2 | $32 million | 2003 | 11/20/15 | $0.00 |
| Class A-3a | $297.5 million | 2003 | 11/20/15 | $234 million |
| Class A-3b | $52.5 million | 2003 | 11/20/15 | $52.5 million |
| **Total Class A** | **$532 million** | | | **Total: $286.5 million** |
| Class B | $150 million | 2003 | 11/20/15 | $150 million |

| Zohar II Note Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $250 million | 2005 | 1/20/17 | $190 million |
| Class A-2 | $550 million | 2005 | 1/20/17 | $418 million |
| Class A-3 | $200 million | 2005 | 1/20/17 | $152 million |
| **Total Class A** | **$1 billion** | | | **Total: $760 million** |
| Class B | $200 million | 2005 | 1/20/20 | $200 million |

| Zohar III Note Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1R | $200 million | 2007 | 4/15/19 | $136 million |
| Class A-1T | $150 million | 2007 | 4/15/19 | $102 million |
| Class A-1D | $350 million | 2007 | 4/15/19 | $237.5 million |
| Class A-2 | $200 million | 2007 | 4/15/19 | $200 million |
| Class A-3 | $116 million | 2005 | 4/15/19 | $116 million |
| **Total Class A** | **$1.016 billion** | | | **Total: $791 million** |
| Class B | $186 million | 2005 | 4/15/19 | $186 million |

6

7.      The Patriarch Secured Parties hold, in the aggregate, over $822 million of the

secured Notes issued by the Debtors.  Specifically:  (a) Patriarch Partners XV, LLC holds

$286,445,355 in principal amount owing under the Class A-3 Notes issued by Zohar I;

(b) Octaluna, LLC holds $150,000,000 in principal amount owing under the Class B Notes

issued by Zohar I; (c) Octaluna II, LLC holds $200,000,000 in principal amount owing under the

Class B Notes issued by Zohar II; and (d) Octaluna III, LLC holds $186,000,000 in principal

amount owing under the Class B Notes issued by Zohar III.[4]  Certain Patriarch entities further

hold the Zohar Funds' preference shares, and as a result are the ultimate owners of the Zohar

Funds.

8.      The liens securing the Class A Notes (and MBIA's Credit Enhancement

Liabilities (as defined below)) and the Class B Notes encumber the same collateral,[5] and have

equal priority.  The Indentures make this expressly clear in their "Granting Clauses," pursuant to

which the Trustee under the Indentures was granted liens in the Debtors' assets for the benefit of

all noteholders, including the Patriarch Secured Parties:

> Such Grants [of security interests and liens "to the Trustee, for the benefit
> and security of the Secured Parties"] by the Issuer and the Zohar
> Subsidiary are made . . . to the Trustee to hold in trust, to secure . . . the
> Notes ***equally and ratably without prejudice, priority, or distinction
> between any Note and any other Note by reason of difference in time of
> issuance or otherwise***, except as expressly provided in this Indenture . . . .

---

[4]   Copies of the Patriarch Secured Parties notes, or evidence of their issuance, are attached to the Schiff
Declaration as Exhibits 4–10. Copies of the Indentures for Zohar I through III are attached to the Schiff
Declaration as Exhibits 1–3.

[5]   The Indentures for the Zohar Funds include "Granting Clauses," pursuant to which the Debtors granted to the
Trustee, "for the benefit and security of the Secured Parties," liens on all of the Debtors' property.  Indenture,
p. 1.  The "Secured Parties" include holders of Class A Notes and Class B Notes.

Indentures, pp. 1–2 (emphasis added). The Class B Notes, however, are subordinate only in right of payment under the Indentures' waterfalls to the Class A Notes and MBIA's Credit Enhancement Liabilities. *Id.* at ¶¶ 13.1(a), (c).

9.    MBIA, as credit enhancer, "wrapped" the Class A-1 and Class A-2 Notes issued by Zohar I and all Class A Notes issued by Zohar II. As such, if Zohar I and Zohar II could not meet their respective repayment obligations under the wrapped Class A Notes, MBIA was obligated to pay any principal and interest owing to the holder of such Notes, after which MBIA would be subrogated to the rights of the applicable Class A noteholders, with MBIA's right to payment from the Debtors defined in the Indentures as the "Credit Enhancement Liabilities." Defaults under the Indentures for Zohar I and Zohar II occurred in November 2015 and January 2017, respectively, resulting in MBIA paying and becoming subrogated to the Class A-1 and A-2 Notes at Zohar I and the Class A Notes at Zohar II. MBIA's payment of these Class A Notes pursuant to the Indentures did not modify the Patriarch Secured Parties' rights as the holders of Class A-3 Notes (at Zohar I) or Class B Notes.

10.    In June 2016, MBIA directed U.S. Bank to auction the collateral securing the Zohar I Notes. The sales notice defined the "collateral" being auctioned as including Zohar I's interests in loans to the Portfolio Companies, as well as the equity in the Portfolio Companies. The Portfolio Company equity, however, is not collateral, and many of the organizational documents for the Portfolio Companies have strict transfer restrictions. Certain of the Patriarch Entities commenced an action to enjoin MBIA's foreclosure sale. Although the foreclosure was initially enjoined through a temporary restraining order, MBIA was ultimately permitted to complete its foreclosure sale (albeit on terms different than originally contemplated) and credit bid a secured claim of over $148 million for Zohar I's interests in the loans to the Portfolio

8

Companies. *As a result, MBIA has no further claim against Zohar I for the amount of MBIA's credit bid. See, e.g.*, *In re GSC, Inc.*, 453 B.R. 132, 176 (Bankr. S.D.N.Y. 2011) (holding that, "by virtue of the credit bid, the claims are extinguished"). Since May 2017, as a result of its foreclosure and credit bid, MBIA has been receiving all principal and interest payments associated with the Zohar I loans obtained through its foreclosure. At most, MBIA's remaining claim against Zohar I is limited to fees and expenses, which as of the foreclosure were approximately $10 million, as reflected in correspondence from U.S. Bank to Patriarch's counsel.[6] MBIA has asserted that despite its credit bid and the controlling case law cited above, MBIA still can assert a secured claim against Zohar I that includes the amount of its credit bid.[7] The Proposed Order vitiates any right to challenge MBIA's assertion of a right to recover *again* on the debt it has already credit bid. Importantly, MBIA kept hidden this bald double-counting windfall, and instead hoped to get this Court to bless this windfall through the Proposed Order without adequate disclosure.

**B.    The Settlement Agreement**

11.    On May 21, 2018, the Court entered the Settlement Order pursuant to which this Court approved the Settlement Agreement. The Settlement Agreement was the product of at least five full days of mediation between the Debtors, Patriarch, MBIA, and the Zohar III Controlling Class, and was a remarkable achievement in these Chapter 11 cases. Among other

---

[6]  *See* February 3, 2017 Letter from B. Jaffe to R. Mastro, attached to the Neumeister Declaration as Exhibit 1: "As you may be aware, the credit portion of MBIA's bid in the Auction included $148,951,585 of its Credit Enhancement Liabilities. However, . . . MBIA's total Credit Enhancement Liabilities are in the amount of $158,579,356."

[7]  Patriarch does not seek to litigate MBIA's allowed claim through this Objection, but raises this issue as grounds for why the stipulations and limitation on challenge rights in the Proposed Order cannot be granted. Further, in the event MBIA is determined to have a remaining allowed claim for the amount of its credit bid, Patriarch reserves all rights as to the legal effect of such finding, including on the purported validity of MBIA's foreclosure.

things, the Settlement Agreement has stayed and tolled the substantial and expensive post-

petition motion practice and litigation among the Debtors, Patriarch, and the Other Stakeholder

Creditors, which resulted in the incurrence of several millions of dollars of legal fees in little

more than a month. The Settlement Agreement also stayed at least fifteen pre-petition litigations

that chilled all efforts to monetize the Portfolio Companies.

