**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 18-10512 (CSS)<br><br>Jointly Administered<br><br>**Hearing Date: November 13, 2018 at 11:00 a.m. (ET)**<br><br>**Ref. Docket Nos. 356 & 502** |

**DECLARATION OF MICHAEL KATZENSTEIN IN SUPPORT OF
THE DEBTORS' REPLY TO PATRIARCH'S OBJECTION
TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER
<u>AUTHORIZING THE USE OF CASH COLLATERAL</u>**

I, Michael Katzenstein, declare under penalty of perjury that:

1. I submit this declaration in support of the *Debtors' Reply to Patriarch's Objection to the Debtors' Motion for Entry of an Order Authorizing the Use of Cash Collateral* (the "<u>Reply</u>") and all capitalized terms that are used but not defined herein have the meaning ascribed to them in the Reply.

2. I am the Chief Restructuring Officer ("<u>CRO</u>") of the Debtors. I was retained by Joseph J. Farnan, Jr., the Debtors' sole independent director, effective as of May 21, 2018.

3. In addition to serving as CRO, I am a Senior Managing Director of FTI Consulting, Inc. ("<u>FTI</u>"). I have over 30 years of transaction, financial, operating, and mergers and acquisitions experience. I have served as a CRO, interim chief executive officer, chief operating officer or on-site advisor to debtors and other parties in interest in numerous

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("<u>Zohar III</u>"), Zohar II 2005-1, Limited (8297) ("<u>Zohar II</u>"), and Zohar CDO 2003-1, Limited (5119) ("<u>Zohar I</u>"). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

restructuring and bankruptcy engagements, including SFX Entertainment; Quirky; Digital Domain; Open Range; GSI Group; CTC Communications; Birch Telecom; VarTec Telecom; Pac-West Telecomm; Pacific USA; Pacific Crossing; PT Cable; Centerpoint Broadband Technologies; PR Wireless; Global Photon and OpTel.  I have also served as a board member or chairman of the board of directors in a variety of businesses in both bankruptcy and non-bankruptcy contexts, including at Caribbean Asset Holdings (cable television, ILEC and wireless operator), RCN (broadband services provider), the Sun-Times Media Group (newspapers) and GSI Group (photonic-based equipment and systems manufacturer and seller).  I have also assembled a team of seasoned professionals at FTI to support me in my role as CRO.

4. The principal creditor constituents in these cases entered into a Settlement Agreement, following a successful mediation before the Honorable Kevin Gross that took place in April 2018.  Prior to undertaking the position as CRO, I reviewed and became familiar with the Settlement Agreement.  This Settlement Agreement has guided the Independent Director and me in performing our responsibilities.

5. One of the requirements of the Settlement Agreement is that the Debtors engage in cash collateral negotiations with their secured creditors.  The Debtors need cash to fund their operations; and like in many chapter 11 cases, these Debtors do not have access to unencumbered collateral to provide that funding.  The only obligation placed on the Debtors in the Settlement Agreement with respect to the use of cash collateral is to prepare "customary bankruptcy case budgets, including anticipated sources and uses of cash (including payments from the Group A Portfolio Companies)."  In my experience, in any Chapter 11 case a budget is a fundamental element to obtaining consent to use cash collateral.

6. The professionals that I am supervising in these cases and I have prepared cash collateral budgets in numerous bankruptcy cases. To fulfil the cash collateral requirements of the Settlement Agreement (and these cases), shortly after my appointment, the Debtors' professionals and I set out to determine the Debtors' cash needs in these chapter 11 cases in light of the Debtors' mandate under the Settlement Agreement and proceeded to develop a budget for the chapter 11 cases. I believe that the process to prepare the Budget was appropriate and reasonable and resulted in a case budget (which has been updated on a rolling basis) that is also reasonable. The case budget takes into account anticipated receipts—primarily interest and principal payments from the various loans held by the Debtors—and projected expenditures. These projected expenditures are primarily the expenses and compensation of the Debtors' Independent Director, their two chief officers, and their professionals, as well as the adequate protection payments discussed below. I believe that the Budget was constructed to account for the various professional services that the Debtors require to fulfil their mandate under the Settlement Agreement and that the amounts used are reasonable. Moreover, the Debtors have generally performed within, and mostly under, budget with respect to their own expenses.

