*Exhibit A*
*Transaction Declaration*

*(attached hereto)*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DECLARATION OF ROBERT S. KOST IN SUPPORT OF ORDER**
**AUTHORIZING THE DENALI TRANSACTION**

I, ROBERT S. KOST, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Monetization Officer ("**CMO**") of each of the above-captioned debtors and debtors in possession (each a "**Debtor**"). I was appointed as CMO effective as of May 21, 2018. Prior to being appointed as CMO, I supported Marc S. Kirschner, in his capacity as Chief Restructuring Officer of the Debtors from approximately March 7, 2018 until the date I was appointed as CMO.

2.      I have over thirty years of experience as an investment banker. I hold a Bachelor of Arts degree from the University of Michigan and a Master of Business Administration degree from Duke University. I have been employed as a Managing Director of Goldin Associates, LLC and Goldin Capital Advisors, LLC (together, "**Goldin**") since 2015. At Goldin, I head the firm's transaction advisory services group. I am a Registered Representative and hold Series 7, 24, and 63 licenses issued by the Financial Industry Regulatory Authority (FINRA). Prior to joining Goldin, I held Partner, Managing Director, or Director positions at several

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

investment banks in groups that focused on restructuring advisory and distressed mergers & acquisitions. I have advised companies and their boards in connection with the sale of companies, debt financings, and refinancings, as well as advised companies, lenders, and other creditors in complex restructuring transactions. In my more than 30 years of experience, I have participated as an advisor in hundreds of transactions and have testified numerous times on matters related to investment banking, as both a fact and expert witness.

3.    I submit this declaration (the "**Declaration**") in support of the *Order Approving Consummation of Denali Portfolio Company Transaction* (the "**Proposed Transaction Order**"), submitted by the Debtors pursuant to that certain *Notice of Binding Portfolio Company Transaction pursuant to Portfolio Company Transaction Procedures* (the "**Transaction Notice**") to which this Declaration has been annexed. I submit this Declaration with the understanding that it is being presented to the Court for purposes of confirming the Independent Director's authority to exercise any and all of the Debtors' rights in connection with the authorization, approval, and closing of the proposed transaction on behalf of the Debtors, and that the proposed transaction is not under any circumstances subject to higher and/or better offers or a bankruptcy auction process.

4.    In my current capacity and involvement with the Debtors, I have become familiar with the Debtors' interest in Denali Incorporated and its subsidiaries (collectively, "**Denali**") and generally familiar with Denali's operations, business and financial affairs. If called upon to testify, I could and would testify competently to the facts set forth herein.

5.    Except as otherwise stated, all facts contained within this Declaration are based upon my personal knowledge, my experience with and knowledge of the Debtors and Denali, my discussions and interactions with Lynn Tilton and representatives of Greenhill & Co., LLC ("**Greenhill**"), and investment banking generally.

6.    Beginning in April, 2018, I met and spoke with Lynn Tilton on several occasions to discuss, among other topics, the process to sell Denali. Ms. Tilton is a director of Denali and, at that time, was the sole director of the Debtors. Ms. Tilton advised me that prior to the Debtors' bankruptcy filing, Denali had reached an advanced stage of discussions with a potential acquirer (who was, in fact, the Buyer), but a transaction agreement was never executed. She cited the prepetition litigation over the nature and extent of the Debtors' interests in the various portfolio companies as a factor contributing to the failure of those discussions. During this time, I also discussed with Ms. Tilton the three investment banking firms she had interviewed to conduct the sale process for Denali, and her decision to retain Greenhill to advise Denali in connection with a potential sale. Greenhill was retained pursuant to an engagement letter dated April 9, 2018. I was familiar with Greenhill and, based on my discussions with Ms. Tilton regarding the selection process and underlying rationale, I was supportive of the selection of Greenhill and believed that the firm could competently lead the Denali sale process.

7.    I began regular contact with members of the Greenhill team, both telephonically and by email, in early June as they prepared for the launch of the Denali sale process. Throughout the Denali sale process, I was generally in weekly contact with members of the Greenhill team, although the frequency of that contact increased or decreased depending on the relative activity of the sale process. Throughout the Denali sale process, I had regular access to members of the Greenhill team, and they were responsive and forthcoming to my requests for information and input that I relayed to them on the Debtors' behalf.

8.    In addition, I conferred numerous times with Ms. Tilton, both telephonically and in-person, throughout the Denali sale process, often with either one or both of the Debtors' Independent Director (Joseph J. Farnan, Jr.) and Chief Restructuring Officer ("**CRO**") (Mike

Katzenstein) participating in those discussions. The Debtors were able to discuss and review with Ms. Tilton her perspectives on Denali's business and the sale process, in her capacity as both a director and indirect shareholder of Denali, and were able to provide her with the Debtors' perspective on Denali.

9.      As CMO, I provided updates to Mr. Farnan, the CRO and the Debtors' advisors at weekly board meetings. These discussions included an update on the status of the Denali sale process. In more recent weeks, these updates have been supplemented by counsel with respect to the discussions surrounding the status of legal diligence and definitive documentation of the Denali sale transaction. In addition, I met weekly, and often daily, with the CRO, his team, and counsel to discuss the status of the monetization process, including the Denali sale process. Where circumstances warranted it, I would meet with the Independent Director, CRO, and counsel on an *ad hoc* basis when matters required attention on a more urgent timeframe than our regularly scheduled meetings allowed. Through these discussions, the Independent Director, CRO, and counsel to the Debtors were kept up-to-date on the Denali sale process.

10.     The Denali sale process was conducted in two stages—an initial stage that was focused primarily on strategic buyers and a second stage that was more broadly focused on both strategic and financial buyers.

11.     My initial discussions with members of the Greenhill team in June 2018 focused on understanding and assessing the universe of potential buyers for Denali and formulating a marketing strategy. The Greenhill team's and Ms. Tilton's view was that a strategic buyer would be the most likely buyer of Denali for a variety of reasons. As a result, the Greenhill team proposed a more targeted sale process directed at strategic parties that the team viewed as the most likely buyers. With my input, the Debtors were supportive of this approach, and by the

4

second half of June, members of the Greenhill team began contacting potential buyers. The Greenhill team and Denali also prepared a confidential information memorandum (the "**CIM**"), that contained information consistent with what buyers would expect to see in a typical mergers & acquisition process.

12.    During the initial stage, which began in June 2018, members of the Greenhill team contacted approximately 31 potential buyers and established a deadline for submitting indications of interest in early August. During this stage, I was in regular contact with the Greenhill team regarding the active participants in the sale process, received the Greenhill team's perspective of those participants, and offered observations the Debtors had regarding the sale process and participants.

13.    Potential buyers signed non-disclosure agreements, received the CIM, and attended management presentations conducted by Denali's management team. I personally participated in one of the management presentations, and I found Denali's management team to be forthcoming, credible, and responsive to the due diligence that potential buyer was undertaking.

14.    At the beginning of August 2018, Denali received three indications of interest from potential buyers. Based on evaluations of these indications of interest and feedback from potential buyers, the Greenhill team, Ms. Tilton, and the Debtors discussed extending the process for the participants in the initial stage and implementing a second stage that would include outreach to a broader group of potential buyers, including an expanded list of financial buyers. With my input, the Debtors were supportive of the decision to proceed with a second stage of the sale process.

15.    While Denali prepared to launch the second stage of the sale process, it updated the CIM, obtained a quality of earnings report from KPMG to assist potential buyers in

their due diligence, and populated an electronic data room for potential buyers to conduct due diligence. The Greenhill team also prepared an expanded buyer list with additional strategic and financial buyers, on which Ms. Tilton and the Debtors had an opportunity to review and provide comment. I was in regular contact with Ms. Tilton and the Greenhill team and received updates from them on the preparations for the second stage of the sale process.

16.     During September 2018, Denali launched the second stage of its marketing process.    By the end of this second stage, members of the Greenhill team had contacted approximately 152 parties, and Denali executed approximately 46 non-disclosure agreements. The second stage saw significant interest from financial sponsors, and members of the Greenhill team remained in contact with the parties that submitted indications of interest in the first stage of the sale process. During the second stage, I was in regular contact with members of the Greenhill team regarding the active participants.    I received the Greenhill team's perspective of those participants and discussed with them questions and observations the Debtors had regarding the sale process and participants.

17.     Ultimately, by mid-November 2018, indications of interest were received from seven parties (including the Buyer and other parties who submitted indications of interest in the first stage of the sale process). The Greenhill team then spent December and January assisting interested parties with due diligence and requested that the interested parties submit refreshed bids. On or about January 10, 2019, refreshed bids were received. The Greenhill team continued to negotiate with the interested parties to clarify and improve their bids. During this time, I remained actively involved in the Denali sale process, discussing developments with the Greenhill team and Ms. Tilton with regard to potential purchasers and monitoring the status of their bids.

18.    Fiber Glass Systems, L.P. ("**Buyer**")—a subsidiary of National Oilwell Varco (NOV)—was one of the parties that submitted an indication of interest for Denali. Upon information and belief, Buyer is a manufacturer of fiberglass reinforced epoxy products used for onshore and offshore corrosion control with manufacturing facilities spanning four continents, and NOV, Buyer's parent, is a publicly traded company with revenues in excess of $8 billion. Buyer's offer was determined to be the best offer based on, among other things, the financial consideration offered, the significant due diligence Buyer had conducted to date, the absence of a financing contingency, and an assessment of the overall certainty for Buyer to close a transaction. With my input, the Debtors were supportive of selecting Buyer as the leading bidder. In early February 2019, the Greenhill team, Denali, and the Debtors negotiated with the Buyer the terms of a letter of intent to acquire all of the outstanding shares of Denali. On February 26, 2019, the parties, including the Debtors, entered into a letter of intent granting Buyer the exclusive right to negotiate and consummate a sale transaction, with an initial exclusivity period of 45 days (this period was subsequently extended with the consent of the Debtors).

19.    From and after the execution of the letter of intent, Denali, with the advice of the Greenhill team and the company's counsel (Holland & Knight LLP), negotiated with Buyer the definitive terms of an agreement to acquire all of the outstanding shares of Denali. The Debtors and their counsel were actively involved in the negotiation of the definitive documentation of the transaction, and were provided the opportunity to provide input on and revisions to each of the principal documents. I believe that all parties to the Denali Transaction have participated in the negotiation of this transaction in good-faith and at arm's length.

20.    In connection with my participation in the negotiation of this transaction, I have reviewed the Proposed Transaction Order, Buyer Side Letter and Ark Side Letter, each as

defined in the Transaction Notice and attached thereto as Exhibits B through D.  The Proposed

Transaction Order, Buyer Side Letter and Ark Side Letter: (i) were negotiated and entered into in

good faith by the parties; (ii) were entered into with the Debtors' approval and consent in the

exercise of sound business judgment; and (iii) are in the best interest of the Debtors, their estates,

and their stakeholders.

21.     The Debtors' interest in Denali consist of indebtedness owed to Zohar III,

Limited ("**Zohar III**") and Zohar III's membership interest in Denali Acquisition, LLC, which is

the owner of shares in Denali.  No other Debtors have an interest in Denali, either by holding

indebtedness owed by Denali or an interest in equity issued by Denali.  A portion of the purchase

price in the Denali Transaction will be used to satisfy all of Denali's outstanding third-party

indebtedness, including indebtedness owed to Zohar III, seller transaction expenses, target net

working capital requirements, and an escrow to cover post-closing indemnity claims of Buyer.

