## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ZOHAR III, CORP., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket Nos. 999, 1001, 1003** |
| | ) | |

## DURA DEBTORS' OBJECTION TO THE ZOHAR FUNDS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 1014(b) DETERMINING THAT THE DURA DEBTORS' BANKRUPTCY CASES SHOULD PROCEED IN THE DISTRICT OF DELAWARE

Dura Automotive Systems, LLC and certain of its direct and indirect subsidiaries that are debtors and debtors in possession (collectively, "Dura" or the "Dura Debtors") in the proceedings styled as *In re Dura Automotive Systems, LLC, et al.*, No. 19-06741 (RSM) (Bankr. M.D. Tenn.), pending before the United States Bankruptcy Court for the Middle District of Tennessee (the "Tennessee Bankruptcy Court"), respectfully represent as follows in support of this objection to *The Zohar Funds' Motion for Entry of an Order Pursuant to Bankruptcy Rule 1014(b) Determining that the Dura Debtors' Bankruptcy Cases Should Proceed in the District of Delaware* [Docket No. 999] (the "Venue Motion"):[2]

---

1 The debtors in these chapter 11 cases, along with the last four digits of each debtor's entity's federal tax identification number, are: Zohar III, Corp. (9612); Zohar II 2005-1, Corp. (4059); Zohar CDO 2003-1, Corp. (3724); Zohar III, Limited (9261); Zohar II 2005-1, Limited (8297); and Zohar CDO 2003-1, Limited (5119). The Zohar Funds' service address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

2 Capitalized terms used but not defined in this objection shall have the meanings ascribed to such terms in the Venue Motion.

**Preliminary Statement**

1.      The Dura Debtors and their non-debtor affiliates operate a global business enterprise that is comprised of 25 facilities and employs more than 7,400 employees located in three states and thirteen countries throughout North America, South America, Europe, and Asia. In recent months, however, Dura has faced an existential liquidity crisis due to the long-running ownership dispute between Ms. Lynn Tilton and the Zohar Funds,[3] which has led prospective lenders to refuse to provide financing, made credit insurance more difficult to obtain, and resulted in certain customers placing Dura on "no bid" lists, resulting in reduced liquidity and revenue.

2.      To chart a path forward, Dura appointed two distinguished restructuring professionals—Marc Beilinson and Jill Frizzley—as independent managers and engaged independent advisers.  Following analysis and stakeholder engagement, Dura's independent managers determined that a chapter 11 filing was necessary to obtain access to new capital.  In connection therewith, Dura's independent managers carefully considered potential venue options, which included the Middle District of Tennessee, the Eastern District of Michigan, and the District of Delaware.  In particular, Dura's independent managers sought to determine which venue would facilitate the most active and convenient involvement of Dura's customers, supply chain partners, other vendors, and employees, as well as mitigate the overhang of the Zohar ownership dispute on Dura's value-maximizing restructuring.  The Middle District of Tennessee was the clear choice: it is home to two of Dura's five U.S. plants, nearly half of Dura's U.S. workforce, approximately 20 customers, and over 450 trade vendors; Nashville is also conveniently located for Dura's Detroit-based management team, most of Dura's restructuring advisors, and a critical mass of

---

[3]      *See Tilton et al., v. Zohar CDO 2003-1 Ltd. et al.*, Case No. 17-016240-CB (Mich. Cir. Ct. Nov. 10, 2017).

Dura's largest trade creditors, which have a unique role to play in automotive restructurings. While Delaware—another potential venue—is convenient for certain of the Zohar Funds' attorneys, Dura respectfully submits that the interests of the individuals that are the lifeblood of Dura's business (who are principally located near Tennessee and certain nearby states, and not Delaware) should take precedence over the travel conveniences of certain of the Zohar Funds' professionals. Additionally, Dura's independent managers determined that a Nashville bankruptcy case would *not* affect the substantive rights or obligations of the Zohar Funds or any other party to the Zohar Funds' settlement agreement [Docket No. 266-1] (the "Settlement Agreement"). Accordingly, on October 17, 2019, Dura's independent managers caused Dura to commence chapter 11 cases with the Tennessee Bankruptcy Court.

3. Postpetition, Dura and its advisers have worked around the clock to maximize stakeholder value, including for the Zohar Funds, the lenders under Dura's $104 million prepetition term loan facility. ***Dura's drive to foster stakeholder consensus culminated in Wednesday's agreement with Bardin Hill to replace Dura's existing DIP and prepetition revolving credit facilities provided by Patriarch Partners Agency Services, LLC and certain of its affiliates***. The consensual Bardin Hill DIP facility (which is supported by the Zohar Funds) will maximize stakeholder value in various ways by: (a) providing capital necessary for Dura to invest in its business; (b) financing Dura's dual-track sale and plan processes; and (c) obviating further distracting litigation regarding the propriety of the former Patriarch Partners-backed DIP facility. Dura intends to build on this momentum on Monday, when it plans to convene an all-hands summit with Bardin Hill and the Zohar Funds (including their CRO and independent director, both of whom Dura expects will have input into its sale process) in New York City to chart the path forward for Dura's dual-track sale and plan processes, as well as other key matters.

3

Dura also plans to continue to engage with certain key customers, supply chain partners, and other key operational stakeholders to regarding Dura's sale process and chapter 11 exit strategy.

4.    This record notwithstanding, the Zohar Funds continue to seek to deprive the Dura Debtors of their chosen forum in the Middle District of Tennessee.  The Venue Motion—which the Zohar Funds filed before Dura entered into the Bardin Hill DIP facility and have refused to withdraw or adjourn following the Bardin Hill announcement—has already cast a pall over Dura's restructuring process and exacerbated the significant financial and operational challenges faced by any operating business in chapter 11.  And the requested relief, if granted, will only drag Dura's operating business into the long-running ownership dispute between Ms. Tilton and the Zohar Funds, at the expense of Dura's operations, employee retention efforts, vendor initiatives, and independent, value-maximizing sale process overseen by Dura's independent managers.

5.    This Court should reject the Zohar Funds' efforts to dictate Dura's venue in the Middle District of Tennessee, which is an indisputably proper venue pursuant to 28 U.S.C. § 1408. The Venue Motion raises fundamental issues of bankruptcy law and policy that go to the heart of the integrity of the bankruptcy system.  Bankruptcy law is clear:  the Dura Debtors' choice of forum, when legally proper (as here), is entitled to great weight and should only be overturned if the Zohar Funds demonstrate, by a preponderance of the evidence, that the transfer of venue is warranted in the interest of justice or convenience of the parties.  The heavy burden required to overrule a debtor's venue determination is in recognition of the fact that no party other than Dura is a fiduciary for all of its stakeholders (including the Zohar Funds, which are holders of Dura's prepetition term loan facility claims).  Indeed, the federal venue statute provides a debtor with maximum flexibility to select an appropriate venue to achieve its restructuring goals.

