## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (KBO) |
| | ) |
| Debtor. | ) Jointly Administered |
| | ) |
| | ) **Ref. Docket No. 1092** |
| | ) |

### PATRIARCH'S OBJECTION TO THE DEBTORS' PROPOSED ORDER
### AUTHORIZING THE USE OF CASH COLLATERAL

Patriarch Partners XV, LLC, Octaluna, LLC, Octaluna II, LLC, and Octaluna III, LLC

(collectively, the "Patriarch Secured Parties"), Patriarch Partners, LLC, Patriarch Partners VIII,

LLC, and Patriarch Partners XIV, LLC (together with the Patriarch Secured Parties, "Patriarch"),

by and through their counsel, hereby submit this objection (the "Objection") to the *Notice of*

*Filing of Proposed Revised Cash Collateral Order* [D.I. 1092] (the "Notice")[2] and the proposed

*Second Final Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 507, and Bankruptcy Rules*

*2002, 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate*

*Protection to Prepetition Secured Parties; (III) Providing Superpriority Administrative Expense*

*Status; (IV) Modifying Automatic Stay; and (V) Granting Related Relief* (the "Proposed Order").

In support of this Objection, Patriarch respectfully represents the following:

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar II and Zohar III, the "Zohar Funds"). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Notice or Settlement Agreement, as applicable.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND INFORMATION ............................................................................ 6

    A.    The Patriarch Secured Parties Are Substantial Secured Creditors in These Chapter 11 Cases.................................................................................................. 6

    B.    The Settlement Agreement and the Monetization Process. .......................... 10

    C.    The Equitable Subordination Adversary and Additional Litigation Among the Parties Have Been Commenced or Resumed................................................. 12

    D.    The Debtors Seek to Modify the Final Cash Collateral Order to the Sole Detriment of Patriarch Without Justification. ............................................... 14

OBJECTION............................................................................................................. 16

    A.    The Debtors Have Not Satisfied Their Burden of Proof For Providing Adequate Protection on Account of the Patriarch Secured Claims............................... 16

    B.    The Proposed Payments of Post-Petition Interest Are Individualized Forms of Adequate Protection that Violate Bankruptcy Law and New York Law to the Detriment of Patriarch................................................................................... 23

    C.    The Proposed Order Impermissibly Provides for Payment of Professional Fees to MBIA and the Controlling Noteholders In Violation of the Waterfalls Set Forth in the Indentures. ................................................................................... 31

    D.    The Proposed Order Should Be Modified to Allow the Debtors to Pursue Chapter 11 Plans and DIP Financing That Do Not Have the Consent of MBIA or the Zohar III Controlling Class................................................................... 39

    E.    The Indenture Trustee Should Not Be Indemnified or Released. ................. 43

    F.    Additional Objections ................................................................................... 45

RESERVATION OF RIGHTS .................................................................................. 47

CONCLUSION......................................................................................................... 48

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Ames Dep't Stores, Inc.*,
   115 B.R. 34 (Bankr. S.D.N.Y. 1990) ...................................................................40

*In re Blackwood Assocs., L.P.*,
   153 F.3d 61 (2d Cir. 1998)..................................................................................40

*In re Cook*,
   384 B.R. 282 (Bankr. N.D. Ala. 2008) .................................................................20

*In re Def. Drug Stores, Inc.*,
   145 B.R. 312 (B.A.P. 9th Cir. 1992).....................................................................40

*In re DVI, Inc.*,
   306 B.R. 496 (Bankr. D. Del. 2004) .....................................................................20

*In re Emerge Energy Services, LP*,
   No. 19-bk-11563 (KBO), slip op. (Bankr. D. Del. Dec. 5, 2019)...........................44

*In re Energy Future Holdings Corp.*,
   566 B.R. 669 (Bankr. D. Del. 2017), *aff'd*, 585 B.R. 341 (D. Del. 2018), *aff'd*,
   773 F. App'x 89 (3d Cir. 2019) ................................................................. 29, 37-38

*First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*,
   134 B.R. 528 (Bankr. S.D.N.Y. 1991).........................................4, 25-26, 29, 38-39

*First Lien Indenture Trustee v. Wilmington Trust, N.A. (In re Energy Future
   Holdings Corp.)*,
   546 B.R. 566 (Bankr. Del. 2016) ............................................................ 4, 21, 36-37

*In re Gen. Wireless Operations Inc.*,
   2017 WL 5462990 (Bankr. D. Del. Apr. 11, 2017) ..............................................18

*Gillman v. Continental Airlines (In re Continental Airlines)*,
   203 F.3d 203 (3d Cir. 2000)................................................................................44

*In re GSC, Inc.*,
   453 B.R. 132 (Bankr. S.D.N.Y. 2011) ....................................................................9

*In re Hari Ram, Inc.*,
   507 B.R. 114 (Bankr. M.D. Pa. 2014) ..................................................................16

*In re Heritage Highgate, Inc.*,
   679 F.3d 132 (3d Cir. 2012)..........................................................................24, 31

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re James Wilson Assocs.*,
    965 F.2d 160 (7th Cir. 1992) ........................................................................... 17-18

*In re K-V Discovery Sols., Inc.*,
    496 B.R. 330 (Bankr. S.D.N.Y. 2013) ................................................................29

*In re Kaplan Breslaw Ash, LLC*,
    264 B.R. 309 (Bankr. S.D.N.Y. 2001) ................................................................21

*Kellogg v. U.S. (In re W. Texas Mktg. Corp.)*,
    155 B.R. 399 (Bank. N.D. Tex 1993) .................................................................30

*In re Lister-Petter Americas, Inc.*,
    No. 15-10502, 2017 WL 1511888 (Bankr. D. Kan. Apr. 26, 2017) .......................21

*In re Marsh Supermarkets Holding, LLC*,
    2017 WL 5463219 (Bankr. D. Del. July 19, 2017) ...............................................18

*MW Post Portfolio Fund Ltd. v. Norwest Bank Minn., N.A. (In re Onco Inv. Co.)*,
    316 B.R. 163 (Bankr. D. Del 2004) ....................................................................30

*Nantucket Investors II v. Cal. Federal Bank (In re Indian Palms Assocs., Ltd.)*,
    61 F.3d 197 (3d Cir. 1995) ................................................................................27

*In re Nuverra Envtl. Sols., Inc.*,
    2017 WL 5483147 (Bankr. D. Del. June 6, 2017) ...............................................18

*In re Octagon Roofing*,
    123 B.R. 583 (Bankr. N.D. Ill. 1991) .................................................................20

*Official Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*,
    501 B.R. 549 (Bankr. S.D.N.Y. 2013) ...........................................................24, 31

*In re Palmdale Hills Prop., LLC*,
    423 B.R. 655 (B.A.P. 9th Cir. 2009), *aff'd,* 654 F.3d 868 (9th Cir. 2011) .............21

*In re Poughkeepsie Hotel Assocs. Joint Venture*,
    132 B.R. 287 (Bankr. S.D.N.Y. 1991) ........................................................... 20-21

*In re Pursuit Athletic Footwear, Inc.*,
    193 B.R. 713 (Bankr. D. Del. 1996) ...................................................................16

*Resolution Trust Corp. v. Swedeland Dev. Grp., Corp. (In re Swedeland Dev. Grp., Inc.)*,
    16 F.3d 552 (3d Cir. 1994)................................................................................16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re SE. Banking Corp.*,
    156 F.3d 1114, 1125 (11th Cir. 1998) ............................................................... 28-29

*In re SE. Banking Corp.*,
    93 N.Y.2d 178 (1999) ......................................................................................29

*In re Springs Hosp., Inc.*,
    No. 06-13331 HRT, 2006 WL 2458679 (Bankr. D. Colo. Aug. 22, 2006) ............................21

*In re Tenney Vill. Co.*,
    104 B.R. 562 (Bankr. D.N.H. 1989) ................................................................. 40-41

*In re Times Sales Finance Corp.*,
    491 F.2d 841 (3rd Cir. 1974) ...............................................................................29

*In re Tribune Media Co.*,
    472 B.R. 223 (Bankr. D. Del. 2012) ......................................................................29

*In re Tribune Media Co.*,
    No. 1:15-CV-01116-RGA, 2018 WL 6167504 (D. Del. Nov. 26, 2018) ..............................31

*U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*,
    569 B.R. 12 (S.D.N.Y. 2017) ..........................................................................5, 28

*United Sav. Ass'n of Tx. v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) ................................................................................... 23-24

*In re Washington Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part on other grounds*, 2012
    WL 1563880 (Bankr. D. Del. Feb. 24, 2012) .................................................................28, 29

*In re Waste Alternatives, Inc.*,
    171 B.R. 147 (Bankr. M.D. Fla. 1994) ............................................................... 19-20

**Statutes**

11 U.S.C. § 361 ..................................................................................................16, 22

11 U.S.C. § 361(1) ...................................................................................................36

11 U.S.C. § 502(b) ....................................................................................23, 25, 29, 31

11 U.S.C. § 506(a) ...................................................................................................24

11 U.S.C. § 506(b) .......................................................................4, 23, 24, 26, 27, 28, 31

11 U.S.C. § 510(a) ..........................................................................28, 29, 32, 34, 35

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Other Authorities**

*Adequate Protection: Overview, Practical Law Practice Note Overview* 8-382-
    8989 (Thomson Reuters, 2019)..................................................................................38

**Rules**

Del. Bankr. L.R. 4001-2(a) ...........................................................................................3

Fed. R. Bankr. P. 4001(b)(1)(A) ...................................................................................3

## PRELIMINARY STATEMENT

1.     In a gross abuse of leverage, MBIA and the Zohar III Controlling Class have once again forced the Debtors to exclude the Patriarch Secured Parties' more than $832 million in secured claims from material protections afforded to other secured creditors under the Proposed Order.[3] Pursuant to the Indentures, no such disparate treatment is allowed: the Patriarch Secured Parties' claims (the "Patriarch Secured Claims") share the same collateral and the same liens as MBIA's and the Zohar III Controlling Class's claims, subject only to certain waterfall-payment provisions in the Indentures that do not justify the treatment provided under the Proposed Order. Accordingly, there is no legitimate basis for the one-sided protections for MBIA and the Zohar III Controlling Class contemplated under the Proposed Order. The Patriarch Secured Parties are entitled to at least the same adequate protection as the Debtors are proposing for MBIA and the Zohar III Controlling Class. This is particularly the case where, as a result of the Court's Monetization Order (defined below), Ms. Tilton has been and continues to expend all of her time (and personal out-of-pocket cost of millions of dollars of her own money) running Portfolio Companies and undertaking a monetization process for the benefit of the Debtors' stakeholders (including MBIA and the Zohar III Controlling Class). Furthermore, the Proposed Order purports to reimburse MBIA and the Zohar III Controlling Class for litigating with the Patriarch Secured Parties while Tilton undertakes such monetization efforts. By failing to provide the Patriarch Secured Parties with the same individualized adequate protection provided to MBIA and the Zohar III Controlling Class, the Debtors cannot satisfy their burden to prove that the

---

[3]  This gross leverage designed to prejudice the Patriarch Secured Parties first arose in the Initial Proposed Order (defined below), whereby MBIA and the Zohar III Controlling Class attempted to advance their position vis-à-vis Patriarch through the proposed cash collateral order. Ultimately, Judge Sontchi did not approve the Initial Proposed Order and, instead, granted the Final Cash Collateral Order, which provided for equivalent adequate protection and/or treatment among all of the Secured Parties.

Patriarch Secured Parties—who are secured creditors with a co-equal interest in the Debtors' cash collateral—are adequately protected under the Proposed Order.

2.      Consequently, if this Court determines that MBIA and the Zohar III Controlling Class are entitled to individualized adequate protection, any cash collateral order must provide the Patriarch Secured Parties with adequate protection on par with what is provided to MBIA and the Zohar III Controlling Class.  In fact, the Proposed Order and Budget (as defined below) contemplate, under the guise of adequate protection, payment to MBIA, the Zohar III Controlling Class, and U.S. Bank, as Indenture Trustee, almost $2 million per month in legal fees—an amount that almost doubles the monthly amount budgeted for the Debtors' lawyers—without any corresponding payments to the Patriarch Secured Parties.  For these reasons and as set forth in more detail below, the Proposed Order must be denied.

