## EXHIBIT A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| | **Ref. Docket Nos. 266, 545 & ____** |

### ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND PATRIARCH PARTNERS MANAGEMENT SERVICES, LLC RELATED TO PENDING OASIS TRANSACTION

Upon the *Motion of the Debtors for an Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction* (the "Motion") [Docket No. ___],[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and that the legal and factual bases set forth in the Motion

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is hereby ORDERED:

1.      The Motion is GRANTED.

2.      For the reasons set forth in the Motion, no Transaction Fee shall be payable to

PPMG in connection with the LVD Transaction.

3.      This Court shall retain jurisdiction over any and all matters arising from the

interpretation or implementation of this Order.

Dated:  September \_\_\_, 2019
         Wilmington, Delaware

                                                          _____
                                                          THE HONORABLE KAREN B. OWENS
                                                          UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

**Settlement Order and Settlement Agreement**

01:25035581.7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (CSS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **Docket Ref. Nos. 222 & 223** |

## ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order,

pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the

Settlement Agreement (attached hereto as **Exhibit 1**) entered into by and between (i) the

Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA, and (v)  Halcyon Capital

Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF

Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD

(collectively, the "Zohar III  Noteholders" and, together with the Debtors, Lynn Tilton, the

Patriarch Stakeholders, and MBIA,  the "Parties"), as more fully described in the Motion; and it

appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware, dated as of February 29, 2012; and it appearing that venue of these

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Settlement Agreement, as applicable.

[3]  The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

01:23222940.4

Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and

the Court may enter a final order on the Motion consistent with Article III of the U.S.

Constitution; and this Court having determined that the relief requested in the Motion is in the

best interests of the Debtors, their estates, creditors, and other parties in interest; and this Court

having found that the relief requested in the Motion is justified by the facts and circumstances;

and it appearing that proper and adequate notice of the Motion has been given and that, except as

otherwise ordered herein, no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, is

approved in its entirety pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule

9019, and is binding on all parties-in-interest in these Chapter 11 cases, including, but not limited

to, the Parties, any new Collateral Manager or New Agent appointed under the terms of the

Settlement Agreement, the Independent Director, the CRO, U.S. Bank, the Other Stakeholders,

the Patriarch Stakeholders, the Committee, and any subsequent holder of any secured notes

issued by any of the Debtors (including, with respect to any of the foregoing, any agents,

successors, or assigns); provided, however, with respect to the Zohar III Controlling Class only,

no Party shall be required to disclose the terms of the Settlement Agreement to any successor,

assign or transferee, nor shall it be liable for any successor's, assign's or transferee 's breach of

the Settlement Agreement;  provided, further however, that the first sentence of paragraph 30 of

the Settlement Agreement shall be null and void solely to the extent it contemplates a separate

"confidential stipulation."

3.    A prospective purchaser or seller of debt issued or guaranteed by the Zohar III,

Corp. or Zohar III, Limited may obtain a copy of the terms of the Settlement Agreement from the

CRO, only after executing a standard NDA consistent with the practice in the District of

Delaware for the sole and limited purpose of evaluating a potential purchase of such debt,

provided however, that such terms shall not include Exhibits to the Settlement Agreement.

Without limiting the binding effect of the Settlement Agreement provided for under Paragraph 2

of this Order, in the event a potential purchaser of debt becomes a holder of Zohar III Claims,

such NDA shall bind the entity requesting access to the terms of the Settlement Agreement, any

individual representing any such entity in such a request, and any individual who is granted

access to the terms of the Settlement Agreement on behalf of any such entity.

4.    Notwithstanding anything in the Order to the contrary, nothing contained in this

Order is or shall be deemed to be an act by the Trustee to consent to or vote for or accept or

adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or

composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to

vote in respect of the claim of any Noteholder in any such Proceeding.  (All capitalized terms

used in the prior sentence have the meaning ascribed to them in the applicable indenture between

the Debtors and U.S. Bank.)

5.    Notwithstanding anything to the contrary in this Order or the Settlement

Agreement, nothing set forth in the Settlement Agreement is binding on Blank Rome LLP.

6.    Notwithstanding anything to the contrary in this Order or the Settlement

Agreement, nothing set forth in the Settlement Agreement is binding on Alvarez & Marsal Zohar

Management LLC ("AMZM"), provided, however, that paragraph 16 of the Settlement

Agreement provides that AMZM shall be terminated.

7.     The Debtors are authorized and empowered to take any and all actions necessary

to carry out, effectuate, or otherwise enforce the terms, conditions, and provisions of the

Settlement Agreement.

8.     This Court shall retain jurisdiction to hear any and all disputes arising out of the

interpretation or enforcement of this Order.

Dated:  May **21**, 2018
        Wilmington, Delaware

_____
Christopher S. Sontchi
United States Bankruptcy Judge

## Exhibit 1

**Settlement Agreement**

**Mediation Term Sheet**
**(In re: Zohar III Corp., et al., Case No. 18-10512 (CSS))**

*15 Month Window* – The period that expires 15 months from the date hereof.

*18 Month Extended Window* – If each of MBIA and the Zohar III Claims receive 50% of their respective Paid in Full amount within the 15 Month Window, the 15 Month Window shall be deemed to be extended by 3 months and shall be hereafter referred to herein as the 18 Month Extended Window.

*Bankruptcy Court* – The United States Bankruptcy Court for the District of Delaware, which is presiding over the Chapter 11 cases of the Debtors.

*Debtors* – The debtors in the Chapter 11 cases captioned: In re: Zohar III Corp., et al., Case No. 18-10512 (CSS).

*Designated Tax Director* - the limited role Tilton shall have on behalf of the Debtors as described in paragraph 2 below.

*Full Payment Date* – The date on which the parties or the classes of noteholders on Exhibit A are Paid in Full.

*Independent Director* – the director appointed by the Mediator. The Independent Director (a) shall be unaffiliated with any party and (b) shall have played no role in connection with and held no claim against or interest in any of the Debtors.

*Indentures* – (1) The Indenture among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1 Corporation, Zohar CDO 2003-1, LLC, and MBIA Insurance Corporation, CDC Financial Products, Inc., and U.S. Bank National Association, dated November 13, 2003; (2) The Indenture among Zohar II 2005-1, Limited, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc., and LaSalle Bank National Association, dated January 12, 2005; and (3) The Indenture among Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., and LaSalle Bank National Association, dated April 6, 2007.

