REDACTED PUBLIC VERSION
OF DI 1164

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>           Debtors. | Chapter 11<br><br>Case No. 18-10512 (KBO)<br><br>Jointly Administered<br><br><br>**Hearing Date:  TBD**<br>**Objection Deadline:  TBD** |

## MOTION OF LYNN TILTON FOR APPROVAL OF TIMELINE AND GUIDELINES REGARDING MONETIZATION OF THE GROUP A PORTFOLIO COMPANIES

Lynn Tilton hereby submits this motion (the "Motion"), by and through her undersigned

counsel, for entry of an order, substantially in the form attached hereto as Exhibit A (the

"Proposed Order"), pursuant to section 105(a) of the Bankruptcy Code and this Court's *Order*

*Approving and Authorizing the Settlement Agreement by and Between the Debtors, Lynn Tilton,*

*the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* [D.I.

266] (the "Settlement Order") approving the proposed timeline (the "Timeline") and guidelines

(the "Guidelines") included in the Proposed Order with respect to the monetization of the

remaining Group A Portfolio Companies as part of the joint monetization process under the

Settlement Agreement.[2]  In support of the Motion, Ms. Tilton respectfully represents as follows:[3]

---

[1]   The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited ("Zohar III") (9261), Zohar II 2005-1, Limited ("Zohar II") (8297), and Zohar CDO 2003-1, Limited (together with Zohar II and Zohar III, the "Zohar Funds") (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2]   The "Settlement Agreement," as used herein, has the meaning set forth in the Settlement Order.  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Settlement Agreement.

[3]   To the extent any party asserts that any of the allegations in this Motion are subject to any mediation privilege, Ms. Tilton asserts that such privilege has been waived.

## PRELIMINARY STATEMENT

1.      Last week, the Court recognized that these cases "may be nearing a point" where a "timeline for a sale process" would be appropriate. Hr'g Tr., Dec. 11, 2019, p. 22:24–23:5. Ms. Tilton agrees. The Court has noted its willingness to call balls and strikes in these cases, but every umpire needs a transparent and rational strike zone. With the goal of establishing a fair playing field for all stakeholders, Ms. Tilton, who with the other Patriarch Stakeholders are also creditors and/or equity owners of the Portfolio Companies, seeks Court approval of the Timeline and Guidelines proposed here, which shall govern the marketing and sale process for the remaining eleven Group A Portfolio Companies, the primary source of recovery for all stakeholders.[4]

2.      Ms. Tilton initially filed these Chapter 11 cases because she believed it was the only path forward to monetize the Portfolio Companies for the benefit of all stakeholders. Years of litigation initiated by Zohar Fund noteholders, among other things challenging ownership of the Portfolio Companies, had the disastrous effect of scaring off buyers and chilling sales, making it impossible for the Portfolio Companies to be sold or refinanced in order to repay their debt to the Zohar Funds. The bankruptcy filing and subsequent Settlement Agreement temporarily placed on hold those value destructive disputes so the Debtors and Ms. Tilton could engage jointly in a process to monetize various Portfolio Companies.

3.      And engage she did. Ms. Tilton worked tirelessly to sell or refinance the Portfolio Companies from the moment the Settlement Agreement was agreed to (and even before): Ms. Tilton negotiated on the companies' behalves the engagement of blue-chip investment bankers to

---

[4]   Dura Automotive Systems, LLC ("Dura") remains a Group A Portfolio Company, but nothing in this Motion or the Proposed Order is intended to impact or affect the sale process currently under way in Dura's separate Chapter 11 cases pending before this Court. The proposed Timeline and Guidelines shall not apply to Dura's marketing and sale efforts.

market the Portfolio Companies; she personally expended millions of dollars of her own money to obtain quality of earnings reports from a highly reputable firm for the key Portfolio Companies; she spent hundreds of hours writing and editing each confidential marketing memorandum; she personally met with many potential bidders; she coordinated with the Portfolio Companies and investment bankers to provide voluminous company information for interested bidders in data rooms and throughout the diligence process. This has all been accomplished while Ms. Tilton continues to actively manage the four most valuable Portfolio Companies as CEO.

