IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 18-10512 (KBO)<br>)<br>) Jointly Administered<br>)<br>) **Hearing Date: TBD**<br>) **Objection Deadline: N/A**<br>) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO ENTER INTO AMENDED PORTFOLIO COMPANY CREDIT AGREEMENT AND GRANTING RELATED RELIEF

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors" or the "Zohar Funds") hereby submit this motion (this "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), for entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), authorizing the Debtors to enter into an amendment to the Credit Agreement (as defined below) in accordance with terms ▉▉▉▉▉▉▉▉▉▉▉▉ set forth in the term sheet attached to the Proposed Order as **Exhibit 1** (the "Term Sheet," and any amendment pursuant to such Term Sheet, a "Credit Agreement Amendment") by and between Zohar II 2005-1, Limited, and Zohar III, Limited (together, the "Lenders"), on the one hand, and ▉▉▉▉▉▉▉ and certain of its affiliated entities (collectively, the "Portfolio Company"), on the other, and granting such other and further relief as the Court deems necessary. *Because the Portfolio Company requires an immediate liquidity infusion to continue operating in the ordinary course, and to best support*

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724) ("Zohar I"), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

*the Portfolio Company's sale process under the Monetization Procedures Order,[2] the Debtors are compelled to seek the <u>interim</u> relief requested herein on an urgent basis and are concurrently filing a motion to shorten the time required for notice of a hearing on this Motion.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *the Debtors are seeking authority from the Court to enter into such Credit Agreement Amendment on an interim basis* ▮▮▮▮ *in light of the Portfolio Company's pressing liquidity needs. The Debtors believe they must position themselves with authority to execute a Credit Agreement Amendment on an interim basis and fund thereunder without delay to avoid potentially catastrophic consequences to the Portfolio Company.* Importantly, both Bardin Hill and MBIA Insurance Corp., significant stakeholders of the Debtors' estates, are in support the relief requested herein. In support of this Motion, the Debtors rely on the declaration of Michael Katzenstein, the Debtors' Chief Restructuring Officer, attached hereto as **Exhibit B** (the "Katzenstein Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1. The Debtors indisputably own 100% of the senior secured debt at the Portfolio Company (more than ▮▮▮▮▮▮▮▮▮▮). And while Ms. Tilton — who is the Portfolio Company's sole director — contends that all equity holdings are disputed, she has always conceded (and confirmed that concession as recently as Friday)[3] that all

---

[2] The *Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [Docket No. 545] shall be referred to herein as the "Monetization Procedures Order").

[3] Hr'g Tr., 83:8-14, Jan. 10, 2020 ("[O]n the ownership issues, it's a red herring, Your Honor…there is no litigation going on right now regarding ownership. Ms. Tilton conceded on day one of these cases in her sworn declaration, that the debtors will receive, until their noteholders are paid in full, the economic benefit of the equity interests in those portfolio companies and that's what we expect.").

25855465.14

of the economic benefit of the Portfolio Company runs to the Debtors to pay off the senior secured noteholders. As the primary economic stakeholder and beneficiary of any monetization process with respect to the Portfolio Company, the Debtors are attempting to avert a short-term crisis, maintain as reasonably as possible the Portfolio Company's existing capital structure and fund a monetization process on terms the Debtors — as the entities with the most to lose here — find wholly commercially reasonable.

2. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████.

3. On the afternoon of January 10, 2020 — while the CRO (as defined below) and the Debtors' advisors were appearing before the Court in these cases — the CRO received an e-mail communication stating that the Portfolio Company projected that it would have insufficient cash to fund its payroll obligations due on Tuesday, January 14, 2020 — just two business days away.

