# <u>EXHIBIT A</u>

**Proposed Redacted Document**

**REDACTED**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **Objection Deadline: July 28, 2020 at 4:00 p.m. (ET)** |
|  | ) | **Hearing Date: August 4, 2020 at 1:00 p.m. (ET)** |
|  | ) |  |

### NOTICE OF MOTION

TO:   (I) THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE; (II) COUNSEL TO THE PATRIARCH STAKEHOLDERS; (III) COUNSEL TO U.S. BANK, AS INDENTURE TRUSTEE; (IV) COUNSEL TO MBIA INSURANCE COMPANY; (V) COUNSEL TO THE ZOHAR III CONTROLLING CLASS; AND (VI) ANY PARTY THAT HAS REQUESTED NOTICE PURSUANT TO BANKRUPTCY RULE 2002

**PLEASE TAKE NOTICE** that the debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") have filed *Debtors' Motion For Entry Of An Order In Aid Of Enforcement Of The Settlement Agreement (A) Staying The Tilton Plaintiffs From Prosecuting Litigation Outside The Delaware Bankruptcy Court, (B) In Connection With The Sales Of Portfolio Companies, (I) Establishing An Escrow For All Amounts Claimed By The Patriarch Stakeholders Pending Their Validation Under Paragraph 18 And (II) Ordering Releases Of The Patriarch Stakeholders' Claims With Such Claims Attaching To The Proceeds Of Such Sale, And (C) Granting Related Relief* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that any objections to the Motion must be filed on or before **July 28, 2020 at 4:00 p.m. (ET)** (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington, Delaware 19801. At the same time, you must serve a copy of any objection upon the undersigned counsel to the Debtors so as to be received on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** THAT A TELEPHONIC HEARING ON THE MOTION WILL BE HELD ON **AUGUST 4, 2020 AT 1:00 P.M. (ET)** BEFORE THE HONORABLE KAREN B. OWENS, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR,

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

COURTROOM NO. 3, WILMINGTON, DELAWARE 19801

**PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR A HEARING.**

Dated: July 21, 2020
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Joseph M. Barry*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jpatton@ycst.com
      rbrady@ycst.com
      mnestor@ycst.com
      jbarry@ycst.com
      rbartley@ycst.com
      sreil@ycst.com

*Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date: August 4, 2020 at 1:00 p.m. (ET)** |
| | ) | **Obj. Deadline: July 28, 2020 at 4:00 p.m. (ET)** |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER IN AID OF ENFORCEMENT OF
THE SETTLEMENT AGREEMENT (A) STAYING THE TILTON PLAINTIFFS FROM
PROSECUTING LITIGATION OUTSIDE THE DELAWARE BANKRUPTCY COURT,
(B) IN CONNECTION WITH THE SALES OF PORTFOLIO COMPANIES,
(I) ESTABLISHING AN ESCROW FOR ALL AMOUNTS CLAIMED BY THE
PATRIARCH STAKEHOLDERS PENDING THEIR VALIDATION UNDER
PARAGRAPH 18 AND (II) ORDERING RELEASES OF THE PATRIARCH
STAKEHOLDERS' CLAIMS WITH SUCH CLAIMS ATTACHING TO THE
PROCEEDS OF SUCH SALE, AND (C) GRANTING RELATED RELIEF**

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned

Chapter 11 cases (collectively, the "Debtors") hereby submit this motion (this "Motion"), pursuant

to (i) section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy

Code"); (ii) rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

(iii) this Court's *Order Approving and Authorizing the Settlement Agreement By and Between the*

*Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III*

*Controlling Class* (the "Settlement Order"), entered on May 21, 2018 [Docket No. 266]; (iv) the

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar
III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar
III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address
is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

Settlement Agreement[2] (as defined in the Settlement Order) [Docket No. 266, Ex. A];[3] (v) this

Court's *Order in Aid of Implementation of the Global Settlement Agreement Approved in These*

*Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization*

*Transactions and Related Relief* (the "Monetization Procedures Order") entered on November 9,

2018 [Docket No. 545]; and (vi) this Court's February 6th Ruling (as defined below), for entry of

an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (a) staying

the prosecution by Ms. Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch

Partners Management Group LLC  ("PPMG"), Ark II CLO 2001-1 ("Ark"), Octaluna LLC,

Octaluna II, LLC, Octaluna III, LLC (together, the "Octaluna Entities" and together with Ms.

Tilton, PPAS, PPMG, and Ark, the "Tilton Plaintiffs") of the seventeen (17) complaints filed by

the Tilton Plaintiffs against the Portfolio Companies in New York state court on June 23, 2020,

July 6, 2020 and July 14, 2020 (the "New York Complaints");[4] (b) in connection with the sales of

Portfolio Companies, (i) establishing an escrow for all amounts claimed by the Patriarch

Stakeholders pending their validation under Paragraph 18 and (ii) ordering releases of the Patriarch

Stakeholders' claims with such claims attaching to the proceeds of such sale as discussed herein;

and (c) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[5]

1.     Ms. Tilton filed these bankruptcy cases over two years ago, declaring two

interrelated goals: monetize the Portfolio Companies for the benefit of the Debtors' stakeholders

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement or the *Debtors' Motion, Pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, for an Order Approving and Authorizing the Settlement Agreement* [Docket No. 222], as applicable.

[3] A copy of the Settlement Order and Settlement Agreement is annexed hereto as **Exhibit B**.

[4] The Debtors reserve the right to supplement this Motion to the extent that any additional or new lawsuits are filed by Ms. Tilton in contravention of the Settlement Agreement.

[5] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them below.

(including herself) in a single proceeding and stay the numerous pending litigations that had stymied her prior efforts to unlock the value of the Portfolio Companies. The Portfolio Companies are now positioned to move sales forward with monetization transactions contemplated in the coming weeks and months. The Patriarch Stakeholders' recent maneuverings, however, are at odds with the shared objective of maximizing the value of the Portfolio Companies for all stakeholders' benefit and necessitate that this Court grant the relief requested herein. Potential buyers - who have expressed concerns regarding Ms. Tilton's role in, and claims against, the Portfolio Companies - can be assured this Court is prepared to authorize the sales free and clear of Ms. Tilton and her claims. Absent the relief requested herein, buyer concern will remain and inbound expressions of value will reflect the cost of uncertainty related to Ms. Tilton's yet-validated claims.

2.      An integral part of the monetization process approved by the Court through the Settlement Agreement (and to quote Ms. Tilton herself) was the "establish[ment of] ***the process*** for resolving disputes relating to the Patriarch Claims" in this Court.[6] However, on June 23rd, July 6th and July 14th, the Tilton Plaintiffs filed seventeen (17) lawsuits against fifteen (15) of the Portfolio Companies in New York state court. Such lawsuits seek adjudication of the ***exact claims*** that Ms. Tilton admitted before this Court (just days ago) are subject to "***the process***" agreed-upon in, and mandated by, Paragraph 18 of the Settlement Agreement. Moreover, those very claims are, in part, the subject of an adversary proceeding pending before this Court.[7] Ms. Tilton's barrage of

---

[6] *Patriarch's Objection to Debtor's Motion for Entry of an Order (A) Enforcing and Implementing the Terms of the Settlement Agreement and (B) Granting Related Relief* [Docket No. 1757] (the "July 7th Objection"), at ¶ 4; *see also, id.* (defining "Patriarch Claims" as "a number of claims against the various Portfolio Companies, including, but not limited to, secured funded debt claims arising from various loan agreements, preferred equity, management fees, unpaid interest, unpaid tax distributions, certain indemnification agreements, equity interests, and transaction fees…").

[7] *Zohar CDO 200301, et al. v. Patriarch Partners, LLC, et al.*, Adv. No. 20-50534 (Bankr. D. Del. March 3, 2020).

lawsuits is contrary to her previous agreements and positions before this Court, and, most critically, threatens the monetization process itself by seeking to improperly adjudicate in a foreign jurisdiction disputes that are (a) already within this Court's authority by the Tilton Plaintiffs' own agreement and (b) in many instances, directly at issue in the adversary proceeding filed by the Debtors in March.

3.      If value is to be ***maximized*** in Portfolio Company sales under the Court-approved monetization process going forward, Ms. Tilton's litigation must be quelled, the cloud created by Ms. Tilton's not-yet-validated (and, in some instances, undocumented) claims must be removed, and buyers must be assured they are purchasing equity or assets free and clear.  The Debtors are not asking the Court to deprive Ms. Tilton of any economic recovery to which she may be entitled (which she will undoubtedly claim the Debtors are doing).  The Debtors are merely asking the Court to remedy a dispute under the monetization process by staying Ms. Tilton's attempt to wrongly litigate her claims in another jurisdiction and escrowing funds until her claims are actually validated in these cases by this Court (as contemplated by Paragraph 18) so that monetizations can move forward to closing without risk that values will reflect buyer insecurity that a sale will not be free of Ms. Tilton and her claims.

4.      If Ms. Tilton is entitled to recoveries from the sales of the Portfolio Companies, her claims and equity must first be validated and then, if validated, receive treatment on a *pari passu* basis with other similarly situated creditors and equity holders.  This is precisely within the Court's authority pursuant to the February 6th Ruling (as defined below) and is exactly what the parties agreed would happen under Paragraph 18 of the Settlement Agreement.  However, unlike the Debtors' funded debt claims and equity interests, which are undisputed (after all, Ms. Tilton was

responsible for creating them), much of Ms. Tilton's claims are unproven, disputed and, in some instances, still undocumented.

5.      Ms. Tilton's ongoing disregard of, or attempts to evade, her obligations under the Settlement Agreement have become the unfortunate and costly "Groundhog Day" of these cases. But unlike Bill Murray's character in that iconic movie, no lessons have been learned and Ms. Tilton's conduct is only getting worse by the day.  As previously reported to the Court, it is undisputed that in the past several months, Ms. Tilton has:

- On March 19, 2020, two (2) days before her mass resignation, negotiated for her own benefit – and to the detriment of two Portfolio Companies – an insurance settlement resulting in a $6.5 million payment to herself that plainly violated the in-force *Status Quo Orders* in the pending "225 Action" in the Delaware Chancery Court, and precluded the subject Portfolio Companies from receiving any recovery at all on account of such insurance;

- wrongfully terminated ABL facilities at two (2) Portfolio Companies, which were left with no immediately financing alternatives;

- reneged on her resignations at certain Portfolio Companies at which she has debt and/or equity by attempting to rescind them or re-installing herself as manager so she could continue to assert control;

- shifted the costs of her personal obligations under the Settlement Agreement in these cases directly onto the Portfolio Companies by demanding they collectively pay over $4 million in legal fees her personal attorneys billed to her related to these cases;

- asserted over $16 million in indemnification claims against three of the Portfolio Companies related to her failed proxies that were rejected in their entirety by the Delaware Chancery Court;

- refused to cause her affiliate PPAS to turn over pledged securities to the Debtors' court-approved lending agent that PPAS was holding to secure loans under which the Zohar Funds are the sole lenders, initially requiring a payment of approximately $3.5 million in fees owed to another certain of her affiliates as a condition of any such release; and

- filed a series of lawsuits against the Portfolio Companies in violation of the Settlement Agreement.[8]

Viewed in combination with her relentless frivolous litigation following the termination of the Settlement Agreement's Fifteen Month Window (defined below) and litigation stay, it is evident that Ms. Tilton will continue throwing whatever is left in her kitchen sink at the monetization process and the stakeholders thereto.  And the already extraordinary costs associated with these cases will continue to rise as the Debtors and other stakeholders are forced to put out more and more fires.  Most importantly, Ms. Tilton's conduct, which continues to damage the Portfolio Companies (including the employees, customers and vendors) that she professed to care so much about, has and will impair buyer confidence in the monetization process and value for the Debtors and their stakeholders.

6.      Not only do Ms. Tilton's actions call into question her commitment to the monetization process, but questions over the propriety of the various transactions that form the basis for Ms. Tilton's more than ████████ of claims abound and are underscored by the July 6, 2020, ruling from Judge Stuart Bernstein of the United States Bankruptcy Court for the Southern District of New York.  In the Chapter 7 case of TransCare Corporation – one of the Group B Portfolio Companies – Judge Bernstein found that Ms. Tilton and PPAS perpetrated an intentionally fraudulent scheme to enrich herself personally and to delay and defraud TransCare's creditors by transferring all of TransCare's assets to Ms. Tilton moments before TransCare's bankruptcy filing.  Ms. Tilton's conduct was adjudicated as a breach of her duties of loyalty and good faith, and Judge Bernstein's 100-page opinion renders judgment against Ms. Tilton in the

---

[8] The cases (that the Debtors know of) and the corresponding dates of their filing are detailed on **Exhibit C**:

amount of $41.8 million, together with a similar fraudulent transfer judgement rendered against her affiliate, PPAS.  Notably, at the time of these self-dealing and defrauding transactions, the Debtors were also creditors and equity holders of TransCare and victims of Ms. Tilton's actions, and, at the same time, Ms. Tilton was serving in a fiduciary capacity to the Debtors as their collateral manager.   Judge Bernstein's ruling calls into question whether the claims Ms. Tilton asserts against the remaining Portfolio Companies are valid, but also whether the Debtors would be able to successfully collect in any subsequent claw-back action given the substantial judgment.[9]

7.      As Ms. Tilton herself has conceded, ***this*** Court must validate and determine the totality of all of the Patriarch Stakeholders' claims pursuant to paragraphs 18 and 25 of the Settlement Agreement, including the claims that Ms. Tilton is attempting to adjudicate in New York.  Pending that determination, any amounts claimed by her or her affiliates should be escrowed from proceeds, and the Patriarch Stakeholders should be directed to release the Portfolio Companies, with their claims attaching to such proceeds pending their adjudication by this Court, so that Portfolio Company sales can be closed without the cloud of litigation and uncertainty.[10]

## JURISDICTION AND VENUE

8.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

---

[9]  On May 7, 2020, Judge Bernstein also granted partial summary judgment against Ms. Tilton and Patriarch on claims against them for unpaid wages, and cleared a path for trial on potential liability under federal and state WARN acts.

[10] The Debtors also reserve their right to argue that proceeds from monetization transactions should be escrowed, even if the Patriarch  Claims are valid, pending the outcome of the Debtors' adversary proceeding.

the Debtors consent to entry of a final order by the Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and legal predicates for the relief requested herein are section 105(a) of the Bankruptcy Code, Bankruptcy Rule 9019, the Settlement Order, the Monetization Procedures Order, the February 6th Ruling (as defined below) and the Settlement Agreement, including paragraphs 18 and 25 thereof.

## BACKGROUND

**A.      General Background**

10.     On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

11.     On May 21, 2018, the Court entered the Settlement Order approving the Settlement Agreement.

**B.      Paragraphs 18 and 25 of the Settlement Agreement**

12.     Paragraph 18 of the Settlement Agreement provides as follows:

Any (A) claim asserted by the Patriarch Stakeholders that is supported by written documentation showing the claim (a) was funded to a Group A Portfolio Company by a Patriarch Stakeholder (in the case of funded debt claim), or (b) represents a fee or other claim arising from a deferral of payment or any management and/or administrative fee owed to a Patriarch Stakeholder[11] and (B) equity interest asserted by the Patriarch Stakeholders is supported by written documentation, then such claim and equity interest, as applicable, shall be deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity unless the applicable credit agreement provides

---

[11] "Management and/or administrative fees as noted here are defined in a separate agreement entered between the parties concurrent with this agreement." [Footnote 3 of Settlement Agreement].

otherwise.[12]  In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders.   All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window (provided the Full Payment Date does not occur on or before such date), but no such claim shall be brought during the 18 Month Window or used to block the closing of any pending transaction in the Monetization Process.   The Patriarch Stakeholders will promptly provide any information reasonably requested by the CRO to verify the existence of the funding and documentation described above (provided that the CRO may share the foregoing information with Other Stakeholders (subject to the execution of an NDA approved by the Mediator) as required in the CRO's reasonable discretion.   With respect to the claims in (A) above, the payments to the Patriarch Stakeholders that shall be made without further analysis or challenge shall be capped at $250 million, with any amounts in excess to be held in escrow until Full Payment Date.  Tilton represents that none of the claims in (A) currently prime the secured claims of the Other Stakeholders in the Group A Portfolio Companies, other than ABLs in [two of the Group A Portfolio Companies].  Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

13.     A central purpose of Paragraph 18 was to ensure that the claims asserted by the Patriarch Stakeholders would not hold up or otherwise interfere with the goal of pursuing and closing sale transactions.  As Patriarch acknowledges, Paragraph 18 of the Settlement Agreement establishes "procedures regarding payments of Patriarch's outstanding claims," which apply regardless of "the nature of Patriarch's claims," including claims asserted on account of "equity, secured debt, or by contract."  *See* Docket No. 1713, Patriarch Stakeholders' *Certification of Counsel Regarding Amended Order Establishing Certain Guidelines and Milestones in Furtherance of the Monetization Process for the Group A and Group B Portfolio Companies*, at pp. 4-5 (the "Patriarch COC").  Also, Paragraph 18 "established the process for resolving disputes relating to the Patriarch Claims," and "[n]o party to the present dispute questions that this

---

[12] Tilton to provide a good faith estimate on a company-by-company basis for each of the Group A Portfolio Companies on an aggregate basis, in each case reflecting the aggregate amount she expects will be covered by this paragraph 17.   [Footnote 4 of Settlement Agreement].

paragraph 18, and footnote four to the same, are the only applicable language addressing the validation of Patriarch claims."  July 7th Obj. ¶¶ 4, 8.

