## <u>EXHIBIT A-1</u>

**Transaction Declaration of Michael Katzenstein**

## DIN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DECLARATION OF MICHAEL KATZENSTEIN
## IN SUPPORT OF ORDER AUTHORIZING RAND TRANSACTION

I, Michael Katzenstein, declare under penalty of perjury that:

1.      I am a Senior Managing Director of FTI Consulting, Inc. ("FTI"), based out of FTI's office at Three Times Square, 9th Floor New York, NY, 10036.  By order dated June 11, 2018, this Court authorized and approved my appointment as the Chief Restructuring Officer (the "CRO") for the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or the "Zohar Funds") effective as of May 21, 2018.

2.      I have also worked closely with Robert Kost, the Chief Monetization Officer of the Debtors, since my appointment and, more recently, with Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the Debtors' investment banker, to stay apprised of developments in the Monetization Process and to direct Mr. Kost and Houlihan Lokey in representing the Debtors.

3.      I submit this declaration in support of the Debtors' entry into an Equity Purchase Agreement with RM Technologies, Inc. to acquire the Debtors' membership interest in RM Acquisition, LLC (together with its subsidiary, "Rand"), as well as the discharge of the Debtors' outstanding indebtedness owed by Rand.

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

4.      In March of this year, Lynn Tilton resigned as the manager of Rand.  Thereafter, the Debtors, as the sole members of Rand, appointed Debtor Zohar II 2005-1, Corp. ("Zohar II Corp") as manager of Rand.  In my capacity as CRO of Zohar II Corp, I have been the person primarily responsible for Zohar II Corp discharging its duties as Rand's manager.  In that role, I have been closely involved in understanding, monitoring, and overseeing the business and financial affairs of Rand, as well as the professionals conducting the process to market and sell Rand.

5.      Rand has its own investment banker, PJ Solomon, L.P. and its affiliate PJ Solomon Securities, LLC ("PJS"), and legal advisor, Latham & Watkins, LLP ("Latham").  PJS and Latham were retained when Ms. Tilton was acting as Rand's manager but continue to advise Rand and its manager with respect to the sale process.

6.      I was kept apprised of the developments in the marketing and sale process for Rand that was conducted over the course of 2019 and into January 2020.  Zohar representatives received summaries of the first and second round bids that were submitted for Rand, and I was apprised, by Mr. Kost, Ms. Tilton or representatives of PJS, of developments with respect to the bidder that engaged in extensive diligence in the second half of 2019 and into January 2020 (such party, "Prospective Buyer 1").  I was also made aware of Rand's degrading financial and operational performance during this period and its performance relative to its 2019 business plan.

7.      In January 2020, Prospective Buyer 1 withdrew from the Rand sale process. Thereafter, the Debtors engaged in discussions with Ms. Tilton and PJS, and the parties agreed that PJS should re-launch the marketing process for Rand.  PJS proposed and all parties agreed that there should be a more-targeted process focused on a smaller number of buyers,

approximately 60 in total, which included approximately 20 out of the 130 buyers that were contacted in 2019 that expressed interest in Rand and a number of new parties.

8.    Shortly after the re-launch, on March 21, 2020, Ms. Tilton resigned, and in early April, I became involved (through Zohar II Corp) in overseeing Rand's management.  At my direction, Rand's management and advisors engaged in a reforecast for 2020, reflecting the trajectory of the business as it stood at the time Zohar II became the manager.  In May 2020, Rand received multiple proposals for an acquisition transaction.  Some of those proposals contemplated the acquisition of Rand entirely, and other proposals contemplated the acquisition of parts of Rand's business.  Rand's management, PJS, and personnel at FTI acting under my direction considered the feasibility of separately conducting sales of segments of Rand's business.  That involved, among other matters, considering the costs of separating the segments, the ability of remaining segments to continue on a stand-alone basis,  complexities and risks of separation, and wind-down costs.  After weighing these considerations against the valuations that were proposed by the "parts" acquirers and input from PJS and others, I concluded that a sum-of-the-parts transaction was not likely to yield more value than a sale of Rand's business as a whole and had significant operational and execution risk.

