## **EXHIBIT A**

Redacted Public Version of Sealed Reply [DI 2437]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>                 Debtors. | Chapter 11<br><br>Case No. 18-10512 (KBO)<br><br>Jointly Administered<br><br>**Hearing Date: April 8, 2021, at 10:00 a.m. ET**<br>**Re Dkt. Nos. 2388, 2392, 2412, 2421, 2422** |

**PATRIARCH'S REPLY IN SUPPORT OF (I) MOTION FOR ENTRY OF
AN ORDER (A) ENFORCING AND IMPLEMENTING THE TERMS OF
THE SETTLEMENT AGREEMENT WITH RESPECT TO A PORTFOLIO
COMPANY SALE AND (B) GRANTING RELATED RELIEF; AND
(II) RELATED MOTION TO SEAL**

Lynn Tilton and the Patriarch Stakeholders (collectively, "Patriarch"), by and through its

counsel, hereby submits this Reply in further support of *Patriarch's Motion for Entry of an Order*

*(A) Enforcing and Implementing the Terms of the Settlement Agreement With Respect to a*

*Portfolio Company Sale and (B) Granting Related Relief* [D.I. 2388] (the "Sale Motion")[2] and

*Patriarch's Motion for Order to Seal the Courtroom During the Presentation of Confidential*

*Information at the Hearing to be Scheduled on the Motion for Entry of an Order (A) Enforcing*

*and Implementing the Terms of the Settlement Agreement With Respect to a Portfolio Company*

*Sale and (B) Granting Related Relief* [D.I. 2392] (the "Sealing Motion"), and in response to the

objections and/or joinders filed by the Debtors to the Sale Motion [D.I. 2412] (the "Sale

Objection"), and by the Debtors [D.I. 2421] and the ZIII Controlling Class [D.I. 2422]

---

[1]  The "Debtors," and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited ("Zohar III") (9261), Zohar II 2005-1, Limited ("Zohar II") (8297), and Zohar CDO 2003-1, Limited (together with Zohar II and Zohar III, the "Zohar Funds") (5119).  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2]  Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Sale Motion and the Sale Objection, as applicable.

(collectively, the "Sealing Objections").  For the reasons stated in the Sale Motion, Sealing Motion, and herein, and as will be proved through testimony and evidence at the hearing commencing on April 8, 2021, both the Sale Motion and Sealing Motion should be granted.

## PRELIMINARY STATEMENT

1.      The relief Patriarch seeks through the Sale Motion is straight forward and well supported.  Patriarch requests that the Court approve and authorize the Company's entry into the Asset Purchase Agreement[3] that contemplates the sale of substantially all of the Company's assets, free and clear of the Debtors' Term Loan liens, to AVA, an affiliate of Patriarch.

2.      This sale is the product of a four months' long, robust sales process pursuant to which the Company, its operations and its assets were marketed to hundreds of strategic and financial purchasers by DPP, the investment banker selected by Ms. Tilton without objection by the Debtors.  Mark Berger, the Independent Manager appointed to manage the sale process, supervised DPP's efforts, negotiated with all potential bidders, and made *all* decisions with respect to the Monetization Process for the Company.  The product of these efforts is the proposed sale to AVA.  There is no bona fide dispute that the proposed transaction is the highest and best offer for the Company, including the Debtors' interests therein.

3.      What is more, the record is clear that DPP and the Independent Manager engaged with the Debtors on the sales process each and every step of the way.  The Debtors received direct and frequent access to Mr. Berger and DPP, including regular weekly meetings and numerous written updates.  The Debtors' input was further regularly solicited in connection with key

---

[3]  The Company and AVA are negotiating an amendment to the Asset Purchase Agreement attached to the Sale Motion in order to address certain issues related to the Company's Mexico and Canadian subsidiaries (the "APA Amendment").  A copy of the APA Amendment will be filed with the Court upon completion.

documents in the sales process.  Indeed, once the Debtors renounced their intent to bid for the Company, they received far more information than Patriarch, which remained a potential bidder.

4.      Tellingly, throughout this entire process, other than their objection to the appointment of Mr. Berger as Independent Manager, the Debtors never sought intervention from the Court to address what they now contend were critical errors in the sales process.  This Court has made clear, time and again, that it is available to the parties, and that it cannot address any party's grievances without a motion.  If the Debtors were truly concerned that the Company's sales process was not proceeding in an orderly and fair fashion, they had every opportunity to seek relief.  They did not do so.  Now that they are unhappy with the outcome of the marketing process, the Debtors have belatedly conjured purported defects in the process.  This Court should not countenance such tactics, particularly with ██████████████████████████████.

5.      Indeed, the Debtors were well aware of the Company's ████████████████
██████.  As noted in their Sale Objection, more than a month ago, the Debtors (and Patriarch) expressly consented to the ██████████████████████████████████████████████████.  When faced with a request in the beginning of March for ██████████████████████████
█████████████████████████████████████████████, the Debtors declined.  The Debtors could have come to this Court for approval to ████████████████████████████████████████████████████████████████████████████████████████████████████████ but they did not do so.

6.      Having declined the ██████████████████████, the Debtors knew that Patriarch ██████████████████████████████████.  Nevertheless, on March 11, the Debtors refused to consent to a transaction with Patriarch and AVA that would not only have ████████████████████████████████████████████████████████, but would have also provided the Debtors an

3

estimated approximately $8 million recovery on their Term Loans.  The Debtors have not explained their refusal to agree to that transaction.

7.    Rather than explain themselves, the Debtors have left this Court with a choice between the ████████████████████████████████, or a sale to AVA, which they carefully (and wrongly) posture as the product of Ms. Tilton's manipulation.  Without any evidentiary support, the Debtors would have this Court decide that some other, yet to be identified alternative to the AVA transaction is available and viable (despite DPP's and Mr. Berger's testimony to the contrary), and that such alternative would yield a materially better return to the Debtors' estates.  However, the only evidence before this Court is that the AVA transaction, if approved, will yield to the Term Loan lenders (including the Debtors) approximately $800,000–$1,000,000 in net proceeds.  The Debtors may regret their decision to reject not only AVA's $44 million offer but also Patriarch's prior firm offers in the summer of 2019, but those regrets do not alter the fact that the Asset Purchase Agreement with AVA reflects the highest and best bid for the Company's assets (including Debtors' interests therein), and if approved will ████████████ ████████████████████████████.

