

# PROOF OF PUBLICATION

Oct-01, 2021

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

Oct 1, 2021, NYT & Natl, pg B3

Sworn to me this 1st day of October, 2021

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (KBO) |
| Debtors. | ) Jointly Administered |

**NOTICE OF ESTABLISHMENT OF CHAPTER 11 BAR DATES**

On March 11, 2018 (the "Petition Date"), Zohar III, Corp. and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On August 27, 2021, the Court entered an order [D.I. 2778] (the "Bar Date Order") establishing bar dates for filing Proofs of Claim and requests for allowance of administrative expenses in the Chapter 11 Cases for all persons and entities.[2]

**THE BAR DATES**

(i) The General Bar Date. All persons or entities holding Prepetition Claims against the Debtors are required to file Proofs of Claim by **October 25, 2021 at 5:00 p.m. (prevailing Eastern time)**. The General Bar Date applies to all types of Prepetition Claims against the Debtors, including Section 503(b)(9) Claims, secured claims, unsecured priority claims, and unsecured nonpriority claims, and claims by governmental units.

(ii) The Amended Schedules Bar Date. If the Debtors amend or supplement their Schedules, the Debtors shall give notice to the holders of claims affected thereby. The deadline for any such holders to file a Proof of Claim with respect to such affected claim shall be the later of (i) the General Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the Debtors provide such notice to the affected holder.

(iii) The Rejection Bar Date. Any entity whose claim arises out of the Court-approved rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code prior to the confirmation of a chapter 11 plan must file a Proof of Claim on or before the later of (a) the General Bar Date, and (b) thirty (30) days after service of notice of the entry of the Court order approving such rejection on the affected claim holder.

(iv) Administrative Expense Bar Date. All persons or entities holding or wishing to assert an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code, other than claims under section 503(b)(9) of the Bankruptcy Code (each, an "Administrative Expense Claim"), which claim arose during the period from the Petition Date through and including August 27, 2021, are required to file a Request for Payment of Administrative Expense Claim by **October 25, 2021 at 5:00 p.m. (prevailing Eastern time)**.

**WHO MUST FILE PROOFS OF CLAIM.** Except where the Rejection Bar Date, the Amended Schedules Bar Date, or one of the exceptions listed in paragraph 9 of the Bar Date Order applies, the following entities must file Proofs of Claim on or before the General Bar Date: (i) any person or entity whose claim against a Debtors is not listed in the Debtors' Schedules or is listed in the Schedules as either one or more of: disputed, contingent, or unliquidated; (ii) any person or entity who believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and who desires to have its claim allowed in a classification or amount other than that identified in the Schedules; (iii) any person or entity that believes its claim is the obligation of a Debtor other than the Debtor in whose Schedules such claim was included; and (iv) any individual noteholder or other person or entity that believes it holds a Prepetition Claim not covered by the claim of U.S. Bank National Association, in its capacity as Indenture Trustee. Claims based on acts or omissions of the Debtors that occurred before the Petition Date must be filed on or prior to the applicable Bar Date, even if such claims are not now fixed, liquidated, or certain or did not mature or become fixed, liquidated, or certain before the Petition Date.

**WHAT TO FILE.** The following requirements shall apply with respect to filing and preparation of each Proof of Claim or Administrative Expense Claim: **(i)** each Proof of Claim must: (a) be written in English; (b) include a claim amount denominated in United States dollars (and to the extent such claim is converted to United States dollars, the conversion rate used in such conversion); (c) conform substantially with the claim form provided by the Debtors or Official Bankruptcy Form B 410; and (d) be signed by the holder of the claim or by an authorized agent of the holder of the claim; **(ii)** all claimants must either submit a Proof of Claim electronically through the Court's electronic claims filing system available at https://ecf.deb.uscourts.gov/cgi-bin/autoFilingClaims.pl or submit an original, written Proof of Claim by mail that substantially conforms with the Proof of Claim Form; **(iii)** each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d) (or, if such documentation is voluminous, filed or otherwise on the record in the cases, or already in the possession of the Debtors and/or their professionals, include a summary of such documentation), or an explanation as to why such documentation is not available; **(iv)** each Administrative Expense Claim must: (a) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (b) be written in English; (c) denominate the asserted claim in lawful currency of the United States as of the Administrative Expense Bar Date; (d) indicate the particular Debtor against which the claim is asserted; and (e) include supporting documentation (or, if such documentation is voluminous, filed or otherwise on the record in the cases, or already in the possession of the Debtors include a summary of such documentation) or an explanation as to why such documentation is not available. Documentation should include both evidence of the nature of the administrative expense claim asserted as well as evidence of the date on which the administrative expense claim arose; **(v)** all claimants must submit an original, written Administrative Expense Claim that substantially conforms with the Administrative Expense Claim Form; (vi) with respect to any request for payment of a claim under section 503(b)(9) of the Bankruptcy Code, include the value of the goods delivered to and received by the Debtors in the twenty (20) days prior to the Petition Date, attach documentation identifying which of the Debtors such goods were shipped to and the date such goods were received by such Debtors, (state whether the value of the goods asserted in the Proof of Claim represents a combination of goods and services and, if applicable, the percentage of alleged value related to services and related to goods, and attach any documentation identifying the particular invoices for which the section 503(b)(9) claim is being asserted; and **(vii)** each Proof of Claim or Administrative Expense Claim, including supporting documentation, must be filed so as to be actually received by the Court on or before the applicable Bar Date as applicable (a) by completing the electronic Proof of Claim Form on the Court's website at https://ecf.deb.uscourts.gov/cgi-bin/autoFilingClaims.pl, or (b) by mail so as to be received on or before the applicable Bar Date at the following address: United States Bankruptcy Court, Attn: Claims, 824 Market Street, 3rd Floor, Wilmington, DE 19801.

