**EXHIBIT A**

Redacted Public Version of Sealed Motion [Docket No. 2836]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ZOHAR III, CORP., *et al.*, | Case No. 18-10512 (KBO) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: October 19, 2021 at 10:00 a.m.**<br>**Objection Deadline: October 12, 2021 at 4:00 p.m.**<br>**Re: Docket No. 2834** |

### THE PATRIARCH STAKEHOLDERS' AMENDED MOTION FOR AUTHORIZATION TO DISCLOSE INFORMATION RELATED TO THE SETTLEMENT AGREEMENT AND MONETIZATION PROCESS

The Patriarch Stakeholders hereby move this Court for an order authorizing them to disclose information related to the Settlement Agreement and Monetization Process, and relieving them of any obligations under Local Rule 9019-5(d) (the "Mediation Rule").[2] Moreover, to the extent the Court does not rule on this matter at the omnibus hearing on October 19, 2021, the Patriarch Stakeholders hereby move in the alternative for an extension of the current deadline to

---

[1] Debtors are Zohar CDO 2003-1, LLC, Zohar II 2005-1, LLC and Zohar III, LLC, Delaware limited liability companies; and Zohar CDO 2003-1, Ltd. (together with Zohar CDO 2003-1, LLC, "Zohar I"), Zohar II 2005-1, Ltd. (together with Zohar II 2005-1, LLC, "Zohar II") and Zohar III, Ltd. (together with Zohar III, LLC, "Zohar III"), Cayman Islands exempted companies. Zohar I, Zohar II and Zohar III are collectively referred to as the "Zohar Funds." The last four digits of the Debtors' taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2] "Patriarch Stakeholders" has the meaning defined in the parties' Settlement Agreement, D.I. 266-1, as well any other Lynn Tilton affiliates. "Monetization Process" and "15 Month Window" have the meanings defined in the Settlement Agreement. Other capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion.

file administrative expense claims against the Debtors from October 25, 2021 to a date that is 10

days after the Court's ruling on this Motion, to afford the Patriarch Stakeholders sufficient time to

finalize and file their administrative expense claims in a manner consistent with the Court's ruling.

In support of this Motion, the Patriarch Stakeholders respectfully state as follows:

## PRELIMINARY STATEMENT

The Patriarch Stakeholders file this Motion to preserve their ability to fully defend

themselves in various adversary proceedings and in connection with certain related proceedings,

and to prosecute certain claims against the Debtors, MBIA, and others in these bankruptcy

proceedings. Without being able to disclose and rely on certain information related to the

Settlement Agreement and the Monetization Process, including specific events and actions taken

by the Debtors, MBIA, and others during the 15 Month Window, in particular the efforts made in

connection with Ms. Tilton's global restructuring proposals, the Patriarch Stakeholders will be

unfairly and wrongfully constrained.

Nearly two years ago, the Debtors brazenly asserted that the entirety of the process during

the 15 Month Window is subject to the Mediation Rule, which provides for the confidentiality of

mediation proceedings. Though the Court previously held that the Mediation Rule prohibited the

disclosure of certain information in the context of the parties' dueling Timeline Motions, the Court

also recognized that determinations concerning the scope and application of the Mediation Rule

likely would shift as the proceedings continued.

Since the Court last considered the applicability of the Mediation Rule, events in these

bankruptcy proceedings, as well as in adversary proceedings and other related litigation, have

made clear that information surrounding the Settlement Agreement and the Monetization Process,

including, specifically, events during the 15 Month Window, are crucial to ensuring that disputes

in these and other proceedings are litigated fully and fairly. And it is also clear that much of the

information is no longer subject to mediation confidentiality (if it ever was). Among other things, the Debtors and MBIA have repeatedly waived any right to claim confidentiality under the Mediation Rule by disclosing and deliberately putting at issue events that they previously claimed should not be disclosed.

Apart from that, the Patriarch Stakeholders face a looming administrative expense claims deadline and will be unable to articulate several claims fully and properly against the Debtors unless the Patriarch Stakeholders can reference and rely on events during the 15 Month Window. The Debtors and MBIA continue to unfairly impugn Ms. Tilton's actions related to the monetization of the Portfolio Companies, including in their affirmative claims against the Patriarch Stakeholders. In light of these allegations, Ms. Tilton's ability to defend herself and her Patriarch entities will be unfairly and prejudicially stymied without the ability to disclose information and events related to the Settlement Agreement and the Monetization Process.

