## EXHIBIT 1

**Blackline**

***THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE
SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE
STATEMENT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR
APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.
THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO
CHANGE.***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., et al., | Case No. 18-10512 (KBO) |
| Debtors[1]. | Jointly Administered |

### DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PLAN OF
### LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR
### ZOHAR III, CORP. AND ITS AFFILIATED DEBTORS, DATED MARCH 21, 2022

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4421)
Ryan M. Bartley (No. 4985)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Attorneys for the Debtors*

Dated: March 2123, 2022

---

[1] The Debtors and the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612),
Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited
(8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is c/o FTI Consulting, Inc., 1166 Avenue of
the Americas, 15th Floor, New York, NY 10036.

| | B. | Reservation of Causes of Action/Reservation of Rights | 70 |
| | C. | Releases by the Debtors of Certain Parties | 70 |
| | D. | Releases by Non-Debtors | 71 |
| | E. | Exculpation | 71 |
| | F. | Plan Injunction | 72 |
| | G. | Term of Bankruptcy Injunction or Stays | 72 |
| | H. | Setoff | 72 |
| | I. | Preservation of Insurance | 72 |

ARTICLE XI. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE;  EFFECT OF FAILURE OF CONDITIONS ........ 73

| | A. | Conditions Precedent to the Effective Date | 73 |
| | B. | Satisfaction of Conditions | 74 |

ARTICLE XII. CONFIRMATION PROCEDURE ........ 74

| | A. | Confirmation Hearing | 74 |
| | B. | Requirements of Section 1129(a) of the Bankruptcy Code | 75 |

ARTICLE XIII. RISK FACTORS ........ 78

| | A. | Parties May Object to the Plan's Classification of Claims and Interests | 78 |
| | B. | The Debtors May Not Be Able to Obtain Confirmation of the Plan | 78 |
| | C. | The Amended Equitable Subordination Complaint Seeks Relief Inconsistent with the Plan | 78 |
| | D. | Allowed Administrative Expense and Priority Claims May Exceed Estimates | 78 |
| | E. | The Conditions Precedent to the Effective Date of the Plan May Not Occur | 79 |
| | F. | Risks Regarding Remaining Portfolio Company Assets | 79 |
| | G. | Risks Regarding Litigation Assets | 80 |
| | H. | Tax Considerations | 80 |

ARTICLE XIV. ALTERNATIVES TO THE PLAN ........ 81

ARTICLE XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........ 81

| | A. | Federal Income Tax Consequences to the Debtors | 82 |
| | B. | Classification, Reporting, and Taxation of the Post-Effective Date Entities | 84 |
| | C. | Federal Income Tax Consequences to Holders of Claims | 84 |
| | D. | Importance of Obtaining Your Own Professional Tax Assistance | 8891 |

28644911.9

ARTICLE XVI. RETENTION OF JURISDICTION ................................................................ 88 91

ARTICLE XVII. RESERVATION OF LITIGATION ASSETS ........................................... 90 93

ARTICLE XVIII. MISCELLANEOUS PROVISIONS ........................................................ 90 93

    A.    Corporate Action ................................................................................... 90 93

    B.    Modification of Plan ............................................................................ 90 93

    C.    Revocation or Withdrawal of the Plan ............................................... 91 94

    D.    Plan Supplement .................................................................................. 91 94

    E.    Payment of Statutory Fees .................................................................. 91 94

    F.    Exemption from Transfer Taxes ......................................................... 91 94

    G.    Expedited Tax Determination ............................................................. 92 95

    H.    Exhibits/Schedules ............................................................................. 92 95

    I.    Substantial Consummation .................................................................. 92 95

    J.    Severability of Plan Provisions ........................................................... 92 95

    K.    Governing Law .................................................................................... 92 95

    L.    Conflicts .............................................................................................. 92 95

    M.    Reservation of Rights .......................................................................... 93 96

    N.    Limiting Notices .................................................................................. 93 96

ARTICLE XIX. CONCLUSION ........................................................................................... 93 96

iv

The Deemed Rejecting Classes are not receiving any recovery under the Plan.  As set forth in the Plan, the treatment of Claims in the Voting Classes and the Deemed Rejecting Classes is consistent with the priority of payment and subordination provisions in the Indentures.  The Debtors believe that recoveries on the Debtors' remaining assets would be less if they were pursued by a chapter 7 trustee, and that the Asset Recovery Entities and Liquidation Trust are the best means to obtain the highest value for the Debtors' assets.  A chapter 7 trustee likely would not seek to optimize the timing of a sale of the Portfolio Companies to ensure that maximum value (rather than prompt liquidation) is obtained, and a chapter 7 trustee would not have the means to, among other things, accommodate any capital or resource needs of the remaining Portfolio Companies pending a sale.  A conversion to chapter 7 would not result in value accretion that would result in putting the Deemed Rejecting Classes "into the money."

