> **\*\*THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.\*\***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., et al., | Case No. 18-10512 (KBO) |
| Debtors[1]. | Jointly Administered |

## DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR ZOHAR III, CORP. AND ITS AFFILIATED DEBTORS, DATED APRIL 6, 2022

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4421)
Ryan M. Bartley (No. 4985)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Attorneys for the Debtors*

Dated:  April 6, 2022

---

[1] The Debtors and the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is c/o FTI Consulting, Inc., 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ............................................................................. 1

    A.     Disclosure Statement Enclosures ................................................... 3

    B.     Overview of the Plan ...................................................................... 3

    C.     Offers to Acquire the Debtors' Assets for a Greater Value ........... 4

    D.     Recommendation ............................................................................ 6

ARTICLE II. ELIGIBILITY TO VOTE ............................................................... 6

ARTICLE III. BACKGROUND OF THE DEBTORS ........................................... 7

    A.     Corporate Structure ........................................................................ 7

    B.     The CLO Structure and Formation of the Zohar Funds.................. 9

    C.     The Deal Documents....................................................................... 9

    D.     The Zohar Noteholders ................................................................. 10

    E.     Ownership of the Zohar Preference Shares ................................. 12

    F.     The Portfolio Companies .............................................................. 12

ARTICLE IV. THE FILING OF THE CHAPTER 11 CASES ............................. 12

    A.     Zohar Litigation ........................................................................... 12

    B.     The Debtors' Chapter 11 Filing ................................................... 13

ARTICLE V. ADMINISTRATION OF THE CHAPTER 11 CASES................... 14

    A.     Overview of Chapter 11 ................................................................ 14

    B.     Commencement of the Chapter 11 Cases and First Day Relief............ 14

    C.     Retention of Professionals ............................................................ 14

    D.     The Initial Contested Matters and the Settlement Agreement .............. 15

    E.     The Appointment of the Independent Director, Chief Restructuring Officer and Chief Monetization Officer ........................................ 16

    F.     Schedules of Assets and Liabilities and Statements of Financial Affairs............. 16

    G.     Appointment of Ankura as New Agent ....................................... 17

    H.     Use of Cash Collateral .................................................................. 17

    I.     The Debtors' DIP Financing......................................................... 18

    J.     The Monetization Process Established Under the Settlement Agreement........... 19

    K.     The Portfolio Company Assets ..................................................... 22

    L.     Post-Petition Litigation ................................................................ 39

i

ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ........................................................................ 45

    A.    General Rules of Classification ................................................ 45

    B.    Treatment of Unclassified Claims ............................................ 45

    C.    Treatment of Classified Claims ................................................ 47

ARTICLE VII. ACCEPTANCE OR REJECTION OF THE PLAN ........................... 54

    A.    Voting of Claims ...................................................................... 54

    B.    Treatment of Vacant Classes ................................................... 54

    C.    [Reserved]. ............................................................................... 54

    D.    Nonconsensual Confirmation ................................................... 54

    E.    Voting Process Generally ......................................................... 55

    F.    Voting Instructions ................................................................... 55

ARTICLE VIII. MEANS OF IMPLEMENTATION OF THE PLAN ........................ 57

    A.    Emergence Date Transactions .................................................. 57

    B.    General Settlement of Claims and Interests ............................. 61

    C.    Cancellation of Agreements and Interests; Termination of Liens ........................ 61

    D.    Modified Substantive Consolidation ....................................... 62

    E.    Wind-Down Company and Wind-Down Administrator ........................ 63

    F.    The Asset Recovery Entities .................................................... 65

    G.    Post-Confirmation Status of Settlement Agreement ................ 67

    H.    Litigation Trust(s) .................................................................... 67

    I.    Establishment, Funding and Distribution of Escrow Accounts ........................ 69

    J.    Effectuating Documents; Further Transactions ....................... 72

    K.    Disposition of Books and Records ........................................... 72

    L.    Objection to Pending Request for Allowance of Adequate Protection Claims under Section 507(b) ........................ 72

    M.    Approval of Case Expense Allocation ..................................... 73

    N.    Disposition of Zohar II Intercompany Claim ........................... 73

    O.    Treatment of Zohar II Indenture Trustee Claim and Zohar III Indenture Trustee Claim ........................ 73

    P.    Disposition of Patriarch Disputed CMA Fee Claims ............... 74

ARTICLE IX. OTHER PLAN IMPLEMENTATION MEASURES ......................... 75

ARTICLE X. EFFECT OF CONFIRMATION ..................................................... 75

    A.    Binding Effect .......................................................................... 75

ii

B.       Reservation of Causes of Action/Reservation of Rights........................ 75

C.       Releases by the Debtors of Certain Parties ........................................... 75

D.       Releases by Non-Debtors....................................................................... 76

E.       Exculpation ............................................................................................ 76

F.       Plan Injunction ...................................................................................... 77

G.       Term of Bankruptcy Injunction or Stays .............................................. 77

H.       Setoff..................................................................................................... 77

I.        Preservation of Insurance...................................................................... 77

ARTICLE XI. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE;  EFFECT
OF FAILURE OF CONDITIONS ........................................................................ 78

A.       Conditions Precedent to the Effective Date .......................................... 78

B.       Satisfaction of Conditions..................................................................... 79

ARTICLE XII. CONFIRMATION PROCEDURE............................................... 79

A.       Confirmation Hearing ........................................................................... 79

B.       Requirements of Section 1129(a) of the Bankruptcy Code .................. 80

ARTICLE XIII. RISK FACTORS........................................................................ 83

A.       Parties May Object to the Plan's Classification of Claims and Interests............. 83

B.       The Debtors May Not Be Able to Obtain Confirmation of the Plan ................... 83

C.       The Amended Equitable Subordination Complaint Seeks Relief
         Inconsistent with the Plan ..................................................................... 83

D.       Allowed Administrative Expense and Priority Claims May Exceed
         Estimates ............................................................................................... 84

E.       The Conditions Precedent to the Effective Date of the Plan May Not
         Occur...................................................................................................... 84

F.       Risks Regarding Remaining Portfolio Company Assets ....................... 84

G.       Risks Regarding Litigation Assets........................................................ 85

H.       Tax Considerations ............................................................................... 85

ARTICLE XIV. ALTERNATIVES TO THE PLAN .................................................. 86

ARTICLE XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ................................................................................................................... 86

A.       Federal Income Tax Consequences to the Debtors............................... 87

B.       Classification, Reporting, and Taxation of the Post-Effective Date Entities........ 89

C.       Federal Income Tax Consequences to Holders of Claims ................... 89

D.       Importance of Obtaining Your Own Professional Tax Assistance ...................... 96

28644911.12

ARTICLE XVI. RETENTION OF JURISDICTION ..................................................... 96

ARTICLE XVII. RESERVATION OF LITIGATION ASSETS ................................ 98

ARTICLE XVIII. MISCELLANEOUS PROVISIONS ............................................. 98

    A.      Corporate Action.................................................................................... 98

    B.      Modification of Plan ............................................................................. 99

    C.      Revocation or Withdrawal of the Plan................................................. 99

    D.      Plan Supplement ................................................................................... 99

    E.      Payment of Statutory Fees ................................................................... 99

    F.      Exemption from Transfer Taxes ........................................................ 100

    G.      Expedited Tax Determination ............................................................ 100

    H.      Exhibits/Schedules ............................................................................ 100

    I.      Substantial Consummation ................................................................ 100

    J.      Severability of Plan Provisions......................................................... 100

    K.      Governing Law ................................................................................... 100

    L.      Conflicts ............................................................................................ 101

    M.      Reservation of Rights......................................................................... 101

    N.      Limiting Notices ................................................................................ 101

ARTICLE XIX. CONCLUSION................................................................................ 101

28644911.12

# ARTICLE I.

# INTRODUCTION

Zohar III, Corp., Zohar II 2005-1, Corp., Zohar CDO 2003-1, Corp., Zohar III, Limited, Zohar II 2005-1, Limited, and Zohar CDO 2003-1, Limited (each, a "Debtor," and collectively, the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on March 11, 2018 (the "Petition Date"), thereby commencing case numbers 18-10512, 18-10513, 18-10514, 18-10515, 18-10516, and 18-10517 (collectively, the "Chapter 11 Cases") currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Since filing for bankruptcy protection, the Debtors have continued to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On March 13, 2018, the Bankruptcy Court entered an order authorizing the joint administration of the Chapter 11 Cases under the lead case In re Zohar III, Corp., et al., Case No. 18-10512 [Docket No. 15].

On January 31, 2022, the Debtors filed their *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and its Affiliated Debtors*.

On March 21, 2022, the Debtors filed the *First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and its Affiliated Debtors*.

On April [__], 2022, the Debtors filed the *Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and its Affiliated Debtors* (the "Plan"), copy of which is annexed hereto as **Exhibit A**.

**APPROVAL OF THIS *DISCLOSURE STATEMENT*[1] BY THE *BANKRUPTCY COURT* DOES NOT MEAN THAT THE *BANKRUPTCY COURT* RECOMMENDS ACCEPTANCE OR REJECTION OF THE *PLAN*.**

The Debtors are solely responsible for the information contained in this Disclosure Statement. This Disclosure Statement does not constitute financial or legal advice. Holders of Claims and Interests should consult their own advisors if they have questions about the Plan or this Disclosure Statement. Capitalized terms used in this Disclosure Statement and not expressly defined herein have the meaning ascribed to them in the Plan. A reference in this Disclosure Statement to a "Section" refers to a section of this Disclosure Statement.

WHILE THIS *DISCLOSURE STATEMENT* DESCRIBES CERTAIN BACKGROUND MATTERS AND THE MATERIAL TERMS OF THE *PLAN*, IT IS INTENDED AS A SUMMARY DOCUMENT ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE *PLAN* AND THE EXHIBITS ATTACHED TO THE *PLAN* AND THIS *DISCLOSURE STATEMENT*. SIMILARLY, DESCRIPTIONS IN THIS *DISCLOSURE STATEMENT* OF

---

[1] Words in all-caps that are italicized and underlined in this Disclosure Statement are defined in the Plan and shall have the meanings given to such terms therein.

PLEADINGS, ORDERS, AND PROCEEDINGS IN THESE *CHAPTER 11 CASES* OR IN OTHER LITIGATIONS ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE RELEVANT DOCKET ITEMS. YOU SHOULD READ THE *PLAN* AND THE EXHIBITS TO OBTAIN A FULL UNDERSTANDING OF THEIR PROVISIONS. ADDITIONAL COPIES OF THIS *DISCLOSURE STATEMENT* AND THE EXHIBITS ATTACHED TO THIS *DISCLOSURE STATEMENT*, AS WELL AS ANY DOCKET ITEMS FROM THESE *CHAPTER 11 CASES*, ARE AVAILABLE FOR INSPECTION DURING REGULAR BUSINESS HOURS AT THE OFFICE OF THE CLERK OF THE *BANKRUPTCY COURT*, UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 3RD FLOOR, 824 MARKET STREET, WILMINGTON, DELAWARE 19801.

THE STATEMENTS AND INFORMATION CONCERNING THE *DEBTORS* AND THE *PLAN* SET FORTH IN THIS *DISCLOSURE STATEMENT* CONSTITUTE THE ONLY STATEMENTS OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED BY THE *BANKRUPTCY COURT* FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE *PLAN*.

THE STATEMENTS CONTAINED IN THIS *DISCLOSURE STATEMENT* ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. NEITHER DELIVERY OF THIS *DISCLOSURE STATEMENT* NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE *PLAN* WILL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THIS *DISCLOSURE STATEMENT* AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS *DISCLOSURE STATEMENT* WERE COMPILED. THE *DEBTORS* ASSUME NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DO NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES, EXCEPT TO THE EXTENT, IF ANY, NECESSARY AT THE *CONFIRMATION HEARING*.

THIS *DISCLOSURE STATEMENT* MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE *PLAN*. CERTAIN OF THE INFORMATION CONTAINED IN THIS *DISCLOSURE STATEMENT* IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN HEREIN, POSSIBLY BY MATERIAL AMOUNTS.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THIS *DISCLOSURE STATEMENT*. PURSUANT TO THE *PLAN*, ANY SECURITIES ISSUED TO ANY PARTY UNDER, PURSUANT TO, OR IN EFFECTUATING THE *PLAN*, AND THE OFFERING AND INSURANCE THEREOF BY ANY PARTY, ARE EXEMPT FROM SECTION 5 OF THE SECURITIES ACT OF 1933, IF APPLICABLE, AND FROM ANY STATE OR FEDERAL SECURITIES LAWS REQUIRING REGISTRATION FOR THE OFFER OR SALE OF A

SECURITY OR REGISTRATION OR LICENSING OF AN ISSUER OR UNDERWRITER OF, OR BROKER OR DEALER IN, A SECURITY, AND OTHERWISE ENJOY ALL EXEMPTIONS AVAILABLE FOR DISTRIBUTIONS OF SECURITIES UNDER A PLAN IN ACCORDANCE WITH ALL APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, SECTION 1145 OF THE *BANKRUPTCY CODE*.

**Holders of Claims and Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial or tax advice. Each Holder should therefore consult with his, her, or its own legal, business, financial and/or tax advisors as to any matter concerning the Chapter 11 Cases, the Plan, and the transactions contemplated thereby.**

A.    **Disclosure Statement Enclosures**

The following documents are annexed hereto as exhibits to this Disclosure Statement:

| EXHIBITS AND SCHEDULES TO THIS DISCLOSURE STATEMENT | |
|---|---|
| Exhibit A | Plan |

B.    **Overview of the Plan**

The following is a brief overview of the Plan, which is qualified in its entirety by reference to the Plan, which is attached hereto as **Exhibit A**. For a complete understanding of the Plan, you should read this Disclosure Statement, the Plan, and the exhibits thereto in their entirety.

The Plan constitutes a liquidating chapter 11 plan for the Debtors. The Plan provides for the Portfolio Company assets for Zohar II and Zohar III to be transferred to newly-formed entities and for the Portfolio Company and litigation assets nominally held by Zohar I to be transferred to MBIA in accordance with the Zohar I Sale Documents, each of which will be responsible for completing the monetization process under the Settlement Agreement for those assets. In addition, a Litigation Trust will be formed to prosecute and reduce to cash the Debtors' Litigation Assets. The ownership of the newly-formed entities created for Zohar II and Zohar III will be transferred to MBIA in the case of Zohar II and the Holders of Allowed Zohar III A-1 Note Claims in the case of Zohar III, and MBIA and the Holders of the Zohar III A-1 Note Claims will indirectly be the beneficiaries of the Litigation Trust with respect to the Litigation Assets of Zohar II and Zohar III, respectively. The Litigation Assets of Zohar I contributed to the Litigation Trust will be distributed in accordance with the Zohar I Indenture, on the terms detailed in the Plan. Finally, a Wind-Down Administrator will be appointed to complete the wind-down of the Debtors and their corporate existence.

As set forth below and in the Plan, the Plan designates a series of Classes of Claims and Interests for each Zohar Fund. These Classes take into account the differing nature of the various Claims and Interests, as well as their relative priority under the Bankruptcy Code. *See* Article VI (Classification and Treatment of Claims and Equity Interests Under the Plan)

3

**The treatment and distributions, if any, provided to Holders of Allowed Claims and Interests pursuant to the Plan will be in full and complete satisfaction of all legal, equitable, or contractual rights represented by such Allowed Claims and Interests as provided for herein and in the Confirmation Order.**

C.    **Offers to Acquire the Debtors' Assets for a Greater Value**

The Plan is premised on the Debtors' view that the value of the assets of Zohar III, Zohar II and Zohar I,[2] respectively, do not exceed:  (i) the amount of the Zohar III A-1 Notes Claims ($387,131,000) for Zohar III; (ii) the amount of the Zohar II Credit Enhancement Liability Claims ($806,582,747.23) for Zohar II; and (iii) the amount of the Zohar I Credit Enhancement Liability Claims ($20,347,522.55) for Zohar I.  This view is informed by, among other things:

- The fact that only 4 operating Group A Portfolio Companies (after taking into account the pending sale of Universal) and 4 operating Group B Portfolio Companies remain unsold.

- The indications of value received in the sale processes that are currently underway or that were previously conducted and put on hold for such Portfolio Companies.

- Indications of potential value and trading multiple ranges provided by investment bankers retained or interviewed at the Portfolio Company-level.

- Recent and projected financial performance of the remaining Portfolio Companies, including the degree of distress that certain companies face.

- The disappointing results that have been obtained in the sale processes that have concluded to date.  Of the ten (10) Portfolio Companies that were sold that had secured debt:  only Denali yielded a return on its equity; many of the sales resulted in substantial deficiency claims or compromised debt amounts; and the Dura and GAS transactions resulted in no recovery on the Zohar Funds' secured loans or equity interests despite those companies representing some of the largest secured debt balances among the Group A Portfolio Companies (each in excess of $100 million).

- The lack of any material information available to the Debtors concerning the remaining non-operating Group B Portfolio Companies, where the Debtors may have continuing loan or equity interests, many of which have been dormant and shuttered for many years.

- The inherent uncertainty related to the Debtors' litigation claims, which have been asserted in material amounts, including:  the anticipation that the defendants will

---

[2] As described in Section 6.1(b) of the Plan, prior to the Petition Date MBIA acquired all right, title and interest (whether legal, equitable or beneficial) of the assets of Zohar I.  As a result, the Plan gives effect to the Zohar I Sale Documents and the prepetition transfer of the debt and equity interests in the Portfolio Companies owned by Zohar I to MBIA.  Thus, any such assets are not subject to potential offers, as described herein

4

vigorously oppose the claims; the risks inherent in all litigation; the likely substantial period of time that it will necessarily take to prosecute claims to a collectable judgment; and the substantial risk and difficulty in collecting from the defendants, as prospective judgment-debtors.

Under Section 13.1 and the Priority of Payments provisions of the Zohar III Indenture, the Zohar III A-1 Notes Claims must be paid in full before any junior class of notes can be paid. Likewise, under the Priority of Payments provisions in the Zohar II Indenture and Zohar I Indenture, the Zohar II Credit Enhancement Liability Claims and Zohar I Credit Enhancement Liability Claim are "Senior Expenses", which must be paid in full before any payments can be made on the Notes issued by each of Zohar II and Zohar I.[3]  Absent a bona fide and executable offer for the applicable Zohar Funds' assets in excess of the amounts of the foregoing senior claims, the Debtors believe that the Bankruptcy Code requires, and the Plan appropriately provides, that junior classes receive no recovery on account of their claims.

The Chapter 11 Cases have been on-going for more than four years, and the monetization process under the Settlement Agreement has been in place for most of that time.  These Chapter 11 Cases have been highly public, and interested parties have long-known what Portfolio Companies are part of these Chapter 11 Cases and that they are (or will be) for sale.  The claims and causes of action that the Debtors have asserted in the Zohar Adversary Proceeding, as well as in various other litigations, have been in the public domain for quite some time and the Zohar Adversary Proceeding has been the subject of (and largely survived) two motions to dismiss, as well.  Accordingly, the Debtors believe that parties interested in acquiring the Debtors' assets have long-known the assets were available, and the Debtors are receptive to any proposed acquisition transaction that provides value to pay the senior most classes in full and place junior-classes "in the money."  No such transaction has been put before the Debtors.

***If any interested party believes that it can provide value to any one or more of the Zohar Funds to acquire their assets or the interest in the applicable Asset Recovery Entity (and related Litigation Trust) at a cash purchase price that is at or above the amount of the A-1 Notes or Credit Enhancement Liabilities, as applicable, it should promptly contact the Debtors.  Subject to customary demonstrations concerning the <u>bona fides</u> of any party seeking to make an offer and its financial wherewithal to complete a transaction at or above the threshold amount, the Debtors will consider offers providing a purchase price at or above the amount of the senior-most claims against the applicable Zohar Fund (i.e., $387,131,000.00 for Zohar III; $806,582,747.23 for Zohar II; and $20,347,522.55 for Zohar I).[4]***

The failure to timely receive a proposal for such a transaction will further support the Debtors' view that the value of the Debtors' assets does not exceed the amount of the A-1 Notes

---

[3] The Credit Enhancement Liability Claims are also subrogated to the rights of the A-1 through A-3 Notes at Zohar II and the A-1 and A-2 Notes at Zohar I, and accordingly, are senior in right of payment to all junior classes of Notes, in accordance with Section 13.1 and the Priority of Payments provision in the respective Zohar II Indenture and Zohar I Indenture.

[4] The Debtors may also, in their discretion, consider offers below these threshold amounts.

at Zohar III or Credit Enhancement Liabilities at Zohar I and Zohar II.

**D.** **Recommendation**

The Debtors recommend that all Holders of Claims entitled to vote on the Plan cast their Ballots to accept the Plan. The Debtors believe that Confirmation of the Plan is superior and preferable to any alternative.

## ARTICLE II.

## ELIGIBILITY TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and therefore, such holders do not need to vote on the Plan.

Holders of Claims in the Classes listed in the following table are Unimpaired, conclusively presumed to have accepted the Plan, and not entitled to vote to accept or reject the Plan (collectively, the "Unimpaired Classes"):

| Class | Description |
|-------|-------------|
| 1 | Zohar III Other Priority Claims |
| 2 | Zohar III Indenture Trustee Claims |
| 2A | Zohar III Patriarch Disputed CMA Fee Claim |
| 2B | Zohar III Ankura CMA Claims |
| 8 | Zohar II Other Priority Claims |
| 9 | Zohar II Indenture Trustee Claims |
| 9A | Zohar II Patriarch Disputed CMA Fee Claim |
| 9B | Zohar II Ankura CMA Claims |
| 13 | Zohar I Other Priority Claims |
| 14A | Zohar I Patriarch Disputed CMA Fee Claim |

Holders of Claims in the Classes listed in the following table are Impaired and entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Description |
|-------|-------------|
| 3 | Zohar III A-1 Note Claims |
| 10 | Zohar II Credit Enhancement Claims |
| 14 | Zohar I Indenture Trustee Claims |
| 15 | Zohar I Credit Enhancement Claims |

6

Holders of Claims and Interests in the Classes listed in the following table are conclusively presumed to have rejected the Plan and not entitled to vote to accept or reject the Plan (collectively, the "Deemed Rejecting Classes"):

| Class | Description |
|---|---|
| 4 | Zohar III A-2 Note Claims |
| 5 | Zohar III A-3 Note Claims |
| 6 | Zohar III B Note Claims |
| 7 | Zohar III General Unsecured Claims |
| 11 | Zohar II B Note Claims |
| 12 | Zohar II General Unsecured Claims |
| 16 | Zohar I A-3 Note Claims |
| 17 | Zohar I B Note Claims |
| 18 | Zohar I General Unsecured Claims |
| 19 | Interests |

Pursuant to the Disclosure Statement Order, the record date for determining the eligibility of any Holder of a Claim in the Voting Classes to vote on the Plan is March 16, 2022. Only the Holders of Claims in the Voting Classes as of such date will receive a Ballot with this Disclosure Statement.

**Pursuant to the Disclosure Statement Order, any Holder of a Claim that is the subject of a claim objection filed and served on or before April 25, 2022 which wishes to contest such objection solely for the purposes of voting on the Plan shall serve on counsel to the Debtors and file with the Bankruptcy Court a motion pursuant to Bankruptcy Rule 3018(a) (a "Rule 3018(a) Motion") no later than May 9, 2022. Any Holder of a Claim which files a Rule 3018(a) Motion by May 9, 2022 shall be promptly provided a Ballot by the Voting Agent, and shall be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018(a) Motion prior to the Voting Deadline (as defined below), then unless otherwise agreed by the parties, at the Confirmation Hearing the Court will determine whether the provisional vote should be counted as a vote on the Plan.**

## ARTICLE III.

## BACKGROUND OF THE DEBTORS

A.    **Corporate Structure**

Debtor Zohar CDO 2003-1, Limited, a Cayman Islands entity ("Zohar I Limited") is the sole shareholder of Debtor Zohar CDO 2003-1, Corp., a Delaware corporation ("Zohar I Corp.," and together with Zohar I Limited, "Zohar I"), and the sole member of non-Debtor Zohar CDO 2003-1, LLC ("Zohar I LLC"), a Delaware limited liability company. Non-debtor Octaluna, LLC ("Octaluna I")—which is indirectly owned and controlled by Lynn Tilton ("Ms. Tilton") through intermediate entities—holds 100% of the preference shares of Zohar I Limited.

7

Debtor Zohar II 2005-1, Limited, a Cayman Islands entity ("Zohar II Limited") is the sole shareholder of Debtor Zohar II 2005-1, Corp., a Delaware corporation ("Zohar II Corp.," and together with Zohar II Limited, "Zohar II"), and the sole member of non-Debtor Zohar II 2005-1, LLC ("Zohar II LLC"), a Delaware limited liability company.  Non-debtor Octaluna II, LLC ("Octaluna II")—which is indirectly owned and controlled by Ms. Tilton through intermediate entities—holds 100% of the preference shares of Zohar II Limited.

Debtor Zohar III, Limited, a Cayman Islands entity ("Zohar III Limited"), is the sole shareholder of Debtor Zohar III Corp., a Delaware corporation ("Zohar III Corp.," and together with Zohar III Limited, "Zohar III"), and the sole member of non-Debtor Zohar III, LLC ("Zohar III LLC"), a Delaware limited liability company.  Non-debtor Octaluna III, LLC ("Octaluna III," and together with Octaluna I and Octaluna II, the "Octaluna Entities")—which is indirectly owned and controlled by Ms. Tilton through intermediate entities—holds 100% of the preference shares of Zohar III Limited.

The general corporate structure for Zohar I, Zohar II, and Zohar III (collectively, the "Zohar Funds") is depicted as follows:



The Octaluna Entities hold a residual equity interest in the Zohar Funds and have a right to receive any excess cash the corresponding Zohar Fund receives and/or retains after all of its note obligations (as discussed more fully below) are paid in full.[5]

## B.    The CLO Structure and Formation of the Zohar Funds

Each of the Zohar Funds is a collateralized loan obligation fund (a "CLO"). A CLO is a securitization vehicle in which a special purpose entity, the issuer, raises capital through the issuance of secured notes, and uses the proceeds to purchase or make loans and other investments that serve as the collateral for the repayment of principal and interest on the notes.

The Zohar Funds invested in the debt and equity interests of Portfolio Companies. Patriarch Partners VIII, LLC, Patriarch Partners XIV, and Patriarch XV (collectively, the "Patriarch Managers") served as the Zohar Funds' collateral managers. The stated expectation was that not all of the Portfolio Companies would be successfully rehabilitated, so the value generated from those that were successful would need to be sufficient to repay the Zohar Funds' note obligations.

Zohar I Limited was formed in 2003 as a CLO, and issued approximately $530 million in principal amount of notes (the "Zohar I Notes") with a maturity of November 2015. Zohar I Corp. is a co-obligor on the Zohar I Notes, and non-Debtor Zohar I LLC has pledged any assets it owns or may acquire as collateral for the Zohar I Note obligations.

Zohar II Limited was formed in 2005 as a CLO, and issued approximately $1 billion in principal amount of notes (the "Zohar II Notes") with a maturity of January 2017. Zohar II Corp. is a co-obligor on the Zohar II Notes, and non-Debtor Zohar II LLC has pledged any assets it owns or may acquire as collateral for the Zohar II Note obligations.

Zohar III Limited was formed in 2007 as a CLO, and issued approximately $1 billion in principal amount of notes (the "Zohar III Notes," and together with the Zohar I Notes and the Zohar II Notes, the "Zohar Notes") with a maturity of April 2019. Zohar III Corp. is a co-obligor on the Zohar III Notes, and non-Debtor Zohar III LLC has pledged any assets it owns or may acquire as collateral for the Zohar III Note obligations.

## C.    The Deal Documents

Each Zohar Fund is governed by a set of documents that include, among others, an indenture (each, an "Indenture," and collectively, the "Indentures"), a collateral management agreement (each, a "CMA," and collectively, the "CMAs"), and a collateral administration agreement.

---

[5]  The preference shares of Zohar I Limited, Zohar II Limited, and Zohar III Limited are referred to herein as the "Zohar I Preference Shares," the "Zohar II Preference Shares," and the "Zohar III Preference Shares," respectively, and they are collectively referred to herein as the "Zohar Preference Shares."

The rights of the Noteholders and the obligations of the Zohar Funds are set forth in the Indentures. The Indentures also govern the rights and obligations of the Zohar Funds vis-à-vis the Noteholders, the credit enhancer (for Zohar I and Zohar II, MBIA), and the Controlling Party and describe the terms of the offering, including the maturity date of the notes, information reporting requirements, and priority of payments, as well as the rights of the parties and certain responsibilities of the collateral manager for that Zohar Fund.

While the Indentures directed that the Zohar Funds would primarily invest in debt, the Indentures contemplated that the Zohar Funds could receive equity in connection with the acquisition of a company, the extension of a new loan, or the restructuring of an existing loan. All loans, equity, and any other property acquired by the Zohar Funds, regardless of how or when acquired, were deemed "Collateral" under the Indentures.

Each CMA is a contract between a Zohar Fund and its collateral manager. Each CMA engages a collateral manager for a Zohar Fund and describes its obligations and compensation, among other things. The CMAs empower the collateral managers to select and manage the collateral to be held by the Zohar Funds.

The Zohar I Indenture and Zohar II Indenture designate MBIA as the "Controlling Party" in its capacity as credit enhancer. The Controlling Party under the Zohar I Indenture and Zohar II Indenture can remove and replace the collateral manager for cause and direct the indenture trustee to sell the collateral; however, the Controlling Party may only take such actions under certain circumstances, such as if a default has occurred and is ongoing. Under the applicable indenture, the Controlling Party also has the right to direct the applicable Zohar Fund with respect to preservation of the collateral, and has consent rights over successor collateral manager appointments, sale of certain collateral, and entry into any supplemental indentures.

