# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*, | Case No. 18-10512 (KBO) |
| Debtors[1]. | Jointly Administered |
| | **Ref. Docket No. 3380** |

### DECLARATION OF MICHAEL KATZENSTEIN IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR ZOHAR III, CORP. AND ITS AFFILIATED DEBTORS

I, Michael Katzenstein, declare, under 28 U.S.C. § 1746, that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer (the "CRO") of the Debtors. I was retained by Joseph J. Farnan, Jr., the Debtors' sole independent director, effective as of May 21, 2018. In addition to serving as the CRO, I am a Senior Managing Director of FTI Consulting, Inc. ("FTI"). I have over 30 years of transaction, financial, operating, and mergers and acquisitions experience, and have served as a chief restructuring officer, interim chief executive officer, chief operating officer, or on-site advisor to debtors and other parties in interest in numerous bankruptcy and restructuring engagements, and I have testified in support of confirmation of a number of chapter 11 plans. Since being appointed as the CRO, I have been principally responsible for overseeing the Debtors' initiatives during these chapter 11 cases (the "Chapter 11 Cases"), including the

---

[1] The Debtors and the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is c/o FTI Consulting, Inc., 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

29285513.7

monetization process under the Settlement Agreement, and the negotiation and formulation of the *Third Amended Chapter 11 Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and Its Affiliated Debtors,* dated as of June 15, 2022 (together with all exhibits thereto, and as may be amended, modified or supplemented, the "Plan").[2]

2. As a result of my tenure as the CRO and, among other things, my review of various documents and my conversations with my colleagues at FTI who have assisted me in connection with the Chapter 11 Cases and with the Debtors' other professionals, I am generally familiar with the Debtors' assets and liabilities, financial affairs, and books and records. I am also familiar with the Plan and the Disclosure Statement.

3. Except as otherwise indicated herein, all facts set forth in this declaration (this "Declaration") are based upon: (i) my personal knowledge; (ii) knowledge I have acquired from my communications with (a) my colleagues at FTI who are assisting me in my role as the CRO and (b) the Debtors' other professionals; (iii) my review of various relevant documents and pleadings; and (iv) my opinions developed through my overall professional experience and personal knowledge of the Debtors' business affairs and financial condition.

4. I am authorized to submit this Declaration on behalf of the Debtors in support of confirmation of the Plan. If I were called upon to testify, I would testify competently to the matters addressed herein.

**BACKGROUND**

5. I am informed and believe that the solicitation process undertaken by the Debtors and Reliable Companies, the Debtors' Court-approved Voting Agent, was in accordance with all applicable rules and regulations governing the adequacy of the Disclosure Statement and the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan.

29285513.7

solicitation of votes to accept or reject the Plan, as well as the Disclosure Statement Order. I am informed and believe that such procedures also satisfy the requirements of sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

6.  On June 15, 2022, the *Declaration of Justin K. Edelson of the Reliable Companies Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and Its Affiliated Debtors, dated April 6, 2022*(the "Voting Report") was filed. Based on the Voting Report, it is my understanding that Class 3 – Zohar III A-1 Note Claims, Class 10 – Zohar II Credit Enhancement Claims, and Class 15 – Zohar I Credit Enhancement Claims voted unanimously to accept the Plan.

## Value of the Debtors' Assets

7.  As an initial matter, the Plan is premised on the Debtors' view that the value of the assets of Zohar III, Zohar II and Zohar I, respectively, do not exceed: (i) the amount of the Zohar III A-1 Notes Claims (proposed to be Allowed under the Plan at $387,131,000) for Zohar III; (ii) the amount of the Zohar II Credit Enhancement Liability Claims (proposed to be Allowed under the Plan at $806,582,747.23) for Zohar II; and (iii) the amount of the Zohar I Credit Enhancement Liability Claims (proposed to be Allowed under the Plan at $20,347,522.55) for Zohar I. This view is informed by, among other things:

- The value to be realized from the pending sale of Universal Instruments.

- The bidding and sale process in the MD Helicopter chapter 11 case.

- A letter of intent to purchase Vulcan.

- A valuation analysis performed by Raymond James & Associates, based upon information provided to it, with respect to Stila and Intrepid. Raymond James & Associates also prepared a hypothetical, estimated aggregate range of sale value, based upon the information provided to it, for the four (4) Group B Portfolio Companies that are still operating.

