**UNSEALED**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. 2876** |

## DEBTORS' PRELIMINARY OBJECTION TO PATRIARCH STAKEHOLDERS' REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or the "Zohar Funds") hereby submit this preliminary objection (the "Preliminary Objection") to Patriarch's[2] *Request for Payment of Patriarch Claim* (the "Patriarch Claim") [Docket No. 2876] filed on October 25, 2021. In support of this Preliminary Objection, the Debtors respectfully state as follows:

## SUMMARY OF PRELIMINARY OBJECTION

1.    The Patriarch Claim is Lynn Tilton's latest attempt to blame the failure of the Zohar investment thesis on the Debtors' disinterested fiduciaries. This time, Patriarch seeks to recover from the Debtors the hypothetical decrease in the value of Ms. Tilton's personal investments, from the value she allegedly ascribed to those holdings in 2019 to what she believes she will actually

---

[1]   The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is c/o FTI Consulting, Inc., 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Patriarch Claim. The Debtors use the term "Patriarch" to refer to the "Patriarch Stakeholders" (as defined in the Patriarch Claim) herein. Capitalized terms used in the Preliminary Statement shall have the meanings ascribed to them below or in the Patriarch Claim.

Docket No. 3041
1/31/22

realize from those holdings today. Patriarch's theory is based on the fact that a consensual resolution of all the parties' disputes (Patriarch's so-called "global settlement" transaction) was not reached after an extremely complex, multi-party mediation overseen by former Judge Gross, as the Court-approved Mediator. That the parties were unable to reach a commercial deal in a complex chapter 11 case is unremarkable. The suggestion that these facts point to bad faith or misconduct is as offensive as it is incredible.

2.      As the Debtors have explained in the motion to strike [Docket No. 3040] ("Motion to Strike") filed contemporaneously herewith, Patriarch's claim is non-cognizable, as it relies on the parties' mediation proposals and responses to those proposals—textbook mediation materials that are barred from admission into evidence (and from discovery) under Local Rule 9019-5(d). Because the evidence Patriarch seeks to rely on is inadmissible, it cannot state a claim.

3.      However, should any of these materials be admitted into evidence (and they should not be),[3] the actual facts would show that the Debtors, their fiduciaries,—retired District Court Judge Joseph J. Farnan, Jr. (selected by the Court-approved Mediator, then-sitting Judge Kevin Gross) and Chief Restructuring Officer ("CRO") Michael Katzenstein (a restructuring professional with a sterling reputation and more than 20 years' experience serving as an officer in chapter 11 proceedings)—and their advisors acted in the utmost good faith, with due care, and in fair consideration of all parties' positions in these chapter 11 cases in connection with the "global settlement" transaction.

---

[3]   In light of the protections under Local Rule 9019-5(d), the Debtors have not addressed the substance of Ms. Tilton's allegations regarding the discussions that took place in mediation, but reserve the right to address them should the Court rule that Local Rule 9019-5(d) does not protect from disclosure, in whole or in part, proposals and responses to proposals by the parties to that the mediation.

4.      The Patriarch Claim fails as a matter of law.  It is not only without merit, but it serves as a roadblock to bringing the administration of these cases to a close because its mere existence may impede confirmation of a chapter 11 plan.  It should be disallowed in its entirety.

5.      ***The Settlement Agreement Claims***.  Patriarch's allegations concerning a "global settlement" transaction, even if admissible, are insufficient to demonstrate that the Debtors violated the Settlement Agreement and that Patriarch is entitled to recover any alleged damages resulting from the Debtors' conduct.  The Debtors never strayed from what the Settlement Agreement required:  pursuit of investment-bank led sales of Portfolio Companies to deliver the Paid in Full (as defined in the Settlement Agreement) amounts to their senior noteholders, as required by Paragraph 12 of the Settlement Agreement (and Paragraph 10 incorporated therein). Patriarch has not alleged that the Debtors failed to adhere to those obligations, nor can it.  Rather, Patriarch claims the Debtors breached the Settlement Agreement by failing to agree to a "global settlement" of myriad disputes among the parties to these cases.  But that is not an obligation of any party under the Settlement Agreement.  To the contrary, the Settlement Agreement contemplated that the parties would not settle all of the disputes between them.  Indeed, the Settlement Agreement provided that the claims of the senior noteholders would only be extinguished upon the Full Payment Date (as defined in the Settlement Agreement), *see* Settlement Agreement, ¶ 13, and that the parties could resume litigation at the expiration of the 15 Month Window (as defined in the Settlement Agreement) and that all of the parties' claims would be preserved until then.  *Id.*, ¶¶ 15, 19, 25.

6.      Thus, Patriarch's theories of liability rooted in breach (express or implied) of the Settlement Agreement fail.

7.      ***The Tortious Interference Claim***.   The tortious interference claim fails because Patriarch has not alleged any affirmative action that the Debtors took to cause the Portfolio Companies to refrain from performing any contractual obligation they had to Patriarch.  Nor could Patriarch state such a claim.  During the 15 Month Window, Ms. Tilton exercised sole control over all the Portfolio Companies under the express terms of the Settlement Agreement.  *See id.*, ¶ 14. The Debtors were powerless to induce a breach between Ms. Tilton and the companies she controlled.  Moreover, had the Debtors caused the Portfolio Companies to fail to honor their contractual obligations to Patriarch, Patriarch could have (and should have) brought to this Court's attention the Debtors' violation of the covenant (that Ms. Tilton vigilantly guarded) that "in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies."  *See id.*, ¶ 10.  That Patriarch failed to do so demonstrates the baselessness of this claim.

8.      Thus, Patriarch' theories of liability premised on tortious interference fail.

9.      ***Prima Facie Tort and Fraud/Promissory Estoppel***.  Patriarch incredibly claims that the Debtors were maliciously intending to harm Ms. Tilton and always planned to reject any offer she made, despite the fact that the Debtors engaged in months-long discussions that cost the estates considerable resources, in both time and money.  To sustain its claims, Patriarch would need to establish that the Debtors acted in bad faith and were motivated by "pure malice." However, the Patriarch Claim is not supported by any particularized allegations regarding the Debtors' and their fiduciaries' intentions, as required to state such a claim.   Instead, Patriarch is limited to conclusory allegations that simply repeat the applicable legal standard.  That is because no facts exist to support Patriarch's absurd allegations.

10.      ***Indemnification and Contribution***.  Patriarch also seeks to hold the Debtors liable for damages for Ms. Tilton's and Patriarch's own misconduct towards MBIA,[4] Dura and its creditors,[5] and elsewhere.  But there has been no affirmative undertaking by the Debtors to provide Ms. Tilton and/or Patriarch any indemnity.  And Patriarch cannot establish that the Debtors are primarily liable for, or co-liable with, Ms. Tilton for damages arising from Ms. Tilton's and Patriarch's own misconduct, the necessary predicate for asserting a common law right to indemnity or contribution.  Patriarch's efforts to make the Debtors its scapegoat fail on the law and the facts.

11.      ***PPAS's Attorney Fees.***  PPAS's reimbursement claim should, at most, be limited to the approximately $55,000 of costs claimed, based on this Court's ruling that the Settlement Agreement limits PPAS to reimbursement for "costs" and that PPAS did not separately negotiate for the reimbursement of "fees."  *See* Mar. 17, 2021 Hr'g Tr. 5:19-24.

12.      But regardless of whether PPAS is entitled to reimbursement of its outside counsel's costs only or both its fees and costs, the Debtors object to shifting those fees to the estate to the extent that the Court finds that the amounts sought were not "reasonable transition costs." The fees and costs asserted by PPAS as "transition costs" span October 2019 (seven months after Ankura's appointment) through September 2021 (two and a half years after Ankura's appointment).  An assessment of what "transitions costs" were being incurred during this extensive period of time after Ankura's appointment is clearly warranted.  And the Debtors anticipate that assessment will show that the work Patriarch's counsel did was defending PPAS's misconduct,

---

[4]   *See, e.g., MBIA Ins. Corp. v. Tilton et al.*, Adv. Pro. No. 20-50776 (KBO), Docket No. 73 (Amended Complaint against Ms. Tilton and her affiliates).

[5]   *See, e.g., In re Dura Automotive Systems, LLC, et al.*, No. 19-12378 (KBO), Docket No. 853 (Notice of Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Debtor's Estate).

not aiding in transition to Ankura:  to wit, there are various "spikes" in the fees sought that coincide with events in the chapter 11 cases that either would not constitute "transition" services or relate to issues where "transition" services where PPAS was called to account for its failures, in the most favorable instances, and to its misdeeds, and only after the Debtors had no choice but to resort to motion practice and formal discovery.  As just one example, PPAS's outside counsel spent 488 hours of time totaling nearly $475,000 in fees and costs during June, July, and August 2021 (well more than two years after Ankura was appointed).  This time period corresponds directly to the motion practice, status conference, discovery, and production related to the pending Galey & Lord dispute.[6]

13.     An examination of the invoices on Exhibit A to the Patriarch Claim, and the context in which the services were rendered, is necessary to determine the extent, if any, of the Debtors' liability under Paragraph 6 of the Settlement Agreement for the amounts invoiced by PPAS's outside counsel.

