**UNSEALED**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (KBO) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Ref. Docket No. 2876, 3040, 3041, 3113, 3157, 3240, 3286** |

### REPLY IN SUPPORT OF DEBTORS' OBJECTION TO PATRIARCH STAKEHOLDERS' REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM AND REQUEST FOR RELIEF UNDER FED. R. BANKR. P. 7012 & 9014 AND FED. R. CIV. P. 12(b)(6)

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Zohar Funds**") hereby submit this reply (the "**Reply**") in support of their objection [Docket No. 3240] (the "**Objection**")[2] to the Patriarch Claims and in response to Patriarch's opposition to the Objection [Docket No. 3286] (the "**Response**"). In support of this Reply, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1.      The Objection sets forth why denial of the Patriarch under Rule 12(b)(6) is warranted, and the Response does nothing more than demonstrate the implausibility of the Patriarch Claims.

---

[1]      The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is c/o FTI Consulting, Inc., 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

[2]      Unless defined herein, capitalized terms have the meaning ascribed to them in the Objection.

29339202.3

Docket No. 3308
5/10/22

2.      First, Patriarch agrees with the Debtors that the five Monetization Process Claims (as defined in the Response) cannot be sustained:  *"The Debtors' principal argument is that the allegations concerning the Monetization Process . . . do not state a claim.  The Patriarch Stakeholders agree[.]"  See* Obj. ¶ 3.  Despite multiple opportunities to plausibly state the Monetization Process Claims, Patriarch has failed to do so.  The Monetization Process Claims should now be denied.  And this Court has jurisdiction to do so despite Patriarch's invocation of the "Divestiture Rule."  That rule plainly permits this Court to enforce the Strike Order and consider denial of the Monetization Process Claims under Rule 12(b)(6).  *See* Part I below.

3.      Second, Patriarch has failed to plausibly establish that any aspect of the Patriarch Claims[3] conferred a benefit upon the Debtors.  All Patriarch has done is alleged that it was damaged, and such allegations are insufficient to justify transferring value from the Debtors and their creditors to Patriarch.  Accordingly, the Patriarch Claims should be denied administrative expense priority. *See* Part II below.

4.      Third, Patriarch has failed to demonstrate that, as a matter of law, it is entitled to relief under the Settlement Agreement.  Patriarch's arguments are rooted in the flawed premise that the Debtors were bound under the Settlement Agreement to engage in negotiations for a "global" transaction— they were not.  Indeed, none of the express terms of the Settlement Agreement support such an interpretation and that interpretation would conflict with various provisions of the Settlement Agreement.  The Settlement Agreement deferred resolution of Zohar-

---

[3]      The Debtors and Patriarch have reached an agreement in principle to resolve the counts asserting unjust enrichment arising out of the QOE Report and the request to reimburse PPAS for legal fees (the "**Resolved Matters**").  The parties agreed to hold the Resolved Matters in abeyance pending documentation of their settlement.  Accordingly, arguments in this Reply do not apply to the Resolved Matters and references to the Patriarch Claims do not include the Resolved Matters.  The Debtors reserve the right to reply in support of the counts included in the Resolved Matters if their settlement is not consummated.

level claims and litigation while the parties attempted to sell or refinance the Portfolio Companies in the 15 Month Window; it did not saddle the monetization process with an obligation to resolve those disputes. And Patriarch's interpretations of the parties' obligations under the Settlement Agreement is in direct conflict with this Court's prior construction of those very terms—going so far as to argue in the Response that under the Settlement Agreement the monetization process terminated at the expiration of the 15 month window despite this Court holding the opposite in a pivotal ruling in these cases. *See* Part III below.

5.      Fourth, Patriarch failed to respond to the Debtors' arguments demonstrating how the Patriarch Claims (apart from the express breach and implied covenant claims) fail to state a claim. It has now waived arguments against denial of those aspects of the Patriarch Claims. *See* Part IV below.

6.      For these reasons, the Court should sustain the Objection and deny the Patriarch Claims under Rule 12(b)(6).

## ARGUMENT

### I.      The Court has authority and jurisdiction to enter an order denying the Patriarch Claims

7.      In the Objection, the Debtors requested that the Court consider the Patriarch Claims (as modified by the un-stayed Strike Order) under Rule 12(b)(6) and find that the Patriarch Claims fail to state a claim on which relief can be granted. Patriarch argues that this Court lacks jurisdiction to consider the Objection due to the pendency of the appeal of the Strike Order[4] and operation of the "Divestiture Rule." *See* Resp. ¶¶ 26-27. Patriarch is wrong.

