### _Exhibit G – Summary of Terms of MD Parent LLC Limited Liability Agreement_

## Without Prejudice Summary of Preliminary MD Holdco Governance Provisions[1]

### Board, Board Observer and Board Rights

- Company to have a seven-member board (the "Board"), comprised as follows:

  - 2 independent Board members to be agreed upon by MBIA and Bardin Hill, who shall initially be Ed Dolanski and Gus Perna

  - The CEO of the company, who shall initially be Brad Pedersen

  - 3 Board members designated by MBIA

  - 1 Board member designated by Bardin Hill

- MBIA, Bardin Hill and MB Global are each entitled to appoint 1 Board observer

- Board members designated by a Unit holder may be removed and re-designated by such Unit holder, such that (i) MBIA shall be entitled to remove and re-designate each of its 3 Board designees in its sole discretion, and shall not require any consultation, (ii) Bardin Hill shall be entitled to remove and re-designate its Board designee in its sole discretion and (iii) MBIA and Bardin Hill shall, upon mutual agreement, be entitled to remove and re-designate the 2 independent Board designees.

- The Company's limited liability company agreement (the "LLCA") will provide that the Board members shall act in accordance with good faith and fair dealing but shall not otherwise owe fiduciary duties to the Company or any other Unit holder.

Notwithstanding any other provision in this term sheet, upon unanimous approval of the Board and approval of a Supermajority (as defined below) of the members, the Company shall be permitted to issue additional Units with rights, powers and duties senior to existing Units and amend any provision of the LLCA to reflect such additional issuance, notwithstanding any other provision of the LLCA (including the provision requiring a supermajority vote to amend the LLCA described below), without any further approvals being necessary.

Issuances of additional Units with rights, powers and duties *pari passu*, junior or subordinate to existing Units may be issued upon approval of the Board (and subject to the pre-emptive rights contained herein), provided, that any amendment to the LLCA to reflect such issuance shall require the consent of a Supermajority to amend the LLCA, as described below. In addition, such issuance shall be based on a valuation determined by an independent accounting firm or investment banking firm engaged by the Company (the "Appraisal") and any such issuance at a price that is more than an agreed upon discount to the valuation set forth in the Appraisal shall require the consent of a Supermajority.

### Board Approval

---

[1] The provisions herein are a summary of certain material governance terms. The governance terms remain subject to discussion among and modification by the relevant parties. The filing of this summary with the Plan Supplement is without prejudice to those discussions and any modifications.

As a general matter and except as set forth in this term sheet, all Company matters shall be decided by the Board, upon majority Board approval, other than the issuance of Units, as described above, and affiliate transactions, which shall require majority approval of the disinterested members on the Board.

## Unit Holder Approvals

1. The following matters shall require the approval of MBIA and other Unit holders holding at least 20% of the outstanding Units (a "Supermajority"):

   a) incurrence of additional indebtedness in excess of $20MM in the aggregate;
   b) undertake an IPO or sale transaction.

2. The unanimous consent of Bardin Hill, MB Global and MBIA shall be required:

   a) for any non-pro rata dividends/distributions/redemptions (other than repurchases of interests held by management pursuant to the terms of contractual arrangements with management or the documents granting such interests).
   b) for additions to the disqualified equityholder/lender lists;
   c) for changes in tax status, including any amendments to the Company's organizational documents implementing such change, that would have a material adverse effect on such Unit holder, except as required by law or other regulatory authority;
   d) to authorize bankruptcy filings, liquidations or dissolutions; and

## Preemptive Rights

- Exercisable on all equity and equity-linked issuances, regardless of whether issued to existing equity holders or issued after the creation of any new class of equity and whether senior, *pari passu*, junior or subordinate to existing Units, subject to customary exceptions
- In connection with any exercise of preemptive rights, where a Unit holder declines to so exercise its rights, such units shall be reallocated to all Unit holders exercising their preemptive rights
- To survive any merger/combination (other than a merger/combination that is a liquidity event) such that future equity issuances by the combined entity will be subject to the preemptive right
- Minimum ownership to exercise pre-emptive rights is 6.0% of the Units outstanding at closing (provided that if a unitholder's percentage ownership slips as a result of dilution, such unitholder shall maintain its preemptive rights)

## Tags

- Unit holders will have customary tag-along rights for a transfer or series of related transfers of twenty percent (20%) or more of the voting rights with respect to the issued

and outstanding Units by a Unit holder or group of Unit holders acting in concert, including on the same terms and the same per-interest consideration as such transferring Unit holders or group of Unit holders acting in concert (such transfer, a "<u>Tag-Along Transfer</u>").

**Drags**

- Subject to the approvals described above, from and after any date that is one (1) year after the closing of the MDHI sale, any Unit holder holding, or group of Unit holders collectively holding, more than 50% of the voting rights with respect to the issued and outstanding Units (the "<u>Dragging Unitholders</u>") shall have the right to effect a sale of the Company to an unaffiliated third party without the approval of the other Unit holders and with no appraisal rights, subject to customary protections for such other Unit holders (such sale, a "<u>Drag-Along Sale</u>")

**Right of First Offer**

- Any proposed transfers of all or a portion of the Units by any Unit holder (other than with respect to a transfer to an affiliate of such Unit holder) (such Unit holder, a "<u>Transferring Unitholder</u>") shall be subject to a right of first offer ("<u>ROFO</u>") exercisable solely by the MBIA Unitholders, Bardin Hill Unitholders, MB Global Unitholders and the Company, in each case, as set forth below
- Each of the MBIA Unitholders, Bardin Hill Unitholders and MB Global Unitholders (each of the MBIA Unitholders, Bardin Hill Unitholders and MB Global Unitholders, a "ROFO Unitholder") shall only be able to exercise their ROFO so long as they own and hold at least 6.0% of the issued and outstanding Units as of the closing (provided that if a unitholder's percentage ownership slips as a result of dilution, such unitholder shall maintain its preemptive rights)
- In the event that a Transferring Unitholder intends to sell, transfer, assign or convey any Units (such Units, the "<u>Offered Units</u>") (other than with respect to a transfer to an affiliate of such Transferring Unitholder), such Transferring Unitholder shall provide a written notice thereof to the each of the ROFO Unitholders and the Company which notice shall include the purchase price and other material terms and conditions for the purchase of the Offered Units (the "<u>ROFO Offer</u>").  For a period of ten (10) business days after delivery of such notice (the "<u>ROFO Period</u>"), each ROFO Unitholder shall have the right, but not an obligation to accept the Offered Units.
- In the event a ROFO Offer is made and not accepted in whole or in part, then for a 150-day period following the rejection of the ROFO Offer or expiration of the ROFO Period, as applicable, the Transferring Unitholder may solicit offers to purchase the portion of the Offered Units that a ROFO Unitholder has not agreed to purchase on terms that are no more favorable to the Transferring Unitholder than the terms of the ROFO Offer.

**Transfer Restrictions**

- Customary transfer restrictions

**Registration Rights and Company Valuation**

- Customary piggy-back registration rights in connection with IPO

- Subject to Board approval, an accounting firm or investment banking firm shall be engaged by the Company on or prior to the 18-month anniversary of the closing to prepare a valuation of the Company (assuming a sale of 100% of the Units).

**Information Rights**

- Customary information and access rights, including annual/quarterly financial reports and access to quarterly earnings calls

***<u>Exhibit J – D&O Expense Escrow Agreement</u>***

*Execution Version*

# D&O EXPENSES ESCROW AGREEMENT

**THIS D&O EXPENSE ESCROW AGREEMENT**, dated as of August 2, 2022 ("***Escrow Agreement***"), is by and between (i) Joseph J. Farnan, Jr. (the "***Independent Director***"), Michael Katzenstein ("***Katzenstein***"), FTI Consulting, Inc. ("***FTI***" and together with Katzenstein, the "***CRO***"), Marc Kirschner ("***Kirschner***"), Robert Kost ("***Kost***"), Teneo Capital LLC f/k/a Goldin Associates LLC ("***Goldin***" and, together with Kost and Kirschner, the "***CMO***" or the "***Former CRO***," as applicable, and together with the Independent Director and the CRO, each, a "***D&O Party***" and collectively, the "***D&O Parties***"); (ii) Ankura Trust Company, LLC, a chartered non-depository trust company organized under the laws of the state of New Hampshire, as Escrow Agent hereunder ("***Escrow Agent***"); (iii) Phoenix II Recovery, LLC, New Phoenix II, LLC and Phoenix II Intermediate, LLC; and (iv) Phoenix III Recovery, LLC (together with Phoenix II Recovery, LLC, the "***Recovery Entities***"), New Phoenix III, LLC, Phoenix III Intermediate, LLC and New Stila Holdco LLC (the entities identified in clauses (iii) and (iv), are referred to herein as the "***Asset Recovery Entities***").

## BACKGROUND

A.  On March 11, 2018, each of Zohar III, Corp., Zohar II 2005-1, Corp, Zohar CDO 2003-1, Corp., Zohar III, Limited, Zohar II 2005-1, Limited and Zohar CDO 2003-1, Limited (each a "***Debtor***" and collectively the "***Debtors***") commenced their bankruptcy cases by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").

B.  On June 21, 2022, the Bankruptcy Court entered an order confirming a chapter 11 plan of liquidation for the Debtors (the "***Plan***") [Docket No. 3400] and approving the Plan Supplement documents, as the same may be amended or modified, including this Escrow Agreement.

C.  The Plan provides that a D&O Expense Escrow Account shall be established, funded and maintained and the funds therein shall be held in trust for the benefit of the D&O Parties and used for the purpose of paying uninsured reasonable and documented fees, costs, or expenses, including compensation for their time expended, as measured by their applicable standard hourly rate, incurred by the Independent Director, the Debtors' current and former Chief Restructuring Officers, the Debtors' Chief Monetization Officer, or their respective supporting personnel solely to the extent such supporting personnel ordinarily bill hourly rates and are, in good faith, determined to be necessary to complete the requisite task, in connection with any proceeding in which the Independent Director, the Chief Restructuring Officers or Chief Monetization Officer, or their respective supporting personnel, are named as a party or participate as a witness or in any other discovery, in all cases related to their status as a current or former officer or director of the Debtors or as supporting personnel thereof (the "***Purpose***").

D.  In order to comply with the Plan, the Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement.

E.   In order to establish the escrow of funds and to effect the provisions of the Plan, including the Purpose, the parties hereto have entered into this Escrow Agreement.

## STATEMENT OF AGREEMENT

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.    <u>Definitions</u>.  The following terms shall have the following meanings when used herein:

"***Escrow Funds***" shall mean the funds deposited with Escrow Agent pursuant to <u>Section 3</u> of this Agreement, together with any interest and other income thereon.  The initial amount of the Escrow Funds shall be $1,500,000.

"***Escrow Period***" shall mean the period commencing on the date hereof and ending on the applicable termination date set forth on <u>Schedule A</u> hereto.

"***Representative***" shall mean the individuals so designated on <u>Schedule A</u> hereto with respect to each D&O Party and each Asset Recovery Entity, or any other person designated in a writing signed by a D&O Party or Asset Recovery Entity and delivered to Escrow Agent in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

"***Written Direction***" shall mean a written direction executed by any Representative and directing Escrow Agent to disburse all or a portion of the Escrow Funds consistent with the Purpose.  Each Written Direction shall include as an attachment an invoice or invoices providing detail sufficient to establish the amount of any cost, expense or fee that is the subject of that Written Direction (which may be redacted to protect any privileged information) and information sufficient to establish that the reimbursement sought is consistent with the Purpose.  A Written Direction shall also contain an undertaking by the D&O Party submitting the Written Direction to (i) use commercially reasonable efforts to pursue or apply for repayment of the requested expenses from any applicable insurance provider and (ii) if any payment is received from any insurer for any cost, expense or fee received under this Escrow Agreement, promptly turnover or reimburse such payment to (x) if such payment is received during the Escrow Period, the Escrow Agent to be included in the Escrow Funds or (y) if such payment is received after the end of the Escrow Period, Phoenix II Recovery, LLC and Phoenix III Recovery, LLC (or any successor thereof appointed in accordance with the Plan or those entities' respective organizational documents) ratably based on the Case Expense Allocation.

Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Plan.

2.      <u>Appointment of and Acceptance by Escrow Agent</u>.  The D&O Parties hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with <u>Section 3</u> below, agrees to hold, invest and disburse the Escrow Funds in accordance with this Escrow Agreement.

3.      <u>Deposit of Escrow Funds.</u>  Immediately upon the Effective Date, each of Zohar II and Zohar III, based on the Case Expense Allocation, will transfer the Escrow Funds to Escrow Agent, by wire transfer of immediately available funds, to the account of the Escrow Agent referenced on <u>Schedule A</u> hereto to be deposited into a non-interest bearing account and then invested in accordance with <u>Section 6</u> of this agreement.

4.      <u>Disbursements of Escrow Funds</u>.

        (a)      Escrow Agent shall disburse Escrow Funds no sooner than five (5) days after receipt of, and in accordance with, a Written Direction.  Such Written Direction shall contain wiring instructions indicating where the funds shall be sent and include a statement that the amounts sought in the Written Direction are consistent with the Purpose.  Any D&O Party submitting a Written Direction to the Escrow Agent shall, simultaneously with the submission of such Written Direction to the Escrow Agent, also send a copy of such Written Direction to all other D&O Parties, the Liquidating Trustees, and Phoenix II Recovery, LLC and Phoenix III Recovery, LLC (or to any successor thereof), care of their managers and their respective Asset Recovery Managers.

        (b)      Within five (5) business days of the end of the Escrow Period, the Escrow Agent shall, without any further instruction from any D&O Party, after deduction and payment to the Escrow Agent of all fees and expenses (including attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder, disburse the balance of the Escrow Funds to Phoenix II Recovery, LLC and Phoenix III Recovery, LLC ratably based on the Case Expense Allocation (i.e., 55% to Phoenix II Recovery, LLC and 45% to Phoenix III Recovery, LLC), or to any successor thereof identified in writing to the Escrow Agent in accordance with the Plan or in the respective organizational documents of Phoenix II Recovery, LLC and Phoenix III Recovery, LLC.

        (c)      All disbursements of funds from the Escrow Funds shall be subject to the fees and claims of Escrow Agent and the Escrow Agent Indemnified Parties (as defined below) pursuant to <u>Section 9</u> and <u>Section 10</u> below.

5.      <u>Suspension of Performance; Disbursement Into Court</u>.  If, at any time, (i) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (ii) the D&O Parties have not within 30 days of the furnishing by Escrow Agent of a notice of resignation pursuant to <u>Section 7</u> hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

(a)    suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Escrow Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed (as the case may be).

(b)    petition (by means of an interpleader action or any other appropriate method) the Bankruptcy Court for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and reasonable attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to the D&O Parties, their shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent.

6.    <u>Investment of Funds.</u>    The Escrow Funds shall be invested by Escrow Agent in either (i) the Federated/Hermes Treasury Obligations Fund, Service Class, Fund #398, or (ii) Federated/Hermes Institutional Prime Obligations Fund, based on written confirmation (which confirmation may be by email) from Phoenix II Recovery, LLC and Phoenix III Recovery, LLC. The D&O Parties agree and represent to the Escrow Agent that any interest or other income earned on any Escrow Account shall, for the purposes of reporting such income to the appropriate tax authorities, be deemed to be earned by Phoenix II Recovery, LLC and Phoenix III Recovery, LLC. Phoenix II Recovery, LLC and Phoenix III Recovery, LLC represent and warrant that they are US persons, as such term is defined by the IRS.  Phoenix II Recovery, LLC and Phoenix III Recovery, LLC understand that, if one or more tax identification numbers is incorrect or is not certified to Escrow Agent, the Internal Revenue Code as amended from time to time, may require withholding of a portion of any interest or other income earned on the Escrow Funds.  Escrow Agent's sole reporting obligation hereunder is to file with the IRS any applicable Form 1099, as required by law, with respect to Escrow Agent's investment of the Escrow Funds under this Agreement in respect of any earnings thereon.  The Recovery Entities agree to assume any and all obligations or liabilities imposed, now or hereafter, by the applicable tax law and/or applicable tax authorities, with respect to any interest or other income or profits earned on the Escrow Funds, and to indemnify, defend and hold Escrow Agent harmless from any liability or obligation on account of taxes, assessments, encumbrances, liens, additions for late payment, interest, penalties, expenses or other governmental charges that may be assessed or asserted against Escrow Agent in connection with or relating to any payment made or other activities performed under the terms of this Escrow Agreement, including, without limitation, any liability for the withholding or deduction of (or the failure to withhold or deduct) the same, and any liability for the failure to obtain proper certifications or to report properly to tax or governmental authorities in connection with this Escrow Agreement, including costs, expenses (including legal fees and expenses),

-4-

interest or penalties, in each case to the extent applicable to, or arising in respect of, the interest or profits earned on the Escrow Account, unless such liability is caused solely by Escrow Agent's gross negligence or willful misconduct. The foregoing indemnification and agreement to defend and hold harmless shall survive the termination of this Agreement.

7.    Resignation of Escrow Agent.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving ten (10) days' prior written notice to the D&O Parties specifying a date when such resignation shall take effect.  Upon any such notice of resignation, the D&O Parties shall appoint a successor Escrow Agent hereunder prior to the effective date of such resignation.  For the avoidance of doubt, the absence of a successor shall not impact the Escrow Agent's ability to resign hereunder. The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Agent's resignation, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement.  Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's corporate trust line of business may be transferred, shall be the Escrow Agent under this Escrow Agreement without further act.

8.    Liability of Escrow Agent.

(a)    The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied.  The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement.  The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent acted with gross negligence or willful misconduct as determined in a final non-appealable order.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement or the

Underlying Agreement, or to appear in, prosecute or defend any such legal action or proceeding. Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. The reasonable and documented fees and expenses of any such counsel shall be paid from the Escrow Funds, subject to <u>Section 10(b)</u>; *provided*, *however*, that there shall be no liability under this <u>Section 8</u> for any amount in excess of the then-current Escrow Account balance.

(b)    The Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Escrow Funds, without determination by the Escrow Agent of such court's jurisdiction in the matter. If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree that it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

9.    <u>Indemnification of the Escrow Agent</u>. From and at all times after the date of this Escrow Agreement, the D&O Parties shall, to the fullest extent permitted by law, defend, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "***Escrow Agent Indemnified Parties***") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Escrow Agent Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation any D&O Parties, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Escrow Agreement or any transactions contemplated herein, whether or not any such Escrow Agent Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; *provided, however*, that no Escrow Agent Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Escrow Agent Indemnified Party. Each Escrow Agent Indemnified Party shall, in its sole discretion, have the

-6-

right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees and expenses of such counsel shall be paid from the Escrow Funds, subject to Section 10(b).   The obligations of the D&O Parties under this Section 9 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.  Notwithstanding anything to the contrary set forth herein, the D&O Parties shall not be required to indemnify the Escrow Agent Indemnified Parties for any amount in excess of the then-current Escrow Account balance.

10.    Compensation to Escrow Agent.

(a)    Fees and Expenses.  The Escrow Agent shall be compensated for its services hereunder in accordance with Schedule A attached hereto and, in addition, the Escrow Agent shall be reimbursed for all of its reasonable out-of-pocket expenses, including reasonable and documented attorneys' fees, travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), copying charges and the like; *provided*, *however*, that notwithstanding anything to the contrary herein, the Escrow Agent shall not be entitled to reimbursement for any attorneys' fees in excess of $75,000, provided further however, that the foregoing proviso shall not apply to legal fees incurred (i) by an Escrow Agent Indemnified Party under Section 9 of this Escrow Agreement or (ii) by the Escrow Agent in connection with any amendment, waiver, supplement or other modification to this Escrow Agreement requested by any party to the Escrow Agreement other than the Escrow Agent..  The additional provisions and information set forth on Schedule A are hereby incorporated by this reference, and form a part of this Escrow Agreement.  All of the compensation and reimbursement obligations set forth in this Section 10 shall be solely payable from the Escrow Account and shall be payable upon demand by Escrow Agent as set forth in Section 10(b). The obligations under this Section 10 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent. Notwithstanding anything to the contrary set forth herein, the D&O Parties shall not be required to compensate or reimburse the Escrow Agent other than from amounts in the Escrow Account.

(b)    Disbursements from Escrow Funds to Pay Escrow Agent.  The Escrow Agent shall deliver to each of the D&O Parties a prior written notice of disbursement (a "***Disbursement Notice***") including an itemized invoice documenting, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent is entitled to seek indemnification pursuant to Section 9 hereof).  Five (5) Business Days following the delivery of a Disbursement Notice to the D&O Parties, the Escrow Agent is authorized to, and may, disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder as set forth in the Disbursement Notice.  The Asset Recovery Entities and the D&O Parties acknowledge and agree that all disbursements made to Escrow Agent in accordance with this Escrow Agreement shall be non-refundable and not subject to any contest, attack, defense, reduction, avoidance, setoff, recoupment, recharacterization, subordination, impairment, claim, counterclaim, cross-claim, charge, assessment, or any other challenge.

11.     <u>Representations and Warranties</u>. Each Asset Recovery Entity makes the following representations and warranties to Escrow Agent:

(a)     It is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or organization, and has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder;

(b)     This Escrow Agreement has been duly approved by all necessary action, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization or moratorium laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies;

(c)     The execution, delivery, and performance of this Escrow Agreement will not violate, conflict with, or cause a default under its articles of incorporation, articles of organization, bylaws, management agreement or other organizational document, as applicable, any applicable law or regulation, any court order or administrative ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture, or other binding arrangement, to which it is a party or any of its property is subject;

(d)     The applicable persons designated on Schedule A hereto have been duly appointed to act as its Representatives hereunder and have full power and authority to amend, modify or waive any provision of this Escrow Agreement and to take any and all other actions as its Representative under this Escrow Agreement, all without further consent or direction from, or notice to, it or any other party; and

(e)     All of its representations and warranties contained herein are true and complete as of the date hereof and will be true and complete at the time of any disbursement of the Escrow Funds.

12.     <u>Identifying Information</u>.  Each D&O Party acknowledges that a portion of the identifying information set forth on <u>Schedule A</u> is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "**Act**"). To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust, or other legal entity, we ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

13.     <u>Consent to Jurisdiction and Venue; Jury Waiver</u>.  In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto agree that the Bankruptcy Court shall have the sole and exclusive jurisdiction over

any such proceeding. If such court lacks federal subject matter jurisdiction, the parties agree that the Court of Chancery in the State of Delaware (and the courts of appeals therefrom) shall have sole and exclusive jurisdiction. Any of these courts shall be proper venue for any such lawsuit or judicial proceeding and the parties hereto waive any objection to such venue. The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts. THE PARTIES HERETO KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE PERFORMANCE OF SERVICES BY THE ESCROW AGENT HEREUNDER.

14.    Notice. All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be deemed to have been given when the writing is delivered if given or delivered by hand, overnight delivery service or email to the address or email address set forth on Schedule A hereto, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date deposited in the mail, if mailed, by first-class, registered or certified mail, postage prepaid, addressed as set forth on Schedule A hereto, or to such other address as each party may designate for itself by like notice.

15.    Amendment or Waiver. This Escrow Agreement may be changed, waived, discharged or terminated only by a writing signed by all of the D&O Parties, Escrow Agent, and the Asset Recovery Entities. No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

16.    Severability. To the extent any provision of this Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

17.    Governing Law. This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of Delaware without giving effect to the conflict of laws principles thereof.

18.    Entire Agreement. This Escrow Agreement constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds.

19.    Binding Effect. All of the terms of this Escrow Agreement, as amended from time to time, shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of the D&O Parties, Escrow Agent, and the Asset Recovery Entities.

20.    Execution in Counterparts. This Escrow Agreement may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction.

21.    <u>Termination.</u>    Upon the disbursement of all amounts in the Escrow Funds pursuant to Written Directions or the disbursement of all amounts in the Escrow Funds into court pursuant to <u>Section 5</u> or <u>Section 7</u> hereof, this Escrow Agreement shall terminate and Escrow Agent shall have no further obligation or liability whatsoever with respect to this Escrow Agreement or the Escrow Funds.

[Signature Page Follows]

**IN WITNESS WHEREOF,** the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

**D&O PARTIES:**

_____
JOSEPH J. FARNAN. JR.


_____
MICHAEL KATZENSTEIN


_____
ROBERT KOST


_____
MARC KIRSCHNER


FTI CONSULTING, INC.

_____
By:
Title:


TENEO CAPITAL LLC

_____
By:
Title:


*[Signature page for D&O Expense Escrow Agreement]*

**ESCROW AGENT:**

ANKURA TRUST COMPANY, LLC

By: _____

Title:

**ASSET RECOVERY ENTITIES:**

NEW PHOENIX II, LLC

By: _____

Title:

PHOENIX II INTERMEDIATE, LLC

By: _____

Title:

PHOENIX II RECOVERY, LLC

By: _____

Title:

*[Signature page for D&O Expense Escrow Agreement]*

NEW PHOENIX III, LLC

_____
By:
Title:


PHOENIX III INTERMEDIATE, LLC

_____
By:
Title:


PHOENIX III RECOVERY, LLC

_____
By:
Title:


NEW STILA HOLDCO LLC

_____
By:
Title:


*[Signature page for D&O Expense Escrow Agreement]*

SCHEDULE A

1.      <u>Escrow Funds</u>.

Escrow Funds wiring instructions:

Bank: Huntington National Bank
ABA: 044000024
Ankura Trust Company LLC
Account number: 01893484573
Ref: Zohar/ DO Escrow

2.      <u>Escrow Agent Fees</u>:

**<u>Initial Acceptance Fee:</u>**          WAIVED

The Initial Acceptance Fee includes the administrative review and all related documentation as Escrow Agent for the initial set-up of the account, and other reasonably required services up to and including the closing, including all Patriot Act/KYC requests for all parties and processing for account acceptance.  This is a one-time fee, payable upon the initial funding of the escrow account.

**<u>Escrow Agent Administration Fee:</u>** $5,000.00 per annum

The Escrow Agent Administration Fee covers the routine duties of the Escrow Agent associated with the administration of the account. The Escrow Agent Administration Fee shall be payable upon the execution of the Agreement and on each anniversary of the execution of the Agreement until the Agreement is terminated. Subsequent Annual fees shall be subject to an annual adjustment of no greater than 5%.

**<u>Fees for Extraordinary Services</u>**: Fees for reasonable extraordinary services are payable to the Escrow Agent for reasonable duties or responsibilities not expected to be incurred at the outset of the transaction or not incurred in the ordinary course of business of administering the Agreement and related documentation. Extraordinary services include, but are not limited to, default administration, restructuring or similar transactions, tenders or exchanges, amendments or supplements, specialized reporting, actual or threatened litigation or arbitration proceedings, enforcement actions, conversions or special redemptions, non-routine calculations, foreign currency conversions, early termination or other services not otherwise specifically provided for in this Schedule.

Fees for extraordinary services will be charged at the relevant professionals' hourly rate then in effect.  The hourly rate will not increase by more than 5% over the course of any fiscal year.

**<u>Out-of-Pocket Expenses</u>**: Any out-of-pocket expenses incurred by us will be billed in accordance with the Agreement and related documentation and will include, but are not be limited to, legal costs, travel expenses, document duplication and facsimiles and courier services.

**<u>Legal Counsel</u>**: The Escrow Agent shall be reimbursed for its retention of Milbank LLP as counsel for the Escrow Agent (and any successor counsel to the Escrow Agent) and a single local counsel to the Escrow Agent in each relevant jurisdiction and any reasonably necessary conflicts counsel.

A-1

<u>SCHEDULE A</u>, continued

**Billing and Payments**: The Acceptance Fee and Account Administration Fee shall be payable upon the execution of the Agreement. Other fees, charges and reimbursements will be billed on a monthly basis. Interest will be charged on past due amounts at a rate of 5% per annum.

3.      <u>Termination and Disbursement</u>.  The Escrow Period shall terminate upon the "***Termination Date***" which shall be the later of (i) six (6) years from the date of the Escrow Agreement (unless extended by agreement of the parties thereto) (the "***Litigation Outside Date***"), or, (ii) in the event there is pending litigation related to the Debtors that remains open as of the Litigation Outside Date, the date on which all such litigation is Concluded.  Concluded means that each count in the litigation has been either (i) dismissed with prejudice or (ii) subject to entry of an order for which the period to appeal or petition for certiorari has expired.

A-2

SCHEDULE A, continued

4.    Representatives.

The following person is hereby designated and appointed as Representative under the Escrow Agreement:

| Party | Representative | Representative's Sample Signature |
|---|---|---|
| Joseph Farnan | Joseph Farnan | |
| Michael Katzenstein | Michael Katzenstein | |
| FTI Consulting, Inc. | Michael Katzenstein | |
| Marc Kirschner | Marc Kirschner | |
| Robert Kost | Robert Kost | |
| Teneo Capital LLC | Robert Kost | |
| Phoenix II Recovery, LLC | David Dunn | |
| Phoenix III Recovery, LLC | David Dunn | |

A-3

SCHEDULE A, continued

4.    Representatives (continued).

The following person is hereby designated and appointed as Representative under the Escrow Agreement:

| New Phoenix II, LLC | David Dunn | |
|---|---|---|
| Phoenix II Intermediate, LLC | David Dunn | |
| New Phoenix III, LLC | David Dunn | |
| Phoenix III Intermediate, LLC | David Dunn | |
| New Stila Holdco LLC | David Dunn | |

A-4

SCHEDULE A, continued

5.      Notice Addresses.

If to Joseph J. Farnan, Jr. at:

       Farnan LLP
       919 North Market St.
       12th Floor
       Wilmington, DE 19801
       Attention:    Joseph J. Farnan, Jr.
       E-mail:farnan@farnanlaw.com

       with a copy to (which shall not constitute notice):

           White & Case LLP
           1221 Avenue of the Americas
           New York, New York 10020-1095
           Attention:    Christopher Shore
                         Brian Pfeiffer
           E-mail:      CShore@whitecase.com
                         BPfeiffer@whitecase.com

If to Michael Katzenstein or FTI at:

       FTI Consulting, Inc.
       Three Times Square, 9th Floor
       New York, New York 10036
       Attention:  Michael Katzenstein
       E-mail:     Mike.Katzenstein@fticonsulting.com

       with a copy to (which shall not constitute notice):

           FTI Consulting, Inc.
           555 12th Street NW | Suite 700
           Washington, DC 20004
           Attention:    Jason Sharp
           Email:        Jason.Sharp@fticonsulting.com

A-5

<u>SCHEDULE A</u>, continued

If to Marc Kirschner, Robert Kost, or Goldin at:

      Teneo Capital, LLC
      350 Fifth Avenue
      New York, NY 10118
      Attention:     Robert Kost and Marc Kirschner
      E-mail:        Robert.Kost@teneo.com; Marc.Kirschner@teneo.com

      <u>with a copy to (which shall not constitute notice)</u>:

         Teneo Capital LLC
         350 Fifth Avenue
         New York, NY 10118
         Attention:     General Counsel
         E-mail:        US-Counsel@teneo.com

If to the Asset Recovery Entities

      David Dunn
      PROVINCE
      700 Canal Street, Suite 12E
      Stamford, CT, 06902
      E-mail: ddunn@provincefirm.com

      -and-

      New Phoenix II, LLC
      Care of MBIA Inc.
      1 Manhattanville Rd #301
      Purchase, New York 10577
      Attn: Jonathan Harris; Anthony McKiernan
      E-mail: Jonathan.Harris@mbia.com; Anthony.McKiernan@mbia.com

      -and-

      New Phoenix III, LLC
      Care of John Greene
      Bardin Hill Investment Partners LP
      299 Park Avenue, 24th Floor | New York, NY 10171
      Email: jgreene@bardinhill.com

SCHEDULE A, continued

with a copy to (which shall not constitute notice):

      Young Conaway Stargatt & Taylor LLP
      1000 North King Street
      Wilmington Delaware 19801
      Attention:  Michael R. Nestor & Joseph M. Barry
      Email: mnestor@ycst.com and jbarry@ycst.com

If to the Litigation Trustees at:

      David Dunn
      PROVINCE
      700 Canal Street, Suite 12E
      Stamford, CT, 06902
      E-mail: ddunn@provincefirm.com

      with copies to (which shall not constitute notice):

      Quinn Emanuel Urquhart & Sullivan, LLP
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      Direct: (212) 849-7115
      Attn: Jonathan E. Pickhardt
      E-mail: jonpickhardt@quinnemanuel.com

      -and-

      Young Conaway Stargatt & Taylor LLP
      1000 North King Street
      Wilmington Delaware 19801
      Attention:  Michael R. Nestor & Joseph M. Barry
      Email: mnestor@ycst.com and jbarry@ycst.com

If to the Escrow Agent at:

      Ankura Trust Company, LLC
      140 Sherman Street, 4th Floor
      Fairfield, CT 06824
      Attention: Ryan Roy
      Telephone: (617) 878-2031
      Email: Ryan.Roy@ankura.com

<u>SCHEDULE A</u>, continued

<u>with a copy to (which shall not constitute notice)</u>:

      Milbank LLP
      55 Hudson Yards
      New York, NY 10001
      Attention: Eric Stodola & Andrew Harmeyer
      E-mail: estodola@milbank.com and aharmeyer@milbank.com

**_Exhibit L-1 – Form of Zohar II Litigation Funding Agreement_**

**DRAFT**

**LOAN AGREEMENT (MBIA TRUST-A&B)**

**by and among**

**ZOHAR LITIGATION TRUST-A, as the LTA Borrower**

**ZOHAR LITIGATION TRUST-B and**
**PHOENIX II RECOVERY, LLC,**
**as the LTB Borrowers,**

**THE GUARANTORS**
**FROM TIME TO TIME PARTY HERETO,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

**and**

**MBIA INSURANCE CORPORATION,**
**as Administrative Agent and Collateral Agent**

**Dated as of August [2], 2022**

# TABLE OF CONTENTS

**Page**

1.  DEFINITIONS AND CONSTRUCTION. ..........................................................3
    1.1  Definitions..........................................................................................3
    1.2  Accounting Terms..............................................................................23
    1.3  UCC .................................................................................................24
    1.4  Construction .....................................................................................24
    1.5  The Agents .......................................................................................24
    1.6  Schedules and Exhibits .....................................................................24
    1.7  Times of Day ....................................................................................24

2.  LOAN AND TERMS OF PAYMENT. ...........................................................25
    2.1  [RESERVED] ....................................................................................25
    2.2  Agreement to Lend ...........................................................................25
    2.3  Borrowing Procedures ......................................................................25
    2.4  Payments; Reductions of Commitment; Prepayments..........................26
    2.5  Evidence of Debt; Repayment of Loans ..............................................30
    2.6  Interest Rates and Rates, Payments and Calculations...........................31
    2.7  Fees .................................................................................................32
    2.8  Extension of Maturity Date................................................................32
    2.9  Increased Costs .................................................................................33
    2.10 Taxes ...............................................................................................34
    2.11 Mitigation Obligations; Replacement of Lenders.................................38
    2.12 Defaulting Lender Adjustments .........................................................39