       12.    The Settlement Agreement unambiguously stayed all claims and litigation by and

among the Debtors, Patriarch, and the MBIA/ZIII Creditors:

> For the avoidance of doubt, with respect to any of the entities identified in
> paragraph 15 [[including "any Other Stakeholders," the Debtors, or the
> Patriarch Stakeholders)] . . . (a) any litigation, claim, motion, or contested
> matter that was or could have been brought prior to the date hereof, and
> (b) any litigation, claim, motion, or contested matter that could be brought
> after the date hereof arising from any facts, acts, or omissions that first
> arose prior to the date hereof, ***shall be stayed during the 15-Month
> Window, with appropriate protections so there is no prejudice to any
> party*** . . . .

Settlement Agreement, ¶ 15 (emphasis added). The parties negotiated for this provision as a

cardinal principle of the Settlement Agreement, as it forces parties to focus on the monetization

process and maximizing value, with all parties reserving their rights to later litigate any disputes

that pre-dated the Settlement Agreement to the extent the Full Payment Date does not occur.

Continued litigation among the parties would not only harm the monetization process that is

underway; it would also re-open prepetition litigation that had resulted in tens of millions of

dollars in legal fees among all parties over the course of several years.

       13.    Perhaps most importantly, the Settlement Agreement set the framework by which

these Chapter 11 cases can proceed forward. Ms. Tilton caused the Debtors to commence these

Chapter 11 cases so that the Portfolio Companies could complete a structured monetization

process that will enable the Debtors to pay the MBIA/ZIII Creditors in full, with any excess

proceeds to satisfy Patriarch's Class B Notes and preference shares.  The Settlement Agreement

provides for a continuation of that monetization process to be carried out jointly among Ms.

Tilton and the Debtors' newly retained Independent Director and Chief Restructuring Officer

(the "CRO").

> C.    **This Court Has Preserved Disputes as To the Allocation of Certain Fees
> Under the Independent Director Services Agreement, and Other Expenses
> Under the Settlement Agreement Should be Similarly Preserved.**

14.    In negotiating the Settlement Agreement, the MBIA/ZIII Creditors demanded a

number of protections that have resulted, or will result, in millions of dollars of additional cost

and expense to the Debtors.  Among these additional costs are (i) the Independent Director's

"Incentive Fee" under the Independent Director Service Agreement approved by this Court [D.I.

345-1], (ii) the need to provide indemnification obligations to the Independent Director and the

new CRO, and (iii) fees and costs of the "New Agent" (as defined under the Settlement

Agreement) or the replacement collateral manager.  In addition, the Debtors and Patriarch agreed

to the formation of a non-statutory "Committee" to represent the interests of the MBIA/ZIII

Creditors, with the Committee's fees and expenses borne by the Debtors' estates.  In short, the

MBIA/ZIII Creditors' demands under the Settlement Agreement will cost the Debtors' estates

millions of dollars for the MBIA/ZIII Creditors' exclusive benefit.

15.    The Settlement Agreement does not specify whether the above-referenced fees

and expenses, negotiated by and for the benefit of the MBIA/ZIII Creditors, should reduce their

allowed claim or should be borne by the Debtors' other stakeholders.  This issue need not and

should not be resolved now, however.

16.    Consistent with this approach, in connection with the Court's approval of the

Independent Director's services agreement, the parties agreed to reserve all issues with respect to

11

the allocation of the Independent Director Incentive Fee.  This agreement was memorialized

under the Court's *Order Approving Independent Director Service Agreement and

Indemnification Agreement* [D.I. 345] (the "Independent Director Approval Order"), which

provides:

> Nothing in the Agreements or this Order is intended to impact, impair or
> prejudice the rights of any party in these Bankruptcy Cases with respect to
> allocation of the costs of the Incentive Fee, and all such rights are
> expressly preserved.

Independent Director Approval Order, ¶ 5.

17.    Further, on June 20, 2018, at the hearing on the Debtors' request for entry of the

Independent Director Approval Order, the parties and this Court discussed the timing for

determining how the Independent Director's Incentive Fee should be allocated.  At a minimum,

all parties agreed that the issue would first be brought to Judge Gross, as mediator, before being

resolved by this Court.  *See* Hr'g Tr. 6/20/18, p. 23:16–19 (counsel for MBIA Insurance

Corporation) ("[T]o the extent there is an issue here the settlement agreement provides

mechanisms by which, as your Honor said, ***parties can negotiate; there's Judge Gross***.")

(emphasis added); p. 24:14–16 (counsel for the Debtors) ("So, I think for purposes of today it's

an issue for another day ***and it's going to go through Judge Gross before it gets to you***; I

think.") (emphasis added); p. 29:4–6 (the Court) ("On the escrow/allocation dispute I'm okay

with the simpl[e] reservation of rights.  There is a mechanism for working this out.  It's through

the settlement itself.").[8]  As explained below, the Other Stakeholder Creditors are now seeking to

unwind this reservation through the Proposed Order.  Further, the allocation of any

---

[8]   A copy of the transcript from the June 20, 2018 hearing is attached to the Neumeister Declaration as Exhibit 2.

indemnification obligations to the Independent Director and the new CRO, and fees and costs of

the New Agent and any replacement collateral manager must similarly be preserved.

**D.     The Debtors and the Other Stakeholder Creditors Have Excluded Patriarch From the Cash Collateral Order and Its Related Negotiations.**

18.     The Settlement Agreement was approved on May 21, 2018, and expressly

provides that "[t]he Debtors shall promptly negotiate with the ***secured parties*** funding of the

Debtors' Chapter 11 cases from the use of the secured parties' cash collateral." Settlement

Agreement, ¶ 17 (emphasis added). The Debtors did not engage in discussions with the Patriarch

Secured Parties regarding the use of cash collateral, notwithstanding the Patriarch Secured

Parties' substantial secured claims against the Debtors' estates and requests to be included in

negotiations. Rather, the Debtors negotiated exclusively with the Other Stakeholder Creditors.

19.     On July 6, 2018, the Debtors filed the Motion seeking authority to use cash

collateral, but did not attach a proposed order or budget. D.I. 356. On July 12, 2018, only six

days before the originally noticed objection deadline, the Debtors filed a proposed form of cash

collateral order and an initial proposed budget [D.I. 365] (the "Initial Budget"). After the filing

of this proposed order, Patriarch's counsel discussed their preliminary list of issues with the

Debtors' counsel, including that the proposed form of order violated the Settlement Agreement

in several material respects. Notwithstanding Patriarch's concerns, the Debtors and the Other

Stakeholder Creditors continued to negotiate revisions to the cash collateral order without

including or conferring with Patriarch. On July 24, 2018, the Debtors circulated the Proposed

Order, which had "been signed off on by the U.S. Trustee, U.S. Bank, MBIA, the Zohar III

Controlling Class and the Debtors," but again excluded the Patriarch Secured Parties, who had

no input on its terms.

13

20.     After receipt of the Proposed Order, Patriarch's counsel reiterated to the Debtors'

counsel that the proposed form of order could not be approved without violating the Settlement

Agreement, and impermissibly excluded the Patriarch Secured Parties as substantial secured

creditors in these Chapter 11 cases.  As required under the Settlement Agreement, the parties

engaged in mediation with Judge Gross over the Proposed Order.  Mediation was unsuccessful.

While Patriarch had hoped to narrow the issues before this Court, the parties are now left to

litigate a Proposed Order that is flawed in numerous fundamental ways, and cannot be approved

without violating the Settlement Agreement, this Court's prior orders, and Bankruptcy Code

sections 361 and 363(c)(2).

## OBJECTION

**A.     The Proposed Order Violates the Settlement Agreement.**

21.     The Proposed Order wholly undermines material bargained-for provisions of the

Settlement Agreement.  Entry into the cash collateral order was expressly contemplated under

the Settlement Agreement, and parties may not use the cash collateral order to forcibly alter

parties' rights under the Settlement Agreement.  *See, e.g.*, *Engelhard Corp. v. N.L.R.B.*, 437 F.3d

374, 381 (3d Cir. 2006) (recognizing the "well established principle[] of contract construction . .