7. Like many chapter 11 cases, the Debtors are proposing certain variances, reserves and a Carve-Out to be permitted under the cash collateral order. First, the Debtors' right to use cash collateral must take into account the fact that unanticipated events may result in significant deviations from forecasted expenses. In my experience, actual expenditures in chapter 11 cases regularly vary from projected amounts as a result of unexpected events and unplanned contingencies that arise in chapter 11 cases. Accordingly, I think it is prudent in these cases, as well as a regular practice in chapter 11 cases, to permit variances within the case budget. Here, the variances are 25% or $750,000 per month. In my professional experience, I think the

proposed variances are reasonable in light of the fact that the Debtors have complicated inter-creditor and inter-estate relationships and the Debtors' assets consist of interests in many different operating businesses.  Moreover, there have been variations in the level of professional fees in these cases and the proposed variances will protect against triggering budget defaults precipitated by the unknown.  As noted above, the Debtors' professionals, who account for the Debtors' primary expenditures under the Budget, have operated responsibly during these cases and have been mostly under-budget.  Second, the Debtors are proposing to establish various reserves to ensure that appropriate funding is available for approximately 13-weeks of case expenses plus reserves, including a $1.5 million Indemnification Reserve to account for potential D&O litigation.  Given the nature of the Debtors' regular revenue stream (interest payments made to Zohar II and Zohar III once per quarter derived from entities over which the Debtors have no control), and the fact that the Independent Director and CRO likely have no ability to generate new funding sources, the Debtors must ensure that they have appropriate reserves to account for any lapse, delay, or cessation in funding.  The reserves and Carve-Out contemplated under the Cash Collateral Order do that.  Again, for these cases to succeed and for the Debtors to monetize the value of their assets for stakeholder recovery, the Debtors must be appropriately financed to conduct these cases.

8.    In addition to promptly beginning the process of developing the Budget, I also requested that counsel to the Debtors engage with the Senior Secured Parties regarding the use of cash collateral.  I believe that it was logical to start with this group because they were both senior in priority of payment and the largest claim holders in these cases.  After that, I intended for the Debtors to engage with Patriarch, as junior claim holder, on cash collateral negotiations.  This is typically how cash collateral negotiations take place.  Primarily through counsel, acting at my

direction, but also on a direct principal-to-principal basis, the Debtors and the Senior Secured Parties engaged in hard-fought negotiations over several weeks this past summer to reach on July 24 a consensual agreement for the use of cash collateral. A guiding principle of the Debtors' cash collateral negotiations was to preserve what the Debtors' believe is one of the primary elements of the Settlement Agreement, appointment of a new *independent* director, and his selected CRO, that would be free from undue influence by any stakeholder in these cases, a result that could have been frustrated by excessive lender-consent and control mechanisms and hair-trigger remedy enforcement rights that exist in many Chapter 11 financing orders. The Debtors successfully pared back a number of "typical" cash collateral provisions that the Senior Secured Parties had insisted on, but that the Debtors believed were unacceptable and were either expressly in conflict with the Settlement Agreement or contrary to the spirit of the Settlement Agreement.

9.  The July 24th Proposed Order includes many of elements of cash-collateral orders that I have negotiated over the course of my career—including, an agreed budget and variance testing, a carve-out, an adequate protection package, stipulations regarding prepetition debt, and various defaults and remedies. However, many of the provisions were far-more borrower-friendly than provisions that are often in cash collateral orders in other chapter 11 cases. This includes: borrower-friendly variance percentages; maintaining a healthy cash reserve to provide for 13 weeks plus of expenses; reserves for D&O indemnification; a Carve-Out that allows the CRO and Independent Director to properly oversee the estates after an event of default; and borrower-friendly events of defaults, which are tied to meet-and-confer obligations that limit what is typically an ability to exercise remedies against collateral should a default occur on an extremely expedited or immediate basis. These reflect substantial concessions from the Senior

Secured Parties and are much more favorable than those in many other chapter 11 cases. Each of these concessions was achieved through dogged negotiation by the Debtors over the months of June and July 2018.