The Debtors currently estimate that the Denali Transaction will yield Zohar III aggregate

consideration in the range of $72.2 million to $77.7 million.  However, this range is subject to

adjustments based on actual seller transaction expenses, net working capital and closing cash

adjustments, and any indemnity claims made by Buyer.

22.     Based on my experience, my personal knowledge, and my participation in

the Denali sale process: (i) the sale process described above was conducted in a commercially

reasonable manner intended to achieve the best offer; (ii) Greenhill conducted a robust process to

thoroughly canvass the market; (iii) the Debtors were provided an appropriate opportunity to

participate in the sale process leading up to the selection of Buyer, and the negotiations and

documentation of the proposed transaction with Buyer after such selection; (iv) the proposed

Denali transaction represents an arms'-length agreement and the documents have been negotiated

and entered into in good faith by the parties; (v) the amounts payable to the Debtors for their interest in Denali, based on the proposed purchase price, represent a fair and reasonable price that has been market tested and was the best offer received; (vi) the Debtors' approval and consent to the Denali transaction is an exercise of sound business judgment; (vi) the Denali transaction is in the best interest of the Debtors, their estates, and their stakeholders; and (vi) the ultimate decision to proceed with the Denali transaction reflects a joint determination by the Debtors and Ms. Tilton to proceed with the best transaction available.  Moreover, to the best of my knowledge, the Buyer (a) is not affiliated with or related in any way to the Debtors or Ms. Tilton, (b) does not own an interest in the Debtors, and (c) is not an insider of the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  June 10, 2019

/s/ Robert S. Kost
Robert S. Kost
Chief Monetization Officer of the Debtors

9

*Exhibit B*
*Proposed Transaction Order*

*(attached hereto)*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Zohar III, Corp., *et al.,*[1] | ) | Case No. 18-10512 (CSS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | Docket Ref. No. 545 and ___ |

### ORDER APPROVING CONSUMMATION OF DENALI PORTFOLIO
### COMPANY TRANSACTION

Upon the *Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [Docket No. 545] (the "Procedures Order"); and upon the notice filed with the Court on June 10, 2019 [Docket No. _____] (the "Transaction Notice")[2] and the declarations and exhibits attached thereto; and the Court having jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Denali Transaction having been provided to the Interested Parties, and it appearing that no other or further notice need be provided; and the Court having found and determined that the consummation of the Denali Transaction (as defined in the Transaction Notice, and hereinafter used) is in the best interests of the Debtors' estates, their creditors, and

---

[1]      The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2]      All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Procedures Order [Docket No. 545], the Procedures Motion [Docket No.481], or the Transaction Notice.

other parties in interest; and any objections to the Denali Transaction having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      Joseph J. Farnan, Jr., as Independent Director, has been fully charged with governance of the Debtors under applicable Cayman or Delaware law, as applicable, to authorize, approve and consummate the Denali Transaction, including, but not limited to (i) authorizing the Debtors to vote or consent to any vote, as applicable, any and all Zohar Interests in favor of the Denali Transaction, (ii) exercising any rights with respect to the Zohar Interests to implement or consummate the Denali Transaction, and (iii) authorizing and approving the release of all of the Encumbrances[3] held by, owned by, or in favor of the Debtors in connection with the Denali Transaction.

2.      The consummation of the Denali Transaction between Fiber Glass Systems, L.P. ("Buyer") and all of the shareholders of Denali Incorporated, a Delaware corporation ("Denali"), including but not limited to Denali Acquisition LLC ("Denali Acquisition") and ARK II CLO 2001-1, Limited (all of the shareholders of Denali are collectively, the "Sellers") on the terms set forth in the Transaction Notice and SPA is legal, valid and properly authorized.

3.      Zohar III, Limited ("Zohar III") is the only Debtor with any right, title, or interest (directly or indirectly) in Denali, its Subsidiaries (as defined in the SPA), or Denali Acquisition, and no other Debtors have any right, title, or interest (directly or indirectly) in Denali, its Subsidiaries (as defined in the SPA), or Denali Acquisition. Zohar III's execution and entry into the Buyer Side Letter and Ark Side Letter, in the forms attached to the Transaction Notice as Exhibits C and D, and all other documents contemplated by or entered into in connection with

---

[3]      "Encumbrances" means "any mortgage, pledge, assessment, security interest, lien, adverse claim, levy, charge, option, right of first refusal, voting agreement, charge, debenture, indenture, deed of trust, easement, right-of-way, restriction, encroachment, license, servitude, concession, security agreement or other encumbrance of any kind or nature."

the Denali Transaction, are hereby authorized and approved, and shall be binding on and enforceable against all parties executing those documents.  Upon entry of this Order, all necessary consents, approvals, or limited liability company authorizations by any member of, holder of an interest in (whether record, beneficial, or otherwise), or other party required to give limited liability company authorization to Denali Acquisition, with respect to the Denali Transaction are hereby deemed to have been provided.  Further, Zohar III shall have authority to vote its interest in Denali Acquisition in support of the Denali Transaction.

4.      Based upon, among other considerations, the Transaction Notice and the Transaction Declarations, the Independent Director's authorization, approval, and consummation of the Denali Transaction is prudent, in good faith, in the best interest of the Debtors' estates, their creditors and other parties in interest, and is fully consistent with the duties imposed upon him as a fiduciary.

5.      The sale of all of the Sellers' equity interests in Denali, as more fully described in and pursuant to the SPA, and the consideration provided by Buyer are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.      All amounts payable to Denali Acquisition under the SPA shall be paid to the account of Zohar III as set forth in the Ark Side Letter and subject to the limitations and escrow provisions set forth in the Ark Side Letter with respect to the allocation and satisfaction of Zohar III's allocable portion of the Seller Representative Expenses (as defined in the Ark Side Letter).

7.      Effective as of the Closing of the SPA (which includes the sale of all of the equity interests in Denali by the Sellers to Buyer and the satisfaction or waiver of the Closing conditions in the SPA), the Denali Transaction shall constitute a legal, valid and effective transfer of all of the equity interests in Denali to Buyer notwithstanding any requirement for

approval or consent by any Person, and shall (i) vest Buyer with all right, title and interest in and to the equity interests in Denali free and clear of all Encumbrances and other interests of any kind, in each case, under the Zohar Secured Debt Facility or otherwise held by Zohar III, and (ii) result in the release and termination of all Encumbrances and other interests of any kind under the Zohar Secured Debt Facility in or against the Assets and Properties of Denali and its Subsidiaries.[4]

8.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

9.      The payment for and release of the Indebtedness under the Zohar Secured Debt Facility, as set forth in Section 2.5(f) of the SPA, is hereby approved free and clear of any and all Encumbrances and other interests of any kind that could be asserted by the Debtors, their Agents (as defined herein) or their creditors, against (i) the equity interests in Denali, (ii) Denali or any of its Subsidiaries, or (iii) the Assets and Properties of Denali or its Subsidiaries. The "Agents" constitute Ankura Trust Company, as agent, and Patriarch Partner Agency Services, LLC, as predecessor agent, under the Zohar Secured Debt Facility.

10.     The Debtors and their Agents are authorized and directed to execute and deliver all instruments and documents, and take such other action—including the exercise of any member, shareholder, or lender approval rights—as may be necessary or appropriate to consummate, implement and effectuate the Denali Transaction pursuant to the SPA, including, but not limited to, execution of any and all instruments necessary to terminate, cancel and release the Zohar Secured Debt Facility, and all Encumbrances and other interests of any kind arising

---

[4]      "Assets and Properties" means "all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person, including, without limitation, cash, cash equivalents, accounts and notes receivable, chattel paper, documents, instruments, general intangibles, real estate, equipment, inventory, goods and Intellectual Property."

under or related to the Zohar Secured Debt Facility, including any mortgage, deed of trust, security agreement, UCC financing statement, pledge, control agreement, Encumbrance, or other instrument related to the perfection of the Encumbrances and other interests of any kind against (i) the equity interests in Denali, (ii) Denali or any of its Subsidiaries, or (iii) the Assets and Properties of Denali or its Subsidiaries by the Debtors, as set forth in the Security Debt Facility or otherwise.

11.     The release by the Debtors and other Releasors, as more fully set forth in Section 6 of the Zohar Authorization Letter Agreement, is authorized and approved, except as follows:

> Notwithstanding anything in the Zohar Authorization Letter Agreement, the Ark Side Letter, the SPA, or any other document entered into in the Denali Transaction to the contrary and solely as among the parties to the Settlement Agreement (and for the avoidance of doubt, such parties to the Settlement Agreement expressly exclude Denali and its Subsidiaries): (i) in the event of a conflict between the provisions of the Settlement Agreement and the releases provided in Section 6 of the Zohar Authorization Letter Agreement and Section 6.7 of the SPA, the Settlement Agreement shall control; (ii) the Debtors, any Patriarch Stakeholder, Denali Acquisition, any Group A Portfolio Company (excluding Denali and its Subsidiaries) or any Group B Portfolio Company, in whatever capacity such entity or individual may exist or serve (collectively, the "Release Carve-Out Parties"), are not releasing, and shall not be deemed to have released, any claims or causes of action they may own, hold, have, or assert against each other (collectively, the "Non-Released Claims"); and (iii) the provisions, statements, or representations in the SPA, Transaction Notice, Buyer Side Letter, Ark Side Letter, or other documents contemplated by or entered into in connection with the Denali Transaction shall have no effect on or prejudice in any way the Non-Released Claims and may not be used in any way in any litigation, contested matter, adversary proceeding related to or involving the Non-Released Claims (or any appeal from any order entered in any of the following).[5]

---

[5]     Capitalized terms used in Paragraph 11 of this Order, but not otherwise defined in this Order, shall have the meaning ascribed to them in the Order entered on May 21, 2018, in Zohar's chapter 11 bankruptcy case at Docket No. 266, including the "Settlement Agreement" annexed as Exhibit 1 thereto.

12.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority to act to terminate and cancel any and all of the Encumbrances and other interests of any kind.

13.     Any stay applicable to this Order under Federal Rule of Bankruptcy Procedure 6004(h) is waived and this Order shall be effective and enforceable immediately upon its entry.

14.     This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated: _____, 2019
        Wilmington, Delaware

                                    _____
                                    THE HONORABLE CHRISTOPHER S. SONTCHI
                                    CHIEF UNITED STATES BANKRUPTCY JUDGE

01:24570281.1                              6

## Exhibit C
### Buyer Side Letter

*(attached hereto)*

*Execution Version*

ZOHAR III, LIMITED
CARE OF FTI CONSULTING, INC.
ATTN: MICHAEL KATZENSTEIN
3 TIMES SQUARE
NEW YORK, NY 10036

June 4, 2019

**VIA ELECTRONIC MAIL**

Fiber Glass System, L.P.
c/o Craig L. Weinstock
Senior Vice President and General Counsel
National Oilwell Varco, L.P.
7909 Parkwood Circle Drive
Houston, Texas 77036

Re: Acknowledgement and Approval of that certain Share Purchase Agreement dated June 4, 2019 (the "SPA") by and among Fiber Glass Systems, L.P. ("Buyer") and multiple sellers (the "Sellers"), including Denali Acquisition LLC ("DA"), transferring all of the equity interests of Denali Incorporated ("Denali")[1]

Dear Mr. Weinstock:

As a material inducement to Buyer to enter into the SPA and to consummate the transactions contemplated by the SPA (from which Zohar III, Limited ("Zohar III") will directly and indirectly benefit) and in recognition that Buyer would not enter into the SPA or consummate the transactions contemplated by the SPA without the provisions of this letter agreement (this "Letter Agreement") and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Zohar III hereby makes the following representations, warranties, acknowledgments and commitments to Buyer:

1. Zohar III has received, reviewed, approved, and consented to the SPA and believes that the monetization transaction contemplated thereunder is a viable Portfolio Company Transaction (as defined in the *Order in Aid of Implementation of the Global Settlement Agreement Approved in these Cases for Authority to Establish certain Procedures for the Corporate Approval of Portfolio Company Transactions and for Related Relief* [Docket No. 545] (the "Procedures Order")) that is in the best interest of Zohar III.