6.      There is no question that this Court is fully capable of handling a case of this magnitude; indeed, Dura's proposed restructuring counsel regularly advises clients to commence cases in Delaware to leverage the unparalleled sophistication of this District's bench and bar, familiarity with complex restructuring matters, and innovative procedures that allow debtors and their stakeholders to efficiently prosecute their restructuring processes.   Respectfully, the Tennessee Bankruptcy Court is equally adept, and other factors in this matter weigh in favor of venue in the Middle District of Tennessee.  As an initial matter, the Zohar Funds do not assert that they are affiliates of the Dura Debtors, as required by Bankruptcy Rule 1014(b).  Rather, the Zohar Funds rely on Ms. Tilton's separate connections to the Zohar Funds and the Dura Debtors.  In any event, the Dura Debtors have no operations, employees, or other ties to Delaware other than that certain Dura Debtors are organized under Delaware law.  In contrast, as highlighted below, of Dura's five U.S. manufacturing facilities, two are located in Tennessee, and Dura conducts business with 20 customers and 458 suppliers in Tennessee.



Facilities, Customers and Suppliers in the State of Tennessee

| Relationship Type | Count |
|---|---|
| Facilities in the State of Tennessee | 2 |
| Customers in the State of Tennessee | 20 |
| Suppliers in the State of Tennessee | 458 |

7.     Further, the only purported connection (other than place of organization) between Delaware and the Dura Debtors is the "monetization process" set forth in the Settlement Agreement.  As this Court is aware, the Zohar Funds, Ms. Tilton, certain Patriarch stakeholders, MBIA Insurance Corp., and a controlling class of noteholders of one of the Zohar Funds are party to the Settlement Agreement, which is intended to facilitate the refinancing and monetization of certain of Ms. Tilton's portfolio companies, including Dura.   Pursuant to the Settlement Agreement, the Zohar Funds' CRO and Ms. Tilton have full and joint authority to conduct a process to monetize Ms. Tilton's portfolio companies through an equity sale, asset sale, or refinancing. ***Importantly, while Ms. Tilton and Dura's former revolving lender are parties to the Settlement Agreement, Dura is not a party to that agreement***.  Those parties cannot now prevent Dura's independent managers from making decisions based on an agreement to which Dura is not a party.  Dura has broader interests than simply monetizing its assets through a sale or refinancing; unlike the Zohar Funds, which are fiduciaries for their own narrow interests, Dura has a fiduciary duty to maximize value for its estate, including trade creditors, which are collectively owed at least $49 million.  At the same time, the Dura Debtors' chapter 11 cases are not necessarily inconsistent with the goal of the monetization process because the Dura Debtors intend to market and conduct a sale process to maximize value for all stakeholders, and the Bardin Hill-backed DIP facility will likely result in input by the Zohar Funds and their independent director in that process.

8.     Furthermore, the fact that certain Dura Debtors are formed under Delaware law is insufficient to overcome the Zohar Funds' high burden of demonstrating that the Dura Debtors' venue choice is contrary to the interest of justice.  If this was a sufficient connection to defeat the Dura Debtors' venue choice, then nearly all large bankruptcies would likely have to be filed in, or transferred to Delaware, based on the fact that over 1.4 million businesses are incorporated in

Delaware. That, however, is not what the venue statute provides. Nor are the Dura Debtors aware of any reported cases where a court has transferred venue from a debtor's chosen forum—in a venue where the debtor has substantial operations—to a venue where the only significant connection is place of organization. This Court should not become the first to do so. Moreover, such relief is not necessary: this Court will retain jurisdiction to allocate the sale proceeds among the Zohar Funds and to adjudicate any purported breaches of, and causes of action arising under, the Settlement Agreement.[4]

9.      Simply put, the Zohar Funds cannot pull the Dura Debtors' chapter 11 filings into this Court in an attempt to bootstrap the Dura Debtors' independent need to restructure into the long-running ownership dispute between Ms. Tilton and the Zohar Funds. Accordingly, for the reasons set forth herein, the Dura Debtors respectfully submit that this Court should deny the Venue Motion and allow the Dura Debtors' chapter 11 cases to proceed in Nashville.

## Background

10.     The Dura Debtors and their non-Debtor affiliates (collectively, the "Company") operate 25 facilities in 13 countries throughout North America, South America, Europe, and Asia. The Company is a global Tier 1 automotive supplier specializing in the design, engineering, and manufacturing of products that support the evolution of automotive mobility, with a special recent emphasis on the electric vehicle. The Company produces a broad array of automotive products and systems, however, over the past four years, the Company has focused its portfolio to meet the

---

[4]    To the extent there are purported violations of the Settlement Agreement by any party subject to that settlement agreement, the Dura Debtors believe that this Court could and should resolve such dispute without regard to whether the Dura Debtors' cases are pending in Tennessee or Delaware. Relatedly, the Zohar Funds assert that all claims between the Zohar Funds and Dura Debtors should be "centralized"—presumably in this Court. (Venue Motion at ¶¶ 28-29.) However, the only claims that the Zohar Funds have against Dura are limited to the Zohar Funds' claims under the Dura term loans. And in any event, Dura has stipulated in its DIP order to the allowability of those claims against Dura.

next generation of automotive platforms and has strategically exited low-margin to no-margin business lines.

11.    The Company is a living, breathing business enterprise that is a leading independent designer and manufacturer of automotive systems, including mechatronic systems,[5] exterior systems, and lightweight structural systems, among others.  The Company's three main product segments generated approximately $1.1 billion in global sales in 2018, and the Company's products are supplied for uses in many of the most popular car, light truck, sport utility, and multi-activity-vehicle models worldwide.  The Company markets its products to most major original equipment manufacturers ("OEMs") in North America, South America, Asia, and Europe, as well as many leading Tier 1 automotive suppliers.  The Company's manufacturing, sales, and engineering centers in Brazil, China, the Czech Republic, France, Germany, India, Japan, Korea, Mexico, Portugal, Romania, the United Kingdom, and the United States serve the Company's worldwide customer base by providing customers with convenient design and engineering expertise close to the customers' development locations.

12.    In recent years, the Company's manufacturing presence has significantly increased in Tennessee.  As of June 2008, Dura had made a substantial operational shift, relocating their shifters production, cable manufacturing, and production capacity to Tennessee.[6]  Today, Dura

---

[5]    Mechatronic systems utilize microprocessors and software to control the motion of mechanical devices.

[6]    Dura and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court in 2006 (the "2006 Dura Debtors").  On December 27, 2011, this Court entered a final decree closing the 2006 Dura Debtors' chapter 11 cases.  Nothing in the Bankruptcy Code or the Bankruptcy Rules require a debtor to file in the same jurisdiction as prior cases.  Indeed, numerous other debtors have filed subsequent chapter 11 cases in a different jurisdiction than their first filing.  *See In re Filene's Basement, Inc.,* No. 99-16985 (WCH) (Bankr. D. Mass. Aug. 23, 1999), No. 09-11525 (MFW) (Bankr. D. Del. May 4, 2009), and No. 11-13511 (KJC) (Bankr. D. Del. Nov. 2, 2011); *In re Global Aviation Holdings Inc.*, No. 12-40783 (CEC) (Bankr. E.D.N.Y. Feb. 5, 2012) and No. 13-12945 (MFW) (Bankr. Del. Nov. 12, 2013); *In re Interstate Bakeries Corp.*, No. 04-45814 (Bankr. W.D. Mo. Sept. 22, 2004) and *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2012); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. July 9, 2012) (cases transferred to the Eastern District of Missouri on November 27, 2012 (No. 12-51502 (KASS) (Bankr. E.D., Mo. July 9, 2019)), No.

employs approximately 800 individuals in the United States, almost half of which are located in Tennessee, two of Dura's five U.S. manufacturing facilities are located in Tennessee, and Dura's business is supplied by over 450 suppliers located in Tennessee.