3.      The proposed adequate protection package violates the Indentures and the Bankruptcy Code.  It is undisputed that MBIA, the Zohar III Controlling Class, and the Patriarch Secured Parties hold notes that are secured by the same liens granted in favor of U.S. Bank, as Indenture Trustee under the Indentures.  Accordingly, U.S. Bank, as the sole lienholder, is the only party entitled to direct adequate protection.  MBIA and the Zohar III Controlling Class are demanding individualized treatment, contrary to the terms of the Indentures, because as explained below, if only U.S. Bank received adequate protection and distributed any cash through the waterfall under the Indentures, MBIA and the Zohar III Controlling Class would not be entitled to payment of any post-petition interest or reimbursement of legal fees ahead of the Patriarch Secured Parties.

4.      The current Proposed Order rewrites the Indentures' waterfalls to provide individualized adequate protection for MBIA and the Zohar III Controlling Class, but not the

Patriarch Secured Parties.  Under this payment structure—which is in no way justified by the terms of the Indentures—it is the Debtors' burden under the Bankruptcy Code to show that their secured creditors, including the Patriarch Secured Parties, are adequately protected.  The Debtors have not even attempted to satisfy that burden—the record is devoid of any motion or evidence supporting the Proposed Order.  Rather, the Debtors simply request entry of the Proposed Order without providing any legal or factual basis for changing the terms of the Final Cash Collateral Order in a way that materially disadvantages the Patriarch Secured Parties.[4]

5.    The Proposed Order fails for other reasons.  For example, a Patriarch Secured Party, not MBIA, is the senior noteholder at Zohar I, or at a minimum is junior to only approximately $10 million of remaining fees incurred by MBIA prior to the Petition Date. Further, both MBIA and the Zohar III Controlling Class are subject to Patriarch's filed Equitable Subordination Complaint, which, if successful, would make the Patriarch Secured Parties senior in right of payment to MBIA and the Zohar III Controlling Class.  Under these circumstances, where the priority of MBIA's and the Zohar III Controlling Class's respective claims are in bona fide dispute, the Court should not countenance the proposed adequate protection payments for only those creditors.

6.    Excluding the Patriarch Secured Parties from the full adequate protection provided under the Proposed Order should be seen for what it is—improper Debtor favoritism of one creditor body over another.  In fact, as described below, recent pleadings filed by the

---

[4]   This procedural deficiency alone is grounds to deny the relief sought by the Debtors in the Proposed Order.  *See* Fed. R. Bankr. P. 4001(b)(1)(A) ("A motion for authority to use cash collateral shall be made in accordance with Rule 9014 and shall be accompanied by a proposed form of order."); Del. Bankr. L.R. 4001-2(a) ("all cash collateral and financing requests . . . shall be heard by motion").  Given the Debtors' failure to file a motion seeking approval of the Proposed Order and providing the Court and the parties with the legal and factual predicates underlying the relief requested, Patriarch was forced to respond to the Proposed Order by speculating at the basis for the relief, thus necessitating the length of this brief.  It is Patriarch's intent that the information provided herein be beneficial, and not burdensome, to the Court and other parties in interest.

Debtors make clear that they contemplate reimbursing MBIA and the Zohar III Controlling Class under the Proposed Order for fees incurred in connection with inter-creditor litigation that is pending outside this Court.  This tactic of providing two secured creditors with a litigation funding advantage over other secured creditors falls outside the proper purpose of adequate protection under the Bankruptcy Code, which is simply meant to "assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property."  *First Lien Indenture Trustee v. Wilmington Trust, N.A. (In re Energy Future Holdings Corp.)*, 546 B.R. 566, 581 (Bankr. Del. 2016).

7.     In early litigation surrounding the Final Cash Collateral Order, the Debtors took the position that individualized adequate protection for MBIA and the Zohar III Controlling Class (and not the Patriarch Secured Properties) properly reflected the priority of payments under the waterfall and/or subordination provisions of the Indentures.  However, this was not, and is not, a correct reading of the Indentures.  In the absence of a fully consensual cash collateral order that includes the Patriarch Secured Parties, no secured party is entitled to payment of post-petition interest or professional fees.

8.     The Debtors also cannot circumvent the law governing adequate protection by recharacterizing payments to MBIA and the Zohar III controlling Class as post-petition interest.  Post-petition interest may only be paid to a secured creditor if that creditor is over-secured.  11 U.S.C. § 506(b).  Where multiple tranches of debt are secured by the same lien, this means that all classes of debt must be over-collateralized.  *First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528, 532 (Bankr. S.D.N.Y. 1991).  The Debtors have not asserted or established that their assets exceed the full amount of debt issued under the Indentures.  In fact, in connection with the litigation over the Final Cash Collateral Order, MBIA

expressly contested this fact—asserting specifically that there is no evidence establishing that the Debtors' assets exceed the full amount of debt issued under the Indentures.  In the absence of a record demonstrating that all notes issued under the Indentures (including those issued to the Patriarch Secured Parties) are over-secured, there is simply no basis under the Bankruptcy Code to pay post-petition interest to MBIA and the Zohar III Controlling Class to the exclusion of the Patriarch Secured Parties.  Further, such payment would violate New York's Rule of Explicitness, which prohibits payment of post-petition interest to a senior creditor over the objection of a junior creditor in the absence of "precise, explicit and unambiguous language" providing for such payment upon a bankruptcy filing.  *E.g.*, *U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*, 569 B.R. 12, 22–23 (S.D.N.Y. 2017).  The Indentures do not include such language, barring payment of post-petition interest as contemplated under the Proposed Order.

9.      Similarly, neither MBIA nor the Zohar III Controlling Class has pointed to any clear, unambiguous senior right to payment of their legal fees under the payment waterfalls in the Indentures.  The Court should not enter a cash collateral order that rewrites the Indentures and modifies the waterfall in a way that harms one group of creditors—the Patriarch Secured Parties—for the express benefit of another group—MBIA and the Zohar III Controlling Class.

10.      In addition, in violation of the Debtors' fiduciary duties to all stakeholders, the Proposed Order effectively turns over the outcome of these Chapter 11 cases to MBIA and the Zohar III Controlling Class by giving them a veto right over any Chapter 11 plan or DIP financing that the Debtors may propose or support.  None of these terms are consistent with the Bankruptcy Code or the Indentures and dictate denial of the Proposed Order particularly where, as here, MBIA and the Zohar III Controlling Class are the subject of an Equitable Subordination Complaint for their inequitable behavior.

11.     In short, while Patriarch does not object to a cash collateral order to fund the reasonable fees and expenses of these Chapter 11 cases, Patriarch respectfully requests that the Court deny entry of the Proposed Order unless the Patriarch Secured Parties are treated on par with MBIA and the Zohar III Controlling Class.  The Proposed Order violates the Indentures, ignores the Patriarch Secured Parties' rights to adequate protection, and grants the other stakeholder creditors rights that are inequitable and unwarranted under the facts of these Chapter 11 cases.

## BACKGROUND INFORMATION

**A.     The Patriarch Secured Parties Are Substantial Secured Creditors in These Chapter 11 Cases.**

12.     The Zohar Funds are innovative collateralized loan obligation funds, whose assets are primarily loans to distressed companies (the "Portfolio Companies").  The Zohar Funds raised capital by issuing notes (collectively, the "Notes") to noteholders who were, in exchange, entitled to interest payments over time, plus return of their principal on the maturity date.  The Notes are secured, and were issued in two classes—Class A (with each Class A tranche having subclasses of notes) and Class B.

13.     A summary of the Zohar Funds' Note issuances and outstanding debt is as follows:

| Zohar I Note Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $150 million | 2003 | 11/20/15 | $0.00 |
| Class A-2 | $32 million | 2003 | 11/20/15 | $0.00 |
| Class A-3a | $297.5 million | 2003 | 11/20/15 | $234 million |
| Class A-3b | $52.5 million | 2003 | 11/20/15 | $52.5 million |
| Class B | $150 million | 2003 | 11/20/15 | $150 million |
| *Necessary Collateral Value* | | | | *$436.5 million* |

| Zohar II Note Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $250 million | 2005 | 1/20/17 | $190 million |
| Class A-2 | $550 million | 2005 | 1/20/17 | $418 million |
| Class A-3 | $200 million | 2005 | 1/20/17 | $152 million |
| Class B | $200 million | 2005 | 1/20/20 | $200 million |
| *Necessary Collateral Value* | | | | *$960 million* |

| Zohar III Note Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1R | $200 million | 2007 | 4/15/19 | $136 million |
| Class A-1T | $150 million | 2007 | 4/15/19 | $102 million |
| Class A-1D | $350 million | 2007 | 4/15/19 | $237.5 million |
| Class A-2 | $200 million | 2007 | 4/15/19 | $200 million |
| Class A-3 | $116 million | 2005 | 4/15/19 | $116 million |
| Class B | $196 million | 2005 | 4/15/19 | $196 million |
| *Necessary Collateral Value* | | | | *$987.5 million* |

14.    The Patriarch Secured Parties hold, in the aggregate, over $832 million of the Class A and Class B Notes issued by the Debtors.  Specifically:  (a) Patriarch Partners XV, LLC ("Patriarch XV") holds $286,445,355 in principal amount owing under the Class A-3 Notes issued by Zohar I; (b) Octaluna, LLC holds $150,000,000 in principal amount owing under the Class B Notes issued by Zohar I; (c) Octaluna II, LLC holds $200,000,000 in principal amount owing under the Class B Notes issued by Zohar II; and (d) Octaluna III, LLC holds $196,000,000 in principal amount owing under the Class B Notes issued by Zohar III.[5]  Certain Patriarch entities further hold the Zohar Funds' preference shares and, as a result, are the ultimate owners of the Zohar Funds.

---

[5]  Copies of the Patriarch Secured Parties' notes, or evidence of their issuance, are attached to the *Declaration of Carolyn Schiff in Support of Patriarch's Objection to the Debtors' Motion for Entry of an Order Authorizing the Use of Cash Collateral* [D.I. 504] (the "Schiff Declaration") as Exhibits 4–10.  Copies of the Indentures for Zohar I through III are attached to the Schiff Declaration as Exhibits 1–3.

15.    The liens securing the Class A Notes (and MBIA's Credit Enhancement

Liabilities (as defined below)) and the Class B Notes encumber the same collateral,[6] and have

equal priority.  The Indentures[7] make this expressly clear in their "Granting Clauses," pursuant to

which the Indenture Trustee under the Indentures was granted liens in the Debtors' assets for the

benefit of all noteholders, including the Patriarch Secured Parties:

> Such Grants [of security interests and liens "to the Trustee, for the benefit
> and security of the Secured Parties"] by the Issuer and the Zohar
> Subsidiary are made . . . to the Trustee to hold in trust, to secure . . . the
> Notes ***equally and ratably without prejudice, priority, or distinction
> between any Note and any other Note by reason of difference in time of
> issuance or otherwise***, except as expressly provided in this Indenture . . . .

Indenture, pp. 1–2 (emphasis added).  Accordingly, there is a single lien encumbering all Notes

issued under the Indentures, with no subordination with respect to lien property.  *See* U.S. Bank

Reply to Initial Objection [D.I. 530], ¶ 5.  The Class B Notes are subordinate only in right of

payment under the Indentures' waterfalls to the Class A Notes and MBIA's Credit Enhancement

Liabilities.  Indenture, §§ 13.1(a), (c).

16.    MBIA, as credit enhancer, "wrapped" the Class A-1 and Class A-2 Notes issued

by Zohar I and all Class A Notes issued by Zohar II.  As such, if Zohar I and Zohar II could not

meet their respective repayment obligations under the wrapped Class A Notes, MBIA was

obligated to pay any principal and interest owing to the holder of such Notes, after which MBIA

would be subrogated to the rights of the applicable Class A noteholders, with MBIA's right to

payment from the Debtors defined in the Indentures as the "Credit Enhancement Liabilities."

---

[6]  The Indentures for the Zohar Funds include "Granting Clauses," pursuant to which the Debtors granted to the Indenture Trustee, "for the benefit and security of the Secured Parties," liens on all of the Debtors' property.  Indenture, p. 1.  The "Secured Parties" include holders of Class A Notes and Class B Notes.

[7]  As defined in the Settlement Agreement, "Indentures" collectively refers to the Zohar I Indenture, the Zohar II Indenture, and the Zohar III Indenture.  Unless otherwise noted, the provisions discussed herein do not materially differ between the three Indentures.

Defaults under the Indentures for Zohar I and Zohar II occurred in November 2015 and January 2017, respectively, resulting in MBIA paying and becoming subrogated to the Class A-1 and A-2 Notes at Zohar I and the Class A Notes at Zohar II. MBIA's payment of these Class A Notes pursuant to the Indentures did not modify the Patriarch Secured Parties' rights as the holders of Class A-3 Notes (at Zohar I) or Class B Notes.