*MBIA* – MBIA Insurance Corp.

*Mediator* – The Honorable Kevin Gross, and if Judge Gross resigns as mediator Judge Sontchi will appoint a replacement mediator.

*Other Stakeholders* – (a) US Bank and MBIA, when not referring to Zohar III, (b) US Bank and the Controlling Class representative when solely referring to Zohar III, and (c) US Bank, MBIA and the Zohar III Controlling Class when referring to Zohar III and either or both of Zohar I and Zohar II.

***Paid in Full*** – The amount owed to the parties and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be updated monthly to reflect accrued and unpaid interest and fees allowable under the Indentures.[1]

***Patriarch Stakeholder*** – Entities included in Exhibit B.

***Group A Portfolio Companies*** – Those companies listed on the schedule attached hereto as Exhibit C.

***Group B Portfolio Companies*** – Those companies listed on the schedule attached hereto as Exhibit D.[2]

***Tilton*** – Ms. Lynn Tilton.

***U.S. Bank*** – U.S. Bank National Association, solely in its capacity as Trustee under the Indentures, and not in its individual capacity.

***Zohar III Noteholders*** – those entities or the classes of noteholders listed on the schedule attached hereto as Exhibit E.

***Zohar III Claims*** – Claims under the Zohar III Indenture $[X]

***Zohar Funds*** – collectively, Zohar CDO 2003-1, Limited; Zohar CDO 2003-1 Corporation; nondebtor Zohar CDO 2003-1, LLC; Zohar II 2005-1, Limited; Zohar II 2005-1, Corp.; nondebtor Zohar II 2005-1, LLC; Zohar III, Limited; Zohar III, Corp.; and nondebtor Zohar III, LLC)

**Terms**

---

[1]    This footnote is intended to cover MBIA's claims. Other than the Policy Payment in the amount of $148,951,585 with respect to Zohar I and the Policy Payment of $770,109,326 with respect to Zohar II reflected on Exhibit A, the calculation of which amounts are not subject to challenge by Tilton; all other rights reserved. MBIA will consult in good faith with Tilton regarding the other amounts and calculations specified in Exhibit A. If the parties are unable to agree on those other amounts, the matter shall be referred to the Mediator. If the Mediator is unable to resolve the dispute, the matter shall be brought to the Bankruptcy Court for resolution. Any equity interest owed to MBIA or Zohar I, as applicable, will be escrowed until the expiration of the 15 Month Window; all parties' rights reserved. Any proceeds from the sale or repayment of Zohar I loans (but not the equity interest) shall be paid directly to MBIA.

[2]    Group B Portfolio Companies will exclude the Group A Portfolio Companies.

1. The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

2. Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors, the Group B Portfolio Companies, and Group A Portfolio Companies) solely for the purpose of exercising (and having no other rights or authority) to (a) manage the tax liability and reporting of the Debtors and the Group B Portfolio Companies, (b) manage the tax reporting of the Group A Portfolio Companies and (c) with respect to the Group B Portfolio Companies, manage any event causing cancellation of debt income (forgiveness of debt, liquidation, unwind, or foreclosure) including to manage the timing of sale of the Group B Portfolio Companies, forgiveness of debt and realizing gains and losses (the "Designated Tax Director"). In that capacity, Tilton shall continue to bear the tax liability associated with ownership of the Debtors, the Group B Portfolio Companies, and the Group A Portfolio Companies, including with respect to any Group A Portfolio Company transactions.

3. Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

4. [TBD: CRO and LT will develop reasonable process milestones related to hiring bankers, ....]

5. The Group A Portfolio Companies will be sold without regard to Tilton's personal tax liability.

6. The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall

have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

7. If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

8. The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "*Monetization Process*"). The CRO shall (a) replace the current CRO, (b) be unaffiliated with any party, and (c) have played no role in connection with and held no claim against or interest in any of the Debtors; provided, however, that Rob Kost may be considered for any role in the monetization process, by the CRO. The Independent Director and CRO each will execute a standard NDA consistent with the practice in the District of Delaware.

9. Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended Window. During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

10. With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio

Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete. Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales. Each shall have full and complete information regarding the Monetization Process and sources and uses of funds in any transaction consummated as part of the Monetization Process. Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

11. Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

12. Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

13. At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies; provided, however, that the resolution of any dispute regarding the escrow referenced in footnote 1 shall not be barred as of the Full Payment Date by the provisions of this paragraph.

14. The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

15. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. The committee shall be comprised of 3 representatives. The members and their respective advisors shall execute standard NDAs consistent with the practice in the District of Delaware. The reasonable fees and expenses of the Committee and its advisors shall be set forth in a budget to be approved by the CRO and shall

be paid by the estates. All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

16. AMZM and any of its affiliates (collectively, "AMZM") shall not be a member of or advisor to the Committee, and, except herein, AMZM shall not be paid or reimbursed by the estates or the Portfolio Companies for any fees or expenses with respect to the Monetization Process or any other purpose; provided, however, that (a) AMZM shall be terminated as Collateral Manager, and MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. Subject to the approval of the CRO, AMZM may be reimbursed for reasonable transition costs solely incurred in the transmitting of information to the new collateral manager. [TBD: Side agreement b/w cro and CM ensuring reasonable fees which will be escrowed to escrow CM fees due under the indenture ]

17. The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. In order to facilitate this negotiation, the Zohar Funds will provide customary bankruptcy case budgets, including anticipated sources and uses of cash (including payments from the Group A Portfolio Companies). It is understood and agreed the Zohar Funds shall not utilize any cash they are holding pending an agreed order. In the event of any dispute among the parties with respect to use of cash collateral, in

01:23191627.1

the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

18. Any (A) claim asserted by the Patriarch Stakeholders that is supported by written documentation showing the claim (a) was funded to a Group A Portfolio Company by a Patriarch Stakeholder (in the case of funded debt claim), or (b) represents a fee or other claim arising from a deferral of payment or any management and/or administrative fee owed to a Patriarch Stakeholder[3] and (B) equity interest asserted by the Patriarch Stakeholders is supported by written documentation, then such claim and equity interest, as applicable, shall be deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity unless the applicable credit agreement provides otherwise.[4] In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window (provided the Full Payment Date does not occur on or before such date), but no such claim shall be brought during the 18 Month Window or used to block the closing of any pending transaction in the Monetization Process. The Patriarch Stakeholders will promptly provide any information reasonably requested by the CRO to verify the existence of the funding and documentation described above (provided that the CRO may share the foregoing information with Other Stakeholders (subject to the execution of an NDA approved by the Mediator) as required in the CRO's reasonable discretion. With respect to the claims in (A) above, the payments to the Patriarch Stakeholders that shall be made without further analysis or challenge shall be capped at $250 million, with any amounts in excess to be held in escrow until Full Payment Date. Tilton represents that none of the claims in (A) currently prime the secured claims of the Other Stakeholders in the Group A Portfolio Companies, other than ABLs in ███████████████. Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

19. All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies

---

[3]    Management and/or administrative fees as noted here are defined in a separate agreement entered between the parties concurrent with this agreement.