4.      Ultimately, Ms. Tilton negotiated and closed two Portfolio Company sales. That more sales were not closed was not due to any lack of effort or desire on the part of Ms. Tilton. Unforeseen market forces and the overhang of the bankruptcy led to a number of disappointing sales processes, as the parties recognized, accepted, and agreed at the time.

5.      ████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████

6.      Ms. Tilton's monetization efforts and management of the Portfolio Companies has continued unabated since the Court entered its September 29, 2019 order continuing the monetization process. She has engaged investment bankers for ███ additional Group A Portfolio Companies, initiated internal sale process preparations at several Portfolio Companies,

and continued the sale process (including continually driving the investment bankers to achieve the best possible marketing process) for several others.

7.      But one woman—even one with the experience, capabilities, and unique expertise of Ms. Tilton—can only do so much at any one time. As the retained investment bankers recognize (and even as the Debtors would have to acknowledge), Ms. Tilton's continued involvement in both the monetization efforts of the Debtors' interests in the Portfolio Companies and managing the Portfolio Companies is critically important to achieving the best value possible. This much is not in dispute. ████████████████████████

████████████████████████████████████

████████████████████

8.      Yet that is precisely what the Debtors propose. ███████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████ █████████████████████

██████████████████████████████

█████████████████████████████████████

███████████████████████████████

████████████████████████████████████

██████████████████████ of the non-Debtor Portfolio Companies for the benefit of all stakeholders.

---

[5] Counsel to the Debtors' Independent Director, Mr. Farnan: "The word monetize means convert to currency; that's it. It does not mean maximize the value of. It does not mean realize the highest and best price for. It does not mean restructure. It does not even mean a public auction for. It means convert to currency." Hr'g Tr., Sept. 24, 2019, p. 19:7–12.

9.    ███████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████

10.    Ms. Tilton never agreed to ████████████████████████

████████████████████—to the detriment of the companies, their employees, their other

creditors, their other stakeholders (including equity holders), or herself.  And so Ms. Tilton has

continued to move forward with the monetization process in a constructive manner designed to

yield the best possible value in a reasonable time period.

11.    Under the Settlement Agreement, the Debtors have for months had the option of

seeking to remove Ms. Tilton from her positions at the Portfolio Companies.  *See* Settlement

Agreement, ¶ 9.  The Debtors have also had the opportunity to seek an order setting a timeline

and more detailed parameters for the joint monetization process.  And at any point during the 15

Month Window, the Debtors could have gone to Court to challenge any of Ms. Tilton's positions

on sales.  They did not do so.

12.    Declining to pursue any of these options, the Debtors have, instead, now chosen at

this late date to submit through their procedurally improper LOI Motion (defined below)

outlandish, false and defaming allegations and misleading half-truths regarding Ms. Tilton and

the monetization process to this Court, even where those misguided allegations have no bearing

on the relief requested.  Indeed, the baseless insults and half-truths are no doubt the same "status

report" the Debtors attempted to provide at the November 1, 2019 hearing, and that this Court

declined to hear.  Hr'g Tr., Nov. 1, 2019, p. 20:8–16.  And the Court's understandable

expressions of concern regarding those lurid allegations during a public hearing were perhaps the

intended effect of including them (the press did, after all, headline those concerns), even though otherwise superfluous and irrelevant to the pending motion. But such procedural gamesmanship has no place here.

13.    Intended or not, the Debtors have maligned Ms. Tilton's reputation and created an environment in which the public and potential bidders perceive a badly damaged process.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████. Such destruction lies squarely at the feet of the Debtors and those acting for them.