4. The Independent Director, CRO (and his team from FTI) and their professional advisors immediately launched a process to stave off the impending crisis at the Portfolio Company. Over the course of Saturday, January 11th through Monday, January 13th, the Debtors and their advisors contacted potential funding sources — including Ms. Tilton and their existing senior secured creditors — to assess what avenues may be available to bridge the Portfolio

25855465.14

Company's immediate liquidity crisis and short-term funding needs while the Portfolio Company's marketing and sale process is initiated and completed.

5. Lynn Tilton — the Portfolio Company's sole director — made proposals to fund the Portfolio Company's liquidity shortfall, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

6. The Debtors, in consultation with their stakeholders and Ms. Tilton, have agreed to provide the required financing on terms substantially similar to those described in the Term Sheet, pursuant to a Credit Agreement Amendment based thereon, under which the Debtors, subject to agreement with the Portfolio Company and approval by this Court, would provide the Portfolio Company with new tranches of term loans consisting of: (i) an additional $3.0 million term loan borrowing **in the interim on January 14, 2020** (the "Term E New Loan") and (ii) subject to approval under further order of this Court, an additional discretionary borrowing of $2.5 million on or before January 29, 2020 (the "Term F New Loan," and together with the Term E New Loan, the "New Loans"). The New Loans would be (a) funded through the Debtors' current cash holdings that have otherwise been allocated for restructuring cost reserves, (b) provided by the Lenders on a *pari passu* basis to all other secured loans under the Credit Agreement (defined below) and (c) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[4] These

---

[4] As the Court is aware, on January 10, 2020, the Court set February 19-20, 2020 as the dates for trial to consider the Debtors' and Ms. Tilton's competing motions to establish timelines, guidelines and procedures with respect to the monetization of the Portfolio Companies. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

4

25855465.14

terms, among others, make entry into a Credit Agreement Amendment the best available option to support the Portfolio Company, its sale process, and the Debtors' interests therein.

7. The Debtors request that this Court authorize them to enter into the Credit Agreement Amendment and to issue the Term E New Loan. The Debtors further request that issuance of the Term F New Loan be considered at the omnibus hearing already scheduled in these chapter 11 cases for January 28, 2020 (the "January 28 Hearing").

8. [REDACTED] . Therefore, to protect the Portfolio Company's value, and the Debtors' interests therein, the Debtors have no alternative but to file this Motion and seek authority from the Court to enter into a Credit Agreement Amendment, [REDACTED] and issue the New Loans. The Debtors submit that issuing the New Loans to provide a short-term cash infusion and support the Portfolio Company's operations and sale process under the Monetization Process, is an appropriate exercise of their business judgment, and is in the best interests of the Debtors, their estates, and creditors. Finally, both Bardin Hill and MBIA Insurance Corp., significant stakeholders of the Debtors' estates, are in support of the Lenders' entry into a Credit Agreement Amendment and the issuance of the New Loans thereunder.

## JURISDICTION

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and

25855465.14

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory and legal predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code.

## BACKGROUND

**A.  General Background**

12. On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors' Chapter 11 cases are being jointly administered, for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).

**B.  The Portfolio Company's Financing from the Debtors**

13. On January 11, 2007, the Debtors, as Lenders, Patriarch Partners Agency Services, LLC ("PPAS"), as initial Agent, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and certain of its subsidiaries, as Borrowers, and certain subsidiaries of ▓▓▓▓, as Guarantors, executed that certain ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (as further amended, the "Credit Agreement"). Ankura Trust Company, LLC currently is serving as the successor Agent of the facilities under the Credit Agreement in accordance with the Settlement Agreement. As of March 31, 2019, under the Credit Agreement, the Debtors were owed the following amounts: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25855465.14

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████ Notably, the Patriarch Stakeholders do not have an economic interest in the debt or economic ownership of the equity of the Portfolio Company.

14. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

## C. The Settlement Agreement

15. On April 30, 2018, the Debtors filed a settlement motion [Docket No. 222] (the "Settlement Motion") seeking entry of the *Order Approving and Authorizing the Settlement Agreement by and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* (the "Settlement Order"[6] and the settlement agreement attached thereto, the "Settlement Agreement"), which provided a comprehensive resolution of the numerous Litigated Contested Matters (as defined in the Settlement Motion) between and among the parties to the Settlement Agreement.