14.     Paragraph 25 of the Settlement Agreement provides that "Upon the expiration of the Fifteen Month Window, the Independent Director/CRO may take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise…[and] all parties…shall have and may exercise any and all rights available under applicable law."

15.     Finally, the Settlement Order "authorized and empowered [the Debtors] to take any and all actions necessary to carry out, effectuate or otherwise enforce the terms, conditions, and provisions of the Settlement Agreement."  Settlement Order ¶ 7.

**C.     The Monetization Procedures Order**

16.     Not long after the Court's approval of the Settlement Agreement, Ms. Tilton began expressing concerns to the Debtors' Independent Director and Chief Restructuring Officer that there was confusion in the marketplace concerning the monetization process.  Ms. Tilton observed that the buying market was unclear regarding how, whether and when the Debtors would be able to transact on the sale of a given Portfolio Company and what issues may arise that could stymie a transaction.  To address these issues and alleviate these concerns, the Debtors collaborated with Ms. Tilton in drafting procedures that would clarify for the market that if potential buyers engaged, their efforts would be rewarded with a smooth and seamless closing uncomplicated by the Zohar bankruptcy cases and the disputes among their stakeholders.  Following extensive negotiations among all of the Debtors' stakeholders, the Debtors filed their sale procedures motion [Docket No. 481] with the full approval and consent of Ms. Tilton and, on November 9, 2018, the Court entered the Monetization Procedures Order.

17.     The Monetization Procedures Order sets forth streamlined procedures for the Debtors to seek final Court approval for any monetization process transaction as contemplated by the Settlement Agreement.  Consistent with Ms. Tilton's stated goal of quelling market concerns, the Monetization Procedures Order provides that:

> In the Proposed Transaction Order with respect to a Portfolio Company Transaction, the Debtor will seek to provide that any and all…Patriarch Stakeholders' liens, claims and encumbrances with respect to any Zohar Interests or Zohar Portfolio Company Debt, as applicable, are released pursuant thereto and will attach to the proceeds of any such Portfolio Company Transaction with the same validity and priority as those being released, in each case consistent with section 363(f) of the Bankruptcy Code.

Monetization Procedures Order ¶ 3(b).  The "Proposed Transaction Order" – which is the Court-approved order implementing and approving Portfolio Company sales – similarly provides that:

> With the consent of the Patriarch Stakeholders and the Other Stakeholders, the sale of the Zohar Interests and/or Zohar Portfolio Company Debt, as applicable, is hereby approved free and clear of any liens, claims and encumbrances that could be asserted by any of the Patriarch Stakeholders and the Other Stakeholders, provided that any and all such liens, claims and encumbrances attach to the proceeds from such Portfolio Company Transaction with the same validity and priority as those being released hereby, and all such proceeds shall be delivered to the Debtors at closing.

*Id.*, Exh. II ¶ 7.

18.     To date, the monetization process has resulted in only two (2) Portfolio Company sales in the over two (2) years since the Settlement Agreement was approved.  However, the Debtors are hopeful that several of the Group A Portfolio Companies will be in a position to transact in the coming months.

**D.      The September 27th Ruling**

19.     As the Court knows, one of the chief bargains Ms. Tilton received under the Settlement Agreement was a fifteen month stay of litigation against her, her affiliates and the

Portfolio Companies, so that the monetization process could be implemented free from the distraction and cost of that litigation (as defined in the Settlement Agreement, the "Fifteen Month Window").

20.     In this period, Ms. Tilton likewise was given an additional benefit under Paragraph 18, the right to payment free of challenges from the Debtors, which the Court recognized in its September 27th ruling.  *Cf.* Hr'g Tr. Sep. 27, 2019 at 13:20-14:2 ("[O]ne could easily argue that the looming expiration of the 15-month window over the monetization process was intended to incentivize all parties to complete the process and reach the full-payment date within the 15-month window to avoid the potential value-destructive activities that could follow.").  Shortly before expiration of the Fifteen Month Window, Ms. Tilton expressed the view that upon its expiration, so too did her obligations to continue the monetization process.[13]  That issue was fully briefed and on September 27, 2019, the Court ruled that despite the expiration of the Fifteen Month Window, the Settlement Agreement unambiguously provided for the continuation of the monetization process until the Settlement Agreement was mutually terminated by agreement of the parties or payment in full of the Debtors' senior creditors (the "September 27th Ruling").  Docket No. 974. On July 13, 2020, the District Court affirmed this Court's ruling in that regard.  *See* Mem. Op., *Tilton v. Zohar III, Corp.*, C.A. No. 19-1874 (MN) [Docket No. 47] (D. Del. July 13, 2020).

**E.      The February 6th Ruling**

21.     Immediately after the September 27th Ruling, Ms. Tilton filed an eighty (80) page complaint against the Debtors' creditors, seeking equitable subordination of their claims.  This

---

[13] Ms. Tilton actually took the position that the entire Settlement Agreement terminated upon expiration of the Fifteen Month Window" but ultimate retreated from that position.

complaint is currently pending before the Court, and hindsight reveals that it was the first of several skirmishes culminating in significant litigation during the end of 2019 and the beginning of 2020.[14]

22.    In early 2020, Ms. Tilton took the position that she never agreed that the Court had the jurisdiction or authority to order the sale or liquidation of her interests or the Debtors' disputed equity interests in the Portfolio Companies absent her full consent. *See, e.g.*, *Mot. Lynn Tilton for Approval of Timeline & Guidelines Regarding Monetization of the Group A Portfolio Companies* at ¶ 72 [Docket No. 1164].   The Court rejected these arguments "completely" and thoroughly detailed the plain, unambiguous meaning and effect of the Settlement Agreement:

> First, the parties agreed in paragraphs ten and twelve of the settlement agreement that they will monetize, not market, the Group A portfolio companies and the Group B portfolio companies, not just the debtors' interest therein.
>
> This language and, thus, the parties' intention is unambiguous and the remainder of the agreements, the settlement agreements, support this conclusion. Among other things, the parties knew how to differentiate between the concepts of the portfolio companies and the debtors' interest therein.   And they failed to do so in paragraphs ten and twelve, and as well as other paragraphs of the settlement agreement that addressed monetization of the portfolio companies as opposed to the debtors' interest therein.
>
> Second, nowhere in the settlement agreement do the parties agree that the monetization of the portfolio companies must be consensual, nor did they agree to limit my authority to adjudicate disputes between them regarding the monetizations.  The parties only agreed that the process to monetize the companies would be joint, not consensual and, importantly, they contemplated in paragraphs eleven and twenty-seven that disputes could arise and that this court would resolve them. . . .
>
> [T]he statements made by and behavior of the parties throughout these cases support the court's holding today that, among other things, the debtors, Ms. Tilton and the Patriarch stakeholders agreed in the settlement agreement to monetize the portfolio companies, not just the debtors' interest therein.  And that the court can settle related disputes, including those over the ultimate consummation of a proposed transaction.

---

[14] As the Court will recall, one of the chief arguments advocated by Ms. Tilton was that allowing litigation to proceed during the monetization process was inconsistent with maximizing value of the Portfolio Companies.

Fourth, and finally, it's important to note that Patriarch's position with respect to the court's authority is unreasonable and will lead to an absurd result that no reasonable person would have accepted when entering into the settlement agreement.

The parties entered the settlement negotiations in the midst of significant litigation and disputes regarding ownership and control of the portfolio companies and defaults under various lending arrangements. They [e]merged with an agreement on a path to move forward to end those disputes, including an agreement to monetize the portfolio companies.

To effectuate that agreement multiple types of transactions could occur, including a sale of the equity interest of the portfolio companies held by the debtors and/or Ms. Tilton and her affiliated entities or a sale of the portfolio companies' assets owned and/or controlled by Ms. Tilton, her affiliated entities and/or the debtors. If the parties only agreed to monetize the debtors' interest in the portfolio companies and, further, only agreed that this court could oversee consensual transactions with respect to such interest, the value of the settlement is called into question.

Moreover . . . if I cannot resolve disputes regarding proposed transactions, the parties' commitments embodied in the settlement agreement will be eviscerated. They will be rendered a "toothless unenforceable promise" as described by MBIA.

In conclusion, I am holding for the second time that the parties agree and, thus, are obligated to monetize the portfolio companies. To effectuate that agreement, I find that I have the authority to enforce those obligations of the parties to the settlement agreement and can order a monetization of a portfolio company over the objection of Ms. Tilton, her affiliated entities or the debtors.

Feb. 6, 2020 Hr'g Tr. at 68:11–71:4 (the "February 6th Ruling"). In other words, the parties agreed to abide by the Court's ruling when it came time transact for the sale of the Portfolio Companies and to comply with the terms of the Court-approved Portfolio Company Transaction, with or without giving their own consent.

F.    **Ms. Tilton's Claims Under Paragraph 18 of the Settlement Agreement**

23.    At various times, including prior to the Petition Date, Ms. Tilton has provided estimates of amounts she claims are due to various Patriarch Stakeholders, including as secured funded debt, unsecured claims, and equity they allegedly hold in the Portfolio Companies.

However, until recently, she has provided only summaries or rough estimates, oftentimes conflicting and with limited detail, and never with any proof of funding, where applicable.

24.    Shortly after the parties entered into the Settlement Agreement, the Debtors, the Independent Director, and the CRO requested information from Ms. Tilton and Patriarch so that they could begin participating in the monetization process and understand the Patriarch Stakeholders' claims at each Portfolio Company.  Months went by, and the Patriarch Stakeholders produced little information.  During these months, the Debtors consistently emphasized the import of obtaining documentation, yet the Patriarch Stakeholders slowly provided only copies of credit agreements, some related documents and amendments and certain, but not all, of the contractual agreements pursuant to which Ms. Tilton asserted claims under Paragraph 18.  During these months, Patriarch repeatedly delayed or explained away the Debtors' need for, or right to, information the Debtors believed was key to Paragraph 18's validation process.[15] While the Debtors had received the credit agreements and the PPMG Management Services Agreements (the "MSAs"), they continued to stress that they needed more than such limited documentation in order to understand and validate the Patriarch Stakeholders' claims under Paragraph 18, but Patriarch continued to withhold further information.

25.    Following the aforementioned years of pushback,  Ms. Tilton provided an updated summary of all amounts claimed by her and the other Patriarch Stakeholders in a declaration submitted to chambers on May 27th with her confidential status report concerning the monetization process (the "May 27th Declaration").   Importantly, in the May 27th Declaration, Ms. Tilton testified: ████████████████████████████████████████████

---

[15] On July 7th, Ms. Tilton produced over 600 pages of documentation to allegedly substantiate her Paragraph 18 claims, thus putting to bed any claim that the Debtors had everything they needed to do so for the past two (2) years.

████████████████████████████████████ May 27th Decl., ¶ 11.  Of course, the

Debtors have never sought to block the payment of valid claims.  Under the Settlement Agreement,

Ms. Tilton's "valid claims" must actually *be validated* before they can be paid and she no longer

enjoys the "free pass" that she received during the 18-Month Window.  Since submitting her May

27th Declaration, Ms. Tilton has asserted new, multi-million dollar indemnification claims against

certain Portfolio Companies and, as detailed herein, a spate of lawsuits that seems to be continuing

by the week.

26.    After repeated requests throughout these cases, on June 6, 2020, the Debtors once

again sent a clear and narrow request, asking that Ms. Tilton provide written documentation and

proof of funding of all amounts she or her affiliates claimed under Paragraph 18 of the Settlement

Agreement.  Rather than respond to the Debtors' June 6th information request (information rights

to which the Debtors are expressly entitled under Paragraph 18), Ms. Tilton simply started suing

the Portfolio Companies in New York to attempt to recover on her Paragraph 18 claims in violation

of the agreed-upon process and the Debtors' claim validation rights under Paragraph 18 of the

Settlement Agreement; rights she fully concedes the Debtors' possess.

27.    On June 23, 2020, certain of the Tilton Plaintiffs sued Portfolio Companies █ and

█n New York State Court, claiming the right to be paid close to $2 million in connection with

notes allegedly executed by Portfolio Company █ and █ in 2019 and 2017, respectively.[16]

28.    The Debtors then followed up with Ms. Tilton's counsel on June 30, 2020 to once

again request documentation of Patriarch's claims and, in order to avoid more unnecessary

---

[16] Copies of the pleadings filed in the June 23rd New York State Court action against Portfolio Company █ which
largely match those filed against Portfolio Company █ are attached hereto as **Exhibit D**.

litigation, asked that Ms. Tilton confirm that proceeds of one potential transaction that seemed imminent at the time be escrowed until adjudication. Ms. Tilton promptly rebuffed the suggestion.

29.     Having received no response at all to their June 6th request for Paragraph 18 information, the Debtors also filed a motion on June 30, 2020 requesting that the Court require Ms. Tilton and the Patriarch Stakeholders to produce such information [Docket No. 1749] (the "June 30th Motion").

30.     On July 6, 2020, certain of the Tilton Plaintiffs sued eight of the Portfolio Companies in New York State Court,[17] seeking to recover accrued and unpaid management fees, indemnification claims and agency fees, which are the **_exact claims_** Ms. Tilton herself concedes are claims that must be validated only through the Settlement Agreement in this Court. *See, e.g.*, July 7th Obj. ¶ 4 ("the Settlement Agreement established **_the process_** for resolving disputes relating to the Patriarch Claims.") (emphasis added); ¶ 8 ("No party to the present dispute questions that this paragraph 18, and footnote four to the same, are the only applicable language addressing the validation of the Patriarch Claims.").

31.     On July 7, 2020, Ms. Tilton objected to the June 30th Motion and in doing so admitted that "the Settlement Agreement provides an agreed-upon process for resolving certain claims held by Patriarch entities involving the Portfolio Companies, subject to certain validation procedures. Patriarch does not dispute the procedure for validating Patriarch's claims as set forth in the Settlement Agreement." July 7th Obj. ¶ 1; *see also id.* ¶ 4 ("Among other things, the Settlement Agreement established **_the process_** for resolving disputes relating to the Patriarch Claims. Relevant to this dispute is paragraph 18 of the Settlement Agreement . . . .") (emphasis added). Her objection also claimed "approximately ▮▮▮▮▮" in Paragraph 18 claims, which

---

[17] A representative Complaint against Portfolio Company ▮ is attached hereto as **Exhibit E**.

26777776.15

17

is $██████ higher than what was provided to the Court and the Debtors barely over a month ago. *Id.* ¶ 3.

32.     As reported to the Court at the July 14th hearing, Ms. Tilton and the Debtors entered into an interim resolution of the June 30th Motion whereby Ms. Tilton will provide additional information as requested by the Debtors and the parties will continue to meet and confer concerning the information supplied and Paragraph 18's claim validation process.  That process is ongoing, and the Debtors are reviewing the documentation aside from the contracts and credit agreements that have been recently been produced.  However, substantive litigation may be required to determine the validity of certain Patriarch claims.

33.     On July 14, 2020, Ms. Tilton filed a new round of complaints, this time suing an additional seven (7) Portfolio Companies in New York, once again seeking collection of her Paragraph 18 claims in that court.

34.     On July 17, 2020, two of the Portfolio Companies filed notices of removal for three of the New York Complaints with the ultimate intention of transferring the complaints so they may be heard before this Court.

G.     **Ms. Tilton's Prior Violations of Paragraph 18 of the Settlement Agreement**

35.     As the Court is aware, only two Group A Portfolio Companies were sold within the Fifteen Month Window – LVD Acquisition LLC ("Oasis") and Denali Incorporated ("Denali") – and no Portfolio Companies have been sold since.  Despite a clear prohibition in Paragraph 18 against Ms. Tilton using her asserted claims "to block the closing of any pending transaction in the Monetization Process," she did exactly that in connection with each of those transactions.

36.     First, shortly after the Debtors and Ms. Tilton agreed to pursue a bid for the equity of Oasis, the Debtors advised Ms. Tilton's counsel that, because the transaction would not result

in full payment of the Debtors' secured debt at Oasis, a 5% transaction fee asserted by PPMG (the "Transaction Fee") under its management services agreement with Oasis would not be triggered at closing.[18]  Ms. Tilton advised through counsel that she disagreed, but failed to provide any justification for her position aside from simply asserting that the Debtors' interpretation of the management services agreement was incorrect.  The Debtors proposed to escrow proceeds of the transaction to cover the claim and resolve the dispute following closing, but Ms. Tilton refused.