9.    Accordingly, I directed PJS to advance negotiations with the four (4) parties that submitted bids for the entirety of Rand, and PJS communicated a deadline to those parties of June 10, 2020 to submit letters of intent ("LOI").  Two (2) of those four (4) parties submitted letters of intent by that deadline and the other two declined to submit an LOI.  In that period, an additional two (2) parties submitted indications of intent with respect to a WholeCo transaction.  Rand's advisors recommended to Zohar II Corp, as manager, and the Debtors, as Rand's members, the LOI submitted by TELEO Capital Management, Inc. ("TELEO") as the highest

and best proposal available. Houlihan Lokey, as the Debtors' investment banker, also recommended entering into the TELEO LOI. TELEO's bid had the highest indicative purchase price, shortest diligence period and included a marked asset purchase agreement and best evidence of financial wherewithal to close (an equity commitment letter and limited guarantee).

10.    While Ms. Tilton was not an equity or debt-holder of Rand at the time of these LOIs, as part of the joint-monetization process, as implemented under the monetization process order in effect at that time, on June 11, 2020, Mr. Kost communicated to Ms. Tilton the status of the LOIs received to date, the recommendation of Rand's advisors to move forward with the TELEO proposal, and the Debtors' view, based on the recommendation of PJS and Houlihan, to move forward with executing and LOI with TELEO. Ms. Tilton indicated she would need additional time to review the proposals.

11.    Rand and the Debtors ultimately executed an LOI with TELEO on June 12, 2020. I advised Ms. Tilton of the execution of the LOI with TELEO on June 14, 2020, and provided her with a copy. In responding to that June 14 communication, Ms. Tilton indicated she may be a bidder for Rand. In light of that, Zohar II Corp instructed Rand's advisors to treat Ms. Tilton in the same manner as other bidders, and it is my understanding that Ms. Tilton was afforded access to the same information as other bidders in this process, with the exception that Ms. Tilton was not given diligence prepared directly in response to specific requests of TELEO.

12.    Thereafter, Rand and TELEO engaged in further confirmatory diligence. During that process substantial matters were uncovered that, in my view, could have jeopardized a sale transaction for Rand and posed potentially adverse impacts on valuation. Throughout this process, Rand continued to face liquidity pressure and was forced to conserve cash. These

liquidity constraints are exacerbated by the fact that Rand currently has no availability on its existing financing.

13.     Zohar II Corp's representatives remained in daily contact with Rand and its advisors to address diligence matters and to keep the TELEO transaction on track.  I personally participated in multiple calls per week (and at times, multiple calls per day) for the last several months to bring the Rand transaction to a signed purchase agreement.

14.     Two areas of importance in the transaction with TELEO were the treatment of claims asserted by the Patriarch Stakeholders against Rand and the treatment of potential claims that Rand had against current and former insiders.  First, consistent with the Court's rulings regarding paragraph 18 of the Settlement Agreement, the EPA and Approval Order will provide that all documented amounts asserted by the Patriarch Stakeholders will be paid, except where the Court orders otherwise.  In exchange for that payment, the Patriarch Stakeholders will be deemed to grant a release of Rand.  Second, the Debtors, as sellers, desired to retain the value of certain claims against current and former insiders of Rand, which includes millions of dollars of payments to these former insiders and their affiliates, many of which are the subject of current lawsuits brought by the Debtors against the Patriarch Stakeholders.  TELEO was willing to allow the Debtors, as sellers, to retain control over these potential claims and the potential value that may flow from them.

15.     Rand's advisors have negotiated a transaction with TELEO that can close in a relatively quick period.  This is particularly important given Rand's capital assets and needs.  In particular, I understand that the only approvals that remain to close the transaction with TELEO are the approval of this Court.  Substantial delay in closing a transaction for Rand would likely

adversely impact Rand's business operations.  Moreover, TELEO was not willing to agree to an outside date beyond 45 days, so time is of the essence to retain the value of the TELEO bid.