8.    The Sale Objection spills substantial ink recounting a partial, selective, and self-serving purported history of the prior efforts to sell Dura and the Company.  Without any apparent irony, the Debtors point to the prior sales process as the gold standard—a process run by Ms. Tilton and without an independent manager—because it resulted in bids in the range of $80 million for the Company.  The Debtors suggest that Ms. Tilton single-handedly thwarted completion of that process by terminating it in favor of pursuing a refinancing of Dura's debt, when they know full well that they had every opportunity to compel a transaction at the time if they believed it was in their best interests to do so.  Indeed, the issue was mediated.  The Debtors did not pursue further

resolution of the dispute with the Court despite their unambiguous right to do so under the terms of the Settlement Agreement.  Instead, post-mediation the parties pursued a strategy to refinance Dura, obtain an award of $2.5 billion in new battery tray business, and later sell both companies (Dura and the Company), together.

9.      Astoundingly, the Debtors invite this Court to infer that the difference in value between the 2018 bids and the current AVA bid is entirely attributable to the imagined actions of Ms. Tilton during the current sale process.  In so doing, the Debtors wholly ignore the effects of the Dura bankruptcy, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████ and the overhang of these bankruptcy cases.  The Debtors further ignore the full history of the Company's sales efforts, and their own poor decision-making in not choosing to accept AVA's $44 million bid, or Patriarch's 2019 offer that was almost three times higher.  In urging some inference that AVA's price is not fair because it compares poorly to the bids from a 2018 process, the Debtors use the mediation privilege as a sword to hide their failure to accept an even higher bid during 2019 and then fail to account for intervening events, including the onset of a global pandemic and consequent global disruptions to the automotive industry supply chain.  None of this history, however, is relevant to the relief Patriarch seeks today.  For that reason, Patriarch will not be baited into a factual dispute over issues that have no bearing on the motion before the Court.

10.      In short, and as discussed below, the Debtors seek to block the only transaction that can be completed ████████████████████████████.  The Debtors' Sale Objection attempts to muddy and confuse the record by (i) making legal arguments that cannot withstand scrutiny or are contrary to binding authority, and (ii) recounting a history of these chapter 11 cases that (a) is

incomplete and inaccurate, and (b) is not at all relevant to the simple issue before the Court. Indeed, the Debtors have concocted multiple new arguments that convey to themselves a veto right over the Court's authority to compel monetization transactions, by asserting that the Court may not compel the release of their liens, or by imposing standards for such relief that are not supported by the Settlement Agreement or applicable law.  As explained in the Sale Motion and below, the Court has already ruled that it has authority to approve such a sale over the Debtors' objection, and for good reason.  Such veto right, whether wielded by Patriarch or Debtors, would chill other sales processes, and discourage bidders from participating, contrary to the very point of the Settlement Agreement and the parties' agreement to jointly monetize these companies.

11.     For the reasons set forth herein and in the Sale Motion, the Court should approve the Purchase Agreement, and grant such other relief necessary to close the transactions contemplated under the Purchase Agreement, including the release of the Debtors' liens against the Company and its assets.

## **REPLY**

### A.     **This Court Has Authority Under the Settlement Agreement to Grant the Relief Requested in the Sale Motion.**

12.     The Sale Objection asserts that the "sole legal authority for Patriarch to rely upon for the relief it requests is enforcement of the Settlement Agreement," and that Patriarch does not cite "any judicial authority supporting the proposed disposition of estate property."  Sale Objection, ¶¶ 1–2.  The Debtors are correct only that Patriarch seeks to enforce the Settlement Agreement.

13.     The Debtors' contention that Patriarch has not cited "judicial authority" to compel the Debtors to take actions necessary to close the proposed sale to AVA, including the release of any liens securing their Term Loan debt, is simply wrong.  To the contrary, Patriarch requests

relief consistent with this Court's prior unambiguous holding on February 6, 2020, that it (a) "can settle related disputes, including those over the ultimate consummation of a proposed transaction," and (b) "ha[s] authority to enforce those obligations of the parties to the settlement agreement and can *order monetization of a portfolio company over the objection of* Ms. Tilton, her affiliated entities, or *the debtors*." *E.g.*, Hr'g Tr. Feb. 6, 2020, 69:15–17, 70:25–71:4 (emphasis added). The Court came to this conclusion based, in part, on its finding that "the parties agreed in paragraphs ten and twelve of the settlement agreement that they will *monetize, not market, the Group A portfolio companies* . . . ." *Id.* at p. 68:11–14 (emphases added). This is law of the case, and certainly constitutes judicial authority for the relief sought in the Motion. *E.g.*, *Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 210 n.7 (3d Cir. 2003) ("Under the law-of-the-case doctrine, once an issue has been decided, parties may not relitigate that issue in the same case.").

14.  Even assuming, arguendo, the Court's prior rulings on this point were not enough, as explained in the Sale Motion, this Court retains "jurisdiction to interpret and enforce" the Settlement Agreement. *E.g.*, *In re Baseline Sports, Inc.*, 393 B.R. 105, 118–19 (Bankr. E.D. Va. 2008); *see also* Sale Motion, ¶ 41; Settlement Agreement, ¶ 11. Moreover, under Bankruptcy Code section 105(a), the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," and "[n]o provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules . . . ." 11 U.S.C. § 105(a); *see also* Sale Motion, ¶ 42. Indeed, the Debtors, themselves confirm that "the *Court may fashion whatever relief it deems appropriate with respect to the Debtors' interests in [the Company]*. . . ." Sale Objection, p. 25 n.10 (emphasis added).

15.    In February 2020, when the Court ruled that it had authority to compel a monetization transaction over either the Debtors' or Patriarch's objection, there were eleven (11) remaining Group A Portfolio Companies to be monetized, nine of which had outstanding secured debt held by the Debtors or Patriarch.[4]  The existing debt structures buttress the inescapable conclusion that, for the Court's February 6 rulings to have any force, if the Court finds that a transaction should be approved over the Debtors' objection, the Court must be capable of ordering the Debtors to take actions necessary to implement that transaction, including consenting to the release of liens.