**WHEN AND WHERE TO FILE.** All Proofs of Claim or Requests for Administrative Expense Claim must be submitted **so as to be actually received by the Court, on or before the applicable Bar Date** (i) by completing the electronic Proof of Claim form on the Court's website at https://ecf.deb.uscourts.gov/cgi-bin/autoFilingClaims.pl, or (ii) by mailing an original, written Proof of Claim and one (1) copy so as to be received **on or before the applicable Bar Date** at the following address: United States Bankruptcy Court, Attn: Claims, 824 Market Street, 3rd Floor, Wilmington, DE 19801.

Proofs of Claim or Requests for Administrative Expense Claim will be deemed filed only when **ACTUALLY RECEIVED** by the Court. It is **NOT** sufficient for the Proof of Claim or Requests for Administrative Expense Claim be post-marked by the applicable Bar Date. Proofs of Claim or Requests for Administrative Expense Claim may **NOT** be delivered by facsimile or electronic mail transmission.

**CONSEQUENCES OF FAILURE TO FILE. ANY PERSON OR ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM BUT THAT FAILS TO DO SO BY THE APPLICABLE BAR DATE DESCRIBED IN THIS NOTICE MAY BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM: (I) ASSERTING ANY PREPETITION CLAIM AGAINST THE DEBTORS IN THE CHAPTER 11 CASES THAT YOU HAVE THAT (A) IS IN AN AMOUNT THAT EXCEEDS THE AMOUNT, IF ANY, THAT MAY BE SET FORTH IN THE DEBTORS' SCHEDULES, OR (B) IS OF A DIFFERENT NATURE OR IN A DIFFERENT CLASSIFICATION THAN WHAT MAY BE SET FORTH IN THE SCHEDULES (IN EITHER CASE, ANY SUCH CLAIM BEING HEREAFTER REFERRED TO AS AN "UNSCHEDULED CLAIM"); AND (II) VOTING UPON, OR RECEIVING DISTRIBUTIONS UNDER, ANY CONFIRMED PLAN OR PLANS OF REORGANIZATION OR LIQUIDATION IN THE CHAPTER 11 CASES IN RESPECT OF AN UNSCHEDULED CLAIM.**

**EXCEPT AS SET FORTH IN SECTION 503(B)(1(D) OF THE BANKRUPTCY CODE OR LOCAL RULE 3002-1(C), ANY HOLDER OF AN ADMINISTRATIVE EXPENSE CLAIM THAT AROSE PRIOR TO AUGUST 27, 2021, WHICH IS THE DATE OF THE ENTRY OF THE BAR DATE ORDER, AGAINST ANY OF THE DEBTORS WHO IS REQUIRED, BUT FAILS, TO FILE A REQUEST FOR ADMINISTRATIVE EXPENSE CLAIM IN ACCORDANCE WITH THE BAR DATE ORDER ON OR BEFORE THE ADMINISTRATIVE EXPENSE BAR DATE SHALL NOT BE PERMITTED TO PARTICIPATE IN ANY DISTRIBUTION IN THE CHAPTER 11 CASES ON ACCOUNT OF SUCH ADMINISTRATIVE EXPENSE CLAIM.**

**ADDITIONAL INFORMATION.** Copies of the Schedules and other filings in the Chapter 11 Cases also are available for a fee at the Court's website at www.deb.uscourts.gov. Copies of the Debtors' Schedules can be found at Docket Nos. 414, 416, 418, 420, 422, & 424. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through PACER at www.pacer.psc.uscourts.gov. Copies of the Schedules and other documents filed in the cases also may be examined between the hours of 9:00 a.m. and 4:30 p.m. (prevailing Eastern time), Monday through Friday, at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.

If you require additional information regarding the filing of a Proof of Claim, you may visit the Court's website at http://www.deb.uscourts.gov/claims-information.

A HOLDER OF A POSSIBLE CLAIM AGAINST THE DEBTORS SHOULD CONSULT ITS OWN ATTORNEY REGARDING ANY MATTERS NOT COVERED BY THIS NOTICE, SUCH AS WHETHER THE HOLDER SHOULD FILE A PROOF OF CLAIM OR A REQUEST FOR ADMINISTRATIVE EXPENSE CLAIM. NEITHER THE COURT NOR COUNSEL TO THE DEBTORS CAN ADVISE CREDITORS WHETHER THEY SHOULD FILE A PROOF OF CLAIM OR A REQUEST FOR ADMINISTRATIVE EXPENSE CLAIM.