Indeed, MBIA's recent Amended Complaint against the Patriarch Stakeholders includes detailed allegations concerning the Settlement Agreement and Monetization Process, and asserts claims specifically based on Ms. Tilton's actions during the 15 Month Window. The Patriarch Stakeholders obviously need to use the same information to defend themselves, but more than that, the Patriarch Stakeholders must be given the opportunity to disprove the Debtors' and MBIA's repeated allegations of bad faith and intentional wrongdoing, and must be permitted to show not only that the Debtors and MBIA are directly responsible for their own losses, but also that the Debtors and MBIA are responsible for causing substantial harm to the Patriarch Stakeholders by breaching the Settlement Agreement and related wrongful conduct.

57772/0001-41717841v1

Accordingly, the Patriarch Stakeholders hereby request that this Court enter an order authorizing them to disclose information related to the Settlement Agreement and Monetization Process.

## **BACKGROUND**

1.      On March 11, 2018, the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code. A flurry of motions by the various stakeholders immediately ensued. On April 4, 2018, the Court appointed the Honorable Kevin Gross to serve as mediator to support the parties' efforts to consensually resolve these motions through mediation. *See* D.I. 143.

2.      An intensive, multi-day mediation ensued. The various stakeholders came to an agreement on the pending motions, as well as various other issues. These agreements were set forth in a Settlement Agreement among the Debtors, Patriarch, MBIA, and the Zohar III Controlling Class. On May 21, 2018, the Court entered an order approving the Settlement Agreement. Among many things, the Settlement Agreement provides for a joint monetization process pursuant to which the parties would seek to sell or refinance the Portfolio Companies. It required the parties to "negotiate in good faith" regarding the monetization of the Portfolio Companies. D.I. 266-1 ¶ 3. The Settlement Agreement also provides that, in the event any disputes arose in connection with the Settlement Agreement – including in connection with the joint monetization process – those disputes "in the first instance, shall be referred to the Mediator." *Id.* ¶ 11. If the parties still could not resolve the disputes, the Settlement Agreement preserved the parties' right to raise any dispute with the Court for resolution. *Id.* In this way, the parties contemplated that the parties' disputes concerning monetization efforts would start in front of the mediator but ultimately might wind up before the Court.

3.      Thus, Judge Gross remained in the role of "on-call mediator" to resolve in the first instance those disputes that arose under the Settlement Agreement. Over the course of 2018 and 2019, the parties brought various disputes to Judge Gross to assist in their resolution.

4.      Beginning in the Spring of 2019 and continuing throughout the summer of 2019, the parties began negotiations over a global restructuring and asked for Judge Gross's assistance with this process. To that end, Ms. Tilton began making restructuring proposals to the Debtors and MBIA; some of these proposals were exchanged through Judge Gross, others were not.

5.      Contrary to MBIA's recent assertions in its Amended Complaint, *MBIA Insurance Corporation v. Lynn Tilton, et al*., Adv. Proc. No. 20-50776 (KBO) (D. Del) ("MBIA Adversary Proceeding"), D.I. 74 ¶¶ 193–203, ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

6.      On September 3, 2019, Judge Gross was succeeded as mediator by the Honorable Christopher Sontchi. D.I. 890. ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

7.      The parties first litigated the scope of the Mediation Rule in the context of their respective Timeline Motions, filed on December 20, 2019. D.I. 1164, 1167, 1168. In the Tilton

Timeline Motion, because the Patriarch Stakeholders believed that the Debtors waived any claim to confidentiality based on their own prior disclosures, D.I. 1164 at 1 n.3, Ms. Tilton discussed events related to the Settlement Agreement and Monetization Process, including regarding certain restructuring proposals.

8.      The Debtors and other key parties did not object to Ms. Tilton's discussion and instead, in their own Milestones Motion, the Debtors specifically referenced Ms. Tilton's monetization proposals, arguing that any delay of the Monetization Process was attributable to Ms. Tilton. *See* D.I. 1167 at 6–8. The Zohar III controlling class went even farther, trying to cast doubt on Ms. Tilton's good faith by alleging: "[d]espite Ms. Tilton's representation to this Court that her intent in filing these cases was to monetize assets and repay the Debtors' secured creditors, the past 667 days . . . have only furthered a strategy of delay . . . contrary to her stated intent [ ] to timely monetize the Portfolio companies." D.I. 1258 ¶ 2.