If the Debtors' remaining assets were liquidated under chapter 7 of the Bankruptcy Code (rather than through the Plan), a number of additional costs would be incurred.  These costs would include, among other things, the statutory fees payable to a chapter 7 trustee, and the fees that would be payable to professionals retained by the chapter 7 trustee.  Under the Plan, there will be fees paid to the trustee(s) for the Liquidation Trust(s), the Wind-Down Administrator, and their respective professionals.  The fees of the Liquidation Trustee's (or Trustees') and Wind-Down Administrator's respective professionals would not be subject to Court approval, while the fees of a chapter 7 trustee 's professionals would be subject to Court approval.

Conversion to chapter 7 of the Bankruptcy Code may also delay any nearer-term monetization of the assets, and will result in the establishment of a new claims bar date, which could result in additional Claims being asserted against the Debtors, thereby potentially diluting recoveries for certain parties.

Moreover, given that they have liens and superpriority claims, as applicable, on substantially all of the Debtors' assets, it is unknown whether in a chapter 7 case the Indenture Trustee, the Controlling Party, and the Zohar III Controlling Class, as applicable, would agree to the use of cash collateral to provide for a treatment similar to what is provided for under the Plan for Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims.  In a chapter 7 case, unlike under the Plan, the foregoing claims are not required to be satisfied and would not recover from the collateral securing the Adequate Protection Claims of the Indenture Trustee, Allowed Zohar I Indenture Trustee Claims, Allowed Zohar I Credit Enhancement Claims, Allowed Zohar II Credit Enhancement Claims, and Allowed Zohar III A-1 Note Claims, which is all of the Debtors assets, absent consent of the Indenture Trustee to use its collateral.

After considering the effects that a chapter 7 liquidation would have on the Debtors' remaining assets and the funds available for distribution to Holders of Allowed Claims, and given (i) that the Debtors' assets, including any claims and causes of action under chapter 5 of the Bankruptcy Code and any commercial tort claims of Zohar II and III, are subject to the liens and superpriority claims, as applicable, of the DIP Lenders and the Indenture Trustee, and (ii) the multitude of unknowns associated with conversion of the Chapter 11 Cases to chapter 7, the Debtors believe that confirmation of the Plan will not provide the Holders of Allowed Claims in Impaired Classes (including the Deemed Rejecting Classes) less than such Holders would receive

28644911.9

If that proves not to be true, the Debtors may have not have sufficient cash to make the Plan become Effective, or the Zohar III Controlling Class and Controlling Party may not consent to the funding of the Escrow Accounts in amounts sufficient to pay these claims, or both. The Debtors would then need to either obtain the consent of the taxing authorities to a treatment other than payment in full, in cash, on the Effective Date, as required under section 1129(a)(9) of the Bankruptcy Code, or pursue an alternative to the Plan.

<h2 align="center">ARTICLE XIV.</h2>

<h2 align="center">ALTERNATIVES TO THE PLAN</h2>

The Debtors believe the Plan affords Holders of Allowed Claims the potential for the greatest realization on the Litigation Assets of Zohar I and the Remaining Assets of Zohar II and Zohar III and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the Debtors believe that the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to chapter 7 of the Bankruptcy Code. Neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, Holders of Claims could revert to a "race to the courthouse," the result being that claimants would not receive a fair and equitable distribution as contemplated by the Plan. And there can be no assurances that the value of the Debtors' interest in the Portfolio Companies or the Litigation Assets would be preserved outside of the context of cases under the Bankruptcy Code.