Rather than a "Controlling Party," the Zohar III Indenture appoints a "Controlling Class," which at this point consists of holders owning a majority of the Class A-1 Notes of Zohar III (the "Zohar III Controlling Class"). The Zohar III Controlling Class has largely the same contractual rights as the Controlling Party under the Zohar I and II Indentures.

Until March 3, 2016, the Patriarch Managers were the collateral managers of Zohar I Limited, Zohar II Limited, and Zohar III Limited, respectively. The Patriarch Managers resigned as collateral managers in February 2016. Their resignations became effective when Alvarez & Marsal Zohar Management, LLC ("AMZM") was appointed as replacement collateral manager pursuant to new CMAs executed on March 3, 2016.

## D.      **The Zohar Noteholders**

Each Debtor granted the applicable Indenture Trustee a lien on all of its assets to secure the obligations arising under the Indentures, including the Zohar Notes, and all of the Debtors' obligations under the Indentures are non-recourse. The Zohar Notes were issued primarily in two classes: Class A (with each Class A tranche having subclasses of notes) (the "Class A Notes"); and Class B (the "Class B Notes"). The subclasses for the Class A Notes have an interclass priority waterfall and differing applicable principal amounts, interest rates, commitment fees, and other

10

varying features.  The Class B Notes are all held by the Octaluna Entities and are subordinate in right of payment to all of the Class A Notes, among other features.

Certain Zohar I Notes and Zohar II Notes were "wrapped" by MBIA, as credit enhancer. In its capacity as credit enhancer, MBIA insured Zohar I Limited's and Zohar II Limited's obligations under their respective Class A Notes by providing a financial guaranty to pay interest and principal in full if Zohar I Limited or Zohar II Limited, respectively, could not meet their repayment obligations.  Under the applicable insurance contracts and financial guaranty policies, upon the payment of claims following a default, MBIA is fully subrogated to the rights of the insured noteholders.

After Zohar I Limited defaulted on the Zohar I Notes on November 20, 2015, MBIA was required to pay the then-holders of the insured Zohar I Notes approximately $149 million. Upon information and belief, Patriarch XV currently holds all of the Class A-3 Zohar I Notes

MBIA also wrapped the Zohar II Notes.  After Zohar II Limited defaulted on the Zohar II Notes on January 20, 2017, MBIA was required to pay the then-holders of the Zohar II Notes approximately $770 million.

The Zohar III Notes are publicly traded notes held by a number of institutional investors.

A summary of the Zohar Notes that have been issued and the Credit Enhancement Liability arising from MBIA's satisfaction of the Zohar I and Zohar II Class A Notes, and the approximately amount thereof outstanding debt as of the Petition Date is as follows:

| Zohar I Notes Class | Original Principal Amount | Issued | Maturity | Approximate Outstanding as of the Petition Date |
|---|---|---|---|---|
| Credit Enhancement Liabilities | n/a | | | $20.3 million |
| Class A-1 | $150 million | 2003 | 11/20/15 | Satisfied by Credit Enhancer |
| Class A-2 | $32 million | 2003 | 11/20/15 | Satisfied by Credit Enhancer |
| Class A-3a | $297.5 million | 2003 | 11/20/15 | $245.7 million |
| Class A-3b | $52.5 million | 2003 | 11/20/15 | $55.1 million |
| **Total Class A:** | **$532 million** | | | **Total: $321.1 million** |
| Class B | $150 million | 2003 | 11/20/15 | $150 million |
| | | | | |
| Zohar II Notes Class | Original Principal Amount | Issued | Maturity | Approximate Outstanding as of the Petition Date |
| Credit Enhancement Liabilities | n/a | | | $806.6 million |
| Class A-1 | $250 million | 2005 | 1/20/17 | Satisfied by Credit Enhancer |
| Class A-2 | $550 million | 2005 | 1/20/17 | Satisfied by Credit Enhancer |
| Class A-3 | $200 million | 2005 | 1/20/17 | Satisfied by Credit Enhancer |
| **Total Class A:** | **$1 billion** | | | **Total: $806.6 million** |
| Class B | $200 million | 2005 | 1/20/20 | $200 million |

11

| Zohar III Notes Class | Original Principal Amount | Issued | Maturity | Approximate Outstanding as of the Petition Date |
|---|---|---|---|---|
| Class A-1R | $200 million | 2007 | 4/15/19 | $136.4 million |
| Class A-1T | $150 million | 2007 | 4/15/19 | $102 3 million |
| Class A-1D | $350 million | 2007 | 4/15/19 | $238.7 million |
| Class A-2 | $200 million | 2007 | 4/15/19 | $201.0 million |
| Class A-3 | $116 million | 2007 | 4/15/19 | $116.6 million |
| **Total Class A:** | **$1.016 billion** | | | **Total: $795.0 million** |
| Class B | $196 million | | 4/15/19 | $196 million |

E.      **Ownership of the Zohar Preference Shares**

The Zohar Funds also issued certain preference shares, which in each case were acquired by Ms. Tilton through certain affiliate entities.  The Zohar Preference Shares are not common equity, but are effectively voting preferred stock having contractual rights under Preference Share Paying Agency Agreements.  As preference shareholder, Ms. Tilton receives the residual value in the Zohar Funds after the Zohar Notes are repaid.  Octaluna I is owner of the Zohar I Preference Shares; Octaluna II is owner of the Zohar II Preference Shares; and Octaluna III is owner of the Zohar III Preference Shares.

F.      **The Portfolio Companies**

As of the Petition Date, the Portfolio Companies comprised operating business platforms across a broad spectrum of industries including automotive, aerospace, fashion, technology, manufacturing, industrial and home goods.

## ARTICLE IV.

## THE FILING OF THE CHAPTER 11 CASES

A.      **Zohar Litigation**

Following Zohar I's note payment default in November 2015, the Debtors and various Zohar stakeholders engaged in multi-jurisdictional litigation, much of which remains pending. This Zohar-related litigation included, but was not limited to, the following lawsuits:

- The Involuntary Chapter 11 proceeding for the Zohar I entities, *In re Zohar CDO 2003-1, Limited*, Case No. 15-23680, *In re Zohar CDO 2003-1, Corp.*, Case No. 15-23681, and *In re Zohar CDO 2003-1, LLC*, Case No. 15-23682 (RDD) (Bankr. S.D.N.Y.);

- An action commenced by AMZM, on behalf of the Debtors, to obtain the Debtors' books and records from the Patriarch Managers, *Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, No. 12247-VCS (Del. Ch. Ct.);

12

- An action concerning the termination of Patriarch Partners Agency Services, LLC ("PPAS") as the Debtors' loan administrative agent and appointment of Alvarez & Marsal Loan Agency Services, LLC as replacement agent for various credit agreements under which the Zohar Funds were lenders and to recover damages for PPAS's breach of its loan agency, *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd.*, No. 16-cv-4488 (S.D.N.Y.) (the "Loan Agent Action");

- An action contesting the sale of Zohar I's collateral following the maturity default at Zohar I, *Patriarch Partners XV, LLC et al v. U.S. Bank National Association et al*, Case No. 1:16-cv-07128-JSR (S.D.N.Y.);

- An action under the RICO statute seeking various damages from Ms. Tilton concerning self-dealing transactions undertaken while she was in control of the Zohar Funds and the Portfolio Companies, and counterclaims by Tilton against the Zohar Funds debtors concerning their conduct with respect to the Zohar Funds, *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-307 (S.D.N.Y.) (the "SDNY RICO Action");

- An action under section 225 of the Delaware General Corporation Laws to determine the managers of three portfolio companies, that ultimately resulted in the adjudication that the Zohar Funds, and not Ms. Tilton, were the beneficial owner of the shares in the three portfolio companies subject to that suit, *Zohar II 2005-1, Limited, et al. v. FSAR Holdings, Inc., et al.*, C.A. No. 12946-VCS (Del. Ch. Ct.) (the "Section 225 Action"); and

- A litany of actions following the Section 225 Action seeking to determine the control and/or ownership of 13 other Portfolio Companies. either commenced by the Zohar Funds, *Zohar CDO 2003-1, Limited v. Croscill Home LLC et al.*, 1:17-cv-01797-JFB-SRF (D. Del.) & *Zohar CDO 2003-1, Limited v. Octaluna LLC*, 18-cv-108 (D. Del.), or by Ms. Tilton, *Tilton v. Zohar CDO 2003-1, Ltd.*, No. CV-2017-013549 (Ariz. Sup. Ct.), *Tilton v. Zohar III, Ltd.*, No. BC683129 (Cal. Sup. Ct.) & *Tilton v. Zohar CDO 2003-1 Ltd.*, No. 17-016240-CB (Mich. Cir. Ct.).

## B.    The Debtors' Chapter 11 Filing

Ms. Tilton, in her capacity as the director of the Debtors, commenced the Chapter 11 Cases, with the stated purposes of obtaining an automatic stay of all of the above litigation (and other potential litigation) and to implement a process to sell the Debtors' assets under the supervision of the Bankruptcy Court.

## ARTICLE V.

## ADMINISTRATION OF THE CHAPTER 11 CASES

### A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of a chapter 11 petition.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor, and all other entities as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of a chapter 11 case until such time as a bankruptcy court has approved a disclosure statement as containing adequate information.  Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement in satisfaction of the applicable disclosure requirements under section 1125 of the Bankruptcy Code.

### B.    Commencement of the Chapter 11 Cases and First Day Relief

On March 11, 2018, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

The Debtors requested that the Chapter 11 Cases be consolidated [Docket No. 4] (the "Joint Administration Motion") for administrative purposes.  On March 13, 2018, the Bankruptcy Court entered an order approving the Joint Administration Motion [Docket No. 15].

### C.    Retention of Professionals

In connection with the Chapter 11 Cases, the Debtors retained Young Conaway Stargatt & Taylor LLP, as bankruptcy counsel [Docket No. 239].  In addition, Goldin Associates, LLC ("Goldin") was retained to provide the Debtors Marc Kirschner as Chief Restructuring Officer and certain support staff [Docket No. 238] (the "Goldin Retention").  However, as described in greater detail below, following approval of the Settlement Agreement (as defined below), the Goldin Retention was amended, and FTI Consulting Inc. ("FTI") was retained [Docket No. 297] to provide Michael Katzenstein as the Debtors' Chief Restructuring Officer.

14

In addition, the Debtors filed a motion seeking authority to employ and compensate certain professionals utilized by the Debtors in the ordinary course of their business (*nunc pro tunc* to the Petition Date) [Docket No. 366], which was approved on July 31, 2018 [Docket No. 392].

As the Chapter 11 Cases progressed, the Debtors retained certain additional professionals, including Waller Lansden Dortch & Davis, LLP, as special counsel [Docket No. 1080]; Morris Nichols Arsht & Tunnell LLP, as special litigation counsel [Docket No. 1157]; Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), as financial advisor and investment banker [Docket No. 1469]; and KPMG LLP, to provide tax compliance and consulting services [Docket No. 2017].

**D.    The Initial Contested Matters and the Settlement Agreement**

The commencement of the Chapter 11 Cases triggered new litigation amongst the Zohar stakeholders.

On March 12, 2018, the Debtors filed a motion to reject the CMAs with AMZM, effective as of the Petition Date [Docket No. 8] (the "Rejection Motion"). Objections to the Rejection Motion were filed by AMZM [Docket No. 86], MBIA [Docket No. 89], the Zohar III Controlling Class [Docket No. 92], and U.S. Bank, N.A. as the trustee under the Zohar Indentures (the "Indenture Trustee") [Docket No. 93]. On April 12, 2018, the Debtors filed an omnibus reply in support of the Rejection Motion [Docket No. 173].

On March 14, 2018, AMZM filed a motion for relief from stay to pursue an action involving the ownership of certain of the Portfolio Companies, which was on appeal before the Delaware Supreme Court [Docket No. 21] (the "AMZM Lift Stay Motion"). The AMZM Lift Stay Motion was joined by the Zohar III Controlling Class [Docket No. 67] and MBIA [Docket No. 88]. On March 29, 2018, the Debtors filed their objection to the AMZM Lift Stay Motion [Docket No. 111] and, on April 12, 2018, AMZM filed its reply in support of the AMZM Lift Stay Motion [Docket No. 172].

On March 26, 2018, MBIA and the Zohar III Controlling Class filed a motion for the dismissal of the Chapter 11 Cases, or alternatively, appointment of a chapter 11 trustee [Docket No. 56] (the "Dismissal/Trustee Motion"). On April 3, 2018, the United States Trustee for Region 3 (the "U.S. Trustee") filed a motion for appointment of a chapter 11 trustee or, alternatively, appointment of an examiner [Docket No. 132] (the "Trustee/Examiner Motion"). On April 10, 2018, the Debtors filed an omnibus objection to the Dismissal/Trustee Motion and the Trustee/Examiner Motion [Docket No. 165]. Ms. Tilton and certain of her affiliated Patriarch entities filed an objection to the Dismissal/Trustee Motion on April 10, 2018 [Docket No. 163], and an objection to the Trustee/Examiner Motion on April 12, 2018 [Docket No. 176]. On April 15, 2018, MBIA and the Zohar III Controlling Class filed a reply in support of the Dismissal/Trustee Motion [Docket No. 182].

The Bankruptcy Court scheduled a two-day trial for April 17-18, 2018, to adjudicate these matters [Docket Nos. 108, 110, 138]. On April 5, 2018, the Bankruptcy Court appointed Judge Kevin Gross (the "Mediator") to mediate the parties' various disputes [Docket No. 143].

The parties thereafter engaged in expedited discovery, including extensive document production and four separate day-long depositions, and devoted significant effort towards preparing for trial while simultaneously engaging in mediation.

After four days of around-the-clock mediation, the parties agreed to a comprehensive resolution of the contested matters, the terms of which are embodied in a settlement agreement (the "Settlement Agreement"), which was approved by the Bankruptcy Court on May 21, 2018 [Docket No. 266]. Among other things, the Settlement Agreement provided an initial period of 15 months to monetize the Debtors' assets (the "15-Month Window"), which was to be automatically extended for an additional three months (the "18-Month Window") if each of MBIA and the claims under the Zohar III Indenture received 50% of the Paid in Full (as defined in the Settlement Agreement) amount within the 15-Month Window. *See* Settlement Agreement at ¶ 29. The Settlement Agreement also provided that all litigation, motions, and contested matters between the parties to the Settlement Agreement were to be stayed and tolled during the 15-Month or 18-Month Window, as applicable, with all parties' rights reserved. *See* Settlement Agreement at ¶¶ 14, 15, 19.

When the 15-Month Window expired, only two Portfolio Company sales had closed, generating less than $150 million in proceeds to the Debtors. Accordingly, the litigation armistice concluded on September 30, 2019 and, as set forth in greater detail below, additional litigation ensued regarding what was to happen with respect to the monetization process.

## E.     The Appointment of the Independent Director, Chief Restructuring Officer and Chief Monetization Officer

On May 21, 2018, the Bankruptcy Court entered an order, consistent with the Settlement Agreement, appointing Joseph J. Farnan, Jr. as the Debtors' independent director (the "Independent Director") and granting certain related relief on an interim basis pending consideration and approval of the Independent Director's service agreement (the "Service Agreement") and indemnification agreement (the "Indemnification Agreement"). *See* Docket Nos. 266 & 267. On June 26, 2018, the Bankruptcy Court entered an order approving the Service Agreement and Indemnification Agreement on a final basis. *See* Docket No. 345. Pursuant to the Settlement Agreement, the Independent Director is "fully charged with the governance of the Zohar Funds under applicable Cayman or Delaware law." Settlement Agreement at ¶ 7.

Also in accordance with the Settlement Agreement, the Debtors retained Michael Katzenstein as their new Chief Restructuring Officer (the "CRO") [Docket No. 297], replacing Marc Kirschner; Robert S. Kost of Goldin as the Debtors' chief monetization officer (the "CMO") [Docket No. 283]; and Ankura Trust Company, LLC ("Ankura") as the new collateral manager [Docket No. 1038].

## F.     Schedules of Assets and Liabilities and Statements of Financial Affairs

On August 17, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 414-425]. On August 23, 2018, the Debtors filed a notice of certain amendments to the Schedules. Docket No. 433.

**G.        Appointment of Ankura as New Agent**

On October 29, 2018, the Debtors filed a motion [Docket No. 490] (the "Ankura Retention Motion"), consistent with the Settlement Agreement, seeking to appoint Ankura as the new agent under the credit agreements between the Debtors and the various Portfolio Companies (including all amendments thereto and any related documents incorporated therein, the "Credit Agreements"). Specifically, the Settlement Agreement provided that Patriarch Partners Agency Services, LLC was to be replaced in its capacity as agent under the Credit Agreements, as it pertained to services provided on behalf of the Debtors in their capacities as lenders to the Portfolio Companies, by an independent administrative agent. The new agent was to be appointed by the Independent Director and the CRO, and report only to the Independent Director, the CRO, and the Indenture Trustee.

Prior to the objection deadline established for the Ankura Retention Motion, the Debtors received an informal objection from the Patriarch Stakeholders. Thereafter, the Debtors in consultation with Ankura, MBIA, the Zohar III Controlling Class, and the Indenture Trustee, agreed to adjourn the hearing on the Ankura Retention Motion in an attempt to consensually resolve the Patriarch Stakeholders' concerns. Mediation sessions were held on November 26, 2018 and December 17, 2018, but proved unsuccessful.

On January 15, 2019, the Patriarch Stakeholders filed an objection to the Ankura Retention Motion [Docket No. 624]. The Patriarch Stakeholders claimed that terms of Ankura's retention expanded and circumvented the express provisions of the Settlement Agreement, and imposed material additional costs or expenses on the Portfolio Companies. Ultimately, the Bankruptcy Court approved the Ankura Retention Motion following certain revisions to the proposed form of order, including the addition of a fee reporting mechanism [Docket No. 709].

**H.        Use of Cash Collateral**

The Settlement Agreement also provides that "the Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. To facilitate this negotiation, the Zohar Funds will provide customary bankruptcy case budgets, including anticipated sources and uses of cash . . ." Settlement Agreement at ¶ 19.

Consistent with this mandate, following approval of the Settlement Agreement, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Use of Cash Collateral* [Docket No. 356], and engaged with the Indenture Trustee, MBIA and the Zohar III Controlling Class regarding the consensual use of cash collateral. These negotiations were conducted in good faith and at arms' length and were, at times, extremely contentious. As negotiations regarding a final order authorizing the use of cash collateral were taking place, the Bankruptcy Court entered interim orders authorizing the use of cash collateral. *See* Docket Nos. 382, 432 and 516.

The Debtors, the Indenture Trustee, MBIA and the Zohar III Controlling Class agreed to the final terms of a consensual cash collateral order, which also incorporated comments from the U.S. Trustee, making the proposed use of cash collateral uncontested in all respects subject to further negotiations with the Patriarch Stakeholders. In an effort to address the concerns of the Patriarch Shareholders, the Mediator convened a mediation session. However, the mediation

17

session was unsuccessful, and a hearing to consider use of cash collateral on a final basis was scheduled for November 13, 2018.

On November 5, 2018, the Patriarch Stakeholders filed the *Objection to the Debtors' Motion for Entry of an Order Authorizing the Use of Cash Collateral* (the "Patriarch Cash Collateral Objection") [Docket No. 502]. After the Patriarch Cash Collateral Objection was filed, the parties continued to negotiate in an attempt to resolve outstanding issues, and as a result of those negotiations, a final order authorizing the use of cash collateral was entered on a fully consensual basis on December 10, 2018 (the "Final Cash Collateral Order") [Docket No. 588]. Among other things, the Final Cash Collateral Order established a mechanism where "Excess Cash" at Zohar II or Zohar III could be released to the applicable Indenture Trustee to satisfy certain fees and expenses, senior obligations under the Indentures, and to make principal and interest payments on the Credit Enhancement Liabilities at Zohar II and Class A-1 Notes at Zohar III in order to satisfy the Debtors' obligations under the Settlement Agreement with regard to "Paid in Full". This adequate protection remains in place today. The Debtors have made distributions to satisfy principal and interest at Zohar II in the amount of $63.0 million and at Zohar III in the amount of $119.0 million.

On September 30, 2019, pursuant to paragraph 18 of the Final Cash Collateral Order, the Debtors' use of cash collateral to fund the Chapter 11 Cases terminated. Accordingly, on November 25, 2019, with the consent of MBIA and the Zohar III Controlling Class, the Debtors submitted a proposed revised Final Cash Collateral Order [Docket No. 1092]. An objection to the proposed revised Final Cash Collateral Order was filed by certain Patriarch Stakeholders. Consequently, the revised proposed Final Cash Collateral Order was never entered, and the Debtors were authorized to use cash collateral pursuant to a series of further interim cash collateral orders [Docket Nos. 1158, 1453, 1512, 1649, 1711, 1895, and 2035]. The last of these interim cash collateral orders provided for the use of cash collateral through November 30, 2020.

I.     **The Debtors' DIP Financing**

After the expiration of the 15 Month Window under the Settlement Agreement, the Debtors received minimal interest collections from loans to the Portfolio Companies. As described in detail below, the sale processes for the Portfolio Companies did not advance significantly in the first two (2) plus years of these cases. Accordingly, the Debtors found themselves facing the risks that they would no longer be able to fund the administration of the Chapter 11 Cases solely with cash collateral or, at a minimum, that they would face timing issues between when expenses were incurred and when asset sale proceeds would be realized.

In light of the foregoing, the Debtors enlisted their investment banker, Houlihan Lokey, to engage in a marketing process to solicit interest in and secure a commitment for debtor-in-possession financing. That process resulted in the Debtors agreeing to a DIP proposal from JMB Capital Partners Lending, LLC, which provided up to $45 million in funding, secured by a priming lien on all of the Debtors' assets, other than certain litigation claims.

Accordingly, on November 16, 2020, the Debtors filed a motion to approve the proposed post-petition financing, as well as to authorize the continued use of cash collateral and provide

adequate protection in connection therewith [Docket No. 2112] (the "DIP Motion").  On December 15, 2020, the Debtors filed the proposed order under certification of counsel, and on December 16, 2020, the order (the "DIP Order") was entered.  *See* Docket No. 2191.

The DIP Credit Agreement had an original maturity date of December 31, 2021.  As the maturity date approached, the Debtors determined that it would be advantageous to further continue the DIP Commitments for Zohar III.  Accordingly, the Debtors negotiated for an assignment of the DIP Credit Agreement under which Zohar III was the Borrower to funds affiliated with, or themselves, members of the Zohar III Controlling Class.  On December 27, 2021, the Court entered an order approving the assignment, amendment and extension of the DIP Credit Agreement to new DIP Lenders [Docket No. 2968].  That order, among other things, approved an extension of the maturity for the DIP Credit Agreement with Zohar III as borrower until December 31, 2022, and provided for an extension of the "Outside Cash Collateral Date" for Zohar III Limited, i.e., the date through which the Debtors can use the cash collateral of the Indenture Trustee, to cover amounts incurred through April 30, 2022.  On March 3, 2022, the Debtors received an initial loan for $6 million under the DIP Facility.

The Debtors are in discussions with the Controlling Party for an extension of the Outside Cash Collateral Date for Zohar II, which most recently was extended through February 28, 2022.

The Debtors have, so far, been able to operate solely on the use of cash collateral, but absent near term proceeds from the sales of Portfolio Companies, the Debtors anticipate a need for draws under the DIP Credit Agreement in the near term.

## J.    **The Monetization Process Established Under the Settlement Agreement**

### 1.    The Monetization Process and Monetization Procedures Order

The Debtors' primary assets are their secured loans to and equity interests in the Portfolio Companies.  The primary purposes of the Settlement Agreement were to stay litigation among the Debtors' various stakeholders for a specified period of time, and establish procedures whereby the Independent Director, the CRO, and Ms. Tilton would jointly monetize the Portfolio Companies to maximize the value of the Debtors' assets for the benefit of all stakeholders (the "Monetization Process").

In aid of the Monetization Process, on October 23, 2018, the Debtors filed the *Motion of the Debtors for Entry of an Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Directors' Approval of Monetization Transactions and Related Relief* [Docket No. 481] (the "Monetization Procedures Motion").  Among other things, the Monetization Procedures Motion was intended to offer the marketplace a measure of certainty regarding the Monetization Process, and confirm the Debtors' ability to consummate Portfolio Company transactions.  The Monetization Procedures Motion was born out of concern, initially expressed by Ms. Tilton, that the marketplace may be uncertain as to the Debtors' ability to close Portfolio Company transactions and/or the processes by which the Debtors would obtain any corporate governance and Bankruptcy Court approvals necessary to do so.

The Monetization Procedures Motion was approved on a fully-consensual basis on November 9, 2019 [Docket No. 545] (the "Monetization Procedures Order"). The Monetization Procedures Order vests the Independent Director with any and all authority to implement a sale or refinancing of the Debtors' loans to and equity interests in the Portfolio Companies. Specifically, the Monetization Procedures Order provides that:

> "Joseph J. Farnan, Jr., as Independent Director, has been fully charged with governance of the Debtors…to authorize, approve and seek to consummate each Portfolio Company Transaction, including, but not limited to (i) authorizing the Debtors to vote or consent to any vote, as applicable, any and all Zohar Interests in favor of a Portfolio Company Transaction, (ii) exercising any rights with respect to the Zohar Interests to implement or consummate a Binding Portfolio Company Transaction, and (iii) authorizing and approving the Debtors' release of any of the Debtors' liens, claims or encumbrances in connection with a Portfolio Company Transaction."

Monetization Procedures Order ¶ 2. In addition, the Monetization Procedures Order outlines a process by which the Debtors can obtain Bankruptcy Court approval to consummate Portfolio Company transactions on an expedited basis. *See, generally,* Monetization Procedures Order ¶ 3.

2.   Dispute Regarding the Continuation of the Monetization Process After Expiration of the 15-Month Window

In July 2019, at which point only one Portfolio Company transaction had been consummated, a dispute arose between the Debtors and Ms. Tilton regarding the continuation of the Monetization Process under the Settlement Agreement. The Debtors interpreted the Settlement Agreement to provide that the Monetization Process continued after the expiration of the 15-Month Window (the aforementioned stay of litigation among the Debtors' various stakeholders), and were thus seeking to move forward with the monetization of the Portfolio Companies. Ms. Tilton, conversely, claimed that the Monetization Process terminated upon the expiration of the 15-Month Window, and thus claimed she was no longer obligated to work with the Debtors to monetize the Portfolio Companies.

A mediation session was conducted on July 31, 2019 in an effort to resolve the dispute, but was unsuccessful. Accordingly, on August 7, 2019, the Debtors filed the *Motion of the Debtors for Entry of an Order (a) Implementing the Terms of the Settlement Agreement and (b) Resolving Dispute over Monetization Process Pursuant to Paragraph 11 of the Settlement Agreement* [Docket No. 833]. Following briefing and oral argument, on September 27, 2019, the Bankruptcy Court issued a bench ruling and order determining that the Monetization Process continued until such time as (i) the Debtors' senior secured creditors were "Paid in Full" (as defined in the Settlement Agreement) or (ii) the parties mutually agreed to terminate the Settlement Agreement. Just days later, beginning on October 1, 2019, one of the larger Portfolio Companies (controlled by Ms. Tilton) abruptly ceased making regular interest payments on their secured loans with the Debtors, followed by almost all of the other Portfolio Companies the next month, thereby

20

depriving the Debtors' estates of cash needed to fund the Chapter 11 Cases. Ms. Tilton unsuccessfully appealed the Bankruptcy Court's ruling. *See In re Zohar III, Corp.*, No. 18-10512 (KBO), 2020 WL 3960820, at *1 (D. Del. July 13, 2020).

3. Competing Motions to Establish Milestones and Procedures and Govern the Monetization Process

On December 20, 2019, Ms. Tilton and the Debtors filed competing motions to establish milestones and procedures to govern the Monetization Process. *See* Docket Nos. 1164 & 1167 (the "Milestones Motions"). Generally, the Debtors' Milestone Motion sought to establish timelines for the monetization of the Portfolio Companies, which prioritized the sale of the Portfolio Companies the Debtors believed to be the most valuable at that time. Ms. Tilton, on the other hand, objected to the nature of the milestones the Debtors proposed, generally sought a longer timeline, and proposed to significantly defer the monetization of the Portfolio Companies prioritized by the Debtors.

In January and February of 2020, the parties engaged in extensive, expedited discovery in connection with the Milestones Motions, including the depositions of Ms. Tilton, the CRO, the CMO, and nine Portfolio Company investment bankers, and briefing in support of their own, and opposition to the other party's, Milestone Motion.

Beginning on February 19, 2020 and concluding on February 24, 2020, the Bankruptcy Court held a three-day trial on the Milestones Motions (as well as the Debtors' motions for continued use of cash collateral and for the employment and retention of Houlihan Lokey, both of which Ms. Tilton objected to). At the close of evidence, the Bankruptcy Court directed the parties to submit post-trial briefs and to attempt to resolve certain discrete issues in mediation with Judge Christopher Sontchi. Mediation was unsuccessful, and the parties submitted their post-trial briefs on March 16, 2020 [Docket Nos. 1491 & 1492].

On March 20, 2020, the Bankruptcy Court entered an order [Docket No. 1500] (the "Original Milestones Order") establishing certain milestones and procedures to govern the Monetization Process going forward.

4. Ms. Tilton's Resignations and the Amended Milestones Order

On March 21, 2020, Ms. Tilton sent a letter to the Independent Director and CRO advising of her immediate resignation as CEO, director and/or manager, as applicable, of all of the Group A and Group B Portfolio Companies, other than Dura Automotive Systems, LLC ("Dura").