- Recent and projected financial performance of the remaining Portfolio Companies, as reported to me or to my colleagues at FTI and the Debtors' other professional advisors, including the degree of distress that certain companies face.

- The lack of any material information available to the Debtors concerning the remaining non-operating Group B Portfolio Companies, where the Debtors may have continuing loan or equity interests, many of which have been dormant and shuttered for many years.

- The inherent uncertainty related to the Debtors' litigation claims, which have been asserted in material amounts, including: the anticipation that the defendants will vigorously oppose the claims; the risks inherent in all litigation; the likely substantial period of time that it will necessarily take to prosecute claims to a collectable judgment; and the substantial risk and difficulty in collecting from the defendants, as prospective judgment-debtors.

8. Since this plan was filed on January 31, 2022, no party has come forward with any alternative to the Plan or proposed to offer values for the Debtors' assets in excess of their respective senior-most claims.

**The Plan Satisfies All Requirements for Confirmation**

9. <u>Plan Negotiations and Formulation</u>. Based on my interactions in connection with the Chapter 11 Cases, I believe that the Plan is proposed following arm's-length and good faith negotiations among the Debtors and certain of their significant stakeholders—MBIA (as the Controlling Party), Bardin Hill (on behalf of the Controlling Class), MB Global (a large Zohar III A-1 Noteholder), and the Indenture Trustee. The Plan will complete the liquidation and wind-down of the Debtors' Estates in a timely and efficient manner, and is designed to achieve a beneficial resolution of the Chapter 11 Cases for creditors, in the best interest of the Debtors' Estates, and an appropriate exercise of the Debtors' business judgment.

10. <u>The Classification of Claims and Interests in the Plan Satisfies the Requirements of Section 1122 of the Bankruptcy Code</u>. It is my understanding that each Class of Claims and Interests contains only those Claims or Interests that are substantially similar to the other Claims or Interests in that Class, and that the Plan's classification scheme is not proposed to manipulate

voting. The Claims and Interests in each Class differ from the Claims and Interests in each other Class in a legal or factual nature or based upon other appropriate criteria. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests under the Plan as provided for therein.

11.     <u>The Plan Satisfies the Requirements of Section 1123(a)(5) of the Bankruptcy Code</u>. I understand that the Plan provides adequate and proper means for the implementation of the Plan. For each Debtor, the Plan will be implemented by or through the Wind-Down Administrator, the Asset Recovery Entities and Asset Recovery Managers, and the Litigation Trusts and Litigation Trustee for such Litigation Trusts. The Plan contemplates the funding of the Escrow Accounts in the amounts and for the purposes provided in Section 6.1(a) of the Plan and these amounts will be used to satisfy the amounts required to be paid under the Plan that are incurred prior to the Effective Date. The Wind-Down Administrator, Asset Recovery Manager, and Litigation Trustee for the Litigation Trusts will have the rights and responsibilities identified in Article VI of the Plan and will be responsible for winding down the Debtors' affairs, liquidating the Portfolio Company assets and prosecuting and resolving Litigation Assets as well as the claims asserted against the Debtors.

12.     The Plan also contemplates the various emergence transactions set forth in Sections 6.1, 6.6 and 6.8 of the Plan, including the sale of the Remaining Assets to the Asset Recovery Entities in exchange for the assumption of debt by them and distribution of stock in them to the Debtors' senior creditors. In addition, the Settlement Agreement will remain in effect after the Effective Date, except that MBIA, for the assets previously owned by Zohar I, and the applicable Asset Recovery Managers shall assume my obligations as the CRO and those of the Debtors' Independent Director with respect to the monetization process (the "<u>Monetization Process</u>") under

the Settlement Agreement and July 2nd Order for the debt and equity interests in the Portfolio Companies transferred to them on the Effective Date.