14.     **_Taxes_**.  Patriarch has not identified what taxes it paid that should have been paid, or were owed, by the Debtors.  But this claim fails on its face, whatever the amount claimed.  The Court has already found that the Debtors are only subject to taxation due to Ms. Tilton's violation of the Debtors' governing documents, and that Patriarch is responsible to indemnify and hold harmless the Debtors for any taxes owed as a result of the Debtors' status as a taxable entity.[7]  If Patriarch has paid any taxes owed or due by the Debtors, that is because it obligated itself to be responsible for such amounts.  Allowance of a claim against the Debtors for any tax amounts

---

[6]  On January 26, 2022, the Debtors filed a supplemental motion [Docket No. 3022] asking the Court to sanction PPAS and others relative to their actions at Galey & Lord.

[7] _See Zohar CDO 2003-1, Ltd. et al. v. Patriarch Partners, LLC et al._, Adv. Pro. No. 20-50534, Docket No. 121 (Memorandum Opinion) (the "MTD Opinion"), p. 37.

would vitiate Patriarch's promise to "hold the Debtors harmless" for tax obligations arising once the Debtors became regarded for tax purposes.

15.     Thus, Patriarch's theories of liability related to any tax payments should be rejected as a matter of law.

16.     ***"Other Settlement Agreement Claims"***.  The Patriarch Claim is devoid of any detail or explanation of what exactly are the "other rights and obligations of the Debtors under the Settlement Agreement" that remain unperformed or give rise to a payment obligation in favor of Patriarch.  The Debtors are not aware of, and do not believe that there are, any amounts owed by the Debtors under the Settlement Agreement.  Patriarch was required to come forward with what its claims are and what is the amount that has accrued in the period subject to the Bar Date Order (*i.e.*, prior to and including August 27, 2021).  And Patriarch should be barred from further asserting any claims for that period.

17.     ***Lack of a Benefit to the Estate for Any of Tilton's Purported Damages***.  Patriarch alleges that its personal, pecuniary interests were harmed by the Debtors' conduct.  Even if it were true that these personal, pecuniary interests were harmed (which the Court need not and should not decide at this stage) and that the Debtors should be held liable for that harm (which Patriarch cannot establish), Patriarch has failed to establish that any harm caused to the value of these investments was the result of a post-petition transaction that conferred an actual and necessary benefit on the Debtors and their estates.  Accordingly, the Court should deny Patriarch's request to award administrative expense status to any damages claim that it has against the Debtors.

18.     ***An Assessment of Damages Is Unnecessary Until the Court Establishes That the Debtors Have Actual and Administrative Expense Liability***.  Since the Debtors are not liable to Patriarch for damages, on an administrative expense basis or otherwise, there is no reason for the

Court to conduct a complex and costly damages trial at this stage. The Debtors believe that separating the liability questions from the damages questions will substantially streamline and expedite resolution of this matter and these cases. A "liability phase" trial can be prepared and put on substantially faster than if the liability and damages components of the "global settlement" transaction counts were tried concurrently. With the liability question resolved in the Debtors' favor, the Debtors believe that a potentially large hurdle to confirmation will be cleared.

19.      To be clear, the Debtors do not concede that Patriarch has any damages arising out of the never-reached "global settlement" and, therefore, the Debtors object to the damages asserted in the Patriarch Claim.

## **BACKGROUND**

I.    **The Debtors, Their Senior Noteholders, And Tilton Agree To Put Aside Their Disputes For A Period Of Time To Focus On Selling The Portfolio Companies.**

20.      On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

21.      According to Ms. Tilton, she commenced the Debtors' chapter 11 cases "to maximize value for all of the Zohar Funds' stakeholders and to protect the Portfolio Company constituents and monetize their considerable value." Docket No. 5 (the "First Day Declaration"), ¶ 101.

22.      In her First Day Declaration, Ms. Tilton affirmed that "[t]here is significant value in the Portfolio Companies in excess of the liabilities of the Debtors." *Id.*, ¶ 91. And "Patriarch has performed financial analyses to value the Portfolio Companies that demonstrates that even a select group of top-performing Portfolio Companies is worth billions of dollars." *Id.*, ¶ 92. Indeed, a subset of 11 of the Portfolio Companies, had "a combined value, for the benefit of Zohar I and

II only, ranging between $952 million and $1.484 billion, which is far in excess of the amount MBIA claims as the controlling creditor." *Id.*, ¶ 93.

23.    Ms. Tilton contended that she commenced the chapter 11 cases "to permit the bankruptcy court to oversee an orderly process of unlocking the value in the Zohar Funds through sales and refinancings of the Portfolio Companies" and that "[o]nly through this process will Noteholders be made whole." *Id.*, ¶ 7.  She then detailed a process to "interview and [engage] investment bankers at the Portfolio Companies to pursue both refinancing and sale of company alternatives," that she alleged was well underway. *Id.*, ¶¶ 144-45.  She further alleged that she had interviewed 30 investment banking firms as of the Petition Date, retained firms for two of the Portfolio Companies, and intended to engage firms to represent 12 other Portfolio Companies in the first two months of these chapter 11 cases. *Id.*, ¶ 145.

24.    Commencement of the chapter 11 cases did not initially have the calming effect that Ms. Tilton anticipated when she signed the Zohar Funds' petitions.  MBIA and the Zohar III Controlling Class filed a motion to dismiss the chapter 11 cases or, alternatively, to appoint a chapter 11 trustee for the Zohar Funds.  *See, generally,* Docket No. 56 (Motion of MBIA Insurance Corporation and Zohar III Controlling Class to Dismiss the Chapter 11 Cases or, If Not Dismissed, to Appoint a Trustee).

25.    On the eve of trial, however, the Zohar Funds, Ms. Tilton and her affiliates, MBIA, and the Zohar III Controlling Class engaged in a mediation of various contested matters in the chapter 11 cases, including the motion to dismiss, and ultimately entered into a settlement agreement (the "Settlement Agreement"), which the Bankruptcy Court subsequently approved. *See* Docket No. 266 (Order Approving and Authorizing the Settlement Agreement by and Between

the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class), Exh. 1.

## II.    The Settlement Agreement Sets Forth The Parties' Rights And Obligations.

26.    First and foremost, the Settlement Agreement implemented new governance for the Debtors.   An Independent Director—former District Court Judge Joseph J. Farnan, Jr.—was appointed by the Mediator (former Judge Gross).  *See* Settlement Agreement, ¶ 1; *see also* Docket No. 267 (the "Farnan Appointment Order").   "The Independent Director [is] fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law."  Farnan Appointment Order, ¶ 7.  Pursuant to the Settlement Agreement, the Independent Director also selected a new CRO for the Debtors—Michael Katzenstein—"to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the 'Monetization Process')."   Settlement Agreement, ¶ 8; *see also* Docket Nos. 279 & 297 (FTI Retention Application and Order).[8]

27.    Second, Paragraph 12 of the Settlement Agreement obligated "Tilton and the CRO [to] work jointly as outlined [in the Settlement Agreement] to monetize the Group A Portfolio Companies."  Settlement Agreement, ¶ 12.  And the Settlement Agreement set a duration for that monetization process: "until such time as the [*sic*] (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date."  *Id.*[9]  Establishment of a monetization process, and setting a duration for it until the Full Payment Date, were consistent with Tilton's representations at the

---

[8]  In addition, the Settlement Agreement required the Independent Director to appoint a replacement – Ankura Trust Company, LLC ("Ankura") – for Patriarch PPAS, as loan administrative agent for the Zohar Funds.  *See* Settlement Agreement, ¶ 6.

[9]  The parties to the Settlement Agreement have never agreed to terminate it.  Nor has the Court entered any order terminating or otherwise staying the monetization process.

outset of these cases that the noteholders could be paid in full through the sale of some or all of the Portfolio Companies.  *See* First Day Declaration, ¶¶ 7, 91-93.

28.    Paragraph 10 of the Settlement Agreement set forth the basic structure for conducting the monetization process:

- "Tilton and [the Debtors'] CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete."  Settlement Agreement, ¶ 10.

- "Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales."  *Id.*

- "Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers."  *Id.*

These monetization process parameters were consistent with Tilton's representations at the outset of these cases as to how she proposed to unlock the value of the Portfolio Companies through investment bank-led sales of the Portfolio Companies.  *See* First Day Declaration, ¶¶ 144-45.

29.    Paragraph 10 of the Settlement Agreement also sets forth the respective standards of conduct for the Debtors and Ms. Tilton:  the Debtors, through the CRO, were required to act "in the best interests of the Zohar Funds."  Ms. Tilton, on the other hand, was required to act "in the best interests of the Group A Portfolio Companies."  Settlement Agreement, ¶10.  These express standards of conduct, and Ms. Tilton in particular, are without regard to Ms. Tilton's personal holdings, personally or through the Patriarch Stakeholders.  *Id.*; *see also id.*, ¶ 3 ("The Group A Portfolio Companies will be sold without regard to Tilton's personal tax liability.").