---

[4]      It is not clear if there is even an extant appeal of the Strike Order. Appeals of interlocutory orders are only permitted with leave of the District Court, *see* 28 U.S.C. 158(a), and Patriarch has acknowledged the possibility that the Strike Order is interlocutory by filing a motion, "in the alternative," for leave to appeal the Strike Order. *See* Case No. 22-119, Docket No. 1 (D. Del. Mar. 11, 2022). The District Court has not acted on Patriarch's motion nor

29339202.3

8.    This Court has explained "[t]he correct statement of the Divestiture Rule is that so long as the lower court is not altering the appealed order, the lower court retains jurisdiction to enforce it."[5]  Here, the Debtors seek to do just that: obtain an order denying the Patriarch Claims, after giving effect to the exclusion of allegations originally made by Patriarch as ordered in the Strike Order (*i.e.,* after enforcing the Strike Order).  Patriarch has not identified any way in which a denial of the Patriarch Claims here would alter the Court's prior ruling in the Strike Order that certain allegations are precluded from disclosure.  Indeed, Patriarch has repeatedly acknowledged that the Debtors are simply asking the Court to enforce the Strike Order.  *See, e.g.,* Resp. ¶¶ 3, 25, 26, 27.  Nor would a ruling that the Patriarch Claims (as modified by the Strike Order) fail to state a claim impair in any way the appellate courts' ability to consider whether the ruling in support of the Strike Order was correct.  Moreover, denying the Patriarch Claims would not "effectively circumvent the appeals process."  Nothing in the denial of the Patriarch Claims (which Patriarch actually concedes fail in the face of the Strike Order) would impair the appellate court's ability to find that this Court incorrectly applied Local Rule 9019-5.  Finally, Patriarch's concern about *res judicata* is one that should be addressed by exercising its post-judgment and appellate rights (if it chooses to do so) in connection with disposition of the Objection.

9.    The principle cases relied on by Patriarch (*DeMarco* and *Hardy*) are inapposite.  First, in *Washington Mutual*, Judge Walrath found that in *DeMarco* (a chapter 13 case), the court

---

entered any order to materially advance the prosecution of that appeal (such as setting a briefing schedule on Patriarch's motion for leave or requesting the parties submit a joint position statement concerning mediation).

[5]    *In re Washington Mut., Inc.,* 461 B.R. 200, 219 (Bankr. D. Del. 2011), *vacated in part,* No. 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012); *see also In re Trib. Co.*, 472 B.R. 223, 232 (Bankr. D. Del. 2012), aff'd in part, vacated in part, No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014), aff'd in part, rev'd in part sub nom. *In re Trib. Media Co.*, 799 F.3d 272 (3d Cir. 2015), and aff'd sub nom. *In re Trib. Media Co.*, 587 B.R. 606 (D. Del. 2018) (adopting the *Washington Mutual* court's interpretation of the divestiture rule).

was not divested of jurisdiction but instead determined to abstain from hearing the dispute. Judge

Walrath went on to explain that concerns of a creditor-appellant regarding mootness should not be

used as a means to stall the resolution of large, complex chapter 11 cases, like these chapter 11

cases.[6]  Instead, concerns over mootness should be addressed by the appellant seeking a stay

pending appeal rather than the Court abstaining from enforcing an unstayed prior order of court in

subsequent aspects of the chapter 11 case.[7]  In *Washington Mutual*, the creditor-appellant did not

seek a stay of the order that was on appeal, and Judge Walrath refused to abstain from hearing

confirmation of the debtors' plan in that case due to the pendency of the appeal.  Like the creditor-

appellants in *Washington Mutual*, Patriarch did not seek, let alone obtain, a stay of the Strike

Order.[8]

        10.     Second, *DeMarco* and *Hardy* are also distinguishable on the facts.  Both cases

concerned a request to enter orders in chapter 13 cases (plan confirmation in *DeMarco* and granting

a secured lender stay relief in *Hardy*) that would have resulted in the adjustment of the debtor's

and its creditors' *in rem* rights.  In both instances, the court determined that the relief sought in the

orders that were the subject of the decisions would have foreclosed relief pursued in appeals of

earlier orders:  In *DeMarco*, the Court stripped the IRS's lien through a claim objection (that the

IRS appealed), and the debtor then filed a chapter 13 plan that would have resulted in the estate's

property vesting in the debtor free and clear of the IRS's lien with no recovery provided for the

---

[6]      *Washington Mut.,* 461 B.R. at 220 (finding that concerns over mootness can be ameliorated by creditors seeking a stay of the complained of order).