3.  CONDITIONS PRECEDENT. .......................................................................40
    3.1  Closing Date......................................................................................40
    3.2  Each Loan .........................................................................................41

4.  REPRESENTATIONS AND WARRANTIES...................................................42
    4.1  Due Organization and Qualification ...................................................42
    4.2  Due Authorization; No Conflict..........................................................42
    4.3  Binding Obligations ..........................................................................43
    4.4  Properties .........................................................................................43
    4.5  Jurisdiction of Formation; Location of Chief Executive Office;
         Jurisdiction; Identification Number ...................................................43
    4.6  [Reserved] ........................................................................................43
    4.7  Fraudulent Transfer...........................................................................43
    4.8  Use of Proceeds.................................................................................43
    4.9  Payment of Taxes ..............................................................................43
    4.10 Compliance with Law ........................................................................43
    4.11 Security Interest in Collateral ............................................................44
    4.12 [Reserved] ........................................................................................44
    4.13 Anti-Terrorism Law; Foreign Corrupt Practices Act............................44
    4.14 No Bank Accounts .............................................................................45

|      | 4.15 | Budget ....................................................................................................45 |

| 5.   | AFFIRMATIVE COVENANTS. ...................................................................45 |
|      | 5.1  | Notices .................................................................................................45 |
|      | 5.2  | Periodic Reports .................................................................................45 |
|      | 5.3  | Conference Calls ................................................................................46 |
|      | 5.4  | Existence .............................................................................................46 |
|      | 5.5  | Use of Proceeds ..................................................................................46 |
|      | 5.6  | Taxes and Obligations ........................................................................46 |
|      | 5.7  | Confirmation Order; Chapter 11 Plan; Litigation Trust Agreements. ...................46 |
|      | 5.8  | Maintaining Records; Access to Properties and Inspections ...............46 |
|      | 5.9  | [Reserved] ...........................................................................................47 |
|      | 5.10 | Compliance with Laws .......................................................................47 |
|      | 5.11 | Budgets ...............................................................................................47 |
|      | 5.12 | Formation of Subsidiaries; Additional Collateral; Further Assurances ................47 |
|      | 5.13 | Post-Closing Covenants. .....................................................................48 |

| 6.   | NEGATIVE COVENANTS. ...........................................................................48 |
|      | 6.1  | Indebtedness .......................................................................................48 |
|      | 6.2  | Liens ...................................................................................................48 |
|      | 6.3  | Restrictions on Fundamental Changes .................................................48 |
|      | 6.4  | Disposal of Assets ..............................................................................49 |
|      | 6.5  | Change Name .....................................................................................49 |
|      | 6.6  | Investments ........................................................................................49 |
|      | 6.7  | Amendments .......................................................................................49 |
|      | 6.8  | [Reserved] ...........................................................................................49 |
|      | 6.9  | Accounting Methods ...........................................................................50 |
|      | 6.10 | [Reserved] ...........................................................................................50 |
|      | 6.11 | Restricted Payments ...........................................................................50 |
|      | 6.12 | Anti-Terrorism Law; Anti-Money Laundering ...................................50 |
|      | 6.13 | Embargoed Persons. ...........................................................................50 |
|      | 6.14 | [Reserved] ...........................................................................................50 |
|      | 6.15 | Litigation Trust ..................................................................................51 |
|      | 6.16 | Budget Variance .................................................................................51 |
|      | 6.17 | Fees ....................................................................................................51 |

| 7.   | GUARANTY. ...................................................................................................51 |
|      | 7.1  | Guaranty of the Obligations ...............................................................51 |
|      | 7.2  | Payment by Guarantors ......................................................................51 |
|      | 7.3  | Liability of Guarantors Absolute ........................................................51 |
|      | 7.4  | Waivers by Guarantors .......................................................................53 |
|      | 7.5  | Continuing Guaranty ..........................................................................54 |
|      | 7.6  | Reinstatement. ....................................................................................54 |
|      | 7.7  | Subrogation; Subordination ................................................................54 |
|      | 7.8  | General Limitation on Guarantee Obligations ....................................54 |

8.      EVENTS OF DEFAULT.................................................................................54
        8.1      Event of Default...............................................................................54
        8.2      Rights and Remedies.......................................................................57
        8.3      Application of Proceeds upon Event of Default ............................58

9.      THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT....................59
        9.1      Appointment ....................................................................................59
        9.2      Agent in Its Individual Capacity ....................................................61
        9.3      Exculpatory Provisions ...................................................................61
        9.4      Reliance by Agent............................................................................62
        9.5      Delegation of Duties ........................................................................63
        9.6      Successor Agent...............................................................................63
        9.7      Non-Reliance on Agent and Other Lenders.....................................63
        9.8      [Reserved]........................................................................................64
        9.9      Indemnification................................................................................64
        9.10     [Reserved]........................................................................................64
        9.11     Lender Action ..................................................................................65
        9.12     [Reserved]........................................................................................65
        9.13     Lender's Representations, Warranties and Acknowledgements.........65
        9.14     Security Documents and Guarantee.................................................65
        9.15     Administrative Agent May File Bankruptcy Disclosure and Proofs of
                 Claim................................................................................................67
        9.16     Erroneous Payments........................................................................68

10.     EXPENSES; INDEMNIFICATION; DAMAGES WAIVER.........................................70

11.     NOTICES...........................................................................................................73

12.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. ....................................75

13.     AMENDMENTS; ASSIGNMENTS; WAIVERS; SUCCESSORS.................................77
        13.1     Amendments and Waivers................................................................77
        13.2     No Waivers; Cumulative Remedies..................................................79
        13.3     Successors ........................................................................................79
        13.4     Assignments .....................................................................................79
        13.5     Register. ...........................................................................................81
        13.6     Participations....................................................................................82
        13.7     Certain Pledges.................................................................................83
        13.8     Assignment of Upside Return...........................................................83

14.     GENERAL PROVISIONS. ...................................................................................84
        14.1     Effectiveness.....................................................................................84
        14.2     Section Headings ..............................................................................84
        14.3     Interpretation....................................................................................84
        14.4     Severability of Provisions ................................................................84
        14.5     No Fiduciary Duty ............................................................................84
        14.6     Counterparts; Electronic Execution .................................................85

| | | |
|---|---|---|
| 14.7 | Revival and Reinstatement of Obligations | 85 |
| 14.8 | Integration | 85 |
| 14.9 | Right of Setoff; Marshalling; Payments Set Aside | 85 |
| 14.10 | Confirmation Order | 86 |
| 14.11 | Confidentiality | 86 |
| **15.** | **JOINT AND SEVERAL LIABILITY.** | 87 |
| 15.1 | [Reserved] | 87 |
| 15.2 | Joint and Several Liability | 87 |
| 15.3 | Separate Exercise of Remedies | 88 |
| 15.4 | Subrogation | 88 |
| 15.5 | Waiver of Defenses | 88 |
| 15.6 | Patriot Act | 88 |

**Exhibits**

Exhibit A        —    Form of Assignment and Assumption
Exhibit B        —    Form of Borrowing Request
Exhibit C-1      —    Initial Litigation Trust A Budget
Exhibit C-2      —    Initial Litigation Trust B Budget
Exhibit C-3      —    Initial Recovery Budget
Exhibit D-1      —    Form of U.S. Tax Compliance Certificate
Exhibit D-2      —    Form of U.S. Tax Compliance Certificate
Exhibit D-3      —    Form of U.S. Tax Compliance Certificate
Exhibit D-4      —    Form of U.S. Tax Compliance Certificate

**Schedules**

Schedule I       —    Commitment Schedule
Schedule II      —    Escrow Accounts

## LOAN AGREEMENT (MBIA TRUST – A&B)

**THIS LOAN AGREEMENT** (this "Agreement"), is entered into as of August 2, 2022, by and among Zohar Litigation Trust-A, a Delaware common law trust ("Litigation Trust A" or the "LTA Borrower"), Zohar Litigation Trust-B, a Delaware common law trust ("Litigation Trust B") and Phoenix II Recovery, LLC, a Delaware limited liability company ("Recovery" and collectively with Litigation Trust B, each a "LTB Borrower" and together, the "LTB Borrowers") (the LTA Borrower and the LTB Borrowers, each a "Borrower" and together, the "Borrowers"), the Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to in Section 1), the Lenders and MBIA Insurance Corporation, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and as collateral agent for the Secured Parties (in such capacity, the "Collateral Agent").

**WHEREAS**, each of Zohar III, Corp. and its affiliated debtors and debtors in possession in the chapter 11 cases (the "Chapter 11 Cases") currently pending in the United States Bankruptcy Court for the District of Delaware and captioned as *Zohar III, Corp., et al.*, Case No. 18-10512 (KBO) (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on March 11, 2018 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on January 31, 2022, the Debtors filed their *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and its Affiliated Debtors* [Docket No. 3042] (as the same may be amended, modified, or supplement from time to time in accordance with the terms and provisions thereof, the "Chapter 11 Plan");[1]

**WHEREAS**, on February 3, 2022, the Debtors filed their *Disclosure Statement for Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and its Affiliated Debtors* [Docket No. 3048] (the "Disclosure Statement");

**WHEREAS**, on April 6, 2022, the Bankruptcy Court entered an order approving the Disclosure Statement [Docket No. 3239];

**WHEREAS**, on May 6, 2022, the Debtors filed their *Plan Supplement to the Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliated Debtors* [Docket No. 3304];

**WHEREAS**, on June 16, 2022, the Debtors filed their *Plan Supplement to the Third Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliated Debtors* [Docket No. 3391];

---

[1] On April 6, 2022, the Debtors filed their *Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and its Affiliated Debtors* [Docket No. 3233]. On June 15, 2022, the Debtors filed their *Third Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III Corp. and its Affiliated Debtors* [Docket No. 3380].

**WHEREAS**, on June 21, 2022, the Bankruptcy Court entered its order confirming the Chapter 11 Plan (the "<u>Confirmation Order</u>") [Docket No. 3400];

**WHEREAS**, the Effective Date of the Chapter 11 Plan occurred on August 2, 2022;

**WHEREAS**, pursuant to and as provided in the Chapter 11 Plan, as of the Effective Date (as hereinafter defined) the parties to the Litigation Trust A Agreement (as hereinafter defined) entered into the Litigation Trust A Agreement to seek to effectuate (a) the creation and establishment of the Litigation Trust A (as defined above) for the benefit of the Litigation Trust-A Beneficiaries (as defined in the Litigation Trust A Agreement) to pursue the Litigation Trust-A Causes of Action (as defined in the Litigation Trust A Agreement), (b) the automatic transfer to the Litigation Trust A of the Litigation Trust-A Assets (as defined in the Litigation Trust A Agreement), as well as the rights and powers of each Debtor and Litigation Trust-A Beneficiary, as applicable, in such Litigation Trust-A Assets, free and clear of all Claims and Interests (as defined in the Litigation Trust A Agreement), (c) the prosecution and settlement of the Litigation Trust-A Causes of Action by the Litigation Trust A Trustee (at the Direction of the Litigation Trust Advisory Board (Trust A)), and (d) the distribution of the proceeds therefrom or from any of the Litigation Trust-A Assets (collectively, the "<u>Litigation Trust-A Proceeds</u>") to the Litigation Trust-A Beneficiaries, in each case as set forth in the Chapter 11 Plan, the Confirmation Order, and the Litigation Trust A Agreement;

**WHEREAS**, pursuant to and as provided in the Chapter 11 Plan, as of the Effective Date (as hereinafter defined) the parties to the Litigation Trust B Agreement (as hereinafter defined) entered into the Litigation Trust B Agreement to seek to effectuate (a) the creation and establishment of the Litigation Trust B (as defined above) for the benefit of the Litigation Trust-B Beneficiaries (as defined in the Litigation Trust B Agreement) to pursue the Litigation Trust-B Causes of Action (as defined in the Litigation Trust B Agreement), (b) the automatic transfer to the Litigation Trust B of the Litigation Trust-B Assets (as defined in the Litigation Trust B Agreement), as well as the rights and powers of each Debtor and Litigation Trust-B Beneficiary, as applicable, in such Litigation Trust-B Assets, free and clear of all Claims and Interests (as defined in the Litigation Trust B Agreement), (c) the prosecution and settlement of the Litigation Trust-B Causes of Action by the Litigation Trust B Trustee (at the Direction of the Litigation Trust Advisory Board (Trust B), and (d) the distribution of the proceeds therefrom or from any of the Litigation Trust-B Assets (collectively, the "<u>Litigation Trust-B Proceeds</u>") to the Litigation Trust-B Beneficiaries, in each case as set forth in the Chapter 11 Plan, the Confirmation Order, and the Litigation Trust B Agreement;

**WHEREAS**, pursuant to and as provided in the Chapter 11 Plan, the Litigation Trust A Agreement provides that the Litigation Trust A shall be funded and vested with that certain Litigation Trust-A Fund (as defined in the Litigation Trust A Agreement);

**WHEREAS**, pursuant to and as provided in the Chapter 11 Plan, the Litigation Trust B Agreement provides that the Litigation Trust B shall be funded and vested with that certain Litigation Trust-B Fund (as defined in the Litigation Trust B Agreement);

**WHEREAS**, in order to provide for such Litigation Trust-A Fund, the LTA Lenders (as hereinafter defined) are providing the commitments and loans to the LTA Borrower under the

Loan Documents (as hereinafter defined) and the Zohar III Lenders (as hereinafter defined) are providing the commitments and loans under the Zohar III Litigation Trust Loan Documents (as hereinafter defined); and

**WHEREAS**, in order to provide for such Litigation Trust-B Fund, the LTB Lenders (as hereinafter defined) are providing the commitments and loans to the LTB Borrowers under the Loan Documents (as hereinafter defined) and the Zohar III Lenders (as hereinafter defined) are providing the commitments and loans to Litigation Trust B under the Zohar III Litigation Trust Loan Documents (as hereinafter defined);

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1.     **DEFINITIONS AND CONSTRUCTION.**

1.1     **Definitions**.    As used in this Agreement, the following terms shall have the meaning specified below:

"Additional Documents" has the meaning specified in Section 5.12(c).

"Administrative Agent" has the meaning specified in the introductory paragraph hereto.

"Administrative Agent's Office" means the office of the Administrative Agent specified in or determined in accordance with the provisions of Section 11(e).

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of fifty percent (50%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person; provided, however, that each of the Lenders as of the Closing Date (together with their respective Affiliates) shall not be considered "Affiliates" for the purposes of the Loan Documents.    For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Agents" means the Administrative Agent and the Collateral Agent; and "Agent" shall mean any of them as the context may require.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Amounts Repaid" means, as of any date, the aggregate amount paid by the Borrowers to the Lenders on account of principal and interest on the Loans, in each case, as of such date. For the avoidance of doubt, "Amounts Repaid" shall not include amounts paid on account of fees and expenses.

"Anti-Terrorism Laws" has the meaning specified in Section 4.13(a).

"Applicable Law" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"Approved Fund" means any Person that is (or will be) engaged in making, purchasing, holding or investing in bank and other commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Recovery Manager" means the "Asset Recovery Manager" of Recovery as set forth in Recovery's Organizational Documents.

"Asset Sale" shall mean (a) any disposition of any property, by any Loan Party (including any disposition of property to a Delaware Divided LLC pursuant to a Delaware LLC Division) and (b) any issuance or sale of any Equity Interests of any Loan Party, in each case, to any Person other than another Loan Party, but shall not include the liquidation or monetization (by settlement, disposition, collection or enforcement) of a Litigation Claim held by either of the Litigation Trusts.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 13.4), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Commitments pursuant to Section 2.4(e) and (c) the date of the termination of the commitments of each Lender to make Loans pursuant to Section 8.2.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom

relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" has the meaning specified in the recitals hereto.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Borrower Materials" has the meaning specified in Section 11(d).

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing Request" means a request by the applicable Borrower in accordance with the terms of Section 2.3(b) and substantially in the form of Exhibit B, or such other form as shall be approved by the Administrative Agent.

"Budget" shall mean the Initial Budgets or the then most current Updated Budgets delivered pursuant to Section 5.11.

"Budget Variance Report" means quarterly variance reports provided by the Borrowers to the Lenders showing, in each case, the actual operating expenses for the immediately preceding quarter, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Initial Budget or the then most current Updated Budget, as the case may be, and shall include explanations in reasonable detail, for all variances that exceed Permitted Variances. The Budget Variance Report shall be in a form reasonably satisfactory to the Required Lenders, and shall contain supporting information reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) and reasonably satisfactory to the Required Lenders; provided, however, that notwithstanding anything to the contrary herein, no Borrower shall be required to disclose or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by Applicable Law, or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Call Period Termination Date" means October 31, 2022.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each

case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Chapter 11 Plan" has the meaning specified in the recitals hereto.

"Chapter 11 Restructuring Transaction" means all corporate or restructuring transactions necessary or appropriate in order to implement and effectuate the Chapter 11 Plan.

"Closing Date" means August 2, 2022.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means the LTA Collateral, the LTB Collateral or both, as the context may require.

"Collateral Agent" has the meaning specified in the introductory paragraph hereto.

"Commitment" means the LTA Commitment, the LTB Commitment or both, as the context may require.

"Commitment Schedule" means the Schedule attached hereto as Schedule I.

"Confirmation Order" has the meaning specified in the recitals hereto.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control Agreement" means, with respect to each Deposit Account and securities account of a Loan Party, an agreement in form and substance reasonably satisfactory to the Collateral Agent, among the depository institution, securities intermediary or other Person holding such Loan Party's funds or securities, and the Collateral Agent (or a designee thereof pursuant to the terms of the Intercreditor Agreement) with respect to collection and Control (as defined in the Security Agreement) of all deposits, securities, balances and other assets held in a Deposit Account or Securities Account maintained by such Loan Party with such depository institution, securities intermediary or other Person.

"Debt Issuance" means the incurrence by any Loan Party of any Indebtedness after the Closing Date (other than as permitted by Section 6.1).

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means, subject to Section 2.12(c), any Lender that (a) has failed to (i) fund all or any portion of its Loans within forty-five (45) days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrowers in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrowers, the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrowers to confirm in writing to the Administrative Agent and the Borrowers that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent or the Borrowers), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.12(c)) upon delivery of written notice of such determination to the Borrowers and each Lender.

"Default Rate" has the meaning specified in Section 2.6(b).

"Delaware LLC" means any limited liability company organized or formed under the laws of the State of Delaware.

"Delaware Divided LLC" means any Delaware LLC which has been formed upon consummation of a Delaware LLC Division.

"Delaware LLC Division" means the statutory division of any Delaware LLC into two or more Delaware LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act.

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"Dollars" or "$" means United States dollars.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" has the meaning set forth in the Chapter 11 Plan.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 13.4(c), (e) and (f) (subject to such consents, if any, as may be required under Section 13.4(c)).

"Embargoed Person" has the meaning specified in Section 6.13.

"Equity Interest" shall mean, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"Equity Issuance" shall mean, without duplication, (i) any issuance or sale by any Borrower after the Closing Date of any Equity Interests in such Borrower (including any Equity Interests issued upon exercise of any warrant or option or equity-based derivative) or any warrants or options or equity-based derivatives to purchase Equity Interests in such Borrower, (ii) any Preferred Stock Issuance or (iii) any contribution to the capital of a Borrower.

"Erroneous Payment" has the meaning specified in Section 9.16(a).

"Erroneous Payment Subrogation Rights" has the meaning specified in Section 9.16(e).

"Escrow Accounts" means the accounts designated as "Escrow Accounts" on Schedule II hereto.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.1.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrowers under Section 2.11(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.10, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with Section 2.10(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order" has the meaning specified in Section 4.13(a).

"Exit Fee" has the meaning specified in Section 2.7(b).

"Extension Fee" has the meaning specified in Section 2.8.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary to the next 1/100th of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fees" means all fees due to the Lenders and the Agents , as the case may be, under this Agreement, any Loan Document, or the Final Order, as applicable, including the Exit Fee.

"<u>Final Order</u>" has the meaning set forth in the Chapter 11 Plan.

"<u>Fixed Return</u>" has the meaning specified in <u>Section 2.7(b)</u>.

"<u>Foreign Lender</u>" means (a) if a Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if a Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"<u>GAAP</u>" means generally accepted accounting principles in the United States, or successors thereto, applied on a consistent basis.

"<u>Governmental Authority</u>" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guaranteed Obligations</u>" has the meaning specified in <u>Section 7.1</u>.

"<u>Guarantors</u>" means each Subsidiary of a Borrower that executes a joinder agreement pursuant to <u>Section 5.12(a)</u>.

"<u>Guaranty</u>" means the guaranty made by the Guarantors under <u>Section 7</u> in favor of the LTB Secured Parties, together with each joinder delivered pursuant to <u>Section 5.12(a)</u> or otherwise.

"<u>Indebtedness</u>" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) [reserved], (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the greater of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any Loan Document, and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 10(b).

"Initial Budget" has the meaning specified in Section 4.15.

"Initial Maturity Date" means August 2, 2027.

"Insolvency Laws" shall mean the Bankruptcy Code and all other insolvency, bankruptcy, receivership, liquidation, conservatorship, assignment for the benefit of creditors, moratorium, rearrangement, reorganization, or similar federal or state Legal Requirements of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Insolvency Proceeding" means (i) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the benefit of creditors, formal or informal moratorium, composition, marshaling of assets for creditor or other similar arrangement in respect of creditors generally or any substantial portion of its creditors, in each case, undertaken under United States Federal or state or non-United States Legal Requirements, including the Bankruptcy Code.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the date hereof, among the Administrative Agent, the Borrowers, Phoenix III Recovery, LLC, Acquiom Agency Services LLC and each other person from time to time party thereto.

"Interest Payment Date" means, with respect to any Loan, the first Business Day of each month, commencing with the first such day following the Closing Date, and the Maturity Date.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Legal Requirements" shall mean, as to any Person, the Organizational Documents of such Person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, judgment, decree, verdict, order, consent order, consent decree, writ, declaration or injunction or determination of an arbitrator or a court or other Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental Authority, in each case applicable to or binding upon such Person or

any of its property or to which such Person or any of its property is subject, in each case whether or not having the force of law.

"Lenders" means, the LTA Lenders, the LTB Lenders or both, as the context may require.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a capital lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Litigation Claims" shall mean all claims and causes of action a Litigation Trust may have against any party.

"Litigation Trust" means Litigation Trust A or Litigation Trust B, or both of them, as the context may require.

"Litigation Trust A" has the meaning specified in the introductory paragraph hereto.

"Litigation Trust A Agreement" means that certain Litigation Trust Agreement (Trust A), dated as of August 2, 2022, among the Debtors (as defined therein), Phoenix II Recovery, LLC, Phoenix III Recovery, LLC, the members of the Litigation Trust Advisory Board party thereto from time to time and the Litigation Trust A Trustee.

"Litigation Trust A Trustee" means, initially, David Dunn, as trustee of Litigation Trust A, together with his successors and permitted assigns.

"Litigation Trust Agreement" means the Litigation Trust A Agreement or Litigation Trust B Agreement, or both of them, as the context may require.

"Litigation Trust Advisory Board" means the Litigation Trust Advisory Board (Trust A) or the Litigation Trust Advisory Board (Trust B), as the context may require.

"Litigation Trust Advisory Board (Trust A)" means the "Litigation Trust Advisory Board" as defined in the Litigation Trust A Agreement.

"Litigation Trust Advisory Board (Trust B)" means the "Litigation Trust Advisory Board" as defined in the Litigation Trust B Agreement.

"Litigation Trust B" has the meaning specified in the introductory paragraph hereto.

"Litigation Trust B Agreement" means that certain Litigation Trust Agreement (Trust B), dated as of August 2, 2022, among the Debtors (as defined therein), Phoenix II Recovery, LLC, Phoenix III Recovery, LLC, the members of the Litigation Trust Advisory Board party thereto from time to time and the Litigation Trust B Trustee.

"Litigation Trust B Trustee" means, initially, David Dunn, as trustee of Litigation Trust B, together with his successors and permitted assigns.

"Litigation Trustee" means the Litigation Trust A Trustee or Litigation Trust B Trustee, or both of them, as the context may require.

"Loan" means LTA Loans, LTB Loans or both, as the context may require.

"Loan Documents" means this Agreement, the Confirmation Order, the Guaranty, the Security Documents, the Additional Documents and any other note or notes executed by the Borrowers in connection with this Agreement and payable to any Lender, any other agreement entered into, now or in the future in connection with this Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Loan Party" means, collectively, the Borrower and each the Guarantors.

"LTA Collateral" means all assets of the LTA Borrower constituting "Collateral" (or equivalent term) as defined in, the Final Order or in any Security Document, including, without limitation, Causes of Action (as defined in the Chapter 11 Plan) of the LTA Borrower.

"LTA Commitment" means, as to each LTA Lender, the commitment of such LTA Lender to make LTA Loans to the LTA Borrower hereunder in an aggregate principal amount not to exceed the amount set forth opposite such LTA Lender's name on the Commitment Schedule under the heading "LTA Commitment", as such commitment may be (a) reduced from time to time pursuant to Sections 2.1(b), 2.2(b) or 2.4 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The aggregate amount of the LTA Commitments as of the Closing Date is $19,413,898.00.

"LTA Erroneous Payment Subrogation Rights" means Erroneous Payment Subrogation Rights to the extent applicable to a LTA Lender.

"LTA Lenders" means, collectively, (a) the financial institutions and other Persons party hereto as "Lenders" on the date hereof with a LTA Commitment or LTA Loans and (b) each financial institution or other Person that becomes a party hereto pursuant to an Assignment and Assumption with a LTA Commitment or a LTA Loan, other than, in each case, any such financial institution or Person that has ceased to be a party hereby pursuant to an Assignment and Assumption.

"LTA Loan" means an extension of credit by a LTA Lender to the LTA Borrower under Section 2.2(b) (and including any applicable PIK Interest or Extension Fee that has been added to the outstanding principal amount of any LTA Loan as provided herein).

"LTA Obligations" means (a) all obligations of the LTA Borrower from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding) on the LTA Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other direct monetary obligations, including fees, costs,

expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding), of the LTA Borrower under this Agreement and the other Loan Documents, (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the LTA Borrower under or pursuant to this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and (c) LTA Erroneous Payment Subrogation Rights.

"LTA Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent and the LTA Lenders.

"LTB Collateral" means all assets of the LTB Borrowers or any other Loan Party (other than the LTA Borrower) constituting "Collateral" (or equivalent term) as defined in, the Final Order or in any Security Document, including, without limitation, Causes of Action (as defined in the Chapter 11 Plan) of any LTB Borrower.

"LTB Commitment" means, as to each LTB Lender, the commitment of such LTB Lender to make LTB Loans to any LTB Borrower hereunder in an aggregate principal amount not to exceed the amount set forth opposite such LTB Lender's name on the Commitment Schedule under the heading "LTB Commitment", as such commitment may be (a) reduced from time to time pursuant to Sections 2.1(b), 2.2(b) or 2.4 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The aggregate amount of the LTB Commitments as of the Closing Date is $4,532,795.11.

"LTB Erroneous Payment Subrogation Rights" means Erroneous Payment Subrogation Rights to the extent applicable to a LTB Lender.

"LTB Lenders" means, collectively, (a) the financial institutions and other Persons party hereto as "Lenders" on the date hereof with a LTB Commitment or LTB Loans and (b) each financial institution or other Person that becomes a party hereto pursuant to an Assignment and Assumption with a LTB Commitment or a LTB Loan, other than, in each case, any such financial institution or Person that has ceased to be a party hereby pursuant to an Assignment and Assumption.

"LTB Loan" means an extension of credit by a LTB Lender to the LTB Borrower under Section 2.2(c) (and including any applicable PIK Interest or Extension Fee that has been added to the outstanding principal amount of any LTB Loan as provided herein).

"LTB Obligations" means (a) all obligations of the LTB Borrowers and the other Loan Parties (other than the LTA Borrower) from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding) on the LTB Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other direct monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations

incurred during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding), of the LTB Borrowers and the other Loan Parties (other than the LTA Borrower) under this Agreement and the other Loan Documents, (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the LTB Borrowers and the other Loan Parties (other than the LTA Borrower) under or pursuant to this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and (c) LTB Erroneous Payment Subrogation Rights.

"LTB Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent and the LTB Lenders.

"Material Adverse Change" means (a) material impairment of the ability of the Loan Parties to fully and timely perform any of their obligations under any Loan Document, (b) a material impairment of the rights of or benefits or remedies available to the Lenders or any Agent under any Loan Document, or (c) a material adverse effect on the Collateral (or any portion thereof) or the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other applicable Secured Parties) on the Collateral or the validity, enforceability, perfection or priority of such Liens.

"Maturity Date" means the date that is the earlier of the following: (i) the later of (x) the Initial Maturity Date and (y) if the Initial Maturity Date is extended pursuant to Section 2.8, such extended maturity date as determined pursuant to such Section and (ii) the first date on which a Termination Event occurs; provided that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"Modification Order" means the *Order (I) Approving Certain Modifications to the Third Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliate Debtors Pursuant to Section 1127(B) of the Bankruptcy Code; (II) Finding That (A) Such Modifications are Not Material and Adverse or (B) The Debtors Have Satisfied the Requirements of Sections 1127(B) and (C) of the Bankruptcy Code with Respect to Such Modifications; (III) Confirming the Modified Plan; and (IV) Granting Related Relief*, entered by the Bankruptcy Court on August 1, 2022.

"Net Cash Proceeds" means:

(a)        with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the proceeds thereof in the form of cash, cash equivalents and marketable securities (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable, or by the sale, transfer or other disposition of any non-cash consideration received in connection therewith or otherwise, but only as and when received) received by any Loan Party (including cash proceeds subsequently received (as and when received by any Loan Party) in respect of non-cash consideration initially received) net of (i) reasonable and customary selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees (including all "Asset Recovery Fees" payable to the Asset Recovery Manager for such Asset Sale pursuant to Exhibit D to the Litigation Trust Agreements (each as in effect

on the date hereof)), transfer and similar taxes (but excluding any such amounts payable to any Affiliate of a Loan Party) and the applicable Loan Party's good faith estimate of income taxes paid or payable in connection with such sale (after taking into account any available tax credits or deductions and any tax sharing arrangements)), (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by any Loan Party associated with the properties sold in such Asset Sale (provided that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money that is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties); and

(b)     with respect to any (i) Debt Issuance, (ii) Equity Issuance or (iii) other issuance or sale of Equity Interests by a Borrower or any of its Subsidiaries, the cash proceeds thereof received by any Loan Party, net of reasonable and customary fees (including legal, accounting and other professional and transaction fees and brokers' fees), commissions, costs and other expenses incurred in connection therewith.

"New Notes" has the meaning specified in the Chapter 11 Plan.

"Obligations" means the LTA Obligations, the LTB Obligations or both, as the context may require.

"OFAC" has the meaning specified in Section 4.13(b).

"Ordinary Course" means, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith. With respect to the Borrowers, "Ordinary Course" shall include operations in the ordinary course since the Effective Date, including the sale, disposition or realization of Collateral as contemplated by the liquidation process set forth in the Chapter 11 Plan and in the applicable Litigation Trust Agreement.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the limited liability company agreement or operating agreement and articles or certificate of formation or organization and all applicable resolutions of any members, managing member, or managers, as applicable, of such limited liability company, (d) for any trust, the certificate of trust, the trust agreement and all applicable written directions or resolutions of the advisory board (or any equivalent or comparable governing body) of such trust and (e) any agreement between any Borrower and its shareholders, manager, members, partners or equity owners, advisory board, trustee or among any of the foregoing.

-16-

"Other Connection Taxes" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.11(b)).

"Participant" has the meaning specified in Section 13.6.

"Participant Register" has the meaning specified in Section 13.6.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"Payment Recipient" has the meaning specified in Section 9.16(a).

"Permitted Buyer" means, (a) with respect to any assignment of LTA Commitment or LTA Loans pursuant to Section 13.4 hereof, any buyer who has acquired or will contemporaneously acquire Equity Interests in Litigation Trust A (or any Affiliate of such buyer) and (b) with respect to any assignment of LTB Commitment or LTB Loans pursuant to Section 13.4 hereof, any buyer who has acquired or will contemporaneously acquire Equity Interests in Litigation Trust B (or any Affiliate of such buyer).

"Permitted Indebtedness" means:

(a)    Indebtedness incurred in the Ordinary Course in respect of Deposit Accounts;

(b)    [RESERVED]

(c)    to the extent constituting Indebtedness, fees owed or owing by one or more Loan Parties to a Litigation Trustee pursuant to the terms and provisions of the Litigation Trust Agreements;

(d)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the Ordinary Course; provided however that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(e)    Indebtedness incurred in respect of the New Notes;

(f)        Indebtedness arising out of the Zohar II Indenture Trustee Claims;

(g)        to the extent constituting Indebtedness, any right to payment from the Escrow Accounts arising under the Chapter 11 Plan;

(h)        to the extent constituting Indebtedness, expenses arising from the administration of the Litigation Trusts, including the expenses described in the Litigation Trust Agreements; and

(i)        Indebtedness incurred under the Zohar III Litigation Trust Credit Agreement (as in effect on the date hereof or modified in accordance with <u>Section 6.7</u>).

"<u>Permitted Lien</u>" means:

(a)        Liens of a collecting bank arising in the Ordinary Course under Section 4-210 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(b)        purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the Ordinary Course;

(c)        Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits and not securing obligations for borrowed money;

(d)        Liens securing the New Notes;

(e)        Liens securing the Zohar III Indenture Trustee Claims; and

(f)        any Lien arising under the Chapter 11 Plan securing a right to payment from the Escrow Accounts.

"<u>Permitted Protest</u>" means the right of any Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax Lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Loan Party's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party in good faith and (c) the Collateral Agent (acting at the direction of the Required Lenders) is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Secured Parties' Liens.

"<u>Permitted Variances</u>" means (i) all variances that are favorable to the financial condition and the interests of the Loan Parties and the interests of the Lenders, and (ii) any variance that is unfavorable to the financial condition and the interests of the Loan Parties or the interests of the Lenders and does not exceed 20% on a cumulative basis, tested every fiscal quarter, based upon the most recent Budget; <u>provided</u>, that variances shall be determined without reference or regard to any reserves established pursuant to <u>Section 10(e)</u>.

"<u>Person</u>" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"<u>Petition Date</u>" has the meaning specified in the recitals hereto.

"<u>PIK Interest</u>" has the meaning specified in <u>Section 2.6(a)</u>.

"<u>Platform</u>" means Debt Domain, Intralinks, Syndtrak, DebtX or a substantially similar electronic transmission system.

"<u>Preferred Stock</u>" shall mean, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person whether now outstanding or issued after the Closing Date.

"<u>Preferred Stock Issuance</u>" shall mean the issuance or sale by any Loan Party of any Preferred Stock after the Closing Date.

"<u>Property</u>" or "<u>property</u>" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests of any Person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property, Litigation Claims, cash, securities, accounts, revenues and contract rights.

"<u>Real Property</u>" shall mean, collectively, all right, title and interest (including any leasehold, fee, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"<u>Record</u>" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"<u>Register</u>" has the meaning specified in <u>Section 13.5</u>.