. to read, if possible, all provisions of a contract together as a harmonious whole").  This Court's

approval of the Settlement Agreement was a milestone event in these Chapter 11 cases, and the

Court should not approve a Proposed Order that contradicts and undermines critical terms of that

agreement.

1.     Any Cash Collateral Order Must Preserve All Parties' Claims and Causes
       of Action.

22.     Through the Proposed Order, the Other Stakeholder Creditors attempt to wholly

disenfranchise all parties-in-interest, including Patriarch, from reviewing and challenging the

14

amount or validity of the Other Stakeholder Creditors' claims and liens, or to assert certain causes of action against them. *See* Proposed Order, ¶ 27. Specifically, the Proposed Order stipulates to, among other things, (i) the allowance of the Other Stakeholder Creditors' claims against the Debtors, including attorneys' fees, (ii) the validity and priority of the Other Stakeholder Creditors' liens on "all property and assets of any type or nature owned by the Debtors," and (iii) the Other Stakeholder Creditors' claims not being "subject to objection, defense, contest, avoidance, recharacterization, reduction, subordination, or any attack of whatever nature by the Debtors or any person or entity . . . ." *Id.* at ¶¶ 4(a)–(c). The Proposed Order further provides that the Independent Director shall have thirty (30) days from the entry of the Proposed Order to challenge the stipulations in paragraphs 4 and 5 of the Proposed Order, after which such stipulation shall be binding upon the Debtors. The stipulations in paragraphs 4 and 5 of the Proposed Order are "binding upon all other parties in interest" upon entry of the Proposed Order. *Id.* at ¶ 27.

23.    The proposed challenge rights under the Proposed Order violate the Settlement Agreement. As noted above, under paragraph 15 of the Settlement Agreement, all of the claims or causes of action that could be asserted in a challenge to the Secured Creditors' claims or liens were stayed during the 15 Month Window. Specifically, the Settlement Agreement provides:

> For the avoidance of doubt, with respect to any of the entities identified in paragraph 15 [including the Debtors, the Patriarch Stakeholders, and the Other Stakeholders]: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, ***shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party*** . . . .

Settlement Agreement, ¶ 15 (emphasis added).

15

24.     This stay was a specific, bargained-for provision of the Settlement Agreement, as it enabled the Debtors, Patriarch, and the Portfolio Companies to focus on the monetization process, rather than litigation.  The Proposed Order impermissibly undermines this provision of the Settlement Agreement.

25.     *First*, the Proposed Order forces the Independent Director prematurely to investigate challenges to the Other Stakeholder Creditors' liens and potentially re-open litigation that should otherwise be stayed.  Rampant pre-petition litigation among the stakeholders directly contributed to the commencement of these Chapter 11 cases, as the cloud of litigation and accusations among the Debtors and their stakeholders materially impaired any attempts to market and monetize the Portfolio Companies.  The post-petition monetization process for the Portfolio Companies is well underway, and Patriarch is confident that it will yield returns sufficient to satisfy the MBIA/ZIII Creditors' allowed claims in full.  However, litigation over the validity or scope of the Other Stakeholder Creditors' liens will again cloud the monetization process and chill bidders from coming forward with value maximizing offers.  Litigation over this issue was expressly stayed, and the cash collateral order contemplated under the Settlement Agreement must preserve the stay of such litigation.

26.     *Second*, the Proposed Order's stipulations and limitations on challenge rights effectively shields the Other Stakeholder Creditors from any claims, causes of action, or objections to the Other Stakeholder Creditors' claims that may be asserted by Patriarch or the Debtors.  This contradicts the full preservation of rights and lack of prejudice to future claims provided under the Settlement Agreement.  As noted above, the Settlement Agreement provides for a stay of "any litigation, claim, motion, or contested matter" with "appropriate protections so there is no prejudice to any party."  Settlement Agreement, ¶ 15.

16

27.     The fundamental flaws in the stipulations and challenge rights under the Proposed Order are best evidenced by the $148 million windfall the order would bestow upon MBIA if approved. In 2016, MBIA was permitted to complete a foreclosure sale and credit bid a secured claim of over $148 million for Zohar I's interests in the loans to the Portfolio Companies. As a result of such foreclosure, MBIA has been receiving all payments of interest and principal on the credit agreements that were between Zohar I and the Portfolio Companies. As a result of that foreclosure, MBIA has no further claim against Zohar I for the amount of MBIA's approximately $148 million MBIA's credit bid. *See, e.g.*, *In re GSC, Inc.*, 453 B.R. at 176 (holding that, "by virtue of the credit bid, the claims are extinguished"); *see also Fire Eagle, LLC v. Spillman Inv. Grp.*, Ltd., 2011 WL 13234814, at *9 (W.D. Tex. Sept. 29, 2011) ("By purchasing by credit bid the collateral underlying the Senior Indebtedness, the debt owed was extinguished."); *In re Ocean Blue Leasehold Prop. LLC*, 414 B.R. 798, 807 (Bankr. S.D. Fla. 2009) ("Legg Mason's claim was extinguished when it credit bid the full value of its claim."). Instead of reducing its claim by $148 million, MBIA has added that amount to its "Paid in Full" amount under the Settlement Agreement, and under the Proposed Order that amount would be stipulated to as an allowed claim, with no right for any party-in-interest to later assert a challenge.

28.     Following the Full Payment Date (as defined in the Settlement Agreement), the Independent Director and CRO will be replaced by Ms. Tilton as director, and her rights to direct claims or objections to claims on behalf of the Debtors against the parties to the Settlement Agreement cannot be abrogated by the cash collateral order. However, the Proposed Order prejudices, and in fact vitiates, Patriarch's rights under the Settlement Agreement, and effectively grants MBIA a $148 million windfall.

2.    The Cash Collateral Order Undermines the Debtors' and Patriarch's Respective Ability to Satisfy the Milestones Under the Settlement Agreement.

29.    Under the Settlement Agreement, the Debtors and the Portfolio Companies have through the completion of the 15 Month Window—August 21, 2019—to satisfy the Paid in Full amounts for the MBIA/ZIII Creditors.  If the Paid in Full amount is not satisfied by the expiration of the 15 Month Window, (a) the stay of litigation described above shall terminate, (b) Ms. Tilton shall not resume her role as sole director of the Zohar Funds, and (c) the CRO and Ms. Tilton "shall negotiate in good faith on how to monetize the Group B Portfolio Companies." *See* Settlement Agreement, ¶¶ 1, 3, 15.  The 15 Month Window shall be extended for all purposes by an additional three (3) months (the "18 Month Extended Window") if the MBIA/ZIII Creditors receive 50% of the Paid in Full amount under the Settlement Agreement within the 15 Month Window.  As a result, the timing and ability to make payments to the Other Stakeholder Creditors pursuant to the waterfall in the Indentures is critical to the structure of the Settlement Agreement.  The Proposed Order modifies the timing of payments to the Other Stakeholder Creditors in at least two critical ways.

30.    *First*, under the Proposed Order, the Debtors shall reserve cash coming into the estates in an amount equal to "the sum of (i) the amount of (a) anticipated cash disbursements, and (b) projected Professionals' fees and expenses, each set forth in the Budget for that Budget Period, inclusive of an additional twenty-five percent (25%) variance cushion, (ii) all unpaid amounts set forth in the Budget for prior Budget Periods, subject to adjustment up or down to account for any Permitted Variance, (iii) $500,000, and (iv) the Indemnification Reserve (as defined herein) (the 'Restructuring Operating Reserve Cap')."  Proposed Order, ¶ 9(a).  Under the Initial Budget, the Restructuring Operating Reserve Cap would total almost $24 million.

18

Under the Proposed Order, only cash in excess of this Restructuring Operating Reserve Cap

would be paid to the Other Stakeholder Creditors pursuant to the waterfall in the Indentures.  In

other words, under the Proposed Order, approximately $24 million in cash that would otherwise

be paid to the Other Stakeholder Creditors pursuant to the waterfall in the Indentures to reduce

the Paid in Full amount, will be set aside.  This payment structure is not provided for under the

Indentures and was not contemplated when the Settlement Agreement was entered into.  In fact,

the Settlement Agreement contemplates working with U.S. Bank, as indenture trustee, "to *satisfy*

*the requirements of the indentures* with respect to the implementation of this Agreement."