10. Of note and consistent with the principles guiding the Debtors' cash collateral negotiations, I believe that the July 24th Proposed Order vests the Independent Director and the CRO with enough financial lee-way to adequately discharge their duties without being subject to the whims or control of any financial party in these chapter 11 cases.

11. The Indenture Trustee, for the benefit of the noteholders, and the noteholders are receiving forms of protection similar to what is provided to secured lenders in other cases. First, the Indenture Trustee, for the benefit of the noteholders, is receiving an adequate protection package—payment of fees, replacement liens and superpriority claims, and, subject to fund availability, payment of interest and principal—that are common in many chapter 11 cases but, in these instances, respect and preserve the borrower-friendly concessions noted above, including the reserves and Carve-Out. The cash collateral order also includes narrow stipulations that I believe are consistent with the intent and spirit of the Settlement Agreement and recognize the Debtors' CLO structure, the indebtedness issued thereunder, and the liens securing that indebtedness. These stipulations are more narrow than stipulations customarily granted in cash collateral orders and are accompanied by a confirmatory "challenge period" that will expire, should the court grant the relief requested, on the date that is 90 days after the hearing, which will be approximately 11 months after the Petition Date. Finally, rather than include broad releases and indemnities in favor of the Indenture Trustee and noteholders, the proposed cash collateral order provides only for findings regarding their good faith and lack of control over the

Debtors, and providing indemnity with respect to, matters related to the negotiation and entry of the cash collateral order.

12.  Under the cash collateral order, the Debtors will be authorized to make certain adequate protection payments to or at the direction of the Indenture Trustee, for the benefit of the noteholders.  I think the amounts proposed to be paid are fair and reasonable.  Such amounts will be paid out of proceeds of the Indenture Trustee's collateral and will not diminish the other protections provided to the Debtors, nor will they impact the variance testing of the Budget. Notable among the adequate protection payments are the payment of interest and the ability to declare a Special Payment Date, subject to prior funding of the amounts set forth in the Budget. These are particularly important in the context of these cases and the Settlement Agreement as those payments will help to actually put money in the hands of the Class A noteholders and help to realize the Paid In Full amounts contemplated under the Settlement Agreement.

13.  I believe that at all times the Debtors, the Senior Secured Parties, and the Indenture Trustee acted in good-faith and at arms'-length with the advice of competent and able counsel.  I do not believe that the cash collateral order was the result of undue influence by any party, and particularly any undue influence or leverage over the Debtors.  In fact, many of the provisions are far more favorable to the Debtors than I think could have been achieved in a more "traditional" chapter 11 case.

14.  Overall, I believe that the terms set forth in the July 24th Proposed Order and the Revised Order are fair and reasonable and supported by sound business judgment.  I think it fairly balances the needs of the Debtors to obtain the funding necessary to conduct their chapter 11 cases and affords the Indenture Trustee (for the benefit of all the noteholders) an appropriate level of adequate protection for its secured interest.

15. Once the Debtors and the Senior Secured Parties came to agreement on the terms for consensual cash collateral usage on July 24, 2018, the Debtors engaged Patriarch to address the terms on which consensual cash collateral usage could be achieved among the Debtors, the Indenture Trustee, and the noteholders (both the Senior Secured Parties and the Patriarch). Unfortunately, since that time, Patriarch's objections could not be consensually resolved nor was a mediated outcome reached.

16. At my direction, the Debtors have requested, and the Senior Secured Parties and the Indenture Trustee have agreed to, even further borrower-friendly concessions, as reflected in the Revised Order. I believe that this further reflects the good faith of these parties.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: November 9, 2018

*/s/ Michael Katzenstein*
Michael Katzenstein
Chief Restructuring Officer