2. Zohar III represents and warrants to Buyer that the statements contained in this Section 2, are true and correct as of the date hereof and will be true and correct as of the Closing Date:

   a. Authority; Authorization of this Letter Agreement and the SPA. Subject to and upon entry of the Transaction Order (as defined herein): (i) Zohar III has all requisite power and authority to execute and deliver this Letter Agreement, to consummate the transactions contemplated hereby, and to perform its obligations hereunder; ii) the execution and delivery of this Letter Agreement by Zohar III, and the consummation of

---

[1] Unless indicated otherwise, capitalized terms shall have the same meaning as set forth in the SPA.

the transactions contemplated hereby, have been duly and validly authorized by all requisite action on the part of Zohar III; and (iii) this Letter Agreement constitutes the legal, valid, and binding obligations of Zohar III, enforceable against Zohar III in accordance with its terms.

b. <u>Ownership and Authority</u>.  Subject to and upon entry of the Transaction Order (i) DA has all requisite power and authority to execute and deliver the SPA and the Transaction Documents to be executed and delivered by DA in connection with the Closing, to consummate the transactions contemplated thereby and to perform its obligations under the SPA and such Transaction Documents; (ii) the execution and delivery by DA of the SPA and the Transaction Documents (to be executed and delivered by DA in connection with the Closing), and the consummation of the transactions contemplated thereby, have been duly and validly authorized by all requisite limited liability company action on the part of DA; and (iii) the SPA constitutes (and the Transaction Documents to be executed and delivered by DA (in connection with the Closing) will, when executed and delivered, constitute), the legal, valid and binding obligations of DA, enforceable against DA in accordance with their terms.  Other than Zohar III's interest in DA, Zohar III does not own, directly or indirectly, any equity interests in Denali or its Subsidiaries, or in any holder of equity interests in Denali.  Zohar III is not party to, and does not own, directly or indirectly, any Option, warrant, right, contract, call, pledge, put, or other agreement or commitment providing for the disposition or acquisition of any of the equity interests in Denali or any of its Subsidiaries or in any holder of equity interests in Denali.  Subject to and upon entry of the Transaction Order and the Closing, the Buyer will obtain at Closing 100% of the equity interests owned by DA in the Company.  Except for Zohar III, no other Zohar Party[2] owns any equity interests, directly or indirectly, in DA, Denali or any of its Subsidiaries or in any holder of equity interests in Denali.

c. <u>Consents and Approvals; No Violations</u>.  Except for the filing of the Transaction Notice and entry of the Transaction Order, neither the execution and delivery of this Letter Agreement by Zohar III nor the compliance by Zohar III with any of the provisions hereof will: (i) conflict with or violate any provision of any Organizational Document of Zohar III; (ii) require any filing with or any permit, consent or approval of, or the giving of notice to any Person; (iii) violate or conflict with any provision of any Law (including the Procedures Order) binding upon Zohar III or its Assets and Properties; or (iv) result in, or require, the creation or imposition of, any Encumbrance upon the Shares or any of the Assets and Properties of Denali or its Subsidiaries.

3. Zohar III has approved and will take the following steps to obtain Bankruptcy Court approval and consummate the transactions contemplated by the SPA:

a. direct its counsel to file with the Zohar Bankruptcy Court the Transaction Notice in the form attached hereto as <u>Exhibit A</u> (the "<u>Transaction Notice</u>") within five (5) business days of the execution of this Letter Agreement;

---

[2] The "<u>Zohar Parties</u>" are the debtors in possession in that certain bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware, Case No. 18-10512, and where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).

      b.  attach to the Transaction Notice and file with the Zohar Bankruptcy Court the form of Transaction Order attached hereto as <u>Exhibit B</u> (the "<u>Transaction Order</u>"); and

      c.  support and use commercially reasonable efforts to obtain entry by the Zohar Bankruptcy Court of the Transaction Order.

4.  This Letter Agreement shall be terminable by Zohar upon written notice to Buyer which may only be delivered after the earlier to occur of (i) termination of the SPA, or (ii) the Bankruptcy Court's denial or refusal to enter the Transaction Order.

5.  Zohar III acknowledges and agrees that DA's share of the Purchase Price should be paid to the account set forth on <u>Schedule 5</u> attached hereto, and shall direct the Seller Representative to designate such account as the account of DA on the Flow of Funds Memo (as defined in the SPA).

6.  Effective as of the Closing Date and upon payment by Buyer of funds and the satisfaction of the terms set forth in (x) the pay-off letter required by Section 2.5(f) of the SPA in the form attached hereto as <u>Exhibit C</u> (the "<u>Zohar Pay-Off Letter</u>") and (y) the Transaction Order, but subject in all instances to any limitation on this Section 6 that is set forth in Paragraph 11 of the Transaction Order, Zohar III, on behalf of itself, and its present, former and future Affiliates, employees, officers, directors, managers, shareholders, members, partners, Representatives, agents, heirs, legatees, successors and assigns (collectively, "<u>Releasors</u>"), irrevocably and unconditionally releases, acquits and forever discharges, without any additional consideration or the need for additional documentation, Denali and its Subsidiaries, Buyer and each of their respective present, former and future Affiliates, employees, officers, directors, managers, shareholders, members, partners, Representatives, agents, heirs, legatees, successors and assigns (collectively, "<u>Buyer Released Parties</u>") from any and all Claims and Liabilities (including, without limitation, attorneys' fees and costs actually incurred, compensation or deferred compensation of any nature whatsoever, and dividends), known, unknown or presently unknowable, contingent or absolute, whether asserted or not, now existing or which may subsequently accrue to them in the future, arising out of (a) the Shares, (b) the ownership, management or operation of Denali and its Subsidiaries, in each case, prior to or on the Closing Date and/or (c) the Assets and Properties of Denali and its Subsidiaries. Each Releasor agrees that it shall not institute, pursue, solicit or assist (other than assistance required by Law) any Proceeding (in law or at equity) against or adverse to Buyer Released Parties arising from or attributable to such Releasor in connection with the foregoing. Notwithstanding anything contained in this <u>Section 5</u>, no release, acquittal or discharge shall be granted by Releasors to the extent such release arises out of or pertains to (i) the obligations of Buyer and rights of Sellers pursuant to the SPA or any Transaction Document, including any and all matters for which any Sellers' Indemnified Person is entitled to indemnity under <u>Article IX</u> of the SPA, (ii) any rights, Claims or Liabilities that cannot be waived or released under applicable Law, or (iii) the matters specified in <u>Paragraph 11</u> of the Transaction Order to be excluded from this release.

7.  Zohar III will promptly implement the Transaction Order once it is entered and take (and will instruct its agents to take) all actions necessary to consummate the SPA, including, but not limited to, the delivery of the Zohar Pay-Off Letter, taking, or authorizing Buyer or Seller Representative on behalf of Zohar III to take, all actions necessary to terminate and remove all Encumbrances and other interests of any kind in favor of Zohar III and its current and predecessor agents, and release any and all Claims of Zohar III and its current and

predecessor agents against the Shares and the Assets and Properties of Denali and its Subsidiaries, including, execution of any and all instruments necessary to terminate, cancel and release the Zohar Secured Debt Facility (as defined in the Transaction Notice), and all Encumbrances and other interests of any kind arising under or related to the Zohar Secured Debt Facility, including any mortgage, deed of trust, security agreement, UCC filing, pledge, control agreement, Encumbrance, or other instrument related to the perfection of the Encumbrances against the Shares and the Assets and Properties of Denali and its Subsidiaries by Zohar III and its current and predecessor agents, as set forth in the Zohar Secured Debt Facility or otherwise.

8. This Letter Agreement may only be amended if such amendment is set forth in a writing executed by Buyer and Zohar III. No failure by Buyer to insist upon the strict performance of any covenant, duty, agreement, or condition of this Letter Agreement or to exercise any right or remedy with respect to a breach thereof or of any representation or warranty shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition. The waiver by Buyer of a breach of any provision of this Letter Agreement shall not operate or be construed a waiver of any subsequent breach.

9. This Letter Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Neither this Letter Agreement nor any of the rights, interests, or obligations hereunder may be assigned by Zohar III without the prior written consent of Buyer. Nothing expressed or implied in this Letter Agreement is intended to confer on any Person other than Buyer and the Buyer Released Parties, and each of their successors and permitted assigns, any rights under this Letter Agreement.

10. Subject to and upon entry of the Transaction Order, a violation by Zohar III of any of the terms of this Letter Agreement will cause Buyer irreparable injury for which adequate remedy at law is not available. Accordingly, Buyer will be entitled to an injunction, restraining order or other equitable relief to prevent breaches of the provisions of this Letter Agreement and to enforce specifically the terms and provisions hereof, without proof of actual damages or any requirement to post a bond, in any court of competent jurisdiction in the United States or any state thereof, in addition to any other remedy to which it may be entitled at law or equity.

11. ZOHAR III AGREES THAT THIS LETTER AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS LETTER AGREEMENT, OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS LETTER AGREEMENT, AND THE LEGAL RELATIONS AMONG ZOHAR III AND BUYER AND THE BUYER RELEASED PARTIES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION. ZOHAR III FURTHER AGREES THAT THE EXCLUSIVE AND SOLE VENUE FOR ANY DISPUTE BETWEEN OR AMONG ZOHAR III, ON THE ONE HAND AND BUYER AND BUYER RELEASED PARTIES ON THE OTHER HAND OR RELATING TO THIS LETTER AGREEMENT, INCLUDING ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS LETTER AGREEMENT, OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS LETTER AGREEMENT, AND THE LEGAL RELATIONS AMONG ZOHAR III, ON THE ONE HAND AND

BUYER AND BUYER RELEASED PARTIES ON THE OTHER HAND, SHALL BE THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, AND THE BUYER CONSENTS TO JURISDICTION AND VENUE IN THAT COURT.

*[Remainder of page intentionally left blank]*

12. This Letter Agreement may be executed and delivered (including by facsimile or as a .pdf or similar attachment to an electronic communication) in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same agreement.

ZOHAR III, LIMITED

By:_____.
Name:  Michael Katzenstein
Title:    Chief Restructuring Officer

**ACKNOWLEDGED, AGREED AND ACCEPTED**

FIBER GLASS SYSTEMS, L.P.

By:    NOV European Holding LLC,
       its general partner

By: _____
Name: _____
Title: _____

Enclosures
cc:    Amy Leder, Esq.
       Michael R. Nestor, Esq.
       Ryan M. Bartley, Esq.
       Omer F. Kuebel, III, Esq.
       Michael T. Peters, Esq.