13.     Dura's ability to operate and grow its business has been negatively affected by its funded indebtedness and the Zohar overhang.  More specifically, earlier this year, despite an extensive process to refinance its European credit facilities, Dura was unable to obtain any committed financing because potential lenders were unwilling or unable to provide financing given the pendency of ongoing disputes in the Zohar Funds' chapter 11 proceedings and the Zohar term loan having matured and defaulted without extension or repayment.  Additionally, Dura was denied credit insurance by two leading credit insurance providers in 2018 and lost coverage from the last leading provider in August of 2019 due to the pall of uncertainty created by the Zohar dispute.  Indeed, five OEMs—three in Detroit and two in Europe—have placed Dura on "no-bid" status due to these issues.

14.     By September 2019, Dura determined that it would likely exhaust all of its remaining liquidity by the end of October and that a chapter 11 filing may be necessary to obtain access to new capital.  As a result, Dura retained Jefferies LLC ("Jefferies") as financial adviser, Kirkland & Ellis LLP ("Kirkland") as restructuring counsel, and Portage Point Partners, LLC ("Portage Point") as restructuring adviser to assess restructuring alternatives.

15.     At the same time, Dura determined that it was appropriate to modify its governance structure, where its CEO, Ms. Tilton, acted as Dura's sole manager.  Accordingly, as noted above,

15-32450 (KLP) (Bankr. E.D. Va. May 12, 2015), and *In re Blackhawk Mining, LLC,* No. 19-11595 (LSS) (Bankr. D. Del. July 19, 2019); *In re Westmoreland Coal Company,* No. 94-01066 (PJW) (Bankr. D. Del. Nov. 8, 1994), No. 96-26092 (MSK) (Bankr. D. Colo. Dec. 23, 1994), and No. 18-35672 (DRJ) (Bankr. S.D. Tex. Oct. 9, 2018).

two independent managers were appointed, who were selected without Ms. Tilton's involvement other than agreeing to the principle of appointing independent managers. On October 12, 2019, Dura appointed Marc Beilinson and Jill Frizzley as independent managers. Mr. Beilinson is the managing partner of Beilinson Advisory Group, LLC and has served as independent director, chief restructuring officer, or similar positions for dozens of distressed companies. He previously was a partner at Pachulski, Stang, Ziehl & Jones LLP. Ms. Frizzley is the president of Wildrose Partners LLC and has over twenty years of experience in corporate governance and debt restructuring situations, including as an attorney at Shearman & Sterling LLP and Weil, Gotshal & Manges LLP. Mr. Beilinson and Ms. Frizzley are fully independent from Ms. Tilton—indeed, neither spoke to Ms. Tilton in connection with this matter prior to the filing of the chapter 11 cases, nor do they know Ms. Tilton personally.

16.     Mr. Beilinson and Ms. Frizzley directed the Dura Debtors and their advisors to evaluate consensual refinancing options in an attempt to avoid a chapter 11 filing. However, notwithstanding Dura's good-faith efforts, Mr. Beilinson and Ms. Frizzley determined that it was likely necessary to file for chapter 11 to access additional capital. In connection with the chapter 11 filing, Dura's independent managers, with the assistance of Dura's advisors, carefully evaluated the venue in which Dura should file. In particular, Dura's independent managers sought to determine which venue would permit the active involvement of Dura's customers, supply chain partners, other vendors, and employees. The independent managers also considered the substantial operational and financial headwinds that the disputes in the Zohar bankruptcy had caused for Dura over many months, and they determined in their business judgment that creating some distance from the Zohar bankruptcy would be beneficial for Dura's ongoing relationships with its customers and vendors, who would otherwise be concerned that Dura would be dragged into the morass of

the litigation feud in Delaware.   After taking all of the foregoing into consideration, the independent managers determined that the Middle District of Tennessee was the clear choice:  it is home to two of Dura's five U.S. plants; nearly half of Dura's U.S. workforce; approximately 20 customers; and over 400 trade vendors.   Accordingly, on October 17, 2019, the independent managers authorized Dura to file its chapter 11 cases in Nashville.

<u>**Argument**</u>

17.   Federal Rule of Bankruptcy Procedure 1014(b) provides that if petitions commencing cases are filed in different districts against a debtor and an affiliate, "the court . . . may determine, in the interest of justice *or* for the convenience of the parties, the district or districts in which any of the cases should proceed." Fed. R. Bankr. P. 1014(b) (emphasis added). As the cases make clear, the test is disjunctive and creates two distinct analytical bases upon which transfer of venue may be grounded. *See, e.g.*, *In re Qualteq, Inc.*, No. 11-12575 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012) (noting that 28 U.S.C. § 1412 is "written in the disjunctive, making transfer of venue appropriate *either* in the interest of justice *or* for the convenience of the parties.") (emphasis in original); *In re Patriot Coal Corp.*, 482 B.R. 718, 747 (Bankr. S.D.N.Y. 2012) (same); *In re Portjeff Dev. Corp.*, 118 B.R. 184, 192 (Bankr. E.D.N.Y. 1990) ("28 U.S.C. § 1412 and Bankruptcy Rule 1014 authorize the transfer of cases from one district to another either in the 'interest of justice' or 'for the convenience of the parties.'").

18.   As set forth in greater detail below, relief under Bankruptcy Rule 1014(b) is not appropriate for four reasons.  ***First***, where venue is proper, as it unquestionably is here, a debtor's choice of venue is entitled to significant deference.  *See, e.g.*, *In re Caesars Entm't Op. Co., Inc.*, No. 15-10047 (KG), 2015 WL 495259, at *7 (Bankr. D. Del. Feb. 2, 2015) (Gross, J.) (collecting cases).   The Dura Debtors' independent managers, following extensive analysis by, and

consultation with, Dura's counsel, caused Dura to file chapter 11 cases in the Tennessee Bankruptcy Court. This decision was due to, among other factors, the significant concentration of nearby operations, customers, employees, trade creditors, and other interested parties. Venue in Nashville is proper pursuant to 28 U.S.C. § 1408 and Dura's venue determination, therefore, is entitled to great deference. Indeed, the Dura Debtors are not aware of any cases where a court has transferred venue from a debtor's chosen forum — in a venue where the debtor has substantial operations — to a venue where the only significant connection is place of organization. Nor are the Dura Debtors aware of any cases where a court has transferred venue on the basis of a contract or agreement to which the debtor is not a party. This Court should not become the first to do so.