17.    In June 2016, MBIA directed U.S. Bank to auction the collateral securing the Zohar I Notes. The sales notice defined the "collateral" being auctioned as including Zohar I's interests in loans to the Portfolio Companies, as well as the equity in the Portfolio Companies. The Portfolio Company equity, however, is not collateral, and many of the organizational documents for the Portfolio Companies have strict transfer restrictions. Certain of the Patriarch Entities commenced an action to enjoin MBIA's foreclosure sale. Although the foreclosure was initially enjoined through a temporary restraining order, MBIA was ultimately permitted to complete its foreclosure sale (albeit on terms different than originally contemplated) and credit bid a secured claim of over $148 million for Zohar I's interests in the loans to the Portfolio Companies (which principal totaled approximately $510.2 million). As a result, MBIA has no further claim against Zohar I for the amount of MBIA's credit bid. *See, e.g.*, *In re GSC, Inc.*, 453 B.R. 132, 176 (Bankr. S.D.N.Y. 2011) (holding that, "by virtue of the credit bid, the claims are extinguished"). Any remaining interests that Zohar I held in the Portfolio Companies, the extent of which is in dispute, remains with Zohar I, and are collateral for Patriarch XV's Class A-3 Notes.

18.    Since May 2017, as a result of its foreclosure and credit bid, MBIA has been receiving all principal and interest payments associated with the Zohar I loans obtained through its foreclosure, which Patriarch estimates to total approximately $24,729,696.08 through May

2019.  Accordingly, Patriarch XV's Class A-3 Notes are the most senior notes issued by Zohar I

or, at most, are subject to MBIA's remaining claim against Zohar I, limited to fees and expenses,

which U.S. Bank and MBIA have asserted were approximately $10 million as of the

foreclosure.[8]

###### B.     The Settlement Agreement and the Monetization Process.

19.     On May 21, 2018, the Court entered its *Order Approving and Authorizing the*

*Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders,*

*MBIA Insurance Corp., and the Zohar III Controlling Class* [D.I. 266] (the "Settlement Order"),

pursuant to which this Court approved the "Settlement Agreement."  The Settlement Agreement

was the product of at least five full days of mediation between the Debtors, Patriarch, MBIA, and

the Zohar III Controlling Class.  Among other things, the Settlement Agreement (i) stayed and

tolled the substantial and expensive prepetition litigation among the Debtors, Patriarch, MBIA,

and the Zohar III Controlling Class (among others) for a 15 Month Window, which could be

extended an additional three months subject to satisfying certain sale benchmarks, and

(ii) provided for a joint monetization process among the Debtors' CEO and Independent

Director, on the one hand, and Tilton, on the other hand, pursuant to which the parties were to

seek to sell or refinance the Debtors' interests in the Portfolio Companies.

20.     After the entry of the Settlement Order, Tilton invested her full effort into the

monetization process (at great personal expense, both in terms of time and money), and, with the

joint participation of the Debtors' Independent Director and CRO, conducted the joint

---

[8]  *See* February 3, 2017 Letter from B. Jaffe to R. Mastro, attached to the Neumeister Declaration [D.I. 506] as
     Exhibit 1:  "As you may be aware, the credit portion of MBIA's bid in the Auction included $148,951,585 of its
     Credit Enhancement Liabilities.  However, . . . MBIA's total Credit Enhancement Liabilities are in the amount
     of $158,579,356."  Note, however, that the claimed expenses appear wholly unreasonable and excessive, and
     Patriarch reserves all rights to challenge the recovery of those expenses.

monetization process contemplated under the Settlement Agreement to liquidate and monetize the Debtors' interests in the Portfolio Companies. These efforts included Tilton's personal expense of millions of dollars of her own money and thousands of hours writing and editing every confidential marketing memorandum and quality of earnings report, as well as assisting with, and supervising, the creation of data rooms to facilitate the monetization process. Further, Tilton personally attended more than 100 buyer and banker meetings in support of the sale of the specific Portfolio Companies. At all times, the Debtors and their advisors were included in these efforts. Ultimately, two Portfolio Companies have been sold, to date, pursuant to the joint monetization process under the Settlement Agreement, and others are in process. [*See* D.I. 817, 918].

21.     Even when the monetization process did not deliver the results originally contemplated, at the direction and urging of the Independent Director and the CRO of the Debtors, Tilton made multiple fully-financed restructuring proposals to the other stakeholders to achieve complete resolution of these cases through plans of reorganization. These proposals would have substantially mitigated damage or loss, if any, that MBIA and the Zohar III Controlling Class potentially face in these cases.

22.     On September 29, 2019, over the objection of Patriarch, the Court entered its *Order (A) Implementing the Terms of the Settlement Agreement and (B) Resolving Dispute Over Monetization Process, Pursuant to Paragraph 11 of the Settlement Agreement* [D.I. 974] (the "Monetization Order"). Pursuant to the Monetization Order, the Court determined that the joint monetization process contemplated under the Settlement Agreement extends beyond expiration of the 15 Month Window. The 15 Month Window was extended with the agreement of all parties, and expired by its own terms on September 30, 2019. [*See* D.I. 871]. Patriarch appealed

the Monetization Order.  [D.I. 984].  To date, that order has not been stayed or vacated, and

several Group A Portfolio Companies are in the process of being marketed for sale.

        **C.**       **The Equitable Subordination Adversary and Additional Litigation Among the Parties Have Been Commenced or Resumed.**

       23.     As a result of the expiration of the stay under the Settlement Agreement, several

litigation matters among the stakeholders in these cases have been commenced or resumed.

       24.     On October 1, 2019, certain Patriarch entities filed a complaint (the "Equitable

Subordination Complaint") in this Court to equitably subordinate the claims of, among others,

MBIA and the Zohar III Controlling Class to the Patriarch Secured Claims.  [*See* Adv. Proc. No.

19-50390 (the "Equitable Subordination Adversary"), Adv. Proc. Dkt. 2, 7].  The Equitable

Subordination Complaint is based on the years-long campaign that MBIA and the Zohar III

Controlling Class have waged against Patriarch in an effort to destroy and/or appropriate the

value of Patriarch's and related entities' respective interests in the Debtors and the Portfolio

Companies, for their sole benefit.  If Patriarch is successful in the Equitable Subordination

Adversary, then the Patriarch Secured Parties will receive recoveries on account of their over

$832 million in secured Notes issued by the Debtors, before any distributions are made to MBIA

or the Zohar III Controlling Class.  A pre-trial conference in the Equitable Subordination

Adversary is scheduled for February 19, 2020.

       25.     The stays have been lifted in two separate litigations in New York state and

federal courts among certain Patriarch entities, on the one hand, and, among others, MBIA and

certain members of the Zohar III Controlling Class, on the other hand, which are proceeding with

significant procedural disputes in process among the parties.  In one case pending in the United

States District Court for the Southern District of New York (the "NY District Court") under Case

No. 17-cv-00307 (WHP) (the "SDNY Action"), certain Patriarch entities have asserted several

counterclaims against MBIA and/or certain members of the Zohar III Controlling Class, which remain pending. These claims are based on MBIA's and the Zohar III Controlling Class's unlawful scheme to wrest control of the Portfolio Companies from Tilton, for their exclusive gain, to the detriment of Patriarch. The Debtors, MBIA, and certain members of the Zohar III Controlling Class have moved to transfer venue over the SDNY Action to this Court. Briefing is ongoing, with a hearing on the parties' request to transfer venue scheduled for January 23, 2020.

26.     In addition, there is a pending lawsuit by certain Patriarch entities against MBIA, commenced in 2015 in New York state court (Westchester County), asserting tort claims and money damages based on MBIA's fraudulent inducement of Patriarch XV to purchase Class A-3 Notes issued by Zohar I for more than $100 million in return for MBIA's promise that it would take certain actions that would unlock the value of those notes, which promise MBIA did not fulfill (the "Westchester Action"). In October 2019, MBIA removed the Westchester Action to the NY District Court, with the intent of ultimately transferring venue to this Court. Pursuant to a schedule set by the NY District Court, the Patriarch plaintiffs filed a motion to remand the Westchester Action back to state court. Briefing is ongoing, with a hearing on the motion to remand scheduled in the NY District Court on January 23, 2020.

27.     Finally, the Debtors, on November 27, 2019, filed an application to retain Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") in connection with an appeal pending before the Delaware Supreme Court that involves a dispute regarding Tilton's and the Debtors' respective ownership and control of three of the Portfolio Companies (the "225 Action"). [D.I. 1103]. This application is a clear indication that the Debtors intend to promptly re-set oral argument with the Delaware Supreme Court with respect to the 225 Action.

**D.      The Debtors Seek to Modify the Final Cash Collateral Order to the Sole Detriment of Patriarch Without Justification.**

28.      On July 6, 2018, the Debtors filed a motion seeking authority to use cash collateral, but did not attach a proposed order or budget.  [D.I. 356].  The proposed order—filed six days before the noticed objection deadline (the "Initial Proposed Order")—sought to (i) stipulate to the validity of MBIA's and the Zohar III Controlling Class's claims in violation of the Settlement Agreement, (ii) pay MBIA and the Zohar III Controlling Class millions of dollars of monthly professional fees, while providing no such payments to the Patriarch Secured Parties, (iii) pay post-petition interest to the senior creditors, and (iv) exclude the Patriarch Secured Parties from receiving any notice or objection rights regarding the budget for use of cash collateral or related reporting rights.

29.      Patriarch objected to the Initial Proposed Order (the "Initial Objection") [D.I. 503], and a hearing was set for November 13, 2018.  Prior to the start of that hearing, Judge Sontchi convened a chambers conference with counsel for the Debtors, Patriarch, MBIA, and the Zohar III Controlling Class.  As a result of this conference, the hearing on November 13 was adjourned, and the parties subsequently negotiated a form of cash collateral order that cured the deficiencies in the Initial Proposed Order.

30.      On December 10, 2018, the Court, with the agreement of all of the key stakeholders in these Chapter 11 cases, entered a final cash collateral order [D.I. 588] (the "Final Cash Collateral Order").  Among other things, the Final Cash Collateral Order (i) preserved all disputes with respect to any challenge to the validity of any parties' claims or liens, Final Cash Collateral Order, ¶ 24; (ii) created a process for all secured parties, including the Patriarch Secured Parties, to review proposed budgets, *id.* at ¶ 8; (iii) provided for payment of interest under the Class A Notes, *id.* at ¶¶ 12(a), (b); (iv) provided for payment of all secured parties',

14

including the Patriarch Secured Parties', respective professional fees, *id.* at ¶ 12(c); and

(v) provided equal reporting for all secured parties, *id.* at ¶ 12(d).

31.    On November 25, 2019, the Debtors filed the Notice [D.I. 1092], pursuant to

which they seek approval of the Proposed Order to replace the Final Cash Collateral Order.  The

Proposed Order includes material and unjustifiable changes from the consensual Final Cash

Collateral Order, each designed to favor MBIA and the Zohar III Controlling Class to the

exclusion and expense of the Patriarch Secured Parties.  For example, the Proposed Order

provides for payment of millions of dollars in professional fees for MBIA, the Zohar III

Controlling Class, and U.S. Bank, but not the Patriarch Secured Parties.  The contemplated fees

include:  (i) for MBIA, $1.155 million in monthly legal expenses, *which is more than the

Debtors' legal expenses*; (ii) for the Zohar III Controlling Class, $460,000 in monthly legal

expenses; and (iii) for U.S. Bank, $375,000 in monthly legal expenses.  *See* Initial Budget [D.I.

1101] (the "Budget").  This payment of fees is on top of post-petition interest to those creditors,

which is expressly contemplated under the Proposed Order but not included in the Budget.

Proposed Order, ¶¶ 12(a)–(b).

32.    In addition, the Debtors have effectively waived any ability to pursue a Chapter

11 plan or any secured or unsecured financing without those parties' consent, putting the

outcome of these cases in the sole discretion of MBIA and the Zohar III Controlling Class.

Proposed Order, ¶¶ 12(d)(5) (Debtors cannot seek or support any chapter 11 plan or secured or

unsecured financing without consent of MBIA and the Zohar III Controlling Class).

33.    The Debtors have not provided any evidence or legal argument that supports these

and other proposed changes to the Final Cash Collateral Order.  The lack of support reflects the

inescapable conclusion that the Proposed Order violates the Bankruptcy Code and the
Indentures, and therefore should not be approved.