[4]    Tilton to provide a good faith estimate on company by company basis for each of the Group A Portfolio Companies on an aggregate basis, in each case reflecting the aggregate amount she expects will be covered by this paragraph 17.

shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

20. Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution. Notwithstanding the foregoing, the Group A Portfolio Companies and the Group B Portfolio Companies can distribute payments as designated by the Designated Tax Director for the payment of their state and federal income taxes.

21. The Group A Portfolio Companies shall share with employees of MBIA (who sign NDAs as described in Paragraph 15 herein) financial statements and backup reasonably requested in writing by MBIA. Any information provided to MBIA shall only be shared in the following way: someone employed by MBIA can view the documents in the New York offices of Gibson Dunn but may not take copies or pictures of any documents or share any information in those documents, except with the CRO. In the event of any dispute among the parties with respect to the reasonableness of that request, such dispute shall be finally decided by the Mediator.

22. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

23. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

24. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties

involved in the dispute, and heard at the Mediator's earliest availability.   Any application shall be in writing and served by email on the other parties.

25. Upon the expiration of the 15 Month Window, the Independent Director/CRO may take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise, including, but not limited to, seeking relief from the Bankruptcy Court to lift the automatic stay, taking action to remove Tilton as a director or manager of the Group A Portfolio Companies or the Group B Portfolio Companies, or dismissing or converting the cases to chapter 7 cases. Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.

26. The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release).   If the parties cannot jointly agree, then the Mediator shall resolve any disputes.   The parties shall also agree to standard non-disparagement terms.

27. The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

28. The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement.   Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator.   If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

29. For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

30. The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties.   The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.

[INSERT SIGNATURE BLOCKS]

EXHIBIT A

01:23191627.1

**ZOHAR I**

| | | | |
|---|---|---|---|
| Amounts paid on Nov. 20, 2015 under the Policy | | 148,951,585 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | | 8,249,532 | Insurance Agreement § 4.03 |
| SUBTOTAL | | 157,201,117 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | | | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 7,531,990 | 7,718,876 | |
| Financial, investment and non-legal advisors | 186,886 | | |
| TOTAL ZOHAR I CLAIM | | 164,919,993* | |

**ZOHAR II**

| | | | |
|---|---|---|---|
| 1/20/2017 Policy Payment | | 770,109,326 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | | 27,080,207 | Insurance Agreement § 4.03 |
| SUBTOTAL | | 797,189,533 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | | | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 10,641,048 | 14,851,685 | |
| Financial, investment and non-legal advisors | 4,210,637 | | |
| TOTAL ZOHAR II CLAIM | | 812,041,218* | |

| | |
|---|---|
| ZOHAR PAID IN FULL AMOUNT | $976,961,211 |

*Assumptions:
All amounts are "as of" April 18, 2018 and will change pending Full Payment Date, including to reflect interest accrued and other
Credit Enhancement Liabilities which MBIA has not yet paid
Portfolio Company Zohar I loan interest payments will continue to be paid directly to MBIA
Zohar II claim amount does not reflect Portfolio Company loan interest payments which MBIA is entitled to receive, but have not
yet been distributed to MBIA.

MBIA is not seeking reimbursement for costs, expenses or interest payments made in connection with MZ Funding loan.

# EXHIBIT A

## [ZOHAR III CLAIMS]

**Disclaimer:** The Zohar III Claims as forth in this Exhibit A have not been verified by the Collateral Manager since January 2016 as required by the Indentures and Management Agreement, and therefore, U.S. Bank makes no representation as to accuracy of the Zohar III Claims as set forth below, which claims and interest accruals may be modified or otherwise revised or verified when the new Collateral Manager is designated in accordance with the Mediation Term Sheet. Once the Collateral Manager is appointed, that person or entity, after consultation with U.S. Bank, will be responsible for updating the amounts herein to reflect unpaid principal, accrued and unpaid interest, and other fees, expenses, and other amounts allowable under the Indentures. Notwithstanding anything to the contrary in this Exhibit A or in the Mediation Term Sheet, nothing shall modify, alter, or otherwise change the Priority of Payments set forth in the Indentures, and U.S. Bank's rights, remedies, and objections to any such modification, alteration, or other change thereto are fully reserved. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Mediation Term Sheet to which this Exhibit A is attached or in the Indentures.

The following does not include interest accruing after 5/18/18. The following schedule excludes certain categories and amounts that must be paid prior to principal and interest owing to the Holders of the notes, including, without limitation, certain fees, expenses, reserves, and other amounts, which are set forth in the Priority of Payments of each Indenture (that have accrued or may accrue in the future):

| Issue Name | Issue Date | Maturity Date | Issue Amount | Original Par Amount | Current Balance | Prepetition Accrued Interest** | Addt'l Accrued Interest Thru 5/18/18*** | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| Class A-1R | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 135,767,116.30 | $ 686,522.34 | $ 586,182.09 | $ 137,039,820.73 |
| Class A-1T | 4/11/2007 | 4/15/2019 | $ 150,000,000.00 | $ 150,000,000.00 | $ 101,825,337.23 | $ 509,743.92 | $ 436,203.28 | $ 102,771,284.43 |
| Class A-1D | 4/11/2007 | 4/15/2019 | $ 350,000,000.00 | $ 350,000,000.00 | $ 237,592,453.54 | $ 1,189,402.47 | $ 1,017,807.66 | $ 239,799,663.77 |
| Class A-2 | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 200,000,000.00 | $ 1,087,156.78 | $ 914,108.70 | $ 202,001,265.48 |
| Class A-3 | 4/11/2007 | 4/15/2019 | $ 116,000,000.00 | $ 116,000,000.00 | $ 116,000,000.00 | $ 689,195.38 | $ 569,346.03 | $ 117,258,541.41 |