14.    Frankly, Ms. Tilton has had enough. It is high time the factual record be set straight.

15.    The Debtors and other stakeholders falsely allege that Ms. Tilton has engaged in a "pattern of conduct," (LOI Motion, ¶ 4) inconsistent with the Settlement Agreement and have even characterized Ms. Tilton's conduct as "flagrant non-performance." (MBIA Cash Collateral Reply [D.I. 1132], at ¶ 2). But as the Debtors' fiduciaries themselves admit, as Portfolio Company employees and investment bankers will testify, and as the documents will plainly show, *no one* has worked harder than Ms. Tilton to monetize the Portfolio Companies since the inception of these bankruptcy cases. Multiple sales processes were commenced by top investment banking houses ████████████████████████████████████

████████████████

16.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

17.     By way of example, and as will be set forth more fully in Ms. Tilton's objection

to the LOI Motion, ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████ The letter of intent for the "PC Sale Candidate" (as defined in the LOI

Motion) ███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████

18.     ███████████████████████████████████████████

████████████████████████████████ Ms. Tilton has *for months* been

urgently entreating the Debtors ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

7

██████████████████████████████████████ The Debtors refused, paying no

heed to Ms. Tilton's repeated warnings. And with regard to the particular PC Sale Candidate,

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

19.    As to the Debtors' complaints regarding ████████████████████

there is no nefarious mystery. ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

20.    Finally, as to the Debtors' allegations regarding the Chapter 11 cases for Dura, the

established record in those cases is contrary to the Debtors' frivolous allegations that Ms. Tilton

sought to steal Dura away from the Zohar Funds. But she also had no choice but to consider

filing Dura for bankruptcy. As she repeatedly and urgently warned the Debtors, Dura was in dire

condition, in large part due to the Debtors' continued refusal to extend maturity of the term debt,

and the impact that such refusal had on Dura's ability to obtain needed additional financing. Ms.

Tilton authorized the appointment of two sophisticated and experienced restructuring professionals as independent managers of Dura who, after careful consideration of the company's financial condition, operational needs, and available restructuring options, made the decision to file chapter 11 petitions. It cannot be that Ms. Tilton "orchestrated" the bankruptcy as a scheme to cheaply acquire Dura when she was not in charge of the bankruptcy filing.

21.     Indeed, wholly ignoring the factual record in Dura's chapter 11 cases, the Debtors allege that Patriarch's proposal to provide debtor-in-possession financing and to serve as a stalking horse purchaser was a *fait accompli* to steal the company. The record shows, however, that Ms. Tilton warned Mr. Farnan and Mr. Katzenstein repeatedly that Dura was in need of financing and that the company may have no other choice than to consider bankruptcy in order to procure funding for day-to-day operational needs. Before selecting Patriarch's DIP proposal, Dura contacted seven banks and credit funds to solicit competing financing proposals and received no actionable proposals. *See Declaration of Richard Morgner, In re Dura Automotive Services, LLC*, No. 19-12378 (KBO) [D.I. 37], at ¶ 12. Dura also considered proposals from Bardin Hill and the Zohar Funds, but those contained onerous financial terms and key deficiencies, and even required significant funding assistance from Ms. Tilton while also disenfranchising her from typical lender rights. That the Patriarch DIP lender was designated a stalking horse is unremarkable. DIP lenders regularly serve as stalking horse bidders. And the Debtors leave out that the bid merely provided a starting point for an active auction process intended entirely to stabilize the business, provided comfort to customers and suppliers, and at all times intended to facilitate a court-supervised sale process of the same duration and run by the

9

same banker as the sale procedures that were ultimately approved by this Court in Dura's bankruptcy.[6]

22.     The Debtors' allegations in the LOI Motion are not only false and intentionally inflammatory, they are designed to manufacture some sense of "emergency" so that the Debtors may now unilaterally impose that which they cannot get through the joint monetization process: ███████████████████████████████ And in truth, the Debtors have every motivation to drive Ms. Tilton out of the joint monetization process with spurious allegations and coordinated attacks. The alternative is to seek final resolution of the long-standing dispute over Portfolio Company ownership and control. But there is significant downside to such an approach, as the Debtors well recognize, namely the tax liability that comes with ownership. By continuously attacking Ms. Tilton, they hope to gain unilateral control over the process while also avoiding the substantial taxes associated with the privilege of control.