---

[5] The assets of Zohar I were subject to a foreclosure proceeding, which Ms. Tilton challenged.

[6] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Order.

25855465.14

16. On May 21, 2018, the Court entered (i) the Settlement Order, thereby, approving and authorizing the Settlement Agreement and (ii) an order appointing Joseph J. Farnan, Jr. as the Debtors' Independent Director.

17. In accordance with the Settlement Agreement, on May 25, 2018, the Debtors filed a motion to retain Mr. Michael Katzenstein as the Debtors' chief restructuring officer (the "CRO") and to retain certain professionals from FTI Consulting Inc. to assist him in carrying out his duties as the CRO. *See* Docket No. 279. On June 11, 2018, the Court entered an order approving the appointment of Mr. Katzenstein as the Debtors' CRO. *See* Docket No. 297. Pursuant to the Settlement Agreement, the CRO was appointed to "participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "Monetization Process").[7]

18. Pursuant to the Settlement Order and the Monetization Procedures Order, the Independent Director and CRO are charged with working jointly with Lynn Tilton to execute the Monetization Process until either the termination of the Monetization Process or the Full Payment Date.

### D. The Portfolio Company's Immediate Liquidity Issues

19. In December of 2019, the Zohar Funds, through Ankura, were made aware that the Portfolio Company expected to experience a liquidity short-fall in the near term and would therefore be seeking potential third-party additional financing as needed to fund its operations. The cause of this potential liquidity shortfall, as conveyed to the Debtors, ███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████. At this time, it was not the Zohar Funds' understanding that this

---

[7] Settlement Agreement ¶ 8.

liquidity need was urgent or acute, and the Zohar Funds were informed that the Portfolio Company was in the process of soliciting additional financing from banks and other third-party funding sources.

20. On the afternoon of January 10, 2020 — while the CRO and the Debtors' advisors were appearing before the Court in these cases — the CRO received an e-mail communication from Ankura stating that the Portfolio Company projected that it would have insufficient cash to fund its payroll obligations due on Tuesday, January 14, 2020 — just two business days away. The Debtors immediately took steps to understand and assess the sudden liquidity crisis and to work with the Portfolio Company, through Ms. Tilton — the Portfolio Company's sole director — and the Debtors' other stakeholders to address the catastrophic liquidity event at the Portfolio Company that could substantially impair its ability to operate in the ordinary course.

21. Over the course of Saturday, January 11th through Monday, January 13th, the Debtors and their advisors contacted potential funding sources — including Ms. Tilton and the Debtors' existing senior secured creditors — to assess what avenues may be available to bridge the Portfolio Company's immediate liquidity crisis and short-term funding needs ███████████ ███████████████████████████████. It quickly became apparent to the Debtors that they were best positioned to offer the Portfolio Company the most expedient and attractive financing through an amendment to the existing Credit Agreement on terms consistent therewith.

22. On Sunday, January 12th, the Debtors formulated the Term Sheet and began discussions with MBIA, Bardin Hill and the Patriarch Stakeholders to address the funding efficiently through an amendment to the Credit Agreement to upsize the existing secured facility to

9

stave off the impending liquidity crisis and offer the Portfolio Company not only the ability to make Tuesday's payroll, but a runway to commence and complete a marketing and sale process under the Monetization Process. Although funding under the Term Sheet would be provided from existing cash holdings reserved to fund the Debtors' chapter 11 cases, the Debtors believe that utilizing those funds to instead fund under the Term Sheet would present the best path forward to maintaining the ordinary course operations of the Portfolio Company and a funding a path to a sale of the Portfolio Company in the near future.