37.    On August 16, 2019,[19] Ms. Tilton demanded that her personal PPMG Transaction Fee relating to Oasis be paid or else she, as the manager of Oasis, would not execute the equity purchase agreement on behalf of Oasis.  In her August 16th e-mail to the Independent Director and CRO, Ms. Tilton stated:

> Gentlemen, We have completed our negotiations with Culligan and are ready to sign documents.  However, there are two issues that remain outstanding that we must settle ***before I will sign the documents***.  First, I need that you [*sic*] agree to pay our PPMG fee. It is listed in the settlement agreement and there are no rights to argue on those issues listed up to $250 million of payments not to include equity payments, during this period….***These issues have been outstanding for some time and now will jeopardize the timing of signing*** if they cannot be resolved.  Lynn

**Exhibit F**.  Rather than allow Ms. Tilton to kill the deal, the Debtors had no choice but to agree (following an unsuccessful mediation) that Ms. Tilton would be paid the $3.8 million Transaction Fee in exchange for her and Patriarch's release of claims against Oasis, subject to the Debtors' right to claw it back through litigation.[20]   Ms. Tilton openly conceded in a deposition on July 13, 2020, that ███████████████████████████████████████████████████████████████

---

[18] A more detailed recitation of the Debtors' position with respect to the asserted 5% Transaction Fee is set forth in the *Debtors' Motion for an Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction* [Docket No. 911].

[19] A copy of Ms. Tilton's August 16th email is attached hereto as **Exhibit F**.

[20] The Debtors' claw-back request is currently scheduled for a contested evidentiary hearing on August 25, 2020.

████████████████████████████████████████

████████████████████████████████████    July 13, 2020 Dep. Tr. 44:18-21.

38.    Similarly, Ms. Tilton threatened the sale of Denali over the calculation the PPMG
Transaction Fee.  By June 3, 2019, the Debtors, Denali, Ms. Tilton and the buyer had finally
completed documenting the sale of Denali.  When a disagreement regarding the calculation of
PPMG's Transaction Fee arose, Ms. Tilton, in her personal capacity, refused to sign the deal
documents on behalf of Denali unless the Debtors' consented to her calculation of the fee, which
was approximately $200,000 more than the Debtors' calculation.  On June 3, 2019, Ms. Tilton
wrote to the Independent Director and CRO stating "I am going to need you both to get involved
in the calculation of the Patriarch Management Fee as I will not sign the papers until we do."[21]
Again, the Debtors reserved their rights to have the Court adjudicate the proper calculation of the
Transaction Fee so that Ms. Tilton and Patriarch would provide their releases and the transaction
could close.

**H.    The Role of Releases in the Sale Process**

39.    As discussed above, seller releases played pivotal roles in the closing of the only
two Portfolio Companies sales thus far.  Without the releases contained in sections 6.07 and 6.7 of
the Oasis Equity Purchase Agreement and the Denali Stock Purchase Agreement, respectively, the
buyers would not have closed at their ultimate purchase prices.  Consistent with the precedent of
the previous two sales and with the goal of obtaining a company free from encumbrances, a buyer
for one Portfolio Company where a sale is approaching is requiring a similar release in its purchase
agreement.  Suffice it to say, buyers are proceeding cautiously given the cloud of litigation and
will continue to do so absent some assurance that they are purchasing the Portfolio Companies free

---

[21] A copy of Ms. Tilton's June 3, 2019 e-mail is attached hereto as **Exhibit G**.

and clear.  Otherwise, the path and pace to monetization will be abated, and the ultimate consideration received in monetization transactions will be significantly depressed.

## RELIEF REQUESTED

40.     Pursuant to the February 6th Ruling, the Settlement Agreement, the Settlement Order, and the Monetization Procedures Order, the Debtors hereby request entry of the Proposed Order: (a) staying the Tilton Plaintiffs' prosecution of the New York Complaints;[22] (b) in connection with the sales of Portfolio Companies, (i) establishing an escrow for all amounts claimed by the Patriarch Stakeholders pending their validation under Paragraph 18 and (ii) ordering releases of the Patriarch Stakeholders' claims with such claims attaching to the proceeds of such sale as discussed herein; and (c) granting related relief.

## BASIS FOR RELIEF REQUESTED

41.     In its February 6th Ruling, the Court ruled that it possesses authority and jurisdiction to order the Debtors and the Patriarch Stakeholders to engage in a monetization transaction, even over the objection of either or both of them.  Here, the Debtors believe it is essential to obtaining maximum value in the monetization process that the Portfolio Companies be sold free and clear of the Debtors' and Patriarch Stakeholders' claims against the Portfolio Companies.  Likewise, the Court ruled that it could resolve disputes related to the monetization process, including the ultimate consummation of transactions, and given Ms. Tilton's decision to seek to validate and collect on her claims through New York State courts rather than under Paragraph 18, this is such a dispute.

---

[22] The Debtors understand that certain or all of the Portfolio Company defendants in the New York Complaints have or are in the process of retaining Latham & Watkins as counsel in those actions and that they have filed or will file requests to remove those actions to the U.S. District Court for the Southern District of New York and will thereafter seek to have those actions transferred to Delaware where they can be addressed as part of Paragraph 18 of the Settlement Agreement.  The stay requested herein is not intended to stay those efforts.

Moreover, paragraphs 18 and 25 of the Settlement Agreement empower the Court to craft the relief requested herein so the monetization process can continue.

42.     Section 105(a) of the Bankruptcy Code also provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code," and that "[n]o provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules....". 11 U.S.C. § 105(a). Further, bankruptcy courts retain "jurisdiction to interpret and enforce settlements and the accompanying orders approving settlements." *See In re Baseline Sports, Inc.,* 393 B.R. 105, 118–19 (Bankr. E.D. Va. 2008); *accord In re Lazy Days' RV Center, Inc.*, 724 F.3d 418, 423 (3d Cir. 2013); *In re Patriot Coal Corp.*, 539 B.R. 812, 818–19 (Bankr. E.D. Mo. 2015). Although "there are some significant limits to a bankruptcy court's ability to use section 105(a) of the Code . . . [it] plainly may be used 'to enforce and implement' earlier orders." *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008); *See Also In re Ames Dep't Stores, Inc.*, 317 B.R. 260, 273–74 (Bankr. S.D.N.Y. 2004).

43.     Consistent with section 105(a) and this decisional law, the Settlement Order specifically provides that the terms of the Settlement Agreement are "binding on all parties-in-interest in these Chapter 11 cases, including, but not limited to, the Parties…the Patriarch Stakeholders…" and the Court expressly "retain[ed] jurisdiction to hear any and all disputes arising out of the interpretation or enforcement of this Order." Settlement Order ¶¶ 2, 8 (emphasis added). As such, it cannot be reasonably disputed that this Court has the authority to interpret and enforce the Settlement Order and Settlement Agreement, including granting the relief requested herein in its totality.

## A.    <u>Ordering Releases is Essential to the Sale Process</u>

44.     In accordance with the Court's February 6th Ruling, Ms. Tilton has agreed – through the bargained-for Settlement Agreement – that this Court's ability to adjudicate disputes regarding the monetization was not limited and the Court retained authority to "settle related disputes, including those over the ultimate consummation of a proposed transaction." Feb. 6th Ruling 69:15-17.  The Court further acknowledged that "value of the settlement is called into question" "[i]f the parties…only agreed that this court could oversee consensual transactions…" *Id.* 70:15-17.

45.     The parties further agree that any Proposed Transaction Order will "provide that any and all…Patriarch Stakeholders' liens, claims and encumbrances with respect to any Zohar Interests or Zohar Portfolio Company Debt are released pursuant thereto and will attach to the proceeds of any such Portfolio Company Transaction with the same validity and priority as those being released, in each case consistent with section 363(f) of the Bankruptcy Code."  Monetization Procedures Order ¶ 3(b).[23]

46.     Moreover, potential buyers require certainty as to whether they are purchasing Portfolio Companies free and clear, and the Debtors wish to assure them that they will, which is consistent with the universal releases provided for in the two sales that have been consummated. Indeed, in the current process, at least one buyer – where the Portfolio Company sale seems imminent – has made seller releases an absolute condition to closing on a transaction.

47.     As set forth above, in connection with closing the sales of Oasis and Denali, Ms. Tilton utilized her personal asserted claims under paragraph 18 to "block the closing of [a] pending

---

[23] "Zohar Interests" and "Zohar Portfolio Company Debt" are defined in the Monetization Procedures Order as "those certain equity or LLC interests…in a Portfolio Company of which the Debtors are record holders and all rights, benefits, and economic interests associated with such interests" and "any outstanding loan obligations from a Portfolio Company to one of the Debtors," respectively.

transaction in the Monetization Process" and obtain economic concessions for her affiliates to which they were likely not entitled and to which the Debtors objected. Specifically, Ms. Tilton – in her capacity as director/manager of those Portfolio Companies – refused to execute binding sale documents that she believed were in the best interest of the Portfolio Companies and the Debtors **unless** and **until** her affiliated entities were paid claims that the Debtors legitimately asserted were not properly "documented" within the meaning of paragraph 18 or otherwise disputed. This is the exact conduct the Debtors and potential bidders are concerned with, and those concerns are growing in light of Judge Bernstein's recent decision in *TransCare*. The only way to address and ameliorate these concerns is the establishment of an escrow and to assure the buyers any sales will be free and clear of Ms. Tilton's claims, without which no sales are likely to transact.

B.     **The Court Should Stay the Tilton Plaintiffs' Prosecution of the New York Complaints**

48.     The Patriarch Stakeholders have recognized that paragraph 18 of the Settlement Agreement "established ***the process*** for resolving disputes in connection with the Patriarch Claims."[24] July 7th Obj. ¶ 4. Indeed, "Patriarch does not dispute the procedure for validating Patriarch's claims as set forth in the Settlement Agreement." *Id.* ¶ 1. Yet, with potential sales of Portfolio Companies drawing near, the Patriarch Plaintiffs filed seventeen (17) lawsuits against fifteen (15) Portfolio Companies in New York seeking to adjudicate the very same claims that they have repeatedly conceded should be resolved by this Court.

---

[24]  While the Debtors' request is to enforce the Settlement Agreement against the parties to it from taking further action in the recently filed actions and not to enjoin the New York State Court itself, the Court would nonetheless have the authority to do so. *See, e.g.*, *In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) ("A bankruptcy court is authorized, once jurisdiction is established, to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. This provision includes the authority to enjoin litigants from pursuing actions pending in other courts that threaten the integrity of a bankrupt's estate.") (quoting *In re Davis*, 730 F.2d 176, 183-84 (5th Cir. 1984); *In re Davis*, 691 F.2d 176, 178 ("[U]nder proper circumstances, a bankruptcy court may issue an injunction to prevent a state prosecution."); *cf.* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except . . . where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.")

49.     It is clear through her multiple filings with this Court, Ms. Tilton agrees with and has conceded that adjudication of her claims falls under this Court's authority by the express terms of the Settlement Agreement.  Nevertheless, she has sought serial adjudication of those very same claims elsewhere.   These two competing strategies simply cannot co-exist, and they add unnecessary and exorbitant costs to these cases. Accordingly, the Court should enforce the Settlement Agreement by staying the Tilton Plaintiff's further prosecution of the New York Complaints.

**C.**     **An Escrow Should be Established Until the Court Adjudicates Ms. Tilton's Claims**

      **i.**     **Ms. Tilton Has Not Complied With Paragraph 18**

50.     Paragraph 18 of the Settlement Agreement contains clear minimum standards: First, the Debtors are entitled to documentary proof of any (a) claim or interest, and (b) funding, if applicable (whether within or following the 18-Month Window).  Second, the CRO is entitled to "promptly [receive] any information reasonably requested…to verify the existence of [such] funding and documentation…as required in the CRO's reasonable discretion."   Third, contemporaneous with the expiration of the 18-Month Window, the tolling of "[a]ll parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests" expires.

51.     To date, the amounts asserted by the Patriarch Stakeholders have been a moving target.  In her May 27th Declaration, Ms. Tilton claimed ████████ is due to her entities for management and agency fees, yet the exhibit to her declaration referred to only ████████ of such claims (which number also appeared to include indemnification claims and may also include other obligations).  May 27th Decl. at ¶ 2, 10.  She also claimed she is owed ████████████ ████████████████████████████████████ yet, again, the exhibit to

her declaration asserted ███ million inclusive of management and agency fees.  May 27th Decl. at ¶ 10.  With respect to Portfolio Companies █ and █, the Debtors only recently learned of the existence of certain promissory notes for purported "tax distributions."

52.    Even if the totality of the Patriarch Stakeholders' claims were not as confusing as Ms. Tilton has presented them, Ms. Tilton has never voluntarily provided the Debtors with ***any proof*** – required by paragraph 18 of the Settlement Agreement – that she or her entities actually funded any of the indebtedness[25] or equity claims that she or her affiliates assert.  And only recently – on July 8th and in response to a pending motion and hearing – did she provide any level of detail regarding the various amounts asserted to be owed under the "███████████████" column in her summary.

53.    As the Debtors review the new documentation beyond the contracts and credit agreements, certain of the claims may require substantive litigation to determine their validity. However, Ms. Tilton is now attempting to validate her claims outside this Court, having filed seventeen (17) lawsuits in New York, seeking a determination as to the validity of her Paragraph 18 claims in New York in clear derogations of the Debtors' rights under Paragraph 18.  These lawsuits come several months after the Debtors put many of these issues in front of the Court by filing their own complaint against the Patriarch Plaintiffs (and other of their affiliates) challenging the propriety of various self-dealing and conflicted transactions, including, among other things,

---

[25] As stated on the record of the July 14th hearing, the Debtors were able to resolve the June 30th Motion.  That resolution included an agreement by Ms. Tilton to provide, by July 17th, proof from two of the Portfolio Companies that they had received the funding of the Class A Interests.  Despite what was discussed at the meet and confer preceding the July 14th hearing or what was stated on the record at the hearing, by July 17th, Ms. Tilton had changed her mind regarding what she agreed to provide and demanded additional conditions before providing to the Debtors what she had previously agreed to provide in resolving the June 30th Motion.  Pending receipt of the remaining documents demonstrating proof of funding, the parties may require the Court to resolve this issue.

amounts paid and owing under the MSAs, paid as agency fees, and on account of converted distributions and dividends on account of taxes.

### ii.    Establishing An Escrow Is Precisely Within The Court's Authority

54.    The validation of Ms. Tilton's claims under Paragraph 18 is a pending dispute under the monetization process which must be resolved by the Court pursuant to the Settlement Agreement and the February 6th Ruling.  That dispute has been exacerbated by Ms. Tilton's actions in, among other things, (a) filing seventeen (17) new lawsuits in New York against fifteen (15) of the Portfolio Companies,[26] (b) waiting until one week ago to provide any detail concerning her claims, (c) failing to provide proof of funding of the debt, Class A Interests and equity claims, (d) recently revealing new, previously unknown tax promissory notes, (e) recently procuring a clandestine $6.5 million insurance settlement to the exclusion of the insured Portfolio Companies, (f) billing the Portfolio Companies millions of dollars of her lawyers' fees in her efforts to avoid her obligations under the Settlement Agreement (which are now asserted as Paragraph 18 claims), and (g) asserting $16.5 million of indemnification claims against the Portfolio Companies that were nominal defendants in the Delaware Chancery Court "225" action (which are now asserted as Paragraph 18 claims).  Payment of Ms. Tilton's claims only after such claims have been fully vetted by the Debtors and, where appropriate, adjudicated and validated by this Court, would (i) be consistent with prior orders of the Court and express agreements and concessions by Ms. Tilton and the Patriarch Stakeholders, (ii) represent no hardship on Ms. Tilton, and (iii) ensure what was originally contemplated – payment and satisfaction of only valid claims of Ms. Tilton and the Patriarch Stakeholders.

---

[26] The claims Ms. Tilton raised in the New York Complaints are also part of the adversary proceeding filed by the Debtors in March.

55.     Further, Ms. Tilton's various litigations filed in New York State Court are an end-run around the adversary proceeding commenced by the Debtors in this Court in March 2020, to seek this Court's adjudication of the validity of many of the Patriarch Stakeholders' claims.  At a minimum:

a.      At least Counts III, IV, XIII, XXV, XXVII, XXIX, XXX, and XXXIII are directly related to the validity of the fees under the MSAs that form the basis of almost all of the state court litigations.

b.      At least Counts VIII, XVIII, and XXIV are directly related to the ownership and entitlement to any tax distributions and, in turn, the validity of the purported notes that are the subject of two of the state court litigations..

c.      At least Count VIII is directly related to the validity of the fees under the credit agreements asserted by PPAS that are the subject of many of the state court litigations.