16.     I understand that Ms. Tilton submitted a bid for Rand on September 15, 2020. Based on my discussions with Rand's advisors, they believe Ms. Tilton's bid is inferior to the TELEO proposal.  First, substantial diligence and documentation was still required to arrive at an executable transaction.  This included the completion and negotiation of disclosure schedules, which could likely have resulted in either valuation reduction or closing conditions that could not be satisfied based on the terms of Ms. Tilton's purchase agreement, and a need to draft and negotiate ancillary transaction documents.  This would substantially risk delay or even failure to execute on a transaction with Ms. Tilton.  In contrast, TELEO is prepared to close upon court approval.  Second, while the headline purchase price in Ms. Tilton's bid was higher than TELEO's, it is subject to economic terms and conditions that may reduce the value of her proposal.  This included the fact that Ms. Tilton requires a release from the Debtors under her purchase agreement.  The Debtors have pending litigation against Ms. Tilton and her affiliates regarding millions of dollars of payments from Rand already taken by Ms. Tilton or her affiliates and millions of dollars of other payments that Ms. Tilton would have paid to her or her affiliates under her proposed purchase agreement.  The value of these claims are preserved and retained in the TELEO transaction.  Third, I understand that Ms. Tilton has not provided an equity commitment letter or other guarantee of financing for her bid.

17.     Based on the recommendations of PJS, Houlihan, and the other advisors to Rand and the Debtors, and all of the facts and circumstances known at the time, Rand and the Debtors, as members of Rand, entered into the EPA on September 21, 2020.

18.     At all times, Rand has been advised by its own counsel and investment banker, the Debtors have been advised by their own counsel and investment banker, and TELEO has been represented by its own counsel.  I believe that all parties to the Rand transaction have participated in the negotiation of this transaction in good faith and at arm's length.

19.     Based on my experience, my personal knowledge, and my participation in the Rand sale process: (i) the sale process described above was conducted in a commercially reasonable manner intended to achieve the best offer; (ii) PJS conducted a full and comprehensive sale process to thoroughly canvass the market; (iii) the Debtors were provided an appropriate opportunity to participate in the Rand sale process leading up to the selection of the Buyer, and the negotiations and documentation of the proposed transaction with Buyer after such selection; (iv) the proposed Rand transaction represents an arms'-length agreement and the documents have been negotiated and entered into in good faith by the parties; (v) the amounts payable under the Rand transaction, based on the proposed purchase price, represent a fair and reasonable price that has been market tested and was the best offer received under the circumstances; (vi) the Sellers' sale of the RM Interests and acceptance of less than payment in full of their outstanding indebtedness as an accommodation to complete the Rand Transaction is an exercise of sound business judgment; and (vi) the Rand Transaction is in the best interest of the Debtors, their estates, and their stakeholders.  Moreover, to the best of my knowledge, Buyer (a) is not affiliated with or related in any way to the Debtors, (b) does not own an interest in the Debtors, and (c) is not an insider of the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  September 25, 2020

*/s/ Michael Katzenstein*
Michael Katzenstein

## **EXHIBIT A-2**

**Transaction Declaration of Fred Vescio**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DECLARATION OF FRED VESCIO
## IN SUPPORT OF ORDER AUTHORIZING RAND TRANSACTION

I, FRED VESCIO hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I submit this declaration (the "Declaration") in support of the *Order Approving Consummation of Portfolio Company Transaction* (the "Proposed Transaction Order") with respect to RM Acquisition, LLC and its subsidiary (together "Rand"), submitted by the above-captioned debtors and debtors in possession (the "Debtors") pursuant to that certain *Notice of Binding Portfolio Company Transaction (Rand Transaction) Pursuant to Portfolio Company Transaction Procedures* (the "Transaction Notice") to which this Declaration has been annexed. If called upon to testify, I could and would testify competently to the facts set forth herein.

2. I am a managing director of Houlihan Lokey Capital, Inc. ("Houlihan").

3. Houlihan was retained by the above-captioned debtors and debtors in possession (the "Debtors") effective as of February 24, 2020, to assist the Debtors with, among other things, the Monetization Process.