16.    The Debtors appear to acknowledge that, in an appropriate case, the Court can in fact compel them to enter into a transaction under paragraph 10, including releasing their liens. However, the Debtors attempt to undermine the Court's prior rulings by (a) imposing a standard of review for any contested transaction that requires a finding "that the proposed transaction advances two separate best interests—those of the Debtors and those of the Portfolio Companies," Sale Objection, ¶ 54; and (b) asserting that paragraph 18 of the Settlement Agreement only requires a release of Patriarch's liens, and not the Debtors," *id.*, ¶ 55.  Both arguments are wholly misplaced.

      a.    <u>The Debtors' Dual-Best Interests Standard is Not Supported by the Settlement Agreement and is Not Rational</u>.

17.    The Debtors assert that a contested monetization transaction cannot be authorized by this Court unless the Court finds that the transaction is both in the best interest of the Debtors and of the Portfolio Companies.  The Debtors seek to justify this novel position by pointing to paragraph 10 of the Settlement Agreement, but that provision does not support the Debtors' contention.

---

[4]  *See* Feb. 19–20, 2020 Hr'g, Ex. 167–77.

18.     As this Court is by now intimately aware, paragraph 10 of the Settlement Agreement sets forth the joint nature of the monetization process imposed under the Settlement Agreement.  Among other things, paragraph 10 provides that "[w]ith full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio Companies."  And the following sentence, relied on by the Debtors in their Sale Objection, provides that "[i]t is acknowledged that the ***CRO will act in the best interests of the Zohar Funds***, and ***Tilton in the best interests of the Group A Portfolio Companies***."  *Id.* (emphasis added).  This latter provision did not set a standard of review for when the Debtors and Ms. Tilton (and/or here, the Independent Manager) disagree over a contemplated transaction.  Rather, paragraph 10 makes clear that, although Ms. Tilton was the sole director and owner of the Debtors when the Settlement Agreement was negotiated and agreed to, the to-be appointed CRO would "act in the best interests of the Zohar Funds," while Ms. Tilton would only be required to "act in the best interest of the Group A Portfolio Companies."  Far from setting a standard of review, paragraph 10 simply identified the persons who would be responsible for acting in the best interests of the Debtors and the Portfolio Companies in connection with the Monetization Process.  In fact, paragraph 10 does not even contemplate disputes as to the joint Monetization Process; paragraph 11 permits the Court to resolve disputes over the Monetization Process.  Accordingly, the Debtors' argument that paragraph 10 of the Settlement Agreement effectively provides a blocking position to any constituent that acts in their best interests (but not the Debtors' interests) is not supported by the text or context of that language.  The avoidance of such a veto right over proposed sales is one of the principal reasons Ms. Tilton filed these chapter 11 cases.

19.    Moreover, the Debtors' assertion that the Court can only compel approval of a monetization transaction if it is in the "separate best interests" of both the Debtors and the Portfolio Companies is not grounded in the agreement, nor does such assertion have any rational basis. A simple hypothetical proves this point. Assume in Transaction A, Buyer (i) has agreed to purchase substantially all of the assets of Seller (a Group A Portfolio Company) for $30 million, (ii) will hire all of Seller's employees, and (iii) will fund the go-forward business with new cash contributed as equity. Assume in Transaction B, Buyer (x) has agreed to purchase substantially all of the assets of Seller for $30 million, (y) will only hire 1/4 of Seller's employees, and (z) will fund the go-forward business with a new loan by Seller's parents (the Debtors) at a 15% interest rate. In this situation, Seller likely prefers Transaction A over Transaction B, as it has the same purchase price, but also preserves the jobs of all employees, and saddles the Seller with less debt going forward. Similarly, the Seller's parents likely prefer Transaction B over Transaction A because it provides the same purchase price but also a favorable interest rate on Buyer's go-forward loan.

20.    Under this hypothetical, it should not be doubted that the Seller's support for Transaction A is in its best interest, or that the Seller's parents' support for Transaction B is in their best interest. Under the Debtors' dual-"best interests" argument, however, the Court would never be able to break the deadlock and approve one transaction over the other. Indeed, if the Court were to accept the Debtors' view of the standard created by paragraph 10, the Debtors could never be compelled to close a transaction that is not entirely in the best interest of the estates, notwithstanding the agreed-upon need to consider and balance the interests of the underlying Portfolio Company. Such a result is not dictated by paragraph 10 of the Settlement Agreement, and this cannot be what the Court intended in its February 6 rulings. Where there is gridlock among the interests of the Debtors and a Portfolio Company, the parties agreed that this Court

would resolve that gridlock.  Settlement Agreement ¶ 11.  And, as noted above, the Court has already ruled that it has authority to compel the parties to transact.  *E.g.*, Hr'g Tr. Feb. 6, 2020, 69:15–17, 70:25–71:4.  While the Debtors appear to concede that the Court does, in fact, have authority to compel a release of the Debtors' liens as part and parcel of its authority to compel a party to transact, the Debtors' dual-"best interests" argument is just an attempt to end-run the Court's prior rulings.

<b>b.    <u>The Debtors' Focus on Paragraph 18 Appears to be Misplaced.</u></b>

21.    The Debtors' position with respect to paragraph 18 of the Settlement Agreement is not clear.  On the one hand, the Debtors assert that "Paragraph 18 does not even appear to be implicated by the instant Motion because the Patriarch Stakeholders, whose conduct Paragraph 18 covers, are the movants and consenting to the Proposed Sale."  Sale Objection, ¶ 57.  On the other hand, the Debtors assert that "Paragraph 18 contains an express obligation that the Patriarch Stakeholders—but not the Debtors—release their liens in transactions in the Monetization Process so long as the Patriarch Stakeholder received *pari passu* treatment."  *Id.*, ¶ 55.

22.    To be clear, paragraph 18 of the Settlement Agreement is implicated here in a limited sense, and the Sale Motion and the Proposed Order comply with that provision.  Under the Proposed Order, Patriarch is entitled to receive a $75,000 payment on account of claims covered by paragraph 18, and the "Debtors' rights to challenge and recover [that payment] shall be preserved in accordance with paragraph 18 of the Settlement Agreement. . . ."  Proposed Order, ¶ 9.  Moreover, at the Company's insistence, $594,586.09 of sale proceeds that would otherwise be paid to Patriarch are being escrowed for later determination as to whether such proceeds shall be distributed to the Debtors or Patriarch.  Proposed Order, ¶ 10.  While Patriarch asserted its right to payment of these escrowed funds subject to any claw-back rights under paragraph 18, it

ultimately agreed to escrow these funds at the request of the Company.  In this limited sense, paragraph 18 is implicated by the proposed transaction and has been satisfied.