Dated: September 3, 2021, Wilmington, Delaware, YOUNG CONAWAY STARGATT & TAYLOR, LLP, */s/ Shane M. Reil*, Shane M. Reil (No. 6195), Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Telephone: (302) 571-6600 / Facsimile: (302) 571-1253, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] The terms "claim," "entity," "person," and "governmental unit" shall have has the meaning given to such terms in section 101 of the Bankruptcy Code. **"Prepetition Claim" means any claim that arose prior to the Petition Date of March 11, 2018. Note, certain exceptions to the requirement to file a Proofs of Claim or Requests for Payment of Administrative Expense Claim are set forth in paragraphs 9 and 10 of the Bar Date Order.**

POLITICS | MEDIA

SUSAN WALSH/ASSOCIATED PRESS

Rohit Chopra, 39, served as a commissioner on the Federal Trade Commission, where he pushed for stiffer penalties for violators.

# Biden's Pick to Lead Consumer Watchdog Squeaks By in Senate

By STACY COWLEY

The Senate confirmed Rohit Chopra on Thursday to run the Consumer Financial Protection Bureau in a 50-to-48 party-line vote that overcame objections from Republicans who said he would wield the bureau's sweeping powers to pursue an anti-business agenda.

Mr. Chopra, 39, served most recently as a commissioner on the Federal Trade Commission, which he often criticized for what he viewed as a reluctance to crack down on violators. Facebook and Google were particular targets of his ire; citing "the endless scandals involving large technology firms," he called for much larger financial penalties and stiffer constraints.

As President Biden's choice for director, Mr. Chopra will be returning to an agency he helped build. Congress created the Consumer Financial Protection Bureau a decade ago with a simple mission: to regulate financial companies and protect consumers. The brainchild of Senator Elizabeth Warren, who lists it in her Twitter bio as one of her children alongside her two human offspring, it set out to crack down on the kinds of abuses that led to the 2008 mortgage crisis and subsequent economic crash. The bureau quickly became one of Washington's most feared and aggressive regulators.

*A new director who helped develop the agency he will run.*

"The C.F.P.B. is a young agency, and you see it whipsawing based on the leadership," said Ashley Taylor, a partner at Troutman Pepper who specializes in consumer finance regulation and enforcement. "The person at the top makes a huge difference."

Mr. Chopra worked on the bureau's development team and then became an assistant director, serving as its inaugural student loan ombudsman until 2015. In that role, he pressed for better safeguards and more active policing of federal student lending as it ballooned to a market of more than $1 trillion.

"He's really part of that original Elizabeth Warren crew that was there at the beginning and stood up the agency and had tremendous vision for what it was supposed to do," said Rachel Rodman, a former enforcement lawyer at the bureau who is now a partner at the law firm Cadwalader, Wickersham & Taft. "I view this as a return to that time and those priorities after the interruption of the Trump administration."

Republicans have often demonized the consumer bureau because of its ability to reshape industries by rewriting their rules and punishing those that push the limits. Senator Patrick J. Toomey of Pennsylvania, the ranking Republican on the Banking Committee, said he feared Mr. Chopra would return the bureau to "the lawless, overreaching, highly politicized agency it was during the Obama administration."

To advance Mr. Chopra's nomination to the final vote, Vice President Kamala Harris broke a tie on a procedural vote. She had also broken deadlocks to confirm Jennifer Abruzzo, who in July became the general counsel of the National Labor Relations Board, and Kiran Ahuja, who became the Office of Personnel Management's director in June.

Mr. Chopra's immediate focus is likely to be on pandemic relief measures. Fearing a wave of foreclosures now that a federal eviction moratorium has expired, the bureau recently authorized new rules making it harder for lenders to seize homes until next year.

Expanded enforcement of fair lending laws is another area where observers expect significant action. At his nomination hearing in March, Mr. Chopra said he was concerned about the privacy and security of the data troves collected by technology companies and financial services providers, and about the risk of bias in the algorithmic systems that increasingly drive lending decisions.

Mr. Chopra's bureau is also likely to take a leading watchdog role over the burgeoning industry of nonbank financial technology companies that issue mortgages, student loans and other credit products.

"Agencies want to be relevant, and with a director who isn't afraid to expand the bureau's authority the C.F.P.B could really shape that space," Ms. Rodman said.

The consumer bureau has in recent years swung like a pendulum between extremes. Under its initial director, Richard Cordray, the agency overhauled mortgage lending rules, prosecuted hundreds of companies and extracted nearly $12 billion from businesses in the form of canceled debts and consumer refunds. When Mr. Cordray departed in the fall of 2017, President Donald J. Trump installed Mick Mulvaney, who as acting director curbed the bureau's enforcement arm and sharply curtailed its work.