9.      Both parties filed objections to the competing timeline motions on January 10, 2020. D.I. 1253, 1254. Notably, though Ms. Tilton had already noted a potential mediation issue, the Debtors did not raise any such arguments in their Objections.

10.      In fact, the Debtors raised an objection to the Tilton Timeline Motion only on January 24, 2020, in a reply in further support of their Milestones Motion, alleging that the Tilton Timeline Motion had "reveal[ed] confidential mediation materials, discussions, and activities," in purported "violat[ion]" of the Mediation Rule. D.I. 1331 at 7 n.7. In particular, the Debtors cited to seven paragraphs concerning various proposals that Ms. Tilton made during the 15 Month Window. *Id*. Notably, the Debtors raised this objection even though discovery related to the Tilton Timeline Motion was already well underway.

11.      On January 30, 2020, the Debtors filed their Motion arguing that parts of the Tilton Timeline Motion, as well as information Ms. Tilton sought to discover, violated the Mediation Rule. The Patriarch Stakeholders filed their Objection to the Debtors' Motion on February 5, 2020, arguing, *inter alia*, that the information in question was not covered by the Mediation Rule and that, even if it were covered, it had been waived by the Debtor's reliance on similar allegations in earlier motions.

12.      The Court granted in part and denied in part the Debtors' Motion at a hearing on the Timeline Motions on February 6, 2020. Specifically, the Court granted the Debtors' motion to strike certain paragraphs from the Tilton Timeline Motion, but "den[ied] the remainder of the relief . . . [because] I can't rule in advance as to what the specific application of that rule [the Mediation Rule] would be in the context of a deposition or a trial." D.I. 1389-1 at 106:24–107:3.

13.      One of the portfolio companies the parties sought to monetize or refinance during the 15 Month Window was Dura Automotive Systems, LLC ("Dura"). On October 17, 2019, Dura filed voluntary petitions in bankruptcy for relief under Chapter 11. *In re Dura Automotive Systems, LLC, et al.*, No. 19-BR-12378 (KBO) (D. Del) ("Dura Bankruptcy"), D.I. 1. In the course of Dura's bankruptcy proceeding, the Debtors deliberately put at issue the facts concerning Ms. Tilton's efforts to monetize and/or refinance Dura. *See, e.g.*, Dura Bankruptcy, D.I. 990-1. Among other things, the Debtors elicited detailed testimony from a representative of Jefferies, an investment bank that assisted Ms. Tilton in making her restructuring proposals during the 15 Month Window. *Id.* at 5 n.5.

14.      Since then, the parties have continued to litigate various disputes in these bankruptcy proceedings, including many disputes that also directly implicate events during the 15 Month Window. Two adversary proceedings against the Patriarch Stakeholders, by the Debtors

7

and by MBIA, recently proceeded past the motion to dismiss stage. In both actions, the Debtors and MBIA broadly challenge Ms. Tilton's good faith, accuse her of stealing portfolio company assets, and blame her for their losses. *See*, *e.g.*, *Zohar CDO 2003-1, LTD, et al. v. Patriarch Partners LLC, et al.*, Adv. Proc. No. 20-50534 (KBO) (D. Del) ("Zohar Funds Adversary Proceeding"), D.I. 129 ¶ 1 (stating that Ms. Tilton "exploited [her] control [over the Portfolio companies] to siphon money from the Zohar Funds, and from the Portfolio Companies, ever since"); MBIA Adversary Proceeding, D.I. 74 ¶ 1 ("MBIA brings this action to redress Defendants' years-long pattern of fraud, self-dealing, and gross mismanagement pursuant to which they systematically looted the assets of three investment funds.")

15.    MBIA recently amended its complaint and added pages of detailed allegations concerning events during the 15 Month Window, including an allegation that Ms. Tilton "never intended to engage in a true, good-faith Monetization Process." *See* MBIA Adversary Proceeding, D.I. 74 ¶ 196; *see also id.* ¶¶ 184–213. In so doing, MBIA has put the 2019 global restructuring proposals squarely at issue. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████    MBIA further alleges that Ms. Tilton "failed to present a serious, executable alternative transaction." *Id.* ¶ 204. ██████████████████████████████████

████████████████████████████████████████████████████████████████

MBIA further accuses Ms. Tilton of "manufacturing" the liquidity crisis at Dura for her own purposes. *Id.* ¶ 205.