As a result of, among other things, the delay, additional costs, and uncertainties that would likely result from any conversion of the Chapter 11 Cases to chapter 7, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would be achieved in chapter 7. Therefore, chapter 7 is not a superior alternative to the Plan. Thus, the Debtors believe that the Plan represents the best available alternative for maximizing returns to Holders of Allowed Claims. For additional discussion regarding why the Debtors believe the Plan is a superior alternative to a conversion to chapter 7, see Article XII.B.1.

<h2 align="center">ARTICLE XV.</h2>

<h2 align="center">CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN</h2>

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors and to certain Holders of Claims. This discussion is based on the Internal Revenue Code ("IRC"), the Treasury regulations thereunder (the "Regulations"), judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below. Furthermore, this discussion is not binding on the IRS or any other tax authority. There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Plan that differs from the tax consequences described

81

price if its terms provide for interest not less than the applicable federal rate.

A Under Section 108 of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a Bankruptcy Court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must generally reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (e) foreign tax credits.  The reduction in a debtor's tax basis in its assets generally does not have to exceed the excess of (i) the debtor's tax basis in assets held immediately after the discharge of indebtedness over (ii) the amount of liabilities remaining immediately after the discharge of indebtedness (the "Liability Floor"). NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under IRC section 108(b)(5) (the "Section 108(b)(5) Election") to reduce the debtor's basis in its depreciable property first.  If a debtor makes a Section 108(b)(5) Election, the Liability Floor does not apply to the reduction in basis of depreciable property. The Debtors have not determined whether to make a Section 108(b)(5) Election.  Any required reduction of tax attributes arising out of the exclusion of COD Income from gross income is made after the determination of the tax due for the year in which the discharge of indebtedness giving rise to excluded COD income occurs.  Accordingly, the Debtors' existing tax attributes, including NOLs, will be available to offset taxable income in the year in which the Debtors realize COD Income in connection with the transactions contemplated by the Plan.

It is anticipated that COD Income will be realized from the exchange of the Zohar II Credit Enhancement Liability Claims for the New Notes issued by Zohar II, the exchange of the Zohar III A Notes for New Notes issued by Zohar III, the exchange of the Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims for beneficial interests in the Zohar I Litigation Sub-Trust, and the cancellation of the Zohar I A-3 Notes, all B Notes and all General Unsecured Claims for new consideration.  The amount of COD Income will be equal to the adjusted issue price of the exchanged debt before the deemed discharge, reduced by the sum of (i) cash (if any), (ii) the issue price of the New Notes, (iii) the fair market value (if any) of any other property transferred to the exchanging Holders, and (iv) the amount of any old debt that remains outstanding after the discharge.  It is anticipated that COD Income will be realized by the Debtors, but will not be recognized by and included in the Debtors' gross income in the year in which the Effective Date occurs pursuant to Section 108 of the IRC.

**2.**    Accrued Interest

To the extent that there exists accrued but unpaid interest on indebtedness owing to holders of Allowed Claims and to the extent that such accrued but unpaid interest has not been deducted previously by the Debtors, portions of payments made in consideration for the indebtedness underlying such Allowed Claims that are allocable to such accrued but unpaid interest should be deductible by the Debtors.  Any such interest that is not paid will not be deductible by the Debtors and will not give rise to COD Income.

83

To the extent that any of the Debtors have previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to such Debtors.  If such amounts are not paid, they will give rise to additional COD Income that would be excluded from gross income pursuant to the bankruptcy exclusion discussed above.  As a result, the Debtors would be required to reduce their tax attributes to the extent of such interest previously deducted and not paid.

**3.** <u>Gain or Loss</u>

The transfer of the Remaining Assets to the Asset Recovery Entities in exchange for the Asset Recovery Entities' assumption of the New Notes is expected to be treated as a taxable asset ~~exchange~~sale for U.S. ~~As a result~~federal income tax purposes. In such sale, the Debtors will recognize gain equal to the ~~extent~~excess, if any, of the fair market value ~~of any property received and liabilities assumed in exchange for the Remaining Assets is greater than the Debtors' adjusted basis in the Remaining Assets or loss to the extent the Debtors' adjusted basis in the Remaining Assets exceeds the fair market value of any property received and liabilities assumed in exchange for the Remaining Assets~~as of the Effective Date of the Debtors' assets over the tax basis in such assets, some or all of which may be offset with available tax attributes, e.g., NOLs, and losses recognized in the asset sale. However, if there is an aggregate gain and such gain exceeds the amount of tax attributes available to offset it, the Debtors may owe a cash tax liability for the taxable year that includes the Effective Date.