To address Ms. Tilton's mass resignations, the Debtors immediately sought Ms. Tilton's consent to undertake certain corporate actions necessary to transition control of the Portfolio Companies to the Debtors. Ms. Tilton refused to execute the organizational documents required by the Debtors. Thus, on March 23, 2020, the Debtors filed an emergency motion [Docket No. 1505] (the "Control Motion") seeking entry of an order that would grant them control of the Portfolio Companies.

21

28644911.12

On March 26, 2020, the Bankruptcy Court held a hearing on the Control Motion, at the conclusion of which the Bankruptcy Court directed the parties to submit under certification of counsel an order consistent with the record at the hearing.  The Bankruptcy Court entered an order on the Control Motion on March 30, 2020 [Docket No. 1542] (the "Control Order").

On June 3, 2020, the Bankruptcy Court held a status conference concerning the Original Milestones Order in light of Ms. Tilton's resignations, at which the Bankruptcy Court made the following observations:

- The parties must set forth specific requests regarding how to address the conflicts of interest presented by Ms. Tilton's "joint" role in the monetization process *and* that she has made clear she is a potential bidder at any or all of the Portfolio Companies.  June 3, 2020 Tr., at 24:15-22;

- The Settlement Agreement did not contemplate or address the situation where Ms. Tilton has resigned from the Portfolio Companies and/or how those resignations affect the "joint" monetization process.  *Id.*, at 23:16-22;

- The Bankruptcy Court did not previously determine, through the Original Milestones Order, that the Monetization Process must continue "jointly" even if Ms. Tilton were to resign because those circumstances were not present when the Original Milestones Order was entered.  *Id.*, at 23:23-24:61; and

- The landscape had changed in light of Ms. Tilton's resignations and the Monetization Process needed to be reshaped going forward.  *Id.*, at 24:13-15.

At the conclusion of the status conference, the Bankruptcy Court asked each party to submit a proposed amended Original Milestones Order and certifications of counsel explaining how their proposed revisions addressed the foregoing issues.  On July 2, 2020, the Bankruptcy Court entered its *Amended Order Establishing Certain Guidelines and Milestones in Furtherance of the Monetization Process for the Group A and Group B Portfolio Companies* [Docket No. 1751] (the "Amended Milestones Order" or "July 2nd Order").

Among other things, the Amended Milestones Order requires that the Debtors and the Patriarch Stakeholders declare whether they intended to be a bidder for any of the Portfolio Companies or irrevocably disclaim their right to be a bidder, in which case, to the extent applicable, they would be provided enhanced access to information regarding the Monetization Process for the subject Portfolio Company.  In addition, the Amended Milestones Order imbues the governing bodies of the Portfolio Companies, to the extent not controlled by the Debtors or Patriarch Stakeholders, with the right to control the Monetization Process for the subject Portfolio Company.

## K.    The Portfolio Company Assets

### 1.    Sold Portfolio Companies

As of the date hereof, the Bankruptcy Court has approved monetization transactions for the following Portfolio Companies:  (a) Denali, Inc. ("Denali"); (b) LVD Acquisition, LLC ("Oasis"); (c) Dura; (d) RM Acquisition, LLC ("Rand"); (e) Libertas Copper, LLC ("Hussey"); (f) Gorham

Paper and Tissue, LLC and White Mountain Tissue, LLC (together, "Gorham"); (g) Snelling Staffing, LLC ("Snelling"), (h) FSAR Holding, Inc. ("FSAR" or "PDP"); (i) Global Automotive Systems, LLC ("GAS"); (j) Croscill Home, LLC ("Croscill"); (k) Heritage Aviation, Ltd ("Heritage"); and (l) UI Acquisition Holding Co. ("Universal").  All of the sales have closed other than Universal, which sale closing is pending.  A summary description of these transactions is below.

The proceeds collected by the Debtors (or MBIA, in the case of Zohar I pursuant to the Settlement Agreement) from monetization transactions for these companies as of March 15, 2022 is summarized below:

($ in 000s)

| Portfolio Company Sale Proceeds (Including Post-Close Escrow Recoveries to Date as at 3/15/2022) | | | | |
|---|---|---|---|---|
| **Portfolio Company** | **Zohar I** | **Zohar II** | **Zohar III** | **Total** |
| Denali | $ - | $ - | $ 78,103 | $ 78,103 |
| Oasis | 9,567 | 43,137 | 19,945 | 72,649 |
| Dura | - | - | - | - |
| Rand | 3,697 | 12,544 | 11,576 | 27,817 |
| Hussey | - | - | 18,986 | 18,986 |
| Gorham | - | - | 3,011 | 3,011 |
| Snelling | 769 | 1,975 | 1,817 | 4,561 |
| GAS | - | - | - | - |
| PDP | - | 29,412 | - | 29,412 |
| Croscill | 1,285 | - | 3,532 | 4,818 |
| Heritage | 3,811 | 3,205 | 840 | 7,856 |
| **Total Portfolio Company Sale Proceeds** | **$ 19,129** | **$ 90,273** | **$ 137,811** | **$ 247,213** |

In addition, Zohar II received an unsecured promissory note in the amount of $5 million as part of the consideration in the sale of FSAR.  No amounts have been collected on the promissory note as of the date of this Disclosure Statement.

In addition, many of these transactions involved the funding of one or more escrows to secure the payment of potential post-closing amounts owed by the sellers.  The Debtors typically retained a ratable interest in the proceeds in those escrow to the extent not used to satisfy post-closing obligations under the applicable transaction agreement.  The below chart summarizes the

maximum potential recoveries the Debtors (or MBIA, in the case of Zohar I) may obtain from the release of these escrows.

($ in 000s)

| Potential Recoveries on Outstanding Portfolio Company Sale Escrows[1] | | | | |
|---|---|---|---|---|
| Portfolio Company | Zohar I | Zohar II | Zohar III | Total |
| Denali | $ - | $ - | $ 1,598 | $ 1,598 |
| Oasis | 53 | 238 | 110 | 400 |
| Dura | - | - | - | - |
| Rand | 65 | 218 | 193 | 476 |
| Hussey | - | - | 2,014 | 2,014 |
| Gorham | - | - | - | - |
| Snelling | 173 | 446 | 411 | 1,030 |
| GAS | 141 | 224 | 186 | 551 |
| PDP[2] | - | - | - | - |
| Croscill | - | - | - | - |
| Heritage | 537 | 447 | 116 | 1,100 |
| Total Potential Escrow Recoveries | $ 969 | $ 1,572 | $ 4,627 | $ 7,168 |

(1) The table details the Zohars' gross, allocable portion of the outstanding escrowed amounts from the historical Portfolio Company sales during the pendency of the bankruptcy. These amounts assume the Zohars will receive 100% of their allocable portions. As such, outstanding amounts seen may vary materially from actual recoveries, if any, as further deductions from these escrowed amounts may exist.
(2) Per the EPA, any tax refunds from the pre-closing ownership period may inure to the benefit of Zohar II.

(a)     *Denali*

On June 26, 2019, the Bankruptcy Court entered an order [Docket No. 797], on an uncontested basis, approving the sale of the equity in Denali to Fiber Glass Systems, L.P. On July 9, 2019, the sale closed. In connection with the sale of Denali, the Debtors' loans to Denali were satisfied in full and the Debtors received a substantial return on the equity in Denali.

(b)     *Oasis*

On September 9, 2019, the Bankruptcy Court entered an order [Docket No. 918], on an uncontested basis, approving the sale of the equity in Oasis to Culligan International Company. The sale closed on September 30, 2019. As the Debtors' loans to Oasis were not paid in full, the Debtors did not receive any recovery on account of their equity interests in Oasis.

24

As described below, the sale of Oasis resulted in a dispute concerning the transaction fee asserted to be payable to Patriarch Partners Management Group, LLC ("PPMG") under the Oasis MSA (as defined below), which was reserved for resolution so as not to delay the closing of the Oasis sale.

       (c)    ***Dura***

On October 17, 2019, Dura and its affiliates filed chapter 11 cases in the Middle District of Tennessee.  The Debtors promptly moved to transfer venue of Dura's chapter 11 cases to the Bankruptcy Court in Delaware.

Dura also sought approval of debtor-in-possession financing from Ms. Tilton, and the approval of a sale and bidding procedures that designated Ms. Tilton as a stalking horse bidder, with a purchase offer that provided no recovery for the Zohar Funds on account of their approximately $105 million secured term loans.  The Debtors appeared at Dura's "First Day" hearing, held on October 18, 2019, and objected to Ms. Tilton's DIP financing and proposed alternative financing backed by Bardin Hill, who manages various funds in the Zohar III Controlling Class.  The bankruptcy judge authorized borrowing under Ms. Tilton's DIP facility on a limited, interim basis to allow time for a full evidentiary hearing, which was held on October 23, 2019.  At the conclusion of evidence on October 23, 2019, Dura determined to accept the alternative Bardin Hill-backed DIP financing.

Dura proceeded to commence a section 363 sale process for its assets.  There was insufficient interest in Dura's assets to obtain a purchase price that would clear the amount of the DIP financing and, as a result, Dura's DIP lenders acquired its assets.

Following the closing of sales of Dura's assets, its chapter 11 cases converted to cases under chapter 7.

Certain causes of action were not purchased in the sale of Dura's assets, which are currently being administered by a chapter 7 trustee.  Dura's chapter 7 trustee hired special litigation counsel to pursue claims and causes of action against Dura's former officers and directors and other affiliates and insiders.

Zohar II and Zohar III have allowed claims in Dura's bankruptcy case, which are not subject to challenge as a result of stipulations in Dura's DIP financing order, on account of their secured term loans.  However, any recovery on account of those claims are speculative, due to both the fact that Dura's DIP lenders are still owed substantial amounts (although they have agreed to subordinate a portion of their claim to general unsecured creditors) and the generally speculative nature of recoveries from litigation assets.

Information concerning the Dura cases can be obtained on the docket of Dura's and its affiliates' jointly administered bankruptcy cases, Case No. 19-12378 (KBO) (Bankr. D. Del.).

    (d)    ***Rand***

On October 22, 2020, the Bankruptcy Court entered an order [Docket No. 2050] (the "Rand Sale Order"), over the objection of Ms. Tilton and her affiliates, approving the sale of the equity in Rand to third party RM Technologies, Inc. ("Teleo"). Ms. Tilton objected to the sale on the grounds that she had submitted an offer in the bidding process that was (in her view) superior, but was rejected. And in submitting her objection, Ms. Tilton agreed to close on a transaction that was identical to Teleo's bid, but with a higher purchase price. Ultimately, the Bankruptcy Court, after an evidentiary hearing, ruled that the Debtors' business judgment supported the sale to Teleo and found that the Monetization Procedures Order precluded Ms. Tilton's bid. *See* Oct. 19, 2020 Hr'g Tr. 229:4-230:9 (business judgment); 233:8-17 (finding topping bid in conflict with Monetization Procedures Order).

On October 23, 2020, the sale closed. As the Debtors' loans were not paid in full, the Debtors did not receive any recovery on account of their equity interests in Rand. At the closing of the sale of Rand, all "Retained Claims" (as defined in the Rand Sale Order) were transferred and conveyed to the Debtors, subject to certain rights, obligations and procedures, including the funding of an escrow with respect to asserted advancement and indemnity obligations.

In addition, certain affiliates of Ms. Tilton received at closing payments of asserted tax obligations and accrued and unpaid management fees and other amounts asserted by PPMG. The Debtors are contesting these amounts and they are currently subject to counts in the Zohar-Patriarch Adversary Proceeding (as defined below).

    (e)    ***Hussey***

On November 30, 2020, the Bankruptcy Court entered an order [Docket No. 2144], on an uncontested basis, approving the sale of the equity in Hussey to Kokkino Inc. On December 7, 2020, the sale closed. As Zohar III's loans were not paid in full, the Debtors did not receive any recovery on account of their equity interests in Hussey.

At the closing of the sale of Hussey, an affiliate of Ms. Tilton received at closing payments of asserted tax obligations, accrued and unpaid management fees and other amounts asserted by PPMG and PPAS. The Debtors are contesting these amounts and they are currently subject to counts in the Zohar-Patriarch Adversary Proceeding (as defined below).

    (f)    ***Gorham***

On November 4, 2020, Gorham filed for chapter 11 relief in the Bankruptcy Court, Case No. 20-12814 (KBO). Additional information concerning Gorham's chapter 11 cases can be found on the docket for those cases.

On December 18, 2020, the Bankruptcy Court entered an order approving the sale of Gorham to third party Gorham Acquisition, LLC. On December 31, 2020, the sale closed, and approximately $4.5 million was placed in a segregated account maintained by Ankura in accordance with the terms of the final post-petition financing order entered in the Gorham chapter 11 case. Pursuant to a settlement agreement approved by the Bankruptcy Court on February 17,

26

2021, $3.2 million of sale proceeds were indefeasibly paid to Ankura and Zohar III Limited for application to their claims under the applicable credit agreements ($3.0 million was ultimately paid to Zohar III).

On December 17, 2021, the Bankruptcy Court entered an order confirming a chapter 11 plan of liquidation for Gorham.  Under the settlement described above, Zohar III's remaining deficiency claims were partially subordinated under the Gorham's chapter 11 plan of liquidation up to the point that administrative and priority claim holders are paid in full and non-insider general unsecured creditors receive either a 5% distribution or $500,000 in the aggregate.  Gorham projected that its general unsecured creditors would receive 2-5% of their claims and, as a result, Zohar III Limited does not anticipate receiving any material recovery under the Gorham chapter 11 plan.

> (g)    *Snelling*

On February 18, 2021, the Bankruptcy Court entered an order [Docket No. 2340], on an uncontested basis, approving the sale of the assets of Snelling and its subsidiaries to third party, HQ Snelling Corporation.

On March 1, 2021, the sale closed.  The Debtors released their liens on Snelling's assets that were the subject of the sale.  The Debtors' secured loans against Snelling were not satisfied in full at the closing, so any remaining assets of Snelling are subject to the liens securing the Debtors' loans, including causes of action commenced on Snelling's behalf in the Zohar-Patriarch Adversary Proceeding.

Snelling has no remaining business operations and is in the process of winding-down.

> (h)    *GAS*

On February 18, 2021, the Bankruptcy Court entered an order [Docket No. 2339], on an uncontested basis, approving the sale of certain real estate owned by a subsidiary of GAS.   That sale closed on or about February 19, 2021.  The Debtors' liens on that real estate were released in connection with the sale, but the Debtors' received no consideration in the sale.  Instead, the Debtors consented to GAS's retention of the sale proceeds to finance its ongoing operations.

On March 23, 2021, Ms. Tilton and her affiliates filed a motion [Docket No. 2388] seeking the Court's authorization of a sale of GAS's assets to an affiliate of Ms. Tilton and directing the Debtors to take actions to consummate the sale.  The Debtors did not support the sale, for various reasons, including because they were not receiving any consideration in the sale, and objected to the sale on the grounds that the transaction was not entirely fair and that the Court could not compel the Debtors to consummate the transaction without finding that the transaction was in the best interests of the Debtors, among others.  *See* [Docket No. 2412].  After two days of evidence and closing argument, the Bankruptcy Court approved the sale of GAS to Ms. Tilton's affiliate, entering an order approving the sale on April 19, 2021 [Docket No. 2509].

The Debtors have appealed the Bankruptcy Court's order, identifying five areas for appellate review:

27

1.      Did the Bankruptcy Court err in entering an order enforcing the Settlement Agreement against the Debtors by directing the Debtors to consent to the sale of GAS without finding that the Debtors had breached their obligations under the Settlement Agreement?

2.      Did the Bankruptcy Court err in ordering the sale of GAS under the Settlement Agreement without finding that the sale was in the best interest of the Debtors?

3.      Did the Bankruptcy Court err in ordering the sale of GAS without finding that the sale to GAS's insider-controller satisfied the entire fairness standard under Delaware law and was therefore in GAS's best interest?

4.      Did the Bankruptcy Court err in forcing secured lenders that are also chapter 11 debtors to release their liens on their borrower's assets for no consideration?

5.      Did the Bankruptcy Court err in allowing Ms. Tilton to structure the allocation of the proceeds of the GAS transaction so as to provide all value to herself and none to the Debtors, when the independent fiduciary and advisors for GAS admitted that they had not conducted any analysis or valuation of GAS's assets and the Debtors' and Patriarch entities' respective liens, collateral and interests therein?

The Debtors' appeal is fully briefed before the District Court. *See* D. Del. Case No. 21-628 (MN), Docket Nos. 12 & 15 (sealed and redacted opening brief), 17 & 22 (sealed and redacted responsive brief), and 23 & 24 (sealed and redacted reply brief).

On April 27, 2021, the sale closed. The Debtors' have received no recovery on their secured loans against GAS, totaling approximately $150 million. However, any remaining assets of GAS are subject to the liens securing the Debtors' loans, including causes of action asserted on GAS's behalf in the Zohar-Patriarch Adversary Proceeding.

It is the Debtors' understanding that GAS has no remaining business operations.

(i)     **FSAR**

On April 14, 2021, the Bankruptcy Court entered an order [Docket No. 2480] (the "FSAR Sale Order"), on an uncontested basis, approving the sale of the equity in FSAR to a third party, PDP Holdings, LLC. On April 21, 2021, the Bankruptcy Court entered an agreed order [Docket No. 2480], amending the FSAR Sale Order, solely to reflect certain working capital adjustments that were made after the entry of the FSAR Sale Order, and which resulted in a recalculation of the Patriarch Closing Date Payment (as defined in the original FSAR Sale Order).

On April 22, 2021, the sale closed. At the closing of the sale of FSAR, all "Retained Claims" as defined in the FSAR Sale Order were transferred and conveyed to Zohar II Limited,

subject to certain rights, obligations and procedures, including maintaining the escrow created under the Rand Sale Order with respect to asserted advancement and indemnity obligations.

The Zohar-Patriarch Adversary Proceeding includes counts seeking to recover amounts paid at the closing of the FSAR sale to PPMG and to Ms. Tilton on account of certain alleged indemnification obligations.

(j)    *Croscill*

On April 14, 2021, the Bankruptcy Court entered an order [Docket No. 2481], on an uncontested basis, approving the sale of the former warehouse facility of Croscill to Watkins Logistics, LLC.  On April 29, 2021, the sale closed.  The Debtors' released their liens on the warehouse facility in connection with the sale.

On August 9, 2021, the Bankruptcy Court entered an order [Docket No. 2733], on an uncontested basis, approving the sale of Croscill's intellectual property to E&E Co. Ltd.  On August 12, 2021, the sale closed.  The Debtors released their liens on Croscill's intellectual property in connection with the sale.

The Debtors' secured loans against Croscill have not been satisfied in full through these two sales, so any remaining assets of Croscill remain subject to the liens securing the Debtors' loans, including causes of action commenced on Croscill's behalf in the Zohar Adversary Proceeding.

Croscill has no remaining business operations and is in the process of winding-down.

(k)    *Heritage*

On November 19, 2021, the Bankruptcy Court entered an order [Docket No. 2926] (the "Heritage Sale Order"), on an uncontested basis, approving the sale of the partnership interests in Heritage to The Albers Group, LLC and Albers Aero Mgmt Co, LLC.

On November 23, 2021, the sale closed.  At the closing of the sale of Heritage, all "Retained Claims," as defined in the Heritage Sale Order, were transferred and conveyed to the Debtors, subject to certain rights, obligations and procedures, including maintaining the escrow created under the Rand Sale Order with respect to asserted advancement and indemnity obligations and increasing the amount thereof to $825,000.

(l)    *Universal*

On January 10, 2022, the Bankruptcy Court entered an order [Docket No. 2988] (the "Universal Sale Order"), on an uncontested basis, approving the sale of the equity in Universal to Delta International Holding Limited B.V.  A closing of the sale is pending.

The notice of the proposed sale of Universal [Docket No. 2966], filed on December 23, 2021, stated:  "The Debtors contemplate that the Sellers will receive between $66.7 and $75.3 million from the [sale of Universal], with the ultimate amount to be determined by the outcome of

certain post-Closing target net working capital and Closing cash reconciliations, the amount of post-Closing expenses of the Seller Representative that are paid, and ultimate distributions from an escrow set up under the EPA as a holdback related to certain net working capital and indemnification provisions. This amount excludes any recoveries from the Retained Claims or the Patriarch Closing Date Payment."  Actual recoveries to the Debtors may vary depending on the timing of sale closing.

The Universal Sale Order provides that, at closing, all "Retained Claims" will be assigned to the "Seller Representative" for the benefit of the "Participating Sellers," including the Debtors (with such capitalized terms having the meaning ascribed to them in the Universal Sale Order), subject to certain rights, obligations and procedures, including maintaining the escrow created under the Rand Sale Order with respect to asserted advancement and indemnity obligations.

2.    Pending Portfolio Company Monetization Processes

As of the date hereof, the following Portfolio Companies are continuing in operations, but have not yet completed a monetization transaction under the Settlement Agreement: (a) 180s, LLC ("180s"); (b) IMG Holdings, Inc. ("IMG"); (c) Intrepid U.S.A., Inc. ("Intrepid"); (d) MD Helicopters, Inc. ("MDHI"); (e) Natura Water, LLC ("Natura"); (f) Scan-Optics, LLC ("Scan Optics"); (g) Stila Styles, LLC ("Stila"); and (h) Vulcan Engineering Co. ("Vulcan").  A summary description of those Portfolio Companies and the Debtors' interest therein as of December 31, 2021 are set forth below.[6]

Under the Plan, in the event that the following Portfolio Companies are not sold by the Effective Date of the Plan, the applicable Asset Recovery Entity (and MBIA, in the case of interests in the name of Zohar I) shall assume the obligations of the Debtors (and their Independent Director and CRO) in the monetization process under the Settlement Agreement for these Portfolio Companies.

---

[6] Most of the Group A Portfolio Companies paid interest on a current basis during the 15 Month Window under the Settlement Agreement, which expired on September 30, 2019.  After the expiration of the 15 Month Window, certain Group A Portfolio Companies ceased paying interest.  The Group B Portfolio Companies generally have not paid interest.  The amounts set forth below do not include interest and default rate interest that has accrued and is unpaid on any loans, except where those amounts have been capitalized into the principal balance of the loan pursuant to the latest reporting available to the Debtors.  There are material balances of outstanding accrued and unpaid interest at these companies.

    (a)    ***180s***

180s is a seller of outdoor winter-weather clothing accessories, primarily ear warmers and gloves.  The summary capital structure for 180s is set forth below:

| 180s - Capital Structure Estimate and Equity Holdings | | | | | |
|---|---|---|---|---|---|
| ($ in 000s) | Zohar I | Zohar II | Zohar III | External | Total |
| Secured Debt | $ 21,408 | $ 39,343 | $ 53,083 | $ - | $ 113,833 |
| Equity Ownership | - | 68.4% | - | 31.6% | 100.0% |

    (b)    ***IMG***

IMG, through its subsidiary, is a seller of consumer products in the fragrances industry. The summary capital structure for IMG is set forth below:

| IMG - Capital Structure Estimate and Equity Holdings | | | | | |
|---|---|---|---|---|---|
| ($ in 000s) | Zohar I | Zohar II | Zohar III | External | Total |
| Secured Debt | $ 11,395 | $ 27,000 | $ 24,927 | $ 950 | $ 64,272 |
| Equity Ownership | 16.9% | 68.2% | 14.8% | - | 100.0% |

    (c)    ***Intrepid***

Intrepid is an at-home healthcare provider whose services include personal care, home health, therapy, palliative care, and at-home hospice care services.  The summary capital structure for Intrepid is as follows:

| Intrepid - Capital Structure Estimate and Equity Holdings | | | | | |
|---|---|---|---|---|---|
| ($ in 000s) | Zohar I | Zohar II | Zohar III | External | Total |
| Senior Secured Debt | $ 14,736 | $ 41,865 | $ 26,473 | $ - | $ 83,074 |
| Equity Ownership (through Snelling Holdings, LLC) | 22.3% | 63.8% | 13.9% | - | 100.0% |

    (d)    ***MDHI***

MDHI is a helicopter manufacturer that produces a family of single and twin engine helicopters for use in civil and military applications, which also has a substantial after-market service and products business.  The summary capital structure for MD is as follows:

31

| MDHI - Capital Structure Estimate and Equity Holdings | | | | | |
|---|---|---|---|---|---|
| *($ in 000s)* | **Zohar I** | **Zohar II** | **Zohar III** | **External** | **Total** |
| Senior Secured Debt | $ 61,647 | $ 141,439 | $ 104,245 | $ 23,194 | $ 330,526 |
| Subordinated Secured Debt | 13,665 | 16,092 | - | 28,447 | 58,204 |
| **Total Secured Debt** | **$ 75,312** | **$ 157,531** | **$ 104,245** | **$ 51,641** | **$ 388,730** |
| Equity Ownership | 21.0% | 28.6% | - | 50.3% | 100.0% |

On March 30, 2022, MDHI and its subsidiary, Monterrey Aerospace, LLC (together the "**MD Debtors**"), filed for chapter 11 protection in the Bankruptcy Court. The MD Debtors' chapter 11 cases (the "**MD Chapter 11 Cases**") are being jointly administered, for procedural purposes only, as Case No. 22-10263 (KBO). Additional information concerning the MD Chapter 11 Cases can be obtained on MD Debtors' case docket, or at the dedicated website maintained by the MD Debtors' claims and noticing agent: https://cases.primeclerk.com/MDHelicopters/.

(1)     MDHI's Prepetition Sale Process

The Zohar Funds are lenders to MDHI under a prepetition, senior-secured term loan facility (the loans thereunder the "**MD Term Loans**" and reflected as the "Senior Secured Debt" in the above chart), holding approximately 93% of the MD Term Loan obligations, and hold junior-secured subordinated notes (the "**MD Sub Notes**" and reflected as the Subordinted Secured Debt in the above chart). Entities controlled or affiliated with Lynn Tilton (the "**Ark Lenders**") hold the remaining approximately 7% of the MD Term Loans obligations and the other MD Sub Notes.

As a result of certain adverse developments at the MD Debtors, and the fact that more than $388 million of funded debt matured long-ago without any prospect of repayment, the Zohar Funds sought and obtained in their own Chapter 11 Cases that certain *Order (I) Authorizing the Debtors to Enter Into One or More Potential Transactions Relating to Company G and (II) Granting Related Relief* [Docket No. 2852] (the "**MD Pre-Transaction Order**"). The MD Pre-Transaction Order authorized the Zohar Funds to, among other things, prepare for and propose a credit bid transaction for the MD Debtors, subject to a further order of the Bankruptcy Court ultimately authorizing the consummation of that transaction.

The Zohar Funds proceeded in accordance with the MD Pre-Transaction Order to participate in the MD Debtors' sale process. The Zohar Funds did so in concert with the largest senior creditors at Zohar I/Zohar II (MBIA) and Zohar III (the members of the Controlling Class and certain funds managed by MB Global). With this creditor consortium, the Zohar Funds submitted an indicative bid that valued the MD Debtors at a purchase price of $210 million, which would be inclusive of additional, new-money financing that the MD Debtors would need to get to the closing of a sale transaction (the "**MD DIP Facility**"). The purchase price would be paid through assumption of the MD DIP Facility and a credit bid of the MD Term Loans for the balance of the purchase price.

In accordance with the Monetization Order, the MD Debtors' sale process was overseen by the MD Debtors' independent director, Alan Carr. During the sale process, the MD Debtors

advised the Zohar Funds that their bid was the best actionable bid available at that time, but indicated that they would continue to negotiate with another potential purchaser. It is the Zohar Funds' understanding that the other purchaser never materialized with an actionable bid.

(2)    <u>The Proposed Credit Bid Transaction</u>

On March 30, 2022, an entity created by the Zohar Funds in accordance with the MD Pre-Transaction Order, MDH Holdco LLC (the "**MD Buyer**"), entered into an asset purchase agreement (the "**MD APA**") to acquire substantially all of the assets of the MD Debtors free and clear of all liens, claims and encumbrances. The purchase price under the APA consists of (i) a credit bid of MD Term Loans of $150 million (the "**Prepetition TL Credit Bid**"), (ii) a credit bid of the MD DIP Facility, (iii) the assumption of specified liabilities, and (iv) cash to be retained by the MD Debtors in an amount to be agreed. If the MD DIP Facility is not fully drawn, the credit bid portion of the MD Term Loans could be increased by the amount not-so-drawn (on a dollar-for-dollar basis) up to a total credit bid of MD Term Loans of $180 million. The MD Buyer also reserved the right to further increase the Prepetition TL Credit Bid.

In connection with the MD APA and to capitalize the MD Buyer, the Zohar Funds would receive equity in the MD Buyer (or its parent company) on account of their MD Term Loans contributed to the Prepetition TL Credit Bid.[7]

In connection with the MD APA, the Zohar Funds has proposed the following treatment for the Ark Lenders: (i) the Ark Lenders would contribute a ratable amount of their MD Term Loans to the Prepetition TL Credit Bid, and (ii) the Ark Lenders would receive a cash payment, at the closing of the sale to the MD Buyer, equal to the amount of MD Term Loans held by the Ark Lenders included in the credit bid. To be clear, the Ark Lenders would not be receiving equity in the MD Buyer—they will receive cash. As an example, if the amount of the Prepetition TL Credit Bid is $150 million:

> ➢ The Ark Lenders would contribute $10,525,500 of MD Term Loans.
> ➢ The Zohar Funds would contribute $139,474,500 of MD Term Loans.
> ➢ The Ark Lenders would receive a cash payment of $10,525,500.
> ➢ The Zohar Funds would receive equity in the MD Buyer valued at $139,474,500.