13. <u>The Plan Satisfies the Requirements of Section 1123(a)(7) of the Bankruptcy Code</u>. The Debtors are managed by me, as the CRO, and the Independent Director, Joseph J. Farnan, Jr. Under the Plan, the Independent Director and I will both be deemed to have resigned upon the occurrence of the Effective Date. The Plan Supplement discloses the following appointments as of the Effective Date: (a) David Dunn as the Wind-Down Administrator, Asset Recovery Manager for Zohar II Recovery LLC and Zohar III Recovery LLC, and the Litigation Trustee for both Litigation Trusts; (b) MBIA is the member-manager for New Zohar II LLC and (c) John Greene as the manager for New Zohar III LLC. The remaining Asset Recovery Entities will be managed by their sole members. Each of these appointments is subject to approval by the Bankruptcy Court in connection with Confirmation. As required by the Plan, I understand that the appointment of David Dunn as the Wind-Down Administrator is acceptable to the Controlling Party and the Controlling Class. The Plan Supplement also discloses the proposed compensation of Mr. Dunn for such roles; no other party will be compensated for these roles. Neither Messrs. Greene and Dunn nor MBIA are insiders of the Debtors. Accordingly, I believe the Plan's provisions related to the selection of a Wind-Down Administrator, the Asset Recovery Managers and Litigation Trustee are consistent with the interests of Holders of Claims and Interests and with public policy.

14. <u>The Plan Satisfies the Requirements of Section 1123(b)(2) of the Bankruptcy Code</u>. The Plan proposes that, by default, all executory contracts and unexpired leases will be rejected unless they are expressly identified to be assumed. I believe that, under the circumstances, the Debtors have exercised sound business judgment in proposing a default rejection plan as it

29285513.7

6

pertains to their executory contracts and unexpired leases (if any) given that the Debtors' affairs are being wound down.

15. <u>The Debtor Releases are Appropriate</u>.  Under Section 10.3 of the Plan, as set forth more fully therein, the Debtors propose to release the Released Parties from any and all claims or Causes of Action existing as of the Effective Date or thereafter arising from or related to any actions, transactions, events or omissions occurring on or before the Effective Date relating to the Debtors or the Chapter 11 Cases (the "<u>Debtor Release</u>").  However, the Debtor Release will not release any Exculpated Party for any act or omission constituting gross negligence, actual fraud or willful misconduct.  I believe that, under the circumstances, the Debtor Release is:  (a) a necessary and integral component of the Plan; (b) supported by sufficient consideration from the parties receiving such releases; and (c) a good faith settlement and compromise of any claims and Causes of Action released pursuant to it.

16. The Debtor Release was one of the critical components identified at the outset of the discussions around the Plan, which itself is the result of arm's-length and good faith negotiations among the Debtors, the Controlling Party, the Controlling Class and other parties in interest.  It became obvious during negotiations regarding the Plan that the Debtor Release would be a necessary condition to implementing the Plan and to obtaining key stakeholders' support for the Plan.  The Controlling Class and Controlling Party are not only the largest Noteholders, they also have the ability to direct the Indenture Trustee, which has liens and superpriority claims, as applicable, on substantially all of the Debtors' assets.  The other Noteholders' support, however, is necessary to ensure the success and confirmability of the Plan.  This is particularly so where sufficient opposition to the Plan from Zohar III A-1 Noteholders outside of the Controlling Class could block Confirmation.

17. The Released Parties[3] have been critical participants in various aspects of the Chapter 11 Cases, including the Monetization Process and the formulation and negotiation of the Plan, and share a common goal with the Debtors in seeing the Plan succeed and ensuring that the Chapter 11 Cases are wound down in a timely and efficient manner. Moreover, the Debtors do not have unencumbered cash with which to make payments to administrative and priority creditors. Holders of Zohar III A-1 Notes that vote to accept the Plan (and do so in sufficient amounts to meet the Confirmation requirements) are allowing for recoveries to flow to other creditors that would not otherwise be available outside of a Plan. The same is the case for MBIA, who holds the sole voting claim at Zohar II.

18. Based on my participation in the Chapter 11 Cases and my discussions with the Debtors' bankruptcy counsel, I am not aware of any viable claims and Causes of Action that the Debtors might assert against the Released Parties. Indeed, it is my understanding that claims for inequitable conduct concerning the Debtors have been levied against the Controlling Class, the Controlling Party, and the Indenture Trustee in litigation before this Court and in Southern District of New York, and both courts found that such claims should be dismissed under Rule 12.