30.    In the event that sales of the Group A Portfolio Companies during the initial 15-month window did not pay off the Debtors' senior noteholders in full, the Settlement Agreement obligated the Debtors and Patriarch to begin discussions for a further process to monetize the "Group B" Portfolio Companies.  *See id.*

31.     The Settlement Agreement was explicit that the Debtors' senior noteholders would have no further claims against or interests in the Debtors or the Portfolio Companies as of the date that they received payment in full:  "At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies . . . ."  *Id.*, ¶ 13.

32.     Third, the Settlement Agreement also provided for a stay of litigation during the first 15 months of the Settlement Agreement and monetization process, to allow the Debtors, Tilton and her affiliates, and the senior noteholders to focus on the monetization process rather than their causes of action against one another.  *Id.*, ¶ 15.  And, importantly, during that stay, "all parties' respective rights shall be reserved with respect [to the stayed litigation claims and rights.]," *id.*, and thereafter, "[u]pon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law."  *Id.*, ¶ 25.

33.     Finally, the Settlement Agreement provided that the Mediator would attempt to help the parties resolve their disputes before bringing any matters before the Bankruptcy Court:

- "Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator." *Id.*, ¶ 11;

- "If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis." *Id.*, ¶ 23; and

- "Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties involved in the dispute, and heard at the Mediator's earliest availability." *Id.*, ¶ 24.

## III.    The Sale Process Falters, So Tilton Proposes To Acquire All The Portfolio Companies And Pay The Senior Noteholders In Full.

34.     By late 2018, the monetization process had resulted in no sales, Ms. Tilton rejected multiple several hundred million dollar initial bids for Dura Automotive and then suspended Dura's marketing and sale process.  Around this time, Ms. Tilton disclosed to the Debtors that she

had identified a source of capital – Jefferies (who was also Dura and GAS's investment bank) – that was willing to finance her acquisition of all of the Portfolio Companies. The initial indications from Ms. Tilton were that she would make a single, "omnibus" transaction available that would pay in full the Zohar Funds' noteholders. The Debtors were supportive of such a transaction because it would deliver the Paid in Full amount—a principal stated goal of the Settlement Agreement—and lead to a prompt resolution to the chapter 11 cases.

35.    The Debtors arranged a meeting with Jefferies in November 2018 to gauge Jefferies' commitment to financing such a transaction. Ms. Tilton unexpectedly showed up at that meeting. The Debtors left that meeting with the belief that Jefferies had a sincere interest in pursuing the financing of a potential acquisition transaction, but that the discussions between Jefferies and Ms. Tilton were in their infancy and significant work remained on Jefferies' diligence on such a proposal, the terms of the acquisition transaction, and its underlying financing.

## IV.    The Debtors, Their Senior Noteholders, And Tilton Enter Mediation.

36.    Much of what follows the Debtors' initial discussions with Ms. Tilton unfolded over the course of mediation and settlement discussions overseen by the Mediator concerning what has been repeatedly and variously described as a potential "global settlement" or "global restructuring" transaction regarding all of the parties' disputes.[10]

---

[10] The Debtors have moved to strike allegations in the Patriarch Claim, and future efforts to obtain discovery concerning: (a) the fact that a proposal was made by any party to the Settlement Agreement during the 2019 mediation commenced upon receipt of Ms. Tilton's global settlement proposal (the "Mediation"); (b) the terms of any proposals; (c) any party's formulation of a proposal to be made in the Mediation; (d) any party's assessment of a proposal received in the Mediation; and (e) communications among the parties to the Mediation concerning any potential or actual proposal made in the Mediation (the "Precluded Matters"), on the grounds that such matters are not protected under Local Rule 9019-5(d). *See* Docket No. 3040 (Motion to Strike).

37.     The Debtors' Independent Director, CRO, CMO, counsel and other advisors dedicated considerable time and effort participating in mediation and settlement discussions with Ms. Tilton and their senior noteholders through August 2019.

38.     After months of mediation, the Mediator filed a status report on the docket on August 13, 2019, stating that "settlement is possible." *See* Docket No. 847 (Mediator's Aug. 13, 2019 Report), p. 2.  The Mediator's status report recapped the latest developments:

> The Mediator conducted a further mediation session on July 31, 2019, which all parties and their lawyers attended.  The mediation took place over approximately nine hours.  At the conclusion of the mediation, the Patriarch Stakeholders made several proposals for Debtors' and creditors' consideration.
>
> Thereafter, the Debtors requested documents from the Patriarch Stakeholders which they need to assess the settlement proposals.  It appears that the Patriarch Stakeholders took exception to the number of documents Debtors requested.

*Id.*  Judge Gross recommended that the parties "return to mediation promptly, perhaps one last time," on August 21, 2019.  *Id.*

39.     On August 22, 2019, the Mediator filed a further status report stating that he "held a further mediation session on August 21, 2019, at which all parties appeared" but that ultimately "[s]ettlement was not reached." Docket No. 863 (Mediator's Aug. 22, 2019 Report).  The Mediator thus "deem[ed] the mediation over which he presided to be closed." *Id.*  Judge Gross then resigned from his position as Mediator.  *Id.*

**V.     Tilton Blames Others For The Unsuccessful Negotiations.**

40.     Approximately one month later, on October 1, 2019, Tilton filed a complaint blaming MBIA and the Zohar III Controlling Class for "attempt[ing] to destroy all potential value for" Tilton and Patriarch in connection with her proposed global settlement.  *See Complaint of Lynn Tilton and the Patriarch & Octaluna Entities for Equitable Subordination*, [Adv. 19-50390; Docket Nos. 2 (sealed) & 7 (redacted)] (the "Subordination Complaint"), ¶ 219.  According to

Tilton, "through their actions in these Chapter 11 Cases, MBIA and the Zohar III Controlling Class have not acted in good faith and seek to obtain far more than they are owed as creditors." *Id.*, ¶ 238.   Over two years after filing her initial complaint, Tilton expanded on her allegations concerning the conduct of MBIA and the Zohar III Controlling Class, when she amended her Complaint to add various allegations concerning the mediation that took place in 2019 (prior to the filing of the initial Subordination Complaint).   *See Amended Complaint of Lynn Tilton and the Patriarch & Octaluna Entities for Equitable Subordination*, [Adv. 19-50390; Docket No. 160] (the "Amended Subordination Complaint"), ¶¶ 10-12, 210-232.

41.    More than two years after filing the Subordination Complaint, on October 25, 2021, Tilton filed the Patriarch Claim, for the first time accusing the Debtors of seeking to destroy value by deliberately torpedoing her "global settlement" transaction in bad faith.   Accordingly, the Patriarch Claim seeks damages under various theories of recovery, including breach of contract, tortious interference with contract, prima facie tort, misrepresentation, and indemnification—all based on the theory that the Debtors acted in bad faith with respect to Patriarch's "global settlement" transaction.

## OBJECTION

42.    There is no merit to the Patriarch Claim.   Most of Patriarch's theories of liability are rooted in accusations concerning the Debtors' conduct related to the Precluded Matters and, in any event, cannot state a claim as a matter of law.[11]

---

[11] The reality is that the Debtors, their fiduciaries and advisors acted in good faith at all times. Should the Court determine it is necessary to look behind the mediation curtain, notwithstanding the strictures of Local Rule 9019-5(d), the Debtors are fully prepared to demonstrate the absurdity of Patriarch's claims even with the Precluded Matters considered.

43.    First, any "global settlement" transaction was completely outside the scope of the Settlement Agreement and, therefore, actions taken with respect to any "global settlement" transaction cannot form the basis of a breach of the Settlement Agreement (or the implied covenant of good faith and fair dealing).  Second, the failure to enter into a "global settlement" transaction was not an "act" that gives rise to any sort of intentional tort.  Third, Patriarch cannot state a claim for indemnification or contribution on the theory that any damages assessed against Patriarch could have been avoided had the parties agreed to a "global settlement" transaction.  And finally, even if Patriarch could state a claim for the actions it identifies, the claim would not be entitled to administrative expense priority because Patriarch does not, and cannot, show that it conferred any benefit on the estate.

44.    The balance of the Patriarch Claim – reimbursement of PPAS's purported transition costs, payment of other specified amounts under the Settlement Agreement or for taxes are unjustified (in the case of PPAS), undefined and unsubstantiated (in the case of the "other" Settlement Agreement amounts), or both (in the case of the taxes).  The Patriarch Claim should be denied as to these amounts as well.