[7]      *Id.*

[8]      More than seventy-five (75) days ago, on the day the Court issued its ruling in support of the Strike Order, the Court advised the parties that it would apply Rule 12(b)(6) to the Patriarch Claims.  But Patriarch never sought a stay of the Strike Order.

IRS's lien and disallowed claim, regardless of the outcome of the appeal.[9]  In *Hardy*, the secured

lender successfully opposed the debtor's plan (and the debtor appealed), and the secured lender

then sought stay relief to foreclose on its collateral.[10]  In each case, the court was concerned that

the subsequent order would dispose of property interests that could not be unwound if the earlier

order was overturned on appeal—a result that is not present here.  In any event, as noted in

*Washington Mutual,* discussed *supra*, the risk of mootness (standing alone) is not sufficient to

invoke the mandatory divestiture of this Court's jurisdiction.[11]

## II.    Patriarch has conceded that any remaining claim is not entitled to administrative expense priority

11.    As Patriarch acknowledges, in the administrative expense context, "consideration

supporting the claimant's right to payment [must be] both supplied to and beneficial to the debtor-in-

possession[.]"  Resp. ¶ 45[12].  And as set forth in the Objection (and not refuted by Patriarch),

Patriarch bears the burden of establishing its entitlement to an administrative expense priority,

including showing that the Debtors' estates were benefitted.  *See* Obj. ¶ 84.  So It is well-

established (not some "novel argument," *cf.* Resp. ¶ 46) that an administrative expense applicant

must demonstrate that the estate received a benefit from the transactions asserted to give rise to an

administrative expense claim.  *See* Obj. ¶ 85 n. 65 (collecting cases).

---

[9]    *In re DeMarco*, 258 B.R. 30, 36 (Bankr. M.D. Fla. 2000).

[10]    *In re Hardy*, 30 B.R. 109, 111 (Bankr. S.D. Ohio 1983).

[11]    The appellant in *Washington Mutual* was not differently situated from the parties in *DeMarco* and *Hardy* that were seeking abstention.  Judge Walrath had issued an order that certain property was owned by the debtor and not the appellant, and the appellant appealed that ruling.  The debtor's plan then proposed to transfer that property to another party, and the appellant argued that confirmation and consummation of the plan would potentially moot its appeal.  Judge Walrath was not persuaded, particularly in the absence of a stay, that she should defer considering confirmation of the plan.

[12]    Quoting *In re Old Carco LLC*, 424 B.R. 650, 656 (Bankr. S.D.N.Y. 2010).

29339202.3

12.    "With respect to [a] motion to dismiss the question [is] not whether [the applicant] actually benefitted the estate, but whether it plausibly alleged that it did so."[13]  Patriarch's problem is that it totally failed to allege (let alone to plausibly allege) how Patriarch benefitted the Debtors such that Patriarch is entitled to an administrative expense claim.[14]  In the Objection, the Debtors argued that "Patriarch does not even attempt to argue that its actions conferred a benefit on the estates."  Obj. ¶ 86.  For the Monetization Process Claims, all Patriarch has argued is that it suffered its own damages because a "global" transaction was not ultimately consummated.  Obj. ¶ 86.  But Patriarch's allegations of its own damages (which are categorically denied) do nothing to establish that the Debtors benefitted from the unconsummated "global" transaction.[15]  For the remaining claims, Patriarch offers nothing at all.  Obj. ¶¶ 64 (no allegations concerning tax payments made that should be reimbursed), 67 (no demonstration of other amounts owed under the Settlement Agreement).