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, brokers, trustees, administrators, managers, advisors and representatives, including accountants, auditors and legal counsel of such Person and of such Person's Affiliates.

"<u>Required Lenders</u>" means, at any date of determination, Lenders holding more than 50% of the sum of (a) the outstanding principal amount of the Loans and (b) the aggregate unused Commitments. For purposes of this definition the outstanding principal amount of Loans and the aggregate unused Commitments shall be determined by excluding the sum of the outstanding principal amount of Loans of each Defaulting Lender and the aggregate unused Commitments of each Defaulting Lender at such time.

"<u>Required LTA Lenders</u>" means, at any date of determination, LTA Lenders holding more than 50% of the sum of (a) the outstanding principal amount of the LTA Loans and (b) the aggregate unused LTA Commitments.  For purposes of this definition the outstanding principal amount of LTA Loans and the aggregate unused LTA Commitments shall be determined by excluding the sum of the outstanding principal amount of LTA Loans of each Defaulting Lender and the aggregate unused LTA Commitments of each Defaulting Lender at such time.

"<u>Required LTB Lenders</u>" means, at any date of determination, LTB Lenders holding more than 50% of the sum of (a) the outstanding principal amount of the LTB Loans and (b) the aggregate unused LTB Commitments.  For purposes of this definition the outstanding principal amount of LTB Loans and the aggregate unused LTB Commitments shall be determined by excluding the sum of the outstanding principal amount of LTB Loans of each Defaulting Lender and the aggregate unused LTB Commitments of each Defaulting Lender at such time.

"<u>Responsible Officer</u>" of any Person shall mean any executive officer, chief financial officer, principal accounting officer, treasurer or controller of such Person, any other officer or similar official thereof with significant responsibility for the administration of the obligations of such Person in respect of this Agreement.  For the avoidance of doubt, the "Responsible Officer" of each Litigation Trust shall be the Litigation Trustee for such Litigation Trust.

"<u>Restricted Payment</u>" means, as the case may be, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests) in any Loan Party or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in any Loan Party or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in any Loan Party or any Subsidiary.

"<u>Sanctions Laws</u>" has the meaning specified in <u>Section 6.13</u>.

"<u>Secured Obligations</u>" means the LTA Obligations, the LTB Obligations or both, as the context may require.

"<u>Secured Parties</u>" means the LTA Secured Parties, the LTB Secured Parties or both, as the context may require.

"<u>Security Agreement</u>" means that certain Security Agreement, dated as of the date hereof, among the Loan Parties and the Collateral Agent for the benefit of the Secured Parties.

"<u>Security Documents</u>" means the Security Agreement, each Control Agreement, each other security document or pledge agreement delivered in accordance with applicable local or foreign Legal Requirements to grant a valid, enforceable, perfected security interest in any property as collateral for the Secured Obligations, all UCC financing statements (including fixture filings), or amendments or continuations thereof or instruments of perfection required by this Agreement, the Security Agreement, any Control Agreement or any other security document or pledge agreement to be filed or registered with respect to the security interests in property created pursuant to the Security Agreement, any Control Agreement, the Confirmation Order and

any other document or instrument utilized to pledge any property as collateral for the Secured Obligations.

"Shared Collateral" has the meaning specified in the Intercreditor Agreement.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Event" means the occurrence of one or more of the following events:

(a)    [RESERVED];

(b)    [RESERVED];

(c)    Litigation Trust A expires, terminates, winds-down or is otherwise not in existence;

(d)    an Event of Default; or

(e)    the filing or commencement of, or any threat or notice of intention of any Governmental Authority to file or commence, any action, suit, litigation or proceeding, whether at law or in equity or otherwise, with respect to any Loan Document or the Chapter 11 Restructuring Transaction that has resulted or could reasonably be expected to result in a Material Adverse Change.

"Total Amount Borrowed" means, as of any date, the aggregate principal amount of Loans made pursuant to Section 2.2(b) and 2.2(c), in each case, as of such date and without giving effect to any repayment or prepayment of such Loans.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct

Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" means the United States of America.

"Updated Budget" means, with respect to each Litigation Trust and Recovery, an updated budget delivered pursuant to Section 5.11(a).

"Upside Return" has the meaning specified in Section 2.7(b).

"Upside Return Assignment" has the meaning specifies in Section 13.8.

"Upside Return Register" has the meaning specified in Section 13.8.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 2.10(g)(ii)(B)(3).

"Wind-Down Budget" has the meaning specified in Section 8.2(v).

"Withholding Agent" means any Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zohar II Allocated Proceeds" means, (a) with respect to Litigation Trust A, the "Allocation of Litigation Trust-A Interests" to "Phoenix II Recovery, LLC on account of Holders of Class 10 Zohar II Credit Enhancement Claims" as set forth on Exhibit A to the Litigation Trust A Agreement and (b) with respect to Litigation Trust B, the "Allocation of Litigation Trust-B Interests" to "Phoenix II Recovery, LLC on account of Holders of Class 10 Zohar II Credit Enhancement Claims" as set forth on Exhibit A to the Litigation Trust B Agreement.

"Zohar II Indenture Trustee Claims" has the meaning specified in the Chapter 11 Plan.

"Zohar III Lenders" means the "Lenders" as defined in the Zohar III Litigation Trust Credit Agreement.

"Zohar III Litigation Trust Credit Agreement" means that certain Loan Agreement, dated as of the date hereof, among Litigation Trust A, Litigation Trust B and Phoenix III Recovery, LLC, as borrowers, the guarantors from time to time party thereto, the Zohar III Lenders and Acquiom Agency Services LLC, as administrative agent and collateral agent for the Zohar III Lenders.

"Zohar III Litigation Trust Loan Documents" means the "Loan Documents" as defined in the Zohar III Litigation Trust Credit Agreement.

**1.2    Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, however, that if the Borrowers notify the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Lenders and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of the Lenders and the Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective.  When used herein, the term "financial statements" shall include the notes and schedules thereto.

**1.3    UCC**.  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, however, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

**1.4    Construction**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals,

replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

      **1.5**    **The Agents**. Notwithstanding any term or provision of this Agreement or any other Loan Document to the contrary (including any term or provision that expressly provides that an Agent may use its discretion or that any term, provision, action or omission is at the discretion of an Agent), such Agent shall not have any right or otherwise be entitled to take any discretionary action or exercise any discretionary powers under this Agreement and the Loan Documents unless the Required Lenders (or Required LTA Lenders or Required LTB Lenders, if applicable) shall have provided a written direction (with e-mail being sufficient) to such Agent to take such action or exercise such powers.

      **1.6**    **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

      **1.7**    **Times of Day**. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**2.**    **LOAN AND TERMS OF PAYMENT**.

      **2.1**    **[RESERVED]**.

      **2.2**    **Agreement to Lend**.

      (a)    [RESERVED].

      (b)    Subject to the terms and conditions of this Agreement and in the Confirmation Order, each LTA Lender severally agrees to make term loans to the LTA Borrower, in Dollars, at any time and from time to time, during the Availability Period, in an aggregate principal amount not to exceed such LTA Lender's unused LTA Commitment at such time. Following the making of any LTA Loan by a LTA Lender, the LTA Commitment of such LTA Lender shall be automatically and permanently reduced by the amount of such LTA Loan so made by such LTA Lender, and shall automatically and permanently terminate when reduced to $0.

      (c)    Subject to the terms and conditions of this Agreement and in the Confirmation Order, each LTB Lender severally agrees to make term loans to the LTB Borrowers, in Dollars, at any time and from time to time, during the Availability Period, in an aggregate principal amount not to exceed such LTB Lender's unused LTB Commitment at such time. Following the making of any LTB Loan by a LTB Lender, the LTB Commitment of such

LTB Lender shall be automatically and permanently reduced by the amount of such LTB Loan so made by such LTB Lender, and shall automatically and permanently terminate when reduced to $0.

(d)      Amounts borrowed under <u>Sections 2.2(b)</u> or <u>(c)</u> and repaid or prepaid may not be reborrowed.

**2.3      <u>Borrowing Procedures</u>**.

(a)      [RESERVED].

(b)      Each LTA Loan made pursuant to <u>Section 2.2(b)</u> shall be made by the LTA Lenders ratably in accordance with their applicable LTA Commitments following the delivery by the LTA Borrower to the Administrative Agent no later than seven (7) Business Days (or such shorter period as the Required Lenders may permit in their sole discretion) of a written Borrowing Request executed by a Responsible Officer of the LTA Borrower; <u>provided</u> that, no such Borrowing Request shall be required for the initial LTA Loans to be made on the Closing Date if so agreed by the Administrative Agent and each LTA Lender.  Each LTB Loan made pursuant to <u>Section 2.2(c)</u> shall be made by the LTB Lenders ratably in accordance with their applicable LTB Commitments following the delivery by the applicable LTB Borrower to the Administrative Agent no later than seven (7) Business Days (or such shorter period as the Required Lenders may permit in their sole discretion) of a written Borrowing Request executed by a Responsible Officer of such LTB Borrower; <u>provided</u> that, no such Borrowing Request shall be required for the initial LTB Loans to be made on the Closing Date if so agreed by the Administrative Agent and each LTB Lender.  Any borrowing of Loans pursuant to <u>Sections 2.2(b)</u> or <u>2.2(c)</u> shall, unless otherwise agreed by the LTA Lenders or the LTB Lenders, as applicable, be in an aggregate principal amount that is (i) an integral multiple of $500,000 and not less than $2,000,000 or (ii) equal to the remaining available balance of the Commitments. Following receipt of a Borrowing Request for an LTA Loan, the Administrative Agent shall promptly inform each LTA Lender of its *pro rata* share of the requested LTA Loans; <u>provided</u>, <u>however</u>, that no more than one Borrowing Request may be submitted in any calendar quarter unless (x) a Defaulting Lender fails to fund its *pro rata* share of the requested LTA Loans, in which case LTA Borrower may submit an additional Borrowing Request to the non-Defaulting Lenders to fund the amounts the Defaulting Lender did not fund, or (y) the Required LTA Lenders otherwise consent to an additional Borrowing Request based on extenuating circumstances; <u>provided</u>, <u>however</u>, in no event shall any LTA Lender be required to make an LTA Loan in excess of such LTA Lender's unused LTA Commitment.  Following receipt of a Borrowing Request for an LTB Loan, the Administrative Agent shall promptly inform each LTB Lender of its *pro rata* share of the requested LTB Loans; <u>provided</u>, <u>however</u>, that no more than one Borrowing Request may be submitted in any calendar quarter unless (x) a Defaulting Lender fails to fund its *pro rata* share of the requested LTB Loans, in which case an LTB Borrower may submit an additional Borrowing Request to the non-Defaulting Lenders to fund the amounts the Defaulting Lender did not fund, or (y) the Required LTB Lenders otherwise consent to an additional Borrowing Request based on extenuating circumstances; <u>provided</u>, <u>however</u>, in no event shall any LTB Lender be required to make an LTB Loan in excess of such LTB Lender's unused LTB Commitment.  Each Lender shall make the amount of its applicable Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office

not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Request for such Loan. Upon satisfaction or waiver of the applicable condition set forth in <u>Section 3.1</u> or <u>Section 3.2</u>, as applicable, the Administrative Agent shall remit the amounts so received, in like funds, to an account as directed by the applicable Borrower in the applicable Borrowing Request or, if a proposed Loan shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the applicable Lenders within two (2) Business Days.

(c)     Unless the Administrative Agent shall have received written notice from a Lender prior to the date of any Loan that such Lender will not make available to the Administrative Agent such applicable Lender's portion of such Loan, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such proposed Loan in accordance with <u>Section 2.3(b)</u>, and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrowers, on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the applicable Borrower(s) severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the applicable Borrower(s) until the date such amount is repaid to the Administrative Agent at (A), in the case of repayment by such Lender, from the date such amount is required to be paid to the date that is two (2) Business Days after payment by such Lender is due hereunder and (B) from the date that is two (2) Business Days after the date such amount is required to be paid to the date such payment is made by such Lender, the Federal Funds Effective Rate. If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's portion of such Loan for purposes of this Agreement, and the applicable Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this <u>Section 2.3(c)</u> shall cease.

**2.4     <u>Payments; Reductions of Commitment; Prepayments</u>.**

(a)     The Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under <u>Section 2.10</u> or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 1:00 p.m.), on the date when due, in (except for payments of PIK Interest) immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its account most recently designated by it for such purpose by notice to the Borrowers and the Lenders except that payments pursuant to <u>Section 2.10</u> and <u>Section 10</u> shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended

to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in Dollars.  Each payment (including each prepayment) by the LTA Borrower on account of principal of and interest on the LTA Loans shall be made on a *pro rata* according to the respective outstanding principal amounts of the LTA Loans then held by the LTA Lenders. Each payment (including each prepayment) by the LTB Borrowers on account of principal of and interest on the LTB Loans shall be made on a *pro rata* according to the respective outstanding principal amounts of the LTB Loans then held by the LTB Lenders.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent from the LTA Borrower to pay fully all amounts of principal, interest and fees then due from the LTA Borrower hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees owing by the LTA Borrower then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (ii) *second*, towards payment of principal on the LTA Loans then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, and (iii) *third*, towards the payment of all other LTA Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amount of such amounts then due to such parties.  If at any time insufficient funds are received by and available to the Administrative Agent from the Loan Parties (other than the LTA Borrower) to pay fully all amounts of principal, interest and fees then due from the Loan Parties (other than the LTA Borrower) hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees owing by the Loan Parties (other than the LTA Borrower) then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (ii) *second*, towards payment of principal on the LTB Loans then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, and (iii) *third*, towards the payment of all other LTB Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amount of such amounts then due to such parties

(c)     Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the applicable Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

(d)     If any Lender shall fail to make any payment required to be made by it pursuant to <u>Section 2.3(b)</u>, <u>2.4(c)</u>, or <u>10(e)</u>, then the Administrative Agent may, at the direction of the Required Lenders (notwithstanding any contrary provision hereof), apply any amounts

thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(e)     The applicable Borrowers shall have the right, subject to Section 2.7(a) below, upon not less than three (3) Business Days' written notice to the Administrative Agent, to terminate the aggregate unfunded LTA Commitments and/or LTB Commitments or, from time to time, reduce the amount of the LTA Commitments and/or the LTB Commitments.    The Borrowers agree that they will request a ratable reduction under this Section 2.4(e) corresponding to any reduction or termination of any "Exit Facility Commitment" under the Zohar III Litigation Trust Credit Agreement (other than in connection with the making of any Exit Facility Loans).    Any such reduction shall, unless agreed by the applicable LTA Lenders or LTB Lenders, be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the applicable Commitments then in effect.    Any reduction of the aggregate unfunded LTA Commitments pursuant to this Section 2.4(e) shall be applied to the LTA Commitments of each applicable LTA Lender on a pro rata basis.    Any reduction of the aggregate unfunded LTB Commitments pursuant to this Section 2.4(e) shall be applied to the LTB Commitments of each applicable LTB Lender on a pro rata basis.    Once reduced, a Commitment may not be increased.

(f)     To the extent not terminated earlier, the unused Commitments of each Lender shall terminate immediately and without further action on the Maturity Date.

(g)     The Borrowers may at any time and from time prepay the Loans, in whole or in part, without premium or penalty, subject to Sections 2.7(a) and 2.7(b) below; provided that partial prepayments of Loans shall, unless otherwise agreed by the LTA Lenders or the LTB Lenders, as applicable, be in an aggregate principal amount of $1,000,000 or a whole multiple thereof. Optional prepayments of Loans shall be applied in accordance with clause (i) below.

(h)     Not later than ten (10) Business Days (unless extended by the Required Lenders in writing in their sole discretion) following the receipt of (i) any Net Cash Proceeds of any Asset Sale by any Loan Party, (ii) any cash or Net Cash Proceeds received by a Loan Party (or their direct or indirect Subsidiaries) from any source (other than proceeds of the Loans) and (iii) Zohar II Allocated Proceeds from any Litigation Claim, the Borrowers shall, subject to the terms of the Intercreditor Agreement, apply 100% of such Net Cash Proceeds, Zohar II Allocated Proceeds or cash to make a prepayment of Loans in accordance with clause (i) below; provided that, this clause (h) shall not apply to any proceeds of any sale or other transfer by Recovery or an Affiliate of Recovery of the Equity Interests in Litigation Trust A or Litigation Trust B.

(i)     Any prepayments required pursuant to clauses (g) and (h) above (i) with respect to any optional prepayment of the LTA Loans or any Net Cash Proceeds (as set forth in clause (h), received by the LTA Borrower) shall be applied *first*, to the payment of the LTA Obligations in accordance with clause (j); *second*, to the extent of any residual, if no LTA Obligations remain outstanding, to automatically and permanently reduce, on a dollar-for-dollar basis, the unused LTA Commitments, as the case may be, of the LTA Lenders on a pro rata basis, until all LTA Commitments, as the case may be, shall have been reduced to zero ($0); and *third*, to the extent any residual Net Cash Proceeds remain after such payments, to be retained by the applicable Borrower and be distributed as required by the Intercreditor Agreement, the

Chapter 11 Plan or the applicable Litigation Trust Agreement, as applicable, and (ii) with respect to any optional prepayment of the LTB Obligations or any Net Cash Proceeds (as set forth in clause (h), received by a Loan Party (other than the LTA Borrower)) shall be applied *first*, to the payment of the LTB Obligations in accordance with clause (j); *second*, to the extent of any residual, if no LTB Obligations remain outstanding, to automatically and permanently reduce, on a dollar-for-dollar basis, the unused LTB Commitments, as the case may be, of the LTB Lenders on a pro rata basis, until all LTB Commitments, as the case may be, shall have been reduced to zero; and *third*, to the extent any residual Net Cash Proceeds remain after such payments, to be retained by the applicable Borrower and be distributed as required by the Intercreditor Agreement, the Chapter 11 Plan, the applicable organizational documents (in the case of Recovery), or the applicable Litigation Trust Agreement, as applicable.

(j)      Any amounts received on account of the LTA Obligations or LTB Obligations pursuant to clause (i) above shall be payable to the applicable Lenders ratably among them in proportion to the respective LTA Obligations or LTB Obligations payable to them.

(k)      The applicable Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., three (3) Business Days before the date of prepayment; <u>provided</u> that a notice of optional prepayment delivered by the applicable Borrower in accordance with Section 2.4(g) that contemplates payment in full of the applicable LTA Loans or LTB Loans may, if the Administrative Agent (in its reasonable discretion) has previously agreed to a customary pay-off letter with the applicable Borrowers, expressly state that such notice is conditioned upon the effectiveness of new credit facilities or similar new Indebtedness and which effectiveness will result in the immediate payment in full of all applicable Obligations, in which case such notice may be revoked by the applicable Borrower (by notice to the Administrative Agent on or prior to 2:00 p.m., one (1) Business Day prior to the specified notice effective date) if such condition is not satisfied (or is then unlikely to be satisfied). Subject to the proviso in the previous sentence, each such notice shall be irrevocable. Each such notice shall specify the prepayment date, the principal amount of the Loans or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Such notice to the Lenders may be by electronic communication. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.4.

(l)      If any Lender shall, by exercising any right of setoff or counterclaim (including pursuant to Section 14.9) or otherwise (including by exercise of its rights under the Security Documents), obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender (with respect to such LTA Loans or LTB Loans, as applicable), then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions

of this Section 2.4(l) shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Eligible Assignee or participant. Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Legal Requirements, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation. If under applicable Insolvency Law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.4(l) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.4(l) to share in the benefits of the recovery of such secured claim.

## 2.5    Evidence of Debt; Repayment of Loans.

(a)    The LTA Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each LTA Lender, the unpaid principal amount of each LTA Loan (including all PIK Interest and Fees capitalized and added to the aggregate outstanding principal amount of LTA Loans) of such LTA Lender on the Maturity Date. The LTB Borrowers each hereby unconditionally promise to pay to the Administrative Agent for the account of each LTB Lender, the unpaid principal amount of each LTB Loan (including all PIK Interest and Fees capitalized and added to the aggregate outstanding principal amount of LTB Loans) of such LTB Lender on the Maturity Date.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the applicable Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain an account in which it will record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the applicable Borrowers to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to Section 2.5(b) and (c) shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers and the other Loan Parties to pay, and perform, the Obligations in accordance with the Loan Documents. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such entries, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

2.6 **Interest Rates and Rates, Payments and Calculations**.

(a) **Interest Rate**. Except as provided in <u>Section 2.6(b)</u>, each Loan shall bear interest on the outstanding principal amount thereof from the date made or deemed made at a rate equal to 18.00% per annum. Accrued interest on each Loan shall be capitalized and added to the aggregate outstanding amount of such Loan on each Interest Payment Date in lieu of cash payment (and shall be treated as principal of such Loan at all times thereafter) (such capitalized interest, "<u>PIK Interest</u>"); <u>provided</u> that (i) interest accrued pursuant to <u>Section 2.6(b)</u> (including interest on past due interest) and all interest accrued but unpaid on or after the Maturity Date shall be payable on demand in cash and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(b) **Default Rate**. Upon the occurrence and during the continuation of an Event of Default, the outstanding principal balance of all Loans and all other Obligations shall bear at a per annum rate equal to two percentage points (2%) above the per annum rate otherwise applicable hereunder (the "<u>Default Rate</u>"), without any notice from the Administrative Agent or any other Person, and shall be payable on demand.

(c) **Calculations**. All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.4</u>, bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d) **Intent to Limit Charges to Maximum Lawful Rate**. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The parties hereto, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; <u>provided</u>, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under Applicable Law, then, *ipso facto*, as of the date of this Agreement, the Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.7 **Fees**.

(a) In the event that there shall occur any (x) reduction or termination of the unused LTA Commitments pursuant to <u>Section 2.4(e)</u> above or (y) prepayment of the LTA Loans pursuant to <u>Section 2.4(g)</u> or <u>2.4(h)</u> above, the LTA Borrower shall pay to the

Administrative Agent, for the ratable benefit of the LTA Lenders, a fee (payable in cash) equal to the sum of (i) 4% multiplied by the aggregate amount of the unused LTA Commitments reduced or terminated and/or (ii) 4% of the then outstanding principal amount of the LTA Loans being prepaid.  In the event that there shall occur any (x) reduction or termination of the unused LTB Commitments pursuant to Section 2.4(e) above or (y) prepayment of the LTB Loans pursuant to Section 2.4(g) or 2.4(h) above, the LTB Borrowers shall pay to the Administrative Agent, for the ratable benefit of the LTB Lenders, a fee (payable in cash) equal to the sum of (i) 4% multiplied by the aggregate amount of the unused LTB Commitments reduced or terminated and/or (ii) 4% of the then outstanding principal amount of the LTB Loans being prepaid.  Any such fee shall be paid on the date of any such reduction or termination or prepayment, as the case may be.

(b)    On the Call Period Termination Date, each Lender party hereto on the Closing Date shall fully earn and be entitled to receive, as fee compensation for such Lender's commitments under this Agreement on such date, an exit fee consisting of its pro rata share of the sum of the following:  (1) in an amount equal to (x) (1.2 *times* the Total Amount Borrowed) *minus* (y) Amounts Repaid (the positive result of such calculation shall be referred to as the "Fixed Return"); and (2) an amount equal to 10% of the Zohar II Allocated Proceeds (the "Upside Return" and collectively with the Fixed Return, the "Exit Fee").  The Exit Fee shall be deemed fully earned and payable in cash by the Borrowers to the Administrative Agent (for the pro rata benefit of the Lenders) on the Call Period Termination Date; provided however, the Fixed Return (if any) shall be calculated as of, and be payable on, (x) the date each prepayment is made pursuant to Sections 2.4(g) and 2.4(h) and (y) the earlier to occur of (i) the Maturity Date and (ii) the date that Obligations are paid in full; and provided further that the Upside Return shall be payable as Zohar II Allocated Proceeds are collected by any Loan Party.  For the avoidance of doubt, the Upside Return, once earned in accordance with this clause (b), shall be payable shall be payable notwithstanding termination of the Commitments, payment in full of all other Obligations hereunder and/or termination of this Agreement. The Borrowers agree that (A) the Exit Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; and (B) the Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made.  For the avoidance of doubt, the Exit Fee shall be payable notwithstanding any mandatory prepayments made pursuant to Section 2.4(f).  The undertaking in this Section 2.7(b) shall survive termination of the Commitments and the payment of all Obligations.

**2.8    Extension of Maturity Date**.    On one (1) occasion during the term of this Agreement, so long as no Termination Event has occurred, the Borrowers may elect at least sixty (60) days prior to the Initial Maturity Date, to extend the Initial Maturity Date for one (1) year from the Initial Maturity Date by the Borrowers providing written notice of such election to the Administrative Agent (which shall promptly notify each of the Lenders).  If on the Initial Maturity Date (i) no Termination Event has occurred, (ii) the Borrowers pay to the Administrative Agent, for the pro rata benefit of the Lenders, an extension fee (the "Extension Fee") equal to 10.00% of the outstanding principal amount of the Loans as of the Initial Maturity Date and (iii) the Borrowers have given written notice to the Administrative Agent of such election to extend the Initial Maturity Date set forth in this Section 2.8, the Initial Maturity Date shall be extended for a period of one (1) year.  The Extension Fee shall be capitalized and added ratably to the aggregate outstanding principal amount of LTA Loans and LTB Loans on the

Initial Maturity Date in lieu of cash payment (and shall be treated as principal of such Loans at all times thereafter).

**2.9** **Increased Costs**.

(a) <u>Increased Costs Generally</u>. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii) subject any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation in any such Loan;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, of participating in, issuing or maintaining, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) <u>Capital Requirements</u>. If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) <u>Certificates for Reimbursement</u>. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as specified in paragraph (a) or (b) of this Section and delivered to the Borrowers, shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d) <u>Delay in Requests</u>. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than

nine months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

> **2.10**   <u>Taxes</u>.

(a)   <u>Defined Terms</u>. For purposes of this <u>Section 2.10</u>, the term "Applicable Law" includes FATCA.

(b)   <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)   <u>Payment of Other Taxes</u>.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)   <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Lender or required to be withheld or deducted from a payment to such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)   <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (1) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (2) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 13.6</u> relating to the maintenance of a Participant Register and (3) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally

imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.10, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.10(g)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that a Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to

time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of <u>Exhibit D-1</u> to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to any Loan Party described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit D-2</u> or <u>Exhibit D-3</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit D-4</u> on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrowers

or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)   if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.   Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Administrative Agent in writing of its legal inability to do so.

(h)   <u>Treatment of Certain Refunds</u>.   If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this <u>Section 2.10</u> (including by the payment of additional amounts pursuant to this <u>Section 2.10</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).   Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.   This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Survival.  Each party's obligations under this Section 2.10 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**2.11    Mitigation Obligations; Replacement of Lenders.**

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 2.9, or requires the Loan Parties to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.10, then such Lender shall (at the request of the Borrowers) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (1) would eliminate or reduce amounts payable pursuant to Section 2.9 or 2.10, as the case may be, in the future, and (2) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 2.9, or if the Loan Parties are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.10 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 2.11(a), or if any Lender is a Defaulting Lender, then the Borrowers may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 13.4), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.9 or Section 2.10) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)    the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 13.4;

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 2.01 or payments required to be made pursuant to Section 2.02, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    such assignment does not conflict with Applicable Law;

(v)    [reserved]; and

(vi)    a Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

Each party hereto agrees that (a) an assignment required pursuant to this paragraph (b) may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and (b) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; <u>provided</u> that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender; <u>provided</u>, <u>further</u> that any such documents shall be without recourse to or warranty by the parties thereto.

**2.12    <u>Defaulting Lender Adjustments</u>** .    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(a)    <u>Waivers and Amendments</u>. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(b)    <u>Defaulting Lender Waterfall</u>.    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Section 8</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 14.9</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers, to be held in a deposit account and released in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in <u>Section 3.2</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all

Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments.

(c)    <u>Defaulting Lender Cure</u>.   If the Borrowers and the Administrative Agent (acting at the direction of the Required Lenders) agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**3.    CONDITIONS PRECEDENT**.

**3.1    <u>Closing Date</u>**.  The obligations of each the Lenders to make Loans pursuant to <u>Section 2.2</u> shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 13.1</u>):

(a)    The Confirmation Order shall be in full force and effect, and shall not (in whole or in part) have been modified or amended (except in connection with the Modification Order), reversed, stayed, vacated or subject to stay pending appeal.  The Modification Order shall be in full force and effect, and shall not (in whole or in part) have been modified or amended, reversed, stayed, vacated or subject to stay pending appeal.  The Lenders shall be entitled to rely in good faith upon the Confirmation Order and the Modification Order, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(b)    The Administrative Agent (or its counsel) shall have received counterparts, duly executed (as applicable) by the applicable parties thereto, of the following, each properly executed by a Responsible Officer of the signing Loan Party and each in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders:

(i)    this Agreement;

(ii)    the Intercreditor Agreement;

(iii)    the Security Agreement and the other Security Documents required to be executed on the Closing Date, together with evidence that all UCC financing statements in the jurisdictions of organization of each Loan Party that the Required Lenders may deem reasonably necessary to satisfy the Collateral requirements under the

Loan Documents shall have been provided for, and arrangements for the filing thereof in a manner reasonably satisfactory to the Required Lenders shall have been made.

(c)     The Borrowers' Organizational Documents (and the governance of the Borrowers' as set forth therein) shall be in a form satisfactory to the Required Lenders; provided, however, that the form of the Borrowers' Organizational Documents as filed with the Bankruptcy Court at Docket No. 3391 shall be deemed satisfactory to the Required Lenders.

(d)     Prior to or substantially concurrently with the funding (or deemed funding) of the Loans, the transactions that are contemplated to occur on or prior to the Closing Date as set forth in the Chapter 11 Plan shall have occurred or have been substantially consummated (including, without limitation, the funding of the Escrow Accounts) and the Loan Parties shall be in compliance in all respects with the Confirmation Order.

(e)     The Effective Date shall have occurred.

(f)     The Administrative Agent shall have received (i) a duly executed and effective copy of the Zohar III Litigation Trust Credit Agreement and (ii) evidence reasonably satisfactory to the Lenders that the "Borrowers" thereunder shall have funded the "Escrow Accounts" as required thereunder (and that appropriate controls with respect thereto have been established).

(g)     The Lenders shall have received the Initial Budgets, in form and substance satisfactory to the Required Lenders.

(h)     The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act that has been reasonably requested at least five (5) Business Days in advance of the Closing Date.  The Administrative Agent shall have received an IRS Form W-9 or applicable IRS Form W-8 duly completed and executed by each Borrower and each Guarantor.

For purposes of determining whether the conditions in this Section 3.1 have been satisfied on the Closing Date, the funding of the Loans hereunder by any Lender that has executed this Agreement shall be deemed to be the consent, approval and/or acceptance by such Lender of, or satisfaction with, each document or other matter required hereunder to be consented to, approved by,  acceptable to or satisfactory to the Administrative Agent or such Lender.

**3.2     Each Loan**.  The obligation of each Lender to make a Loan (including on the Closing Date), is subject to the satisfaction of the following conditions:

(a)     The Borrowers shall have delivered a Borrowing Request, duly executed and completed, by the time specified in Section 2.3(b) (if required pursuant to Section 2.3(b)).

(b)     The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects (other than any representation or warranty qualified as to "materiality", "Material Adverse Change" or similar language, which

shall be true and correct in all respects) with the same effect as though made on and as of the date of such Loan, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects (other than any representation or warranty qualified as to "materiality", "Material Adverse Change" or similar language, which shall be true and correct in all respects) only as of such specified date).

(c)     At the time of and immediately after giving effect to such Loan, no Default or Event of Default shall have occurred and be continuing.

(d)     No law, regulation, order, judgment or decree of any Governmental Authority shall, and the Administrative Agent shall not have received any notice that litigation is pending or threatened which is likely to enjoin, prohibit or restrain the borrowing of such Loan.

(e)     The Administrative Agent and Lenders shall have received evidence reasonably satisfactory to the Lenders that prior to or substantially concurrently with the funding of such Loans, the "Lenders" (other than any "Defaulting Lenders") under the Zohar III Litigation Trust Credit Agreement have made corresponding "Loans" to the "Borrowers" thereunder (i) with respect to LTA Loans, to the LTA Borrower in an amount equal to 50% of such LTA Loans and (ii) with respect to LTB Loans to Litigation Trust B, to Litigation Trust B in an amount equal to 200% of such LTB Loans.

The delivery of each Borrowing Request (or if no Borrowing Request is so required, the acceptance by the Borrowers of the applicable Loans) shall constitute a representation and warranty by the Borrowers of the correctness of the matters specified in clauses (b), (c) and (d) above.

4.     **REPRESENTATIONS AND WARRANTIES**.

Each Loan Party makes the following representation and warranties to the Agents and the Lenders and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1     **Due Organization and Qualification**. Each Loan Party (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, and (ii) subject to any limitation under the Bankruptcy Code or other Debtor Relief Law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

4.2     **Due Authorization; No Conflict**. Subject to the entry of the Confirmation Order and the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Loan Party is party, (a) do not require any consent, exemption, authorization or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) consents, approvals, exemptions, authorizations, registrations, filings, permits or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Change, (b) will not violate the Organizational Documents of any Loan Party, (c) will

not violate or result in a default or require any consent or approval (other than such as have been obtained and are in full force and effect) under (x) any indenture, instrument, agreement, or other document binding upon any Loan Party or its property or to which any Loan Party or its property is subject, or give rise to a right thereunder to require any payment to be made by any Loan Party or (y) any Organizational Document, (d) will not violate any Legal Requirement in any material respect, and (e) will not result in the creation or imposition of any Lien on any property of any Loan Party.  No Default or Event of Default has occurred and is continuing.

**4.3**    **Binding Obligations**.    Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

**4.4**    **Properties**.  Subject to the entry of the Confirmation Order and after giving effect to the transactions contemplated by the Chapter 11 Plan, each Loan Party has good title in all of its property.

**4.5**    **Jurisdiction of Formation; Location of Chief Executive Office; Jurisdiction; Identification Number**.

(a)    The name, jurisdiction of formation, chief executive office, tax identification numbers (if applicable) and organizational identification numbers (if applicable) of each Loan Party are set forth on Schedule 6 to the Security Agreement.

**4.6**    **[Reserved]**.

**4.7**    **Fraudulent Transfer**.  No transfer of property is being made by a Loan Party and no obligation is being incurred by a Loan Party in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Loan Party.

**4.8**    **Use of Proceeds**.  The Borrowers will use the proceeds of the Loans solely in accordance with Section 5.5.

**4.9**    **Payment of Taxes**.  All United States federal, state and other material tax returns and reports of each Loan Party required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than (a) taxes that are the subject of a Permitted Protest, and (b) with respect to the Collateral, the Loan Parties are not aware of any proposed tax assessment against a Loan Party with respect to United States federal, state or municipal taxes that is not being actively contested by such Loan Party diligently, in good faith, and by appropriate proceedings; provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**4.10**   **Compliance with Law**.  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, each Loan Party and each Subsidiary is in compliance with all Legal Requirements applicable to it or its property.