Settlement Agreement, ¶ 28 (emphasis added).[9]

31.     *Second*, the Proposed Order contemplates funding a $1.5 million cash reserve to

satisfy the indemnification claims that the Debtors' Independent Director, CRO, and Chief

Monetization Officer (the "CMO") may have against the Debtors' estates (the "Indemnification

Reserve").  Proposed Order, ¶ 9(c).  Under the Proposed Order, the Indemnification Reserve may

be increased with either the consent of the Other Stakeholder Creditors or approval by this Court.

Notwithstanding their status as secured creditors and the parties that would be most impacted by

an increase of this reserve, the Proposed Order denies the Patriarch Secured Parties any rights

with respect to a proposed increase in the Indemnification Reserve.  Further, the Indemnification

Reserve was not provided for in the retention agreements for the Independent Director, CMO, or

CRO, notwithstanding the substantial negotiations over those agreements.  *See* D.I. 297, 298,

345. As a result of this Indemnification Reserve, at least $1.5 million (and potentially more) that

---

[9]   Further, during the delay in reaching entry of a cash collateral order, the Debtors have not made any principal or interest payments to MBIA at Zohar II or to the Zohar III Controlling Class, resulting in delayed satisfaction of the Paid in Full amounts under the Settlement Agreement, and increasing the accrual of interest.  Patriarch reserves all rights with respect to whether any claim on account of such increased interest should be included in any Paid in Full amount or allowed claim.

would otherwise be paid to the Other Stakeholder Creditors to reduce their Paid in Full amounts

will sit dormant at the expense of Patriarch's rights under the Settlement Agreement.

32.    Accordingly, as drafted, the Proposed Order could materially affect the ability to

satisfy the Paid in Full amounts under the Settlement Agreement. As a result, to the extent the

Court is to approve a cash collateral order that includes the Restructuring Operating Reserve Cap

or the Indemnification Reserve, any cash held in such reserves should be applied to the Paid in

Full amounts for purposes of determining whether 50% of the Paid in Full amounts has been

satisfied in order to extend the 15 Month Window an additional three months. In the absence of

such relief, Patriarch could be deprived of the benefits of the Settlement Agreement even if the

Portfolio Companies are successfully monetized in amounts that otherwise would satisfy the

MBIA/ZIII Creditors' milestones under the terms of the settlement.

          3.    The Proposed Order Impermissibly Expands the Other Stakeholder
                Creditors' Right to Portfolio Company and Monetization Process
                Information Beyond the Terms of the Settlement Agreement.

33.    Under the Settlement Agreement, the parties agreed to the formation of a

Committee "to oversee and monitor the Zohar bankruptcy" for the benefit of the MBIA/ZIII

Creditors. Settlement Agreement, ¶ 15. The parties agreed that the "CRO shall provide the

Committee members with all information necessary to assess and represent the interests of the

Other Stakeholders other than information whose distribution is reasonably limited at the request

of investment bankers or potential buyers." *Id.* Further, only one of the MBIA/ZIII Creditors—

MBIA—negotiated for a right to receive Portfolio Company information, but any such right had

very specific restrictions:

> The Group A Portfolio Companies shall share with employees of MBIA
> (who sign NDAs as described in Paragraph 15 herein) financial statements
> and backup reasonably requested in writing by MBIA. Any information
> provided to MBIA shall only be shared win the following way: someone

> employed by MBIA can view the documents in the New York offices of
> Gibson Dunn but may not take copies or pictures of any documents or
> share any information in those documents, except with the CRO.

Settlement Agreement, ¶ 21.

34.     Notwithstanding the agreements with respect to flow of information in the

Settlement Agreement, the MBIA/ZIII Creditors are now seeking expanded information under

the Proposed Order that is not provided under the Settlement Agreement. *First*, although MBIA

threatened to blow up the Settlement Agreement without getting this right to information, ***they***

***have not made a single request in the six months since the entry of the Settlement Order for***

***information from the Portfolio Companies*** pursuant to paragraph 21 of the Settlement

Agreement. *Second*, although the MBIA/ZIII Creditors required the Debtors and Patriarch to

bear the time and expense of mediating and then litigating the form of a non-disclosure

agreement (an "NDA") for the Committee, they have slow-played completing that NDA, thereby

preventing the Committee's formation and its receipt of information.  Following this Court's

confidential hearing on the form of Committee NDA on September 4, 2018, Patriarch circulated

a revised form of NDA to the Debtors and the MBIA/ZIII Creditors on September 5.  The

MBIA/ZIII Creditors took a month to provide comments to that form.[10]

35.     MBIA's failure to exercise their rights under paragraph 21 of the Settlement

Agreement to review Portfolio Company information, as well as the delay in finalizing the NDA

for the Committee to be formed, appears to be a calculated tactic to bypass the bargained-for

provisions of the Settlement Agreement, and instead to attempt to expand their access to

Portfolio Company and monetization process information through the Proposed Order.  Under

---

[10]  On October 19, 2018, the Debtors circulated a proposed form of NDA that the MBIA/ZIII Creditors have
agreed to.  This NDA does not accurately reflect this Court's prior rulings or the Settlement Agreement.  If the
parties are unable to resolve their disputes, then competing forms of order may need to be provided to this Court
for further discussion.

the Proposed Order, the Other Stakeholder Creditors are seeking, among other things, (a) weekly "reports with respect to the progress and status of the Monetization Process," (b) bi-weekly "statement[s] of cash balances, cash receipts and cash disbursements," without clarification as to whether these are limited to the Debtors, and (c) weekly conference calls regarding the "Monetization Process . . . and any material developments relating to the collateral being monetized or the Monetization Process." Proposed Order, ¶¶ 12(d)(1)–(2).

36.    Patriarch does not oppose the Other Stakeholder Creditors receiving reporting at the Debtor level in order to protect their interests. This is consistent with the Other Stakeholder Creditors' rights under the Indentures, which restricted their reporting rights to the Debtor (not the Portfolio Company) level. Indentures, § 7.9. However, Patriarch specifically negotiated in the Settlement Agreement to restrict the MBIA/ZIII Creditors' right to access Portfolio Company information due to substantial concerns regarding certain MBIA/ZIII Creditors' misuse of confidential Portfolio Company prior to the Petition Date.[11] The reporting provisions in the Proposed Order expand the Indentures and the Settlement Agreement by providing the MBIA/ZIII Creditors with direct access to information involving the Portfolio Companies and the monetization process. Appropriate portions of such information should be provided to the Committee, subject to the limitations in the Settlement Agreement and the NDA (once entered into), but the cash collateral order cannot be used to grant the MBIA/ZIII Parties with similar information the parties negotiated to be provided only to the Committee under the Settlement Agreement.

---

[11]  Patriarch provided examples of such misuse in its confidential submission to chambers, dated as of August 30, 2018.  Patriarch reserves the right to provide evidence of such misuse at the hearing on the Motion on November 13.

**B.**  **The Proposed Order Impermissibly Denies Adequate Protection to the Patriarch Secured Parties While Providing the Other Stakeholder Creditors with Unnecessary and Excessive Adequate Protection Rights.**

37.  Section 363(c)(2) of the Bankruptcy Code prevents a debtor in possession from using cash collateral unless (i) the entity that asserts an interest in such cash collateral consents, or (ii) a bankruptcy court authorizes such use after notice and a hearing.  This provision works in tandem with section 363(e), which provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  As a result of these provisions, courts typically authorize a debtor in possession to use cash collateral to continue their operations during a bankruptcy case so long as the interests asserted by creditor in such collateral are adequately protected.