12. This Letter Agreement may be executed and delivered (including by facsimile or as a .pdf or similar attachment to an electronic communication) in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same agreement.

ZOHAR III, LIMITED

By:_____
Name:  Michael Katzenstein
Title:   Chief Restructuring Officer

**ACKNOWLEDGED, AGREED AND ACCEPTED**

FIBER GLASS SYSTEMS, L.P.

By:    NOV European Holding LLC,
       its general partner

By: _____
Name: _Brigitte M. Hunt_____
Title: _Vice president_____

Enclosures
cc:    Amy Leder, Esq.
       Michael R. Nestor, Esq.
       Ryan M. Bartley, Esq.
       Omer F. Kuebel, III, Esq.
       Michael T. Peters, Esq.

**SCHEDULE 5**
**ACCOUNT**

See attached.

*[Omitted from filing version]*

**EXHIBIT A**
**TRANSACTION NOTICE**

See attached.

*[See Notice to which this document is Annexed]*

**EXHIBIT B**
**TRANSACTION ORDER**

See attached.

*[See __Exhibit B__ to Notice]*

**EXHIBIT C**
**PAY-OFF LETTER**

See attached.

**EXHIBIT C to Zohar Authorization Letter – Zohar Pay-Off Letter**


PAYOFF LETTER


June [___], 2019


Denali Incorporated
6708 East 81st Street, Suite 195
Tulsa, Oklahoma 74133
Attention: Tim Maynard, Chief Financial Officer
Email: tmaynard@denali-inc.com

Ladies and Gentlemen:

        Reference is made to that certain Credit Agreement dated as of March 5, 2009 (as modified, amended and supplemented and in effect on the date hereof, the "Credit Agreement"; together with the various instruments, documents and other agreements executed in connection therewith, the "Credit Documents") among Denali Incorporated, as borrower (the "Borrower"), the Domestic Subsidiaries that from time to time became guarantors thereunder, the financial institutions and other investors from time to time lenders thereto (collectively, the "Lenders") and Ankura Trust Company, LLC, a Delaware limited liability company ("Ankura Trust Company"), as successor administrative agent for such Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

        The Borrower has advised the Administrative Agent that the Borrower intends to repay in full all amounts outstanding under the Credit Agreement and the other Credit Documents on or about June [___], 2019, in connection with the sale of 100% of the Borrower's issued and outstanding equity interests (the "Payoff Date").

        1.     This letter confirms that the aggregate amount (the "Payoff Amount") as of the Payoff Date necessary to pay all amounts owing by the Borrower to the Administrative Agent and the Lenders under the Credit Agreement and the other Credit Documents is specified on Schedule 1 hereto, subject to the same being paid by wire (together with notification to the Administrative Agent of the applicable federal funds wire reference number(s)) to, and confirmed received not later than 2:00 p.m. (New York City time) on the Payoff Date (the "Required Payment Time") by, the Administrative Agent in U.S. Dollars in immediately available funds to the account of the Administrative Agent as specified on Schedule 2 hereto (except for payment of fees and expenses of the Administrative Agent's legal counsel, which shall be remitted by wire by such time directly to such counsel as specified in such schedule). Please note that such amounts which comprise the Payoff Amount assume that no further extension of credit (or repayment of the Loans) will be made under the Credit Agreement after the date of this letter. The Borrower agrees that, from the date hereof through the Effective Time (as defined below), the Borrower shall neither request nor receive any borrowing under the Credit Agreement, and the Borrower and the Administrative Agent agree that the Administrative Agent and Lenders shall not fund any borrowing request received from the Borrower from the date hereof through the Effective Date. In the event the Payoff Amount is not received by the Required Payment Time in accordance with the terms of this letter, the Payoff Amount will be subject to an increase at a per diem rate of $9,286.67 (the "Per Diem Rate"). If the Payoff Amount as increased by the applicable Per Diem Rate is not received before 2:00 p.m. (New York City Time) on [_____], 2019, then this letter shall automatically terminated and be of no further force or effect.

- 2 -

2.      The Borrower and each other Credit Party:

(a)      acknowledge that, as of the Payoff Date, the Payoff Amount is due and owing pursuant to the Credit Documents. If, for any reason, any of the Payoff Amount or any other amounts applied by the Administrative Agent or the Lenders to payment of the Obligations is voided or rescinded or must otherwise be returned by the Administrative Agent of the Lenders as a result of Borrower's insolvency, bankruptcy, or otherwise required by applicable law, the Borrower acknowledges and agrees that its obligations and liabilities under the Credit Agreement shall be reinstated with full force and effect, without need for any action by any Person, and shall be enforceable against the Borrower and the other Credit Parties and their successors and assigns as if such payment had never been made;

(b)      agree that, as of the Effective Time, the Administrative Agent, the Lenders and their respective participants, if any, shall have no further obligation, duty, liability or responsibility under the Credit Agreement, any other Credit Document or any other document or agreement that is either or both executed and delivered in connection therewith (except as otherwise expressly provided herein); and

(c)      agree that, as of the Effective Time, the Borrower and the other Credit Parties release and discharge the Administrative Agent, Patriarch Partners Agency Services, LLC ("PPAS"), the predecessor administrative agent under the Credit Agreement and the other Credit Documents, and each Lender, and their respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys and Affiliates from any and all claims, suits, demands, accounts or causes of action the Borrower and the other Credit Parties may have against the Administrative Agent, PPAS, or any Lender or their respective agents, officers and directors, arising out of the obligations under the Credit Agreement or any other Credit Document (the "Credit Agreement Claims"). For the avoidance of doubt, such Credit Agreement Claims do not include any rights or remedies of the Borrower and Credit Parties against Zohar III, Limited and the other Releasors, which may be enforced at any time, under Section 6 of that certain Letter Agreement dated as of June [___], 2019, executed by Zohar III, Limited in connection with the SPA (as such terms are defined in such June [___], 2019 Letter Agreement).

3.      This letter confirms that effective as of the time of receipt by the Administrative Agent of the Payoff Amount in the manner described above (such time being referred to as the "Effective Time") the Administrative Agent and the Lenders agree and acknowledge that:

(a)      all indebtedness of the Borrower and the other Credit Parties to the Administrative Agent and the Lenders under the Credit Agreement and the other Credit Documents shall be fully paid and satisfied in full and discharged;

(b)      all unfunded commitments of the Lenders to make Loans or otherwise extend credit to the Borrower under the Credit Agreement and the other Credit Documents shall be terminated;

(c)      all security interests, mortgages, deeds of trust and other liens on the assets and property of the Borrower and the other Credit Parties granted to or held by the Administrative Agent for the benefit of the Lenders and any other secured parties under the Credit Documents shall be forever satisfied, released and discharged without further action; and

(d)      all other obligations of the Borrower and the other Credit Parties to the Administrative Agent and the Lenders under the Credit Agreement and each other Credit Document shall be released and discharged, except any such obligations that are otherwise expressly stated in the Credit Agreement or any other Credit Document as surviving that

- 3 -

respective agreement's termination, which in any such case shall, as so specified, survive without prejudice and remain in full force and effect.

4.    The Administrative Agent hereby represents and warrants that as of the date hereof:

(a)    Zohar III is the sole Lender under the Credit Agreement and the other Credit Documents; and

(b)    Ankura Trust Company is the successor administrative agent under the Credit Agreement and the other Credit Documents.

(c)    PPAS is the predecessor administrative agent under the Credit Agreement and the other Credit Documents and remains an agent of the Lender under the Credit Agreement and the other Credit Documents solely for collateral perfection purposes.

5.    From and after the Effective Time, the Administrative Agent hereby acknowledges and agrees that Borrower or its designees may execute and deliver the terminations and releases attached hereto as Exhibit A, together with any other Uniform Commercial Code termination statements, mortgage release documents, intellectual property release documents and other instruments of release and discharge pertaining to the security interests, mortgages and other liens described above of the Administrative Agent in any of the property, real or personal, of the Credit Parties, and the Administrative Agent hereby agrees to promptly execute and deliver any additional documents as may be required and as the Borrower may reasonably request to effectuate, or reflect of public record, the release and discharge of all such security interests, mortgages and liens. Each of the Administrative Agent and PPAS will, from and after the Effective Time, deliver promptly all collateral in its possession, along with the original Notes and Guaranties (or fully executed releases of all Guaranties) to Borrower at the address designated by Borrower using a nationally-recognized overnight courier service. All of the foregoing deliveries shall be at the expense of the Borrower.

6.    This letter and any right, remedy, obligation, claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this letter shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflicts of law principles that would lead to the application of laws other than the law of the State of New York.

7.    This letter may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which when taken together shall constitute but one and the same letter. Delivery of an executed signature page of this letter by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

Sincerely,

ANKURA TRUST COMPANY, LLC, in its capacity as
the Administrative Agent under the Credit Agreement

By:_____
                              Name:
Title:


ZOHAR III, LIMITED, as Lender


By:_____
Name:_____
Title:_____


PATRIARCH PARTNERS AGENCY SERVICES,
LLC, in its capacity as predecessor Administrative
Agent under the Credit Agreement and limited collateral
agent


By:_____
Name:_____
Title:_____




Acknowledged and Agreed
as of the date first written above:

DENALI INCORPORATED,
as Borrower


By:_____
Name:_____
Title:_____

:.

*Exhibit D*
*Ark Side Letter*

*(attached hereto)*

**ARK II CLO 2001-1 LIMITED**
1 Liberty St., 35th floor
New York, NY 10006

June 4, 2019

Zohar III, Limited
c/o FTI Consulting, Inc.
Three Times Square, 9th floor
New York, NY 10036
Attention: Michael Katzenstein,
Chief Restructuring Officer

Denali Acquisition, LLC
Attn: Lynn Tilton, Manager
c/o Patriarch Partners, LLC
One Liberty Place, 35th Floor
New York, NY 10006

**Re:    Sale of Denali Incorporated.**

Mr. Katzenstein:

Reference is made to that certain Share Purchase Agreement, by and among Fiber Glass Systems, L.P. ("Buyer"), ARK II CLO 2001-1 Limited ("ARK II"), Denali Acquisition LLC ("Denali Acquisition"), certain other sellers named therein (together with ARK II and Denali Acquisition, the "Sellers") and ARK II as representative of the Sellers (the "Seller Representative"), dated of even date herewith (the "SPA"), pursuant to which Buyer has agreed to purchase all of the outstanding capital stock of Denali Incorporated ("Denali") from Sellers pursuant to the terms and conditions set forth in the SPA. Capitalized terms used but not defined herein shall have the meaning set forth in the SPA.

Reference is also made to Case No. 18-10512 (CSS) (the "Zohar Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and that certain Settlement Agreement (the "Settlement Agreement") approved by the Bankruptcy Court on May 21, 2018, pursuant to that certain Order Approving and Authorizing the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp. and the Zohar III Controlling Class (Document No. 266).