19.     *Second*, the Zohar Funds assert that both the Zohar Funds and the Dura Debtors are affiliates of Ms. Tilton; the Zohar Funds do not even assert any facts to support a finding of an "affiliate" relationship between the Zohar Funds and the Dura Debtors. ***Third***, the interest of justice favors the Dura Debtors' selection of Nashville rather than Wilmington because, as noted above, there are significant operational and other connections between Dura and Nashville. Furthermore, the fact that this Court approved the Settlement Agreement does not change the interests of justice analysis because the pendency of Dura's bankruptcy case in Tennessee will not negatively affect rights or obligations the Zohar Funds, Patriarch Partners, or Ms. Tilton (or any other, actual signatory thereto) may have under the Settlement Agreement. ***Fourth***, Nashville is in fact the most convenient venue for these cases except with respect to certain of the Zohar Funds' attorneys, a consideration that is greatly outweighed by the benefits of Nashville venue for the people and operational partners that are the lifeblood of Dura's business.

I.      **The Dura Debtors' Selection of the Tennessee Bankruptcy Court as a Proper Venue Is Entitled to Great Deference.**

20.     The federal bankruptcy venue statute is written broadly to provide debtors with numerous options:  a case may be commenced in the district in which the debtor's domicile, residence, principal place of business in the United States, or principal assets in the United States have been located for at least 180 days before filing. 28 U.S.C. § 1408(1).  Under 28 U.S.C. § 1408(2), a debtor's affiliates can file wherever venue is proper for the debtor.

21.     Where venue is proper, a debtor's choice of venue is entitled to significant deference.  *See, e.g.*, *In re Caesars Entm't Op. Co., Inc.*, No. 15-10047 (KG), 2015 WL 495259, at *7 (Bankr. D. Del. Feb. 2, 2015) (Gross, J.) (collecting cases).  In *Enron*, the court recognized that "[a] debtor's choice of forum is entitled to great weight if venue is proper," and rejected an attempt to disrupt that choice.  *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002).  As the *Enron* court cautioned, "[t]ransferring venue of a bankruptcy case is not to be taken lightly." *Id.*  "Where a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." *Id.* at 342-43 (citation omitted).  In light of these and other considerations, the *Enron* court honored the debtors' choice of venue even though most of the debtors' principal places of business; a majority of their employees, directors, and officers; and numerous substantive witnesses were located in the proposed alternative venue.

22.     As an initial matter, the Zohar Funds incorrectly assert that the Dura Debtors filed in the Tennessee Bankruptcy Court "at the behest of Ms. Tilton to avoid and circumvent the bargain she struck in the Delaware Bankruptcy Court."  (Venue Motion at ¶ 5.)  This assertion is simply false as a factual matter:  the Dura Debtors' independent managers (and *not* Ms. Tilton) oversaw the venue selection process.  Furthermore, the Zohar Funds' distortions about Ms. Tilton's

role in the venue selection process aside, there is no dispute that the Dura Debtors' choice of venue in the Middle District of Tennessee was proper under 28 U.S.C. § 1408(1). The principal assets and operations of Debtor Dura G.P. consist of a 235,000 square foot manufacturing facility located in Lawrenceburg, Tennessee, which is located in the Middle District of Tennessee. Likewise, the Zohar Funds' suggestion that the fact no Dura Debtor is incorporated in Tennessee undermines venue in Nashville is unavailing. (Venue Motion at ¶ 5.) A corporate debtor may file anywhere that it has principal assets, principal place of business, or state of incorporation, or an affiliate's chapter 11 case is pending. That is exactly what the Dura Debtors did—Dura G.P.'s principal assets are a plant that is located in Lawrenceburg, Tennessee, which is in the Middle District of Tennessee.

23.      The process undertaken by Dura's independent managers which resulted in its bankruptcy filing in Nashville included significant analysis of all relevant considerations. More specifically, that decision was driven by, among other factors, the proximity of Dura's substantial operations in Tennessee, and that such a filing would allow Dura's numerous customers, vendors, and employees located in such state with convenient access to participate in the chapter 11 cases. By contrast, Dura has no operations, customers, vendors, or employees in Delaware.

24.      The independent managers' decision to cause Dura to file their cases in the Middle District of Tennessee is consistent with their fiduciary duties and is entitled to great weight. In contrast, the Zohar Funds' choice of forum should not be entitled to any weight and the Zohar Funds bear the burden of showing by a preponderance of the evidence that the transfer of venue is warranted.[7] In fact, removing the Dura Debtors' cases from the Middle District of Tennessee

---

[7]    *See In re Buffets Holdings Inc.*, 397 B.R. 725, 727 (Bankr. D. Del. 2008) ("The moving party must demonstrate by a preponderance of the evidence that transfer of venue is warranted."); *In re Visteon Corp.*, No. 09-11786, 2011 WL 5025004 at *1 (Bankr. D. Del. Oct. 21, 2011) ("GBSI, as defendant, bears the burden of demonstrating,

would impose significant costs on the Dura Debtors, as no efficiencies in administration of the Dura Debtors' bankruptcy cases would be gained by removing them from Tennessee.

## II.    The Zohar Funds Do Not Assert That Any Dura Debtor Is an "Affiliate" of Any Zohar Fund.

25.    Relief under Bankruptcy Rule 1014(b) is inappropriate because, as an initial matter, the Zohar Funds do not appear to allege facts in the Venue Motion that, if true, would support a finding of an "affiliate" relationship for purposes of Bankruptcy Rule 1014(b).  Bankruptcy Rule 1014(b) specifically speaks to the relationship between "a debtor and an affiliate," not an affiliate of an affiliate.  *See* Fed. R. Bankr. P. 1014(b).  In the Venue Motion, the Zohar Funds argue that Ms. Tilton directly or indirectly owns twenty percent or more of the Zohar Funds.  (Venue Motion at ¶ 26.)  The Zohar Funds next assert that Ms. Tilton is the beneficial owner of Dura through her asserted ownership of the Dura Debtors' non-Debtor parent, Dura Buyer, LLC ("Dura Buyer").  *Id*.  What the Zohar Funds do not even argue, however, is how Ms. Tilton's purported ownership of two separate companies results in these companies being affiliates of each other—which is what is required for Bankruptcy Rule 1014(b) to apply.  The Zohar Funds' approach is not surprising because the ownership structure of Dura Buyer remains subject to litigation, and resolution of that matter will require discovery, briefing, and resolution by a court of competent jurisdiction.

26.    Furthermore, in the Dura term loan credit agreement, pursuant to which the Zohar Funds are the lenders, and the Dura Debtors are the borrowers, there is an explicit acknowledgment that neither the Zohar Funds nor any affiliate of the Zohar lenders were "Affiliates" of the Dura

---

by a preponderance of the evidence, that a transfer of venue is warranted."); *In re Hayes Lemmerz Intern Inc*., 312 B.R. 44, 46 (Bankr. D. Del. 2004) ("The party seeking a transfer bears the burden of demonstrating by a preponderance of the evidence that a transfer of venue is warranted."); *In re Hechinger Inv. Co. of Delaware Inc.*, 296 B.R. 323, 324 (Bankr. D. Del. 2003) ("The decision of whether venue should be transferred lies within the sound discretion of the Court, though the moving party must demonstrate by a preponderance of the evidence that such change is warranted.")