## **OBJECTION**

**A.      The Debtors Have Not Satisfied Their Burden of Proof For Providing
Adequate Protection on Account of the Patriarch Secured Claims.**

34.      "The burden of proof is on the debtor to demonstrate that the secured creditor is
adequately protected for purposes of using its cash collateral." *In re Hari Ram, Inc.*, 507 B.R.
114, 120 (Bankr. M.D. Pa. 2014) (citing *Resolution Trust Corp. v. Swedeland Dev. Grp., Corp.
(In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994)); *accord In re Pursuit
Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996).  Whether a party has been
afforded adequate protection is generally determined on a case-by-case basis.  *E.g.*, *In re
Swedeland Dev. Grp., Inc.*, 16 F.3d at 564.  The Bankruptcy Code provides some guidance in
determining whether a secured creditor or interest holder has been provided adequate protection.
*See* 11 U.S.C. § 361.

35.      Here, the Debtors fail, and in fact through the Notice have not even attempted, to
satisfy their burden to prove that the Proposed Order provides adequate protection for the
Patriarch Secured Claims.  The Patriarch Secured Parties hold over $832 million in secured Class
A and Cass B Notes issued by the Debtors.  As a result, they are one of the largest individual
secured creditors in these Chapter 11 cases, including the holders of the most senior notes issued
by Zohar I (or, in the worst case, subject only to approximately $10 million of senior claims,
which must be proven by MBIA).  And yet, the Debtors, MBIA, and the Zohar III Controlling
Class request that the Court approve a cash collateral order that contemplates individualized
adequate protection for MBIA, the Zohar III Controlling Class, and U.S. Bank by paying them

almost $2 million per month in legal fees, on top of post-petition interest, without making any payments to the Patriarch Secured Parties.

36.     While the Debtors have provided no justification for such individualized treatment in their Notice, in connection with the Initial Proposed Order, the Debtors previously justified this individualized treatment for MBIA and the Zohar III Controlling Class by asserting that, if they just made the payments to U.S. Bank, then U.S. Bank "would have simply given effect to the Priority of Payments and the clear and unambiguous subordination provisions in Section 13.1 and paid those amounts over to the Senior Secured Parties (not Patriarch)." *See* Debtors' Reply to Initial Objection [D.I. 542], ¶ 22.   As explained below, this position is inconsistent with the Bankruptcy Code and the Indentures.  Accordingly, under the structure of the Proposed Order, which affords individualized adequate protection payments to MBIA and the Zohar III Controlling Class, as noteholders under the Indentures, the Patriarch Secured Parties must receive equal treatment.

1.     <u>The Patriarch Secured Parties Are Substantial Secured Creditors In These Cases and Are Entitled to Individualized Adequate Protection to the Same Extent as MBIA and/or the Zohar III Controlling Class.</u>

37.     The Patriarch Secured Parties' Notes are secured by the same liens as the senior Notes under the Indentures, and therefore, regardless of the existence of notes senior in right of payment (which is not the case with Zohar I, where Patriarch XV is the senior noteholder), the Patriarch Secured Parties are not junior lienholders.  Even junior secured lenders, however, may be entitled to adequate protection of their interests under Bankruptcy Code section 363(c)(2), even if they are payment-subordinated or lien-subordinated (which is not the case here) to a senior secured lender.  *E.g.*, *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir. 1992)

(affirming bankruptcy court order overruling senior secured lender's objection to diversion of cash collateral to pay attorneys' fees of junior secured creditor).[9]

38.    In fact, Judge Posner could not have been more clear that a junior secured lender is entitled to adequate protection payments in a bankruptcy case, when he reasoned and held as follows:

> But is it permissible to bite into [a senior secured lender's liens] in order to pay attorney's fees and to protect the interest of another, but junior, secured creditor? We think so, given the oversecured character of Metropolitan's claim. A security interest is—a security interest. It is not a fee simple. . . . It has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest.

*In re James Wilson Assocs.*, 965 F.2d at 171.

39.    Here, the Patriarch Secured Parties hold over $832 million in secured notes issued by the Debtors. This includes over $286 million in Class A-3 Notes issued by Zohar I. As a result of MBIA's foreclosure and credit bid, these Class A-3 Notes are the most senior notes issued by Zohar I (or, in the worst case, subject only to approximately $10 million of senior claims, which must be proven by MBIA). Further, the Patriarch Secured Parties hold $546 million in Class B Notes among the Zohar Funds. The Class B Notes and the Class A Notes are secured by the same collateral, and have equal lien priority. Indenture, pp. 1–2 ("Such Grants . . . secure . . . the Notes ***equally and ratably without prejudice, priority, or distinction between***

---

[9]    Indeed, cash collateral orders in Delaware bankruptcy courts routinely include provisions for adequate protection of junior secured creditors in the form of, *inter alia*, periodic cash payments, replacement liens, attorneys' fees, and administrative priority claims. *See, e.g.*, *In re Gen. Wireless Operations Inc.*, 2017 WL 5462990, at *12 (Bankr. D. Del. Apr. 11, 2017) (cash collateral order granting adequate protection to junior lienholders in the form of, *inter alia*, weekly mandatory payments, and subjecting revisions of the cash collateral budget to the written consent of the junior lien agent); *In re Marsh Supermarkets Holding, LLC*, 2017 WL 5463219, at *1 (Bankr. D. Del. July 19, 2017) (cash collateral order providing that a certain junior secured noteholder is entitled to adequate protection in the form of replacement liens); *In re Nuverra Envtl. Sols., Inc.*, 2017 WL 5483147, at *21 (Bankr. D. Del. June 6, 2017) (DIP and cash collateral order granting second lien lenders adequate protection in the form of attorneys' fees and superpriority claims).

*any Note and any other Note by reason of difference in time of issuance or otherwise*, except as expressly provided in this Indenture . . . .") (emphasis added).[10]  The Patriarch Secured Parties' substantial interests in the Debtors and their cash collateral are entitled to individualized adequate protection to the extent MBIA and the Zohar III Controlling Class are so entitled.

40.    The Final Cash Collateral Order incorporated the equality of treatment among secured creditors and provided for payment of the Patriarch Secured Parties' legal fees, along with those of MBIA and the Zohar III Controlling Class.  Nothing in the record justifies the Proposed Order's deviation from that fair treatment and resulting disparate, punitive, and inequitable treatment of the Patriarch Secured Parties.

2.    <u>The Priority of MBIA's and the Zohar III Controlling Class's Secured Claims Is in Bona Fide Dispute and Cannot Be Used as an Argument to Disenfranchise the Patriarch Secured Parties.</u>

41.    A secured creditor whose claim or lien is in bona fide dispute is not entitled to adequate protection pending a determination of the validity of such claim or lien.  *See, e.g.*, *In re*

---

[10]  Given the lack of information in the Notice, it is unclear whether the Debtors continue to assert that the liens securing the Class B Notes are junior to the liens securing the Class A Notes and Credit Enhancement Liabilities due to Section 13.1 of the Indentures.  To the extent they continue to assert this position, it is plainly incorrect under the plain language of the Indentures.  The language at issue provides:

Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A Notes and the Credit Enhancer that the ***Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral*** (collectively, the "<u>Subordinate Interests</u>") shall be subordinate and junior to the Class A Notes, all Credit Enhancement Liabilities and all Credit Enhancement Premium (the "<u>Senior Interests</u>") ***to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided***.

Indenture, § 13.1(a) (emphasis added).  This language does not result in lien subordination.  *First*, the language "rights in and to the Collateral" is limited to the "Issuer's rights."  The lack of a possessive apostrophe in referring to the Class B Notes makes clear that while the Class B Notes, themselves, are subordinate, any "rights in and to the Collateral" are not.  *Second*, the subordination is limited to the extent provided in the Indenture.  Sections 11.1 and 11.2 provide the payment waterfall, but do not provide lien subordination.  Nor does any other provision of the Indentures.  As a result, the Class B Notes are not lien subordinated—they are only payment subordinated under the Indentures' waterfall.  U.S. Bank agreed with this interpretation of the Indentures in connection with the litigation over the Initial Proposed Order.  *See* U.S. Bank Reply to Initial Objection [D.I. 530], ¶ 5 ("The Trustee agrees with Patriarch" with respect to Patriarch's contention that the Indentures do "not result in lien subordination.").

*Waste Alternatives, Inc.*, 171 B.R. 147, 148 (Bankr. M.D. Fla. 1994) (declining to grant adequate protection to creditor pending determination of validity and extent of lien); *In re Cook*, 384 B.R. 282, 291 (Bankr. N.D. Ala. 2008) (finding that if a creditor were to "amend his request and allege lack of adequate protection, he will be required to first prove he has an interest in the Property . . . which entitles him to adequate protection"). A bona fide dispute exists when there is an objective basis for a legal or factual dispute. *In re DVI, Inc*., 306 B.R. 496, 504 (Bankr. D. Del. 2004) (citing *In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991)).

42.     In connection with the Initial Proposed Order, the Debtors and other parties defended the payment of MBIA's and the Zohar III Controlling Class's legal fees—without paying the Patriarch Secured Parties' fees—on the ground that MBIA and the Zohar III Controlling Class hold senior claims vis-à-vis the Patriarch Secured Parties. As explained below, the Indentures do not support subordination of the Patriarch Secured Parties' legal fees to other noteholders' similar fees. *See infra* Section C. Even if this were not the case, the secured claims of MBIA and the Zohar III Controlling Class are subject to the Equitable Subordination Complaint as a result of their prepetition wrongdoing and substantial harm caused to Patriarch. If Patriarch succeeds in this litigation, then the Patriarch Secured Parties will be entitled to payment on account of the Patriarch Secured Claims before payment to MBIA and/or the Zohar III Controlling Class.

43.     Courts routinely consider the viability of equitable subordination or another bona fide challenge to a claim when ruling on relief sought by secured creditors. For example, an equitable subordination defense can preclude the granting of relief from the automatic stay. *See In re Poughkeepsie Hotel Assocs. Joint Venture*, 132 B.R. 287, 293 (Bankr. S.D.N.Y. 1991) ("Should, for example, the respondent to a motion for relief from the automatic stay prevail on

an equitable subordination defense, the movant would be deprived of secured status, thereby

creating equity for the benefit of the estate. . . . While adjudication of the merits of potential

counterclaims and affirmative defenses could seriously infringe upon the creditor's right to an

expedited hearing, it is perfectly appropriate to acknowledge the presence of such claims in

determining that creditor's equitable right to relief."); *see also In re Lister-Petter Americas, Inc.*,

No. 15-10502, 2017 WL 1511888, at *10 (Bankr. D. Kan. Apr. 26, 2017); *In re Palmdale Hills*

*Prop., LLC*, 423 B.R. 655, 664 (B.A.P. 9th Cir. 2009), *aff'd*, 654 F.3d 868 (9th Cir. 2011); *In re*

*Springs Hosp., Inc.*, No. 06-13331 HRT, 2006 WL 2458679, at *9 (Bankr. D. Colo. Aug. 22,

2006); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 327 (Bankr. S.D.N.Y. 2001).  Yet here,

the Proposed Order impermissibly grants MBIA and the Zohar III Controlling Class adequate

protection and other benefits superior to those of Patriarch when the priority of their claims is in

bona fide dispute as a result of the Equitable Subordination Complaint.  If Patriarch prevails in

that action and the claims of MBIA and the Zohar III Controlling Class are subordinated to

Patriarch's, those parties may not be entitled to adequate protection at all, let alone the millions

upon millions of dollars being sought here.

        3.      <u>The Proposed Order Is Aimed at Securing a Litigation Advantage, Rather Than Providing Adequate Protection to Secured Creditors</u>.

44.     While "'adequate protection' is meant only to assure that a secured creditor does

not suffer a decline in the value of its interest in the estate's property," *In re Energy Future*

*Holdings Corp.*, 546 B.R. at 581, the proposed Budget and a recent filing by the Debtors in the

SDNY Action make clear that the Proposed Order's payment of professional fees for MBIA and

the Zohar III Controlling Class, excluding Patriarch, is nothing but a tactic to attempt to gain or

bestow an advantage in litigation outside this Court.  Such relief is not consistent with the

purpose of adequate protection and should not be approved by this Court.

45.     In the Debtors' recent motion to transfer venue in the SDNY Action, the Debtors assert that "MBIA and the Zohar III Controlling Class are also entitled to receive, as adequate protection under 11 U.S.C. § 361, payment of the fees and expenses of their professionals," citing the Final Cash Collateral Order, suggesting that the Final Cash Collateral Order and the Proposed Order require the Debtors to fund MBIA's and the Zohar III Controlling Class's litigation costs in the SDNY Action.[11]  MBIA and the Zohar III Controlling Class joined in this position.[12]  It is highly questionable whether MBIA's and the Zohar III Controlling Class's fees in defending the SDNY Action are in fact covered by either the Final Cash Collateral Order or the Proposed Order, given that the right to reimbursement of fees in such order is limited to fees "in connection with (i) the [Chapter 11] Cases or any successor case; (ii) the Settlement Agreement; (iii) the Transaction Documents; or (iv) enforcement of any rights or remedies under the Transaction Documents . . . ."  Final Cash Collateral Order, ¶ 12(c); Proposed Order, ¶ 12(c). Inter-creditor litigation based on MBIA's and the Zohar III Controlling Class's bad faith conduct prior to the Petition Date does not appear to fall within the limited scope of attorneys' fees reimbursable under the Final Cash Collateral Order or Proposed Order.