**This is the accrued interest that wasn't paid because of the $4,637,241.39 deposit of interest outside the collection account before the petition date
***The "Addt'l Accrued Interest Thru 5/18/18" column capitalizes the "Prepetition Accrued Interest" into the Current Balance and then Accrues Interest Thereon through 5/18/18

EXHIBIT B

**Exhibit B: Patriarch Stakeholders**

• Ark Entities (including Ark Angels, LLC; Ark Angels II, LLC; Ark Angels III, LLC; Ark Angels VIII, LLC; Ark Investment Partners II, LP; Ark II CLO 2001-1, Ltd.)
• LD Investments, LLC
• Lynn Tilton
• Octaluna LLC Entities (including Octaluna LLC; Octaluna II, LLC; Octaluna III, LLC)
• Patriarch Partners Entities (including Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners, XIV, LLC; Patriarch Partners XV, LLC)
• Patriarch Partners Management Group, LLC (PPMG)
• Patriarch Partners Agency Services, LLC (PPAS)
• Zohar Holdings, LLC

EXHIBIT C

**Group A Portfolio Companies**

**[REDACTED]**

01:23191627.1

EXHIBIT D

**Group B Portfolio Companies**

**[REDACTED]**

EXHIBIT E

[To be provided]

01:23191627.1

EXHIBIT F

**The Zohar Funds, Lynn Tilton, MBIA, and the Zohar III Noteholders
Announce Resolution to
Stay Litigation, Refinance and Monetize Zohar Assets**

NEW YORK – April [XX], 2018 –Zohar CDO 2003-1, Zohar CDO 2003-1 Corp., Zohar II
2005-1, Limited, Zohar II 2005-1 Corp., Zohar III, Limited, and Zohar III, Corp.
(collectively, the "Zohar Funds"), Lynn Tilton, MBIA Insurance Corporation, a wholly owned
subsidiary of MBIA Inc. (NYSE: MBI), and the Zohar III Controlling Class of Noteholders
jointly announce today that the parties have mutually resolved the motions pending in
federal Bankruptcy Court in the District of Delaware relating to the Zohar Funds, and have
agreed to a deal that will include a stay of all pending litigation between the parties. This
agreement is intended to facilitate the refinancing and monetization of assets of the Zohar
Funds to the benefit of all stakeholders, and the parties have agreed to work in a mutually
cooperative process in support of such refinancing and monetization.

As part of the agreement, an Independent Director will be appointed to govern the Zohar
Funds, along with a Chief Restructuring Officer, who together with Ms. Tilton as director
and manager of each Portfolio Company, will jointly implement the refinancing and
monetization process.  During the process, Ms. Tilton will remain in her current roles at the
Portfolio Companies, all litigation between the parties will be stayed for a minimum of 15
months, and the bankruptcy cases will proceed without the appointment of a Trustee.

Ms. Tilton stated, "This agreement is a meaningful and important step towards allowing the
Zohar Funds to monetize and refinance their assets in order to pay off all creditor claims in
full.  It is in the best interest of all stakeholders that we lay down our swords and stop the
years of damaging litigation in order to maximize value for all of the Funds' stakeholders."

Anthony McKiernan, Chairman of MBIA Insurance Corporation, stated that "MBIA is
pleased that the parties have been able to come to a consensual agreement that will put in
place a process to enable MBIA to recover on the significant amounts it has paid its
policyholders."

Marc Kirschner of Goldin Associates, Chief Restructuring Officer of the Zohar Funds, added,
"The resolution of the hotly contested litigation in the bankruptcy cases is in the best
interests of the Zohar Funds and their stakeholders as it will pave the way for the Zohar
Funds to maximize the value of their assets for the benefit of all.  The mediated result was
the culmination of significant negotiations and the Zohar Funds are deeply appreciative of
the efforts of the mediator, Judge Kevin Gross, for facilitating a settlement of the pending
matters, which was no simple task."

Today's agreement will have no immediate effect on the operations of the Portfolio

Companies to whom the Zohar Funds have made senior secured loans.  The Portfolio Companies will continue to operate their businesses in the ordinary course as they are not parties to these bankruptcy cases.

**MEDIA CONTACTS:**

<u>FOR LYNN TILTON</u>
**Brunswick Group**
Alex Yankus
212-333-3810
<u>ayankus@brunswickgroup.com</u>

**MBIA**
Greg Diamond, 914-765-3190
Investor and Media Relations
<u>greg.diamond@mbia.com</u>

01:23191627.1

**EXHIBIT C**

**Credit Agreement Provisions**

Section 2.8    Interest on Loans.

(a)    Applicable Rates.  Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) on the unpaid principal amount thereof at a rate per annum equal to LIBOR plus the Applicable Margin.

(b)    Calculation of Interest Rates.  Interest payable pursuant to this Section 2.8 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an interest period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an interest period applicable to such Loan shall be excluded; provided, if such Loan is repaid on the same day on which it is made, one day's interest shall be paid on such Loan.  For the purposes of the Interest Act (Canada), (i) whenever any interest or fees under this Agreement or any other Credit Document is calculated using a rate based on a year of 360 days, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate, (y) multiplied by the actual number of days in the calendar year in which the period for which such interest is payable (or compounded) ends, and (z) divided by 360, (ii) the principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement, and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

(c)    Payment of Interest.  Interest on the Loans shall be payable in arrears on (i) the first day of each calendar month, (ii) the date of any prepayment of the Loans, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (iii) the Maturity Date, including final maturity.

(d)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default described in Section 8.1, the principal amount of all Loans and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall thereafter bear interest (including, without limitation, interest, as provided in this Agreement, accruing after the filing of a petition initiating any insolvency proceedings, whether or not such interest accrues or is recoverable against the Borrowers after the filing of such petition for purposes of the Bankruptcy Code or is an allowed claim in such proceeding) payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Agent or any Lender.