23.     It is time to restore order to the joint monetization process. Ms. Tilton seeks exactly that—order to a damaged process—so that she can return her full time and attention to the companies and to generating value.

24.     The Timeline proposed in this Motion rightly balances the interests of a timely process with the goal of maximizing the value of the Debtors' assets for the benefit of all stakeholders. It is a rational and achievable plan that provides for tangible deadlines, including dates certain by which each Group A Portfolio Company sale process will commence, and is designed to reasonably accommodate all stakeholder interests, including those of the Debtors and each Portfolio Company.

---

[6]     Indeed, at the suggestion of Ms. Tilton, the Dura bidding procedures included Joe Farnan, the Debtors' Independent Director, as a consultation party.

25.     The proposed Guidelines also provide much-needed rules of the road for the balance of the joint monetization process. The Guidelines make clear that (a) both the Debtors and Ms. Tilton must have full and unfettered access to the investment bankers retained by the Portfolio Companies, (b) both the Debtors and Ms. Tilton receive all information relating to potential purchasers of the Portfolio Companies, and (c) positions or communications that may be detrimental to the sale process are prohibited. The Guidelines also make clear that the Debtors and their professionals may not interfere with the operation of the Portfolio Companies, including by contacting employees or offering current employees or third parties positions at the Portfolio Companies.

26.     Finally, while recognizing that there may be times when the Court has to intervene, the Guidelines discourage the Debtors from continuing to spill into the public record unsupported allegations about Ms. Tilton's alleged "harmful" positions with respect to the Portfolio Companies and other stakeholders that are prejudicial, unfounded, and detrimental to the estate and the Portfolio Companies.[7] They set certain standards by which parties may seek this Court's involvement in the event of a dispute over a potential transaction, and they will put the parties on a constructive path toward maximizing value and resolving these bankruptcies.

27.     Ms. Tilton seeks to have this Motion heard as soon as possible and, through her counsel, will immediately meet and confer with the Debtors to implement a schedule for discovery as necessary.

## JURISDICTION

28.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for

---

[7]  Hr'g Tr., Dec. 11, 2019, p. 22:6.

the District of Delaware dated as of February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware, Ms. Tilton consents to the entry of a final order by the Court in connection

with this Motion[8] to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III

of the United States Constitution.

29.     Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

30.     The statutory and legal predicates for the relief sought herein are section 105(a) of

the Bankruptcy Code, the Settlement Agreement, and the Settlement Order.

## BACKGROUND

**A.     General Background.**

31.     On March 11, 2018 (the "Petition Date"), Ms. Tilton, then as sole director for the

Debtors, caused the Debtors to file petitions for relief under Chapter 11 of the Bankruptcy Code.

The Debtors' Chapter 11 cases are being jointly administered, for procedural purposes only,

pursuant to Bankruptcy Rule 1015(b).

32.     General information about the Debtors and the events leading up to the Petition

Date can be found in the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions*

[D.I. 6] and the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [D.I. 5], each filed

on March 12, 2018.

**B.     The Settlement Agreement and the Monetization Procedures Order.**

33.     On May 21, 2018, the Court entered its Settlement Order, pursuant to which this

Court approved the Settlement Agreement.  The Settlement Agreement was the product of at

---

[8]  Ms. Tilton and the Patriarch Stakeholders do not consent to the jurisdiction of this Court or to entry of a final order for any purpose other than the resolution of this Motion.

least five full days of mediation between the Debtors, the Patriarch Stakeholders, MBIA, and the Zohar III Controlling Class. Among other things, the Settlement Agreement (i) stayed and tolled the substantial and expensive prepetition litigation among the Debtors, the Patriarch Stakeholders, MBIA, and the Zohar III Controlling Class (among others) for a 15 Month Window, which could be extended an additional three months subject to satisfying certain sale benchmarks, (ii) provided for the appointment of an Independent Director for the Debtors— Joseph J. Farnan Jr.—and retention of a Chief Restructuring Officer ("CRO")—Michael Katzenstein, and (iii) provided for a joint monetization process among the Debtors' CRO and Independent Director, on the one hand, and Ms. Tilton, on the other hand, pursuant to which the parties were to seek to sell or refinance the Debtors' interests in the Portfolio Companies. Under the Settlement Agreement, Ms. Tilton, on behalf of the Portfolio Companies, and the Independent Director and CRO, on behalf of the Debtors, are to "jointly . . . select transactions to complete." Settlement Agreement, ¶ 10.