23. The Term Sheet is, and Credit Agreement Amendment will be, narrowly tailored to provide the Portfolio Company with a short-term cash infusion limited to the amount necessary to continue operating in the ordinary course ▇▇▇▇▇▇▇▇▇▇▇▇, secured by interests *pari passu* with those of the Debtors under the current Credit Agreement. A Credit Agreement Amendment best protects the Debtors' existing secured debt position and equity interests in the Portfolio Company, for the benefit of their estates and other stakeholders. Absent authority to enter into a Credit Agreement Amendment (or alternative financing arrangements on onerous terms), the Portfolio Company will not be able to continue to operate past Tuesday, which would be devastating to the Portfolio Company, and to the Debtors' recovery on their existing investments.

24. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ the Debtors are compelled to file this Motion in advance of any such agreement to create a potential avenue to address the Portfolio Company's liquidity crisis while the parties continue to negotiate.

25855465.14

**RELIEF REQUESTED**

25.     By this Motion, the Debtors request that the Court: (i) authorize the Debtors, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to enter into a Credit Agreement Amendment and issue the Term E New Loan; (ii) establish the January 28 Hearing as the hearing date to consider authorizing the Debtors to issue the Term F New Loan, and (iii) grant such other and further relief as the Court may deem appropriate.

**BASIS FOR RELIEF**

26.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

27.     Based on the facts set forth herein and in the Katzenstein Declaration, the Debtors respectfully submit that entering into a Credit Agreement Amendment on terms substantially similar to those described in the Term Sheet is a sound exercise of their business judgment and, therefore, should be authorized under section 363(b).

11

25855465.14

28. As this Court is aware, the creditor recovery in these Chapter 11 Cases is inextricably tied to the monetization value to be realized for the portfolio companies through the Monetization Process. The only hope that secured creditors will be paid in full is if the sale of the portfolio companies realizes sufficient value to pay them in full.

29. The Portfolio Company's dire liquidity need — which requires an infusion of cash on or before January 14, 2020 — significantly risks the Portfolio Company's ability to operate in the ordinary course, ███████████████████████████████.

30. The Debtors have determined, in their business judgment, that the Portfolio Company's liquidity needs justify entry into a Credit Agreement Amendment under terms substantially similar to those of the Term Sheet. Such Credit Agreement Amendment is narrowly tailored to provide the Portfolio Company with a short-term cash infusion limited to the amount necessary to continue operating in the ordinary course and is secured by interests *pari passu* with those of the Debtors under the current Credit Agreement. A Credit Agreement Amendment best protects the Debtors' existing secured debt position and equity interests in the Portfolio Company, for the benefit of their estates and other stakeholders. Significantly, the Debtors' largest stakeholders, Bardin Hill and MBIA Insurance Corp., both agree that a Credit Agreement Amendment is in the best interests of the Debtors and their estates. Absent authority to enter into a Credit Agreement Amendment (or alternative, priming financing arrangement on terms that are not acceptable to the Debtors), the Portfolio Company will not be able to continue to operate in the ordinary course past Tuesday, which would be devastating to the Portfolio Company.

31. Against this backdrop, authorization of a Credit Agreement Amendment is a sound exercise of the Debtors' business judgment, as it will best support the Portfolio Company's

sale process, and the Debtors' Monetization Process, thus maximizing the value of the Debtors' assets.

## NOTICE

32. Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) counsel to the Patriarch Stakeholders; (iii) counsel to U.S. Bank, as indenture trustee; (iv) counsel to MBIA; (v) counsel to the Zohar III Controlling Class; (vi) the Portfolio Company; and (vii) all parties that have filed a notice of appearance in these Chapter 11 cases pursuant to Fed. R. Bankr. P. 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court authorize the Debtors' entry into a Credit Agreement Amendment under terms substantially similar to those of the Term Sheet and grant such other and further relief as the Court deems just and proper.

Dated: January 14, 2020
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Joseph M. Barry*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*

25855465.14