56.     The relief requested herein is also consistent with Paragraphs 18 and 25 of the Settlement Agreement and the Monetization Procedures Order.  The parties agree that the only manner in which Ms. Tilton's claims can be validated is through Paragraph 18 of the Settlement Agreement in this Court.   Paragraph 25 empowers the Debtors to "take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise…"  And the no-contest right enjoyed by Ms. Tilton during the Eighteen Month Window has expired.  Ms. Tilton herself also concedes that the Monetization Procedures Order ¶ 3(b) "maintains Patriarch's unaltered rights with regards to their claims…."  July 7th Obj. ¶ 6.  As her claims would be unaltered in a monetization transaction, the relief requested herein will give effect to the attachment of her claims to the proceeds of any sale transaction and will, in fact, further

protect any rightful distributions to which she may otherwise be entitled while her claims are validated.[27]

### iii.    Ms. Tilton Does Not Require Immediate Payment Because She Purported to Resign as Tax Director

57.    Additionally, Ms. Tilton herself concedes that the reason Paragraph 18 was included in the Settlement Agreement to ensure that she had a source of funds to satisfy her Settlement Agreement mandated tax obligations as the Debtors' Designated Tax Director.  Ms. Tilton has previously referred to the payment assurance provided by Paragraph 18 as a material component of her consent to the terms of the Settlement Agreement because it assured her she would have sufficient funds to satisfy her tax payment obligations.  Ms. Tilton has now purported to resign as Designated Tax Director and will presumably take the view that her previous commitment to satisfy the Debtors' tax liabilities no longer exists.  Given Ms. Tilton's concession as to the purpose of Paragraph 18 – to aid in her satisfaction of the Debtors' tax obligations – unless and until the extent, validity and consequences of Ms. Tilton's resignation as Designated Tax Director are fully understood, it would be improper to permit her to receive payments under Paragraph 18 of the Settlement Agreement if, as admitted by Ms. Tilton, its main purpose was to ensure she had sufficient funds to pay tax liabilities that she may now claim she does not have.

## CONCLUSION

58.    The disputes regarding Ms. Tilton and the other Patriarch Stakeholders' claims must be resolved before they impede a transaction and prejudice value for all stakeholders, and the Debtors propose a straightforward solution that will not in any way prejudice Ms. Tilton or her affiliates.  Consistent with the Settlement Agreement, the Debtors propose to establish an escrow

---

[27] The Proposed Order provides that Ms. Tilton's claims will attach to the proceeds once escrowed pending adjudication of her claims.

in an amount equal to the asserted Patriarch claims until the Court adjudicates the dispute.  Because the escrow will sufficiently cover all of the asserted Patriarch claims, the Patriarch Stakeholders should also be ordered to release the Portfolio Companies and the buyers thereof in connection with sales.

## **NOTICE**

59.    The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) counsel to the Patriarch Stakeholders; (iii) counsel to U.S. Bank, as indenture trustee; (iv) counsel to MBIA; (v) counsel to the Zohar III Controlling Class; and (vi) all parties that, as of the filing of this Motion, have requested notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors request entry of the Proposed Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: July 21, 2020                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                                    */s/ Joseph M. Barry*
                                      James L. Patton, Jr. (No. 2202)
                                      Robert S. Brady (No. 2847)
                                      Michael R. Nestor (No. 3526)
                                      Joseph M. Barry (No. 4221)
                                      Ryan M. Bartley (No. 4985)
                                      Shane M. Reil (No. 6195)
                                      Rodney Square
                                      1000 North King Street
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 571-6600
                                      Facsimile: (302) 571-1253

                                      *Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

## Proposed Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Docket Ref. No. ___** |

### ORDER IN AID OF ENFORCEMENT OF THE SETTLEMENT AGREEMENT (A) STAYING THE PATRIARCH STAKEHOLDERS FROM PROSECUTING LITIGATION OUTSIDE THE DELAWARE BANKRUPTCY COURT, (B) ESTABLISHING AN ESCROW IN CONNECTION WITH POTENTIAL PORTFOLIO COMPANY SALES, AND (C) GRANTING RELATED RELIEF

Upon the *Debtors' Motion for Entry of an Order in Aid of Enforcement of the Settlement Agreement (A) Establishing Escrow in Connection with Potential Portfolio Company Sale, and (B) Granting Related Relief* (the "Motion") [Docket No.__],[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"); and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and this Court having found and determined that the relief sought in the Motion is in the best interests of the

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Debtors' estates, their creditors, and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED**:

1.    The Motion is **GRANTED** to the extent provided herein.

2.    The Tilton Plaintiffs' prosecution of the New York Complaints against Portfolio Companies ███████████ and ██ is hereby stayed, provided, however, that such stay shall not prevent any of the foregoing Portfolio Companies from pursuing removal of such actions to federal district court and subsequent transfer to the District of Delaware or the Tilton Plaintiffs' right to oppose such relief.

3.    Except as otherwise agreed by the Debtors in writing, pending the Court's adjudication of a claim against a Portfolio Company or interest in a Portfolio Company asserted by any Patriarch Stakeholder, the funds on account of such claims or interests otherwise distributable to the applicable Patriarch Stakeholder shall be paid into escrow upon the closing of such monetization process transaction, and such funds shall be held in a segregated account pending further order of the Court or joint written direction from the Debtors and the affected Patriarch Stakeholder (the "Escrowed Funds"), and any claim by a Patriarch Stakeholder shall attach to the Escrowed Funds with the same validity and priority it had as of the closing of such Portfolio Company transaction. Any sale pursuant to the Settlement Agreement and/or the Monetization Procedures Order shall be free and clear of any lien, claims or encumbrances asserted by any Patriarch Stakeholder against the applicable Portfolio Company and the Patriarch Stakeholders' recoveries on account of their claims against Portfolio Companies shall be limited to the Escrowed Funds. The Patriarch Stakeholders shall execute a release or settlement, accord

and satisfaction in connection with any claims or equity related to a Portfolio Company in connection with the closing of the sale of the Portfolio Company in connection with the foregoing.

4.      Any notice requesting approval of a monetization transaction shall identify the appropriate Patriarch Stakeholders' claims and interest, the amount to be deposited as the Escrowed Funds, any documents the Patriarch Stakeholders are required to execute to effectuate the transaction, and any other information the Debtors believe is necessary to substantiate the amount of the Escrowed Funds.

5.      This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated: _____, 2020
       Wilmington, Delaware

                                       _____
                                     THE HONORABLE KAREN B. OWENS
                                     UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**Settlement Order and Settlement Agreement**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | )    Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | ) <br> )    Case No. 18-10512 (CSS) <br> ) <br> )    Jointly Administered |
| Debtors. | ) <br> )    **Docket Ref. Nos. 222 & 223** |

## ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the Settlement Agreement (attached hereto as **Exhibit 1**) entered into by and between (i) the Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA, and (v) Halcyon Capital Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD (collectively, the "Zohar III Noteholders" and, together with the Debtors, Lynn Tilton, the Patriarch Stakeholders, and MBIA, the "Parties"), as more fully described in the Motion; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and it appearing that venue of these

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Settlement Agreement, as applicable.

[3] The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

01:23222940.4

Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and

the Court may enter a final order on the Motion consistent with Article III of the U.S.

Constitution; and this Court having determined that the relief requested in the Motion is in the

best interests of the Debtors, their estates, creditors, and other parties in interest; and this Court

having found that the relief requested in the Motion is justified by the facts and circumstances;

and it appearing that proper and adequate notice of the Motion has been given and that, except as

otherwise ordered herein, no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, is

approved in its entirety pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule

9019, and is binding on all parties-in-interest in these Chapter 11 cases, including, but not limited

to, the Parties, any new Collateral Manager or New Agent appointed under the terms of the

Settlement Agreement, the Independent Director, the CRO, U.S. Bank, the Other Stakeholders,

the Patriarch Stakeholders, the Committee, and any subsequent holder of any secured notes

issued by any of the Debtors (including, with respect to any of the foregoing, any agents,

successors, or assigns); provided, however, with respect to the Zohar III Controlling Class only,

no Party shall be required to disclose the terms of the Settlement Agreement to any successor,

assign or transferee, nor shall it be liable for any successor's, assign's or transferee 's breach of

the Settlement Agreement;  provided, further however, that the first sentence of paragraph 30 of

the Settlement Agreement shall be null and void solely to the extent it contemplates a separate

"confidential stipulation."

3.      A prospective purchaser or seller of debt issued or guaranteed by the Zohar III,

Corp. or Zohar III, Limited may obtain a copy of the terms of the Settlement Agreement from the

CRO, only after executing a standard NDA consistent with the practice in the District of

Delaware for the sole and limited purpose of evaluating a potential purchase of such debt,

provided however, that such terms shall not include Exhibits to the Settlement Agreement.

Without limiting the binding effect of the Settlement Agreement provided for under Paragraph 2

of this Order, in the event a potential purchaser of debt becomes a holder of Zohar III Claims,

such NDA shall bind the entity requesting access to the terms of the Settlement Agreement, any

individual representing any such entity in such a request, and any individual who is granted

access to the terms of the Settlement Agreement on behalf of any such entity.

4.      Notwithstanding anything in the Order to the contrary, nothing contained in this

Order is or shall be deemed to be an act by the Trustee to consent to or vote for or accept or

adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or

composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to

vote in respect of the claim of any Noteholder in any such Proceeding.  (All capitalized terms

used in the prior sentence have the meaning ascribed to them in the applicable indenture between

the Debtors and U.S. Bank.)

5.      Notwithstanding anything to the contrary in this Order or the Settlement

Agreement, nothing set forth in the Settlement Agreement is binding on Blank Rome LLP.

6.      Notwithstanding anything to the contrary in this Order or the Settlement

Agreement, nothing set forth in the Settlement Agreement is binding on Alvarez & Marsal Zohar

Management LLC ("AMZM"), provided, however, that paragraph 16 of the Settlement

Agreement provides that AMZM shall be terminated.

      7.      The Debtors are authorized and empowered to take any and all actions necessary

to carry out, effectuate, or otherwise enforce the terms, conditions, and provisions of the

Settlement Agreement.

      8.      This Court shall retain jurisdiction to hear any and all disputes arising out of the

interpretation or enforcement of this Order.


Dated: May **21**, 2018
      Wilmington, Delaware

                                       Christopher S. Sontchi
                                       United States Bankruptcy Judge

Case 18-10512-CSS   Doc 266-1   Filed 05/24/18   Page 43 of 105

## Exhibit 1

**Settlement Agreement**

**Mediation Term Sheet**
**(In re: Zohar III Corp.,** *et al.,* **Case No. 18-10512 (CSS))**

*15 Month Window* – The period that expires 15 months from the date hereof.

*18 Month Extended Window* – If each of MBIA and the Zohar III Claims receive 50% of their respective Paid in Full amount within the 15 Month Window, the 15 Month Window shall be deemed to be extended by 3 months and shall be hereafter referred to herein as the 18 Month Extended Window.

*Bankruptcy Court* – The United States Bankruptcy Court for the District of Delaware, which is presiding over the Chapter 11 cases of the Debtors.

*Debtors* – The debtors in the Chapter 11 cases captioned: In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS).

*Designated Tax Director*  - the limited role Tilton shall have on behalf of the Debtors as described in paragraph 2 below.

*Full Payment Date* – The date on which the parties or the classes of noteholders on Exhibit A are Paid in Full.

*Independent Director* – the director appointed by the Mediator.  The Independent Director (a) shall be unaffiliated with any party and (b) shall have played no role in connection with and held no claim against or interest in any of the Debtors.

*Indentures* – (1) The Indenture among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1 Corporation, Zohar CDO 2003-1, LLC, and MBIA Insurance Corporation, CDC Financial Products, Inc., and U.S. Bank National Association, dated November 13, 2003; (2) The Indenture among Zohar II 2005-1, Limited, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc., and LaSalle Bank National Association, dated January 12, 2005; and (3) The Indenture among Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., and LaSalle Bank National Association, dated April 6, 2007.

*MBIA* – MBIA Insurance Corp.

*Mediator* – The Honorable Kevin Gross, and if Judge Gross resigns as mediator Judge Sontchi will appoint a replacement mediator.

*Other Stakeholders* –  (a) US Bank and MBIA, when not referring to Zohar III, (b) US Bank and the Controlling Class representative when solely referring to Zohar III, and (c) US Bank, MBIA and the Zohar III Controlling Class when referring to Zohar III and either or both of Zohar I and Zohar II.

*Paid in Full* – The amount owed to the parties and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be updated monthly to reflect accrued and unpaid interest and fees allowable under the Indentures.[1]

*Patriarch Stakeholder* – Entities included in Exhibit B.

*Group A Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit C.

*Group B Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit D.[2]

*Tilton* – Ms. Lynn Tilton.

*U.S. Bank* – U.S. Bank National Association, solely in its capacity as Trustee under the Indentures, and not in its individual capacity.

*Zohar III Noteholders* – those entities or the classes of noteholders listed on the schedule attached hereto as Exhibit E.

*Zohar III Claims* – Claims under the Zohar III Indenture $[X]

*Zohar Funds* – collectively, Zohar CDO 2003-1, Limited; Zohar CDO 2003-1 Corporation; nondebtor Zohar CDO 2003-1, LLC; Zohar II 2005-1, Limited; Zohar II 2005-1, Corp.; nondebtor Zohar II 2005-1, LLC; Zohar III, Limited; Zohar III, Corp.; and nondebtor Zohar III, LLC)

**Terms**

---

[1]    This footnote is intended to cover MBIA's claims. Other than the Policy Payment in the amount of $148,951,585 with respect to Zohar I and the Policy Payment of $770,109,326 with respect to Zohar II reflected on Exhibit A, the calculation of which amounts are not subject to challenge by Tilton; all other rights reserved. MBIA will consult in good faith with Tilton regarding the other amounts and calculations specified in Exhibit A. If the parties are unable to agree on those other amounts, the matter shall be referred to the Mediator. If the Mediator is unable to resolve the dispute, the matter shall be brought to the Bankruptcy Court for resolution. Any equity interest owed to MBIA or Zohar I, as applicable, will be escrowed until the expiration of the 15 Month Window; all parties' rights reserved. Any proceeds from the sale or repayment of Zohar I loans (but not the equity interest) shall be paid directly to MBIA.

[2]    Group B Portfolio Companies will exclude the Group A Portfolio Companies.

1. The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

2. Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors, the Group B Portfolio Companies, and Group A Portfolio Companies) solely for the purpose of exercising (and having no other rights or authority) to (a) manage the tax liability and reporting of the Debtors and the Group B Portfolio Companies, (b) manage the tax reporting of the Group A Portfolio Companies and (c) with respect to the Group B Portfolio Companies, manage any event causing cancellation of debt income (forgiveness of debt, liquidation, unwind, or foreclosure) including to manage the timing of sale of the Group B Portfolio Companies, forgiveness of debt and realizing gains and losses (the "Designated Tax Director"). In that capacity, Tilton shall continue to bear the tax liability associated with ownership of the Debtors, the Group B Portfolio Companies, and the Group A Portfolio Companies, including with respect to any Group A Portfolio Company transactions.

3. Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

4. [TBD: CRO and LT will develop reasonable process milestones related to hiring bankers, ....]

5. The Group A Portfolio Companies will be sold without regard to Tilton's personal tax liability.

6. The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall

have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

7. If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

8. The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "*Monetization Process*"). The CRO shall (a) replace the current CRO, (b) be unaffiliated with any party, and (c) have played no role in connection with and held no claim against or interest in any of the Debtors; provided, however, that Rob Kost may be considered for any role in the monetization process, by the CRO. The Independent Director and CRO each will execute a standard NDA consistent with the practice in the District of Delaware.

9. Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended Window. During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

10. With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio

Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete. Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales. Each shall have full and complete information regarding the Monetization Process and sources and uses of funds in any transaction consummated as part of the Monetization Process. Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

11. Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

12. Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

13. At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies; provided, however, that the resolution of any dispute regarding the escrow referenced in footnote 1 shall not be barred as of the Full Payment Date by the provisions of this paragraph.