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

4.      After Houlihan was engaged, my team and I, began to immediately familiarize ourselves with the various Portfolio Companies, their businesses, their prospects for sale, and the sales and marketing efforts that had been undertaken to date.  This involved a substantial number of meetings and phone calls with Robert Kost, the Debtors' chief monetization officer, Mike Katzenstein, the Debtors' chief restructuring officer, personnel at FTI Consulting, Inc. working under Mr. Katzenstein's direction, and the Debtors' counsel.  We also met with the investment bankers that had been engaged by each of the Portfolio Companies.

5.      My colleagues and I at Houlihan participated in a number of calls with Rand's investment banker,  PJ Solomon ("PJS"), along with, at various times, Mr. Kost, Mr. Katzenstein and FTI personnel, to discuss the status of their market outreach prior to the May deadline for the submission of initial indication of interest (the "May Deadline").

6.      After the May Deadline, Houlihan was provided the details of each of the indications of interest that were received by PJS.  I understand there were ten (10) total:  four (4) proposed a sale of Rand in its entirety, and six (6) proposed a sale of less than all of Rand's business segments.  Rand's management, the FTI team and PJS worked determine the impact and feasibility of selling Rand's business segments in more than one transaction, and the ultimate conclusion reached was that a less than "WholeCo" transaction would not be value maximizing at the valuations being proposed for such transactions.  Based upon the information provided, Houlihan supported the recommendation to pursue negotiations only with the WholeCo bidders based on that analysis.

7.      The Houlihan team continued to be in regular contact with PJS in the period from the May Deadline until June 10 (the "June Deadline"), which was the date set for the WholeCo bidders to provide revised indications of interest or letter of intent ("LOI").  Two (2) letters of

intent (each an "LOI") were received from the initial group of WholeCo bidders, and the other two declined to submit LOIs. Two (2) other indications of interests for a WholeCo transaction were also received in that period. Houlihan, met with PJS to obtain PJS's assessment, evaluation and recommendation based on the WholeCo proposals. PJS recommended that Rand and the Debtors enter into an LOI with TELEO Capital Management, Inc. ("TELEO"). The Houlihan team and the Debtors separately met to discuss the LOIs and ultimately concurred with PJS's recommendation to proceed with the TELEO bid. In addition to the TELEO bid providing the highest indicative purchase price, I understand the bid was supported by committed financing, included a marked purchase agreement, and contemplated signing in a two (2) to three (3) week period, which was considered to be achievable at the time by Rand's advisors. PJS also indicated that it believed TELEO was furthest along its diligence and presented the quickest speed to close among the remaining bidders.

8. Thereafter, I understand TELEO engaged in substantial confirmatory diligence. Based on discussions with PJS, I understand this confirmatory diligence revealed a number of issues that were not identified to TELEO when it submitted its LOI. Members of the Houlihan team participated in several calls with PJS, Mr. Katzenstein, FTI personnel and Rand's management regarding various aspects of this confirmatory diligence and the steps that Rand took in response. These actions substantially delayed the execution of a purchase agreement with TELEO. Ultimately, however, TELEO and Rand arrived at final terms of an equity purchase agreement for the sale of the Debtors' interests in Rand to TELEO's affiliate, RM Technologies, Inc. (the "Buyer"), and satisfaction of the Debtors' secured indebtedness at Rand (the "EPA").

9. Under the EPA the Buyer maintained the original purchase price under the TELEO LOI, subject to establishment of additional escrows and adjustments to address the undisclosed

liabilities.  I understand that the only condition to close on the TELEO transaction is approval by the Bankruptcy Court.  Importantly for the Debtors, the EPA also provided for the Debtors to retain control over and the value of litigation claims against Rand's insiders and their affiliates.

10.     Based on the information available to Houlihan and after consultation with PJS, Houlihan recommended to the Debtors entering into the EPA.  The EPA presents the best value available to the Debtors for their interests in Rand and allows them to preserve causes of action against Rand's insiders, which may result in additional value to the Debtors.  The purchase price to be paid under the EPA was the result of a comprehensive marketing process overseen by PJS where I understand approximately 170 parties in all were contacted regarding the opportunity dating back to January 2019.  The EPA also presents the quickest path to a closing.  The EPA is fully-documented and there is no remaining diligence or other conditions to close, other than Court approval.  Timing of closing is important in this transaction given Rand's capital assets and needs and lack of availability under its existing credit facilities.