23.     Paragraph 18 is not otherwise directly relevant to the relief sought in the Sale Motion.  Paragraph 18 was negotiated among the parties out of recognition that (a) due to Patriarch's significant investments and services provided to the Portfolio Companies, Patriarch held substantial claims and interests in the companies, and (b) prior to the Settlement Agreement, MBIA and the Zohar III Controlling Class, without real evidence or support, questioned the validity or propriety of certain of those claims and interests.  *E.g.*, MBIA Motion to Dismiss [D.I. 56], ¶¶ 12, 31, 108.  In exchange for, among other things, Ms. Tilton ceding control of the Debtors and these chapter 11 cases and agreeing to continue to pay the taxes of the Debtors and Portfolio Companies so long as she was Designated Tax Director, the parties to the Settlement Agreement agreed that Patriarch would be paid its claims, fees, and interests upon the monetization of a Portfolio Company, on a *pari passu* basis with other similarly situated claims and interests, with any challenge rights of other parties preserved.  Settlement Agreement, ¶ 18.  And upon payment of such claims, fees, and interests on a *pari passu* basis, Patriarch agreed that it would release any applicable liens.  *Id.*  Similar language in the Settlement Agreement was not necessary or considered with respect to the payment of the Debtors' funded debt claim or liens because such claims and liens were not disputed by any party prior to negotiating the Settlement Agreement.

24.     Accordingly, to the extent the Debtors are arguing that the Court is only authorized under the Settlement Agreement to release liens of Patriarch, and not those of the Debtors, the Debtors are mistaken.  Such a conclusion is not supported by either the text or the purpose behind the Settlement Agreement.  It would render the entire Settlement Agreement and Monetization Process a nullity if the Debtors, after engaging in a joint process that was found to be full, fair, and

robust, could nevertheless refuse consent to a transaction and refuse to release their liens (and worse, to do so without the fiduciaries' explanation, as is the case here). Such a result would be wholly incompatible with the Court's prior rulings that it has authority to compel a monetization transaction over the Debtors' objection. *E.g.*, Hr'g Tr. Feb. 6, 2020, 69:15–17, 70:25–71:4.[5]

**B.      The Proposed Sale to AVA Should be Approved Because it is the Highest and Best Bid Resulting from a Fair Process.**

25.      While the Debtors go to great lengths to stretch the Settlement Agreement, non-bankruptcy law, and the record beyond their reasonable bounds in order to assert that the Court must apply some different standard in reviewing the Sale Motion than would be applied in connection with other sale transactions, the fact is that, as in other transactions approved or proposed in these chapter 11 cases, the sale to AVA should be approved because it is the highest and best bid resulting from a fair process conducted by a third-party investment banker and overseen by the Company's Independent Manager and the Debtors. *In re SubMicron Sys. Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) ("[T]he market's reaction to a sale best reflects the economic realities of assets' worth."); *see also* Sale Motion, ¶ 34; *Debtors' Emergency Motion for Entry of an Order Enforcing and Implementing the Terms of the Settlement Agreement and Granting Related Relief* [D.I. 1115], ¶ 34 ("The market has spoken as it relates to the PC Sale Candidate. The company has been thoroughly shopped by a well-regarded and eminently capable investment banker."). This standard of review is consistent with the terms of the Settlement Agreement and

---

[5]   While not directly relevant to paragraph 18, with respect to the parties' Term Loans, the Debtors' Sale Objection brings into focus the existence of a dispute over the order of priority of Term Loan proceeds between Patriarch and the Debtors. Specifically, the Debtors argue that, because the Term Loans have matured, the intercreditor agreement priorities no longer apply. Patriarch disagrees, but does not want this issue to distract from the need to close on this transaction promptly. If the proposed sale to AVA is approved, Patriarch requests that the net proceeds payable to the holders of Term Loan be held in escrow pending resolution (by Court order or agreement) regarding the distribution of those proceeds.

the subsequent orders defining the terms and process through which the Monetization Process is to proceed.

26.     The Settlement Agreement imposes a process by which the Debtors' CRO and Independent Director, acting in the best interests of the Debtors, and Ms. Tilton, in the best interests of the Group A Portfolio Companies, will monetize the Portfolio Companies.  Settlement Agreement, ¶ 10.  The Amended Monetization Process Order provides further detail regarding the joint process:

- It set the timeline by which the Group A Portfolio Companies (including the Company) are to be marketed and sold, subject to extension with the mutual agreement of the Debtors and Ms. Tilton, Amended Monetization Process Order, ¶ 2;
- It delegated responsibility for "conducting the sales process on behalf of [a] Portfolio Company" to any independent manager or director overseeing the sale process for such company, *id.*, ¶ 8;
- It established "regularly-scheduled status conferences, to occur at least once per month or at such other intervals as appropriate, . . . [to] provide the Court with an update on the monetization of each Portfolio Company," *id.*, ¶ 17; and
- It created a dispute resolution process providing that "[i]f a dispute arises in connection with the scheduling and conduct of the monetization of a Portfolio Company and/or the terms of this Order, the parties may advise the Court of such dispute without the need to first submit the issue to mediation," *id.*, ¶ 18.

27.     Patriarch submits that the Amended Monetization Process Order and the Settlement Agreement set forth the parties' agreement and the Court's determination of the process by which the Portfolio Companies should be monetized.  If a marketing process runs its course and is conducted consistent with the procedures approved by this Court in the Amended Monetization Process Order, then the highest and best bid resulting from that process should be approved.  This is the standard the Court applied in approving the Rand transaction over Patriarch's objection.  In approving the sale to the Debtors' proposed buyer, the Court found:  (i) "[t]he sale process was full and comprehensive, conducted in a commercially reasonable manner intended to canvas the market and achieve the best offers for Rand"; (ii) "the proposed Rand transaction represents an

14

arm's length agreement and the documents have been negotiated and entered into in good faith by the parties"; (iii) "the amounts payable under the Rand transaction, based on the proposed purchase price, represent a fair and reasonable price that has been market-tested, and was the best offer received under the circumstances"; and (iv) "it's critical for the transaction to close and that there be no further delay, given Rand's liquidity needs."  Hr'g Tr. Oct. 19, 2020, pp. 229:9–19, 230:7–9.  Patriarch submits that the record supports the same findings with respect to the proposed sale to AVA.