He was replaced by Kathleen Kraninger, a less-fiery leader who shared Mr. Mulvaney's aversion to stricter financial regulation. She criticized the bureau for "pushing the envelope" and gutted a planned rule that would have constrained payday lending.

But a Supreme Court ruling last year gave the president the power to fire the director of the Consumer Financial Protection Bureau at will, and Mr. Biden used that authority to oust Ms. Kraninger in January. Since then, the bureau has been led by an acting director, Dave Uejio, who has worked there for nine years and served most recently as its chief strategy officer.

To replace Mr. Chopra on the Federal Trade Commission, Mr. Biden nominated Alvaro Bedoya, an online privacy expert.

# TV Producer Saw Red Flags as Ozy Built Talk Show

FROM FIRST BUSINESS PAGE

Another warning sign, Mr. Bessey said, was that one of the other producers pointed out that A&E had already scheduled "Hoarders" for the time slot that was supposedly meant for "The Carlos Watson Show."

Through much of July, Mr. Bessey was willing to "suspend my disbelief," he said, partly because of the difficulties of running a show under the restrictions related to the pandemic and partly because he "was so hopeful for that social justice conversation."

He oversaw Mr. Watson's interviews with the actor Terry Crews, for the premiere, as well as the presidential candidate Andrew Yang and the writers Malcolm Gladwell and Roxane Gay. The booker told guests in emails, which were reviewed by The Times, that the show would be on A&E.

In addition to Mr. Bessey, Heidi Clements, a veteran TV writer who was among the producers of "The Carlos Watson Show," said in an interview that she was told the program would appear on A&E.

"It was constantly talked about that it was for A&E," she said.

Ms. Clements, who is white, said she was inspired by Mr. Watson's pitch for the show during a 45-minute call before she joined the staff. She added that she was part of what she called the "great white awakening" during that summer of nationwide civil rights protests, describing herself as "excited to work for a Black media company and tell those stories that were overlooked."

Toward the end of July, Mr. Bessey got in touch with an A&E executive to confirm that the channel would broadcast "The Carlos Watson Show." That's when he learned it wouldn't appear on A&E, he said.

A&E Networks had a prior relationship with Ozy, having broadcast a special produced by the company and hosted by Mr. Watson in 2020, but it said no to "The Carlos Watson Show" before taping began, an A&E spokesman said.

Mr. Bessey said he resigned when he learned that the show would not appear on the channel. In a farewell email to Mr. Watson and Mr. Rao, which he shared with The Times, he wrote, "You are playing a dangerous game with the truth. The consequences of offering an A&E show to guests when we don't have one to offer are catastrophic for Ozy and for me."

Mr. Bessey said he told the show's staff that he was leaving during a Zoom call on Aug. 3. During the call, for which Mr. Watson was present, the producer also said the program was not, in fact, going to be shown on A&E. Mr. Watson then told the people on the call that "The Carlos Watson Show" would eventually wind up on A&E, according to Mr. Bessey and one other person on the call; and until that time, Mr. Watson added, the show would appear on YouTube as part of its YouTube Originals, a slate of programming made by professional studios and paid for by YouTube. (In an email from Mr. Watson to a contractor that was reviewed by The Times, he wrote that he had "sold" TV shows to YouTube, among other companies. In fact, Ozy hadn't sold any shows to YouTube, a YouTube spokesperson said.)

"The Carlos Watson Show" ended up appearing on Ozy.com and on YouTube, although not as a YouTube Original. A YouTube official confirmed that the show was not a YouTube Original. Mr. Watson, Mr. Rao and an Ozy spokesperson did not reply to requests for comment. There are now roughly 500 videos posted on the YouTube channel for "The Carlos Watson Show," including the host's interviews of Bill Gates, Billy Crystal, Amber Ruffin, Neil deGrasse Tyson and Dr. Anthony S. Fauci.

Ozy's claims about its relationship with YouTube have been at the heart of its crisis, which began when The Times reported on Sunday that someone at the company had apparently impersonated the YouTube executive overseeing YouTube Originals during a conference call with Goldman Sachs in February.

During the call, the person posing as the YouTube executive praised Mr. Watson and talked up Ozy's relationship with YouTube. In the Times report, Mr. Watson said that Mr. Rao, Ozy's chief operating officer, was the impersonator, adding that Mr. Rao had been going through a mental health crisis at the time. (Mr. Rao has not replied to requests for comment concerning the call.)

NOAM GALAI/GETTY IMAGES FOR HISTORY

Carlos Watson in early 2020, months before work on his eponymous talk show began, ostensibly for A&E.

**'You are playing a dangerous game with the truth.'**

Brad Bessey, who resigned about two months after becoming executive producer of "The Carlos Watson Show."

Ozy's board of directors initially praised Ozy's handling of the matter. "The board was made aware of the incident, and we fully support the way it was handled," Marc Lasry, a hedge fund manager who was the chairman of the Ozy board, said in a statement to The Times on Sunday. On Tuesday, however, the Ozy board hired a law firm to investigate the company's business practices and leadership team. And on Thursday, Mr. Lasry resigned as chairman, saying Ozy needed someone with more experience in crisis management and investigations.