16.    All these allegations are made in support of MBIA's broad claim that Ms. Tilton supposedly breached the Settlement Agreement by "manipulating the sales process in bad faith." *Id.* ¶ 271(a). Such claims, among others, cut to the heart of what occurred during the 15 Month

Window and to the restructuring proposals that Ms. Tilton made during that time. The Patriarch Stakeholders are entitled to a full and fair defense of such claims, including evidence showing that the proposed transaction was, in fact, "serious," ███████ and "executable," and further are entitled to bring counterclaims and raise affirmative defenses based on the Debtors' and MBIA's bad-faith conduct during that time period as well.

17.     In addition, during an August 25, 2021 hearing, the Court set a deadline of October 25, 2021 for the Patriarch Stakeholders to file their administrative expense claims against the Debtors. As the Patriarch Stakeholders previewed during the hearing, several of their post-petition claims will be premised on facts that the Debtors may assert are covered by the Mediation Rule (for example, a claim that the Debtors failed to abide by their obligations under the Settlement Agreement will require the Patriarch Stakeholders to rely on information and evidence that occurred during the 15 Month Window that the Debtors previously contended are under the ambit of the Mediation Rule).

18.     As a result, the Patriarch Stakeholders now move for an order allowing them to disclose information relating to the Settlement Agreement and the Monetization Process.

## THE MEDIATION RULE

19.     The Mediation Rule provides that "[t]he mediator and the participants in a mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation." Del. Bankr. L. R. 9019-5(d)(i). The Rule further prohibits someone from "rely[ing] on or introduc[ing] as evidence in any arbitral, judicial or other proceeding, evidence pertaining to any aspect of the mediation effort" as well as "seek[ing] discovery from any participant in the mediation with respect to any information disclosed during mediation." *Id.*

9

20.     The scope and application of the Mediation Rule are limited in two key respects.

21.     First, as a local rule, it "may be modified by the Court in the interest of justice." Del. Bankr. L. R. 1001-1(c). As such, this Court has full discretion to modify the Mediation Rule or excuse the parties from any of its requirements in the interest of justice.

22.     Second, the Mediation Rule is a confidentiality provision; it does not create or reflect a mediation privilege. In fact, at the federal level, there is no established mediation privilege. Federal evidentiary privileges are governed by the common law. *See* Fed. R. Evid. 501 (stating that the "common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege"). "A local rule, like any court order, can impose a duty of confidentiality as to any aspect of litigation, including mediation. But privileges are created by federal common law. It's doubtful that a district court can augment the list of privileges by local rule." *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1040–41 (9th Cir. 2011) (internal citations omitted); *Pearson v. Miller*, 211 F.3d 57, 68 (3d Cir. 2000) (holding that "[s]tatutory provisions providing for duties of confidentiality do not automatically imply the creation of evidentiary privileges binding on courts").

23.     No Circuit Court of Appeals, including the Third Circuit, has explicitly recognized a mediation privilege.[3] *See Stewart Title Guar. Co. v. Owlett & Lewis, P.C.*, 297 F.R.D. 232, 239 (M.D. Pa. 2013) (noting that the Third Circuit has not recognized a mediation privilege); *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003) (recognizing

---

[3] Some district courts, including one in the Third Circuit, have done so. *See Sheldone v. Pa. Turnpike Comm'n*, 104 F. Supp. 2d 511, 515 (W.D. Pa. 2000); *see also Spruce Env't Techs., Inc. v. Festa Radon Techs., Co.*, 370 F. Supp. 3d 275, 278-79 (D. Mass. 2019); *ACQIS, LLC v. EMC Corp.*, No. 14-CV-13560 (ADB), 2017 WL 2818984, at \*2 (D. Mass. June 29, 2017); *Folb v. Motion Picture Industry Pension & Health Plans*, 16 F. Supp. 2d 1164, 1181 (C.D. Cal 1998); *In re RDM Sports Grp., Inc.*, 277 B.R. 415, 430 (Bankr. N.D. Ga. 2002).

only a more general settlement privilege); *see also Molina v. Lexmark Intern., Inc.*, No. CV 08–04796, 2008 WL 4447678 (C.D. Cal. Sept. 30, 2008) (questioning whether a federal mediation privilege should exist).