**B.** **Classification, Reporting, and Taxation of the Post-Effective Date Entities**

The Asset Recovery Entities are anticipated to be formed by the Controlling Party of Zohar II, in the case of New Zohar II LLC, Zohar II Intermediate LLC and Zohar II Recovery LLC and the Controlling Class of Zohar III, in the case of New Zohar III LLC, Zohar III Intermediate LLC, and Zohar III Recovery LLC, and taxed as corporations.  The Asset Recovery Entities will be obligated to treat the basis of the assets that they are deemed to purchase from the Debtors as the fair market value of those assets, as determined by the Debtors under Section 6.6(d) of the Plan.

The Litigation Trust is currently anticipated to be subject to grantor trust tax rules and, as a result, items of income and loss will be allocated to the respective beneficiaries of the Litigation Trust in accordance with the Litigation Trust Agreement.

**C.** **Federal Income Tax Consequences to Holders of Claims**

**1.** <u>Treatment Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims.</u>

For purposes of this discussion, it is assumed that the transactions described in Section ~~6.1(b~~6.1(c) and (~~c~~d) of the Plan will be structured as a significant debt modification followed by a "*Bruno's* transaction" and treated as: (i) an exchange of the Zohar II Credit Enhancement Liability Claims for New Notes issued by Zohar II Limited, a sale of Zohar II's assets to, and an assumption of the New Notes by, an indirect subsidiary of New Zohar II LLC, *i.e.*, Zohar II Recovery LLC, and an exchange ~~of the~~by Zohar II Recovery LLC of interests in New Zohar II LLC in satisfaction

of all but $100,000 of New Notes assumed by Zohar II Recovery LLC and (ii) an exchange of the Zohar III A-1 Note Claims for New Notes issued by Zohar III Limited, a sale of Zohar III's assets to, and an assumption of the New Notes by, an indirect subsidiary of New Zohar III LLC, *i.e.*, Zohar III Recovery LLC, in and an exchange for the by Zohar III Recovery LLC of interests in New Zohar III LLC in satisfaction of all but $100,000 of New Notes assumed by Zohar III Recovery LLC. Under this characterization, these exchanges will be treated as a fully taxable transaction. In that case, a U.S. holder of a Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder (other than the amount, if any, allocable to accrued interest, discussed below under "Accrued but Untaxed Interest") in the exchange of New Notes for existing indebtedness. The character of such gain or loss as capital or ordinary will be determined by a number of factors, including (but not limited to) the tax status of the U.S. holder, whether the prepetition notes exchanged constitute a capital asset in the U.S. holder's hands, whether the prepetition notes exchanged have been held for more than one year, whether the prepetition notes exchanged have bond premium or market discount, and whether and to what extent the U.S. holder previously claimed a bad debt deduction with respect to the prepetition notes exchanged. Gain or loss realized must be calculated separately for each identifiable block of prepetition notes surrendered in the exchanges for New Notes, and the deductibility of capital losses is subject to limitations. The transfer of the Remaining Assets to the Asset Recovery Entities in exchange for the Asset Recovery Entities' assumption of the obligations under the New Notes will be treated as a taxable exchange of assets. Accordingly, the Remaining Assets will be treated as purchased by the Asset Recovery Entities and the Asset Recovery Entities and the basis in the Remaining Assets in the hands of the Asset Recovery Entities will be equal to the fair market value of the Remaining Assets as determined in accordance with the Plan.

In connection with the holding of equity in the Asset Recovery Entities, a U.S. holder of such equity generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid in respect of such equity to the extent such distributions are paid out of any current or accumulated earnings and profits as determined for federal income tax purposes. "Qualified dividend income" received by a non-corporate U.S. holder is subject to preferential tax rates. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a U.S. holder's adjusted tax basis in the equity held by such U.S. holder, but not below zero. Any excess amount will be treated as gain from a sale or exchange of such equity. U.S. holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of the Asset Recovery Entities' earnings and profits.