And if the Prepetition TL Credit Bid is increased to $180 million:

> ➢ The Ark Lenders would contribute $12,630,600 of MD Term Loans.
> ➢ The Zohar Funds would contribute $167,369,400 of MD Term Loans.
> ➢ The Ark Lenders would receive a cash payment of $12,630,600.

---

[7]   If the Effective Date of the Plan does not occur prior to the closing of a sale to the MD Buyer, the Zohar Funds would distribute the equity in the MD Buyer to their noteholders in exchange for a ratable reduction of their noteholder claims based on the amount of the MD Term Loans contributed by Zohar II and Zohar III to the Prepetition TL Credit Bid. In this scenario, the recovery on the MD Term Loans contributed by Zohar I would be paid to MBIA.

33

&#10148;   The Zohar Funds would receive equity in the MD Buyer valued at $167,369,400.

In each of these scenarios, the Zohar Funds and Ark Lenders would retain any remaining claims related to the remaining outstanding MD Term Loans and to the Sub Notes, as well as any non-debt unsecured claims that they have against the MD Debtors.  The outcome of this sale transaction is, in fact, the exact treatment that was provided for in prior assets sales approved in the Chapter 11 Cases, such as Snelling Staffing and GAS (a transaction that the Ark Lenders and their affiliates actively supported).

Also, as described below, the MD DIP Fees (as defined herein) would be payable in equity of the MD Buyer (or its parent company) if the MD Buyer acquires the MD Debtors' assets under the APA.

(3)    The MD DIP Facility

The MD Debtors also obtained a commitment for the MD DIP Facility from the members of the Controlling Class and certain funds managed by MB Global.  The MD DIP Facility has borrowing availability for loans of up to $60 million, and includes a backstop fee equal to 8% of the commitments (the "Backstop Fee") and an exit fee equal to 5% of the commitments (the "Exit Fee" and with the Backstop Fee, together the "MD DIP Fees"), as such fees are payable pursuant to and in accordance with the documentation for the MD DIP Facility, with a total nominal value of $7.8 million.

There are certain limitations on the payment of the MD DIP Fees.  The MD Debtors are not obligated to pay the Exit Fee if a sale to the MD Buyer under the APA is not consummated.  And if that transaction is consummated, the Exit Fee will be assumed and paid by the MD Buyer, either in cash or equity of the MD Buyer, pursuant to and in accordance with the documentation for the MD DIP Facility.  The obligation to pay the Backstop Fee in cash will be limited to 8% of the amount drawn (which would currently result in a $1 million fee) if the MD Facility is refinanced before the entry of final order approving the MD DIP Facility.  In the event the MD DIP Facility is approved by a final order, the MD Debtors will be obligated to pay in cash the Backstop Fee on the full $60 million dollars of commitments.  If the MD Buyer is the successful bidder in the auction for the MD Debtors' assets, the full amount of the Backstop Fees (less any amounts paid in cash by the MD Debtors in the event of a refinancing) will be assumed by MD Buyer as part of its assumption of the MD DIP Facility and will be payable either in cash or equity of MD Buyer (or its parent company) as set forth in the documentation for the MD DIP Facility.

On March 31, 2022, the Ark Lenders filed a preliminary objection to the the MD Debtors' motion for approval of the MD DIP Facility, in which, among other things, they objected to the terms of the MD DIP Facility, the priming of liens by the MD DIP Facility and the Zohar Funds' ability to credit bid the MD Term Loans without the Ark Lenders' consent.

On April 4, 2022, the Bankruptcy Court entered an order approving the MD Debtors' entry into the MD DIP Facility on an interim basis over the Ark Lenders' objection.

34

(4)    <u>Current Status of the Proposed Credit Bid Transaction</u>

On April 1, 2022, at a hearing in the Chapter 11 Cases, the Court indicated that it would hear any objection to the Zohar Funds' ability to consummate the credit bid transactions in the MD APA at the "Second Day Hearing" in the MD Chapter 11 Cases, in connection with the MD Debtors' bidding and sale procedures motion [MD Chapter 11 Cases, Docket No. 28] (the "<u>MD Sale and Bidding Procedures Motion</u>"),  which is currently scheduled for April 25, 2022.

The Zohar Funds believe they are entitled to credit bid without the Ark Lenders' consent and, if they are ultimately determined to be the highest and best bidder for the MD Debtors' assets, intend to consummate the transactions provided for in the MD APA.

The Zohar Funds have also entered into a restructuring support agreement with the MD Debtors to pursue consummation of the sale under the MD APA, subject to higher and better offers in a court-supervised auction and sale process in the MD Chapter 11 Cases.  The restructuring support agreement also provides that the parties may pivot to implementation of the proposed transaction under a chapter 11 plan for the MD Debtors.

Parties are encouraged to consult the pleadings filed in the MD Chapter 11 Cases and to consult the docket in that MD Chapter 11 Cases for updates on the sale process for the MD Debtors, including the restructuring support agreement [MD Chapter 11 Cases, Docket No. 19, Exhibit B], the MD Debtors' motion to approve the DIP Facility [MD Chapter 11 Cases, Docket No. 20], the MD Sale and Bidding Procedures Motion,, and the interim order approving the MD DIP Facility [MD Chapter 11 Cases, Docket No. 114].

(e)    ***Natura***

Natura is a seller of filtered water dispensers for commercial use in restaurants, hotels and other similar applications.  The summary capital structure for Natura is as follows:

| Natura - Capital Structure Estimate and Equity Holdings | | | | | |
|---|---|---|---|---|---|
| *($ in 000s)* | **Zohar I** | **Zohar II** | **Zohar III** | **External** | **Total** |
| Secured Debt | $ 4,875 | $ 8,335 | $ 10,788 | $ - | $ 23,998 |
| Equity Ownership | - | - | - | 100.0% | 100.0% |

(f)    ***Scan Optics***

Scan Optics is an information management services provider. The summary capital structure of Scan Optics is as follows:

| Scan Optics - Capital Structure Estimate and Equity Holdings | | | | | |
|---|---|---|---|---|---|
| *($ in 000s)* | **Zohar I** | **Zohar II** | **Zohar III** | **External** | **Total** |
| Secured Debt | $ 5,321 | $ 23,828 | $ 5,094 | $ - | $ 34,242 |
| Equity Ownership | 18.0% | 82.0% | - | - | 100.0% |

35

(g)    *Stila*

Stila is a seller of color cosmetics products, including eyeliner and lipsticks, and its products are carried by major retailers domestically and internationally.  The summary capital structure for Stila is as follows:

| Stila - Capital Structure Estimate and Common Interests | | | | | |
|---|---|---|---|---|---|
| *($ in 000s)* | Zohar I | Zohar II | Zohar III | External | Total |
| Senior Secured Debt | $ - | $ - | $ - | $ - | $ - |
| Class A Interest[1] | - | - | - | 50,000 | 50,000 |
| Common Interests | - | - | 100.0% | - | 100.0% |

(1) Stila purportedly issued to an affiliate of Lynn Tilton Class A Membership Interests that purport to provide a preference in distributions ahead of the Common Member in the amount of $50 million. The Zohar Funds have challenged the issuance of the Class A Membership Interests.

(h)    *Vulcan*

Vulcan is the largest in-house engineering, manufacturing, and installation group in North America dedicated to the metalcasting and heavy industrial markets.  The summary capital structure for Vulcan is as follows:

| Vulcan -  Capital Structure Estimate and Common Equity Holdings | | | | | |
|---|---|---|---|---|---|
| *($ in 000s)* | Zohar I | Zohar II | Zohar III | External | Total |
| Senior Secured Debt | $ 1,429 | $ 14,820 | $ - | $ - | $ 16,248 |
| Convertible Preferred Stock[1] | - | 25,727 | - | - | 25,727 |
| Common Equity Ownership | - | - | - | 100.0% | 100.0% |

(1) The Preferred Stock is convertible into 80% of the common stock, on a fully diluted basis.

3.    Recoveries from Portfolio Companies Outside of the Monetization Process

The Debtors have set forth below recoveries and potential recoveries from Portfolio Companies Assets that are known to the Debtors.  The Debtors were lenders and owners to a significant number of Portfolio Companies over the course of their existence, and it is possible that the Debtors are entitled to recover amounts that are unknown to the Debtors at this time, but may be uncovered as the Debtors continue to obtain information, including through litigation.  These amounts are separate from amounts the Debtors seek to recover or value they otherwise seek to realize upon in various pending litigation, including the Zohar-Patriarch Adversary Proceeding, the Loan Agent Action and the Stila Proceeding.

a.    *Actual Post-Petition Receipts*

The Debtors have received the below extra-ordinary distributions (*i.e.*, excluding interest payments) from, or on account of their interest in, the Portfolio Companies after the Petition Date:

28644911.12

($ in 000s)

| Principal Paydowns | | | | |
|---|---|---|---|---|
| Portfolio Company | Zohar I | Zohar II | Zohar III | Total |
| Vulcan | $ - | $ 5,000 | $ - | $ 5,000 |
| Heritage | 3,898 | 3,257 | 845 | 8,000 |
| **Total Principal Paydowns** | **$ 3,898** | **$ 8,257** | **$ 845** | **$ 13,000** |

($ in 000s)

| Stock Redemptions | | | | |
|---|---|---|---|---|
| Portfolio Company | Zohar I | Zohar II | Zohar III | Total |
| PDP | $ - | $ 12,661 | $ - | $ 12,661 |
| **Total Stock Redemptions** | **$ -** | **$ 12,661** | **$ -** | **$ 12,661** |

| Other Non-Interest Payment Receipts | | | | |
|---|---|---|---|---|
| Portfolio Company | Zohar I | Zohar II | Zohar III | Total |
| Galey & Lord Liquidation | $ 582 | $ 712 | $ 2,865 | $ 4,159 |
| Hawker Beechcraft Receipts | - | - | 216 | 216 |
| Tribune Receipts | - | 44 | 143 | 187 |
| Dana Spain Real Estate Sale Proceeds | 387 | 1,572 | - | 1,960 |
| Netversant Settlement Proceeds | 23 | 21 | 30 | 75 |
| **Total Other Non-Interest Payment Receipts** | **$ 992** | **$ 2,349** | **$ 3,255** | **$ 6,597** |

b.    ***The Galey & Lord Dispute***

On October 2, 2018, MBIA (with respect to loans originally held by Zohar I) and the Debtors received the approximately $4.2 million in payments described above from PPAS, in its capacity as loan administrative agent for a credit agreement with Galey & Lord LLC and its affiliates (collectively, "Galey & Lord").  Despite inquiries from the Debtors to PPAS at the time and thereafter, the Debtors were not provided full and complete information regarding the source of the funds and whether additional funds would be distributed on account of the Debtors' loans to Galey & Lord, for more than two years.

After extensive motion practice concerning PPAS's failure to fully transition loan administrative agent functions and collateral possession to Ankura, PPAS agreed to provide the Debtors with information relating to various Portfolio Companies, including Galey & Lord.  On January 31, 2021, PPAS provided the Debtors a "liquidation summary" for Galey & Lord.  That liquidation summary and subsequent due diligence revealed that, among other things, PPAS

37

received approximately $33 million from a single item of foreclosed collateral (the settlement of a litigation claim), all of which was collected after the Petition Date. Based on a review of that spreadsheet and subsequent discussions with PPAS's representatives, the Debtors undertook an investigation to determine what interest the Debtors had in the collateral proceeds identified in the liquidation summary and to assess and determine the propriety of the use of the collateral proceeds.

The Debtors' investigation revealed that prior to the Petition Date, PPAS, as agent for the Debtors and other entities affiliated with Ms. Tilton, as lenders, foreclosed on, and took possession of, most of Galey & Lord's assets in a "partial" strict foreclosure. So the cash collections detailed in the January 31, 2021 liquidation summary reflected proceeds of assets owned by Galey & Lord's lenders, including the Debtors. Documents subsequently produced by PPAS during the Debtors' investigation indicated that the Lynn Tilton-affiliated lenders to Galey & Lord had been paid in full or, if any amounts were due to them, they were *de minimis*. The same documents indicated that as of March 31, 2021, the Debtors were still owed approximately $107 million on account of their Galey & Lord secured debt holdings. As such, the foreclosed funds should have been turned over to the Debtors or Ankura; they were not. Instead, they have either been used to pay other obligations of Galey & Lord, PPAS, or other of their affiliates, or they are being held by PPAS and a Galey & Lord affiliate. The Debtors understand that there is at least $18 million or more of foreclosed cash proceeds from their collateral that has yet to be paid to the Debtors. On June 22, 2021, the Court ordered that these funds be frozen pending further Court order.

On January 26, 2022, the Debtors filed a motion [Docket No. 3022] seeking sanctions against PPAS and others and requesting that the remaining collateral proceeds (an amount believed to be in excess of $18 million) be paid to Ankura for further payment to the Debtors. On February 17, 2022, Patriarch filed an objection to the Debtors' sanctions motion [Docket No. 3074]. No hearing has been scheduled for the sanctions motion.

       c.    ***Transcare***

Each of the Debtors were lenders to Transcare Corporation and its affiliates ("Transcare"), which are debtors in chapter 7 proceedings pending in the United States Bankruptcy Court for the Southern District of New York. *See* Case No 16-10407 (SMB) (Bankr. S.D.N.Y.). The Debtors held over 75% of the loans in a secured lending facility for which PPAS was the administrative agent, and PPAS filed a proof of claim on account of the obligations owed under the credit agreement. In 2020 and 2021, the chapter 7 trustee for Transcare obtained judgments against Ms. Tilton, PPAS and their affiliates, Transcendence Transit, Inc. and Transcendence Transit II, Inc., which are collectable up to the amounts of $51 million, plus post-judgment interest and obtained an order disallowing the claims of PPAS under section 502(d) of the Bankruptcy Code. Ms. Tilton and PPAS are appealing those judgments, and Ms. Tilton has posted a *supersedeas* appeal bond. It is possible that the Debtors may obtain a recovery in the Transcare bankruptcy cases on account of their claims, but the Debtors cannot determine the likelihood of receiving any recovery or the potential amount thereof.

## L.    Post-Petition Litigation

A number of adversary proceedings were initiated in the Bankruptcy Court and, in one instance, the Delaware Court of Chancery, in connection with the Chapter 11 Cases, which are generally described below.[8]

1.    *Blank Rome LLP, FFP (Cayman) Limited,* et al. *v.*
       *Zohar CDO 2003-1, Corp.,* et al., Adversary Case No. 19-50273

On July 12, 2019, Blank Rome LLP, FFP (Cayman) Limited, Maples and Calder, MaplesFS Limited, Morris, Nichols, Arsht & Tunnel LLP, Gary Neems, Quinn Emanuel Urquhart & Sullivan LLP, and Cohen & Gresser LLP commenced an adversary proceeding in the Bankruptcy Court against Zohar III, seeking a declaratory judgement that certain funds held in escrow were not estate property.  *See* Adv. Docket No. 1.

On October 30, 2019, following negotiations between the parties, the Debtors filed a motion seeking approval of a settlement resolving the adversary, whereby $1,818,115.54 would be distributed to the plaintiffs, and $601,884.46 would be distributed to MBIA.  *See* Adv. Docket No. 19.  On November 4, 2019, Patriarch Partners XV, LLC and Octaluna I filed a motion to intervene as both a "creditor and an "equity" holder of the Debtors.  *See* Adv. Docket No. 21.  On November 13, 2019, Patriarch Partners XV, LLC and Octaluna I filed an objection to the settlement motion, arguing that neither the plaintiffs nor the Debtors had demonstrated any plausible claim to the funds held in escrow, and that the funds should be preserved for the benefit of the Debtors' creditors.  *See* Adv. Docket No. 26.  On November 18, 2019, the Debtors objected to the motion to intervene, stating that the settlement of this adversary proceeding resulted from good-faith, arms-length negotiations, and that the resolution of the adversary proceeding was fair and cost-effective.  *See* Adv. Docket No. 27.  The plaintiffs joined the Debtors' objection, and argued that the motion to intervene constituted an attempt to obstruct the settlement.  *See* Adv. Docket No. 28.

On January 24, 2020, the Bankruptcy Court granted the motion to intervene, finding that Patriarch Partners XV, LLC and Octaluna I had a right to intervene under Rule 24(a) of the Federal Rules of Civil Procedure.  *See* Adv. Docket No. 41.  Ultimately, the objection to the settlement motion was withdrawn, and on January 26, 2021, the Bankruptcy Court approved the settlement, holding that the resolution was in the best interests of the Debtors, their estates, creditors, and other parties in interest.  *See* Adv. Docket No. 64.

2.    *Tilton,* et al. *v. MBIA Inc.,* et al., Adversary Case No. 19-50390

On October 1, 2019, certain Patriarch Stakeholders commenced an adversary proceeding against MBIA, the Indenture Trustee, AMZM, and the Zohar III Controlling Class in the Bankruptcy Court for equitable subordination on account of the defendants' alleged actions.  *See*

---

[8]  The descriptions provided herein are qualified in their entirety by the actual pleadings filed in the respective adversary proceeding.  To the extent that there is any inconsistency between such descriptions and the pleadings, the pleadings shall control.  Moreover, such descriptions are not intended to be an exhaustive summary of the adversary proceedings, and the Debtors urge interested parties to consult the actual pleadings.

Adv. Docket No. 1.  The related complaint [Adv. Docket No. 2] (the "Equitable Subordination Complaint") makes several allegations, including that: (1) certain defendants, as statutory insiders, exercised control over the material day-to-day activities of the Debtors; (2) in the alternative, defendants are non-statutory insiders who acted in bad faith towards plaintiffs and took an unfair advantage concerning plaintiffs; (3) defendants engaged in a years-long pattern of inequitable conduct towards plaintiffs; and (4) defendants' misconduct provided them an unfair advantage, which resulted in injury to plaintiffs as creditors of the Debtors.

On October 30, 2020, the defendants individually filed motions and briefs supporting a dismissal of the Equitable Subordination Complaint, generally denying the claims asserted therein. *See* Adv. Docket Nos. 64-82.  The Indenture Trustee asserted that: (1) it had not engaged in inequitable conduct as either an insider or a non-insider; (2) the complaint fails to allege that the Indenture Trustee's conduct resulted in injury to the plaintiffs or conferred an unfair advantage on the Indenture Trustee; and (3) equitable subordination is inconsistent with the provisions of the Bankruptcy Code.  *See* Adv. Docket No. 65.  The Zohar III Controlling Class urged dismissal on the grounds that the Indenture bars claims against the Zohar III Controlling Class's members and that the complaint failed to state an equitable subordination claim.  *See* Adv. Docket No. 68.  MBIA argued that:  (1) the Equitable Subordination Complaint fails to allege inequitable conduct by MBIA and injury or unfair advantage as a result of MBIA's alleged conduct; (2) the Equitable Subordination Complaint is barred by judicial estoppel; and (3) the complaint does not state a claim against MBIA Inc., an affiliate of MBIA.  *See* Adv. Docket No. 71.  Finally, AMZM maintained that: (1) the certain underlying litigation cannot form the basis for the plaintiffs' equitable subordination claim; and (2) the remainder of the allegations do not state a claim for equitable subordination.  *See* Adv. Docket No. 81.

On March 31, 2021, the plaintiffs filed an omnibus objection to the motions to dismiss the complaint [Docket No. 103], generally denying the assertions made by the defendants.  Plaintiffs reiterated their allegations that each of the defendants are insiders of the Debtors, and that their conduct satisfies the standard of equitable subordination.  Alternatively, the plaintiffs claim that the defendants' conduct constitutes fraud and misrepresentation warranting equitable subordination.  Thereafter, MBIA, the Indenture Trustee, AMZM, and the Zohar III Controlling Class filed replies to the omnibus objection [Adv. Docket Nos. 107, 109, 110, & 113], and each of those parties, along with the plaintiffs, requested oral argument on the motions to dismiss. Subsequently, the plaintiffs sought leave to amend the Equitable Subordination Complaint (which resulted in the oral argument scheduled for October 27, 2021 being cancelled), and on December 16, 2021, the Bankruptcy Court entered an order granting such leave [Adv. Docket. 154] over the objection of MBIA and the Zohar III Controlling Class.

On January 6, 2022, the plaintiffs filed the amended Equitable Subordination Complaint [Adv. Docket No. 160] (the "Amended Equitable Subordination Complaint").

On January 28, 2022, in accordance with a scheduling order entered by the Bankruptcy Court on January 21, 2022 [Adv. Docket No. 165], MBIA, AMZM, and the Zohar III Controlling Class filed renewed or supplemental motions to dismiss the Amended Equitable Subordination Complaint [Adv. Docket Nos. 167-69], and the Indenture Trustee relied on its initial motion to dismiss.  The renewed pleadings raised the same theories for dismissal as set forth in the initial

briefing, as applicable to the allegations in the Amended Equitable Subordination Complaint. AMZM (joined by MBIA) also argued that a recent decision in the SDNY RICO Action, finding that allegations nearly identical to those in the Amended Equitable Subordination Complaint were insufficient to state claims for myriad counts alleged against the Defendants in the SDNY RICO Action. And MBIA also argued that the Amended Equitable Subordination Complaint did not plead a cognizable injury to the Plaintiffs. Briefing on the motions to dismiss was completed on February 24, 2022 [*see Defendants' Joint Notice of Completion of Briefing*, Adv. No. 19-50390 (KBO), Docket No. 211], and oral argument was held on March 3, 2022.

On March 25, 2022, the Bankruptcy Court a memorandum opinion and order [Adv. Docket No. 236] (the "**Dismissal Order**") dismissing the Amended Equitable Subordination Complaint in its entirety without leave to amend. On March 29, 2022, the plaintiffs filed a notice of appeal of the Dismissal Order and a related motion for stay pending appeal [Adv. Docket No. 237 & 239]. A hearing to consider the motion for stay pending appeal is currently scheduled for April 13, 2022 at 10:00 a.m. (ET).

*The Debtors intend to pursue confirmation of the Plan notwithstanding the plaintiffs' appeal.*

*The Plan presumes that the Dismissal Order will not be overturned on appeal.*

3. *Zohar CDO 2003-1*, et al. *v. Patriarch Partners, LLC*, et al.,
Adversary Case No. 20-50534 (the "Zohar-Patriarch Adversary Proceeding")

On March 9, 2020, certain of the Debtors filed a complaint in the Bankruptcy Court against certain Patriarch Stakeholders, seeking, among other things: (1) invalidation of defendants' efforts to consolidate control of the Portfolio Companies; (2) remedies for misconduct in collateral management; (3) remedies for tax election issues; and (4) remedies for misconduct in Portfolio Company management. *See* Adv. Docket Nos. 1-2. The complaint alleges thirty-three counts of breaches of contractual and fiduciary duties to the Zohar Funds.

The Debtors allege, among other things, that: (1) Ms. Tilton consolidated control of various Portfolio Companies by directing the Patriarch Managers to execute a series of documents on behalf of the Zohar Funds, purportedly transferring the right to govern and control the Portfolio Companies from the Zohar Funds to other entities owned and controlled by Ms. Tilton; (2) Ms. Tilton made an election for the Zohar Funds to be taxed as corporations, allegedly in contravention of the terms of the Zohar Funds' constituent documents and their Indentures; and (3) Ms. Tilton sought to maximize her personal financial stake in the Portfolio Companies most likely to be sold at substantial value. The Debtors allege that all of Tilton's self-dealing transactions were concealed from all parties associated with the Zohar Funds other than the Patriarch Stakeholders and their affiliates.

The defendants moved to dismiss all counts of the complaint, and contend that many of the Debtors' claims are moot, insufficiently pled, not actionable as a matter of law, or otherwise precluded. *See* Adv. Docket Nos. 43-45. The Court generally denied the Motion to Dismiss, but dismissed Count 23 (a request for a permanent injunction related to future check the box elections)

41

with prejudice and dismissed portions of various counts, either with or without leave to replead. *See* Adv. Docket Nos. 121 (Opinion) and 122 (Order).

On September 1, 2021, the Debtors filed an amended complaint (the "Amended Zohar-Patriarch Complaint").  Adv. Docket No. 125.  The Amended Zohar-Patriarch Complaint incorporates much of the same relief in the original complaint but was amended to: (i) plead certain claims alleging Portfolio Company claims as either derivative claims of the Portfolio Companies or as claims of the Zohar Funds as assignee of the Portfolio Companies, to the extent the claims were "Retained Claims" under the applicable Sale Order; (ii) seek damages for Ms. Tilton's improper authorization of tax distribution payments from the Portfolio Companies and in violation of the Settlement Agreement; (iii) seek damages for Ms. Tilton's misconduct in the GAS sale process; (iv) clarify that it was seeking damages under the "faithless servant" doctrine; (v) seek damages related to the use of the Debtors' funds arising from the liquidation of the assets acquired from Galey & Lord; (vi) recover amounts required to be paid under Paragraph 18 of the Settlement Agreement; and (vii) recover payments made to Ms. Tilton for professional fees and expenses under the Cash Collateral Order.

On October 18, 2021, the defendants filed a motion to dismiss certain counts of the Amended-Zohar Patriarch Complaint.  Adv. Docket No. 131.  The defendants argued that (i) the Debtors could not sustain their claims to recoup tax dividends, (ii) the Debtors claims alleging breach of the Settlement Agreement failed, (iii) the Debtors failed to state a claim for breach of the implied covenant under the applicable LLC agreements, (iv) the payments under paragraph 18 were appropriate, and (v) claims against Patriarch Partners were not adequately pled.   After briefing and oral argument, on February 25, 2022, the court denied the motion to dismiss, except that the Court ordered that all claims or counts that were dismissed without leave to amend pursuant to the Court's prior Memorandum Opinion [Adv. Docket No. 121] and Order [Adv. Docket No. 122] be stricken from the First Amended Complaint.

On March 10, 2022, the Debtors filed their Second Amended Complaint [Adv. Docket No. 168], which was corrected on March 18, 2022 [Adv. Docket No. 171].  On April 1, 2022, the Defendants filed an answer the Second Amended Complaint [Adv. Docket No. 174].

4.    *MBIA Insurance Corporation v. Lynn Tilton,* et al.*, Adversary Case No. 20-50776*

On July 30, 2020, MBIA filed a complaint in the Bankruptcy Court against certain Patriarch Stakeholders seeking, among other things:  (1) damages for breach of contract; (2) damages for tortious interference with contracts; (3) various declaratory judgments that MBIA is the owner of the Zohar I equity interests in the Portfolio Companies, and that certain restrictions on these equity interests are invalid; (4) damages for breach of fiduciary duty; (5) damages for aiding and abetting breach of fiduciary duty; (6) forfeiture of monies received based on faithless servant allegations; (7) damages for conversion of property rights, rights to payments, and other equity rights and interests; (8) restitution for unjust enrichment; (9) damages for malicious prosecution; and (10) damages for abuse of process. *See* Adv. Docket No. 1. Following motions to dismiss, the Bankruptcy Court found that MBIA had pled sufficiently allegations to survive a motion to dismiss in certain aspect of its claims, but the Bankruptcy Court, (a) dismissed without leave to amend the abuse of process count and certain aspects of the malicious prosecution count,

and (b) dismissed with leave to amount at least certain aspects, and in some cases the entirety, of the counts described in (2) through (7) of the prior sentence.

On September 24, 2021, MBIA filed an Amended Complaint, alleging (1) damages for breach of contract; (2) damages for tortious interference with contracts; (3) various declaratory judgments that MBIA is the owner of the Zohar I equity interests in the Portfolio Companies, and that certain restrictions on these equity interests are invalid; (4) damages for malicious prosecution; (5) damages for abuse of process; and (6) breach of the Settlement Agreement.  Upon motion of the defendants, on January 25, 2022, the Court ordered that certain portions of the Amended Complaint be stricken, and that a further amended pleading be filed by February 1, 2022.

On February 1, 2022, MBIA filed a second Amended Complaint [Adv. Docket No. 91, revised at Adv. Docket No. 105], which the defendants answered on March 15, 2022 [Adv. Docket No. 104].  On April 4, 2022, the defendants filed an amended answer to the second Amended Complaint [Adv. Docket No. 107].

<u>The PPMG Transaction Fee Dispute and Appeals</u>

At closing of the Oasis transaction, pursuant to Paragraph 18 of the Settlement Agreement, PPMG was paid approximately $3.8 million on account of an unsecured "Transaction Fee" it alleged was due and owing under the terms of its Management Services Agreement with Oasis (the "<u>Oasis MSA</u>").

On September 6, 2019, the Debtors filed a motion [Docket No. 911] requesting that the Bankruptcy Court determine that PPMG was not in fact entitled to the "Transaction Fee" because the Oasis transaction did not result in full payment of Oasis's secured debt as required by the terms of the Oasis MSA.

On October 15, 2020, following briefing [*see* Docket Nos. 1093, 1130, 1200, 1915 and 1916], the presentation of witness testimony, and oral argument, the Bankruptcy Court found that no Transaction Fee was owed under the unambiguous terms of the Oasis MSA, and ordered that the approximately $3.8 million Transaction Fee originally paid to PPMG be turned over to the Debtors.

PPMG appealed the ruling to the District Court.  *See* D. Del. Case No. 20-1419 (MN).  On August 26, 2021, the District Court affirmed the Bankruptcy Court's ruling.

PPMG has further appealed the outcome to the Third Circuit.  *See* 3d Cir. Case No. 21-2799.  Briefing before the Third Circuit is complete.

The Plan assumes that the Bankruptcy Court's ruling will not be reversed on appeal.