19. Additionally, the Debtors have indemnification obligations to the Released Parties, such as their own officers, directors and professionals, Ankura, the Indenture Trustee, the Controlling Party, and the Controlling Class, under the Debtors' organizational documents and certain other agreements, including various engagement agreements, the Zohar Indentures and

---

[3] The Released Parties are, collectively, in each case, solely in their respective capacities, (a) the Exculpated Parties, (b) Ankura, (c) the Indenture Trustee, (d) each DIP Lender, (e) the Controlling Party, (f) the members of the Controlling Class, (g) all Holders of Claims that vote to accept the Plan, and with respect to each of the Entities described in subsections (c) through (g), such Entity's Related Parties; *provided*, *however*, that notwithstanding any provision of the Plan to the contrary, (i) Lynn Tilton, the Patriarch Stakeholders, the respective Affiliates of any of them and their Related Parties (other than the Exculpated Parties and Ankura, if they are related Parties or Affiliates of the foregoing) shall not be Released Parties.

29285513.7

related Transaction Documents, the New Agent Order, and the Zohar II and Zohar III Ankura CM Agreements (as applicable, and each as defined in the Disclosure Statement). Accordingly, in my business judgment, I believe the value of pursuing claims against the Released Parties, if any, that will be released pursuant to the Debtor Release would be significantly outweighed by the attendant costs.

20. Based on my participation in the Chapter 11 Cases, and my consideration of information provided to me, I believe that the Debtor Release is an essential component of the Plan, and constitutes a sound exercise of the Debtors' business judgment. I believe that the Debtor Release is a significant part of the overall consideration being offered to creditors under the Plan and was important to obtaining the necessary support for the Plan from the Controlling Party, the Controlling Class, and the other Zohar III A-1 Noteholders that voted in favor of the Plan.

21. <u>Substantive Consolidation is Appropriate</u>. As set forth more fully therein, Section 6.4 of the Plan provides for the substantive consolidation, as of the Effective Date, of (i) Zohar I Corp. with Zohar I Limited, (ii) Zohar II Corp. with Zohar II Limited, and (iii) Zohar III. Corp. with Zohar III Limited for all purposes, including voting, confirmation, and Distribution. This consolidation was not done to prejudice any creditor. I believe that, under the circumstances of the Chapter 11 Cases, this is appropriate and in the best interest of the Estates, and that in its absence, the process of implementing the Plan and resolving these cases could be more time consuming and costly.

22. <u>Resolution of Intercompany Claims</u>. Under the cash collateral and DIP financing orders in the Chapter 11 Cases, the Debtors were required to allocate the overall costs of the Chapter 11 Cases between the Zohar II and Zohar III estates (with Zohar II retaining a claim against Zohar I for Zohar I's share of these costs). The sharing ratio was initially established at

55%-45%. The Debtors recently considered whether it was appropriate to revisit this allocation based on the activities to date in the Chapter 11 Cases. The Debtors considered various means by which case expenses could be allocated based on the total value of claims and assets as well as the level of activities borne and the benefit inured by the Estate. The Debtors concluded that the 55%-45% ratio was a fair proxy for allocating the majority of Estate related costs of the Chapter 11 Cases but for a re-allocation where the Zohar III estate should pay $342,308 to the Zohar II estate.

23. <u>Allocation of Trust Beneficial Interests</u>. I understand that the Controlling Party and Controlling Class engaged in extensive discussions regarding the funding for prosecution of the primary Litigation Assets—including the claims in the Zohar-Patriarch Adversary Proceeding and other similar actions against the Patriarch parties—and the allocation of prospective recoveries from those Litigation Assets. I understand that these discussions have resulted in the allocation of these assets into two separate Litigation Trusts, as well as an allocation of the initial funding of the Litigation Trusts and the allocation of the beneficial interests in the Litigation Trusts all as set forth in the Litigation Trust Agreements. I believe that those discussions were extensive, undertaken in good-faith and reflective of an informed view of the risks, benefits and potential outcomes from the various Litigation Assets that will be pursued by the applicable Litigation Trusts.

24. <u>The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3))</u>. The Plan was the product of good faith and arm's-length negotiations between the Debtors and various stakeholders, including the Controlling Party, the Controlling Class, and the Indenture Trustee. The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of favorably resolving the Chapter 11 Cases and enabling the prompt and efficient wind-down of the Estates. I also believe that the unanimous acceptance of the Plan

by every creditor that actually voted on the Plan reflects the Plan's fairness and the Debtors' good faith efforts to achieve the objectives of chapter 11.