## I.    Patriarch Fails To Plead Bad Faith.

45.    Patriarch does not identify any specific instances of bad faith conduct, nor any badges or circumstantial evidence of bad faith, either on an admissible or inadmissible basis.  This alone is not sufficient to state a claim for bad faith.[12]  Worse yet, the Patriarch Claim contradicts

---

[12] *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (instructing that courts "are not bound to accept as true a legal conclusion couched as a factual allegation"); *cf. DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*, 75 A.3d 101, 108 (Del. 2013) ("The ultimate determination that a party acted in good faith is a legal issue.").

itself—it adopts a narrative that the Debtors failed to engage in good faith during the Mediation while, at the same time, acknowledging that a significant effort at mediation was undertaken by all the parties.   And the Debtors took a serious and diligent approach to the mediation and consideration of the issues raised therein, as observed by the Mediator.   *See* Docket No. 847 (Mediator's Aug. 13, 2019 Report) (noting, "At the conclusion of the mediation, the Patriarch Stakeholders made several proposals for Debtors' and creditors' consideration.   Thereafter, the Debtors requested documents from the Patriarch Stakeholders which they need to assess the settlement proposals.   It appears that the Patriarch Stakeholders took exception to the number of documents Debtors requested.").[13]

46.     Accordingly, there is no merit to Patriarch's claims for breach of contract, breach of the implied covenant, tortious interference, prima facie tort, fraud/promissory estoppel, or indemnification/contribution, which are all premised on Patriarch's conclusory allegations of bad faith.   *See* Patriarch Claim, ¶¶ 13–14.

## II.     Patriarch's Settlement Agreement Claims Fail As A Matter Of Law.

### A.  The Debtors Did Not Breach An Obligation In The Settlement Agreement.

47.     The Debtors fully performed their obligations under the Settlement Agreement. The Settlement Agreement contemplates investment-banker led sales of each Group A Portfolio Company that do not stop until the Debtors' senior Noteholders are "Paid in Full," *see* Settlement

---

[13] Patriarch's accusations of bad faith also impugn the Mediator.   He presided over the Mediation, observing late into the process that "settlement remained possible" and urging the parties to keep at their efforts.   To accept Patriarch's accusations of bad faith would require the Court to conclude either that the Debtors thoroughly hoodwinked him or that Judge Gross was willing to permit bad-faith conduct by the Debtors to string Ms. Tilton along.   Neither conclusion is remotely justified by the Patriarch Claim.

Agreement, ¶ 12, and it is explicit about what the Debtors are actually obligated to do to sell each Group A Portfolio Company:

- "Tilton and [the Debtors'] CRO shall jointly

    o select bankers and other professionals,

    o prioritize sales,

    o oversee the bid process and

    o select transactions to complete."  Settlement Agreement, ¶ 10.

- "Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales." *Id.*

- "Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers." *Id.*

48.    The Debtors have always acted in accordance with these requirements of the Settlement Agreement for each and every Group A Portfolio Company—either reaching agreement with Ms. Tilton (where her agreement was required) or seeking the Mediator or Court's assistance to resolve any disputes.[14]  Patriarch does not even allege that the Debtors breached any of these express terms in connection with the disposition of any Portfolio Company.

49.    Instead, Patriarch's claims are all rooted in conduct concerning "global settlement" transactions.  But nothing in the Settlement Agreement obligates the Debtors (or any other party) to negotiate for a "global settlement" transaction resolving all of the parties' disputes.  And reading such a requirement into the Settlement Agreement would have been fundamentally at odds with various express provision of the Settlement Agreement:  sales of the Group A Portfolio Companies

---

[14]  In its Order dated July 2, 2020, the Court clarified Ms. Tilton's role as a "joint" participant in the monetization process and ordered that decisions did not need to be made jointly with Ms. Tilton at Portfolio Companies where she did not assert debt or equity investments.  *See* Docket No. 1751 (Amended Order Establishing Certain Guidelines and Milestone in Furtherance of the Monetization Process for the Group A and Group B Portfolio Companies), ¶ 7.

will occur until the senior noteholders are Paid in Full, *see* Settlement Agreement, ¶ 12; the senior noteholders would retain their claims and interest until such time as they were Paid in Full, *see id.*, ¶ 13; the claims the parties held against each other, while stayed for the duration of the 15 Month Window, would be reserved, *see id.*, ¶ 19; and that all parties can exercise "any and all rights available under applicable law" at the expiration of the 15 Month Window, *see id.*, ¶ 25.  So the suggestion that parties to the Settlement Agreement were required to negotiate or accept a "global settlement" as part of the process of monetizing the Portfolio Companies under the Settlement Agreement (and that the failure to do so would violate the Settlement Agreement) cannot be reconciled with these express terms.  In fact, this Court (and the District Court) have observed that "the fact that the parties can start taking forceful action after 15 months could be viewed as a useful feature of the Settlement Agreement, not a fatal inconsistency."[15]  This "useful feature" would have been without any utility if parties were also required to affirmatively pursue a "global settlement" of the very rights that the Settlement Agreement preserved—in effect a compromise of the Settlement Agreement itself.[16]

50.    Thus no party can be held in breach of the Settlement Agreement by declining to "globally settle," which would necessarily involve a compromise of the very obligations and rights (monetization, pursuit of Paid in Full, litigation claim tolling and preservation, among others) created or preserved under the Settlement Agreement.  Yet still, Patriarch attempts to hang its

---

[15] *See Tilton et al. v. Zohar III, Corp. et al.*, No. 01:19-cv-01874-MN, Docket No. 47 (Memorandum Opinion) (the "District Court Op."), p. 19; *see also* Sept. 27, 2019 Hr'g Tr. 13:15-14:2.

[16] *Cf. Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless.").

breach-of-contract claim on two narrow provisions—Paragraphs 3 and 12.  *See* Patriarch Claim,

p. 13.  Neither supports its claims.

51.     Patriarch argues that "Paragraph 3 of the Settlement Agreement includes a

requirement to 'negotiate in good faith' on how to monetize the Group B Portfolio Companies."

*Id*.  This is a serious mischaracterization of Paragraph 3 of the Settlement Agreement which,

actually says:

> Subject to the last sentence of this Paragraph 3, ***if the Full Payment Date does not occur***
> ***within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on***
> ***how to monetize the Group B Portfolio Companies***.  In the event of any dispute in such
> negotiations, in the first instance such dispute shall be referred to the Mediator.  If the
> Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the
> Bankruptcy Court resolving such disputes.

(emphasis added).

52.     Under the plain language of Paragraph 3, the "requirement" is subject to a condition

precedent:  "if the Full Payment Date does not occur within the 15 Month Window," *then* the

parties will begin negotiations with respect to the Group B companies.  When the sentence is read

in its entirety, it demonstrates that whatever obligations the Debtors may have had under Paragraph

3 could not arise until—at the earliest—expiration of the 15 Month Window (*i.e*., on September

30, 2019).  Patriarch's allegations are all confined to conduct in the 15 Month Window.  While the

Debtors breached no obligations under the Settlement Agreement, they cannot possibly have

breached Paragraph 3 based on conduct that ended before the 15 Month Window closed.

53.     Patriarch's breach-of-contract claim under Paragraph 12 fares no better.  Paragraph

12 provides that "Tilton and the CRO shall work jointly as outlined herein to monetize the Group

A Portfolio Companies until such time as the (i) . . . parties each agree in writing to terminate this

settlement agreement, such agreement to be granted or withheld in their sole respective discretion

or (ii) . . . Full Payment Date."  Patriarch appears to interpret Paragraph 12 as the provision that

actually establishes the parties' obligation to work jointly.  In fact, Paragraph 12 simply provides the end date for the parties' obligations under the monetization process that is otherwise "outlined" in the rest of the Settlement Agreement.  *See* Sept. 27, 2019 Hr'g Tr. 12:18–13:5.

54.     The reason that Patriarch focuses on Paragraph 12—rather than Paragraph 10, which actually describes what it means to "work jointly" on the monetization process—is because it has no other choice.  Paragraph 10 makes clear that any global settlement of the chapter 11 cases would be ***outside*** of the monetization process ***that actually is outlined in*** the Settlement Agreement.  As explained above, that process includes, for instance, "jointly select[ing] bankers and other professionals, prioritiz[ing] sales, oversee[ing] the bid process and select[ing] transactions to complete."   Settlement Agreement, ¶ 10.   It does not require the Debtors to negotiate, let alone accept, a "global settlement" transaction (which, again, would be a settlement of that which has already been settled – in the Settlement Agreement).

55.     And of course, Paragraph 12 speaks only to the Group A Portfolio Companies. Nothing in Paragraph 12 imposes any obligations on any party with respect to the Group B Portfolio Companies or any other dispute between the parties.  Accordingly, Paragraph 12 cannot reasonably be interpreted to require the Debtors to negotiate a "global settlement" transaction which would, by necessity, include all Portfolio Companies and all claims and disputes related thereto.

56.     In short, the Debtors engaged in good faith at all times during these cases but had no obligation under the Settlement Agreement to do anything with respect to any "global settlement" transaction proposal.

**B.   The Implied Covenant Of Good Faith And Fair Dealing Is Inapplicable.**

57.     Unable to allege a breach of the actual obligations under the Settlement Agreement concerning the monetization process, *viz.* the conduct of a competitive, investment-bank led bidding and sale process for each Portfolio Company, Patriarch seeks refuge in the implied covenant of good faith and fair dealing.  *See* Patriarch Claim, p. 12.  Patriarch likewise fails with its alternative argument that the Debtors breached the implied covenant.  As an initial matter, the Debtors did act in good faith and deal fairly with Tilton at all times and there is not a scintilla of proof to the contrary.