_____

[13]    *In re Energy Future Holdings Corp.*, 990 F.3d 728, 747 (3d Cir. 2021).  In *Energy Future Holdings*, the debtors entered into a merger agreement with the administrative expense claim applicant.  The merger with the applicant was ultimately not consummated after several months of pursuing it, but the debtors later consummated a merger with another party.  The applicant argued that its work negotiating the merger was beneficial to the estates because it served as a stalking horse and its work pursuing the merger set a roadmap that guided the debtors' efforts in the subsequently consummated merger.  The Third Circuit found that the two theories were not "analytically distinct" and went on to extensively consider the allegations made by the applicant about how its work in pursuing the failed merger, including extensive negotiations with the debtors' regulator and outside creditor constituencies, led to the successful consummation of the later merger transaction and how the expenses incurred by the applicant related to its work in pursuing the failed merger.  *Energy Future Holdings*, 990 F.3d at 744-747.

[14]    Patriarch's response to the Objection misses the mark.  The Objection criticizes Patriarch for failing to *identify* a benefit altogether not a failure to "quantify the value of" a benefit.  Resp. ¶ 46.

[15]    *Energy Future Holdings Corp.*, 990 F.3d at 742 ("The question is 'not whether [the creditor] deserves to get paid, but whether [it] deserves to get paid at the expense of [the debtor's] existing unsecured creditors.'  The focus is thus on the 'benefit to the estate, not the loss to the creditor.'" (quoting *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 441 (5th Cir. 2019) (cleaned up)).

29339202.3

13.    The Response only focused on the now Resolved Matters.  *See* Resp. ¶ 45.  For the balance of the counts in the Patriarch Claims (the Monetization Process Claims, the tax-related count and the Settlement Agreement "catch all" count), the Response offers no explanation of any benefit conferred upon the estate by the "global" transaction proposals.[16]

14.    Having failed to plausibly allege any benefit the Debtors received, the Patriarch Claims should be denied administrative expense status.[17]

### III.    The Monetization Process Claims are not sustainable.

15.    Patriarch concedes that the Objection should be sustained because it can no longer make allegations that it believes would support the Monetization Process Claims.  *See* Resp. ¶¶ 3, 25.  However, Patriarch has not affirmatively withdrawn the Monetization Process Claims.  So the Court should enter an order denying the Monetization Process Claims.

16.    In addition to lacking allegations establishing the plausibility of the Monetization Process Claims, the specific counts alleging that the Debtors expressly breached the Settlement Agreement or breached the implied covenant of good faith and fair dealing have no support in the Settlement Agreement itself and can be separately denied on those grounds as a matter of law.  As to the remaining three Monetization Process Claims (tortious interference, *prima facie* tort and indemnity and contribution), Patriarch has waived those claims by failing to response to the arguments set forth in the Objection. *See*  Part IV below.

---

[16]    *Energy Future Holdings* is the lead case Patriarch cites in arguing that it is has plausibly stated administrative expense claims.  *See* Resp. ¶ 23.  Yet, the allegations in the Patriarch Claims are at the opposite end of the plausibility spectrum from the detailed allegations that gave rise to the Third Circuit's determination in *Energy Future Holdings* that the applicant had met the plausibility standard for the benefit to the estate prong.  *See* n. 13 *supra*.

[17]    As noted above, the Debtors reserve all rights with respect to the Resolved Matters.

29339202.3

A.    **Patriarch has not alleged an actual breach of any express term of the Settlement Agreement**

17.    As demonstrated in the Objection, under the Settlement Agreement, the Debtors and Ms. Tilton were obligated to undertake a process to sell or monetize each Portfolio Company, and the Settlement Agreement outlined specific, Portfolio Company-level objectives that were required to be pursued under paragraphs 10 of the Settlement Agreement:  selecting bankers, prioritizing sales, overseeing bidding processes, meeting with banker and buyers, and selecting transactions to complete.[18]  None of the Patriarch Claims nor the Response allege that the Debtors breached these express requirements of the Settlement Agreement by failing to take any of these steps to negotiate a stand-alone monetization transaction (either a sale or refinancing) of any Portfolio Company (or any combination of them).