**4.11**   **Security Interest in Collateral**.  The Security Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent, for the benefit of the applicable Secured Parties, and upon the making of Uniform Commercial Code filings and the taking of such other actions required to be taken hereby or by the applicable Loan Document, such Liens shall constitute first priority perfected and continuing Liens on the applicable Collateral, subject to no other Liens other than the Liens created by the Security Documents (except, in the case of the "Shared Collateral" (as defined in the Intercreditor Agreement), the Liens in favor of the "Zohar III Lenders" (as defined in the Intercreditor Agreement)) and Permitted Liens.

**4.12**   **[Reserved]**.

**4.13**   **Anti-Terrorism Law; Foreign Corrupt Practices Act**.

(a)     Each Loan Party is, and, to the knowledge of each Loan Party, its Affiliates are, in compliance with all applicable Legal Requirements relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Patriot Act.  No Loan Party and, to the knowledge of each Loan Party, none of its Affiliates shall use any proceeds of the Loans in violation of, any Legal Requirements relating to Anti-Terrorism Laws.

(b)     No Loan Party and to the knowledge of each Loan Party, no Affiliate or broker or other agent of any Loan Party acting or benefiting in any capacity in connection with the Loans, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Borrowers will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

(c)     No Loan Party and, to the knowledge of each Loan Party, no Affiliate or broker or other agent of any Loan Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in Section 4.13(b), (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or frozen pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)     No Loan Party nor any director or officer, nor to the knowledge of any Loan Party, any agent, employee or other Person acting, directly or indirectly, on behalf of any Loan Party, has, in the course of its actions for, or on behalf of, any Loan Party, directly or indirectly (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (iv)

made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

**4.14** **No Bank Accounts**.  As of the Closing Date, no Loan Party maintains any account other than the accounts set forth on Schedule II hereto and any accounts listed in the Security Agreement or otherwise disclosed to the Collateral Agent.

**4.15** **Budget**. Attached hereto as Exhibit C-1, Exhibit C-2 and Exhibit C-3 are the initial budgets (each, an "Initial Budget") prepared by (i) in the case of the Litigation Trusts, the Litigation Trustees and (ii) in the case of Recovery, the Asset Recovery Manager, in each case, that sets forth in reasonable detail all of the projected expenses for the Litigations Trusts and Recovery, as applicable.

**5.** **AFFIRMATIVE COVENANTS**.

Subject to the terms of the Confirmation Order and the Chapter 11 Plan, each Loan Party covenants and agrees that, until termination of the Commitments and payment in full of the Obligations, it shall, and shall cause each of its Subsidiaries to, comply with each of the following:

**5.1** **Notices**.  Deliver to Administrative Agent and each Lender written notice of the following (and, in any event, within five (5) Business Days following the date on which a Responsible Officer obtains knowledge thereof):

(a)    any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity or otherwise by or before any Governmental Authority, (i) against any Loan Party or any Affiliate thereof that has had, or could reasonably be expected to result in, a Material Adverse Change or (ii) with respect to any Loan Document;

(c)    any development that has resulted, or could reasonably be expected to result, in a Material Adverse Change after the Closing Date; provided, however, that no Loan Party shall be required to disclose or discuss any document, information or matter (x) in respect of which disclosure is prohibited by Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product;

(d)    any notices provided to the "Borrowers" under the Zohar III Litigation Trust Credit Agreement and related loan documents, together with copies thereof; and

(e)    the incurrence of any Lien (other than a Permitted Lien or Lien described in Section 6.2(a)) on, or claim asserted against, all or any substantial portion of the Collateral.

**5.2** **Periodic Reports**. Furnish to the Administrative Agent and the Lenders with copies of all reports, annual plans and budgets provided to (i) the Litigation Trust Advisory Boards pursuant to Section 3.12 of the Litigation Trust Agreements and (ii) the member of Recovery pursuant to the terms of its Organizational Documents; provided, however

notwithstanding anything to the contrary herein, no Loan Party shall be required to disclose or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

     **5.3**    **Conference Calls**.  If requested, each Litigation Trustee and the Asset Recovery Manager shall participate in a conference call with the Required Lenders, following the Closing Date regarding the status of the liquidation of the "Litigation Trust-A Assets" and/or the "Litigation Trust-B Assets" (as defined in the applicable Litigation Trust Agreement), the assets of Recovery, in each case as applicable, and other matters; provided, however notwithstanding anything to the contrary herein, no Loan Party shall be required to disclose or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

     **5.4**    **Existence**.  At all times (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits, could not reasonably be expected to result in a Material Adverse Change.

     **5.5**    **Use of Proceeds**.  (a) Use the proceeds of the LTA Loans (i) to fund the Escrow Account of the LTA Borrower described on Schedule II and (ii) to fund the Zohar II Allocation of the budgeted expenses of Litigation Trust A and expenses related to preserving, liquidating and distributing the assets thereof and (b) use the proceeds of the LTB Loans (i) to fund the Escrow Accounts of the Loan Parties (other than the LTA Borrower) described on Schedule II and (ii) to fund the Zohar II Allocation of the budgeted expenses of Litigation Trust B and Recovery, and expenses related to preserving, liquidating and distributing the assets thereof.

     **5.6**    **Taxes and Obligations**.  Pay and discharge prior to delinquency (a) all Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets unless they are the subject of a Permitted Protest; and (b) all lawful claims which, if unpaid, would by law become a Lien upon any Collateral.

     **5.7**    **Confirmation Order; Chapter 11 Plan; Litigation Trust Agreements**. Comply with their respective obligations and responsibilities under the Confirmation Order, the Chapter 11 Plan and the Litigation Trust Agreements.

     **5.8**    **Maintaining Records; Access to Properties and Inspections** .  Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Legal Requirements are made of all dealings and transactions in relation to its business and activities.  Each Loan Party will permit any representatives designated by the Administrative Agent or any Lender (i) to visit and inspect the financial records and the property of such Loan Party upon reasonable prior notice and at reasonable times, and (ii) to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent (or, upon the occurrence and during the continuation of any Event of Default, any Lender) to discuss the affairs, finances, accounts and condition of any Loan Party with the officers and employees thereof, or advisors therefor (including independent accountants); provided, however

notwithstanding anything to the contrary herein, no Loan Party shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

**5.9**   **[Reserved]**.

**5.10**   **Compliance with Laws**.  Comply with the requirements of all Applicable Laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

**5.11**   **Budgets**.

(a)    Deliver to the Administrative Agent, by no later than December 31, 2022 (with respect to any update to an Initial Budget), and each annual anniversary of the Closing Date thereafter, commencing August 2, 2023, (i) with respect to a Litigation Trust, the annual budget delivered pursuant to each Litigation Trust Advisory Board pursuant to Section 3.12(c) of the applicable Litigation Trust Agreements and (ii) with respect to Recovery, the annual expense budget, in each case covering the upcoming 12-month period.

(b)    Each of the Litigation Trusts and Recovery shall comply with the Budget that is applicable to it, subject to Permitted Variances.

(c)    No later than the 20th day following the end of each fiscal quarter, commencing with the fiscal quarter ending March 31, 2023, the Loan Parties shall deliver a Budget Variance Report.

**5.12**   **Formation of Subsidiaries; Additional Collateral; Further Assurances**.

(a)    No Loan Party shall form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary without the consent of the Required Lenders in their sole discretion; provided, however, that Recovery may acquire direct or indirect equity interests in Intrepid as contemplated by the Chapter 11 Plan.  Any Subsidiary that is formed after the Effective Date shall be considered a Guarantor and execute any documentation reasonably requested by the Administrative Agent including, without limitation, a joinder agreement to this Agreement in form and substance satisfactory to the Required Lenders pursuant to which such Subsidiary agrees to be bound by the terms of the Guaranty and a joinder agreement to the Security Agreement (in the form contemplated thereby) pursuant to which such Subsidiary agrees to be bound by the terms thereof, which shall be accompanied by appropriate organizational resolutions, other organizational documentation and, if requested by the Required Lenders, legal opinions in form and substance reasonably satisfactory to the Required Lenders.  In connection therewith, the Administrative Agent shall have received all documentation and other information regarding such newly formed or acquired Subsidiaries as may be reasonably requested by the Administrative Agent and any Lender to comply with the applicable "know your customer" rules and regulations, including the Patriot Act.  Each such Person delivering a joinder agreement to this Agreement and to the Security Agreement (x) shall automatically become a Guarantor

hereunder and thereupon shall have all of the rights, benefits, duties and obligations in such capacity under the Loan Documents and (y) will grant Liens to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, in any property of such Person which constitutes Collateral.

(b)　　Each Loan Party will cause, and will cause each other Loan Party to cause, all Collateral (to the extent required by the Security Documents) to be subject at all times to first priority Liens in favor of the Collateral Agent for the benefit of the applicable Secured Parties to secure the applicable Secured Obligations in accordance with the terms and conditions of the Security Documents, subject, with respect to Shared Collateral, to the Intercreditor Agreement provided that any Liens on the Escrow Accounts shall be junior in priority to the rights to payment therefrom under the Chapter 11 Plan.

(c)　　At any time upon the reasonable request of the Collateral Agent, each Loan Party shall execute or deliver to the Collateral Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the "Additional Documents") that the Collateral Agent may reasonably request in form and substance reasonably satisfactory to the Collateral Agent to create or perfect any necessary liens, and any documents or filings which may be required by law or which the Collateral Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents, all at the expense of the applicable Loan Party.

### 5.13　Post-Closing Covenants.

Not later than the date that is thirty (30) days after the Closing Date (or such later date as agreed by the Required Lenders in their sole discretion), deliver each Control Agreement required to be provided pursuant to the Security Agreement, or as otherwise provided in the Loan Documents.

## 6.　NEGATIVE COVENANTS.

Subject to the terms of the Confirmation Order and the Chapter 11 Plan, each Loan Party covenants and agrees that, until termination of the Commitments and payment in full of the Obligations, no Loan Party will do any of the following:

### 6.1　Indebtedness.　Except for the applicable Obligations hereunder and the Permitted Indebtedness, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness.

### 6.2　Liens.　Create, incur, or assume, on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of its property, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for (a) Liens created by the Loan Documents, and subject to the Intercreditor Agreement, Liens created by the Zohar III Litigation Trust Loan Documents, (b) Permitted Liens and (c) any other Lien that is the subject of a Permitted Protest.

### 6.3　Restrictions on Fundamental Changes.

(a)     Except for transactions contemplated by the Chapter 11 Plan, no Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, (i) any Subsidiary of a Borrower may merge into a Borrower (other than a Litigation Trust) in which a Borrower is the surviving entity, (ii) any Loan Party (other than a Litigation Trust) may merge into any other Loan Party (other than a Litigation Trust) in a transaction in which the surviving entity is a Loan Party and (iii) any Subsidiary that is not a Loan Party may liquidate or dissolve if it is liquidated into a Loan Party (other than a Litigation Trust) or the Borrowers determine in good faith that such liquidation or dissolution is not materially disadvantageous to the Lenders.

(b)     No Loan Party will, nor will it permit any Subsidiary to, engage in any business other than the business of the type conducted by such Loan Party and its Subsidiaries on the Closing Date.

**6.4     Disposal of Assets**.  Effect any Asset Sale, or agree to effect any Asset Sale of any property, except for:

(a)     transactions contemplated by the Chapter 11 Plan; and

(b)     with respect to the Litigation Trusts, transactions or other actions contemplated by the applicable Litigation Trust Agreement (in each case, as in effect on the date hereof).; and

(c)     Assets Sales, transfers and other dispositions consented to by the Required Lenders.

**6.5     Change Name**.  Change such Loan Party's name, state of organization, organizational identity or, to the extent applicable, organizational identification number.

**6.6     Investments**.  Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any Person or any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except for (a) investments permitted by Section 3.9 of the applicable Litigation Trust Agreement as in effect on the date hereof, (b) as contemplated by the Chapter 11 Plan, (c) for loans or advances made by any Loan Party to another Loan Party and (d) investments held by Recovery as of the date hereof.

**6.7     Amendments**.  Change or modify the terms of or alter any Organizational Document, including, without limitation, any Litigation Trust Agreement, except, in each case, with the prior written consent of the Required Lenders.  Terminate any Litigation Trust Agreement, without the consent of Required Lenders.  Amend, modify or waive any provision of the Zohar III Litigation Trust Credit Agreement or any other Zohar III Litigation Trust Loan

Documents in a manner that would materially impact the allocations set forth in any Litigation Trust Agreement or the funding of any Litigation Trust.

**6.8    [Reserved]**.

**6.9    Accounting Methods**.    Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

**6.10    [Reserved]**.

**6.11    Restricted Payments**.  Make any Restricted Payments or distributions on account of the "Litigation Trust-A Assets" or "Litigation Trust-B Assets" other than (i) Restricted Payments and distributions contemplated by the Litigation Trust A Agreement and the Litigation Trust B Agreement, respectively, in each case as in effect on the date hereof and (ii) as contemplated by the Chapter 11 Plan; provided however that no Default or Event of Default shall have occurred and be continuing or would result from the making of such Restricted Payment or distribution.

**6.12    Anti-Terrorism Law; Anti-Money Laundering**.

(a)    Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in Section 4.13, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this Section 6.12).

(b)    Cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of Legal Requirements.

**6.13    Embargoed Persons**. Cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any Person subject to sanctions or trade restrictions under United States law ("Embargoed Person" or "Embargoed Persons") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by applicable Legal Requirements, or the Loans made by the Lenders would be in violation of Legal Requirements, or (2) the Executive Order, any related enabling legislation or any other similar executive orders (the Legal Requirements referred to in clauses (1) and (2), collectively, "Sanctions Laws"), (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the investment in the Loan Parties

(whether directly or indirectly) is prohibited by applicable Legal Requirements or the Loans are in violation of applicable Legal Requirements or (c) any Loan Party to conduct any business or engage in any action that is in violation of any Sanctions Law.

**6.14    [Reserved]**.

**6.15    Litigation Trust**.  No Litigation Trust shall engage in any business activities or own any property except (i) as set forth, and as contemplated by, its respective Litigation Trust Agreement, as in effect on the date hereof, and the Chapter 11 Plan, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) performance of its obligations under this Agreement or the other Loan Document to which it is a party.

**6.16    Budget Variance**.  From and after December 31, 2022, the Borrowers shall not allow any variances to exist from the applicable Budget, except for Permitted Variances.

**6.17    Fees**.  Pay, or enter into an agreement to pay, fees to any Lender other than the Fees described in Section 2.7.

**7.    GUARANTY**.

**7.1    Guaranty of the Obligations**.  Each Guarantor hereby jointly and severally hereby irrevocably and unconditionally guarantees, in favor of each LTB Secured Party, the due and punctual payment in full of all LTB Obligations of the LTB Borrowers and each other Loan Party (other than the LTA Borrower) when the same shall become due, whether at stated maturity, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code (collectively the "Guaranteed Obligations")).

**7.2    Payment by Guarantors**.  Each Guarantor hereby jointly and severally agree, in furtherance of Section 7.1 and not in limitation of any other right which any LTB Secured Party may have at law or in equity against any LTB Borrower or any Guarantor by virtue hereof, that upon the failure of a LTB Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), the Guarantors will, immediately upon demand by the Administrative Agent, pay or cause to be paid to the Administrative Agent, in cash, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations and all other Guaranteed Obligations then owed to the LTB Secured Parties as aforesaid.

**7.3    Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability; this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    the Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between an LTB Secured Party and the LTB Borrowers with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of the LTB Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of the LTB Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against an LTB Borrower or any of such other guarantors and whether or not an LTB Borrower is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if a LTB Secured Party is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    each LTB Secured Party may, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time: (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations, in each case, to the extent permitted by the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other LTB Obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such LTB Secured Party in respect of the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that the LTB Secured Parties may have against any such security, in each case as such LTB Secured Party in its sole discretion may determine consistent herewith, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against a LTB Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:   (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the Loan Documents or from the proceeds of Collateral) to the payment of indebtedness other than the Guaranteed Obligations, even though Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) the requisite Lender's consent to the change, reorganization or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any Collateral; (vii) any defenses, setoffs or counterclaims which any Loan Party may allege or assert against Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.4     Waivers by Guarantors**. Each Guarantor hereby waives, to the extent permitted by Applicable Law, for the benefit of the LTB Secured Parties:  (a) any right to require an LTB Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against an LTB Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any Collateral, any such other guarantor or any other Person, or (iii) pursue any other remedy in the power of a LTB Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of a LTB Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of an LTB Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon an LTB Secured Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable

discharge of such Guarantor's obligations hereunder other than as a result of payment in full of the Guaranteed Obligations, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to setoffs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that an LTB Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto,; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.5    Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.6    Reinstatement**.   The obligations of Guarantor under this Section 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of a LTB Borrower or other Loan Party (other than the LTA Borrower) in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**7.7    Subrogation; Subordination**.   Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the LTB Commitments of the LTB Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.1, whether by subrogation or otherwise, against the LTB Borrowers of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

**7.8    General Limitation on Guarantee Obligations**.   In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency or reorganization law or other Legal Requirement affecting the rights of creditors generally, if the obligations of a Guarantor under Section 7.1 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.1, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the rights of subrogation established in Section 7.7) that is valid and enforceable, not void or voidable and not subordinated to the claims of other creditors as determined in such action or proceeding.

8.    **EVENTS OF DEFAULT**.

     8.1    <u>**Event of Default**</u>.  Any one or more of the following events shall constitute an event of default, without any requirement of notice from Lender to any Loan Party (each, an "<u>Event of Default</u>") under this Agreement:

         (a)    default shall be made in the payment of any principal of any Loan within five (5) days when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

         (b)    default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, within five (5) days when and as the same shall become due and payable, whether at the due date thereof (including an Interest Payment Date) or at a date fixed for prepayment (whether voluntary or mandatory) or by acceleration or demand thereof or otherwise;

         (c)    any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings of Loans hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

         (d)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in <u>Sections 5.1</u>, <u>5.4</u>, <u>5.5</u>, <u>5.6</u>, <u>5.8</u>, <u>5.12</u> or in <u>Section 6</u>;

         (e)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of ten (10) days after the earlier of (i) written notice thereof to such Loan Party and (ii) actual knowledge of such default by a Responsible Officer of any Loan Party; <u>provided</u> that, if (A) such default cannot be cured within such ten (10)-day period, (B) such default is capable of cure and (C) the applicable Loan Party is proceeding with diligence and in good faith to cure such default, then such ten (10) day cure period shall be extended to such date, not to exceed a total of fifteen (15) days, as shall be necessary for such Loan Party to diligently cure such default;

         (f)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed, unvacated, unbounded or unstayed pending appeal for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(g)     any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (f) of this Section 8.1, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(h)     any Loan Party shall, admit in writing its inability, or publicly declare its intention not to, or fail generally, to pay its debts generally as they become due;

(i)     one or more final judgments for the payment of money in an aggregate amount in excess of $100,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of the claim and does not dispute coverage) shall be rendered against any Loan Party and the same shall remain unpaid, not vacated or undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed;

(j)     [reserved];

(k)     the Guaranty shall fail to remain in full force or effect (other than pursuant to the terms hereof or thereof) or any action shall be taken by any Guarantor to discontinue or to assert in writing the invalidity or unenforceability of the Guaranty (in each case, other than as a result of the discharge of such Guarantor in accordance with the terms thereof, or any Guarantor shall deny in writing that it has any further liability under the Guaranty (other than as a result of the discharge of such Guarantor in accordance with the terms thereof, or shall give written notice to such effect);

(l)     except as permitted by the terms of any Security Document, (i) any Security Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected Lien with respect to any material portion of the Collateral (other than solely by reason of (w) a Uniform Commercial Code filing having lapsed because a Uniform Commercial Code continuation statement (or similar statements or filings in other jurisdictions) was not filed in a timely manner or such cessation is due to any act or failure to act on the part of the Collateral Agent or any Secured Party, (x) such perfection not being required pursuant to the Loan Documents, (y) a release of Collateral in accordance with the terms hereof or thereof or (z) the Secured Obligations shall have been indefeasibly paid in full or any other termination of such Loan Document in accordance with the terms thereof);

(m)     any Security Document shall fail to remain in full force or effect (other than pursuant to the terms hereof or thereof or due to any action or omission of any action of the Secured Parties) or any action shall be taken by a Loan Party to discontinue or to assert in writing the invalidity or unenforceability of any Security Document;

(n)    any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge (in writing) the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(o)    any Litigation Trustee shall be enjoined, suspended or barred from taking any further action in performing the Litigation Trustee's duties on behalf of the applicable Litigation Trust;

(p)    failure to replace a Litigation Trustee within ninety (90) days of their removal or resignation; provided however that if in connection with the resignation of a Litigation Trustee a successor is not appointed or does not accept its appointment within such ninety (90) day period and the resigning Litigation Trustee files a motion with the Bankruptcy Court for the appointment of a successor Litigation Trustee, such ninety (90) day period shall be extended to five (5) days after the entry of an order appointing a successor Litigation Trustee by the Bankruptcy Court;

(q)    any Loan Party or any Subsidiary shall (i) fail to pay when due (whether by scheduled maturity, acceleration or otherwise and after giving effect to any applicable grace period) any principal of or interest on (x) any Indebtedness (other than (a) the Indebtedness incurred pursuant to this Agreement and (b) any Indebtedness owed to a Borrower or a Subsidiary) having an aggregate principal amount exceeding $100,000 or (y) Indebtedness under the Zohar III Litigation Trust Credit Agreement or (ii) after giving effect to any applicable grace period, fail to observe, perform or comply with any condition, covenant or agreement contained in any agreement or instrument evidencing or relating to any such Indebtedness, and the effect of such failure is to cause, or permit the holder or holders of such Indebtedness (or a trustee or agent on its or their behalf) to cause (with the giving of notice or otherwise), such Indebtedness to become due, or to be prepaid, redeemed, purchased or defeased, prior to its stated maturity; or

(r)    a Termination Event shall have occurred.

**8.2**    **Rights and Remedies**.  If any Event of Default occurs and is continuing, the Administrative Agent may and, at the written request of the Required Lenders, shall take any or all of the following actions:

(i)    declare the Commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers and each other Loan Party;

(iii)    terminate the Loan Documents as to any future liability or obligation of the Lenders hereunder, but without affecting any of the Loan Obligations or the Liens securing the Loan Obligations;

(iv)    charge interest at the Default Rate; and

(v)    exercise (or cause the Collateral Agent to exercise) on behalf of itself and the Lenders all rights and remedies available to the Agents and the Lenders under the Loan Documents or Applicable Law, including, without limitation, the enforcement of any and all Liens created pursuant to the Security Documents; provided, however, in the event of this clause (v), the Required Lenders shall agree to a wind-down budget (a "Wind-Down Budget") in order to provide for the payment of expenses necessary for the orderly winding up of the Loan Parties' affairs as is appropriate under the circumstances.

provided, further, that upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.  Except as expressly provided for herein, presentment, demand, protest and all other notices (including notice of acceleration and notice of intent to accelerate) of any kind are hereby waived by the Borrowers and each of the other Loan Parties.

**8.3    Application of Proceeds upon Event of Default**.

(a)    After the exercise of remedies provided for in this Section 8 (or after the Loans have automatically become immediately due and payable), any amounts received under any Security Documents shall be applied by the Administrative Agent:

(i)    to the extent constituting the proceeds of LTA Collateral:

(A)    *first*, to pay that portion of the LTA Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents) then due and payable to the Agents in their respective capacities as such, until payment in full of all such fees shall have been made;

(B)    *second*, to pay expenses in accordance with the Wind-Down Budget;

(C)    *third*, to pay that portion of the LTA Obligations constituting Fees, indemnities, expenses and other amounts (other than principal and interest) payable to the LTA Lenders, ratably among them in proportion to the amounts described in this clause second payable to them;

(D)    *fourth*, to pay ratably all accrued and unpaid interest on the LTA Loans, until payment in full of all such interest shall have been made;

(E)    *fifth*, to pay the unpaid principal amount of the LTA Loans ratably, until payment in full of the principal of all LTA Loans shall have been made;

(F)     *sixth*, to pay all other LTA Obligations ratably, until payment in full of all such other LTA Obligations shall have been made; and

(G)     finally, to pay to the LTA Borrower, or as a court of competent jurisdiction may direct, any surplus then remaining (including from the proceeds of the LTA Collateral owned by it);

(ii)     to the extent constituting the proceeds of LTB Collateral:

(A)     *first*, to pay that portion of the LTB Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents) then due and payable to the Agents in their respective capacities as such, until payment in full of all such fees shall have been made;

(B)     *second*, to pay expenses in accordance with the Wind-Down Budget;

(C)     *third*, to pay that portion of the LTB Obligations constituting Fees, indemnities, expenses and other amounts (other than principal and interest) payable to the LTB Lenders, ratably among them in proportion to the amounts described in this clause second payable to them;

(D)     *fourth*, to pay ratably all accrued and unpaid interest on the LTB Loans, until payment in full of all such interest shall have been made;

(E)     *fifth*, to pay the unpaid principal amount of the LTB Loans ratably, until payment in full of the principal of all LTB Loans shall have been made;

(F)     *sixth*, to pay all other LTB Obligations ratably, until payment in full of all such other LTB Obligations shall have been made; and

(G)     finally, to pay to the LTB Borrowers or the other applicable Loan Parties (other than the LTA Borrower), or as a court of competent jurisdiction may direct, any surplus then remaining (including from the proceeds of the LTB Collateral owned by it).

The Administrative Agent may make such distributions hereunder in cash or in kind or, on a ratable basis, in any combination thereof.

(b)     In making the payments and allocations required by this Section 8.3, the Administrative Agent will be entitled to rely on information from (i) its own records for information as to the Lenders, their Obligations and actions taken by them, (ii) any Lender for information as to its Obligations and actions taken by it, to the extent that the Administrative Agent has not obtained such information from its own records, and (iii) the Borrowers, to the extent that the Administrative Agent has not obtained information from the foregoing sources. All distributions made by the Administrative Agent pursuant to this Section 8.3 shall be final

(except in the event of manifest error) and the Administrative Agent shall have no duty to inquire as to the application by any Lender of any amount distributed to it.

## 9.    THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT.

**9.1    <u>Appointment</u>**.  (a)  Each Lender hereby irrevocably designates and appoints MBIA Insurance Corporation as the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents and MBIA Insurance Corporation hereby accepts such designations and appointments.  Each Lender irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this <u>Section 9</u> are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any such provisions.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Borrower or any of their Subsidiaries.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law.  Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    Each Lender hereby irrevocably authorizes the Administrative Agent and the Collateral Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Collateral Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by Collateral Agent (whether by judicial action or otherwise) in accordance with applicable Legal Requirements.

(c)    Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Legal Requirement a security interest can be perfected by possession or control.  Should any Lender (other than the Collateral Agent) obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly following the Collateral Agent's request therefor, shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(d)    Any corporation or association into which any Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which such Agent is a party, will be and become the successor Agent, as applicable, under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

**9.2    Agent in Its Individual Capacity**.  Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender, if applicable, as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder, if applicable, in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, any Company or Affiliate thereof as if it were not an Agent hereunder and without duty to account therefor to the Lenders.

**9.3    Exculpatory Provisions**.  No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 13.1); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability, if such Agent is not indemnified to its satisfaction, or that is contrary to any Loan Document or applicable Legal Requirements including, for the avoidance of doubt any action that may be in violation of the automatic stay under any Insolvency Law or that may effect a foreclosure, modification or termination of property of a Defaulting Lender under any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose or shall be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8.3 or Section 13.1) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof describing such Default or Event of Default is given to such Agent by a Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or

observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 3.2 or elsewhere in any Loan Document.  Each party to this Agreement acknowledges and agrees that the Administrative Agent may from time to time use one or more outside service providers for the tracking of all UCC financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to the Loan Documents and the notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that each of such service providers will be deemed to be acting at the request and on behalf of the Borrowers and the other Loan Parties.  No Agent shall be liable for any action taken or not taken by any such service provider.  Neither any Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by any Agent under or in connection with any of the Loan Documents.  In no event shall any Agent be liable for any failure or delay in the performance of their respective obligations under this Agreement or any related documents because of circumstances beyond such Agent's control, including, but not limited to, a failure, termination, or suspension of a clearing house, securities depositary, settlement system or central payment system in any applicable part of the world or acts of God, flood, war (whether declared or undeclared), civil or military disturbances or hostilities, nuclear or natural catastrophes, political unrest, explosion, severe weather or accident, earthquake, terrorism, fire, riot, labor disturbances, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like (whether domestic, federal, state, county or municipal or foreign) which delay, restrict or prohibit the providing of the services contemplated by this Agreement or any related documents, or the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or any other causes beyond such Agent's control whether or not of the same class or kind as specified above.

Nothing in this Agreement or any other Loan Document shall require the Administrative Agent or the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

The Agents shall have no obligation for (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under the Loan Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times; or (c) providing, maintaining, monitoring, or preserving insurance on or the payment of taxes with respect to any Collateral.

**9.4    Reliance by Agent**.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper Person.  Each Agent also may rely upon any statement made to it

orally and believed by it to be made by a proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless each Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

      **9.5**    **Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of each Agent and any such sub-agent, and shall apply, without limiting the foregoing, to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.  The Agents shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

      **9.6**    **Successor Agent**.  Each Agent may resign as such at any time upon at least 10 days' prior notice to the Lenders and the Borrowers.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent or Collateral Agent, as the case may be.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within ten (10) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent, as the case may be.  If no successor Agent shall have been appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents, and the Required Lenders shall assume and perform all of the duties of such Administrative Agent or Collateral Agent, as the case may be, under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent.

      Upon the acceptance of its appointment as an Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents (if not already discharged therefrom as provided in this paragraph).  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed among the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Section 9, Section 10, Section 12 and Section 14.9 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as an Agent.

**9.7**    **Non-Reliance on Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it has deemed appropriate, conducted its own independent investigation of the financial condition and affairs of the Loan Parties and their Subsidiaries and made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof (including any such terms and conditions set forth, or otherwise maintained, on the Platform with respect thereto). Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

**9.8**    **[Reserved]**.

**9.9**    **Indemnification**.  The Lenders severally agree to indemnify each Agent in its capacity as such and each of its Related Parties (to the extent not reimbursed by the Borrowers or the Guarantors and without limiting the obligation of the Borrowers or the Guarantors to do so), ratably according to their respective outstanding Loans and Commitments in effect on the date on which indemnification is sought under this Section 9.9 (or, if indemnification is sought after the date upon which all Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such outstanding Loans and Commitments as in effect immediately prior to such date), from and against any and all Indemnified Liabilities (IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF ANY AGENT OR RELATED PARTIES); provided that no Lender shall be liable for the payment of any portion of such Indemnified Liabilities that are found by a final and nonappealable judgment of a court of competent jurisdiction to have directly resulted solely and directly from such Agent's or Related Party's, as the case may be, gross negligence or willful misconduct; provided, however, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be provided by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.9.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.9 shall apply whether or not any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limiting the foregoing, the Lenders shall reimburse each Agent upon demand ratably according to their respective outstanding Loans and Commitments in effect on the date on which reimbursement is sought under this Section 9.9 (or if such reimbursement payment is sought after the date on which the Loans have been paid in full and the Commitments have terminated, ratably in accordance with the outstanding Loans and Commitments as in effect immediately prior to such date) any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise and including the enforcement of this Section 9.9) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to

herein, to the extent that the Agents are not reimbursed for such expenses by or on behalf of the Borrowers. Each Lender hereby authorizes the Agents to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this <u>Section 9.9</u>.  The undertaking in this <u>Section 9.9</u> shall survive termination of the Commitments, the payment of all other Obligations and the resignation or removal of the Agents.  The agreements in this <u>Section 9.9</u> shall survive the payment of the Loans and all other amounts payable hereunder.

**9.10    [Reserved]**.

**9.11    <u>Lender Action</u>**.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures or cause any of the foregoing (through Affiliates or otherwise), with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  Without limiting the foregoing, each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent, it will not take any enforcement action, accelerate Obligations under any Loan Documents, or exercise any right that it might otherwise have under applicable Legal Requirements to credit bid or purchase any portion of the Collateral at any sale or foreclosure thereof referred to in <u>Section 9.1(b)</u>; <u>provided</u> that nothing contained in this Section shall affect any Lender's right to credit bid its pro rata share of the Obligations pursuant to Section 363(k) of the Bankruptcy Code.

**9.12    <u>[Reserved]</u>**.

**9.13    <u>Lender's Representations, Warranties and Acknowledgements</u>**.  Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Borrowers and their respective Subsidiaries in connection with the transactions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Borrowers and their respective Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.  Each Lender acknowledges that no Agent or Related Party of any Agent has made any representation or warranty to it.  Except for documents expressly required by any Loan Document to be transmitted by an Agent to the Lenders, no Agent shall have any duty or responsibility (either express or implied) to provide any Lender with any credit or other information concerning any Loan Party, including the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of a Loan Party, that may come in to the possession of an Agent or any of its Related Parties.

**9.14    Security Documents and Guarantee**.

(a)    Agents under Security Documents and Guarantee.  Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guaranty, the Collateral and the Loan Documents.  Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or disposition of assets, release any Lien encumbering any item of Collateral owned by any Subsidiary no longer required to become a Guarantor pursuant to Section 5.12(a) or to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented or (ii) with respect to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented.

(b)    Right to Realize on Collateral and Enforce Guarantee.  Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrowers, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the applicable Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the applicable Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

(c)    Release of Collateral, Termination of Loan Documents.

(i)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent shall take such actions as shall be required to release its security interest in any Collateral subject to any disposition permitted by the Loan Documents, and to release any guarantee obligations under any Loan Document of any Person subject to such disposition, to the extent necessary to permit consummation of such disposition in accordance with the Loan Documents.

(ii)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Secured Obligations (other than contingent expense reimbursement and indemnity obligations that are not then due and payable) have been paid in full and all Commitments have terminated or expired, upon request of the Borrowers, the Administrative Agent and the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any other Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Loan Document, whether or not on the date of such release there may be outstanding contingent expense reimbursement and indemnity obligations that are not then due and payable.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(iii)    The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

**9.15    Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on a Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise: to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Collateral Agent and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Collateral Agent and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Collateral Agent and the Administrative Agent under Sections 2.7 and 10) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Collateral Agent to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Collateral Agent, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under this Agreement.   To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.16    Erroneous Payments.**

(a)    If the Administrative Agent (x) notifies a Lender or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 9.16 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking

industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Lender, Secured Party or any Person who has received funds on behalf of a Lender or Secured Party (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)     it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)     such Lender or Secured Party shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this clause (b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this clause (b) shall not have any effect on a Payment Recipient's obligations pursuant to clause (a) or on whether or not an Erroneous Payment has been made.

(c)     Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)     The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received

funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party, as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by the Borrowers or any other Loan Party; provided that this Section 9.16 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from, or on behalf of (including through the exercise of remedies under any Loan Document), the Borrowers for the purpose of making a payment on the Obligations.

(e)     To the extent permitted by Applicable Law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

Each party's obligations, agreements and waivers under this Section 9.16 shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Secured Obligations (or any portion thereof) under any Loan Document.