38.  "The burden of proof is on the debtor to demonstrate that the secured creditor is adequately protected for purposes of using its cash collateral." *In re Hari Ram, Inc.*, 507 B.R. 114, 120 (Bankr. M.D. Pa. 2014) (citing *Resolution Trust Corp. v. Swedeland Dev. Grp., Corp. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994)); *accord In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996).  Whether a party has been afforded adequate protection is generally determined on a case-by-case basis. *E.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564.  The Bankruptcy Code provides some guidance in determining whether a secured creditor or interest holder has been provided adequate protection. See 11 U.S.C. § 361.  Section 361 of the Bankruptcy Code provides that adequate protection may be provided in the form of (1) "a cash payment or periodic cash payments," (2) "an additional or replacement lien," or (3) "such other relief as will result in the realization by [the grantee] of the indubitable equivalent of such entity's request in such property."

39.     While courts vary in what form of adequate protection is sufficient, they
consistently hold that "'adequate protection' is meant only to assure that a secured creditor does
not suffer a decline in the value of its interest in the estate's property, rather than to compensate
the creditor for the bankruptcy-imposed delay in enforcing its rights in that property." *First Lien
Indenture Trustee v. Wilmington Trust, N.A. (In re Energy Future Holdings Corp.)*, 546 B.R.
566, 581 (Bankr. Del. 2016) (quoting *In re Addison Props. Ltd. P'ship*, 185 B.R. 766, 769–70
(Bankr. N.D. Ill. 1995)); *In re WorldCom., Inc.*, 304 B.R. 611, 618–19 (Bankr. S.D.N.Y. 2004);
*In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the
legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of
adequate protection to go beyond the scope of protecting the secured claim holder from a
diminution in the value of the collateral securing the debt."). A sale or use of estate assets that
may violate a lender's loan documents with a debtor does not entitle such lender to adequate
protection. *In re Shubh Hotels Pitt., LLC*, 439 B.R. 637, 645–46 (Bankr. W.D. Penn. 2010)
(finding that although a debtor's proposal to enter into a franchise agreement to brand its hotel
without the lender's consent violated that lender's loan documents, this did not trigger any
entitlement to adequate protection).

40.     Here, the Debtors fail to satisfy their burden of proof that the Proposed Order
provides adequate protection for the Patriarch Secured Parties' interests. In fact, the Motion does
not even reference such secured interests, and the Proposed Order wholly excludes the Patriarch
Secured Parties, and does not grant them any rights to protect or preserve their interests during
these Chapter 11 cases. For example, notwithstanding the Patriarch Secured Parties' substantial
secured claims against the Debtors' estates, the Proposed Order, among other things:
(a) precludes the Patriarch Secured Parties from reviewing or commenting on (i) modifications to

24

the Budget, *see* Proposed Order, ¶ 8, (ii) the reasonableness of professional fees to be paid to the

Other Stakeholder Creditors during these Chapter 11 cases, *see id.* at ¶ 12(c); (b) does not

provide the Patriarch Secured Parties any rights in the event of termination events under the

order, *see id.* at ¶¶ 17, 18; and (c) does not provide the Patriarch Secured Parties even

rudimentary adequate protection rights, such as payment of postpetition interest, attorneys' fees,

reporting, or the granting of adequate protection claims and liens, *see id.* at ¶¶ 11, 12(a)–(d).

Further, the Proposed Order provides the Other Stakeholder Creditors with adequate protection

that is excessive under the facts of these Chapter 11 cases.  Such excessive and unnecessary

rights are not surprising in light of the Debtors' need for use of cash collateral, and the

intentional exclusion of Patriarch—who is the primary party affected by the Other Stakeholder

Creditors' excessive demands—from negotiations over the cash collateral order.  In short, the

Proposed Order wholly ignores the valid claims and interests of the Patriarch Secured Parties,

while granting the Other Stakeholder Creditors rights that are not necessary.  Such relief is not

appropriate or permitted under Bankruptcy Code sections 361 or 363(c)(2).

           1.      <u>The Patriarch Secured Parties Are Substantial Secured Creditors In These<br>Cases and Are Entitled to Adequate Protection.</u>

      41.     The Patriarch Secured Parties' liens against the collateral are not junior, but even

junior secured lenders are generally entitled to adequate protection of their interests under

Bankruptcy Code section 363(c)(2), even if they are payment-subordinated or lien-subordinated

(which is not the case here) to a senior secured lender.  *E.g., In re James Wilson Assocs.*, 965

F.2d 160, 171 (7th Cir. 1992) (affirming bankruptcy court order overruling senior secure lender's

objection to diversion of cash collateral to pay attorneys' fees of junior secured creditor).

Indeed, cash collateral orders in Delaware bankruptcy courts routinely include provisions for

adequate protection of junior secured creditors in the form of, *inter alia*, periodic cash payments,

replacement liens, attorneys' fees, and administrative priority claims. *See, e.g., In re Gen. Wireless Operations Inc.*, 2017 WL 5462990, at *12 (Bankr. D. Del. Apr. 11, 2017) (cash collateral order granting adequate protection to junior lienholders in the form of, inter alia, weekly mandatory payments, and subjecting revisions of the cash collateral budget to the written consent of the junior lien agent); *In re Marsh Supermarkets Holding, LLC*, 2017 WL 5463219, at *1 (Bankr. D. Del. July 19, 2017) (cash collateral order providing that a certain junior secured noteholder is entitled to adequate protection in the form of replacement liens); *In re Nuverra Envtl. Sols., Inc.*, 2017 WL 5483147, at *21 (Bankr. D. Del. June 6, 2017) (DIP and cash collateral order granting second lien lenders adequate protection in the form of attorneys' fees and superpriority claims).

42.     In fact, Judge Posner could not have been more clear that a junior secured lender is entitled to adequate protection payments in a bankruptcy case, when he reasoned and held as follows:

> But is it permissible to bite into [a senior secured lender's liens] in order to pay attorney's fees and to protect the interest of another, but junior, secured creditor? We think so, given the oversecured character of Metropolitan's claim. A security interest is—a security interest. It is not a fee simple. . . . It has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest.

*In re James Wilson Assocs.*, 965 F.2d at 171.

43.     Here, the Patriarch Secured Parties hold over $822 million in secured notes issued by the Debtors. This includes over $286 million in Class A-3 Notes issued by Zohar I, plus accruing interest. As a result of MBIA's foreclosure and credit bid, these Class A-3 Notes are the senior notes issued by Zohar I (or in a worst case subject only to approximately $10 million of senior claims). Further, the Patriarch Secured Parties hold $536 million in Class B Notes

26

among the Zohar Funds. The Patriarch Secured Parties are entitled to payment of their attorneys'

fees in connection with the "costs and expenses of collection" under both the Class A-3 Notes

and the Class B Notes. Indentures, § 5.3. The Patriarch Secured Parties' Class B Notes are

waterfall-payment subordinated to the Class A Notes and MBIA's Credit Enhancement

Liabilities. Indentures, § 13.1(a), (c). However, the Class B Notes and the Class A Notes are

secured by the same collateral, and have equal lien priority. Indentures, p. 2 ("Such Grants . . .

secure . . . the Notes *equally and ratably without prejudice, priority, or distinction between any*

*Note and any other Note by reason of difference in time of issuance or otherwise*, except as

expressly provided in this Indenture . . . .") (emphasis added).[12] The Patriarch Secured Parties'

substantial interests in the Debtors and their cash collateral are entitled to adequate protection.

44.    As explained below, *infra* Section B.2.a, MBIA has admitted that the Class A

Notes in these Chapter 11 cases are substantially overcollateralized. As a result, the Patriarch

Secured Parties are entitled to adequate protection of their interests.

---

[12]    The Patriarch Secured Parties understand that the Other Stakeholder Creditors assert that the liens securing the Class B Notes are junior to the liens securing the Class A Notes and Credit Enhancement Liabilities due to Section 13.1 of the Indentures. This is incorrect under the plain language of the Indentures. The language at issue provides:

> Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A Notes and the Creditor Enhancer that the *Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral* (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A Notes, all Credit Enhancement Liabilities and all Credit Enhancement Premium (the "Senior Interests") *to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided*.