This letter agreement (the "Letter Agreement") addresses and sets forth the agreement between the parties hereto with respect to certain matters in connection with the SPA and the Escrow Agreement. The parties agree as follows:

1.      Zohar III Limited ("Zohar"), Denali Acquisition, and ARK II hereby affirm, covenant, and agree that nothing set forth in the SPA or any Transaction Documents is intended to, does, or shall be deemed to result in the release of any claims held by (i) Zohar against Denali Acquisition or any Patriarch Stakeholder (as such term is defined in the Settlement Agreement), or (ii) Denali Acquisition or any Patriarch Stakeholder against Zohar or any Debtor (as defined in the Settlement Agreement). The Bankruptcy Court's order approving the SPA (*i.e.*, the Sale Order) shall include a provision mutually acceptable to the Seller Representative and Zohar providing that all claims and causes of action that are tolled or stayed under the Settlement Agreement are not impaired, released, or affected by the SPA or any related documents. The parties hereto agree that paragraph 11 of the Sale Order attached hereto as Exhibit A satisfies the foregoing condition.

Page Two

    2.    Although ARK II will act on behalf of the Sellers as Seller Representative with respect to the SPA and the Escrow Agreement, ARK II acknowledges and agrees that it shall provide Zohar with all written notices received by or addressed to the Seller Representative with respect to or in connection with either or both the Escrow Agreement and the SPA, and, in each case within three (3) business day of receipt of such notice. Seller Representative shall provide Zohar at least three (3) business days' notice prior to entering into any amendment to either or both the SPA and the Escrow Agreement.

    3.    The proceeds payable on account of the Shares owned by Denali Acquisition shall be paid to Zohar net of allocable Seller Representative Expenses (as defined below).  This shall be effectuated by the following:

    (a)    Seller Representative and Denali Acquisition, as applicable, shall direct Buyer to make payment to the Zohar Account[1] of the amount payable to Denali Acquisition under Section 2.2(a)(ii) of the SPA less Denali Acquisition's share of the Sellers Escrow Amount (as defined below);

    (b)    If a Purchase Price Deficit exists, Seller Representative shall direct Buyer to make payment to the Zohar Account of an amount equal to Denali Acquisition's proportionate share of the Purchase Price Deficit;

    (c)    At the same time that Seller Representative notifies the escrow agent to release funds to Sellers from the Sellers Escrow, Seller Representative shall direct the escrow agent to deposit, in the Zohar Account, any portion of the Sellers Escrow Amount released to Sellers from the Sellers Escrow that is attributable to or payable on account of the Shares owned by Denali Acquisition;

    (d)    Seller Representative shall direct the Escrow Agent under the Escrow Agreement to make payment to the Zohar Account of any amounts payable by the Escrow Agent to Sellers under Section 2.3(d) of the SPA that are attributable to the Shares owned by Denali Acquisition; and

    (e)    If any other amounts are received by Seller Representative on account of the Shares owned by Denali Acquisition, within five (5) business days of receipt of such amount, Seller Representative shall deposit such amount in the Zohar Account.

    4.    The parties agree that there will be a separate escrow (the "Sellers Escrow") to be funded with an amount not to exceed $1,000,000 (the "Sellers Escrow Amount") from which to make payments with respect to any Purchase Price Overpayment due from Sellers to Buyer pursuant to Section 2.3 of the SPA and any Seller Transaction Expenses that fall under clause (b) of the definition of Seller Transaction Expenses that were incurred on or prior to the Closing Date but not paid at the Closing.  The amount of the Sellers Escrow Amount to be contributed by each Seller to the Sellers Escrow shall be based on each Seller's proportionate ownership of the Shares immediately prior to the Closing. The Sellers Escrow shall be established pursuant to an escrow agreement that is (a) substantially in the form attached hereto as Exhibit B and (b) executed by the Seller Representative and Zohar (the "Sellers Escrow Agreement"). The Sellers Escrow Agreement will establish a separate sub-escrow, not to exceed $500,000 and funded from the Sellers Escrow Amount, that shall be reserved for the payment of reasonable and documented expenses actually incurred by Seller Representative and fees and expenses of outside firms retained by the Seller Representative in connection with the transactions contemplated by the SPA ("Seller Representative Expenses"). Seller Representative Expenses will be submitted for review and approval of Zohar (such approval not to be unreasonably withheld) prior to reimbursement to the Seller Representative. If Zohar does not object in writing, which objection shall include reasonable detail setting forth the basis for any objection to the payment of any Seller Representative Expenses, within ten

---

[1]    "Zohar Account" means the account owned by Zohar that is identified on Schedule I to this Letter Agreement. Zohar may designate one or more new bank accounts as the Zohar Account by providing Seller Representative with at least two (2) business days' written notice.

Page Three

(10) days following the submission of a request for reimbursement of Seller Representative Expenses, Zohar shall be deemed to have consented to the payment of such expense.

    5.    **Miscellaneous**.

    (a)    This Letter Agreement constitutes a valid and binding agreement of the parties hereto, provided that the terms of this Letter Agreement shall only be binding upon, and in full force and effect against, any of the parties hereto upon entry of the Sale Order.

    (b)    This Letter Agreement shall be amended, waived or assigned (in each case, whether by merger, consolidation, reclassification, recapitalization, or otherwise) only through a written amendment, waiver, or instrument of assignment (as applicable) executed by the parties hereto.

    (c)    This Letter Agreement may be executed by facsimile or .pdf in multiple counterparts which, when taken together, shall constitute one and the same agreement.

    (d)    This Letter Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard for its conflict of laws provisions. All matters arising under this Letter Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

    (e)    Any notices to be delivered to any party hereto shall be delivered at the address set forth on Schedule I attached hereto.

    (f)    This Letter Agreement is executed and effective as of the date first written above.

    **[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Very truly yours,

**ARK II CLO 2001-1, LIMITED**
(as Seller Representative and a Seller)

By: _____
    Name: Lynn Tilton
    Title: Director

ACKNOWLEDGED, ACCEPTED AND AGREED:

**ZOHAR III, LIMITED**
(as member of Denali Acquisition LLC)

By: _____
Name:  Michael Katzenstein
TITLE:   CHIEF RESTRUCTURING OFFICER

**DENALI ACQUISITION LLC**
(as a Seller)

By: _____
Name:  Lynn Tilton
Title:   Manager

Very truly yours,

**ARK II CLO 2001-1 LIMITED**
(as Seller Representative and a Seller)


By:_____
    Name: Lynn Tilton
    Title:  Director


ACKNOWLEDGED, ACCEPTED AND AGREED:

**ZOHAR III, LIMITED**
(as member of Denali Acquisition LLC)


By:_____
Name: Michael Katzenstein
TITLE: CHIEF RESTRUCTURING OFFICER


**DENALI ACQUISITION LLC**
(as a Seller)


By:_____
Name: Lynn Tilton
Title: Manager

Exhibit A

Form of Sale Order

(attached)

*[See __Exhibit B__ to Notice]*

Page Six

<u>Exhibit B</u>

Form of Escrow Agreement for Sellers

(attached)

## FORM OF ESCROW AGREEMENT

This Escrow Agreement dated this [●] day of [●], 2019 (the "*Escrow Agreement*") is entered into by and among ARK II CLO 2001-1, Limited, a limited company organized under the laws of the Cayman Islands ("*ARK II*"), in its capacity as Seller Representative, Zohar III, Limited, a limited company organized under the laws of the Cayman Islands ("*Zohar*", and together with the Seller Representative, each a "*Party*" and collectively, the "*Parties*"), and Fifth Third Bank, an Ohio banking corporation, as escrow agent (the "*Escrow Agent*"). Capitalized terms used but not defined herein shall have the meaning set forth in the Purchase Agreement (defined below).

## RECITALS

A.    The Sellers and Seller Representative, together with Fiber Glass Systems, L.P., a Texas limited partnership ("*Buyer*"), have entered into that certain Share Purchase Agreement dated [●][●], 2019 (the "*Purchase Agreement*"), whereby the Sellers have agreed to sell to Buyer all of the issued and outstanding stock of Denali Incorporated, a Delaware corporation (the "*Company*");

B.    Pursuant to the terms of the Purchase Agreement, there are several obligations of the Sellers to either or both Buyer and the Company, including (i) a Purchase Price adjustment pursuant to Section 2.3 of the Purchase Agreement, and (ii) Seller Transaction Expenses through the Closing Date (collectively, the "*Purchase Agreement Obligations*");

C.    The Parties also desire to set aside certain funds for any reasonable and documented costs and expenses of the Seller Representative incurred by the Seller Representative in fulfilling its obligations pursuant to the Purchase Agreement, including expenses actually incurred by outside firms retained by Seller Representative in connection with the transactions contemplated by the Purchase Agreement;

D.    The Parties desire to place an amount in cash equal to $[●] (the "*Escrow Amount*") into two escrow accounts for the purpose of (i) satisfying any of the Purchase Agreement Obligations (the "*PA Obligations Account*") and (ii) reimbursing Seller Representative for its reasonable and documented costs and expenses in fulfilling its obligations pursuant to the Purchase Agreement (the "*SR Account*" and together with the PA Obligations Account, the "*Escrow Accounts*"); and

E.    The Parties desire to appoint the Escrow Agent as escrow agent hereunder in the manner hereinafter set forth and the Escrow Agent is willing to act in such capacity.

NOW THEREFORE, in consideration of the foregoing and of the covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties and the Escrow Agent agree as follows:

ARTICLE 1
ESCROW DEPOSIT

Section 1.1     Receipt of Escrow Funds.

(a)     Promptly upon the execution of this Escrow Agreement, the Seller Representative shall deliver or cause to be delivered to the Escrow Agent by wire transfer of immediately available U.S. funds in accordance with the payment instructions provided by the Escrow Agent and attached hereto as Schedule 1, and the Escrow Agent shall acknowledge to the Parties promptly upon (and in any event, no later than (1) Business Day following) receipt of, the Escrow Amount (such amount, as increased by any earnings, interest and gains on and proceeds from the investment or reinvestment thereof (*"Earnings"*), is hereinafter referred to as the *"Escrow Funds"*). The Escrow Funds shall be administered and disbursed in accordance with the terms of this Escrow Agreement. $[●] of the Escrow Amount shall be deposited in the PA Obligations Account, and the remainder of the Escrow Amount shall be deposited in the SR Account.

(b)     All Parties to this Escrow Agreement represent and warrant to the Escrow Agent and each other that they have full and complete authority to enter into and execute this Escrow Agreement on behalf of the respective Party hereto. Each Party hereto acknowledges and agrees that with respect to the PA Obligations Account and, subject to Sections 2.1(b) and 2.1(c) hereto, the SR Account, Seller Representative shall have the authority to represent and bind their interests, and act on their behalf with respect to this Escrow Agreement, and Escrow Agent shall be permitted to rely on such authority. Concurrent with the execution of this Escrow Agreement, each of Zohar and Seller Representative shall deliver to the Escrow Agent an Incumbency Certificate in the form of Exhibit A to this Escrow Agreement. Such Incumbency Certificate establishes the identity of the representatives of such Party entitled to issue notices or instructions to the Escrow Agent or to otherwise enter into documentation or agreement on behalf of each such Party (each, an *"Authorized Representative"*). In the event of any change in the identity of such representatives, a new Incumbency Certificate shall be executed and delivered to the Escrow Agent, executed on behalf of the appropriate Party by one of the then-remaining Authorized Representatives listed on the previously effective Incumbency Certificate. Each of the Parties to this Escrow Agreement acknowledge and agree the Escrow Agent may rely without inquiry on any Incumbency Certificate delivered to the Escrow Agent in accordance with this Escrow Agreement. In the event instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by electronic transmission or otherwise, the Escrow Agent may (but is not obligated to) seek confirmation of such instructions by telephone call back to an Authorized Representative, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the Authorized Representative. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, the Escrow Agent shall not be required to execute the instruction until all issues have been resolved in its sole discretion. The Parties agree to notify the Escrow Agent of any errors, delays or other problems within five (5) calendar days after receiving notification that a transaction has been executed.