Debtors for purposes of the credit agreement.[8]  However, this Court need not and should not reach this issue, because even assuming the Dura Debtors and the Zohar Funds are "affiliates," venue transfer is inappropriate.

### III.   The Interest of Justice Favors Tennessee—Not Delaware.

27.   When evaluating the "interest of justice" prong, courts apply a "broad and flexible standard" that "considers whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness, and fairness."  *In re Enron Corp.*, 274 B.R. 327 at 343. These factors favor respecting the Dura Debtors' choice of venue.  Here, no efficiencies in the administration of the Dura Debtors' bankruptcy cases would be gained by removing these cases from Tennessee.  In fact, transferring these cases to Delaware would impose significant costs on the Dura Debtors' estates and likely would delay the ongoing administration of these chapter 11 cases.  Further, transferring these cases to Delaware would not promote judicial economy as this Court retains jurisdiction over the monetization process and the allocation of proceeds among equity holders of Dura Buyer, which sits "above" the Dura Debtors.  Accordingly, there is no risk of overlap with respect to decisions made by this Court and the Tennessee Bankruptcy Court.

---

[8]   Term Loan Credit Agreement § 1.1, definition of "Affiliate" ("Affiliate" means, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds ten (10%) percent or more of any class of Voting Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds ten (10%) percent or more of any class of Voting Stock or in which such Person beneficially owns or holds ten (10%) percent or more of the equity interests and (iii) any director or executive officer of such Person.  For the purposes of this definition and the definition of "Voting Stock", the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement or otherwise. ***Notwithstanding the foregoing, for purposes of this Agreement, none of the Agent, any Lender or any Affiliate of any Lender shall be an Affiliate of the Borrower or any of its Subsidiaries.***") (emphasis added).  The Dura Debtors intend to introduce a copy of the Term Loan Credit Agreement (to which the Zohar Debtors are party) into evidence at the hearing.

28.     While the Venue Motion was timely filed, the Tennessee Bankruptcy Court has already held two hearings in the Dura Debtors' chapter 11 cases.  An immediate request to transfer venue does not shift the strong presumption away from maintaining the Dura Debtors' properly chosen forum.  With respect to fairness, as courts have recognized, the Dura Debtors' independent managers determined that the Middle District of Tennessee was the most appropriate venue.  Indeed, it could even be a breach of fiduciary duty to fail to determine the optimal venue for a bankruptcy case.  *See Patriot Coal Corp.*, 482 B.R. at 742 ("No party has alleged, and there is no evidence in the record, that the Debtors acted in bad faith in filing their chapter 11 cases in New York.  Indeed, it could be argued that doing so was entirely consistent with, or even required by, the Debtors' fiduciary duties."); *see also United States v. Cinemark USA, Inc.*, 66 F. Supp. 2d 881, 889 (N.D. Ohio 1999) ("[U]nlike defendant forum shopping, plaintiff forum shopping is not an evil to be avoided, but rather is an inherent part of our federal court network.  A plaintiff may have available numerous places of equal convenience to bring his or her suit, and has every right to file in the forum that is most geographically convenient or that has the most favorable law.") (internal quotation marks omitted).

29.     As described further above, Dura has strong ties to Tennessee:  nearly half of its U.S. workforce and two of its five U.S. plants are located near Nashville, and Dura's independent managers believed that having the chapter 11 cases filed close to Dura's operations would also be beneficial to maintain strong relationships with Dura's vendors, customers, and employees, and allow such parties convenient access to participate in the chapter 11 cases.  As noted elsewhere herein, Dura's independent managers analyzed and determined that it is appropriate to prosecute their chapter 11 cases in a district other than the venue where the long-running Zohar ownership dispute remains subject to litigation.  Accordingly, the independent managers determined that the

Middle District of Tennessee was the most appropriate venue, and authorized Dura to file its chapter 11 cases there.  Venue in Nashville serves the interests of justice and this Court should, therefore, respect that decision.

30.     Finally, the Settlement Agreement between the Zohar Funds and Ms. Tilton does not change the fact that the interests of justice favor Tennessee over Delaware.  More specifically, as further detailed below, Dura is not a party to the Settlement Agreement, and any claim relating to a purported breach of the Settlement Agreement by any party thereto may proceed in this Court. Finally, the interests of justice are served by allowing Dura to prosecute its chapter 11 restructuring in Tennessee rather than Delaware, because Dura has a variety of stakeholders other than the Zohar Funds, including trade creditors that collectively are owed at least $49 million as of the petition date.  The Dura Debtors are fiduciaries for *all* of their constituencies, and forcing Dura's chapter 11 cases to Delaware based solely on the narrow interests of the Zohar Funds and the Settlement Agreement they signed with Ms. Tilton would not maximize value or be in the interests of Dura's numerous other stakeholders, none of whom are represented in the Zohar Funds' bankruptcy cases.

## IV.   Convenience of the Parties Also Favors the Dura Debtors' Venue Choice of the Middle District of Tennessee.

31.     Venue in the Middle District of Tennessee is also appropriate because it is the more convenient forum—and certainly not a less convenient forum—for the parties than Delaware. When evaluating the "convenience of the parties," courts consider many factors, including: (a) proximity of creditors of every kind to the court; (b) the proximity of the debtor to the court; (c) the proximity of witnesses necessary for the administration of the estate; (d) the location of the debtor's assets; and (e) the economic administration of the estate.  *See In re Innovative Commc'ns*

*Co.*, 358 B.R. 120, 126 (Bankr. D. Del. 2006).[9]  Under these factors, Tennessee clearly represents

a convenient forum for the Dura Debtors' bankruptcy cases; indeed, even more so than Delaware.

32.     To be clear, both this Court and the Tennessee Bankruptcy Court are highly

competent and well-equipped to administer these chapter 11 cases fairly. To the extent, however,

that the Court embarks on a convenience analysis, the convenience of the parties weighs heavily

in support of the Dura Debtors' choice of the Middle District of Tennessee.  Moreover, even if the

relevant factors are ultimately inconclusive as to a determination of the location convenient to the

parties, the fact that the Dura Debtors chose the Middle District of Tennessee weighs heavily in

favor of that venue.  *See FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, No. 11-cv-7670, 2014 WL

3858365, at *4 (N.D. Ill. Aug. 5, 2014) ("The witnesses and parties are located across the country,

and neither party has made a convincing argument that it would be more convenient to travel to

one forum as opposed to the other. But the fact that the plaintiff chose the Northern District of

Illinois as its forum is significant, and because the other factors are inconclusive, the private

interest factors as whole favor the Trustee.").

### A.     The Economic Administration of the Dura Debtors' Chapter 11 Cases Favors Tennessee.

33.     Of the various convenience factors that courts analyze, the economic administration

of the estate is the most important.  *In re Commonwealth Oil Refining*, 596 F.2d 1239, 1247 (5th

Cir. 1979); *In re Suzanne de Lyon, Inc.*, 125 B.R. 863, 869 (Bankr. S.D.N.Y. 1991).  In this case,

the Middle District of Tennessee has multiple advantages over Delaware.

---

[9]    A sixth factor—the necessity for ancillary administration if liquidation should result—is inapplicable in this matter.