46.     Nonetheless, the Debtors appear to have adopted this position, as they have agreed to a Budget under the Proposed Order that, if approved, would pay monthly attorneys' fees to MBIA exceeding $1.15 million, to the Zohar III Controlling Class of $460,000, and to U.S. Bank of $525,000.  ***This doubles, and in some cases quadruples***, the budgeted professional fees for these parties in connection with the original budget under the Final Cash Collateral

---

[11]   *See Zohar Funds' Memorandum of Law in Support of Motion to Transfer Venue*, Dkt. No. 152, SDNY Action (S.D.N.Y.), a true and correct copy of which is attached hereto as Exhibit A.

[12]   *See Third-Party Defendants MBIA Inc.'s, MBIA Insurance Corp.'s, Credit Value Partners, LP's, Halcyon Capital Management LP's, Cooperatieve Rabobank U.S.'s and Varde Partners, Inc.'s Joinder in Plaintiff Zohar Funds' Motion to Transfer Venue*, Dkt. No. 155, SDNY Action (S.D.N.Y.), a true and correct copy of which is attached hereto as Exhibit B.

Order.  *See* Final Cash Collateral Order, Ex. 1.  MBIA, the Zohar III Controlling Class, and U.S. Bank have had limited roles in these cases to date.  The only justification for this increase in fees is to fund their defense of inter-creditor litigation with Patriarch.

47.     By agreeing to fund litigation costs of MBIA, the Zohar III Controlling Class, and U.S. Bank, but withholding reimbursement of Patriarch's expenses, the Debtors have favored one creditor group over another, without any legitimate basis.  This is not at all the purpose of adequate protection under the Bankruptcy Code and is inconsistent with the Debtors' and the Indenture Trustee's fiduciary duties.  The Court should not condone such gamesmanship.

**B.     The Proposed Payments of Post-Petition Interest Are Individualized Forms of Adequate Protection that Violate Bankruptcy Law and New York Law to the Detriment of Patriarch.**

      1.     <u>The Bankruptcy Code Prohibits Payment of Post-Petition Interest to Senior Noteholders Unless Patriarch Is or Will Be Paid in Full.</u>

48.     The Bankruptcy Code disallows post-petition interest as unmatured interest under Bankruptcy Code section 502(b)(2).  This general rule is subject to an exception under section 506(b), if the creditor's allowed claim is secured by property with value that exceeds the allowed claim amount.  11 U.S.C. § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim . . . provided for under the agreement . . . under which such claim arose.").  Absent meeting the statutory standard under section 506(b), a creditor is not entitled to payment of post-petition interest.  *See United Sav. Ass'n of Tx. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73 (1988) ("Since [section 506(b)] permits postpetition interest to be paid only out of the 'security cushion', the undersecured

creditor, who has no such cushion, falls within the general rule disallowing post-petition

interest.").

49.      Given that the Indenture Trustee is the sole lienholder pursuant to the applicable

Indentures, *see infra*, the Indenture Trustee is the only party that could be entitled to receive

payment of post-petition interest.[13]  The ultimate burden is on the party seeking payment of post-

petition interest pursuant to section 506(b) to establish that a creditor is over-secured.  *Official*

*Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R.

549, 590 (Bankr. S.D.N.Y. 2013) (citing *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d

Cir. 2012)).  Pursuant to section 506(a) of the Bankruptcy Code, in order for the Indenture

Trustee to be over-secured (and, thus, entitled to post-petition interest), the value of the collateral

securing the Indenture Trustee's lien must exceed the Indenture Trustee's secured claim amount.

11 U.S.C. § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the

estate has an interest . . . is a secured claim to the extent of the value of such creditors' interest in

the estate's interest in such property . . .  and is an unsecured claim to the extent that the value of

such creditor's interest . . . is less than the amount of such claim.").  But this would require a

showing that the Indenture Trustee's lien—which secures the value of all of the Notes, as to all

of the Secured Parties (including the Patriarch Secured Parties as shown in the amounts set forth

in the chart in Section A above )—is over-secured.  The Debtors and the Indenture Trustee have

---

[13]   In litigating the Initial Proposed Order, the Debtors and the Indenture Trustee asserted that the only lien granted
under each of the Indentures was granted to the Indenture Trustee.  *See* Debtors' Reply to Initial Objection, ¶ 20
("[T]here is only one 'secured' party – U.S. Bank, as Indenture Trustee . . . . Accordingly, the Indentures
expressly provide the Indenture Trustee is the lienholder – not the individual noteholders[.]"); U.S. Bank Reply
to Initial Objection, ¶ 5.  Insofar as there is only one grant of liens under each of the respective Indentures to the
Indenture Trustee, only the Indenture Trustee is entitled to receive adequate protection from the Debtors
because only the Indenture Trustee, as lienholder, has an interest in cash collateral.  *See* 11 U.S.C. § 363(c)(2).
The Debtors have agreed that—as a matter of law—no individual creditor other than the Indenture Trustee is
entitled to be paid adequate protection payments.  *See* Debtors' Reply to Initial Objection, ¶ 22 ("[T]he only
party who can claim an entitlement to adequate protection is the Indenture Trustee because it is the sole
lienholder.").

failed to do so and, in fact, MBIA has even claimed previously that the record is devoid of

information as to the value of the collateral securing the Indenture Trustee's claim under each

indenture.  *See* MBIA Reply to Initial Objection [D.I. 540], ¶¶ 24–26.  As a result, because there

is no evidence that the Indenture Trustee's claims are over-secured, the Debtors should not be

permitted to pay any post-petition interest in connection with the Proposed Order.

50.     Put another way, the Indenture Trustee can never be deemed to be over-secured

(or even fully secured) unless and until it becomes apparent that the collateral value pledged to

the Indenture Trustee under an applicable Indenture supports the payment in full of all of the

Notes issued under such Indenture, including not only the Class A Notes held by MBIA and the

Zohar III Controlling Class, ***but also the Patriarch Secured Parties' Class A and Class B Notes***.

Hence, until there is a showing that the Patriarch Secured Parties can be paid in full pursuant to

an applicable Indenture, neither the Indenture Trustee (who holds the liens under each Indenture)

nor the other individual creditors who look to that lien for credit support are entitled to receive

post-petition interest pursuant to the Bankruptcy Code because there is no evidence the Indenture

Trustee's claim amount is over-secured.  *See* 11 U.S.C. § 502(b)(2).

51.     For example, in the case of *Ionosphere Clubs*, the indenture provided for the

issuance of three series of secured certificates (i.e., first priority series, second priority series, and

third priority series) and designated individual series trustees for each series of certificates.  *First

Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528, 529

(Bankr. S.D.N.Y 1991).  To secure repayment of all three series of certificates, the debtor

granted a single lien on a designated pool of assets to the collateral trustee.  *Id.*  While the

debtor's chapter 11 case was pending, the debtor, the series trustees, and the collateral trustee

entered into an agreement providing for stay relief and the debtor's turnover of all collateral to

the collateral trustee.  *Id.* at 530.  After the collateral had been turned over to the collateral trustee, the collateral trustee received conflicting instructions from the series trustees with respect to the distribution of the collateral among the various series of certificate holders.  *Id.*

52.     The collateral trustee sought a determination from the bankruptcy court, based on an interpretation of the indenture, as to whether the first series certificate-holders held an over-secured claim, thereby entitling them to post-petition interest under section 506(b).  *Id.* at 531–32.  The court noted that "[i]n order to decide whether a claim exists . . . for post-petition interest, it must be determined whether, under § 506(b), the three series hold three separate secured claims or are co-owners of one secured claim."  *Id.*  The court determined that the indenture provided for only one lien to secure the claims of all three series of certificate-holders and, as such, there was only one claim:

> The parties have not cited and this Court has not located any cases that hold that the granting of one lien can give rise to more than one secured claim. While § 506(a) bifurcates an undersecured claim into two claims, one secured and one unsecured, there is no indication in the Code that any similar procedure should be followed to allow separate secured claims to separate classes of certificateholders who jointly hold one lien.

*Id.* at 532.

53.     The same is the case here.  Because no party can be over-secured unless and until it is demonstrated that there is value to pay all of the Notes under an applicable indenture in full (including the Patriarch Secured Parties' Notes), no party is entitled to be paid post-petition interest under section 506(b) of the Bankruptcy Code.

54.     Indeed, given the substantial amounts owed to the Patriarch Secured Parties as holders of Class A and Class B Notes, paying MBIA and the Zohar III Controlling Class disallowed post-petition interest as "adequate protection" on account of the Class A Notes defies logic and is plainly impermissible.  Assuming, arguendo, that the Indenture Trustee's liens are

over-secured under each of the Indentures (which the Debtors have not established and MBIA has contested), this would mean that the value of the collateral securing such liens significantly exceeds the portion of the Indenture Trustee's claim amount attributable to the Class A Notes.  It would mean that the collateral has value over and above the amount of the Class A Notes by $150 million at Zohar I, $200 million at Zohar II, and $196 million at Zohar III.  In such a scenario, where the collateral value securing the Indenture Trustee's lien under each Indenture significantly exceeds the amount of the Class A Notes, there is no need to provide the holders of these Class A Notes with individualized adequate protection because there is a substantial cushion in the value of the collateral over and above the amount of the Class A Notes.  As such, the holders of Class A Notes would not face any diminution in value of their interest in such property.  *See Nantucket Investors II v. Cal. Federal Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 207–08 (3d Cir. 1995).

55.     Exacerbating matters further, the Debtors have not even attempted to make a showing that the Indenture Trustee's claim under each Indenture is over-secured by the value of the underlying collateral.  In fact, MBIA has previously gone out of its way to assert that there is "no evidence of valuation" of the collateral securing the Indenture Trustee's claims under the Indentures.  MBIA Reply to Initial Objection, ¶ 24.  MBIA has asserted that numerous indications as to value (identified by Patriarch in the Initial Objection), including statements and public disclosures from MBIA itself and its employees, are "irrelevant" and "do not constitute reliable evidence," and, as such, there is an "absence of evidence of value" in the record.  *Id.* at ¶¶ 24–26.  As such, the Debtors have not carried the burden of establishing that the holders of Class A Notes are entitled to payment of post-petition interest—there is no evidence in the record to establish that the liens of the Indenture Trustee under each of the Indentures are over-

secured.  Accordingly, pursuant to section 506(b) of the Bankruptcy Code, payment of post-petition interest should not be permitted.

> 2.    The Payment Under the Proposed Order of Disallowable Post-Petition Interest Violates New York's Rule of Explicitness.

56.    As set forth above, the Debtors have not provided—and by all accounts do not intend to provide—any evidence that the Indenture Trustee's claims are over-secured under the applicable Indentures.  Accordingly, section 506(b) cannot be relied upon to assert an entitlement to the payment of post-petition interest of the Controlling Secured Parties and the Indenture Trustee.  Nonetheless, the Debtors appear to believe that the proposed post-petition interest payments to the Class A Noteholders do not harm Patriarch because the waterfall provisions in the applicable Indentures somehow permit the payment of disallowed post-petition interest to the holders of Class A Notes on a senior basis.

57.    The Debtors' reasoning, however, is in contravention of New York's "Rule of Explicitness,"[14] which provides that a junior creditor can only be subordinated to disallowable post-petition interest of a senior creditor if there is "precise, explicit and unambiguous language" in the relevant subordination agreement providing for the senior creditor's entitlement to post-petition interest in the event that the debtor files for bankruptcy.  *See U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*, 569 B.R. 12, 22–23 (S.D.N.Y. 2017); *In re Washington Mut., Inc.*, 461 B.R. 200, 250 (Bankr. D. Del. 2011), *vacated in part on other grounds*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (Rule of Explicitness relevant in determining applicability of Bankruptcy Code section 510(a) to New York subordination agreements).[15]  Generally, courts have only

---

[14]  Each of the Indentures is governed by New York law.  *See, e.g.*, Zohar I Indenture, § 18.9.