Section 2.9    Changed Circumstances.  If the introduction of or any change in or in the interpretation of (in each case, after the date hereof) any law or regulation applicable to any Lender makes it unlawful, or any Governmental Body asserts, after the date hereof, that it is

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP        PP105226
ON BEHALF OF PATRIARCH PARTNERS LLC

**SCHEDULE 2.1**

**COMMITMENTS**

Revolving Credit Commitments

| Lender | Revolving Credit Commitment |
|---|---|
| ZOHAR III, LIMITED | $2,000,000.00 |
| **Total** | **$2,000,000.00** |

Term A Loan Commitments

| Lender | Term A Loan Commitment |
|---|---|
| ZOHAR CDO 2003-1, LIMITED | $9,303,993.33 |
| ZOHAR II 2005-1, LIMITED | $30,014,224.60 |
| ZOHAR III, LIMITED | $11,639,322.55 |
| **Total** | **$50,957,540.48** |

Term B Loan Commitments

| Lender | Term B Loan Commitment |
|---|---|
| N/A | $0.00 |
| **Total** | **$0.00** |

DL1-6247158v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP105283

**<u>EXHIBIT D</u>**

**Payoff Letter**

PAYOFF LETTER

[  ], 2019

LVD Acquisition, LLC
222 East Campus View Blvd.
Columbus, Ohio 43235
Attention: President and Chief Executive Officer
Email: MLeibold@oasiscoolers.com
        LBudzak@oasiscoolers.com

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of June 1, 2009 (as modified, amended and supplemented and in effect on the date hereof, the "Credit Agreement"; together with the various instruments, documents and other agreements executed in connection therewith, the "Credit Documents") among LVD Acquisition, LLC ("LVD") and B2 Acquisition, Inc., as borrowers (together, the "Borrowers"), the Domestic Subsidiaries that from time to time became guarantors thereunder, the financial institutions and other investors from time to time as lenders thereto (collectively, the "Lenders") and Ankura Trust Company, LLC, a Delaware limited liability company ("Ankura Trust Company"), as successor administrative agent for such Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

LVD and the Lenders have advised the Administrative Agent that LVD and the Lenders, on the one hand, and Culligan International Company ("Buyer"), on the other have entered into that certain Equity Purchase Agreement dated as of August __, 2019 (the "EPA"), pursuant to which the Buyer will purchase 100% of the Interests (as defined in the EPA) of LVD. Through the contemplated sale to the Buyer, LVD has advised the Administrative Agent that the Borrowers intend to repay an amount equal to 100% of the Agreed Upon Payoff Amounts (as defined in the EPA) received by LVD in connection with the transaction contemplated by the EPA, which amount shall be applied as set forth in Section 2.13(b) of the Credit Agreement on [October 6, 2019] (the "Payoff Date")[1] and shall be deemed a payment in full under the Credit Agreement.

Each of the undersigned Lenders (which Lenders constitute 100% of the Lenders under the Credit Agreement) hereby directs the Administrative Agent to accept its Pro Rata Share of the Lender Payoff Amount (as defined on Schedule 1) in full satisfaction of the Obligations. This direction is irrevocable and may not be amended, modified or waived except by written instrument signed by the Lenders and the Administrative Agent.

1.      This letter confirms that the aggregate amount (the "Payoff Amount") as of the Payoff Date necessary to be deemed to pay all amounts owing by the Borrowers to the Administrative Agent and the Lenders under the Credit Agreement and the other Credit Documents is specified on Schedule 1 hereto, subject to the same being paid by wire (together with notification to the Administrative Agent of the applicable federal funds wire reference number(s)) to, and confirmed received not later than 2:00 p.m. (New York City time) on the Payoff Date (the "Required Payment Time") by, the Administrative Agent in U.S. Dollars in immediately available funds to the account of the Administrative

---

[1] NTD: To align with the inside date in the Equity Purchase Agreement.

- 2 -

Agent as specified on Schedule 2 hereto (except for payment of fees and expenses of the Administrative Agent's legal counsel, which shall be remitted by wire by such time directly to such counsel as specified in such schedule). Please note that such amounts which comprise the Payoff Amount assume that no further extension of credit (or repayment of the Loans) will be made under the Credit Agreement after the date of this letter. The Borrowers agree that, from the date hereof through the Effective Time (as defined below), the Borrowers shall neither request nor receive any borrowing under the Credit Agreement, and the Borrowers and the Administrative Agent agree that the Administrative Agent and Lenders shall not fund any borrowing request received from the Borrowers from the date hereof through the Effective Date. If the Payoff Amount is not received before 2:00 p.m. (New York City Time) on [October 6, 2019], then this letter shall automatically terminate and be of no further force or effect.

      2.      The Borrowers and each other Credit Party:

      (a)      acknowledge that, (i) the aggregate outstanding principal amount of the Loans (other than Tranches TLD, TLE and TLF) as of the Payoff Date is equal to $59,957,540.49 and accrued and unpaid interest thereon (excluding default interest) is equal to $[710,008.33][2] and (ii) the aggregate outstanding amount of Tranches TLD, TLE and TLF as of the Payoff Date is not less than $20,291,872.91 (collectively, "Outstanding Obligations"). Interest is calculated at the non-default rate under the Credit Agreement and no interest is calculated with respect to Tranches TLD, TLE and TLF. Such calculations are not admissions or concessions by the Lenders or the Administrative Agent that interest at the default rate is not owed on the Loans or that interest (LIBOR or default rate) is not owed with respect to Tranches TLD, TLE and TLF. The foregoing amounts do not include fees, expenses and other amounts that are chargeable or otherwise reimbursable under the Credit Documents;

      (b)      acknowledge that, as of the Payoff Date, the Payoff Amount is due and owing pursuant to the Credit Documents, which Payoff Amount the Lenders and Administrative Agent have agreed to receive in full satisfaction of the Credit Agreement. If, for any reason, any of the Payoff Amount or any other amounts previously received by the Administrative Agent or the Lenders to payment of the Obligations is voided or rescinded or must otherwise be returned by the Administrative Agent of the Lenders as a result of Borrowers' insolvency, bankruptcy, or otherwise required by applicable law, the Borrowers acknowledge and agree that their obligations and liabilities under the Credit Agreement (including the Outstanding Obligations) shall be reinstated with full force and effect, without need for any action by any Person, and shall be enforceable against the Borrowers and the other Credit Parties and their successors and assigns as if such payment had never been made;

      (c)      agree that, as of the Effective Time, the Administrative Agent, the Lenders and their respective participants, if any, shall have no further obligation, duty, liability or responsibility under the Credit Agreement, any other Credit Document or any other document or agreement that is either or both executed and delivered in connection therewith (except as otherwise expressly provided herein); and

      (d)      agree that, as of the Effective Time, the Borrowers and the other Credit Parties release and discharge the Administrative Agent, Patriarch Partners Agency Services, LLC ("PPAS"), the predecessor administrative agent under the Credit Agreement and the other Credit Documents, and each Lender, and their respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys and Affiliates from any and all claims, suits, demands, accounts or causes of action the Borrowers and the other Credit Parties may have

---

[2] Amount currently only includes interest through end of August. This number will be updated to calculate interest for October through the Payoff Date.