34.     On November 9, 2018, the Court entered its *Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [D.I. 545] (the "Monetization Procedures Order"). The Monetization Procedures Order established procedures that, after the Debtors and Ms. Tilton jointly select a transaction to complete, govern the process by which the Debtors may (i) provide notice of such transaction to the Court and other stakeholders in these cases, and (ii) obtain Court authorization to complete such transaction on behalf of the Debtors' estates.

35.     Two sale transactions have closed pursuant to the Monetization Procedures Order. [*See* D.I. 817, 918]. For the avoidance of doubt, Ms. Tilton is not seeking any modification to the Monetization Procedures Order.

**C.      The Joint Monetization Process.**

36.     After the entry of the Settlement Order, Ms. Tilton invested her full effort into the monetization process (at great personal expense, both in terms of time and money), and, with the joint participation and encouragement of the Debtors' Independent Director and CRO, conducted the joint monetization process contemplated under the Settlement Agreement to monetize the Debtors' interests in the Portfolio Companies. Among other things, even before expiration of the 15 Month Window under the Settlement Agreement, under Ms. Tilton's leadership: ▮▮▮▮ bankers were interviewed; bankers were hired for ▮ companies, sales processes were commenced for ▮ companies and ▮▮ of sales prospects were contacted.

37.     In connection with these sales processes, Ms. Tilton personally invested millions of dollars of her own money and thousands of hours writing and editing every confidential marketing memorandum, as well as assisting with, and supervising, the creation of data rooms to facilitate the monetization process. Further, Ms. Tilton personally attended more than ▮ buyer and banker meetings in support of the sale and/or refinancing of specific Portfolio Companies. At all times, the Debtors and their advisors were included in and advised of these efforts.

38.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



These results were fully shared with and known by Mr. Farnan and Mr. Katzenstein, and at all times Ms. Tilton coordinated with Mr. Farnan and Mr. Katzenstein with

respect to the results of the monetization process and the path forward.  Indeed, over the course of the 15 Month Window, the Debtors brought not one dispute to this Court.

39.



40.

41.



[REDACTED]

[REDACTED]

45.   [REDACTED]

[REDACTED]

46.     In a tacit acknowledgment of Ms. Tilton's importance to the monetization process, on September 20, 2019, the Debtors moved for an order to continue the joint monetization process under the Settlement Agreement past the 15 Month Window. [D.I. 938]. At that time, it appeared important to the Debtors that Ms. Tilton continue to work to monetize the Portfolio Companies. The Debtors' desire to ensure Ms. Tilton's continued involvement was understandable given her superior knowledge of the Portfolio Companies and the tireless efforts—both on a personal and monetary basis—she had made to monetize the Portfolio Companies during the 15 Month Window.

47.     On September 29, 2019, over the objection of certain of the Patriarch Stakeholders, the Court entered its *Order (A) Implementing the Terms of the Settlement Agreement and (B) Resolving Dispute Over Monetization Process, Pursuant to Paragraph 11 of the Settlement Agreement* [D.I. 974] (the "Monetization Order"). Pursuant to the Monetization Order, the Court determined that the joint monetization process contemplated under the

Settlement Agreement extends beyond expiration of the 15 Month Window. The 15 Month

Window was extended with the agreement of all parties while the Monetization Order motion

was *sub judice*, and expired by its own terms on September 30, 2019. [*See* D.I. 871]. Patriarch

appealed the Monetization Order. [D.I. 984]. To date, that order has not been vacated, and

several Group A Portfolio Companies are in the process of being marketed for sale.