14. The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

15. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. The committee shall be comprised of 3 representatives. The members and their respective advisors shall execute standard NDAs consistent with the practice in the District of Delaware. The reasonable fees and expenses of the Committee and its advisors shall be set forth in a budget to be approved by the CRO and shall

be paid by the estates._ All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

16. AMZM and any of its affiliates (collectively, "AMZM") shall not be a member of or advisor to the Committee, and, except herein, AMZM shall not be paid or reimbursed by the estates or the Portfolio Companies for any fees or expenses with respect to the Monetization Process or any other purpose; provided, however, that (a) AMZM shall be terminated as Collateral Manager, and MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. Subject to the approval of the CRO, AMZM may be reimbursed for reasonable transition costs solely incurred in the transmitting of information to the new collateral manager. [TBD: Side agreement b/w cro and CM ensuring reasonable fees which will be escrowed to escrow CM fees due under the indenture ]

17. The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. In order to facilitate this negotiation, the Zohar Funds will provide customary bankruptcy case budgets, including anticipated sources and uses of cash (including payments from the Group A Portfolio Companies). It is understood and agreed the Zohar Funds shall not utilize any cash they are holding pending an agreed order. In the event of any dispute among the parties with respect to use of cash collateral, in

the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

18. Any (A) claim asserted by the Patriarch Stakeholders that is supported by written documentation showing the claim (a) was funded to a Group A Portfolio Company by a Patriarch Stakeholder (in the case of funded debt claim), or (b) represents a fee or other claim arising from a deferral of payment or any management and/or administrative fee owed to a Patriarch Stakeholder[3] and (B) equity interest asserted by the Patriarch Stakeholders is supported by written documentation, then such claim and equity interest, as applicable, shall be deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity unless the applicable credit agreement provides otherwise.[4] In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window (provided the Full Payment Date does not occur on or before such date), but no such claim shall be brought during the 18 Month Window or used to block the closing of any pending transaction in the Monetization Process. The Patriarch Stakeholders will promptly provide any information reasonably requested by the CRO to verify the existence of the funding and documentation described above (provided that the CRO may share the foregoing information with Other Stakeholders (subject to the execution of an NDA approved by the Mediator) as required in the CRO's reasonable discretion. With respect to the claims in (A) above, the payments to the Patriarch Stakeholders that shall be made without further analysis or challenge shall be capped at $250 million, with any amounts in excess to be held in escrow until Full Payment Date. Tilton represents that none of the claims in (A) currently prime the secured claims of the Other Stakeholders in the Group A Portfolio Companies, other than ABLs in ███████████████. Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

19. All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies

---

[3]  Management and/or administrative fees as noted here are defined in a separate agreement entered between the parties concurrent with this agreement.

[4]  Tilton to provide a good faith estimate on company by company basis for each of the Group A Portfolio Companies on an aggregate basis, in each case reflecting the aggregate amount she expects will be covered by this paragraph 17.

shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

20. Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution. Notwithstanding the foregoing, the Group A Portfolio Companies and the Group B Portfolio Companies can distribute payments as designated by the Designated Tax Director for the payment of their state and federal income taxes.

21. The Group A Portfolio Companies shall share with employees of MBIA (who sign NDAs as described in Paragraph 15 herein) financial statements and backup reasonably requested in writing by MBIA. Any information provided to MBIA shall only be shared in the following way: someone employed by MBIA can view the documents in the New York offices of Gibson Dunn but may not take copies or pictures of any documents or share any information in those documents, except with the CRO. In the event of any dispute among the parties with respect to the reasonableness of that request, such dispute shall be finally decided by the Mediator.

22. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

23. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

24. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties

01:23191627.1

involved in the dispute, and heard at the Mediator's earliest availability. Any application shall be in writing and served by email on the other parties.

25. Upon the expiration of the 15 Month Window, the Independent Director/CRO may take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise, including, but not limited to, seeking relief from the Bankruptcy Court to lift the automatic stay, taking action to remove Tilton as a director or manager of the Group A Portfolio Companies or the Group B Portfolio Companies, or dismissing or converting the cases to chapter 7 cases. Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.

26. The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release). If the parties cannot jointly agree, then the Mediator shall resolve any disputes. The parties shall also agree to standard non-disparagement terms.

27. The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

28. The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement. Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

29. For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

30. The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties. The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.

[INSERT SIGNATURE BLOCKS]

01:23191627.1

EXHIBIT A

Case 18-10512-CSS Doc 1260-1 Filed 05/24/20 Page 54 of 105

**ZOHAR I**

| | | |
|---|---|---|
| Amounts paid on Nov. 20, 2015 under the Policy | 148,951,585 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 8,249,532 | Insurance Agreement § 4.03 |
| SUBTOTAL | 157,201,117 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 7,718,876 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 7,531,990 | |
| Financial, investment and non-legal advisors | 186,886 | |
| **TOTAL ZOHAR I CLAIM** | **164,919,993*** | |

**ZOHAR II**

| | | |
|---|---|---|
| 1/20/2017 Policy Payment | 770,109,326 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 27,080,207 | Insurance Agreement § 4.03 |
| SUBTOTAL | 797,189,533 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 14,851,685 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 10,641,048 | |
| Financial, investment and non-legal advisors | 4,210,637 | |
| **TOTAL ZOHAR II CLAIM** | **812,041,218*** | |

| | |
|---|---|
| **ZOHAR PAID IN FULL AMOUNT** | **$976,961,211** |

*Assumptions:
All amounts are "as of" April 18, 2018 and will change pending Full Payment Date, including to reflect interest accrued and other Credit Enhancement Liabilities which MBIA has not yet paid
Portfolio Company Zohar I loan interest payments will continue to be paid directly to MBIA
Zohar II claim amount does not reflect Portfolio Company loan interest payments which MBIA is entitled to receive, but have not yet been distributed to MBIA.

MBIA is not seeking reimbursement for costs, expenses or interest payments made in connection with MZ Funding loan.

# EXHIBIT A

## [ZOHAR III CLAIMS]

**Disclaimer**: The Zohar III Claims as forth in this Exhibit A have not been verified by the Collateral Manager since January 2016 as required by the Indentures and Management Agreement, and therefore, U.S. Bank makes no representation as to accuracy of the Zohar III Claims as set forth below, which claims and interest accruals may be modified or otherwise revised or verified when the new Collateral Manager is designated in accordance with the Mediation Term Sheet. Once the Collateral Manager is appointed, that person or entity, after consultation with U.S. Bank, will be responsible for updating the amounts herein to reflect unpaid principal, accrued and unpaid interest, and other fees, expenses, and other amounts allowable under the Indentures. Notwithstanding anything to the contrary in this Exhibit A or in the Mediation Term Sheet, nothing shall modify, alter, or otherwise change the Priority of Payments set forth in the Indentures, and U.S. Bank's rights, remedies, and objections to any such modification, alteration, or other change thereto are fully reserved. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Mediation Term Sheet to which this Exhibit A is attached or in the Indentures.

The following does not include interest accruing after 5/18/18. The following schedule excludes certain categories and amounts that must be paid prior to principal and interest owing to the Holders of the notes, including, without limitation, certain fees, expenses, reserves, and other amounts, which are set forth in the Priority of Payments of each Indenture (that have accrued or may accrue in the future):

| Issue Name | Issue Date | Maturity Date | Issue Amount | Original Par Amount | Current Balance | Prepetition Accrued Interest** | Addt'l Accrued Interest Thru 5/18/18*** | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| Class A-1R | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 135,767,116.30 | $ 686,522.34 | $ 586,182.09 | $ 137,039,820.73 |
| Class A-1T | 4/11/2007 | 4/15/2019 | $ 150,000,000.00 | $ 150,000,000.00 | $ 101,825,337.23 | $ 509,743.92 | $ 436,203.28 | $ 102,771,284.43 |
| Class A-1D | 4/11/2007 | 4/15/2019 | $ 350,000,000.00 | $ 350,000,000.00 | $ 237,592,453.54 | $ 1,189,002.47 | $ 1,017,807.66 | $ 239,799,663.67 |
| Class A-2 | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 200,000,000.00 | $ 1,087,156.78 | $ 914,108.70 | $ 202,001,265.48 |
| Class A-3 | 4/11/2007 | 4/15/2019 | $ 116,000,000.00 | $ 116,000,000.00 | $ 116,000,000.00 | $ 689,195.38 | $ 569,346.03 | $ 117,258,541.41 |

**This is the accrued interest that wasn't paid because of the $4,637,241.39 deposit of interest outside the collection account before the petition date

***The "Addt'l Accrued Interest Thru 5/18/18" column capitalizes the "Prepetition Accrued Interest" into the Current Balance and then Accrues Interest Thereon through 5/18/18

EXHIBIT B

**Exhibit B: Patriarch Stakeholders**

• Ark Entities (including Ark Angels, LLC; Ark Angels II, LLC; Ark Angels III, LLC; Ark Angels VIII, LLC; Ark Investment Partners II, LP; Ark II CLO 2001-1, Ltd.)
• LD Investments, LLC
• Lynn Tilton
• Octaluna LLC Entities (including Octaluna LLC; Octaluna II, LLC; Octaluna III, LLC)
• Patriarch Partners Entities (including Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners, XIV, LLC; Patriarch Partners XV, LLC)
• Patriarch Partners Management Group, LLC (PPMG)
• Patriarch Partners Agency Services, LLC (PPAS)
• Zohar Holdings, LLC

EXHIBIT C

**Group A Portfolio Companies**

**[REDACTED]**

01:23191627.1

EXHIBIT D

**Group B Portfolio Companies**

**[REDACTED]**

EXHIBIT E

[To be provided]

EXHIBIT F

## The Zohar Funds, Lynn Tilton, MBIA, and the Zohar III Noteholders
## Announce Resolution to
## Stay Litigation, Refinance and Monetize Zohar Assets

NEW YORK – April [XX], 2018 –Zohar CDO 2003-1, Zohar CDO 2003-1 Corp., Zohar II 2005-1, Limited, Zohar II 2005-1 Corp., Zohar III, Limited, and Zohar III, Corp. (collectively, the "Zohar Funds"), Lynn Tilton, MBIA Insurance Corporation, a wholly owned subsidiary of MBIA Inc. (NYSE: MBI), and the Zohar III Controlling Class of Noteholders jointly announce today that the parties have mutually resolved the motions pending in federal Bankruptcy Court in the District of Delaware relating to the Zohar Funds, and have agreed to a deal that will include a stay of all pending litigation between the parties. This agreement is intended to facilitate the refinancing and monetization of assets of the Zohar Funds to the benefit of all stakeholders, and the parties have agreed to work in a mutually cooperative process in support of such refinancing and monetization.

As part of the agreement, an Independent Director will be appointed to govern the Zohar Funds, along with a Chief Restructuring Officer, who together with Ms. Tilton as director and manager of each Portfolio Company, will jointly implement the refinancing and monetization process. During the process, Ms. Tilton will remain in her current roles at the Portfolio Companies, all litigation between the parties will be stayed for a minimum of 15 months, and the bankruptcy cases will proceed without the appointment of a Trustee.

Ms. Tilton stated, "This agreement is a meaningful and important step towards allowing the Zohar Funds to monetize and refinance their assets in order to pay off all creditor claims in full. It is in the best interest of all stakeholders that we lay down our swords and stop the years of damaging litigation in order to maximize value for all of the Funds' stakeholders."

Anthony McKiernan, Chairman of MBIA Insurance Corporation, stated that "MBIA is pleased that the parties have been able to come to a consensual agreement that will put in place a process to enable MBIA to recover on the significant amounts it has paid its policyholders."

Marc Kirschner of Goldin Associates, Chief Restructuring Officer of the Zohar Funds, added, "The resolution of the hotly contested litigation in the bankruptcy cases is in the best interests of the Zohar Funds and their stakeholders as it will pave the way for the Zohar Funds to maximize the value of their assets for the benefit of all. The mediated result was the culmination of significant negotiations and the Zohar Funds are deeply appreciative of the efforts of the mediator, Judge Kevin Gross, for facilitating a settlement of the pending matters, which was no simple task."

Today's agreement will have no immediate effect on the operations of the Portfolio

01:23191627.1

Companies to whom the Zohar Funds have made senior secured loans.  The Portfolio Companies will continue to operate their businesses in the ordinary course as they are not parties to these bankruptcy cases.

**MEDIA CONTACTS:**

FOR LYNN TILTON
**Brunswick Group**
Alex Yankus
212-333-3810
ayankus@brunswickgroup.com


**MBIA**
Greg Diamond, 914-765-3190
Investor and Media Relations
greg.diamond@mbia.com

01:23191627.1

**<u>EXHIBIT C</u>**

**New York Complaints**

- June 19, 2020:

  - *Octaluna LLC v. RM Acquisition, LLC* (alleging approximately $1 million owed for tax distributions)

- June 23, 2020:

  - *Octaluna III, LLC v. Libertas Copper, LLC* (alleging approximately $680,000 owed for tax distributions)

- July 6, 2020:

  - *Octaluna LLC v. RM Acqustion, LLC* (alleging nearly $2 million owed for tax distributions (asserting a different number than in the June 19th Complaint), PPMG fees, and PPAS fees)

  - *Patriarch Partners Management Grp., LLC v. Glenoit Universal, Ltd.* (alleging $80,000 owed in PPMG fees and over $2 million for indemnification of Ms. Tilton)

  - *Patriarch Partners Management Grp., LLC v. Heritage Aviation, Ltd.* (alleging $50,000 owed in PPMG fees)

  - *Patriarch Partners Management Grp., LLC v. Libertas Copper, LLC* (alleging approximately $745,000 owed in PPMG fees)

  - *Patriarch Partners Management Grp., LLC v. Intrepid U.S.A., Inc.* (alleging almost $3.4 million owed in PPMG fees as well as $25,000 owed to PPAS)

  - *Patriarch Partners Management Grp., LLC v. FSAR Holdings, Inc.* (alleging almost $372,000 owed in PPMG fees and over $2 million for indemnification of Ms. Tilton)

  - *Patriarch Partners Management Grp., LLC v. Snelling Holdings, LLC* (alleging over $4.3 million owed in PPMG and PPAS fees)

  - *Patriarch Partners Management Grp., LLC v. Vulcan Eng'g Co.* (alleging almost $572,000 owed in PPMG fees)

- July 14, 2020:

  - *Patriarch Partners Management Grp., LLC v. 180s, Inc.* (alleging almost $2.7 million owed in PPMG fees)

  - *Patriarch Partners Management Grp., LLC v. Croscill Home LLC* (alleging approximately $314,000 owed in PPMG fees)

  - *Patriarch Partners Management Grp., LLC v. Gorham Paper & Tissue, LLC* (alleging over $2.5 million owed in PPMG and PPAS fees)

  - *Patriarch Partners Management Grp., LLC v. IMG Holdings, Inc.* (alleging approximately $3.5 million owed in PPMG and PPAS fees)

  - *Patriarch Partners Management Grp., LLC v. Natura Water, LLC* (alleging over $1.4 million owed in PPMG fees)

  - *Patriarch Partners Management Grp., LLC v. Scan-Optics, LLC* (alleging over $3.6 million owed in PPMG fees)

  - *Patriarch Partners Management Grp., LLC v. UI Acquisition Holding Co.* (alleging almost $372,000 owed in PPMG fees)

Also, in every complaint where PPMG is a plaintiff, PPMG asserts that it is entitled to indemnification by the defendant-Portfolio Company.

## EXHIBIT D

**June 23rd Action Against Portfolio Company** ▌

Case 18-10512-KBO   Doc 1829-1   Filed 07/24/20   Page 65 of 105

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OCTALUNA III, LLC, and ARK II CLO 2001-1,
LTD.,

                        Plaintiffs,

-against-

LIBERTAS COPPER, LLC,

                        Defendant.

Index No. _____

**SUMMONS**

**TO THE ABOVE NAMED DEFENDANT**:

**YOU ARE HEREBY SUMMONED** and required to appear in this action and to answer the

accompanying Notice of Motion, served in lieu of a complaint, by serving a copy of your

answering papers on the undersigned attorneys for Plaintiffs Octaluna III, LLC and Ark II CLO

2001-1, Ltd., not later than ten (10) days prior to July 24, 2020, the date for which such motion is

noticed. Upon your failure to answer, a default judgment will be taken against you for the relief

demanded in the Notice of Motion, including damages, contractual and statutory interest,

reasonable attorneys' fees and the costs and disbursements of this action. The nature of this

action is default of promissory notes/breach of contract. Plaintiffs designate New York County as

the place of venue under CPLR § 503(a) and pursuant to the Promissory Notes underlying this

action.

FILED: NEW YORK COUNTY CLERK 06/23/2020 02:18 PM
NYSCEF DOC. NO. 1
Case 18-10512-KBO    Doc 1829-1    Filed 07/24/20    Page 66 of 105

INDEX NO. 652656/2020
RECEIVED NYSCEF: 06/23/2020

Dated: New York, New York
June 23, 2020

SHER TREMONTE LLP


By: /s/ Theresa Trzaskoma
    Theresa Trzaskoma
    Kimo S. Peluso
    Jennifer X. Luo
90 Broad Street, 23rd Floor
New York, New York 10004
Tel:  (212) 202-2600
ttrzaskoma@shertremonte.com
kpeluso@shertremonte.com
jluo@shertremonte.com


*Attorneys for Plaintiffs Octaluna III, LLC and Ark
II CLO 2001-1, Ltd.*


TO:    Libertas Copper, LLC
       100 Washington Street
       Leetsdale, PA 15056

2

SUPREME COURT OF THE STATE OF
NEW YORK COUNTY OF NEW YORK

OCTALUNA III, LLC, and ARK II CLO 2001-1,
LTD.,

                Plaintiffs,

-against-

LIBERTAS COPPER, LLC,

                Defendant.