11.     I am also aware that while negotiations were being finalized with TELEO, Lynn Tilton submitted a bid for Rand.  I understand that Rand's advisors did not consider that bid to be actionable as submitted and that additional diligence and documentation would be necessary. These open items would have resulted in delay of presenting Ms. Tilton's bid to the Court for approval, if it were accepted, and could have resulted in reduction to the stated purchase price. While Ms. Tilton's bid had a nominally higher stated purchase price than TELEO's stated purchase price, Ms. Tilton's bid had various economic terms that would serve to reduce the stated purchase price.  Additionally, Ms. Tilton's bid included a release of her and her affiliates.  The Debtors are actively engaged in litigation with Ms. Tilton and the other Patriarch Stakeholders regarding her conduct at the Portfolio Companies, including Rand.  The proposed release of Ms. Tilton could

eliminate the Debtors' ability to pursue that litigation to the extent of the proposed release.  On the other hand, the TELEO bid expressly preserved the value of such causes of action for the benefit of the Debtors.  Based on these considerations, Houlihan supported the recommendation of Rand's advisors that the TELEO bid was superior to the alternative proposed by Ms. Tilton.

1.      Debtors, and (c) is not an insider of the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  September 25, 2020

_/s/ Fred Vescio_ _____
Fred Vescio

## **EXHIBIT A-3**

**Transaction Declaration of Jason Russell**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DECLARATION OF JASON RUSSELL
## IN SUPPORT OF ORDER AUTHORIZING RAND TRANSACTION

I, Jason Russell, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.     I submit this declaration (the "Declaration") in support of the *Order Approving Consummation of Portfolio Company Transaction* (the "Proposed Transaction Order") with respect to RM Acquisition, LLC and its subsidiary (together "Rand"), submitted by the above-captioned debtors and debtors in possession (the "Debtors") pursuant to that certain *Notice of Binding Portfolio Company Transaction (Rand Transaction) Pursuant to Portfolio Company Transaction Procedures* (the "Transaction Notice") to which this Declaration has been annexed. If called upon to testify, I could and would testify competently to the facts set forth herein.

2.     I am a Managing Director of PJ Solomon, L.P. (together with its affiliate PJ Solomon Securities, LLC, "Solomon").  I have over 13 years of experience as an investment banker. I am Head of Software & Disruptive Technologies within Solomon's Technology, Media & Telecommunications Group.  I joined Solomon in 2017 and have extensive experience advising clients on sell and buy-side M&A and financings.  Prior to joining Solomon, I worked at Citi as an

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

investment banker, Lear Corporation as a quality manager, and Caliber Logistics (acquired by FedEx) as an engineer.  I earned an M.B.A., with distinction, from the University of Michigan and B.S. from The Ohio State University.

3.     Solomon was retained by Rand pursuant to an engagement letter dated July 10, 2018 (as may be amended from time to time).  At the time of Solomon's engagement, I understood that Lynn Tilton was the manager of Rand.  Solomon took direction from Ms. Tilton with respect to its work for Rand until the spring of 2020 when I understand that Ms. Tilton resigned as Rand's manager.  Thereafter, I understand that Zohar II, Corp. was appointed as the manager of Rand.  Following Ms. Tilton's resignation, Solomon worked with and took direction from Zohar II, Corp., as Rand' manager, principally through Mike Katzenstein, who I understand to be an officer of Zohar II, Corp.

4.     Throughout the sale process, Solomon was in contact with the Debtors regarding the progress of the sale process and decisions in connection therewith.  This contact was primarily through Mr. Katzenstein and Rob Kost, who I understand to be the Debtors' chief monetization officer.  In the spring of 2020, I understand that the Debtors also retained Houlihan Lokey as independent investment banker to advise them with respect to various sale processes, including for Rand.  Following Houlihan Lokey's retention, I was in contact with various professionals at Houlihan Lokey on the Debtors' behalf.