28.    Contrary to the Settlement Agreement and prior standards advocated and used in these chapter 11 cases, the Debtors attempt to now impose heightened scrutiny with respect to the proposed sale to AVA, an affiliate of Patriarch, notwithstanding the appointment of Mr. Berger as Independent Manager to oversee the Company's sale process.

29.    But the Debtors' Independent Director through his counsel has made clear how low of a bar he finds necessary to satisfy the standard for monetization under the Settlement Agreement:

> There can be no dispute about this.  ***The word monetize means convert to currency; that's it.  It does not mean maximize the value of.  It does not mean realize the highest and best price for***.  It does not mean restructure. ***It does not even mean conduct a public auction for.  It means convert to currency***.

Hr'g Tr. Sept. 24, 2019, p. 19:7–12 (emphases added).  Unless the Amended Monetization Process Order expressly modifies it, the "Settlement Agreement shall remain in full force and effect . . . ." Amended Monetization Process Order, ¶ 21.  In other words, the term and meaning of "monetize" has not changed.  As explained in the Sale Motion and herein, the proposed sale to AVA is the highest and best bid, and in fact the only viable bid, for the Company's assets.  By any standard,

this transaction should be approved, but particularly based on the low bar advocated by the Debtors' principal.

### C. The Proposed Sale to AVA Satisfies All Other Standards Advocated by the Debtors.

a. <u>The Entire Fairness Standard Does Not Apply Under Non-Bankruptcy Law, But it is Nonetheless Satisfied</u>.

30.    As explained above, the Court may authorize the proposed sale to AVA over the Debtors' objection because it is the highest and best bid resulting from a full and fair marketing process.  The Company selected AVA as the winning bidder, in part, because its offer not only provided a fair price, but because it had a substantially greater likelihood to close than other submitted LOIs during the time period dictated by ██████████████████.  In fact, had the Company not selected the AVA bid, there is a real chance that the Company would already have closed its doors, because the Debtors refused to provide any necessary funding, and only Patriarch agreed to provide the Company with the $2 million in necessary financing to get through a contemplated sale.  The Debtors now try to block the sale to AVA by asserting that it must satisfy the "entire fairness" standard.  For the reasons explained below (i) the entire fairness standard does not apply as a matter of Delaware law, and (ii) if the entire fairness does apply, it has been satisfied.

i.    <u>The Entire Fairness Standard Does Not Apply</u>.

31.    The Debtors assert that the entire fairness standard applies, notwithstanding the waiver of fiduciary duties in the Company's LLC agreement, because such LLC agreement provides that insider transactions are only permitted if they are "no less favorable than those the Company could reasonably be expected to obtain from unrelated third parties."  LLC Agreement, ¶ 5.14; *see also Gatz Prps., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1212–13 (Del. 2012). *Gatz* also makes clear that, under these facts, where an interested transaction is "conditioned . . .

upon the approval of" a disinterested fiduciary, the entire fairness standard simply does not apply. *Id.* at 1213.  This is distinct from the "traditional corporate law setting," where the involvement of a disinterested fiduciary may result only in burden-shifting with respect to the entire fairness standard.  *Id.* at 1213 n.20.

32.    The Debtors assert that the proposed sale to AVA does not satisfy the standard set forth in *Kahn v. M & F Worldwide Corp. ("MFW")*, 88 A.3d 635 (Del. 2014) for replacing a control person with an independent manager or special committee for three reasons.  All three grounds are wrong.

33.    *First*, the Debtors assert that, "to avoid the entire fairness standard, a controller must actually abdicate control from the outset of the transaction."  Sale Objection, ¶ 52 (citing *In re Dell Techs. Inc. Class V Stockholders Litig.*, 2020 WL 3096748, at *6 (Del. Ch. June 11, 2020)). This is not the holding of *Dell*, and is contradicted by the Supreme Court of Delaware's decision in *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).  The court in *Flood* expressly held that in order to satisfy the independence requirements under *MFW*, the independent fiduciary must only control the transaction process "before any substantive economic negotiations begin" with the interested party.  *Id.* at 762.  Here, the Debtors take issue with the fact that "Mr. Berger was not put in place at the outset of the transaction—the sale process began months before his appointment."  Sale Objection, ¶ 53.  Elsewhere in the Sale Objection, the Debtors take issue with the fact that "Ms. Tilton and her management team" were involved in the creation of the Company's CIM and that Patriarch reviewed materials populating the data room.[6]  *Id.*, ¶ 27. Setting aside that none of this can fairly be considered surprising given Ms. Tilton's years of

---

[6]    For example, as the ultimate taxpayer for the Company, a disregarded entity for tax purposes, Patriarch was involved in providing tax and other documents for DPP's inclusion in the data room.

experience managing the Company, none of this even approaches involvement in "substantive economic negotiations" and do not credibly call into question the independence of this process under Mr. Berger's and DPP's control.

34.     Here, the Company's Independent Manager was appointed on or about December 10, 2020.  Berger Declaration, ¶ 6.  The Court has already overruled the Debtors' objection to the Independent Manager's appointment.  The Company's investment banker, DPP, began contacting a wide range of potential buyers only a few weeks prior to the Independent Manager's retention.  This was long before the beginning of any "substantive economic negotiations" between the Independent Manager and Ms. Tilton; initial offers were not even due until January 15, 2021, and the deadline for Letters of Intent was extended through March 5, 2021.  The Debtors cannot credibly assert, much less prove, that the Independent Manager was not in place and controlling the marketing and sale process for the Company before "substantive economic negotiations" with Patriarch or AVA commenced.