Questions about Ozy arose among some people long before the call with Goldman Sachs, as documents and interviews related to "The Carlos Watson Show" suggest.

After Mr. Bessey and Ms. Clements quit, the producers made the show to suit YouTube Originals' postproduction requirements, although they believed it would be posted on the platform like any user-generated video, according to two of the show's former producers, who spoke on the condition of anonymity to protect their job prospects.

The marketing campaign for "The Carlos Watson Show" included billboards and posters in New York and Los Angeles. Those ads included splashy quotes with misleading attributions. One such quote, attributed to the Hollywood website Deadline, calls Mr. Watson "the best interviewer on TV." That description did appear in a July 31, 2020, Deadline article, but was taken from a statement by Mr. Rao in praise of Mr. Watson. Another quote described Mr. Watson as "Anderson Cooper meets Oprah." That line, attributed to The Los Angeles Times, was drawn from an advertising supplement that Ozy ran in that newspaper.

Mr. Bessey and another person who worked on the show said the marketing was aimed at potential investors and executives in television and advertising, rather than general viewers. The campaign seems to have worked, at least on one front. Sponsors of "The Carlos Watson Show" have included Chevrolet and other large companies.

Some of the videos on "The Carlos Watson Show" YouTube channel have received fewer than 100 views, while others have hundreds of thousands or more than a million views. Those figures, and the small number of comments on most videos, "may indicate paid boosting," according to an analysis by Tubular Labs, a company that tracks audiences for online videos.

It's common for companies to pay YouTube to place ads that pop up automatically onscreen before videos, which drives up the number of views. Tubular Labs suggests that Ozy may be using that tactic with its videos.

At the start of 2021, Mr. Watson was deep in talks with Goldman Sachs about a potential $40 million investment in Ozy. On Jan. 12, a Goldman executive sent an email to Mr. Watson and Mr. Rao asking to "speak to YouTube," according to a copy of the email shared by its recipient.

The response came from Mr. Rao, connecting the investors to a Gmail address for Alex Piper, the head of YouTube Originals; that email address turned out to be a fake, Mr. Piper said, as Ozy confirmed. And on Feb. 2, the Goldman Sachs team was on a conference call with the impersonator, who claimed that Ozy's videos were a great success on YouTube.

*UCC Public Sale Notice*

Please take notice that Jones Lang LaSalle ("**JLL**"), on behalf of INVICTUS 187 MEZZ LLC, a Delaware limited liability company (the "**Secured Party**"), as successor-in-interest to Prophet Mortgage Opportunities L.P., offers for sale at public auction on **Thursday, November 4, 2021, at 10:00 a.m.** (Eastern Time) at the offices of Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, and also being broadcast for remote participation via Zoom videoconference, in connection with a Uniform Commercial Code sale, 100% of the limited liability company membership interests (the "**Interests**") in 187 KENT OWNER LLC, a New York limited liability company (the "**Mortgage Borrower**"), which is the sole owner of the property commonly known as: 187 Kent Avenue, Brooklyn, New York 11249 (the "**Property**"). The Interests are currently owned by 187 KENT, LLC, a New York limited liability company (the "**Mezzanine Borrower**").

The Secured Party, as lender, made a loan (the "**Mezzanine Loan**") to the Mezzanine Borrower. In connection with the Mezzanine Loan, the Mezzanine Borrower granted to the Secured Party a first priority lien on the Interests pursuant to that certain Pledge and Security Agreement, dated as of October 11, 2019 (the "**Pledge Agreement**"). The Secured Party is offering the Interests for sale in connection with the foreclosure on the pledge of such Interests. The Mezzanine Loan is subordinate to (i) a certain mortgage loan to Mortgage Borrower (the "**Mortgage Loan**"); and (ii) other obligations and liabilities of the Mortgage Borrower that are otherwise affecting the Property.

The sale of the Interests will be subject to all applicable third-party consents and regulatory approvals, if any. Without limitation to the foregoing, please take notice that there are specific requirements for any potential successful bidder in connection with (i) obtaining information and (ii) bidding on the Interests, including but not limited to, (1) that each bidder must be a "Qualified Transferee" as that term is defined in that certain Intercreditor Agreement, dated October 11, 2019 (the "**Intercreditor Agreement**"), entered into by and among the Secured Party, the holder of the Mortgage Loan, and the holder of the Mezzanine Loan, as well as complying with any and all other requirements thereunder; (2) that the successful bidder must satisfy all of the applicable requirements of the Intercreditor Agreement, including but not limited to Section 6 thereof; and (3) that each bidder must deliver such documents and pay such amounts as required by the Intercreditor and the applicable governing documents relating to the Interests. Please note, meeting any requirements of the Intercreditor Agreement shall be at the sole risk, cost, and expense of a prospective bidder.