24. Therefore, the Mediation Rule is solely a confidentiality provision.[4] "'[C]onfidential' does not necessarily mean 'privileged.' Privileges are not lightly created and cannot be inferred absent a clear manifestation of Congressional intent." *Fed. Deposit Ins. Corp. v. White*, No. 3-96-CV-0560-BD, 1999 WL 1201793, at *2 (N.D. Tex. Dec. 14, 1999) (quoting *In re Grand Jury Subpoena,* 148 F.3d 487, 492 (5th Cir. 1998)); *see also Molina*, 2008 WL 4447678, at *10 ("Although 'confidentiality' and 'privilege' are often used interchangeably in discussions of mediation, the terms refer to two distinct concepts. 'Confidentiality' refers to a duty to keep information secret, while 'privilege' refers to protection of information from compelled disclosure." (internal citations omitted)).

25. As a confidentiality provision, rather than a privilege, the Mediation Rule is not subject to the same absolutist approaches typically seen with privileges. For example, the Second Circuit has created a straightforward balancing test to determine when confidential mediation information should be disclosed:

> A party seeking disclosure of confidential mediation communications must demonstrate (1) a special need for the confidential material, (2) resulting unfairness from a lack of discovery, and (3) that the need for the evidence outweighs the interest in maintaining confidentiality. . . . All three factors are necessary to warrant disclosure of otherwise non-discoverable documents.

---

[4] The Patriarch Stakeholders acknowledge that in previous discussions related to the Mediation Rule, they informally referred to the confidentiality provision as a privilege. They did so in error. It is clear that there is a significant distinction between a privilege, such as the attorney-client privilege, and the confidentiality provisions at issue here.

*In re Teligent, Inc.*, 640 F.3d 53, 58 (2d Cir. 2011). This test relies on provisions in the Uniform Mediation Act, the Administrative Dispute Resolution Act of 1996, 5 U.S.C. §§ 571 et seq., and the Administrative Dispute Resolution Act of 1998, 28 U.S.C. §§ 651 et seq., all of which recognize that there are instances where the need for disclosure outweighs the need to ensure the confidentiality of mediation. *See id.*

## ARGUMENT

26.     For three independent reasons, the Mediation Rule should not bar the Patriarch Stakeholders from relying on information concerning Ms. Tilton's restructuring proposals made in connection with the Monetization Process.

27.     First, the Debtors and MBIA have themselves repeatedly disclosed and deliberately put at issue information concerning the Monetization Process and events during the 15 Month Window, such that much of the information is no longer confidential and not subject to the Mediation Rule (if it ever was).

28.     Second, even if the Mediation Rule applies to this information, the Court should modify the rule in the interest of justice. A strict application of the rule would unfairly prevent the Patriarch Stakeholders from bringing meritorious claims and asserting critical defenses.

29.     Finally, in light of all that has occurred in these and other proceedings over the past two years, the Patriarch Stakeholders' need to rely on Ms. Tilton's restructuring offers greatly outweighs any interest in keeping the information confidential.

## A. The Mediation Rule Is Inapplicable Because the Information at Issue Is Not Confidential

30.     The Mediation Rule does not protect mediation-related information that is not confidential. Here, as described above, the Debtors and MBIA already disclosed material facts surrounding the Mediation for their own use in these proceedings and in related litigation. *See*

*supra* ¶¶ 13–16. Since this information is no longer secret, there is no basis for prohibiting the Patriarch Stakeholders from using it and related information. Indeed, the Mediation Rule makes clear that it does not prohibit disclosure of information that is not confidential. *See* Del. Bankr. L. R. 9019(5)(d)(i) ("Information otherwise discoverable or admissible in evidence does not become exempt from discovery, or inadmissible in evidence, merely by being used by a party in the mediation.").

31.     Among other things, as discussed above, the Debtors already disclosed details about the parties' negotiations pursuant to the Settlement Agreement, such as accusing Ms. Tilton of being responsible for delays in the Monetization Process by focusing on the restructuring proposal. The Debtors made further elicited disclosures of Ms. Tilton's restructuring proposal in the context of the Dura bankruptcy proceeding. *See supra* ¶¶ 13–16.