A U.S. holder will recognize gain or loss upon the sale or other taxable disposition of equity in the Asset Recovery Entities equal to the difference between the amount realized upon the disposition and the U.S. holder's adjusted tax basis in the equity interest sold. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. holder has held such equity for more than one year as of the date of disposition. U.S. holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

28644911.9

Alternative characterizations of the transactions are possible. Any alternative characterization could result in U.S. federal income tax consequences different from those described above. Holders of Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims should consult their own tax advisors regarding possible alternative characterizations as well as the consequences to them of such alternative characterizations, including possibly limiting the ability of holders of Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims to take a loss on such exchange.

2.    Treatment Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims

Holders of Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims will become beneficiaries of the Litigation Trust, with an interest in the Zohar I Litigation Sub-Trust.

The exchange of the Claims of the Holders of Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims for beneficial interests in the Litigation Trusts Trust will be a fully taxable transaction. A U.S. holder of a Claim will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder in exchange for its Claim and such U.S. holder's adjusted tax basis in the Claim. Any such gain or loss should be capital in nature (subject to any "market discount" rules described below) and should be a long term capital gain (or loss) if the surrendered Claims were held for more than one year by the U.S. holder. However, any such gain would be treated as ordinary income to the extent attributable to any market discount such U.S. holder had accrued with respect to its surrendered Claim, unless the U.S. holder has elected to include market discount in income currently as it accrues.

3.    Treatment of Litigation Trust

Pursuant to the Plan, the Litigation Assets exchanged for Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the respective Holders of Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims receiving beneficial interests in the Litigation Trust (with each Holder receiving an undivided interest in such assets in accordance with such Holder's economic interests in such assets), followed by the transfer by the Holders of such assets to the Litigation Trust in exchange for a beneficial interest in the Litigation Trust. Similarly, any Litigation Assets acquired by the Asset Recovery Entities will be contributed to the Litigation Trusts Trust for adjudication in exchange for beneficial interests in the Litigation Trust. Accordingly, all parties must treat the Litigation Trust as a grantor trust of which the holders of beneficial interests in the Litigation Trust are the owners and grantors, and treat the holders of beneficial interests in the Litigation Trust as the direct owners of an undivided interest in the Litigation Assets, consistent with their respective economic interests therein, for all U.S. federal income tax purposes.

Prior to the Effective Date, the Debtors shall make a good faith determination of the fair market value of the Litigation Assets as of the Effective Date, provided, however, that the Debtors shall not be required to hire an expert to make such a valuation. This valuation shall be used

86

interest, and the deductibility of previously included unpaid interest for tax purposes.

    **5.**    <u>Market Discount</u>

    Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

    In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

    Any gain recognized by a U.S. holder on the taxable disposition (determined as described above) of debts that it acquired with market discount will generally be treated as ordinary income to the extent of any market discount that accrued thereon while such debts were considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued). If a U.S. holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry the obligations constituting its Allowed Claim, such deferred amounts would become deductible at the time of such taxable disposition. To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property, any additional accrued but unrecognized market discount may be required to be carried over to the property received therefor. Any gain recognized by such U.S. holder on a subsequent sale, exchange, redemption or other disposition of such property received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount with respect to the exchanged debt instrument.

    <u>**6.**</u>    <u>Non-U.S. Holders</u>

    The rules governing U.S. federal income taxation of a non-U.S. holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to non-U.S. holders. The discussion does not include any non-U.S. tax considerations. Non-U.S. holders should consult with such holders' own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws or treaties, with regard to such holders' participation in the transactions contemplated by the Plan and such holders' ownership of Claims.

    Any distributions made with respect to Asset Recovery Entities will constitute dividends for federal income tax purposes to the extent such distributions are paid out of the Asset Recovery Entities' current or accumulated earnings and profits as determined for federal income tax

28644911.9

purposes. Except as described below, dividends paid with respect to the equity in Asset Recovery Entities held by a non-U.S. holder that are not effectively connected with such non-U.S. holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. holder in the United States) will be subject to federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). A non-U.S. holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the non-U.S. holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to equity in Asset Recovery Entities held by a non-U.S. holder that are effectively connected with a non-U.S. holder's conduct of a U.S. trade or business (and if required by an applicable income tax treaty, are attributable to a permanent establishment maintained by such non-U.S. holder in the United States) generally will not be subject to withholding tax, provided the non-U.S. holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S. federal income tax in the same manner as a U.S. holder, and a non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Whether a non-U.S. holder realizes gain or loss on an exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders. Subject to the discussions below regarding FATCA (as defined below) and backup withholding, any gain recognized by a non-U.S. holder on the exchange of prepetition notes held by such non-U.S. holder for New Notes or a subsequent sale or other taxable disposition of equity in Asset Recovery Entities generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale, exchange or other taxable disposition occurs and certain other conditions are met, (b) such gain is effectively connected with the conduct by such non-U.S. holder of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such non-U.S. older in the United States), or (c) solely with respect to equity in Asset Recovery Entities, the issuer of such equity is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") as defined in section 897 of the IRC.