PPMG has management service agreements at a number of other Portfolio Companies, and if the Bankruptcy Court's decision is upset on appeal, PPMG may assert entitlement to similar transaction fees in connection with other Portfolio Company sale transactions where the consideration did not clear the debt-hurdle to earn the fee.

43

5.      The Stila Proceeding

On April 30, 2021, Zohar III Limited executed an action by written consent of the sole common member of Stila appointing Kevin Carey as Stila's manager and removing any other party serving or purporting to serve as Stila's manager at that time. Ms. Tilton, who was acting as Stila's manager up until that point, objected to Mr. Carey's appointment and contended that she was validly serving as Stila's manager. On May 3, 2021, Zohar III Limited filed a complaint in the Delaware Court of Chancery under section 110 of the Delaware LLC Act seeking a determination that Mr. Carey was Stila's sole manager. *See Zohar III, Limited v. Stila Styles, LLC and Lynn Tilton*, Case No. 2021-0384-JRS.

Ms. Tilton removed the matter to federal court, with the matter ultimately being referred to the Bankruptcy Court. *See* Adv. Proc. No. 21-50477-KPB. On June 21, 2021, the Bankruptcy Court remanded the action to the Delaware Court of Chancery on mandatory abstention grounds. *See id* Docket No. 29.

In the Stila Proceeding, Zohar III Limited has asked the Chancery Court to determine that the Class A Interests in Stila, which carry a $50 million liquidation preference, were invalidly issued and that, as a result, Zohar had the sole authority to appoint Mr. Carey as manager and that Mr. Carey is Stila's manager. A trial was held before the Delaware Court of Chancery on December 1 and 2, 2021, and the parties are engaged in post-trial briefing and oral argument was held on February 18, 2022. A ruling is expected within 90 days of oral argument consistent with the Delaware Court of Chancery's historical practices and operating procedures.

6.      The Patriarch Stakeholders' Administrative Claim

On October 25, 2021, the Patriarch Stakeholders filed an Administrative Claim asserting (a) damages arising out of a transaction they proposed in the summer of 2019 in an amount of not less than $873 million and (b) other unspecified amounts. On February 24, 2022, the Bankruptcy Court entered an order striking substantially all of the factual allegations concerning their transaction described in clause (a) of the previous sentence. On March 10, 2022, Patriarch filed a notice of appeal of the Bankruptcy Court's ruling. On March 11, 2022, Patriarch filed an amended administrative expense claim asserting approximately $1-2 million in damages arising out of New Agent transaction costs under the Settlement Agreement and alleged unjust enrichment for certain quality of earnings reports that Patriarch prepared. The Debtors intend to vigorously contest this Administrative Claim, and will seek to have the Debtors' objection to the Administrative Claim resolved at or prior to the anticipated Confirmation Hearing.

**ARTICLE VI.**

44

## CLASSIFICATION AND TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

**A.**     **General Rules of Classification**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims and Interests for all purposes under the Plan, including, without limitation, voting, confirmation, and Distributions.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Claims, Adequate Protection Claims, and Priority Tax Claims, as described below, have not been classified.  These Claims are not entitled to vote to accept or reject the Plan.

**B.**     **Treatment of Unclassified Claims**

1.     **Administrative Claims.**  Unless otherwise agreed to by a Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall receive a Cash payment equal to the Allowed Amount of such Claim from the Administrative and Priority Claims Escrow Account.  Such payment will be made: (a) at such time as all Allowed Administrative Claims, Priority Tax Claims and Other Priority Claims against the applicable Debtor are Allowed; (b) at such time and upon such terms as may be agreed upon by such Holder and the applicable Litigation Trustee; or (c) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

2.     **Time for Filing Administrative Claims.**  The Holder of an Administrative Claim, arising after August 26, 2021, other than: (a) Professional Claims; (b) any Administrative Claims that (i) have been previously paid by the Debtors in the ordinary course of business or otherwise or (ii) have otherwise been satisfied; (c) any Administrative Claims previously Filed; (d) any Administrative Claim that has been Allowed by prior order of the Bankruptcy Court; (e) any Administrative Claims held by any Debtor; (f) any claims for fees payable to the Clerk of the Bankruptcy Court; (g) any U.S. Trustee Fees; and (h) any Administrative Claim entitled to administrative expense status pursuant to section 503(b)(1)(D), must File and serve on counsel to the Wind-Down Administrator, a written request for such Administrative Claim so as to be received by 5:00 p.m. on the Post-Effective Date Administrative Claims Bar Date.  Such request must include at a minimum: (i) the name of the Debtor(s) that are purported to be liable for the Administrative Claim; (ii) the name of the Holder of the Administrative Claim; (iii) the amount of the Administrative Claim; (iv) the basis of the Administrative Claim; and (v) supporting documentation for the Administrative Claim.  **FAILURE TO FILE AND SERVE SUCH NOTICE OR REQUEST TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND EXTINGUISHED**.

3.     **Professional Claims**All Persons seeking Allowance of Professional Claims under the Plan shall File, on or before the date that is thirty (30) calendar days after the Effective Date, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred. Notwithstanding anything to the contrary in the Plan, any objection to any Professional Claim of the New Agent shall be resolved as provided in the New Agent Order. Objections to any Professional Claim must be Filed and served on counsel to the

45

Wind-Down Administrator and the requesting Professional by no later than twenty-one days (21) days after the service of the applicable final request for payment of the Professional Claim. Each Holder of an Allowed Professional Claim shall be paid in full in Cash from the Professional Claims Escrow Account (i) within five (5) Business Days after entry of the order approving such Allowed Professional Claim, (ii) with respect to any Professional Claim of the New Agent, within five (5) Business Days after such Professional Claim becomes Allowed in accordance with the New Agent Order, or (iii) or at such time and upon such terms as may be agreed upon by such Professional and the Wind-Down Administrator.

4. **DIP Claims.** All remaining unpaid DIP Claims, if any, shall be deemed Allowed as of the Effective Date in an amount equal to all accrued and unpaid fees, expenses, noncontingent indemnification obligations and other amounts payable under the DIP Credit Agreement and the DIP Order. Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment or pursuant to the "Roll Option" (as defined in the DIP Credit Agreement), if exercised, in full and final satisfaction, settlement, and release, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim (as determined by settlement or Final Order of the Bankruptcy Court) shall be paid in full, in Cash, on the Effective Date.

5. **Adequate Protection Claims.** On the Effective Date, the Adequate Protection Claims held by the Indenture Trustee against Zohar III shall be deemed satisfied by the transfer of Zohar III's assets to Zohar III Recovery LLC and the Litigation Trust for Zohar III, as provided for in Section 6.1 of the Plan, and the treatment afforded to Classes 2 and 3 under the Plan. On the Effective Date, the Adequate Protection Claims held by the Indenture Trustee against Zohar II shall be deemed satisfied by the transfer of Zohar II's assets to Zohar II Recovery LLC and the Litigation Trust for Zohar II, as provided for in Section 6.1 of the Plan, and the treatment afforded to Classes 9 and 10 under the Plan. On the Effective Date, the Adequate Protection Claims held by the Indenture Trustee against Zohar I shall be deemed satisfied by the transfer of Zohar I's assets to the Litigation Trust for Zohar I, to the extent provided for in Section 6.1 of the Plan, and the treatment afforded to Classes 14 and 15 under the Plan.

6. **Priority Tax Claims** Unless the Holder has agreed otherwise, each Holder of an Allowed Priority Tax Claim shall receive a Cash payment equal to the Allowed Amount of such Claim from the Administrative and Priority Claims Escrow Account. Such payment will be made: (i) at such time as all Administrative Claims, Priority Tax Claims and Other Priority Claims against the applicable Debtor are Allowed; (ii) at such time and upon such terms as may be agreed upon

46

by such Holder and the applicable Litigation Trustee; or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

## C.    Treatment of Classified Claims[9]

| Class | Description | Treatment |
|-------|-------------|-----------|
| 1<br>Unimpaired<br>Not entitled to vote. | Zohar III Other Priority Claims<br><br>Amount asserted to date: $0.00. | Each Holder of an Allowed Other Priority Claim against Zohar III shall receive a Cash payment equal to the Allowed Amount of such Claim from the Administrative and Priority Claims Escrow Account. Such payment will be made: (i) at such time as all Administrative Claims, Priority Tax Claims and Other Priority Claims against Zohar III are Allowed; (ii) at such time and upon such terms as may be agreed upon by such Holder and the applicable Litigation Trustee; or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:  As set forth in the applicable Proof of Claim or Schedules |
| 2<br>Unimpaired<br>Not entitled to vote. | Zohar III Indenture Trustee Claims<br><br>Estimated Amount: Undetermined | Indenture Trustee Claims against Zohar III shall be assumed by Zohar III Recovery LLC and paid from the Distributable Cash of Zohar III Recovery LLC.<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:  Zohar III Limited and Zohar III Corp. |
| 2A<br>Unimpaired<br>Not entitled to vote. | Zohar III Patriarch Disputed CMA Fee Claim<br><br>Asserted Amount:  not less than $1,016,466.31, which is Disputed | To the extent Allowed, the Zohar III Patriarch CMA Fee Claim shall be paid from the funds in the Patriarch CMA Fee Escrow allocated to it pursuant to the terms of the Patriarch CMA Fee Documents<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:  Zohar III Limited and Zohar III Corp. |

---

[9] The asserted claim amounts set forth in this chart reflect anticipated objections to certain proofs of claim filed in these Chapter 11 Cases.

47

| Class | Description | Treatment |
|-------|-------------|-----------|
| 2B<br><br>Unimpaired<br><br>Not entitled to vote. | Zohar III Ankura CMA Claims<br><br>Asserted Amount: Undetermined. | The Zohar III Ankura CMA Claims shall be paid from the funds in the Zohar III Ankura CMA Escrow pursuant to the terms of the Zohar III Ankura CM Agreement.<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:  Zohar III Limited and Zohar III Corp. |
| 3<br><br>Impaired<br><br>Entitled to vote. | Zohar III A-1 Note Claims<br><br>Allowed Amount: $387,131,000 | On the Effective Date, the Zohar III A-1 Notes shall be deemed to be reduced in amount to the Zohar III Adjusted Plan Value, and each Holder of a Zohar III A-1 Note Claim shall receive, in exchange for its Zohar III A-1 Note Claim, its pro rata share of (i) the New Notes assumed by Zohar III Recovery LLC, MDHI Holdco (to the extent provided for in Section 6.17 of the Plan), and, if applicable, a Litigation Trust in the aggregate amount of $100,000, (ii) the Zohar III MDHI Holdco Interests (to the extent provided for in Section 6.17 of the Plan), and (iii) 100% of the membership interests in New Zohar III LLC; *provided*, *however*, that Holders of the Zohar III A-1 Note Claims may also receive their pro rata share of the beneficial interests in a Litigation Trust to the extent provided for in the Plan Supplement.<br><br>*Estimated Percentage Distribution Under Plan*: Less than 100%<br><br>*Applicable Debtor*:  Zohar III Limited and Zohar III Corp. |
| 4<br><br>Impaired<br><br>Not entitled to vote. | Zohar III A-2 Note Claims<br><br>Estimated Amount: $200,991,582.56 | Holders of Zohar III A-2 Note Claims shall receive no distribution on account of such Claims or the Zohar III A-2 Notes.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*:  Zohar III Limited and Zohar III Corp. |

48

| Class | Description | Treatment |
|-------|-------------|-----------|
| 5<br><br>Impaired<br><br>Not entitled to vote. | Zohar III A-3 Note Claims<br><br>Estimated Amount: $116,628,606.77 | Holders of Zohar III A-3 Note Claims shall receive no distribution on account of such Claims or the Zohar III A-3 Notes.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*:  Zohar III Limited and Zohar III Corp. |
| 6<br><br>Impaired<br><br>Not entitled to vote. | Zohar III B Note Claims<br><br>Estimated Amount: $196,000,000 | Holders of Zohar III B Note Claims shall receive no distribution on account of such Claims or the Zohar III B Notes.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*:  Zohar III Limited and Zohar III Corp. |
| 7<br><br>Impaired<br><br>Not entitled to vote. | Zohar III General Unsecured Claims<br><br>Amount asserted to date:  Not less than $12,211,667.56 | The Holders of General Unsecured Claims against Zohar III shall neither receive Distributions nor retain any property under the Plan for or on account of such General Unsecured Claims.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*:  As set forth in the applicable Proof of Claim or Schedules |
| 8<br><br>Unimpaired<br><br>Not entitled to vote. | Zohar II Other Priority Claims<br><br>Amount asserted to date:  $0.00 | Each Holder of an Allowed Other Priority Claim against Zohar II shall receive a Cash payment equal to the Allowed Amount of such Claim from the Administrative and Priority Claims Escrow Account. Such payment will be made: (i) at such time as all Administrative Claims, Priority Tax Claims and Other Priority Claims against Zohar II are Allowed; (ii) at such time and upon such terms as may be agreed upon by such Holder and the applicable Litigation Trustee; or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:  As set forth in the applicable Proof of Claim or Schedules |

49

| Class | Description | Treatment |
|-------|-------------|-----------|
| 9<br><br>Unimpaired<br><br>Not entitled to vote. | Zohar II Indenture Trustee Claims<br><br>Estimated Amount: Undetermined | The Indenture Trustee Claims against Zohar II shall be assumed by Zohar II Recovery LLC and paid from the Distributable Cash of Zohar II Recovery LLC.<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:   Zohar II Limited and Zohar II Corp. |
| 9A<br><br>Unimpaired<br><br>Not entitled to vote. | Zohar II Patriarch Disputed CMA Fee Claim<br><br>Asserted Amount:  not less than $2,197,485.96, which is Disputed | To the extent Allowed, the Zohar II Patriarch CMA Fee Claim shall be paid from the funds in the Patriarch CMA Fee Escrow allocated to it pursuant to the terms of the Patriarch CMA Fee Documents<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:   Zohar II Limited and Zohar II Corp. |
| 9B<br><br>Unimpaired<br><br>Not entitled to vote. | Zohar II Ankura CMA Claims.<br><br>Asserted Amount: Undetermined | The Zohar II Ankura CMA Claims shall be paid from the funds in the Zohar II Ankura CMA Escrow pursuant to the terms of the Zohar II Ankura CM Agreement.<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:   Zohar II Limited and Zohar II Corp. |

50

| Class | Description | Treatment |
|---|---|---|
| 10<br><br>Impaired<br><br>Entitled to vote. | Zohar II Credit Enhancement Claims<br><br>Allowed Amount: $806,582,747.23 | On the Effective Date, the Zohar II Credit Enhancement Claims shall be deemed to be reduced in amount to the Zohar II Adjusted Plan Value, and each Holder of Zohar II Credit Enhancement Claims shall receive, in exchange for its Zohar II Credit Enhancement Claims, its pro rata share of (i) the New Notes assumed by Zohar II Recovery LLC, MDHI Holdco (to the extent provided for in Section 6.17 of the Plan) and, if applicable, a Litigation Trust in the aggregate amount of $100,000, (ii) the Zohar II MDHI Holdco Interests (to the extent provided for in Section 6.17 of the Plan), and (iii) 100% of the membership interests in New Zohar II LLC; *provided, however,* that Holders of Zohar II Credit Enhancement Claims may also receive their pro rata share of the beneficial interests in a Litigation Trust to the extent provided for in the Plan Supplement.<br><br>*Estimated Percentage Distribution Under Plan*: Less than 100%<br><br>*Applicable Debtor*:  Zohar II Limited and Zohar II Corp. |
| 11<br><br>Impaired<br><br>Not entitled to vote. | Zohar II B Note Claims<br><br>Estimated Amount: $200,000,000 | Holders of Zohar II B Note Claims shall receive no distribution on account of such Claims or the Zohar II B Notes.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*:  Zohar II Limited and Zohar II Corp. |
| 12<br><br>Impaired<br><br>Not entitled to vote. | Zohar II General Unsecured Claims<br><br>Amount asserted to date:  Not less than $271,611.48 | The Holders of General Unsecured Claims against Zohar II shall neither receive Distributions nor retain any property under the Plan for or on account of such General Unsecured Claims.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*:  As set forth in the applicable Proof of Claim or Schedules |

| Class | Description | Treatment |
|-------|-------------|-----------|
| 13<br><br>Unimpaired<br><br>Not entitled to vote. | Zohar I Other Priority Claims<br><br>Amount asserted to date: $0.00 | Each Holder of an Allowed Other Priority Claim against Zohar I shall receive a Cash payment equal to the Allowed Amount of such Claim from the Administrative and Priority Claims Escrow Account. Such payment will be made: (i) at such time as all Administrative Claims, Priority Tax Claims and Other Priority Claims against Zohar I are Allowed; (ii) at such time and upon such terms as may be agreed upon by such Holder and the applicable Litigation Trustee; or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*:  As set forth in the applicable Proof of Claim or Schedules |
| 14<br><br>Impaired<br><br>Entitled to vote. | Zohar I Indenture Trustee Claims<br><br>Estimated Amount: Undetermined | Indenture Trustee Claims against Zohar I shall be paid, up to the Allowed amount of the Indenture Trustee Claims against Zohar I, from the Distributable Cash attributable to Zohar I in the Litigation Trust applicable to Zohar I available after payment in full of all Allowed Administrative Claims and Priority Claims against Zohar I, as required by the Plan.<br><br>*Estimated Percentage Distribution Under Plan*: Less than 100%<br><br>*Applicable Debtor*: Zohar I Limited and Zohar I Corp. |
| 14A<br><br>Unimpaired<br><br>Not entitled to vote. | Zohar I Patriarch Disputed CMA Fee Claim<br><br>Asserted Amount:  not less than $170,454.55, which is Disputed | To the extent Allowed, the Zohar I Patriarch CMA Fee Claim shall be paid from the funds in the Patriarch CMA Fee Escrow allocated to it pursuant to the terms of the Patriarch CMA Fee Documents<br><br>*Estimated Percentage Distribution Under Plan*: 100% of Allowed amount<br><br>*Applicable Debtor*: Zohar I Limited and Zohar I Corp. |

52

| Class | Description | Treatment |
|---|---|---|
| 15<br><br>Impaired<br><br>Entitled to vote. | Zohar I Credit Enhancement Claims<br><br>Allowed Amount: $20,347,522.55 | Each Holder of a Zohar I Credit Enhancement Claim shall receive (i) the treatment provided for in Section 6.1(b) of the Plan with respect to the Zohar I Sale and (ii) a Cash payment, up to the Allowed amount of the Zohar I Credit Enhancement Claim, from the Distributable Cash attributable to Zohar I in the Litigation Trust applicable to Zohar I remaining after payment in full of the Zohar I Indenture Trustee Claim.<br><br>*Estimated Percentage Distribution Under Plan*: Less than 100%<br><br>*Applicable Debtor*: Zohar I Limited and Zohar I Corp. |
| 16<br><br>Impaired<br><br>Not entitled to vote. | Zohar I A-3 Note Claims<br><br>Estimated Amount: $300,867,253.26 | Holders of Zohar I A-3 Note Claims shall receive no distribution on account of such Claims or the Zohar I A-3 Notes.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*: Zohar I Limited and Zohar I Corp. |
| 17<br><br>Impaired<br><br>Not entitled to vote. | Zohar I B Note Claims<br><br>Estimated Amount: $150,000,000 | Holders of Zohar I B Note Claims shall receive no distribution on account of such Claims or the Zohar I B Notes.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*: Zohar I Limited and Zohar I Corp. |
| 18<br><br>Impaired<br><br>Not entitled to vote. | Zohar I General Unsecured Claims<br><br>Amount asserted to date: Not less than $279,800.66 | The Holders of General Unsecured Claims against Zohar I shall neither receive Distributions nor retain any property under the Plan for or on account of such General Unsecured Claims.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*: As set forth in the applicable Proof of Claim or Schedules |

28644911.12

| Class | Description | Treatment |
|-------|-------------|-----------|
| 19<br><br>Impaired<br><br>Not entitled to vote. | Interests | Interests shall be cancelled, released, and extinguished, and Holders of Interests shall neither receive any Distributions nor retain any property under the Plan for or on account of such Interests.<br><br>*Estimated Percentage Distribution Under Plan*: 0%<br><br>*Applicable Debtor*:  Each Debtor |

## ARTICLE VII.

## ACCEPTANCE OR REJECTION OF THE PLAN

### A. Voting of Claims

1. **Classes Entitled to Vote.**  Each Claim in the Voting Classes (Classes 3, 10, 14, and 15) shall be entitled to vote separately to accept or reject the Plan, as provided in the Disclosure Statement Order or any other applicable order of the Bankruptcy Court.

2. **Class Conclusively Presumed to Accept.** The Unimpaired Classes (Classes 1, 2, 2A, 2B, 8, 9, 9A, 9B, 13, and 14A) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3. **Classes Deemed to Reject.** The Deemed Rejecting Classes (Classes 4 through 7, Classes 11 and 12, and Classes 16 through 19) will not (or are not anticipated to) receive a recovery or retain any interest under the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, these Classes are deemed to have rejected the Plan.

### B. Treatment of Vacant Classes

Any Class of Claims or Interests that does not contain a Holder of an Allowed Claim or Allowed Interest shall be deemed deleted from the Plan for all purposes.

### C. [Reserved].

### D. Nonconsensual Confirmation

If any Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 13.2 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to Impaired Classes of Claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**E.**     **Voting Process Generally**

Section 1129(a) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan if certain conditions have been met and, with certain exceptions, if each class of claims or interests that is impaired under the plan has voted to accept the plan.

Under section 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if such plan has been accepted by claimholders in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class, excluding holders whose acceptances or rejections were found not to be in good faith.  Under the Bankruptcy Code, only parties that actually vote will be counted for purposes of determining acceptance or rejection by any impaired class.  However, it should also be noted that even if the Voting Classes accept the Plan, the Plan is subject to certain other requirements under section 1129(a) of the Bankruptcy Code and might not be confirmed by the Bankruptcy Court.  The Debtors are confident, however, that the Plan satisfies those requirements of section 1129(a), and can be confirmed by the Bankruptcy Court.

As stated above, Holders of Claims in the Deemed Rejecting Classes will be deemed to have rejected the Plan, and therefore the Debtors will seek to confirm the Plan, subject to Bankruptcy Court approval, over those Classes' rejection pursuant to section 1129(b) of the Bankruptcy Code, on the grounds that the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes.

**F.**     **Voting Instructions**

This Disclosure Statement and other documents described herein are being furnished by the Debtors to certain Holders of Claims in the Voting Classes for the purpose of soliciting votes on the Plan.

A Ballot to be used to accept or to reject the Plan has been enclosed with all copies of this Disclosure Statement mailed to Holders of Claims in the Voting Classes.  A copy of the Disclosure Statement Order and a notice of, among other things, voting procedures and the dates set for objections to, and the hearing on confirmation of, the Plan (the "Notice of the Confirmation Hearing") are also being transmitted with this Disclosure Statement to Holders of Claims in the Voting Classes.  The Disclosure Statement Order and the Notice of the Confirmation Hearing set forth in detail, among other things, the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, and the assumptions for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot for each of the Voting Classes.  Each Holder of a Claim within the Voting Classes should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning voting.  Holders of Claims in the Voting Classes should vote and return their Ballots in accordance with the instructions accompanying their Ballots.  PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.  To be counted, your vote indicating acceptance or rejection of the Plan must be

properly completed in accordance with the instructions accompanying the Ballots.  Holders of Claims in more than one of the Voting Classes must use separate Ballots for each Class.

To be counted as a vote to accept or reject the Plan, each Ballot, including Master Ballots but excluding Beneficial Holder Ballots (which Beneficial Holder Ballots must be received by the applicable Note Claims Nominee[10] on or before the submission deadline and in the manner imposed by the Note Claims Nominee in the instructions accompanying the Ballots), must be properly executed, completed, and delivered to Reliable Companies (the "<u>Voting Agent</u>") at one of the following addresses, so as to be received by the Voting Agent no later than **<u>May 20, 2022 at 5:00 p.m. (ET)</u>** (the "<u>Voting Deadline</u>"), unless extended by the Debtors in writing (which writing may be an email):

| <u>If by First-Class Mail, Hand Delivery or Overnight Mail:</u> | <u>If by Electronic Mail</u>: |
|---|---|
| Zohar Ballot Processing<br>c/o Reliable Companies<br>Nemours Building<br>1007 Orange Street, Suite 110<br>Wilmington, DE 19801 | Zohar Ballot Processing<br>c/o Reliable Companies<br>jedelson@reliable-co.com |

**Ballots will not be accepted by facsimile transmission or electronic transmission other than electronic mail, unless approved by the Debtors in writing (which writing may be an email) or otherwise ordered by the Court.  Any Ballots delivered by electronic mail must be: (a) hand signed (computer generated electronic signatures or typed signatures will not be accepted) by an authorized signatory who has full power and authority to vote to accept or reject the Plan and execute and return the Ballot, electronically scanned, and then the electronically scanned copy must be electronically mailed to the Voting Agent as provided for herein and in the Disclosure Statement Order; and (b) promptly mailed to the Voting Agent after being electronically mailed (although the mailed Ballot need not be actually received by the Voting Agent prior to the Voting Deadline).**

**All Beneficial Holder Ballots must be sent to the applicable Note Claims Nominee in accordance with the instructions accompanying such Beneficial Holder Ballot.**

After carefully reviewing the Plan, including all schedules thereto, and this Disclosure Statement and its exhibits, please indicate your vote on the enclosed Ballot, sign it, and then return it in accordance with the instructions accompanying your Ballot.  In voting to accept or to reject the Plan, please use only a Ballot sent to you with this Disclosure Statement.  If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by contacting counsel for the Debtors (Attention:  Shane M. Reil, (302) 571-6745, sreil@ycst.com).  To the

---

[10]  Master Ballots, Beneficial Holder Ballots and Note Claims Nominee shall have the meaning ascribed to such terms in the Disclosure Statement Order.

extent that you wish to withdraw a Ballot, please review the Disclosure Statement Order and the instructions accompanying your Ballot.

## ARTICLE VIII.

## MEANS OF IMPLEMENTATION OF THE PLAN

**A.    Emergence Date Transactions**

For each Debtor, the Plan will be implemented by or through a Wind-Down Company (if applicable), Wind-Down Administrator, Asset Recovery Entity and Asset Recovery Manager, Litigation Trust and Litigation Trustee(s).  The post-Effective Date organization of the Asset Recovery Entities are set forth on Annex A to the Plan.

1.    Funding of Escrows

To ensure adequate implementation of the Plan, the following amounts and accounts shall be funded on the Effective Date as set forth below, subject to Article 11 of the Plan:

| Account | Purpose | Amount of Funding | Source of Funding |
|---|---|---|---|
| Administrative and Priority Claims Escrow Accounts (with sub-accounts for Zohar I, Zohar II and Zohar III) | Payment of all Allowed Administrative and Priority Claims (other than Professional Claims) against Zohar II and Zohar III | As estimated by Zohar I, Zohar II and Zohar III, based on the respective Claims asserted against them | Zohar II (for itself and Zohar I) and Zohar III (solely for itself) |
| D&O Indemnity Escrow Account | Payment of any indemnification obligations owed to the Independent Director, CROs and CMO | As determined by the Debtors, in consultation with the Controlling Party and Controlling Class, and disclosed in the Plan Supplement | Zohar II and Zohar III, based on the Case Expense Allocation |
| Professional Claims Escrow Account | Payment of all Allowed Professional Fees | The Professional Claims Escrow Amount, which shall be the total projected amount of unpaid Professional Claims on the Effective Date, as reasonably determined by the Debtors' Chief Restructuring Officer | Zohar II and Zohar III, based on the Case Expense Allocation |

57

| Account | Purpose | Amount of Funding | Source of Funding |
|---|---|---|---|
| Retained Claims Escrow | To be held pursuant to the Sale Orders with respect to any Retained Claim Actions (as defined in the Sale Orders) | $825,000 | Zohar II and Zohar III, based on the Case Expense Allocation |
| Wind-Down Escrow Account | Wind-down expenses | As determined by the Debtors, in consultation with the Controlling Party and Controlling Class, and disclosed in the Plan Supplement | Zohar II and Zohar III, based on the Case Expense Allocation |
| Litigation Trust Bank Account(s) | Expenses of the Litigation Trust(s) and Litigation Trustee(s) | As determined by the Debtors, in consultation with the Controlling Party and Controlling Class, as applicable, and disclosed in the Plan Supplement | To be disclosed in the Plan Supplement |
| Asset Recovery Entity Bank Accounts | Expenses of the applicable Asset Recovery Entity and Asset Recovery Manager | As determined by the Debtors, in consultation with the Controlling Party and Controlling Class, as applicable, and disclosed in the Plan Supplement | To be disclosed in the Plan Supplement |
| Reserves for Indenture Trustee Claims | To fund the Indenture Trustee Claims assumed by the Asset Recovery Entities and the Litigation Trust(s) | Initially, $250,000 for the Zohar II Indenture Trustee Claim and $250,000 for the Zohar III Indenture Trustee Claim, and to be replenished on an "evergreen" basis as such Indenture Trustee Claims are paid | $250,000 from Zohar II and $250,000 from Zohar III |

58

2.      Zohar I

Under the Zohar I Sale Documents, MBIA acquired all the right, title and interest (whether legal, equitable or beneficial) of the assets of Zohar I existing as of such date and a Participation (as defined in the Zohar I Sale Documents) in 100% of the equitable and beneficial ownership interests in each such asset for which MBIA did not receive the legal and record ownership of such asset.  The Confirmation Order shall authorize, approve and deem MBIA to be the legal and record owner of all such assets, in addition to its previous acquisition of the beneficial and equity ownership interests in such assets, except to the extent that an asset was disposed of in connection with a third-party sale transaction approved by the Bankruptcy Court prior to the Effective Date.