25.  <u>The Plan Is in the Best Interests of Creditors (Section 1129(a)(7))</u>.  As set forth more fully in Article XII.B.1 of the Disclosure Statement, after considering the effects that a chapter 7 liquidation would have on the Debtors' remaining assets and the funds available for distribution to Holders of Allowed Claims; and given (a) that the Debtors' assets, including any claims and causes of action under chapter 5 of the Bankruptcy Code and any commercial tort claims of Zohar II and III, are subject to the liens and superpriority claims, as applicable, of the DIP Lenders and the Indenture Trustee, and (b) the multitude of unknowns associated with conversion of the Chapter 11 Cases to chapter 7, the Debtors believe that confirmation of the Plan will not provide the Holders of Allowed Claims in Impaired Classes (including the Deemed Rejecting Classes) less than such Holders would receive if the Chapter 11 Cases were converted to chapter 7.  As a result, I believe that the Plan is a superior alternative to converting the Chapter 11 Cases to chapter 7 of the Bankruptcy Code (and any other theoretical alternative to the Plan), and will provide Holders of Allowed Claims with a greater recovery than such Holders would receive upon conversion of the Chapter 11 Cases to chapter 7.

26.  In light of the foregoing, it is my belief that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

27.  <u>The Plan Is Feasible (Section 1129(a)(11))</u>.  The Plan is a plan of liquidation, and appoints the Wind-Down Administrator to resolve and wind down the Debtors' affairs.  The Plan will also provide for the appointment of  Mr. Dunn as Asset Recovery Manager for Zohar II Recovery LLC and Zohar III Recovery LLC and Litigation Trustee, and he will have the primary responsibilities set forth in the Plan.  Based on discussions with my colleagues at FTI who are

assisting me in my role as CRO, I believe that the funding of the Escrow Accounts will be sufficient to allow the applicable party under the Plan to make the various payments required to be made thereunder.  I have reviewed estimates for the projected cash needs of the Wind-Down Administrator, as well as estimates for the costs to administer the Asset Recovery Manager and Litigation Trusts.  I believe that these estimates are reasonable based on my discussions with the Debtors' advisors and supporting personnel.  I understand that the amounts estimated to be incurred by the Wind-Down Administrator will be fully funded on the Effective Date; that as Asset Recovery Manager, Mr. Dunn is anticipated to have cash on-hand or commitments for funding to cover these estimated expenses for at least the first six months (and I anticipate that one or more sales will close in that period that could provide additional funding); and that the Debtors' senior creditors intend for the Litigation Trust to have cash on-hand and commitments for additional funding to cover the expenses they anticipate the Litigation Trust to incur.  The source of the funding on the Effective Date will be cash on hand at the Debtors or in accounts maintained by the Indenture Trustee and commitments to be made in connection with the Plan by the Debtors' largest creditors, which are the subject of ongoing discussions and it has been represented to my advisors that the Debtors will receive written commitments for this funding.  My advisors have been kept apprised of discussions concerning this funding, and I also understand from my advisors that Mr. Dunn and his advisors have participated in discussions with the senior creditors concerning the funding needs for the post-emergence entities and commitments by the senior creditors to ensure that there will be sufficient funding to discharge his duties.  Accordingly, I believe that section 1129(a)(11) of the Bankruptcy Code has been satisfied.

28. <u>The Debtor Does Not Have Retiree Benefits Obligations (Section 1129(a)(13))</u>. The Debtor has no obligation to provide for any "retiree benefits," as such term is defined under section 1114 of the Bankruptcy Code.

29. <u>Sections 1129(a)(14)-(a)(16) of the Bankruptcy Code Are Inapplicable</u>. The Debtors (a) are not required to pay any domestic support obligations; (b) are not individuals; and (c) are not nonprofit corporations or trusts.

30. <u>The Plan Is Not an Attempt to Avoid Tax Obligations (Section 1129(d))</u>. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of the Securities Act, and no party in interest has filed an objection alleging otherwise.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 16, 2022

> */s/ Michael Katzenstein*
> Michael Katzenstein
> Chief Restructuring Officer

29285513.7