58.     But, in any event, implied-covenant claims cannot survive when they rest on the same conduct as a breach of contract claim.[17]  Here, Patriarch's breach of contract and implied-covenant claims are based on the exact same conduct.  Patriarch's implied-covenant claim is, thus, entirely redundant of its breach-of-contract claim.  Patriarch itself lumps these two causes of action under a single heading in the Patriarch Claim given their shared basis.  *See* Patriarch Claim, p. 13.

59.     Fundamentally, the implied covenant has no role to play here.  "The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions.  Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty unattached to the underlying legal document.'"[18]  As such, when a contract expressly addresses an issue, an implied covenant claim is not viable and must be

---

[17] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC,* 27 A.3d 531, 539 (Del. 2011) (interpreting New York law); *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, No. CV N19C-12-033, 2021 WL 252823, at *6-7 (Del. Super. Ct. Jan. 26, 2021).

[18] *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005) (internal alterations and quotations omitted).

29029569.1

dismissed.[19]  And as explained above, the Settlement Agreement is explicit about what the Debtors are required to do to market and sell each Group A Portfolio Company.  The Debtors did just that and, as noted above, Patriarch does not even allege anything to the contrary.

60.    Nor is this a situation in which the Settlement Agreement confers broad discretion on the Debtors in determining how to monetize the Group A Portfolio Companies.[20]  The Settlement Agreement expressly lays out the steps for the monetization process—investment-bank led sales selected by the Debtors (jointly with Ms. Tilton, where applicable) that are prioritized on a company-by-company basis.  *See* Settlement Agreement, ¶ 10.  The Settlement Agreement even sets out the governing standard of conduct:  Paragraph 10 states that "the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. . . ."  The standard of conduct here is not "implied"—it is explicit.

61.    What the Settlement Agreement contemplates is effectively the opposite of a global settlement.  One of the foundational aspects of the Settlement Agreement is that the parties would put litigation of their disputes on hold *for fifteen (15) months* to allow the Debtors to get cash in the door for the Portfolio Companies.  To quote Patriarch's counsel, "[t]he entire structure was premised on the notion that the parties would temporarily cease their hostilities, lay down arms for a finite period, fifteen months during which time they would together, in a collaborative process seek to monetize group A portfolio companies . . . ."[21]

---

[19] *See, e.g.*, *Buck v. Viking Holding Mgmt. Co. LLC*, No. N20C-08-249 AML, 2021 WL 673459, at *5 (Del. Super. Ct. Feb. 22, 2021); *Collab9, LLC v. En Pointe Techs. Sales, LLC*, No. CVN16C12032MMJCCLD, 2019 WL 4454412, at *6 (Del. Super. Ct. Sept. 17, 2019*); Cambridge Cap. Real Est. Invs., LLC v. Archstone Enter. LP*, 137 A.D.3d 593, 595 (N.Y. App. Div. 2016).

[20] *DG BF, LLC v. Ray*, No. CV 2020-0459-MTZ, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021) ("When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith.").

[21] Sep. 24, 2019 Hr'g Tr. at 24:1-5.

62. The Settlement Agreement is explicit that the parties' claims against one another are preserved (paragraphs 15 and 19) and that, after the 15 Month Window, the Debtors and their secured lenders can fully enforce their rights against Tilton, including seeking to remove her from her positions with the Group A companies (paragraph 9) and "exercis[ing] any and all rights available under applicable law" (paragraph 25). Indeed, as noted above, this Court and the District Court considered this aspect to be a useful feature of the Settlement Agreement.[22]

63. Another foundational aspect of the Settlement Agreement is the pursuit of the "Full Payment Date" or "Paid in Full" recoveries.[23] Tilton has not alleged (nor can she) that the Debtors frustrated a transaction that would have provided a Paid in Full return for the senior noteholders.

64. Moreover, the causes of action that the Settlement Agreement *preserved* are exactly the causes of action that a global settlement required to be *settled* and *released*. Accordingly, any global settlement proposals would not be in furtherance of implementing the Settlement Agreement—they would be made to get out from under the liabilities and obligations under that agreement.[24]

---

[22] *See* District Court Op., p. 19; Sept. 27, 2019 Hr'g Tr. 13:15-14:2.

[23] *See* Settlement Agreement, ¶ 1 (providing that Independent Director will serve until the Full Payment Date); ¶ 3 (providing for negotiations over Group B Portfolio Companies if Full Payment Date not achieved in first 15 months); ¶ 12 (providing for monetization of Group A Portfolio Companies until the Full Payment Date); ¶ 13 (providing for release of claims and interests of senior Noteholder upon attaining Full Payment Date); ¶ 18 (providing for tolling of claims against Patriarch and escrow of amounts payable to Patriarch unless the Full Payment Date occurs).

[24] *Cf. In re Allianz Global Investors US LLC Alpha Series Litig.*, 2021 WL 4481215, at *17 (Del. Ch. Sept. 30, 2021) (upholding implied-implied covenant claim based on allegations that the defendant "acted contrary to the purpose of the parties' agreements" by "abandoning the investment strategy" that the plaintiffs and defendants had discussed).

### III.    Patriarch's Tort-Based Claims Fail As A Matter Of Law.

65.    Patriarch's tort-based claims—tortious interference with contract, prima facie tort, and fraud/promissory estoppel/misrepresentation—fail in the first instance because Patriarch cannot state a predicate act that could give rise to any of these torts.  But even if it could, Patriarch does not and cannot identify any facts showing that the Debtors acted with the requisite malicious intent.

### A.  Patriarch Cannot State A Claim For Tortious Interference With Contract.

66.    As an initial matter, there are legitimate questions as to whether Patriarch's contracts with the Portfolio Companies are valid and enforceable in the first place, given that Tilton was on both sides of the transactions.[25]  But putting that issue to the side, Patriarch cannot state a claim for tortious interference.

67.    Tortious interference requires, among other things, "*an intentional* act by the defendant that is a significant factor in causing the breach of contract . . . without justification . . . ."[26]  "The critical questions . . . are did [the defendant] *act so as to bring about* [plaintiff's counterparty's] breach and, if so, *was it justified by legitimate pursuit of its own*

---

[25] *See Zohar CDO 2003-1, Ltd. et al. v. Patriarch Partners, LLC et al.*, Adv. Proc. No. 20-50534, Docket No. 125 (Amended Complaint against Patriarch by the Debtors).

[26] *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987) (emphasis added); *accord Rose v. Different Twist Pretzel, Inc.*, 999 N.Y.S.2d 438, 439-40 (N.Y. App. Div. 2014) (holding that plaintiffs must prove the following:  (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom); *see also* RESTATEMENT (SECOND) OF TORTS § 767 (1979).

*interest* in so acting."[27]  Tortious interference with contract is an intentional tort,[28] and a plaintiff

must show that the defendant's actions were the "proximate cause" of the breach of contract.[29]

68.     Here, Patriarch cannot identify any "intentional act" that the Debtors took to induce

the Portfolio Companies to not comply with contractual obligations they allegedly owe to

Patriarch.  The Patriarch Claim does not assert that the Debtors ever discouraged or dissuaded any

of the Portfolio Companies from complying with any obligations they owed to Patriarch.  Nor has

Patriarch even established how it is that the Debtors' "act[ions] . . . br[ought] about" any Portfolio

Companies' breach.  The Patriarch Claim is devoid of any causal nexus between any of the

Debtors' conduct and whatever purported breaches occurred.  And all Patriarch can offer is

conclusory allegation of the Debtors' intent.

69.     Moreover, Patriarch has not adequately alleged that any conduct by the Debtors

was a "significant factor" in the Portfolio Companies' alleged breaches.  Patriarch provides no

explanation for how the Debtors' conduct, in and of itself, precluded the Portfolio Companies from

paying Patriarch.  Indeed, Tilton herself controlled the Portfolio Companies that allegedly failed

to pay her Patriarch affiliates.  Settlement Agreement, ¶ 10.  Patriarch was, after all, receiving

management fees while the Portfolio Companies were simultaneously not paying interest on their

loans from the Debtors.[30]  Tilton cannot legitimately claim that the Debtors were responsible for

depriving Patriarch the benefit of its bargain when it was Tilton herself who controlled the

Portfolio Companies' purse strings.

---

[27] *Irwin & Leighton, Inc.*, 532 A.2d at 992 (emphasis added).

[28] *See, e.g., Brandle Meadows, LLC v. Bette*, 84 A.D.3d 1579, 1580 (N.Y. App. Div. 2011); see also RESTATEMENT (SECOND) OF TORTS § 766(C).

[29] *See State Street Bank v. Inversiones Errazuriz*, 374 F.3d 158, 171-172 (2nd Cir. 2004).

[30] *See, e.g.*, Feb. 19, 2020 Hr'g Tr. 314:11-20.

70.    In any event, whatever of the Debtors' actions Patriarch complains of, the Debtors can establish that such action was justified[31] because the Debtors have, throughout these cases, adhered to the Court-approved and Patriarch-agreed-to Settlement Agreement, and simply enforced their own rights under their applicable contracts with the Portfolio Companies.