18.    The Patriarch Claim alleges that two specific provisions of the Settlement Agreement were breached by the Debtors, paragraphs 3 and 12.  First, in the Objection, the Debtors argued that paragraph 3 was wholly inapplicable because it had no effect until the 15 Month Window expired, a date occurring after the allegations in the Patriarch Claim.  *See* Obj. ¶¶ 25-26. The Debtors' construction of paragraph 3 is the exact same construction given to it by this Court in its pivotal September 27, 2019 ruling that rejected Patriarch's earlier argument that the monetization process terminated at the end of the 15 Month Window:

> Importantly, the provisions of Paragraph 3 of the settlement agreement indicate that the parties contemplated the exact scenario which is before the Court right now; namely, one in which the monetization process *does not yield enough value during the 15-month window to reach the full payment date*. In such a circumstance, the parties expressly agreed what would happen: the parties will discuss how to jointly monetize the

---

[18]    *See* Settlement Agreement ¶ 10.

Group B portfolio companies, as agreed to in Paragraph 10. *They did not agree that the monetization process would end*.[19]

Patriarch responded with the baffling argument that the Debtors' construction of paragraph 3 "is impossible to square with the other provisions of the Settlement Agreement, which contemplated that the parties would be released from any obligations to jointly pursue monetization once the 15 Month Window had expired" and "would render Paragraph 3 illusory by limiting its scope to a period when the Settlement Agreement, by its own terms, would no longer bind the parties." Resp. ¶ 31. Given the Court's prior, clear and rational construction of paragraph 3, it can find that allegations of the Debtors' conduct, all of which occurred prior to the expiration of the 15 Month Window on September 30, 2019, do not state a claim for breach of paragraph 3 as a matter of law.

19. Second, paragraph 12, as interpreted by the Court in the same September 27, 2019 ruling, simply establishes the timeline for conducting the monetization process for the Group A Portfolio Companies and points to other provisions of the Settlement Agreement (notably paragraph 10) that actually "outline" what is to be done in the monetization process. *See* Obj. ¶ 27. As noted above, there are no allegations in the Patriarch Claims or the Response that the Debtors did not comply with the express provisions outlined in the Settlement Agreement for how the parties should conduct the monetization process. Nor does Patriarch even allege that the Debtors withdrew from or refused to participate in the monetization process under the Settlement Agreement before its expiration, and the only obligation expressly imposed in paragraph 12 is the obligation to conduct the monetization process for a specified duration. Thus, the Court can find that the Patriarch Claim does not state a claim for a breach of paragraph 12.

20. In the Response, Patriarch offers only that Ms. Tilton's "global restructuring agreement . . . would monetize the Portfolio Companies through refinancing . . . [and s]uch a

---

[19]     Sep. 27, 2019 Hr'g Tr. 11:1-10 (emphasis added).

monetization through refinancing is precisely the Monetization Process to which the parties committed[.]"  Resp. ¶ 30.  And, therefore, the Debtors are improperly "reframing" the global transactions as "separate and apart from the Monetization Process."  *Id.*  As demonstrated in the Part III.B. of this Reply, construing a "global settlement" proposal as "separate and apart" from the Portfolio Company monetization process established under the Settlement Agreement is the only view that is wholly consistent with the Settlement Agreement.

> **B.     The Patriarch Claims fail because Patriarch improperly conflates the obligation to monetize the Portfolio Companies with Ms. Tilton's efforts to globally resolve her liability to the Zohar Funds and their creditors**

21.     At bottom, Patriarch misconstrues the Debtors' construction of the Settlement Agreement.  The Debtors are not arguing that the "Settlement Agreement did not impose an obligation on them to negotiate with Ms. Tilton in good faith."  *See* Resp. ¶ 29.  The Debtors' argument is that any obligation under the Settlement Agreement to work with Ms. Tilton in the monetization process was limited in scope to transactions intended only to sell or refinance the Portfolio Companies.  Once a transaction crossed the line from a straightforward sale or refinancing of a Portfolio Company and required the adjustment or compromise of the Debtor-creditor relationship in the Debtors' chapter 11 cases, it then ceased to be a monetization transaction for purposes of the Settlement Agreement.[20]

---

[20]     It is, of course, not the natural result of the Debtors' argument that once Patriarch proposed a global settlement transaction, "the Patriarch Stakeholders released the Debtors from the monetization process obligations."  *Cf.* Resp. ¶ 30.  Patriarch failed to offer any explanation in support of this inference.  As the Court well knows, the Debtors have steadfastly maintained that both the Debtors and Patriarch are obligated to pursue the monetization process obligations under the Settlement Agreement, and the Debtors have diligently enforced those obligations throughout these cases.  The Court can take judicial notice of these facts and its own judicial experience at the Rule 12(b)(6) stage.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001).