**10.    EXPENSES; INDEMNIFICATION; DAMAGES WAIVER**.

(a)     Subject to Section 10(h) hereof, the Borrowers jointly and severally agree to pay (i) all reasonable and documented out-of-pocket costs and expenses for the Administrative Agent, the Collateral Agent or any Lender (including the reasonable fees, charges and disbursements of counsel for the each of the foregoing) incurred by any Agent, the Lenders and any of their respective Affiliates, in connection with the structuring, documentation, negotiation, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing, extending or replacing, in whole or in part, the credit facilities provided herein, including the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or any other document or matter requested by the Borrowers or any other Borrower, (ii) all reasonable and documented out-of-pocket costs and expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Collateral Agent for the benefit of the Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and other charges of counsel to the Collateral Agent and of counsel providing any opinions that the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) may reasonably request in respect of the Collateral or the Liens created pursuant to the Security Documents and (iii) all out-of-pocket expenses incurred by the Administrative Agent or any

Lender (including the fees, charges and disbursements of any counsel or other advisor for the Administrative Agent, Collateral Agent or any Lender, including the Lender Advisors) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this <u>Section 10</u>, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; <u>provided</u> that the Borrowers shall not be required to reimburse the legal fees and expenses of more than (x) one outside counsel (in addition to any special counsel and up to one local counsel in each applicable local jurisdiction) for the Agents and their Related Parties, taken as a whole and (y) one outside counsel (in addition to any special counsel and up to one local counsel in each applicable local jurisdiction) for the Lenders and their Related Parties, taken as a whole, or, in the case of an actual or potential conflict of interest, of one additional counsel to the affected Lenders to the extent such Lenders are similarly situated.

(b)    Subject to <u>Section 10(h)</u> hereof, the Borrowers agree, jointly and severally, to indemnify the Agents, each Lender and each of their respective Related Parties (each such Person being called an "<u>Indemnitee</u>") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrowers) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) the environmental condition of any property owned, leased or operated by any Loan Party at any time, or the applicability of any Legal Requirements relating to such property, whether or not occasioned wholly or in party by any condition, accident or event caused by any act or omission of any Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnitee is a party thereto (all such losses, claims, damages, liabilities, expenses, fees, time charges and disbursements, the "<u>Indemnified Liabilities</u>"); <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) result from a claim not involving an act or omission of the Borrowers and that is brought by an Indemnitee against another Indemnitee (other than against the arranger or the Administrative Agent in their capacities as such). This paragraph shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    [Reserved].

(d)     The provisions of this <u>Section 10</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Chapter 11 Plan and the other transactions contemplated hereby and thereby, the repayment of the Loans, and any other Secured Obligations, the release of Guarantor or of all or any portion of the Collateral, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents or any Lender, <u>provided</u> that the provisions of this Section 10 shall survive (x) with respect to each Litigation Trust, until the "Termination Date" of such Litigation Trust (as defined in the applicable Litigation Trust Agreement) and (y) with respect to Recovery, until the dissolution of Recovery in accordance with the terms of its Organization Documents.

(e)     All amounts due under this <u>Section 10</u> shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested. Notwithstanding anything to the contrary contained herein, no Loan Party shall be required to establish any reserves with respect to amounts due (or that may be due) under this <u>Section 10</u> unless and until a claim has been made therefor.

(f)     To the extent that the Loan Parties fail to pay any amount required to be paid by them to the Agents under <u>Sections 10(a)</u> or <u>(b)</u>, each applicable Lender severally agrees to pay to the Agents, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or, if such payment is sought after the date on which the Loans have been paid in full and the Commitments terminated, determined immediately prior to the time that the Loans were paid in full and the Commitments terminated)) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); <u>provided</u> that the unreimbursed amount was incurred by or asserted against any of the Agents in its capacity as such.  For purposes of this <u>Section 10(e)</u>, a Lender's "*pro rata* share" shall be determined based upon its share of the sum of the total outstanding LTA Loans and / or LTB Loans and unused LTA Commitments and / or unused LTB Commitments at the time, as applicable.  Each Lender hereby authorizes the Agents to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this <u>Section 10(e)</u>.

(g)     To the fullest extent permitted by applicable Legal Requirements, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential, or punitive damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby or thereby, the Chapter 11 Plan, the Loans or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.

(h)     All amounts due under this <u>Section 10</u> shall be payable not later than ten (10) days after demand therefor.

-72-

(i)    Notwithstanding anything to the contrary contained in this <u>Section 10</u>, (i) the LTA Borrower shall not have any obligation to reimburse any costs or expenses to the extent relating to the LTB Borrowers or the other Loan Parties or provide any indemnification for any losses, claims, damages, liabilities and related expenses to the extent relating to the LTB Borrowers or the other Loan Parties and (ii) the LTB Borrowers and the other Loan Parties (other than the LTA Borrower) shall not have any obligation to reimburse any costs or expenses to the extent relating to the LTA Borrower or provide any indemnification for any losses, claims, damages, liabilities and related expenses to the extent relating to the LTA Borrower.

(j)    The agreements in this <u>Section 10</u> shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**11.    NOTICES**.

(a)    All notices or demands relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by reputable overnight courier dispatched for next Business Day delivery, or electronic mail (at such email addresses as a party may designate in accordance herewith) together with, at the sender's option, a copy by reputable overnight courier dispatched for next Business Day delivery. In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to Recovery:

David Dunn
PROVINCE
700 Canal Street, Suite 12E
Stamford, CT 06902
Telephone: (702) 840-1271
Email:  ddunn@provincefirm.com

With a copy, which shall not constitute notice, to:

Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Attn:   Joseph R. Dunn; Abigail V. O'Brient
Telephone:  (858) 314-1516; (310) 226-7886
Email:  jrdunn@mintz.com; avobrient@mintz.com

If to the Litigation Trusts:

David Dunn
PROVINCE
700 Canal Street, Suite 12E
Stamford, CT 06902
Telephone: (702) 840-1271
Email:  ddunn@provincefirm.com

With a copy, which shall not constitute notice, to:

>Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
>3580 Carmel Mountain Road, Suite 300
>San Diego, CA 92130
>Attn:   Joseph R. Dunn; Abigail V. O'Brient
>Telephone:  (858) 314-1516; (310) 226-7886
>Email:  jrdunn@mintz.com; avobrient@mintz.com

If to the Agents:

>MBIA Insurance Corporation
>1 Manhattanville Rd #301
>Purchase, New York 10577
>Attn:  Jonathan Harris; Anthony McKiernan
>Telephone:  (914) 765-3298 (JH); (914) 765-361 (AM)
>Email:  Jonathan.Harris@mbia.com; Anthony.McKiernan@mbia.com

With a copy, which shall not constitute notice, to:

>Cadwalader Wickersham & Taft LLP
>650 South Tryon Street
>Charlotte, NC 28202
>Attn:  Christopher McDermott, Esq.
>Telephone: (704) 348-5184
>Email:  Chris.McDermott@cwt.com

Any party hereto may change the address at which they are to receive notices hereunder by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11 shall be deemed received: (a) if personally delivered, on the date of receipt; (b) if sent by sent by reputable overnight courier dispatched for next Business Day delivery, on the next Business Day after dispatch; and (c) if sent by electronic mail, upon the date of dispatch if either confirmed by electronic mail or if a copy is sent by overnight courier dispatched for next Business Day delivery.

>(b)     Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications on the Platform.

>(c)     The Platform is provided "as is" and "as available."  The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrowers or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special,

incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrowers, any Loan Party's or the Administrative Agent's transmission of communications through the Platform.  "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

(d)     The Borrowers hereby acknowledge that certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrowers or their respective Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  Each Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the materials and information provided by or on behalf of the Borrowers hereunder and under the other Loan Documents (collectively, "Borrower Materials") that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Agents and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrowers or its securities for purposes of U.S. federal and state securities Laws; (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".  Each Public Lender will designate one or more representatives that shall be permitted to receive information that is not designated as being available for Public Lenders.

(e)     The Administrative Agent hereby designates its office located at the address set forth above, or any subsequent office which shall have been specified for such purpose by written notice to the Administrative Agent and Lenders, as the Administrative Agent's Office referred to herein, to which payments due are to be made and at which Loans will be disbursed.

## 12.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)     THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    SUBJECT TO THE LAST PROVISO OF THIS SENTENCE AND CLAUSE (C), THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK COUNTY, NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OR ANY LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH PARTY HERETO WAIVES TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASES REMAINS PENDING.

EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO WAIVES TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b).

(c)    NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWERS OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION, AND HEREBY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT.

(d)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY HERETO REPRESENTS THAT EACH SUCH PARTY HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

13.    **AMENDMENTS; ASSIGNMENTS; WAIVERS; SUCCESSORS**.

13.1    **Amendments and Waivers**.  No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders and the Loan Parties, and acknowledged by the Administrative Agent, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that, the Administrative Agent and the Borrowers may, without the consent of the Lenders, amend, modify or supplement this Agreement and any other Loan Document to cure any ambiguity, typographical error, defect or inconsistency if such amendment, modification or supplement does not adversely affect the rights of any Agent or any Lender and (z) no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.2) without the written consent of such Lender (it being understood that a waiver of any condition precedent or the waiver of any Default or mandatory prepayment shall not constitute an extension or increase of any Commitment of any Lender); postpone any date fixed by this Agreement or any other Loan Document for any scheduled payment of principal, interest or fees due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(b)    reduce the principal of, or the rate of interest specified herein on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(c)    change (A) Section 8.3 in a manner that would alter the application or pro rata sharing of payments required thereby without the written consent of each Lender affected thereby or (B) the order of application of any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 2.4(i), in any manner that adversely affects the Lenders without the written consent of each Lender adversely affected thereby;

(d)    change any provision of this Section 13.1 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender adversely affected thereby;

(e)    release all or substantially all of the LTA Collateral or LTB Collateral in any transaction or series of related transactions, without the written consent of each applicable Lender, in each case except as expressly provided in the Loan Documents and except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Required Lenders pursuant to section 363(k), section 1129(b)(2)(a)(ii) or any other section of the Bankruptcy Code or any other sale or other disposition of assets in connection with other Debtor

Relief Laws or an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents;

(f)     release all or substantially all of the value of the Guaranty, without the written consent of each LTB Lender;

(g)     waive, amend or otherwise modify Section 2.4(a), Section 2.4(j) or Section 2.4(l) hereof (or any comparable provision of any other Loan Document) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender adversely affected thereby; or

(h)     (i) contractually subordinate the Obligations in right of payment to any other Indebtedness, or (ii) except as provided by operation of Applicable Laws, subordinate the Liens securing the Loans with respect to all or substantially all of the Collateral to any other Lien (except as expressly permitted by the Loan Documents), in either case, without the written consent of each Lender adversely affected thereby;

provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, affect the rights or duties of the Collateral Agent under this Agreement or any other Loan Document.

Notwithstanding anything to the contrary contained in this Section 13.1, Guaranty, Security Documents and related documents executed by Loan Parties or any Subsidiaries of the Borrowers in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrowers without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure any ambiguity, typographical error, defect or inconsistency or (iii) to cause such Guaranty, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

Notwithstanding anything to the contrary contained in this Section 13.1, (i) no amendment, waiver or consent that disproportionately affects the LTA Borrower, the LTA Commitments, the LTA Loans or the LTA Collateral shall be approved without the additional consent of the Required LTA Lenders, all LTA Lenders or affected LTA Lenders, as applicable, (ii) no amendment, waiver or consent that disproportionately affects a LTB Borrower or another Loan Party (other than the LTA Borrower), the LTB Commitments, the LTB Loans or the LTB Collateral shall be approved without the additional consent of the Required LTB Lenders, all LTB Lenders or affected LTB Lenders, as applicable, (iii) any amendment, waiver or consent that only affects the LTA Borrower, the LTA Commitments, the LTA Loans or the LTA Collateral shall be approved with the consent of the Required LTA Lenders, all LTA Lenders or affected LTA Lenders, as applicable, without requiring the consent of any LTB Lenders and (iv) any amendment, waiver or consent that only affects a LTB Borrower or another Loan Party

(other than the LTA Borrower), the LTB Commitments, the LTB Loans or the LTB Collateral shall be approved with the consent of the Required LTB Lenders, all LTB Lenders or affected LTB Lenders, as applicable, without requiring the consent of any LTA Lenders.

13.2    **No Waivers; Cumulative Remedies**.  No failure or delay by any Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by Section 13.1, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.  No notice or demand on the Borrowers or any other Loan Party in any case shall entitle the Borrowers or any other Loan Party to any other or further notice or demand in similar or other circumstances.

13.3    **Successors**.  This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby; provided, however, that no Loan Party may assign or otherwise transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Administrative Agent, the Collateral Agent, and each Lender, which consent may be withheld in their respective sole discretion (and any attempted assignment or transfer by any Loan Party without such consent shall be absolutely void *ab initio*).  Nothing in this Agreement or any other Loan Document, express or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent expressly provided in Section 13.6 and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement or any other Loan Document.

13.4    **Assignments**.

Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its applicable Commitment and the applicable Loans at the time owing to it (regardless of any assignment by such Lender of all or portion of its right (if any) to the Upside Return)); provided that any such assignment shall be subject to the following conditions:

(a)    Minimum Amounts.

(i)    in the case of an assignment of the entire remaining amount of the assigning Lender's applicable Commitment or the applicable Loans at the time owing to it or contemporaneous assignments to or by related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in Section

13.4(a)(ii) in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(ii)    in any case not described in Section 13.4(a)(i), the aggregate amount of the applicable Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the applicable Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrowers otherwise consents (each such consent not to be unreasonably withheld or delayed).

(b)    [Reserved].

(c)    Required Consents.    No consent shall be required for any assignment except to the extent required by Section 13.4(a)(ii) and, in addition:

(i)    the consent of the Borrowers (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender, an Approved Fund or a Permitted Buyer; provided that the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and

(ii)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(d)    Assignment and Assumption.    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(e)    No Assignment to Certain Persons.    No such assignment shall be made to (i) the Borrowers or any of the Borrowers' Affiliates or Subsidiaries; (ii) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof; or (iii) either directly or indirectly, whether through a synthetic arrangement, derivative or other arrangement or understanding, to Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan).

(f)      [Reserved].

(g)      Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrowers and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full *pro rata* share of all applicable Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 13.5, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 10 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.6.

For the avoidance of doubt, (i) each Lender shall be permitted to assign their rights and obligations in respect of the LTA Loans and LTA Commitments independently of such Lender's rights and obligations (if any) in respect of the LTB Loans and LTB Commitments and (ii) each Lender shall be permitted to assign their rights and obligations in respect of the LTB Loans and LTB Commitments independently of such Lender's rights and obligations (if any) in respect of the LTA Loans and LTA Commitments.

**13.5      Register.**  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the applicable Lenders, and the applicable Commitments of, and principal amounts (and stated interest) of the applicable Loans owing to, each Lender pursuant to the terms hereof from time to

time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the applicable Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

13.6    **Participations.** Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a Borrower or any of a Borrower's Affiliates or Subsidiaries or Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan)) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment or the applicable Loans owing to it); provided that (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (c) the Borrowers, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 2.10(d) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) is described in clauses (a) and (b) of Sections 13.1 and (2) directly affects such Participant.  The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.9 and 2.10 (subject to the requirements and limitations therein, including the requirements under Section 2.10(g) (it being understood that the documentation required under Section 2.10(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 13.4; provided that such Participant (A)agrees to be subject to the provisions of Section 2.11 as if it were an assignee under Section 13.4 of this Article; and (B)shall not be entitled to receive any greater payment under Sections 2.9 or 2.10, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.11(b) with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 14.9 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.4(l) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is

necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

For the avoidance of doubt, (i) each Lender shall be permitted to sell participations in their rights and obligations in respect of the LTA Loans and LTA Commitments independently of such Lender's rights and obligations (if any) in respect of the LTB Loans and LTB Commitments and (ii) each Lender shall be permitted to sell participations in their rights and obligations in respect of the LTB Loans and LTB Commitments independently of such Lender's rights and obligations (if any) in respect of the LTA Loans and LTA Commitments.

**13.7     Certain Pledges.** Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto, or otherwise violate any other provision of this Agreement.

**13.8     Assignment of Upside Return.** Any Lender may at any time assign to one or more assignees all or a portion of its right to receive its Upside Return (regardless of any assignment by such Lender of all or portion of its applicable Commitment and or Loans at the time owing to it) pursuant to an assignment agreement in form and substance reasonably satisfactory to such Lender and the Administrative Agent (each, an "Upside Return Assignment"); provided, however, no Upside Return may be assigned to Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan). No consent shall be required for any assignment of a Lender's Upside Return pursuant to this Section 13.8. The parties to each assignment pursuant to this Section 13.8 shall execute and deliver to the Administrative Agent an Upside Return Assignment, together with a processing and recordation fee of $1,250; provided that that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Upside Return Assignment delivered to it pursuant to this Section 13.8 and a register for the recordation of the names and addresses of the applicable Lenders, and the applicable Upside Return assigned by a Lender pursuant to the terms hereof from time to time (the "Upside Return Register"). The entries in the Upside Return Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the applicable Lenders shall treat each Person whose name is recorded in the Upside Return Register pursuant to the terms hereof as a Lender entitled to the Upside Return hereunder for all purposes of this Agreement. The Upside Return Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

14. **GENERAL PROVISIONS**.

**14.1** <u>**Effectiveness**</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent and/or the Arrangers, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 3</u>, the Confirmation Order and the Chapter 11 Plan, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**14.2** <u>**Section Headings**</u>.  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**14.3** <u>**Interpretation**</u>.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**14.4** <u>**Severability of Provisions**</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**14.5** <u>**No Fiduciary Duty**</u>.  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "<u>Lenders</u>"), may have economic interests that conflict with those of the Loan Parties, their stockholders or other equity holders and/or their affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other. The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or other equity holders or its affiliates with respect to the transactions contemplated hereby or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its

stockholders or other equity holders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders or other equity holders, creditors or any other Person.  Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

**14.6    Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement; but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

**14.7    Revival and Reinstatement of Obligations**.  To the extent that any payments on the Indebtedness or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, receiver and manager, interim receiver or other Person under any bankruptcy law or other Insolvency Law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and each Loan Party shall take (and shall cause each other Loan Party to take) such action as may be requested by the Administrative Agent, the Collateral Agent or the Required Lenders to effect such reinstatement.

**14.8    Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**14.9    Right of Setoff; Marshalling; Payments Set Aside**.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirements, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of any Loan Party now or hereafter existing under this Agreement or any other Loan Documents held by such Lender,

irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender under this <u>Section 14.9</u> are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  Each Lender agrees to notify the Borrowers and the Administrative Agent promptly after any such setoff and application; <u>provided</u>, <u>however</u>, that in no event shall the failure to give such notice effect the validity or enforceability of any such setoffs.  None of any Agent or any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Loan Party makes a payment or payments to Administrative Agent or the Lenders (or to Administrative Agent, on behalf of the Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

      **14.10**  **<u>Confirmation Order</u>**.  Notwithstanding anything to the contrary set forth herein, in the event of a conflict between the terms of this Agreement or any Loan Document and the Confirmation Order, the Confirmation Order shall control in all respects and any such conflicting terms set forth herein or in such Loan Document shall be deemed automatically amended to be consistent with the terms set forth in the Confirmation Order.

**14.11  <u>Confidentiality</u>**.

      (a)  Each of the Agents and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to their respective  branches and Affiliates and to their respective Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (iii) to the extent required by Applicable Laws or by any subpoena or similar legal process; (iv) to any other party hereto; (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (vi) subject to an agreement containing provisions substantially the same as (or no less restrictive than) those of this Section, to (x) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (y) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrowers and its obligations, this Agreement or payments hereunder; (vii) with the consent of the Borrowers; or (viii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the either Agent, any Lender or any of their respective branches or Affiliates on a nonconfidential basis from a source other than the

Borrowers who did not acquire such information as a result of a breach of this Section. In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents or any Lender in connection with the administration of this Agreement, the other Loan Documents, and the Commitments. Notwithstanding the foregoing, each of the Agents and the Lenders agree that under no circumstances shall they disclose any Information, directly or indirectly, to (i) Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan), or (ii) any Person who is the subject of a Litigation Claim.

For purposes of this Section, "Information" means all information received from a Borrower or any of its Subsidiaries relating to such Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by a Borrower or any of its Subsidiaries; provided that, in the case of information received from a Borrower or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    Each Lender party to this Agreement as of the Closing Date and a holder of an Equity Interest (or other beneficial interest) in a Borrower agrees that, in connection with any transfer or other assignment of such Equity Interest (or beneficial interest), such assignment shall be subject to an agreement containing provisions substantially the same as (or no less restrictive than) the confidentiality provisions set forth in the applicable Litigation Trust Agreements or other Organizational Documents.

## 15.    JOINT AND SEVERAL LIABILITY.

**15.1    [Reserved]**.

**15.2    Joint and Several Liability** Each LTB Borrower hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Administrative Agent and the LTB Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the LTB Borrowers and in consideration of the undertakings of the other LTB Borrowers to accept joint and several liability for the LTB Obligations. Each of the LTB Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other LTB Borrowers, with respect to the payment and performance of all of the LTB Obligations (including, without limitation, any LTB Obligations arising under this Section 15.2), it being the intention of the parties hereto that all of the LTB Obligations shall be the joint and several obligations of each of the LTB Borrowers without preferences or distinction among them. If and to the extent that any of the LTB Borrowers shall fail to make any payment with respect to any of the LTB Obligations as and when due or to perform any of the LTB Obligations in accordance with the terms thereof, then in

each such event, the other LTB Borrowers will make such payment with respect to, or perform, such LTB Obligation.  Subject to the terms and conditions hereof, the LTB Obligations of each of the LTB Borrowers under the provisions of this Section 15.2 constitute the absolute and unconditional, full recourse LTB Obligations of each of the LTB Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.  For the avoidance of doubt, the LTA Obligations of the LTA Borrower on the one hand and the LTB Obligations of the LTB Borrowers on the other hand shall be several and not joint and the LTA Borrower shall not be liable for any LTB Obligations and the LTB Borrowers shall not be liable for any LTA Obligations.

15.3   **Separate Exercise of Remedies**.  The provisions of this Section 15.3 are made for the benefit of the Agents, the Lenders and their successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Agents, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 15.3 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

15.4   **Subrogation**.  Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations (other than contingent reimbursement and indemnification obligations) have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

15.5   **Waiver of Defenses**.  Each of the Loan Parties hereby waives any and all suretyship defenses available to a Guarantor arising out of the joint and several nature of its respective duties and obligations hereunder (including any defense contained in Section 7).

15.6   **Patriot Act**.  Each Lender hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address and taxpayer identification number of each Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the Patriot Act.

[Signature pages follow.]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

<u>**BORROWERS**</u>:

**ZOHAR LITIGATION TRUST-A**, as the LTA Borrower

By: _____
Name: David Dunn
Title: Litigation Trustee

**ZOHAR LITIGATION TRUST-B**, as an LTB Borrower

By: _____
Name: David Dunn
Title: Litigation Trustee

**PHOENIX II RECOVERY, LLC**, as an LTB Borrower

By: _____
Name:  David Dunn
Title:  Asset Recovery Manager

**ADMINISTRATIVE AGENT AND**
**COLLATERAL AGENT:**

**MBIA INSURANCE CORPORATION**, as
Administrative Agent and Collateral Agent


By: _____
Name:
Title:

**<u>LENDERS</u>:**

**MBIA INSURANCE CORPORATION**, as a
LTA Lender and a LTB Lender

By: _____
Name:
Title:

Schedule I
to Loan Agreement

Commitment Schedule

| Lender | LTA Commitment | LTB Commitment |
|---|---|---|
| MBIA INSURANCE CORPORATION | [$_____] | [$_____] |

Schedule II
to Loan Agreement

**<u>Escrow Accounts</u>**

**<u>Litigation Trust A</u>:**

1.  <u>Litigation Trust A - Escrow Account Funding</u>

**<u>Litigation Trust B / Recovery</u>:**

2.  <u>Litigation Trust B - Escrow Account Funding</u>

3.  <u>Asset Recovery Entity - Escrow Account Funding</u>

4.  <u>Professional Claims Escrow Account</u>

5.  <u>Admin and Priority Claims Escrow Accounts</u>

6.  <u>Wind-Down Funding Escrow Account</u>

**_Exhibit L-2 – Form of Amended and Restated Loan Agreement_**

*Draft*

**AMENDED AND RESTATED LOAN AGREEMENT**

**by and among**

**ZOHAR LITIGATION TRUST-A,**
**ZOHAR LITIGATION TRUST-B and**
**PHOENIX III RECOVERY, LLC,**
as the Borrowers,

**THE GUARANTORS**
**FROM TIME TO TIME PARTY HERETO,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

**and**

**ACQUIOM AGENCY SERVICES LLC,**
as Administrative Agent and Collateral Agent

**Dated as of August [2], 2022**

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION. | 1 |
| | 1.1 Definitions | 1 |
| | 1.2 Accounting Terms | 20 |
| | 1.3 UCC | 20 |
| | 1.4 Construction | 20 |
| | 1.5 The Agents | 21 |
| | 1.6 Schedules and Exhibits | 21 |
| | 1.7 Times of Day | 21 |
| 2. | LOAN AND TERMS OF PAYMENT. | 21 |
| | 2.1 [Reserved] | 21 |
| | 2.2 Agreement to Lend | 21 |
| | 2.3 Borrowing Procedures | 21 |
| | 2.4 Payments; Reductions of Exit Facility Commitment; Prepayments | 23 |
| | 2.5 Evidence of Debt; Repayment of Loans | 26 |
| | 2.6 Interest Rates and Rates, Payments and Calculations | 26 |
| | 2.7 Fees | 27 |
| | 2.8 Extension of Maturity Date | 28 |
| | 2.9 Increased Costs | 28 |
| | 2.10 Taxes | 29 |
| | 2.11 Mitigation Obligations; Replacement of Lenders | 33 |
| | 2.12 Defaulting Lender Adjustments | 35 |
| 3. | CONDITIONS PRECEDENT. | 36 |
| | 3.1 Conditions to Closing Date | 36 |
| | 3.2 Each Loan | 37 |
| 4. | REPRESENTATIONS AND WARRANTIES. | 38 |
| | 4.1 Due Organization and Qualification | 38 |
| | 4.2 Due Authorization; No Conflict | 38 |
| | 4.3 Binding Obligations | 38 |
| | 4.4 Properties | 39 |
| | 4.5 Jurisdiction of Formation; Location of Chief Executive Office; Jurisdiction; Identification Number | 39 |
| | 4.6 [Reserved] | 39 |
| | 4.7 Fraudulent Transfer | 39 |
| | 4.8 Use of Proceeds | 39 |
| | 4.9 Payment of Taxes | 39 |
| | 4.10 Compliance with Law | 39 |
| | 4.11 Security Interest in Collateral | 39 |
| | 4.12 [Reserved] | 40 |
| | 4.13 Anti-Terrorism Law; Foreign Corrupt Practices Act | 40 |
| | 4.14 No Bank Accounts | 40 |

4.15 Budgets. ...................................................................................40

5. AFFIRMATIVE COVENANTS. ...........................................................41
 5.1 Notices ...............................................................................41
 5.2 Periodic Reports....................................................................41
 5.3 Conference Calls ..................................................................41
 5.4 Existence ..............................................................................42
 5.5 Use of Proceeds....................................................................42
 5.6 Taxes and Obligations..........................................................42
 5.7 Confirmation Order; Chapter 11 Plan; Litigation Trust Agreements. ..................42
 5.8 Maintaining Records; Access to Properties and Inspections ...............42
 5.9 [Reserved] ............................................................................42
 5.10 Compliance with Laws .........................................................42
 5.11 Budgets ................................................................................43
 5.12 Formation of Subsidiaries; Additional Collateral; Further Assurances................43
 5.13 Post-Closing Covenants ........................................................44

6. NEGATIVE COVENANTS. .................................................................44
 6.1 Indebtedness.........................................................................44
 6.2 Liens.....................................................................................44
 6.3 Restrictions on Fundamental Changes.................................44
 6.4 Disposal of Assets................................................................45
 6.5 Change Name .......................................................................45
 6.6 Investments ..........................................................................45
 6.7 Amendments .........................................................................45
 6.8 [Reserved] ............................................................................45
 6.9 Accounting Methods .............................................................45
 6.10 [Reserved] ............................................................................45
 6.11 Restricted Payments.............................................................45
 6.12 Anti-Terrorism Law; Anti-Money Laundering....................46
 6.13 Embargoed Persons..............................................................46
 6.14 [Reserved] ............................................................................46
 6.15 Litigation Trust ....................................................................46
 6.16 Budget Variance...................................................................47
 6.17 Fees ......................................................................................47

7. GUARANTY. .......................................................................................47
 7.1 Guaranty of the Obligations.................................................47
 7.2 Payment by Guarantors........................................................47
 7.3 Liability of Guarantors Absolute .........................................47
 7.4 Waivers by Guarantors.........................................................49
 7.5 Continuing Guaranty............................................................49
 7.6 Reinstatement.......................................................................50
 7.7 Subrogation; Subordination .................................................50
 7.8 General Limitation on Guarantee Obligations ....................50

| | | | |
|---|---|---|---|
| 8. | | EVENTS OF DEFAULT. | 50 |
| | 8.1 | Event of Default | 50 |
| | 8.2 | Rights and Remedies | 53 |
| | 8.3 | Application of Proceeds upon Event of Default | 54 |
| | | | |
| 9. | | THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT | 55 |
| | 9.1 | Appointment | 55 |
| | 9.2 | Agent in Its Individual Capacity | 56 |
| | 9.3 | Exculpatory Provisions | 56 |
| | 9.4 | Reliance by Agent | 57 |
| | 9.5 | Delegation of Duties | 58 |
| | 9.6 | Successor Agent | 58 |
| | 9.7 | Non-Reliance on Agent and Other Lenders | 58 |
| | 9.8 | [Reserved] | 59 |
| | 9.9 | Indemnification | 59 |
| | 9.10 | [Reserved] | 60 |
| | 9.11 | Lender Action | 60 |
| | 9.12 | [Reserved] | 60 |
| | 9.13 | Lender's Representations, Warranties and Acknowledgements | 60 |
| | 9.14 | Security Documents and Guarantee | 61 |
| | 9.15 | Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim | 62 |
| | 9.16 | Erroneous Payments | 63 |
| | | | |
| 10. | | EXPENSES; INDEMNIFICATION; DAMAGES WAIVER. | 65 |
| | | | |
| 11. | | NOTICES. | 68 |
| | | | |
| 12. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. | 71 |
| | | | |
| 13. | | AMENDMENTS; ASSIGNMENTS; WAIVERS; SUCCESSORS. | 72 |
| | 13.1 | Amendments and Waivers | 72 |
| | 13.2 | No Waivers; Cumulative Remedies | 74 |
| | 13.3 | Successors | 74 |
| | 13.4 | Assignments | 74 |
| | 13.5 | Register. | 76 |
| | 13.6 | Participations | 76 |
| | 13.7 | Certain Pledges. | 78 |
| | 13.8 | Assignment of Upside Return | 78 |
| | | | |
| 14. | | GENERAL PROVISIONS. | 78 |
| | 14.1 | Effectiveness | 78 |
| | 14.2 | Section Headings | 79 |
| | 14.3 | Interpretation | 79 |
| | 14.4 | Severability of Provisions | 79 |
| | 14.5 | No Fiduciary Duty | 79 |
| | 14.6 | Counterparts; Electronic Execution | 79 |

14.7    Revival and Reinstatement of Obligations ............................................................80
14.8    Integration .....................................................................................................80
14.9    Right of Setoff; Marshalling; Payments Set Aside ...............................................80
14.10   Confirmation Order...........................................................................................81
14.11   Confidentiality .................................................................................................81

15.    ADMINISTRATIVE BORROWER; JOINT AND SEVERAL LIABILITY. ..................82
15.1    Administrative Borrower .....................................................................................82
15.2    Joint and Several Liability ..................................................................................82
15.3    Separate Exercise of Remedies...........................................................................83
15.4    Subrogation ......................................................................................................83
15.5    Waiver of Defenses............................................................................................83
15.6    Patriot Act ........................................................................................................83

**Exhibits**

| | | |
|---|---|---|
| Exhibit A | — | Form of Assignment and Assumption |
| Exhibit B | — | Form of Borrowing Request |
| Exhibit C-1 | — | Initial Litigation Trust-A Budget |
| Exhibit C-2 | — | Initial Litigation Trust-B Budget |
| Exhibit C-3 | — | Initial ARE Budget |
| Exhibit D-1 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit D-2 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit D-3 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit D-4 | — | Form of U.S. Tax Compliance Certificate |

**Schedules**

| | | |
|---|---|---|
| Schedule I | — | Commitment Schedule |
| Schedule II | — | Bank Accounts |
| Schedule 4.5 | — | Name, Location, Jurisdiction, Identification Number |

## AMENDED AND RESTATED LOAN AGREEMENT

**THIS AMENDED AND RESTATED LOAN AGREEMENT** (this "<u>Agreement</u>"), is entered into as of August 2, 2022, by and among Phoenix III Recovery, LLC, a Delaware limited liability company ("<u>Recovery</u>" or the "<u>Administrative Borrower</u>"), Litigation Trust-A and Litigation Trust-B (as defined herein) (collectively, the "<u>Litigation Trusts</u>" and collectively with Recovery, the "<u>Borrowers</u>"), the Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to in <u>Section 1</u>), the Lenders and Acquiom Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "<u>Administrative Agent</u>") and as collateral agent for the Secured Parties (in such capacity, the "<u>Collateral Agent</u>").

**WHEREAS**, on March 11, 2018 (the "<u>Petition Date</u>"), a voluntary petition was filed by Zohar III, Limited and certain of its direct and indirect subsidiaries (each a "<u>Debtor</u>" and collectively the "<u>Debtors</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") under Chapter 11 of the Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), each case of each Debtor, a "<u>Case</u>" and collectively, the "<u>Cases</u>");

**WHEREAS**, in connection with the Cases, the Debtors entered into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement dated as of December 17, 2020 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Existing DIP Credit Agreement</u>"), by and among the Debtors, the DIP Lenders, pursuant to which the DIP Lenders provided to the Debtors, senior secured, super-priority financing under Sections 105, 364(c) and 364(d) of the Bankruptcy Code; and

**WHEREAS**, on June 21, 2022, the Bankruptcy Court entered an order (the "<u>Confirmation Order</u>") confirming the Debtors' *Third Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliated Entities* (as amended, supplemented, or otherwise modified from time to time, the "<u>Chapter 11 Plan</u>") filed in the Cases of the Debtors, which Confirmation Order, *inter alia*, authorized the Borrowers' entry into and performance under this Agreement.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION.

**1.1    <u>Definitions</u>**.  As used in this Agreement, the following terms shall have the meaning specified below:

"<u>Additional Documents</u>" has the meaning specified in <u>Section 5.12(c)</u>.

"<u>Administrative Agent</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Administrative Agent's Office</u>" means the office of the Administrative Agent specified in or determined in accordance with the provisions of <u>Section 11(e)</u>.