Indenture, § 13.1(a) (emphasis added). This language does not result in lien subordination. *First*, the language "rights in and to the Collateral" is limited to the "Issuer's rights." The lack of a possessive apostrophe in referring to the Class B Notes makes clear that while the Class B Notes, themselves, are subordinate, any "rights in and to the Collateral" is not. *Second*, the subordination is limited to the extent provided in the Indenture. Sections 11.1 and 11.2 provide the payment waterfall, but do not provide lien subordination. Nor does any other provision of the Indentures. As a result, the Class B Notes are not lien subordinated—they are only payment subordinated under the Indentures' waterfall.

57772/0001-16492492V1

45.    The Proposed Order's punitive omission of the Patriarch Secured Parties violates Bankruptcy Code sections 361 and 363(c)(2). The Patriarch Secured Parties and the MBIA/ZIII Creditors have equal priority liens against the Debtors' assets, including cash collateral. While the Patriarch Secured Parties are subordinate in payment rights under the Indentures' waterfalls to the MBIA/ZIII Creditors, this should not diminish their statutory right to adequate protection of their interests during these Chapter 11 cases. *See Matter of James Wilson Assocs.*, 965 F.2d at 171. The Other Stakeholder Creditors' attempt to exclude the Patriarch Secured Parties from the cash collateral order is just a further attempt to disenfranchise Patriarch's rights in these cases, and the Court should not sanction such tactics.

2.    <u>The Adequate Protection Proposed for the Other Stakeholder Creditors is Excessive and Unnecessary</u>.

46.    Exclusive of the substantial adequate protection package included in the Proposed Order, the Other Stakeholder Creditors already benefit from significant protections against a "decline in the value of their interest in the estate's property . . . ." *In re Energy Future Holdings Corp.*, 546 B.R. at 581. Substantial evidence demonstrates that the Other Stakeholder Creditors are substantially oversecured, and, as such, are adequately protected by an "equity cushion" in their collateral. It is well recognized that a secured creditor's equity cushion in its collateral, alone, can serve as adequate protection. *E.g.*, *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ("The existence of an equity cushion alone can constitute adequate protection."); *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *In re Lafayette Hotel P'Ship*, 227 B.R. 445, 453 (S.D.N.Y. 1998); *accord* 3 Collier on Bankruptcy ¶ 363.05[3] (16th ed. 2016) ("While cases are varied, substitute liens, equity cushions and operating controls have all been found sufficient.").

57772/0001-16492492V1

47.     These Chapter 11 cases will have been pending for over seven months when the

Court finally considers approval of the Proposed Order.  During that time, the record does not

demonstrate any diminution of the value of their interests in these Chapter 11 cases, undermining

the Other Stakeholders' right to any form of adequate protection.  Notwithstanding that fact, for

the reasons explained below, certain provisions of the Proposed Order's adequate protection

package are excessive, particularly in light of the Other Stakeholder Creditors' equity cushion,

and must be paired back so as to not prejudice other parties in interest in these Chapter 11 cases.

a)     The Other Stakeholder Creditors Are Protected by a Substantial
       Equity Cushion.

48.     Undisputed evidence introduced in the Delaware 225 Action from multiple

sources over the past several years all reached the same conclusion—namely, that the preference

shares, payable only after noteholders, are "in the money."  Neither AMZM, while collateral

manager for the Zohar Funds, nor the Other Stakeholder Creditors have ever disputed these

valuations on their merits, and they do not appear to dispute that value here.  Moreover, MBIA

has admitted in public filings that the Portfolio Companies are worth far more than what is owed

to MBIA and other Zohar Fund creditors.  *See, e.g.*, Neumeister Declaration, Ex. 6 (MBIA Inc.

Form 10-K for the fiscal year ended December 31, 2017) at p. 22 ("MBIA Insurance Corporation

believes there will be sufficient recoveries on the Zohar Collateral to both repay amounts due

under the Facility and to substantially reimburse it for the Zohar Claims Payments, . . . [but]

there can be no assurance . . . .").[13]

---

[13]  *See also, e.g.*, Neumeister Declaration, Ex. 3 (MBIA Form 8-K, Jan. 10, 2017) at p. 4; Ex. 5 (MBIA Form 10-Q,
Aug. 8, 2016) at p. 57 ("MBIA Corp. believes that the primary source of such reimbursement [for insurance
payment made with regard to Zohar II notes] will come from liquidation of the Zohar II Collateral."); Ex. 4
(MBIA Form 8-K, Nov. 28, 2016) at pp. 10–21 (attaching Houlihan Lokey presentation concluding that the
value of just the top 11 portfolio companies would provide "sufficient asset coverage" to MBIA); Ex. 7 (225
Avitabile Dep.) at 54:13–56:13, 96:12–98:22 (admitting that MBIA has used the PJT Partners analyses to
"estimate potential recovery values" for MBIA's financial statements).  Only relevant excerpts of the cited
*(Cont'd on next page)*

49.



50.     Based on the foregoing, the Other Stakeholder Creditors are adequately protected by a substantial "equity cushion" in their collateral.  They are therefore not entitled to the substantial additional adequate protection provided under the Proposed Order.

          **b)**    The Proposed Order and Budget Reward and Encourage Over-Spending of Attorneys' Fees By the Other Stakeholder Creditors.

51.     The Proposed Order, as currently structured, permits and, in fact, encourages the Other Stakeholder Creditors to deteriorate the value that may be paid to the Patriarch

---

*(Cont'd from previous page)*

    public MBIA 10-K and 10-Q filings with the SEC are being submitted so as not to burden the Court with voluminous public filings. The full versions of all cited public filings with the SEC are available at sec.gov.

[14]  *See* McKiernan Dep., p. 135:19–136:4.

[15]  *Id.* at p. 61:19–62:24.

[16]  *See id.* at p. 60:16–22.

57772/0001-16492492V1

Stakeholders, and impair the ability to satisfy the Paid in Full amounts under the timeline

contemplated by the Settlement Agreement, through payment of their inflated and unnecessary

professional fees.  Specifically, under the Proposed Order and Initial Budget:

- The Other Stakeholder Creditors are entitled to payment of <u>pre-petition and post-petition</u> professional fees without any limitation or cap as to amount.  Proposed Order, ¶¶ 8, 12(c).

- The Initial Budget provides for payments to the Other Stakeholder Creditors on account of attorneys' fees incurred through June 30, 2018 totaling almost $7.5 million.  ***This is 2.5 times the amount of attorneys' fees incurred by the Debtors' professionals for that same period***.  Further, the Other Stakeholder Creditors' monthly budgeted attorneys' fees range between $665,000 and $690,000.  As a result, at all times under the Initial Budget, the Other Stakeholder Creditors' monthly budgeted attorneys' fees ***exceed the attorneys' fees budgeted for the Debtors***.  The Debtors' budgeted attorneys' fees were only later increased in separate interim budgets.[17]

- The Proposed Order excludes the Patriarch Secured Parties, the parties in interest that would be most affected by excessive legal fees in these cases, from having the right to review and object to the Other Stakeholder Creditors' monthly invoices.  Proposed Order, ¶ 12(c).

This proposed treatment is far in excess of what is required to provide the Other Stakeholder

Creditors with adequate protection under the Bankruptcy Code for multiple reasons.

52.    *First*, in the absence of equal treatment among all secured creditors (including

payment of the Patriarch Secured Parties' professional fees), this case is the rare exception where

attorneys' fees are not necessary to provide adequate protection to the Other Stakeholder

Creditors.  In connection with the Settlement Agreement, the Other Stakeholder Creditors

negotiated for the formation of the Committee to represent their interests, with the Committee's

fees and expenses paid from the Debtors' estates.  Settlement Agreement, ¶ 15.  The Committee

---

[17]  D.I. 382, 432. 469.  The Patriarch Secured Parties have been excluded from further negotiations over the Debtors' budget, so do not know whether the Other Stakeholders' fees to have been similarly increased or decreased.

31

is intended to act as the primary body working with the Debtors to ensure the Other Stakeholder

Creditors' interests are protected during these Chapter 11 cases. Formation of a committee,

whose fees and expenses are paid from the estate, to represent the interests of secured creditors is

very atypical in any district. However, the existence of such a committee vitiates the need for a

secured creditor to incur or be paid significant legal fees in connection with the bankruptcy case.