2

Section 1.2    Investments.

(a)    The Escrow Agent is authorized and directed to deposit, transfer, hold, and invest the Escrow Funds in accordance with such written instructions and directions as may from time to time be provided to the Escrow Agent by Seller Representative; provided that such funds shall be at all times invested in one of the options described in Exhibit B to this Escrow Agreement.  In the event that the Escrow Agent does not receive written instructions to invest funds held in the Escrow Account, the Escrow Agent shall invest such funds in a Fifth Third BankSafe Deposit Account or a successor or similar product.

(b)    The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement. The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made in accordance with the terms of this Escrow Agreement.  The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.  Any loss or expense incurred as a result of an investment will be borne by the Escrow Funds. The Parties understand that the Escrow Agent is not making any guarantees, including without limitation, a guarantee as to any specific level of performance of the Escrow Account. The Parties further understand and acknowledge that investments are subject to various market, currency, economic, and business risks and each Party hereby assumes such risks. The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account.

(c)    The Escrow Agent shall send statements to each Party on a monthly basis reflecting activity in the Escrow Account for the preceding month.  Although the Parties each recognize that they may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Parties hereby agree that confirmations of investments are not required to be issued by the Escrow Agent for each month in which a monthly statement is rendered.  No statement need be rendered for the Escrow Account if no activity occurred for such month.

## ARTICLE 2
## DISBURSEMENTS.

Section 2.1    Disbursement Notices.

(a)    Seller Representative, with respect to the PA Obligations Account and the SR Account, may, from time to time, but in all events not later than [●][●], 20[23][1] (the "***Escrow Termination Date***"), deliver to the Escrow Agent and, contemporaneously therewith, to Zohar, a written notice executed by an Authorized Representative of such Party (each such notice, a "***Disbursement Notice***", substantially in the form of Exhibit C hereto with respect to an intended Disbursement Notice) directing payment on behalf of the Parties to Buyer, Seller

---

[1] NTD: Termination date to be discussed, but should be at least 6 months to 1 year after the termination of the other escrow, in case there are claims pending.

Representative or another party in connection with the Purchase Agreement. Each Disbursement Notice shall include the amount to be disbursed, the account from which such disbursement amount should be deducted, the recipient(s) and all relevant wire instructions for each applicable recipient. The Escrow Agent shall make such disbursements promptly, and in any event (i) with regards to disbursements from the SR Account, in accordance with Sections 2.1(b) and 2.1(c) hereof and (ii) with regards to disbursements from the PA Obligations Account, within two (2) Business Days after receipt of such Disbursement Notice. The Escrow Agent shall not be required to inquire whether a Disbursement Notice complies with the requirements of the Purchase Agreement or this Escrow Agreement and shall be permitted to treat any notice claiming to constitute a Disbursement Notice as a Disbursement Notice within the meaning of this Escrow Agreement; provided that it has been sent by or on behalf of Seller Representative.

        (b)     *Objection Notices With Respect to SR Account.* With respect to disbursements to be made from the SR Account, Zohar may reply by written notice executed by an Authorized Representative of Zohar to the Escrow Agent, with a copy to Seller Representative, which notice shall state whether Zohar disputes the validity or amount included in the applicable Disbursement Notice relating thereto (an "***Objection Notice***"). If, by the close of business on the tenth (10th) calendar day after the date of receipt by the Escrow Agent of such Disbursement Notice (the "***Dispute Period***"), the Escrow Agent shall not have received (in accordance with Section 6.2 hereof) an Objection Notice, then Zohar shall be deemed to have agreed with such Disbursement Notice. The Escrow Agent shall not have any obligation to verify Zohar's receipt of such Disbursement Notice. Thereafter, the Escrow Agent shall promptly, and in any event within three (3) Business Days thereafter, pay to Seller Representative or other person designated in such Disbursement Notice from the SR Account the amount indicated on such Disbursement Notice and the SR Account shall be reduced to the extent thereof. If the Objection Notice provides that a specified portion of the amount indicated in such Disbursement Notice is valid, the Escrow Agent shall promptly thereafter disburse to the party(ies) designated in such Disbursement Notice the amount so provided as valid. The Escrow Agent shall not be required to inquire whether an Objection Notice meets the requirements of this Escrow Agreement and shall be permitted to treat any notice claiming to constitute an Objection Notice as an Objection Notice within the meaning of this Escrow Agreement; provided that it has been sent by or on behalf of Zohar.

        (c)     *Resolution of Disputes With Respect to the SR Account.* If an Objection Notice is delivered by Zohar in accordance with Section 2.1(b) hereof, then the amount included in the applicable Disbursement Notice, less any amount admitted in the Objection Notice by Zohar as valid and agreed that is disbursed to the designated party in such Disbursement Notice, shall be treated as disputed (a "***Disputed Claim***" and such contested amount, the "***Disputed Amount***"). Zohar and Seller Representative agree to use their commercially reasonable efforts to resolve in good faith any Disputed Claims as promptly as practical and in any event within thirty (30) calendar days; provided that if the Seller Representative and Zohar do not resolve such Disputed Claim within such thirty (30) day period, either Party may submit such dispute to the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") for resolution. The Disputed Amount shall be held by the Escrow Agent as an undivided portion of the SR Account, and Escrow Agent shall hold such portion until Zohar and Seller Representative deliver to the Escrow Agent either: (i) joint written instructions executed by an Authorized

Representative of each of Seller Representative and Zohar with respect to such amount substantially in the form attached hereto as <u>Exhibit C</u> (as modified to apply to this Section 2.1(c), a "*Joint Written Instruction*"), at which time the Escrow Agent shall either (y) promptly, and in any event within two (2) Business Days thereafter, disburse the amount specified in such Joint Written Instruction from the SR Account pursuant to such Joint Written Instruction or (z) retain such amount in the Escrow Account as no longer subject to a Disputed Claim; or (ii) subject to Section 6.4, a judgment, order or decree of an arbitrator, court or other judicial body that decided the disbursement of the Disputed Amount, together with a certificate of the presenting Party to the effect that such judgment is final, non-appealable and from a court of competent jurisdiction or arbitrator having proper authority, upon which certificate the Escrow Agent shall be entitled to conclusively rely without further investigation (a "*Final Order*"). For purposes of the foregoing definition, "*final, non-appealable*" means that such order, judgment or decree has not been reversed, stayed, modified or amended and, as to which (1) the time to appeal, petition for certiorari, or move for reconsideration, re-argument or rehearing has expired and no timely appeal, petition for certiorari, or motion for reconsideration, re-argument or rehearing is pending, (2) any right to appeal, petition for certiorari, or move for reconsideration, re-argument or rehearing has been waived in writing, or (3) if an appeal, petition for certiorari, or motion for reconsideration, re-argument or rehearing thereof has been denied, the time to take any further appeal or to further petition for certiorari or move for further reconsideration, re-argument or rehearing has expired.

Section 2.2    <u>Release of Funds in PA Obligations Account</u>.  Within two (2) Business Days following the Escrow Agent's receipt of a written request in the form of <u>Exhibit D</u> attached hereto, or otherwise to the satisfaction of the Escrow Agent (in either case, a "*Final Disbursement Request*"), executed by an Authorized Representative of Seller Representative, the Escrow Agent shall disburse an aggregate amount, if any, equal to the then-current balance of the PA Obligations Account to the recipient(s) specified in the Final Disbursement Request. Seller Representative shall submit the Final Disbursement Request with respect to the PA Obligations Account at any time on or after the date the Purchase Price Overpayment or the Purchase Price Deficit, as the case may be, has been determined in accordance with Section 2.3 of the Purchase Agreement (and in any event, Seller Representative shall submit such Final Disbursement Request no later than fifteen (15) Business Days after such final determination). The Final Disbursement Request shall set forth (i) the amount of the Purchase Price Overpayment (if any), which amount of Purchase Price Overpayment shall be paid to Buyer, (ii) the amount of the Seller Transaction Expenses not paid on the Closing Date (if any), as reasonably determined by the Company and Seller Representative in connection with the determination of the Closing Statement, which amount shall be paid to the third parties indicated on Schedule A-1 of such written request, and (iii) after determination of such amounts, subject to adjustments (if any) required pursuant to that certain Cross-Indemnity and Contribution Agreement, dated as of [●], 2019, by and among the Sellers (the "*Contribution Agreement*"), each Seller's share of such remaining funds, determined (x) with respect to each Seller except for Denali Acquisition LLC, in accordance with such Seller's equity ownership of the Company (prior to Closing) as set forth on Exhibit 2.1 to the Purchase Agreement (attached as Schedule 2 hereto) (the "*Pro Rata Share*"), and (y) with respect to Zohar on behalf of Denali Acquisition LLC, Denali Acquisition LLC's Pro Rata Share. All amounts to be paid shall be set forth in the Final Disbursement Request, together with all required wire instructions. The Escrow Agent

shall not be required to inquire whether a Final Disbursement Request complies with the requirements of the Purchase Agreement, the Contribution Agreement or this Escrow Agreement and shall be permitted to treat any notice claiming to constitute a Final Disbursement Request as a Final Disbursement Request within the meaning of this Escrow Agreement; provided that it has been sent by or on behalf of Seller Representative.

Section 2.3    Final Release.    Within two (2) Business Days following the Escrow Agent's receipt of a Final Disbursement Request with respect to the SR Account in the form of Exhibit D attached hereto, or otherwise to the satisfaction of the Escrow Agent, executed by an Authorized Representative of Seller Representative, received at any time on or after the Escrow Termination Date, the Escrow Agent shall pay to the recipient(s) specified in such Final Disbursement Request an aggregate amount, if any, equal to (x) the then-current balance of the SR Account minus (y) the aggregate total of all Disputed Amounts then remaining unresolved and all amounts for which Disbursement Notices have been submitted with respect to which the Dispute Period has not expired (such aggregate amount is herein referred to as the "*Retained Amount*"). Subject to adjustments (if any) required pursuant to the Contribution Agreement, (i) each Seller other than Denali Acquisition LLC shall receive such Seller's Pro Rata Share of such funds, and (ii) on behalf of Denali Acquisition LLC, Zohar shall receive Denali Acquisition LLC's Pro Rata Share. All amounts to be paid shall be set forth in the Final Disbursement Request, together with all required wire instructions. The Escrow Agent shall thereafter release from the SR Account the Retained Amount as and when it receives Joint Written Instructions or a Final Order with respect to all or any portion of the Retained Amount.

ARTICLE 3
DUTIES OF THE ESCROW AGENT

Section 3.1    Scope of Responsibility.    Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature. Under no circumstances will the Escrow Agent be deemed to be a fiduciary to any Party or any other person. The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document (including the Purchase Agreement) other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document. References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto. This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement. The permissive rights of the Escrow Agent to take the actions expressly enumerated in this Escrow Agreement as being at the Escrow Agent's discretion shall not be construed as duties. No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or

potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

Section 3.2   <u>Attorneys and Agents</u>.  The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted in good faith by the Escrow Agent in connection with any disputes hereunder.   The Escrow Agent shall be reimbursed as set forth in Section 4.4 for any and all compensation (fees, expenses and other costs) paid and reimbursed to such counsel and professionals.  The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and nominees.