34.      *Most significantly, Nashville is a central and easily-accessible location for other stakeholders and advisors located in all parts of the country*.   Nashville is serviced by a large international airport providing numerous travel options for the Dura Debtors' stakeholders and their respective advisors.  *See Enron Corp.*, 274 B.R. at 339 (explaining that, for similar reasons, New York "is convenient with respect to both the diversity of locations served and the frequency of service provided"); *see id.* at 345 ("The Debtors' multifaceted business enterprises affect parties throughout the nation and the world. New York's accessibility for all creditors (and stockholders) weighs in favor of a New York venue.").   For individuals traveling from Detroit, Michigan (the location of the Dura Debtors' headquarters), Nashville provides more flight options, including more direct flights, and decreased travel time when compared to a trip to Wilmington.  *See, e.g.*, *In re Bruno's, Inc.*, 227 B.R. 311, 330 (Bankr. N.D. Ala. 1998) (declining transfer to Delaware where "witnesses would be inconvenienced by travel to Delaware without access to direct airplane flights, change in time zone, and in some cases having to stay one or more nights away from their homes, family, and jobs.").

**B.      Proximity of the Dura Debtors to the Court Favors Tennessee.**

35.      As set forth above, the Dura Debtors have significant operations in and around the Middle District of Tennessee.  The Dura Debtors' Tennessee manufacturing facilities employ more than 325 people, representing almost half of their U.S. workforce.  By comparison, none of the Dura Debtors have any physical assets, operations, or employees in Delaware.  If venue were transferred to Delaware under these facts, based solely on Dura's state of incorporation and when there are zero operations in Delaware, the bankruptcy courts in the other 93 judicial districts would be effectively foreclosed from adjudicating large chapter 11 cases given the substantial number of Delaware companies.  That is neither good policy nor consistent with the law.

20

36.     In a similar vein, bankruptcy courts also prefer venues where "[m]ost of the entities and individuals expected to be responsible for the financial restructuring and development of a plan of reorganization in [the] case are located . . . or have ready access." *Enron*, 274 B.R. at 349. Key among this group are "Debtors' legal and financial advisors." *Id*. Here, Kirkland (Dura's proposed lead restructuring counsel) and Portage Point (Dura's proposed restructuring advisor) are primarily based out of Chicago, Illinois which is an hour and a half flight to Nashville, Tennessee. Further, the Dura Debtors' Chief Financial Officer, Kevin Grady, lives in the metro Detroit area, which is also an hour and a half away from Nashville by plane.  By contrast, there are no direct flights between either Chicago or Detroit to Wilmington, and any flight to Philadelphia or Washington, D.C. would require a lengthy car or train ride thereafter.

### C.     Proximity of the Creditors to the Court Favors Tennessee.

37.     Nashville is likewise a more convenient forum for the Dura Debtors' non-Zohar creditors.  More specifically, 458 of the Dura Debtors' world-wide suppliers are located in Tennessee.  *None* are located in Delaware.  And, as highlighted below, of the Dura Debtors' 41 largest unsecured creditors that are located in the United States, 26 are located in Tennessee or the nearby states of Michigan, Illinois, Indiana, or Kentucky.  Again, *none* are located in Delaware:



**Dura Debtors' Top Unsecured Creditors by State**

| State | Creditors |
|---|---|
| Michigan: | 16 |
| Illinois: | 5 |
| Pennsylvania: | 5 |
| Tennessee: | 3 |
| Texas: | 3 |
| New Jersey: | 2 |
| Alabama: | 1 |
| Arkansas: | 1 |
| California: | 1 |
| Indiana: | 1 |
| Kentucky: | 1 |
| Oregon: | 1 |
| Rhode Island: | 1 |
| Delaware: | 0 |

38.     Further, the Zohar Funds are not operating companies; they are collateralized loan origination vehicles formed under Delaware law.   In contrast, the Dura Debtors are living, breathing companies with ongoing operations, employees, customers, and vendors with operations in multiple states and a dozen foreign countries.  This is relevant to the analysis here because one must not conflate *place of incorporation* and *physical location*; only the latter matters for the convenience inquiry. *See, e.g.*, *Bruno's*, 227 B.R. at 330 ("Location . . . refers to the physical location of the parties, rather than their state of incorporation.").  Neither the Zohar Funds, nor *any* of the Dura Debtors' creditors have their principal place of business in Delaware; indeed, the footnote on the first page of the Venue Motion (and each other pleading in these cases) provides that the Zohar Funds' business affairs are managed out of FTI Consulting's New York City office.

39.     With respect, this Court should not put the professionals ahead of the people who are the lifeblood of Dura's business.   Nashville is a more convenient travel location than Wilmington for nearly all relevant parties, including the Dura Debtors, their advisors, and their significant creditors, save for certain of the Zohar Funds' attorneys, some of whom are based in Wilmington.   And, as demonstrated by the below chart, even with respect to those certain stakeholders that are located in New York City (such as certain advisors to the Zohar Funds and their stakeholders), Nashville is nearly as convenient as Wilmington, given the frequency and short duration of direct flights from New Jersey and New York to Nashville.[10]

|  | To Nashville | To Wilmington |
|---|---|---|
| **From Nashville** | **No Travel Required** | **Flight to Philadelphia - no nonstop flights** |
| **From Detroit** | **Flight: 1 hour, 36 minutes** | **Flight to Philadelphia: 1 hour, 39 minutes, followed by an approximately 45 minute drive to Wilmington** |
| **From Chicago** | **Flight: 1 hour, 35 minutes** | **Flight to Philadelphia: 2 hours, 2 minutes, followed by an approximately 45 minute drive** |
| **From New York** | **Flight: 2 hours, 28 minutes** | **Fastest Train: 1 hour, 42 minutes**<br><br>**Drive: 2 hours, 12 minutes** |

**D.     Proximity to Witnesses Necessary for the Administration of the Estate Is Not Relevant and, Even if It Were, It Would Favor Tennessee.**

40.     While courts will assess the proximity of witnesses when evaluating the convenience of multiple forums, such an inquiry is relevant only to the extent that the witnesses

---

[10]     The representative travel times in the following chart were calculated by searching kayak.com for representative durations of nonstop flights, and by reference to Google Maps for representative train and driving travel time.

may be actually unavailable for the trial in one of the forums. *In re DHP Holdings II Corp.*, 435 B.R. 264, 274 (Bankr. D. Del. 2010) (*citing Jumara*, 55 F.3d at 879); *see also Enron Corp.*, 724 B.R. at 347 (declining to transfer to forum where witnesses with substantial knowledge are located). No party-in-interest has alleged that any material witnesses are available in Delaware that would not be available in Nashville.

41.     Even if the proximity of witnesses were a relevant consideration, this factor also favors Nashville. As explained above, the Dura Debtors' Chief Financial Officer and majority of advisors are located in Detroit and Chicago, respectively. Thus, key witnesses necessary for the administration of the estate likewise are generally located in those places. Further, with respect to advisors located in New York, New York, the fastest train route from Penn Station to Wilmington, Delaware is one hour and 42 minutes—consistent with the flight time from Chicago and Detroit to Nashville.