[15]  While some courts have questioned whether the Rule of Explicitness survived the enactment of section 510(a) of the Bankruptcy Code, in *In re SE. Banking Corp.*, the Eleventh Circuit held that the question was one of "applicable non-bankruptcy law" under section 510(a) and certified to the New York Court of Appeals the

found the Rule of Explicitness satisfied where there are unambiguous references to subordination of a junior creditor interest to payment of post-petition interest (sufficient to alert the junior creditor to such possibility), whether or not such post-petition interest constitutes part of the senior creditor's allowed claim. *See In re Ionosphere Clubs, Inc.*, 134 B.R. at 534–35 (holding that indenture that explicitly mentioned subordination to "post-petition interest" which was "owing" did not meet rule of explicitness because it did not explicitly mention that subordinated debt was subordinate to interest otherwise disallowed under section 502(b)(2) of the Bankruptcy Code, failing to alert the junior creditors to such possibility).

58.      In the Indentures at issue, there is no language explicitly setting forth that junior creditor claims are subordinated to senior creditor post-petition interest (let alone disallowed post-petition interest).  The Indentures solely provide that the "Subordinate Interests" (which include the Class B Notes) shall be "subordinate and junior" to the "Senior Interests" (which

---

question, "[w]hat, if any, language does New York law require in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest?"  156 F.3d 1114, 1125 (11th Cir. 1998).  The New York Court of Appeals responded that "this Court can and should recognize the Rule of Explicitness" and that in order to include post-petition interest as senior debt, "New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest demand."  *In re SE. Banking Corp.*, 93 N.Y.2d 178, 186 (1999); *see also In re Tribune Media Co.*, 472 B.R. 223, 250 (Bankr. D. Del. 2012), *aff'd in part, vacated in part*, No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014) (interpreting Delaware and Illinois law and citing *Washington Mutual* favorably with parenthetical: "applying New York law—which still requires the Rule of Explicitness—to interpret a subordination agreement on the post-petition interest issue"); *In re Energy Future Holdings Corp.*, 566 B.R. 669, 688 (Bankr. D. Del. 2017), *aff'd*, 585 B.R. 341 (D. Del. 2018), *aff'd*, 773 F. App'x 89 (3d Cir. 2019) (declining to extend the SDNY's holding in U.S. Bank—that Rule of Explicitness applies as a matter of New York contract law—in part because distributions were not subject to the waterfall at issue); *In re K-V Discovery Sols., Inc.*, 496 B.R. 330, 336–37 (Bankr. S.D.N.Y. 2013), *as corrected* (Aug. 28, 2013) ("Whatever the validity of this holding [in a First Circuit case rejecting the Rule of Explicitness], the Court went on to demonstrate why the Rule of Explicitness is alive and well notwithstanding the adoption of § 510(a) of the Bankruptcy Code."); *In re Washington Mut., Inc.*, 461 B.R. at 249–50 ("The Court disagrees . . . that the Rule of Explicitness is no longer applicable.  While section 510(a) provides that subordination agreements are enforceable, it states that they are only enforceable 'to the same extent that such agreement is enforceable under applicable law.'"); *In re Times Sales Finance Corp.*, 491 F.2d 841, 844 (3rd Cir. 1974) ("If a creditor desires to establish a right to post-petition interest and a concomitant reduction in the dividends due to subordinated creditors, the agreement should clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended.").

include the Class A Notes) "to the extent and in the manner set forth in this Indenture," including the waterfall provisions of Sections 11.1 and 11.2. *See, e.g.*, Zohar I Indenture, § 13.1(a). This language does not provide an unambiguous reference to the subordination of the Subordinate Interests to the payment of post-petition interest to the holders of Senior Interests, whether or not such post-petition interest is allowed as part of the Indenture Trustee's claim. No other provision of Section 13.1, the waterfall provisions of Sections 11.1 and 11.2, or any other provision of the Indentures provides any specific reference to disallowed post-petition interest.[16]

59.     Additionally, the Class B Notes themselves provide only that "the payments of principal and interest on this Note and the Commitment Fee and all other amounts due on this Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture." This language is likewise too general and does not provide for the unambiguous language needed to meet the Rule of Explicitness and permit the payment of post-petition interest to the holders of Class A Notes.

60.     Put simply, neither the Indentures nor any of the other supporting documents can be credibly read to meet the Rule of Explicitness. Accordingly, neither the Patriarch Secured Parties nor any other holders of Subordinate Interests can be forced to subsidize the disallowable post-petition interest claims of the Senior Interests under the guise of individualized adequate protection. As the Debtors have no authority—under the Bankruptcy Code or the applicable Indentures' waterfalls or subordination provisions—to pay the holders of Senior Interests post-

---

[16] Section 13.1 of the Indentures provides that upon certain "bankruptcy" defaults, the Senior Interests are entitled to be paid in full and in cash before the Subordinated Interests are entitled to any recovery on account of their claims. Yet "payment in full" does not include payments of amounts that are otherwise disallowed under bankruptcy law, because such debt is never "payable" in the first instance. *See MW Post Portfolio Fund Ltd. v. Norwest Bank Minn., N.A. (In re Onco Inv. Co.)*, 316 B.R. 163, 166–67 (Bankr. D. Del 2004); *Kellogg v. U.S. (In re W. Texas Mktg. Corp.)*, 155 B.R. 399, 404 (Bank. N.D. Tex. 1993) ("In a bankruptcy proceeding, postpetition interest on unsecured claims is due and payable upon payment of the allowed claims and only if there is a surplus.").

petition interest to the detriment of the holders of Subordinate Interests, the Proposed Order

should not permit them to do so.

### C. The Proposed Order Impermissibly Provides for Payment of Professional Fees to MBIA and the Controlling Noteholders In Violation of the Waterfalls Set Forth in the Indentures.

61.     As discussed above, the Debtors and the Indenture Trustee previously conceded

that no party other than the Indenture Trustee is entitled to individualized adequate protection.

Inexplicably, however, the Proposed Order attempts to provide for the payment of fees and

expenses to certain creditors to the detriment of others.  *See* Proposed Order, ¶¶ 12(a)–(c).  Like

the proposed payment of disallowed post-petition interest, such individualized adequate

protection payments run afoul of the Bankruptcy Code and the applicable Indentures.[17]

62.     As set forth previously, the Debtors have not provided any record evidence that

the Indenture Trustee's claims are over-secured under the applicable Indentures.  Accordingly,

section 506(b) is inapplicable here and cannot be relied upon to assert an entitlement to the

payment of fees and expenses of the Controlling Secured Parties and the Indenture Trustee.  *See*

11 U.S.C. § 506(b).  In light of this, the Debtors, the Indenture Trustee, and MBIA previously

---

[17]  In considering a creditor's entitlement to payment of fees and expenses, the Bankruptcy Code provides that payment of reasonable fees and expenses is permitted pursuant to section 506(b) when the creditor is over-secured.  11 U.S.C. § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim . . . any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose.").  The ultimate burden under section 506(b) is on the party seeking payment of post-petition fees to establish that a creditor is over-secured and, thus, entitled to payment of fees.  *In re Residential Capital, LLC*, 501 B.R. at 590 (citing *In re Heritage Highgate, Inc.*, 679 F.3d at 140).  The Debtors and the Indenture Trustee have failed to make such showing and, as a result, so long as the Debtors seek entry of a cash collateral order that favors MBIA and the Zohar III Controlling Class over Patriarch, the Debtors should not be permitted to pay post-petition fees and expenses pursuant to section 506(b) of the Bankruptcy Code.  (Unlike post-petition interest, which is expressly disallowed under 11 U.S.C. § 502(b)(2), there is no provision of the Bankruptcy Code that explicitly disallows fees and expenses as unsecured claims.  *See In re Tribune Media Co.*, No. 1:15-CV-01116-RGA, 2018 WL 6167504, at *2 (D. Del. Nov. 26, 2018).)  In addition to the inapplicability of section 506(b) of the Bankruptcy Code, the Controlling Secured Parties and the Indenture Trustee are not entitled to payment of their fees and expenses under the applicable Indentures.  As such, the Proposed Order should not be permitted to change this.

argued that the waterfalls in the applicable Indentures provide for the Controlling Secured Parties and the Indenture Trustee to recover their fees ahead of the Subordinate Interests held by the Patriarch Secured Parties.  *See* Debtors' Reply to Initial Objection, ¶ 22  ("Here, the adequate protection being offered by the Debtors is entirely consistent with, and gives effect to, the provisions of the Indentures."); U.S. Bank Reply to Initial Objection, ¶ 4 ("The Indentures already dictate the applicable payment priorities . . . ."); MBIA Reply to Initial Objection, ¶ 8 (noting that Settlement Agreement provides for payments to "flow through the Indentures' respective priority waterfalls . . ."); *but see* Zohar III Controlling Class Reply to Initial Objection [D.I. 544], ¶ 14 (noting, "[i]ronically, Patriarch demands that funds flow through the Priority of Payments in the Indenture, yet payment of Patriarch's fees would require funds to flow contrary to the Priority of Payments . . . ").

63.     Contrary to the Zohar III Controlling Class's assertion, the Patriarch Secured Parties *agree* that the subordination provisions set forth in the Indentures are enforceable pursuant to their express terms under the Bankruptcy Code.  *See* 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the extent that such agreement is enforceable under applicable nonbankruptcy law."); *see also* U.S. Bank Reply to Initial Objection, ¶ 4 ("The Indentures already dictate the applicable payment priorities, and the contractual subordination features of the Indentures are undoubtedly enforceable under section 510(a) of the Bankruptcy Code.").  The Patriarch Secured Parties, however, *disagree* that the payment of fees to the Controlling Secured Parties and the Indenture Trustee ahead of the Patriarch Secured Parties' fees is authorized—let alone required—by the waterfall provisions of the Indentures (on which the Debtors and these favored creditors purport to rely).

64.     For instance, MBIA previously argued that it is somehow entitled to be paid its legal fees in its capacity as the "Credit Enhancer," for which it incurs "Credit Enhancement Liabilities."  *See* MBIA Reply to Initial Objection, ¶ 9 n.10 ("Patriarch's objection to the payment of creditor legal fees as adequate protection fails to acknowledge that such fees are part of the Credit Enhancement Liabilities owed to MBIA as the Credit Enhancer pursuant to the Indenture.").  But there are fundamental problems with MBIA's argument.

65.     The Credit Enhancement Liabilities are not a continuing liability under the express terms of the Indentures and, therefore, are neither required nor authorized to be paid pursuant to the waterfalls contained therein.  This is because the determination of what amounts are due and owing as Credit Enhancement Liabilities is tied to specific payment dates pursuant to the terms of the Indentures.  Therefore, once the calculation periods for the Credit Enhancement Liabilities have expired, there will never be any Credit Enhancement Liability amounts that are accrued and unpaid.  Because the Credit Enhancement Liability calculation periods pursuant to the Zohar I and Zohar II Indentures end in November 2018 and January 2020, respectively, no fees shall be accrued and unpaid after these dates.  Specifically, the Zohar I Indenture and Zohar II Indenture provide as follows:

- "Credit Enhancement Liabilities" are "[w]ith respect to any ***Payment Date***, an amount equal to all accrued and unpaid amounts owing by the Issuer to the Credit Enhancer pursuant to the Credit Enhancement Agreement ***as of the related Determination Date*** in respect of the Credit Enhancement or otherwise . . . ."  *See, e.g.*, Zohar I Indenture, p. 22 (emphasis added).

- The "Determination Date" in turn is defined as the last day of the "Due Period."  *See id.* at 24.

- The "Due Period" in turn is defined as "[w]ith respect to any ***Payment Date***, the period commencing immediately following the eighth Business Day prior to the preceding Payment Date . . . and ending on (and including) the eighth Business Day prior to such Payment Date . . . ."  *See id.* at 25 (emphasis added).

- "Payment Date" is the 20th of every February, May, August, and November of each year, provided that, in the case of the Zohar I indenture, "the final Payment Date will be November 20th 2018," and with respect to the Zohar II indenture, "the final Payment Date will be January 20th, 2020." *See id.* at 41; Zohar II Indenture, p. 47.

66. Because the Credit Enhancement Liabilities are tied to a Payment Date, by the express terms of the Indentures, there simply can never be any Credit Enhancement Liabilities accruing that are due and owing other than on a stated Payment Date. And because the final Payment Dates under the Zohar I and Zohar II Indentures have occurred or will occur in January 2020, there is no go-forward entitlement to any Credit Enhancement Liabilities because no such amounts will be due and owing on a go-forward basis pursuant to the express terms of the Zohar I and Zohar II Indentures.