- 3 -

against the Administrative Agent, PPAS, or any Lender or their respective agents, officers and directors, arising out of the obligations under the Credit Agreement or any other Credit Document (the "Credit Agreement Claims").

3.    This letter confirms that effective as of the time of receipt by the Administrative Agent of the Payoff Amount in the manner described above (such time being referred to as the "Effective Time") the Administrative Agent and the Lenders agree and acknowledge that:

(a)    all indebtedness of the Borrowers and the other Credit Parties to the Administrative Agent and the Lenders under the Credit Agreement and the other Credit Documents shall be satisfied and discharged;

(b)    all unfunded commitments of the Lenders to make Loans or otherwise extend credit to the Borrowers under the Credit Agreement and the other Credit Documents shall be terminated;

(c)    all security interests, mortgages, deeds of trust and other liens on the assets and property of the Borrowers and the other Credit Parties granted to or held by, and all guarantees made by the Borrowers and the other Credit Parties in favor of, the Administrative Agent for the benefit of the Lenders and any other secured parties under the Credit Documents shall be forever satisfied, released and discharged without further action; and

(d)    all other obligations of the Borrowers and the other Credit Parties to the Administrative Agent and the Lenders under the Credit Agreement and each other Credit Document shall be released and discharged, except any such obligations that are otherwise expressly stated in the Credit Agreement or any other Credit Document as surviving that respective agreement's termination, which in any such case shall, as so specified, survive without prejudice and remain in full force and effect.

4.    The Administrative Agent hereby represents and warrants that as of the date hereof:

(a)    Ankura Trust Company is the successor administrative agent under the Credit Agreement and the other Credit Documents; and

(b)    PPAS is the predecessor administrative agent under the Credit Agreement and the other Credit Documents and remains an agent of the Lender under certain Credit Documents solely for collateral perfection purposes.

5.    From and after the Effective Time, the Administrative Agent hereby acknowledges and agrees that Borrowers or their designees may execute and deliver the terminations and releases attached hereto as Exhibit A, together with any other Uniform Commercial Code termination statements, mortgage release documents, intellectual property release documents and other instruments of release and discharge pertaining to the security interests, mortgages and other liens described above of the Administrative Agent in any of the property, real or personal, of the Credit Parties, and the Administrative Agent and PPAS hereby agree to promptly execute and deliver any additional documents as may be required and as the Borrowers may reasonably request to effectuate, or reflect of public record, the release and discharge of all such security interests, mortgages and liens. Each of the Administrative Agent and PPAS will, from and after the Effective Time, deliver promptly all collateral in its possession, along with the original Notes and Guaranties (or fully executed releases of all Guaranties) to Borrowers at the address designated by Borrowers using a nationally-recognized overnight courier service. All of the foregoing deliveries shall be at the expense of the Borrowers.

- 4 -

6.      This letter and any right, remedy, obligation, claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this letter shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflicts of law principles that would lead to the application of laws other than the law of the State of New York.

7.      This letter may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which when taken together shall constitute but one and the same letter.  Delivery of an executed signature page of this letter by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

Sincerely,

ANKURA TRUST COMPANY, LLC, in its capacity as
the Administrative Agent under the Credit Agreement


By:_____

Name:

Title:


PATRIARCH PARTNERS AGENCY SERVICES,
LLC, in its capacity as predecessor Administrative
Agent under the Credit Agreement and limited collateral
agent


By:_____

Name:

Title:

*[Signature Page to LVD Term Loan Payoff Letter]*

ZOHAR CDO 2003-1, LIMITED, as Lender

By:_____

Name:  Michael Katzenstein

Title:    Chief Restructuring Officer

ZOHAR II 2005-1, LIMITED, as Lender

By:_____

Name:  Michael Katzenstein

Title:    Chief Restructuring Officer

ZOHAR III, LIMITED, as Lender

By:_____

Name:  Michael Katzenstein

Title:

Chief Restructuring Officer

*[Signature Page to LVD Term Loan Payoff Letter]*

Acknowledged and Agreed
as of the date first written above:

LVD ACQUISITION, LLC,
as Borrower

By:_____

Name:

Title:

B2 ACQUISITION, INC.,
as Borrower

By:_____

Name:

Title:

**EXHIBIT E**

**Amendment 8**

01:25035581.7

**AMENDMENT NO. 8
TO CREDIT AGREEMENT OF
LVD ACQUISITION, LLC**

Amendment No. 8 (this "<u>Amendment</u>"), dated as of November __, 2015, to the Credit Agreement, effective as of June 1, 2010 (as modified to the date hereof, the "<u>Credit Agreement</u>"), among LVD ACQUISITION, LLC, a Delaware limited liability company, and the other borrower signatory hereto (each a "<u>Borrower</u>" and, collectively, the "<u>Borrowers</u>"), the guarantors from time to time party thereto, the financial institutions and other investors from time to time party thereto as Lenders and PATRIARCH PARTNERS AGENCY SERVICES, LLC, a Delaware limited liability company, as administrative agent for such Lenders (in such capacity, the "<u>Administrative Agent</u>").  Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

W I T N E S S E T H :

WHEREAS, the Borrowers, the Guarantors, the Lenders and the Administrative Agent are party to the Credit Agreement; and

WHEREAS, the Lenders party to this Amendment, the Borrowers and the Administrative Agent have agreed, subject to certain limitations and conditions set forth below, to make certain amendments to the Credit Agreement, as more specifically set forth below;

NOW, THEREFORE, the parties hereto agree as follows:

Section 1.    <u>Amendments to the Credit Agreement</u>.    The Credit Agreement is, effective as of the date first written above and subject to the satisfaction (or due waiver) of the conditions set forth in <u>Section 2</u> (<u>Conditions Precedent to the Effectiveness of this Amendment</u>) hereof, hereby amended as follows (with bold, underline, highlighting, indenting and other formatting modified to conform to the formatting of the Credit Agreement):

(a)    <u>Amendments to Schedules</u>.