48.     Notwithstanding the appeal, Ms. Tilton continued her efforts to monetize the

Portfolio Companies. Over the course of the Fall, ███ additional investment bankers have been

retained (in addition to the ███ previously retained) for ███ additional Portfolio Companies,

and several Group A Portfolio Companies sales efforts are ongoing.

49.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████

50.     Nevertheless, Ms. Tilton sought to work with the Debtors in an effort to construct

a mutually agreeable timetable. The Debtors have, to date, refused to agree to a reasonable

timetable and, accordingly, Ms. Tilton has brought this motion.

**D.     The Proposed Timeline and Guidelines.**

51.     On December 10, 2019, the Debtors filed an emergency motion (the "LOI

Motion") to compel Ms. Tilton to execute a non-binding Letter of Intent for a ██████████

████████████████████████████████  [*See* D.I. 1115].

████████████████████████████████████

████████████████████████████████████████



52.

While this Motion is not the place, Ms. Tilton looks forward to responding to these allegations in detail in the Objection and at the January 10 hearing on the LOI Motion.

53.     During a telephonic hearing on the Debtors' request for a ruling on the LOI Motion on an expedited basis, the Court stated that these cases "may be nearing a point" where a "timeline for a sale process" would be appropriate.  Hr'g Tr., Dec. 11, 2019, p. 22:24–23:5.  For the reasons set forth herein, Ms. Tilton strongly agrees that these cases would benefit from a timeline and guidelines with respect to the joint monetization process that the Court has determined must proceed.

54.    Ms. Tilton has developed the following Timeline by which the Group A Portfolio

Companies will complete their retention of investment bankers (nearly all the companies have

already), and by which marketing processes for such companies shall be launched to potential

purchasers.

| Portfolio Company | Investment Banker Retention Date | Deadline for (Re)Commencement of Market Sale Efforts |
|---|---|---|
| ███████ | ██████ | ████████ |
| ████████ | ███████████ | ████████ |
| ████████ | ██████ | █████████ |
| ████████ | ███████ | ██████ |
| ████████ | ███████ | ██████ |
| ████████ | ███████ | ██████ |
| ████████ | ███████ | ████████ |
| ████████ | ██████ | ███████ |
| ████████ | ████████ | |

55.    ████████████████████████

████████████████████████

████████████████████████

████████

56.    The Timeline is structured to allow Ms. Tilton and the Debtors to pursue the joint

monetization process contemplated under the Settlement Agreement ████████████

████████████████████████

██████████████████████ Ms. Tilton is an essential party to the successful

monetization of the remaining Group A Portfolio Companies, and also serves as CEO ██████

████████████████████████████████████ and has served

in that role for many years and well before the initiation of these Chapter 11 cases.  This is

critically important to a successful process.

57.    As the Debtors agree, Ms. Tilton is critical to the successful sale of all Group A

Portfolio Companies based on her familiarity and relationships with the businesses. ████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████

58.    Similarly, for the continued monetization of the Group A Portfolio Companies to

be successful, certain minimum guidelines must be established to make clear that (a) both the

Debtors and Ms. Tilton must have full and unfettered access to the investment bankers retained

by the Portfolio Companies, (b) both the Debtors and Ms. Tilton receive all information relating

to potential purchasers of the Portfolio Companies, and (c) positions or communications that may

be detrimental to the sale process are prohibited.  Among other things, the Guidelines provide:





59.     Further, in the event of a dispute among Ms. Tilton and the Debtors with respect to a potential transaction, there must be a clear standard as to when it is appropriate to involve the Court to resolve such disputes.  Accordingly, Ms. Tilton, the Debtors, or any other party in interest may only seek relief from this Court with respect to a potential transaction involving a Portfolio Company if ███████████████████████████████ ███████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████

60.     For the reasons set forth herein, Ms. Tilton proposes the Timeline and Guidelines

set forth in the Proposed Order as the appropriate means to ensure an organized and structured

joint monetization process.