Index No. _____

**NOTICE OF MOTION FOR
SUMMARY JUDGMENT
IN LIEU OF COMPLAINT**

       PLEASE TAKE NOTICE THAT, upon the annexed Affidavit of Lynn Tilton, dated June 22, 2020, and the exhibits attached thereto, and the accompanying Memorandum of Law, Plaintiffs Octaluna III, LLC and Ark II CLO 2001-1, Ltd. (together, "Plaintiffs"), through their attorneys Sher Tremonte LLP, will move this Court in the Motion Submission Part Courtroom, Room 130, at the courthouse located at 60 Centre Street, New York, New York 10007, on the 24th day of July, 2020, at 9:30 a.m., or as soon thereafter as counsel can be heard, for an order, under Civil Practice Law & Rules ("CPLR") § 3213, granting summary judgment in favor of Plaintiffs and against Defendant Libertas Copper, LLC ("Libertas"), and granting to Plaintiffs such other and further relief as is just and proper.

       This is an action based upon instruments for the payment of money only, specifically, two Promissory Notes issued by Libertas in favor of Plaintiffs.

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR § 3213, answering papers,

if any, shall be served upon the undersigned counsel for Plaintiffs so as to be received no later

than ten (10) days before the return date of this motion.

Dated: New York, New York
      June 23, 2020

**SHER TREMONTE LLP**

By: /s/ Theresa Trzaskoma
    Theresa Trzaskoma
    Kimo S. Peluso
    Jennifer X. Luo
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: (212) 202-2600
ttrzaskoma@shertremonte.com
kpeluso@shertremonte.com
jluo@shertremonte.com

*Attorneys for Plaintiffs Octaluna III, LLC and Ark*
*II CLO 2001-1, Ltd.*

TO:    Libertas Copper, LLC
       100 Washington Street
       Leetsdale, PA 15056

2

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OCTALUNA III, LLC, and ARK II CLO 2001-1, LTD.,

                    Plaintiffs,

-against-

LIBERTAS COPPER, LLC,

                    Defendants.

Index No. _____

**AFFIDAVIT OF LYNN TILTON IN SUPPORT OF OCTALUNA III, LLC'S AND ARK II CLO 2001-1, LTD.'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT**

COUNTY OF NEW YORK  )
                    ) ss.
STATE OF NEW YORK   )

LYNN TILTON, being duly sworn, deposes and says:

1.      I am the Manager and ultimate owner of Plaintiff Octaluna III, LLC ("Octaluna III") and the sole Director and ultimate owner of Plaintiff Ark II CLO 2001-1, Ltd. ("Ark II," and together with Octaluna III, "Plaintiffs").

2.      I submit this Affidavit in support of Plaintiffs' Motion for Summary Judgment in Lieu of Complaint.

3.      I have personal knowledge of the issues discussed herein.

**Defendant Enters into the Promissory Notes**

4.      Libertas Copper, LLC ("Libertas") is a Delaware limited liability company with its principal place of business in Leetsdale, Pennsylvania. Libertas does business as "Hussey Copper" and is a manufacturer of coppers and copper-nickel alloys. John Harrington is the Chief Executive Officer of Libertas. Libertas is not registered with New York's Division of Corporations.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

5.      Octaluna III is a Delaware limited liability company with its principal place of business in New York County, New York. Ark II is a Cayman Islands limited company with its principal place of business in New York County, New York.

6.      Libertas failed to make certain mandatory tax distributions to Octaluna III and Ark II for the tax year 2018.

7.      In June 2019, Libertas executed a Promissory Note in favor of Octaluna III in connection with outstanding and unpaid mandatory tax distribution obligations in the amount of $530,269. A true and correct copy of the Octaluna III Promissory Note is attached hereto as **Exhibit A**.

8.      In June 2019, Libertas executed a Promissory Note in favor of Ark II in connection with outstanding and unpaid mandatory tax distribution obligations in the amount of $110,133. A true and correct copy of the Ark II Promissory Note is attached hereto as **Exhibit B**.

9.      Under the terms of both Promissory Notes, Libertas was obligated to repay the entire amount of principal due on both Notes by the Due Date, September 1, 2019.

**Defendant Defaults on Its Payment Obligations Under the Notes in Suit**

10.     Despite demands for payment, Libertas has failed to pay the principal sums under the Promissory Notes. Specifically, Libertas failed to pay the principal sum of $530,269 due on the Octaluna III Promissory Note and failed to pay the principal sum of $110,133 due on the Ark II Promissory Note.

11.     Libertas has also failed to pay interest due on the Promissory Notes accruing at "the prime rate (as published in the print version of the Wall Street Journal from time to time) plus three percent (3%) per annum, accruing daily" for principal amounts remaining unpaid by the Due Date, September 1, 2019. Ex. A at 1, Ex. B. at 1. As of June 17, 2020, the principal due

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

under the Octaluna III Promissory Note has accrued $31,249 in interest, and the principal due

under the Ark II Promissory Note has accrued $6,490 in interest.

12.    Currently, the total principal sum that remains outstanding under the Notes

between Libertas and Plaintiffs is $640,402. The accrued and outstanding interest due under the

Notes as of June 17, 2020 is $37,739.

**Libertas Does Not Have Counterclaims Against Plaintiffs**

13.    Libertas has not asserted, nor upon information and belief does it have, any

counterclaims against either Octaluna III or Ark II.

Dated:  New York, New York
        June 22, 2020

                                                Lynn Tilton

Subscribed and sworn to before me this
22nd day of June, 2020

Notary Public

CARLOS E MERCADO
Notary Public, State of New York
No. 01ME6154614
Qualified in Kings County
Commission Expires October 23, 20 22

3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

# Exhibit A

**PROMISSORY NOTE**

Holder: OCTALUNA III, LLC                              New York, New York
Principal Amount: $530,269                                     June 28, 2019

FOR VALUE RECEIVED, the undersigned, LIBERTAS COPPER, LLC, a Delaware limited liability company (the "*Obligor*"), hereby promises to pay to the order of the Holder set forth above the Principal Amount set forth above in full at the earliest possible date but in any event not later than September 1, 2019 (the "**Due Date**"). The Obligor acknowledges and agrees that it is obligated to pay Holder the Principal Amount as part of the tax distribution amount due to Holder based on IRS Form K1 submitted for the tax periods January 1, 2018 to December 31, 2018 (the "*Tax Distribution Obligation*"). No amount owing hereunder shall bear interest except when any amount payable hereunder shall not be paid by the Due Date hereunder, in which case the amount past due hereunder shall bear interest at the prime rate (as published in the print version of the Wall Street Journal from time to time) plus three percent (3%) *per annum*, accruing daily, calculated on the basis of a 360-days year for actual days elapsed, and due and payable daily in arrears. Each determination by the Holder of an interest rate hereunder shall be conclusive and binding absent manifest error. Notwithstanding the foregoing, the interest rate applicable hereunder shall not exceed the maximum rate permitted by applicable law.

From and after the date all amounts owing under this Note are repaid in full, all rights of the Holder shall cease with respect hereto (other than any indemnification rights set forth below). The Obligor agrees that, so long as any amounts shall be due hereunder, it shall comply with the covenants set forth herein. The Obligor agrees to pay on demand all stamp and other taxes (other than withholding taxes and taxes imposed on, or measured by, net income or overall gross receipts and capital and franchise taxes) payable in connection with the execution and delivery of this Note and all reasonable costs and expenses in connection with the preparation, execution, delivery, administration, modification, amendment, refinancing, restructuring or enforcement of or in commencing, defending or intervening in any litigation or in filing any pleading in legal proceedings relating to, this Note or the transactions contemplated hereby (including, without limitation, reasonable expenses of counsel).

The Obligor hereby represents and warrants that (a) it is duly organized as a limited liability company, validly existing and in good standing under the laws of the State of Delaware, is duly qualified as a foreign corporation and in good standing under the law of any jurisdiction where it is conducting its business and has the corporate power and authority to transact the business in which it is now engaged or proposes to be engaged, (b) the execution, delivery and performance by it of its obligations hereunder have been duly authorized by all necessary actions and will not contravene its organizational documents, violate any legal requirement, require any filing with (or the approval of) any governmental authority, require the consent of any person (other than those lawfully obtained prior to the date hereof) and will not result in a breach or constitute a default under any material contractual obligation to which it is a party or by which its properties are bound, (c) this Note has been duly executed and delivered and constitutes the legal, valid and binding obligation of the Obligor, enforceable against it in accordance with its terms except as such enforcement may be limited by general principles of equity and applicable bankruptcy, insolvency and similar legal requirements affecting creditors' rights and remedies generally.

If (i) the Obligor shall fail to make the payment by the Due Date, (ii) the Obligor shall fail to comply with any covenant set forth above (or any other provision hereof or thereof)

Case 18-10512-KBO    Doc 1829-1    Filed 07/24/20    Page 74 of 105

or any of the representations and warranties set forth above shall be untrue when made (unless, in each case, such failure is cured within 30 days of the occurrence thereof), or (iii) the Obligor shall, or shall take any corporate action to obtain authorization to, (1) make an assignment for the benefit of its creditors, (2) generally not pay its debts as they become due or (3) petition, apply, consent or be party to any voluntary or involuntary proceeding under (or any decree or order for relief in respect of the Obligor, including, without limitation, a winding up, dissolution or split-up of the Obligor, shall be entered under) any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt, dissolution, liquidation or similar legal requirements and, in the case of any such proceeding against (but not instituted by) the Obligor, such proceeding shall remain undismissed or unstayed for 45 days or any of the actions sought therein shall occur, or (iv) any interest in all or substantial part of the assets of the Obligor are condemned, seized or appropriated by any governmental authority, (v) any provision of this Note shall cease to be valid, binding or enforceable, (vi) one or more final, non-appealable material judgments or orders shall be entered against the Obligor in excess of $100,000.00, or (vii) any event or condition shall exist if the effect of such event or condition is to permit any indebtedness of the Obligor (other than the Tax Distribution Obligation) in excess of $100,000.00 to be accelerated and become due prior to the maturity date thereof (each an "*Event of Default*"), *then*, immediately upon notice from the Holder (except in the case of *clause (iii)* above, in which case no such notice shall be required hereunder) the entire Principal Amount, together with all interest accrued to such date and any other amounts owing hereunder shall immediately become due and payable. Each remedy of the Holder shall be cumulative and not exclusive, and no failure to exercise, and no delay in exercise, or single or partial exercise of, any right or remedy of the Holder, shall preclude any further or other exercise of any right or remedy thereof.

The Obligor agrees to indemnify the Holder from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits and reasonable, documented, out-of-pocket cost, expenses and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Holder or its affiliates or any of their respective stockholders, directors, officers, agents, attorneys, trustees and employees, or any of their successors and assigns (collectively, the "*Indemnitees*") in any way relating to or arising out of this Note (other than the preparation thereof) or any related transaction (whether actual or proposed), or any action taken or omitted by the Holder hereunder; provided, that the Obligor shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of such Indemnitee as determined in a final, non-appealable judgment by a court of competent jurisdiction. This paragraph shall survive the repayment of this Note.

Demand, diligence, presentment, protest, notice of dishonor and notice of non-payment are hereby waived by the Obligor. This Note (i) shall be deemed to have been issued under, and shall be governed by and construed in accordance with, the laws of the State of New York, (ii) has been executed in the English language, and the English text shall prevail over any translation, (iii) is for the exclusive benefit of the parties hereto and their successors (and, if permitted, assigns) and constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof, (iv) may be modified, waived or assigned only by a writing signed by the Holder and the Obligor (and any attempt to assign this Note without such writing shall be null and void), (v) may be executed in counterparts, which may be transmitted by fax or e-mail and which, together, shall constitute one and the same instrument and (vi) is a negotiated document, entered into freely among the parties upon advice of their own counsel, and it should not be construed against any of its drafters. The fact that any term or provision of this Note is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of the remaining

terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person. Each party hereto hereby irrevocably submits to the non-exclusive jurisdiction of the courts located in the City of New York, Borough of Manhattan (and the appropriate appellate courts) and hereby irrevocably and unconditionally (x) waives (1) any objection to the laying of venue in any such court for any claim, action or proceeding directly or indirectly with respect to, arising out of or relating to this Note or the actions of the parties hereto or any of their affiliates or representatives in the negotiation, performance or enforcement of this letter agreement or the Tax Distribution Obligation and **(2) any right to trial by jury with respect to any such claim, action or proceeding** and (y) consents to service of process in any such action or proceeding by, in addition to any other means otherwise permitted by law, the mailing of copies of such process at its address specified herein.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Obligor has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

LIBERTAS COPPER, LLC

By: _____

Name: John Harrington
Title: Chief Executive Officer

Address for Notices:

100 Washington Street
Leetsdale, PA 15056

ACCEPTED AND AGREED
AS OF THE DATE FIRST ABOVE WRITTEN:

OCTALUNA III, LLC
By: Patriarch Partners XV, LLC,
its Managing Member

By: _____

Name: Lynn Tilton
Title: Manager

Address for Notices:

One Liberty Plaza, 35th Floor
New York, NY 10006

SIGNATURE PAGE TO PROMISSORY NOTE OF LIBERTAS COPPER, LLC TO OCTALUNA III ( $530,269)

# Exhibit B

## PROMISSORY NOTE

Holder: ARKII CLO 2001-1, LTD.                          New York, New York
Principal Amount: $110,133                                    June 28, 2019

FOR VALUE RECEIVED, the undersigned, LIBERTAS COPPER, LLC, a Delaware limited liability company (the "*Obligor*"), hereby promises to pay to the order of the Holder set forth above (the "*Holder*") the Principal Amount set forth above in full at the earliest possible date but in any event not later than September 1, 2019 (the "**Due Date**"). The Obligor acknowledges and agrees that it is obligated to pay Holder the Principal Amount as part of the tax distribution amount due to Holder based on IRS Form K1 submitted for the tax periods January 1, 2018 to December 31, 2018 (the "*Tax Distribution Obligation*"). No amount owing hereunder shall bear interest except when any amount payable hereunder shall not be paid by the Due Date hereunder, in which case the amount past due hereunder shall bear interest at the prime rate (as published in the print version of the Wall Street Journal from time to time) plus three percent (3%) *per annum*, accruing daily, calculated on the basis of a 360-days year for actual days elapsed, and due and payable daily in arrears. Each determination by the Holder of an interest rate hereunder shall be conclusive and binding absent manifest error. Notwithstanding the foregoing, the interest rate applicable hereunder shall not exceed the maximum rate permitted by applicable law.

From and after the date all amounts owing under this Note are repaid in full, all rights of the Holder shall cease with respect hereto (other than any indemnification rights set forth below). The Obligor agrees that, so long as any amounts shall be due hereunder, it shall comply with the covenants set forth herein. The Obligor agrees to pay on demand all stamp and other taxes (other than withholding taxes and taxes imposed on, or measured by, net income or overall gross receipts and capital and franchise taxes) payable in connection with the execution and delivery of this Note and all reasonable costs and expenses in connection with the preparation, execution, delivery, administration, modification, amendment, refinancing, restructuring or enforcement of or in commencing, defending or intervening in any litigation or in filing any pleading in legal proceedings relating to, this Note or the transactions contemplated hereby (including, without limitation, reasonable expenses of counsel).

The Obligor hereby represents and warrants that (a) it is duly organized as a limited liability company, validly existing and in good standing under the laws of the State of Delaware, is duly qualified as a foreign corporation and in good standing under the law of any jurisdiction where it is conducting its business and has the corporate power and authority to transact the business in which it is now engaged or proposes to be engaged, (b) the execution, delivery and performance by it of its obligations hereunder have been duly authorized by all necessary actions and will not contravene its organizational documents, violate any legal requirement, require any filing with (or the approval of) any governmental authority, require the consent of any person (other than those lawfully obtained prior to the date hereof) and will not result in a breach or constitute a default under any material contractual obligation to which it is a party or by which its properties are bound, (c) this Note has been duly executed and delivered and constitutes the legal, valid and binding obligation of the Obligor, enforceable against it in accordance with its terms except as such enforcement may be limited by general principles of equity and applicable bankruptcy, insolvency and similar legal requirements affecting creditors' rights and remedies generally.