5.     At the outset of our engagement, Solomon worked with Rand's management team to develop a comprehensive understanding of Rand's business, its products, the markets it operates in, its financial outlook, and potential drivers of value in the Rand sale process.  We then worked under the direction of Ms. Tilton, as Rand's manager, to develop a sale and marketing plan for Rand and to assist with preparing Rand for sale.  This sale and marketing plan was structured to

include an initial phase of outreach to potentially interested parties culminating in the submission of indications of interest (each an "IOI") and a second phase of outreach in which certain parties submitting IOIs would be selected to conduct additional diligence on Rand with the goal of receiving refreshed offers for the purchase of Rand (each an "LOI").  It was expected that Rand would execute one of the LOIs that were submitted and proceed to negotiating and entering into definitive documentation for a sale transaction.

6.     Solomon also worked with Rand's management to develop both a "teaser" and a confidential information memorandum (the "CIM").  The teaser was intended to be distributed to parties we identified as potentially interested in the Rand opportunity describing the transaction opportunity on a "no names" basis, and the CIM was intended to be distributed to parties that entered into a non-disclosure agreement, and that could be used to form the basis of an IOI.  An initial "teaser" and CIM were completed in early 2019 and used in the initial launch of Rand's sale process.  In addition, Solomon worked with Rand to create, populate and maintain a virtual data room ("VDR") for potential buyers.  Rand also engaged an accounting firm, KPMG (US) LLP, to prepare a Quality of Earnings Report to be provided to potential buyers as part of their due diligence on Rand, which was finalized in January 2019.

7.     The Rand sale process was launched in January, 2019.  In connection with that launch, Solomon, in consultation with Ms. Tilton (as Rand's manager) and the Debtors' representatives, developed a list of 132 potentially interested parties to contact with respect to the Rand sale process.  This list included 35 strategic parties, 11 financial sponsors with a strategic party in their portfolio, and 86 other financial buyers.  During this stage, members of the Solomon team contacted parties on the potentially interested purchaser list and established a deadline for submitting IOIs on or about April 2, 2019.  Sixty-eight (68) potential buyers signed non-disclosure agreements

and received the CIM and ten (10) parties were provide the opportunity to meet with Rand's management.  Six (6) parties submitted IOIs on or around the April deadline, and a further five (5) parties continued to indicate interest in an acquisition of Rand.

8.    Thereafter, Rand selected two (2) of the parties that submitted IOIs and two (2) other strategic parties, which had not submitted IOIs, to continue into the second phase of the M&A process for Rand.  During this phase, those parties continued to conduct diligence for a period of several weeks, including receiving access to the VDR, attending management presentations from Rand's management team, and engaged in discussions with Solomon on various diligence items.  Rand established a deadline of June 13, 2019 to submit LOIs.  However, as of that deadline three (3) of the four (4) parties withdrew from the process and the last party was not in a position where it was able to submit a bid for Rand.  Accordingly, no LOIs were submitted by that deadline.  That fourth party who had not withdrawn from the process as of the June 13 deadline (such party, "Prospective Buyer 1") ultimately submitted a preliminary non-binding indication of interest approximately one month later on July 18, 2019.

9.    Solomon then led a months-long negotiation with Prospective Buyer 1 over the terms of a potential letter of intent and to assist Prospective Buyer 1 in its due diligence regarding Rand.  This entailed multiple financial updates and diligence regarding Rand's business, operations, and financial performance.  These discussions continued into January 2020, when Prospective Buyer 1 indicated that it was withdrawing from the sales process for Rand.  During the period in which Rand was negotiating with Prospective Buyer 1, Rand's operational and financial performance missed budgets and projections, and Prospective Buyer 1 expressed concern throughout this period regarding these persistent, downward trends.  Ms. Tilton (as Rand's manager) and the Debtors were

kept apprised of Rand's operational and financial difficulties and the concerns that they posed to Prospective Buyer 1.

10.     Prospective Buyer 1 withdrew from the process in January 2020, and after that, Solomon worked with Ms. Tilton, as Rand's manager, to develop a process to re-launch the M&A effort for Rand.  In the course of those discussion, I also discussed the re-launch process with Mr. Katzenstein and Mr. Kost, as representatives of the Debtors.  Solomon developed a list of sixty-two (62) potential buyers (twenty-one (21) of which had participated in the sale process in 2019) to contact as part of the re-launch process, and Solomon worked with Rand's management, including Ms. Tilton, to prepare an updated "teaser," a financial update presentation to be provided to parties that had already received the CIM and provide them with a bridge to Rand's current financial picture, and an executive summary of the Rand opportunity to provide to parties that did not receive the CIM in the process that was ran in 2019.  These materials reflected a substantially different, and downward adjusted, outlook for Rand than was presented in the CIM initially prepared in 2019.