35.     *Second*, the Debtors make general reference to an asserted lack of independence for the Independent Manager or his advisors.  Sale Objection, ¶ 52.  This is simply unfounded conjecture.  As will be made clear through testimony and evidence, Mr. Berger was completely independent from Patriarch, as was the Company's counsel, Morrison Cohen LLP ("MoCo") whom Mr. Berger relied upon for purposes of conducting the marketing process and his ultimate negotiations with Ms. Tilton and AVA with respect to the Purchase Agreement.  This is evidenced in part by the protocols established by the Independent Director and the Company's counsel, as set forth in a Confidential Memorandum (the "Independent Sale Protocol Memorandum")[7] that MoCo circulated in late December 2020, which set forth the limitations on communications and

---

[7]  A true and correct copy of the Independent Sale Protocol Memorandum is attached hereto as Exhibit A.

information among the Company and its advisors, on the one hand, and Patriarch, on the other

hand, to ensure the sanctity and separateness of Mr. Berger's and DPP's marketing process.

Among other things, the Independent Sale Protocol Memorandum provides:

- "All decisions regarding the Monetization Process will be made by the Independent Manager."  Independent Sale Protocol Memorandum, ¶ 1.

- "To the extent the Independent Manager or DPP is in need of information about the Company that the Deal Team advises the Independent Manager it does not possess and that the needed information is in the possession or knowledge of the Manager or Patriarch, the Independent Manager will use his best judgment to consult with the Manager or Patriarch in a manner that prevents or minimizes to the extent possible, any disclosure of information relating to the Monetization Process in order to ensure that the Independent Manager does not do anything that might confer a competitive advantage on the Manager or Patriarch in its capacity as a bidder." *Id.*, ¶ 4.

- "Any communications from or relating to the Zohars is to be forwarded and directed to Company Counsel, to be evaluated on a case by case basis." *Id.*, ¶ 8.

36.     As will be further demonstrated at the evidentiary hearing, the Independent

Manager, DPP, and the Company's counsel all took their independence in the sale and marketing

process very seriously.  And the process they ultimately conducted was the best process achievable

███████████████████████████████████████████████████████████

██████████████████. The fact that the highest and best bid from the Company's marketing process

came from Patriarch does not, in itself, exhibit a lack of independence, which, at base, is what the

Debtors assert.

37.     *Third*, the Debtors assert that, "if the controller interferes in the sale process, entire

fairness will apply."  Sale Objection, ¶ 52.  As evidence of purported "interference," the Debtors

point to the fact that the Company's "█████████████ could only have been solved, according to Mr.

Berger, through █████████████████████████████████████████, ensuring that Ms.

Tilton had all of the leverage in any negotiations with Mr. Berger over the Tilton LOI that he

ultimately signed." *Id.* at 52.  In so doing, the Debtors fail to acknowledge that, before accepting

Patriarch's ██████████████ and the Final AVA LOI, the Company first requested that

the Debtors ██████████, as the Debtors and their stakeholders have done on several

prior occasions at other Portfolio Companies.  The Debtors declined, leaving Patriarch as the only

remaining viable option.  This cannot constitute "interference" with the sales process.  Neither the

Debtors nor their advisors should be surprised that ████████████████████

may also negotiate for protections or other terms related to a sale process.  This is common practice

in bankruptcy when ████████████████████████

████ a sale process.  There is simply nothing nefarious about Patriarch ██████████

████████████ to complete a sale transaction and to ████████████

██████████.  Any prudent lender would have done the same.

38.     Under *MFW* and *Gatz,* the entire fairness standard does not apply.

ii.     <u>The Proposed Sale to AVA Satisfies the Entire Fairness Standard</u>.

39.     Even if entire fairness did apply to the Court's consideration of the Sale Motion,

which it does not, that high standard is still satisfied here.  The entire fairness standard "requires

proof of both: (i) fair dealing and (ii) fair price, examined together as a whole."  *In re Green Field

Energy Servs., Inc.*, 594 B.R. 239, 297 (Bankr. D. Del. 2018) (citations omitted).  Judge Gross

explained the considerations for proof of fair dealing and fair price as follows:

(i)     "Fair dealing" involves elements such as (a) when the transaction was
timed, (b) how it was initiated, (c) how was it structured, (d) how it was
negotiated, (e) how it was disclosed to the directors, and (f) how the
approvals of the directors and the stockholders were obtained.

(ii)    "Fair price" includes such considerations as "economic and financial
considerations of the proposed merger, including all relevant factors:
assets, market value, earnings, future prospects, and any other elements that
affect the intrinsic or inherent value of a company's stock."

*Id.* (citing *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 106 (Bankr. D. Del. 2010)).

1.     The Sale to AVA is the Product of Fair Dealing.

40.     "Fair dealing" is primarily focused on process, and the process resulting in the proposed Asset Purchase Agreement was transparent, at arms' length, and designed to maximize value.   The sale and marketing process was timed and structured under the advice and recommendations of DPP, whom the Debtors consented to as the Company's investment banker in May 2020.   DPP recommended that the Company launch its marketing campaign in late November 2020 based on industry-specific diligence.   Further, DPP created a list of potential acquirers, and, with the assistance of the Company (including Ms. Tilton as Manager) developed a comprehensive CIM, all of which were provided to the Debtors and Patriarch.   Ultimately, DPP distributed a teaser describing the Company and its contemplated sale process to 298 potential acquirers.   Notwithstanding the broad solicitation, only three LOIs were ultimately submitted, including the LOI submitted by AVA.   Both the Independent Manager and DPP analyzed all three of the LOIs that were submitted and concluded that "under the totality of the circumstances the AVA LOI represent[ed] the highest and best offer for GAS's assets."   Berger Declaration, ¶¶ 49–51.

41.     The Debtors attempt to attack the process conducted by the Company's Independent Manager and investment banker, DPP, on a *post hac* basis, but do not and cannot explain (a) if their concerns were material, why they were not raised with the Court pursuant to the Amended Monetization Process Order, or (b) why their concerns would have changed the result of the sale process.   For example, the Debtors complain that "they were never permitted access to, or participation in the development of, the most materials aspects of the CIM (such as incorporation

and presentation of GAS's financials)," and that the "CIM prominently featured Ms. Tilton, who was a bidder for GAS." Sale Objection, ¶ 27. The CIM for the company's joint process with Dura in November 2018 was also principally drafted by, or with the input of, Ms. Tilton, and she was similarly prominently featured. And yet, the Debtors now trumpet the offers received from that process ("in the range of $86 to $137 million"). *See id.,* ¶ 4. If the Debtors truly believed that their failure to comment on the CIM would impact the sale, they had the opportunity and should have brought the dispute to the Court at that time. Amended Monetization Process Order, ¶ 18; Hr'g Tr. Oct. 19, 2020, p. 188:7–10 (M. Nestor: "And Your Honor, [with respect to the Rand Process, Ms. Tilton] can't have it both ways. She can't cry foul because she didn't get information, but then not avail herself of the information that was available to her."). Similarly, the Debtors complain of the "leverage" that Patriarch obtained through ██████████████████████ ████████████████████████████████████, but conveniently decline to tell the Court that they had the opportunity to ████████████████ and declined to do so. Sale Objection, ¶ 45.