The Interests are being offered as a single lot, "as-is, where-is", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party and each bidder must make its own inquiry regarding the Interests. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

Secured Party reserves the right to credit bid, set a minimum reserve price, reject all bids (including, without limitation, any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by Secured Party upon prospective bidders in connection with the sale or to whom in Secured Party's sole judgment a sale may not lawfully be made), terminate or adjourn the sale to another time, without further notice, and to sell the Interests at a subsequent public or private sale and to impose any other commercially reasonable conditions upon the sale of the Interests as Secured Party may deem proper. Secured Party further reserves the right to determine the qualifications of any bidder, including a prospective bidder's ability to close the transaction on the terms and conditions referenced herein and to modify these terms of sale. Secured Party further reserves the right to verify that each certificate for the Interests to be sold bears a legend substantially to the effect that such interests have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and to impose such other limitations or conditions in connection with the sale of the Interests as the Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

All bids (other than credit bids of the Secured Party) must be for cash, and the successful bidder must be prepared to deliver immediately available good funds within forty-eight (48) hours after the sale and otherwise comply with the bidding requirements. Further information concerning the Interests, the requirements for obtaining information, the requirements for bidding on the interests, and the Terms of Sale can be found at http://www.187kentuccsale.com/ or by contacting JLL using the contact information below.

**Contact Information for Jones Lang LaSalle**:
Attn: Brett Rosenberg
212-812-5926, brett.rosenberg@am.jll.com

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (KBO) |
| Debtors. | ) Jointly Administered |

**NOTICE OF ESTABLISHMENT OF CHAPTER 11 BAR DATES**

On March 11, 2018 (the "Petition Date"), Zohar III, Corp. and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On August 27, 2021, the Court entered an order [D.I. 2778] (the "Bar Date Order") establishing bar dates for filing Proofs of Claim and requests for allowance of administrative expenses in the Chapter 11 Cases for all persons and entities.[2]

**THE BAR DATES**

(i) The General Bar Date. All persons or entities holding Prepetition Claims against the Debtors are required to file Proofs of Claim by **October 25, 2021 at 5:00 p.m. (prevailing Eastern time)**. The General Bar Date applies to all types of Prepetition Claims against the Debtors, including Section 503(b)(9) Claims, secured claims, unsecured priority claims, and unsecured nonpriority claims, and claims by governmental units.

(ii) The Amended Schedules Bar Date. If the Debtors amend or supplement their Schedules, the Debtors shall give notice to the holders of claims affected thereby. The deadline for any such holders to file a Proof of Claim with respect to such affected claim shall be the later of (i) the General Bar Date or (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the Debtors provide such notice to the affected holder.

(iii) The Rejection Bar Date. Any entity whose claim arises out of the Court-approved rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code prior to the confirmation of a chapter 11 plan must file a Proof of Claim on or before the later of (a) the General Bar Date, and (b) thirty (30) days after service of notice of the entry of the Court order approving such rejection on the affected claim holder.

(iv) Administrative Expense Bar Date. All persons or entities holding or wishing to assert an administrative expense claim pursuant to section 503(b) of the Bankruptcy Code, other than claims under section 503(b)(9) of the Bankruptcy Code (each, an "Administrative Expense Claim"), which claim arose during the period from the Petition Date through and including August 27, 2021, are required to file a Request for Payment of Administrative Expense Claim by **October 25, 2021 at 5:00 p.m. (prevailing Eastern time)**.

**WHO MUST FILE PROOFS OF CLAIM.** Except where the Rejection Bar Date, the Amended Schedules Bar Date, or one of the exceptions listed in paragraph 9 of the Bar Date Order applies, the following entities must file Proofs of Claim on or before the General Bar Date: (i) any person or entity whose claim against a Debtors is not listed in the Debtors' Schedules or is listed in the Schedules as either one or more of: disputed, contingent, or unliquidated; (ii) any person or entity who believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and who desires to have its claim allowed in a classification or amount other than that identified in the Schedules; (iii) any person or entity that believes its claim is the obligation of a Debtor other than the Debtor in whose Schedules such claim was included; and (iv) any individual noteholder or other person or entity that believes it holds a Prepetition Claim not covered by the claim of U.S. Bank National Association, in its capacity as Indenture Trustee. Claims based on acts or omissions of the Debtors that occurred before the Petition Date must be filed on or prior to the applicable Bar Date, even if such claims are not now fixed, liquidated, or certain or did not mature or become fixed, liquidated, or certain before the Petition Date.