32.     Putting aside the Debtors' prior disclosures, MBIA recently disclosed extensive information concerning the Settlement Agreement and Monetization Process in its First Amended Complaint. *See* MBIA Adversary Proceeding, D.I. 73, 74. As discussed above, MBIA's allegations include numerous details concerning the restructuring/monetization proposals Ms. Tilton made while Judge Gross was still serving as the on-call mediator.

33.     Under these circumstances, the parties' conduct during the 15 Month Window and in connection with the Monetization Process, including their conduct while Judge Gross remained on call, is already before the Court and there is nothing left for the Mediation Rule to protect.

**B.    Even if Still Applicable, the Mediation Rule Should Not Be Applied to Events Related to the Settlement Agreement and Monetization Process in The Interest of Justice**

34.     To the extent the Court concludes that any information remains confidential and falls under the Mediation Rule, the Mediation Rule should not be applied to information concerning the Settlement Agreement and Monetization Process, including Ms. Tilton's

restructuring offers. Local Rule 1001-1(c) specifically permits the Court to modify the Mediation

Rule "in the interest of justice." Here, allowing the Patriarch Stakeholders to disclose information

concerning the Monetization Process, and in particular Ms. Tilton's restructuring offers, is clearly

in the interest of justice for several reasons.

35.     First, modifying the Meditation Rule will ensure that the underlying purpose of the

Settlement Agreement is effectuated. The purpose of that Agreement was to facilitate the parties'

efforts to monetize the Portfolio Companies through a combination of potential sales and

refinancings. As part of those monetization efforts, the parties created a process in which they

would first attempt to resolve any disputes through mediation, but then, if that was unsuccessful,

they agreed to go to the Court. D.I. 266-1 ¶ 11. The structure of this dispute resolution process

confirms the parties' intent that disputes arising during the mediation context might well end up in

front of the Court and that information concerning those disputes would need to be disclosed to

the Court.

36.     Moreover, this understanding of the Settlement Agreement and the unique role of

mediation in the Monetization Process is demonstrated by the parties' actions. For example, in

August 2019, the Debtors filed a motion seeking to resolve a dispute that originally arose in

mediation: whether the Monetization Process would continue past August 21, 2019. D.I. 833 ¶ 1

(Motion of the Debtors, seeking *inter alia*, to resolve a dispute pursuant to Rule 11 of the

Settlement Agreement). The Debtors noted that they "were unsuccessful in resolving this dispute

before the Mediator so, now, the Debtors seek an order of the Bankruptcy Court resolving this

dispute as permitted pursuant to paragraph 11 of the Settlement Agreement." *Id.* ¶ 3. In making

their motion, the Debtors clearly referenced events related to the Monetization Process. *Id.* ¶ 14

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

37.     Therefore, to the extent that the application of the Mediation Rule to the process created by the Settlement Agreement is unclear, the Court should exercise its power under the Local Rules to modify the Rule and ensure the agreed-to terms of the Settlement Agreement are effectuated.

38.     Second, modifying the Mediation Rule to allow for disclosure of information about the events relating to the Settlement Agreement and Monetization Process is also in the interest of justice because otherwise the Patriarch Stakeholders will not be able to defend themselves against the salacious accusations the Debtors and MBIA have made, nor will the Patriarch Stakeholders be able to support some of their anticipated affirmative claims, including their administrative expense claims.

39.     In the numerous litigations between the parties inside and outside of this bankruptcy, the Debtors and MBIA have attacked Ms. Tilton and the Patriarch Stakeholders for purportedly putting their own interests ahead of the Portfolio Companies and other stakeholders, including throughout the monetization process.

40.     Just by way of example, the Debtors allege that the Patriarch Stakeholders, including Ms. Tilton:

- "[U]sed the Zohar Funds and the Portfolio Companies for their own personal gain." Zohar Funds Adv. Proc., D.I. 129 ¶ 8.

- "[H]arvested for her own account (to the exclusion of the Zohar Funds) years of favorable tax attributes generated from losses generated by the Portfolio Companies that she used for years to shield incomes from her vast enterprises from cash tax liability." *Id.* ¶ 4.

- "[B]razenly withheld both information and cash from the Zohar Funds, taken advantage of her insider status to shift every possible recovery from the Zohar Funds to herself in the Portfolio Company sales process, and all the while continued to insist that Portfolio Companies pay her enormous sums in accordance with the improper and self-dealing agreements." *Id.* ¶ 9.