If the first exception applies, to the extent that any gain is recognized, the non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. holder's capital gains allocable to U.S. sources exceed such holder's capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. holder generally will be subject to U.S. federal income tax with respect to any gain recognized in the same manner as a U.S. Holder. Such gain generally will not be subject to withholding tax, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). In addition, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, such non-U.S. holder may be subject to a branch profits tax equal to 30% (or such lower rate

provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

With respect to the third exception above, the Debtors do not expect any of the Asset Recovery Entities to become a USRPHC. Because the determination of whether an Asset Recovery Entity is a USRPHC depends, however, on the fair market value of its "U.S. real property interests" relative to the fair market value of its non-U.S. real property interests and its other business assets, there can be no assurance that any Asset Recovery Entities will not become a USRPHC in the future. If an Asset Recovery Entity becomes a USRPHC, gain arising from the sale or other taxable disposition by a non-U.S. holder of equity in such Asset Recovery Entity will not be subject to U.S. federal income tax if such equity is "regularly traded," as defined by applicable Treasury Regulations, on an established securities market, and such non-U.S. holder owned, actually and constructively, 5% or less of such equity throughout the shorter of (x) the five-year period ending on the date of the sale or other taxable disposition and (y) the non-U.S. holder's holding period.

Withholding taxes may be imposed under sections 1471 to 1474 of the Tax Code (such sections commonly referred to as the Foreign Account Tax Compliance Act, or "FATCA") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on dividends paid in respect of the equity of Asset Recovery Entities paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the IRC), unless (1) the foreign financial institution undertakes certain diligence, reporting, and withholding obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the IRC) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence, reporting and withholding requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertakes to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the IRC), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Prior to the issuance of recently proposed Treasury Regulations, withholding under FATCA would have also applied to payments of gross proceeds from the sale or other disposition of equity in the Asset Recovery Entities on or after January 1, 2019. However, the proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

**7.**    ~~6.~~Backup Withholding Tax and Information Reporting Requirements

The applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest.  The applicable withholding will comply with all applicable information reporting requirements of the IRC. Payments and other distributions in respect of Allowed Claims

28644911.9

**L.**     **Conflicts**

To the extent that any provision of the Disclosure Statement conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  The Confirmation Order will govern in the event of any conflict between the Confirmation Order and the Plan.

**M.**     **Reservation of Rights**

If the Plan is not confirmed, or if the Plan is confirmed and does not become effective, the rights of all parties-in-interest in the Chapter 11 Cases are and will be reserved in full.  Any concessions or settlements reflected in the Plan, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.

**N.**     **Limiting Notices**

Only Persons that file renewed requests to receive documents pursuant to Bankruptcy Rule 2002 on or after the Effective Date shall be entitled to receive notice under Bankruptcy Rule 2002 with respect to the Chapter 11 Cases.  After the Effective Date, the Wind-Down Administrator, Asset Recovery Manager, and Litigation Trustee are authorized to limit the list of Persons receiving documents with respect to the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 to those Persons who have Filed such renewed requests.

## ARTICLE XIX.

## CONCLUSION

**IN THE OPINION OF THE DEBTORS, THE PLAN IS SUPERIOR AND PREFERABLE TO ANY ALTERNATIVE.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN THE VOTING CLASSES VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION OF THE PLAN.**

Dated: Wilmington, Delaware
        March 2123, 2022

Respectfully submitted,

Zohar I Limited
Zohar I Corp.
Zohar II Limited
Zohar II Corp.
Zohar III Limited
Zohar III Corp.

By:     /s/ *Michael Katzenstein*
Name:  Michael Katzenstein

96

28644911.9