On the Effective Date, Zohar I shall complete the transactions contemplated by the Zohar I Sale Documents by (i) fully and finally transferring to MBIA any debt and equity interests that remain recorded in the name of Zohar I; *provided, however,* that, subject to Section 6.17 of the Plan, MBIA shall contribute, or cause the contribution, to MDHI Holdco the MD Term Loan Indebtedness recorded in the name of Zohar I in exchange for the Zohar I MDHI Holdco Interests, and the Zohar I MDHI Holdco Interests shall be distributed to MBIA; and (ii) substituting MBIA for Zohar I as the Plaintiff (or movant, as applicable) in all pending Causes of Action, including the Zohar-Patriarch Adversary Proceeding, other than with respect to the Avoidance Actions arising under the Bankruptcy Code asserted in Counts XIX, XX, XXI, and XXII.

The Avoidance Actions asserted in Counts XIX, XX, XXI, and XXII of the Zohar-Patriarch Adversary Proceeding shall be transferred to a Litigation Trust as provided in the Plan Supplement on the Effective Date, and that Litigation Trust shall be substituted for Zohar I as the Plaintiff for such Avoidance Actions, subject to any liens of the Indenture Trustee securing the Zohar I Indenture Trustee Claims.

3.      Zohar II

*Step 1*:  Zohar II shall fund its share of the Escrow Accounts.

*Step 2*:  The Zohar II Credit Enhancement Claims shall be reduced to the Zohar II Adjusted Plan Value and exchanged for the New Notes issued by Zohar II with a face amount equal to the Zohar II Adjusted Plan Value.

*Step 3*: Subject to Section 6.17 of the Plan, the MD Term Loan Indebtedness held by Zohar II shall be transferred to MDHI Holdco in exchange for MDHI Holdco's assumption of New Notes issued by Zohar II in an amount equal to the Zohar II MD Credit Bid Amount.

*Step 4*: Subject to Section 6.17 of the Plan, all but $15,000 of the New Notes issued by Zohar II and assumed by MDHI Holdco will be converted into the Zohar II MDHI Holdco interests.

*Step 5*:  All of the Remaining Assets of Zohar II shall be transferred to Zohar II Recovery LLC in exchange for Zohar II Recovery LLC's assumption of the New Notes

59

issued by Zohar II that were not assumed by MDHI Holdco, if applicable, and the Zohar II Indenture Trustee Claim.

*Step 6*:  All but $85,000 (or $100,000, to the extent provided for in Section 6.17 of the Plan) of the New Notes issued by Zohar II and assumed by Zohar II Recovery LLC will be converted into equity of New Zohar II LLC.

*Step 7*:  To the extent identified in the Plan Supplement, Zohar II Recovery LLC shall contribute any of its Group A PC Assets or Other Assets to one or more subsidiary holding companies, each of which shall be wholly owned by Zohar II Recovery LLC.

*Step 8*:  The applicable Litigation Trust shall also be substituted for Zohar II in all actions where Zohar II is the Plaintiff (or movant as applicable).

4.    <u>Zohar III</u>

*Step 1*:  Zohar III shall fund its share of the Escrow Accounts.

*Step 2*:  The Zohar III A Note Claims shall be reduced to the Zohar III Adjusted Plan Value and exchanged for New Notes issued by Zohar III with a face amount equal to the Zohar III Adjusted Plan Value.

*Step 3*: Subject to Section 6.17 of the Plan, the MD Term Loan Indebtedness held by Zohar III shall be transferred to MDHI Holdco in exchange for MDHI Holdco's assumption of New Notes issued by Zohar III in an amount equal to the Zohar III MD Credit Bid Amount.

*Step 4*: Subject to Section 6.17 of the Plan, all but $10,000 of the New Notes issued by Zohar III and assumed by MDHI Holdco will be converted into the Zohar III MDHI Holdco interests.

*Step 5*:  All of the Remaining Assets of Zohar III shall be transferred to Zohar III Recovery LLC in exchange for Zohar III Recovery LLC's assumption of the New Notes issued by Zohar III that were not assumed by MDHI Holdco, if applicable, and the Zohar III Indenture Trustee Claim.

*Step 6*:  All but $90,000 (or $100,000, to the extent provided for in Section 6.17 of the Plan) of the New Notes issued by Zohar III and assumed by Zohar III Recovery LLC will be converted into equity of New Zohar III LLC.

*Step 7*:  To the extent identified in the Plan Supplement, Zohar III Recovery LLC shall contribute any of its Group A PC Assets or Other Assets to one or more subsidiary holding companies, each of which shall be wholly owned by Zohar III Recovery LLC.

*Step 8*:  The applicable Litigation Trust shall also be substituted for Zohar III in all actions where Zohar III is the Plaintiff (or movant as applicable).

5.      Authorization of Transactions

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363, 1123, 1141 and 1142 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**B.      General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims, Interests, Causes of Action (other than the Litigation Assets transferred to a Litigation Trust), and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such claims, Interests, Causes of Action (other than the Litigation Assets transferred to a Litigation Trust), and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such claims, Interests, Causes of Action (other than the Litigation Assets transferred to a Litigation Trust), and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  All distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

**For the avoidance of doubt, notwithstanding anything in the Plan or the Confirmation Order to the contrary, neither the Plan nor the Confirmation Order shall settle any Causes Of Action or claims or rights to payment that belong to the Debtors with respect to Lynn Tilton, the Patriarch Stakeholders, the respective Affiliates of any of them and their related Parties (other than the Exculpated Parties and Ankura, if they are Related Parties or Affiliates of the foregoing).**

**C.      Cancellation of Agreements and Interests; Termination of Liens**

On the Effective Date, except to the extent otherwise specifically provided for in the Plan: (a) the Zohar Indentures, the Interests in the Debtors, and all notes, bonds, agreements, instruments, certificates, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, and any other instruments or documents directly or indirectly evidencing, creating, or, relating to any indebtedness or obligations of, or ownership interest, equity, or profits interest in, the Debtors, or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity ownership, or profits interests in the Debtors giving rise to any Claims or Interests (collectively, the "Canceled Debt and Equity Documentation") shall be canceled, surrendered, extinguished and of no force or effect and deemed surrendered to the Debtors and neither the Debtors nor any successor in interest thereto shall have any continuing obligations thereunder; (b) the obligations of the Debtors pursuant, relating, or pertaining to the Zohar Indentures, the Interests in the Debtors and all other Canceled

61

Debt and Equity Documentation shall be fully released, settled, and compromised; and (c) the Indenture Trustee shall be discharged and the collateral manager for each Debtor shall be terminated.

From and after the Effective Date, the parties to the Zohar Indentures and the Transaction Documents and such other Canceled Debt and Equity Documentation will have no rights arising from or related to the Zohar Indentures and the Transaction Documents and such other Canceled Debt and Equity Documentation, all such rights being expressly extinguished pursuant to this Plan;; *provided*, that, notwithstanding Confirmation or the occurrence of the Effective Date, any such Zohar Indenture or other Canceled Debt and Equity Documentation that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan solely as expressly provided herein, including the treatment of the Indenture Trustee Claims in Classes 2, 9, 14.

On the Effective Date, all liens in favor of the Indenture Trustee securing the Noteholder Claims, whether arising prior to or after the Petition Date, shall be automatically released; *provided*, *however*, that the Indenture Trustee shall retain all of its liens on the Debtors' assets (but, for the avoidance of doubt, excluding assets transferred to MBIA under the Zohar I Sale Documents) to secure the payment of the Indenture Trustee Claims until such Indenture Trustee Claims have been satisfied.  For the avoidance of doubt, the liens of the Indenture Trustee on any Litigation Assets (x) shall be senior to any interests held by or any distributions made on account thereof to the beneficiaries of any Litigation Trust whose interests in that Litigation Trust arise from Noteholder Claims, but (y) shall, if applicable, be junior to the liens of any litigation funder for that Litigation Trust.  The Indenture Trustee shall not be required to file UCC financing statements or take any other actions to record or perfect its surviving liens pursuant to this section, and such liens shall be deemed perfected and enforceable upon entry of the Confirmation Order.

Upon the payment in full of the Allowed DIP Claims, all liens on property of the DIP Debtors arising out of or related to the DIP Order or the DIP Credit Agreement shall automatically terminate, and all collateral subject to such liens shall be automatically released from such liens, in each case without further action by the DIP Lender and all obligations of the DIP Debtors arising out of or related to the DIP Claims shall be automatically released, in each case without further action by the DIP Lender.

The Indenture Trustee, Noteholders and DIP Lender shall take all actions to effectuate and confirm such termination and release as reasonably requested by the DIP Debtors, the Wind-Down Administrator, the Asset Recovery Managers or the Litigation Trustee(s).

## D.    Modified Substantive Consolidation

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of: (i) Zohar I Corp. with Zohar I Limited, (ii) Zohar II Corp. with Zohar II Limited, and (iii) Zohar III. Corp. with Zohar III Limited for all purposes, including voting, confirmation, and Distribution.  On and after the Effective Date, (i) all assets and liabilities of Zohar I Corp. shall be pooled with Zohar I Limited, Zohar II Corp. shall be pooled with Zohar II Limited, and Zohar

62

III. Corp. shall be pooled with Zohar III Limited, (ii) except with respect to the Zohar II Intercompany Claim discussed in Article XIII.N hereof, no Distributions shall be made under the Plan on account of any Claim held by a Debtor against any Debtor with which it has been consolidated under the Plan, (iii) no Distributions shall be made under the Plan on account of any Interest held by a Debtor in any other Debtor with which it has been consolidated under the Plan, and (iv) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor, and any joint or several liability of any of the Debtors shall be one obligation of the substantively consolidated Debtors.

## E.   Wind-Down Company and Wind-Down Administrator

### 1.   The Wind-Down Company

On the Effective Date, the Debtors may, at their election and with the consent of the Controlling Party and Controlling Class, form the Wind-Down Company for the purposes of resolving the affairs of the Debtors after the Effective Date, which, if formed, shall be deemed the successor to the Debtors as provided for herein.

The Wind-Down Company shall hold the Escrow Accounts funded on the Effective Date. If the Debtors elect not to form the Wind-Down Company, the Escrow Accounts shall be held by one or more of the Litigation Trust(s) as set forth in the Plan Supplement.

### 2.   Appointment and Authority of Wind-Down Administrator

To the maximum extent permitted by applicable law, the Wind-Down Administrator shall have all power and authority that may be or could have been exercised, with respect to the Debtors, by any officer, director, shareholder, member, manager or other party acting in the name of such Debtor or its Estate with like effect as if duly authorized, exercised and taken by action of such officer, director, shareholder, member, manager or other party.

The identity of the Wind-Down Administrator will be disclosed in the Plan Supplement, and shall be acceptable to the Controlling Party and Controlling Class, each in their reasonable discretion, and the appointment of the Wind-Down Administrator shall be approved in the Confirmation Order.   In the event of the Wind-Down Administrator's resignation, death, incapacity or otherwise inability to serve, a replacement Wind-Down Administrator shall be appointed by the Litigation Trustee or, if there is more than one Litigation Trust provided for in the Plan Supplement, by a plurality of the Litigation Trustees.

### 3.   Duties of Wind-Down Administrator

The Wind-Down Administrator will be responsible for:

Winding up the Debtors' affairs as is appropriate under the circumstances;

Administering the Plan and taking such actions as are necessary to effectuate the Plan;

At the election of the Wind-Down Administrator, effecting the dissolution and cancellation of each of the Debtors;

Filing all appropriate (including final) tax returns;

Administering Distributions to Holders of Allowed Administrative and Priority Claims;

Ensuring that all reports required by the U.S. Trustee through the date each Debtor's Chapter 11 Case is closed are Filed; and

Seeking entry of an order closing the Chapter 11 Case and obtaining a final decree for each Debtor, subject to, as applicable, obtaining the consent of the affected Asset Recovery Manager and the affected Litigation Trustee in each instance.

The Wind-Down Administrator shall be discharged upon the filling of a certification with the Bankruptcy Court (or delivery to the Litigation Trustee(s) and Asset Recovery Managers, if no Chapter 11 Case remains open at that time) that the foregoing actions have all been completed, except that items (6) and (7) shall be assumed by the Litigation Trustee(s) if any Chapter 11 Case remains open at the time that the Wind-Down Administrator has otherwise completed its responsibilities under the Plan.

4.    <u>Expenses of the Wind-Down Administrator</u>

All fees, costs and expenses of the Wind-Down Administrator shall be paid from the funds on deposit in the Wind-Down Escrow Account.

5.    <u>Engagement of Professionals</u>

The Wind-Down Administrator shall have the authority to retain professionals to assist it in carrying out the purposes of discharging its obligations, which shall be paid from the Wind-Down Escrow Account and no other source.  There shall be no limitation on the Wind-Down Administrator's selection of professionals and no professional may be disqualified from or prohibited from representing the Wind-Down Administrator based on the fact that it previously represented or currently represents a party in interest in the Chapter 11 Cases.

6.    <u>Corporate Existence and Dissolution or Cancellation of Debtors</u>

Any officer, director or manager of each Debtor shall be deemed to have resigned upon the occurrence of the Effective Date.

Immediately after the Effective Date, the Wind-Down Administrator shall be authorized to take, in his or her sole and absolute discretion, all actions deemed to be appropriate in connection with dissolving or canceling the existence of the Debtors under applicable laws, including under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  The Wind-Down Administrator shall be authorized

64

to file any certificate of dissolution or cancellation or other documents as may be necessary or desirable to terminate the legal existence of the Debtors.  For the avoidance of doubt, the Wind-Down Administrator is not obligated to take any affirmative action to dissolve or cancel the existence of any Debtor.

The Wind-Down Administrator and Debtors shall not be required to pay any stamp or similar tax or any other taxes or fees in connection with effecting the dissolution or cancellation of the Debtors.

**F.      The Asset Recovery Entities**

*Parties are strongly encouraged to review the Asset Recovery Entity Agreements to be included in a Plan Supplement, which will set forth, among other things, the respective rights of the Holders receiving stock in the applicable Asset Recovery Entity.*

1.      Establishment of the Asset Recovery Entities

The Controlling Party of Zohar II shall create New Zohar II LLC, Zohar II Intermediate LLC and Zohar II Recovery LLC, which shall have the ownership structure and capitalization described in the Plan Supplement.  Each of these three entities shall elect to be treated as corporations for federal income tax purposes.

The Controlling Class of Zohar III shall create New Zohar III LLC, Zohar III Intermediate LLC and Zohar III Recovery LLC, which shall have the ownership structure and capitalization described in the Plan Supplement.  Each of these three entities shall elect to be treated as corporations for federal income tax purposes.

Zohar II Recovery LLC and Zohar III Recovery LLC may also have one or more subsidiaries, as described in the Plan Supplement, which shall each be wholly owned by its respective parent entity.  The organizational documents for each of the Asset Recovery Entities shall provide that the equity of such Asset Recovery Entities be freely tradeable or assignable to the maximum extent practicable.

2.      Appointment of the Asset Recovery Managers

On the Effective Date, an Asset Recovery Manager for each Asset Recovery Entity shall be appointed by the applicable Controlling Class or Controlling Party at such Asset Recovery Entity, as the case may be, and shall constitute a representative of the applicable Debtor's estate under section 1123 of the Bankruptcy Code.  The identity of each initial Asset Recovery Manager and its proposed compensation shall be disclosed in the Plan Supplement and shall be subject to approval by the Bankruptcy Court at the Confirmation Hearing.

The same party can serve as the Asset Recovery Manager for more than one Asset Recovery Entity and can also serve as Wind-Down Administrator or a Litigation Trustee.

65

3.      Responsibilities of the Asset Recovery Manager

Each Asset Recovery Manager's primary responsibility shall be to maximize the value of the Remaining Assets (other than the Litigation Assets, which shall be administered by the Litigation Trustee(s)) held by its respective Asset Recovery Entity for the benefit of members of the respective Asset Recovery Entity.  Subject to Section 6.7 of this Plan, except as set forth in the Asset Recovery Entity Agreement, no Asset Recovery Entity or Asset Recovery Manager shall have any obligations to the Debtors or any Holders of Claims or Interests against the Debtors.

4.      Transfer of the Remaining Assets; Free and Clear Transfer

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date, pursuant to the terms and conditions of the applicable Asset Recovery Entity Agreement, the Debtors shall be deemed to have automatically transferred to each Asset Recovery Entity all of their right, title, and interest in and to all of the Remaining Assets in accordance with section 1141 of the Bankruptcy Code.  All such assets shall automatically vest in the Asset Recovery Entity free and clear of all Claims, Liens, and other interests, subject only to the expenses of the Asset Recovery Entity and liens securing the applicable Indenture Trustee Claims as set forth in the Plan and in the applicable Asset Recovery Entity Agreement.  Thereupon, the Debtors and Holders of Claims and Interests against the Debtors shall have no interest in or with respect to the Remaining Assets so transferred or the Asset Recovery Entities.

Any provision in any contract purporting to restrict the rights of the Debtors to assign or transfer any Remaining Asset, to prohibit the assignment of any Remaining Asset, or to limit or restrict the rights of any assignee of any Remaining Asset shall not be enforced or enforceable with respect to the Transfer of the Remaining Assets under the Plan.

Prior to the Effective Date, the Debtors shall make a good faith determination of the fair market value of the Remaining Assets as of the Effective Date, provided, however, that the Debtors shall not be required to hire an expert to make such a valuation.  This valuation shall be used consistently by all parties (including the Debtors, the applicable Asset Recovery Entity and its Asset Recovery Manager, and the members of the applicable Asset Recovery Entity) for all federal income tax purposes.

5.      Expenses of Asset Recovery Manager; Retention of Advisors

Each Asset Recovery Entity shall be responsible for its own expenses, including the fees and costs of its Asset Recovery Manager and any professionals retained by it.

Except as provided in the applicable organizational documents, there shall be no limitation on an Asset Recovery Manager's selection of professionals and no professional may be disqualified from or prohibited from representing an Asset Recovery Manager based on the fact that it previously represented or currently represent a party in interest.

6.      Payments to be Made Upon Dissolution of an Asset Recovery Entity

In connection with the dissolution or termination of any Asset Recovery Entity, provisions shall be made for the treatment of any payments to be paid to such Asset Recovery Entity hereunder so as to preserve such payment for its intended beneficiaries, including by substituting the Litigation Trust for the applicable Zohar Fund as the recipient of such payment.

G.      **Post-Confirmation Status of Settlement Agreement**

The terms and provisions of the Settlement Agreement shall remain in full force and effect from and after the Effective Date, except that MBIA, for the assets acquired under the Zohar I Sale Documents, and the applicable Asset Recovery Managers shall assume the obligations of the Independent Director and the CRO with respect to the monetization process under the Settlement Agreement and July 2 Order for the debt and equity interests in the Portfolio Companies contributed to them on the Effective Date.  The applicable Asset Recovery Managers shall also assume any claims and defenses of the applicable Debtors against any party with respect to the Settlement Agreement, including, without limitation, any claims that the Settlement Agreement was breached.  Furthermore, paragraphs 6 and 18 of the Settlement Agreement, shall remain in effect and binding on the parties to the Settlement Agreement, Ankura (and any successor to it), the Wind-Down Administrator and each Asset Recovery Entity and its respective Asset Recovery Manager.

H.      **Litigation Trust(s)**

*Parties are strongly encouraged to review any Litigation Trust Agreements to be included in a Plan Supplement, which will set forth, among other things, the administration of the Litigation Trust, means of allocating expenses and recoveries of the Litigation Trust, and the respective rights of the Litigation Trust beneficiaries.  The transfer of the Litigation Assets to the Litigation Trust (or trusts) will be done in a manner so as to minimize any tax impact on the Debtors and their estates.*

1.      Establishment of the Litigation Trust(s)

One or more Litigation Trusts will be created, and the Litigation Assets will be transferred to and vest in the Litigation Trust(s) as provided for in the Plan Supplement as of the Effective Date.  The transfer of the Litigation Assets to the Litigation Trust(s) will be done in a manner so as to minimize any tax impact on the Debtors and their estates.

From and after the Effective Date, the Litigation Trust(s) and the Litigation Trustee(s) may commence, litigate, and settle any Causes of Action or claims or rights to payment or claims that belong to the Debtors or Estates as of the Effective Date or are instituted by the Litigation Trust(s) or Litigation Trustee(s) on or after the Effective Date, except as otherwise expressly provided in the Plan and the Litigation Trust Agreement(s).  The Litigation Trust(s) shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the applicable Debtor and its Estate, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  Without

67

the need for filing any motion for such relief, in connection with the Litigation Assets, the Litigation Trust(s) or the Litigation Trustee(s) (as applicable) hereby shall be deemed substituted for the applicable Debtor (i) in all pending matters including, but not limited to, motions, contested matters and adversary proceedings in the Bankruptcy Court; and (ii) with respect to any Causes of Action pending before the Bankruptcy Court or any other court, other than as expressly provided for in Section 6.1(b) with respect to Zohar I.

On and after the Effective Date, the Litigation Trust(s) shall have no liability on account of any Claims against, or Interests in, the Debtors except as set forth in the Plan and in the Litigation Trust Agreement(s).

2.      Appointment of the Litigation Trustee(s)

On the Effective Date, the Litigation Trustee(s) shall be appointed, and the Litigation Trust(s) and Litigation Trustee(s) shall constitute a representative of the Debtor's estate under section 1123 of the Bankruptcy Code.  The identity of the Litigation Trustee(s) and their compensation shall be disclosed in the Plan Supplement and subject to approval by the Bankruptcy Court at the Confirmation Hearing.  In the event of a Litigation Trustee's resignation, death, incapacity or otherwise inability to serve, a successor Litigation Trustee shall be appointed in accordance with the applicable Litigation Trust Agreement.

The same party can serve as a Litigation Trustee, Wind-Down Administrator or an Asset Recovery Manager.

3.      Responsibilities of the Litigation Trustee

Each Litigation Trustee's primary responsibilities shall be as follows, but shall additionally include any other matters set forth in the applicable Litigation Trust Agreement:

> Pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve the Litigation Assets;

> Determine the allocation of expenses for prosecuting, reducing to cash and collecting the proceeds of any Litigation Assets;

> Determine the allocation of recoveries from Litigation Assets to the extent the recovery is not directly traceable to Litigation Assets; and

> Determine the amount and timing of Distributions of the Cash proceeds of the Litigation Assets to the beneficiaries of the applicable Litigation Trust.

4.      Transfer of the Litigation Assets

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date, pursuant to the terms and conditions of the Litigation Trust Agreement(s), the Debtors shall be deemed to have automatically transferred to the Litigation Trust(s), all of their right, title, and interest in and to all of the Litigation Assets in accordance with section 1141 of the

68

Bankruptcy Code.  All such assets shall automatically vest in the Litigation Trust(s) free and clear of all Claims, Liens, and other interests, subject only to the expenses of the Litigation Trust(s) and the liens securing the Zohar II Indenture Trustee Claims and Zohar III Indenture Trustee Claims as set forth in the Plan and the Litigation Trust Agreement(s).  Thereupon, the Debtors shall have no interest in or with respect to the Litigation Assets or the Litigation Trust(s).

5.      <u>Expenses of Litigation Trustee; Retention of Advisors</u>

The expenses of any Litigation Trust and Litigation Trustee of such trust, including the fees and expenses of any professionals retained by such Litigation Trustee, shall be paid solely from the assets of such Litigation Trust, including any financing obtained by such Litigation Trust. The allocation of the expenses in such Litigation Trust of such trust shall be determined as set forth in the applicable Litigation Trust Agreement.

There shall be no limitation on a Litigation Trustee's selection of professionals and no professional may be disqualified or prohibited from representing a Litigation Trustee based on the fact that it previously represented or currently represents a party in interest.

6.      <u>Payments to Be Made upon Dissolution of the Litigation Trust(s)</u>

In connection with the dissolution or termination of the Litigation Trust, provisions shall be made for the treatment of any payments to be paid to the Litigation Trust hereunder so as to preserve such payment for its intended recipient.

**I.     Establishment, Funding and Distribution of Escrow Accounts**

***The amounts to be funded to the Administrative and Priority Claims Escrow Account, D&O Indemnity Escrow Account, Professional Claims Escrow Account, and Wind-Down Funding Escrow Account will be the sole recourse for the Claims to be paid from such accounts and shall be determined based on the best information available to the Debtors and known Claims asserted against the Debtors' estates at the time of funding.  While the Debtors believe the amounts funded will in each case be sufficient to cover all disbursements from the respective Escrow Accounts, there can be no guarantees.***

1.      <u>Administrative and Priority Claims Escrow Account</u>

On the Effective Date, the Administrative and Priority Claims Escrow Account shall be established, shall be divided into sub-accounts for each Debtor, and shall be funded from the applicable Debtor's Cash, subject to the next sentence.  Solely with respect to Zohar I, if the Administrative and Priority Claims Escrow Account is not funded in full on the Effective Date, it shall be funded by the relevant Litigation Trustee prior to the distribution of any Distributable Cash to holders of Claims in Classes 14 and 15.  The Wind-Down Administrator shall have responsibility for directing the Distribution of the funds in the Administrative and Priority Claims Escrow Account in accordance with the terms of the Plan.

The funds in the Administrative and Priority Claims Escrow Account shall be distributed to satisfy all Allowed Administrative and Priority Claims against the Debtors until the Holders of

69

all such Claims are paid the full Allowed amount of their Claims (or such other less favorable treatment agreed to by the holder of such claim). If there are any funds in the respective sub-account for any Debtor in the Administrative and Priority Claims Escrow Account after the Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims against such Debtor are paid the full Allowed amount of such Claims, the balance of such funds shall be remitted to: (i) the Liquidation Trust specified in the Plan Supplement, for payment of Allowed Claims against Zohar I in accordance with the Plan, (ii) Zohar II Recovery LLC, for payment of Allowed Claims against Zohar II in accordance with the Plan, and (iii) Zohar III Recovery LLC, for payment of Allowed Claims against Zohar III in accordance with the Plan.

      2.      <u>D&O Indemnity Escrow Account</u>

On the Effective Date, the D&O Indemnity Escrow Account shall be established, funded, and maintained pursuant to the D&O Indemnity Escrow Agreement. The funds in the D&O Indemnity Escrow Account shall be held in trust for the benefit of the Independent Director, CROs and CMO, and used solely for the purpose of satisfying any indemnification obligations owed to each of them.

The Plan Supplement shall include the form of D&O Indemnity Escrow Agreement, which shall detail the manner for disbursing the funds therein and the duration for such escrow account. Amounts remaining in the D&O Indemnity Escrow Account at its termination shall be remitted to the Zohar II Asset Recovery Entity and Zohar III Asset Recovery Entity, ratably based on the Case Expense Allocation.

      3.      <u>Professional Claims Escrow Account</u>

On the Effective Date, the Professional Claims Escrow Account shall be established, funded in the amount of the Professional Claims Escrow Amount, and maintained by the Wind-Down Administrator. The funds in the Professional Claims Escrow Account shall be held in trust for the benefit of the Professionals and used solely for the purpose of satisfying Professional Claims.

From and after the Effective Date, pending the final Allowance of their Professional Claims, retained Professionals shall be paid from the Professional Claims Escrow Account the interim amount permitted to be paid under the Interim Compensation Order on account of their Professional Claims. Allowed amounts shall be paid within three (3) business days of interim or final allowance, as applicable, including interim allowance in accordance with the procedures set forth in the Interim Compensation Order. If there are any funds in the Professional Claims Escrow Account after each Holder of an Allowed Professional Claim has received payment in full, the balance of such funds shall be remitted to the Zohar II Asset Recovery Entity and Zohar III Asset Recovery Entity, ratably based on the Case Expense Allocation.

      4.      <u>Wind-Down Escrow Account</u>

On the Effective Date, the Wind-Down Escrow Account shall be established, funded in the amount determined by the Debtors (in consultation with the Controlling Party and Controlling

70

Class) and set forth in the Plan Supplement, and maintained by the Wind-Down Administrator. The funds in the Wind-Down Escrow Account shall be held in trust for the benefit of the Wind-Down Administrator and used solely for the purpose of satisfying the expenses incurred in discharging the Wind-Down Administrator's duties and obligations.

Any amount that remains in the Wind-Down Escrow Account at the time the Wind-Down Administrator has discharged its duties and is eligible to be discharged, as determined by the Wind-Down Administrator in its sole discretion, shall be distributed to Zohar II Recovery LLC and Zohar III Recovery LLC ratably in accordance with the Case Expense Allocation.

5.    Patriarch Disputed CMA Fee Escrow

Once all Patriarch Disputed CMA Fee Claims are Allowed or Disallowed, any funds remaining in the Patriarch Disputed CMA Fee Escrow after payment of the Allowed amounts of the Patriarch CME Fee Claims shall be paid to (i) the Litigation Trust for Zohar I for any amounts originally contributed by Zohar I that remain after payment of the Zohar I Patriarch Disputed CMA Fee Claim, (ii) Zohar II Recovery LLC for amounts originally contributed by Zohar II that remain after payment of the Zohar II Patriarch Disputed CMA Fee Claim, and (iii) Zohar III Recovery LLC for amounts originally contributed by Zohar III that remain after payment of the Zohar III Patriarch Disputed CMA Fee Claim

6.    Ankura CMA Escrows

Not later than five (5) Business Days prior to the Effective Date, the Debtors shall provide Ankura with written notice of the Effective Date.  Not later than three (3) business days prior to the Effective Date, Ankura shall provide each of Zohar II and Zohar III with an estimate of the amounts anticipated to be incurred and payable under Article III of the respective Ankura CM Agreement as of the occurrence of the Effective Date.  On the Effective Date, the Debtors shall deposit into the applicable Ankura CMA Escrow the amount by which the current balance of the applicable Ankura CMA Fee Escrow is less than the estimate provided to the applicable Zohar Fund pursuant to the prior sentence.  Ankura and its professionals shall not be required to submit any fee applications and all requests for payment of Ankura CMA Claims shall be submitted in accordance with the Ankura CMA Order.  As soon as reasonably practicable after the Effective Date, (i) any amounts in the Ankura Zohar II Escrow shall be used to pay the outstanding Zohar II Ankura CMA Claims incurred and payable through the Effective Date and the balance of such escrow shall be paid to Zohar II Recovery LLC and (ii) any amounts in the Ankura Zohar III Escrow shall be used to pay the outstanding Zohar III Ankura CMA Claims incurred and payable through the Effective Date and the balance of such escrow shall be paid to Zohar III Recovery LLC.  Once such payments have been made in accordance with the Ankura CMA Order, they shall be non-refundable and not subject to challenge as provided in the Ankura CMA Order and the parties to the documents governing the Ankura CMA Escrows shall take all steps necessary to terminate such escrows.