71.    Accordingly, Patriarch's claim for tortious interference thus fails as a matter of law.

**B. Patriarch Cannot State A Claim For Prima Facie Tort.**

72.    Patriarch's claim for prima facie tort similarly fails. That cause of action requires, among other things, the intentional infliction of harm without excuse or justification.[32] And the intentional act inflicting harm must be "motivated solely by the desire to do injury."[33] In other words, a defendant who had "other motives, such as profit, self-interest, or business advantage[,] for acting the way it did . . . cannot be liable in prima facie tort."[34]

---

[31] Delaware has adopted the following factors from the Restatement (Second) of Torts to evaluate whether a party's conduct is justified: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties. *See Irwin & Leighton, Inc.* 532 A.2d at 993.

[32] *Williams v. Atl. L. Grp., LLC*, 174 F. Supp. 3d 874, 878–79 (D. Del. 2016); *see also* Lord v. Souder, 748 A.2d 393, 402–03 (Del. 2000). The Patriarch Claim suggests, without support or explanation, that the prima fact tort claim would be subject to New York law. *See* Patriarch Claim, ¶ 12. But there is no conflict between Delaware and New York law. See, e.g., *Twin Lab'ys, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990). Thus, the Court need not perform any choice-of-law analysis. *See, e.g., Pig Imp. Co. v. Middle States Holding Co.*, 943 F. Supp. 392, 396 (D. Del. 1996) ("A choice-of-law analysis is not required, however, where the laws of the affected jurisdictions do not conflict.").

[33] *Williams*, 174 F. Supp. 3d at 878 (*quoting Colbert v. Goodville Mut. Cas. Co.*, 2010 WL 2636860 at *9 (Del. Super. Ct. June 30, 2010).

[34] *Id*. (internal quotation marks omitted); *see also Twin Lab'ys, Inc.,* 900 F.2d at 571 (holding that a claim for prima facie tort was "without merit" because the plaintiff "does not, and could not, suggest that [the defendant's] primary motive was not based on self-interest").

73.     Moreover, courts are wary about the over-extension of prima facie tort as a cause of action:  it is not a "catch-all" alternative for every cause of action that fails to establish the elements of traditional torts.[35]  Where a plaintiff alleges wrongdoing that could fall within another tort or contract action, a prima facie tort claim will fail.[36]  Patriarch's claim fails here.

74.     First, the Debtors' actions in these chapter 11 cases have been dictated by the Settlement Agreement and, as set forth above, the Debtors have faithfully adhered to the Settlement Agreement.  Adherence to the Settlement Agreement is sufficient to overcome the low bar of "without excuse or justification."  And, the existence of the Settlement Agreement, and Patriarch's contention that the Debtors violated it, takes Patriarch outside of the bounds of a prima facie tort claim.[37]

75.     Second, a prima facie tort is an intentional tort and requires an intentional act.[38]  At most, Patriarch alleges a failure to act.

76.     Third, Patriarch's prima facie tort claim fails because Patriarch cannot show, and has not alleged, that the Debtors acted with "disinterested malevolence."[39]  Again, as explained

---

[35] *McKenzie v. Dow Jones & Co.*, 355 F. App'x 533, 535 (2d Cir. 2009); *Colbert v. Goodville Mut. Cas. Co.*, No. K10C-01-001 JTV, 2010 WL 2636860, at *3 (Del. Super. Ct. June 30, 2010); *Belsky v. Lowenthal*, 405 N.Y.S.2d 62, 65 (N.Y. App. Div. 1978) ("Prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs.").

[36] *Colbert*, 2010 WL 2636860, at *3 (holding that a "prima facie tort claim 'is not a duplicative remedy for claims that can be sounded in other traditionally recognized tort theories, or a catchall remedy of last resort for claims that are not otherwise salvageable under traditional causes of action"); *McKenzie*, 355 F. App'x at 535 (2d Cir. 2009) (holding that a prima facie tort claim failed because the alleged wrongful actions fell within the scope of a defamation claim).

[37] *See Colbert* and *McKenzie*, *supra* notes 35, 36.

[38] *See, e.g.*, *Williams*, 174 F. Supp. 3d at 878–79.

[39] *Twin Lab'ys*, 900 F.2d at 571 (holding that "[t]he touchstone is 'disinterested malevolence', meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm") (internal citations omitted); *see also Colbert*, 2010 WL

above, and as the Debtors can clearly show if the Court looks behind the mediation curtain, the Debtors acted in good faith.  Patriarch does not, and cannot, identify any instance of actual malevolence on the Debtors' part, and the Court need not accept Patriarch's conclusory accusations that the Debtors' Independent Director, CRO, and counsel all secretly held economically irrational intentions to harm Lynn Tilton all along.[40]  The accusations are unsupported and unbelievable.  And, the Mediator would not have allowed the mediation to go on if the parties were not seriously committed to it.

77.    Accordingly, even without looking behind the mediation curtain, the fact remains that Patriarch cannot identify any predicate act giving rise to an intentional tort or any facts that would support the idea that the sole motivation of the Debtors and their representatives was pure and unadulterated malice.  Patriarch's claim for prima facie tort thus fails as a matter of law.

### C. Patriarch Cannot State A Claim For Misrepresentation.

78.    Patriarch's claim for misrepresentation also fails.[41]  First, there is no basis for Patriarch's claim that the Debtors misrepresented that they would negotiate in good faith, because the Debtors *did* negotiate in good faith and the Court is under no obligation to accept Patriarch's conclusory accusations to the contrary.

79.    In any event, Patriarch cannot state a claim for misrepresentation.  Asserting such a claim requires, at the most basic level, that the Debtors made a false representation, "usually one

---

2636860, at *9 (holding that harm is intentionally inflicted when it is "motivated solely by the desire to do injury") (internal quotation marks omitted).

[40] *Cf. Iqbal*, 556 U.S. at 663 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Papasan*, 478 U.S. at 286 (instructing that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

[41] The Patriarch Claim labels this claim as "Fraud/Promissory Estoppel," but the substance of Patriarch's allegation is that the Debtors misrepresented that they were acting in good faith.  *See* Patriarch Claim, p. 13.

of fact," and that Patriarch was injured by relying on that misrepresentation.[42]  More specifically, Patriarch must identify its alleged misrepresentation with particularity.[43]  It must identify "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[44]  And Patriarch must show that the Debtors' alleged misrepresentation was "a factual cause of the harm in the sense that the harm would not have occurred but for the misrepresentation or omission."[45]

80.     Here, Patriarch's claim of fraudulent misrepresentation against the Debtors fails as a matter of law.  First and foremost, Patriarch does not—and cannot—allege that the Debtors made any misrepresentation in the first place.  Indeed, the Patriarch Claim only states that the Debtors "promised/misrepresented that they were entering into settlement/mediation discussions in good faith in an effort to resolve disputes between the parties."  Patriarch Claim, p. 13.  Although the Debtors acted in good faith to consider the "global settlement" transaction offered by Patriarch, the claim fails as a matter of law because Patriarch never identifies (i) who actually made the alleged misrepresentation, (ii) when or where it was made, or (iii) what its actual contents were.  Of course, Patriarch's failure to identify any of these particulars is because the Debtors never made any misrepresentation in the first place.

---

[42] *Carrow v. Arnold*, 2006 WL 3289582, at *8 (Del. Ch. Oct. 31, 2006), *aff'd*, 933 A.2d 1249 (Del. 2007); *see also Oglesby v. Conover*, 2011 WL 3568276, at *3 (Del. Super. Ct. May 16, 2011).

[43] *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

[44] *See id.*; *see also Cambridge Cap.*, 2021 WL 4481183, at *26 (finding that the plaintiff had failed to plead fraud with sufficient particularity where it alleged that the defendant "made misrepresentations 'during this time' and 'throughout the negotiations" (internal quotation marks omitted)); *Greenspan v. Allstate Ins. Co.*, 937 F. Supp. 288, 291 (S.D.N.Y. 1996) (holding that a complaint "must link the allegedly fraudulent statement to an individual speaker; attribution to a corporate entity or its representative is insufficient"); *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 876 F. Supp. 41, 44 (S.D.N.Y. 1995) (holding that a fraud claim was not stated with particularity where the alleged misleading statement could have been made over a "period of several months").

[45] *Vichi v. Koniklijke Philips Elec.,* N.V., 85 A.3d 725,814 (Del. Ch. 2014).

81.     Moreover, Patriarch cannot show that any supposed misrepresentation by the Debtors was the actual cause of any harm to Patriarch.  Patriarch's allegation are rooted in a "***global settlement***" transaction, not a simple bilateral transaction with the Debtors.  So even if there was a misstatement by the Debtors (there was not), Patriarch cannot show that the statement was a "but for" cause of its alleged damages.[46]  Patriarch incurred costs because it entered into a mediation with the parties to the Settlement Agreement to resolve an extremely complex situation on a global basis with a variety of stakeholders.  Ostensibly it did so because the benefits to Patriarch of a "global settlement" transaction justified that costs of pursuing those negotiations, not because of any alleged misstatement by the Debtors.