22.    Patriarch bases its claim on the failure of a transaction that it continuously describes as "global" in nature, resulting in a "global restructuring" of the Zohar Funds[21] and a "global settlement" among the parties.[22]  A global restructuring or settlement in a chapter 11 case is wholly different from the sale of the Debtors' assets and a "global" transaction in these cases would clearly encompass more than just the sale or refinancing of a Portfolio Company (or even several of them). Even if Patriarch's allegations that the global transaction would have resulted in a sale or refinancing of the Debtors' asset is accepted, it does not follow that including disposition of the Debtors' assets as part of a "global" transaction brings the entire "global" transaction under the auspices of the Settlement Agreement's monetization process.

23.    Under Patriarch's interpretation, the Debtors would be bound under the Settlement Agreement to negotiate with Ms. Tilton for any proposal she made, with any terms attendant to it, so long as some aspect of the proposal can be characterized as a refinancing or sale of any Portfolio Company.  For instance, under her position, Ms. Tilton could propose to refinance the smallest loan to the smallest Portfolio Company and attach to that proposal a condition that the Debtors restructure all of their note obligations or that the Debtors and their creditors settle all possible causes of action against Ms. Tilton (*i.e.*, a global settlement), and the Debtors would be obligated to engage in negotiation of that transaction.

24.    Nothing in the Settlement Agreement supports such an interpretation.  Patriarch has not demonstrated how the obligation under the Settlement Agreement to sell (or refinance) the Portfolio Companies can be bootstrapped into a much larger obligation to negotiate a global restructuring or settlement.  In fact, read as a whole, the Settlement Agreement supports the finding

---

[21]    Original Claim, Attachment p. 4, 5; Resp. ¶  2, 16, 20, 21, 22, 30, 36.

[22]    Original Claim, Attachment p. 5, 6; Resp. ¶ 27.

that the parties did not intend for the sale and refinancing of the Portfolio Companies to be bound up in the resolution of Zohar Fund-level issues and disputes with Ms. Tilton and the other Patriarch entities.[23]    Among other things, the Settlement Agreement includes specifically negotiated provisions staying and preserving all of the claims during the 15-Month Window and requiring the parties to pursue sales until Payment in Full was reached, among other things.  *See* Obj. ¶ 23. Patriarch provides no explanation for the fact that its interpretation of the Settlement Agreement would force the parties to negotiate a "monetization transaction" (that was also a "global settlement") that would impair rights that were specifically preserved.

**C.    Patriarch has also failed to adequately allege the application of the implied covenant or any breach of it**

25.    Patriarch's implied covenant arguments are equally faulty.  In the Objection, the Debtors demonstrated that the implied covenant claim was identical to the breach of contract claim and, thus, not sustainable as a matter of law.  *See* Obj. ¶ 31.  The Debtors also demonstrated that the implied covenant could not be used as a "gap filler" because the parties had extensively negotiated how the parties should conduct themselves in the monetization process.  *See id.* ¶ 32; *see also id.* ¶¶ 34-37.  Patriarch did not respond to and, therefore, concedes these arguments.

26.    Patriarch, however, addresses only the Debtors' third argument against application of the implied covenant and alleges that the Settlement Agreement "confers broad discretion on the Debtors in regard to the monetization process," Resp. ¶ 32, and thus the Debtors' must exercise that discretion in good faith.  Patriarch's characterization of the Settlement Agreement is, again, at odds with the words the parties actually used and what the parties agreed to.

---

[23]    This is not to say that the parties were prohibited from engaging in these type of discussions; only that they were outside of the monetization process the parties were obligated to pursue under the Settlement Agreement.

27.     Rather than conferring broad discretion on the Debtors, the Settlement Agreement required that the monetization process be conducted "jointly" between Ms. Tilton and the Independent Director/CRO.  *See* Settlement Agreement ¶ 10.  Further, the CRO was not granted broad discretion to act but, instead, was held to an express standard of conduct—to "act in the best interests of the Zohar Funds."  *See id.*  Lastly, the Independent Director's and CRO's ability to act was further limited by paragraph 11 of the Settlement Agreement, which required that if there was a dispute with Ms. Tilton over any action that the Independent Director/CRO wanted to take in the monetization process, that action could only be implemented without Ms. Tilton's consent pursuant to an order of the Court.  *See id.* ¶ 11.