"<u>Administrative Borrower</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of fifty percent (50%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person; <u>provided</u>, <u>however</u>, that each of the Lenders as of the Closing Date (together with their respective Affiliates) shall not be considered "Affiliates" for the purposes of the Loan Documents.  For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent; and "<u>Agent</u>" shall mean any of them as the context may require.

"<u>Agents' Fees</u>" has the meaning specified in <u>Section 2.7(d)</u>.

"<u>Agreement</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Amounts Repaid</u>" means, as of any date, the aggregate amount paid by the Borrowers to the Lenders on account of principal and interest on the Loans, in each case, as of such date. For the avoidance of doubt, "Amounts Repaid" shall not include amounts paid on account of fees and expenses.

"<u>Anti-Terrorism Laws</u>" has the meaning specified in <u>Section 4.13(a)</u>.

"<u>Applicable Law</u>" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"<u>Approved Fund</u>" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in bank and other commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Recovery Manager</u>" means the "Asset Recovery Manager" of Recovery as set forth in Recovery's Organizational Documents.

"<u>Asset Sale</u>" shall mean (a) any disposition of any property, by any Loan Party (including any disposition of property to a Delaware Divided LLC pursuant to a Delaware LLC Division) and (b) any issuance or sale of any Equity Interests of any Loan Party, in each case, to any Person other than another Loan Party, but shall not include the liquidation or monetization (by settlement, disposition, collection or enforcement) of a Litigation Claim held by either of the Litigation Trusts.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by <u>Section 13.4</u>), and accepted by the Administrative Agent, in substantially the form of <u>Exhibit A</u> or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"<u>Availability Period</u>" means the period from and including the Effective Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Exit Facility Commitments pursuant to <u>Section 2.4(e)</u> and (c) the date of the termination of the commitments of each Lender to make Loans pursuant to <u>Section 8.2</u>.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Code</u>" has the meaning specified in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals hereto.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 11(c)</u>.

"<u>Borrowers</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Borrowing Request</u>" means a request by the Administrative Borrower in accordance with the terms of <u>Section 2.2(b)</u> and substantially in the form of <u>Exhibit B</u>, or such other form as shall be approved by the Administrative Agent.

"<u>Budget</u>" shall mean the Initial Budgets or the then most current Updated Budgets delivered pursuant to <u>Section 5.11</u>.

"<u>Budget Variance Report</u>" means quarterly variance reports provided by the Borrowers to the Lenders showing, in each case, the actual operating expenses for the immediately preceding quarter, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Initial Budget or the then most current Updated Budget, as the case

may be, and shall include explanations in reasonable detail, for all variances that exceed Permitted Variances.  The Budget Variance Report shall be in a form reasonably satisfactory to the Required Lenders, and shall contain supporting information reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) and reasonably satisfactory to the Required Lenders; provided, however, that notwithstanding anything to the contrary herein, no Borrower shall be required to disclose or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by Applicable Law, or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Call Period Termination Date" means October 31, 2022.

"Case" and "Cases" shall have the meaning specified in the recitals hereto.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Restructuring Transaction" means all corporate or restructuring transactions necessary or appropriate in order to implement and effectuate the Chapter 11 Plan as in effect on the Closing Date.

"Chapter 11 Plan" has the meaning specified in the recitals hereto.

"Closing Date" means August 2, 2022.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all the "Collateral" (or equivalent term) as defined in, the Final Order or in any Security Document, including, without limitation, Causes of Action (as defined in the Chapter 11 Plan).

"Collateral Agent" has the meaning specified in the introductory paragraph hereto.

-4-

"Commitment Schedule" means the Schedule attached hereto as Schedule I.

"Confirmation Order" has the meaning specified in the recitals hereto.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control Agreement" means, with respect to each Deposit Account and Securities of a Loan Party, an agreement in form and substance reasonably satisfactory to the Administrative Agent, among the depository institution, securities intermediary or other Person holding such Loan Party's funds or securities, and the Collateral Agent with respect to collection and Control (as defined in the Security Agreement) of all deposits, securities, balances and other assets held in a Deposit Account or Securities Account maintained by such Loan Party with such depository institution, securities intermediary or other Person.

"Debt Issuance" means the incurrence by any Loan Party of any Indebtedness after the Closing Date (other than as permitted by Section 6.1).

"Debtor" and "Debtors" have the meanings specified in the recitals hereto.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means, subject to Section 2.12(c), any Lender that (a) has failed to (i) fund all or any portion of its Loans within five (5) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrowers in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrowers, the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrowers to confirm in writing to the Administrative Agent and the Borrowers that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent or the Borrowers), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under

any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.12(c)) upon delivery of written notice of such determination to the Borrowers and each Lender.

"Default Rate" has the meaning specified in Section 2.6(b).

"Delaware LLC" means any limited liability company organized or formed under the laws of the State of Delaware.

"Delaware Divided LLC" means any Delaware LLC which has been formed upon consummation of a Delaware LLC Division.

"Delaware LLC Division" means the statutory division of any Delaware LLC into two or more Delaware LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act.

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"DIP Lenders" means Bardin Hill Event-Driven Master Fund LP, HCN LP, and the other lenders that are parties to this Credit Agreement at any time prior to the Closing Date, solely in such capacity.

"Dollars" or "$" means United States dollars.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>" has the meaning set forth in the Chapter 11 Plan.

"<u>Eligible Assignee</u>" means any Person that meets the requirements to be an assignee under <u>Section 13.4(c)</u>, <u>(e)</u> and <u>(f)</u> (subject to such consents, if any, as may be required under <u>Section 13.4(c)</u>).

"<u>Embargoed Person</u>" has the meaning specified in <u>Section 6.13</u>.

"<u>Equity Interest</u>" shall mean, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), or if such Person is a limited liability company, membership interests and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"<u>Equity Issuance</u>" shall mean, without duplication, (i) any issuance or sale by any Borrower after the Closing Date of any Equity Interests in such Borrower (including any Equity Interests issued upon exercise of any warrant or option or equity-based derivative) or any warrants or options or equity-based derivatives to purchase Equity Interests in such Borrower, (ii) any Preferred Stock Issuance or (iii) any contribution to the capital of a Borrower.

"<u>Erroneous Payment</u>" has the meaning specified in <u>Section 9.16(a)</u>.

"<u>Erroneous Payment Subrogation Rights</u>" has the meaning specified in <u>Section 9.16(e)</u>.

"<u>Escrow Accounts</u>" means the accounts designated as "Escrow Accounts" on <u>Schedule II</u> hereto.

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Excess Net Cash Proceeds</u>" has the meaning specified in <u>Section 2.4(i)</u>.

"<u>Event of Default</u>" has the meaning specified in <u>Section 8.1</u>.

"<u>Excluded Taxes</u>" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on

amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Exit Facility Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Exit Facility Commitment (other than pursuant to an assignment request by the Borrowers under Section 2.11(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.10, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with Section 2.10(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order" has the meaning specified in Section 4.13(a).

"Existing DIP Credit Agreement has the meaning specified in the recitals hereto.

"Existing DIP Obligations" means a principal amount of all "Obligations" outstanding under and as defined in the Existing DIP Credit Agreement (including, without limitation, all accrued and unpaid interest, "Fees" and "Lender Expenses" (as such terms are defined in the Existing DIP Credit Agreement)).

"Exit Facility" means, at any time, the aggregate amount of the Lenders' Exit Facility Commitments at such time.  On the Closing Date, the Exit Facility is $16,300,000.

"Exit Facility Commitment" means, as to each Lender, the commitment of such Lender to make New Money Loans to the applicable Borrowers hereunder in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Schedule under the heading "Exit Facility Commitment", as such commitment may be (a) reduced from time to time pursuant to Sections 2.2 or 2.4 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption.  The aggregate amount of the Exit Facility Commitments as of the Closing Date is $16,300,000.

"Exit Fee" has the meaning specified in Section 2.7(b).

"Extension Fee" has the meaning specified in Section 2.8.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary to the next 1/100th of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" shall mean the Fee Letter, dated August 2, 2022, among the Borrowers and the Agents.

"Fees" means all fees due to the Lenders and the Agents, as the case may be, under this Agreement, any Loan Document or the Final Order, as applicable, including the Exit Fee.

"Final Order" has the meaning set forth in the Chapter 11 Plan.

"Fixed Return" has the meaning specified in Section 2.7(b).

"Foreign Lender" means (a) if a Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if a Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"GAAP" means generally accepted accounting principles in the United States, or successors thereto, applied on a consistent basis.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning specified in Section 7.1.

"Guarantors" means Stila Holdings and each other Subsidiary of a Borrower that executes a joinder agreement pursuant to Section 5.12(a).

"Guaranty" means the guaranty made by the Guarantors under Section 7 in favor of the Secured Parties, together with each joinder delivered pursuant to Section 5.12(a) or otherwise.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) [reserved], (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still

outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the greater of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any Loan Document, and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 10(b).

"Interest Payment Date" means, with respect to any Loan, the first Business Day of each month, commencing with the first such day following the Closing Date, and the Maturity Date.

"Initial Budget" has the meaning specified in Section 4.15.

"Initial Maturity Date" means August 2, 2027.

"Insolvency Laws" shall mean the Bankruptcy Code and all other insolvency, bankruptcy, receivership, liquidation, conservatorship, assignment for the benefit of creditors, moratorium, rearrangement, reorganization, or similar federal or state Legal Requirements of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Insolvency Proceeding" means (i) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (ii) any general assignment for the benefit of creditors, formal or informal moratorium, composition, marshaling of assets for creditor or other similar arrangement in respect of creditors generally or any substantial portion of its creditors, in each case, undertaken under United States Federal or state or non-United States Legal Requirements, including the Bankruptcy Code.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of the date hereof, among the Collateral Agent, the Borrowers, Phoenix Recovery II LLC, MBIA Insurance Corporation and each other person from time to time party thereto.

"Intrepid" means Intrepid U.S.A., Inc.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Legal Requirements" shall mean, as to any Person, the Organizational Documents of such Person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, judgment, decree, verdict, order, consent order, consent decree, writ, declaration or injunction or determination of an arbitrator or a court or other Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, in each case whether or not having the force of law.

"Lenders" means, collectively, (a) the financial institutions and other Persons who are a party hereto as "Lenders" on the date hereof, unless and until such financial institution or Person ceases to be a party hereby pursuant to an Assignment and Assumption and (b) each financial institution or other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution or Person that has ceased to be a party hereby pursuant to an Assignment and Assumption.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a capital lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Litigation Claims" shall mean all claims and causes of action a Litigation Trust may have against any party.

"Litigation Trust-A" means the Zohar Litigation Trust-A that is established pursuant to the Litigation Trust Agreement (Trust A).

"Litigation Trust Advisory Board" means the Litigation Trust Advisory Board (Trust A) or the Litigation Trust Advisory Board (Trust B), as the context may require.

"Litigation Trust Advisory Board (Trust A)" means the "Litigation Trust Advisory Board" as defined in the Litigation Trust Agreement (Trust A).

"Litigation Trust Advisory Board (Trust B)" means the "Litigation Trust Advisory Board" as defined in the Litigation Trust Agreement (Trust B).

"Litigation Trust Agreement" means the Litigation Trust Agreement (Trust A) or the Litigation Trust Agreement (Trust B), as the context may require.

"Litigation Trust Agreement (Trust A)" means that certain Litigation Trust Agreement (Trust A), dated as of August 2, 2022, among the Debtors (as defined therein), Zohar II Recovery LLC, Phoenix III Recovery, LLC, the members of the Litigation Trust Advisory Board (Trust A) party thereto from time to time and the Litigation Trustee (A).

"<u>Litigation Trust Agreement (Trust B)</u>" means that certain Litigation Trust Agreement (Trust B), dated as of August 2, 2022, among the Debtors (as defined therein), Zohar II Recovery LLC, Phoenix III Recover LLC, the members of the Litigation Trust Advisory Board (Trust B) party thereto from time to time and the Litigation Trustee (B).

"<u>Litigation Trust-B</u>" means the Zohar Litigation Trust-B that is established pursuant to the Litigation Trust Agreement (Trust B).

"<u>Litigation Trustee</u>" means the Litigation Trustee-A or the Litigation Trustee-B, as the context may require.

"<u>Litigation Trustee-A</u>" means, initially, David Dunn, as trustee of the Litigation Trust-A, together with his successors and permitted assigns pursuant to the Litigation Trust Agreement (Trust A).

"<u>Litigation Trustee-B</u>" means, initially, David Dunn, as trustee of the Litigation Trust-B, together with his successors and permitted assigns pursuant to the Litigation Trust Agreement (Trust B).

"<u>Litigation Trusts</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Loan</u>" means a loan made by a Lender to the Borrowers under <u>Section 2</u>, including any New Money Term Loan (and including any PIK Interest or Extension Fee that has been added to the outstanding principal amount of any Loan as provided herein).

"<u>Loan Documents</u>" means this Agreement, the Confirmation Order, the Guaranty, the Security Documents, the Intercreditor Agreement, the Fee Letter, the Additional Documents and any other note or notes executed by the Borrowers in connection with this Agreement and payable to any Lender, any other agreement entered into, now or in the future in connection with this Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"<u>Loan Party</u>" means, collectively, the Borrowers and each the Guarantors.

"<u>Material Adverse Change</u>" means (a) material impairment of the ability of the Loan Parties to fully and timely perform any of their obligations under any Loan Document, (b) a material impairment of the rights of or benefits or remedies available to the Lenders or any Agent under any Loan Document, or (c) a material adverse effect on the Collateral (or any portion thereof) or the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the validity, enforceability, perfection or priority of such Liens.

"<u>Maturity Date</u>" means the date that is the earlier of the following: (i) the later of (x) the Initial Maturity Date and (y) if the Initial Maturity Date is extended pursuant to <u>Section 2.8</u>, such extended maturity date as determined pursuant to such Section; and (ii) the first date on which a Termination Event occurs; <u>provided</u> that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"<u>Modification Order</u>" means the *Order (I) Approving Certain Modifications to the Third Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code for Zohar III, Corp. and its Affiliate Debtors Pursuant to Section 1127(B) of the Bankruptcy Code; (II) Finding That (A) Such Modifications are Not Material and Adverse or (B) The Debtors Have Satisfied the Requirements of Sections 1127(B) and (C) of the Bankruptcy Code with Respect to Such Modifications; (III) Confirming the Modified Plan; and (IV) Granting Related Relief*, entered by the Bankruptcy Court on August 1, 2022.

"<u>Net Cash Proceeds</u>" means:

(a)　　with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the proceeds thereof in the form of cash, cash equivalents and marketable securities (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable, or by the sale, transfer or other disposition of any non-cash consideration received in connection therewith or otherwise, but only as and when received) received by any Loan Party (including cash proceeds subsequently received (as and when received by any Loan Party) in respect of non-cash consideration initially received) net of (i) reasonable and customary selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees (including all "Asset Recovery Fees" payable to the Asset Recovery Manager for such Asset Sale pursuant to Exhibit D to the Litigation Trust Agreements (each as in effect on the date hereof)), transfer and similar taxes (but excluding any such amounts payable to any Affiliate of a Loan Party) and the applicable Loan Party's good faith estimate of income taxes paid or payable in connection with such sale (after taking into account any available tax credits or deductions and any tax sharing arrangements)), (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by any Loan Party associated with the properties sold in such Asset Sale (<u>provided</u> that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money that is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties); and

(b)　　with respect to any (i) Debt Issuance, (ii) Equity Issuance or (iii) other issuance or sale of Equity Interests by a Borrower or any of its Subsidiaries, the cash proceeds thereof received by any Loan Party, net of reasonable and customary fees (including legal, accounting and other professional and transaction fees and brokers' fees), commissions, costs and other expenses incurred in connection therewith.

"<u>New Money Loans</u>" has the meaning specified in <u>Section 2.2(b)</u>.

"<u>New Notes</u>" has the meaning specified in the Chapter 11 Plan.

"<u>Obligations</u>" means (a) all obligations of the Borrowers and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of

and premium, if any, and interest (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other direct monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding), of the Borrowers and the other Loan Parties under this Agreement and the other Loan Documents, (c) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrowers and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and (d) Erroneous Payment Subrogation Rights.

"OFAC" has the meaning specified in Section 4.13(b).

"Ordinary Course" means, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith. With respect to the Borrowers, "Ordinary Course" shall include operations in the ordinary course since the Effective Date, including the sale, disposition or realization of Collateral as contemplated by the liquidation process set forth in the Chapter 11 Plan and in the applicable Litigation Trust Agreement.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the limited liability company agreement or operating agreement and articles or certificate of formation or organization and all applicable resolutions of any members, managing member, or managers, as applicable, of such limited liability company, (d) for any trust, the certificate of trust, the trust agreement and all applicable written directions or resolutions of the advisory board (or any equivalent or comparable governing body) of such trust and (e) any agreement between any Borrower and its shareholders, manager, members, partners or equity owners, advisory board, trustee or among any of the foregoing.

"Other Connection Taxes" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are

-14-

Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.11(b)).

"Participant" has the meaning specified in Section 13.6.

"Participant Register" has the meaning specified in Section 13.6.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"Payment Recipient" has the meaning specified in Section 9.16(a).

"Permitted Indebtedness" means:

(a)     Indebtedness incurred in the Ordinary Course in respect of Deposit Accounts;

(b)     [RESERVED];

(c)     to the extent constituting Indebtedness, fees owed or owing by one or more Loan Parties to a Litigation Trustee pursuant to the terms and provisions of the Litigation Trust Agreements;

(d)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the Ordinary Course; provided however that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(e)     Indebtedness incurred in respect of the New Notes;

(f)     Indebtedness arising out of the Zohar III Indenture Trustee Claims;

(g)     to the extent constituting Indebtedness, any right to payment from the Escrow Accounts arising under the Chapter 11 Plan;

(h)     to the extent constituting Indebtedness, expenses arising from the administration of the Litigation Trusts, including the expenses described in the Litigation Trust Agreements; and

(i)     Indebtedness incurred under the Zohar II Credit Agreement (as in effect on the date hereof or modified in accordance with Section 6.7).

"Permitted Lien" means:

(a)     Liens of a collecting bank arising in the Ordinary Course under Section 4-210 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(b)     purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the Ordinary Course;

-15-

(c)      Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits and not securing obligations for borrowed money;

(d)      Liens securing the New Notes;

(e)      Liens securing the Zohar III Indenture Trustee Claims; and

(f)      any Lien arising under the Chapter 11 Plan securing a right to payment from the Escrow Accounts.

"Permitted Protest" means the right of any Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax Lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Loan Party's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party in good faith and (c) the Collateral Agent (acting at the direction of the Required Lenders) is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Secured Parties' Liens.

"Permitted Variances" means (i) all variances that are favorable to the financial condition and the interests of the Loan Parties and the interests of the Lenders, and (ii) any variance that is unfavorable to the financial condition and the interests of the Loan Parties or the interests of the Lenders and does not exceed 20% on a cumulative basis, tested every fiscal quarter, based upon the most recent Budget; provided, that variances shall be determined without reference or regard to any reserves established pursuant to Section 10(e).

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest" has the meaning specified in Section 2.6(a).

"Platform" means Debt Domain, Intralinks, Syndtrak, DebtX or a substantially similar electronic transmission system.

"Preferred Stock" shall mean, with respect to any Person, any and all preferred or preference Equity Interests (however designated) of such Person whether now outstanding or issued after the Closing Date.

"Preferred Stock Issuance" shall mean the issuance or sale by any Loan Party of any Preferred Stock after the Closing Date.

"Property" or "property" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and

including Equity Interests of any Person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property, Litigation Claims, cash, securities, accounts, revenues and contract rights.

"Real Property" shall mean, collectively, all right, title and interest (including any leasehold, fee, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Register" has the meaning specified in Section 13.5.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, brokers, trustees, administrators, managers, advisors and representatives, including accountants, auditors and legal counsel of such Person and of such Person's Affiliates.

"Required Lenders" means, at any date of determination, Lenders holding more than 50% of the sum of (a) the outstanding principal amount of the Loans and (b) the aggregate unused Exit Facility Commitments. For purposes of this definition the outstanding principal amount of Loans and the aggregate unused Exit Facility Commitments shall be determined by excluding the sum of the outstanding principal amount of Loans of each Defaulting Lender and the aggregate unused Exit Facility Commitments of each Defaulting Lender at such time. Notwithstanding the foregoing, prior to the Closing Date, "Required Lenders" shall mean Bardin Hill Investment Partners, LP (or one of its Affiliates) and MB Global Partners LLC (or one of its Affiliates).

"Responsible Officer" of any Person shall mean any executive officer, chief financial officer, principal accounting officer, treasurer or controller of such Person, any other officer or similar official thereof with significant responsibility for the administration of the obligations of such Person in respect of this Agreement. For the avoidance of doubt, the "Responsible Officer" of each Litigation Trust shall be the Litigation Trustee for such Litigation Trust.

"Restricted Payment" means, as the case may be, any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests) in any Loan Party or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in any Loan Party or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in any Loan Party or any Subsidiary.

"Sanctions" has the meaning specified in Section 6.13.

"Secured Obligations" means the Obligations.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent and the Lenders.

"Security Agreement" means that certain Security Agreement, dated as of the date hereof, among the Loan Parties and the Collateral Agent for the benefit of the Secured Parties.

"Security Documents" means the Security Agreement, each Control Agreement, each other security document or pledge agreement delivered in accordance with applicable local or foreign Legal Requirements to grant a valid, enforceable, perfected security interest in any property as collateral for the Secured Obligations, all UCC financing statements (including fixture filings), or amendments or continuations thereof or instruments of perfection required by this Agreement, the Security Agreement, any Control Agreement or any other security document or pledge agreement to be filed or registered with respect to the security interests in property created pursuant to the Security Agreement, any Control Agreement, the Confirmation Order and any other document or instrument utilized to pledge any property as collateral for the Secured Obligations.

"Shared Collateral" has the meaning set forth in the Intercreditor Agreement.

"Stila Holdings" means New Stila HoldCo LLC, a Delaware limited liability company.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Event" means the occurrence of one or more of the following events:

(a)     [RESERVED];

(b)     [RESERVED];

(c)     Litigation Trust-A expires, terminates, winds-down or is otherwise not in existence;

(d)     an Event of Default; or

(e)     the filing or commencement of, or any threat or notice of intention of any Governmental Authority to file or commence, any action, suit, litigation or proceeding, whether at law or in equity or otherwise, with respect to any Loan Document or the Chapter 11 Restructuring Transaction that has resulted or could reasonably be expected to result in a Material Adverse Change.

-18-

"Total Amount Borrowed" means, as of any date, the aggregate principal amount of Loans made (or deemed made) pursuant to Section 2.2 as of such date and without giving effect to any repayment or prepayment of such Loans.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" means the United States of America.

"Updated Budget" means, with respect to each Litigation Trust and Recovery, an updated budget delivered pursuant to Section 5.11(a).

"Upside Return" has the meaning specified in Section 2.7(b).

"Upside Return Assignment" has the meaning specified in Section 13.8.

"Upside Return Register" has the meaning specified in Section 13.8.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 2.10(g)(ii)(B)(3).

"Wind-Down Budget" has the meaning specified in Section 8.2(v).

"Withholding Agent" means any Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to

provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"Zohar II Credit Agreement" means that certain Loan Agreement (MBIA Trust - A&B), dated as of the date hereof, among the Litigation Trusts, Phoenix II Recovery LLC, the lenders from time to time party thereto and MBIA Insurance Corporation, as administrative agent and collateral agent.

"Zohar III Allocated Proceeds" means, collectively, the "Allocation of Litigation Trust-A Interests" and the "Allocation of Litigation Trust-B Interests" to "Zohar III Recovery LLC on account of Holders of Class 3 Zohar III A-1 Note Claims", in each case, as set forth on Exhibit A to each of the Litigation Trust Agreements.

"Zohar III Indenture Trustee Claims" has the meaning specified in the Chapter 11 Plan.

**1.2**    **Accounting Terms**.    All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, however, that if the Borrowers notify the Administrative Agent that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Lenders and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of the Lenders and the Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective.    When used herein, the term "financial statements" shall include the notes and schedules thereto.

**1.3**    **UCC**.    Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, however, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

**1.4**    **Construction**.    Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments,

changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

**1.5    The Agents**. Notwithstanding any term or provision of this Agreement or any other Loan Document to the contrary (including any term or provision that expressly provides that an Agent may use its discretion or that any term, provision, action or omission is at the discretion of an Agent), such Agent shall not have any right or otherwise be entitled to take any discretionary action or exercise any discretionary powers under this Agreement and the Loan Documents unless the Required Lenders shall have provided a written direction (with e-mail being sufficient) to such Agent to take such action or exercise such powers.

**1.6    Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**1.7    Times of Day**. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**2.    LOAN AND TERMS OF PAYMENT**.

**2.1    [Reserved]**.

**2.2    Agreement to Lend**.

(a)    [Reserved].

(b)    Subject to the terms and conditions of this Agreement and in the Confirmation Order, each Lender severally agrees to make term loans to the Borrowers, in Dollars, at any time and from time to time, during the Availability Period, in an aggregate principal amount not to exceed such Lender's unused Exit Facility Commitment (the "New Money Loans") at such time. Following the making of any New Money Loan by a Lender, the Exit Facility Commitment of such Lender shall be automatically and permanently reduced by the amount of such New Money Loan so made by such Lender. Amounts borrowed under this Section 2.2 and repaid or prepaid may not be reborrowed.

**2.3    Borrowing Procedures**.

(a)    [Reserved].

(b)     Each New Money Loan made pursuant to Section 2.2(b) shall be made by the Lenders ratably in accordance with their applicable Exit Facility Commitments following the delivery by the Administrative Borrower to the Administrative Agent no later than seven (7) Business Days (or such shorter period as the Required Lenders may permit in their sole discretion) of a written Borrowing Request executed by a Responsible Officer of the Administrative Borrower.  Any borrowing of New Money Loans pursuant to Section 2.2(b) shall be in an aggregate principal amount that is (i) an integral multiple of $500,000 and not less than $2,000,000 or (ii) equal to the remaining available balance of the Exit Facility Commitments. Following receipt of a Borrowing Request, the Administrative Agent shall promptly inform each Lender of its *pro rata* share of the requested New Money Loans; provided, however, that no more than one Borrowing Request may be submitted in any calendar quarter unless (x) a Defaulting Lender fails to fund its *pro rata* share of the requested New Money Loans, in which case the Administrative Borrower may submit an additional Borrowing Request to the non-Defaulting Lenders to fund the amounts the Defaulting Lender did not fund, or (y) the Required Lenders otherwise consent to an additional Borrowing Request based on extenuating circumstances; provided, however, in no event shall any Lender be required to make a New Money Loan in excess of such Lender's unused Exit Facility Commitment.  Each Lender shall make the amount of its New Money Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Request for New Money Loan.  Upon satisfaction or waiver of the applicable condition set forth in Section 3.2, the Administrative Agent shall remit the amounts so received, in like funds, to an account as directed by the Administrative Borrower in the applicable Borrowing Request or, if a proposed New DIP Loan shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders within two (2) Business Days.

(c)     Unless the Administrative Agent shall have received written notice from a Lender prior to the date of any New Money Loan that such Lender will not make available to the Administrative Agent such Lender's portion of such Loan, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such proposed Loan in accordance with Section 2.3(b) and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrowers, as the case may be, on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrowers severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the applicable Borrowers until the date such amount is repaid to the Administrative Agent at (A), in the case of repayment by such Lender, from the date such amount is required to be paid to the date that is two (2) Business Days after payment by such Lender is due hereunder and (B) from the date that is two (2) Business Days after the date such amount is required to be paid to the date such payment is made by such Lender, the Federal Funds Effective Rate.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's portion of such Loan for purposes of this Agreement, and the applicable Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.3(c) shall cease.

**2.4    Payments; Reductions of Exit Facility Commitment; Prepayments.**

(a)    The Borrowers shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.10 or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 1:00 p.m.), on the date when due, in (except for payments of PIK Interest) immediately available funds, without setoff, deduction or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its account most recently designated by it for such purpose by notice to the Borrowers and the Lenders except that payments pursuant to Section 2.10 and Section 10 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in Dollars.  Each payment (including each prepayment) by the Borrowers on account of principal of and interest on the Loans shall be made on a *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, (ii) *second*, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, and (iii) *third*, towards the payment of all other Obligations then due hereunder, ratably among the parties entitled thereto in accordance with the amount of such amounts then due to such parties.

(c)    Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules or practices on interbank compensation.

(d)      If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.3(b), 2.4(c), or 10(e), then the Administrative Agent may, at the direction of the Required Lenders (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(e)      The Borrowers shall have the right, subject to Section 2.7(a) below, upon not less than three (3) Business Days' written notice to the Administrative Agent, to terminate the aggregate unfunded Exit Facility Commitments or, from time to time, reduce the amount of the Exit Facility Commitments; provided, that no such termination or reduction in Exit Facility Commitments shall be permitted if, after giving effect thereto and to any concurrent prepayment hereunder, the total outstanding principal amount of New Money Loans would exceed the Exit Facility Commitments.  Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Exit Facility Commitments then in effect.  Any reduction of the aggregate unfunded Exit Facility Commitments pursuant to this Section 2.4(e) shall be applied to the Exit Facility Commitments of each applicable Lender on a pro rata basis.  Once reduced, an Exit Facility Commitment may not be increased.

(f)      To the extent not terminated earlier, the unused Exit Facility Commitments of each Lender shall terminate immediately and without further action on the Maturity Date.

(g)      The Borrowers may at any time and from time prepay the Loans, in whole or in part, without premium or penalty, subject to Sections 2.7(a) and 2.7(b) below; provided that partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof. Optional prepayments of Loans shall be applied in accordance with clause (i) below.

(h)      Not later than ten (10) Business Days (unless extended by the Required Lenders in writing in their sole discretion) following the receipt of (i) any Net Cash Proceeds of any Asset Sale by any Loan Party (including, without limitation, any Asset Sale permitted pursuant to the provisions of Section 6.4(c)), (ii) any cash or Net Cash Proceeds received by a Loan Party (or their direct or indirect Subsidiaries) from any source (other than proceeds of the Loans) and (iii) Zohar III Allocated Proceeds from any Litigation Claim, the Borrowers shall, subject to the terms of the Intercreditor Agreement, apply 100% of such Net Cash Proceeds, Zohar III Allocated Proceeds or cash to make a prepayment of Loans in accordance with clause (i) below.  All prepayments pursuant to this clause (h) shall be subject to Section 2.7(a) below.

(i)      Any prepayments required pursuant to clauses (g) and (h) above shall applied to the payment of the Obligations, in accordance with clause (j) below.  After payment in full of the Obligations pursuant to clause (h) above, to the extent any residual Net Cash Proceeds (such residual being "Excess Net Cash Proceeds") remain after such payment, (x) any unused Exit Facility Commitments of the Lenders shall be reduced, on a dollar-for-dollar basis, by the amount of such Excess Net Cash Proceeds and (y) such Excess Net Cash Proceeds shall be retained by the Borrowers and *first*, distributed to Litigation Trust-A in an amount not to exceed the unfunded budgeted expenses of Litigation Trust-A as set forth in the Budget and, to the

extent all such expenses have been funded, *second*, to Recovery, to be distributed as required by the Chapter 11 Plan or the applicable Organizational Documents, as the case may be.

(j)     Any amounts received on account of the Obligations pursuant to clause (i) above shall be payable to the Lenders ratably among them in proportion to the respective Obligations payable to them.

(k)     The Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., three (3) Business Days before the date of prepayment; provided that a notice of optional prepayment delivered by the Administrative Borrower in accordance with Section 2.4(g) that contemplates payment in full of the Loans may, if the Administrative Agent (in its reasonable discretion) has previously agreed to a customary pay-off letter with the Borrowers, expressly state that such notice is conditioned upon the effectiveness of new credit facilities or similar new Indebtedness and which effectiveness will result in the immediate payment in full of all Obligations, in which case such notice may be revoked by the Administrative Borrower (by notice to the Administrative Agent on or prior to 2:00 p.m., one (1) Business Day prior to the specified notice effective date) if such condition is not satisfied (or is then unlikely to be satisfied).  Subject to the proviso in the previous sentence, each such notice shall be irrevocable.  Each such notice shall specify the prepayment date, the principal amount of the Loans or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Such notice to the Lenders may be by electronic communication.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.4.

(l)     If any Lender shall, by exercising any right of setoff or counterclaim (including pursuant to Section 14.9) or otherwise (including by exercise of its rights under the Security Documents), obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 2.4(l) shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Eligible Assignee or participant.  Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Legal Requirements, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.  If under applicable Insolvency Law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.4(l) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of

such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.4(l) to share in the benefits of the recovery of such secured claim.

**2.5    Evidence of Debt; Repayment of Loans**.

(a)    The Borrowers hereby unconditionally promise to pay to the Administrative Agent for the account of each Lender, the unpaid principal amount of each Loan (including all PIK Interest and Fees capitalized and added to the aggregate outstanding principal amount of Loans) of such Lender on the Maturity Date.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain an account in which it will record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to Section 2.5(b) and (c) shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers and the other Loan Parties to pay, and perform, the Obligations in accordance with the Loan Documents.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such entries, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**2.6    Interest Rates and Rates, Payments and Calculations**.

(a)    **Interest Rate**.  Except as provided in Section 2.6(b), each Loan shall bear interest on the outstanding principal amount thereof from the date made or deemed made at a rate equal to 18.00% per annum.  Accrued interest on each Loan shall be capitalized and added to the aggregate outstanding amount of such Loan on each Interest Payment Date in lieu of cash payment (and shall be treated as principal of such Loan at all times thereafter) (such capitalized interest, "PIK Interest"); provided that (i) interest accrued pursuant to Section 2.6(b) (including interest on past due interest) and all interest accrued but unpaid on or after the Maturity Date shall be payable on demand in cash and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(b)    **Default Rate**.  Upon the occurrence and during the continuation of an Event of Default, the outstanding principal balance of all Loans and all other Obligations shall bear at a per annum rate equal to two percentage points (2%) above the per annum rate otherwise

applicable hereunder (the "Default Rate"), without any notice from the Administrative Agent or any other Person, and shall be payable on demand.

(c)     **Calculations**.  All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.4, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)     **Intent to Limit Charges to Maximum Lawful Rate**.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The parties hereto, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, the Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

**2.7**     **Fees**.

(a)     In the event that there shall occur any (x) reduction or termination of the unused Exit Facility Commitments pursuant to Section 2.4(e) above or (y) prepayment of the Loans pursuant to Sections 2.4(g) or 2.4(h) above, the Borrowers shall pay to the Administrative Agent, for the ratable benefit of the applicable Lenders, a fee (payable in cash) equal to the sum of (i) 4% multiplied by the aggregate amount of the unused Exit Facility Commitments terminated and/or (ii) 4% of the then outstanding principal amount of the Loans being prepaid. Such fee shall be paid on the date of any such reduction or termination or prepayment, as the case may be.