At a minimum, such fees should be substantially curtailed.

53.     *Second*, the budgeted amount of attorneys' fees for the Other Stakeholder

Creditors rewards them for their excessive litigation tactics at the outset of these Chapter 11

cases, and incentivizes them to continue to over-lawyer these cases to the detriment of all other

stakeholders. On March 28, 2018, in response to sixteen pleadings and declarations filed by the

Other Stakeholder Creditors in two days, largely duplicative of one another, this Court warned

counsel that "we're not going to have a litigation orgy."[18] Now, under the auspices of adequate

protection, the Other Stakeholder Creditors are seeking to have the Debtors pay for such

behavior, with the bill for the Other Stakeholder Creditors' legal fees totaling almost $7.5 million

through June 30, 2018. This amount grossly exceeds the Debtors' legal fees for the same period,

which total less than $3 million. This treatment is excessive, and not consistent with the purpose

of adequate protection under Bankruptcy Code section 363(c)(2). Further, it will delay the

ability to satisfy the Paid in Full amounts under the Settlement Agreement.

54.     *Third*, the go-forward budgeted attorneys' fees for the Other Stakeholder

Creditors are excessive when compared to the estate's own professional fees, and in light of their

limited role in these Chapter 11 cases. Under the Initial Budget, the Other Stakeholder

Creditors' monthly budgeted attorneys' fees range between $665,000 and $690,000. This is

---

[18]    Hr'g Tr. 3/28/18, p. 22:15–19.

greater than the $650,000 budgeted for the Debtors' counsel in the Initial Budget.[19]  The

Settlement Agreement provided a structure where independent third parties would be put in place

as the estate fiduciaries, and all litigation would be stayed.  There is simply no legitimate reason

for the Other Stakeholder Creditors to be incurring the legal fees budgeted for them.  In fact,

MBIA's counsel has itself made this clear. ███████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████. The professional fees contemplated under the Initial

Budget are excessive, and must be substantially reduced to reflect the realities of these cases, and

the minimal legitimate legal work required by the Other Stakeholder Creditors.

55.     *Finally*, the Proposed Order impermissibly excludes the Patriarch Secured Parties

from the list of persons or entities that have the right to review and object to the Other

Stakeholder Creditors' monthly invoices.  In fact, with the exception of a footnote defining the

Settlement Agreement, the Proposed Order does not even mention Patriarch.  The Patriarch

Secured Parties are the stakeholders that are most affected by the administrative burn of these

cases.  Excessive fees will, among other things, (a) delay satisfaction of the Paid in Full amount

under the Settlement Agreement, and (b) diminish proceeds that would otherwise be paid to

Patriarch under the Patriarch Secured Claims or their preference shares.  Accordingly, the

Patriarch Secured Parties should have the right to review and object to any unreasonable fees and

expenses. *See, e.g., In re Hale-Halsell Co.*, 391 B.R. 459, 469 (Bankr. N.D. Okla. 2008)

---

[19]  *See supra* Note 17.

("Bankruptcy is designed to be a transparent process, where creditors and the public can easily view and understand what is going on in any particular case. Fee arrangements between professionals and a bankruptcy estate are to be equally transparent.").

56.      In short, if the Other Stakeholder Creditors are entitled to payment of legal fees at all, the Proposed Order and the Initial Budget must be revised so as to not encourage reckless incurrence of legal fees by the Other Stakeholder Creditors.

        3.      The Other Stakeholder Creditors Should Not Receive Weekly Reporting.

57.      Under the Proposed Order, the Debtors are required to, (i) on a weekly basis, (a) provide the Other Stakeholder Creditors with status reports on the monetization process, and (b) host weekly conference calls regarding the monetization process and the Debtors' financial performance and information provided in the debtors' ongoing reports, and (ii) on a bi-weekly basis, (a) provide a "statement of cash balances, cash receipts and cash disbursements," and (b) a report of variances against the budget (collectively, the "Proposed Reporting"). *See* Proposed Order, ¶ 12(d).  All such reports and calls would be reviewed or attended by three different creditor constituencies (in addition to the Committee) and their professionals.  This is grossly excessive in light of the nature of the Debtors' business and the bargained-for protections under the Settlement Agreement.

58.      *First*, the Debtors are not operating companies.  Their sole source of income is proceeds from the loans made by the Zohar Funds to the Portfolio Companies, and eventually from the monetization of the Debtors' interests in the Portfolio Companies.  Weekly calls and bi-weekly reporting on receipts, disbursements, and variances is simply unnecessary for the Other Stakeholder Creditors to ensure the preservation of their interests in the Debtors, and will serve only to unnecessarily inflate the administrative costs of these Chapter 11 cases.

59.    *Second*, although Patriarch is hopeful that the monetization process will soon bear fruit and result in cash proceeds to pay down the claims of the MBIA/ZIII Creditors, the process will inherently be deliberate and by agreement span up to fifteen to eighteen months. As a result, the Proposed Order builds in reporting obligations that will unnecessarily drive up the administrative costs of these cases.

60.    *Third*, to the extent there is consistent reporting, it should be made to the Committee, not the three different constituencies consisting of the Other Stakeholder Creditors. The Committee was agreed to and will be formed for the purpose of "oversee[ing] and monitor[ing] the Zohar bankruptcy." Settlement Agreement, ¶ 15. In fact, under the Settlement Agreement, "[t]he CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders . . . ." *Id.* Insisting through the Proposed Order that the Debtors provide frequent reporting to the Other Stakeholder Creditors is inconsistent with and contradicts the bargain agreed to in the Settlement Agreement that such reporting would be provided to the Committee, acting for the benefit of the MBIA/ZIII Creditors. The administrative burn required by the Proposed Order for (a) the Debtors to provide the contemplated reporting, and (b) for the Other Stakeholder Creditors and their advisors to review and comment on such reporting, will be excessive. The Other Stakeholder Creditors will not be actively involved in the monetization process, and insisting on excessive reporting requirements will only benefit the Other Stakeholder Creditors' professionals, to the detriment of all other parties in interest.

61.    In short, Proposed Reporting is inconsistent with the realities of these Chapter 11 cases and with the Settlement Agreement, and is unnecessary for the Other Stakeholder Creditors to ensure adequate protection against the diminution in value of their interests in the Debtors.

57772/0001-16492492V1

4.    The Other Stakeholder Creditors Are Not Entitled to Veto Rights over Settlements and Compromises.

62.    The Proposed Order provides as follows:

> No Debtor shall **attempt to** or otherwise compromise, release, or transfer any cause of action **without the consent of the Controlling Secured Parties and the Indenture Trustee (except as to MBIA in the case of Zohar I)** or an order of the Bankruptcy Court; and any purported compromise, release, or transfer of any cause of action by and Debtor which does not comply with the foregoing is void *ab initio*.

Proposed Order, ¶ 14 (emphasis added). The Patriarch Secured Parties have no problem with settlements being subject to this Court's approval. However, the Other Stakeholder Creditors should not be entitled to a blocking position on the Debtors' "attempt[s]" to settle or compromise claim or causes of action, which would effectively hamstring the Debtors' ability to reach concessions in these Chapter 11 cases without the Other Stakeholder Creditors' pre-approval.

5.    Any Adequate Protection Payments Should Be Limited to the Extent the MBIA/ZIII Creditors Are Found to be Oversecured.

63.    Patriarch is confident that the monetization process, if permitted to proceed pursuant to the Settlement Agreement, will provide sufficient proceeds to pay the MBIA/ZIII Creditors in full, with distributions to Patriarch on account of the Class B Notes and preference shares. If that is the case, then pursuant to Bankruptcy Code section 506(b), the MBIA/ZIII Creditors may be entitled to interest and "reasonable fees, costs or charges" on their secured claim. However, in the event these Chapter 11 cases do not provide sufficient assets to satisfy the MBIA/ZIII Creditors' claims in full, then any adequate protection payments paid during the

36

pendency of these Chapter 11 cases should be applied to principal. This is a routine provision in this jurisdiction.[20]

### C. The Court Should Condition Any Surcharge or Equities of the Case Waivers on Preserving Parties' Rights Regarding the Allocation of Certain Fees and Expenses Incurred as a Result of the Settlement Agreement.