Section 3.3   <u>Reliance</u>.  The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction of the Seller Representative, with respect to the PA Obligations Account, or the joint direction (or non-objection) of Seller Representative and Zohar, with respect to the SR Account, or the consent of the Parties or their respective agents, representatives, successors, or assigns.  The Escrow Agent shall not be liable for acting or refraining to act upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority.

## ARTICLE 4
## PROVISIONS CONCERNING THE ESCROW AGENT

Section 4.1   <u>Indemnification</u>.   The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated by a court of competent jurisdiction to have been caused by the Escrow Agent's fraud, willful misconduct or gross negligence . The provisions of this Section 4.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 4.2   <u>Exculpation; Limitation of Liability</u>.  The Escrow Agent shall not be liable, directly or indirectly, for any (i) damages, losses or expenses arising out of the services provided hereunder other than damages, losses or expenses which have been fully adjudicated to have resulted from the Escrow Agent's fraud, gross negligence or willful misconduct, or (ii) special, indirect or consequential damages or losses of any kind whatsoever (including without limitation lost profits), even if the Escrow Agent has been advised of the possibility of such losses or damages and regardless of the form of action.  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its reasonable control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

Section 4.3    <u>Resignation or Removal</u>.  The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a written notice, executed by an Authorized Representative of Seller Representative, of its removal along with payment of all fees and expenses to which it is entitled through the date of termination.  Such resignation or removal, as the case may be, shall be effective upon the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by written instructions, executed by an Authorized Representative of Seller Representative, filed with the Escrow Agent or in accordance with a court order.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

Section 4.4    <u>Compensation</u>.  The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as <u>Exhibit E</u>, which compensation shall be paid by the Seller Representative on behalf of Sellers in accordance with their Pro Rata Share. The Party to be invoiced by the Escrow Agent shall be Seller Representative.  In addition to the foregoing, the Escrow Agent shall be reimbursed upon request for all expenses, disbursements and advances, including reasonable fees of outside counsel, if any, incurred or made by it in connection with the carrying out of its duties under this Escrow Agreement. To the extent any amount due to the Escrow Agent pursuant to this Escrow Agreement is not paid, the Escrow Agent shall notify the Parties hereto and if such amount is not paid within five (5) Business Days of such notice, then the Escrow Agent may deduct the same from the Escrow Funds.  The Sellers shall be jointly and severally liable to the Escrow Agent for the fees payable to the Escrow Agent pursuant to this Section 4.4.  This Section 4.4 shall survive the termination of this Escrow Agreement and the resignation or removal of the Escrow Agent and shall be in addition to any other rights or remedies available to the Escrow Agent.  The Escrow Agent shall have, and is hereby granted, a prior lien with respect to the Escrow Funds with respect to its unpaid fees and expenses.  In addition, in the event a Seller fails to pay such amounts, the Escrow Agent shall be entitled to retain out of the portion of the Escrow Funds that would have otherwise been distributed to such Seller, the amount of such fees and expenses that are due and payable by such Seller to the Escrow Agent.  If any amount due to the Escrow Agent hereunder is not paid within 30 days of the date due, the Escrow Agent in its sole discretion may charge interest on such amount up to five percent (5%) per annum.

Section 4.5    <u>Disagreements</u>.  If any conflict, disagreement or dispute arises between, among, or involving any of the Parties and/or the Escrow Agent concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent is authorized to retain such amount of the Escrow Funds in dispute (the "*Disputed Escrow Amount*") until the Escrow Agent (i) receives a Final Order directing delivery of the Disputed Escrow Amount, (ii) receives Joint Written Instructions, executed by an Authorized Representative of each of Seller Representative and Zohar, in which event the Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such Final Order or Joint

Written Instructions, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Disputed Escrow Amount and shall be entitled to recover attorneys' fees, expenses and other reasonable and documented costs incurred in commencing and maintaining any such interpleader action out of the Disputed Escrow Amount. The Escrow Agent shall be entitled to act on any such Final Order or Joint Written Instructions without further question, inquiry, or consent.

Section 4.6    Attachment of Escrow Funds; Compliance with Legal Orders.   In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Funds, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction; provided that the Escrow Agent shall notify the Parties of the receipt of any such court order, judgement or decree. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any Party or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

## ARTICLE 5
## TAX MATTERS

Section 5.1    Allocation of Earnings.   Except as stated herein, the Escrow Agent does not have any interest in the Escrow Funds but is serving as escrow holder only and having only possession thereof. The Parties agree that for tax reporting purposes, all Earnings under this Agreement shall be allocated to the Sellers, in the percentages set forth on Schedule 2 attached hereto and the Escrow Agent shall report the amount of all Earnings on IRS Form 1099-INT to the Seller Representative on behalf of the Sellers. Sellers shall report the amount of any and all Earnings during any applicable tax reporting period to the appropriate taxing authority as income earned on the Escrow Funds by the Sellers and Sellers shall pay the income taxes that are due and payable on such Earnings whether or not said income has been distributed during such year. The Escrow Agent shall have no duty to prepare or file any information reports (including without limitation IRS Forms 1099-B) other than such information reports of Earnings earned on the Escrow Fund as the Escrow Agent is required to prepare and file in the ordinary course of its business. The Escrow Agent shall have no obligation to report any amounts to the Parties resulting from the deposit of the Escrow Amount or the release of the Escrow Amount as a result of or related to the transactions contemplated by the Purchase Agreement. Each of the Sellers shall furnish the Escrow Agent with an Internal Revenue Service Form W-8 or Form W-9, as applicable to each of them, properly completed and signed and any other forms and documents that the Escrow Agent may reasonably request to determine the amount, if any, to be withheld, and to complete such information and payee statements and to comply with any U.S. or foreign tax requirements that apply to the Escrow Agent. In the event the payee is not a party to this Agreement, Seller Representative or Buyer, as applicable, shall provide the Escrow Agent with a duly completed and properly executed IRS Form W-9 (or applicable W-8, in the case of a non-U.S. person) from such payee prior to payment being made. Each of the Parties understands that,

in the event valid U.S. tax forms, or other relevant forms, are not provided to the Escrow Agent, the tax law may require withholding of tax on disbursements and on a portion of any Earnings on the investment of the Escrow Funds. Should any information supplied in the tax documentation provided pursuant to this Section 5.1 change, the Parties shall promptly notify Escrow Agent. Seller Representative hereby represents and warrants that it has full and complete authority to consent to the allocation of Earnings as set forth in this Section 5.1 on behalf of the Sellers.

Section 5.2    Withholding. The Escrow Agent shall be entitled to deduct and withhold from any amount distributed or released from the Escrow Funds all taxes which may be required to be deducted or withheld under any provision of applicable tax law, shall timely remit such taxes to the appropriate authorities and shall provide the applicable Party with a certified receipt or other evidence reasonably satisfactory to such Party of the payment of such taxes.  All such withheld amounts shall be treated as having been delivered to the Party entitled to the amount distributed or released in respect of which such tax has been deducted or withheld.

Section 5.3    Tax Indemnity. To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Funds. Sellers, jointly and severally, shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the fraud, willful misconduct or gross negligence of the Escrow Agent.  The indemnification provided by this Section 5.3 is in addition to the indemnification provided in Section 4.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 5.4    Tax Treatment of Escrow. For U.S. federal, state and local income tax purposes, the Escrow Funds shall be treated as a contingent installment obligation from Buyer to the Sellers, subject to Section 453(a) of the Code, to the extent permitted by applicable law, and the Sellers shall treat the amounts released to the Sellers pursuant to this Escrow Agreement as Buyer's deferred payment of a portion of the Purchase Price (as defined in the Purchase Agreement) to the Sellers pursuant to an installment obligation.

ARTICLE 6
MISCELLANEOUS

Section 6.1    Successors and Assigns. This Escrow Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns.  No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of any of the Parties (including a collateral assignment) shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed).  Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which

10

the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 6.2    Notices.  All notices and communications required or permitted under this Escrow Agreement shall be in writing and addressed as set forth below.    Any notice, communication or delivery hereunder shall be deemed to have been duly made and the receiving Party charged with notice (i) if personally delivered, when received, except that if received on a day other than a Business Day, or after 5:00 pm local time on a Business Day for the receiving Party, delivery shall be deemed to occur on the next Business Day, (ii) if sent by electronic transmission, when received, except that if received on a day other than a Business Day, or after 5:00 pm local time on a Business Day for the receiving Party, delivery shall be deemed to occur on the next Business Day, (iii) if mailed, five (5) Business Days after mailing, certified mail, return receipt requested, or (iv) if sent by overnight courier, one (1) Business Day after sending. In the case of notices and communications delivered to the Escrow Agent, such notices or communications shall be deemed to have been given on the date actually received by the Escrow Agent at the address set forth below.   It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

If to Seller Representative:

ARK II CLO 2001-1, Limited
c/o Patriarch Partners, LLC
One Liberty Place, 35th Floor
New York, NY 10006
Attn: Lynn Tilton, Director
Email: Lynn.Tilton@PatriarchPartners.com

With a copy to:

Holland & Knight LLP
31 W. 52nd Street, 12th Floor
New York, New York 10019
Email: amy.leder@hklaw.com
Attention: Amy S. Leder

If to Zohar :

Zohar III, Limited
c/o FTI Consulting, Inc. Three Times Square, 9th floor
New York, NY 10036
Email: Mike.Katzenstein@fticonsulting.com
Attention: Michael Katzenstein

With a copy, that shall not constitute notice, to:

11

Young Conaway Stargatt & Taylor, LLP
1000 N. King Street
Wilmington, DE 19801
Email: rbartley@ycst.com
Attention: Ryan M. Bartley

If to Escrow Agent:
Fifth Third Bank
8100 Burlington Pike
Florence, KY 41042
Attn: Derrick Theetge
Phone: (859) 283-8634
Email: Derrick.Theetge@53.com

Section 6.3    Governing Law.    This Escrow Agreement and any and all transactions related to or arising out of this Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Ohio and the respective rights and obligations of the Parties and the Escrow Agent shall be governed by Ohio law, without regard to principles of conflicts of laws.

Section 6.4    Submission to Jurisdiction.    Each Party and the Escrow Agent hereby irrevocably submits to the exclusive jurisdiction of (i) for matters to which Zohar is named as a party, the Bankruptcy Court, and (ii) for matters to which Zohar is not named as a party, any Ohio state or federal court sitting in Hamilton County, Ohio, over any action or proceeding arising out of or relating to this Escrow Agreement and any and all transactions related to or arising out of this Escrow Agreement, and each of the Parties hereby irrevocably agrees that all claims in respect of such action or proceeding shall be heard and determined in the Bankruptcy Court or such Ohio state or federal court, as applicable. Each Party and the Escrow Agent hereby irrevocably waives, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue in any action or proceeding in any such court as well as any right it may now or hereafter have to remove such action or proceeding, once commenced, to another court on the grounds of forum non conveniens or otherwise. Each Party and the Escrow Agent agrees that a final, non-appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 6.5    WAIVER OF JURY TRIAL EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS ESCROW AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.