### E.     The Location of the Dura Debtors' Assets Favors Tennessee.

42.     The final factor—the location of the debtor's assets—is less relevant where, as is the case here, the Dura Debtors are not liquidating entities. *See Enron Corp.*, 274 B.R. at 347–48; *Patriot Coal*, 482 B.R. at 753–54. Nevertheless, this factor still favors Tennessee, as the Dura Debtors have major assets and operations in Tennessee, and none in Delaware.

## V.     The Zohar Funds' Other Arguments Regarding Transfer of Venue to Delaware Also Do Not Mandate Transfer from Tennessee.

### A.     The Settlement Agreement Between the Zohar Funds and Ms. Tilton Has No Bearing on the Validity of the Dura Debtors' Choice of Forum.

43.     Ultimately, the Zohar Funds' principal justification for venue in Delaware is that the Zohar Funds and Ms. Tilton (among other parties, but not including the Dura Debtors) entered

24

into the Settlement Agreement, and that the Dura Debtors will undermine that agreement by proceeding in Tennessee.  This argument is flawed for many reasons, most critically that no Dura Debtor nor any of its independent managers is party to the Settlement Agreement.

44.    The Venue Motion's recurrent theme that the Dura Debtors are somehow bound by the Settlement Agreement due to the fact their CEO and largest indirect shareholder signed that agreement likewise does not pass muster.  It is a bedrock principle of Delaware corporate law that shareholders are separate from corporations in which they hold stock, and neither is responsible for the liabilities of the other.[11]  The marketplace's expectation of corporate separateness under Delaware corporate law is significant in American commerce:  it has led Delaware—a state with a population of approximately 950,000 people—to become the home of over 1.4 million corporations, including over 2/3 of the Fortune 500 and over 80% of all public companies.[12]  The suggestion that the Dura Debtors are bound by the Settlement Agreement signed by their shareholders is at odds with this critical principle of Delaware law.  Likewise, the Zohar Funds certainly could have bargained to have Ms. Tilton's portfolio companies also sign the Settlement Agreement.  The Zohar Funds did not do so.  Therefore, the Zohar Funds cannot now reform that agreement or obtain equitable relief in this proceeding to remedy their failure to do so.[13]

---

[11]    *See*, *e.g.*, *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 314 (Del. Super. Ct. 1973) ("As a general rule, the corporation is an entity distinct from its shareholders even if its stock is wholly owned by one person or corporation."); *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 38 Del. Ch. 490, 494, 154 A.2d 684, 687 (1959) ("A creditor of the parent corporation may not, in the absence of fraud, disregard the separate existence of a subsidiary corporation and look directly to specific assets of a subsidiary for satisfaction of his claim against the parent.").

[12]    *See* Delaware Division of Corporations: 2018 Annual Report Statistics, attached hereto as **Exhibit A**.

[13]    The relief requested in the Venue Motion effectively seeks reformation of the settlement agreement to include the Dura Debtors as a party, or an injunction binding the Dura Debtors to an agreement they did not sign.  The rest of this objection speaks for itself on the venue argument, but the Zohar Funds have not complied with the requirements for such relief.  Reformation of a contract requires an adversary proceeding pursuant to Bankruptcy Rule 7001, and the Zohar Funds have not commenced an adversary proceeding.  An injunction would require an applicable provision of the Bankruptcy Code and supporting facts.  In any event, the Dura Debtors are not aware

45.    Even if this Court were to determine that Dura was bound by the monetization process set forth in the Settlement Agreement, filing for bankruptcy in the Middle District of Tennessee is not necessarily inconsistent with the monetization process.  Filing for chapter 11 protection is not itself a monetization event; as of the time of the chapter 11 filing, Dura was indisputably out of liquidity to continue operations, and was nearly $50 million behind on debts to its trade vendors.  The monetization process contemplates cooperation between Ms. Tilton and the CRO of the Zohar Funds regarding a sale process; it does not contemplate restrictions on filing for bankruptcy when necessary in order to preserve the continued operations of an insolvent company.  In any event, the Dura Debtors intend to run a transparent marketing and sale process to maximize value for all stakeholders, and due to the Bardin Hill-backed DIP facility, the Zohar Funds and their independent director are expected to have input in that process.

### B.    The Tennessee Bankruptcy Court May Exercise Jurisdiction Over the Dura Debtors Notwithstanding the Zohar Funds' Claims.

46.    The Zohar Funds also assert that the Tennessee Bankruptcy Court cannot have jurisdiction over critical aspects of the Dura Debtors' restructuring—namely, approval of postpetition financing on a nonconsensual basis and/or a sale free and clear of the Dura Debtors' term loan claims based on the fact that the Zohar Funds are chapter 11 debtors with cases pending before a different bankruptcy court.

47.    This argument is flawed because it demands that the Tennessee Bankruptcy Court decline to exercise its properly-vested jurisdiction over potentially critical issues in the Dura Debtors' chapter 11 cases because a technical reading of the Bankruptcy Code may vest the

---

of any provision of the Bankruptcy Code that would permit the Zohar Funds to bind the Dura Debtors to an agreement they did not sign.

Delaware Bankruptcy Court with overlapping exclusive jurisdiction over an indirect, beneficial lien interest purportedly held by the Zohar Funds.  This argument ignores the foundational and fundamental truth that the Tennessee Bankruptcy Court (and no other court) has jurisdiction over the Dura Debtors and their property. *See* 28 U.S.C. § 1334(e). For the avoidance of any doubt, the Dura Debtors and their property are not property of the Zohar Funds' estates. *See In re Residential Capital, LLC*, 556 B.R. 555, 561 (Bankr. S.D.N.Y. 2016) (citing *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198 (1983)) (finding that the mere fact that the debtor possessed a mortgage over certain property was insufficient to convert the mortgaged property into property of the debtors' estates); *see also Farmers Bank v. March (In re March)*, 140 B.R. 387 (E.D. Va. 1992), *aff'd*, 998 F.2d 498 (4th Cir. 1993).  Instead, under the plain text of 28 U.S.C. § 1334(e), the Tennessee Bankruptcy Court has exclusive jurisdiction over the Dura Debtors' property (which property is proposed to be pledged as collateral in the proposed DIP facility).

48.    The Zohar Funds argue that their rights as indirect beneficiaries of the lien securing the Dura Debtors' obligations under the prepetition term loan agreement are property of their estates that can only be decided by this Court.  However, to be clear, such lien was granted, not to the Zohar Funds themselves, but rather to the prepetition term loan agent, Ankura.  Ankura is not a chapter 11 debtor.  Moreover, upon an event of default under the applicable credit documents, "the [Prepetition Term Loan Agent] may (on behalf of itself and [the Prepetition Term Loan Lenders]) demand, sue for, collect, or make any settlement or compromise it deems desirable with respect to the [Prepetition Term Loan Collateral]."  For these reasons, it is the prepetition term loan agent (as lienholder) who has the power, subject to the terms of that certain intercreditor agreement dated January 21, 2010, by and among the RBL agent and the term loan agent, among others (the "Intercreditor Agreement"), to request adequate protection of the lien, and to make

27

decisions with respect to the prepetition term loan agent's lien on the prepetition term loan collateral (albeit at the direction of the required prepetition term loan lenders).  Nonetheless, this makes the Zohar Funds' interest in the lien remote and indirect.