67. Apparently realizing as much, the Proposed Order attempts a wholesale re-write of the Indentures' waterfall provisions by providing for a "Special Payment Date" that would extend the accrual of "Credit Enhancement Liabilities" potentially into perpetuity. *See* Proposed Order, ¶ 9(b) (providing for a "Special Payment Date" on any date that "Excess Cash" exists, which "may be deemed a 'Payment Date' under the Indentures" and providing for payment in accordance with the Proposed Order, in contravention of the waterfall set forth in the Indentures). Not only is this work-around of the Indentures' waterfall provisions disingenuous (particularly in the light of the Debtors', Indenture Trustee's, and MBIA's continuing insistence that the waterfall provisions of the Indentures be followed), but it violates section 510 of the Bankruptcy Code by subverting the express terms of a subordination agreement (i.e., the waterfall in the Indentures), which is enforceable pursuant to the Bankruptcy Code to the same extent as under applicable non-bankruptcy law. 11 U.S.C. § 510(a); *see also* U.S. Bank Reply to Initial Objection, ¶ 5 ("The Indentures already dictate the applicable payment priorities, and the

contractual subordination features of the Indentures are undoubtedly enforceable under E(a) of the Bankruptcy Code.").[18]

68.    As to the Zohar III Indenture, the Zohar III Controlling Class did not even bother to make the effort to argue that payment of their fees and expenses is provided in the waterfall under the Zohar III Indenture.  In fact, the Zohar III Controlling Class could not make such argument because the Zohar III Indenture is devoid of the "Credit Enhancement Liabilities" concept.  As a result, the Zohar III Controlling Class, in advocating for the Initial Proposed Order, relied solely on the Debtors' argument that the Controlling Secured Parties' fees and expenses are payable pursuant to Section 5.3 of the Zohar III Indenture.  *See* Debtors' Reply to Initial Objection, ¶ 22 ("What is more, Patriarch acknowledges that the noteholders are 'entitled to payment of their attorneys' fees in connection with the "costs and expenses of collection"' under Section 5.3 of the Indentures (while failing to acknowledge that any such payment to the Patriarch Secured Parties is subordinate to the payment in full of the Senior Secured Parties)."); *see also* Zohar III Controlling Class Reply to Initial Objection, pp. 8–9.

69.    This argument too, however, fails.  The waterfall provisions of the Zohar III Indenture do not mention payments required to be made pursuant to Section 5.3 of the Indenture. Neither the Debtors nor the Controlling Secured Parties have pointed to any provision in the Zohar III Indenture that would require, let alone authorize, the payment of fees and expenses under Section 5.3 to the Controlling Secured Parties ahead of the fees and expenses under Section 5.3 payable to the holders of Subordinate Interests.

---

[18]    The Patriarch Secured Parties agreed to this provision in the Final Cash Collateral Order as part of a consensual resolution that treated all Secured Parties, including Patriarch, fairly through the payment of post-petition legal fees and expenses.  The Proposed Order unwinds the equitable structure of the Final Cash Collateral Order, and therefore is not consensual and cannot be used to bolster MBIA's rights beyond those provided under the Indentures.

70.     With respect to fees and expenses more generally, the Debtors and MBIA have previously asserted that any adequate protection payments made to the Patriarch Secured Parties would have to be immediately turned over to the holders of Senior Interests.  *See* Debtors' Reply to Initial Objection, ¶ 21 (noting that Class A Notes get paid before any "payment or distribution is made on account of the Subordinate Interests"); MBIA Reply to Initial Objection, ¶ 22 (stating that "if a Class B Noteholder receives any payment or distribution on account of its subordinated notes, such amounts much be turned over to the Trustee for satisfaction of the senior Class A Notes . . . .").  Nevertheless, this assertion is incorrect for the following reasons.

71.     *First*, the subordination provisions of Section 13.1 do not apply to adequate protection payments.  Section 13.1 of the Indentures only addresses the subordination of payments made "on account of Subordinate Interests."  Here, to the extent the Debtors were to make adequate protection payments to the Patriarch Secured Parties (in the form of fees and expenses or otherwise) such payments would be made expressly as adequate protection and not on account of the Patriarch Secured Parties' Subordinate Interests.  Such adequate protection payments would be made to compensate the Patriarch Secured Parties for the diminution in the value of the collateral held by the Indenture Trustee which would, in turn, put the Patriarch Secured Parties at risk.  Adequate protection is not a payment "on account" of a debt, but rather, it is designed to protect secured creditors against the diminution in value of their collateral.  *See* 11 U.S.C. § 361(1) (providing adequate protection payments to the extent of "a decrease in value of" an interest in property).

72.     Other courts addressing similar issues have also found that certain payments, including adequate protection payments, are not payments on account of a creditor's interest and, thus, not subject to subordination or turnover provisions.  For example, in *Energy Future*

*Holdings*, certain creditors argued that periodic adequate protection payments were made "in connection with" the relevant collateral and were, therefore, required to be allocated among the creditors in a manner that took into account the hypothetical accrual of post-petition interest under the various tranches of debt. *In re Energy Future Holdings Corp.*, 546 B.R. 566, 580–81 (Bankr. D. Del. 2016).  The court disagreed, stating that:

> Adequate Protection payments are ***not*** a payment of collateral—rather, adequate protection is designed to protect secured creditors against diminution in value of their collateral.  The purpose of adequate protection "is to protect a secured creditor from diminution in value of its interest in the particular collateral during the period of use by the debtor." . . . As such, adequate protection against diminution in the value of collateral does not constitute a payment of collateral.

*Id*. at 581 (emphasis added) (citation omitted).

73.     Because adequate protection payments are not a payment of collateral, such payments are also not made on "on account of" underlying debt.  Thus, any adequate protection payments made here would not be made "on account of Subordinate Interests" and, as a result, would not be subject to Section 13.1 of the Indentures.  In *Energy Future Holdings*, in affirming the lower court's rejection of the notion that payments were on account of collateral, the Third Circuit noted that a "payment of collateral reduces the amount of money owed on a debt," and that because the adequate protection payments "did not decrease the amount of money the [debtor] owed"—but were made "in exchange for the creditors' agreement to let the [debtor] use the collateral for other purposes"—such payments were not "payments of collateral." *In re Energy Future Holdings Corp.*, 773 F. App'x 89, 93 (3d Cir. 2019).

74.     This is the case here as well.  To the extent the Patriarch Secured Parties receive adequate protection payments from the Debtors, such payments would solely be to protect the Patriarch Secured Parties against the diminution in the value of their collateral.  Payment of fees

to the Patriarch Secured Parties in exchange for the Patriarch Secured Parties agreeing to allow the Debtors to use cash collateral would not reduce the Patriarch Secured Parties' outstanding claim amounts and, therefore, would not be "on account of" its underlying claim. *See Adequate Protection: Overview, Practical Law Practice Note Overview* 8-382-8989 (Thomson Reuters, 2019) ("[T]he creditor is only entitled to adequate protection in an amount equal to the decline in value of its collateral, measured at some point in time, and not the right to have its debt repaid. Secured creditors only have the right to have their collateral applied in repayment of the debt on completion of the bankruptcy case."). Accordingly, the turnover provisions in Section 13.1 of the Indenture are not applicable to adequate protection payments. Had the parties intended to include adequate protection payments as part of the subordinated obligations under Section 13.1 of the Indentures, they easily could have done so by explicitly referencing such payments. However, the parties did not do so here, clearly evidencing that Section 13.1 of the Indenture was not intended to address such a situation. *In re Energy Future Holdings Corp.*, 773 F. App'x at 93.

75.      *Second*, by its terms, Section 13.1 of the Indentures only subordinates the Patriarch Secured Parties' recovery "to the extent and in the manner set forth in the indenture." *See, e.g.*, Zohar I Indenture, § 13.1(a).[19] Because no provision of the Indentures expressly subordinates adequate protection payments made to holders of Subordinate Interests, no such subordination of adequate protection payments exists under Section 13.1 and no turnover requirement is implicated as a result. Moreover, as discussed above, the rationale from *Ionosphere Clubs* should apply with equal force to the payment of fees and expenses as it does to

---

[19]   As discussed above, as a result of MBIA's foreclosure and credit bid, Patriarch XV's Class A-3 Notes are the most senior notes issued by Zohar I (or, in the worst case, subject only to approximately $10 million of senior claims, which must be proven by MBIA).

the payment of post-petition interest.  Pursuant to *Ionosphere Clubs*, the subordination provisions

of the Indentures should be explicit in alerting junior creditors that their interests could

potentially be subordinated to the payment of senior creditor fees and expenses.  Because the

subordination provisions of the Indentures at issue here are not explicit with respect to junior

creditor subordination to senior creditor fees and expenses, no such subordination should exist.

*Ionosphere Clubs, Inc.*, 134 B.R. at 535 (where indenture could be read to subordinate junior

creditors but could also be read as "failing to tell the [subordinated creditors] that they would

have to pay the [senior creditors] post-petition interest, in the event of a reorganization," court

adopted reading not subordinating junior creditors).  Accordingly, the Proposed Order should not

now provide for the holders of Subordinate Interests to be subordinated to the fees and expenses

of the Controlling Secured Parties when the Indentures failed to specifically provide for such a

priority arrangement.

      **D.**      **The Proposed Order Should Be Modified to Allow the Debtors to Pursue Chapter 11 Plans and DIP Financing That Do Not Have the Consent of MBIA or the Zohar III Controlling Class.**

      76.      Under the Proposed Order, the Debtors are waiving any ability in these Chapter

11 cases to pursue a Chapter 11 plan or DIP financing that is not consented to by MBIA or the

Zohar III Controlling Class.  There is no basis at this point in these cases to give a limited body

of secured creditors the right to control the ultimate resolution of these cases, where the Debtors

have fiduciary duties to other creditors beyond MBIA and the Zohar III Controlling Class.  This

is particularly true (i) where both MBIA and the Zohar III Controlling Class are subject to the

Equitable Subordination Complaint based on their inequitable prepetition behavior and (ii) with

Zohar I, where Patriarch XV, not MBIA, is the remaining secured creditor as a result of MBIA's

prepetition foreclosure and credit bid.

77.    "[A]ny agreement authorizing the use of cash collateral under § 363(c)(2) must be approved by the bankruptcy court," which "must satisfy itself that the agreement complies with the Code." *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998).  The primary purpose of this review is to protect stakeholders who were not parties to the agreement.  *Id.* at 67–68 (citing 9 Collier on Bankruptcy ¶ 4001.08[4] (16th ed. 2019) ("there is seldom any need to protect the parties to the agreement, who may be deemed to have waived their rights to the extent the agreement does not comply with the Code")).

78.    In approving a post-petition agreement between a debtor and creditor, courts must assess "whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." *In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992).[20]  The court must ensure that the "agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

79.    In *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 569 (Bankr. D.N.H. 1989), the court rejected a post-petition financing agreement because, among other offensive provisions, it included as a "termination event" the confirmation of a plan of reorganization over the creditor's objection.  104 B.R. at 567–68.  The court found it objectionable that the creditor "would have the ultimate say over the very goal of this Chapter 11 case, a confirmed plan of reorganization. No longer could a plan be confirmed over the Bank's objection under the cram-down provisions

---

[20]  "Debtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a prepetition lien on cash collateral.  As a result, lenders often exact favorable terms that harm the estate and creditors." *Id.* (citing *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); *In re Tenney Vill. Co.*, 104 B.R. 562, 567–570 (Bankr. D.N.H. 1989)).

of § 1129(b)(2)(A) [because] [s]uch a confirmation is a 'termination event.'"  *Id.* at 568.  The

court viewed the agreement as one that "would pervert the reorganizational process from one

designed to accommodate all classes of creditors and equity interests to one specially crafted for

the benefit of the Bank and the [guarantors]."  *Id.*

80.     Under the Proposed Order, the Debtors are required to consult and negotiate with

MBIA and the Zohar III Controlling Class.  Proposed Order, ¶ 12(d)(5).  The Proposed Order

also includes as a "Termination Event" the filing of a plan that is not approved by MBIA, the

Zohar III Controlling Class, and U.S. Bank.  *Id.* at ¶ 18(a)(9).  The Patriarch Secured Parties

recognize it is not uncommon in this district for courts to enter cash collateral and DIP orders

that define termination events to include the filing of a Chapter 11 plan that does not pay a

creditor in full or that is not otherwise approved by the secured creditor.  However, the Proposed

Order goes a step further, and effectively forecloses any party in interest, including the Debtors,

from ever pursuing a Chapter 11 plan or DIP financing without MBIA's and the Zohar III

Controlling Class's consent.

81.     The Proposed Order expressly bars the Debtors from filing, seeking Court

approval of, or supporting any Chapter 11 plan or DIP Financing without the consent of U.S.