(i)    The contents of the columns set forth on <u>Schedule A</u> hereto are hereby inserted at the end of Schedule 2.1 to the Credit Agreement to reflect a restructuring of $20,291,872.92 of unpaid interest and commitment fees into Tranches TLD, TLE, and TLF.  In addition, Administrative Agent hereby waives its ability to call an Event of Default for the past failure to pay such unpaid interest.

Section 2.    <u>Conditions Precedent to the Effectiveness of this Amendment</u>.    This Amendment shall become effective as of the date first written above (the "<u>Amendment Effective Date</u>") when, and only when, each of the following conditions precedent shall have been satisfied or duly waived by the Administrative Agent (the date each such conditions precedent is satisfied or duly waived, the "<u>Conditions Precedent Date</u>"):

(a)    <u>Certain Documents</u>.  The Administrative Agent shall have received this Amendment, duly executed by the Borrowers and the Lenders constituting all Lenders, together with such additional documentation as the Administrative Agent may reasonably require, dated

**Patriarch/PC Confidential**

the Amendment Effective Date (unless otherwise agreed by the Administrative Agent) and in form and substance satisfactory to it;

      (b)    <u>Representations and Warranties</u>.  Each of the representations and warranties contained in this Amendment were true when made;

      (c)    <u>No Default or Event of Default</u>.  After giving effect to this Amendment, no Default or Event of Default shall be continuing, either on the date hereof or on the Conditions Precedent Date;

      (d)    <u>Corporate and Other Proceedings</u>.  All corporate and other proceedings, and all documents, instruments, consents and other legal matters ancillary to the transactions contemplated by this Amendment shall be completed in a form and manner satisfactory in all respects to the Administrative Agent; and

      (e)    <u>Fees and Expenses Paid</u>.  The Borrower shall have paid all Obligations due, after giving effect to this Amendment, on or before the later of the date hereof and the Conditions Precedent Date, including, without limitation, all fees set forth in <u>Section 4</u> (<u>Fees and Expenses</u>) hereof and all other costs, expenses and fees due under any Credit Document and invoiced prior to the Conditions Precedent Date.

      Section 3.    <u>Representations and Warranties</u>.  On and as of the date hereof and as of the Conditions Precedent Date, after giving effect to this Amendment, each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

      (a)    <u>Binding Obligation</u>.  This Amendment has been duly authorized, executed and delivered by such Borrower and constitutes a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms and the Credit Agreement as modified by this Amendment;

      (b)    <u>Subsidiaries</u>.  (i) the representations and warranties set forth in <u>Section 4.1(m)</u> (<u>Subsidiaries</u>) of the Credit Agreement are true as of the date hereof (replacing "Closing Date" therein with the date of this Amendment and taking into account any updated information delivered by any Borrower to the Administrative Agent on or prior to the date hereof) and] all Subsidiaries of any Borrower existing on the Conditions Precedent Date have executed the Credit Documents required to be executed with respect to such Subsidiaries pursuant to the Credit Agreement, including, without limitation, <u>Section 5.1(m)</u> (<u>Further Assurances</u>) thereof and (ii) in any case, all certificates, statements, updated schedules, collateral and other updates and other documents required to be delivered by such Borrower to the Administrative Agent or any Lender pursuant to any Credit Document as modified hereby have been delivered thereunder and all filings required to be made by or on behalf of such Borrower pursuant to any such Credit Document have been made;

      (c)    <u>Representations and Warranties in Credit Documents</u>.  Each of the other representations and warranties of such Borrower contained any Credit Document (as modified hereby) or in any certificate, document or financial or other statement furnished at any time under or in connection therewith is true in all material respects on and as of the date hereof and the Conditions Precedent Date, in each case as if made on and as of such date and except to the extent that such representations and warranties expressly relate to a specific date, in which case such representations and warranties shall be true in all material respects as of such specific date;

**Patriarch/PC Confidential**

provided, however, that, as used therein, (i) "Credit Agreement" shall refer to the Credit Agreement and after giving effect to this Amendment and (ii) "Credit Documents" shall include this Amendment;

(d)    No Litigation or Defense.   No litigation has been commenced or threatened against such Borrower or any of its Subsidiaries seeking to restraint or enjoin (whether temporarily, preliminarily or permanently) the performance of any action by any Borrower or any Subsidiary of any Borrower required or contemplated by the terms of this Amendment or any other Credit Document as modified hereby, and there exists no cause of action, offset, claim, counterclaim or defense, whether or not asserted, against the Administrative Agent or any Lender or any of their Related Parties (as defined below) with respect to the Obligations under any Credit Document; and

Section 4.    Fees and Expenses.

(a)    Borrowers jointly and severally agree to pay on demand in accordance with the terms of Section 11.3 (Expenses) of the Credit Agreement all costs and expenses of the Administrative Agent in connection with the preparation, reproduction, execution, delivery and enforcement of this Amendment and all other Credit Documents entered into in connection herewith (including, without limitation, the fees and expenses of attorneys, advisors and other professionals hired by the Administrative Agent with respect to the Credit Parties or the Credit Documents).

Section 5.    Release.   In further consideration for the execution by the Administrative Agent and the Lenders party hereto of this Amendment and without limiting any rights or remedies the Administrative Agent or any Lender may have, each Borrower hereby releases each of the Administrative Agent, each Lender and each of their Related Parties (each a "Releasee" and, collectively, the "Releasees") from any and all Claims that such Borrower has or may have against any Releasee, whether or not relating to any Credit Document, Obligation, Collateral, or legal relationship that exists or may exist between any Releasee and any Borrower.  As used in this Section 5, (i) "Claims" means all liabilities, rights, demands, covenants, duties, obligations (including, without limitation, indebtedness, receivables and other contractual obligations), claims, actions and causes of actions, suits, disputes, judgments, damages, losses, debts, responsibilities, fines, penalties, sanctions, commissions and interest, disbursements, taxes, charges, costs, fees and expenses (including, without limitation, fees, charges and disbursements of financial, legal and other advisors, consultants and professionals and, if applicable, any value-added and other taxes and charges thereon), in each case of any kind or nature, whether joint or several, whether now existing or hereafter arising and however acquired and whether or not known, asserted, direct, contingent, liquidated, due, consequential, actual, punitive or treble, (ii) "Related Party" means, with respect to any Person, any Affiliate of such Person or of another Related Party of such Person (excluding, in each case, (A) the Borrowers and their Controlled Affiliates and (B) any other Person and its Controlled Affiliates in which any Lender or any other Affiliated Investor has made any investment, whether through the purchase of debt or equity securities, loans or otherwise) and such Person's and such Affiliate's predecessors, successors, assigns, managers, members, partners, directors, officers, employees (regardless of whether seconded to a third party and including, without limitation, individuals with independent contractor or similar status), individual stockholders, agents, attorneys-in-fact, trustees, fiduciaries, representatives and advisors, (iii) "Affiliated Investor" means any Person that is a collateralized debt obligation, collateralized loan obligation or any other investment pooling vehicle or other entity that (A) is created primarily to invest in equity or debt securities, loans and