## RELIEF REQUESTED

61.     By this Motion, Ms. Tilton request that the Court, pursuant to section 105(a) of

the Bankruptcy Code, the Settlement Agreement, and the Settlement Order, enter the Proposed

Order setting the Timeline and Guidelines with respect to the go-forward processes to monetize

the Group A Portfolio Companies.

## BASIS FOR RELIEF

62.     Bankruptcy courts retain "jurisdiction to interpret and enforce settlements and the

accompanying orders approving settlements." *See In re Baseline Sports, Inc.*, 393 B.R. 105,

118–19 (Bankr. E.D. Va. 2008); *accord In re Lazy Days' RV Center, Inc.*, 724 F.3d 418, 423 (3d

Cir. 2013); *In re Patriot Coal Corp.*, 539 B.R. 812, 818–19 (Bankr. E.D. Mo. 2015).  Although

"there are some significant limits to a bankruptcy court's ability to use section 105(a) of the

Code . . . [it] plainly may be used 'to enforce and implement' earlier orders." *In re River Ctr.*

*Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008); *see also In re Ames Dep't Stores,*

*Inc.*, 317 B.R. 260, 273–74 (Bankr. S.D.N.Y. 2004).  In addition, section 105(a) of the

Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of the Bankruptcy Code," and that "[n]o

provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest

shall be construed to preclude the court from, *sua sponte*, taking any action or making any

determination necessary or appropriate to enforce or implement court orders or rules . . . ." 11 U.S.C. § 105(a).

63.      Under paragraph 10 of the Settlement Agreement, "Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete." Further, in the event of "[a]ny dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton," such dispute is to be first referred to the Mediator. Settlement Agreement, ¶ 11. "If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute." *Id.*

64.      According to the Debtors, they, "acting through the Independent Director, are vested with full authority to consummate, among other things, the sale of any and 'all rights, benefits and economic interests associated with' the 'equity or LLC Interests . . . in a Portfolio Company of which the Debtors are record holders . . . ." LOI Motion, ¶ 18. However, any process by which the Debtors seek to monetize their interests in the Portfolio Companies must be aimed at optimizing value and realizing a fair price for the Debtors' interests. *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) ("The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there is a business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith."); *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005) (recognizing that a debtor may only sell property outside the ordinary course where "optimal value is realized by the estate under the circumstances").

65.     Since the expiration of the 15 Month Window, the Debtors and their advisors have relentlessly demanded ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ with the Debtors' creditors simply looking to litigate against Ms. Tilton to attempt to make up for any self-imposed loss of value that results from a monetization process that is not coordinated or designed to maximize value. *See* Hr'g Tr., Sept. 24, 2019, p. 19:7–12 (C. Shore, counsel for the Independent Director, "The word monetize means convert to currency; that's it.  It does not mean maximize the value of.  It does not mean realize the highest and best price for.  It does not mean restructure.  It does not even mean conduct a public auction for.  It means convert to currency.").

66.     Ms. Tilton does not contest that, unless the Court's Monetization Order is overturned, she and the Debtors are obligated under the Settlement Agreement to continue the joint process to monetize the Group A Portfolio Companies.  And she continues to actively drive the joint process forward.  However, the monetization process must proceed in a structured and organized manner that provides the greatest chance of maximizing value for the stakeholders. The proposed Timeline and Guidelines are designed to realize such value.

67.     The Timeline serves multiple purposes that inure to the benefit of all stakeholders in these cases.  *First*, the Timeline will provide a fair and organized marketing process that maximizes value.  *Second*, the Timeline will provide transparency for the key stakeholders in these cases, allowing them to set expectations with respect to recoveries on their investments. *Third*, the Timeline provides for a ████████████████████████████████████

████████████████████████████████████████████████

████████████████████

68.    The Settlement Agreement originally contemplated sales of the Group A Portfolio

Companies over a fifteen to eighteen month period, out of recognition that marketing and selling

all fourteen Portfolio Companies at the same time was impossible. The expiration of the 15

Month Window has not changed that reality. The Timeline is designed to allow for a prompt and

reasonable sale process, while also maximizing value and generating sale proceeds on a

reasonable timeframe.