If (i) the Obligor shall fail to make the payment by the Due Date, (ii) the Obligor shall fail to comply with any covenant set forth above (or any other provision hereof or thereof)

Promissory Note of Libertas Copper, LLC

or any of the representations and warranties set forth above shall be untrue when made (unless, in each case, such failure is cured within 30 days of the occurrence thereof), or (iii) the Obligor shall, or shall take any corporate action to obtain authorization to, (1) make an assignment for the benefit of its creditors, (2) generally not pay its debts as they become due or (3) petition, apply, consent or be party to any voluntary or involuntary proceeding under (or any decree or order for relief in respect of the Obligor, including, without limitation, a winding up, dissolution or split-up of the Obligor, shall be entered under) any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt, dissolution, liquidation or similar legal requirements and, in the case of any such proceeding against (but not instituted by) the Obligor, such proceeding shall remain undismissed or unstayed for 45 days or any of the actions sought therein shall occur, or (iv) any interest in all or substantial part of the assets of the Obligor are condemned, seized or appropriated by any governmental authority, (v) any provision of this Note shall cease to be valid, binding or enforceable, (vi) one or more final, non-appealable material judgments or orders shall be entered against the Obligor in excess of $100,000.00, or (vii) any event or condition shall exist if the effect of such event or condition is to permit any indebtedness of the Obligor (other than the Tax Distribution Obligation) in excess of $100,000.00 to be accelerated and become due prior to the maturity date thereof (each an "*Event of Default*"), *then*, immediately upon notice from the Holder (except in the case of *clause (iii)* above, in which case no such notice shall be required hereunder) the entire Principal Amount, together with all interest accrued to such date and any other amounts owing hereunder shall immediately become due and payable. Each remedy of the Holder shall be cumulative and not exclusive, and no failure to exercise, and no delay in exercise, or single or partial exercise of, any right or remedy of the Holder, shall preclude any further or other exercise of any right or remedy thereof.

The Obligor agrees to indemnify the Holder from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits and reasonable, documented, out-of-pocket cost, expenses and disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Holder or its affiliates or any of their respective stockholders, directors, officers, agents, attorneys, trustees and employees, or any of their successors and assigns (collectively, the "*Indemnitees*") in any way relating to or arising out of this Note (other than the preparation thereof) or any related transaction (whether actual or proposed), or any action taken or omitted by the Holder hereunder; provided, that the Obligor shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of such Indemnitee as determined in a final, non-appealable judgment by a court of competent jurisdiction. This paragraph shall survive the repayment of this Note.

Demand, diligence, presentment, protest, notice of dishonor and notice of non-payment are hereby waived by the Obligor. This Note (i) shall be deemed to have been issued under, and shall be governed by and construed in accordance with, the laws of the State of New York, (ii) has been executed in the English language, and the English text shall prevail over any translation, (iii) is for the exclusive benefit of the parties hereto and their successors (and, if permitted, assigns) and constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof, (iv) may be modified, waived or assigned only by a writing signed by the Holder and the Obligor (and any attempt to assign this Note without such writing shall be null and void), (v) may be executed in counterparts, which may be transmitted by fax or e-mail and which, together, shall constitute one and the same instrument and (vi) is a negotiated document, entered into freely among the parties upon advice of their own counsel, and it should not be construed against any of its drafters. The fact that any term or provision of this Note is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of the remaining

PROMISSORY NOTE OF LIBERTAS COPPER, LLC

terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person. Each party hereto hereby irrevocably submits to the non-exclusive jurisdiction of the courts located in the City of New York, Borough of Manhattan (and the appropriate appellate courts) and hereby irrevocably and unconditionally (x) waives (1) any objection to the laying of venue in any such court for any claim, action or proceeding directly or indirectly with respect to, arising out of or relating to this Note or the actions of the parties hereto or any of their affiliates or representatives in the negotiation, performance or enforcement of this letter agreement or the Tax Distribution Obligation and **(2) any right to trial by jury with respect to any such claim, action or proceeding** and (y) consents to service of process in any such action or proceeding by, in addition to any other means otherwise permitted by law, the mailing of copies of such process at its address specified herein.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Obligor has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

LIBERTAS COPPER, LLC

By: _____
    Name: John Harrington
    Title: Chief Executive Officer

Address for Notices:

100 Washington Street
Leetsdale, PA 15056

ACCEPTED AND AGREED
AS OF THE DATE FIRST ABOVE WRITTEN:

OCTALUNA III, LLC
By: Patriarch Partners XV, LLC,
its Managing Member

By: _____
    Name: Lynn Tilton
    Title: Manager

Address for Notices:

One Liberty Plaza, 35th Floor
New York, NY 10006

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

OCTALUNA III, LLC, and ARK II CLO 2001-1,
LTD.,

                          Plaintiffs,

-against-

LIBERTAS COPPER, LLC,

                          Defendant.

Index No. _____

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

Plaintiffs Octaluna III, LLC ("Octaluna III") and Ark II CLO 2001-1, Ltd. ("Ark II")

respectfully submit this memorandum of law in in support of their motion under Rule 3213 of

Civil Practice Law and Rules ("CPLR") for summary judgment in lieu of complaint against

Defendant Libertas Copper, LLC ("Libertas").

This is a straightforward collection action under CPLR § 3213 seeking enforcement of

clear payment obligations set forth in unambiguous, identical promissory notes that the parties

expressly agreed were executed in connection with certain mandatory tax distribution obligations

Libertas owed to Plaintiffs. Libertas consented to jurisdiction in New York and agreed that

Plaintiffs may use any and all procedures available to them under New York law[1] to enforce the

---

[1]      The Notes provide that they "shall be deemed to have been issued and shall be governed by and construed in accordance with, the laws of the State of New York." Tilton Aff. ¶ 7, Ex. A at 2, ¶ 8, Ex. B at 2. Under the Notes, Libertas also submitted to the "jurisdiction of the courts located in the City of New York, Borough of Manhattan," and consented to service of process by "the mailing of copies of such process at its address specified" in the Notes. *Id.*, Ex. A at 3, Ex. B at 3. This court is therefore an appropriate venue for this action. Accordingly, Plaintiffs are entitled to proceed in New York pursuant to the procedures that govern actions in this forum.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

agreements. *See* Affidavit of Lynn Tilton, dated June 22, 2020 ("Tilton Aff."), ¶ 7, Ex. A at 3–4, ¶ 8, Ex. B at 3–4.

## STATEMENT OF FACTS

Libertas is a Delaware limited liability company with its principal place of business in Leetsdale, Pennsylvania. Tilton Aff. ¶ 4. It does business as "Hussey Copper" and is a manufacturer of coppers and copper-nickel alloys. *Id*. Octaluna III is a Delaware limited liability company with its principal place of business in New York County, New York. *Id.* ¶ 5. Ark II is a Cayman Islands limited company with its principal place of business in New York County, New York. *Id*.

Libertas was obligated to make mandatory tax distributions to Octaluna III and Ark II for the 2018 tax period. Tilton Aff. ¶¶ 7, 8. In connection with these tax distributions, on June 28, 2019, Libertas executed two Promissory Notes ("Notes"), one in favor of Octaluna III and the other in favor of Ark II. Tilton Aff. ¶¶ 7, 8, Ex. A, Ex. B. The Notes reflect tax distribution amounts that Libertas was obligated to pay to Octaluna III and Ark II for tax periods in 2018. *Id.* ¶ 6. The Notes are signed by Libertas's Chief Executive Officer, John Harrington. *Id.* Ex. A at 4, Ex. B at 4. The terms in each note are identical, save for the holder and the principal amounts.

By the Notes, Libertas agreed to pay Octaluna III and Ark II the principal amounts "as part of the tax distribution amount due to Holder based on IRS Form K1 submitted for the tax periods January 1, 2018 to December 31, 2018." Tilton Aff. Ex. A at 1, Ex. B at 1. Specifically, Libertas agreed to pay Octaluna III the sum of $530,269, *id.* ¶ 7, Ex A. at 1, and agreed to pay Ark II the sum of $110,133. *Id.* ¶ 8, Ex. B at 1. According to the terms of the Notes, no interest would accrue on the unpaid principal prior to the "Due Date" of September 1, 2019. *Id.* ¶¶ 7, 8, Ex. A at 1, Ex. B at 1. Any principal amounts remaining unpaid as of September 1, 2019 would

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

begin to accrue interest at "the prime rate (as published in the print version of the Wall Street Journal from time to time) plus three percent (3%) *per annum*, accruing daily." *Id.*

The parties further agreed that in the event of default, including where Libertas "shall fail to make the payment by the Due Date," then "the entire Principal Amount, together with all interest accrued to such date and any other amounts owing hereunder shall immediately become due and payable." Tilton Aff. ¶¶ 7, 8, Ex. A at 1–2, Ex. B at 1–2. Libertas also agreed to pay "all reasonable costs and expenses in connection with the . . . enforcement of or in commencing, defending or intervening in any litigation or in filing any pleading in legal proceedings relating to" the Notes, "including, without limitation, reasonable expenses of counsel." *Id.*, Ex. A at 1, Ex. B at 1.

Libertas failed to pay Octaluna III the entire principal sum of $530,269 as required on the Due Date. Tilton Aff. ¶ 10. Libertas also failed to pay Ark II the principal sum of $110,1133 as required on the Due Date. *Id.* As of June 17, 2020, Libertas has also failed to pay the accrued and outstanding interest of $37,739. *Id.* ¶ 12. Despite repeated demands for payment of both notes, Libertas has defaulted on its clear obligations. *Id.* ¶¶ 10, 11.

## ARGUMENT

Under CPLR § 3213, "[w]hen an action is based upon an instrument for the payment of money only . . . , the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint." CPLR § 3213 applies to a "payment of money only" which is an "unconditional promise by defendant to pay plaintiff a sum certain over a stated period." *Solanki v. Pandya*, 269 A.D.2d 189, 189 (1st Dep't 2000).

A promissory note is an "instrument for the payment of money only within the meaning of CPLR 3213." *Bennell Hanover Assocs. v. Neilson*, 215 A.D.2d 710, 711 (2d Dep't 1995); *see*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

*also Alard, L.L.C. v. Weiss*, 1 A.D.3d 131 (1st Dep't 2003) ("Plaintiff was properly granted summary judgment in lieu of complaint in this action on a promissory note."). A prima facie case on enforcement of a promissory note "can be defeated only by proof demonstrating the existence of a triable issue of fact with respect to a bona fide defense." *Friends Lumber, Inc. v. Cornell Dev. Corp.,* 243 A.D.2d 886, 887 (3rd Dep't 1997). "Mere conclusions, unsubstantiated allegations, or expressions of hope are insufficient" to defeat the motion. *Fair v. Fuchs,* 219 A.D.2d 454, 456 (1st Dep't 1995) (citing *Zuckerman v. City of N.Y.*, 49 N.Y.2d 557 (1980)).

A prima facie case for summary judgment in lieu of complaint is set forth where the plaintiff establishes that the defendant (a) executed a promissory note containing an unconditional promise to pay a sum certain and (b) defaulted under the promissory note. *See Mehta v. Mehta*, 168 A.D.3d 716, 716 (2nd Dep't 2019); *Azteca v. Una Vez Mas San Francisco*, No. 653778/12, LLC, 2013 WL 3477136 (Sup. Ct. 2013) (citing *Seaman-Andwall Corp. v. Wright Mach. Corp.*, 31 A.D.2d 136, 137 (1st Dep't 1968)).

Further, where a promissory note provides that the maker shall pay the attorneys' fees, costs and expenses incurred by the holder in being forced to bring a suit for collection of the amounts due under the note, the holder is entitled to such an award. *See NARA Bank v NYC Visual Group, LLC*, No. 114361/10, 2011 WL 675244 (unpaginated) (Sup Ct. February 17, 2011) (citing *AG Ship Maintenance Corp. v. Lezak*, 69 NY2d 1, 5 (1986)).

In this case, the Notes executed by Libertas represent unconditional promises to pay Plaintiffs sums certain by the Due Date of September 1, 2019, plus interest accruing on portions of the principal remaining unpaid after the Due Date. Although the obligations under the Notes became due on September 1, 2019, Libertas has not satisfied its obligations to Plaintiffs and is plainly in default under both Notes. Libertas has no bona fide defense for its failure to pay.

4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Thus, pursuant to the terms of the Notes, Octaluna III is now entitled to summary judgment for the $530,269 principal amount plus interest, and Ark II is entitled to summary judgment for the $110,133 principal amount plus interest. Octaluna III and Ark II are also entitled to an award for the reasonable attorneys' fees, costs and expenses incurred in asserting their rights under the Notes.

## CONCLUSION

Based on the foregoing, Plaintiffs Octaluna III and Ark II respectfully request that the Court (i) grant their motion for summary judgment in lieu of complaint, (ii) award judgment in favor of Octaluna III against Libertas in the principal amount of $530,269, plus total accrued interest; (iii) award judgment in favor of Ark II against Libertas in the principal amount of $110,133, plus total accrued interest; (iv) award Plaintiffs all attorneys' fees, costs and expenses incurred in connection with enforcing the Notes[2]; and (v) grant such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        June 23, 2020

                        **SHER TREMONTE LLP**

                        By:  ___/s/ Theresa Trzaskoma_____
                             Theresa Trzaskoma
                             Kimo S. Peluso
                             Jennifer X. Luo
                        90 Broad Street, 23rd Floor
                        New York, New York 10004
                        Tel: (212) 202-2600
                        ttrzaskoma@shertremonte.com
                        kpeluso@shertremonte.com
                        jluo@shertremonte.com

                        *Attorneys for Plaintiffs Octaluna III, LLC and Ark II*
                        *CLO 2001-1, Ltd.*

---

[2]      Upon request, Octaluna III and Ark II will provide details regarding the attorneys' fees, costs and expenses they have incurred in enforcing their rights under the Notes.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 18-10512-KBO   Doc 1829-1   Filed 07/24/20   Page 87 of 105

**REQUEST FOR JUDICIAL INTERVENTION**

(rev. 07/29/2019)

SUPREME _____ COURT, COUNTY OF NEW YORK

Index No: _____   Date Index Issued: _____

| **For Court Use Only:** |
| --- |
| IAS Entry Date |
| Judge Assigned |
| RJI Filed Date |

**CAPTION**   Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

Octaluna III, LLC and Ark II CLO 2001-1, Ltd.

Plaintiff(s)/Petitioner(s)

-against-

Libertas Copper, LLC

Defendant(s)/Respondent(s)

**NATURE OF ACTION OR PROCEEDING**   Check only one box and specify where indicated.

**COMMERCIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ◉ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (specify):_____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**REAL PROPERTY**   Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):   ○ Residential   ○ Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- ○ Tax Certiorari
- ○ Tax Foreclosure
- ○ Other Real Property (specify): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see *NOTE* in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (specify): _____

**MATRIMONIAL**
- ○ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI ADDENDUM (UCS-840M).*
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**TORTS**
- ○ Asbestos
- ○ Child Victims Act
- ○ Environmental (specify): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (specify): _____
- ○ Other Negligence (specify): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration) [see *NOTE* in **COMMERCIAL** section]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (specify): _____
- ○ Other Special Proceeding (specify): _____

**STATUS OF ACTION OR PROCEEDING**   Answer YES or NO for every question and enter additional information where indicated.

|  | YES | NO |  |
| --- | --- | --- | --- |
| Has a summons and complaint or summons with notice been filed? | ○ | ◉ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ○ | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**   Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice   Date Issue Joined: _____
- ◉ Notice of Motion   Relief Requested: Summary Judgment in Lieu of Complaint   Return Date: 07/24/2020
- ○ Notice of Petition   Relief Requested: _____   Return Date: _____
- ○ Order to Show Cause   Relief Requested: _____   Return Date: _____
- ○ Other Ex Parte Application   Relief Requested: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

1 of 2

**RELATED CASES**   List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PARTIES**   For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties (List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants (For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email.) | Issue Joined (For each defendant, indicate if issue has been joined.) | Insurance Carriers (For each defendant, indicate insurance carrier, if applicable.) |
|---|---|---|---|---|
| ☐ | Name: Octaluna III, LLC  Role(s): Plaintiff | Theresa Trzaskoma, Sher Tremonte LLP, 90 Broad St, 23rd Fl, New York, NY 10004; (212)202-2600; ttrzaskoma@shertremonte.com | ○ YES  ○ NO | |
| ☐ | Name: Ark II CLO 2001-1, Ltd.  Role(s): Plaintiff | Theresa Trzaskoma, Sher Tremonte LLP, 90 Broad St, 23rd Fl, New York, NY 10004; (212)202-2600; ttrzaskoma@shertremonte.com | ○ YES  ○ NO | |
| ☐ | Name: Octaluna III, LLC  Role(s): Plaintiff | Kimo S. Peluso, Sher Tremonte LLP, 90 Broad St, 23rd Fl, New York, NY 10004; (212)202-2600; kpeluso@shertremonte.com | ○ YES  ○ NO | |
| ☐ | Name: Ark II CLO 2001-1, Ltd.  Role(s): Plaintiff | Kimo S. Peluso, Sher Tremonte LLP, 90 Broad St, 23rd Fl, New York, NY 10004; (212)202-2600; kpeluso@shertremonte.com | ○ YES  ○ NO | |
| ☐ | Name: Octaluna III, LLC  Role(s): Plaintiff | Jennifer X. Luo, Sher Tremonte LLP, 90 Broad St, 23rd Fl, New York, NY 10004; (212)202-2600; jluo@shertremonte.com | ○ YES  ○ NO | |
| ☐ | Name: Ark II CLO 2001-1, Ltd.  Role(s): Plaintiff | Jennifer X. Luo, Sher Tremonte LLP, 90 Broad St, 23rd Fl, New York, NY 10004; (212)202-2600; jluo@shertremonte.com | ○ YES  ○ NO | |
| ☐ | Name: Libertas Copper, LLC  Role(s): Defendant | 100 Washington Street, Leetsdale, PA 15056 | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |
| ☐ | Name:  Role(s): | | ○ YES  ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: 06/23/2020

Signature

Theresa Trzaskoma

2978864

Attorney Registration Number          Print Name

2 of 2

UCS-840C
3/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF **New York**
_____x

Octaluna III, LLC, and Ark II CLO 2001-1, Ltd.