11.     On March 4, 2020, Solomon re-launched the process to identify a potential buyer for Rand.  In the weeks after the re-launch of the sale process, I was advised that Ms. Tilton had resigned as Rand's manager effective as of March 20, 2020, and that Zohar II, Corp. had been appointed as the manager of Rand and that Mr. Katzenstein, would be the person responsible for directing Zohar II, Corp., in its capacity as Rand's manager.  Thereafter, Solomon took direction from Zohar II, Corp., and specifically Mr. Katzenstein as an officer of Zohar II, Corp., in its capacity as Rand's manager.

12.     By early May 2020, ten (10) potential buyers had submitted IOIs, comprising four (4) "WholeCo" indications and six (6) segment-level indications.  Following receipt of these IOIs, Solomon worked with Mr. Katzenstein and his supporting personnel to determine the

5

feasibility of pursuing a less-than-WholeCo transaction for Rand. These "parts" transactions were determined not to be value maximizing based on, among other considerations, the complexity of segregating out separate businesses units, the timing and costs associated with carving out business segments, the costs attendant to winding-down the unsold parts of Rand, and lower overall value to be realized in a "parts" sale. Accordingly, the "WholeCo" indications were invited to the second round of the sale process throughout May and early June of 2020, after which two (2) of the potential "WholeCo" buyers submitted second-round LOIs and two (2) of those parties declined to submit LOIs. Each of the four (4) buyers invited to the second round of the sale process had access to the same legal, financial and other information related to the sale process that was maintained in the VDR. In addition, during that period, two (2) additional parties submitted IOIs for "WholeCo" in early June 2020 which were taken under consideration. I believe that all interested bidders were on even footing with respect to access to information.

13.     On June 12, 2020, Rand ultimately entered into an LOI with TELEO Capital Management, Inc. ("TELEO"), for an indicative purchase price of $40 million on a cash-free, debt-free basis, which was supported by an equity commitment letter and limited guarantee. The TELEO LOI provide for an initial exclusivity period until June 26, 2020, which was subject to extension until July 3, 2020 if certain conditions were met and the indicative purchase price was affirmed. While the TELEO LOI was subject to confirmatory finance/accounting, tax, HR, IT, and legal due diligence, TELEO had already conducted extensive work in preparing its LOI, including submitting a marked-up purchase agreement approximately the week prior. TELEO was projecting a two (2) to three (3) week exclusivity period to get from signing the LOI to executing a definitive asset purchase agreement.

14.    However, once the LOI was signed, TELEO's confirmatory diligence identified various matters that required substantial time (and expense) of both parties to investigate and evaluate, many of which could have resulted in a collapse of the deal.  These matters had not been disclosed to the buyers (including TELEO) in formulating their initial bids and included matters related to Rand's accounting processes and procedures, legal, tax, and accounting, which could have resulted in downward adjustments to the valuation of Rand.  TELEO was ultimately not able to finalize its diligence during its exclusivity period but the parties, nonetheless continued to work diligently towards finalizing their negotiations.  During this period, Rand also failed to perform in accordance with its 2020 business plan.  Nonetheless, TELEO maintained its initial valuation, albeit with additional protection for various items that were not disclosed or available to it in formulating its LOI.  These negotiations concluded on September 21, 2020, resulting in entry into that certain Equity Purchase Agreement (the "EPA") with TELEO's affiliate, RM Technologies, Inc. (the "Buyer").

15.    Rand was thoroughly and substantially exposed to the market.  Rand was the subject of two separate market outreaches that included approximately 170 parties.  In May and June of this year, multiple offers were received for Rand and TELEO's bid presented the best value proposition among them.  The TELEO transaction contains no further contingencies to a closing beyond approval of the Bankruptcy Court.  Execution risk has been minimized with respect to the EPA and reflects the substantial work and diligence that has been by TELEO, Rand and the Debtors since executing the TELEO LOI.