42.    In short, the process resulting in the Asset Purchase Agreement with AVA was conducted by independent professionals retained by the Company, and resulted in what the Company has determined to be the highest and best bid. The Court should not reward the Debtors' *post hac* attempt to attack the process just because they are unhappy with the result. Such attacks are unavailing and/or any purported issues with the process are of their own making (by failing to either take alternative action or seek timely relief).

2.    The Sale to AVA Represents a Fair Price.

43.    The sale contemplated by the Asset Purchase Agreement also represents a fair price. Under the Purchase Agreement, AVA has agreed to pay a purchase price totaling $32 million, and

is assuming the Company's accounts payable and accrued expenses, which as of February 2021 totaled approximately $22.4 million.[8]  This purchase price will be paid in part by credit bidding the outstanding amount under the ABL Facility, totaling approximately █████████████ ████████████████████████, with a substantial portion of the cash balance allocated to certain taxes and standard closing expenses.  The only cash from this transaction being paid directly to Patriarch is $75,000 on account of an unpaid PPAS agency fee, with all parties' rights expressly reserved as to this payment under paragraph 18 of the Settlement Agreement.  Further, notwithstanding Patriarch's assertion of its right to payment at closing under paragraph 18, the Company negotiated to escrow an additional $594,586.09 subject to the Debtors' and Patriarch's rights preserved as to the ultimate disposition of these assets.  Net of all such payments, credit bids, and escrows, there is anticipated to be approximately $800,000 to $ 1 million in proceeds to the Company, which could be used to make pro rata distributions on the Term Loan, exclusive of the escrowed proceeds which the Debtors may assert should not be paid to Patriarch.[9]  Accordingly, the Debtors are simply incorrect when they assert that the proposed sale to AVA does not provide them any value as Term Lenders, assuming of course the Debtors' underlying right to such proceeds under the Term Loan documents themselves.  *See* Sale Objection, ¶¶ 60, 83.

44.    While the Debtors take issue with the amount and/or adequacy of their recovery from the Purchase Agreement, this is again largely of their own making.  On March 5, 2021, AVA submitted an LOI specifying a bid of $44 million.  Even after payment in full of the ABL Facility,

---

[8]   Under the Purchase Agreement, the Purchase Price is reduced for any assumed accounts payable that are 60+ days past due, but those are only estimated to be approximately $4.1 million.

[9]   Attached as Exhibit B and C are sale proceed waterfalls prepared by DPP, as of March 11, 2021, calculating projected recoveries for stakeholders based on a $32 million enterprise value, which is the ultimately enterprise value reflected under the Asset Purchase Agreement.

this purchase price would have generated approximately $8.8 million in proceeds to pay the Term Loans.[10]  The Debtors, however, rejected this proposal.

45.     After ██████████████████████████, and considering the ████████ ████████ and the risks and expense of having a full trial on this transaction, AVA decreased its purchase price to $36 million, which was reflected in the Final AVA LOI executed by the Company.  The purchase price was further reduced by $4 million when the parties agreed to eliminate a planned $6.5 million escrow to cover potential future liabilities related to current litigation and other matters.  While the Debtors complain of this reduction, they fail to advise the Court that it actually resulted in a better potential net recovery to the Debtors.  Under the Final AVA LOI, net cash proceeds were not projected to be paid to the Seller, and, accordingly, there would be no cash payments to the Debtors.  However, by eliminating the $6.5 million reserve and, in return, reducing the purchase price by $4 million (resulting in a $32 million purchase price, not including the $22.4 million in liabilities that AVA also agreed to assume) net proceeds may be available for potential distribution to the Debtors.  Because the $6.5 million reserve exceeded the amount of the $4 million purchase price reduction, approximately $800,000 to $1 million in net proceeds from the sale may be paid to the Company (and potentially distributed to the Term Loan Lenders, including the Debtors).  Indeed, discovery confirms that the Company specifically advised the Debtors of the potential purchase price reduction, providing them a waterfall of both scenarios and expressly asked for their view as to which option should be exercised.

46.     Under the circumstances, the consideration provided under the Purchase Agreement, consisting of both a $32 million purchase price and the assumption of approximately

---

[10]   Attached as <u>Exhibit D</u> is an "Equity Value Waterfall" prepared by DPP as of March 8, 2021, reflecting the waterfall under AVA's $44 million bid.

$22.4 million in accounts payable and assumed liabilities, reflects a fair price.  The proposed Asset Purchase Agreement is the result of an extensive, arms'-length, and value-maximizing marketing process, and the market has spoken:  the Asset Purchase Agreement reflects the highest and best purchase price for the Company's assets being acquired by AVA.  *See In re SubMicron Sys. Corp.*, 432 F.3d at 461.  While the Debtors take issue with the purchase price (compared to AVA's initial LOI, which the Debtors rejected) or the value the Asset Purchase Agreement allocates to any Term Loan priority collateral, the marketing process (without pressure or coercion) did not yield any other bid that would achieve better results.

          b.     <u>The Proposed Sale Agreement is Also in the Best Interests of the Debtors and the Company.</u>

47.     For the reasons set forth herein, the Court is not required under the Settlement Agreement to find, unequivocally and without further context, that the Asset Purchase Agreement is in the Debtors' "best interests" in order to approve the Asset Purchase Agreement and grant the relief requested in the Sale Motion.  *See infra* Section <u>A(a)</u>.  This is not to say that the Debtors' best interest is not relevant; however, the Court should balance the Debtors' interest with those of the Company.

48.     The benefit of the Asset Purchase Agreement to the Company is clear.  The business will ███████████████ outside the cloud of these chapter 11 cases, with AVA committed to ███████████████████████████████████████████████ ███████████.  The Asset Purchase Agreement is the product of an extensive marketing process and is recommended by the Company's Independent Manager and investment banker, DPP.