**WHAT TO FILE.** The following requirements shall apply with respect to filing and preparation of each Proof of Claim or Administrative Expense Claim: **(i)** each Proof of Claim must: (a) be written in English; (b) include a claim amount denominated in United States dollars (and to the extent such claim is converted to United States dollars, the conversion rate used in such conversion); (c) conform substantially with the claim form provided by the Debtors or Official Bankruptcy Form B 410; and (d) be signed by the holder of the claim or by an authorized agent of the holder of the claim; **(ii)** all claimants must either submit a Proof of Claim electronically through the Court's electronic claims filing system available at https://ecf.deb.uscourts.gov/cgi-bin/autoFilingClaims.pl or submit an original, written Proof of Claim by mail that substantially conforms with the Proof of Claim Form; **(iii)** each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and 3001(d) (or, if such documentation is voluminous, filed or otherwise on the record in the cases, or already in the possession of the Debtors and/or their professionals, include a summary of such documentation), or an explanation as to why such documentation is not available; **(iv)** each Administrative Expense Claim must: (a) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant; (b) be written in English; (c) denominate the asserted claim in lawful currency of the United States as of the Administrative Expense Bar Date; (d) indicate the particular Debtor against which the claim is asserted; and (e) include supporting documentation (or, if such documentation is voluminous, filed or otherwise on the record in the cases, or already in the possession of the Debtors include a summary of such documentation) or an explanation as to why such documentation is not available. Documentation should include both evidence of the nature of the administrative expense claim asserted as well as evidence of the date on which the administrative expense claim arose; **(v)** all claimants must submit an original, written Administrative Expense Claim that substantially conforms with the Administrative Expense Claim Form; (vi) with respect to any request for payment of a claim under section 503(b)(9) of the Bankruptcy Code, include the value of the goods delivered to and received by the Debtors in the twenty (20) days prior to the Petition Date, attach documentation identifying which of the Debtors such goods were shipped to and the date such goods were received by such Debtors, (state whether the value of the goods asserted in the Proof of Claim represents a combination of goods and services and, if applicable, the percentage of alleged value related to services and related to goods, and attach any documentation identifying the particular invoices for which the section 503(b)(9) claim is being asserted; and **(vii)** each Proof of Claim or Administrative Expense Claim, including supporting documentation, must be filed so as to be actually received by the Court on or before the applicable Bar Date as applicable (a) by completing the electronic Proof of Claim Form on the Court's website at https://ecf.deb.uscourts.gov/cgi-bin/autoFilingClaims.pl, or (b) by mail so as to be received on or before the applicable Bar Date at the following address: United States Bankruptcy Court, Attn: Claims, 824 Market Street, 3rd Floor, Wilmington, DE 19801.

**WHEN AND WHERE TO FILE.** All Proofs of Claim or Requests for Administrative Expense Claim must be submitted **so as to be actually received by the Court, on or before the applicable Bar Date** (i) by completing the electronic Proof of Claim form on the Court's website at https://ecf.deb.uscourts.gov/cgi-bin/autoFilingClaims.pl, or (ii) by mailing an original, written Proof of Claim and one (1) copy so as to be received **on or before the applicable Bar Date** at the following address: United States Bankruptcy Court, Attn: Claims, 824 Market Street, 3rd Floor, Wilmington, DE 19801.

Proofs of Claim or Requests for Administrative Expense Claim will be deemed filed only when **ACTUALLY RECEIVED** by the Court. It is **NOT** sufficient for the Proof of Claim or Requests for Administrative Expense Claim be post-marked by the applicable Bar Date. Proofs of Claim or Requests for Administrative Expense Claim may **NOT** be delivered by facsimile or electronic mail transmission.

**CONSEQUENCES OF FAILURE TO FILE.** ANY PERSON OR ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM BUT THAT FAILS TO DO SO BY THE APPLICABLE BAR DATE DESCRIBED IN THIS NOTICE MAY BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM: (I) ASSERTING ANY PREPETITION CLAIM AGAINST THE DEBTORS IN THE CHAPTER 11 CASES THAT YOU HAVE THAT (A) IS IN AN AMOUNT THAT EXCEEDS THE AMOUNT, IF ANY, THAT MAY BE SET FORTH IN THE DEBTORS' SCHEDULES, OR (B) IS OF A DIFFERENT NATURE OR IN A DIFFERENT CLASSIFICATION THAN WHAT MAY BE SET FORTH IN THE SCHEDULES (IN EITHER CASE, ANY SUCH CLAIM BEING HEREAFTER REFERRED TO AS AN "UNSCHEDULED CLAIM"); AND (II) VOTING UPON, OR RECEIVING DISTRIBUTIONS UNDER, ANY CONFIRMED PLAN OR PLANS OF REORGANIZATION OR LIQUIDATION IN THE CHAPTER 11 CASES IN RESPECT OF AN UNSCHEDULED CLAIM.

**EXCEPT AS SET FORTH IN SECTION 503(B)(1(D) OF THE BANKRUPTCY CODE OR LOCAL RULE 3002-1(C), ANY HOLDER OF AN ADMINISTRATIVE EXPENSE CLAIM THAT AROSE PRIOR TO AUGUST 27, 2021, WHICH IS THE DATE OF THE ENTRY OF THE BAR DATE ORDER, AGAINST ANY OF THE DEBTORS WHO IS REQUIRED, BUT FAILS, TO FILE A REQUEST FOR ADMINISTRATIVE EXPENSE CLAIM IN ACCORDANCE WITH THE BAR DATE ORDER ON OR BEFORE THE ADMINISTRATIVE EXPENSE BAR DATE SHALL NOT BE PERMITTED TO PARTICIPATE IN ANY DISTRIBUTION IN THE CHAPTER 11 CASES ON ACCOUNT OF SUCH ADMINISTRATIVE EXPENSE CLAIM.**

**ADDITIONAL INFORMATION.** Copies of the Schedules and other filings in the Chapter 11 Cases also are available for a fee at the Court's website at www.deb.uscourts.gov. Copies of the Debtors' Schedules can be found at Docket Nos. 414, 416, 418, 420, 422, & 424. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through PACER at www.pacer.psc.uscourts.gov. Copies of the Schedules and other documents filed in the cases also may be examined between the hours of 9:00 a.m. and 4:30 p.m. (prevailing Eastern time), Monday through Friday, at the office of the Clerk of the Court, United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.