- "[S]ought to further maximize the value she could personally extract from the Portfolio Companies." *Id.* ¶ 183.

- "[C]ontinually found new ways to extract value from the Debtors estate, further diminishing the Zohar Funds' assets, while secured creditors' claims have been substantially impaired." *Id.* ¶ 208.

- Engaged in "entirely self-interested schemes to enrich herself to the detriment of the Debtors and to the administration of the estates." *Id.* ¶ 259.

And MBIA alleges that the Patriarch Stakeholders, including Ms. Tilton:

- Engaged in "years-long pattern of fraud, self-dealing, and gross mismanagement pursuant to which they systematically looted the assets of three investment funds." MBIA Adv. Proc., D.I. 74 ¶ 1.

- "[E]mbarked on an egregious campaign of stunning theft and self-dealing." *Id*. ¶ 5.

- "[T]reated equity and control positions in Portfolio Companies acquired by the Funds with fund assets as though they belong to Tilton — a legal fiction Tilton and Defendants have only recently abandoned — seizing for themselves the benefits of such equity." *Id.* ¶ 6.

- "[A]ctively conceal[ed] from MBIA the extent of the Insured Zohar Funds' equity holdings, secretly claiming legal and beneficial ownership of the Funds' equity interests, and absconding with economic and other benefits attending to such ownership." *Id.* ¶ 79.

- Provided a proposed plan for reorganization in the bankruptcy proceeding that "made clear that Tilton in fact had no legitimate intention to monetize the Zohar I Collateral." *Id.* ¶ 152.

- "[I]mpeded the monetization process and obstructed the MBIA's recoveries at every turn," *id*. ¶ 182, including within months of agreeing to the Settlement Agreement, when "Tilton renewed her efforts to impede and obstruct the Zohar Funds' monetization of the Portfolio Companies and extract for herself and her affiliates whatever value she could from the Collateral to the detriment of MBIA and the Zohar Funds," *id.* ¶ 192.

- Engaged in "conduct [that] revealed that [Ms. Tilton] never intended to engage in a true, good-faith Monetization Process." *Id.* ¶ 196.

16

- "[A]bandoned her duties and obligations to sell Portfolio Companies, and having now failed to present a serious, executable alternative transaction, Tilton surreptitiously engaged in scorched-earth tactics." *Id.* ¶ 204.

To refute these allegations of bad faith and wrongdoing, the Patriarch Stakeholders must be able to present evidence of the fair and executable restructuring proposals Ms. Tilton made during the Monetization Process, and the communications among and between the parties to the Settlement Agreement relating to those efforts. That evidence is critical to the Patriarch Stakeholders' ability to disprove such false allegations of bad faith and self-dealing.

41.    Additionally, the Patriarch Stakeholders need to be able to disclose information concerning Ms. Tilton's restructuring proposals to support anticipated affirmative claims and counterclaims, including administrative expense claims based on the Debtors' failure to comply with their obligations under the Settlement Agreement to negotiate the monetization of the Portfolio Companies in good faith. To properly assert these claims, the Patriarch Stakeholders will need to disclose information relating the parties' conduct during the time when a mediator was still involved in the Monetization Process.

42.    Accordingly, the Court should modify the Mediation Rule in the interest of justice to allow Patriarch Stakeholders to disclose information related to the Settlement Agreement and the Monetization Process.

**C.** **The Patriarch Stakeholders' Need to Disclose Information Concerning the Monetization Process Outweighs Any Need to Maintain the Confidentiality of that Information**

43.     As a confidentiality provision, the Mediation Rule must be balanced against a party's need for evidence. Indeed, the Court already acknowledged the need for a balancing approach to determine whether the information relating to the Settlement Agreement and Monetization Process can be disclosed. *See* D.I. 1389-1 at 107:1–7 (noting that the Court will "take every matter as it comes" when determining whether the Mediation Rule applies).

44.     Though the Third Circuit has not recognized a specific test to determine when a party may disclose confidential mediation communications, the Second Circuit adopted a three-part test that takes into account the various interests at stake:

> A party seeking disclosure of confidential mediation communications must demonstrate (1) a special need for the confidential material, (2) resulting unfairness from a lack of discovery, and (3) that the need for the evidence outweighs the interest in maintaining confidentiality. . . . All three factors are necessary to warrant disclosure of otherwise non-discoverable documents.