7.    Zohar I Issuer Holdback

The Indenture Trustee shall continue to hold the Zohar I Issuer Holdback to secure the

71

payment of the Zohar I Indenture Trustee Claims as permitted by the Zohar I Issuer Holdback Documents. If any funds remain in the Zohar I Issuer Holdback once all Allowed Zohar I Indenture Trustee Claims have been paid in full, the remaining funds shall be distributed to the Litigation Trust for Zohar I.

8.   AMZM Escrow Accounts

Upon and after the Effective Date of this Plan and the discharge of the Indenture Trustee pursuant to Section 6.3 of the Plan, any funds to be released from the AMZM Escrow Accounts shall be transferred to the Zohar II Recovery LLC or Zohar III Recovery LLC, as applicable based on the source of the funds in the particular AMZM Escrow Account.

**J.   Effectuating Documents; Further Transactions**

The appropriate officer, director or authorized representative of the Debtors or the Wind-Down Administrator, as applicable, shall be, and hereby are, authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, and Confirmation of the Plan shall constitute all necessary corporate or limited liability company authorizations necessary to carry out such actions.

**K.   Disposition of Books and Records**

After the Effective Date, the Debtors shall transfer the Debtors' non-privileged books and records in the Debtors' actual possession and otherwise assign their rights and interest in such books and records to (i) the relevant Litigation Trust, with respect to the books and records related to the Litigation Assets transferred to such Litigation Trust, and (ii) the respective Asset Recovery Entities with respect to the books and records related to all Remaining Assets other than the Litigation Assets. The Debtors shall also transfer privileged books and records related to the Litigation Assets and/or the Remaining Assets to the relevant Litigation Trust and/or the Asset Recovery Entities, as applicable, and the Plan Supplement shall specify the treatment and manner in which any privileged materials related to the Litigation Assets and the Remaining Assets will be transferred to such Litigation Trust and Asset Recovery Entities, as applicable. From and after the Effective Date, the Asset Recovery Entities and Litigation Trust shall continue to preserve and maintain all documents and electronic data transferred to them by the Debtors for at least such period as necessary to allow the Wind-Down Administrator to fulfill its obligations.

**L.   Objection to Pending Request for Allowance of Adequate Protection Claims under Section 507(b)**

The Plan constitutes an objection to any request for a claim under Section 507(b) of the Bankruptcy Code filed or made by any party other than the Indenture Trustee. The Court has determined that the Indenture Trustee is the sole party having any lien or security interest in the Debtors' property and, correspondingly, is the only party entitled to assert a claim for any diminution in the value of its interest in the Debtors' property. Therefore, the Debtors object to the pending administrative expense claims filed by MBIA Insurance Corp. against the Zohar II Debtors (Docket Nos. [2877 and 2878]), Bardin Hill Investment Partners, LP, on account of funds

72

managed by itself and its affiliates, against the Zohar III Debtors [Docket No. 2879 and 2880] and the Patriarch Stakeholders (as defined in their request) against all Debtors [Docket No. 2882], as well as any future claim under section 507(b) of the Bankruptcy Code submitted by a party other than the applicable Indenture Trustee.

For the avoidance of doubt, the Debtors are not objecting to any claim to enforce a right to payment held by the Controlling Party or the Controlling Class under the DIP Order.

**M.      Approval of Case Expense Allocation**

The Case Expense Allocation shall be disclosed in the Plan Supplement and approved at the Confirmation Hearing.

**N.      Disposition of Zohar II Intercompany Claim**

The Plan contemplates a settlement of the Zohar II Intercompany Claim. Specifically, if the Plan is confirmed for Zohar I and Zohar II, Zohar II shall be deemed to have consented to a treatment, subject to the occurrence of the Effective Date for Zohar I, that results in Zohar II (or Zohar II Recovery, LLC, if it succeeds to the assets of Zohar II) receiving a beneficial interest in the relevant Litigation Trust on account of the Zohar II Intercompany Claim, with a payment preference senior to Classes 14 through 19, in lieu of the treatment required under section 1129(a)(9)(A) of the Bankruptcy Code. As a result of such treatment, and expressly conditioned on the payment preference described in the foregoing sentence, no amounts shall be required to be placed into the Administrative and Professional Claims Escrow Account on account of the Zohar II Intercompany Claim.

**O.      Treatment of Zohar II Indenture Trustee Claim and Zohar III Indenture Trustee Claim**

Zohar II Recovery LLC and the Zohar II Litigation Trust shall be deemed to have assumed the Zohar II Indenture Trustee Claim and Zohar III Recovery LLC and the Zohar III Litigation Trust shall be deemed to have assumed the Zohar III Indenture Trustee Claim, and the Indenture Trustee shall retain its liens on all assets received by the Asset Recovery Entities from the Debtors, including any Litigation Assets subsequently transferred to the Litigation Trust, to ensure that the foregoing claims are Unimpaired. On the Effective Date, the Indenture Trustee shall remit to Zohar II Recovery LLC all funds in its possession with respect to any "Account", as defined in the Zohar II Indenture, of Zohar II, and the Indenture Trustee shall remit to Zohar III Recovery LLC all funds in its possession with respect to any "Account", as defined in the Zohar III Indenture, of Zohar III. [The Asset Recovery Entity Agreements and Liquidation Trust(s) shall provide for a reserve to be established for each of the Zohar II Indenture Trustee Claims and Zohar III Indenture Trustee Claims and replenished on an "evergreen" basis (using funds from the proceeds received by the applicable Asset Recovery Entity and Litigation Trust) to secure the payment of such Indenture Trustee Claims, and the "evergreen" amount of each such reserve shall be $250,000, unless the Indenture Trustee agrees to a lesser amount.

Notwithstanding anything else in the Plan to the contrary, there shall be no requirement for the Indenture Trustee to file with the Bankruptcy Court any request for payment of a Zohar II

Indenture Trustee Claim or Zohar III Indenture Trustee Claim.  Instead, the Indenture Trustee shall present all requests for payment of a Zohar II Indenture Trustee Claim or Zohar III Indenture Trustee Claim to each of Zohar II Recovery LLC, Zohar III Recovery LLC and the Litigation Trustee(s), and such parties shall have the rights to dispute such amounts in accordance with the applicable provisions of the Indentures.

**P.    Disposition of Patriarch Disputed CMA Fee Claims**

The applicable Litigation Trustee(s) shall be substituted for AMZM and the applicable Debtors under the Patriarch CMA Fee Dispute Documents.  If there are different Litigation Trustee(s), such substitution shall be with respect to the Patriarch CMA Fees (and corresponding amounts in the Patriarch Disputed CMA Fee Escrow Agreement) for the respective Zohar Fund to which the Litigation Trustee is a successor.   The Litigation Trustee shall prosecute to conclusion or settlement the dispute over the Patriarch Disputed CMA Fee Claims in accordance with the Patriarch CMA Fee Dispute Documents.

The Debtors believe that the Plan leaves the Patriarch Disputed CMA Fee Claims Unimpaired.  Prior to the Petition Date, the holders of the Patriarch Disputed CMA Fee Claims agreed, pursuant to the Patriarch CMA Fee Dispute Documents, that any amounts payable on account of such Claims would be placed into the Patriarch CMA Fee Escrow pending the adjudication of whether such Holders remained entitled to be paid for those Claims, with such Holders to be paid from the Patriarch CMA Fee Escrow if a Holder was found to be entitled to payment and with such amounts to be released to the Debtors if a Holder was found not to be entitled to payment of its respect withheld fees.  The Plan provides for that dispute to be adjudicated and resolved pursuant to the Patriarch CMA Fee Dispute Documents, in the manner agreed to by the Holders.  The Debtors understand that the Holders of these Claims may take the position that these Claims are Impaired under the Plan.

**Q.    MD Credit Bid Transaction**

To the extent that a sale of substantially all of the assets of, or a restructuring of, MD Helicopters, Inc. has not been consummated prior to the Confirmation Date, on the Effective Date, (i) the MD Buyer Equity and (ii) the MD Term Loan Indebtedness owned or held in the name of each of Zohar I, Zohar II and Zohar III will be contributed to MDHI Holdco.  MDHI Holdco and MD Buyer will then prosecute to conclusion the MD Credit Bid Transaction.

If a sale of substantially all of the assets of, or a restructuring of, MD Helicopters, Inc. is consummated prior to the Confirmation Date, (i) the Confirmation Order shall contain provisions sufficient to ensure implementation of the MD Credit Bid Transaction to the extent it has been approved by the Bankruptcy Court in the MD Chapter 11 Cases; (ii) any references in the Plan to the creation of MDHI Holdco, distribution of MDHI Holdco Interests and any contribution of MD Buyer Equity and MD Term Loan Indebtedness to MDHI Holdco shall be excised from the Plan; (iii) the MD Term Loan Indebtedness held by Zohar II and Zohar III as of the Effective Date shall be included as Remaining Assets and contributed to the applicable Asset Recovery Entity; (iv) any MD Term Loan Indebtedness and any equity interests in MD Helicopters Inc. held by or in the name of Zohar I shall be distributed in accordance with Section 6.1(b) hereof; and (v) the amount

74

of outstanding New Notes at Zohar II Recovery, LLC and Zohar III Recovery, LLC following "Step 6" in Section 6.1(c) and (d) shall be $100,000 for each entity.

## ARTICLE IX.

## OTHER PLAN IMPLEMENTATION MEASURES

In addition to the means of implementing the Plan set forth above, Article VII of the Plan sets forth various procedures for making distributions under the plan, Article VIII of the Plan sets forth the procedures for resolving disputed claims, and Article XI of the Plan set forth the treatment of executory contracts and unexpired leases (which will be default rejected unless specified).

## ARTICLE X.

## EFFECT OF CONFIRMATION

**A.**     **Binding Effect**

Subject to the occurrence of the Effective Date, the provisions of the Plan, the Plan Supplement, and the Confirmation Order shall bind (a) any Holder of a Claim or Interest and such Holder's successors and assigns (whether or not the Claims or Interests are Impaired under the Plan, whether or not such Holder has voted to accept the Plan, and whether or not such Holder is entitled to a Distribution under the Plan), (b) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, (c) each Person acquiring property under the Plan or the Confirmation Order, and (d) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

**B.**     **Reservation of Causes of Action/Reservation of Rights**

Except where expressly released or exculpated in the Plan, nothing contained in the Plan shall be deemed to be a waiver or the relinquishment of any claim or Cause of Action that the Debtors, the Estates or the Litigation Trust(s), as applicable, may have or may choose to assert against any Person, including, but not limited to, the Litigation Assets.

**C.**     **Releases by the Debtors of Certain Parties**

**To the maximum extent permitted by applicable law, pursuant to section 1123(b)(3) of the Bankruptcy Code, for good and valuable consideration, including the actions of the Released Parties to facilitate the Plan and the implementation of the Plan, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession for itself and on behalf of its Estate, and any person claiming through, on behalf of, or for the benefit of each Debtor and its Estate, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date or thereafter whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity, arising from or related to any actions, transactions, events or omissions occurring on or before the Effective Date relating to the Debtors, in any**

75

way whatsoever, or the Chapter 11 Cases.  The Wind-Down Company (if any) and each Wind-Down Administrator, Asset Recovery Entity, Asset Recovery Manager, Litigation Trust(s) And Litigation Trustee(s), shall be bound, to the same extent that the Debtors and the Estate are bound, by the releases set forth above.  Notwithstanding anything herein to the contrary, the release set forth in this Section 10.3 of the Plan shall not apply to any act or omission constituting gross negligence, actual fraud or willful misconduct by any of the Exculpated Parties.

D.      **Releases by Non-Debtors**

To the maximum extent permitted by applicable law, pursuant to sections 105(a) and 1123(b)(5) and (6) of the Bankruptcy Code, for good and valuable consideration, including the actions of the Released Parties to facilitate the Plan and the implementation of the Plan, effective as of the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date or thereafter whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity arising from or related to any actions, transactions, events or omissions occurring on or before the Effective Date relating to the Debtors, in any way whatsoever, or the Chapter 11 Cases.  For the avoidance of doubt, the foregoing release shall not waive or release any right that a Releasing Party has under the Plan, including to receive a distribution under the Plan; provided, however, that notwithstanding any other provision of the Plan to the contrary, nothing herein shall constitute a waiver or release of any claims or causes of action to enforce or arising under the Zohar I Issuer Holdback Documents.

E.      **Exculpation**

Except as otherwise specifically provided in the Plan, the Plan Supplement or related documents, no Exculpated Party shall have or incur any liability to any entity for any act or omission taken (or not taken, as the case may be) on or after the Petition Date and prior to the Effective Date in connection with, or related to, the Debtors or arising out of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation or consummation of the Plan, the Disclosure Statement, the exhibits to the Plan and the Disclosure Statement, the Plan Supplement documents, any instrument, release or other agreement or document created, modified, amended or entered into in connection with the Plan, except for their willful misconduct or gross negligence as determined by a Final Order.

No Entity may commence or pursue a claim or Cause of Action of any kind against any Exculpated Party without the Bankruptcy Court (i) first determining after notice that such claim or Cause of Action represents a colorable claim for willful misconduct or gross negligence against that Exculpated Party and (ii) specifically authorizing such entity to bring such Claim.  The United States Bankruptcy Court for the District of Delaware will have, and expressly retains, sole jurisdiction to adjudicate any such claim for which approval of the court to commence or pursue has been granted.

**F.**     <u>Plan Injunction</u>

**Subject to the occurrence of the Effective Date, Confirmation of the Plan shall act as a permanent injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset (except as permitted by Section 10.8 of the Plan) or recover any claim, interest, or Cause of Action satisfied, released or exculpated under the Plan to the fullest extent authorized or provided by the Bankruptcy Code.**

**Without limiting the foregoing, from and after the Effective Date, all Entities that have held, hold, or may hold claims, interests, or Causes of Action satisfied, released or exculpated under the Plan shall be permanently enjoined from taking any of the following actions against, as applicable, the Asset Recovery Entity, Asset Recovery Manager, Litigation Trust(s), Litigation Trustee(s), Wind-Down Company (if any), Wind-Down Administrator, Released Parties or Exculpated Parties, on account of any such claims, interests, or Causes of Action: (a) commencing or continuing in any manner any suit, action or other proceeding; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; and (d) commencing or continuing in any manner any action or other proceeding of any kind.**

**G.**     <u>Term of Bankruptcy Injunction or Stays</u>

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect following Confirmation of the Plan, for the maximum period permitted under the Bankruptcy Code, Bankruptcy Rules and the Local Bankruptcy Rules.

**H.**     <u>Setoff</u>

Notwithstanding anything in the Plan, in no event shall any Holder of a Claim be entitled to setoff any Claim against any claim, right, or cause of action of the Debtors, unless such Holder preserves its right to setoff by preserving such right to set-off in a timely filed proof of claim or filing a motion for authority to effect such setoff on or before the Confirmation Date (regardless of whether such motion is heard prior to or after the Confirmation Date).

**I.**     <u>Preservation of Insurance</u>

Notwithstanding anything in the Plan or Plan Supplement to the contrary, Confirmation of the Plan shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Debtors' current and former officers and directors, or any other person or entity.

<u>**ARTICLE XI.**</u>

77

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE; EFFECT OF FAILURE OF CONDITIONS

**A.    Conditions Precedent to the Effective Date**

The Effective Date shall not occur, and the Plan shall not become effective with respect to a Debtor unless and until the following conditions are satisfied in full or waived by that Debtor and the Controlling Party or Controlling Class for the applicable Debtor and, in the case of condition (h), below, the Independent Director and CRO:

(a) the Confirmation Order shall have been entered, and shall not be subject to any stay;

(b) the Confirmation Order shall be a Final Order;

(c) the Wind-Down Company shall have been formed;

(d) the Escrow Accounts shall have been funded in the amounts identified in the Plan and Plan Supplement;

(e) the Asset Recovery Entities and Litigation Trust(s) shall have been formed and the Remaining Assets shall have been transferred to the applicable Asset Recovery Entities and the Litigation Assets to the Litigation Trust(s);

(f) the Wind-Down Administrator and each Asset Recovery Manager and Litigation Trustee shall have accepted his, her or its appointment;

(g) the Confirmation Order shall have determined and fixed the maximum amounts payable under Paragraph 18 of the Settlement Agreement, other than for contingent indemnification claims, to the Patriarch Stakeholders and approved the Paragraph 18 Bar Order;

(h) the D&O Indemnity Escrow Agreement shall be acceptable to the Independent Director and CRO, in their sole discretion;

(i) the Plan (as confirmed by the Bankruptcy Court), Confirmation Order, Case Expense Allocation, D&O Indemnity Escrow Agreement, Asset Recovery Entity Agreements and Liquidation Trust Agreement(s) shall be in final form reasonably acceptable to the Controlling Party (with respect to Zohar I and Zohar II) and Controlling Class (with respect to Zohar III);

(j) the amounts required to be deposited into the Escrow Accounts on the Effective Date pursuant to the Plan are acceptable to the Controlling Class and Controlling Party, in their reasonable discretion; and

28644911.12

(k) the applicable Controlling Class or Controlling Party for such Debtor, as the case may be, shall have provided its prior written consent to the occurrence of the Effective Date with respect to such Debtor.

## B.    Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

In the event that the conditions specified in Section 11.1 of the Plan shall not have occurred or otherwise been waived as permitted under the Plan with respect to any Debtor, (a) the Plan shall be deemed withdrawn with respect to that specific Debtor, (b) all Holders of Claims and Interests against that specific Debtor shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Order were never entered as to that specific Debtor, and (c) that specific Debtor's obligations with respect to Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against that specific Debtor or any other Person or prejudice in any manner the rights of that specific Debtor or any Person in any further proceedings involving that specific Debtor.

For the avoidance of doubt, the Plan may become effective for one or more Debtors on a date that is different from the date the Plan becomes effective for the other Debtors.

## ARTICLE XII.

## CONFIRMATION PROCEDURE

## A.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing (the "Confirmation Hearing") with respect to the Plan.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  **The Confirmation Hearing has been scheduled to commence at 9:00 a.m. (prevailing Eastern Time) on June 1, 2022 before the Honorable Karen B. Owens, United States Bankruptcy Court, District of Delaware, 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801**.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice to parties other than noting the adjournment in the hearing agenda for the noticed Confirmation Hearing or a filing on the docket of the Chapter 11 Cases in addition to any announcement that may be made in the Bankruptcy Court at the Confirmation Hearing or any adjourned Confirmation Hearing.

Any party-in-interest may object to Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.  **The Bankruptcy Court has set May 13, 2022 at 4:00 p.m. (prevailing Eastern Time), as the deadline for filing and serving objections to Confirmation of the Plan**.  To the extent that you wish to object to Confirmation of the Plan,

please review the Disclosure Statement Order and the Confirmation Hearing Notice for additional information regarding filing and serving such an objection.

## B.     Requirements of Section 1129(a) of the Bankruptcy Code

The Bankruptcy Court will confirm the Plan only if it finds that all of the applicable requirements enumerated in section 1129(a) of the Bankruptcy Code have been met or, if all of the requirements of section 1129(a) other than the requirements of section 1129(a)(8) have been met (*i.e.*, that all impaired classes have accepted the plan), that all of the applicable requirements enumerated in section 1129(b) of the Bankruptcy Code have been met.

Among other things, sections 1129(a) and (b) require that the Plan be (i) in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan, (ii) feasible, and (iii) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class.

The Plan provides that the Deemed Rejecting Classes are not receiving any Distribution under the Plan and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, assuming the Plan is accepted by at least one of the Voting Classes (determined without including the acceptance of any insider), then as to the Deemed Rejecting Classes and any of the Voting Classes that vote to reject the Plan, the Debtors are seeking confirmation of the Plan in accordance with sections 1129(a) and (b) of the Bankruptcy Code either under the terms provided in the Plan or upon such terms as may exist if the Plan is modified in accordance with section 1127(d) of the Bankruptcy Code.

### 1.     Best Interests Test

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the Effective Date.

If the Plan is confirmed and the Effective Date occurs, all Allowed Administrative Claims, Allowed Professional Claims, Allowed DIP Claims, Allowed Adequate Protection Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims will be satisfied, as required by the Bankruptcy Code, through the treatment provided for such Claims in the Plan.

In addition, through the transactions contemplated by the Plan, the Litigation Assets of Zohar I and the Remaining Assets of Zohar II and Zohar III will be monetized in a timely and efficient manner, which will provide recoveries to the Holders of Allowed Zohar I Indenture Trustee Claims, Allowed Zohar I Credit Enhancement Claims, Zohar II Credit Enhancement Claims, and Zohar III A-1 Note Claims, whose Allowed Claims are secured by substantially all of the Debtors' assets.  The Debtors believe that such Holders, which comprise the Voting Classes, support the Plan, and will vote in favor of it in sufficient numbers to obtain confirmation.

The Deemed Rejecting Classes are not receiving any recovery under the Plan.  As set forth in the Plan, the treatment of Claims in the Voting Classes and the Deemed Rejecting Classes is consistent with the priority of payment and subordination provisions in the Indentures.  The Debtors believe that recoveries on the Debtors' remaining assets would be less if they were pursued by a chapter 7 trustee, and that the Asset Recovery Entities and Liquidation Trust are the best means to obtain the highest value for the Debtors' assets.  A chapter 7 trustee likely would not seek to optimize the timing of a sale of the Portfolio Companies to ensure that maximum value (rather than prompt liquidation) is obtained, and a chapter 7 trustee would not have the means to, among other things, accommodate any capital or resource needs of the remaining Portfolio Companies pending a sale.  A conversion to chapter 7 would not result in value accretion that would result in putting the Deemed Rejecting Classes "into the money."

If the Debtors' remaining assets were liquidated under chapter 7 of the Bankruptcy Code (rather than through the Plan), a number of additional costs would be incurred.  These costs would include, among other things, the statutory fees payable to a chapter 7 trustee, and the fees that would be payable to professionals retained by the chapter 7 trustee.  Under the Plan, there will be fees paid to the trustee(s) for the Liquidation Trust(s), the Wind-Down Administrator, and their respective professionals.  The fees of the Liquidation Trustee's (or Trustees') and Wind-Down Administrator's respective professionals would not be subject to Court approval, while the fees of a chapter 7 trustee's professionals would be subject to Court approval.

Conversion to chapter 7 of the Bankruptcy Code may also delay any nearer-term monetization of the assets, and will result in the establishment of a new claims bar date, which could result in additional Claims being asserted against the Debtors, thereby potentially diluting recoveries for certain parties.

Moreover, given that they have liens and superpriority claims, as applicable, on substantially all of the Debtors' assets, it is unknown whether in a chapter 7 case the Indenture Trustee, the Controlling Party, and the Zohar III Controlling Class, as applicable, would agree to the use of cash collateral to provide for a treatment similar to what is provided for under the Plan for Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims.  In a chapter 7 case, unlike under the Plan, the foregoing claims are not required to be satisfied and would not recover from the collateral securing the Adequate Protection Claims of the Indenture Trustee, Allowed Zohar I Indenture Trustee Claims, Allowed Zohar I Credit Enhancement Claims, Allowed Zohar II Credit Enhancement Claims, and Allowed Zohar III A-1 Note Claims, which is all of the Debtors assets, absent consent of the Indenture Trustee to use its collateral.

After considering the effects that a chapter 7 liquidation would have on the Debtors' remaining assets and the funds available for distribution to Holders of Allowed Claims, and given (i) that the Debtors' assets, including any claims and causes of action under chapter 5 of the Bankruptcy Code and any commercial tort claims of Zohar II and III, are subject to the liens and superpriority claims, as applicable, of the DIP Lenders and the Indenture Trustee, and (ii) the multitude of unknowns associated with conversion of the Chapter 11 Cases to chapter 7, the Debtors believe that confirmation of the Plan will not provide the Holders of Allowed Claims in Impaired Classes (including the Deemed Rejecting Classes) less than such Holders would receive

81

if the Chapter 11 Cases were converted to chapter 7.

2.    **Feasibility**

Under section 1129(a)(11) of the Bankruptcy Code, the Debtors must demonstrate that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. This requirement is satisfied as the Plan proposes a liquidation, and the Debtors believe that, as applicable, the Debtors, the Wind-Down Administrator or the applicable Distribution Agent will be able to make all payments required to be made under the Plan.

3.    **Confirmation Without Acceptance by All Impaired Classes**

As discussed above, because the Deemed Rejecting Classes are deemed to have rejected the Plan, the Debtors are seeking confirmation of the Plan as to such Classes, and as to any of the Voting Classes that votes to reject the Plan, pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm a plan at the request of a debtor if, as to each impaired class that has not accepted the plan, the plan "does not discriminate unfairly" and is "fair and equitable."

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submits that the Plan does not "discriminate unfairly" against any rejecting Class.

Under the Plan, the Claims and Interest in the Deemed Rejecting Classes are junior to all other Classes of Claims and Interests. Thus, from the perspective of the Holders of Claims and Interests in the Deemed Rejecting Classes, no junior classes will be receiving (or retaining on account of such junior interest) any property under the Plan. Similarly, to the extent that one of the Voting Classes rejects the Plan, given that the Deemed Rejecting Classes are not receiving a recovery under the Plan, no classes junior to any such Voting Class will be receiving (or retaining on account of such junior interest) any property under the Plan.

Based on the foregoing, the Debtors believe that the Plan meets the "fair and equitable" test.

# ARTICLE XIII.

# RISK FACTORS

## A.    Parties May Object to the Plan's Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.    The Debtors May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan in the Chapter 11 Cases, the Debtors may not receive the requisite acceptances to confirm a plan.  In the event that votes with respect to Claims in the Voting Classes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court.  If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan.  Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still might not confirm such plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Allowed Claims as the terms of the Plan.  In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

## C.    The Amended Equitable Subordination Complaint Seeks Relief Inconsistent with the Plan

The Plan treats the various obligations under the Indentures in accordance with the contractual rights of the parties under the Indentures.  The plaintiffs in the Amended Equitable Subordination Complaint have sought to alter those rights pursuant to section 510(c) of the Bankruptcy Code.  The plaintiffs may object to confirmation of the Plan due to the pendency of the appeal of the Dismissal Order or, if they are unsuccessful in objecting to confirmation on those grounds, seek a stay of the effectiveness of the Confirmation Order. If they are successful in their objection or obtain a stay, it could impair the Debtors' ability to obtain confirmation of the Plan or to cause the Effective Date of the Plan to occur.

Further, if the plaintiffs are ultimately successful in overturning the Dismissal Order, the Plan may need to be modified to account for any subordination ordered by the Court.  The Debtors cannot be assured that such a plan (as modified) could be confirmed and become effective.

**D.**     **Allowed Administrative Expense and Priority Claims May Exceed Estimates**

The Debtors do not anticipate having any material Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims, and that the cash funding obligations of the Chapter 11 Cases on the Emergence Date will largely consist of the payment of Allowed Professional Fee Claims.  Based on these anticipated cash needs as of the Effective Date, the Debtors believe that they will be able to consummate the Plan.

The Court has already set a bar date for Priority Tax Claims and Other Priority Claims, as well as Administrative Claims arising through August 26, 2021.  The claims register contains a small number of claims that were timely filed as of the Bar Date.

The Debtors do not believe any proofs of claims that would constitute Other Priority Claims are valid priority claims, and only a single Priority Tax Claim, in a *de minimis* amount, has been filed as of January 31, 2022.  It is possible that parties seek leave to file late Other Priority Claims or Priority Tax Claims.

The Patriarch Stakeholders have filed an administrative expense claim asserting damages of not less than $873 million.  *See* Docket No. 2882.  The Debtors believe that this claims is without merit, and are actively contesting the claim.

Taxing authorities are not required to file request for administrative expenses with respect to post-petition tax obligations.  The Debtors do not anticipate that they will have post-petition tax obligations beyond a *de minimis* amount.  But, the Debtors' estimates and their actual tax liability may be materially different.  *See* "Tax Considerations" below.

If any Administrative Claim, Other Priority Claim, or Priority Tax Claim is allowed in a material amount, or a reserve is required to be funded in a material amount, the Debtors may not have the ability to satisfy such obligation on the Effective Date.  As a result, the Debtors may need to obtain the consent of the holder of any such claim to a treatment other than payment in full, in cash, on the Effective Date, or risk that the Plan will not become effective.