82.     Thus, Patriarch's claim for fraudulent misrepresentation thus fails.

**IV.    Patriarch's Claim For Contribution Or Indemnification Fails.**

83.     Patriarch cannot state a claim for contribution or indemnification.  The only theory of recovery Patriarch advances is that claims against it by MBIA, the Dura chapter 7 trustee, and others could have been avoided had the Debtors negotiated in good faith.  But, as explained above, the Debtors did in fact engage in good faith on Patriarch's "global settlement" transaction.  And, in any event, the Debtors are not liable for contribution or indemnification simply because Patriarch did not achieve the "global settlement" transaction it desired.

84.     Patriarch's contention seems to be that by engaging with Patriarch on negotiations for a "global settlement" transaction, the Debtors became guarantors of any liability Patriarch has to third parties for Patriarch's own wrong-doing.  This simply makes no sense and the Court should reject it out of hand.

---

[46] *See Vichi,* 85 A.3d at 814.

85.     Generally, "contribution is the right of one who has discharged a common liability to recover from another who is also liable."[47]  In other words, a cause of action for contribution requires two parties to be co-liable on the underlying debt.[48]

86.     On the other hand, indemnification arises in two ways:  through an express contractual provision or where implied by law.[49]  Here, the Settlement Agreement does not contain an express provision indemnifying the Patriarch Stakeholders against failure to negotiate.  Nor has Patriarch identified any other contractual right to indemnity.  Accordingly, an indemnification obligation will exist only if it is imposed by operation of law.  Common-law indemnification is a doctrine that places the "burden of a loss upon the party ultimately liable or responsible for it, and by whom the loss should have been discharged initially."[50]

---

[47] *Reddy v. PMA Ins. Co.*, 20 A.3d 1281, 1284 (Del. 2011).

[48] *See* 10 *Del. C.* § *6301 et seq.*; *Lutz v. Boltz*, 100 A.2d 647 (Del. Super. 1953); *see also Levy v. HLI Operating Co.*, 924 A.2d 210, 220 (Del. Ch. 2007) ("To succeed on a contribution claim, a party must show concurrent obligations existed to the same entities, and that the obligors essentially insured the same interests and the same risks.").

[49] *See, e.g., Quereguan v. New Castle Cty.*, No. CIV.A. 20298-NC, 2006 WL 2522214, at *5 (Del. Ch. Aug. 18, 2006).

[50] *Levy*, 924 A.2d at 221; *see also Quereguan*, 2006 WL 2522214, at *5 ("A key difference between 'common law indemnification,' which is defined as a general right of reimbursement for debts owed to third parties by the indemnitor as a secondarily liable party, and 'contractual indemnification' is that common law indemnification involves the responsibility to pay for another's liability."); *cf. Lamela v. Verticon, Ltd.*, 185 A.D.3d 1319, 1322 (N.Y. App. Div. 2020) ("The principle of common-law, or implied indemnification, permits one who has been compelled to pay for the wrong of another to recover from the wrongdoer the damages it paid to the injured party. . .  Common-law indemnification is generally available 'in favor of one who is held responsible solely by operation of law because of his [or her] relation to the actual wrongdoer".) (internal citations omitted); *XPO Logistics v. Malcomb*, No. 654921-2017, 2021 WL 408243, at *5 (N.Y. Feb. 5, 2021) ("With respect to the proposed common law indemnity claims, it is well established that 'since the predicate of [such claims] is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that the party who has itself participated to some degree in the wrongdoing cannot receive the benefit of the doctrine.").

87.     Here, Patriarch cannot state a claim for contribution because the Debtors are not co-liable for the debts that Patriarch owes to MBIA, the Dura estate, and others.  Patriarch does not even allege that the Debtors are co-liable.  It cannot because the Debtors are not.

88.     Nor can Patriarch allege that the Debtors have an express contractual obligation to indemnify Patriarch against third-party claims.  Again, Patriarch does not identify any contractual indemnification.  The Settlement Agreement plainly does not have it; nor does any other document Patriarch has identified.

89.     Accordingly, an indemnification obligation will exist only if it is imposed by operation of law.  But again, Patriarch fails to state a cognizable claim because the Debtors are not "ultimately liable" for the debts that Patriarch owes to MBIA, the Dura estate, and others.  This is not a situation in which Patriarch, on behalf of the Debtors, has satisfied a debt that the Debtors owed to MBIA or another third party.  Patriarch is liable in its own right.  Common-law indemnification thus has no role to play here.

90.     Even if Patriarch had some basis for indemnification, the claim is completely speculative.  Patriarch has not satisfied any of MBIA's claims, let alone a claim for which the Debtors are ultimately liable.  Indeed, in the Patriarch Claim, it "strongly dispute[s]" that any such claims exist in the first place.  But a cause of action for indemnification accrues only after the dispute is finally concluded and the party seeking indemnification has made payment to the third party.[51]  Thus, even if Patriarch did have some basis for a common-law indemnification claim against the Debtors (it does not), its claim is premature at best.

91.     Accordingly, Patriarch's claim for contribution or indemnification fails as a matter of law.

---

[51] *See Levy*, 2006 WL 985361, at *11.

V.    **The Debtors Are Not Liable To Patriarch For Any Tax Payments; Patriarch Is Actually Liable To The Debtors For Payment Of Any Such Taxes.**

92.    Patriarch has not identified what taxes it has paid that should have been paid, or were owed, by the Debtors.[52]  But this claims fails on its face, whatever the amount claimed.  The Court has already found that:

> The plain language of Section E of the Investor Questionnaire provides that the Octaluna Entities "agree" that the Funds would be treated as a disregarded entity. . . . Furthermore, the Investor Questionnaire is clear that the Octaluna Entities made agreements therein as it concludes with the agreement of the Octaluna Entities to "indemnify and hold harmless the [Funds] . . . from and against all loss, damage or liability due to or arising out of a breach of any . . . agreement" they made therein.  For these reasons, any argument that the Octaluna Entities did not have the obligation pursuant to the Subscription Agreements to maintain the disregarded status of the Funds is unavailing.[53]

If Patriarch has paid any taxes owed or due by the Debtors, it has simply honored its obligations to "indemnify and hold harmless" the Debtors.  As found by this Court, Patriarch's agreement to do so was "clear."  Allowance of a claim against the Debtors for any tax amounts would not "hold the Debtors harmless" for taxes arising out of Patriarch's breach of the Debtors' governing documents as Patriarch is required to do.

93.    Thus, Patriarch's theories of liability related to any tax payments should be rejected.

VI.    **The PPAS Reimbursement Request Is Massively Overstated And May Be As Little As Zero.**

94.    This Court recently held that the Settlement Agreement only entitles PPAS to be reimbursed for reasonable transition "costs," noting that the "difference between the use of the

---

[52]  As this Court has already found, under the Debtors' governing documents, the Debtors are only taxpayers because Patriarch violated its own obligations to the Debtors and Patriarch is, in fact, obligated to indemnify and hold harmless the Debtors for any tax obligations.  The Debtors, therefore, object to any effort by Patriarch to transfer or impose its tax obligations on the Debtors.

[53]  *See* MTD Opinion, p. 37.

words 'fees' and 'cost' was or should have been well-known and appreciated." *See* Mar. 17, 2021 Hr'g Tr. 5:19-24 (denying a request under Paragraph 6 of the Settlement Agreement to compel the Debtors to pay in-house legal fees for "time and expertise").

95.    The Patriarch Claim only evidences approximately $55,000 of costs, and the request for more than $1.053 million in fees should be denied consistent with the Court's prior ruling.  Should the Court consider the costs portion only, or include the fees as well, the Debtors object to PPAS's request for additional reasons.

96.    PPAS's entitlement is limited to its "transition costs" that are "reasonable" and "incurred in transition to the New Agent." *See* Settlement Agreement, ¶ 6.  Given PPAS's conduct in these cases, the Debtors question whether the invoices for Patriarch's counsel summarized on Exhibit A to the Patriarch Claim are "reasonable" or even for "transition costs" when viewed in light of the time periods to which the invoices relate.  As an initial matter, the invoices begin with a period more than seven months after Ankura's appointment, which itself suggest an "unreasonable" transition period, and a majority of the amount claimed was incurred in and after February 2021, at least two years after the Court-approved Ankura's retention.