28.     The structure for the decision-making process in the monetization process under the Settlement Agreement—with its express standards of conduct for the Debtors' representatives and Ms. Tilton and the expressly contemplated recourse to mediation and the Court if a decision cannot be reached—reflects the type of contractual provisions where the court in *DG BF, LLC v. Ray* held the implied covenant was not implicated:

> [T]he implied covenant does not come into play when "the scope of discretion is specified," because in that instance, "there is no gap." Moreover, there is no gap when an "[a]greement expressly provides for the way in which" a process ought to occur.  In those cases, "an implied covenant is not appropriate to supplement or to reform the express terms for the process," or to expand the agreement to include new parties in that process.[24]

Indeed, the Response is itself contradictory, noting that the Debtors had a "duty to act in the best interest of the [Zohar] Funds" but then arguing that the Debtors are liable to Patriarch because of their "failure to work with the Patriarch Stakeholders in good faith to monetize the Portfolio

---

[24]     *DG BF, LLC v. Ray*, No. CV 2020-0459-MTZ, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021)

Companies." Resp.¶ 32.  Because Patriarch fails to establish that the implied covenant applies to the Debtors' conduct this theory of liability fails as a matter of law.

## IV.   Patriarch has waived all of the counts in the Patriarch Claims other than the two Settlement Agreement-based counts

29.     Each of these Parts of the Objection set forth in detail why specific counts of the Patriarch Claims fail as a matter of law and should be denied under Rule 12(b)(6):  (1) Patriarch failed to state a tortious interference claim (Obj., Part I.B, ¶¶ 43-47); (2) Patriarch failed to state a claim for *prima facie* tort (Obj., Part I.C., ¶¶ 48-54); (3) Patriarch has not stated claims for indemnification and contribution (Obj., Part I.D, ¶¶ 55-63); (4) The Debtors are not liable to Patriarch for any tax payments; Patriarch is actually liable for any such taxes paid. (Obj., Part I.E, ¶¶ 64-66); and (5) Patriarch has not adequately alleged a claim for any "other Settlement Agreement claims" (Obj., Part I.F, ¶ 67).  Patriarch failed to respond on the merits to these argument and, in doing so, has waived those counts.[25]  Accordingly, the Patriarch Claims should be denied as to these counts.

---

[25]     *See, e.g., Griglak v. CTX Mortg. Co., LLC*, No. 09-5247MLC, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count."); *see also Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Tidewater Equip. Co.*, No. 3:21-CV-00551, 2022 WL 896876, at *4 (M.D. Pa. Mar. 9, 2022), report and recommendation adopted, No. 3:21-CV-551, 2022 WL 891428 (M.D. Pa. Mar. 25, 2022); *Arcuri v. Cnty. of Montgomery*, No. CV 20-5408, 2021 WL 1811576, at *10 (E.D. Pa. May 6, 2021); *Daugherty v. Adams*, No. CV 17-368, 2019 WL 7987859, at *13 (W.D. Pa. Nov. 15, 2019), report and recommendation adopted sub nom. *Daugherty v. Tiversa Holding Corp.*, No. CV 17-368, 2020 WL 467828 (W.D. Pa. Jan. 29, 2020).

29339202.3

## CONCLUSION

30.    For the reasons set forth in the Objection and this Reply, the Court should enter an

order denying the Patriarch Claim.[26]

Dated: May 10, 2022                     YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                                            */s/ Ryan M. Bartley*
                                            James L. Patton, Jr. (No. 2202)
                                            Robert S. Brady (No. 2847)
                                            Michael R. Nestor (No. 3526)
                                            Joseph M. Barry (No. 4221)
                                            Ryan M. Bartley (No. 4985)
                                            Rodney Square
                                            1000 North King Street
                                            Wilmington, Delaware 19801
                                            Telephone: (302) 571-6600
                                            Facsimile: (302) 571-1253
                                            Email: jpatton@ycst.com
                                                      rbrady@ycst.com
                                                      mnestor@ycst.com
                                                      jbarry@ycst.com
                                                      rbartley@ycst.com

                                            *Counsel to the Debtors*

---

[26]    Again, for the avoidance of doubt, the Debtors have agreed to hold disposition of the
Resolve Matters in abeyance and they are not treated as part of the Patriarch Claims for purposes
of this Reply.