(b)     On the Call Period Termination Date, each Lender party hereto on the Closing Date shall fully earn and be entitled to receive, as fee compensation for such Lender's commitments under this Agreement on such date, an exit fee consisting of its pro rata share of the sum of the following:  (1) in an amount equal to (x) 1.2 *times* the Total Amount Borrowed *minus* (y) Amounts Repaid (the positive result of such calculation shall be referred to as the "Fixed Return"); and (2) an amount equal to 10% of the Zohar III Allocated Proceeds (the "Upside Return" and collectively with the Fixed Return, the "Exit Fee").  The Exit Fee shall be deemed fully earned and payable in cash by the Borrowers to the Administrative Agent (for the pro rata benefit of the Lenders) on the Call Period Termination Date; provided however, the Fixed Return (if any) shall be calculated as of, and be payable on, (x) the date each prepayment is made pursuant to Sections 2.4(g) and 2.4(h) and (y) the earlier to occur of (i) the Maturity Date and (ii) the date that Obligations are paid in full; and provided further that the Upside Return

-27-

shall be payable as Zohar III Allocated Proceeds are collected by any Loan Party.  For the avoidance of doubt, the Upside Return, once earned in accordance with this clause (b), shall be payable shall be payable notwithstanding termination of the Exit Facility Commitments, payment in full of all other Obligations hereunder and/or termination of this Agreement.  The Borrowers agree that (A) the Exit Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; and (B) the Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made.  For the avoidance of doubt, the Exit Fee shall be payable notwithstanding any mandatory prepayments made pursuant to <u>Section 2.4(f)</u>.  The undertaking in this <u>Section 2.7(b)</u> shall survive termination of the Exit Facility Commitments and the payment of all Obligations.

(c)      [Reserved].

(d)      The Borrowers agree to pay to the Agents, for their own account, the fees set forth in the Fee Letter in the amounts and at the times set forth in the Fee Letter (the "<u>Agents' Fees</u>").  Such fees shall be fully earned when paid and shall not be refundable whatsoever, except as otherwise set forth in the Fee Letter.  Such fees will be in addition to the payment of the Agents' fees, costs and expenses pursuant to the terms of the Loan Documents.

**2.8     Extension of Maturity Date**.  On one (1) occasion during the term of this Agreement, so long as no Termination Event has occurred, the Borrowers may elect at least sixty (60) days prior to the Initial Maturity Date, to extend the Initial Maturity Date for one (1) year from the Initial Maturity Date by the Administrative Borrower providing written notice of such election to the Administrative Agent (which shall promptly notify each of the Lenders).  If on the Initial Maturity Date (i) no Termination Event has occurred, (ii) the Borrowers pay to the Administrative Agent, for the pro rata benefit of the Lenders, an extension fee (the "<u>Extension Fee</u>") equal to 10.00% of the outstanding principal amount of the Loans as of the Initial Maturity Date and (iii) the Administrative Borrower have given written notice to the Administrative Agent of such election to extend the Initial Maturity Date set forth in this <u>Section 2.8</u>, the Initial Maturity Date shall be extended for a period of one (1) year.  The Extension Fee shall be capitalized and added to the aggregate outstanding principal amount of New Money Loans on the Initial Maturity Date in lieu of cash payment (and shall be treated as principal of such New Money Loans at all times thereafter).

**2.9     Increased Costs**.

(a)      <u>Increased Costs Generally</u>. If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation in any such Loan;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, of participating in, issuing or maintaining, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Exit Facility Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.   A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as specified in paragraph (a) or (b) of this Section and delivered to the Administrative Borrower, shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.   Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**2.10**    **Taxes**.

(a)    Defined Terms. For purposes of this Section 2.10, the term "Applicable Law" includes FATCA.

(b)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the

applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     Payment of Other Taxes.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify each Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Lender or required to be withheld or deducted from a payment to such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Administrative Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (1) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (2) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.6 relating to the maintenance of a Participant Register and (3) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.10, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Administrative Borrower and the Administrative Agent, at the time or times reasonably requested by the Administrative Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Administrative Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Administrative Borrower or the Administrative Agent as will enable the Administrative Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.10(g)(ii)(A)</u>, <u>(ii)(B)</u> and <u>(ii)(D)</u> of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that a Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Administrative Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of,

U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

        (2)      executed copies of IRS Form W-8ECI;

        (3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to any Loan Party described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

        (4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of each such direct and indirect partner;

        (C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Administrative Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

        (D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Administrative Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation

reasonably requested by the Administrative Borrower or the Administrative Agent as may be necessary for the Administrative Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    <u>Treatment of Certain Refunds</u>.    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this <u>Section 2.10</u> (including by the payment of additional amounts pursuant to this <u>Section 2.10</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).    Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.    Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.    This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    <u>Survival</u>.  Each party's obligations under this <u>Section 2.10</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Exit Facility Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**2.11    <u>Mitigation Obligations; Replacement of Lenders</u>**.

(a)    <u>Designation of a Different Lending Office</u>.    If any Lender requests compensation under <u>Section 2.9</u>, or requires the Loan Parties to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.10</u>, then such Lender shall (at the request of the Administrative Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (1) would eliminate

-33-

or reduce amounts payable pursuant to <u>Section 2.9</u> or <u>2.10</u>, as the case may be, in the future, and (2) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.    If any Lender requests compensation under <u>Section 2.9</u>, or if the Loan Parties are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.10</u> and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 2.11(a)</u>, or if any Lender is a Defaulting Lender, then the Borrowers may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 13.4</u>), all of its interests, rights (other than its existing rights to payments pursuant to <u>Section 2.9</u> or <u>Section 2.10</u>) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that:

(i)    the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in <u>Section 13.4</u>;

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under <u>Section 2.01</u> or payments required to be made pursuant to <u>Section 2.02</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)    such assignment does not conflict with Applicable Law;

(v)    [reserved]; and

(vi)    a Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

Each party hereto agrees that (a) an assignment required pursuant to this paragraph (b) may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and (b) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; <u>provided</u> that, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the

applicable Lender; provided, further that any such documents shall be without recourse to or warranty by the parties thereto.

**2.12**   **Defaulting Lender Adjustments** .  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)   Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(b)   Defaulting Lender Waterfall.   Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 14.9 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder (including, without limitation, amounts owing in respect of New Money Loans made by non-Defaulting Lenders pursuant to the proviso to the second sentence of Section 2.3(b)); *second*, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers, to be held in a deposit account and released in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Exit Facility Commitments.

(c)   Defaulting Lender Cure.   If the Borrowers and the Administrative Agent (acting at the direction of the Required Lenders) agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Exit Facility Commitments, whereupon such Lender will cease to be a Defaulting Lender; provided

that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**3.      CONDITIONS PRECEDENT**.

**3.1      Conditions to Closing Date**.    The obligations of each the Lenders to make Loans pursuant to Section 2.2 on the Closing Date shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 13.1):

(a)      The Confirmation Order shall be in full force and effect, and shall not (in whole or in part) have been modified or amended (except in connection with the Modification Order), reversed, stayed, vacated or subject to stay pending appeal.   The Modification Order shall be in full force and effect, and shall not (in whole or in part) have been modified or amended, reversed, stayed, vacated or subject to stay pending appeal.   The Lenders shall be entitled to rely in good faith upon the Confirmation Order and the Modification Order, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(b)      The Administrative Agent (or its counsel) shall have received counterparts, duly executed (as applicable) by the applicable parties thereto, of the following, each properly executed by a Responsible Officer of the signing Loan Party and each in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders:

(i)      this Agreement; and

(ii)      the Security Agreement and the other Security Documents required to be executed on the Closing Date, together with evidence that all UCC financing statements in the jurisdictions of organization of each Loan Party that the Required Lenders may deem reasonably necessary to satisfy the Collateral requirements under the Loan Documents shall have been provided for, and arrangements for the filing thereof in a manner reasonably satisfactory to the Required Lenders shall have been made.

(c)      The Borrowers' Organizational Documents (and the governance of the Borrowers' as set forth therein) shall be in a form satisfactory to the Required Lenders; provided, however, that the form of the Borrowers' Organizational Documents as filed with the Bankruptcy Court at Docket No. [●] shall be deemed satisfactory to the Required Lenders.

(d)      The Agents' Fees and all other Fees and expenses required to be paid hereunder on the Closing Date shall have been paid.

(e)      The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act that has been reasonably requested at least

five (5) Business Days in advance of the Closing Date.  The Administrative Agent shall have received an IRS Form W-9 or applicable W-8 duly completed and executed by each Borrower and each Guarantor.

(f)     Prior to or substantially concurrently with the funding of the New Money Loans, the transactions that are contemplated to occur on or prior to the Effective Date as set forth in the Chapter 11 Plan shall have occurred or have been substantially consummated (including, without limitation, the funding of the Escrow Accounts) and the Loan Parties shall be in compliance in all respects with the Confirmation Order.

(g)     The Effective Date shall have occurred.

(h)     The Administrative Agent shall have received (i) a duly executed and effective copy of the Zohar II Credit Agreement and (ii) evidence reasonably satisfactory to the Lenders that the "Borrowers" thereunder shall have funded the "Escrow Accounts" as required thereunder (and that appropriate controls with respect thereto have been established).

(i)     The Lenders shall have received the Initial Budgets, in form and substance satisfactory to the Required Lenders.

(j)     The Lenders shall have received evidence, in form and substance satisfactory to the Required Lenders, that the Existing DIP Obligations have been repaid.

For purposes of determining whether the conditions in this Section 3.1 have been satisfied on the Effective Date, the funding of the New Money Loans hereunder by each Lender that has executed this Agreement shall be deemed to be the consent, approval and/or acceptance by such Lender of, or satisfaction with, each document or other matter required hereunder to be consented to, approved by, acceptable to or satisfactory to the Administrative Agent or such Lender.

**3.2**    **Each Loan**.  The obligation of each Lender to make a Loan (including on the Closing Date and the Effective Date), is subject to the satisfaction of the following conditions:

(a)     The Borrowers shall have delivered a Borrowing Request, duly executed and completed, by the time specified in Section 2.3.

(b)     The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects (other than any representation or warranty qualified as to "materiality", "Material Adverse Change" or similar language, which shall be true and correct in all respects) with the same effect as though made on and as of the date of such Loan, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects (other than any representation or warranty qualified as to "materiality", "Material Adverse Change" or similar language, which shall be true and correct in all respects) only as of such specified date).

(c)     At the time of and immediately after giving effect to such Loan, no Default or Event of Default shall have occurred and be continuing.

(d)     No law, regulation, order, judgment or decree of any Governmental Authority shall, and the Administrative Agent shall not have received any notice that litigation is pending or threatened which is likely to enjoin, prohibit or restrain the borrowing of such Loan.

(e)     The Administrative Agent and Lenders shall have received evidence reasonably satisfactory to the Lenders that prior to or substantially concurrently with the funding of such Loans, the "Lenders" (other than any "Defaulting Lenders") under the Zohar II Credit Agreement have made corresponding "Loans" to the "Borrowers" thereunder in an amounts required by Exhibit B to the Litigation Trust-A Agreement (as in effect on the Effective Date).

The delivery of each Borrowing Request shall constitute a representation and warranty by the Borrowers of the correctness of the matters specified in clauses (b), (c) and (d) above.

## 4.     REPRESENTATIONS AND WARRANTIES.

Each Loan Party makes the following representation and warranties to the Agents and the Lenders and such representations and warranties shall survive the execution and delivery of this Agreement:

**4.1     Due Organization and Qualification**. Each Loan Party (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, and (ii) subject to any limitation under the Bankruptcy Code or other Debtor Relief Law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

**4.2     Due Authorization; No Conflict**.  Subject to the entry of the Confirmation Order and the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Loan Party is party, (a) do not require any consent, exemption, authorization or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) consents, approvals, exemptions, authorizations, registrations, filings, permits or actions the failure of which to obtain or perform could not reasonably be expected to result in a Material Adverse Change, (b) will not violate the Organizational Documents of any Loan Party, (c) will not violate or result in a default or require any consent or approval (other than such as have been obtained and are in full force and effect) under (x) any indenture, instrument, agreement, or other document binding upon any Loan Party or its property or to which any Loan Party or its property is subject, or give rise to a right thereunder to require any payment to be made by any Loan Party or (y) any Organizational Document, (d) will not violate any Legal Requirement in any material respect, and (e) will not result in the creation or imposition of any Lien on any property of any Loan Party.  No Default or Event of Default has occurred and is continuing.

**4.3     Binding Obligations**.  Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

**4.4**    **Properties**.  Subject to the entry of the Confirmation Order and after giving effect to the transactions contemplated by the Chapter 11 Plan, each Loan Party has good title in all of its property.

**4.5**    **Jurisdiction of Formation; Location of Chief Executive Office; Jurisdiction; Identification Number**.

(a)    The name (within the meaning of Section 9-503 of the UCC) and jurisdiction of formation of each Loan Party is set forth on Schedule 4.5.

(b)    The chief executive office of each Loan Party is located at the address indicated on Schedule 4.5.

(c)    The tax identification numbers and organizational identification numbers, if any, of each Loan Party are as set forth on Schedule 4.5.

**4.6**    **[Reserved]**.

**4.7**    **Fraudulent Transfer**.  No transfer of property is being made by a Loan Party and no obligation is being incurred by a Loan Party in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Loan Party.

**4.8**    **Use of Proceeds**.  The Borrowers will use the proceeds of the Loans solely in accordance with Section 5.5.

**4.9**    **Payment of Taxes**.  All United States federal, state and other material tax returns and reports of each Loan Party required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than (a) taxes that are the subject of a Permitted Protest, and (b) with respect to the Collateral, the Loan Parties are not aware of any proposed tax assessment against a Loan Party with respect to United States federal, state or municipal taxes that is not being actively contested by such Loan Party diligently, in good faith, and by appropriate proceedings; provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**4.10**    **Compliance with Law**.  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, and each Subsidiary is in compliance with all Legal Requirements applicable to it or its property.

**4.11**    **Security Interest in Collateral**.  This Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, and upon the making of Uniform Commercial Code filings and the taking of such other actions required to be taken hereby or by the applicable Loan Document, such Liens shall constitute first priority perfected and continuing Liens on the Collateral, subject to (i) the Liens created by the Security Documents (except, in the case of the Shared Collateral), (ii) the Liens in favor of the "MBIA Lenders" (as defined in the Intercreditor Agreement), and (iii) Permitted Liens.

**4.12    [Reserved]**.

**4.13    Anti-Terrorism Law; Foreign Corrupt Practices Act**.

(a)    Each Loan Party is, and, to the knowledge of each Loan Party, its Affiliates are, in compliance with all applicable Legal Requirements relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Patriot Act.  No Loan Party and, to the knowledge of each Loan Party, none of its Affiliates shall use any proceeds of the Loans in violation of, any Legal Requirements relating to Anti-Terrorism Laws.

(b)    No Loan Party and to the knowledge of each Loan Party, no Affiliate or broker or other agent of any Loan Party acting or benefiting in any capacity in connection with the Loans, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Borrowers will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

(c)    No Loan Party and, to the knowledge of each Loan Party, no Affiliate or broker or other agent of any Loan Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in Section 4.13(b), (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or frozen pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)    No Loan Party nor any director or officer, nor to the knowledge of any Loan Party, any agent, employee or other Person acting, directly or indirectly, on behalf of any Loan Party, has, in the course of its actions for, or on behalf of, any Loan Party, directly or indirectly (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

**4.14    No Bank Accounts**.  As of the Closing Date, no Loan Party maintains any account other than the accounts set forth on Schedule II hereto.

**4.15    Budgets.**  Attached hereto as Exhibit C-1, Exhibit C-2 and Exhibit C-3 are the initial budgets (each, an "Initial Budget"), prepared by (i) in the case of the Litigation Trusts, the Litigation Trustees and (ii) in the case of Recovery, the Asset Recovery Manager, in each case, that sets forth in reasonable detail all of the projected expenses for the Litigations Trusts and Recovery, as applicable.

**5.**    **AFFIRMATIVE COVENANTS**.

Subject to the terms of the Confirmation Order and the Chapter 11 Plan, each Loan Party covenants and agrees that, until termination of the Exit Facility Commitments and payment in full of the Obligations, it shall, and shall cause each of its Subsidiaries to, comply with each of the following:

**5.1**    **Notices**.    Deliver to Administrative Agent and each Lender written notice of the following (and, in any event, within five (5) Business Days following the date on which a Responsible Officer obtains knowledge thereof):

(a)    any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)    the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity or otherwise by or before any Governmental Authority, (i) against any Loan Party or any Affiliate thereof that has had, or could reasonably be expected to result in, a Material Adverse Change or (ii) with respect to any Loan Document;

(c)    any development that has resulted, or could reasonably be expected to result, in a Material Adverse Change after the Closing Date; provided, however, that no Loan Party shall be required to disclose or discuss any document, information or matter (x) in respect of which disclosure is prohibited by Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product;

(d)    any notices provided to the "Borrowers" under the Zohar II Credit Agreement and related loan documents, together with copies thereof; and

(e)    the incurrence of any Lien (other than a Permitted Lien) or Lien described in Section 6.2(a) on, or claim asserted against, all or any substantial portion of the Collateral.

**5.2**    **Periodic Reports**. Furnish to the Administrative Agent and the Lenders with copies of all reports, annual plans and budgets provided to (i) the Litigation Trust Advisory Boards pursuant to Section 3.12 of the Litigation Trust Agreements and (ii) the member of Recovery pursuant to the terms of its Organizational Documents; provided, however notwithstanding anything to the contrary herein, no Loan Party shall be required to disclose or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

**5.3**    **Conference Calls**.    If requested, each Litigation Trustee and the Asset Recovery Manager shall participate in a conference call with the Required Lenders, following the Closing Date regarding the status of the liquidation of the "Litigation Trust-A Assets" and/or the "Litigation Trust-B Assets" (as defined in the applicable Litigation Trust Agreement), the assets of Recovery, in each case as applicable, and other matters; provided, however notwithstanding anything to the contrary herein, no Loan Party shall be required to disclose or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by

Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

**5.4**    **Existence**.  At all times (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits, could not reasonably be expected to result in a Material Adverse Change.

**5.5**    **Use of Proceeds**.  Use the proceeds of New Money Loans to (i) refinance Existing DIP Obligations on the Closing Date, (ii) fund the Escrow Accounts on the Closing Date in accordance with the terms and provisions of the Chapter 11 Plan and (iii) fund the Zohar III Allocation of the budgeted expenses of the Litigation Trusts, Phoenix III LLC, Phoenix III Intermediate LLC, Phoenix III Recovery and any of their respective Subsidiaries, and expenses related to preserving, liquidating and distributing the assets thereof,

**5.6**    **Taxes and Obligations.**  Pay and discharge prior to delinquency (a) all Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets unless they are the subject of a Permitted Protest; and (b) all lawful claims which, if unpaid, would by law become a Lien upon any Collateral.

**5.7**    **Confirmation Order; Chapter 11 Plan; Litigation Trust Agreements.**  Comply with their respective obligations and responsibilities under the Confirmation Order, the Chapter 11 Plan and the Litigation Trust Agreements.

**5.8**    **Maintaining Records; Access to Properties and Inspections** .  Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Legal Requirements are made of all dealings and transactions in relation to its business and activities. Each Loan Party will permit any representatives designated by the Administrative Agent or any Lender (i) to visit and inspect the financial records and the property of such Loan Party upon reasonable prior notice and at reasonable times, and (ii) to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent (or, upon the occurrence and during the continuation of any Event of Default, any Lender) to discuss the affairs, finances, accounts and condition of any Loan Party with the officers and employees thereof, advisors therefor (including independent accountants); provided, however notwithstanding anything to the contrary herein, no Loan Party shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information or other matter (x) in respect of which disclosure is prohibited by Applicable Law or (y) that is subject to attorney-client or similar privilege or constitutes attorney work product.

**5.9**    **[Reserved]**.

**5.10**    **Compliance with Laws**.  Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.11    **Budgets**.

   (a) Deliver to the Administrative Agent, by no later than December 31, 2022 (with respect to any update to an Initial Budget), and each annual anniversary of the Closing Date thereafter, commencing August 2, 2023, (i) with respect to a Litigation Trust, the annual budget delivered pursuant to each Litigation Trust Advisory Board pursuant to Section 3.12(c) of the applicable Litigation Trust Agreements and (ii) with respect to Recovery, the annual expense budget, in each case covering the upcoming 12-month period.

   (b) Each of the Litigation Trusts and Recovery shall comply with the Budget that is applicable to it, subject to Permitted Variances.

   (c) No later than the 20th day following the end of each fiscal quarter, commencing with the fiscal quarter ending March 31, 2023, the Loan Parties shall deliver a Budget Variance Report.

5.12    **Formation of Subsidiaries; Additional Collateral; Further Assurances**.

   (a) No Loan Party shall form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary without the consent of the Required Lenders in their sole discretion; provided, however, that Recovery may acquire direct or indirect equity interests in Intrepid as contemplated by the Chapter 11 Plan.  Any Subsidiary that is formed after the Effective Date shall be considered a Guarantor and execute any documentation reasonably requested by Lender including, without limitation, a joinder agreement to this Agreement in form and substance satisfactory to the Required Lenders pursuant to which such Subsidiary agrees to be bound by the terms of the Guaranty and a joinder agreement to the Security Agreement (in the form contemplated thereby) pursuant to which such Subsidiary agrees to be bound by the terms thereof, which shall be accompanied by appropriate organizational resolutions, other organizational documentation and, if requested by the Required Lenders, legal opinions in form and substance reasonably satisfactory to the Required Lenders.  In connection therewith, the Administrative Agent shall have received all documentation and other information regarding such newly formed or acquired Subsidiaries as may be reasonably requested by the Administrative Agent and any Lender to comply with the applicable "know your customer" rules and regulations, including the Patriot Act.  Each such Person delivering a joinder agreement to this Agreement and to the Security Agreement (x) shall automatically become a Guarantor hereunder and thereupon shall have all of the rights, benefits, duties and obligations in such capacity under the Loan Documents and (y) will grant Liens to the Collateral Agent, for the benefit of the Collateral Agent and the other Secured Parties, in any property of such Loan Party which constitutes Collateral.

   (b) Each Loan Party will cause, and will cause each other Loan Party to cause, all Collateral (to the extent required by the Security Documents) to be subject at all times to first priority Liens in favor of the Collateral Agent for the benefit of the Secured Parties to secure the Secured Obligations in accordance with the terms and conditions of the Security Documents, subject, with respect to the Shared Collateral, to the Intercreditor Agreement; provided that any Liens on the Escrow Accounts shall be junior in priority to the rights to payment therefrom under the Chapter 11 Plan; provided further that any Liens on the $250,000 evergreen reserve to be

maintained under the Chapter 11 Plan to secure the Zohar III Indenture Trustee Claim shall be junior in priority to the Indenture Trustee's right to payment therefrom.

(c)    At any time upon the reasonable request of the Collateral Agent, each Loan Party shall execute or deliver to the Collateral Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the "Additional Documents") that the Collateral Agent may reasonably request in form and substance reasonably satisfactory to the Collateral Agent to create or perfect any necessary liens, and any documents or filings which may be required by law or which the Collateral Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents, all at the expense of the applicable Loan Party.

**5.13**    **Post-Closing Covenants**. Not later than the date that is thirty (30) days after the Closing Date (or such later date as agreed by the Required Lenders in their sole discretion), deliver each Control Agreement required to be provided pursuant to the Security Agreement, or as otherwise provided in the Loan Documents.

## 6.    NEGATIVE COVENANTS.

Subject to the terms of the Confirmation Order and the Chapter 11 Plan, each Loan Party covenants and agrees that, until termination of the Exit Facility Commitments and payment in full of the Obligations, no Loan Party will do any of the following:

**6.1**    **Indebtedness**.    Except for the Obligations hereunder and the Permitted Indebtedness, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness.

**6.2**    **Liens**.    Create, incur, or assume, on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of its property, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for (a) Liens created by the Loan Documents and, subject to the Intercreditor Agreement, Liens created by the Zohar II Credit Agreement and related "Loan Documents", (b) Permitted Liens and (c) any other Lien that is the subject of a Permitted Protest.

**6.3**    **Restrictions on Fundamental Changes**.

(a)    Except for transactions contemplated by the Chapter 11 Plan, no Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, (i) any Subsidiary of a Borrower may merge into a Borrower (other than a Litigation Trust) in which a Borrower is the surviving entity, (ii) any Loan Party (other than a Litigation Trust) may merge into any other Loan Party (other than a Litigation Trust) in a transaction in which the surviving entity is a Loan Party and (iii) any Subsidiary that is not a Loan Party may liquidate or dissolve if it is liquidated into a Loan Party (other than a Litigation Trust) or the Borrowers determine in good faith that such liquidation or dissolution is not materially disadvantageous to the Lenders.

-44-

(b)     No Loan Party will, nor will it permit any Subsidiary to, engage in any business other than the business of the type conducted by such Loan Party and its Subsidiaries on the Closing Date.

**6.4     Disposal of Assets**.   Effect any Asset Sale, or agree to effect any disposition of any property, except for:

(a)     transactions contemplated by the Chapter 11 Plan;

(b)     with respect to the Litigation Trusts, transactions or other actions contemplated by the applicable Litigation Trust Agreement (in each case, as in effect on the date hereof);

(c)     a disposition or monetization of any asset under the Settlement Agreement (as defined in the Chapter 11 Plan) or other Asset Sale with respect to Intrepid; provided that the Net Cash Proceeds of such Asset Sale are subject to the provision of Section 2.4(h); and

(d)     the distribution of the Equity Interests of Stila Holdings.

**6.5     Change Name**.   Change such Loan Party's name, state of organization, organizational identity or, to the extent applicable, organizational identification number.

**6.6     Investments**.   Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any Person or any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except (i) for investments permitted by Section 3.9 of the Litigation Trust Agreements, in each case, as in effect on the date hereof, (ii) as contemplated by the Chapter 11 Plan, (iii) for loans or advances made by any Loan Party to any other Loan Party and (iv) investments held by Recovery as of the date hereof.

**6.7     Amendments**.   Change or modify the terms of or alter any Organizational Document, including, without limitation, either Litigation Trust Agreement, or amend, modify or waive any provision of the Zohar II Credit Agreement, in each case, in a manner that would materially impact the allocations set forth in either of the Litigation Trust Agreements or the funding of either of the Litigation Trusts.

**6.8     [Reserved]**.

**6.9     Accounting Methods**.   Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

**6.10     [Reserved]**.

**6.11     Restricted Payments**.   Make any Restricted Payments or distributions on account of the "Litigation Trust-A Assets" or "Litigation Trust-B Assets" other than (i) Restricted Payments

and distributions contemplated by the Litigation Trust Agreement (Trust A) and the Litigation Trust Agreement (Trust B), respectively, in each case as in effect on the date hereof and (ii) as contemplated by the Chapter 11 Plan; provided however that no Default or Event of Default shall have occurred and be continuing or would result from the making of such Restricted Payment or distribution.

**6.12**    **Anti-Terrorism Law; Anti-Money Laundering**.

(a)    Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in Section 4.13, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this Section 6.12).

(b)    Cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of Legal Requirements.

**6.13**    **Embargoed Persons**. Cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any Person subject to sanctions or trade restrictions under United States law ("Embargoed Person" or "Embargoed Persons") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by applicable Legal Requirements, or the Loans made by the Lenders would be in violation of Legal Requirements, or (2) the Executive Order, any related enabling legislation or any other similar executive orders (the Legal Requirements referred to in clauses (1) and (2), collectively, "Sanctions Laws"), (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by applicable Legal Requirements or the Loans are in violation of applicable Legal Requirements or (c) any Loan Party to conduct any business or engage in any action that is in violation of any Sanctions Law.

**6.14**    **[Reserved]**.

**6.15**    **Litigation Trust**.  No Litigation Trust shall engage in any business activities or own any property except (i) as set forth, and as contemplated by, its respective Litigation Trust Agreement, as in effect on the date hereof, and the Chapter 11 Plan, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) performance of its obligations under this Agreement or the other Loan Document to which it is a party.

-46-

**6.16**   **Budget Variance**.  From and after December 31, 2022, the Borrowers shall not allow any variances to exist from the applicable Budget, except for Permitted Variances.

**6.17**   **Fees**.  Pay, or enter into an agreement to pay, fees to any Lender other than the Fees described in Section 2.7.

**7.**   **GUARANTY**.

**7.1**   **Guaranty of the Obligations**.  Each Guarantor hereby jointly and severally hereby irrevocably and unconditionally guarantees, in favor of each Secured Party, the due and punctual payment in full of all Obligations of the Borrowers and each other Loan Party when the same shall become due, whether at stated maturity, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code (collectively the "Guaranteed Obligations")).

**7.2**   **Payment by Guarantors**.  Each Guarantor hereby jointly and severally agree, in furtherance of Section 7.1 and not in limitation of any other right which any Secured Party may have at law or in equity against any Borrower or any Guarantor by virtue hereof, that upon the failure of a Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), the Guarantors will, immediately upon demand by the Administrative Agent, pay or cause to be paid to the Administrative Agent, in cash, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations and all other Guaranteed Obligations then owed to the Secured Parties as aforesaid.

**7.3**   **Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)   this Guaranty is a guaranty of payment when due and not of collectability; this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)   the Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute a Secured Party and the Borrowers with respect to the existence of such Event of Default;

(c)   the obligations of each Guarantor hereunder are independent of the obligations of the Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against a Borrower or any of such other guarantors and whether or not a Borrower is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if a Secured Party is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    each Secured Party may, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time: (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations, in each case, to the extent permitted by the Loan Documents; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other Obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect of the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that the Secured Parties may have against any such security, in each case as such Secured Party in its sole discretion may determine consistent herewith, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against a Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for

the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the Loan Documents or from the proceeds of Collateral) to the payment of indebtedness other than the Guaranteed Obligations, even though Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) the requisite Lender's consent to the change, reorganization or termination of the corporate structure or existence of any Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any Collateral; (vii) any defenses, setoffs or counterclaims which any Loan Party may allege or assert against Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.4** **Waivers by Guarantors**.  Each Guarantor hereby waives, to the extent permitted by applicable law, for the benefit of the Secured Parties:  (a) any right to require a Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against a Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any Collateral, any such other guarantor or any other Person, or (iii) pursue any other remedy in the power of a Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of a Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of a Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon a Secured Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder other than as a result of payment in full of the Guaranteed Obligations, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to setoffs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that a Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto,; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.5** **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full.  Each

Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.6** **Reinstatement**. The obligations of Guarantor under this <u>Section 7</u> shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of a Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**7.7** **Subrogation; Subordination**. Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Exit Facility Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in <u>Section 7.1</u>, whether by subrogation or otherwise, against the Borrowers of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

**7.8** **General Limitation on Guarantee Obligations**. In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency or reorganization law or other Legal Requirement affecting the rights of creditors generally, if the obligations of a Guarantor under <u>Section 7.1</u> would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under <u>Section 7.1</u>, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the rights of subrogation established in <u>Section 7.7</u>) that is valid and enforceable, not void or voidable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**8.** **EVENTS OF DEFAULT**.

**8.1** **Event of Default**. Any one or more of the following events shall constitute an event of default, without any requirement of notice from Lender to any Loan Party (each, an "<u>Event of Default</u>") under this Agreement:

(a) default shall be made in the payment of any principal of any Loan within five (5) days when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b) default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, within five (5) days when and as the same shall become due and payable, whether at the due date thereof (including an Interest Payment Date) or at a date fixed for prepayment (whether voluntary or mandatory) or by acceleration or demand thereof or otherwise;

(c)    any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings of Loans hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in <u>Sections 5.1</u>, <u>5.4</u>, <u>5.5</u>, <u>5.6</u>, <u>5.8</u>, <u>5.12</u> or in <u>Section 6</u>;

(e)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of ten (10) days after the earlier of (i) written notice thereof to such Loan Party and (ii) actual knowledge of such default by a Responsible Officer of any Loan Party; <u>provided</u> that, if (A) such default cannot be cured within such ten (10)-day period, (B) such default is capable of cure and (C) the applicable Loan Party is proceeding with diligence and in good faith to cure such default, then such ten (10) day cure period shall be extended to such date, not to exceed a total of fifteen (15) days, as shall be necessary for such Loan Party to diligently cure such default;

(f)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed, unvacated, unbounded or unstayed pending appeal for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(g)    any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (f) of this <u>Section 8.1</u>, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(h)    any Loan Party shall, admit in writing its inability, or publicly declare its intention not to, or fail generally, to pay its debts generally as they become due;

(i)    one or more final judgments for the payment of money in an aggregate amount in excess of $100,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of the claim and does not dispute coverage) shall be rendered against any Loan Party and the same shall remain unpaid, not vacated or undischarged

for a period of sixty (60) consecutive days during which execution shall not be effectively stayed;

(j)      [reserved];

(k)      the Guaranty shall fail to remain in full force or effect (other than pursuant to the terms hereof or thereof) or any action shall be taken by any Guarantor to discontinue or to assert in writing the invalidity or unenforceability of the Guaranty (in each case, other than as a result of the discharge of such Guarantor in accordance with the terms thereof, or any Guarantor shall deny in writing that it has any further liability under the Guaranty (other than as a result of the discharge of such Guarantor in accordance with the terms thereof, or shall give written notice to such effect);

(l)      except as permitted by the terms of any Security Document, (i) any Security Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected Lien with respect to any material portion of the Collateral (other than solely by reason of (w) a Uniform Commercial Code filing having lapsed because a Uniform Commercial Code continuation statement (or similar statements or filings in other jurisdictions) was not filed in a timely manner or such cessation is due to any act or failure to act on the part of the Collateral Agent or any Secured Party, (x) such perfection not being required pursuant to the Loan Documents, (y) a release of Collateral in accordance with the terms hereof or thereof or (z) the Secured Obligations shall have been indefeasibly paid in full or any other termination of such Loan Document in accordance with the terms thereof);

(m)      any Security Document shall fail to remain in full force or effect (other than pursuant to the terms hereof or thereof or due to any action or omission of any action of the Secured Parties) or any action shall be taken by a Loan Party to discontinue or to assert in writing the invalidity or unenforceability of any Security Document;

(n)      any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge (in writing) the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(o)      the Litigation Trustee shall be enjoined, suspended or barred from taking any further action in performing the Litigation Trustee's duties on behalf of either Litigation Trust;

(p)      failure to replace a Litigation Trustee within ninety (90) days of their removal or resignation; provided however that if in connection with the resignation of a Litigation Trustee a successor is not appointed or does not accept its appointment within such ninety (90) day period and the resigning Litigation Trustee files a motion with the Bankruptcy Court for the appointment of a successor Litigation Trustee, such ninety (90) day period shall be extended to five (5) days after the entry of an order appointing a successor Litigation Trustee by the Bankruptcy Court;

(q)    any Loan Party or any Subsidiary shall (i) fail to pay when due (whether by scheduled maturity, acceleration or otherwise and after giving effect to any applicable grace period) any principal of or interest on (x) any Indebtedness (other than (a) the Indebtedness incurred pursuant to this Agreement and (b) any Indebtedness owed to a Borrower or a Subsidiary) having an aggregate principal amount exceeding $100,000 or (y) Indebtedness under the Zohar II Credit Agreement or (ii) after giving effect to any applicable grace period, fail to observe, perform or comply with any condition, covenant or agreement contained in any agreement or instrument evidencing or relating to any such Indebtedness, and the effect of such failure is to cause, or permit the holder or holders of such Indebtedness (or a trustee or agent on its or their behalf) to cause (with the giving of notice or otherwise), such Indebtedness to become due, or to be prepaid, redeemed, purchased or defeased, prior to its stated maturity; or

(r)    a Termination Event shall have occurred.