64.     In negotiating the Settlement Agreement, the MBIA/ZIII Creditors negotiated for a number of provisions that they viewed as necessary to preserve the value of their interests in the Debtors, while the Debtors and the Portfolio Companies meanwhile engage in a joint effort to monetize the Portfolio Companies. Specifically, the MBIA/ZIII Creditors required the Debtors to appoint (a) the Independent Director, (b) a replacement CRO and supporting temporary staff with FTI Consulting Inc. ("FTI"), and (c) the New Agent for the Debtors' loans to the Portfolio Companies. All of these additional professionals result in substantial additional cost to the Debtors' estates, which, as the holder of the Class B Notes and the Zohar Funds' preference shares, in the absence of an order of this Court, may ultimately be borne by Patriarch. However, given that these expenses are being incurred at the sole request and for the sole benefit of the MBIA/ZIII Creditors, Patriarch should be permitted to seek allocation of such expenses to reduce the allowed amounts of the MBIA/ZIII Creditors' secured claims, and such right should be preserved pending completion of the monetization process and during the stay contemplated under the Settlement Agreement. This Court held as such with respect to the Independent Director's Incentive Fee. *See* Hr'g Tr. 6/20/18, p. 29:4–6 ("On the escrow/allocation dispute I'm ok with the simply reservation of rights. There is a mechanism for working this out. It's through the settlement itself.").

---

[20]  *See, e.g., In re Remington Outdoor Company, Inc.*, Case No. 18-10684, Docket No. 177, ¶ 20(i) (Bankr. D. Del. Apr. 16, 2018); *In re Mac Acquisition LLC*, Case No. 17-12224, Docket No. 179, ¶ 16(c) (Bankr. D. Del. Nov. 13, 2017).

57772/0001-16492492V1

65.     The MBIA/ZIII Creditors through the Proposed Order are seeking to undercut the reservation of rights ordered by this Court with respect to the Independent Director's Incentive Fee, and further predetermine who shall bear costs and expenses that are being borne solely for the benefit of and at the request of the MBIA/ZIII Creditors. The MBIA/ZIII Creditors are attempting do so through waivers of the estate's right to surcharge the MBIA/ZIII Creditors' collateral under Bankruptcy Code section 506(c) and of the "equities of the case" exception under Bankruptcy Code section 552(b). *See* Proposed Order, ¶¶ 21, 23. No such relief is warranted here.

66.     The Third Circuit has recognized that the equities of the case exception under section 552(b) "is normally relevant in Chapter 11 . . . to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate." *In re Tower Air, Inc.*, 397 F.3d 191 (3d Cir. 2005). Similarly, Judge Walrath recently recognized that "[t]he purpose behind the 'equities of the case' rule . . . is, in a proper case, ***to enable those who contribute to the production of proceeds during chapter 11 to share jointly with pre-petition creditors secured by proceeds***." *In re Muma Serv, Inc.*, 322 B.R. 541, 558 (Bankr. D. Del. 2005) (quoting *In re Crouch*, 51 B.R. 331, 332 (Bankr. D. Or. 1985)) (emphasis added). Further, at least one court has expressly refused to prospectively waive the equities of the case doctrine through a cash collateral order. *In re Metaldyne Corp.*, 2009 WL 2883045, at *6 (Bankr. D. Del. June 23, 2009).

67.     Similarly, Bankruptcy Code section 506(c) authorizes a debtor's estate to seek to surcharge a secured creditor's collateral to satisfy the costs associated with "preserving . . . or disposing" a secured creditor's collateral. "[S]ection 506(c) is designed to prevent a windfall to

the secured creditor . . . ." *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995).

68.     Patriarch is not asking the Court to determine now whether certain fees and expenses should be surcharged against the MBIA/ZIII Creditors' collateral, or whether such fees and expenses should be borne by the MBIA/ZIII Creditors under the "equities of the case" rule under Bankruptcy Code section 552(b).  Rather, as the Court already ruled with respect to the Independent Director's Incentive Fee, Patriarch requests that any disputes be fully preserved in connection with the entry of the cash collateral order.  This reservation is particularly appropriate where, as here, (a) the MBIA/ZIII Creditors are not advancing any new money into the Debtors' estates, (b) the MBIA/ZIII Creditors are the only parties in interest that requested the installation of the professionals that are incurring the subject costs, (c) the MBIA/ZIII Creditors' interest are adequately protected in the absence of any provisions waiving any party's rights under sections 506(c) or 552(b), and (d) the Debtors, Patriarch, and the Portfolio Companies—not the MBIA/ZIII Creditors—are expending thousands of hours conducting a monetization process designed to first pay the MBIA/ZIII Creditors' allowed claims in full.

**D.    Additional Objections**

69.     In addition to the principle issues raised above, Patriarch incorporates the objections raised in the table attached hereto as Exhibit A.  Patriarch has further prepared a modified form of cash collateral order, attached hereto as Exhibit B, that appropriately balances the interests of the Debtors, the Other Stakeholder Creditors, and the Patriarch Secured Parties, and comports with the terms and conditions of the Settlement Agreement.  However, for the convenience of the Court, Patriarch further raises the additional issues with respect to the Proposed Order:

39

- The Proposed Order contemplates payment of prepetition interest and attorneys' fees. *See* Proposed Order, ¶ 12(a)–(c). No secured creditors should be getting paid prepetition interest, attorneys' fees, or other amounts as adequate protection. *See, e.g., In re Duval Manor Assocs.*, 191 B.R. 622, 633 (Bankr. E.D. Pa. 1996) ("For purposes of adequate protection, the claim of the secured creditor is fixed as of the date of filing"). "'[A]dequate protection' is meant only to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property, rather than to compensate the creditor for the bankruptcy-imposed delay in enforcing its rights in that property." *In re Energy Future Holdings Corp.*, 546 B.R. at 581. Payment of prepetition interest or attorneys' fees is not consistent with this purpose.

- For the same reason that the Proposed Order's stipulations and limitations on challenge rights violate the Settlement Agreement, *see supra* Paragraph A.1, the Proposed Order cannot approve any right to credit bid the Other Stakeholder Creditors' claims while all potential claims and objections with respect to those claims are stayed. *See* Proposed Order, ¶ 16. Further, the MBIA/ZIII Creditors have taken a broad interpretation of the extent of their collateral, and to the extent any proposed monetization transaction includes such collateral, pre-authorization for the Other Stakeholder Creditors to credit bid could chill the marketing process.

- Paragraph 28(a) of the Proposed Order seeks to give the Independent Director blanket authority to settle and satisfy prepetition claims against the Debtors. This appears primarily aimed at settling certain prepetition claims asserted by Blank Rome LLP ("Blank Rome"). Patriarch disputes the validity of Blank Rome's claim. The Proposed Order should not curtail parties' right to notice and a hearing before the estates can settle claims. *See* Fed. R. Bankr. P. 9019.

70.      In the absence of the changes proposed by Patriarch, the Court should not enter the Proposed Order.

## CONCLUSION

WHEREFORE, Patriarch respectfully requests that this Court deny the Motion and not enter the Proposed Order in its current form.

57772/0001-16492492V1

Dated: October 30, 2018

**COLE SCHOTZ P.C.**

By: */s/ Norman L. Pernick*
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
preilley@coleschotz.com

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Robert Klyman (Admitted Pro Hac Vice)
Michael S. Neumeister (Admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
mneumeister@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

Randy M. Mastro (Admitted Pro Hac Vice)
Mary Beth Maloney (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
mmaloney@gibsondunn.com

*Counsel to Patriarch Partners, LLC, Patriarch
Partners VIII, LLC; Patriarch Partners XIV, LLC;
Patriarch Partners XV, LLC; Octaluna, LLC;
Octaluna II, LLC; and Octaluna III, LLC*

41