Section 6.6   <u>Severability</u>. The Parties agree that (i) the provisions of this Agreement shall be severable in the event that for any reason whatsoever any of the provisions hereof are invalid, void or otherwise unenforceable, (ii) such invalid, void or otherwise unenforceable provisions shall be automatically replaced by other provisions which are as similar as possible in terms to such invalid, void or otherwise unenforceable provisions but are valid and enforceable and (iii) the remaining provisions shall remain enforceable to the fullest extent permitted by law.

Section 6.7   <u>Amendment</u>.   This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

Section 6.8   <u>Waivers</u>.   No waiver by the Escrow Agent of any provision of this Agreement shall be effective unless explicitly set forth in writing and signed by the Escrow Agent. No waiver by Escrow Agent shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after such waiver. The failure of the Escrow Agent or any Party at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance. A waiver by the Escrow Agent or any Party of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

Section 6.9   <u>Interpretation</u>. The headings of the Articles and Sections of this Escrow Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any of the terms or provisions of this Escrow Agreement. All Exhibits attached to this Escrow Agreement are hereby incorporated and made a part of this Escrow Agreement. This Escrow Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The schedules and exhibits referred to herein shall be construed with, and as an integral part of, this Escrow Agreement to the same extent as if they were set forth verbatim herein. For purposes of this Escrow Agreement, "*Business Days*" shall refer to any day other than Saturday, Sunday or any other day on which banks in the state of Ohio are authorized to be closed. Time shall be of the essence in this Escrow Agreement.

Section 6.10   <u>Further Assurances</u>. No party to this Escrow Agreement is (or will be) a person with whom the Escrow Agent is restricted from doing business under regulations of the Office of Foreign Asset Control ("*OFAC*") of the Department of the Treasury of the United States of America (including, those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. The Parties acknowledge that prior to the establishment of the Escrow Account and from time to time throughout the term of the Escrow Agreement, the Escrow Agent is authorized to establish and effectuate identity verification procedures to obtain information which may be used to confirm

13

the Parties' identity of such Party and their authorized representatives including without limitation name, address and organizational documents or driver's license ("*identifying information*") to the extent required by applicable law or the policies and procedures of the Escrow Agent. The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

Section 6.11   **IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.** *To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions (which includes the Escrow Agent) to obtain, verify and record information that identifies each person or entity who opens an account, including any deposit or treasury management account. What this means for the Parties: For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity, including a list of affiliates and subsidiaries, if necessary. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation. For an individual person, the Escrow Agent may ask for your name, address, date of birth and other information that will allow the Escrow Agent to identify you. The Escrow Agent may also ask to see the individual's drivers license or other identifying documents. In the event any Party (or their respective Authorized Representatives) violates any of the provisions of the Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318 or the regulations purported thereunder, such event shall constitute a default hereunder and shall entitle Escrow Agent to exercise all of its rights and remedies at law or in equity, including, but not limited to, terminating this Agreement.*

Section 6.12   <u>Counterparts</u>.  This Escrow Agreement may be executed and delivered in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  The exchange of copies of this Escrow Agreement and of signature pages by facsimile or by electronic image scan transmission in .pdf format shall constitute effective execution and delivery of this Escrow Agreement as to the Parties and the Escrow Agent and may be used in lieu of the original Escrow Agreement for all purposes.  Signatures of the Parties and the Escrow Agent transmitted by facsimile or electronic image scan transmission in .pdf format shall be deemed to be their original signatures for all purposes.  The Escrow Agent or any Party that delivers an executed counterpart signature page by facsimile or by electronic scan transmission in .pdf format shall promptly thereafter deliver a manually executed counterpart signature page to each of the other Parties and the Escrow Agent, as applicable; provided, however, that the failure to do so shall not affect the validity, enforceability, or binding effect of this Escrow Agreement.

Section 6.13   <u>Entire Agreement</u>.    This Escrow Agreement constitutes the entire understanding among the Parties and the Escrow Agent, their respective partners, members, trustees, shareholders, officers, directors and employees with respect to the escrow described herein, superseding all negotiations, prior discussions and prior agreements and understandings relating to such subject matter; provided that as among the Parties, the Purchase Agreement shall govern the disbursement of the Escrow Funds.

[*Remainder of Page Left Intentionally Blank; Signature Page Follows.*]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed effective as of the date first written above.

ARK II CLO 2001-1, LIMITED,
as Seller Representative

_____

Name: Lynn Tilton
Title:

ZOHAR III, LIMITED

_____

Name: Michael Katzenstein
Title: Chief Restructuring Officer

FIFTH THIRD BANK, as Escrow Agent

_____

Name:  Derrick Theetge
Title:  Vice President

EXHIBIT A

CERTIFICATE OF INCUMBENCY[2]

    The undersigned, [●], of [●], hereby certifies that the following named officers have been duly appointed, qualified and acting in the capacity set forth opposite his/her/its name, have been authorized by appropriate corporate or limited liability company action to execute Escrow Agreements with Fifth Third Bank or amendments thereto on behalf of the above-named party and to furnish Fifth Third Bank, as Escrow Agent, with directions relating to any matter concerning Escrow Agreements with Fifth Third Bank and the funds and/or property held pursuant thereto, the following signature is the true and genuine signature of said officer and that each person's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback and effect changes in Authorized Representatives, all in accordance with the terms of the relevant Escrow Agreement.

| Name and Title | Signature | Telephone Numbers | Date of Birth |
|---|---|---|---|
| _____ | _____ | Office:_____<br>Cell:_____ | _____ |
| _____ | _____ | Office:_____<br>Cell:_____ | _____ |
| _____ | _____ | Office:_____<br>Cell:_____ | _____ |

    Such officers are hereby authorized to furnish the Escrow Agent with directions relating to any matter concerning this Agreement and the funds and/or property held pursuant thereto.

    IN WITNESS WHEREOF, this Certificate of Incumbency has been executed this ____ day of [●], 20[●].

          [●]

          By_____

          Name_____

          Title: Secretary

---

[2] To be completed by Zohar and Seller Representative.

<u>EXHIBIT B</u>

<u>PERMITTED INVESTMENTS</u>

Fifth Third BankSafe Deposit Account

EXHIBIT C

[DISBURSEMENT NOTICE]
[JOINT WRITTEN INSTRUCTION]

[Date]

Fifth Third Bank
8100 Burlington Pike
Florence, KY 41042
Attention: Derrick Theetge

Re: Escrow Account No. [●], among the Parties and Fifth Third Bank, as Escrow
Agent (the "*Escrow Agent*")

The undersigned hereby give notice (this ["*Disbursement Notice*"]["*Joint Written
Instruction*"]) pursuant to Section 2.1[(a)][(b) and (c)] of that certain Escrow Agreement (the
"*Escrow Agreement*"), dated [●], 2019, by and among Fifth Third Bank, as escrow agent (the
"*Escrow Agent*"), ARK II CLO 2001-1, Limited, a limited company organized under the laws of
the Cayman Islands ("*ARK II*"), as Seller Representative, and Zohar III, Limited ("*Zohar*"), and
direct the Escrow Agent to disburse the amount(s) set forth below and in the manner set forth
below. Capitalized terms used but not defined in this [Disbursement Notice][Joint Written
Instruction] shall have the meanings ascribed thereto in the Escrow Agreement.

**Disbursement to [name of recipient][3]:**

Disbursement Amount:        [_____]

Account:                    [PA Obligations Account][SR Account]

Wiring Instructions:        [_____]

IN WITNESS WHEREOF, the undersigned have caused this [Disbursement
Notice][Joint Written Instructions] to be executed and delivered on this [____] day of
[_____], 20[___]

**ARK II CLO 2001-1, LIMITED:**          **ZOHAR III, LIMITED:**
As Seller Representative[4]

---

[3] This information may be included in any Schedule A to this notice.
[4] Only Seller Representative is required to sign a Disbursement Notice with respect to the PA Obligations Account
or the SR Account, but in the event of a Disputed Claim with respect to the SR Account, resolution of such Disputed
Claim requires joint written instructions executed by Zohar and the Seller Representative, and such joint written
instructions shall include reference to the Disputed Claim and Disputed Amount resolved by such joint written
instructions.

EXHIBIT C

By_____          By_____
Name:                                Name:
Title:                               Title:

EXHIBIT C

EXHIBIT D

FINAL DISBURSEMENT REQUEST

Date

Fifth Third Bank
8100 Burlington Pike
Florence, KY 41042
Attention: Derrick Theetge

>           Re: Escrow Account No. [●], among the Parties and Fifth Third Bank, as Escrow
>           Agent (the "*Escrow Agent*")

The undersigned hereby gives notice (this "*Final Disbursement Request*") pursuant to Section
[2.2]/[2.3] of that certain Escrow Agreement (the "*Escrow Agreement*"), dated [●], 2019, by and
among Fifth Third Bank, as escrow agent (the "*Escrow Agent*"), ARK II CLO 2001-1, Limited,
a limited company organized under the laws of the Cayman Islands ("*ARK II*"), as Seller
Representative and Zohar III, Limited ("*Zohar*"), and directs the Escrow Agent to disburse the
amount(s) set forth below and in the manner set forth below. Capitalized terms used but not
defined in this Final Disbursement Request shall have the meanings ascribed thereto in the
Escrow Agreement.

>           **Disbursement to the Parties, in accordance with each such Party's Pro
>           Rata Share, as set forth in Schedule A attached hereto:**

>           Disbursement Amount:          [_____]$^5$

>           Account:                      [PA Obligations Account][SR Account]

>           Wiring Instructions:          [_____]

    IN WITNESS WHEREOF, the undersigned have caused this Final Disbursement Request
to be executed and delivered on this [____] day of [_____], 20[___].

**ARK II CLO 2001-1, LIMITED:**
As Seller Representative


By_____

---

$^5$ Only Seller Representative is required to sign a Final Disbursement Request with respect to the PA Obligations
Account and the SR Account. Seller Representative will include adjusted amounts to Sellers if there is an obligation
outstanding under the Contribution Agreement. If Buyer or any third party is receiving any payment in connection
with the PA Obligations Account or the SR Account, payee and wire instructions should be included in Schedule A-
1.

7797651.2

Name:
Title:

7797651.2

EXHIBIT D

EXHIBIT E

SCHEDULE OF FEES

**Acceptance Fee:**                                                                                      **$3,500**

Initial Fees as they relate to the Escrow Agent acting in the capacity of Escrow Agent, including examination and execution of the Escrow Agreement; acceptance of the Escrow Agent appointment; setting up of an Escrow Account and accounting records; and the coordination of receipt of funds for deposit to the Escrow Account.  Acceptance fee is payable at time of Escrow Agreement execution.

**Escrow Agent Annual Administration Fee:**                                          **Waived**

For ordinary services of the Escrow Agent, including normal administration of the Escrow Account.  Ordinary services include: daily routine account management; investment transactions; cash transaction processing, including wires and check processing; monitoring claim notices pursuant to the agreement; disbursement of the funds in accordance with the agreement; and account statements sent to all applicable parties.  Payable in advance, with the first installment payable at the time of Escrow Agreement execution. This fee will not be prorated in the case of early termination in the first year.

*Fifth Third Bank's bid is based on the following assumptions:*

- Number of escrow accounts to be established:  1

- Estimated period of time for Escrow Account to be in existence:   until the Escrow Termination Date

- **ALL FUNDS WILL BE INVESTED IN ONE DEPOSIT PRODUCT**

**Documentation Fee:**                                                                              **Waived**