49.     Additionally, as the Supreme Court correctly stated in the *Whiting Pools* case, the Bankruptcy Code "does not expand the rights of the debtors in the hands of the estate . . . [and] the estate succeeds to no more or greater causes of action against third parties than those held by the Debtor." *Whiting Pools*, 462 U.S. at 204 n.8; *see also Butner v. U.S.*, 440 U.S. 48, 55 (1979) ("[p]roperty interests are created and defined by state law."). Here, under the express terms of the prepetition term loan security agreement, the liens granted to the Zohar Funds are subjected to and limited by the Intercreditor Agreement.  Pursuant to the *Prepetition Term Loan Security Agreement* § 1 ("To secure . . . the Obligations . . . *subject to the [Intercreditor Agreement]*, each grantor hereby pledges, charges, assigns, and grants, to Agent, for the benefit of itself and for the benefit of the other Secured Parties, a continuing security interest in and Lien on . . . [Prepetition Term Loan Collateral]") (emphasis added). The Intercreditor Agreement expressly contemplates and authorizes the Dura Debtors' entry into the DIP facility (including the priming liens associated therewith).

50.     In short, the Zohar Funds demand that the Tennessee Bankruptcy Court decline to exercise its *in rem* and *in personam* jurisdiction over the Dura Debtors and their property with respect to financing or sale matters, on the grounds that the Delaware Bankruptcy Court has exclusive jurisdiction over the Zohar Funds' indirect interest in a lien that is expressly conditioned on compliance with the Intercreditor Agreement.  This demand represents the proverbial "tail wagging the dog" and flies in the face of the policy underlying 28 U.S.C. § 1334(e), namely, that a "bankruptcy court's *in rem* jurisdiction over a debtor's estate . . . permits a determination of all

28

claims that anyone, whether named in the action or not, has to the property or thing in question." *Universal Oil Ltd. v. Allfirst Bank (In re Millennium Seacarriers, Inc.)*, 419 F.3d 83, 92 (2d Cir. 2005).  Moreover, the Zohar Funds' jurisdictional argument is moot now that the Dura Debtors have selected the Bardin Hill DIP, which has the support of the Zohar Funds.

51.     The Tennessee Bankruptcy Court's *in rem* jurisdiction permits it to determine claims against the Dura Debtors' property.  This Court's *in rem* jurisdiction permits it to determine claims against the relevant property of the Zohar Funds' estates (namely, any claims against the Zohar Funds' indirect interest in the lien on the Prepetition Term Loan Collateral).  With respect, under 28 U.S.C. § 1334(e), this Court cannot determine claims against the Dura Debtors or their property.  Those tasks are properly within the ambit of the Tennessee Bankruptcy Court's jurisdiction over the Dura Debtors' chapter 11 cases.  Moreover, the purpose of this Court's *in rem* jurisdiction with respect to the Zohar Funds' interest in the lien on the prepetition term loan collateral would not be violated by the Tennessee Bankruptcy Court's entry of a DIP order, because such approval does not, in any way, determine what rights the Zohar Funds' creditors may have with respect to such lien.

52.     Finally, applying 28 U.S.C. § 1334(e) to prevent the Tennessee Bankruptcy Court from entering any order that affects the term loan claims violates two critical canons of statutory construction: namely, that statutes not be construed to produce absurd results,[14] and that specific words in a statue should not be read in a vacuum, but with reference to the statutory context and purpose.[15]  The Zohar's application of 28 U.S.C. § 1334(e) leads to the absurd result that the

---

[14]   *See, e.g., Contreras Aybar v. Sec'y U.S. Dep't of Homeland Sec.*, 916 F.3d 270, 274 (3d Cir. 2019); *U.S. v. Fitzgerald*, 906 F.3d 437, 447 (6th Cir. 2018).

[15]   *See Borenstein v. Comm'r of Internal Revenue*, 919 F.3d 746, 752 (2d Cir. 2019).

Tennessee Bankruptcy Court—the Court with exclusive jurisdiction over the Dura Debtors' property—exceeds its jurisdictional mandate when it enters any order that has any impact on the Zohar Funds' interest in the prepetition term loan agent's lien.  This reasoning also ignores the statutory context and purpose of 28 U.S.C. § 1334(e), which, as discussed herein, is to provide the Tennessee Bankruptcy Court with sufficient jurisdiction over the Dura Debtors' property evaluate claims made against such property. The Zohar Funds' application of 1334(e) would, in fact, have the exact opposite result, by prohibiting the Tennessee Bankruptcy Court from making any such determinations without this Court's permission.

### Conclusion

53.    In sum, the Dura Debtors did not choose to file in Tennessee because they were "running away" from Delaware and this Court.  The decision to file the Dura Debtors' chapter 11 cases in the Tennessee Bankruptcy Court was based upon analysis by the Dura Debtors' advisors and Dura's independent managers.  Dura determined that filing its chapter 11 cases in Tennessee, which is close to a substantial number of its vendors, customers and employees, would be beneficial and value-maximizing.  Dura was also concerned that having the ownership dispute pending in the same court as Dura's chapter 11 cases would cause confusion and ultimately chill bidding by prospective purchasers of Dura's assets.  The decision to file the Dura chapter 11 cases in Tennessee was driven by the independent managers' determination that their fiduciary duties to Dura's stakeholders were best fulfilled by filing in a district without the significant headwinds of the separate ownership dispute regarding Dura's non-debtor parent Dura Buyer, and in an indisputably convenient forum where the Dura Debtors have substantial operations.

54.    The Zohar Funds are adequately represented and involved in the Dura Debtors' chapter 11 cases.  To the extent the Zohar Funds believe there has been a violation of the settlement

agreement by Ms. Tilton, they are free to pursue their remedies against her in this Court. Accordingly, the Dura Debtors respectfully submit that this Court should deny the Venue Motion and allow the Dura Debtors' chapter 11 cases to proceed in their chosen forum.

[*Remainder of page intentionally left blank.*]

Respectfully submitted,

October 27, 2019
Wilmington, Delaware

/s/ Justin R. Alberto
_____

Justin R. Alberto (DE 5126)           James H.M. Sprayregen, P.C.
**BAYARD, P.A.**                      Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
600 North King Street, Suite 400      Gregory F. Pesce (admitted *pro hac vice*)
Wilmington, Delaware 19801            **KIRKLAND & ELLIS LLP**
Telephone:      (302) 655-5000        **KIRKLAND & ELLIS INTERNATIONAL LLP**
Facsimile:      (302) 658-6395        300 North LaSalle Street
                                      Chicago, Illinois 60654
                                      Telephone:      (312) 862-2000
                                      Facsimile:      (312) 862-2200

                                      - and -

                                      Christopher Marcus, P.C. (admitted *pro hac vice*)
                                      **KIRKLAND & ELLIS LLP**
                                      **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                      601 Lexington Avenue
                                      New York, New York 10022
                                      Telephone:      (212) 446-4800
                                      Facsimile:      (212) 446-4900

                                      *Co-Counsel to the Dura Debtors*