Bank, MBIA, or the Zohar III Controlling Class.  *Id.* at ¶ 12(d)(5).  If there is a dispute with

respect to such matters, then the dispute shall be referred to the Mediator, and in the absence of a

resolution, the "parties may submit the matter to the Bankruptcy Court for resolution."  *Id.*

Further, the Proposed Order provides that "[s]o long as this Order remains in effect," any

proceeds from post-petition financing, regardless of the source, must be paid to U.S. Bank for

distribution pursuant to the waterfall under the Indentures.  *Id.* at ¶ 31.  The net effect of these

provisions is that the Debtors will never be able to file a Chapter 11 plan that crams down, and

does not pay in full, MBIA or the Zohar III Controlling Class.  If the Debtors are no longer able

to use cash collateral due to the filing of a cram down plan, then they would likely require

alternative DIP financing in order to fund other administrative expenses of the case in order to

confirm the plan.  However, because paragraph 31 is tied to the Proposed Order "remain[ing] in

effect," rather than to a Termination Event, the Debtors and any co-plan proponent would not be

able to use DIP financing to fund any claims other than those under the Indentures.

82.     Further, the provision in the Proposed Order allowing the parties to mediate or

take to this Court any dispute over a Chapter 11 plan or DIP financing only unnecessarily

complicates these cases and creates a wholly ambiguous procedural posture and standard for this

Court to resolve any dispute.  For example, if a dispute is brought to the mediator or to the Court,

will the issue for review be whether MBIA, the Zohar III Controlling Class, or U.S. Bank

"unreasonably withheld" consent to the proposed Chapter 11 plan or DIP financing?  This is a

wholly unnecessary and ambiguous provision.  If the Debtors propose a Chapter 11 plan without

the consent of the secured parties, then that constitutes a Termination Event, and the parties can

litigate whether (i) the use of cash collateral should be granted without secured creditor consent,

(ii) a DIP financing should be approved, or (iii) a Chapter 11 plan can be confirmed over the

objection of MBIA or the Zohar III Controlling Class.  Bestowing any greater rights on MBIA or

the Zohar III Controlling Class, particularly in light of the obvious ambiguity in these provisions

in the Proposed Order, is wholly unnecessary and inappropriate.

83.     In sum, under the Proposed Order, MBIA and the Zohar III Controlling Class are

getting a significant blocking position should the Debtors later determine to exit the cases

through a Chapter 11 plan, or fund the cases through DIP financing, if not supported by their

secured creditors.  The Court should not permit the Debtors to waive such rights for the

exclusive benefit of a limited body of creditors, to the potential detriment of other stakeholders to whom the Debtors also owe fiduciary duties.

**E.    The Indenture Trustee Should Not Be Indemnified or Released.**

84.    The Proposed Order impermissibly releases the Indenture Trustee for breach of duty and other claims that the Patriarch Secured Parties may seek to assert in connection with the negotiation and implementation of the Proposed Order.  *See, e.g.*, Proposed Order, ¶ 5(b).  For the reasons explained above, the Proposed Order wholly runs afoul of the plain language of the Indentures and well-established legal principles, for the exclusive benefit of MBIA and the Zohar III Controlling Class, and to the detriment of the Patriarch Secured Parties.  The Indenture Trustee owes duties to all Secured Parties under the Indentures, and a release in favor of the Indenture Trustee is simply not appropriate in light of the blatant favoritism exhibited by the Proposed Order in its current form.

85.    Specifically, Section 5.3 of each of the Indentures provides that:

> In any Proceedings brought by the Trustee on behalf of the Secured Parties, the Trustee shall be held to represent all Secured Parties to which amounts are owing by the Issuer or the Co-Issuer under this Indenture, <u>provided</u> it shall not have any fiduciary obligations to any Secured Parties other than a Noteholder.

*See, e.g.*, Zohar II Indenture, p. 110.  A "[p]roceeding" is defined as "[a]ny suit in equity, action at law or other judicial or administrative proceeding."  *Id.* at 51.

86.    After utterly ignoring its contractual duty to the Patriarch Secured Parties in connection with the negotiation of the Proposed Order, the Indenture Trustee now seeks to add insult to injury by compelling the Patriarch Secured Parties to release the Indenture Trustee for claims that the Patriarch Secured Parties can assert against the Indenture Trustee pursuant to the terms of the Indenture.  *See* Proposed Order, ¶ 5(b) (providing Indenture Trustee with broad release from the Patriarch Secured Parties for any claims they may have for Indenture Trustee's

conduct arising out of or related to the Proposed Order); ¶ 6(g) (providing that the Debtors' estates will indemnify the Controlling Secured Parties and the Indenture Trustee for suits arising out of the Proposed Order); ¶ 37 (stating that the Indenture Trustee will have no liability for actions taken in reliance on Proposed Order).

87.     Even though the Debtors have argued that no creditor constituency (other than the Indenture Trustee) is entitled to individualized adequate protection, and even though the Indenture Trustee has an indisputable duty to represent *all* Noteholders, it nonetheless negotiated for individualized adequate protection consisting of interest and fees paid to certain preferred creditors.  This despite the fact that such payments violate (a) the Bankruptcy Code's prohibition on payment of post-petition interest, (b) New York's Rule of Explicitness, and (c) the waterfall and subordination provisions set forth in the applicable Indentures.

88.     The Patriarch Secured Parties cannot be compelled to non-consensually provide a release to, or otherwise directly or indirectly indemnify (as creditors of the Debtors' estate) the Indenture Trustee.[21]  The Debtors have presented no evidence—or even argued—that they investigated potential claims against the Indenture Trustee to determine the value of those claims they are releasing in the Proposed Order or the consideration provided for such release.  If, as the Debtors say, the Indenture Trustee is the only party entitled to adequate protection, then the Debtors should simply make all payments to the Indenture Trustee and the Indenture Trustee can, in turn, make distributions to the Noteholders as mandated by the terms of the applicable Indentures, including the waterfall provisions.  The fact that the Debtors, the Indenture Trustee, and the Controlling Secured Parties refuse to adopt this simple approach evidences their clear

---

[21]   The release cannot be approved unless the Debtors could meet certain factors—fairness, necessity to the reorganization, and specific factual findings to support these conclusions—which they cannot do.  *See In re Emerge Energy Services, LP*, No. 19-bk-11563 (KBO), slip op. at 23 n.58 (Bankr. D. Del. Dec. 5, 2019) (citing *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000)).

intent to end-run around the terms of the Indentures, re-writing the terms for their own benefit in contravention of the Bankruptcy Code, applicable state law, and the express terms of the Indentures.  The parties should not be permitted to do so and the Proposed Order should not be entered in its current form.

### F.  Additional Objections

89.     In addition to the objections raised above, Patriarch raises the following additional objections to the Proposed Order and Notice.

90.     *First*, under Paragraph 12(d)(5) of the Proposed Order, the Debtors are required to "consult and negotiate in good faith with the Controlling Secured Parties and Indenture Trustee regarding (i) any potential chapter 11 plan being considered by the Debtors and (ii) any proposed secured or unsecured financing being considered by the Debtors."  The Patriarch Secured Parties hold more than $832 million in secured claims against the Debtors.  Just as any plan or DIP financing considered by the Debtors will impact MBIA and the Zohar III Controlling Class, such documents and transactions may materially impact the rights of the Patriarch Secured Parties, which are secured creditors under the same Indentures as MBIA and the Zohar III Controlling Class.  This provision amounts simply to a bias against one secured creditor over another, which is not a legitimate basis to cut the Patriarch Secured Parties from discussions over any plan or DIP financing.  The Patriarch Secured Parties should have the same consultation rights as MBIA and the Zohar III Controlling Class with respect to any Chapter 11 plan or DIP financing.

91.     *Second*, footnote 13 of the Proposed Order provides that nothing in the order shall be deemed to affect the rights of any parties with respect to the payment of any fees or expenses of the Patriarch Secured Parties under the Final Cash Collateral Order.  Patriarch does not object to this concept, but this provision must be reciprocal among all parties.  Patriarch proposes the following revised language:

45

> For the avoidance of doubt, nothing herein shall be deemed to impact, alter, or prejudice any rights, claims, objections, or remedies of any party with respect to any fees, costs, or expenses paid to any Secured Party pursuant to the First Final Cash Collateral Order.

Such language would preserve all parties' rights, without the current favoritism currently exhibited by this provision of the Proposed Order.

92.    *Third*, Patriarch objects to the assertion in the Notice that "on or about September 30, 2019, pursuant to paragraph 18 of the Cash Collateral Order, the Debtors' consensual use of cash collateral to fund these Chapter 11 cases terminated." *See* Notice, p. 2.  On September 30, 2019, a "Termination Event" occurred as a result of the 15 Month Window under the Settlement Agreement. *See* Final Cash Collateral Order, ¶ 18(a)(6).  The Debtors' right to use cash collateral pursuant to the Final Cash Collateral Order is not limited by the occurrence of a Termination Event; rather the Debtors lose the right to use cash collateral upon the "Termination Date." *E.g.*, *id.* at ¶ 7 ("The Debtors are hereby authorized to use Cash Collateral during the period from the date of entry of this Order through and including the ***Termination Date*** (as defined below) . . . .") (emphasis added).  The "Termination Date" is defined as "the effective date of termination of the use of Cash Collateral under this Order ***following an Expedited Request for Relief, if any***." *Id.* at ¶ 18(d) (emphasis added).  An "Expedited Request for Relief" is defined as a request by the Debtors "to immediately seek relief from the Court on no less than fourteen (14) days' notice" after a Termination Event. *Id.* at ¶ 12(c).  The Notice constitutes an Expedited Request for Relief.[22]

93.    As a result, the Debtors' right to use of cash collateral only terminates on the Termination Date, which will occur upon approval or denial of the Proposed Order.  The Secured

---

[22]   This is evidenced in part by the procedural posture of the Debtors' Notice, which ignores applicable Local Rules and Bankruptcy Rules requiring a request for use of cash collateral by motion.

Parties' right to payment of professional fees under the Final Cash Collateral Order is similarly tied to the Termination Date.  *See id.* at ¶ 7 ("The Debtors are hereby authorized to use Cash Collateral during the period from the date of entry of this Order through and including the **Termination Date** . . . for . . . payments to the Patriarch Secured Parties under paragraph 12(g) hereof . . . .") (emphasis added); ¶ 12(c) (providing for payment of fees and expenses). Accordingly, regardless of whether the Court approves the Proposed Order in its current form, the Debtors must pay the professional fees of all secured parties pursuant to the terms of the Final Cash Collateral Order through at least the hearing date on the Proposed Order.

94.    *Finally*, the Proposed Order provides that a "Termination Event" occurs twelve (12) months after the entry of the Proposed Order, which may be extended with the consent of MBIA, the Zohar III Controlling Class, and the Indenture Trustee.  Proposed Order, ¶ 18(a)(10). As secured noteholders, the Patriarch Secured Parties have rights under the Proposed Order, and the Proposed Order impacts the Patriarch Secured Parties' position in these Chapter 11 cases. Accordingly, extension of any cash collateral order must also have the consent of the Patriarch Secured Parties.  As noted in the Proposed Order, in the event of any disagreement among the parties, the dispute can be mediated and/or brought before the Court.

## RESERVATION OF RIGHTS

95.    The Debtors have filed the Proposed Order without filing a motion or providing any argument or evidence supporting the changes made to the Final Cash Collateral Order.  As a result, Patriarch has been left to assume the grounds and extrapolate arguments the Debtors and other parties rely on in support of the Proposed Order.  As explained above, this procedural maneuvering renders the Notice ineffective on its face, as the Debtors have the burden of proving that all secured creditors are adequately protected; the Debtors have not made, or even attempted

to make, such showing.  In view of the foregoing, Patriarch reserves the right to submit a

supplemental brief in response to any "replies" or other filings in response to this Objection, and

further reserves its right to seek to continue the December 20, 2019, hearing in order to allow for

appropriate briefing or the development of an evidentiary record, as appropriate.

## CONCLUSION

WHEREFORE, Patriarch respectfully requests that this Court deny the Motion and not

enter the Proposed Order in its current form.

**COLE SCHOTZ P.C.**


By: */s/ Norman L. Pernick*
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
preilley@coleschotz.com

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Robert Klyman (Admitted Pro Hac Vice)
Michael S. Neumeister (Admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
mneumeister@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

Randy M. Mastro (Admitted Pro Hac Vice)
Mary Beth Maloney (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
mmaloney@gibsondunn.com

*Counsel to Patriarch Partners, LLC, Patriarch
Partners VIII, LLC; Patriarch Partners XIV, LLC;
Patriarch Partners XV, LLC; Octaluna, LLC;
Octaluna II, LLC; and Octaluna III, LLC*