- 3 -

Patriarch/PC Confidential

other investments, (B) does not operate any trade or business and (C) is administered, advised or managed by, or directly or indirectly under common administration, advice or management with, the Administrative Agent or any Lender or any Affiliate of any Lender or the Administrative Agent and (iv) "Controlled Affiliate" means, with respect to any entity, any Person directly or indirectly "controlled" (as defined in the definition of "Affiliate" set forth in the Credit Agreement on the date hereof) by one or more of such entity and its other Controlled Affiliates.

Section 6.    Reaffirmation of Obligations.  Each Borrower hereby reaffirms (a) all of its obligations and liabilities, as expressly modified hereby, under the Credit Documents and agrees that such obligations and liabilities shall remain in full force and effect, (b) the Liens granted under the Credit Documents, and agrees that such Liens shall continue to secure the Obligations as expressly modified hereby, and (c) the validity and enforceability of the Credit Documents.

Section 7.    Effect on the Credit Documents.  This Amendment is a Credit Document and is limited as written.  As of the date each modification set forth herein shall become effective, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference in the other Credit Documents to the Credit Agreement (including, without limitation, by means of words like "thereunder," "thereof" and words of like import), shall refer to the Credit Agreement as modified thereby, and this Amendment and the Credit Agreement shall be read together and construed as a single agreement.  The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, (a) waive or modify any right, power or remedy under, or any other provision of, any Credit Document or (b) commit or otherwise obligate the Administrative Agent or any Lender to enter into or consider entering into any other waiver or modification of any Credit Document.  This Amendment is intended to cure and waive prior Events of Defaults caused by any failure to comply with the provisions it specifically modifies (whether modified directly or through a change in a definition) that would not have occurred if this Amendment had been in effect at the time of such failure, together with any Event of Default that may exist by reason of any failure to deliver notice thereof pursuant to the Credit Agreement and by past misrepresentations under the Credit Agreement, if any, that no Default or Event of Default existed and were continuing.

Section 8.    Waiver of Jury Trial; Miscellaneous.  Headings are for convenience only and do not form part of this Amendment, except when used to reference an article or section, in which case such title reference shall govern absent manifest error in case of conflict.  All communications and notices hereunder shall be given as provided in the Credit Documents.  This Amendment (a) shall be governed by and construed in accordance with the law of the State of New York, (b) is for the exclusive benefit of the parties hereto and, together with the other Credit Documents, constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof, (c) may be modified, waived or assigned only in writing and only to the extent such modification, waiver or assignment would be permitted under the Credit Documents (and any attempt to assign this Amendment without such writing shall be null and void), (d) may be executed in counterparts, which may be effectively transmitted by fax or e-mail (in each case return receipt requested and obtained) and which, together, shall constitute one and the same instrument, (e) is a negotiated document, entered into freely among the parties upon advice of their own counsel, and it should not be construed against any of its drafters and (f) shall survive the satisfaction or discharge of the Obligations.  The fact that any term or provision of this Amendment is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of

- 4 -

the remaining terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person. **Each party hereto hereby irrevocably and unconditionally waives any right to trial by jury with respect to this Amendment.**

[SIGNATURE PAGES FOLLOW]

**Patriarch/PC Confidential**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized, as of the date first written above.

LVD ACQUISITION, LLC,
    as Borrower

By: _____
    Name: *Sacha Polvanoff*
    Title: *CEO*

B2 ACQUISITION, INC.,
    as Borrower

By: _____
    Name: *John Jacobs*
    Title: *CEO*

Patriarch/PC Confidential

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
as Administrative Agent

By: _____
Name: Lynn Tilton
Title: Manager


ZOHAR CDO 2003-1, LIMITED,
as Lender
By: Patriarch Partners VIII, LLC,
its Collateral Manager

By: _____
Name: Lynn Tilton
Title: Manager


ZOHAR II 2005-1, LIMITED,
as Lender
By: Patriarch Partners XIV, LLC,
its Collateral Manager

By: _____
Name: Lynn Tilton
Title: Manager


ZOHAR III, LIMITED,
as Lender
By: Patriarch Partners XV, LLC,
its Collateral Manager

By: _____
Name: Lynn Tilton
Title: Manager

Patriarch/PC Confidential

SCHEDULE A
AMENDMENT NO. 8
TO CREDIT AGREEMENT
LVD ACQUISITION, LLC

| Type of Loan | Tranche | Commitments[1] | Outstandings | Lender | Applicable Margin | Interest Payment Date | Maturity Date | Commitment Period (if applicable) | Prepayment Preference | OID Number |
|---|---|---|---|---|---|---|---|---|---|---|
| Term Loan | TLD | $1,261,796.67 | $1,261,796.67 | ZOHAR CDO 2003-1, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |
| Term Loan | TLE | $14,526,968.44 | $14,526,968.44 | ZOHAR II 2005-1, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |
| Term Loan | TLF | $4,503,107.80 | $4,503,107.80 | ZOHAR III, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |

[1] For loans which, when repaid, may not be reborrowed, only outstanding undrawn commitments are shown.

Patriarch/PC Confidential

**EXHIBIT F**

**PPMG MSA**

# [FILED UNDER SEAL]

# EXHIBIT G

**Portions of EPA Disclosure Schedules**

# [FILED UNDER SEAL]

## EXHIBIT H

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

01:25035581.7

**<u>EXHIBIT I</u>**

**FoF Model**

# [FILED UNDER SEAL]