69.    The Guidelines are similarly designed to ensure that parties have full access to

information in the joint monetization process contemplated under the Settlement Agreement, so

that they can make fully-informed decisions with respect to potential transactions. Among other

things, the Guidelines ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

70.    These Guidelines are not designed to be comprehensive bid procedures to

establish all rules and milestones with respect to the marketing and sale of the remaining Group

A Portfolio Companies. This is intentional, as the Group A Portfolio Companies, that are the

subject of the proposed Timeline and Guidelines are not themselves debtors in these Chapter 11

cases, and the companies are largely in different industries, with different potential buyers, and

different investment bankers overseeing the sale and marketing processes. Ms. Tilton and the

---

9    ████████████████████████████████████████████

Debtors, in consultation with the Portfolio Companies' investment bankers, can and should negotiate more specific steps to complete the remaining sales as needed. The proposed Timeline and Guidelines, however, set forth a reasonable timeframe for the process, and the Guidelines set forth fundamental rules aimed at ensuring that the sales proceed in an organized fashion with appropriate transparency.

71.    The proposed Timeline and Guidelines should be approved to provide more structure and to set appropriate expectations with respect to the joint monetization process that is ongoing and will continue until ordered otherwise.

## **RESERVATION OF RIGHTS**

72.    Neither this Motion nor any appearance in connection with this Motion shall constitute a waiver of (i) the right to have final orders in non-core matters entered only after de novo review by a District Judge, (ii) the right to trial by jury in any proceeding related to, or triable in, these cases or any case, controversy or proceeding related to these cases, (iii) the right to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (iv) any objection to the jurisdiction of this Court for any purpose other than with respect to this Motion, (v) an election of remedy, or (vi) any other rights, claims, actions, defenses, setoffs or recoupments as appropriate, in law or in equity, under any agreements, all of which rights, claims, actions, defenses, setoffs and recoupments are expressly reserved. Further, with the exception of Dura, the Portfolio Companies are not debtors in bankruptcy proceedings before this Court, and do not consent to the jurisdiction of this Court for any purpose, and do not consent to any final order in this Court.

73.    Prior to the Petition Date, the Zohar Funds (through their prior collateral manager) and Ms. Tilton, among others, were engaged in litigation as to which persons or

entities owned the record and/or beneficial equity interests in the Portfolio Companies. Nothing in this Motion shall constitute an admission, waiver, or modification with respect to any of the positions or arguments taken in such litigation. Further, certain of the Patriarch Stakeholders are appealing the Monetization Order. Ms. Tilton has brought this Motion based on the fact that the Monetization Order has not been stayed, and is therefore currently binding. Nothing in this Motion shall constitute an admission, waiver, or modification with respect to the appeal of the Monetization Order.

## NOTICE

74.     Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) counsel to the Debtors; (iii) counsel to U.S. Bank, as indenture trustee; (iv) counsel to MBIA; (v) counsel to the Zohar III Controlling Class; and (vi) all parties that have filed a notice of appearance in these chapter 11 cases pursuant to Fed. R. Bankr. P. 2002. In light of the nature of the relief requested herein, Ms. Tilton submits that no other or further notice is necessary.

## CONCLUSION

75.     WHEREFORE, Ms. Tilton respectfully requests that this Court enter the Proposed Order, approving the Timeline and Guidelines with respect to the joint monetization process for the remaining Group A Portfolio Companies.

Dated:  December 20, 2019

**COLE SCHOTZ P.C.**


By: /s/ Norman L. Pernick_____
Norman L. Pernick (No. 2290)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
preilley@coleschotz.com

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Robert Klyman (Admitted Pro Hac Vice)
Michael S. Neumeister (Admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
mneumeister@gibsondunn.com


Randy M. Mastro (Admitted Pro Hac Vice)
Mary Beth Maloney (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
mmaloney@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO  80202
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Lynn Tilton*