Plaintiff(s)/Petitioner(s)

-against-

Libertas Copper, LLC

Defendant(s)/Respondent(s)
_____x

Index No. _____

RJI No. (if any) _____

## COMMERCIAL DIVISION
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

[X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

[ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

[ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

[ ] Shareholder derivative actions — without consideration of the monetary threshold

[ ] Commercial class actions — without consideration of the monetary threshold

[ ] Business transactions involving or arising out of dealings with commercial banks and other financial institutions

[ ] Internal affairs of business organizations

[ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

[ ] Environmental insurance coverage

[ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

[ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

[ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ 640,402 _____

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Plaintiffs respectfully request that the Court grant their motion for summary judgment in lieu of complaint and award judgment in favor of Plaintiffs based on Defendant's failure to satisfy its obligations on two promissory notes held by Plaintiffs. Plaintiffs seek judgment for the principal sum of $640,402, plus accrued interest, and all attorneys' fees, costs, and expenses they have incurred in enforcing the notes.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: **06/23/2020** _____

_____
**SIGNATURE**

**THERESA TRZASKOMA**
_____
**PRINT OR TYPE NAME**

**<u>EXHIBIT E</u>**

**Complaint Against Portfolio Company** █

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- x

PATRIARCH PARTNERS MANAGEMENT    :
GROUP, LLC, and PATRIARCH PARTNERS    :
AGENCY SERVICES, LLC,    :        Index No. _____

                    Plaintiffs,   :

                            :        **SUMMONS**

        -against-          :

                            :

INTREPID U.S.A., INC.,          :

                    Defendant.  :

-------------------------------------------------------------- X

To the above named defendant:

 Intrepid U.S.A., Inc.

      You are hereby summoned to answer the complaint in this action and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's attorney within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

amended complaint.

      The basis of venue is Plaintiff's residence, which is 1 Liberty Street, New York, New

York 10006, and a forum selection clause, pursuant to CPLR 501 and 503(d).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Dated:          July 6, 2020
                New York, New York


                            ALLEGAERT BERGER & VOGEL LLP


                            By:      /s/ David A. Berger
                                     David A. Berger
                                     John S. Craig
                                     Bianca Lin

                            111 Broadway, 20th Floor
                            New York, New York 10006
                            (212) 571-0550

                            *Attorneys for Plaintiff Patriarch Partners*
                            *Management Group, LLC and Patriarch Partners*
                            *Agency Services, LLC*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

PATRIARCH PARTNERS MANAGEMENT     :
GROUP, LLC, and PATRIARCH PARTNERS     :
AGENCY SERVICES, LLC,     :
    :
                    Plaintiffs,     :     Index No. _____
    :
          -against-     :     **COMPLAINT**
    :
    :
    :
INTREPID U.S.A., INC.,     :
                  Defendant.     :

------------------------------------------------------------x

Plaintiffs Patriarch Partners Management Group, LLC ("PPMG") and Patriarch

Partners Agency Services, LLC ("PPAS", and together with PPMG, "Plaintiffs"), by and through

its undersigned attorneys, Allegaert Berger & Vogel LLP, as and for its Complaint against

Defendant Intrepid U.S.A., Inc. ("Defendant"), states upon knowledge with respect to its own

acts and status, and upon information and belief as to all other matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.        This is a straightforward action arising from Defendant's failure to pay PPMG for

amounts due and owing under a Management Services Agreement, dated as of October 25, 2010,

as amended as of October 2, 2015 (the "MSA"), for management and operational consulting and

other services (and associated expenses) duly provided to Defendant,  and failure to pay PPAS

for amounts due and owing under a First Amended and Restated Credit Agreement, among

PPAS, Defendant and certain of Defendants' subsidiaries, dated as of January 11, 2007 (the

"Credit Agreement"), for administrative agency services.  Plaintiffs have made due demand of

Defendant for the amounts outstanding to no avail, thereby necessitating commencement of this

action for breach of contract and related relief.

1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## THE PARTIES

2.      Plaintiff Patriarch Partners Management Group, LLC is a Delaware limited

liability company with its principal place of business in New York, New York.

3.      Plaintiff Patriarch Partners Agency Services, LLC is a Delaware limited liability

company with its principal place of business in New York, New York.

4.      Defendant Intrepid U.S.A., Inc.  is a corporation organized and existing under the

laws of Minnesota with its principal place of business in Dallas, Texas.

## PERSONAL JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over Defendant because, pursuant to Section

10 of the MSA and Section 10.8 of the Credit Agreement, respectively, Defendant has

irrevocably submitted to the exclusive jurisdiction of the state or federal courts in the City of

New York with respect to any action or proceeding arising out of or relating to each such

agreement, and has waived any defense of an inconvenient forum to the maintenance of any such

action.

6.      Venue is proper in New York County, pursuant to CPLR § 501, because the

parties elected such venue in Section 10 of the MSA and in Section 10.8 of the Credit

Agreement, and pursuant to CPLR § 503(a), in that Plaintiffs' principal places of business are in

New York County, and a substantial part of the events or omissions giving rise to this action

occurred in New York County.

## STATEMENT OF FACTS

### Defendant's Breach of the MSA

7.      Pursuant to the MSA, Defendant engaged PPMG to provide certain management,

operational consulting and other services (the "Services") to it, as specified in Section 1 of the

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

MSA. PPMG duly provided the Services to Defendant for a period of more than nine years,
commencing in or about October 2010.

8.       PPMG regularly submitted invoices for the Services it provided to Defendant, as
well as for reasonable expenses incurred in connection therewith, which Defendant was
obligated to pay under Section 3 of the MSA. Defendant has never rejected, returned, or
objected to any of the invoices, and, following due demand, has failed to pay 33 of them (the
"MSA Invoices"). The total of the amount of the unpaid Invoices is $3,389,221.39.

9.       A summary of the outstanding MSA Invoices is as follows, with amounts that
have been partially paid, is as follows:

| Invoice Date | Invoice Amount | Amount Paid | Balance |
|---|---|---|---|
| 9/1/2017 | $100,000.00 | $82,566.61 | $17,433.39 |
| 10/1/2017 | $100,000.00 | $0.00 | $100,000.00 |
| 11/1/2017 | $100,000.00 | $0.00 | $100,000.00 |
| 12/1/2017 | $100,000.00 | $0.00 | $100,000.00 |
| 1/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 2/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 3/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 4/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 5/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 6/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 7/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 8/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 9/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 10/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 11/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 12/1/2018 | $100,000.00 | $0.00 | $100,000.00 |
| 1/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 2/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 3/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 4/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 5/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 6/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 7/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 8/1/2019 | $100,000.00 | $0.00 | $100,000.00 |

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

| Invoice Date | Invoice Amount | Amount Paid | Balance |
|---|---|---|---|
| 9/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 10/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 11/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 12/1/2019 | $100,000.00 | $0.00 | $100,000.00 |
| 1/1/2020 | $100,000.00 | $0.00 | $100,000.00 |
| 2/1/2020 | $100,000.00 | $0.00 | $100,000.00 |
| 2/28/2020 | $371,788.00 | $0.00 | $371,788.00 |
| 3/1/2020 | $100,000.00 | $0.00 | $100,000.00 |
| | | **Total:** | **$3,389,221.39** |

10.     Defendant is also obligated under the terms of the MSA to indemnify PPMG for all costs, disbursements, and fees (including attorney's fees) in connection with this action because this action has been caused by, relates to, is based upon or otherwise arises out of or in connection with the engagement of PPMG under the MSA or in connection with Services provided thereunder.

11.     PPMG has duly performed all obligations required of it under the MSA.

**Defendant's Breach of the Credit Agreement**

12.     In the Credit Agreement, PPAS was appointed to act as administrative agent thereunder.  Pursuant to Section 2.8 of the Credit Agreement, Defendant agreed to pay PPAS an annual "Agent Fee" of $75,000 for providing administrative services ("Administrative Services") as set forth in the Credit Agreement.

13.     PPAS has duly performed all obligations required of it under the Credit Agreement.

14.     Section 10.7 of the Credit Agreement further provided that "[n]o failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other Credit Documents will operate as a waiver of the right, power or privilege."  Credit Agreement § 10.7.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

15.     The Credit Agreement is governed by New York law, § 10.10, and contains a forum selection provision requiring any action to be brought in either a state or federal court in New York, § 10.8.

16.     PPAS regularly submitted invoices for the Administrative Services it provided to Defendant, as well as for reasonable expenses incurred in connection therewith, which Defendant was obligated to pay under Section 2.8 of the Credit Agreement.  Defendant has never rejected, returned, or objected to any of the invoices.

17.     On January 1, 2019, PPAS sent Defendant an invoice for $25,000 (the "Credit Agreement Invoice") for its agent fees of $75,000 reduced by a credit of $50,000.  Defendant has never rejected, returned, or objected to the Credit Agreement Invoice, and, following due demand, has failed to pay the Credit Agreement Invoice.

18.     In breach of its clear obligations under the Credit Agreement, Defendant has failed to pay PPAS agent fees in the amount of $25,000.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)
### By PPMG

19.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

20.     Under the terms of the MSA, Defendant was obligated to pay PPMG fees for, and to reimburse PPMG for reasonable expenses incurred in connection with, the Services.

21.     PPMG duly provided the Services and incurred reasonable expenses in connection therewith, and has otherwise performed all of its obligations under the MSA, and is thereby entitled to payment for the Services, reimbursement of its reasonable expenses incurred, and interest in connection therewith, all as provided for in the MSA.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

22.     Defendant has failed to pay for the Services rendered and reasonable expenses incurred therewith in an amount of at least $3,389,221.39, in material breach of the MSA.

23.     As a direct and proximate result of Defendant's material breach of the MSA, PPMG has suffered, and continues to suffer, injury, including damages of at least $3,389,221.39, in addition to applicable interest, costs of suit (including attorney's fees) and other damages to which it is entitled.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Account Stated on Behalf of PPMG)

24.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully stated herein.

25.     PPMG provided the Services to Defendant and incurred reasonable expenses in connection therewith, and duly presented its statement of account regularly as set forth in the MSA Invoices regularly submitted to Defendant.

26.     Defendant received and retained each such statement of account in the form of each invoice submitted, without any dispute, rejection, return, or objection made thereto or to any item set forth therein.

27.     As reflected in the MSA Invoices as to which Defendant never disputed, rejected returned or objected to, the amount due and owing to PPMG thereunder is $3,389,221.39, in addition to such other costs and damages to which it is entitled.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Unjust Enrichment/Quantum Meruit on Behalf of PPMG)

28.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

29.     Defendant was enriched by the Services provided by PPMG, and by PPMG's payment of reasonable expenses incurred in connection therewith, to PPMG's detriment, as Defendant has failed to pay therefor.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 07/06/2020

30.     The circumstances thus make it inequitable for Defendant to retain the benefit of the Services and Administrative Services provided (and reasonable expenses incurred by Plaintiffs in connection therewith) without paying PPMG value in return.

31.     The fair value of the benefit of the Services and expenses incurred by PPMG for the benefit of Defendant is at least $3,389,221.39, which amount is now due and owing to PPMG in addition to interest, costs of suit (including attorney's fees) and such other appropriate damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract on Behalf of PPAS)

32.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

33.     Under the terms of the Credit Agreement, Defendant was obligated to pay PPAS fees for, and to reimburse PPAS for reasonable expenses incurred in connection with, the Administrative Services.

34.     PPAS duly provided the Administrative Services and incurred reasonable expenses in connection therewith, and has otherwise performed all of its obligations under the Credit Agreement, and is thereby entitled to payment for the Administrative Services, reimbursement of its reasonable expenses incurred, and interest in connection therewith, all as provided for in the Credit Agreement.

35.     Defendant has failed to pay for the Administrative Services rendered and reasonable expenses incurred therewith in an amount of at least $25,000, in material breach of the Credit Agreement.

36.     As a direct and proximate result of Defendant's material breach of the Credit Agreement, PPAS has suffered, and continues to suffer, injury, including damages of at least

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

$25,000, in addition to applicable interest, costs of suit (including attorney's fees) and other damages to which it is entitled.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Account Stated on Behalf of PPAS)

37.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully stated herein.

38.     PPAS provided the Administrative Services to Defendant and incurred reasonable expenses in connection therewith, and duly presented its statement of account regularly as set forth in the Credit Agreement Invoice submitted to Defendant.

39.     Defendant received and retained each such statement of account in the form of each invoice submitted, without any dispute, rejection, return, or objection made thereto or to any item set forth therein.

40.     As reflected in the Credit Agreement Invoice as to which Defendant never disputed, rejected returned or objected to, the amount due and owing to PPAS thereunder is $25,000, in addition to such other costs and damages to which it is entitled.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendant on each of Plaintiffs' causes of action, in addition to applicable interest, such incidental and consequential damages as may be applicable, costs of suit, including reasonable attorney's fees, and such other and further relief as the Court deems just and proper.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dated:  New York, New York
        July 6, 2020

                                    ALLEGAERT BERGER & VOGEL LLP


                                    By:  ___/s/ David A. Berger_____
                                         David A. Berger
                                         John S. Craig
                                         Bianca Lin

                                    111 Broadway, 20th Floor
                                    New York, New York 10006
                                    (212) 571-0550

                                    *Attorneys for Plaintiffs*
                                    *Patriarch Partners Management Group, LLC and*
                                    *Patriarch Partners Agency Services, LLC*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## **EXHIBIT F**

### **August 16th Email**

Message

| | |
|---|---|
| **From**: | Lynn Tilton [Lynn.Tilton@PatriarchPartners.Com] |
| **on behalf of** | Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> [Lynn.Tilton@PatriarchPartners.Com] |
| **Sent**: | 8/16/2019 5:04:36 PM |
| **To**: | Joseph J. Farnan, Jr. (farnan@farnanlaw.com) [farnan@farnanlaw.com]; Michael Katzenstein (mike.katzenstein@fticonsulting.com) (mike.katzenstein@fticonsulting.com) [mike.katzenstein@fticonsulting.com] |
| **Subject**: | Patriarch/Portfolio Company Confidential Information |

Gentlemen,

We have completed our negotiations with Culligan and are ready to sign documents. However, there are two issues that remain outstanding that we must settle before I will sign the documents.
First, I need that you agree to pay our PPMG fee.  It is listed in the settlement agreement and there are no rights to argue on those issues listed up to $250 million of payments not to include equity payments, during this period.
Please refer to the settlement agreement.
Second, we must agree on the seller's representative.  You may take that position provided I have the proper indemnification.  However, since you know little about the company and or the agreement,  I am not sure why you would want that role.

These issues have been outstanding for some time and now will jeopardize the timing of signing if they cannot be resolved.

Lynn



*Lynn Tilton*
*Chief Executive Officer*
*Patriarch Partners, LLC*
*One Liberty, 35th Floor*
*New York, NY 10006*
*212-825-6772*
*212-825-2038 – FAX*
*Lynn.Tilton@PatriarchPartners.com*
*Web: www.patriarchpartners.com*

## **EXHIBIT G**

**June 3, 2019 Email**

**To:** Michael Katzenstein (mike.katzenstein@fticonsulting.com)
(mike.katzenstein@fticonsulting.com)[mike.katzenstein@fticonsulting.com]; Loseman, Monica K.
(MLoseman@gibsondunn.com)[MLoseman@gibsondunn.com]
**Cc:** Carolyn Schiff[Carolyn.Schiff@PatriarchPartners.com]
**From:** Lynn Tilton[Lynn.Tilton@PatriarchPartners.Com]
**Sent:** Mon 6/3/2019 11:34:12 AM (UTC-04:00)
**Subject:** Patriarch/Portfolio Company Information Confidential

I am going to need you both to get involved in the calculation of the Patriarch Management Fee as I will not sign the papers until we do.  If we need to hire a third party corporate counsel to interpret the documents, then we must, but I am not giving in on this point.



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Liberty Plaza, 35th Floor
New York, NY 10006
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com