16.    I believe that it is important that the Rand Transaction proceed to a close as expeditiously as possible.  In order to remain sustainable, the Rand business needs additional capital but Rand has no borrowing capacity under its existing credit agreement.  So, a substantial delay in

closing the Rand Transaction may result in harm to the value of the business.  Indeed, one of the final points of negotiation was for how long the Buyer would hold open the "outside closing date" for the Rand Transaction.

17.     Further, I believe that Rand, TELEO and the Debtors engaged in good faith, arm's-length negotiations regarding the terms of the purchase of the Debtors' interests in Rand.  Moreover, TELEO was represented by its own legal and other advisors in the transaction, Rand was represented by its own independent legal and other advisors, and the Debtors were represented by their own legal and other advisors.

18.     On September 15, 2020, Ms. Tilton submitted a bid for Rand, accompanied by a signed markup of the purchase agreement, which was to remain open for 7 days.  We and Rand's other advisors ultimately viewed Ms. Tilton's bid to be inferior and not acceptable for the reasons explained below.

19.     While I understood that Ms. Tilton had expressed interest in pursuing a bid for Rand, she had not been an active participant in the sales process.  For instance, Ms. Tilton did not submit an IOI or an LOI.  Nor did Ms. Tilton engage with Solomon on any matters related to a proposal for Rand until August 2020.  As a courtesy, Ms. Tilton retained access to the VDR at all times (other than for the period of August 14 to August 17), notwithstanding the fact that all other competing bidders had had their VDR access terminated once the TELEO LOI exclusivity period started in June.  In short, Ms. Tilton was entitled to the same access that other bidders were provided in formulating their initial proposals for Rand.  It is my understanding that Ms. Tilton engaged in only cursory activity in the VDR up until August 17, when we received an inquiry regarding her access to the VDR.  Moreover, Ms. Tilton did not direct any specific requests for information to Solomon that did not receive a response prior to submitting her bid on September 15, 2020, except

that Solomon declined to provide information and materials in response to what I understood to be a blanket request for all information that was provided to TELEO. In my experience with M&A transactions, bidders are not typically afforded access to the specific diligence provided to competing bidders in response to specific requests formulated by those competing bidders.

20.     Upon receiving Ms. Tilton's bid, Solomon, in its role as investment banker, analyzed and evaluated her bid as compared to TELEO's bid on a variety of factors including the amount offered; the nature of the offer and whether it was supported by an equity commitment letter; the likelihood that the amount offered would, in fact, be received; and other terms and conditions of the bid that would affect its economic value. After a careful review of Ms. Tilton's bid, it was apparent that her bid was inferior to TELEO's offer in several critical respects. As an initial matter, Ms. Tilton did not provide an equity commitment with her bid, nor any detailed sources of funds to cover the purchase price. Solomon immediately requested, and advised Ms. Tilton that she would need to provide, an equity commitment letter, but Solomon never received one. In addition to the lack of an equity commitment letter, there was a question whether the amount Ms. Tilton offered would actually be received in light of the various litigation matters involving Ms. Tilton. Moreover, while Ms. Tilton's stated purchase price was nominally higher than TELEO's stated purchase price, Ms. Tilton's bid contained other terms that substantially reduced the actual value of her bid. For example, Ms. Tilton's bid required an affirmative release for her and her affiliates from all claims of the Debtors, and we understand that the Debtors are actively litigating against Ms. Tilton claims concerning millions of dollars of payments paid to her and her affiliates by Rand. By contrast, TELEO's bid did not require any such release of claims. Further, while Ms. Tilton described her bid as firm for 7 days, substantial diligence and documentation would still be required to arrive at an executable transaction that could be recommended to Rand's members. This included the

completion and negotiation of disclosure schedules, which could have resulted in either valuation reductions or closing conditions that could not be satisfied based on the terms of Ms. Tilton's purchase agreement, and drafting and negotiation of other transaction documents and ancillary transaction documents.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  September 25, 2020

 */s/ Jason Russell*
Jason Russell