49.     For the same reasons that the Asset Purchase Agreement satisfies the entire fairness standard, it is in the best interests of the Debtors.  For the convenience of the Court, Patriarch will

not duplicate that description in its entirety, but the proposed Asset Purchase Agreement is in the best interests of the Debtors for at least the following reasons:

- The Purchase Agreement is the highest and best bid resulting from a months' long marketing process overseen by the Company's Independent Manager and investment banker. There is approximately $800,000 to $1 million in proceeds that is estimated to be available to pay the Term Loan lenders (including the Debtors). In addition, there is $594,586.09 in escrowed proceeds that may not be released to Patriarch absent Court order or the agreement of the parties, and an additional $75,000 paid to PPAS subject to the Debtors' rights under paragraph 18 of the Settlement Agreement. While this may not be the distribution the Debtors hoped to realize, it is the best value available after a marketing process conducted consistent with the Settlement Agreement and the Amended Monetization Process Order.

- The Sale Objection seeks to place a significant amount, if not all, of the blame for ███████████████ on Ms. Tilton and Patriarch. While this is unfounded, the Purchase Agreement and Proposed Order do not release any such claims. Specifically, the Company is not selling its "Retained Claims," which include any potential claims against Patriarch, and whatever value the Debtors believe those claims hold. Should the Company seek to pursue any such Retained Claims, and such claims result in a monetary recovery, then those amounts may be available for distribution to the Term Loan Lenders, including the Debtors.

- While the Debtors do not describe ███████████████████ as a benefit to them, that is too narrow a view. The value of the remaining Group A Portfolio Companies is dependent on the ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ This risk is compounded by the fact that the Debtors have objected to the sealing of the hearing on the Sale Motion. [D.I. 2421]. As a result, if the Debtors have their way, not only will ████████ ████████████████████████████████████████████████.

50.    If, as the Debtors' Independent Director asserts, all that is required under the Settlement Agreement is to "convert [the Portfolio Companies] to currency," and that "realiz[ing] the highest and best price" is not required, then the Debtors have no real argument to contest the approval of the Asset Purchase Agreement based on their "best interests." Nonetheless, the Asset Purchase Agreement does reflect the highest and best price for the Company's assets.

51.      Most importantly, the Debtors have presented no evidence whatsoever of a viable alternative to the AVA bid.  The other two "offers" were non-binding, did not have a marked-up purchase agreement, risked falling apart on representation, warranty, and indemnification issues, and were contingent on due diligence and financing, among other problems.  There is no time to resolicit bids. ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.  The Debtors cannot simply come to Court and complain about the bid on the table, while presenting no solution to ███████████████████████████, and expect a buyer in this circumstance to simply pay them more money to solve for the problem the Debtors created by rejecting a consensual bid that would have yielded significant return to the Term Loan lenders in the first instance.  There is no basis on this record to conclude that there is any other alternative that would yield the Debtors significantly (or any) more funds, at the behest of ██████████████████████████ ████████████████████████.

D.       **The Objections to the Sealing Motion Should be Overruled.**

52.      In furtherance of their strategy to litigate the proposed sale to AVA to its literal demise, the Debtors and the Zohar III Controlling Class inexplicably object to Patriarch's Sealing Motion.  In so doing, the Debtors again ask the Court to apply a different standard to a Patriarch request than that applied to similar requests by the Debtors.  The Debtors clearly understand the necessity of maintaining the confidentiality of Portfolio Company commercial information.  Indeed, they have repeatedly sought, and been granted, authority to file documents under seal when the information at issue is Portfolio Company commercial information.  For example, in the *Debtors' Motion for Entry of an Order Authorizing the Filing of Portions of the Debtors' Motion*

*Pursuant to Paragraphs 18 and 20 of the Settlement Agreement to Compel Refund of Amounts Paid to Patriarch Stakeholders and for Related Relief Under Seal* [D.I. 2206], the Debtors argued:

> The Sealed Material includes certain information relating to Rand's and Hussey's businesses that, if disclosed, could negatively impact those companies' respective operations, provide their competitors with a competitive advantage, or is otherwise commercially sensitive. The Debtors further submit that filing the [underlying motion] with the Sealed Material redacted will not cause undue prejudice to any parties in interest.

*Id.* ¶ 10; *see also* D.I. 2244 (order granting relief). This is the exact standard that should apply to the instant Sealing Motion.

53.    Moreover, under the Court's order governing the presentation of monetization transactions selected by the Debtors [D.I. 545, ¶ 3(d)], information that, if made public could impact the value of a transaction, can be sealed upon the Debtors' election. The Debtors are not ambiguous about why they have opposed the Sealing Motion. They opposed the Sealing Motion because they do not support the Company's proposed transaction with AVA. In other words, while the Debtors have authority to keep confidential any commercial information for a sale that they support, they oppose keeping similar information confidential when they oppose that sale. This is simply a further attempt to impose a blocking position when the Debtors do not agree to the terms of a monetization transaction. Section 107 should not be used as a tool for the Debtors to obtain greater leverage in the Monetization Process than what is provided under the Settlement Agreement.

## **CONCLUSION**

WHEREFORE, Patriarch respectfully requests that the Court overrule the Sale Objection and Sealing Objections and enter the Proposed Order, (i) enforcing and implementing the terms of the Settlement Agreement; (ii) resolving a dispute over the Monetization Process under paragraph 11 of the Settlement Agreement with respect to the Company, by ordering the Debtors to (a)

execute, or cause the execution, of any definitive sale documents for the Company, and (b) take all actions reasonable necessary to advance the sale of the Company, including but not limited to releasing all liens, claims and interests in and against the Company and its assets; (iii) authorizing the completion of the sale contemplated under the Asset Purchase Agreement; and (iv) granting related relief.

Dated: April 5, 2021
Wilmington, Delaware

**COLE SCHOTZ P.C.**

By: */s/ G. David Dean*
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Monica K. Loseman (*Admitted Pro Hac Vice*)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Patriarch*

## **EXHIBIT A**

# (REDACTED)

**<u>EXHIBIT B</u>**

# (REDACTED)

**EXHIBIT C**

(REDACTED)

**<u>EXHIBIT D</u>**

# (REDACTED)