If you require additional information regarding the filing of a Proof of Claim, you may visit the Court's website at http://www.deb.uscourts.gov/claims-information.

A HOLDER OF A POSSIBLE CLAIM AGAINST THE DEBTORS SHOULD CONSULT ITS OWN ATTORNEY REGARDING ANY MATTERS NOT COVERED BY THIS NOTICE, SUCH AS WHETHER THE HOLDER SHOULD FILE A PROOF OF CLAIM OR A REQUEST FOR ADMINISTRATIVE EXPENSE CLAIM. NEITHER THE COURT NOR COUNSEL TO THE DEBTORS CAN ADVISE CREDITORS WHETHER THEY SHOULD FILE A PROOF OF CLAIM OR A REQUEST FOR ADMINISTRATIVE EXPENSE CLAIM.

Dated: September 3, 2021, Wilmington, Delaware, YOUNG CONAWAY STARGATT & TAYLOR, LLP, */s/ Shane M. Reil* , Shane M. Reil (No. 6195), Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Telephone: (302) 571-6600 / Facsimile: (302) 571-1253, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] The terms "claim," "entity," "person," and "governmental unit" shall have has the meaning given to such terms in section 101 of the Bankruptcy Code. **"Prepetition Claim" means any claim that arose prior to the Petition Date of March 11, 2018. Note, certain exceptions to the requirement to file a Proofs of Claim or Requests for Payment of Administrative Expense Claim are set forth in paragraphs 9 and 10 of the Bar Date Order.**

*UCC Public Sale Notice*

Please take notice that Jones Lang LaSalle, on behalf of Reuben Brothers Limited, incorporated and registered in Bermuda (the "Secured Party"), offers for sale at public auction on October 29, 2021 at 3:00 p.m. (ET) in the offices of Reed Smith LLP, 599 Lexington Avenue, 24th Floor, New York, NY 10022 (remote access to the public sale by telephone will be made available to prospective purchasers on request), in connection with a Uniform Commercial Code sale, 40% of the limited liability company membership interests in Gramercy Park House LLC, a Delaware limited liability company (the "Issuer"), which is the sole owner of the property commonly known as 14-16 East 16th Street, New York, NY 10003 (together with all rights, interests, privileges, benefits, powers, preferences, restrictions, and limitations related thereto, the "Interests"). The Interests are owned by DoIT Hospitality Delaware LLC, a Delaware limited liability company (the "Pledgor").

The Secured Party, as lender, made a loan in the original principal amount of $11,400,000 USD (the "Loan") to the Pledgor. In connection with the Loan, the Pledgor granted to the Secured Party a first priority security interest in the Interests pursuant to that certain Pledge and Security Agreement, dated as of March 21, 2019, between the Pledgor and the Secured Party. The Secured Party is offering the Interests for sale in connection with the foreclosure on the pledge of such Interests.

The Interests are being offered as a single lot, "as-is, where-is", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party and each bidder must make its own inquiry regarding the Interests. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Interests.

The Secured Party reserves the right to credit bid, set a minimum reserve price, reject all bids (including without limitation any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made) and terminate or adjourn the sale to another time, without further notice. The Secured Party further reserves the right to restrict prospective bidders to those who will represent that they are purchasing the Interests for their own account for investment not with a view to the distribution or resale of such Interests, to verify that each certificate for the Interests to be sold bears a legend substantially to the effect that such interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be disposed of in violation of the provisions of the Securities Act and to impose such other limitations or conditions in connection with the sale of the Interests as the Secured Party deems necessary or advisable in order to comply with the Securities Act or any other applicable law.

All bids (other than credit bids of the Secured Party) must be for immediately available good funds, and the successful bidder must be prepared to deliver immediately available good funds within 24 hours after the sale and otherwise comply with the bidding requirements. Further information concerning the Interests, the requirements for obtaining information and bidding on the interests and the Terms of Sale can be found at www.16east16uccsale.com.

Brett Rosenberg
+1 212-812-5926
brett.rosenberg@am.jll.com

COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES
INVESTMENT PROPERTIES
(600)
Investment Properties Other Areas 605
CARIBBEAN DEVELOPMENT OPPORTUNITY
161 acres, 6000 ft of white sand beach and turquoise water.
Adjoining international airport.
Call owner John 305-481-0613

RIVERDALE SECTION in the BRONX R6 zoned with 13,189 sq ft. FAR: 2.43 Tiny home on 4 Lane Rd. $4 Million Call 845-661-8773