*In re Teligent, Inc.*, 640 F.3d 53, 58 (2d. Cir 2011).

45.     The Patriarch Stakeholders meet every prong of this test.

46.     First, they have a special need for information related to the Settlement Agreement and the Monetization Process, particularly given the disclosures and allegations already made to date.

47.     Throughout these proceedings, the Debtors and MBIA have complained vociferously about various efforts to monetize the Portfolio Companies and have attempted to blame Ms. Tilton for any challenges. But the truth is that the Debtors and MBIA both would have been better off with any of the proposals Ms. Tilton made during the 15 Month Window and Ms. Tilton should be able to tell that truth. In fact, Ms. Tilton proposed numerous ways to monetize

18

the companies. However, many of these proposals were advanced during the 15 Month Window established by the Settlement Agreement that the Debtors previously argued is covered by the Mediation Rule. The Debtors and MBIA cannot expect Ms. Tilton to counter their arguments that she acted in bad faith and failed to fulfill her obligations generally, and under the Settlement Agreement specifically, without being able to reference almost all the actions she, in fact, took and that, in fact, reflect her consistent good faith, as well as the Debtors' and MBIA's responses to those actions. Moreover, the Patriarch Stakeholders' anticipated administrative expense claims will focus on the Debtors' actions in the period after the Settlement Agreement, arguing that it is the Debtors that have frustrated the Monetization Process. But again, the Patriarch Stakeholders need to rely on materials and events that occurred during the 15 Month Window to adequately assert such claims.

48.     Second, the Patriarch Stakeholders' inability to gather further information as part of discovery will result in significant unfairness. The information the Patriarch Stakeholders seek to rely on is not available anywhere else because Ms. Tilton's monetization proposals were made within the framework of the Settlement Agreement. As a result, there are no documents that Ms. Tilton can rely on or testimony she can seek to elicit that would not be, in some way, related to the Mediation Rule's provisions, under the broad application of that provision proposed by the Debtors.

49.     Third, the need for evidence to support the parties' various claims and defenses about the Settlement Agreement and Monetization Process greatly outweighs the interest of maintaining confidentiality. The ability to monetize the Portfolio Companies is at the heart of the parties' disputes. This is evident from both the numerous allegations that the Debtors and MBIA advanced that Ms. Tilton's actions somehow thwarted attempts at monetization and from the

Patriarch Stakeholders' anticipated administrative expense claims that will allege that the Debtors and MBIA, not Ms. Tilton, failed to abide by their obligations under the Settlement Agreement to negotiate in good faith when considering monetization proposals advanced by Ms. Tilton. It is simply impossible for the Patriarch Stakeholders to adequately state their claims and defend against the claims by the Debtors and MBIA without disclosing aspects of the Monetization Process. *See Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2019 WL 6702069, at *2 (S.D.N.Y. Dec. 9, 2019) (noting that "there are cases in which the strong interest in preserving confidentiality in mediation must — and does — give way to other, even weightier interests").

50.     Accordingly, the Patriarch Stakeholders should be allowed to disclose information related to the Settlement Agreement and Monetization Process because the need for such disclosure, and for a full and fair litigation of the issues, substantially outweighs any potential need to protect the confidentiality of communications made while a mediator was involved in that process.

57772/0001-41717841v1

## **CONCLUSION**

51.    For the foregoing reasons, the Patriarch Stakeholders respectfully request that the

Court enter the Proposed Order granting the Motion and allowing the Patriarch Stakeholders to

disclose information related to the Settlement Agreement and the Monetization Process in these

bankruptcy proceedings and related actions; or, in the alternative enter an interim Order extending

the Patriarch Stakeholders' deadline to file administrative expense claims against the Debtors until

10 days after the Court's ruling on the Motion. The Patriarch Stakeholders further respectfully

request that the Court grand such other relief as the Court may deem appropriate.

Dated: October 7, 2021

**COLE SCHOTZ P.C**.

By: */s/ G. David Dean*
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

– and –

SHER TREMONTE LLP
Theresa Trzaskoma (Admitted Pro Hac Vice)
Michael Tremonte (Admitted Pro Hac Vice)
Vikram Shah (Admitted Pro Hac Vice)
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com
vshah@shertremonte.com

*Counsel to the Patriarch Stakeholders*

57772/0001-41717841v1