**E.**     **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in the Plan, the Effective Date is subject to several conditions precedent.  There can be no assurance that any or all of such conditions will be satisfied (or waived).  If such conditions precedent are not met or waived, the Effective Date will not occur.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

**F.**     **Risks Regarding Remaining Portfolio Company Assets**

Noteholder recoveries rely, in large part, on generating proceeds from the sale of the Portfolio Companies.  In the event that sales are delayed, expenses incurred with respect to the monetization process exceed anticipated amounts, a Portfolio Company's performance or prospects decline, or the applicable market declines due to economic conditions or other constraints, recoveries may be jeopardized.

84

The ability to monetize any particular Portfolio Company is subject to certain risks, including, without limitation:  local, national, and international economic conditions; the market for the goods or services that the particular Portfolio Company sells; changes in interest rates; changes in environmental laws or regulations, planning laws and other governmental roles and fiscal and monetary policies; uninsured casualties; force majeure acts, terrorist events, under-insured or uninsurable losses; and other factors that are beyond the reasonable control of the Asset Recovery Entities.

A number of the Remaining Assets consist of interests in escrow accounts remaining after the sale of certain Portfolio Companies.  The funds in those escrow accounts are subject to claims from the Debtors' counterparties in the applicable Portfolio Company sale transactions, which may decrease the amounts available to the Debtors (or their successors under the Plan).  The Debtors have no way of quantifying the reduction in the funds in the escrow accounts due to claims made by such counterparties and, it is possible, that for each escrow accounts, the funds therein are depleted by the claims made against the escrow accounts.

Also, the Debtors anticipate that a variety of expenses would likely be incurred with respect to the Remaining Assets related to the Portfolio Companies, the amount of which is not susceptible to precise determination.  Unexpected conditions regarding the individual remaining Portfolio Companies and a variety of other variables may affect the actual expenses incurred, and thus affect, potentially adversely, the net proceeds of the sales of the Remaining Assets related to the Portfolio Companies.

## G.    Risks Regarding Litigation Assets

After the Effective Date, the applicable Litigation Trust shall have and retain and may enforce any Litigation Assets.  The proceeds of the Litigation Assets will distributed in accordance with the Plan.  As is the case with most litigation, the outcomes with respect to any Litigation Assets are difficult to assess or quantify, and the magnitude of the potential gain relating to the Litigation Assets may remain unknown for substantial periods of time.  Ultimately, the results with respect to the Litigation Assets may not be as the Debtors anticipate, which could adversely affect recoveries under the Plan, potentially by meaningful amounts.

## H.    Tax Considerations

The Debtors were initially formed to be disregarded as taxpayers.  Ms. Tilton caused the Debtors to elect to be taxed as a corporation in violation of their governing documents.  Under the Settlement Agreement, Ms. Tilton agreed to bear the Debtors' tax liability, but later renounced that obligation.  The Debtors have been diligently seeking to understand their tax profile and determine their potential tax liabilities.  The Debtors continue to evaluate potential tax obligations arising from their ownership of the Portfolio Companies, including their status as partners in various tax partnerships, various Portfolio Company-level transactions, and the sales of the Portfolio Company assets, including under the prepetition Zohar I Sale Documents and the post-petition sales of Portfolio Companies.  As described above, no material prepetition tax claims have been filed.  But no bar date exists (or will be set) for post-petition tax claims, so the Debtors must

rely on their own estimates for post-petition tax claims. At present, the Debtors believe that the Plan will not result in the imposition of material post-effective date tax obligations.

If that proves not to be true, the Debtors may have not have sufficient cash to make the Plan become Effective, or the Zohar III Controlling Class and Controlling Party may not consent to the funding of the Escrow Accounts in amounts sufficient to pay these claims, or both. The Debtors would then need to either obtain the consent of the taxing authorities to a treatment other than payment in full, in cash, on the Effective Date, as required under section 1129(a)(9) of the Bankruptcy Code, or pursue an alternative to the Plan.

## ARTICLE XIV.

## ALTERNATIVES TO THE PLAN

The Debtors believe the Plan affords Holders of Allowed Claims the potential for the greatest realization on the Litigation Assets of Zohar I and the Remaining Assets of Zohar II and Zohar III and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the Debtors believe that the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to chapter 7 of the Bankruptcy Code. Neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, Holders of Claims could revert to a "race to the courthouse," the result being that claimants would not receive a fair and equitable distribution as contemplated by the Plan. And there can be no assurances that the value of the Debtors' interest in the Portfolio Companies or the Litigation Assets would be preserved outside of the context of cases under the Bankruptcy Code.

As a result of, among other things, the delay, additional costs, and uncertainties that would likely result from any conversion of the Chapter 11 Cases to chapter 7, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would be achieved in chapter 7. Therefore, chapter 7 is not a superior alternative to the Plan. Thus, the Debtors believe that the Plan represents the best available alternative for maximizing returns to Holders of Allowed Claims. For additional discussion regarding why the Debtors believe the Plan is a superior alternative to a conversion to chapter 7, see Article XII.B.1.

## ARTICLE XV.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors and to certain Holders of Claims. This discussion is based on the Internal Revenue Code ("**IRC**"), the Treasury regulations thereunder (the "**Regulations**"), judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service ("**IRS**"), all as in effect on the date hereof. Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment

described below.  Furthermore, this discussion is not binding on the IRS or any other tax authority.  There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Plan that differs from the tax consequences described below.  No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of the Plan.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the IRC (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and persons that have a functional currency other than the U.S. dollar).  This summary does not address state, local, or non-United States tax consequences of the Plan, nor does this summary address federal taxes other than income taxes.  Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are Unimpaired under the Plan or that are not entitled to receive or retain any property under the Plan or to persons who are deemed to have rejected the Plan.

References to a Holder of a Claim refer to such Holder in its capacity as a Holder of a Claim, even if such Holder also holds an Equity Interest.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES.  THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE AND IS NOT A TAX OPINION.  THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS DEPEND UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  THIS SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE FROM THE HOLDER'S TAX ADVISOR BASED UPON THE HOLDER'S PARTICULAR CIRCUMSTANCES.  EACH HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN TO SUCH HOLDER.

## A.    Federal Income Tax Consequences to the Debtors

### 1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new debt instrument issued by the debtor, and (z) the fair market value of any other consideration (including New Notes) given in satisfaction of such indebtedness at the time of the exchange.  The issue price of any such new debt instrument is

87

determined under either Section 1273 or 1274 of the IRC. Generally, these provisions treat the fair market value of a debt instrument treated as publicly traded for U.S. federal income tax purposes as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for interest not less than the applicable federal rate.

Under Section 108 of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a Bankruptcy Court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must generally reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("<u>NOLs</u>"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (e) foreign tax credits. The reduction in a debtor's tax basis in its assets generally does not have to exceed the excess of (i) the debtor's tax basis in assets held immediately after the discharge of indebtedness over (ii) the amount of liabilities remaining immediately after the discharge of indebtedness (the "**<u>Liability Floor</u>**"). NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under IRC section 108(b)(5) (the "**<u>Section 108(b)(5) Election</u>**") to reduce the debtor's basis in its depreciable property first. If a debtor makes a Section 108(b)(5) Election, the Liability Floor does not apply to the reduction in basis of depreciable property. The Debtors have not determined whether to make a Section 108(b)(5) Election. Any required reduction of tax attributes arising out of the exclusion of COD Income from gross income is made after the determination of the tax due for the year in which the discharge of indebtedness giving rise to excluded COD income occurs. Accordingly, the Debtors' existing tax attributes, including NOLs, will be available to offset taxable income in the year in which the Debtors realize COD Income in connection with the transactions contemplated by the Plan.

It is anticipated that COD Income will be realized from the exchange of the Zohar II Credit Enhancement Liability Claims for the New Notes issued by Zohar II, the exchange of the Zohar III A Notes for New Notes issued by Zohar III, the exchange of the Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims for beneficial interests in the Litigation Trust, and the cancellation of the Zohar I A-3 Notes, all B Notes and all General Unsecured Claims for new consideration. The amount of COD Income will be equal to the adjusted issue price of the exchanged debt before the deemed discharge, reduced by the sum of (i) cash (if any), (ii) the issue price of the New Notes, (iii) the fair market value (if any) of any other property transferred to the exchanging Holders, and (iv) the amount of any old debt that remains outstanding after the discharge. It is anticipated that COD Income will be realized by the Debtors, but will not be recognized by and included in the Debtors' gross income in the year in which the Effective Date occurs pursuant to Section 108 of the IRC.

2.      Accrued Interest

To the extent that there exists accrued but unpaid interest on indebtedness owing to holders of Allowed Claims and to the extent that such accrued but unpaid interest has not been deducted previously by the Debtors, portions of payments made in consideration for the indebtedness underlying such Allowed Claims that are allocable to such accrued but unpaid interest should be

deductible by the Debtors.  Any such interest that is not paid will not be deductible by the Debtors and will not give rise to COD Income.

To the extent that any of the Debtors have previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to such Debtors.  If such amounts are not paid, they will give rise to additional COD Income that would be excluded from gross income pursuant to the bankruptcy exclusion discussed above.  As a result, the Debtors would be required to reduce their tax attributes to the extent of such interest previously deducted and not paid.

3.    Gain or Loss

The transfer of the Remaining Assets to the Asset Recovery Entities in exchange for the Asset Recovery Entities' assumption of the New Notes is expected to be treated as a taxable asset sale for U.S. federal income tax purposes.  In such sale, the Debtors will recognize gain equal to the excess, if any, of the fair market value as of the Effective Date of the Debtors' assets over the tax basis in such assets, some or all of which may be offset with available tax attributes, *e.g.*, NOLs, and losses recognized in the asset sale.  However, if there is an aggregate gain and such gain exceeds the amount of tax attributes available to offset it, the Debtors may owe a cash tax liability for the taxable year that includes the Effective Date.

**B.    Classification, Reporting, and Taxation of the Post-Effective Date Entities**

The Asset Recovery Entities and MDHI Holdco, if applicable, are anticipated to be formed by the Controlling Party of Zohar II, in the case of New Zohar II LLC, Zohar II Intermediate LLC and Zohar II Recovery LLC and the Controlling Class of Zohar III, in the case of New Zohar III LLC, Zohar III Intermediate LLC, and Zohar III Recovery LLC, and one or both of them in the case of MDHI Holdco, and taxed as corporations.  The Asset Recovery Entities will be obligated to treat the basis of the assets that they are deemed to purchase from the Debtors as the fair market value of those assets, as determined by the Debtors under Section 6.6(d) of the Plan.

The Litigation Trust is currently anticipated to be subject to grantor trust tax rules and, as a result, items of income and loss will be allocated to the respective beneficiaries of the Litigation Trust in accordance with the Litigation Trust Agreement.

**C.    Federal Income Tax Consequences to Holders of Claims**

1.    Treatment Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims.

For purposes of this discussion, it is assumed that the transactions described in Section 6.1(c) and (d) of the Plan will be structured as a significant debt modification followed by a "*Bruno's* transaction" and treated as: (i) an exchange of the Zohar II Credit Enhancement Liability Claims for New Notes issued by Zohar II Limited, a sale of Zohar II's assets to, and an assumption of the New Notes by, an indirect subsidiary of New Zohar II LLC, *i.e.*, Zohar II Recovery LLC, and an exchange by Zohar II Recovery LLC of interests in New Zohar II LLC in satisfaction of all but $100,000 of New Notes assumed by Zohar II Recovery LLC and (ii) an exchange of the Zohar

89

III A-1 Note Claims for New Notes issued by Zohar III Limited, a sale of Zohar III's assets to, and an assumption of the New Notes by, an indirect subsidiary of New Zohar III LLC, *i.e.*, Zohar III Recovery LLC, and an exchange by Zohar III Recovery LLC of interests in New Zohar III LLC in satisfaction of all but $100,000 of New Notes assumed by Zohar III Recovery LLC. [11]  Under this characterization, these exchanges will be treated as a fully taxable transaction.  In that case, a U.S. holder of a Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder (other than the amount, if any, allocable to accrued interest, discussed below under "Accrued but Unpaid Interest") in the exchange of New Notes for existing indebtedness.  The character of such gain or loss as capital or ordinary will be determined by a number of factors, including (but not limited to) the tax status of the U.S. holder, whether the prepetition notes exchanged constitute a capital asset in the U.S. holder's hands, whether the prepetition notes exchanged have been held for more than one year, whether the prepetition notes exchanged have bond premium or market discount, and whether and to what extent the U.S. holder previously claimed a bad debt deduction with respect to the prepetition notes exchanged.  Gain or loss realized must be calculated separately for each identifiable block of prepetition notes surrendered in the exchanges for New Notes, and the deductibility of capital losses is subject to limitations.  The transfer of the Remaining Assets to the Asset Recovery Entities in exchange for the Asset Recovery Entities' assumption of the obligations under the New Notes will be treated as a taxable exchange of assets.  Accordingly, the Remaining Assets will be treated as purchased by the Asset Recovery Entities and the Asset Recovery Entities and the basis in the Remaining Assets in the hands of the Asset Recovery Entities will be equal to the fair market value of the Remaining Assets as determined in accordance with the Plan.

In connection with the holding of equity in the Asset Recovery Entities, a U.S. holder of such equity generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid in respect of such equity to the extent such distributions are paid out of any current or accumulated earnings and profits as determined for federal income tax purposes. "Qualified dividend income" received by a non-corporate U.S. holder is subject to preferential tax rates. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a U.S. holder's adjusted tax basis in the equity held by such U.S. holder, but not below zero. Any excess amount will be treated as gain from a sale or exchange of such equity. U.S. holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of the Asset Recovery Entities' earnings and profits.

A U.S. holder will recognize gain or loss upon the sale or other taxable disposition of equity

---

[11]  If MDHI Holdco is formed in connection with the Plan, the transactions related to MDHI Holdco are anticipated to be structured as a "*Bruno's* transaction," like the transactions with respect to the Remaining Assets and the Asset Recovery Entities:  there will be a sale of the MD Term Loan Indebtedness held by Zohar II and Zohar III to, and an assumption of certain New Notes by, MDHI Holdco, and an exchange by MDHI Holdco of equity interests in one of its indirect parents in satisfaction of New Notes in the amounts specified in Section 6.1(c) and 6.1(d) of the Plan.  If those transactions occur, it is assumed that they will have the same treatment with respect to the MD Term Loan Indebtedness held by Zohar II and Zohar III and MDHI Holdco as described herein for the Remaining Assets and Asset Recovery Entities, respectively.

in the Asset Recovery Entities equal to the difference between the amount realized upon the disposition and the U.S. holder's adjusted tax basis in the equity interest sold. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. holder has held such equity for more than one year as of the date of disposition. U.S. holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

Alternative characterizations of the transactions are possible. Any alternative characterization could result in U.S. federal income tax consequences different from those described above. Holders of Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims should consult their own tax advisors regarding possible alternative characterizations as well as the consequences to them of such alternative characterizations, including possibly limiting the ability of holders of Zohar II Credit Enhancement Liability Claims and Zohar III A-1 Note Claims to take a loss on such exchange.

    2.     <u>Treatment Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims</u>

Holders of Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims will become beneficiaries of the Litigation Trust.

The exchange of the Claims of the Holders of Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims for beneficial interests in the Litigation Trust will be a fully taxable transaction. A U.S. holder of a Claim will generally recognize gain or loss equal to the difference between the "amount realized" by such U.S. holder in exchange for its Claim and such U.S. holder's adjusted tax basis in the Claim. Any such gain or loss should be capital in nature (subject to any "market discount" rules described below) and should be a long term capital gain (or loss) if the surrendered Claims were held for more than one year by the U.S. holder. However, any such gain would be treated as ordinary income to the extent attributable to any market discount such U.S. holder had accrued with respect to its surrendered Claim, unless the U.S. holder has elected to include market discount in income currently as it accrues.

    3.     <u>Treatment of Litigation Trust</u>

Pursuant to the Plan, the Litigation Assets exchanged for Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the respective Holders of Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims receiving beneficial interests in the Litigation Trust (with each Holder receiving an undivided interest in such assets in accordance with such Holder's economic interests in such assets), followed by the transfer by the Holders of such assets to the Litigation Trust in exchange for a beneficial interest in the Litigation Trust. Similarly, any Litigation Assets acquired by the Asset Recovery Entities will be contributed to the Litigation Trust for adjudication in exchange for beneficial interests in the Litigation Trust. Accordingly, all parties must treat the Litigation Trust as a grantor trust of which the holders of beneficial interests in the Litigation Trust are the

owners and grantors, and treat the holders of beneficial interests in the Litigation Trust as the direct owners of an undivided interest in the Litigation Assets, consistent with their respective economic interests therein, for all U.S. federal income tax purposes.

Prior to the Effective Date, the Debtors shall make a good faith determination of the fair market value of the Litigation Assets as of the Effective Date, provided, however, that the Debtors shall not be required to hire an expert to make such a valuation. This valuation shall be used consistently by all parties (including the Debtors, the applicable Asset Recovery Entity and its Asset Recovery Manager, the members of the applicable Asset Recovery Entity, and the Holders of Zohar I Indenture Trustee Claims and Zohar I Credit Enhancement Liability Claims) for all U.S. federal income tax purposes.

The U.S. federal income tax reporting obligation of a trust beneficiary is not dependent upon a trust distributing any cash or other proceeds. The Litigation Trust Agreement will provide that the Litigation Trust will allocate items of income, gain, loss, expense, and other tax items to Litigation Trust beneficiaries in accordance with the relative beneficial interest of each Litigation Trust beneficiary. Therefore, a Litigation Trust beneficiary may incur an income tax liability with respect to such Litigation Trust beneficiary's allocable share of the income of the Litigation Trust whether or not the Litigation Trust has made any concurrent distribution to the Litigation Trust beneficiary.

The Litigation Trust Agreement will require the Litigation Trustee to file tax returns for the Litigation Trust as a "grantor trust" pursuant to Treasury Regulation § 1.671-4(a). Each year, the Litigation Trust is expected to send each Litigation Trust beneficiary a separate statement setting forth the Litigation Trust beneficiary's share of items of income, gain, loss, deduction, or credit, and such beneficiary will be responsible for the payment of taxes on a current basis that result from such allocations.

LITIGATION TRUST BENEFICIARIES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE APPROPRIATE FEDERAL INCOME TAX REPORTING WITH RESPECT TO THE LITIGATION TRUST.

4.    Accrued but Unpaid Interest

In general, to the extent a U.S. holder of a debt instrument receives cash or property in satisfaction of interest accrued but unpaid during the holding period of such instrument, the amount of such cash or the value of such property will be taxable to the U.S. holder as ordinary interest income (if not previously included in the U.S. holder's gross income). Conversely, such U.S. holder may recognize a deductible loss to the extent that any accrued interest was previously included in its gross income and is not paid. The extent to which cash or property received by a U.S. holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes), and thereafter, to the extent permitted under the Bankruptcy Code, to accrued but unpaid interest, if any. However, the provisions of the Plan are not binding on the IRS nor a Bankruptcy Court with respect to the appropriate tax treatment for creditors. Certain legislative history indicates that

an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization generally is binding for U.S. federal income tax purposes. However, regulations issued by the IRS require, in general, that payments made on a debt instrument first be allocated to accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Each U.S. holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest for tax purposes.

5.      Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. holder on the taxable disposition (determined as described above) of debts that it acquired with market discount will generally be treated as ordinary income to the extent of any market discount that accrued thereon while such debts were considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued). If a U.S. holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry the obligations constituting its Allowed Claim, such deferred amounts would become deductible at the time of such taxable disposition. To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property, any additional accrued but unrecognized market discount may be required to be carried over to the property received therefor. Any gain recognized by such U.S. holder on a subsequent sale, exchange, redemption or other disposition of such property received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount with respect to the exchanged debt instrument.

6.      Non-U.S. Holders

The rules governing U.S. federal income taxation of a non-U.S. holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to non-U.S. holders. The discussion does not include any non-U.S. tax considerations. Non-U.S. holders should consult with such holders' own tax advisors to determine the effect of U.S. federal,

state, and local tax laws, as well as any other applicable non-U.S. tax laws or treaties, with regard to such holders' participation in the transactions contemplated by the Plan and such holders' ownership of Claims.

Any distributions made with respect to Asset Recovery Entities will constitute dividends for federal income tax purposes to the extent such distributions are paid out of the Asset Recovery Entities' current or accumulated earnings and profits as determined for federal income tax purposes. Except as described below, dividends paid with respect to the equity in Asset Recovery Entities held by a non-U.S. holder that are not effectively connected with such non-U.S. holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. holder in the United States) will be subject to federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). A non-U.S. holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the non-U.S. holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to equity in Asset Recovery Entities held by a non-U.S. holder that are effectively connected with a non-U.S. holder's conduct of a U.S. trade or business (and if required by an applicable income tax treaty, are attributable to a permanent establishment maintained by such non-U.S. holder in the United States) generally will not be subject to withholding tax, provided the non-U.S. holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S. federal income tax in the same manner as a U.S. holder, and a non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

Whether a non-U.S. holder realizes gain or loss on an exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders. Subject to the discussions below regarding FATCA (as defined below) and backup withholding, any gain recognized by a non-U.S. holder on the exchange of prepetition notes held by such non-U.S. holder for New Notes or a subsequent sale or other taxable disposition of equity in Asset Recovery Entities generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale, exchange or other taxable disposition occurs and certain other conditions are met, (b) such gain is effectively connected with the conduct by such non-U.S. holder of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such non-U.S. older in the United States), or (c) solely with respect to equity in Asset Recovery Entities, the issuer of such equity is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") as defined in section 897 of the IRC.

If the first exception applies, to the extent that any gain is recognized, the non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S.

holder's capital gains allocable to U.S. sources exceed such holder's capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. holder generally will be subject to U.S. federal income tax with respect to any gain recognized in the same manner as a U.S. Holder. Such gain generally will not be subject to withholding tax, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). In addition, if such non-U.S. holder is a corporation for U.S. federal income tax purposes, such non-U.S. holder may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

With respect to the third exception above, the Debtors do not expect any of the Asset Recovery Entities to become a USRPHC. Because the determination of whether an Asset Recovery Entity is a USRPHC depends, however, on the fair market value of its "U.S. real property interests" relative to the fair market value of its non-U.S. real property interests and its other business assets, there can be no assurance that any Asset Recovery Entities will not become a USRPHC in the future. If an Asset Recovery Entity becomes a USRPHC, gain arising from the sale or other taxable disposition by a non-U.S. holder of equity in such Asset Recovery Entity will not be subject to U.S. federal income tax if such equity is "regularly traded," as defined by applicable Treasury Regulations, on an established securities market, and such non-U.S. holder owned, actually and constructively, 5% or less of such equity throughout the shorter of (x) the five-year period ending on the date of the sale or other taxable disposition and (y) the non-U.S. holder's holding period.

Withholding taxes may be imposed under sections 1471 to 1474 of the Tax Code (such sections commonly referred to as the Foreign Account Tax Compliance Act, or "**FATCA**") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities.  Specifically, a 30% withholding tax may be imposed on dividends paid in respect of the equity of Asset Recovery Entities paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the IRC), unless (1) the foreign financial institution undertakes certain diligence, reporting, and withholding obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the IRC) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence, reporting and withholding requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertakes to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the IRC), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Prior to the issuance of recently proposed Treasury Regulations, withholding under FATCA would have also applied to payments of gross proceeds from the sale or other disposition of equity in the Asset Recovery Entities on or after January 1, 2019. However, the proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury

95

Regulations are issued.

7.      Backup Withholding Tax and Information Reporting Requirements

The applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest.  The applicable withholding will comply with all applicable information reporting requirements of the IRC. Payments and other distributions in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding.  Unless the payee otherwise establishes an exemption, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan if the U.S. holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a U.S. holder's U.S. federal income tax liability, and a U.S. holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. holders' tax returns.

**D.      Importance of Obtaining Your Own Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON HOLDER'S INDIVIDUAL CIRCUMSTANCES.   ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL AND NON-UNITED STATES INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XVI.

## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters in connection with, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including to:

(a)    hear and determine motions for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    hear and determine any and all adversary proceedings, applications and contested matters;

(c)    hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    hear and determine any objections (including requests for estimation) in connection with Disputed Claims, in whole or in part;

(e)    enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f)    issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including the Confirmation Order;

(h)    hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, the Asset Recovery Entity Agreements, the Litigation Trust Agreement(s), the Settlement Agreement, any transactions or payments contemplated hereby or thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i)    hear and determine (i) matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any request by the Debtors), prior to the Effective Date or (ii) requests by the Wind-Down Administrator after the Effective Date for an expedited determination of tax issues under section 505(b) of the Bankruptcy Code;

(j)    issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(k)    hear and determine such other matters as may be provided in the Confirmation Order;

(l)    hear and determine any rights, claims or Causes of Action, held by or accruing to the Debtors, the Estates or the Litigation Trust(s) pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

97

(m)      recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(n)      enforce the terms of any Asset Recovery Entity Agreement or Litigation Trust Agreement;

(o)      enforce the releases granted and injunctions issued pursuant to the Plan and the Confirmation Order;

(p)      enter a final decree closing the Chapter 11 Cases; and

(q)      hear and determine any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XVII.

## RESERVATION OF LITIGATION ASSETS

The failure to specifically identify in the Disclosure Statement, the Plan, the Confirmation Order, the Plan Supplement or the Litigation Trust Agreement any Litigation Asset is not intended to and shall not limit the rights of the Estates and the Litigation Trust to pursue any such Litigation Assets. The Debtors and the Estates expressly reserve all Litigation Assets other than those that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as Litigation Assets for later adjudication, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such Litigation Assets after the Effective Date.

Moreover, no Person may rely on the absence of a specific reference in the Disclosure Statement, the Plan, the Confirmation Order, the Plan Supplement or the Litigation Trust Agreement to any Litigation Assets against such Person as any indication that the Estates or the Litigation Trust will not pursue any and all available Litigation Assets against such Person. Nothing contained in the Disclosure Statement, the Plan, the Confirmation Order, the Plan Supplement or the Litigation Trust Agreement will be deemed to be a waiver, release, or relinquishment of any Litigation Assets which the Debtors and the Estates had immediately prior to the Effective Date other than those that are expressly waived, relinquished, released, compromised, or settled in the Plan or the Confirmation Order.

## ARTICLE XVIII.

## MISCELLANEOUS PROVISIONS

A.      **Corporate Action**

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of shareholders, directors, members, or managers of one or more of the Debtors shall be in effect from and after the Effective Date pursuant to the applicable general business, corporation

98

or limited liability company law of the states or country in which the Debtors are incorporated or organized, without any requirement of further action by the shareholders, directors, members, or managers of the Debtors.

## B.    Modification of Plan

Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date; *provided*, that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation; provided, that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications.  A Holder of a Claim that has accepted the Plan prior to any alteration, amendment, or modification will be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Holders of the Claims.

Prior to the Effective Date, the Debtors may upon consultation with the applicable Indenture Trustee, Controlling Class and Controlling Party for each Debtor, as the case may be, make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not materially change the treatment of Holders of Claims or Interests.

## C.    Revocation or Withdrawal of the Plan

Each Debtor reserves the right to revoke or withdraw the Plan as to it prior to the Confirmation Date.  Subject to the foregoing sentence, if a Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void for that Debtor.  In such event, nothing contained in the Plan shall constitute or be deemed an admission, waiver or release of any Claims or Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of that Debtor, its Estate or any Person in any further proceedings involving any of the Debtors or the Estates.

## D.    Plan Supplement

The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full in the Plan.  The documents initially included in the Plan Supplement may thereafter be amended and supplemented, prior to the Effective Date.

## E.    Payment of Statutory Fees

U.S. Trustee Fees for each Debtor shall be paid until the earlier of such time that a particular case is closed, dismissed or converted.  For the avoidance of doubt, all U.S. Trustee Fees coming due after the Effective Date of the Plan shall be paid by the applicable Liquidation Trust.

**F.      Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan shall not be taxed under any law imposing a stamp tax or similar tax.

**G.      Expedited Tax Determination**

The Debtors and Wind-Down Administrator (as applicable) are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

**H.      Exhibits/Schedules**

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full in the Plan.

**I.      Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

**J.      Severability of Plan Provisions**

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the request of the Debtors have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

**K.      Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to its principles of conflict of law.

28644911.12

**L.**     **Conflicts**

To the extent that any provision of the Disclosure Statement conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  The Confirmation Order will govern in the event of any conflict between the Confirmation Order and the Plan.

**M.**     **Reservation of Rights**

If the Plan is not confirmed, or if the Plan is confirmed and does not become effective, the rights of all parties-in-interest in the Chapter 11 Cases are and will be reserved in full.  Any concessions or settlements reflected in the Plan, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Cases shall be bound or deemed prejudiced by any such concession or settlement.

**N.**     **Limiting Notices**

Only Persons that file renewed requests to receive documents pursuant to Bankruptcy Rule 2002 on or after the Effective Date shall be entitled to receive notice under Bankruptcy Rule 2002 with respect to the Chapter 11 Cases.  After the Effective Date, the Wind-Down Administrator, Asset Recovery Manager, and Litigation Trustee are authorized to limit the list of Persons receiving documents with respect to the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 to those Persons who have Filed such renewed requests.

## ARTICLE XIX.

## CONCLUSION

**IN THE OPINION OF THE DEBTORS, THE PLAN IS SUPERIOR AND PREFERABLE TO ANY ALTERNATIVE.   ACCORDINGLY, THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN THE VOTING CLASSES VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION OF THE PLAN.**

Dated: Wilmington, Delaware
        April 6, 2022

Respectfully submitted,

Zohar I Limited
Zohar I Corp.
Zohar II Limited
Zohar II Corp.
Zohar III Limited
Zohar III Corp.

By:      /s/ *Michael Katzenstein*
Name: Michael Katzenstein

Title:   Chief Restructuring Officer

28644911.12