97.    However, overlaying the invoices (and amounts claimed) with what was happening in these cases during the corresponding billing period is very troubling.  Of great concern to the Debtors has been PPAS's conduct concerning Galey & Lord.[54]  In January 2021 (a month for which PPAS is seeking $50,142.68 in total), PPAS revealed, for the first time, that it had collected post-petition more than $30 million of proceeds of collateral owned by the Debtors and used those

---

[54]  This egregious conduct has been laid out, most recently, in the Debtors' request to enforce the settlement agreement against PPAS and sanction Patriarch.  *See* Docket No. 3022 (*Debtors' Amended and Supplemental Motion for Entry of an Order (A) Enforcing the Settlement Agreement and the Ankura Appointment Order Regarding Galey & Lord, LLC and for Related Relief (Docket No. 2611) and (B) Sanctioning Patriarch*).

proceeds to pay, or place into "reserve," amounts owed to its affiliates. In fact, PPAS has paid little of the amount collected to the owner of these funds—the Debtors. In June and July 2021, the Debtors engaged in intensive efforts to understand the scope of PPAS's misdeeds; PPAS is now seeking to charge the Debtors $402,209.20 in total for "transition costs" in those two months alone, which were well over two years past Ankura's appointment. Even more concerning is what followed that (extremely tardy) disclosure: in June through August 2021, the Debtors undertook an investigation to determine what exactly happened at Galey & Lord and engaged in various motion practice, discovery and a status conference before the Court. Patriarch Partners Agency Services, LLC's ("PPAS") bill *to the Debtors* for that period: ***nearly $475,000*** for those three months alone.

98.    These concerns are not isolated to Galey & Lord:

- PPAS's outside counsel spent 87 hours of time totaling over $83,000 in fees and costs during July and August 2020. This time period corresponds to the Debtors' "Pledged Securities Motion" wherein the Debtors were forced to compel PPAS to tender collateral in its possession to facilitate a pending sale under the monetization procedures under the Settlement Agreement as well as the Debtors' motion to compel Patriarch to produce information to establish its claims under Paragraph 18 under the Settlement Agreement.

- The "Pledged Securities Motion" was a necessary response to PPAS withholding the Debtors' collateral (Portfolio Company stock certificates needed to be physically pledged to a Portfolio Company financing source) in May 2020, just weeks after Ms. Tilton's mass resignation, as leverage to try to compel payment of $3.4 million of disputed fees owed to its affiliates from a Portfolio Company. *See* Docket No 1748 (Zohar Funds' Motion to Compel Compliance with Prior Orders Directing the Transition of Loan Agency Services, Including the Turn Over of Possessory Collateral and For an Accounting), ¶ 3. For May 2020, PPAS seeks almost $30,000 from the Debtors.

- In October 2019, PPAS's outside counsel spent over 100 hours of time at a cost of over $100,000 which time period correlates to, among other things, Patriarch's appeal of the Court's ruling on the continuation of the monetization procedures motion after expiration of the 15 Month Window and litigation over the Dura chapter 11 cases both in Tennessee and in Delaware, where PPAS was agenting a loan facility that was designed to wipe-out the Debtors' interest in Dura.

99.    The point is that the requirement in Paragraph 6 of the Settlement Agreement to reimburse PPAS for its "reasonable transition costs" does not put the Debtors on the hook to pay PPAS's counsel to defend and justify PPAS's wrongful conduct directed at the Debtors.

100.    An evidentiary hearing is required where PPAS must substantiate the work done by its outside professionals—to establish that the work done was "incurred in transition to the New Agent" and that they are, in fact, "reasonable transition costs."  *See* Settlement Agreement, ¶ 6.

## VII.    Patriarch's Other Claims Are Not Cognizable.

101.    None of Patriarch's other miscellaneous "causes of action" state a cognizable claim.

102.    First, Patriarch's cause of action for "reduction of any judgment obtained by the Debtors" is not a claim in the first place—it is a defense to a claim.[55]

103.    Second, Patriarch must identify the actual "claims and rights" under Paragraph 18 of the Settlement Agreement that it contends give rise to administrative-expense claims incurred during the period covered by the Administrative Expense Bar Date.  The Debtors cannot even legitimately respond to such vague claims.  Unless Patriarch identifies some basis for these claims, they must be denied.[56]

## VIII.    Patriarch Is Not Entitled To Administrative-Expense Priority.

104.    Even if Patriarch's claims had any merit, those claims would not be entitled to administrative-expense priority because Patriarch cannot carry the heavy burden of showing that

---

[55] *Cf. In re DHP Holdings II Corp.*, 435 B.R. 220, 232 (Bankr. D. Del. 2010) ("The Third Circuit has held that recoupment is a defense, not a claim.").

[56] *See In re Kmart Corp.*, 293 B.R. 905, 910-11 (Bankr. N.D. Ill. 2003) (holding that the creditor bears the burden of proof on an administrative-expense claim); *In re Enron Corp.*, 279 B.R. at 706 (holding that "a speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority").

its actions benefited the Debtors' estates.[57]  The mere fact that a claim arises postpetition does not automatically entitle the holder to administrative priority.[58]  To the contrary, the Bankruptcy Code provides that only "the actual, necessary costs and expenses of preserving the estate" are entitled to priority as administrative expenses.[59]  If there was no benefit to the estate, the expenses cannot have been "necessary" within the meaning of 503(b)(1)(A).[60]

105.    Thus, the critical inquiry is the extent to which the estate has benefited—"to prevent unjust enrichment of the estate, not to compensate the creditor for its loss."[61]  In other words, when determining whether to grant administrative-expense priority, a court will look to the actual benefit to the estate as opposed to the loss sustained by the creditor.[62]

---

[57] *In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021); *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 818 (3d Cir. 2010) (internal citation omitted); *In re Phila. Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999); *see also In re SRC Liquidation, LLC*, 573 B.R. 537, 540 (Bankr. D. Del. 2017) ("The claimant bears the ultimate burden of establishing a valid administrative expense claim by a preponderance of the evidence.") (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir.1992); *In re New Century TRS Hldgs., Inc.*, 446 B.R. 656 (Bankr. D. Del. 2011) ("Claimants who seek to have their claims paid ahead of general unsecured creditors bear the burden of establishing that their claim qualifies for priority status.").

[58] *In re Old Carco LLC*, 424 B.R. 650, 657 (Bankr. S.D.N.Y. 2010).

[59] 11 U.S.C. §§ 503(b)(1)(A), 507(a)(2); see also *Energy Future Holdings*, 990 F.3d at 741 (emphasis added); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) (same); *accord In re Mallinckrodt*, No. 20-12522, slip op., 2021 WL 4876908 (Bankr. D. Del. Oct. 19, 2021) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)); *Calpine Corp*, 181 F.3d at 532-33 (quotations and brackets omitted); *In re Unidigital, Inc.*, 262 B.R. at 288; *see also In re Cont'l Airlines*, 146 B.R. 520, 526 (Bankr. D. Del. 1992) ("[O]nly those expenses that genuinely inure to the benefit of the estate deserve payment ahead of other claimants . . . .  If the estate has not benefited, the administrative claim results in unnecessary depletion of assets to the detriment of all creditors.").

[60] *Energy Future Holdings,* 990 F.3d at 741 (3d Cir. 2021) (citing *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 443 (5th Cir. 2019)).

[61] *In re WorldCom, Inc.*, 308 B.R. 157, 166 (Bankr. S.D.N.Y. 2004).

[62] *Energy Future Holdings*, 990 F.3d at 742.

106.    Here, however, the premise of the Patriarch Claim is that Patriarch could have preserved hundreds of millions of dollars of value had the "global settlement" transaction been consummated.  *See* Patriarch Claim, ¶ 13, pp. 14-15.  But these are Patriarch's losses, not the estates' gains.  Indeed, Patriarch measures all of its causes of action in terms of the damages it incurred not the benefits it conferred.  *Id.*  Patriarch does not even attempt to argue that its actions conferred a benefit on the estates.  Nor can it.

107.    Accordingly, Patriarch's claims would not be entitled to administrative-expense priority even if they had merit.

## <u>RESERVATION OF RIGHTS</u>

108.    The Debtors fully reserve any all rights to object to the Patriarch Claim on any of those bases or to supplement the objections that are set forth in this Objection.  In particular, the Debtors have filed their Motion to Strike contemporaneous herewith.  Depending on how the Court treats the Precluded Matters, the Debtors reserve the right to supplement this objection to incorporate the facts surrounding the Precluded Matters in a supplement objection, including to provide a more definitive showing of the Debtors' good faith, which has only been generally alleged so as not to avoid further perpetuation of Patriarch's extant violation of Local Rule 9019-5(d).

109.    Because this Objection is not an omnibus objection, the requirements of Local Rule 3007-1(f)(iii) do not apply.  Under the circumstances, however, and out of an abundance of caution, the Debtors respectfully seek relief from Local Rule 3007-1(f)(iii) to the extent necessary.

## CONCLUSION

**WHEREFORE,** the Debtors respectfully request that the Court enter an order (i) denying the Patriarch Claim and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated:  January 31, 2022  
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Ryan M. Bartley*

James L. Patton, Jr. (No. 2202)  
Robert S. Brady (No. 2847)  
Michael R. Nestor (No. 3526)  
Joseph M. Barry (No. 4221)  
Ryan M. Bartley (No. 4985)  
Shane M. Reil (No. 6195)  
Rodney Square  
1000 North King Street  
Wilmington, Delaware 19801  
Telephone: (302) 571-6600  
Facsimile: (302) 571-1253  
Email: jpatton@ycst.com  
   rbrady@ycst.com  
   mnestor@ycst.com  
   Jbarry@ycst.com  
   rbartley@ycst.com  
   sreil@ycst.com

*Counsel to the Debtors and Debtors in Possession*

29029569.1