**8.2**    **Rights and Remedies**.    If any Event of Default occurs and is continuing, the Administrative Agent may and, at the written request of the Required Lenders, shall take any or all of the following actions:

(i)    declare the Exit Facility Commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers and each other Loan Party;

(iii)    terminate the Loan Documents as to any future liability or obligation of the Lenders hereunder, but without affecting any of the Loan Obligations or the Liens securing the Loan Obligations;

(iv)    charge interest at the Default Rate; and

(v)    exercise (or cause the Collateral Agent to exercise) on behalf of itself and the Lenders all rights and remedies available to the Agents and the Lenders under the Loan Documents or applicable Law, including, without limitation, the enforcement of any and all Liens created pursuant to the Security Documents; provided, however, in the event of this clause (v), the Required Lenders shall agree to a wind-down budget (a "Wind-Down Budget") in order to provide for the payment of expenses necessary for the orderly winding up of the Loan Parties' affairs as is appropriate under the circumstances;

provided, further, that upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.    Except as expressly provided for herein, presentment, demand, protest and all other

notices (including notice of acceleration and notice of intent to accelerate) of any kind are hereby waived by the Borrowers and each of the other Loan Parties.

**8.3**    **Application of Proceeds upon Event of Default**.

(a)    After the exercise of remedies provided for in this <u>Section 8</u> (or after the Loans have automatically become immediately due and payable), any amounts received under any Security Documents shall be applied by the Administrative Agent:

(i)    *first*, to pay that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents) then due and payable to the Agents in their respective capacities as such, until payment in full of all such fees shall have been made;

(ii)    *second*, to pay expenses in accordance with the Wind-Down Budget;

(iii)    *third*, to pay that portion of the Obligations constituting Fees, indemnities, expenses and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the amounts described in this clause second payable to them;

(iv)    *fourth*, to pay ratably all accrued and unpaid interest on the Loans, until payment in full of all such interest shall have been made;

(v)    *fifth*, to pay the unpaid principal amount of the Loans ratably, until payment in full of the principal of all Loans shall have been made;

(vi)    *sixth*, to pay all other Obligations ratably, until payment in full of all such other Obligations shall have been made; and

(vii)    finally, to pay to the Borrowers or the relevant Loan Party, or as a court of competent jurisdiction may direct, any surplus then remaining (including from the proceeds of the Collateral owned by it).

The Administrative Agent may make such distributions hereunder in cash or in kind or, on a ratable basis, in any combination thereof.

(b)    In making the payments and allocations required by this <u>Section 8.3</u>, the Administrative Agent will be entitled to rely on information from (i) its own records for information as to the Lenders, their Obligations and actions taken by them, (ii) any Lender for information as to its Obligations and actions taken by it, to the extent that the Administrative Agent has not obtained such information from its own records, and (iii) the Borrowers, to the extent that the Administrative Agent has not obtained information from the foregoing sources. All distributions made by the Administrative Agent pursuant to this <u>Section 8.3</u> shall be final (except in the event of manifest error) and the Administrative Agent shall have no duty to inquire as to the application by any Lender of any amount distributed to it.

9.    **THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT**.

**9.1    <u>Appointment</u>**.  (a) Each Lender hereby irrevocably designates and appoints Acquiom Agency Services LLC as the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents and Acquiom Agency Services LLC hereby accepts such designations and appointments.  Each Lender irrevocably authorizes each Agent, in such capacity, through its agents or employees, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this <u>Section 9</u> are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any such provisions.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and any rights of the Secured Parties with respect thereto as contemplated by and in accordance with the provisions of this Agreement and the other Loan Documents.  In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Borrower or any of their Subsidiaries.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    Each Lender hereby irrevocably authorizes the Administrative Agent and the Collateral Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by Collateral Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by Collateral Agent (whether by judicial action or otherwise) in accordance with applicable Legal Requirements.

(c)    Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Legal Requirement a security interest can be perfected by possession or control.  Should any Lender (other than the Collateral Agent) obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly following the Collateral Agent's request therefor, shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(d)    Any corporation or association into which any Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or

substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which such Agent is a party, will be and become the successor Agent, as applicable, under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

9.2     **Agent in Its Individual Capacity**.  Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender, if applicable, as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder, if applicable, in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, any Company or Affiliate thereof as if it were not an Agent hereunder and without duty to account therefor to the Lenders.

9.3     **Exculpatory Provisions**.  No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 13.1</u>); <u>provided</u> that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability, if such Agent is not indemnified to its satisfaction, or that is contrary to any Loan Document or applicable Legal Requirements including, for the avoidance of doubt any action that may be in violation of the automatic stay under any Insolvency Law or that may effect a foreclosure, modification or termination of Property of a Defaulting Lender under any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose or shall be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.  No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Section 8.3</u> or <u>Section 13.1</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and nonappealable judgment.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof describing such Default or Event of Default is given to such Agent by a Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity,

enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in <u>Section 3.2</u> or elsewhere in any Loan Document.  Each party to this Agreement acknowledges and agrees that the Administrative Agent may from time to time use one or more outside service providers for the tracking of all UCC financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to the Loan Documents and the notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof, and that each of such service providers will be deemed to be acting at the request and on behalf of the Borrowers and the other Loan Parties.  No Agent shall be liable for any action taken or not taken by any such service provider.  Neither any Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by any Agent under or in connection with any of the Loan Documents.  In no event shall any Agent be liable for any failure or delay in the performance of their respective obligations under this Agreement or any related documents because of circumstances beyond such Agent's control, including, but not limited to, a failure, termination, or suspension of a clearing house, securities depositary, settlement system or central payment system in any applicable part of the world or acts of God, flood, war (whether declared or undeclared), civil or military disturbances or hostilities, nuclear or natural catastrophes, political unrest, explosion, severe weather or accident, earthquake, terrorism, fire, riot, labor disturbances, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like (whether domestic, federal, state, county or municipal or foreign) which delay, restrict or prohibit the providing of the services contemplated by this Agreement or any related documents, or the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or any other causes beyond such Agent's control whether or not of the same class or kind as specified above.

Nothing in this Agreement or any other Loan Document shall require the Administrative Agent or the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

The Agents shall have no obligation for (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under the Loan Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times; or (c) providing, maintaining, monitoring, or preserving insurance on or the payment of taxes with respect to any Collateral.

**9.4**    <u>**Reliance by Agent**</u>.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper Person.  Each Agent also may rely upon any statement made to it orally and believed by it to be made by a proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a

Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless each Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or advisors.

**9.5**    **Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Affiliates of each Agent and any such sub-agent, and shall apply, without limiting the foregoing, to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.  The Agents shall not be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

**9.6**    **Successor Agent**.  Each Agent may resign as such at any time upon at least 10 days' prior notice to the Lenders and the Borrowers.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent or Collateral Agent, as the case may be.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within ten (10) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent, as the case may be.  If no successor Agent shall have been appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents, and the Required Lenders shall assume and perform all of the duties of such Administrative Agent or Collateral Agent, as the case may be, under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent.

Upon the acceptance of its appointment as an Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring (or retired) Agent shall be discharged from its duties and obligations under the Loan Documents (if not already discharged therefrom as provided in this paragraph).  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed among the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Section 9, Section 10, Section 12 and Section 14.9 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while it was acting as an Agent.

**9.7**    **Non-Reliance on Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their

respective Affiliates and based on such documents and information as it has deemed appropriate, conducted its own independent investigation of the financial condition and affairs of the Loan Parties and their Subsidiaries and made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof (including any such terms and conditions set forth, or otherwise maintained, on the Platform with respect thereto). Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their respective Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

**9.8** **[Reserved]**.

**9.9** **Indemnification**.  The Lenders severally agree to indemnify each Agent in its capacity as such and each of its Related Parties (to the extent not reimbursed by the Borrowers or the Guarantors and without limiting the obligation of the Borrowers or the Guarantors to do so), ratably according to their respective outstanding Loans and Exit Facility Commitments in effect on the date on which indemnification is sought under this Section 9.9 (or, if indemnification is sought after the date upon which all Exit Facility Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such outstanding Loans and Exit Facility Commitments as in effect immediately prior to such date), from and against any and all Indemnified Liabilities (IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF ANY AGENT OR RELATED PARTIES); provided that no Lender shall be liable for the payment of any portion of such Indemnified Liabilities that are found by a final and nonappealable judgment of a court of competent jurisdiction to have directly resulted solely and directly from such Agent's or Related Party's, as the case may be, gross negligence or willful misconduct; provided, however, that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be provided by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.9.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.9 shall apply whether or not any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limiting the foregoing, the Lenders shall reimburse each Agent upon demand ratably according to their respective outstanding Loans and Exit Facility Commitments in effect on the date on which reimbursement is sought under this Section 9.9 (or if such reimbursement payment is sought after the date on which the Loans have been paid in full and the Exit Facility Commitments have terminated, ratably in accordance with the outstanding Loans and Exit Facility Commitments as in effect immediately prior to such date) any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise and including the enforcement of this Section 9.9) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Agents are not reimbursed for such expenses by or on behalf of the Borrowers. Each

Lender hereby authorizes the Agents to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this <u>Section 9.9</u>.  The undertaking in this <u>Section 9.9</u> shall survive termination of the Exit Facility Commitments, the payment of all other Obligations and the resignation or removal of the Agents.  The agreements in this <u>Section 9.9</u> shall survive the payment of the Loans and all other amounts payable hereunder.

**9.10** **[Reserved]**.

**9.11** **Lender Action**.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures or cause any of the foregoing (through Affiliates or otherwise), with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  Without limiting the foregoing, each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent, it will not take any enforcement action, accelerate Obligations under any Loan Documents, or exercise any right that it might otherwise have under applicable Legal Requirements to credit bid or purchase any portion of the Collateral at any sale or foreclosure thereof referred to in <u>Section 9.1(b)</u>; <u>provided</u> that nothing contained in this Section shall affect any Lender's right to credit bid its pro rata share of the Obligations pursuant to Section 363(k) of the Bankruptcy Code.

**9.12** **[Reserved]**.

**9.13** **Lender's Representations, Warranties and Acknowledgements**.  Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Borrowers and their respective Subsidiaries in connection with the transactions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Borrowers and their respective Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.  Each Lender acknowledges that no Agent or Related Parties of any Agent has made any representation or warranty to it.  Except for documents expressly required by any Loan Document to be transmitted by an Agent to the Lenders, no Agent shall have any duty or responsibility (either express or implied) to provide any Lender with any credit or other information concerning any Loan Party, including the business, prospects, operations, Property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of a Loan Party, that may come in to the possession of an Agent or any of its Related Parties.

**9.14    Security Documents and Guarantee**.

(a)    Agents under Security Documents and Guarantee.  Each Secured Party hereby further authorizes the Administrative Agent or the Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guaranty, the Collateral and the Loan Documents.  Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or the Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement, release any Lien encumbering any item of Collateral that is the subject of such sale or disposition of assets, release any Lien encumbering any item of Collateral owned by any Subsidiary no longer required to become a Guarantor pursuant to Section 5.12(a) or to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented or (ii) with respect to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented.

(b)    Right to Realize on Collateral and Enforce Guarantee.  Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrowers, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

(c)    Release of Collateral, Termination of Loan Documents.

(i)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent shall take such actions as shall be required to release its security interest in any Collateral subject to any disposition permitted by the Loan Documents, and to release any guarantee obligations under any Loan Document of any Person subject to such disposition, to the extent necessary to permit consummation of such disposition in accordance with the Loan Documents.

(ii)      Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Secured Obligations (other than contingent expense reimbursement and indemnity obligations that are not then due and payable) have been paid in full and all Exit Facility Commitments have terminated or expired, upon request of the Borrowers, the Administrative Agent and the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any other Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations provided for in any Loan Document, whether or not on the date of such release there may be outstanding contingent expense reimbursement and indemnity obligations that are not then due and payable.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(iii)      The Collateral Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Collateral Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

**9.15    Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on a Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise: to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Collateral Agent and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Collateral Agent and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Collateral Agent and the Administrative Agent under Sections 2.7 and 10) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Collateral Agent to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Collateral Agent, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under this Agreement.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**9.16**    **Erroneous Payments.**

(a)    If the Administrative Agent (x) notifies a Lender or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 9.16 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking

industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting immediately preceding clause (a), each Lender, Secured Party or any Person who has received funds on behalf of a Lender or Secured Party (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)    it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender or Secured Party shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one] (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this clause (b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this clause (b) shall not have any effect on a Payment Recipient's obligations pursuant to clause (a) or on whether or not an Erroneous Payment has been made.

(c)    Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)    The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received

funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party, as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Secured Obligations owed by the Borrowers or any other Loan Party; provided that this Section 9.16 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from, or on behalf of (including through the exercise of remedies under any Loan Document), the Borrowers for the purpose of making a payment on the Obligations.

(e)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

Each party's obligations, agreements and waivers under this Section 9.16 shall survive the resignation or replacement of the Administrative Agent, the termination of the Exit Facility Commitments and/or the repayment, satisfaction or discharge of all Secured Obligations (or any portion thereof) under any Loan Document.

## 10.    EXPENSES; INDEMNIFICATION; DAMAGES WAIVER.

(a)     Subject to Section 10(h) hereof, the Borrowers jointly and severally agree to pay (i) all reasonable and documented out-of-pocket costs and expenses for the Administrative Agent, the Collateral Agent or any Lender (including the reasonable fees, charges and disbursements of counsel for the each of the foregoing) incurred by any Agent, the Lenders and any of their respective Affiliates, in connection with the structuring, documentation, negotiation, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing, extending or replacing, in whole or in part, the credit facilities provided herein, including the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or any other document or matter requested by the Borrowers or any other Loan Party, (ii) all reasonable and documented out-of-pocket costs and expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Collateral Agent for the benefit of the Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and other charges of counsel to the Collateral Agent and of counsel providing any opinions that the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) may reasonably request in respect of the Collateral or the Liens created pursuant to the Security Documents and (iii) all out-of-pocket expenses incurred by the Administrative Agent or any

Lender (including the fees, charges and disbursements of any counsel or other advisor for the Administrative Agent, Collateral Agent or any Lender, including the Lender Advisors) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that the Borrowers shall not be required to reimburse the legal fees and expenses of more than (x) one outside counsel (in addition to any special counsel and up to one local counsel in each applicable local jurisdiction) for the Agents and their Related Parties, taken as a whole and (y) one outside counsel (in addition to any special counsel and up to one local counsel in each applicable local jurisdiction) for the Lenders and their Related Parties, taken as a whole, or, in the case of an actual or potential conflict of interest, of one additional counsel to the affected Lenders to the extent such Lenders are similarly situated.

(b)     Subject to Section 10(h) hereof, the Borrowers agree, jointly and severally, to indemnify the Agents, each Lender and each of their respective Related Parties (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrowers) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) the environmental condition of any property owned, leased or operated by any Loan Party at any time, or the applicability of any Legal Requirements relating to such property, whether or not occasioned wholly or in party by any condition, accident or event caused by any act or omission of any Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) result from a claim not involving an act or omission of the Borrowers and that is brought by an Indemnitee against another Indemnitee (other than against the arranger or the Administrative Agent in their capacities as such). This paragraph shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     [Reserved].

(d)     The provisions of this <u>Section 10</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Chapter 11 Plan and the other transactions contemplated hereby and thereby, the repayment of the Loans, and any other Secured Obligations, the release of Guarantor or of all or any portion of the Collateral, the expiration of the Exit Facility Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents or any Lender; <u>provided</u> that the provisions of this <u>Section 10</u> shall survive (x) with respect to each Litigation Trust, until the "Termination Date" of such Litigation Trust (as defined in the applicable Litigation Trust Agreement) and (y) with respect to Recovery, until the dissolution of Recovery in accordance with the terms of its Organization Documents.

(e)     All amounts due under this <u>Section 10</u> shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested. Notwithstanding anything to the contrary contained herein, no Loan Party shall be required to establish any reserves with respect to amounts due (or that may be due) under this <u>Section 10</u> unless and until a claim has been made therefor.

(f)     To the extent that the Loan Parties fail to pay any amount required to be paid by them to the Agents under <u>Sections 10(a)</u> or <u>(b)</u>, each Lender severally agrees to pay to the Agents, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought (or, if such payment is sought after the date on which the Loans have been paid in full and the Exit Facility Commitments terminated, determined immediately prior to the time that the Loans were paid in full and the Exit Facility Commitments terminated)) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); <u>provided</u> that the unreimbursed amount was incurred by or asserted against any of the Agents in its capacity as such.  For purposes of this <u>Section 10 (e)</u>, a Lender's "*pro rata* share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Exit Facility Commitments at the time.  Each Lender hereby authorizes the Agents to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agents to such Lender from any source against any amount due to the Agents under this <u>Section 10(e)</u>.

(g)     To the fullest extent permitted by applicable Legal Requirements, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential, or punitive damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby or thereby, the Chapter 11 Plan, the Loans or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.

(h)     All amounts due under this <u>Section 10</u> shall be payable not later than ten (10) days after demand therefor.

(i)     The agreements in this <u>Section 10</u> shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Exit Facility Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**11.    NOTICES.**

(a)     All notices or demands relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by reputable overnight courier dispatched for next Business Day delivery, or electronic mail (at such email addresses as a party may designate in accordance herewith) together with, at the sender's option, a copy by reputable overnight courier dispatched for next Business Day delivery. In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Administrative Borrower:

> c/o David Dunn
> PROVINCE
> 700 Canal Street, Suite 12E
> Stamford, CT 06902
> Telephone:  (702) 840-1271
> Email:  ddunn@provincefirm.com

With a copy, which shall not constitute notice, to:

> Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
> 3580 Carmel Mountain Road, Suite 300
> San Diego, CA 92130
> Attn:   Joseph R. Dunn; Abigail V. O'Brient
> Telephone:  (858) 314-1516; (310) 226-7886
> Email:  jrdunn@mintz.com; avobrient@mintz.com

If to the Litigation Trusts:

> David Dunn
> PROVINCE
> 700 Canal Street, Suite 12E
> Stamford, CT 06902
> Telephone:  (702) 840-1271
> Email:  ddunn@provincefirm.com

With a copy, which shall not constitute notice, to:

> Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
> 3580 Carmel Mountain Road, Suite 300
> San Diego, CA 92130
> Attn:   Joseph R. Dunn; Abigail V. O'Brient
> Telephone:  (858) 314-1516; (310) 226-7886
> Email:  jrdunn@mintz.com; avobrient@mintz.com

If to Stila Holdings:

      c/o Bardin Hill Investment Partners LP
      299 Park Avenue, 24th Floor
      New York, NY 10171
      Attn:   John Greene
      Telephone:  (212) 303-9455
      Email:  jgreene@bardinhill.com

With a copy, which shall not constitute notice, to:

      Arnold & Porter Kaye Scholer LLP
      70 West Madison Suite 4200
      Chicago, IL  60602-4231
      Attn:   Brian J. Lohan, Esq
      Telephone:    (312) 583-2403
      Email:  Brian.Lohan @arnoldporter.com

If to the Agents:

      Acquiom Agency Services LLC
      150 South Fifth Street
      Suite 2600
      Minneapolis, MN 55402
      Attn:  Beth Cesari
      Telephone:  (512) 639-3871
      Email:  loanagency@srsacquiom.com

With a copy, which shall not constitute notice, to:

      Arnold & Porter Kaye Scholer LLP
      250 West 55th Street
      New York, NY 10019
      Attn:   Jonathan I. Levine, Esq
      Telephone:  (212) 836-7010
      Email:  Jonathan.Levine@arnoldporter.com

Any party hereto may change the address at which they are to receive notices hereunder by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11 shall be deemed received: (a) if personally delivered, on the date of receipt; (b) if sent by sent by reputable overnight courier dispatched for next Business Day delivery, on the next Business Day after dispatch; and (c) if sent by electronic mail, upon the date of dispatch if either confirmed by electronic mail or if a copy is sent by overnight courier dispatched for next Business Day delivery.

      (b)    Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications on the Platform.

-69-

(c)    The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrowers or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrowers, any Loan Party's or the Administrative Agent's transmission of communications through the Platform. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

(d)    The Borrowers hereby acknowledge that certain of the Lender (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrowers or their respective Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Each Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the materials and information provided by or on behalf of the Borrowers hereunder and under the other Loan Documents (collectively, "Borrower Materials") that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Agents and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrowers or its securities for purposes of U.S. federal and state securities Laws; (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information". Each Public Lender will designate one or more representatives that shall be permitted to receive information that is not designated as being available for Public Lenders.

(e)    The Administrative Agent hereby designates its office located at the address set forth above, or any subsequent office which shall have been specified for such purpose by written notice to the Administrative Agent and Lenders, as the Administrative Agent's Office referred to herein, to which payments due are to be made and at which Loans will be disbursed.

12.     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER**.

(a)     THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)     SUBJECT TO THE LAST PROVISO OF THIS SENTENCE AND CLAUSE (c), THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK COUNTY, NEW YORK; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OR ANY LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH PARTY HERETO WAIVES TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>; <u>PROVIDED</u>, <u>FURTHER</u>, <u>HOWEVER</u>, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CASES REMAIN PENDING.

EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO WAIVES TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>.

(c)     NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWERS OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION, AND HEREBY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT.

(d)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY HERETO REPRESENTS THAT EACH SUCH PARTY HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

## 13.    AMENDMENTS; ASSIGNMENTS; WAIVERS; SUCCESSORS.

**13.1    <u>Amendments and Waivers</u>**.    No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders and the Loan Parties, and acknowledged by the Administrative Agent, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that (x) any amendment or waiver to the Fee Letter, or waiver of any rights or privileges thereunder, shall only require the consent of the Borrowers and the Agents, (y) the Administrative Agent and the Borrowers may, without the consent of the Lenders, amend, modify or supplement this Agreement and any other Loan Document to cure any ambiguity, typographical error, defect or inconsistency if such amendment, modification or supplement does not adversely affect the rights of any Agent or any Lender and (z) no such amendment, waiver or consent shall:

(a)     extend or increase the Exit Facility Commitment of any Lender (or reinstate any Exit Facility Commitment terminated pursuant to <u>Section 8.2</u>) without the written consent of such Lender (it being understood that a waiver of any condition precedent or the waiver of any Default or mandatory prepayment shall not constitute an extension or increase of any Exit Facility Commitment of any Lender); postpone any date fixed by this Agreement or any other Loan Document for any scheduled payment of principal, interest or fees due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(b)     reduce the principal of, or the rate of interest specified herein on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(c)     change (A) <u>Section 8.3</u> in a manner that would alter the application or pro rata sharing of payments required thereby without the written consent of each Lender affected thereby or (B) the order of application of any prepayment of Loans from the application thereof

-72-

set forth in the applicable provisions of Section 2.4(i), in any manner that adversely affects the Lenders without the written consent of each Lender adversely affected thereby;

(d)    change any provision of this Section 13.1 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender adversely affected thereby;

(e)    release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender, in each case except as expressly provided in the Loan Documents and except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Required Lenders pursuant to section 363(k), section 1129(b)(2)(a)(ii) or any other section of the Bankruptcy Code or any other sale or other disposition of assets in connection with other Debtor Relief Laws or an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents;

(f)    release all or substantially all of the value of the Guaranty, without the written consent of each Lender;

(g)    waive, amend or otherwise modify Section 2.4(a), Section 2.4(j) or Section 2.4(l) hereof (or any comparable provision of any other Loan Document) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender adversely affected thereby; or

(h)    (i) contractually subordinate the Obligations in right of payment to any other Indebtedness, or (ii) except as provided by operation of applicable Laws, subordinate the Liens securing the Loans with respect to all or substantially all of the Collateral to any other Lien (except as expressly permitted by the Loan Documents), in either case, without the written consent of each Lender adversely affected thereby;

provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, affect the rights or duties of the Collateral Agent under this Agreement or any other Loan Document.

Notwithstanding anything to the contrary contained in this Section 13.1, Guaranty, Security Documents and related documents executed by Loan Parties or any Subsidiaries of the Borrowers in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrowers without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure any ambiguity, typographical error, defect or inconsistency or (iii) to cause such Guaranty, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

**13.2    No Waivers; Cumulative Remedies**.  No failure or delay by any Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by Section 13.1, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.  No notice or demand on the Borrowers or any other Loan Party in any case shall entitle the Borrowers or any other Loan Party to any other or further notice or demand in similar or other circumstances.

**13.3    Successors**.  This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby; provided, however, that no Loan Party may assign or otherwise transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Administrative Agent, the Collateral Agent, and each Lender, which consent may be withheld in their respective sole discretion (and any attempted assignment or transfer by any Loan Party without such consent shall be absolutely void *ab initio*).  Nothing in this Agreement or any other Loan Document, express or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent expressly provided in Section 13.6 and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement or any other Loan Document.

**13.4    Assignments**.

Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Exit Facility Commitment and the Loans at the time owing to it (regardless of any assignment by such Lender of all or portion of its right (if any) to the Upside Return)); provided that any such assignment shall be subject to the following conditions:

(a)    Minimum Amounts.

(i)    in the case of an assignment of the entire remaining amount of the assigning Lender's Exit Facility Commitment or the Loans at the time owing to it or contemporaneous assignments to or by related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in Section 13.4(a)(ii) in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(ii)    in any case not described in Section 13.4(a)(i), the aggregate amount of the Exit Facility Commitment (which for this purpose includes Loans

outstanding thereunder) or, if the Exit Facility Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Administrative Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(b)    [Reserved].

(c)    Required Consents.    No consent shall be required for any assignment except to the extent required by Section 13.4(a)(ii) and, in addition:

(i)    the consent of the Administrative Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Administrative Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and

(ii)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(d)    Assignment and Assumption.    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(e)    No Assignment to Certain Persons.    No such assignment shall be made to (i) the Borrowers or any of the Borrowers' Affiliates or Subsidiaries; (ii) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof; or (iii) either directly or indirectly, whether through a synthetic arrangement, derivative or other arrangement or understanding, to Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan).

(f)    No Assignment to Natural Persons.    No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(g)    Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrowers and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 13.5, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 10 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.6.

**13.5    Register.**  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the applicable Lenders, and the Exit Facility Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the applicable Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

**13.6    Participations.** Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than (i) a natural Person, or (ii) a holding company, investment vehicle or trust for, or owned and operated for the

primary benefit of, a natural Person, or (iii) a Borrower or any of a Borrower's Affiliates or Subsidiaries, or (iv) Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan)) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Exit Facility Commitment or the Loans owing to it); provided that (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (c) the Borrowers, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 2.10(d) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) is described in clauses (a) and (b) of Sections 13.1, and (2) directly affects such Participant. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.9 and 2.10 (subject to the requirements and limitations therein, including the requirements under Section 2.10(g) (it being understood that the documentation required under Section 2.10(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 13.4; provided that such Participant (A) agrees to be subject to the provisions of Section 2.11 as if it were an assignee under Section 13.4 of this Article; and (B) shall not be entitled to receive any greater payment under Sections 2.9 or 2.10, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.11(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 14.9 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.4(l) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For

the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

**13.7**    **Certain Pledges.** Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto, or otherwise violate any other provision of this Agreement.

**13.8**    **Assignment of Upside Return.** Any Lender may at any time assign to one or more assignees all or a portion of its right to receive its Upside Return (regardless of any assignment by such Lender of all or portion of its Exit Facility Commitment and or Loans at the time owing to it) pursuant to an assignment agreement in form and substance reasonably satisfactory to such Lender and the Administrative Agent (each, an "Upside Return Assignment"); provided, however, no Upside Return may be assigned to Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan). No consent shall be required for any assignment of a Lender's Upside Return pursuant to this Section 13.8. The parties to each assignment pursuant to this Section 13.8 shall execute and deliver to the Administrative Agent an Upside Return Assignment, together with a processing and recordation fee of $1,250; provided that that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Upside Return Assignment delivered to it pursuant to this Section 13.8 and a register for the recordation of the names and addresses of the applicable Lenders, and the applicable Upside Return assigned by a Lender pursuant to the terms hereof from time to time (the "Upside Return Register"). The entries in the Upside Return Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the applicable Lenders shall treat each Person whose name is recorded in the Upside Return Register pursuant to the terms hereof as a Lender entitled to the Upside Return hereunder for all purposes of this Agreement. The Upside Return Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

**14.**    **GENERAL PROVISIONS.**

**14.1**    **Effectiveness.** This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent and/or the Arrangers, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 3, the Confirmation Order and the Chapter 11 Plan, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of

this Agreement by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

**14.2    <u>Section Headings</u>**.  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**14.3    <u>Interpretation</u>**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**14.4    <u>Severability of Provisions</u>**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**14.5    <u>No Fiduciary Duty</u>**.  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "<u>Lenders</u>"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other.  The Loan Parties acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its stockholders or its affiliates with respect to the transactions contemplated hereby or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Loan Party, its management, stockholders, creditors or any other Person.  Each Loan Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.

**14.6    <u>Counterparts; Electronic Execution</u>**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this

Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement; but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

**14.7** **Revival and Reinstatement of Obligations**. To the extent that any payments on the Indebtedness or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, receiver and manager, interim receiver or other Person under any bankruptcy law or other Insolvency Law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect. In such event, each Loan Document shall be automatically reinstated and each Loan Party shall take (and shall cause each other Loan Party to take) such action as may be requested by the Administrative Agent, the Collateral Agent or the Required Lenders to effect such reinstatement.

**14.8** **Integration**. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**14.9** **Right of Setoff; Marshalling; Payments Set Aside**. If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirements, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Loan Party against any and all of the obligations of any Loan Party now or hereafter existing under this Agreement or any other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender under this Section 14.9 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to notify the Borrowers and the Administrative Agent promptly after any such setoff and application; provided, however, that in no event shall the failure to give such notice effect the validity or enforceability of any such setoffs. None of any Agent or any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to Administrative Agent or the Lenders (or to Administrative Agent, on behalf of the Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law or any equitable cause, then, to the extent of such recovery, the

obligation or part thereof originally intended to be satisfied, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**14.10   Confirmation Order**.   Notwithstanding anything to the contrary set forth herein, in the event of a conflict between the terms of this Agreement or any Loan Document and the Confirmation Order, the Confirmation Order shall control in all respects and any such conflicting terms set forth herein or in such Loan Document shall be deemed automatically amended to be consistent with the terms set forth in the Confirmation Order.

**14.11   Confidentiality**.

(a)      Each of the Agents and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to their respective branches and Affiliates and to their respective Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (iii) to the extent required by Applicable Laws or by any subpoena or similar legal process; (iv) to any other party hereto; (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (vi) subject to an agreement containing provisions substantially the same as (or no less restrictive than) those of this Section, to (x) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (y) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrowers and its obligations, this Agreement or payments hereunder; (vii) with the consent of the Borrowers; or (viii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the either Agent, any Lender or any of their respective branches or Affiliates on a nonconfidential basis from a source other than the Borrowers who did not acquire such information as a result of a breach of this Section.   In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents or any Lender in connection with the administration of this Agreement, the other Loan Documents, and the Exit Facility Commitments.   Notwithstanding the foregoing, each of the Agents and the Lenders agree that under no circumstances shall they disclose any Information, directly or indirectly, to (i) Lynn Tilton, any of her Affiliates, or any other entity owned or controlled by any of the foregoing, including any of the Patriarch Stakeholders (as such term is defined in the Chapter 11 Plan), or (ii) any Person who is the subject of a Litigation Claim.

For purposes of this Section, "Information" means all information received from a Borrower or any of its Subsidiaries relating to such Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by a Borrower or any of its Subsidiaries; provided that, in the case of information received from a Borrower or any of its Subsidiaries after

the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    Each Lender party to this Agreement as of the Closing Date and a holder of an Equity Interest (or other beneficial interest) in a Borrower agrees that, in connection with any transfer or other assignment of such Equity Interest (or beneficial interest), such assignment shall be subject to an agreement containing provisions substantially the same as (or no less restrictive than) the confidentiality provisions set forth in the applicable Litigation Trust Agreements or other Organizational Documents.

## 15.    ADMINISTRATIVE BORROWER; JOINT AND SEVERAL LIABILITY.

**15.1    <u>Administrative Borrower</u>**.  Each Borrower hereby irrevocably appoints Recovery as the borrowing agent and attorney-in-fact for the Borrowers which appointment shall remain in full force and effect unless and until the Agents shall have received prior written notice signed by all of the Borrowers (other than Recovery) that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to the Agents and receive from the Agents all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.

**15.2    <u>Joint and Several Liability</u>** Each Borrower hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Administrative Agent and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.  Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this <u>Section 15.2</u>), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them; <u>provided</u> that, notwithstanding the foregoing, the liability of Litigation Trust-A under the Loan Documents shall not exceed thirty-three percent (33%) of the value of Litigation Trust-A.  If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.  Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this <u>Section 15.2</u> constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or

enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

**15.3**    **Separate Exercise of Remedies**.  The provisions of this <u>Section 5.3</u> are made for the benefit of the Agents, the Lenders and their successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Agents, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this <u>Section 15.3</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied.

**15.4**    **Subrogation**.  Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations (other than contingent reimbursement and indemnification obligations) have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

**15.5**    **Waiver of Defenses**. Each of the Loan Parties hereby waives any and all suretyship defenses available to a Guarantor arising out of the joint and several nature of its respective duties and obligations hereunder (including any defense contained in <u>Section 7</u>).

**15.6**    **Patriot Act**.  Each Lender hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address and taxpayer identification number of each Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the Patriot Act.

[Signature pages follow.]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

<u>**BORROWERS**</u>**:**

**ZOHAR LITIGATION TRUST-A**

By: _____
Name:  David Dunn
Title:    Litigation Trustee

**ZOHAR LITIGATION TRUST-B**

By: _____
Name:  David Dunn
Title:    Litigation Trustee

**PHOENIX III RECOVERY, LLC**

By: _____
Name:  David Dunn
Title:    Asset Recovery Manager

**GUARANTOR:**

**NEW STILA HOLDCO LLC**

By: _____
Name:  John Greene
Title:   Authorized Person

[Signature Page to Amended and Restated Loan Agreement]

**ADMINISTRATIVE AGENT AND
COLLATERAL AGENT:**

**ACQUIOM AGENCY SERVICES LLC, as
Administrative Agent and Collateral Agent**


By: _____
Name:
Title:

**<u>LENDERS</u>:**

**JMB CAPITAL PARTNERS LENDING, LLC**

By: _____
Name:
Title:

**BARDIN HILL EVENT-DRIVEN MASTER FUND LP**

**By: Bardin Hill Investment Partners**

By: _____
Name:
Title:

By: _____
Name:
Title:

**HCN LP**

**By: Bardin Hill Investment Partners**

By: _____
Name:
Title:

By: _____
Name:
Title:

[Signature Page to Amended and Restated Loan Agreement]

[Signature Page to Amended and Restated Loan Agreement]