# **<u>EXHIBIT 1</u>**

[EXECUTION COUNTERPART]

## ZOHAR CDO 2003-1, LIMITED

## ZOHAR CDO 2003-1, CORP.

## ZOHAR CDO 2003-1, LLC

## MBIA INSURANCE CORPORATION,
as Credit Enhancer

## CDC FINANCIAL PRODUCTS INC.,
as Class A-1 Note Agent

## U.S. BANK NATIONAL ASSOCIATION,
as Trustee

### INDENTURE

### Dated as of November 13, 2003

RESPONDENTS'
EXHIBIT

1

AP No. 16462

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP049930
INDEX

- 66 -

## ARTICLE 2

## THE NOTES

Section 2.1.    Forms Generally

(a)    Each Class A Note shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-1, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  Each Class B Note shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-2, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  Each Class C Note shall be issued in the form of a restricted note in definitive, fully registered, certificated form without interest coupons substantially in the form attached as Exhibit A-3, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.  No Person may acquire a Class A Note, Class B Note or Class C Note (or any beneficial interest therein) after the Closing Date except for a Holder who acquires legal and beneficial ownership of such interest upon provision to the Issuer and the Trustee of an applicable Class A Note Certificate, Class B Note Certificate or Class C Note Certificate, as applicable.

(b)    The Co-Issuers in issuing the Notes will obtain "CUSIP" or "private placement" numbers (if then generally in use), and the Trustee will indicate the "CUSIP" or "private placement" numbers (as applicable) of the Notes in notices of redemption and related materials as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and related materials.

Section 2.2.    Authorized Amount; Note Interest Rate; Stated Maturity; Denominations

(a)    The aggregate principal amount of Class A Notes which may be issued under this Indenture may not exceed U.S.$532,000,000, excluding Class A Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Class A Notes pursuant to Section 2.4, 2.5 or 8.5.

(b)    The Notes shall be divided into five Classes (with Class A-3 being divided into two sub-Classes, Class A-3a and Class A-3b) having designations, original principal amounts, original Note Interest Rates and Stated Maturities as follows:

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050002

| Designation | Principal Amount | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A-1 Notes | U.S.$150,000,000[1] | LIBOR + Class A Applicable Margin (or CP Funding Rate) | November 20, 2015 |
| Class A-2 Notes | U.S.$32,000,000[2] | LIBOR + Class A Applicable Margin | November 20, 2015 |
| Class A-3 Notes | | | |
| - Class A-3a Notes | U.S.$297,500,000[3] | LIBOR + Class A Applicable Margin | November 20, 2015 |
| - Class A-3b Notes | U.S.$52,500,000[4] | LIBOR + Class A Applicable Margin | November 20, 2015 |
| Class B Notes | U.S.$150,000,000[5] | N/A[6] | November 20, 2018 |
| Class C Notes | N/A[7] | N/A[8] | November 20, 2018 |

The Class A Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class B Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class C Notes are not subject to a minimum denomination in connection with the initial issuance thereof. After issuance any Note may fail to be in such required minimum denominations or integral multiples due to repayment of principal thereof in accordance with the Priority of Payments or, with respect to the Class A Notes, due to Borrowings with respect thereto. or, with respect to the Class B Notes, due to cancellations thereof pursuant to Section 7.13(b).

(c)(i)    Interest shall accrue on the Outstanding principal amount of the Class A Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Closing Date or the date of any Borrowing and will be payable in arrears on each Payment Date in accordance with the Priority of Payments. Interest on the Class A Notes and interest on Defaulted Interest in respect of the Class A Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(ii)    Class A-1 Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-1 Notes for each day from and including the Closing Date to but excluding the date the Class A-1 Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-1 Commitment Fee Rate. Accrued Class A-1 Commitment Fee not paid on any Payment Date will

---

[1]    Such denomination will evidence only the applicable Class A-1 Commitment.
[2]    Such denomination will evidence only the applicable Class A-2 Commitment.
[3]    Such denomination will evidence only the applicable Class A-3 Commitment.
[4]    Such denomination will evidence only the applicable Class A-3 Commitment.
[5]    The Class B Notes will not be issued for cash.  Additional Class B Notes may be issued.
[6]    The Class B Notes shall not bear interest.
[7]    The Class C Notes will not be issued on the Closing Date, and will be issued after the Closing Date only as provided in Section 7.13(b).
[8]    The Class C Notes shall not bear interest.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050003

accrue interest at a per annum rate equal to LIBOR plus 0.60%, which interest will constitute "Class A-1 Commitment Fee" for purposes of the Priority of Payments. Class A-1 Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

(iii)     Class A-2 Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-2 Notes for each day from and including the Closing Date to but excluding the date the Class A-2 Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-2 Commitment Fee Rate. Accrued Class A-2 Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus 0.60%, which interest will constitute "Class A-2 Commitment Fee" for purposes of the Priority of Payments. Class A-2 Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

(iv)     Class A-3 Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-3 Notes for each day from and including the Closing Date to but excluding the date the Class A-3 Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-3 Commitment Fee Rate. Accrued Class A-3 Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus 0.60%, which interest will constitute "Class A-3 Commitment Fee" for purposes of the Priority of Payments. Class A-3 Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

(v)     The Class B Notes will not bear a stated rate of interest.

(vi)     The Class C Notes will not bear a stated rate of interest.

(d)     The Notes shall be redeemable as provided in Articles 9 and 12.

(e)     The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

Section 2.3.     Execution, Authentication, Delivery and Dating

(a)     The Class A Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers, and the Class B Notes and (subject to Section 7.13(b)) Class C Notes shall be executed on behalf of the Issuer by an Authorized Officer thereof. The signatures of any such Authorized Officer on the Notes may be manual or facsimile (including in counterparts).

(b)     Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)     At any time and from time to time after the execution and delivery of this Indenture, the applicable Co-Issuers may deliver Notes executed by the applicable Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)     Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050004
ON BEHALF OF PATRIARCH PARTNERS LLC

The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.6.    Payment of Interest, Principal and Commitment Fees; Rights Preserved

(a)    Each Class of Class A Notes shall accrue interest during each Interest Period applicable to such Class at the applicable Note Interest Rate specified in Section 2.2.  Interest on each such Class of Notes shall be due and payable on each Payment Date immediately following the related Interest Period; provided that payments of interest on all Notes are subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

The Class A-1 Notes shall accrue the Class A-1 Commitment Fee during each Interest Period to the extent specified in Section 2.2(c).  The accrued Class A-1 Commitment Fee shall be due and payable on each Payment Date; provided that payment of Class A-1 Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.  The Class A-2 Notes shall accrue Class A-2 Commitment Fee during each Interest Period to the extent specified in Section 2.2(c).  The accrued Class A-2 Commitment Fee shall be due and payable on each Payment Date; provided that payment of Class A-2 Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.  The Class A-3 Notes shall accrue Class A-3 Commitment Fee during each Interest Period to the extent specified in Section 2.2(c).  The accrued Class A-3 Commitment Fee shall be due and payable on each Payment Date; provided that payment of the Class A-3 Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

Subject to the next succeeding paragraph of this Section 2.6(a), interest will cease to accrue on each Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments.  To the extent lawful and enforceable, for so long as the Class A Notes are outstanding, interest shall accrue on any Defaulted Interest on any Class A Note at the applicable Note Interest Rate until paid as provided herein.

So long as any Class A Notes are Outstanding (or until all Class A-1 Commitments, all Class A-2 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero), any Class A Additional Interest, Class A-1 Additional Amounts and Additional Class A-3 Adjusted Amounts due in respect of the Class A Notes that is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date shall not be considered "due and payable" for the purposes of Section 5.1 until the Payment Date on which such Class A Additional Interest, Class A-1 Additional Amounts or Additional Class A-3 Adjusted Amounts, as applicable, are available to be paid in accordance with the Priority of Payments.

(b)    The principal of each Class of Notes shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by operation of the Priority of Payments, by declaration of acceleration, by redemption or otherwise; provided that (1) so long as any Class A Notes are Outstanding or until all Class A-1 Commitments, all Class A-2 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class B Notes (A) may only occur after principal of the Class A Notes has been paid in full (without giving effect to the payment of any Insured Payments paid with proceeds from the Credit Enhancement) and all Class A-1 Commitments, all Class A-2 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                                          PP050010
ON BEHALF OF PATRIARCH PARTNERS LLC

payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class A-1 Commitment Fee, the Class A-2 Commitment Fee and the Class A-3 Commitment Fee, any Credit Enhancement Premium, any Credit Enhancement Liabilities, any Class A-1 Additional Amounts and other amounts due in accordance with the Priority of Payments and (2) so long as any Class A Notes or Class B Notes are Outstanding or until all Class A-1 Commitments, all Class A-2 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class C Notes (A) may only occur after principal of the Class A Notes has been paid in full (without giving effect to the payment of any Insured Payments paid with proceeds from the Credit Enhancement) and all Class A-1 Commitments, all Class A-2 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero and principal of the Class B Notes has been paid in full and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class A-1 Commitment Fee, the Class A-2 Commitment Fee and the Class A-3 Commitment Fee, any Credit Enhancement Premium, any Credit Enhancement Liabilities, any Class A-1 Additional Amounts, the principal of the Class B Notes and other amounts due in accordance with the Priority of Payments. Any payment of principal of the Class B Notes and Class C Notes that is not paid, in accordance with the Priority of Payments, on any Payment Date shall not be considered "due and payable" for purposes of Section 5.1(b) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments.

(c)     So long as the Class A Coverage Tests are met, principal shall not be payable on any Class of Notes prior to the end of the Reinvestment Period except upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5. If any of the Class A Coverage Tests is not satisfied, or after the Reinvestment Period, principal shall not be payable on any Class of Notes except (i) upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5 and (ii) on each Payment Date from Principal Proceeds, Interest Proceeds and amounts on deposit in the Cash Collateral Account in accordance with the Priority of Payments.

(d)     As a condition to the payment of any principal of or interest on any Note, any Class A-1 Commitment Fee, any Class A-2 Commitment Fee, any Class A-3 Commitment Fee or any Class A-1 Additional Amounts, as applicable, without the imposition of withholding tax, any Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee, the Credit Enhancer and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)     Payments in respect of principal of and interest on the Notes and in respect of any Class A-1 Commitment Fee, any Class A-2 Commitment Fee, any Class A-3 Commitment Fee or any Class A-1 Additional Amounts, as applicable, shall be payable by wire transfer in immediately available funds to a Dollar account maintained by the Noteholders in accordance with written wire transfer instructions received by any Paying Agent on or before the Record Date or, if no such wire transfer instructions are received by a Paying Agent, by a Dollar-denominated check drawn on a bank in the U.S.

(f)     The principal of and interest on any Note, any Class A-1 Commitment Fee, any Class A-2 Commitment Fee, any Class A-3 Commitment Fee and any Class A-1 Additional Amounts, as applicable, that are payable in accordance with the Priority of Payments on such Payment Date and are punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the Record Date for such payment. All such payments that are mailed or wired and returned to the Paying

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050011

Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2.

Except as otherwise expressly provided herein with respect to the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, payments to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the Note Register in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(g)   Payment of any Defaulted Interest in respect of the Class A Notes may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(h)   All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)   Notwithstanding anything contained herein to the contrary, the obligations of each Co-Issuer under the Notes and this Indenture and under each other Transaction Document to which it is a party are limited recourse obligations of the Co-Issuers payable solely from the Collateral and, in the case of Insured Payments with respect to the Class A-1 Notes and Class A-2 Notes, the Credit Enhancement, and following realization of the Collateral, any claims of the Noteholders, the Credit Enhancer, the Collateral Manager, the Administrator, the Collateral Administrator, the Placement Agent and each other counterparty to any Zohar Obligor under the Transaction Documents (subject to the terms of the Issuer Charter) shall be extinguished.  No recourse shall be had for the payment of any amount owing under or in respect of the Notes or any other Transaction Document against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns.  It is understood that the foregoing provisions of this Section 2.6(i) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral, (ii) limit the rights of the Trustee, the Credit Enhancer and the Holders of the Notes or the obligations of the Credit Enhancer under the Credit Enhancement or (iii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished.  It is further understood that the foregoing provisions of this Section 2.6(i) shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

(j)   Subject to the foregoing provisions of this Section 2.6 and the provisions of Sections 2.4 and 2.5, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest, Class A-1 Commitment Fees (if applicable), Class A-2 Commitment Fees (if applicable), Class A-3 Commitment Fee (if applicable), Class A-1 Additional Amounts (if applicable) and principal that were carried by such other Note.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                    PP050012
ON BEHALF OF PATRIARCH PARTNERS LLC

Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture (and shall upon receipt thereof provide a copy to the Controlling Party). In determining whether the Holders of the requisite Aggregate Outstanding Amount of the Class A Notes, the Class B Notes or the Class C Notes have given any direction or notice, any Holder of a Class of Notes who is also a Holder of another Class of Notes or any Affiliate of any such Holder shall be counted as a Holder of each such Note for all purposes.

Section 5.6.    Trustee May Enforce Claims Without Possession of Notes

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7.

Section 5.7    Application of Money Collected

Any Money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any Money that may upon such collection then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied subject to Section 13.1 and in accordance with the provisions of Sections 11.1 and 11.2, at the date or dates fixed by the Trustee.

Section 5.8.    Limitation on Suits

Subject to the proviso in Section 5.4(a), no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given to the Trustee written notice of an Event of Default and such Holder has obtained the prior consent of the Controlling Party to the institution of such proceeding;

(b)    except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of the then most senior Class of Notes shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(c)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(d)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Controlling Party;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC
NY3:#7320267

PP050035

If the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more Persons that could constitute the Controlling Party, each singly not constituting the Controlling Party, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.9.   Unconditional Rights of Noteholders to Receive Principal, Interest, Class A-1 Commitment Fee, Class A-2 Commitment Fee, Class A-3 Commitment Fee and Certain Other Amounts

(a)   Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i) and the Priority of Payments), the Holder of any Class A Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Class A Note, Class A-1 Commitment Fee, Class A-2 Commitment Fee or Class A-3 Commitment Fee, as applicable, Class A-1 Additional Amounts, as applicable, Class A Additional Interest, as applicable, and Additional Class A-3 Adjusted Amounts, as applicable, as such principal, interest, Class A-1 Commitment Fee, Class A-2 Commitment Fee, Class A-3 Commitment Fee, Class A-1 Additional Amounts, Class A Additional Interest and Additional Class A-3 Adjusted Amounts become due and payable in accordance with the Priority of Payments and, subject to the provisions of Section 5.8, to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.  Holders of Class A-1 Notes shall have no right to institute proceedings for the enforcement of any such payment of amounts constituting Class A-1 Additional Amounts (other than Senior Class A-1 Additional Amounts) until such time as no Class A Notes remain Outstanding (other than with respect to such Class A-1 Additional Amounts or Class A Additional Interest) and all Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero and the Credit Enhancement Premium and the Credit Enhancement Liabilities have been irrevocably paid in full, which right to institute proceedings shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder and the Credit Enhancer (so long as no Credit Enhancement Event has occurred and is continuing).

(b)   Notwithstanding any other provision in this Indenture (but subject to Sections 2.6(i) and 7.13(b)), the Holder of any Class B Note shall have the right, which is absolute and unconditional, to receive payment of the principal of such Class B Note as such principal becomes due and payable in accordance with Section 13.1 and the Priority of Payments. Holders of Class B Notes shall have no right to institute proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding and the Credit Enhancer has been irrevocably paid in full all outstanding Credit Enhancement Liabilities and Credit Enhancement Premium (and all Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments shall have expired, terminated or been reduced to zero), which right to institute proceedings shall be subject to the provisions of Section 5.8 and this Section 5.9, and shall not be impaired without the consent of any such Holder.

(c)   Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i)), the Holder of any Class C Note shall have the right, which is absolute and unconditional, to receive payment of the principal of such Class C Note as such principal becomes due and payable in accordance with Section 13.1 and the Priority of Payments. Holders of Class C Notes shall have no right to institute proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding and the Credit Enhancer has been irrevocably paid in full all outstanding Credit Enhancement Liabilities and Credit Enhancement Premium (and all Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments shall have expired, terminated or been reduced to zero) and no Class B Note remains Outstanding, which right to institute proceedings shall be subject to the provisions of Section 5.8 and this Section 5.9, and shall not be impaired without the consent of any such Holder.

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

NY3:#7320267

PP050036

(I)      after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of outstanding principal of the Class B Notes until the principal of the Class B Notes has been paid in full; and

(J)      after the Reinvestment Period, any remaining Principal Proceeds (other than the Excluded Property) to the Cash Collateral Account.

(b)      Except as otherwise expressly provided in Section 11.1(a), if on any Payment Date, the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by any alphabetized paragraph of the Priority of Payments specified therein to different Persons, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

(c)      Notwithstanding the foregoing provisions of Section 11.1(a)(i), on the Initial Payment Date the amount that shall be disbursed by the Trustee pursuant to subclauses (B), (C) and (D) of Section 11.1(a)(i) (to the extent funds are available therefor) shall be adjusted to reflect the different number of days in the initial Due Period (as compared to the number of days in subsequent Due Periods).

(d)      Notwithstanding the foregoing provisions of Section 11.1(a), the amounts distributed to the Holders of the Class A-3 Notes will be paid to such Holders from the Class A-3 Proceeds Account pursuant to Section 11.7 to the extent of available funds therein.

Section 11.2.      Disbursements of Monies from Cash Collateral Account

(a)      Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Section 13.1, on each Payment Date, the Trustee shall disburse amounts on deposit in the Cash Collateral Account (immediately after application of Interest Proceeds and Principal Proceeds on such Payment Date in accordance with the priority of payments specified in Section 11.1) as follows and for application by the Trustee in accordance with the following order of priority:

(i)      prior to the date on which amounts on deposit in the Cash Reserve Account are transferred to the Cash Collateral Account for application as described in the last sentence of Section 10.7(c), if the balance in the Cash Reserve Account is less than the Required Reserve Amount, to deposit into the Cash Reserve Account an amount as shall cause the balance therein to equal the Required Reserve Amount, provided that the amount so deposited on any Payment Date shall not exceed U.S.$500,000;

(ii)      to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the applications on such Payment Date provided for in Section 11.1(a);

(iii)      if the Class A Coverage Tests are satisfied as of the related Determination Date, no Rating Confirmation Failure with respect to the Class A Notes has occurred and is continuing and no Event of Default has occurred and is continuing, to a deposit in the Preference Share Distribution Account, provided that (1) the aggregate amount deposited in the Preference Share Distribution Account pursuant to this clause (iii) on all Payment Dates from the Closing Date through and including such Payment Date shall not exceed an amount equal to U.S.$3,750,000

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                                        PP050118
ON BEHALF OF PATRIARCH PARTNERS LLC

multiplied by (x) the number of such Payment Dates (including such Payment Date) plus (y) two; and (2) the aggregate amount deposited in the Preference Share Distribution Account for all Payment Dates pursuant to this clause (iii) shall not in any event exceed U.S.$30,000,000;

(iiiA)   if such Payment Date is after the Rate Adjustment Date and the Class A Coverage Tests are satisfied as of the related Determination Date, pro rata to the payment in full of (x) all accrued and unpaid Additional Class A-3 Adjusted Amounts and (y) all accrued and unpaid Additional Premium Adjusted Amounts;

(iv)   if the Class A Coverage Tests are satisfied as of the related Determination Date and no Event of Default has occurred and is continuing, pro rata to (a) the Subordinated Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date; and (b) the Arranger Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Arranger Fee owed on any prior Payment Date;

(v)   during the Reinvestment Period, to a deposit to the Issuer Principal Collection Account in the amount (if any) specified by the Collateral Manager (for application to acquire Collateral Debt Obligations in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein and invested in Eligible Investments in accordance with the terms of this Indenture or, at the discretion of the Collateral Manager, to repay principal of the Class A-1 Notes on such Payment Date); and, to the extent not so specified, to be retained in the Cash Collateral Account for application on subsequent Payment Dates;

(vi)   after the Reinvestment Period, an amount equal to the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes will be applied as follows:

(1) an amount equal to the Class A-1 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2) an amount equal to the Class A-2 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3) an amount equal to the Class A-3 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (vi) is less than the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(vii)   after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of the Minimum Total Credit

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050119

Enhancement Premium Amount to the Credit Enhancer, but only to the extent not previously paid in full after the applications on or prior to such Payment Date pursuant to the Priority of Payments;

(viii)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, first to the payment of principal of the Class B Notes until the principal of each such Note has been paid in full and then to the payment of principal of the Class C Notes until the principal of each such Note has been paid in full;

(ix)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero and the principal of the Class B Notes and Class C Notes has been paid in full, first to the payment of any amounts payable to the Credit Enhancer with respect to Credit Enhancement Liabilities that were not paid under Section 11.1(a) as a result of the limitations on the amounts set forth therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii)); and second to the payment of the amounts referred to in paragraphs (J) through (L) of Section 11(a)(i), in the same order of priority but without regard to any Dollar limitation specified therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii));

(x)    after the Reinvestment Period, if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Closing Date, to the payment of such amounts (inclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party and any other amount owing in respect of such Hedge Agreement and not paid under Section 11.1(a)(i)(E)); and

(xi)    after the Reinvestment Period, on the earliest of (A) the Stated Maturity of the Class C Notes, (B) the Payment Date on or after the first date on which substantially all of the Issuer's assets have been sold or otherwise disposed of (so long as the principal of and interest on the Class A Notes, the principal of the Class B Notes and the principal of the Class C Notes has been paid in full on such date) and (C) any date specified by the Collateral Manager if the Class A Notes and all interest thereon has been paid in full, the Class A-1 Commitments, Class A-2 Commitments and Class A-3 Commitments have expired, terminated or been reduced to zero, the Class B Notes have been paid in full and the Class C Notes have been paid in full, the remainder (other than the Excluded Property) to a deposit to the Preference Share Distribution Account.

(b)    Except as otherwise expressly provided in Section 11.2(a), if on any Payment Date, the amount available in the Cash Collateral Account is insufficient to make the full amount of the disbursements required by any numeric paragraph of the Priority of Payments specified therein to different Persons, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050120

Section 12.3.    Conditions Applicable to all Transactions Involving Sale or Grant

(a)    Any transaction effected under this Article or under Section 10.14 shall be conducted on an arm's-length basis for fair market value and in accordance with the requirements of the Management Agreement and applicable law, and, if effected with the Collateral Manager, the Issuer, the Zohar Subsidiary, or the Trustee, or any Affiliate of any of the foregoing shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so Affiliated; provided that if any disposition of a Collateral Debt Obligation is made to an Affiliate of the Issuer or the Zohar Subsidiary or to the Collateral Manager or any of their Affiliates, then such disposition shall be made only with the prior written approval of (A) the Preference Share Paying Agent (acting at the direction of the Majority of the Preference Shares) and (B) the Controlling Party and (z) for a price not less than (aa) the average of the bona fide bids for such Collateral Debt Obligation obtained by the Collateral Manager at the time of such disposition from any two Independent qualified dealers chosen by the Collateral Manager or (bb) if two such bids are not able to be obtained, an amount equal to the greater of (I) the fair market value thereof as determined by the Collateral Manager and (II) (a) the original Purchase Price paid by the Issuer or the Zohar Subsidiary therefor, plus (b) any additional advances made by the Issuer or the Zohar Subsidiary in respect thereof, minus (c) any repayments of principal received by the Issuer or the Zohar Subsidiary with respect thereto.

The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

(b)    Upon any Grant pursuant to this Article, all of the Issuer's or the Zohar Subsidiary's right, title and interest to the applicable Pledged Obligation or Securities shall be Granted to the Trustee pursuant to this Indenture and, if applicable, the Trustee shall receive such Pledged Obligation or Securities. The Trustee shall also receive, not later than the date of delivery of any Collateral Debt Obligation delivered after the Closing Date, (i) an Officer's certificate of the Collateral Manager certifying that, as of the date of such Grant, such Grant complies with the applicable conditions of and is permitted by this Article, including, without limitation, the Eligibility Criteria, and (ii) an Officer's certificate of the Issuer containing the statements set forth in Section 3.2(b).

(c)    Notwithstanding anything contained in this Article to the contrary, the Issuer and the Zohar Subsidiary shall have the right to effect any transaction which has been consented to by Holders of Notes evidencing 100% of the Aggregate Outstanding Amount of each Class of Notes and (so long as no Credit Enhancement Event has occurred and is continuing) the Credit Enhancer and of which each Rating Agency has been notified.

## ARTICLE 13

## NOTEHOLDERS' RELATIONS

Section 13.1.    Subordination

(a)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A Notes and the Credit Enhancer that the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A Notes, all Credit Enhancement Liabilities, all Supplemental Credit Enhancement Liabilities, all Credit Enhancement Premium and all Supplemental Credit Enhancement Premium (the

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050133

"Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A Notes shall be paid in full in Cash or, to the extent a Majority of the Class A Notes consents, other than in Cash (without giving effect to the Credit Enhancement), before any further payment or distribution is made on account of the Subordinate Interests. The Holders of Class B Notes, the Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A Notes and the Credit Enhancer, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class B Notes or the Class C Notes, as applicable, or hereunder in respect of any such Class of Notes until the payment in full of the Class A Notes and all Credit Enhancement Liabilities and Credit Enhancement Premium and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(b)  Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash or, to the extent a Majority of the Class B Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class C Notes or hereunder in respect of any such Class of Notes until the payment in full of the Class B Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(c)  In the event that notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until the applicable Senior Interests shall have been paid in full in Cash or (with regard to clause (a) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class A Notes or the Credit Enhancer, as the case may be, consents, other than in Cash (without giving effect to the Credit Enhancement) or (with regard to clause (b) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class B Notes consents, other than in Cash) in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the holders of the applicable Senior Interests in accordance with this Indenture; provided that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including, without limitation, this Section 13.1.

(d)  Each Holder of Subordinate Interests agrees with the holders of the applicable Senior Interests that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including, without limitation, this Section 13.1; provided that (i) after the Class A Notes and all Credit Enhancement Liabilities and all Credit Enhancement Premium have been paid in full, the Holders

of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A Notes and (ii) after the Class B Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class B Notes. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

Section 13.2.    Standard of Conduct

(a)      In exercising any of the Credit Enhancer's or (without duplication) the Controlling Party's voting rights, rights to direct and consent or any other rights as a Secured Party, as the Credit Enhancer or as the Controlling Party under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 and so long as no Credit Enhancement Event has occurred, the Credit Enhancer shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

(b)      In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

Section 13.3.    Controlling Party

No party dealing with the Controlling Party in connection with the exercise by the Controlling Party of its rights hereunder shall have any obligation to determine the right, power and authority of the Controlling Party to exercise such rights or the compliance of such exercise with the provisions hereof, and each and every such party may conclusively rely on the existence of such right, power, authority and compliance.

Section 13.4.    Non-Petition

The Holders of Notes agree not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Holders of Class A Notes  (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency proceeding filed or commenced against such Zohar Obligor by a Person other than the Holders of Class A Notes, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                            PP050135

**IN WITNESS WHEREOF**, we have set our hands as of the 13th day of November, 2003.

ZOHAR CDO 2003-1, LIMITED,
as Issuer

By: _____

Name: **Chris Watler**

Title: Director

Indenture

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050161

ZOHAR CDO 2003-1, CORP.,
  as Co-Issuer

By: _____

Name:   **Donald J. Puglisi**

Title:   **President**

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

**PP050162**

ZOHAR CDO 2003-1, LLC,
    as Zohar Subsidiary

By:  ZOHAR CDO 2003-1, LIMITED
    as Managing Member

By:_____

Name:  **Chris Watler**

Title:  Director

Indenture

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**                    **PP050163**

MBIA INSURANCE CORPORATION,
as Credit Enhancer

By: _____

Name:   Adam M. Carta
Title:    Assistant Secretary

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050164

CDC FINANCIAL PRODUCTS INC.

as Class A-1 Note Agent

By: _____

Name:

Title: Ralph J. Inglese

Managing Director

By: _____

Name:

Title:

Kathy Lynch

Director

NY3:#7320267
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050165

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
Name:
Title:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050166

# EXHIBIT 2

EXECUTION COPY

## INDENTURE

among

### ZOHAR II 2005-1, LIMITED

### ZOHAR II 2005-1, CORP.

### ZOHAR II 2005-1, LLC

### MBIA INSURANCE CORPORATION,
as Credit Enhancer

### IXIS FINANCIAL PRODUCTS INC.,
as Class A-1 Note Agent and Class A-3 Note Agent

and

### LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

### Dated as of January 12, 2005

RESPONDENTS'
EXHIBIT

**8**

AP No. 16462

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050259

**INDEX**

Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

Section 2.2.  Authorized Amount; Note Interest Rate; Stated Maturity; Denominations

(a)  The aggregate principal amount of Class A Notes which may be issued under this Indenture may not exceed U.S.$1,000,000,000, excluding Class A Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Class A Notes pursuant to Section 2.4, 2.5 or 8.5.

(b)  The Notes shall be divided into five Classes having designations, original principal amounts, original Note Interest Rates and Stated Maturities as follows:

| Designation | Principal Amount | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A-1 Notes | U.S.$250,000,000 | LIBOR + Class A Applicable Margin (or CP Funding Rate) | January 20, 2017 |
| Class A-2 Notes | U.S.$550,000,000 | LIBOR + Class A Applicable Margin | January 20, 2017 |
| Class A-3 Notes | U.S.$200,000,000 | LIBOR + Class A Applicable Margin | January 20, 2017 |
| Class B Notes | U.S.$200,000,000 | N/A | January 20, 2020 |
| Class C Notes | N/A | N/A | January 20, 2020 |

The Class A Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class B Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class C Notes are not subject to a minimum denomination in connection with the initial issuance thereof. After issuance any Note may fail to be in such required minimum denominations or integral multiples due to repayment of principal thereof in accordance with the Priority of Payments or, with respect to the Class A Notes, due to Borrowings with respect thereto or, with respect to the Class B Notes, due to reductions of the Outstanding face amount thereof pursuant to Section 7.13(b).

(c)(i)  Interest shall accrue on the Outstanding principal amount of the Class A Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date or the date of any Borrowing and will be payable in arrears on each Payment Date in accordance with the Priority of Payments. Interest on the Class A Notes and interest on Defaulted Interest in respect of the Class A Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(ii)  Class A-1 Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-1 Notes for each day from and including the Funding Date to but excluding the date the Class A-1 Commitments terminate, expire or are reduced to zero,

73

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 80 of 447

at a rate per annum equal to the Class A-1 Commitment Fee Rate. Accrued Class A-1 Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus 0.50%, which interest will constitute "Class A-1 Commitment Fee" for purposes of the Priority of Payments. Class A-1 Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

      (iii)    [reserved]

      (iv)    Class A-3 Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-3 Notes for each day from and including the Funding Date to but excluding the date the Class A-3 Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-3 Commitment Fee Rate. Accrued Class A-3 Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus 0.50%, which interest will constitute "Class A-3 Commitment Fee" for purposes of the Priority of Payments. Class A-3 Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

      (v)    The Class B Notes will not bear a stated rate of interest.

      (vi)    The Class C Notes will not bear a stated rate of interest.

    (d)    The Notes shall be redeemable as provided in Articles 9 and 12.

    (e)    The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

      Section 2.3.    Execution, Authentication, Delivery and Dating

    (a)    The Class A Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers, and the Class B Notes and (subject to Section 7.13(b)) Class C Notes shall be executed on behalf of the Issuer by an Authorized Officer thereof. The signatures of any such Authorized Officer on the Notes may be manual or facsimile (including in counterparts).

    (b)    Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

    (c)    At any time and from time to time after the execution and delivery of this Indenture, the applicable Co-Issuers may deliver Notes executed by the applicable Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

    (d)    Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Funding Date shall be dated as of the Funding Date. All other Notes that are authenticated after the Funding Date for any other purpose under this Indenture shall be dated the date of their authentication.

74

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050339

Issuers and such new Note shall be entitled, subject to the second paragraph of this Section 2.5, to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same class duly issued hereunder.

The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.6.    Payment of Interest, Principal and Commitment Fees; Rights Preserved

(a)    Each Class of Class A Notes shall accrue interest during each Interest Period applicable to such Class at the applicable Note Interest Rate specified in Section 2.2. Interest on each such Class of Notes shall be due and payable on each Payment Date immediately following the related Interest Period; provided that payments of interest on all Notes are subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

The Class A-1 Notes shall accrue the Class A-1 Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-1 Commitment Fee shall be due and payable on each Payment Date; provided that payment of Class A-1 Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments. The Class A-3 Notes shall accrue the Class A-3 Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-3 Commitment Fee shall be due and payable on each Payment Date; provided that payment of the Class A-3 Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

Subject to the next succeeding paragraph of this Section 2.6(a), interest will cease to accrue on each Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments. To the extent lawful and enforceable, for so long as the Class A Notes are outstanding, interest shall accrue on any Defaulted Interest on any Class A Note at the applicable Note Interest Rate until paid as provided herein.

So long as any Class A Notes are Outstanding (or until all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero), any Class A Additional Interest and Class A-1 Additional Amounts due in respect of the Class A Notes that is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date shall not be considered "due and payable" for the purposes of Section 5.1 until the Payment Date on which such Class A Additional Interest or Class A-1 Additional Amounts, as applicable, are available to be paid in accordance with the Priority of Payments.

(b)    The principal of each Class of Notes shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by operation of the Priority of Payments, by declaration of acceleration, by redemption or otherwise; provided that (1) so long as any Class A Notes are Outstanding or until all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class B Notes (A) may only occur after principal of the Class A Notes has been paid in full (without giving effect to the payment of any Insured Payments paid with proceeds from the Credit Enhancement) and all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on

85

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050350

Respondents' Exhibit 8   pg. 92 of 447

the Class A Notes, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, any Credit Enhancement Premium, any Credit Enhancement Liabilities, any Class A-1 Additional Amounts and other amounts due in accordance with the Priority of Payments and (2) so long as any Class A Notes or Class B Notes are Outstanding or until all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class C Notes (A) may only occur after principal of the Class A Notes has been paid in full (without giving effect to the payment of any Insured Payments paid with proceeds from the Credit Enhancement) and all Class A-1 Commitments and all Class A-3 Commitments shall have expired, terminated or been reduced to zero and principal of the Class B Notes has been paid in full and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class A-1 Commitment Fee, the Class A-3 Commitment Fee, any Credit Enhancement Premium, any Credit Enhancement Liabilities, any Class A-1 Additional Amounts, the principal of the Class B Notes and other amounts due in accordance with the Priority of Payments.  Any payment of principal of the Class B Notes and Class C Notes that is not paid, in accordance with the Priority of Payments, on any Payment Date shall not be considered "due and payable" for purposes of Section 5.1(b) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments.

(c)    So long as the Class A Coverage Tests are met, principal shall not be payable on any Class of Notes prior to the end of the Reinvestment Period except upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5.  If any of the Class A Coverage Tests is not satisfied, or after the Reinvestment Period, principal shall not be payable on any Class of Notes except (i) upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5 and (ii) on each Payment Date from Principal Proceeds, Interest Proceeds and amounts on deposit in the Cash Collateral Account in accordance with the Priority of Payments.

(d)    As a condition to the payment of any principal of or interest on any Note, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee or any Class A-1 Additional Amounts, as applicable, without the imposition of withholding tax, any Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee, the Credit Enhancer and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)    Payments in respect of principal of and interest on the Notes and in respect of any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts and any Class A Redemption Break Funding Costs, as applicable, shall be payable by wire transfer in immediately available funds to a Dollar account maintained by the Noteholders in accordance with written wire transfer instructions received by any Paying Agent on or before the Record Date or, if no such wire transfer instructions are received by a Paying Agent, by a Dollar-denominated check drawn on a bank in the U.S.

(f)    The principal of and interest on any Note, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts and any Class A Redemption Break Funding Costs, as applicable, that are payable in accordance with the Priority of Payments on such Payment Date and are punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the Record Date for such payment.  All such payments that are mailed or wired

86

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8    pg. 93 of 447

and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2.

Except as otherwise expressly provided herein with respect to the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, payments to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the Note Register in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(g)     Payment of any Defaulted Interest in respect of the Class A Notes may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)     Notwithstanding anything contained herein to the contrary, the obligations of each Co-Issuer under the Notes and this Indenture and under each other Transaction Document to which it is a party are limited recourse obligations of the Co-Issuers payable solely from the Collateral and, in the case of Insured Payments with respect to the Class A-1 Notes and Class A-2 Notes, the Credit Enhancement, and following realization of the Collateral, any claims of the Noteholders, the Credit Enhancer, the Collateral Manager, the Administrator, the Collateral Administrator, the Placement Agent and each other counterparty to any Zohar Obligor under the Transaction Documents (subject to the terms of the Issuer Charter) shall be extinguished, and shall not thereafter revive. No recourse shall be had for the payment of any amount owing under or in respect of the Notes or any other Transaction Document against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns. It is understood that the foregoing provisions of this Section 2.6(i) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral, (ii) limit the rights of the Trustee, the Credit Enhancer and the Holders of the Notes or the obligations of the Credit Enhancer under the Credit Enhancement or (iii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this Section 2.6(i) shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

(j)     Subject to the foregoing provisions of this Section 2.6 and the provisions of Sections 2.4 and 2.5, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest, Class A-1 Commitment Fees, Class A-3 Commitment Fees, Class A-1 Additional Amounts and any Class A Redemption Break Funding Costs, if applicable, and principal that were carried by such other Note.

87

NY3-#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Respondents' Exhibit 8   pg. 94 of 447

Section 2.7.    Persons Deemed Owners

The Co-Issuers, the Trustee, the Note Registrar, the Collateral Manager, the Class A-1 Note Agent, the Class A-3 Note Agent, the Controlling Party and any agent of any of them (collectively, the "Relevant Persons") may treat the Person in whose name any Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest, any Class A-1 Commitment Fee, any Class A-3 Commitment Fee, any Class A-1 Additional Amounts, any Class A Redemption Break Funding Costs and, subject to Section 16.1(b), on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary.

Section 2.8.    Cancellation

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to it. Any Notes purchased by either of the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

Section 2.9.    Debt Treatment

The Co-Issuers and each Holder (and each beneficial owner of a Note), by acceptance of its Note (or its interest therein, as the case may be) shall be deemed to have agreed to treat, and shall treat, the Class A Notes as unconditional debt of the Issuer for tax, accounting and financial reporting purposes. The Issuer and the Holders of the Class B and Class C Notes agree to treat such Notes as equity for tax purposes unless, in the case of the Class B Notes, the Trustee has received an Opinion of Counsel that such Class B Notes will be treated as debt for U.S. federal income tax purposes.

Section 2.10.    Issuance of Additional Class B Notes

At the direction of the Credit Enhancer, the Holders of all of the Class B Notes, the Holders of all Class C Notes (if any) and the Holders of all of the Preference Shares, the Issuer shall issue (and, upon Issuer Order, the Trustee shall authenticate) additional Class B Notes ("Additional Class B Notes") to the Collateral Manager or its designees (without payment of any amounts by the Collateral Manager or such designees to the Issuer or any other Zohar Obligor) on one or more Business Days (each, an "Additional Class B Note Issuance Date"); provided that the following conditions are met:

(a)    the party requesting the issuance of such Additional Class B Notes shall have given not less than 10 Business Days' written notice thereof to the Collateral Manager, the Trustee, the Issuer, the Credit Enhancer, each Noteholder, each Holder of Preference Shares and each Rating Agency;

(b)    except for issuance date, the terms of the Additional Class B Notes are identical to the terms of the other Class B Notes then Outstanding;

(c)    no Default or Event of Default shall have occurred and be continuing, and the Class A Coverage Tests shall be satisfied, as of such Additional Class B Note Issuance Date (after giving effect to the issuance of such Additional Class B Notes);

88

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050353

Outstanding Amount of the Class A Notes, the Class B Notes or the Class C Notes have given any direction or notice, any Holder of a Class of Notes who is also a Holder of another Class of Notes or any Affiliate of any such Holder shall be counted as a Holder of each such Note for all purposes.

Section 5.6.    Trustee May Enforce Claims Without Possession of Notes

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.7.

Section 5.7    Application of Money Collected

Any Money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any Money that may upon such collection then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied, subject to Section 13.1 and in accordance with the provisions of Sections 11.1 and 11.2, at the date or dates fixed by the Trustee.

Section 5.8.    Limitation on Suits

Subject to the proviso in Section 5.4(a), no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    either (i) such Holder has previously given to the Trustee written notice of an Event of Default and such Holder has obtained the prior consent of the Controlling Party to the institution of such Proceeding; or (ii) except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of the then most senior Class of Notes shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(b)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(c)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Controlling Party;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more Persons that could constitute the Controlling Party, each singly not constituting the Controlling Party, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

113

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050378

same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11(a)(i);

(I)       after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of outstanding principal of the Class B Notes until the principal of the Class B Notes has been paid in full; and

(J)       after the Reinvestment Period, any remaining Principal Proceeds (other than the Excluded Property) to the Cash Collateral Account.

(b)       Except as otherwise expressly provided in Section 11.1(a), if on any Payment Date, the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by any paragraph of the Priority of Payments specified therein, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

Section 11.2.   Disbursements of Monies from Cash Collateral Account

(a)       Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Section 13.1, on each Payment Date, the Trustee shall disburse amounts on deposit in the Cash Collateral Account (immediately after application of Interest Proceeds and Principal Proceeds on such Payment Date in accordance with the Priority of Payments specified in Section 11.1) as follows and for application by the Trustee in accordance with the following order of priority:

(i)       prior to the date on which amounts on deposit in the Cash Reserve Account are transferred to the Cash Collateral Account for application as described in the last sentence of Section 10.7(c), if the balance in the Cash Reserve Account is less than the Required Reserve Amount, to deposit into the Cash Reserve Account an amount as shall cause the balance therein to equal the Required Reserve Amount, provided that the amount so deposited on any Payment Date shall not exceed U.S.$500,000;

(ii)      to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the applications on such Payment Date provided for in Section 11.1(a);

(iii)     if the Class A Coverage Tests are satisfied as of the related Determination Date, no Rating Confirmation Failure with respect to the Class A Notes has occurred and is continuing and no Event of Default has occurred and is continuing, to a deposit in the Preference Share Distribution Account, provided that (1) the aggregate amount deposited in the Preference Share Distribution Account pursuant to this clause (iii) on all Payment Dates from the Funding Date through and including such Payment Date shall not exceed an amount equal to U.S.$7,500,000 multiplied by (x) the number of such Payment Dates (including such Payment Date) plus (y) one; and (2) the aggregate amount deposited in the Preference Share Distribution Account for all Payment Dates pursuant to this clause (iii) shall not in any event exceed U.S.$60,000,000 and (3) for purposes of calculating the Class A Overcollateralization Ratio Test for this Section 11.2(a)(iii) only, the Principal Balance of a Collateral Debt Obligation shall not include any principal amount representing previously deferred or capitalized interest;

195

NY3:#7347151v22
**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

PP050460

(iv)    if the Class A Coverage Tests are satisfied as of the related Determination Date and no Event of Default has occurred and is continuing and U.S.$60,000,000 has been deposited in the Preference Share Distribution Account pursuant to Section 11.2(a)(iii), pro rata to the Subordinated Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date; provided that for purposes of calculating the Class A Overcollateralization Ratio Test for this Section 11.2(a)(iv) only, the Principal Balance of a Collateral Debt Obligation shall not include any principal amount representing previously deferred or capitalized interest;

(v)    during the Reinvestment Period, to a deposit to the Issuer Principal Collection Account in the amount (if any) specified by the Collateral Manager (for application to acquire Collateral Debt Obligations in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein and invested in Eligible Investments in accordance with the terms of this Indenture or, at the discretion of the Collateral Manager, to repay principal of the Class A-1 Notes on such Payment Date); and, to the extent not so specified, to be retained in the Cash Collateral Account for application on subsequent Payment Dates, provided that if U.S.$60,000,000 has been deposited in the Preference Share Distribution Account pursuant to Section 11.2(a)(iii), then the amount to be retained in the Cash Collateral Account shall be as specified by the Collateral Manager but no more than U.S.$5,000,000;

(vi)    after the Reinvestment Period, an amount equal to the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes will be applied as follows:

(1)    an amount equal to the Class A-1 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1 Notes until the outstanding principal of the Class A-1 Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(2)    an amount equal to the Class A-2 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)    an amount equal to the Class A-3 Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

provided that if the amount of funds available to be distributed under this clause (vi) is less than the Aggregate Outstanding Amount of the Class A Notes plus the Aggregate Undrawn Amount of the Class A-1 Notes, then the funds available will be applied under clauses (1), (2) and (3) above ratably in accordance with the Class A-1 Principal Sharing Percentage, Class A-2 Principal Sharing Percentage and Class A-3 Principal Sharing Percentage, respectively;

(vii)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, to the payment of the Minimum Total Credit Enhancement Premium Amount to the Credit Enhancer, but only to the extent not previously paid in full after the applications on or prior to such Payment Date pursuant to the Priority of Payments;

196

Indenture

(viii)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, first to the payment of principal of the Class B Notes until the principal of each such Note has been paid in full and then to the payment of principal of the Class C Notes until the principal of each such Note has been paid in full;

(ix)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full and the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero and the principal of the Class B Notes and Class C Notes has been paid in full, first to the payment of any amounts payable to the Credit Enhancer with respect to Credit Enhancement Liabilities that were not paid under Section 11.1(a) as a result of the limitations on the amounts set forth therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii)); and second to the payment of the amounts referred to in paragraphs (J) through (L) of Section 11(a)(i), in the same order of priority but without regard to any Dollar limitation specified therein (but only to the extent not previously paid in full after the applications on such Payment Date provided for in Sections 11.1(a)(i) and 11.1(a)(ii));

(x)    after the Reinvestment Period, if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Funding Date, to the payment of such amounts (inclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party and any other amount owing in respect of such Hedge Agreement and not paid under Section 11.1(a)(i)(E)); and

(xi)    after the Reinvestment Period, on the earliest of (A) the Stated Maturity of the Class C Notes, (B) the Payment Date on or after the first date on which substantially all of the Issuer's assets have been sold or otherwise disposed of (so long as the principal of and interest on the Class A Notes, the principal of the Class B Notes and the principal of the Class C Notes has been paid in full on such date) and (C) any date specified by the Collateral Manager if the Class A Notes and all interest thereon has been paid in full, the Class A-1 Commitments and the Class A-3 Commitments have expired, terminated or been reduced to zero, the Class B Notes have been paid in full and the Class C Notes have been paid in full, the remainder (other than the Excluded Property) to a deposit to the Preference Share Distribution Account.

(b)    Except as otherwise expressly provided in Section 11.2(a), if on any Payment Date, the amount available in the Cash Collateral Account is insufficient to make the full amount of the disbursements required by any paragraph of the Priority of Payments specified therein, the Trustee will make the disbursements called for by such paragraph ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

Section 11.3.    [Reserved]

Section 11.4.    Disbursements of Monies from Unfunded Revolver Discount Account

(a)    The Trustee shall apply amounts on deposit in the Unfunded Revolver Discount Account to extend credit in respect of Collateral Debt Obligations that are Revolving Collateral Debt Obligations and Delayed Funding Collateral Debt Obligations to the extent specified in Section 9.7.

(b)    Except as otherwise provided in Section 11.4(c), if on any Determination Date the Balance on deposit in the Unfunded Revolver Discount Account exceeds the sum of the Discount Amounts remaining with respect to the Unutilized Commitments as of such date, then the Collateral

197

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050462

Section 12.3.    Conditions Applicable to all Transactions Involving Sale or Grant

(a)    Any transaction effected under this Article or under
Section 10.14 shall be conducted on an arm's-length basis for fair market value and in accordance with
the requirements of the Management Agreement and applicable law, and, if effected with the Collateral
Manager, the Issuer, the Zohar Subsidiary, or the Trustee, or any Affiliate of any of the foregoing shall be
effected on terms as favorable to the Noteholders as would be the case if such Person were not so
Affiliated; provided that if any disposition of a Collateral Debt Obligation is made to an Affiliate of the
Issuer or the Zohar Subsidiary or to the Collateral Manager or any of their Affiliates, then such
disposition shall be made only (x) with the prior written approval of (A) the Preference Share Paying
Agent (acting at the direction of the Majority of the Preference Shares) and (B) the Controlling Party and
(y) for a price not less than (aa) the average of the bona fide bids for such Collateral Debt Obligation
obtained by the Collateral Manager at the time of such disposition from any two Independent qualified
dealers chosen by the Collateral Manager or (bb) if two such bids are not able to be obtained, an amount
equal to the greater of (I) the fair market value thereof as determined by the Collateral Manager and
(II) (a) the original Purchase Price paid by the Issuer or the Zohar Subsidiary therefor; plus (b) any
additional advances made by the Issuer or the Zohar Subsidiary in respect thereof; minus (c) any
repayments of principal received by the Issuer or the Zohar Subsidiary with respect thereto.
Notwithstanding anything herein to the contrary, the Issuer and/or the Zohar Subsidiary may (solely with
the written consent of the Controlling Party) acquire from the Collateral Manager or any Affiliate of the
Collateral Manager for nominal consideration any equity security issued by an obligor on or an issuer of
any Collateral Debt Obligation (or any Affiliate of such obligor or issuer) then held by the Issuer and/or
the Zohar Subsidiary.

The Trustee shall have no responsibility to oversee compliance with this clause by the
other parties.

(b)    Upon any Grant pursuant to this Article, all of the Issuer's or the Zohar
Subsidiary's right, title and interest to the applicable Pledged Obligation or Securities shall be Granted to
the Trustee pursuant to this Indenture and, if applicable, the Trustee shall receive such Pledged Obligation
or Securities. The Trustee shall also receive, not later than the date of delivery of any Collateral Debt
Obligation delivered after the Funding Date, (i) an Officer's certificate of the Collateral Manager
certifying that, as of the date of such Grant, such Grant complies with the applicable conditions of and is
permitted by this Article, including, without limitation, the Eligibility Criteria, and (ii) an Officer's
certificate of the Issuer containing the statements set forth in Section 3.2(b).

(c)    Notwithstanding anything contained in this Article to the contrary, the Issuer and
the Zohar Subsidiary shall have the right to effect any transaction which has been consented to by the
Controlling Party and of which each Rating Agency has been notified.

## ARTICLE 13

## NOTEHOLDERS' RELATIONS

Section 13.1.    Subordination

(a)    Anything in this Indenture or the Notes to the contrary notwithstanding, the
Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the
Holders of the Class A Notes and the Credit Enhancer that the Class B Notes, the Class C Notes and the
Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and

211

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050476

junior to the Class A Notes, all Credit Enhancement Liabilities and all Credit Enhancement Premium (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A Notes shall be paid in full in Cash or, to the extent a Majority of the Class A Notes consents, other than in Cash (without giving effect to the Credit Enhancement), before any further payment or distribution is made on account of the Subordinate Interests. The Holders of Class B Notes, the Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A Notes and the Credit Enhancer, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class B Notes or the Class C Notes, as applicable, or hereunder in respect of any such Class of Notes until the payment in full of the Class A Notes and all Credit Enhancement Liabilities and Credit Enhancement Premium and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(b)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Sections 11.1 and 11.2 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash or, to the extent a Majority of the Class B Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Class C Notes and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class C Notes or hereunder in respect of any such Class of Notes until the payment in full of the Class B Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(c)    In the event that notwithstanding the provisions of this Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until the applicable Senior Interests shall have been paid in full in Cash or (with regard to clause (a) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class A Notes or the Credit Enhancer, as the case may be, consents, other than in Cash (without giving effect to the Credit Enhancement) or (with regard to clause (b) above) to the extent a Majority of the Aggregate Outstanding Amount of the Class B Notes consents, other than in Cash) in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the holders of the applicable Senior Interests in accordance with this Indenture; provided that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including, without limitation, this Section 13.1.

(d)    Each Holder of Subordinate Interests agrees with the holders of the applicable Senior Interests that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this

212

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

Indenture

PP050477

Indenture including, without limitation, this Section 13.1; provided that (i) after the Class A Notes and all Credit Enhancement Liabilities and all Credit Enhancement Premium have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A Notes and (ii) after the Class B Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class B Notes. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

### Section 13.2.   Standard of Conduct

(a)      In exercising any of the Credit Enhancer's or (without duplication) the Controlling Party's voting rights, rights to direct and consent or any other rights as a Secured Party, as the Credit Enhancer or as the Controlling Party under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 and so long as no Credit Enhancement Event has occurred, the Credit Enhancer shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

(b)      In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Credit Enhancer, the Issuer, or any other Person.

### Section 13.3.   Controlling Party

No party dealing with the Controlling Party in connection with the exercise by the Controlling Party of its rights hereunder shall have any obligation to determine the right, power and authority of the Controlling Party to exercise such rights or the compliance of such exercise with the provisions hereof, and each and every such party may conclusively rely on the existence of such right, power, authority and compliance.

### Section 13.4.   Non-Petition

The Holders of Notes agree not to institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings or other Proceedings under federal or state bankruptcy or similar laws until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture; provided that nothing in this clause shall preclude, or be deemed to stop, the Holders of Class A Notes  (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (a) any case or Proceeding voluntarily filed or commenced by such Zohar Obligor or (b) any involuntary insolvency Proceeding filed or commenced against such Zohar Obligor by a Person other than the Holders of Class A Notes, or (ii) from commencing against any Zohar Obligor or any properties of any Zohar Obligor any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

213

Indenture

NY3:#7347151v22
CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP050478

**IN WITNESS WHEREOF,** we have set our hands as of the ____ day of January, 2005.

> ZOHAR II 2005-1, LIMITED,
> as Issuer
>
> By:_____
> Name: **Chris Watler**
> Title: **Director**
>
> ZOHAR II 2005-1, CORP.,
> as Co-Issuer
>
> By:_____
> Name:
> Title:
>
> ZOHAR II 2005-1, LLC,
> as Zohar Subsidiary
>
> By:_____
> Name: Zohar II 2005-1, LIMITED
> Title: MANAGING MEMBER
>
> MBIA INSURANCE CORPORATION,
> as Credit Enhancer
>
> By:_____
> Name:
> Title:
>
> IXIS FINANCIAL PRODUCTS INC.
> as Class A-1 Note Agent and Class A-3 Note Agent
>
> By:_____
> Name:
> Title:

Indenture

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC**

PP050500

IN WITNESS WHEREOF, we have set our hands as of the ____ day of January, 2005.

ZOHAR II 2005-1, LIMITED,
as Issuer

By:_____
Name:
Title:

ZOHAR II 2005-1, CORP.,
as Co-Issuer

By:_____
Name:    Donald J. Puglisi
Title:       President

ZOHAR II 2005-1, LLC,
as Zohar Subsidiary

By:_____
Name:
Title:

MBIA INSURANCE CORPORATION,
as Credit Enhancer

By:_____
Name:
Title:

IXIS FINANCIAL PRODUCTS INC.
as Class A-1 Note Agent and Class A-3 Note Agent

By:_____
Name:
Title:

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

**IN WITNESS WHEREOF**, we have set our hands as of the ____ day of January, 2005.

> ZOHAR II 2005-1, LIMITED,
> as Issuer
>
> By:_____
>   Name:
>   Title:
>
> ZOHAR II 2005-1, CORP.,
> as Co-Issuer
>
> By:_____
>   Name:
>   Title:
>
> ZOHAR II 2005-1, LLC,
> as Zohar Subsidiary
>
> By:_____
>   Name:
>   Title:
>
> MBIA INSURANCE CORPORATION,
> as Credit Enhancer
>
> By:_____
>   Name: Adam M. Carta
>   Title: Assistant Secretary
>
> IXIS FINANCIAL PRODUCTS INC.
> as Class A-1 Note Agent and Class A-3 Note Agent
>
> By:_____
>   Name:
>   Title:

Indenture

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

PP050502

IN WITNESS WHEREOF, we have set our hands as of the ____ day of January, 2005.

> ZOHAR II 2005-1, LIMITED,
>     as Issuer
>
>
> By:_____
>     Name:
>     Title:
>
>
> ZOHAR II 2005-1, CORP.,
>     as Co-Issuer
>
>
> By:_____
>     Name:
>     Title:
>
>
> ZOHAR II 2005-1, LLC,
>     as Zohar Subsidiary
>
>
> By:_____
>     Name:
>     Title:
>
>
> MBIA INSURANCE CORPORATION,
>     as Credit Enhancer
>
>
> By:_____
>     Name:
>     Title:
>
>
> IXIS FINANCIAL PRODUCTS INC.
>     as Class A-1 Note Agent and Class A-3 Note Agent
>
>
> By:_____
>     Name:
>     Title: Ralph J. Inglese          Christopher Hayden
>            Managing Director         Managing Director

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**

Indenture
PP050503

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

By:
Name:    KOREN SUMSER
Title:    FIRST VICE PRESIDENT

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

# EXHIBIT 3

EXECUTION COPY

# INDENTURE

among

## ZOHAR III, LIMITED

## ZOHAR III, CORP.

## ZOHAR III, LLC

## NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent

and

## LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

**Dated as of April 6, 2007**

NY3:#7377192v32

RESPONDENTS'
EXHIBIT
**12**
AP No. 16462

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001748

and related materials. The Co-Issuers may use different "CUSIP" numbers for different Borrowings made with respect to the Class A-1D Notes. In connection therewith, the Trustee shall, on any Business Day after the earlier of (1) the date on which the Class A-1D Commitments have terminated, expired or been irrevocably reduced to zero and (2) the Payment Date falling in December, 2007, direct DTC to exchange such "CUSIP" numbers for a single "CUSIP" number in respect of the Aggregate Outstanding Amount of the Class A-1D Notes (which single "CUSIP" number may be the "CUSIP" number assigned in respect of the Borrowing made on the Class A-1D Notes on the Funding Date). "CUSIP" numbers for the Rule 144A Global Notes must meet the requirements set forth in Section 7.19(d).

(c)     On or after the Exchange Date, interests in a Temporary Regulation S Global Note shall be exchangeable for interests in permanent Regulation S Global Notes of the same Class in definitive, fully registered form without interest coupons upon certification that the beneficial interests in such Temporary Regulation S Global Note are owned by Persons who are not U.S. Persons. Such global notes shall have the applicable legends set forth in Exhibit A-4 hereto added to the form of such Notes (each, a "Regulation S Global Note"), and shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of Euroclear and Clearstream, duly executed by the Co-Issuers and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Any such Regulation S Global Note shall be so issued and delivered in exchange for only that portion of the Temporary Regulation S Global Note in respect of which there shall have been presented to the Depository by Euroclear or Clearstream a certification to the effect that it has received from or in respect of a Person entitled to an interest (as shown by its records) therein a certification that the beneficial interests in such Temporary Regulation S Global Note are owned by Persons who are not U.S. Persons.

(d)     The aggregate principal amount of the Regulation S Global Notes and Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(e)     This Section 2.1(e) shall apply only to Global Notes deposited with or on behalf of the Depository.

The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Temporary Regulation S Global Notes and the Regulation S Global Notes insofar as interests in such Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depository and the Depository may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Global Note for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Global Note.

Section 2.2.     Authorized Amount; Note Interest Rate; Stated Maturity; Denominations

(a)     The aggregate principal amount of Class A Notes which may be issued under this Indenture may not exceed U.S.$1,016,000,000, excluding Class A Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Class A Notes pursuant to Section 2.4, 2.5 or 8.5.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001822

(b)    The Notes shall be divided into six Classes having designations, original principal amounts, original Note Interest Rates and Stated Maturities as follows:

| Designation | Principal Amount | Note Interest Rate | Note Stated Maturity |
|---|---|---|---|
| Class A-1R Notes | U.S.$200,000,000 | LIBOR + Class A-1R Applicable Margin | April 15, 2019 |
| Class A-1T Notes | U.S.$150,000,000 | LIBOR + Class A-1T Applicable Margin | April 15, 2019 |
| Class A-1D Notes | U.S.$350,000,000 | LIBOR + Class A-1D Applicable Margin | April 15, 2019 |
| Class A-2 Notes | U.S.$200,000,000 | LIBOR + Class A-2 Applicable Margin | April 15, 2019 |
| Class A-3 Notes | U.S.$116,000,000 | LIBOR + Class A-3 Applicable Margin | April 15, 2019 |
| Class B Notes | U.S.$196,000,000 | N/A | April 15, 2019 |
| Class C Notes | N/A | N/A | April 15, 2019 |

The Class A Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class B Notes shall be issuable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S.$50,000 in excess thereof. The Class C Notes are not subject to a minimum denomination in connection with the initial issuance thereof. After issuance any Note may fail to be in such required minimum denominations or integral multiples due to repayment of principal thereof in accordance with the Priority of Payments or, with respect to the Class A-1 Notes, due to Borrowings or Prepayments with respect thereto or in connection with the Class A-1R Final Advance or, with respect to the Class B Notes, due to reductions of the Outstanding face amount thereof pursuant to Section 7.13(b).

(c)(i)    Interest shall accrue on the Outstanding principal amount of the Class A-1 Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date or the date of any Borrowing and will be payable in arrears on each Payment Date in accordance with the Priority of Payments. Interest on the Class A-1 Notes and interest on Defaulted Interest in respect of the Class A-1 Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(ii)    Class A-1R Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-1R Notes for each day from and including the Funding Date to but excluding the date the Class A-1R Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-1R Commitment Fee Rate. Accrued Class A-1R Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus the Class A-1R Applicable Margin, which interest will constitute "Class A-1R Commitment Fee" for purposes of the Priority of Payments. Class A-1R Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001823

(iii)    Class A-1D Commitment Fee shall accrue on the Aggregate Undrawn Amount of the Class A-1D Notes for each day from and including the Funding Date to but excluding the date the Class A-1D Commitments terminate, expire or are reduced to zero, at a rate per annum equal to the Class A-1D Commitment Fee Rate.  Accrued Class A-1D Commitment Fee not paid on any Payment Date will accrue interest at a per annum rate equal to LIBOR plus the Class A-1D Applicable Margin, which interest will constitute "Class A-1D Commitment Fee" for purposes of the Priority of Payments.  Class A-1D Commitment Fee will be calculated on the basis of a 360 day year and the actual number of days elapsed.

(iv)    Interest shall accrue on the Outstanding principal amount of the Class A-2 Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date and will be payable in arrears on each Payment Date in accordance with the Priority of Payments.  Interest on the Class A-2 Notes and interest in respect of Defaulted Interest of the Class A-2 Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(v)    Interest shall accrue on the Outstanding principal amount of the Class A-3 Notes (determined as of the first day of each Interest Period relating thereto and after giving effect to any payment of principal occurring on such day) from the Funding Date and will be payable in arrears on each Payment Date in accordance with the Priority of Payments.  Interest on the Class A-3 Notes and interest on Defaulted Interest in respect of the Class A-3 Notes will be computed on the basis of a 360 day year and the actual number of days elapsed.

(vi)    The Class B Notes will not bear a stated rate of interest.

(vii)    The Class C Notes will not bear a stated rate of interest.

(d)    The Notes shall be redeemable as provided in Articles 9 and 12.

(e)    The Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes as evidenced by their execution of such Notes.

Section 2.3.    Execution, Authentication, Delivery and Dating

(a)    The Class A Notes shall be executed on behalf of the Co-Issuers by an Authorized Officer of each of the Co-Issuers, and the Class B Notes and (subject to Section 7.13(b)) Class C Notes shall be executed on behalf of the Issuer by an Authorized Officer thereof.  The signatures of any such Authorized Officer on the Notes may be manual or facsimile (including in counterparts).

(b)    Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of either of the Co-Issuers shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the applicable Co-Issuers may deliver Notes executed by the applicable Co-Issuers to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                            PP001824

benefits of this Indenture equally and proportionately with any and all other Notes of the same class duly issued hereunder.

The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Notes.

Section 2.6.    Payment of Interest, Principal and Commitment Fees; Rights Preserved

(a)    Each Class of Class A Notes shall accrue interest during each Interest Period applicable to such Class at the applicable Note Interest Rate specified in Section 2.2. Interest on each such Class of Notes shall be due and payable on each Payment Date immediately following the related Interest Period; provided that payments of interest on all Notes are subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

The Class A-1R Notes shall accrue the Class A-1R Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-1R Commitment Fee shall be due and payable on each Payment Date; provided that payment of Class A-1R Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments. The Class A-1D Notes shall accrue the Class A-1D Commitment Fee during each Interest Period to the extent specified in Section 2.2(c). The accrued Class A-1D Commitment Fee shall be due and payable on each Payment Date; provided that payment of the Class A-1D Commitment Fee is subordinated to the payment on each Payment Date of other amounts in accordance with the Priority of Payments.

Subject to the next succeeding paragraph of this Section 2.6(a), interest will cease to accrue on each Note, or in the case of a partial repayment, on such part, from the date of repayment or Stated Maturity unless payment of principal is improperly withheld or unless a Default is otherwise made with respect to such payments. To the extent lawful and enforceable, for so long as the Class A Notes are outstanding, interest shall accrue on any Defaulted Interest on any Class A Note at the applicable Note Interest Rate until paid as provided herein.

(b)    The principal of each Class of Notes shall be payable no later than the Stated Maturity thereof unless the unpaid principal of such Note becomes due and payable at an earlier date by operation of the Priority of Payments, by declaration of acceleration, by redemption or otherwise; provided that:

(1)    so long as any Class A-1 Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class A-2 Notes (A) may only occur after principal of the Class A-1 Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and other amounts due in accordance with the Priority of Payments;

(2)    so long as any Class A-1 Notes or Class A-2 Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class A-3 Notes (A) may only occur after principal of the Class A-1 Notes and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001835

Class A-2 Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes and the Class A-2 Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and other amounts due in accordance with the Priority of Payments;

(3)    so long as any Class A Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class B Notes (A) may only occur after principal of the Class A Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and other amounts due in accordance with the Priority of Payments; and

(4)    so long as any Class A Notes or Class B Notes are Outstanding or any Class A-1R Commitments or Class A-1D Commitments have not expired, terminated or been reduced to zero, except as otherwise provided in Article 9 and the Priority of Payments, the payment of principal of the Class C Notes (A) may only occur after principal of the Class A Notes has been paid in full and all Class A-1R Commitments and all Class A-1D Commitments shall have expired, terminated or been reduced to zero and principal of the Class B Notes has been paid in full and (B) is subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee, the principal of the Class B Notes and other amounts due in accordance with the Priority of Payments.

Any payment of principal of the Class B Notes and Class C Notes that is not paid, in accordance with the Priority of Payments, on any Payment Date shall not be considered "due and payable" for purposes of Section 5.1(b) until the Payment Date on which such principal may be paid in accordance with the Priority of Payments.

(c)    So long as the Class A Coverage Tests are met, principal shall not be payable on any Class of Notes prior to the end of the Reinvestment Period except upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5. If any of the Class A Coverage Tests is not satisfied, or after the Reinvestment Period, principal shall not be payable on any Class of Notes except (i) upon the occurrence of a redemption or repayment pursuant to Sections 9.1 and 9.5 and (ii) on each Payment Date from Principal Proceeds and Interest Proceeds in accordance with the Priority of Payments.

(d)    As a condition to the payment of any principal of or interest on any Note, any Class A-1R Commitment Fee or any Class A-1D Commitment Fee, as applicable, without the imposition of withholding tax, any Paying Agent shall require certification acceptable to it to enable the Co-Issuers, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of such Note or the Holder of such Note under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

(e)    Payments in respect of principal of and interest on the Notes and in respect of any Class A-1R Commitment Fee, any Class A-1D Commitment Fee and any Class A Redemption Break Funding Costs, as applicable, shall be payable by wire transfer in immediately available funds to a Dollar

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                          PP001836

account maintained by the Noteholders in accordance with written wire transfer instructions received by any Paying Agent on or before the Record Date or, if no such wire transfer instructions are received by a Paying Agent, by a Dollar-denominated check drawn on a bank in the U.S.

(f)    The principal of and interest on any Note, any Class A-1R Commitment Fee, any Class A-1D Commitment Fee and any Class A Redemption Break Funding Costs, as applicable, that are payable in accordance with the Priority of Payments on such Payment Date and are punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the Record Date for such payment. All such payments that are mailed or wired and returned to the Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.2.

Except as otherwise expressly provided herein with respect to the Class A-1R Notes, the Class A-1T Notes and the Class A-1D Notes, payments to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the Note Register in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(g)    Payment of any Defaulted Interest in respect of the Class A Notes may be made in any other lawful manner in accordance with the Priority of Payments if notice of such payment is given by the Trustee to the Co-Issuers and the Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(h)    All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(i)    Notwithstanding anything contained herein to the contrary, the obligations of each Co-Issuer under the Notes and this Indenture and under each other Transaction Document to which it is a party are limited recourse obligations of the Co-Issuers payable solely from the Collateral and, following realization of the Collateral, any claims of the Noteholders, the Collateral Manager, the Administrator, the Collateral Administrator, the Placement Agent and each other counterparty to any Zohar Obligor under the Transaction Documents (subject to the terms of the Issuer Charter) shall be extinguished, and shall not thereafter revive. No recourse shall be had for the payment of any amount owing under or in respect of the Notes or any other Transaction Document against any Officer, member, director, employee, securityholder or incorporator of the Co-Issuers or their respective successors or assigns. It is understood that the foregoing provisions of this Section 2.6(i) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral, (ii) limit the rights of the Trustee and the Holders of the Notes or (iii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this Section 2.6(i) shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                        PP001837

(j)      Subject to the foregoing provisions of this Section 2.6 and the provisions of Sections 2.4 and 2.5, each Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest, Class A-1R Commitment Fees, Class A-1D Commitment Fees and any Class A Redemption Break Funding Costs, if applicable, and principal that were carried by such other Note.

Section 2.7.      Persons Deemed Owners

The Co-Issuers, the Trustee, the Note Registrar, the Collateral Manager, the Class A-1R Note Agent, the Class A-1D Note Agent and any agent of any of them (collectively, the "Relevant Persons") may treat the Person in whose name any Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest, any Class A-1R Commitment Fee, any Class A-1D Commitment Fee and any Class A Redemption Break Funding Costs and on any other date for all other purposes whatsoever (whether or not such Note is overdue), and no Relevant Person shall be affected by notice to the contrary.

Section 2.8.      Cancellation

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall promptly be canceled by it and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.8, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to it. Any Notes purchased by either of the Co-Issuers shall be immediately delivered to the Trustee for cancellation.

Section 2.9.      Debt Treatment

The Co-Issuers and each Holder (and each beneficial owner of a Note), by acceptance of its Note (or its interest therein, as the case may be) shall be deemed to have agreed to treat, and shall treat, the Class A Notes as unconditional debt of the Issuer for tax, accounting and financial reporting purposes. The Issuer and the Holders of the Class B and Class C Notes agree to treat such Notes as equity for tax purposes unless, in the case of the Class B Notes, the Trustee has received an Opinion of Counsel that such Class B Notes will be treated as debt for U.S. federal income tax purposes.

Section 2.10.      Issuance of Additional Class B Notes

At the direction of the Holders of all of the Class B Notes, the Holders of all Class C Notes (if any) and the Holders of all of the Preference Shares, the Issuer shall issue (and, upon Issuer Order, the Trustee shall authenticate) additional Class B Notes ("Additional Class B Notes") to the Collateral Manager or its designees (without payment of any amounts by the Collateral Manager or such designees to the Issuer or any other Zohar Obligor) on one or more Business Days (each, an "Additional Class B Note Issuance Date"); provided that the following conditions are met, as certified by an Officer's certificate of the Issuer:

(a)      the party requesting the issuance of such Additional Class B Notes shall have given not less than 10 Business Days' written notice thereof to the Collateral Manager, the Trustee, the Issuer, each Noteholder, each Holder of Preference Shares and each Rating Agency;

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                              PP001838

    (b)    except for issuance date, the terms of the Additional Class B Notes are identical to the terms of the other Class B Notes then Outstanding;

    (c)    no Default or Event of Default shall have occurred and be continuing, and the Class A Coverage Tests shall be satisfied, as of such Additional Class B Note Issuance Date (after giving effect to the issuance of such Additional Class B Notes);

    (d)    each Holder of Additional Class B Notes shall be (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, shall meet all of the other conditions of ownership of the Class B Notes and shall have delivered to the Issuer and the Trustee a Class B Note Certificate duly executed by such Holder;

    (e)    the Trustee shall have received an Opinion of Counsel to the effect that it is not necessary in connection with the issuance of such Additional Class B Notes to register the Notes (including the Additional Class B Notes) under the Securities Act or to qualify this Indenture under the Trust Indenture Act of 1939, as amended, or the rules and regulations of the Securities and Exchange Commission applicable to an indenture which is qualified thereunder;

    (f)    the Trustee shall have received an Officer's certificate of the Issuer:

    (1)    attaching a letter signed by Moody's and confirming that, after giving effect to the issuance of such Additional Class B Notes, the Class A-1R Notes, the Class A-1T Notes and the Class A-1D Notes are rated "Aaa" by Moody's; the Class A-2 Notes are rated "Aaa" by Moody's; the Class A-3 Notes are rated at least "Aa2" by Moody's; and the Class B Notes (including such Additional Class B Notes) are rated at least "Baa3" by Moody's;

    (2)    attaching a letter signed by Standard & Poor's and confirming that, after giving effect to the issuance of such Additional Class B Notes, the Class A-1R Notes, the Class A-1T Notes and the Class A-1D Notes are rated "AAA" by Standard & Poor's; the Class A-2 Notes are rated "AAA" by Standard & Poor's; the Class A-3 Notes are rated at least "AA" by Standard & Poor's; and the Class B Notes (including such Additional Class B Notes) are rated at least "BBB-" by Standard & Poor's; and

    (3)    stating that each such rating is in full force and effect on such Additional Class B Note Issuance Date (after giving effect to the issuance of such Additional Class B Notes), and

    (g)    the issuance date is at least 10 Business Days prior to the next succeeding Payment Date,

    (h)    either (1) the Trustee shall have received an Opinion of Counsel that such Additional Class B Notes will be treated as debt for U.S. federal income tax purposes, or (2) the Issuer has delivered an Officer's Certificate to the Trustee certifying that following the issuance of such Additional Class B Notes, there are and would at all times be no more than 98 "partners" in the Issuer for purposes of Treasury Regulation section 1.7704-1(h) (counting as equity of the Issuer for this purpose the Preference Shares, Class C Notes and any Class B Notes and assuming compliance with any documentary restrictions on transfer),

it being understood that (x) each of the above ratings by Standard & Poor's on the Class A Notes will address the timely payment in full of the principal of and interest on the Class A Notes and commitment

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                      PP001839

Section 5.7    <u>Application of Money Collected</u>

Any Money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any Money that may upon such collection then be held or thereafter received by the Trustee with respect to the Notes hereunder shall be applied, subject to Section 13.1 and in accordance with the provisions of Section 11.1, at the date or dates fixed by the Trustee.

Section 5.8.    <u>Limitation on Suits</u>

Subject to the proviso in Section 5.4(a), no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    either (i) such Holder has previously given to the Trustee written notice of an Event of Default and such Holder has obtained the prior consent of the Controlling Class to the institution of such Proceeding; or (ii) except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of the then most senior Class of Notes shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(b)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(c)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Notes or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

If the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more Persons that could constitute the Controlling Class, each singly not constituting the Controlling Class, the Trustee shall follow the instructions of the group representing the higher percentage of interest in the applicable Class of Notes, notwithstanding any other provisions of this Indenture.

Section 5.9.    <u>Unconditional Rights of Noteholders to Receive Principal, Interest, Class A-1R Commitment Fee, Class A-1D Commitment Fee and Certain Other Amounts</u>

(a)    Notwithstanding any other provision in this Indenture (but subject to Section 2.6(i) and the Priority of Payments), the Holder of any Class A Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Class A Note, the Class A-1R Commitment Fee, the Class A-1D Commitment Fee and the Class A Redemption Break Funding Costs, each as applicable, as the same become due and payable in accordance with the Priority of Payments and, subject to the provisions of Section 5.8, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

NY3:#7377192v32

**CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP**
**ON BEHALF OF PATRIARCH PARTNERS LLC**                                              PP001861

Administration Agreement, the Hedge Agreements or the Note Purchase Agreements (provided that, in the case of notices required to be provided by the Collateral Manager under this clause (e), the Collateral Manager has actual knowledge of such material breach).

        The Issuer shall promptly notify the Trustee and the Collateral Manager if the rating of any Class of Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn.

## ARTICLE 11

## APPLICATION OF MONIES

Section 11.1.   Disbursements of Monies from Payment Account

      (a)     Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section and Sections 9.5 and 13.1, on each Payment Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts pursuant to Section 10.2(i) as follows and for application by the Trustee in accordance with the following priorities:

        (i)     On each Payment Date, Interest Proceeds with respect to the related Due Period shall be applied as follows:

          (A)     to the payment of Administrative Expenses constituting taxes, registration fees and filing fees owing by the Zohar Obligors (as certified by an Authorized Officer of the applicable Zohar Obligor or of the Collateral Manager to the Trustee);

          (B)     (1) first, to the payment or reimbursement of accrued and unpaid Administrative Expenses constituting the Trustee's fees pursuant to the Trustee Fee Letter; and (2) second, to the payment or reimbursement of other accrued and unpaid Administrative Expenses (in the following order) constituting fees, unpaid expenses or indemnities of the Trustee under this Indenture, of the Collateral Administrator under the Collateral Administration Agreement, of the Administrator under the Administration Agreement, of the Preference Share Paying Agent, of the Preference Share Registrar under the Preference Share Paying Agency Agreement and of the Rating Agencies; provided that payments pursuant to clause (1) above shall be limited to an amount not to exceed the sum of 0.01% of the Quarterly Asset Amount with respect to such Payment Date plus U.S.$7,500 and payments pursuant to clause (2) above shall be limited to an amount not to exceed U.S.$117,500;

          (C)     if such date is prior to the date on which amounts on deposit in the Expense Account are transferred to the Issuer Principal Collection Account pursuant to Section 10.6 and if the Balance of all Eligible Investments and Cash in the Expense Account on the related Determination Date is less than U.S.$400,000, for deposit into the Expense Account of an amount equal to such amount as would have caused the Balance of all Eligible Investments and Cash in the Expense Account, immediately after such deposit, to equal U.S.$400,000; provided that the amount so deposited on any Payment Date shall not exceed U.S.$200,000;

          (D)     to the pro rata payment of (i) the Senior Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                PP001931

Senior Collateral Management Fee owed with respect to any prior Payment Date (provided that, if such Payment Date is on or prior to the Ramp Up End Date, no payment may be made under this clause (D)(i) to the extent the inclusion of such payment would cause the amounts payable in clauses (E) and (F) not to be paid in full) and (ii) prior to the date on which amounts on deposit in the Professional Fee Account are transferred to the Issuer Principal Collection Account pursuant to Section 10.6 or that the balance in the Professional Fee Account is less than U.S.$1,500,000, for deposit into the Professional Fee Account of an amount equal to such amount as would have caused the Balance of all Eligible Investments and Cash in the Professional Fee Account, immediately after such deposit, to equal U.S.$1,500,000; provided that the amount so deposited on any Payment Date shall not exceed 0.0375% of the Aggregate Principal Balance of all Pledged Collateral Investments on such Determination Date;

(E)    if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Funding Date, to the payment of such amounts (exclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party);

(F)    first, to the pro rata payment of (i) the Class A-1 Interest Distribution Amount for such Payment Date, (ii) the Class A-1R Commitment Fee Amount for such Payment Date and (iii) the Class A-1D Commitment Fee Amount for such Payment Date, second, to the payment of the Class A-2 Interest Distribution Amount and, third, to the payment of the Class A-3 Interest Distribution Amount;

(G)    on the Initial Payment Date and each Payment Date thereafter, to the payment of the Senior Collateral Management Fee due on such Payment Date and not paid above and to the payment of any accrued and/or deferred and unpaid Senior Collateral Management Fee owed with respect to any prior Payment Date (provided that no payment may be made under this clause (G) on any Payment Date to the extent the inclusion of such payment would cause the Class A Interest Coverage Ratio Test not to be satisfied (calculated on a pro forma basis as of such Determination Date after giving effect to such application));

(H)    if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "Class A Note Reduction Amount" for such Payment Date) necessary to cause all of the Class A Coverage Tests to be satisfied (in each case calculated on a pro forma basis as of such Determination Date after giving effect to such application) and, in the case of a Rating Confirmation Failure will be applied as follows (provided that if there is a Post-Ramp Up Plan, only to the extent specified therein):

(1)    first, to the Class A-1 Notes as follows:

(x)    an amount equal to the Class A-1R Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001932

(y)    an amount equal to the Class A-1T Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)    an amount equal to the Class A-1D Principal Sharing Percentage of such Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (H)(1) is less than the Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (x), (y) and (z) above ratably in accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)    second, any remaining portion of the Class A Note Reduction Amount will be applied to repay the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full;

(3)    third, any remaining portion of the Class A Note Reduction Amount will be applied to repay the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(I)    to the payment, first, of any amounts described in clause (B) above in the same order of priority to the extent not paid thereunder as a result of the dollar limitation set forth in such clause and, second, of any Administrative Expenses (to the extent not paid in full by application of amounts from the Expense Account, the Closing Expense Account or the Professional Fee Account on such Payment Date); provided that the aggregate amount applied pursuant to this clause (I) on any Payment Date shall not exceed U.S.$200,000;

(J)    to the payment of the Class A-1R Note Agent Fee due on such Payment Date and to the payment of any accrued and unpaid Class A-1R Note Agent Fee owed on any prior Payment Date;

(K)    for application as follows:

(1)    first, for deposit in the Preference Share Distribution Account in an aggregate amount equal to the sum of the Specified Realized Gain Amounts received during such Due Period; and

(2)    second, if the Class A Coverage Tests are satisfied as of the related Determination Date, no Rating Confirmation Failure with respect to the Class A Notes has occurred and is continuing and no Event of Default has occurred and is continuing:

(I)    first, for deposit in the Preference Share Distribution Account; provided that (x) the aggregate amount deposited in the Preference Share Distribution Account pursuant to this clause (I) on all Payment Dates from the

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001933

Funding Date through and including such Payment Date shall not exceed an amount equal to U.S.$5,625,000 multiplied by (A) the number of such Payment Dates (including such Payment Date) plus (B) one; and (y) the aggregate amount deposited in the Preference Share Distribution Account for all Payment Dates pursuant to this clause (I) shall not in any event exceed U.S.$45,000,000; and

(II)     second, if U.S.$45,000,000 has been deposited in the Preference Share Distribution Account pursuant to clause (I) above, pro rata to the Subordinated Collateral Management Fee due on such Payment Date and to the payment of any accrued and/or deferred and unpaid Subordinated Collateral Management Fee owed on any prior Payment Date;

provided that for purposes of calculating the Class A Overcollateralization Ratio Test for this clause (K)(2) only, the Principal Balance of a Collateral Investment shall not include any principal amount representing previously deferred or capitalized interest;

(L)     during the Reinvestment Period, for deposit to the Issuer Principal Collection Account in the amount (if any) specified by the Collateral Manager for application to acquire or originate Collateral Investments in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein as Eligible Investments or, at the discretion of the Collateral Manager, to repay principal of the Class A-1R Notes on such Payment Date);

(M)     after the Reinvestment Period:

(1)     first, an amount equal to the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes will be applied as follows:

(x)     an amount equal to the Class A-1R Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(y)     an amount equal to the Class A-1T Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)     an amount equal to the Class A-1D Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (M)(1) is less than the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes, then the funds available will be applied under clauses (x), (y) and (z) above ratably in

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                         PP001934

accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)    second, to be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

(3)    third, to be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(N)    after the Reinvestment Period, first, to the payment of principal of the Class B Notes until the principal of each such Note has been paid in full and, second, to the payment of principal of the Class C Notes until the principal of each such Note has been paid in full;

(O)    after the Reinvestment Period, to the payment of the amounts referred to in clause (I) above and in same order of priority (without regard to any Dollar limitation specified therein, but only to the extent not previously paid in full);

(P)    after the Reinvestment Period, if the Issuer has entered into any Hedge Agreement that requires payment of amounts by the Issuer to a Hedge Counterparty after the Funding Date, to the payment of such amounts (inclusive of any Hedge Termination Amount if the Hedge Counterparty is the sole affected or defaulting party and any other amount owing in respect of such Hedge Agreement and not paid under clause (E) above); and

(Q)    after the Reinvestment Period, the remainder (other than the Excluded Property) for deposit to the Preference Share Distribution Account.

(ii)    On each Payment Date, Principal Proceeds transferred to the Payment Account with respect to such Payment Date shall be distributed in the following order of priority (immediately following the applications of Interest Proceeds referred to in the foregoing clause (i)):

(A)    first, after the Reinvestment Period, for deposit in the Class A-1R Future Funding Reserve Account in an amount equal to the Net Aggregate Exposure Amount (if any) on such Payment Date and, second, for deposit in the Issuer Principal Collection Account in an amount equal to the excess (if any) of (1) the Unfunded Portfolio Amount as of the related Determination Date over (2) the sum of (w) the Aggregate Undrawn Amount of the Class A-1R Notes as of such date as reported by the Class A-1R Note Agent to the Trustee (determined immediately after giving effect to any reductions in the Class A-1R Commitments to occur on such date pursuant to Sections 9.5 and 9.6); plus (x) the Aggregate Undrawn Amount of the Class A-1D Notes as of such date as reported by the Class A-1D Note Agent to the Trustee (determined after giving effect to the expiration of the Class A-1D Commitments on or prior to such date pursuant to Section 9.5); plus (y) the Balance on deposit in the Unfunded Revolver Discount Account on such date; plus (z) the Balance on deposit in the Class A-1R Future Funding Reserve Account (to be retained in the Issuer Principal Collection Account for application to fund

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                PP001935

Unfunded Portfolio Amounts or, at the discretion of the Collateral Manager, to repay principal of the Class A-1R Notes on such Payment Date);

(B)     to the payment of all Senior Expense Amounts (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i);

(C)     if any Class A Coverage Test was not satisfied on the related Determination Date or if a Rating Confirmation Failure with respect to the Class A Notes exists as of such Determination Date, then funds in an aggregate amount (the "Remaining Class A Note Reduction Amount" for such Payment Date) necessary to cause all of the Class A Coverage Tests to be satisfied (in each case calculated on a pro forma basis as of such Determination Date after giving effect to such application and any application of funds under Section 11.1(a)(i)(H) on such Payment Date) and, in the case of a Rating Confirmation Failure, to the extent specified in the related Post-Ramp Up Plan, will be applied as follows:

(1)     first, to the Class A-1 Notes as follows:

(x)     an amount equal to the Class A-1R Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(y)     an amount equal to the Class A-1T Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)     an amount equal to the Class A-1D Principal Sharing Percentage of such Remaining Class A Note Reduction Amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (C)(1) is less than the Remaining Class A Note Reduction Amount for such Payment Date, then the funds available will be applied under clauses (x), (y) and (z) above ratably in accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)     second, any remaining portion of the Remaining Class A Note Reduction Amount will be applied to repay the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001936

(3)    third, any remaining portion of the Remaining Class A Note Reduction Amount will be applied to repay the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(D)    if any Class A Notes are Outstanding or any Class A-1R Commitments or any Class A-1D Commitments have not expired, terminated, or been reduced to zero, for deposit to the Issuer Principal Collection Account in an amount sufficient to cause the aggregate amount on deposit therein to equal the Cash Retention Amount for such Payment Date;

(E)    during the Reinvestment Period, for deposit to the Issuer Principal Collection Account (for application to acquire or originate Collateral Investments in accordance with Article 12, to fund Unfunded Amounts or for distribution as Principal Proceeds on the next succeeding Payment Date and, until so applied, to be held therein as Eligible Investments or, at the discretion of the Collateral Manager, to repay principal of the Class A-1R Notes on such Payment Date);

(F)    after the Reinvestment Period:

(1)    first, an amount equal to the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes will be applied as follows:

(x)    an amount equal to the Class A-1R Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1R Notes until the outstanding principal of the Class A-1R Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

(y)    an amount equal to the Class A-1T Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1T Notes until the outstanding principal of the Class A-1T Notes has been repaid in full; and

(z)    an amount equal to the Class A-1D Principal Sharing Percentage of such amount will be applied to the payment of principal of the Class A-1D Notes until the outstanding principal of the Class A-1D Notes has been repaid in full (with any remainder to be deposited in the Issuer Principal Collection Account);

provided that if the amount of funds available to be distributed under this clause (F)(1) is less than the Aggregate Outstanding Amount of the Class A-1 Notes plus the Aggregate Undrawn Amount of the Class A-1R Notes, then the funds available will be applied under clauses (x), (y) and (z) above ratably in accordance with the Class A-1R Principal Sharing Percentage, Class A-1T Principal Sharing Percentage and Class A-1D Principal Sharing Percentage, respectively;

(2)    second, to be applied to the payment of principal of the Class A-2 Notes until the outstanding principal of the Class A-2 Notes has been repaid in full; and

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                        PP001937

(3)    third, to be applied to the payment of principal of the Class A-3 Notes until the outstanding principal of the Class A-3 Notes has been repaid in full;

(G)    after the Reinvestment Period, to the payment of the amounts referred to in clauses (I) through (J) of Section 11.1(a)(i) (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i);

(H)    after the Reinvestment Period, if the principal of the Class A Notes has been paid in full, the Class A-1R Commitments and the Class A-1D Commitments have expired, terminated or been reduced to zero, first, to the payment of outstanding principal of the Class B Notes until the principal of the Class B Notes has been paid in full and, second, to the payment of outstanding principal of the Class C Notes until the principal of the Class C Notes has been paid in full and, third, to the payment of accrued and unpaid Additional Amounts; and

(I)    after the Reinvestment Period, any remaining Principal Proceeds (other than the Excluded Property) to the payment of the amounts referred to in clauses (O), (P) and (Q) of Section 11.1(a)(i) (and in the same manner, subject to the same conditions and in the same order of priority), but only to the extent not previously paid in full after the application on such Payment Date provided for in Section 11.1(a)(i).

(b)    Except as otherwise expressly provided in Section 11.1(a), if on any Payment Date, the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by any clause of the Priority of Payments specified therein, the Trustee will make the disbursements called for by such clause ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

Section 11.2.    Disbursements of Monies from Rollover Proceeds Account

(a)    Upon receipt of an Issuer Order pursuant to Section 12.1, the Trustee shall apply amounts on deposit in the Rollover Proceeds Account to acquire Exchanged Securities on behalf of the Issuer or the Zohar Subsidiary and subject to the terms of Section 12.1(c).

(b)    The Collateral Manager shall calculate the amount of funds deposited into and withdrawn from the Rollover Proceeds Account on a "first-in/first-out" basis, and shall notify the Trustee promptly of the amount of any funds that are (based on such calculations) held in or credited to the Rollover Proceeds Account for a period in excess of 60 days. Promptly upon receipt of such notice, the Trustee shall withdraw from the Rollover Proceeds Account the amount of any funds that have been held in the Rollover Proceeds Account for a period in excess of 60 days and shall deposit such amount in the Issuer Principal Collection Account.

(c)    Without limiting clause (a) above, the Collateral Manager may in its discretion, by Issuer Order, direct the Trustee to (and if so directed the Trustee shall) transfer funds on deposit in the Rollover Proceeds Account to the Issuer Principal Collection Account from time to time to fund Unfunded Amounts in respect of Collateral Investments that are Revolving Collateral Investments and Delayed Funding Collateral Investments.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001938

originated or committed to be acquired or originated by the Issuer, designate such Collateral Investment as an "Unrestricted Collateral Investment" by giving notice of such designation to the Issuer, the Trustee and each Rating Agency, <u>provided</u> that (1) after giving effect to such designation and the payment of the purchase price therefor, each of the Collateral Quality Tests and the Class A Coverage Tests are satisfied, the Class A Overcollateralization Ratio is greater than or equal to 125%, and the ratings on each Class of the Class A Notes by Moody's and Standard & Poor's shall be at or above the ratings on such Class on the Closing Date by such Rating Agency; and (2) Collateral Investments with an Aggregate Principal Balance of not more than 10% of the Maximum Investment Amount may at any time constitute Unrestricted Collateral Investments.

(b)     The Collateral Manager may, at any time, by written notice to the Issuer, the Trustee and the Rating Agencies, remove the "Unrestricted Collateral Investment" designation from any Unrestricted Collateral Investment, <u>provided</u> that no such redesignation shall occur if such redesignation would cause any Class A Coverage Test or Collateral Quality Test to fail to be in compliance immediately after giving effect thereto (or, if any such test is not so in compliance, the level of compliance with such tests are maintained or improved).

(c)     Unrestricted Collateral Investments will not be included in determining compliance with the Collateral Quality Tests or the Eligibility Criteria (other than as expressly stated in Article 12) and will be treated as having a Principal Balance equal to zero for purposes of the Class A Coverage Tests. For purposes of the Class A Interest Coverage Ratio Test, scheduled interest payments due on the Unrestricted Collateral Investments will be ignored until actually received (and net of taxes, if any).

## ARTICLE 13

### NOTEHOLDERS' RELATIONS

Section 13.1.     <u>Subordination</u>

(a)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class A-2 Notes, the Holders of the Class A-3 Notes, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A-1 Notes that the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "<u>Subordinate Interests</u>") shall be subordinate and junior to the Class A-1 Notes (the "<u>Senior Interests</u>") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-1 Notes shall be paid in full in Cash or, to the extent a Majority of the Class A-1 Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-1 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class A-1 Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class A-3 Notes, the Holders of the Class B Notes and the Holders of the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                          PP001950

Class C Notes agree for the benefit of the Holders of the Class A-2 Notes that the Class A-3 Notes, the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A-2 Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-2 Notes shall be paid in full in Cash or, to the extent a Majority of the Class A-2 Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-2 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class A-2 Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(c)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer, the Holders of the Class B Notes and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A-3 Notes that the Class B Notes, the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class A-3 Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A-3 Notes shall be paid in full in Cash or, to the extent a Majority of the Class A-3 Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class A-3 Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class A-3 Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(d)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes agree for the benefit of the Holders of the Class B Notes that the Class C Notes and the Issuer's rights in and to the Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class B Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class B Notes shall be paid in full in Cash or, to the extent a Majority of the Class B Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class B Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(e)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer agrees for the benefit of the Holders of the Class C Notes that the Issuer's rights in and to the

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                                      PP001951

Collateral (collectively, the "Subordinate Interests") shall be subordinate and junior to the Class C Notes (the "Senior Interests") to the extent and in the manner set forth in this Indenture including, without limitation, as set forth in Section 11.1 and hereinafter provided. If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article 5, including, without limitation, as a result of an Event of Default specified in Section 5.1(f) or (g), the Class C Notes shall be paid in full in Cash or, to the extent a Majority of the Class C Notes consents, other than in Cash, before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Subordinate Interests and the holders of equity in the Issuer and Co-Issuer agree, for the benefit of the Holders of the Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under or in respect of the Subordinate Interests until the payment in full of the Class C Notes and not before at least one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including, without limitation, any period established pursuant to the laws of the Cayman Islands.

(f)     In the event that, notwithstanding the provisions of this Indenture, any Holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until each Class of Senior Interests with respect thereto shall have been paid in full in Cash or, to the extent a Majority of such Class of Senior Interests consents, other than in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Class of Senior Interests in accordance with this Indenture; provided that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(g)     Each Holder of Subordinate Interests agrees with the Holders of the applicable Senior Interests that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including, without limitation, this Section 13.1; provided that (i) after the Class A-1 Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A-1 Notes, (ii) after the Class A-2 Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A-2 Notes, (iii) after the Class A-3 Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A-3 Notes and (iv) after the Class B Notes have been paid in full, the Holders of the applicable Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class B Notes. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

Section 13.2.     Standard of Conduct

In exercising any of a Noteholder's voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including, without limitation, Section 5.9 a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or at its direction or any failure by it to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any other Secured Party, the Issuer, or any other Person.

NY3:#7377192v32

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC                                    PP001952

IN WITNESS WHEREOF, we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
as Issuer

By:_____
Name:  Chris Watler
Title:    Director


ZOHAR III, CORP.,
as Co-Issuer


By:_____
Name:
Title:


ZOHAR III, LLC,
as Zohar Subsidiary

By:_____
Name:  Chris Watler
Title:    Director

NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent


By:_____
Name:
Title:

By:_____
Name:
Title:


LASALLE BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
Name:
Title:

Indenture

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001969

**IN WITNESS WHEREOF**, we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
   as Issuer

By: _____
   Name:
   Title:

ZOHAR III, CORP.,
   as Co-Issuer

By: _____
   Name:  Gregory F. Lavelle
   Title:  Attorney-In-Fact

ZOHAR III, LLC,
   as Zohar Subsidiary

By: _____
   Name:
   Title:

NATIXIS FINANCIAL PRODUCTS INC.,
   as Class A-1R Note Agent and Class A-1D Note Agent

By: _____
   Name:
   Title:

By: _____
   Name:
   Title:

LASALLE BANK NATIONAL ASSOCIATION,
   as Trustee

By: _____
   Name:
   Title:

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001970

**IN WITNESS WHEREOF,** we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
as Issuer


By:_____
  Name:
  Title:


ZOHAR III, CORP.,
as Co-Issuer


By:_____
  Name:
  Title:


ZOHAR III, LLC,
as Zohar Subsidiary


By:_____
  Name:
  Title:

NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent


By:_____
  Name: Ralph J. Inglese
  Title: Managing Director

By:_____
  Name: Todd Vyste
  Title: Director


LASALLE BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
  Name:
  Title:


Indenture

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001971

**IN WITNESS WHEREOF**, we have set our hands as of the ___ day of April, 2007.

ZOHAR III, LIMITED,
as Issuer

By:_____
    Name:
    Title:

ZOHAR III, CORP.,
as Co-Issuer

By:_____
    Name:
    Title:

ZOHAR III, LLC,
as Zohar Subsidiary

By:_____
    Name:
    Title:

NATIXIS FINANCIAL PRODUCTS INC.,
as Class A-1R Note Agent and Class A-1D Note Agent

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

LASALLE BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
    Name:   Suzanne Smith
    Title:   First Vice President

Indenture

NY3:#7377192

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

PP001972

# **EXHIBIT 4**

**INDEX**

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OR PLEDGE OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER OR PLEDGE ). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## ZOHAR CDO 2003-1, LIMITED

### CLASS B ZERO COUPON SECOND PRIORITY SECURED NOTE DUE 2018

CUSIP # 98976W AB 9                                                            November 13, 2003
Certificate No. B-1                                                           U.S.$150,000,000

ZOHAR CDO 2003-1, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer") for value received, hereby promise to pay to OCTALUNA, LLC or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of ONE HUNDRED FIFTY MILLION United States Dollars (U.S.$150,000,000) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Class B Note on the Payment Date in November, 2018 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of Class B Zero Coupon Second Priority Secured Notes due 2018 (the "Class B Notes") issued and to be issued under an Indenture dated as of November 13, 2003, as supplemented and otherwise modified and in effect from time to time (the "Indenture"), among the Issuer, Zohar CDO 2003-1, Corp. (the "Co-Issuer"), Zohar CDO 2003-1, LLC, MBIA Insurance Company (the "Credit Enhancer"), CDC Financial Products Inc., as agent for the Holders of the Class A-1 Notes (together with any successors in such capacity, the "Class A-1 Note Agent"), and U.S. Bank National Association, as trustee (together with any successor trustee as permitted under the Indenture, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein (including, without limitation, the Note Purchase Agreement related hereto) for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Credit Enhancer, the Class A-1 Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

This Class B Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture.

A portion of the principal amount of this Class B Note may be reduced in the circumstances and to the extent provided in the Indenture.

The principal of this Class B Note which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to

the Person in whose name this Class B Note (or one or more predecessor Notes) is registered at the close of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The payments of principal of this Class B Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

All reductions in the principal amount of this Class B Note (or one or more predecessor Class B Notes) effected pursuant to Section 7.13 of the Indenture by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Class B Note issued upon the registration of transfer of this Class B Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Class B Note.

This Class B Note is a registered Note pursuant to Section 2.4 of the Indenture and neither this Note nor any interest herein may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of this Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture or in this Note, or made based upon any false or inaccurate representation made by the transferee to the Co-Issuers or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Co-Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of this Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

The Issuer, the Trustee, the Collateral Manager, and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Issuer, the Trustee, and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

ZOHAR CDO 2003-1, LIMITED

By: _____
Name: Donald J. Puglisi
Title: Attorney-in-Fact

## CERTIFICATE OF AUTHENTICATION

This is one of the Class B Zero Coupon Second Priority Secured Notes referred to in the within-mentioned Indenture.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
Authorized Signatory

# EXHIBIT 5

**U.S.$150,000,000 Class B Zero Coupon
Second Priority Secured Notes**

**ZOHAR CDO 2003-1, LIMITED**

**SUBSCRIPTION AGREEMENT**

Zohar CDO 2003-1, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
Attention: The Directors

Ladies and Gentlemen:

      1.    *Subscription.*  The Issuer hereby agrees to issue, and the undersigned (the *"Investor"*) hereby subscribes to acquire from the Issuer, the Class B Zero Coupon Second Priority Secured Notes due 2018  (the *"Class B Notes"*) of Zohar CDO 2003-1, Limited, an exempted company organized under the laws of the Cayman Islands (the *"Issuer"*), in the aggregate amount set forth opposite the Investor's name on the signature page hereto.  Capitalized terms used herein and in the attached Investor Questionnaire shall have the respective meanings given to them in the Indenture (the *"Indenture"*) dated as of the date hereof among the Issuer, Zohar CDO 2003-1, Corp., Zohar CDO 2003-1, LLC, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and  U.S. Bank National Association, as Trustee (the *"Trustee"*).

      The Investor acknowledges that this subscription (i) is irrevocable and (ii) is subject only to the satisfaction of the conditions precedent set forth in the Indenture.  The issuer acknowledges that the Class B Notes are not being issued for cash, but nevertheless the Issuer is receiving good and valuable consideration for the Class B Notes.

      2.    *Representations and Warranties.*  To induce the Issuer to accept this subscription, the Investor represents and warrants as follows (which representations and warranties will be deemed to be repeated by the Investor on each date that the Investor acquires Class B Notes pursuant to Paragraph 1 above):

      (a)    *Accredited Investor Status; Investment Intent.*  The Investor is an "accredited investor" (as defined in Rule 501(a) under the Securities Act (the *"Securities Act"*) (an *"Accredited Investor"*) and is acquiring the Class B Notes

for its own account for investment purposes and not with a view to the distribution thereof in violation of applicable securities laws. The Investor understands that the Class B Notes have not been approved or disapproved by the Securities and Exchange Commission (the "*SEC*") or any other governmental authority or agency of any jurisdiction.

(b)    *Investor Sophistication; Non-Reliance; Suitability; Access to Information.* The Investor (i) has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Class B Notes, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Issuer, the Placement Agent, the Collateral Manager or any of their respective affiliates (or any representative of any of the foregoing) and (iv) has determined that an investment in the Class B Notes is suitable and appropriate for it. The Investor has received, and has had an adequate opportunity to review the contents of, the Indenture, the Management Agreement and the other Transaction Documents. The Investor has had access to such financial and other information concerning the Issuer and the Class B Notes as it has deemed necessary to make its own independent decision to acquire the Class B Notes, and has been afforded an opportunity to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Class B Notes.

(c)    *Securities Law Limitations on Resale.* The Investor understands that the Class B Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act and have not been and will not be registered under the Securities Act. The Investor understands that an appropriate legend substantially to the foregoing effect must be placed on each certificate representing any Class B Note.

(d)    *Limited Liquidity.* The Investor understands that there is no market for the Class B Notes and that no assurance can be given as to the liquidity of any trading market for the Class B Notes and that it is unlikely that a trading market for the Class B Notes will develop.

(e)    *Investment Company Act.* The Investor is a "qualified purchaser" (a "*Qualified Purchaser*") as defined in the Investment Company Act of 1940, as amended (the "*Investment Company Act*"), a company each of whose beneficial owners is a Qualified Purchaser, a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "*Knowledgeable Employee*") or a company owned exclusively by Knowledgeable Employees with respect to the Issuer. The Investor understands and acknowledges that the Issuer has no intention of registering as an "investment company" under the Investment Company Act.

PP-DEL2-000026992

(f)    *ERISA.* The Investor agrees to certify (a) whether or not it is, or is acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan pursuant to 29 C.F.R. § 2510.3-101 or otherwise (the *"Plan Asset Regulation"*) (each, a *"Plan"*) and (b) whether it is a "benefit plan investor", as defined in the Plan Asset Regulation, and/or a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to any such assets or is an affiliate of any such person (each such person, a "controlling person"). If the Investor is, or is acting on behalf of, a Plan, the Investor represents and warrants that, assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise, its acquisition, ownership and disposition of the Class B Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any similar federal, state or local law) for which an exemption is not available. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Class B Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. The Investor (i) agrees to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a "benefit plan investor" or a "controlling person", (ii) agrees to promptly dispose of its interests in the Class B Notes in a manner consistent with the restrictions on transfer set forth in the Indenture, if it is becoming a "benefit plan investor" or a "controlling person", and it has been notified that its ownership of the Class B Notes would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Issuer's Class B Notes, the Preference Shares or of any other equity interest of the Issuer being held by "benefit plan investors" and (iii) understands and agrees that the information supplied in this Subscription Agreement upon acquisition of the Class B Notes and as requested thereafter will be utilized to determine whether "benefit plan investors" own less than 25% of the value of the Class B Notes of the Issuer, both upon the original issuance of Class B Notes and upon any subsequent transfer of the Class B Notes, Preference Shares or any other equity interest in the Issuer.

(g)    *Certain Tax Matters.* The Investor (i) represents that: (a) it is either (1) a United States person within the meaning of Code section 7701(a)(30) or (2) a person whose separate existence is disregarded pursuant to Treasury Regulation § 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30); (b) it has less than (and will at all times have no more than) 98 partners for U.S. Federal income tax purposes and (c) it is

PP-DEL2-000026993

not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of the Class B Notes or cause the Class B Notes to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations, and (ii) understands and agrees that (a) it may not sell, pledge or otherwise transfer a Class B Note (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Note to a derivative or swap counterparty), (b) it will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Class B Notes or receive payment in respect of its investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate.

(h)    *Limitations on Flow-Through Status.*  The Investor represents that, unless the Investor is a Qualifying Investment Vehicle (as defined below), (i) if the Investor would be an investment company but for the exceptions in Section 3(c)(1) or 3(c)(7) of the Investment Company Act, the amount of the Investor's investment in the Class B Notes does not exceed 40% of the total assets (determined on a consolidated basis with its subsidiaries) of the Investor; (ii) no person owning any equity or similar interest in the Investor exercises control, on an investment-by-investment basis, over the amount of such person's contribution to any investment made by the Investor; and (iii) the Investor was not organized or reorganized for the specific purpose of acquiring the Class B Notes or the Preference Shares.  For this purpose, a "*Qualifying Investment Vehicle*" is an entity (a) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Trustee each of the representations set forth herein, in each case with modifications to such representations satisfactory to the Issuer to reflect the indirect nature of the interests of such beneficial owners in the Class B Notes, and (b) as to which, if such entity would be an investment company but for the exceptions provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act (any such entity, an "*excepted investment company*"): (x) all of the beneficial owners of outstanding securities (other than short-term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("*pre-amendment beneficial owners*"); and (y) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act.

PP-DEL2-000026994

(i)     *Transfers Void*.  The Investor agrees that no sale, pledge or other transfer of a Class B Note (or any portion thereof) may be made.  The Investor acknowledges and agrees that (i) any sale, pledge or other transfer of a Class B Note (or any portion thereof) made in violation of the transfer restrictions contained in the Indenture, will be void and of no force or effect and (ii) none of the Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class B Note (or any interest therein) made in violation of any such transfer restriction.

(j)     *Limited Recourse; Non-Petition*.  The Investor acknowledges that the obligations of the Issuer under the Class B Notes and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral, as provided therein and in the Indenture and, following realization of the Collateral, any claims of the Investor hereunder or under the Indenture shall be extinguished.  No recourse shall be had for the payment of any amount owing hereunder against any officer, member, director, employee, securityholder or incorporator of the Issuer or its successors or assigns.  The Investor acknowledges that the Issuer shall be the sole obligor on or in respect of the Class B Notes, and the Co-Issuer shall not have any obligations in respect thereof.  The Investor agrees that it shall not, prior to the date which is one year and one day (or, if longer, any applicable preference period then in effect) after the payment in full of all the Notes, institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under Federal or state bankruptcy or similar laws; provided, however, that nothing in this clause shall preclude, or be deemed to stop, the Investor (a) from taking any action prior to the expiration of the aforementioned one year and one day period in (i) any case or proceeding voluntarily filed or commenced by any Zohar Obligor or (ii) any involuntary insolvency proceeding filed or commenced against any Zohar Obligor by a Person other than the Investor, or (b) from commencing against any Zohar Obligor or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency or a liquidation proceeding.

(k)     *Reliance on Representations, etc.*  The Investor acknowledges that the Issuer, the Collateral Manager, the Placement Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Class B Notes are no longer accurate, the Investor will promptly notify the Issuer and Placement Agent.

(l)     *Cayman Islands*.  The Investor is not a member of the public of the Cayman Islands.

(m)     *Subscription Agreement*.  The Investor has the power and authority to enter into this Subscription Agreement and each other document required to be

PP-DEL2-000026995

executed and delivered by or on behalf of the Investor in connection with this subscription for Class B Notes, and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby, and the person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for Class B Notes. Such execution, delivery and compliance by the Investor does not conflict with, or constitute a default under, any instruments governing the Investor, any applicable law (assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise), regulation or order, or any material agreement to which the Investor is a party or by which the Investor is bound. This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor, enforceable against the Investor in accordance with its terms.

(n)  *Investor Location.* If the Investor's permanent address specified in the Investor Questionnaire is located in the United States, the Investor was offered the Class B Notes in the State listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Issuer and intends that the securities law of that State govern the Investor's subscription for the Class B Notes.

3.  *Tax Information.* The Investor certifies under penalties of perjury that (i) the Investor's name, taxpayer identification or social security number (if any) and address provided in the Investor Questionnaire are correct and (ii) the information contained in any Form W-9 (Request for Taxpayer Identification Number and Certification) or any other tax-related form submitted to the Issuer is correct (which certification will be deemed to be repeated on any date on which any tax form is delivered to the Issuer after the date hereof). The Investor agrees to in a timely manner complete (accurately and in a manner reasonably satisfactory to the Issuer), execute, arrange for any required certification of, and deliver to the Issuer or such governmental or taxing authority as the Issuer directs, any form, document or certificate that may be required or reasonably requested by the Issuer. The Investor further agrees to promptly inform the Issuer of any change in any such information previously provided to the Issuer and to execute a new form or other document with the correct information.

4.  *Further Advice and Assurances.* All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue. The Investor agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may be subject.

PP-DEL2-000026996

5.      *Indemnity.* The Investor understands that the information provided herein will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase the Class B Notes. The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase the Class B Notes. The Investor agrees to indemnify and hold harmless the Issuer, the Placement Agent and each of their respective affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in the Class B Notes. Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

6.      *Delivery of Class B Notes.* On the Closing Date, the Issuer shall cause the Class B Notes to be registered in the Investor's name in the register maintained on behalf of the Issuer by the Trustee under the Indenture, and have delivered to the Investor its Class B Notes.

7.      *Binding Effect.* Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, executors, legal representatives and transferees, as applicable.

8.      *Benefit of Agreement.* The Investor acknowledges that each representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Class B Notes is made for the benefit of the Issuer, the Collateral Manager and each of their respective affiliates and also for the benefit of the Trustee under the Indenture and holders from time to time of the Notes issued thereunder.

9.      *Miscellaneous.* This Subscription Agreement is not assignable by the Investor without the consent of the Issuer. The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the transactions contemplated hereby and any investigation made by the Issuer. The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein. This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of New York.

10.      *Waiver of Jury Trial.* **THE INVESTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY (BUT NO OTHER JUDICIAL REMEDIES) IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, INDENTURE, AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

11.      *Notices.* Notices shall be given hereunder as specified in, and with the effect provided for by, Section 18.3 of the Indenture.

PP-DEL2-000026997

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement on the date set forth below.

Date:  November 12, 2003
**Aggregate Principal Amount of Class B Notes subscribed for:** U.S.$150,000,000

OCTALUNA, LLC:
By:  Patriarch Partners VIII, LLC,
Its Managing Member

By: _____
Name:  Lynn Tilton
Title:  Manager

PP-DEL2-000026998

The Issuer hereby accepts the above application
for subscription for Class B Notes.

ZOHAR CDO 2003-1, LIMITED

By: _____

Name: **Chris Watler**

Title: **Director**

Date: November 13, 2003

PP-DEL2-000026999

## INVESTOR QUESTIONNAIRE

**A.    General Information**

1.    Print Full Name of Investor:                    Octaluna, LLC

2.    Name in which Class B Notes
       should be registered:                            Octaluna, LLC

3.    Address and Contact Person                   Octaluna, LLC
       for Notices:                                         c/o Patriarch Partners VIII, LLC
                                                                40 Wall Street
                                                                New York, New York 10005
                                                                Attention:    Lynn Tilton

4.    Telephone Number:                              (212) 825-0550

5.    Telecopier Number:                             (212) 825-2038

6.    Permanent Address:                             N/A
       (if different from above)

7.    U.S. Taxpayer
       Identification or Social
       Security Number (if any)                      13-4268300

8.    Payment Instructions:                          Wachovia Bank, N.A.
                                                                ABA# 053000219
                                                                Account # 2000021336162
                                                                Octaluna, LLC

9.    Instructions for delivery
       of Class B Notes:                              Patriarch Partners VIII, LLC
                                                                40 Wall Street
                                                                New York, New York 10005
                                                                Attention:  Lynn Tilton

**B.    Accredited Investor**

The Investor represents and warrants that the Investor is an "accredited investor" within the
meaning of Rule 501(a) under the Securities Act (an "*Accredited Investor*") and has

checked the box or boxes below which are next to the categories under which the Investor so qualifies as an Accredited Investor:

☐      (A)    It is an entity, including a grantor trust, in which all of the equity owners are accredited investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐      (B)    It is a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐      (C)    It is an insurance company as defined in Section 2(13) of the Securities Act.

☐      (D)    It is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐      (E)    It is an investment company registered under the Investment Company Act of 1940, as amended (the "***Investment Company Act***").

☐      (F)    It is a business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐      (G)    It is a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐      (H)    It is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "***Investment Advisers Act***").

☐      (I)    It is an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Class B Notes, with total assets in excess of U.S. $5,000,000.

PP-DEL2-000027001

☐                 (J)       It is a trust with total assets in excess of U.S. $5,000,000 not formed for the specific purpose of acquiring Class B Notes, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Class B Notes.

### C.   Qualified Purchaser Status

1. The Investor represents and warrants that the Investor is a "qualified purchaser" within the meaning of the Investment Company Act (a "*Qualified Purchaser*") and has checked the box or boxes below which are next to the categories under which the Investor qualifies as a qualified purchaser:

☐                 (A)       It is a company that (1) owns not less than $5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not formed for the specific purpose of acquiring Class B Notes of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐                 (B)       It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐                 (C)       It is a Person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without

PP-DEL2-000027002

limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "**Parent Company**") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Class B Notes unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐      (D)     It is a "qualified institutional buyer" within the meaning of Rule 144A(a) promulgated under the Securities Act, acting for its own account, the account of another qualified institutional buyer or the account of a Qualified Purchaser; provided:

         (1)    that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25 million in securities of issuers that are not affiliated persons of the dealer; and

         (2)    that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☐      (E)     It is an entity in which each beneficial owner of the Investor's securities is a Qualified Purchaser.

Alternatively, the Investor represents and warrants that the Investor is a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "*Knowledgeable Employee*") or a company owned exclusively by Knowledgeable Employees.

☐ Yes      ☐ No

PP-DEL2-000027003

2.   If the Investor is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an *"excepted investment company"*):

>   (i) all of the beneficial owners of outstanding securities (other than short-term paper) of the Investor (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as *"pre-amendment beneficial owners"*); and

>   (ii) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Investor,

have consented to the Investor's treatment as a qualified purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

**D.    Supplemental Data**

1.   Legal form of entity (corporation, partnership, trust, etc.):   <u>limited liability company</u>

Jurisdiction of organization:   <u>        Delaware                    </u>

2.   The Investor certifies that it is not a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle (each such term as defined in the Subscription Agreement to which this Questionnaire is attached).

☐ Yes      ☐ No

3.   (a) Is the Investor, or is the Investor acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a *"Plan"*), <u>whether or not such Plan is subject to ERISA,</u> and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a *"Benefit Plan Investor"*) pursuant to 29 C.F.R. §2510.3-101 (the *"Plan Asset Regulation"*) or otherwise.

☐ Yes      ☐ No

For example, a plan which is maintained by a foreign entity, governmental entity or church, is an employee benefit plan within the meaning of Section 3(3) of ERISA even though it is generally not subject to ERISA (collectively *"Non-ERISA Plans"*) and a Keogh plan covering no common-law employees and an individual retirement

**PP-DEL2-000027004**

account, which are also not subject to ERISA, are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person) is held by Benefit Plan Investors, would be deemed to hold the assets of one or more employee benefit plans or plans pursuant to the Plan Asset Regulation.

(b) Is the Investor, or is the Investor acting on behalf of, a Benefit Plan Investor which is subject to ERISA or Section 4975 of the Code:

☐ Yes        ☐ No

(c)(1) Is the investor a life insurance company?

☐ Yes              ☐ No

(c)(2) If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Investor's interest in the Class B Notes being acquired with the assets of the Investor's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)(3) If the Investor indicated in question (c)(2) above that general account assets are being used to acquire the Investor's interest in the Class B Notes, please complete the following:

_____% of such general account assets used to acquire Class B Notes represent "plan assets" within the meaning of the Plan Asset Regulation

(d) Is the Investor a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (each, a "*Controlling Person*").

☐ Yes        ☐ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled

PP-DEL2-000027005

by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e) The Investor understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of any class of the Issuer's Class B Notes, both upon the original issuance of Class B Notes and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Class B Notes, for any reason. Accordingly, the Investor undertakes:

(i) to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the information provided in this paragraph,

(ii) to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Issuer and the Trustee to make a determination with respect to the portion of the Class B Notes of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii) to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a Benefit Plan Investor or a Controlling Person and

(iv) to promptly dispose of its interests in the Class B Notes if it is becoming a Benefit Plan Investor or a Controlling Person and is notified that its ownership of the Class B Notes would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Class B Notes of the Issuer being held by Benefit Plan Investors.

(f) If the Investor is, or is acting on behalf of, a Benefit Plan Investor subject to ERISA and/or Section 4975 of the Code, the Investor represents and warrants that, its acquisition, ownership and disposition of the Class B Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, any similar federal, state or local law) for which an exemption is not applicable. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Class B Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

E.    **Certain Tax Matters**

1.    The Investor represents to each of (A), (B) and (C) below as follows:

☐　　(A)　It is and at all times will be either (i) a United States person within the meaning of Code section 7701(a)(30) or (ii) a person whose separate existence is disregarded pursuant to Treasury Regulation § 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30).

☐　　(B)　It has less than (and will have no more than) 98 partners for U.S. Federal income tax purposes.

☐　　(C)　The Investor is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Class B Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Note to a derivative or swap counterparty) or cause any Class B Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Note to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

The Investor understands and agrees that:

(1)　Solely for United States Federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Class B Notes, Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Class B Notes of the Issuer will constitute partners of the Issuer,

(2)　It will not elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code,

(3)　It will provide such information and complete such forms as may be reasonably requested by or on behalf of the Issuer in connection with the Issuer's preparation and filing of tax returns and other forms, if any, and

(4)　It will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Class B Notes or receive payments in respect of investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate or to give full effect to the agreed tax

PP-DEL2-000027007

treatment described above or to allow the Issuer to prepare and file tax forms or returns that the Issuer believes to be required of it, with any such form or document to be accurate and completed in a manner reasonably satisfactory to the Issuer and to be executed and to be delivered with any reasonably required certification.

(5)  A portion of the principal amount of its Class B Notes may be reduced in the circumstances and to the extent provided in the Indenture.

F.    **Related Parties**

1.    To the best of the Investor's knowledge, does the Investor control, or is the Investor controlled by or under common control with, any other investor in the Issuer?

☐ Yes        ☐ No

2.    Will any other person or persons have a beneficial interest in the Class B Notes to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

☐ Yes        ☐ No

If either question above was answered "Yes", please contact the Issuer for additional information that will be required.

G.    **Cayman Islands**

1.    The Investor certifies that it is not a member of the public in the Cayman Islands.

☐ Yes        ☐ No

PP-DEL2-000027008

The Investor understands that the foregoing information will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Class B Notes of the Issuer. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an Accredited Investor or as a Qualified Purchaser, to determine the status of the Issuer under ERISA and/or Section 4975 of the Code or to otherwise determine its eligibility to purchase Class B Notes of the Issuer. The Investor further agrees to promptly notify the Issuer by telephone and in writing if any of the information contained in this Investor Questionnaire becomes untrue prior to the registration of the Class B Notes in the name of the Investor in the Note Share Register (as defined in the Indenture). The Investor agrees to indemnify and hold harmless the Issuer and its affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signatures:

OCTALUNA, LLC:

By: Patriarch Partners VIII, LLC,
     its Managing Member

By:
   (Signature)

__Lynn Tilton__ __Manager_____
(Print Name and Title)

Date: __November 13, 2003__

NY3:#7323030

Form **W-9**
(Rev. January 2003)
Department of the Treasury
Internal Revenue Service

### Request for Taxpayer
### Identification Number and Certification

Give form to the requester. Do not send to the IRS.

Name
**Octaluna, LLC**

Business name, if different from above

Check appropriate box: ☐ Individual/ Sole proprietor  ☐ Corporation  ☑ Partnership  ☐ Other ▶ _____   ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
**c/o Patriarch Partners VIII, LLC, 112 South Tryon Street, Suite 700**

City, state, and ZIP code
**Charlotte, NC 28284**

Requester's name and address (optional)

List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note: If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number
1 3 4 2 6 8 3 0 0

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), **and**

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, **and**

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here    Signature of U.S. person ▶    Date ▶

### Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**Note:** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Foreign person.** If you are a foreign person, use the appropriate Form W-8 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

Cat. No. 10231X    Form **W-9** (Rev. 1-2003)

# EXHIBIT 6

EXECUTION COPY

**U.S.$200,000,000 Class B Zero Coupon
Second Priority Secured Notes**

### ZOHAR II 2005-1, LIMITED

### SUBSCRIPTION AGREEMENT

Zohar II 2005-1, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
Attention: The Directors

Ladies and Gentlemen:

      1.    Subscription. The Issuer hereby agrees to issue, and the undersigned (the "Investor") hereby subscribes to acquire from the Issuer, the Class B zero coupon second priority secured notes due 2020 (the "Class B Notes") of Zohar II 2005-1, Limited, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), in the aggregate amount set forth opposite the Investor's name on the signature page hereto. Capitalized terms used herein and in the attached Investor Questionnaire, but not otherwise defined herein or therein, shall have the respective meanings given to them in the Indenture, dated as of the date hereof (the "Indenture"), among the Issuer, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, as Credit Enhancer, IXIS Financial Products Inc., as Class A-1 Note Agent and Class A-3 Note Agent, and LaSalle Bank National Association, as trustee.

      The Investor acknowledges that this subscription (i) is irrevocable and (ii) is subject only to the satisfaction of the conditions precedent set forth in the Indenture. The issuer acknowledges that the Class B Notes are not being issued for cash, but nevertheless the Issuer is receiving good and valuable consideration for the Class B Notes.

      2.    Representations and Warranties. To induce the Issuer to accept this subscription, the Investor represents and warrants as follows (which representations and warranties will be deemed to be repeated by the Investor on each date that the Investor acquires Class B Notes pursuant to Paragraph 1 above):

      (a)    Accredited Investor Status; Investment Intent. The Investor is an "accredited investor" (as defined in Rule 501(a) under the Securities Act (the

"Securities Act") (an "Accredited Investor") and is acquiring the Class B Notes for its own account for investment purposes and not with a view to the distribution thereof in violation of applicable securities laws. The Investor understands that the Class B Notes have not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any other governmental authority or agency of any jurisdiction.

(b)    Investor Sophistication; Non-Reliance; Suitability; Access to Information. The Investor (i) has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Class B Notes, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Issuer, the Placement Agent, the Collateral Manager or any of their respective Affiliates (or any representative of any of the foregoing) and (iv) has determined that an investment in the Class B Notes is suitable and appropriate for it. The Investor has received, and has had an adequate opportunity to review the contents of, the Indenture, the Management Agreement and the other Transaction Documents. The Investor has had access to such financial and other information concerning the Issuer and the Class B Notes as it has deemed necessary to make its own independent decision to acquire the Class B Notes, and has been afforded an opportunity to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Class B Notes.

(c)    Securities Law Limitations on Resale. The Investor understands that the Class B Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act and have not been and will not be registered under the Securities Act. The Investor understands that an appropriate legend substantially to the foregoing effect must be placed on each certificate representing any Class B Note.

(d)    Limited Liquidity. The Investor understands that there is no market for the Class B Notes and that no assurance can be given as to the liquidity of any trading market for the Class B Notes and that it is unlikely that a trading market for the Class B Notes will develop.

(e)    Investment Company Act. The Investor is a "qualified purchaser" (a "Qualified Purchaser") as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act"), a company each of whose beneficial owners is a Qualified Purchaser, a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee") or a company owned exclusively by Knowledgeable Employees with respect to the Issuer. The Investor understands and acknowledges that the Issuer has no intention of registering as an "investment company" under the Investment Company Act.

2

(f)    ERISA. The Investor agrees to certify (a) whether or not it is, or is acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan pursuant to 29 C.F.R. Section 2510.3-101 or otherwise (the "Plan Asset Regulation") (each, a "Plan") and (b) whether it is a "benefit plan investor", as defined in the Plan Asset Regulation, and/or a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to any such assets or is an Affiliate of any such person (each such person, a "controlling person"). If the Investor is, or is acting on behalf of, a Plan, the Investor represents and warrants that, assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise, its acquisition, ownership and disposition of the Class B Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any similar federal, state or local law) for which an exemption is not available. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Class B Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. The Investor (i) agrees to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a "benefit plan investor" or a "controlling person", (ii) agrees to promptly dispose of its interests in the Class B Notes in a manner consistent with the restrictions on transfer set forth in the Indenture, if it is becoming a "benefit plan investor" or a "controlling person", and it has been notified that its ownership of the Class B Notes would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Issuer's Class B Notes, the Preference Shares or of any other equity interest of the Issuer being held by "benefit plan investors" and (iii) understands and agrees that the information supplied in this Subscription Agreement upon acquisition of the Class B Notes and as requested thereafter will be utilized to determine whether "benefit plan investors" own less than 25% of the value of the Class B Notes of the Issuer, both upon the original issuance of Class B Notes and upon any subsequent transfer of the Class B Notes, Preference Shares or any other equity interest in the Issuer.

(g)    Certain Tax Matters. The Investor (i) represents that: (a) it is either (1) a United States person within the meaning of Code section 7701(a)(30) or (2) a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30); (b) it is a partnership that has, and at all

3

times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2)and (c) it is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of the Class B Notes or cause the Class B Notes to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations, and (ii) understands and agrees that (a) it may not (except as otherwise provided in the Indenture) sell, pledge or otherwise transfer a Class B Note (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Note to a derivative or swap counterparty), (b) it will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Class B Notes or receive payment in respect of its investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate.

(h) <u>Limitations on Flow-Through Status</u>. The Investor represents that, unless the Investor is a Qualifying Investment Vehicle (as defined below), (i) if the Investor would be an investment company but for the exceptions in Section 3(c)(1) or 3(c)(7) of the Investment Company Act, the amount of the Investor's investment in the Class B Notes does not exceed 40% of the total assets (determined on a consolidated basis with its subsidiaries) of the Investor; (ii) no person owning any equity or similar interest in the Investor exercises control, on an investment-by-investment basis, over the amount of such person's contribution to any investment made by the Investor; and (iii) the Investor was not organized or reorganized for the specific purpose of acquiring the Class B Notes or the Preference Shares. For this purpose, a "<u>Qualifying Investment Vehicle</u>" is an entity (a) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Trustee each of the representations set forth herein, in each case with modifications to such representations satisfactory to the Issuer to reflect the indirect nature of the interests of such beneficial owners in the Class B Notes, and (b) as to which, if such entity would be an investment company but for the exceptions provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act (any such entity, an "<u>excepted investment company</u>"): (x) all of the beneficial owners of outstanding securities (other than short-term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("<u>pre-amendment beneficial owners</u>"); and (y) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any

4

Subscription Agreement (Class B Notes)

outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act.

(i)     Transfers Void.  The Investor agrees that no sale, pledge or other transfer of a Class B Note (or any portion thereof) may be made (except as otherwise provided in the Indenture).  The Investor acknowledges and agrees that (i) any sale, pledge or other transfer of a Class B Note (or any portion thereof) made in violation of the transfer restrictions contained in the Indenture, will be void ab initio and of no force or effect and (ii) none of the Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class B Note (or any interest therein) made in violation of any such transfer restriction.

(j)     Limited Recourse; Non-Petition.  The Investor acknowledges that the obligations of the Issuer under the Class B Notes and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral, as provided therein and in the Indenture and, following realization of the Collateral, any claims of the Investor hereunder or under the Indenture shall be extinguished and shall not thereafter revive.  No recourse shall be had for the payment of any amount owing hereunder against any officer, partner, agent, Affiliate, member, director, employee, securityholder or incorporator of the Issuer or its successors or permitted assigns.  The Investor acknowledges that the Issuer shall be the sole obligor on or in respect of the Class B Notes, and the Co-Issuer shall not have any obligations in respect thereof.  The Investor agrees that it shall not, prior to the date which is one year and one day (or, if longer, any applicable preference period then in effect) after the payment in full of all the Notes, institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under federal or state bankruptcy or similar laws; provided, however, that nothing in this clause shall preclude, or be deemed to stop, the Investor (a) from taking any action prior to the expiration of the aforementioned one year and one day period in (i) any case or Proceeding voluntarily filed or commenced by any Zohar Obligor or (ii) any involuntary insolvency Proceeding filed or commenced against any Zohar Obligor by a Person other than the Investor, or (b) from commencing against any Zohar Obligor or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency or a liquidation Proceeding.

(k)     Reliance on Representations, etc.  The Investor acknowledges that the Issuer, the Collateral Manager, the Placement Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Class B Notes are no longer accurate, the Investor will promptly notify the Issuer and Placement Agent.

5

PP-DEL2-000630411

(l)     Cayman Islands.  The Investor is not a member of the public of the Cayman Islands.

(m)     Subscription Agreement.  The Investor has the power and authority to enter into this Subscription Agreement and each other document required to be executed and delivered by or on behalf of the Investor in connection with this subscription for Class B Notes, and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby, and the person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for Class B Notes.  Such execution, delivery and compliance by the Investor does not conflict with, or constitute a default under, any instruments governing the Investor, any applicable law (assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise), regulation or order, or any material agreement to which the Investor is a party or by which the Investor is bound.  This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor, enforceable against the Investor in accordance with its terms.

(n)     Investor Location.  If the Investor's permanent address specified in the Investor Questionnaire is located in the United States, the Investor was offered the Class B Notes in the state listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Issuer and intends that the securities law of that state govern the Investor's subscription for the Class B Notes.

3.     Tax Information.  The Investor certifies under penalties of perjury that (i) the Investor's name, taxpayer identification or social security number (if any) and address provided in the Investor Questionnaire are correct and (ii) the information contained in any Form W-9 (Request for Taxpayer Identification Number and Certification) or any other tax-related form submitted to the Issuer is correct (which certification will be deemed to be repeated on any date on which any tax form is delivered to the Issuer after the date hereof).  The Investor agrees to in a timely manner complete (accurately and in a manner reasonably satisfactory to the Issuer), execute, arrange for any required certification of, and deliver to the Issuer or such governmental or taxing authority as the Issuer directs, any form, document or certificate that may be required or reasonably requested by the Issuer.  The Investor further agrees to promptly inform the Issuer of any change in any such information previously provided to the Issuer and to execute a new form or other document with the correct information.

4.     Further Advice and Assurances.  All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue.  The Investor

6

Subscription Agreement (Class B Notes)

PP-DEL2-000630412

agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may be subject.

5.     Indemnity.  The Investor understands that the information provided herein will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase the Class B Notes.  The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase the Class B Notes.  The Investor agrees to indemnify and hold harmless the Issuer, the Placement Agent and each of their respective Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in the Class B Notes.  Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

6.     Delivery of Class B Notes.  On the Funding Date, the Issuer shall cause the Class B Notes to be registered in the Investor's name in the register maintained on behalf of the Issuer by the Trustee under the Indenture, and have delivered to the Investor its Class B Notes.

7.     Binding Effect.     Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, executors, legal representatives and permitted transferees, as applicable.

8.     Benefit of Agreement.     The Investor acknowledges that each representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Class B Notes is made for the benefit of the Issuer, the Collateral Manager and each of their respective Affiliates and also for the benefit of the Trustee under the Indenture and holders from time to time of the Notes issued thereunder.

9.     Miscellaneous.  This Subscription Agreement is not assignable by the Investor without the consent of the Issuer.  The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the transactions contemplated hereby and any investigation made by the Issuer.  The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein.  This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of New York.

10.     Waiver of Jury Trial.     **THE INVESTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY (BUT NO**

7

Subscription Agreement (Class B Notes)

**PP-DEL2-000630413**

**OTHER JUDICIAL REMEDIES) IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT, THE INDENTURE, AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

11.    Notices.  Notices shall be given hereunder as specified in, and with the effect provided for by, Section 18.3 of the Indenture.

12.    Certain Transactions.  Notwithstanding anything to the contrary contained herein or in any other Transaction Document, the Investor hereby acknowledges and agrees that (i) the Issuer has purchased the assets designated as the "Zohar I Assets" set forth in Schedule A-1 of the Indenture from Zohar CDO 2003-1, Limited (an Affiliate of Patriarch Partners) with proceeds of Warehouse Advances, and the Investor hereby consents to such acquisitions at such prices and waive any and all conflicts of interest relating thereto, and (ii) the Issuer and/or the Zohar Subsidiary shall (on or about the Funding Date) purchase the assets set forth in Schedule A-2 of the Indenture from Ark CLO 2000-1, Limited and/or Ark CLO 2000-1, LLC (each an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2 of the Indenture), and the Investor hereby consents to such acquisitions at such prices (including without limitation pursuant to the pricing methodology set forth in Schedule A-2 of the Indenture) and waives any and all conflicts of interest relating thereto and shall not thereafter revive.  The above described purchases and sales have been or will be, as applicable, made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in Schedule A-1 of the Indenture and Schedule A-2 of the Indenture, as applicable.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

8

Subscription Agreement (Class B Notes)

PP-DEL2-000630414

The Issuer hereby accepts the above application
for subscription for Class B Notes.

ZOHAR II 2005-1, LIMITED

By:_____

    Name:    **Chris Watler**
    Title:    **Director**

Date:_____

Subscription Agreement (Class B Notes)

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement on the date set forth below.

Date: January ___, 2005
**Aggregate Principal Amount of Class B Notes subscribed for:** U.S.$200,000,000

OCTALUNA II, LLC:

By: Patriarch Partners XIV, LLC, its Managing Member

By: _____
Name: Lynn Tilton
Title: Manager

## INVESTOR QUESTIONNAIRE

Reference is made to the Indenture, dated as of January 12, 2005 (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), among the Zohar II 2005-1, Limited , Zohar II 2005-1, Corp. , Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc. and LaSalle Bank National Association, as trustee. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

### A.    General Information

1.    Print Full Name of Investor:                    _____

2.    Name in which Class B Notes
       should be registered:                             _____

3.    Address and Contact Person
       for Notices:                                            _____
                                                                   _____
                                                                   _____

                                                                   Attention: _____

4.    Telephone Number:                             _____

5.    Telecopier Number:                             _____

6.    Permanent Address:                            _____
       (if different from above)                      _____
                                                                   _____

7.    U.S. Taxpayer
       Identification or Social
       Security Number (if any)                    _____

8.    Payment Instructions:                        _____
                                                                   _____
                                                                   _____

9.    Instructions for delivery
       of Class B Notes:                              _____
                                                                   _____
                                                                   _____

Subscription Agreement (Class B Notes)

B.   **Accredited Investor**

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "<u>Accredited Investor</u>") and has checked the box or boxes below which are next to the categories under which the Investor so qualifies as an Accredited Investor:

☐         (A)    It is an entity, including a grantor trust, in which all of the equity owners are Accredited Investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐         (B)    It is a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐         (C)    It is an insurance company as defined in Section 2(13) of the Securities Act.

☐         (D)    It is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐         (E)    It is an investment company registered under the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>").

☐         (F)    It is a business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐         (G)    It is a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐         (H)    It is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "<u>Investment Advisers Act</u>").

☐         (I)    It is an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or

2

Subscription Agreement (Class B Notes)

PP-DEL2-000630418

partnership, in each case not formed for the specific purpose of acquiring Class B Notes, with total assets in excess of U.S.$5,000,000.

☐    (J)    It is a trust with total assets in excess of U.S.$5,000,000 not formed for the specific purpose of acquiring Class B Notes, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Class B Notes.

## C.    **Qualified Purchaser Status**

1.    The Investor represents and warrants that the Investor is a "qualified purchaser" within the meaning of the Investment Company Act (a "Qualified Purchaser") and has checked the box or boxes below which are next to the categories under which the Investor qualifies as a Qualified Purchaser:

☐    (A)    It is a company that (1) owns not less than U.S.$5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not formed for the specific purpose of acquiring Class B Notes of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐    (B)    It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐    (C)    It is a Person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than U.S.$25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a

3

Subscription Agreement (Class B Notes)

company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Class B Notes unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐     (D)     It is a "qualified institutional buyer" within the meaning of Rule 144A(a) promulgated under the Securities Act, acting for its own account, the account of another qualified institutional buyer or the account of a Qualified Purchaser; provided:

(1)     that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of the dealer; and

(2)     that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☐     (E)     It is an entity in which each beneficial owner of the Investor's securities is a Qualified Purchaser.

Alternatively, the Investor represents and warrants that the Investor is a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee") or a company owned exclusively by Knowledgeable Employees.

☐ Yes     ☐ No

2.     If the Investor is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

(i)     all of the beneficial owners of outstanding securities (other than short-term paper) of the Investor (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

(ii)     all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly

4

Subscription Agreement (Class B Notes)

PP-DEL2-000630420

or indirectly, owns any outstanding securities of the Investor, have consented to the Investor's treatment as a qualified purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

D.    **Supplemental Data**

1.    Legal form of entity (corporation, partnership, trust, etc.): _____

      Jurisdiction of organization: _____

2.    The Investor certifies that it is not a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle.

      ☐ Yes        ☐ No

3.    (a)    Is the Investor, or is the Investor acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a "Plan"), whether or not such Plan is subject to ERISA, and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a "Benefit Plan Investor") pursuant to 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise.

      ☐ Yes        ☐ No

      For example, a plan which is maintained by a foreign entity, governmental entity or church, is an employee benefit plan within the meaning of Section 3(3) of ERISA even though it is generally not subject to ERISA (collectively "Non-ERISA Plans") and a Keogh plan covering no common-law employees and an individual retirement account, which are also not subject to ERISA, are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any Affiliate of such a person) is held by Benefit Plan Investors, would be deemed to hold the assets of one or more employee benefit plans or plans pursuant to the Plan Asset Regulation.

      (b)    Is the Investor, or is the Investor acting on behalf of, a Benefit Plan Investor which is subject to ERISA or Section 4975 of the Code:

      ☐ Yes        ☐ No

5

(c)(1)   Is the investor a life insurance company?

☐ Yes                    ☐ No

(c)(2)   If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Investor's interest in the Class B Notes being acquired with the assets of the Investor's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)(3)   If the Investor indicated in question (c)(2) above that general account assets are being used to acquire the Investor's interest in the Class B Notes, please complete the following:

_____% of such general account assets used to acquire Class B Notes represent "plan assets" within the meaning of the Plan Asset Regulation

(d)      Is the Investor a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (each, a "Controlling Person").

☐ Yes          ☐ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)      The Investor understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of any class of the Issuer's Class B Notes, both upon the original issuance of Class B Notes and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Class B Notes, for any reason. Accordingly, the Investor undertakes:

(i)      to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the information provided in this paragraph,

(ii)     to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Issuer and the

6

Trustee to make a determination with respect to the portion of the Class B Notes of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii) to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a Benefit Plan Investor or a Controlling Person and

(iv) to promptly dispose of its interests in the Class B Notes if it is becoming a Benefit Plan Investor or a Controlling Person and is notified that its ownership of the Class B Notes would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Class B Notes of the Issuer being held by Benefit Plan Investors.

(f) If the Investor is, or is acting on behalf of, a Benefit Plan Investor subject to ERISA and/or Section 4975 of the Code, the Investor represents and warrants that, its acquisition, ownership and disposition of the Class B Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, any similar federal, state or local law) for which an exemption is not applicable. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Class B Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

E. **Certain Tax Matters**

1. The Investor represents to each of (A), (B) (C) and (D) below as follows:

   (A) Either

   ☐ (1) It will at all times be a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code, or

   ☐ (2) It will at all times be a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code.

7

Subscription Agreement (Class B Notes)

PP-DEL2-000630423

    (B)   Either

☐    (1)   It is not for U.S. federal income tax purposes a partnership, grantor trust or S corporation, or

☐    (2)   It was not formed for the purpose of holding the Class B Notes or any other equity interests in the Issuer and not more than 50% of the value of the interest of any of the Investor's beneficial owners will be attributable to Preference Shares or any other equity interests of the Issuer, or

☐    (3)   It will provide an opinion of a nationally recognized tax counsel that its purchase will not cause the Issuer to be treated as a publicly traded partnership and such other representations and information as the Trustee in its sole discretion may request, in form and substance satisfactory to the Trustee, or

☐    (4)   It is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2).

    (C)   The Investor is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Class B Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Notes to a derivative or swap counterparty) or cause any Class B Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Note to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

The Investor understands and agrees that:

    (1)   Solely for United States federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Class B Notes, Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Class B Notes of the Issuer will constitute partners of the Issuer,

    (2)   It will not elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code,

8

PP-DEL2-000630424

(3)     It will provide such information and complete such forms as may be reasonably requested by or on behalf of the Issuer in connection with the Issuer's preparation and filing of tax returns and other forms, if any, and

(4)     It will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Class B Notes or receive payments in respect of investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate or to give full effect to the agreed tax treatment described above or to allow the Issuer to prepare and file tax forms or returns that the Issuer believes to be required of it, with any such form or document to be accurate and completed in a manner reasonably satisfactory to the Issuer and to be executed and to be delivered with any reasonably required certification.

(5)     A portion of the principal amount of its Class B Notes may be reduced in the circumstances and to the extent provided in the Indenture.

## F.   **Related Parties**

1.   To the best of the Investor's knowledge, does the Investor control, or is the Investor controlled by or under common control with, any other investor in the Issuer?

☐ Yes          ☐ No

2.   Will any other person or persons have a beneficial interest in the Class B Notes to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

☐ Yes          ☐ No

If either question above was answered "Yes", please contact the Issuer for additional information that will be required.

## G.   **Cayman Islands**

1.   The Investor certifies that it is not a member of the public in the Cayman Islands.

☐ Yes          ☐ No

9

Subscription Agreement (Class B Notes)

PP-DEL2-000630425

The Investor understands that the foregoing information will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Class B Notes of the Issuer. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an Accredited Investor or as a Qualified Purchaser, to determine the status of the Issuer under ERISA and/or Section 4975 of the Code or to otherwise determine its eligibility to purchase Class B Notes of the Issuer. The Investor further agrees to promptly notify the Issuer by telephone and in writing if any of the information contained in this Investor Questionnaire becomes untrue prior to the registration of the Class B Notes in the name of the Investor in the Note Register. The Investor agrees to indemnify and hold harmless the Issuer and its Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signatures:

OCTALUNA II, LLC:

By: Patriarch Partners XIV, LLC, its Managing Member

By:_____
(Signature)

Lynn Tilton, Manager
(Print Name and Title)

Date:_____

Subscription Agreement (Class B Notes)

# EXHIBIT 7

## CLASS B NOTE

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. NO TRANSFER OR PLEDGE OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE (AND THE TRUSTEE AND THE NOTE REGISTRAR WILL NOT RECOGNIZE ANY SUCH TRANSFER OR PLEDGE). ACCORDINGLY, AN INVESTOR IN THIS NOTE MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## ZOHAR III, LIMITED

### CLASS B ZERO COUPON FOURTH PRIORITY SECURED NOTE DUE 2019

CUSIP No.: 989767AA6

ISIN No.: US989767AA62

April 11, 2007
Certificate No. B/1
U.S.$186,000,000

ZOHAR III, LIMITED, an exempted company organized under the laws of the Cayman Islands (the "Issuer"), for value received, hereby promise to pay to OCTALUNA III, LLC or registered assigns, upon presentation and surrender of this Note (except as otherwise permitted by the Indenture referred to below), the principal sum of ONE HUNDRED EIGHTY SIX MILLION United States Dollars (U.S.$186,000,000) (or such lesser amount as shall equal the aggregate outstanding principal amount of this Class B Note on the Payment Date in April 2019 (the "Stated Maturity") except as provided below and in said Indenture.

This Note is one of a duly authorized issue of Class B zero coupon fourth priority secured notes due 2019 (the "Class B Notes") issued and to be issued under an Indenture dated as of April 6, 2007, as supplemented and otherwise modified and in effect from time to time (the "Indenture"), among the Issuer, Zohar III, Corp. (the "Co-Issuer"), Zohar III, LLC, Natixis Financial Products Inc., as agent for the Holders of the Class A-1R Notes (the "Class A-1R Note Agent") and as agent for the Holders of the Class A-1D Notes (the "Class A-1D Note Agent"), and LaSalle Bank National Association, as trustee (in such capacity, the "Trustee"). Capitalized terms used in this Note, but not defined herein, shall have the meanings set forth in the Indenture. Reference is hereby made to the Indenture, all indentures supplemental thereto and all agreements referred to therein for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Co-Issuers, the Class A-1R Note Agent, the Class A-1D Note Agent, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

This Class B Note may be redeemed, in whole but not in part, in the manner and with the effect provided in the Indenture.

A portion of the principal amount of this Class B Note may be reduced in the circumstances and to the extent provided in the Indenture

The principal of this Class B Note which is payable in accordance with the Priority of Payments on any Payment Date and is punctually paid or duly provided for on such Payment Date shall be paid to the Person in whose name this Class B Note (or one or more predecessor Notes) is registered at the close

of business on the Record Date with respect to such Payment Date, which Record Date shall be the fifteenth day (whether or not a Business Day) prior to such Payment Date.

The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral as provided in the Indenture. The payments of principal of this Class B Note are subject to the Priority of Payments and are subordinated to the payment of certain other amounts as provided therein and in Section 13.1 of the Indenture.

No recourse shall be had for the payment of any amount owing in respect of this Note against any Officer, member, director, employee, securityholder or incorporator of the Issuer or its respective successors or assigns for any amounts payable under this Note or the Indenture. It is understood that the foregoing shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by this Note or secured by the Indenture until such Collateral has been realized and the proceeds thereof applied as provided in the Indenture, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing shall not limit the right of any Person to name any Zohar Obligor as a party defendant in any action or suit or in the exercise of any other remedy under this Note or the Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

All reductions in the principal amount of this Class B Note (or one or more predecessor Class B Notes) effected pursuant to Section 7.13 of the Indenture or by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders hereof and of any Class B Note issued upon the registration of transfer of this Class B Note or in exchange therefor or in lieu thereof, whether or not such payment is noted on this Class B Note.

This Class B Note is a registered Note pursuant to Section 2.4 of the Indenture and neither this Note nor any interest herein may be transferred or pledged, and the Trustee and the Note Registrar (if either has actual knowledge thereof) will not recognize any such transfer or pledge. Any purported sale, pledge or other transfer of this Note (or any interest therein) made in violation of the transfer restrictions contained in the Indenture or in this Note, or made based upon any false or inaccurate representation made by the transferee to the Issuer or the Trustee, will be void ab initio and of no force or effect; none of the Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of this Note (or any interest therein) made in violation of any such transfer restrictions or made based upon any such false or inaccurate representation.

The Issuer, the Trustee, the Collateral Manager, and any agent of any of them may treat the Person in whose name this Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on this Note and for all other purposes whatsoever (whether or not this Note is overdue), subject to the Indenture (including, without limitation, Section 2.7 thereof).

Amounts payable hereunder shall be paid to the Person in whose name this Note (or one or more predecessor Notes) is registered in the Note Register at the close of business on the applicable Record Date for such payment, subject to the Indenture (including, without limitation, Section 2.6(f) thereof). Payments hereunder shall be made by wire transfer in immediately available funds to a Dollar account maintained by the Holders in accordance with wire transfer instructions received by any Paying Agent on or before the applicable Record Date or, if no wire transfer instructions are received by a Paying Agent, by a Dollar check drawn on a bank in the United States in accordance with the Indenture.

As a condition to the payment of any amount hereunder without the imposition of withholding tax, the applicable Paying Agent shall require certification acceptable to it to enable the Issuer, the Trustee, and such Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of this Note or the Holder hereof under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

Unless the certificate of authentication hereon has been executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

If an Event of Default shall occur and be continuing, the Class B Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO THE CONFLICT OF LAWS OR CHOICE OF LAW PRINCIPLES THEREOF.



IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

ZOHAR III, LIMITED



By:

Name:

Title:             Gregory F. Lavelle
                   Attorney-In-Fact

## CERTIFICATE OF AUTHENTICATION

This is one of the Class B zero coupon fourth priority secured notes referred to in the within-mentioned Indenture.

LASALLE BANK NATIONAL ASSOCIATION, as Trustee

By: _____
     Authorized Signatory



# **EXHIBIT 8**

EXECUTION COPY

**U.S.$186,000,000 Class B Zero Coupon**
**Fourth Priority Secured Term Notes**

**ZOHAR III, LIMITED**

**SUBSCRIPTION AGREEMENT**

Zohar III, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
Attention: The Directors

Ladies and Gentlemen:

1.    <u>Subscription</u>.  The Issuer hereby agrees to issue, and the undersigned (the "<u>Investor</u>") hereby subscribes to acquire from the Issuer, the Class B zero coupon fourth priority secured term notes due 2019 (the "<u>Class B Notes</u>") of Zohar III, Limited, an exempted company organized under the laws of the Cayman Islands (the "<u>Issuer</u>"), in the aggregate amount set forth opposite the Investor's name on the signature page hereto.  Capitalized terms used herein and in the attached Investor Questionnaire, but not otherwise defined herein or therein, shall have the respective meanings given to them in the Indenture, dated as of the date hereof (the "<u>Indenture</u>"), among the Issuer, Zohar III, Corp., Zohar III, LLC., Natixis Financial Products Inc., as Class A-1R Note Agent and Class A-1D Note Agent, and LaSalle Bank National Association, as trustee.

The Investor acknowledges that this subscription (i) is irrevocable and (ii) is subject only to the satisfaction of the conditions precedent set forth in the Indenture.  The issuer acknowledges that the Class B Notes are not being issued for cash, but nevertheless the Issuer is receiving good and valuable consideration for the Class B Notes.

2.    <u>Representations and Warranties</u>.  To induce the Issuer to accept this subscription, the Investor represents and warrants as follows (which representations and warranties will be deemed to be repeated by the Investor on each date that the Investor acquires Class B Notes pursuant to Paragraph 1 above):

(a)    <u>Accredited Investor Status; Investment Intent</u>.  The Investor is an "accredited investor" (as defined in Rule 501(a) under the Securities Act (the "<u>Securities Act</u>") (an "<u>Accredited Investor</u>") and is acquiring the Class B Notes for its own account for investment purposes and not with a view to the distribution thereof in violation of applicable securities laws.  The Investor understands that the Class B Notes have not been approved or disapproved by the United States Securities and Exchange Commission (the "<u>SEC</u>") or any other governmental authority or agency of any jurisdiction.

(b)    <u>Investor Sophistication; Non-Reliance; Suitability; Access to Information</u>.  The Investor (i) has such knowledge and experience in financial and

Patriarch/PC Confidential

business matters that the Investor is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Class B Notes, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Issuer, the Placement Agents, the Collateral Manager or any of their respective Affiliates (or any representative of any of the foregoing) and (iv) has determined that an investment in the Class B Notes is suitable and appropriate for it. The Investor has received, and has had an adequate opportunity to review the contents of, the Indenture, the Management Agreement and the other Transaction Documents. The Investor has had access to such financial and other information concerning the Issuer and the Class B Notes as it has deemed necessary to make its own independent decision to acquire the Class B Notes, and has been afforded an opportunity to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Class B Notes.

(c)    Securities Law Limitations on Resale. The Investor understands that the Class B Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act and have not been and will not be registered under the Securities Act. The Investor understands that an appropriate legend substantially to the foregoing effect must be placed on each certificate representing any Class B Note.

(d)    Limited Liquidity. The Investor understands that there is no market for the Class B Notes and that no assurance can be given as to the liquidity of any trading market for the Class B Notes and that it is unlikely that a trading market for the Class B Notes will develop.

(e)    Investment Company Act. The Investor is a "qualified purchaser" (a "Qualified Purchaser") as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act"), a company each of whose beneficial owners is a Qualified Purchaser, a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee") or a company owned exclusively by Knowledgeable Employees with respect to the Issuer. The Investor understands and acknowledges that the Issuer has no intention of registering as an "investment company" under the Investment Company Act.

(f)    ERISA. The Investor agrees to certify (a) whether or not it is, or is acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA subject to the fiduciary responsibility requirements of Title I of ERISA and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each a "benefit plan investor") pursuant to 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise (each, a "Plan") and (b) whether it is a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or is an Affiliate of any such person (each such person, a "controlling person"). If the Investor is, or is acting on behalf of, a Plan, the Investor represents and warrants that its acquisition, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any similar federal, state or local law) for which an exemption is not available. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed

2

of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. The Investor (i) agrees that no sale, pledge or other transfer of such Preference Share (or any interest therein) may be made if, immediately after giving effect to such transfer, 25% or more, as determined under the Plan Asset Regulation, of the value of the Preference Shares or of any other class of equity interest of the Issuer would be held by "benefit plan investors", (ii) agrees to inform the Issuer and the Preference Share Paying Agent immediately of any change in the status of the Investor which results in the Investor's becoming a "benefit plan investor" or a "controlling person", (iii) agrees to promptly dispose of its interests in the Preference Shares if it is becoming a "benefit plan investor" or a "controlling person", and it has been notified that its ownership of the Preference Shares would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Issuer's Preference Shares or of any other class of equity interest in the Issuer being held by "benefit plan investors" and (iv) understands and agrees that the information supplied in this Subscription Agreement upon acquisition of the Preference Shares and as requested thereafter from time to time will be utilized to determine whether benefit plan investors own less than 25% of the value of the Preference Shares or of any other class of equity interest in the Issuer, both upon the original issuance of Preference Shares and upon any subsequent transfer of the Preference Shares or of any other class of equity interest in the Issuer.

(g)     Certain Tax Matters. The Investor (i) represents that: (a) it is either (1) a United States person within the meaning of Code section 7701(a)(30) or (2) a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30); (b) it is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2) and, (c) it is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of the Class B Notes or cause the Class B Notes to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations, and (ii) understands and agrees that (a) it may not (except as otherwise provided in the Indenture) sell, pledge or otherwise transfer a Class B Note (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Note to a derivative or swap counterparty), and (b) it will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Class B Notes or receive payment in respect of its investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate.

(h)     Limitations on Flow-Through Status. The Investor represents that, unless the Investor is a Qualifying Investment Vehicle (as defined below), (i) if the Investor would be an investment company but for the exceptions in Section 3(c)(1) or 3(c)(7) of the Investment Company Act, the amount of the Investor's investment in the Class B Notes does not exceed 40% of the total assets (determined on a consolidated

3

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

basis with its subsidiaries) of the Investor; (ii) no person owning any equity or similar interest in the Investor exercises control, on an investment-by-investment basis, over the amount of such person's contribution to any investment made by the Investor; and (iii) the Investor was not organized or reorganized for the specific purpose of acquiring the Class B Notes or the Preference Shares. For this purpose, a "<u>Qualifying Investment Vehicle</u>" is an entity (a) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Trustee each of the representations set forth herein, in each case with modifications to such representations satisfactory to the Issuer to reflect the indirect nature of the interests of such beneficial owners in the Class B Notes, and (b) as to which, if such entity would be an investment company but for the exceptions provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act (any such entity, an "<u>excepted investment company</u>"):  (x) all of the beneficial owners of outstanding securities (other than short-term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("<u>pre-amendment beneficial owners</u>"); and (y) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act.

(i)     <u>Transfers Void</u>.  The Investor agrees that no sale, pledge or other transfer of a Class B Note (or any portion thereof) may be made (except as otherwise provided in the Indenture).  The Investor acknowledges and agrees that (i) any sale, pledge or other transfer of a Class B Note (or any portion thereof) made in violation of the transfer restrictions contained in the Indenture, will be void <u>ab</u> <u>initio</u> and of no force or effect and (ii) none of the Issuer, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Class B Note (or any interest therein) made in violation of any such transfer restriction.

(j)     <u>Limited Recourse; Non-Petition</u>.  The Investor acknowledges that the obligations of the Issuer under the Class B Notes and the Indenture are limited recourse obligations of the Issuer payable solely from the Collateral, as provided therein and in the Indenture and, following realization of the Collateral, any claims of the Investor hereunder or under the Indenture shall be extinguished and shall not thereafter revive. No recourse shall be had for the payment of any amount owing hereunder against any officer, partner, agent, Affiliate, member, director, employee, securityholder or incorporator of the Issuer or its successors or permitted assigns.  The Investor acknowledges that the Issuer shall be the sole obligor on or in respect of the Class B Notes, and the Co-Issuer shall not have any obligations in respect thereof. The Investor agrees that it shall not, prior to the date which is one year and one day (or, if longer, any applicable preference period then in effect) after the payment in full of all the Notes, institute against, or join any other Person in instituting against, any Zohar Obligor any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceedings, or other Proceedings under federal or state bankruptcy or similar laws; provided, however, that nothing in this clause shall preclude, or be deemed to stop, the Investor (a) from taking any action prior to the expiration of the aforementioned one year and one day period in (i) any case or Proceeding voluntarily filed or commenced by any Zohar Obligor or (ii) any involuntary insolvency Proceeding filed or commenced against

4

any Zohar Obligor by a Person other than the Investor, or (b) from commencing against any Zohar Obligor or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency or a liquidation Proceeding.

(k)     Reliance on Representations, etc.  The Investor acknowledges that the Issuer, the Collateral Manager, the Placement Agents and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Class B Notes are no longer accurate, the Investor will promptly notify the Issuer and Placement Agents.

(l)     Cayman Islands.  The Investor is not a member of the public of the Cayman Islands.

(m)     Subscription Agreement.  The Investor has the power and authority to enter into this Subscription Agreement and each other document required to be executed and delivered by or on behalf of the Investor in connection with this subscription for Class B Notes, and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby, and the person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for Class B Notes.  Such execution, delivery and compliance by the Investor does not conflict with, or constitute a default under, any instruments governing the Investor, any applicable law (assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise), regulation or order, or any material agreement to which the Investor is a party or by which the Investor is bound.  This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor, enforceable against the Investor in accordance with its terms.

(n)     Investor Location.  If the Investor's permanent address specified in the Investor Questionnaire is located in the United States, the Investor was offered the Class B Notes in the state listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Issuer and intends that the securities law of that state govern the Investor's subscription for the Class B Notes.

3.     Tax Information.  The Investor certifies under penalties of perjury that (i) the Investor's name, taxpayer identification or social security number (if any) and address provided in the Investor Questionnaire are correct and (ii) the information contained in any Form W-9 (Request for Taxpayer Identification Number and Certification) or any other tax-related form submitted to the Issuer is correct (which certification will be deemed to be repeated on any date on which any tax form is delivered to the Issuer after the date hereof).  The Investor agrees to in a timely manner complete (accurately and in a manner reasonably satisfactory to the Issuer), execute, arrange for any required certification of, and deliver to the Issuer or such governmental or taxing authority as the Issuer directs, any form, document or certificate that may be required or reasonably requested by the Issuer.  The Investor further agrees to promptly inform the Issuer of any change in any such information previously provided to the Issuer and to execute a new form or other document with the correct information.

4.     Further Advice and Assurances.  All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct

5

NY3:#7391530
Patriarch/PC Confidential

and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue. The Investor agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may be subject.

5.   Indemnity. The Investor understands that the information provided herein will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase the Class B Notes. The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase the Class B Notes. The Investor agrees to indemnify and hold harmless the Issuer, the Placement Agents and each of their respective Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in the Class B Notes. Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

6.   Delivery of Class B Notes. On the Funding Date, the Issuer shall cause the Class B Notes to be registered in the Investor's name in the register maintained on behalf of the Issuer by the Trustee under the Indenture, and have delivered to the Investor its Class B Notes.

7.   Binding Effect. Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, executors, legal representatives and permitted transferees, as applicable.

8.   Benefit of Agreement. The Investor acknowledges that each representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Class B Notes is made for the benefit of the Issuer, the Collateral Manager and each of their respective Affiliates and also for the benefit of the Trustee under the Indenture and holders from time to time of the Notes issued thereunder.

9.   Miscellaneous. This Subscription Agreement is not assignable by the Investor without the consent of the Issuer. The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the transactions contemplated hereby and any investigation made by the Issuer. The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein. This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of New York.

10.   Waiver of Jury Trial. **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS**

6

NY3:#7391530

Patriarch/PC Confidential

**REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

> 11.    <u>Notices</u>. Notices shall be given hereunder as specified in, and with the effect provided for by, Section 1y.3 of the Indenture.

> 12.    <u>Certain Transactions</u>. The Issuer shall purchase on or about the Funding Date certain assets (designated as the "Zohar I Assets" and the "Zohar II Assets" under the Indenture) from Zohar CDO 20031, Limited and/or Zohar II CDO 2005-1, Limited (each an Affiliate of Patriarch Partners) and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed  to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  In addition, the Issuer and/or the Zohar Subsidiary will  exchange for Preference Shares certain assets from the Ark Seller (an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology) identified in the Indenture, and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  The above described purchases and sales have been or will be made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in the schedules to the Indenture.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

7

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement on the date set forth below.

Date:  April 6, 2007
**Aggregate Principal Amount of Class B Notes subscribed for:** U.S.$186,000,000

OCTALUNA III, LLC

By:  Patriarch Partners XV, LLC,
    its Managing Member

By: _____
    Name:  Lynn Tilton
    Title:  Manager

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

The Issuer hereby accepts the above application
for subscription for Class B Notes.

ZOHAR III, LIMITED

By:_____
   Name:   ~~Chris Watler~~
   Title:   Director

Date:___April 16, 2007___

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

## INVESTOR QUESTIONNAIRE

Reference is made to the Indenture, dated as of April 6, 2007 (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), among the Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc. and LaSalle Bank National Association, as trustee. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

A. **General Information**

| | | |
|---|---|---|
| 1. | Print Full Name of Investor: | Octaluna III, LLC |
| 2. | Name in which Class B Notes should be registered: | Octaluna III, LLC |
| 3. | Address and Contact Person for Notices: | 227 W Trade Street<br>Suite 1400<br>Charlotte, NC 28202<br><br>Attention: Virginia Blount |
| 4. | Telephone Number: | (704) 227-1217 |
| 5. | Telecopier Number: | (704) 375-0358 |
| 6. | Permanent Address: (if different from above) | |
| 7. | U.S. Taxpayer Identification or Social Security Number (if any) | 20-8784040 |
| 8. | Payment Instructions: | Branch Banking & Trust<br>200 South College St, 2nd Floor<br>Charlotte, NC 28202<br>Routing #: 053101121 Acct #: 5295917581 |
| 9. | Instructions for delivery of Class B Notes: | |

B. **Accredited Investor**

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "Accredited Investor") and has checked the box or boxes below which are next to the categories under which the Investor so qualifies as an Accredited Investor:

☒      (A)     It is an entity, including a grantor trust, in which all of the equity owners are Accredited Investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐      (B)     It is a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐      (C)     It is an insurance company as defined in Section 2(13) of the Securities Act.

☐      (D)     It is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐      (E)     It is an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

☐      (F)     It is a business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐      (G)     It is a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐      (H)     It is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

☐      (I)     It is an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Class B Notes, with total assets in excess of U.S.$5,000,000.

☐      (J)     It is a trust with total assets in excess of U.S.$5,000,000 not formed for the specific purpose of acquiring Class B Notes, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Class B Notes.

**C.**    **Qualified Purchaser Status**

1.    The Investor represents and warrants that the Investor is a "qualified purchaser" within the meaning of the Investment Company Act (a "Qualified Purchaser") and has checked the box or boxes below which are next to the categories under which the Investor qualifies as a Qualified Purchaser:

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

☐       (A)    It is a company that (1) owns not less than U.S.$5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not formed for the specific purpose of acquiring Class B Notes of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐       (B)    It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐       (C)    It is a Person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than U.S.$25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "<u>Parent Company</u>") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Class B Notes unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐       (D)    It is a "qualified institutional buyer" within the meaning of Rule 144A(a) promulgated under the Securities Act, acting for its own account, the account of another qualified institutional buyer or the account of a Qualified Purchaser; <u>provided</u>:

      (1)    that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of the dealer; and

      (2)    that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☒       (E)    It is an entity in which each beneficial owner of the Investor's securities is a Qualified Purchaser.

3

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

Alternatively, the Investor represents and warrants that the Investor is a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee") or a company owned exclusively by Knowledgeable Employees.

☐ Yes    ☐ No

2. If the Investor is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

(i)    all of the beneficial owners of outstanding securities (other than short-term paper) of the Investor (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

(ii)    all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Investor, have consented to the Investor's treatment as a qualified purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

D.    **Supplemental Data**

1. Legal form of entity (corporation, partnership, trust, etc.): <u>Limited Liability Company</u>

Jurisdiction of organization:  <u>    Delaware                          </u>

2. The Investor certifies that it is not a Flow-Through Investment Vehicle other than a Qualifying Investment Vehicle.

☒ Yes ☐ No

3.    (a)    Is the Investor, or is the Investor acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a "Plan") that is subject to fiduciary responsibility requirements of Title I of ERISA or a plan to which Section 4975 of the Code applies or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a "Benefit Plan Investor") pursuant to Section 3(42) of ERISA or 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise.

☐ Yes ☒ No

For example, a plan which is maintained by a foreign entity, governmental entity or church, is an employee benefit plan within the meaning of Section 3(3) of ERISA even though it is generally not subject to ERISA (collectively, "Non-ERISA Plans") and a Keogh plan covering no common-law employees and an individual retirement account, which are also not subject to ERISA, are plans within the meaning of

4

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any Affiliate of such a person) is held by Benefit Plan Investors, would be deemed to hold the assets of one or more employee benefit plans or plans pursuant to the Plan Asset Regulation.

(b)     If the Investor checked the box "Yes" in the preceding question 3(a), the maximum percentage of such Holder's assets that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulation is ___%.

> **Note:** Because of the level of Benefit Plan Investor ownership of an entity may vary from time to time due to normal subscription and redemption activity, we recommend the percentage included above represent more than twice the level of Benefit Plan Investor ownership at the time this certificate is completed. (In this regard, please note the requirements of questions 3(d) and 3(e) below).

IF YOU DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE ABOVE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

(c)(1)   Is the investor a life insurance company?

☐ Yes        ☒ No

(c)(2)   If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Investor's interest in the Class B Notes being acquired with the assets of the Investor's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)(3)   If the Investor indicated in question (c)(2) above that general account assets are being used to acquire the Investor's interest in the Class B Notes, please complete the following:

_____% of such general account assets used to acquire Class B Notes represent "plan assets" within the meaning of the Plan Asset Regulation

5

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

(d)    Is the Investor a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (each, a "Controlling Person").

☐ Yes ☒ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)    The Investor understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Issuer's Class B Notes, both upon the original issuance of Class B Notes and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Class B Notes, for any reason.    Accordingly, the Investor undertakes:

(i)    to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the information provided in this paragraph,

(ii)  to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Issuer and the Trustee to make a determination with respect to the portion of the Class B Notes of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii)  to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a Benefit Plan Investor or a Controlling Person and

(iv)  to promptly dispose of its interests in the Class B Notes if it is becoming a Benefit Plan Investor or a Controlling Person and is notified that its ownership of the Class B Notes would, in the event of a transfer, result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Class B Notes of the Issuer being held by Benefit Plan Investors.

(f)    If the Investor is, or is acting on behalf of, a Benefit Plan Investor subject to ERISA and/or Section 4975 of the Code, the Investor represents and warrants that, its acquisition, ownership and disposition of the Class B Notes will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a non-U.S., governmental or church plan, any similar non-U.S., federal, state or local law) for which an exemption is not applicable.  In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they

6

Patriarch/PC Confidential

have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Class B Notes was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

E.    **Certain Tax Matters**

1.    The Investor represents to <u>each of</u> (A), (B) (C) and (D) below as follows:

      (A)    <u>Either</u>

☒          (1)    It will at all times be a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code, <u>or</u>

☐          (2)    It will at all times be a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code.

      (B)    <u>Either</u>

☐          (1)    It is not for U.S. federal income tax purposes a partnership, grantor trust or S corporation, <u>or</u>

☐          (2)    It was not formed for the purpose of holding the Class B Notes or any other equity interests in the Issuer and not more than 50% of the value of the interest of any of the Investor's beneficial owners will be attributable to Preference Shares or any other equity interests of the Issuer, <u>or</u>

☐          (3)    It will provide an opinion of a nationally recognized tax counsel that its purchase will not cause the Issuer to be treated as a publicly traded partnership and such other representations and information as the Trustee in its sole discretion may request, in form and substance satisfactory to the Trustee, <u>or</u>

☒          (4)    It is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2).

      (C)    The Investor is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Class B Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Notes to a derivative or swap counterparty) or cause any Class B Notes (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Class B Note to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

7

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

The Investor understands and agrees that:

(1)      Solely for United States federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Class B Notes, Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Class B Notes of the Issuer will constitute partners of the Issuer,

(2)      It will not elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code,

(3)      It will provide such information and complete such forms as may be reasonably requested by or on behalf of the Issuer in connection with the Issuer's preparation and filing of tax returns and other forms, if any, and

(4)      It will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Class B Notes or receive payments in respect of investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate or to give full effect to the agreed tax treatment described above or to allow the Issuer to prepare and file tax forms or returns that the Issuer believes to be required of it, with any such form or document to be accurate and completed in a manner reasonably satisfactory to the Issuer and to be executed and to be delivered with any reasonably required certification.

(5)      A portion of the principal amount of its Class B Notes may be reduced in the circumstances and to the extent provided in the Indenture.

F.    **Related Parties**

1.    To the best of the Investor's knowledge, does the Investor control, or is the Investor controlled by or under common control with, any other investor in the Issuer?

        ☒ Yes ☐ No

2.    Will any other person or persons have a beneficial interest in the Class B Notes to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

        ☐ Yes ☒ No

    If either question above was answered "Yes", please contact the Issuer for additional information that will be required.

G.    **Cayman Islands**

1.    The Investor certifies that it is not a member of the public in the Cayman Islands.

        ☒ Yes ☐ No

8

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

The Investor understands that the foregoing information will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Class B Notes of the Issuer. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an Accredited Investor or as a Qualified Purchaser, to determine the status of the Issuer under ERISA and/or Section 4975 of the Code or to otherwise determine its eligibility to purchase Class B Notes of the Issuer. The Investor further agrees to promptly notify the Issuer by telephone and in writing if any of the information contained in this Investor Questionnaire becomes untrue prior to the registration of the Class B Notes in the name of the Investor in the Note Register. The Investor agrees to indemnify and hold harmless the Issuer and its Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signatures:

OCTALUNA III, LLC

By: Patriarch Partners XV, LLC,
    its Managing Member

By: _____
    Name:  Lynn Tilton
    Title:    Manager

Subscription Agreement (Class B Notes)

Patriarch/PC Confidential

Form **W-9**
(Rev. November 2005)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

**Give form to the requester. Do not send to the IRS.**

Name (as shown on your income tax return)

**OCTALUNA III LLC**

Business name, if different from above

Check appropriate box: ☐ Individual/ Sole proprietor  ☐ Corporation  ☒ Partnership  ☐ Other ▶ _____  ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

**227 W TRADE STREET STE 1400**

City, state, and ZIP code

**CHARLOTTE, NC 28202**

Requester's name and address (optional)

List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter

Social security number

**or**

Employer identification number

**20-8784040**

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here**    Signature of U.S. person ▶    Date ▶ 4/5/2007

# Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

- An individual who is a citizen or resident of the United States,

- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

- Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

- The U.S. owner of a disregarded entity and not the entity,

ISA
STF FED8132F 1

*Patriarch/PC Confidential*

**EXECUTION COPY**

**U.S.$15,000,000 Preference Shares
ZOHAR III, LIMITED**

**SUBSCRIPTION AGREEMENT**

Zohar III, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
Attention: The Directors

Ladies and Gentlemen:

1.      Subscription. The Issuer hereby sells, and the undersigned (the "Investor") hereby purchases Preference Shares ("Preference Shares") of Zohar III, Limited, a newly formed exempted company incorporated under the laws of the Cayman Islands (the "Issuer"), in the aggregate amount set forth opposite the Investor's name on the signature page hereto, and for an aggregate purchase price, equal to U.S.$15,000,000. Capitalized terms used herein and in the attached Investor Questionnaire, but not otherwise defined herein or therein, shall have the respective meanings given to them in the Indenture, dated as of the date hereof (the "Indenture"), among the Issuer, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., as Class A-1R Note Agent and Class A-1D Note Agent, and LaSalle Bank National Association, as trustee.

The Investor acknowledges that this subscription (i) is irrevocable and (ii) is subject only to delivery by the Issuer of the Preference Shares.

2.      Representations and Warranties. To induce the Issuer to accept this subscription, the Investor represents and warrants as follows (which representations and warranties will be deemed to be repeated by the Investor on each date that the Investor purchases Preference Shares pursuant to Paragraph 1 above):

(a)      Accredited Investor Status; Investment Intent. The Investor is an "accredited investor" (as defined in Rule 501(a) under the Securities Act (the "Securities Act") (an "Accredited Investor") and is acquiring the Preference Shares for its own account for investment purposes and not with a view to the distribution thereof in violation of applicable securities laws. The Investor understands that the Preference Shares have not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any other governmental authority or agency of any jurisdiction.

(b)      Investor Sophistication; Non-Reliance; Suitability; Access to Information. The Investor (i) has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Preference Shares, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Issuer or any of its Affiliates (or any representative of the Issuer) and (iv) has determined that an investment in the Preference Shares is suitable and appropriate for it. The Investor has received, and has had an adequate opportunity to review the contents of, the Issuer Charter, the Preference Share Paying Agency Agreement and the other Transaction

Patriarch/PC Confidential

Documents. The Investor has had access to such financial and other information concerning the Issuer and the Preference Shares as it has deemed necessary to make its own independent decision to purchase the Preference Shares, and has been afforded an opportunity to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Preference Shares.

(c)    <u>Certification Upon Transfer</u>. The Investor will, prior to any sale, pledge or other transfer by it of any Preference Share (or any interest therein), obtain from the transferee and deliver to the Issuer and the Preference Share Paying Agent a duly executed transferee certificate in the form of Exhibit B attached to the Preference Share Paying Agency Agreement and such other certificates and other information as the Issuer or the Preference Share Paying Agent may reasonably require to confirm that the proposed transfer complies with the transfer restrictions contained in the Preference Share Paying Agency Agreement.

(d)    <u>Minimum Denominations</u>. The Investor agrees that no Preference Shares (or any interest therein) may be sold, pledged or otherwise transferred in less than the applicable minimum number of Preference Shares set forth in the Preference Share Paying Agency Agreement.

(e)    <u>Securities Law Limitations on Resale</u>.  The Investor understands that the Preference Shares are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, have not been and will not be registered under the Securities Act, and may be re-offered, resold, pledged, or otherwise transferred only to a person whom the Investor reasonably believes is (i) a Qualified Institutional Buyer purchasing for its own account or for the account of another Qualified Institutional Buyer to whom notice is given, in each case, that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A or (ii) an Accredited Investor, in each case, subject to the transfer restrictions set forth in the Preference Share Paying Agency Agreement. The Investor understands that an appropriate legend substantially to the foregoing effect must be placed on each certificate representing any Preference Shares.

(f)    <u>Limited Liquidity</u>. The Investor understands that there is no market for the Preference Shares and that no assurance can be given as to the liquidity of any trading market for the Preference Shares and that it is unlikely that a trading market for the Preference Shares will develop.

(g)    <u>Investment Company Act</u>. The Investor is a "qualified purchaser" (a "<u>Qualified Purchaser</u>") as defined in the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"), a company each of whose beneficial owners is a Qualified Purchaser, a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "<u>Knowledgeable Employee</u>") or a company owned exclusively by Knowledgeable Employees with respect to the Issuer. The Investor agrees that no sale, pledge or other transfer of a Preference Share (or any portion thereof) may be made (i) unless such transfer is made to a transferee who is a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser, or (ii) if such transfer would have the effect of requiring the Issuer or its assets to register as an investment company under the Investment Company Act. The Investor understands and acknowledges that the Issuer has no intention of registering as an "investment company" under the Investment Company Act.

(h)    <u>ERISA</u>. The Investor agrees to certify (a) whether or not it is, or is acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA subject to the

Patriarch/PC Confidential

fiduciary responsibility requirements of Title I of ERISA and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each a "benefit plan investor") pursuant to 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise (each, a "Plan") and (b) whether it is a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or is an Affiliate of any such person (each such person, a "controlling person").  If the Investor is, or is acting on behalf of, a Plan, the Investor represents and warrants that its acquisition, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any similar federal, state or local law) for which an exemption is not available.  In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.  The Investor (i) agrees that no sale, pledge or other transfer of such Preference Share (or any interest therein) may be made if, immediately after giving effect to such transfer, 25% or more, as determined under the Plan Asset Regulation, of the value of the Preference Shares or of any other class of equity interest of the Issuer would be held by "benefit plan investors", (ii) agrees to inform the Issuer and the Preference Share Paying Agent immediately of any change in the status of the Investor which results in the Investor's becoming a "benefit plan investor" or a "controlling person", (iii) agrees to promptly dispose of its interests in the Preference Shares if it is becoming a "benefit plan investor" or a "controlling person", and it has been notified that its ownership of the Preference Shares would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Issuer's Preference Shares or of any other class of equity interest in the Issuer being held by "benefit plan investors" and (iv) understands and agrees that the information supplied in this Subscription Agreement upon acquisition of the Preference Shares and as requested thereafter from time to time will be utilized to determine whether benefit plan investors own less than 25% of the value of the Preference Shares or of any other class of equity interest in the Issuer, both upon the original issuance of Preference Shares and upon any subsequent transfer of the Preference Shares or of any other class of equity interest in the Issuer.

        (i)      Certain Tax Matters.  The Investor (i) represents that  (a) it is either (1) a United States person within the meaning of Code section 7701(a)(30) or (2) a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30), (b) it is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2) and (c) it is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of the Preference Shares or cause the Preference Shares to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations, and (ii) understands and agrees that (a) it may not sell, pledge or otherwise transfer a Preference Share (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) if it would cause there to be more than 99 beneficial owners of the Preference Shares and any other equity interests of the Issuer or otherwise cause the Issuer to be treated as a publicly traded partnership for such purposes, and (b) it will provide any form or document, and will join in the execution of such additional

Patriarch/PC Confidential

documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payment in respect of its investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate.

(j)     Limitations on Flow-Through Status.  The Investor represents that, unless the Investor is a Qualifying Investment Vehicle (as defined below), (i) if the Investor would be an investment company but for the exceptions in Section 3(c)(1) or 3(c)(7) of the Investment Company Act, the amount of the Investor's investment in the Preference Shares does not exceed 40% of the total assets (determined on a consolidated basis with its subsidiaries) of the Investor; (ii) no Person owning any equity or similar interest in the Investor exercises control, on an investment-by-investment basis, over the amount of such Person's contribution to any investment made by the Investor; and (iii) the Investor was not organized or reorganized for the specific purpose of acquiring the Preference Shares.  For this purpose, a "Qualifying Investment Vehicle" is an entity (a) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Preference Share Paying Agent each of the representations set forth herein and in the Preference Share Paying Agency Agreement required to be made upon transfer of any of the Preference Shares (with modifications to such representations satisfactory to the Issuer to reflect the indirect nature of the interests of such beneficial owners in the Preference Shares) and (b) as to which, if such entity would be an investment company but for the exceptions provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act (any such entity, an "excepted investment company"): (x) all of the beneficial owners of outstanding securities (other than short-term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("pre-amendment beneficial owners"); and (y) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act.

(k)     Certain Transfers Void.  The Investor agrees that (i) any sale, pledge or other transfer of a Preference Share (or any portion thereof) made in violation of the transfer restrictions contained in the Preference Share Paying Agency Agreement, or made based upon any false or inaccurate representation made by the Investor or a transferee to the Issuer, will be void ab initio and of no force or effect and (ii) none of the Issuer, the Preference Share Paying Agent or the Share Registrar has any obligation to recognize any sale, pledge or other transfer of a Preference Share (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(l)     Reliance on Representations, etc.  The Investor acknowledges that the Issuer, the Preference Share Paying Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Preference Shares are no longer accurate, the Investor will promptly notify the Issuer and Preference Share Paying Agent.

(m)     Cayman Islands.  The Investor is not a member of the public of the Cayman Islands.

(n)     Subscription Agreement. The Investor has the power and authority to enter into this Subscription Agreement and each other document required to be executed and delivered by or on behalf of the Investor in connection with this subscription for Preference Shares, and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby, and the Person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for Preference Shares. Such execution, delivery and compliance by the Investor does not conflict with, or constitute a default under, any instruments governing the Investor, any applicable law (assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise), regulation or order, or any material agreement to which the Investor is a party or by which the Investor or its property is bound. This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor, enforceable against the Investor in accordance with its terms.

(o)     Investor Location. If the Investor's permanent address specified in the Investor Questionnaire is located in the United States, the Investor was offered the Preference Shares in the state listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Issuer and intends that the securities law of that state governs the Investor's subscription for the Preference Shares.

3.     Tax Information. The Investor certifies under penalties of perjury that (i) the Investor's name, taxpayer identification or social security number (if any) and address provided in the Investor Questionnaire are correct and (ii) the information contained in any Form W-9 (Request for Taxpayer Identification Number and Certification) or any other tax-related form submitted to the Issuer is correct (which certification will be deemed to be repeated on any date on which any tax form is delivered to the Issuer after the date hereof). The Investor agrees to in a timely manner complete (accurately and in a manner reasonably satisfactory to the Issuer), execute, arrange for any required certification of, and deliver to the Issuer or such governmental or taxing authority as the Issuer directs, any form, document or certificate that may be required or reasonably requested by the Issuer. The Investor further agrees to inform promptly the Issuer of any change in any such information previously provided to the Issuer and to execute a new form or other document with the correct information.

4.     Further Advice and Assurances. All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue. The Investor agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may be subject.

5.     Indemnity. The Investor understands that the information provided herein will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Preference Shares. The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase Preference Shares. The Investor agrees to indemnify and hold harmless the Issuer, the Preference Share Paying Agent and each of their respective Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares. Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

Patriarch/PC Confidential

6.    Payment of Subscription Price; Delivery of Preference Shares.  Simultaneously with the delivery hereof and in consideration of the Preference Shares purchased hereunder, the Investor shall waive payment of the "Interim Management Fee" (as defined in the Interim Collateral Management Agreement referred to below) by the Issuer pursuant to the Interim Collateral Management Agreement, dated as of September 19, 2005 between the Investor and the Issuer (the "Interim Collateral Management Agreement"), and the Issuer shall cause the Preference Shares to be registered in the Investor's name in the register maintained on behalf of the Issuer by the Share Registrar under the Preference Share Paying Agency Agreement, and have delivered to the Investor its Preference Shares.

7.    Binding Effect.  Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, executors, legal representatives and permitted transferees.

8.    Benefit of Agreement.  The Investor acknowledges that each representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares is made for the benefit of the Issuer and its Affiliates and the other Holders of Preference Shares issued by the Issuer and also for the benefit of the Preference Share Paying Agent under the Preference Share Paying Agency Agreement and Holders from time to time of the Preference Shares issued thereunder.

9.    Miscellaneous.  This Subscription Agreement is not assignable by the Investor without the consent of the Issuer.  The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the transactions contemplated hereby and any investigation made by the Issuer. The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein.  This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of New York.

10.    Waiver of Jury Trial.  **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

11.    Notices.  Notices shall be given hereunder as specified in, and with the effect provided for by, Section 8.4 of the Preference Share Paying Agency Agreement.

12.    No Recourse.  Notwithstanding anything to the contrary contained herein, the Investor hereby acknowledges and agrees that the Issuer's obligations hereunder will be solely the corporate obligations of the Issuer, and the Investor will not have any recourse to any of the directors, officers, shareholders, incorporators, partners, agents, members or Affiliates of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  Recourse in respect of any obligations of the Issuer hereunder will be

Patriarch/PC Confidential

limited to the Collateral and on the exhaustion thereof all claims against the Issuer arising from this subscription or any transactions contemplated hereby shall be extinguished and shall not thereafter revive.

      13.    <u>Certain Transactions</u>.  The Issuer shall purchase on or about the Funding Date certain assets (designated as the "Zohar I Assets" and the "Zohar II Assets" under the Indenture) from Zohar CDO 2003 1, Limited and/or Zohar II CDO 2005-1, Limited (each an Affiliate of Patriarch Partners) and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed  to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  In addition, the Issuer and/or the Zohar Subsidiary will  exchange for Preference Shares certain assets from the Ark Seller (an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology) identified in the Indenture, and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  The above described purchases and sales have been or will be made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in the schedules to the Indenture.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Patriarch/PC Confidential

**IN WITNESS WHEREOF**, the undersigned has executed this Subscription Agreement on the date set forth below.

Date:  April 6, 2007
**Aggregate Number of Preference Shares subscribed
for: U.S.$15,000,000 Preference Shares**

Patriarch Partners XV, LLC

By: _____
   Name:  Lynn Tilton
   Title:    Manager

Patriarch/PC Confidential

The Issuer hereby accepts the above application
for subscription for Preference Shares.

ZOHAR III, LIMITED


By:_____
Name:    Chris Watler
Title:    Director

Date:___April 6, 2007_____

Patriarch/PC Confidential

## INVESTOR QUESTIONNAIRE

Reference is made to the Indenture, dated as of April 6, 2007 (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), among the Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc. and LaSalle Bank National Association, as trustee. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

**A.    General Information**

1.    Print Full Name of Investor:        Patriarch Partners XV, LLC

2.    Name in which Preference
      Shares should be registered:       Patriarch Partners XV, LLC

3.    Address and Contact Person          227 W Trade Street
      for Notices:                        Suite 1400
                                          Charlotte, NC 28202
                                          Attention: Virginia Blount

4.    Telephone Number:                   (704) 227-1217

5.    Telecopier Number:                  (704) 375-0358

6.    Permanent Address:
      (if different from above)

7.    U.S. Taxpayer
      Identification or Social
      Security Number (if any)            20-8784122

8.    Payment Instructions:               Branch Banking & Trust
                              200 South College St. 2nd Fl, Charlotte, NC 28202
                                    Routing #: 053101121 Acct #: 5294558642

9.    Instructions for delivery
      of Preference Shares:               As per side letter

**B.    Accredited Investor**

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "Accredited Investor") and has checked the box or boxes below which are next to the categories under which the Transferee so qualifies as an Accredited Investor:

☑         (A)     It is an entity, including a grantor trust, in which all of the equity owners are Accredited Investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐         (B)     It is a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐         (C)     It is an insurance company as defined in Section 2(13) of the Securities Act.

☐         (D)     It is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐         (E)     It is an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

☐         (F)     It is a business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐         (G)     It is a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐         (H)     It is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

☐         (I)     It is an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Preference Shares, with total assets in excess of U.S.$5,000,000.

☐         (J)     It is a trust with total assets in excess of U.S.$5,000,000 not formed for the specific purpose of acquiring Preference Shares, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Preference Shares.

**C.**   **Qualified Purchaser Status**

1.    The Investor represents and warrants that the Investor is a "qualified purchaser" within the meaning of the Investment Company Act (a "Qualified Purchaser") and has checked the box or boxes below which are next to the categories under which the Investor qualifies as a Qualified Purchaser:

☐         (A)     It is a company that (1) owns not less than U.S.$5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not

formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐     (B)    It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settler or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐     (C)    It is a Person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than U.S.$25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐     (D)    It is a "qualified institutional buyer" within the meaning of Rule 144A(a) promulgated under the Securities Act, acting for its own account, the account of another qualified institutional buyer or the account of a Qualified Purchaser; provided:

    (1)    that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of the dealer; and

    (2)    that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☒     (E)    It is an entity in which each beneficial owner of the Investor's securities is a Qualified Purchaser.

Alternatively, the Purchaser represents and warrants that the Purchaser is a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee") or a company owned exclusively by Knowledgeable Employees.

☐ Yes      ☐ No

2.    If the Investor is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

    (i)    all of the beneficial owners of outstanding securities (other than short-term paper) of the Investor (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the

Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

(ii)    all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Investor, have consented to the Investor's treatment as a qualified purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

D.    **Supplemental Data**

1.    Legal form of entity (corporation, partnership, trust, etc.): <u>Limited Liability Company</u>

Jurisdiction of organization: <u>   Delaware                        </u>

2.    The Investor certifies that it is not a Flow-Through Investment Vehicle (as defined in the Indenture) other than a Qualifying Investment Vehicle (as defined in the Preference Share Paying Agency Agreement).

☒ Yes  ☐ No

3.    (a)    Is the Investor, or is the Investor acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a "Plan") that is subject to fiduciary responsibility requirements of Title I of ERISA or a plan to which Section 4975 of the Code applies or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a "Benefit Plan Investor") pursuant to Section 3(42) of ERISA or 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise.

☐ Yes ☒ No

For example, a plan which is maintained by a foreign entity, governmental entity or church, is an employee benefit plan within the meaning of Section 3(3) of ERISA even though it is generally not subject to ERISA (collectively, "Non-ERISA Plans") and a Keogh plan covering no common-law employees and an individual retirement account, which are also not subject to ERISA, are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any Affiliate of such a person) is held by Benefit Plan Investors, would be deemed to hold the assets of one or more employee benefit plans or plans pursuant to the Plan Asset Regulation.

(b)    If the Investor checked the box "Yes" in the preceding question 3(a), the maximum percentage of such Holder's assets that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulation is ___%.

**Note:** Because of the level of Benefit Plan Investor ownership of an entity may vary from time to time due to normal subscription and redemption activity, we recommend the percentage included above represent more than twice the

level of Benefit Plan Investor ownership at the time this certificate is completed. (In this regard, please note the requirements of questions 3(d) and 3(e) below).

IF YOU DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE ABOVE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

(c)(1)   Is the investor a life insurance company?

☐ Yes          ☒ No

(c)(2)   If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Investor's interest in the Preference Shares being acquired with the assets of the Investor's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)(3)   If the Investor indicated in question (c)(2) above that general account assets are being used to acquire the Investor's interest in the Preference Shares, please complete the following:

_____% of such general account assets used to acquire Preference Shares represent "plan assets" within the meaning of the Plan Asset Regulation

(d)      Is the Investor a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (each, a "Controlling Person").

☐ Yes ☒ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)      The Investor understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Issuer's Preference Shares, both upon the original issuance of Preference Shares and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Preference Shares, for any reason. Accordingly, the Investor undertakes:

(i) to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the information provided in this paragraph,

(ii) to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Issuer and the Trustee to make a determination with respect to the portion of the Preference Shares of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii) to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a Benefit Plan Investor or a Controlling Person and

(iv) to promptly dispose of its interests in the Preference Shares if it is becoming a Benefit Plan Investor or a Controlling Person and is notified that its ownership of the Preference Shares would, in the event of a transfer, result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Preference Shares of the Issuer being held by Benefit Plan Investors.

(f)     If the Investor is, or is acting on behalf of, a Benefit Plan Investor subject to ERISA and/or Section 4975 of the Code, the Investor represents and warrants that, its acquisition, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a non-U.S., governmental or church plan, any similar non-U.S., federal, state or local law) for which an exemption is not applicable. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

E.     **Certain Tax Matters**

1.     The Investor understands that no purchase or transfer of a Preference Share (or any interest therein) may be made (and the Preference Share Paying Agent will not recognize any such purchase or transfer) if it would cause there to be more than 99 beneficial owners of Preference Shares and any other equity interests in the Issuer for U.S. federal income tax purposes or otherwise cause the Issuer to become a publicly traded partnership treated as a corporation for such purposes.

2.     The Investor represents to each of (A), (B) (C) and (D) below as follows:

Patriarch/PC Confidential

(A)　　Either

☐　　　　(1)　　It will at all times be a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code, or

☒　　　　(2)　　It will at all times be a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code.

(B)　　Either

☐　　　　(1)　　It is not for U.S. federal income tax purposes a partnership, grantor trust or S corporation, or

☐　　　　(2)　　It was not formed for the purpose of holding Preference Shares or any other equity interests in the Issuer and not more than 50% of the value of the interest of any of the Investor's beneficial owners will be attributable to Preference Shares or any other equity interests of the Issuer, or

☐　　　　(3)　　It will provide an opinion of a nationally recognized tax counsel that its purchase will not cause the Issuer to be treated as a publicly traded partnership and such other representations and information as the Preference Share Paying Agent in its sole discretion may request, in form and substance satisfactory to the Preference Share Paying Agent, or

☐　　　　(4)　　It is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2).

☒　　(C)　　The Investor is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) or cause any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

The Investor understands and agrees that:

(1)　　Solely for United States federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Preference Shares of the Issuer will constitute partners of the Issuer,

(2)　　It will not elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code,

(3)    It will provide such information and complete such forms as may be reasonably requested by or on behalf of the Issuer in connection with the Issuer's preparation and filing of tax returns and other forms, if any, and

(4)    It will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payments in respect of investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate or to give full effect to the agreed tax treatment described above or to allow the Issuer to prepare and file tax forms or returns that the Issuer believes to be required of it, with any such form or document to be accurate and completed in a manner reasonably satisfactory to the Issuer and to be executed and to be delivered with any reasonably required certification.

F.    **Related Parties**

1.    To the best of the Investor's knowledge, does the Investor control, or is the Investor controlled by or under common control with, any other investor in the Issuer?

       ☒ Yes  ☐ No

2.    Will any other person or persons have a beneficial interest in the Preference Shares to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

       ☐ Yes  ☒ No

If either question above was answered "Yes", please contact the Issuer for additional information that will be required.

G.    **Cayman Islands**

1.    The Investor certifies that it is not a member of the public in the Cayman Islands.

       ☒ Yes  ☐ No

The Investor understands that the foregoing information will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Preference Shares of the Issuer. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an Accredited Investor or as a Qualified Purchaser, to determine the status of the Issuer under ERISA and/or Section 4975 of the Code or to otherwise determine its eligibility to purchase Preference Shares of the Issuer. The Investor further agrees to promptly notify the Issuer by telephone and in writing if any of the information contained in this Investor Questionnaire becomes untrue prior to the registration of the Preference Shares in the name of the Investor in the Share Register (as defined in the Preference Share Paying Agency Agreement). The Investor agrees to indemnify and hold harmless the Issuer and its Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signatures:

Patriarch Partners XV, LLC

By: _____

Name: Lynn Tilton

Title:   Manager

Form **W-9**
(Rev. November 2005)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

Give form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)

**PATRIARCH PARTNERS XV LLC**

Business name, if different from above

Check appropriate box:  ☐ Individual/ Sole proprietor   ☐ Corporation   ☐ Partnership   ☒ Other ▶ DISREGARDED ENTITY        ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

**227 W TRADE STREET STE 1400**

City, state, and ZIP code

**CHARLOTTE, NC 28202**

Requester's name and address (optional)

List account number(s) here (optional)

*Print or type   See Specific Instructions on page 2.*

---

**Part I**    **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

**or**

Employer identification number
**20-8784122**

---

**Part II**    **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here**   Signature of U.S. person ▶                Date ▶ 4/5/2007

---

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

   1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

   2. Certify that you are not subject to backup withholding, or

   3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

• An individual who is a citizen or resident of the United States,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

• Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

• The U.S. owner of a disregarded entity and not the entity,

ISA
STF FED08132F 1

Form **W-9** (Rev. 11-2005)

*Patriarch/PC Confidential*

EXECUTION COPY

**U.S.$10,000,000 Preference Shares**
**ZOHAR III, LIMITED**

**SUBSCRIPTION AGREEMENT**

Zohar III, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
Attention: The Directors

Ladies and Gentlemen:

1. <u>Subscription</u>. The Issuer hereby sells, and the undersigned (the "<u>Investor</u>") hereby purchases Preference Shares ("<u>Preference Shares</u>") of Zohar III, Limited, a newly formed exempted company incorporated under the laws of the Cayman Islands (the "<u>Issuer</u>"), in the aggregate amount set forth opposite the Investor's name on the signature page hereto, and for an aggregate purchase price, equal to U.S.$10,000,000. Capitalized terms used herein and in the attached Investor Questionnaire, but not otherwise defined herein or therein, shall have the respective meanings given to them in the Indenture, dated as of the date hereof (the "<u>Indenture</u>"), among the Issuer, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., as Class A-1R Note Agent and Class A-1D Note Agent, and LaSalle Bank National Association, as trustee.

The Investor acknowledges that this subscription (i) is irrevocable and (ii) is subject only to delivery by the Issuer of the Preference Shares.

2. <u>Representations and Warranties</u>. To induce the Issuer to accept this subscription, the Investor represents and warrants as follows (which representations and warranties will be deemed to be repeated by the Investor on each date that the Investor purchases Preference Shares pursuant to Paragraph 1 above):

(a) <u>Accredited Investor Status; Investment Intent</u>. The Investor is an "accredited investor" (as defined in Rule 501(a) under the Securities Act (the "<u>Securities Act</u>") (an "<u>Accredited Investor</u>") and is acquiring the Preference Shares for its own account for investment purposes and not with a view to the distribution thereof in violation of applicable securities laws. The Investor understands that the Preference Shares have not been approved or disapproved by the United States Securities and Exchange Commission (the "<u>SEC</u>") or any other governmental authority or agency of any jurisdiction.

(b) <u>Investor Sophistication; Non-Reliance; Suitability; Access to Information</u>. The Investor (i) has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Preference Shares, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Issuer or any of its Affiliates (or any representative of the Issuer) and (iv) has determined that an investment in the Preference Shares is suitable and appropriate for it.

Patriarch/PC Confidential

The Investor has received, and has had an adequate opportunity to review the contents of, the Issuer Charter, the Preference Share Paying Agency Agreement and the other Transaction Documents. The Investor has had access to such financial and other information concerning the Issuer and the Preference Shares as it has deemed necessary to make its own independent decision to purchase the Preference Shares, and has been afforded an opportunity to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Preference Shares.

(c)    <u>Certification Upon Transfer</u>.  The Investor will, prior to any sale, pledge or other transfer by it of any Preference Share (or any interest therein), obtain from the transferee and deliver to the Issuer and the Preference Share Paying Agent a duly executed transferee certificate in the form of Exhibit B attached to the Preference Share Paying Agency Agreement and such other certificates and other information as the Issuer or the Preference Share Paying Agent may reasonably require to confirm that the proposed transfer complies with the transfer restrictions contained in the Preference Share Paying Agency Agreement.

(d)    <u>Minimum Denominations</u>.  The Investor agrees that no Preference Shares (or any interest therein) may be sold, pledged or otherwise transferred in less than the applicable minimum number of Preference Shares set forth in the Preference Share Paying Agency Agreement.

(e)    <u>Securities Law Limitations on Resale</u>.  The Investor understands that the Preference Shares are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, have not been and will not be registered under the Securities Act, and may be re-offered, resold, pledged, or otherwise transferred only to a person whom the Investor reasonably believes is (i) a Qualified Institutional Buyer purchasing for its own account or for the account of another Qualified Institutional Buyer to whom notice is given, in each case, that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A or (ii) an Accredited Investor, in each case, subject to the transfer restrictions set forth in the Preference Share Paying Agency Agreement.  The Investor understands that an appropriate legend substantially to the foregoing effect must be placed on each certificate representing any Preference Shares.

(f)    <u>Limited Liquidity</u>.  The Investor understands that there is no market for the Preference Shares and that no assurance can be given as to the liquidity of any trading market for the Preference Shares and that it is unlikely that a trading market for the Preference Shares will develop.

(g)    <u>Investment Company Act</u>.  The Investor is a "qualified purchaser" (a "<u>Qualified Purchaser</u>") as defined in the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"), a company each of whose beneficial owners is a Qualified Purchaser, a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "<u>Knowledgeable Employee</u>") or a company owned exclusively by Knowledgeable Employees with respect to the Issuer.  The Investor agrees that no sale, pledge or other transfer of a Preference Share (or any portion thereof) may be made (i) unless such transfer is made to a transferee who is a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser, or (ii) if such transfer would have the effect of requiring the Issuer or its assets to register as an investment company under the Investment Company Act.  The Investor understands and acknowledges that the Issuer has no intention of registering as an "investment company" under the Investment Company Act.

Patriarch/PC Confidential

(h)    ERISA.  The Investor agrees to certify (a) whether or not it is, or is acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA subject to the fiduciary responsibility requirements of Title I of ERISA and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each a "benefit plan investor") pursuant to 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise (each, a "Plan") and (b) whether it is a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or is an Affiliate of any such person (each such person, a "controlling person").  If the Investor is, or is acting on behalf of, a Plan, the Investor represents and warrants that its acquisition, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any similar federal, state or local law) for which an exemption is not available.  In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.  The Investor (i) agrees that no sale, pledge or other transfer of such Preference Share (or any interest therein) may be made if, immediately after giving effect to such transfer, 25% or more, as determined under the Plan Asset Regulation, of the value of the Preference Shares or of any other class of equity interest of the Issuer would be held by "benefit plan investors", (ii) agrees to inform the Issuer and the Preference Share Paying Agent immediately of any change in the status of the Investor which results in the Investor's becoming a "benefit plan investor" or a "controlling person", (iii) agrees to promptly dispose of its interests in the Preference Shares if it is becoming a "benefit plan investor" or a "controlling person", and it has been notified that its ownership of the Preference Shares would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Issuer's Preference Shares or of any other class of equity interest in the Issuer being held by "benefit plan investors" and (iv) understands and agrees that the information supplied in this Subscription Agreement upon acquisition of the Preference Shares and as requested thereafter from time to time will be utilized to determine whether benefit plan investors own less than 25% of the value of the Preference Shares or of any other class of equity interest in the Issuer, both upon the original issuance of Preference Shares and upon any subsequent transfer of the Preference Shares or of any other class of equity interest in the Issuer.

(i)    Certain Tax Matters.  The Investor (i) represents that  (a) it is either (1) a United States person within the meaning of Code section 7701(a)(30) or (2) a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30), (b) it is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2) and (c) it is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of the Preference Shares or cause the Preference Shares to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations, and (ii) understands and agrees that (a) it may not sell, pledge or otherwise transfer a Preference Share (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) if it would cause there to be more than 99 beneficial owners of the Preference Shares and any other equity interests of the Issuer or

Patriarch/PC Confidential

otherwise cause the Issuer to be treated as a publicly traded partnership for such purposes, and (b) it will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payment in respect of its investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate.

    (j)    <u>Limitations on Flow-Through Status</u>.  The Investor represents that, unless the Investor is a Qualifying Investment Vehicle (as defined below), (i) if the Investor would be an investment company but for the exceptions in Section 3(c)(1) or 3(c)(7) of the Investment Company Act, the amount of the Investor's investment in the Preference Shares does not exceed 40% of the total assets (determined on a consolidated basis with its subsidiaries) of the Investor; (ii) no Person owning any equity or similar interest in the Investor exercises control, on an investment-by-investment basis, over the amount of such Person's contribution to any investment made by the Investor; and (iii) the Investor was not organized or reorganized for the specific purpose of acquiring the Preference Shares.  For this purpose, a "Qualifying Investment Vehicle" is an entity (a) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Preference Share Paying Agent each of the representations set forth herein and in the Preference Share Paying Agency Agreement required to be made upon transfer of any of the Preference Shares (with modifications to such representations satisfactory to the Issuer to reflect the indirect nature of the interests of such beneficial owners in the Preference Shares) and (b) as to which, if such entity would be an investment company but for the exceptions provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act (any such entity, an "<u>excepted investment company</u>"): (x) all of the beneficial owners of outstanding securities (other than short-term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("<u>pre-amendment beneficial owners</u>"); and (y) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act.

    (k)    <u>Certain Transfers Void</u>.  The Investor agrees that (i) any sale, pledge or other transfer of a Preference Share (or any portion thereof) made in violation of the transfer restrictions contained in the Preference Share Paying Agency Agreement, or made based upon any false or inaccurate representation made by the Investor or a transferee to the Issuer, will be void <u>ab initio</u> and of no force or effect and (ii) none of the Issuer, the Preference Share Paying Agent or the Share Registrar has any obligation to recognize any sale, pledge or other transfer of a Preference Share (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

    (l)    <u>Reliance on Representations, etc</u>.  The Investor acknowledges that the Issuer, the Preference Share Paying Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Preference Shares are no longer accurate, the Investor will promptly notify the Issuer and Preference Share Paying Agent.

Patriarch/PC Confidential

(m)     Cayman Islands.  The Investor is not a member of the public of the Cayman Islands.

(n)     Subscription Agreement.  The Investor has the power and authority to enter into this Subscription Agreement and each other document required to be executed and delivered by or on behalf of the Investor in connection with this subscription for Preference Shares, and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby, and the Person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for Preference Shares. Such execution, delivery and compliance by the Investor does not conflict with, or constitute a default under, any instruments governing the Investor, any applicable law (assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise), regulation or order, or any material agreement to which the Investor is a party or by which the Investor or its property is bound.  This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor, enforceable against the Investor in accordance with its terms.

(o)     Investor Location.  If the Investor's permanent address specified in the Investor Questionnaire is located in the United States, the Investor was offered the Preference Shares in the state listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Issuer and intends that the securities law of that state governs the Investor's subscription for the Preference Shares.

3.     Tax Information.  The Investor certifies under penalties of perjury that (i) the Investor's name, taxpayer identification or social security number (if any) and address provided in the Investor Questionnaire are correct and (ii) the information contained in any Form W-9 (Request for Taxpayer Identification Number and Certification) or any other tax-related form submitted to the Issuer is correct (which certification will be deemed to be repeated on any date on which any tax form is delivered to the Issuer after the date hereof).  The Investor agrees to in a timely manner complete (accurately and in a manner reasonably satisfactory to the Issuer), execute, arrange for any required certification of, and deliver to the Issuer or such governmental or taxing authority as the Issuer directs, any form, document or certificate that may be required or reasonably requested by the Issuer.  The Investor further agrees to inform promptly the Issuer of any change in any such information previously provided to the Issuer and to execute a new form or other document with the correct information.

4.     Further Advice and Assurances.  All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue.  The Investor agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may be subject.

5.     Indemnity.  The Investor understands that the information provided herein will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Preference Shares.  The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase Preference Shares.  The Investor agrees to indemnify and hold harmless the Issuer, the Preference Share Paying Agent and each of their respective Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any

Patriarch/PC Confidential

other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares. Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

6.    Payment of Subscription Price; Delivery of Preference Shares. Simultaneously with the delivery hereof and in consideration of the Preference Shares purchased hereunder, the Investor shall cancel the Mezzanine Note issued to it by the Issuer, and the Issuer shall cause the Preference Shares to be registered in the Investor's name in the register maintained on behalf of the Issuer by the Share Registrar under the Preference Share Paying Agency Agreement, and have delivered to the Investor its Preference Shares.

7.    Binding Effect. Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, executors, legal representatives and permitted transferees.

8.    Benefit of Agreement. The Investor acknowledges that each representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares is made for the benefit of the Issuer and its Affiliates and the other Holders of Preference Shares issued by the Issuer and also for the benefit of the Preference Share Paying Agent under the Preference Share Paying Agency Agreement and Holders from time to time of the Preference Shares issued thereunder.

9.    Miscellaneous. This Subscription Agreement is not assignable by the Investor without the consent of the Issuer. The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the transactions contemplated hereby and any investigation made by the Issuer. The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein. This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of New York.

10.    Waiver of Jury Trial. **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

11.    Notices. Notices shall be given hereunder as specified in, and with the effect provided for by, Section 8.4 of the Preference Share Paying Agency Agreement.

12.    No Recourse. Notwithstanding anything to the contrary contained herein, the Investor hereby acknowledges and agrees that the Issuer's obligations hereunder will be solely the corporate obligations of the Issuer, and the Investor will not have any recourse to any of the directors, officers, shareholders, incorporators, partners, agents, members or Affiliates of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any

Patriarch/PC Confidential

transactions contemplated hereby.  Recourse in respect of any obligations of the Issuer hereunder will be limited to the Collateral and on the exhaustion thereof all claims against the Issuer arising from this subscription or any transactions contemplated hereby shall be extinguished and shall not thereafter revive.

13.    Certain Transactions.  The Issuer shall purchase on or about the Funding Date certain assets (designated as the "Zohar I Assets" and the "Zohar II Assets" under the Indenture) from Zohar CDO 20031, Limited and/or Zohar II CDO 2005-1, Limited (each an Affiliate of Patriarch Partners) and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed  to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  In addition, the Issuer and/or the Zohar Subsidiary will  exchange for Preference Shares certain assets from the Ark Seller (an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology) identified in the Indenture, and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  The above described purchases and sales have been or will be made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in the schedules to the Indenture.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Patriarch/PC Confidential

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement on the date set forth below.

Date: April **6**, 2007
**Aggregate Number of Preference Shares subscribed for:**
**U.S.$10,000,000 Preference Shares**

Phoenix VIII, LLC

By: _____
Name:  Lynn Tilton
Title:   Manager

Patriarch/PC Confidential

The Issuer hereby accepts the above application
for subscription for Preference Shares.

ZOHAR III, LIMITED

By: _____

   Name:  Chris Watler
   Title:   Director

Date: April 16, 2007

Patriarch/PC Confidential

## INVESTOR QUESTIONNAIRE

Reference is made to the Indenture, dated as of April 6, 2007 (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), among the Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc. and LaSalle Bank National Association, as trustee. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

### A.    General Information

1.    Print Full Name of Investor:          Phoenix VIII, LLC

2.    Name in which Preference
      Shares should be registered:          Phoenix VIII, LLC

3.    Address and Contact Person          227 W Trade Street
      for Notices:                         Suite 1400
                                           Charlotte, NC 28202
                                  Attention: Virginia Blount

4.    Telephone Number:                    (704) 227-1217

5.    Telecopier Number:                   (704) 375-0358

6.    Permanent Address:
      (if different from above)

7.    U.S. Taxpayer
      Identification or Social
      Security Number (if any)             20-8783340

8.    Payment Instructions:                Branch Banking & Trust
                             200 South College St, 2nd Flr, Charlotte, NC 28202
                                  Routing #: 053101121 Acct #: 5294558618

9.    Instructions for delivery
      of Preference Shares:                As per side letter

### B.    Accredited Investor

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "Accredited Investor") and has checked the box or boxes below which are next to the categories under which the Transferee so qualifies as an Accredited Investor:

Patriarch/PC Confidential

☒                 (A)     It is an entity, including a grantor trust, in which all of the equity owners are Accredited Investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐                 (B)     It is a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐                 (C)     It is an insurance company as defined in Section 2(13) of the Securities Act.

☐                 (D)     It is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐                 (E)     It is an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

☐                 (F)     It is a business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐                 (G)     It is a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐                 (H)     It is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

☐                 (I)     It is an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Preference Shares, with total assets in excess of U.S.$5,000,000.

☐                 (J)     It is a trust with total assets in excess of U.S.$5,000,000 not formed for the specific purpose of acquiring Preference Shares, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Preference Shares.

**C.**    **Qualified Purchaser Status**

1.    The Investor represents and warrants that the Investor is a "qualified purchaser" within the meaning of the Investment Company Act (a "Qualified Purchaser") and has checked the box or boxes below which are next to the categories under which the Investor qualifies as a Qualified Purchaser:

☐                 (A)     It is a company that (1) owns not less than U.S.$5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not

Patriarch/PC Confidential

formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐      (B)     It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settler or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐      (C)     It is a Person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than U.S.$25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐      (D)     It is a "qualified institutional buyer" within the meaning of Rule 144A(a) promulgated under the Securities Act, acting for its own account, the account of another qualified institutional buyer or the account of a Qualified Purchaser; provided:

         (1)   that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of the dealer; and

         (2)   that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☒      (E)     It is an entity in which each beneficial owner of the Investor's securities is a Qualified Purchaser.

Alternatively, the Purchaser represents and warrants that the Purchaser is a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee") or a company owned exclusively by Knowledgeable Employees.

☐ Yes      ☐ No

2.   If the Investor is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

     (i)     all of the beneficial owners of outstanding securities (other than short-term paper) of the Investor (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the

Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

(ii)    all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Investor, have consented to the Investor's treatment as a qualified purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

**D.    Supplemental Data**

1.    Legal form of entity (corporation, partnership, trust, etc.):  <u>Limited Liability Company</u>

Jurisdiction of organization:  <u>Delaware</u>

2.    The Investor certifies that it is not a Flow-Through Investment Vehicle (as defined in the Indenture) other than a Qualifying Investment Vehicle (as defined in the Preference Share Paying Agency Agreement).

☒ Yes  ☐ No

3.    (a)    Is the Investor, or is the Investor acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a "Plan") that is subject to fiduciary responsibility requirements of Title I of ERISA or a plan to which Section 4975 of the Code applies or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a "Benefit Plan Investor") pursuant to Section 3(42) of ERISA or 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise.

☐ Yes ☒ No

For example, a plan which is maintained by a foreign entity, governmental entity or church, is an employee benefit plan within the meaning of Section 3(3) of ERISA even though it is generally not subject to ERISA (collectively, "Non-ERISA Plans") and a Keogh plan covering no common-law employees and an individual retirement account, which are also not subject to ERISA, are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any Affiliate of such a person) is held by Benefit Plan Investors, would be deemed to hold the assets of one or more employee benefit plans or plans pursuant to the Plan Asset Regulation.

(b)    If the Investor checked the box "Yes" in the preceding question 3(a), the maximum percentage of such Holder's assets that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulation is ___%.

**Note:**    Because of the level of Benefit Plan Investor ownership of an entity may vary from time to time due to normal subscription and redemption activity, we recommend the percentage included above represent more than twice the

level of Benefit Plan Investor ownership at the time this certificate is completed. (In this regard, please note the requirements of questions 3(d) and 3(e) below).

IF YOU DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE ABOVE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

(c)(1)  Is the investor a life insurance company?

☐ Yes        ☒ No

(c)(2)  If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Investor's interest in the Preference Shares being acquired with the assets of the Investor's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)(3)  If the Investor indicated in question (c)(2) above that general account assets are being used to acquire the Investor's interest in the Preference Shares, please complete the following:

_____% of such general account assets used to acquire Preference Shares represent "plan assets" within the meaning of the Plan Asset Regulation

(d)     Is the Investor a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (each, a "Controlling Person").

☐ Yes ☒ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person. "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)     The Investor understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Issuer's Preference Shares, both upon the original issuance of Preference Shares and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Preference Shares, for any reason. Accordingly, the Investor undertakes:

(i) to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the information provided in this paragraph,

(ii) to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Issuer and the Trustee to make a determination with respect to the portion of the Preference Shares of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii) to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a Benefit Plan Investor or a Controlling Person and

(iv) to promptly dispose of its interests in the Preference Shares if it is becoming a Benefit Plan Investor or a Controlling Person and is notified that its ownership of the Preference Shares would, in the event of a transfer, result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Preference Shares of the Issuer being held by Benefit Plan Investors.

(f)     If the Investor is, or is acting on behalf of, a Benefit Plan Investor subject to ERISA and/or Section 4975 of the Code, the Investor represents and warrants that, its acquisition, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a non-U.S., governmental or church plan, any similar non-U.S., federal, state or local law) for which an exemption is not applicable. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

E.    **Certain Tax Matters**

1.    The Investor understands that no purchase or transfer of a Preference Share (or any interest therein) may be made (and the Preference Share Paying Agent will not recognize any such purchase or transfer) if it would cause there to be more than 99 beneficial owners of Preference Shares and any other equity interests in the Issuer for U.S. federal income tax purposes or otherwise cause the Issuer to become a publicly traded partnership treated as a corporation for such purposes.

2.    The Investor represents to each of (A), (B) (C) and (D) below as follows:

(A)   Either

☐     (1)   It will at all times be a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code, or

☒     (2)   It will at all times be a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code.

(B)   Either

☐     (1)   It is not for U.S. federal income tax purposes a partnership, grantor trust or S corporation, or

☐     (2)   It was not formed for the purpose of holding Preference Shares or any other equity interests in the Issuer and not more than 50% of the value of the interest of any of the Investor's beneficial owners will be attributable to Preference Shares or any other equity interests of the Issuer, or

☐     (3)   It will provide an opinion of a nationally recognized tax counsel that its purchase will not cause the Issuer to be treated as a publicly traded partnership and such other representations and information as the Preference Share Paying Agent in its sole discretion may request, in form and substance satisfactory to the Preference Share Paying Agent, or

☒     (4)   It is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2).

☒   (C)   The Investor is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) or cause any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

The Investor understands and agrees that:

(1)   Solely for United States federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Preference Shares of the Issuer will constitute partners of the Issuer,

(2)   It will not elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code,

(3)      It will provide such information and complete such forms as may be reasonably requested by or on behalf of the Issuer in connection with the Issuer's preparation and filing of tax returns and other forms, if any, and

(4)      It will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payments in respect of investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate or to give full effect to the agreed tax treatment described above or to allow the Issuer to prepare and file tax forms or returns that the Issuer believes to be required of it, with any such form or document to be accurate and completed in a manner reasonably satisfactory to the Issuer and to be executed and to be delivered with any reasonably required certification.

F.      **Related Parties**

1.      To the best of the Investor's knowledge, does the Investor control, or is the Investor controlled by or under common control with, any other investor in the Issuer?

        ☒ Yes  ☐ No

2.      Will any other person or persons have a beneficial interest in the Preference Shares to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

        ☐ Yes  ☒ No

If either question above was answered "Yes", please contact the Issuer for additional information that will be required.

G.      **Cayman Islands**

1.      The Investor certifies that it is not a member of the public in the Cayman Islands.

        ☒ Yes  ☐ No

The Investor understands that the foregoing information will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Preference Shares of the Issuer. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an Accredited Investor or as a Qualified Purchaser, to determine the status of the Issuer under ERISA and/or Section 4975 of the Code or to otherwise determine its eligibility to purchase Preference Shares of the Issuer. The Investor further agrees to promptly notify the Issuer by telephone and in writing if any of the information contained in this Investor Questionnaire becomes untrue prior to the registration of the Preference Shares in the name of the Investor in the Share Register (as defined in the Preference Share Paying Agency Agreement). The Investor agrees to indemnify and hold harmless the Issuer and its Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signatures:

Phoenix VIII, LLC

By: _____

Name:   Lynn Tilton

Title:   Manager

Subscription Agreement (Preference Shares)

Patriarch/PC Confidential

Form **W-9**
(Rev. November 2005)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

Give form to the
requester. Do not
send to the IRS.

**Print or type** **See Specific Instructions on page 2.**

Name (as shown on your income tax return)
**PHOENIX VIII LLC**

Business name, if different from above

Check appropriate box:
☐ Individual/ Sole proprietor  ☐ Corporation  ☐ Partnership  ☒ Other ▶  **DISREGARDED ENTITY**  ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
**227 W TRADE STREET STE 1400**

City, state, and ZIP code
**CHARLOTTE, NC 28202**

Requester's name and address (optional)

List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

**or**

Employer identification number
**20-8783340**

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification Instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here**    Signature of U.S. person ▶    Date ▶ 4/5/2007

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

• An individual who is a citizen or resident of the United States,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

• Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

• The U.S. owner of a disregarded entity and not the entity,

Form **W-9** (Rev. 11-2005)

ISA
STF FED8132F 1

Patriarch/PC Confidential

EXECUTION COPY

**U.S.$35,000,000 Preference Shares**
**ZOHAR III, LIMITED**

**SUBSCRIPTION AGREEMENT**

Zohar III, Limited
c/o Maples Finance Limited
P.O. Box 1093 GT, Queensgate House
South Church Street, George Town
Grand Cayman, Cayman Islands
Attention: The Directors

Ladies and Gentlemen:

1.    Subscription. The Issuer hereby sells, and the undersigned (the "Investor") hereby purchases Preference Shares ("Preference Shares") of Zohar III, Limited, a newly formed exempted company incorporated under the laws of the Cayman Islands (the "Issuer"), in the aggregate amount set forth opposite the Investor's name on the signature page hereto, and for an aggregate purchase price, equal to U.S.$35,000,000. Capitalized terms used herein and in the attached Investor Questionnaire, but not otherwise defined herein or therein, shall have the respective meanings given to them in the Indenture, dated as of the date hereof (the "Indenture"), among the Issuer, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., as Class A-1R Note Agent and Class A-1D Note Agent, and LaSalle Bank National Association, as trustee.

        The Investor acknowledges that this subscription (i) is irrevocable and (ii) is subject only to delivery by the Issuer of the Preference Shares.

2.    Representations and Warranties. To induce the Issuer to accept this subscription, the Investor represents and warrants as follows (which representations and warranties will be deemed to be repeated by the Investor on each date that the Investor purchases Preference Shares pursuant to Paragraph 1 above):

        (a)    Accredited Investor Status; Investment Intent. The Investor is an "accredited investor" (as defined in Rule 501(a) under the Securities Act (the "Securities Act") (an "Accredited Investor") and is acquiring the Preference Shares for its own account for investment purposes and not with a view to the distribution thereof in violation of applicable securities laws. The Investor understands that the Preference Shares have not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any other governmental authority or agency of any jurisdiction.

        (b)    Investor Sophistication; Non-Reliance; Suitability; Access to Information. The Investor (i) has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Preference Shares, (ii) is financially able to bear such risk, (iii) in making such investment is not relying on the advice or recommendations of the Issuer or any of its Affiliates (or any representative of the Issuer) and (iv) has determined that an investment in the Preference Shares is suitable and appropriate for it. The Investor has received, and has had an adequate opportunity to review the contents of, the Issuer Charter, the Preference Share Paying Agency Agreement and the other Transaction

NY3:#7391533

Patriarch/PC Confidential

Documents.  The Investor has had access to such financial and other information concerning the Issuer and the Preference Shares as it has deemed necessary to make its own independent decision to purchase the Preference Shares, and has been afforded an opportunity to ask questions and receive answers concerning the Issuer and the terms and conditions of the offering of the Preference Shares.

(c)    Certification Upon Transfer.  The Investor will, prior to any sale, pledge or other transfer by it of any Preference Share (or any interest therein), obtain from the transferee and deliver to the Issuer and the Preference Share Paying Agent a duly executed transferee certificate in the form of Exhibit B attached to the Preference Share Paying Agency Agreement and such other certificates and other information as the Issuer or the Preference Share Paying Agent may reasonably require to confirm that the proposed transfer complies with the transfer restrictions contained in the Preference Share Paying Agency Agreement.

(d)    Minimum Denominations.  The Investor agrees that no Preference Shares (or any interest therein) may be sold, pledged or otherwise transferred in less than the applicable minimum number of Preference Shares set forth in the Preference Share Paying Agency Agreement.

(e)    Securities Law Limitations on Resale.  The Investor understands that the Preference Shares are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, have not been and will not be registered under the Securities Act, and may be re-offered, resold, pledged, or otherwise transferred only to a person whom the Investor reasonably believes is (i) a Qualified Institutional Buyer purchasing for its own account or for the account of another Qualified Institutional Buyer to whom notice is given, in each case, that the resale, pledge or other transfer is being made in reliance on the exemption from Securities Act registration provided by Rule 144A or (ii) an Accredited Investor, in each case, subject to the transfer restrictions set forth in the Preference Share Paying Agency Agreement.  The Investor understands that an appropriate legend substantially to the foregoing effect must be placed on each certificate representing any Preference Shares.

(f)    Limited Liquidity.  The Investor understands that there is no market for the Preference Shares and that no assurance can be given as to the liquidity of any trading market for the Preference Shares and that it is unlikely that a trading market for the Preference Shares will develop.

(g)    Investment Company Act.  The Investor is a "qualified purchaser" (a "Qualified Purchaser") as defined in the Investment Company Act of 1940, as amended (the "Investment Company Act"), a company each of whose beneficial owners is a Qualified Purchaser, a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee") or a company owned exclusively by Knowledgeable Employees with respect to the Issuer.  The Investor agrees that no sale, pledge or other transfer of a Preference Share (or any portion thereof) may be made (i) unless such transfer is made to a transferee who is a Qualified Purchaser or a company each of whose beneficial owners is a Qualified Purchaser, or (ii) if such transfer would have the effect of requiring the Issuer or its assets to register as an investment company under the Investment Company Act.  The Investor understands and acknowledges that the Issuer has no intention of registering as an "investment company" under the Investment Company Act.

(h)    ERISA.  The Investor agrees to certify (a) whether or not it is, or is acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA subject to the

NY3:#7391533

Patriarch/PC Confidential

fiduciary responsibility requirements of Title I of ERISA and/or a plan within the meaning of Section 4975 of the Code or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each a "benefit plan investor") pursuant to 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise (each, a "Plan") and (b) whether it is a person who has discretionary authority or control with respect to the assets of the Issuer or provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or is an Affiliate of any such person (each such person, a "controlling person"). If the Investor is, or is acting on behalf of, a Plan, the Investor represents and warrants that its acquisition, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, under any similar federal, state or local law) for which an exemption is not available. In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. The Investor (i) agrees that no sale, pledge or other transfer of such Preference Share (or any interest therein) may be made if, immediately after giving effect to such transfer, 25% or more, as determined under the Plan Asset Regulation, of the value of the Preference Shares or of any other class of equity interest of the Issuer would be held by "benefit plan investors", (ii) agrees to inform the Issuer and the Preference Share Paying Agent immediately of any change in the status of the Investor which results in the Investor's becoming a "benefit plan investor" or a "controlling person", (iii) agrees to promptly dispose of its interests in the Preference Shares if it is becoming a "benefit plan investor" or a "controlling person", and it has been notified that its ownership of the Preference Shares would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Issuer's Preference Shares or of any other class of equity interest in the Issuer being held by "benefit plan investors" and (iv) understands and agrees that the information supplied in this Subscription Agreement upon acquisition of the Preference Shares and as requested thereafter from time to time will be utilized to determine whether benefit plan investors own less than 25% of the value of the Preference Shares or of any other class of equity interest in the Issuer, both upon the original issuance of Preference Shares and upon any subsequent transfer of the Preference Shares or of any other class of equity interest in the Issuer.

(i)      Certain Tax Matters. The Investor (i) represents that (a) it is either (1) a United States person within the meaning of Code section 7701(a)(30) or (2) a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of Code section 7701(a)(30), (b) it is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2)and (c) it is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of the Preference Shares or cause the Preference Shares to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations, and (ii) understands and agrees that (a) it may not sell, pledge or otherwise transfer a Preference Share (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) if it would cause there to be more than 99 beneficial owners of the Preference Shares and any other equity interests of the Issuer or otherwise cause the Issuer to be treated as a publicly traded partnership for such purposes, and (b) it will provide any form or document, and will join in the execution of such additional

3

documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payment in respect of its investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate.

(j)    Limitations on Flow-Through Status.  The Investor represents that, unless the Investor is a Qualifying Investment Vehicle (as defined below), (i) if the Investor would be an investment company but for the exceptions in Section 3(c)(1) or 3(c)(7) of the Investment Company Act, the amount of the Investor's investment in the Preference Shares does not exceed 40% of the total assets (determined on a consolidated basis with its subsidiaries) of the Investor; (ii) no Person owning any equity or similar interest in the Investor exercises control, on an investment-by-investment basis, over the amount of such Person's contribution to any investment made by the Investor; and (iii) the Investor was not organized or reorganized for the specific purpose of acquiring the Preference Shares.  For this purpose, a "Qualifying Investment Vehicle" is an entity (a) as to which all of the beneficial owners of any securities issued by such entity have made, and as to which (in accordance with the document pursuant to which such entity was organized or the agreement or other document governing such securities) each such beneficial owner must require any transferee of any such security to make, to the Issuer and the Preference Share Paying Agent each of the representations set forth herein and in the Preference Share Paying Agency Agreement required to be made upon transfer of any of the Preference Shares (with modifications to such representations satisfactory to the Issuer to reflect the indirect nature of the interests of such beneficial owners in the Preference Shares) and (b) as to which, if such entity would be an investment company but for the exceptions provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act (any such entity, an "excepted investment company"): (x) all of the beneficial owners of outstanding securities (other than short-term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("pre-amendment beneficial owners"); and (y) all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act.

(k)    Certain Transfers Void.  The Investor agrees that (i) any sale, pledge or other transfer of a Preference Share (or any portion thereof) made in violation of the transfer restrictions contained in the Preference Share Paying Agency Agreement, or made based upon any false or inaccurate representation made by the Investor or a transferee to the Issuer, will be void ab initio and of no force or effect and (ii) none of the Issuer, the Preference Share Paying Agent or the Share Registrar has any obligation to recognize any sale, pledge or other transfer of a Preference Share (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(l)    Reliance on Representations, etc.  The Investor acknowledges that the Issuer, the Preference Share Paying Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in connection with its purchase of the Preference Shares are no longer accurate, the Investor will promptly notify the Issuer and Preference Share Paying Agent.

(m)    Cayman Islands.  The Investor is not a member of the public of the Cayman Islands.

Patriarch/PC Confidential

(n)     Subscription Agreement. The Investor has the power and authority to enter into this Subscription Agreement and each other document required to be executed and delivered by or on behalf of the Investor in connection with this subscription for Preference Shares, and to perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby, and the Person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for Preference Shares. Such execution, delivery and compliance by the Investor does not conflict with, or constitute a default under, any instruments governing the Investor, any applicable law (assuming that none of the assets of the Issuer constitute "plan assets" within the meaning of the Plan Asset Regulation or otherwise), regulation or order, or any material agreement to which the Investor is a party or by which the Investor or its property is bound. This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor, enforceable against the Investor in accordance with its terms.

(o)     Investor Location. If the Investor's permanent address specified in the Investor Questionnaire is located in the United States, the Investor was offered the Preference Shares in the state listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Issuer and intends that the securities law of that state governs the Investor's subscription for the Preference Shares.

3.     Tax Information. The Investor certifies under penalties of perjury that (i) the Investor's name, taxpayer identification or social security number (if any) and address provided in the Investor Questionnaire are correct and (ii) the information contained in any Form W-9 (Request for Taxpayer Identification Number and Certification) or any other tax-related form submitted to the Issuer is correct (which certification will be deemed to be repeated on any date on which any tax form is delivered to the Issuer after the date hereof). The Investor agrees to in a timely manner complete (accurately and in a manner reasonably satisfactory to the Issuer), execute, arrange for any required certification of, and deliver to the Issuer or such governmental or taxing authority as the Issuer directs, any form, document or certificate that may be required or reasonably requested by the Issuer. The Investor further agrees to inform promptly the Issuer of any change in any such information previously provided to the Issuer and to execute a new form or other document with the correct information.

4.     Further Advice and Assurances. All information which the Investor has provided to the Issuer, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Issuer immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue. The Investor agrees to provide such information and execute and deliver such documents as the Issuer may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Issuer may be subject.

5.     Indemnity. The Investor understands that the information provided herein will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Preference Shares. The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase Preference Shares. The Investor agrees to indemnify and hold harmless the Issuer, the Preference Share Paying Agent and each of their respective Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares. Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

6.     Payment of Subscription Price; Delivery of Preference Shares. Simultaneously with the delivery hereof, the Investor shall deliver the purchase price for its preference shares hereunder by effecting a transfer of certain assets listed in Schedule I hereto to the Issuer and the Issuer shall cause the Preference Shares to be registered in the Investor's name in the register maintained on behalf of the Issuer by the Share Registrar under the Preference Share Paying Agency Agreement, and have delivered to the Investor its Preference Shares.

7.     Binding Effect. Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, executors, legal representatives and permitted transferees.

8.     Benefit of Agreement.    The Investor acknowledges that each representation, warranty or agreement of the Investor contained in this Subscription Agreement or in any other document provided by the Investor to the Issuer in connection with the Investor's investment in Preference Shares is made for the benefit of the Issuer and its Affiliates and the other Holders of Preference Shares issued by the Issuer and also for the benefit of the Preference Share Paying Agent under the Preference Share Paying Agency Agreement and Holders from time to time of the Preference Shares issued thereunder.

9.     Miscellaneous. This Subscription Agreement is not assignable by the Investor without the consent of the Issuer.   The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the transactions contemplated hereby and any investigation made by the Issuer.   The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated by reference herein.   This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of New York.

10.     Waiver of Jury Trial.   **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

11.     Notices.  Notices shall be given hereunder as specified in, and with the effect provided for by, Section 8.4 of the Preference Share Paying Agency Agreement.

12.     No Recourse.  Notwithstanding anything to the contrary contained herein, the Investor hereby acknowledges and agrees that the Issuer's obligations hereunder will be solely the corporate obligations of the Issuer, and the Investor will not have any recourse to any of the directors, officers, shareholders, incorporators, partners, agents, members or Affiliates of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  Recourse in respect of any obligations of the Issuer hereunder will be limited to the Collateral and on the exhaustion thereof all claims against the Issuer arising from this subscription or any transactions contemplated hereby shall be extinguished and shall not thereafter revive.

13.     <u>Certain Transactions</u>.  The Issuer shall purchase on or about the Funding Date certain assets (designated as the "Zohar I Assets" and the "Zohar II Assets" under the Indenture) from Zohar CDO 20031, Limited and/or Zohar II CDO 2005-1, Limited (each an Affiliate of Patriarch Partners) and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed  to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  In addition, the Issuer and/or the Zohar Subsidiary will  exchange for Preference Shares certain assets from the Ark Seller (an Affiliate of Patriarch Partners) at the prices (including without limitation pursuant to the pricing methodology) identified in the Indenture, and the Zohar Obligors, the Secured Parties and the other parties to the Transaction Documents will, by entering into the transactions contemplated by the Indenture, be deemed to consent to such acquisitions at the purchase prices for such assets and waive any and all conflicts of interest relating thereto.  The above described purchases and sales have been or will be made between the Issuer, on the one hand, and Affiliates of the Issuer, on the other hand, and as such additional disclosure about the actual and potential conflicts of interest and the valuation methodology used to determine the process for such purchases and sales are more fully described in the schedules to the Indenture.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Subscription Agreement (Preference Shares)

NY3:#7391533

Patriarch/PC Confidential

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement on the date set forth below.

Date: April **6**, 2007
**Aggregate Number of Preference Shares subscribed for: U.S.$35,000,000 Preference Shares**

ARK II CLO 2001-1, LIMITED

By: _____
Name: Lynn Tilton
Title:    Manager

The Issuer hereby accepts the above application
for subscription for Preference Shares.

ZOHAR III, LIMITED

By:_____

   Name:    Chris Watler

   Title:     Director

Date:_____

Subscription Agreement (Preference Shares)

Patriarch/PC Confidential

## INVESTOR QUESTIONNAIRE

Reference is made to the Indenture, dated as of April 6, 2007 (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Indenture"), among the Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc. and LaSalle Bank National Association, as trustee. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

### A.    General Information

1.    Print Full Name of Investor:    ARK II CLO 2001-1, LIMITED

2.    Name in which Preference
       Shares should be registered:    ARK II CLO 2001-1, LIMITED

3.    Address and Contact Person    227 W. Trade St.
       for Notices:    Suite 1400
       Charlotte, NC 28202
       Attention:  Virginia Blount

4.    Telephone Number:    (704) 227-1217

5.    Telecopier Number:    (704) 375-0358

6.    Permanent Address:
       (if different from above)

7.    U.S. Taxpayer
       Identification or Social
       Security Number (if any)    98-0358999

8.    Payment Instructions:    Branch Banking & Trust
       200 South College St, 2nd Floor Charlotte, NC 28202
       Routing: 05310121 Act# 5291103776

9.    Instructions for delivery
       of Preference Shares:    As Per Side Letter

### B.    Accredited Investor

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act (an "Accredited Investor") and has checked the box or boxes below which are next to the categories under which the Transferee so qualifies as an Accredited Investor:

Patriarch/PC Confidential

☒           (A)     It is an entity, including a grantor trust, in which all of the equity owners are Accredited Investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

☐           (B)     It is a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐           (C)     It is an insurance company as defined in Section 2(13) of the Securities Act.

☐           (D)     It is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐           (E)     It is an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

☐           (F)     It is a business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐           (G)     It is a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐           (H)     It is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

☐           (I)     It is an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Preference Shares, with total assets in excess of U.S.$5,000,000.

☐           (J)     It is a trust with total assets in excess of U.S.$5,000,000 not formed for the specific purpose of acquiring Preference Shares, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Preference Shares.

C.    **Qualified Purchaser Status**

1.    The Investor represents and warrants that the Investor is a "qualified purchaser" within the meaning of the Investment Company Act (a "Qualified Purchaser") and has checked the box or boxes below which are next to the categories under which the Investor qualifies as a Qualified Purchaser:

☐           (A)     It is a company that (1) owns not less than U.S.$5,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons and (2) was not

formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐      (B)    It is a trust that is not covered by clause (A) above and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settler or other person who has contributed assets to the trust, is a person described in clause (A) or (C).

☐      (C)    It is a Person, acting for its own account or the account of other Qualified Purchasers, who (1) in the aggregate owns and invests on a discretionary basis, not less than U.S.$25,000,000 in Investments as valued in accordance with such Rule 2a51-1 (including, without limitation, after deducting from the amount of such investments the amount of any outstanding indebtedness incurred to acquire or for the purpose of acquiring such investments) (including Investments owned by majority-owned subsidiaries of the company and Investments owned by a company (a "Parent Company") of which the company is a majority-owned subsidiary, or by a majority-owned subsidiary of the company and other majority-owned subsidiaries of the Parent Company) and (2) was not formed for the specific purpose of acquiring Preference Shares of the Issuer unless each beneficial owner of the Investor's securities is a Qualified Purchaser.

☐      (D)    It is a "qualified institutional buyer" within the meaning of Rule 144A(a) promulgated under the Securities Act, acting for its own account, the account of another qualified institutional buyer or the account of a Qualified Purchaser; provided:

         (1)    that a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of the dealer; and

         (2)    that a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☒      (E)    It is an entity in which each beneficial owner of the Investor's securities is a Qualified Purchaser.

Alternatively, the Purchaser represents and warrants that the Purchaser is a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act (a "Knowledgeable Employee")  or a company owned exclusively by Knowledgeable Employees.

☐ Yes       ☐ No

2.    If the Investor is a company that, but for the exceptions provided for in paragraph (1) or (7) of Section 3(c) of the Investment Company Act, would be an investment company (hereinafter in this paragraph referred to as an "excepted investment company"):

    (i)     all of the beneficial owners of outstanding securities (other than short-term paper) of the Investor (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the

Investment Company Act) that acquired such securities on or before April 30, 1996 (hereinafter in this paragraph referred to as "pre-amendment beneficial owners"); and

(ii)    all pre-amendment beneficial owners of the outstanding securities (other than short-term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of the Investor, have consented to the Investor's treatment as a qualified purchaser in accordance with Section 2(a)(51)(C) of, and Rule 2a51-2 promulgated under, the Investment Company Act.

D.    **Supplemental Data**

1.    Legal form of entity (corporation, partnership, trust, etc.): ___Corporation___

       Jurisdiction of organization: ___Cayman Islands___

2.    The Investor certifies that it is not a Flow-Through Investment Vehicle (as defined in the Indenture) other than a Qualifying Investment Vehicle (as defined in the Preference Share Paying Agency Agreement).

              ☒ Yes  ☐ No

3.    (a)    Is the Investor, or is the Investor acting on behalf of, an employee benefit plan within the meaning of Section 3(3) of ERISA (a "Plan") that is subject to fiduciary responsibility requirements of Title I of ERISA or a plan to which Section 4975 of the Code applies or an entity which is deemed to hold the assets of any such employee benefit plan or plan (each, a "Benefit Plan Investor") pursuant to Section 3(42) of ERISA or 29 C.F.R. Section 2510.3-101 (the "Plan Asset Regulation") or otherwise.

              ☐ Yes  ☒ No

       For example, a plan which is maintained by a foreign entity, governmental entity or church, is an employee benefit plan within the meaning of Section 3(3) of ERISA even though it is generally not subject to ERISA (collectively, "Non-ERISA Plans") and a Keogh plan covering no common-law employees and an individual retirement account, which are also not subject to ERISA, are plans within the meaning of Section 4975 of the Code. In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act and in which 25% or more of the value of any class of equity interests (exclusive of the value of any equity interests held by a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of such entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any Affiliate of such a person) is held by Benefit Plan Investors, would be deemed to hold the assets of one or more employee benefit plans or plans pursuant to the Plan Asset Regulation.

       (b)    If the Investor checked the box "Yes" in the preceding question 3(a), the maximum percentage of such Holder's assets that will constitute "plan assets" for purposes of conducting the 25% test under the Plan Asset Regulation is ___%.

              Note:  Because of the level of Benefit Plan Investor ownership of an entity may vary from time to time due to normal subscription and redemption activity, we recommend the percentage included above represent more than twice the

level of Benefit Plan Investor ownership at the time this certificate is completed. (In this regard, please note the requirements of questions 3(d) and 3(e) below).

IF YOU DO NOT INCLUDE ANY PERCENTAGE IN THE BLANK SPACE ABOVE, YOU WILL BE COUNTED AS IF YOU FILLED IN 100% IN THE BLANK SPACE.

(c)(1)   Is the investor a life insurance company?

☐ Yes          ☒ No

(c)(2)   If the answer to the question in (c)(1) above is "Yes", please indicate the relative percentages of the Investor's interest in the Preference Shares being acquired with the assets of the Investor's general account and separate accounts:

_____% is being acquired with the assets of the general account.

_____% is being acquired with the assets of one or more separate accounts.

(c)(3)   If the Investor indicated in question (c)(2) above that general account assets are being used to acquire the Investor's interest in the Preference Shares, please complete the following:

_____% of such general account assets used to acquire Preference Shares represent "plan assets" within the meaning of the Plan Asset Regulation

(d)      Is the Investor a person other than a Benefit Plan Investor who has discretionary authority or control with respect to the assets of the Issuer or who provides investment advice to the Issuer for a fee, direct or indirect, with respect to such assets or any affiliate of any such person (each, a "Controlling Person").

☐ Yes ☒ No

For purposes of the foregoing, an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person.  "Control", with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

(e)      The Investor understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the Issuer's Preference Shares, both upon the original issuance of Preference Shares and upon subsequent transfer of any equity interest of the Issuer, including, without limitation, the Preference Shares, for any reason.  Accordingly, the Investor undertakes:

(i) to inform the Issuer, the Collateral Manager and the Trustee immediately of any change in the information provided in this paragraph,

(ii) to provide to the Issuer and the Trustee such information as the Issuer or the Trustee may reasonably request from time to time to enable the Issuer and the Trustee to make a determination with respect to the portion of the Preference Shares of the Issuer that may be held by or for the benefit of Benefit Plan Investors,

(iii) to inform the Issuer, the Trustee and the Collateral Manager immediately of any change in the status of the Investor which results in the Investor's becoming a Benefit Plan Investor or a Controlling Person and

(iv) to promptly dispose of its interests in the Preference Shares if it is becoming a Benefit Plan Investor or a Controlling Person and is notified that its ownership of the Preference Shares would, in the event of a transfer, result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Preference Shares of the Issuer being held by Benefit Plan Investors.

(f)     If the Investor is, or is acting on behalf of, a Benefit Plan Investor subject to ERISA and/or Section 4975 of the Code, the Investor represents and warrants that, its acquisition, ownership and disposition of the Preference Shares will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a non-U.S., governmental or church plan, any similar non-U.S., federal, state or local law) for which an exemption is not applicable.  In addition, if the Investor is, or is acting on behalf of, a Plan subject to ERISA, the fiduciaries of such Plan represent and warrant that they have been informed of and understand the Issuer's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Preference Shares was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

E.    **Certain Tax Matters**

1.    The Investor understands that no purchase or transfer of a Preference Share (or any interest therein) may be made (and the Preference Share Paying Agent will not recognize any such purchase or transfer) if it would cause there to be more than 99 beneficial owners of Preference Shares and any other equity interests in the Issuer for U.S. federal income tax purposes or otherwise cause the Issuer to become a publicly traded partnership treated as a corporation for such purposes.

2.    The Investor represents to each of (A), (B) (C) and (D) below as follows:

(A)    <u>Either</u>

☐     (1)    It will at all times be a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code, <u>or</u>

☒     (2)    It will at all times be a person whose separate existence is disregarded pursuant to Treasury regulation section 301.7701-3 for United States federal income tax purposes all of whose equity is owned by a single person that is a United States person within the meaning of section 7701(a)(30) of the United States Internal Revenue Code.

(B)    <u>Either</u>

☐     (1)    It is not for U.S. federal income tax purposes a partnership, grantor trust or S corporation, <u>or</u>

☐     (2)    It was not formed for the purpose of holding Preference Shares or any other equity interests in the Issuer and not more than 50% of the value of the interest of any of the Investor's beneficial owners will be attributable to Preference Shares or any other equity interests of the Issuer, <u>or</u>

☐     (3)    It will provide an opinion of a nationally recognized tax counsel that its purchase will not cause the Issuer to be treated as a publicly traded partnership and such other representations and information as the Preference Share Paying Agent in its sole discretion may request, in form and substance satisfactory to the Preference Share Paying Agent, <u>or</u>

☒     (4)    It is a partnership that has, and at all times will have, no more than 98 "partners" for purposes of Treasury regulation section 1.7704-1(h)(1)(2).

☒    (C)    The Investor is not acquiring and will not sell, transfer, assign, participate, pledge or otherwise dispose of any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) or cause any Preference Shares (or any interest therein, including through any derivative or swap arrangement that transfers all or substantially all of the economic benefits of ownership of a Preference Share to a derivative or swap counterparty) to be marketed on or through an "established securities market" within the meaning of Section 7704(b)(1) of the Code, including, without limitation, an interdealer quotation system that regularly disseminates firm buy or sell quotations.

The Investor understands and agrees that:

(1)    Solely for United States federal and, to the extent permitted by applicable law, state and local income tax purposes, for so long as there is a single beneficial owner of the Preference Shares and any other equity interest in the Issuer, the Issuer will be treated as a disregarded entity and otherwise the Issuer will be treated as a partnership and the holders of Preference Shares of the Issuer will constitute partners of the Issuer,

(2)    It will not elect to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code,

(3)      It will provide such information and complete such forms as may be reasonably requested by or on behalf of the Issuer in connection with the Issuer's preparation and filing of tax returns and other forms, if any, and

(4)      It will provide any form or document, and will join in the execution of such additional documents and elections, that may be required or reasonably requested in writing by or on behalf of the Issuer in order to allow the Issuer to make a payment in respect of the Preference Shares or receive payments in respect of investments without any deduction or withholding for or on account of any tax or with such deduction or withholding at a reduced rate or to give full effect to the agreed tax treatment described above or to allow the Issuer to prepare and file tax forms or returns that the Issuer believes to be required of it, with any such form or document to be accurate and completed in a manner reasonably satisfactory to the Issuer and to be executed and to be delivered with any reasonably required certification.

F.    **Related Parties**

1.    To the best of the Investor's knowledge, does the Investor control, or is the Investor controlled by or under common control with, any other investor in the Issuer?

☒ Yes  ☐ No

2.    Will any other person or persons have a beneficial interest in the Preference Shares to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

☐ Yes  ☒ No

If either question above was answered "Yes", please contact the Issuer for additional information that will be required.

G.    **Cayman Islands**

1.    The Investor certifies that it is not a member of the public in the Cayman Islands.

☒ Yes  ☐ No

The Investor understands that the foregoing information will be relied upon by the Issuer for the purpose of determining the eligibility of the Investor to purchase Preference Shares of the Issuer. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an Accredited Investor or as a Qualified Purchaser, to determine the status of the Issuer under ERISA and/or Section 4975 of the Code or to otherwise determine its eligibility to purchase Preference Shares of the Issuer. The Investor further agrees to promptly notify the Issuer by telephone and in writing if any of the information contained in this Investor Questionnaire becomes untrue prior to the registration of the Preference Shares in the name of the Investor in the Share Register (as defined in the Preference Share Paying Agency Agreement). The Investor agrees to indemnify and hold harmless the Issuer and its Affiliates from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

Signatures:

ARK II CLO 2001-1, LIMITED

By: _____
Name:   Lynn Tilton
Title:   Manager

Subscription Agreement (Preference Shares)

Patriarch/PC Confidential

Form **W-9**
(Rev. November 2005)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

**Give form to the requester. Do not send to the IRS.**

<table>
<tr><td rowspan="9"><b>Print or type</b><br>See Specific Instructions on page 2.</td></tr>
<tr><td>Name (as shown on your income tax return)<br><b>ARK II CLO 2001-1 LIMITED</b></td></tr>
<tr><td>Business name, if different from above</td></tr>
<tr><td>Check appropriate box: ☐ Individual/ Sole proprietor  ☐ Corporation  ☐ Partnership  ☒ Other ▶ <u>DISREGARDED ENTITY</u>    ☐ Exempt from backup withholding</td></tr>
<tr><td>Address (number, street, and apt. or suite no.)<br><b>C/O PATRIARCH PARTNERS LLC 227 W. TRADE STREET STE. 1400</b></td><td>Requester's name and address (optional)</td></tr>
<tr><td>City, state, and ZIP code<br><b>CHARLOTTE, NC 28202</b></td></tr>
<tr><td>List account number(s) here (optional)</td></tr>
</table>

## Part I — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

**Social security number**

**or**

**Employer identification number**
98-0358999

## Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here**
Signature of U.S. person ▶    Date ▶ 4/5/2007

# Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

- An individual who is a citizen or resident of the United States,

- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

- Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

- The U.S. owner of a disregarded entity and not the entity,

Patriarch/PC Confidential

Form **W-9** (Rev. 11-2005)

ISA
STF FED8132F.1

# EXHIBIT 9

**EXECUTION VERSION**

## PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this "*Agreement*") is made as of January 12, 2017, between U.S. BANK NATIONAL ASSOCIATION ("*U.S. Bank*"), as Trustee pursuant to the Indenture (as hereinafter defined) (the "*Seller*"), ZOHAR CDO 2003-1, LIMITED, as Issuer (the "*Issuer*"), ZOHAR CDO 2003-1, LLC (the "*Subsidiary*") and MBIA INSURANCE CORPORATION, as purchaser (the "*Purchaser*").

WITNESSETH:

WHEREAS, U.S. Bank is the Trustee pursuant to that certain Indenture, dated as of November 13, 2003 (as amended, supplemented or otherwise modified from time to time the "*Indenture*"), by and among the Issuer, Zohar CDO 2003-1, Corp., as Co-Issuer (the "*Co-Issuer*", and, together with the Issuer, the "*Issuers*"), the Subsidiary, MBIA Insurance Corporation, as Credit Enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and U.S. Bank, as Trustee, pursuant to which the Issuers have issued certain debt securities (the "*Notes*"), and capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Indenture;

WHEREAS, the Seller, as required by the Indenture, conducted an auction (the "*Auction*") of certain loans and other assets (the "*Assets*") owned by the Issuer and the Subsidiary on December 21, 2016 (the "*Auction Date*");

WHEREAS, the sale of the Assets is subject to the satisfaction of the conditions described in this Agreement and in the Notice of Rescheduling of Public Sale and Fourth Notice of Public Sale and Invitation to Bid, dated December 8, 2016, from the Seller; and

WHEREAS, the Seller desires to sell the Assets identified on Exhibit I attached hereto (collectively, the "*Purchaser Assets*") to the Purchaser;

NOW THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.    <u>Agreement to Purchase and Sell</u>. Subject to all of the other conditions set forth herein, upon receipt by the Seller prior to 5:00 p.m. (Eastern Time ("*ET*")) on January 13, 2017 (the "*Settlement Date*") of (a) a direction to reduce the outstanding Credit Enhancement Liabilities by the amount of the Purchaser's bid in the Auction, as may be reduced if and to the extent the Seller requires any payment in cash (the amount of any such payment in cash, the "*Minimum Cash Amount*") and (b) cash in the amount of the Minimum Cash Amount, if any, in each case from the Purchaser (collectively, the "*Purchase Price*"), each of the Seller, the Issuer and the Subsidiary hereby irrevocably agrees to sell, transfer, assign, grant, set over, deposit with and otherwise convey to the Purchaser, without recourse, and the Purchaser hereby irrevocably agrees to purchase, acquire, assume, and accept on the Settlement Date, all the right, title and interest (whether legal, equitable or beneficial) of the Seller, the Issuer and the Subsidiary in and to all of the Purchaser Assets and all payments on or other amounts or property received in respect of the Purchaser Assets after the Settlement Date. Payments or distributions (whether received by set off or otherwise) of cash (including interest), notes, securities, or other property or proceeds under or in respect of the Purchaser Assets made after the Settlement Date (the "*Payments*") and received into the Accounts by the Issuer, the Subsidiary, or the Seller, on behalf of the Issuer (each, a "*Recipient*"), shall be remitted to the Purchaser or its designee(s) (in accordance with its instructions) by the applicable Recipient(s) promptly after receipt thereof by such Recipient(s); *provided* that the economic benefit of not-otherwise-scheduled permanent repayments of principal and any non-ordinary course fees made after the Auction Date and other amounts or property received in respect of the Purchaser Assets after the Auction Date shall be paid to the Purchaser or its designee(s); *provided further* that such Payments, if received by a Recipient shall be held on behalf and for the sole benefit of the Purchaser and none of the

1

Seller, the Issuer or the Subsidiary shall have an equitable or beneficial interest in such Payment. If a Payment received by the applicable Recipient(s) includes securities or other non-cash Payment, such Recipient(s) shall, to the extent permitted by law, endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at the Purchaser's sole expense) to assist the Purchaser to cause to be registered in the Purchaser's name, or such name as the Purchaser may direct, and deliver such securities to the Purchaser or to such entity as the Purchaser may direct as soon as reasonably practicable.

2.    Payment. (a)    On the Settlement Date, the Purchaser shall wire transfer to the Seller in immediately available funds an amount equal to the Minimum Cash Amount prior to 5:00 p.m. ET according to the following wiring instructions:

> Trustee Wire Instructions:
> Bank: US Bank
> ABA #: 091000022
> Account Name: Zohar 1
> Account #: 1731-0332-2199
> FFC: 743771-201
> Ref: Zohar CDO 2003-1, Limited

(b)    Conditions Precedent to Sale. Notwithstanding anything to the contrary, the obligation of each of the Seller, the Issuer and the Subsidiary to sell, transfer, assign, grant, set over, deposit with and otherwise convey the Purchaser Assets to the Purchaser is subject to the Seller's determination that after receipt of notice as required pursuant to the Indenture, no Holder of a Class B Note or Holder of a Class C Note issued pursuant to the Indenture has exercised its right under the Indenture to arrange for a Person to purchase the Assets, within three Business Days of such notice, in an amount equal to or more favorable to the Issuer than the amount described in such notice. In the event the foregoing condition is not satisfied in the reasonable determination of the Seller, (i) the sale of the Assets to the Purchaser shall be cancelled, and (ii) this Agreement shall automatically terminate.

3.    Registration of Transfer of the Purchaser Assets. Except as otherwise agreed to by the Seller and the Purchaser, each of the Issuer, the Subsidiary, the Seller and the Purchaser agrees to use commercially reasonable efforts to promptly take all actions necessary to cause the sale, transfer, assignment, grant, set-over, deposit, or other conveyance of the Purchaser Assets on the Settlement Date. In furtherance of the foregoing, the Purchaser shall use its best efforts in (i) preparing, executing and delivering such transfer certificates, assignments, assignment agreements, endorsements, administrative questionnaires and such other documents or instruments as may be necessary or appropriate, (ii) obtaining such necessary consents to such sale, transfer, assignment, grant, set-over, deposit or other conveyance as may be necessary or appropriate, (iii) paying any transfer and assignment fees as may be required to effect such sale, transfer, assignment, grant, set-over, deposit or other conveyance, and (iv) providing such notices and legal opinions to any persons as may be necessary or appropriate, in each case regardless of whether such obligation to take such action is on the part of the transferor or the transferee of such Purchaser Asset.  In the event any such requirements require actions on the part of the Seller, the Issuer or the Subsidiary which cannot be performed by the Purchaser as agreed to above, each of the Seller, the Issuer and the Subsidiary agrees to cooperate with the Purchaser, at the Purchaser's request and expense, to cause such sale, transfer, assignment, grant, set-over, deposit, or other conveyance, including without limitation the agreement of the Seller, the Issuer or the Subsidiary to execute such assignments, endorsements, certificates and such other documentation reasonably requested by the Purchaser and required to effect such sale, transfer, assignment, grant, set-over, deposit, or other conveyance. Except as otherwise provided in this Section 3, in no event shall the Seller be liable to the Purchaser in any manner arising from the sale, transfer, assignment, grant, set-over, deposit, or other conveyance of any Purchaser Assets, other than for its gross negligence. Upon completing the sale, transfer, assignment, grant, set-over,

2

deposit, or other conveyance of the Purchaser Assets in the name of the Purchaser, the Purchaser agrees to provide prompt notice thereof to each of the Issuer, the Subsidiary, and the Seller (which notice may be given by email).  None of the foregoing requirements shall be deemed or interpreted to impose any obligation or liability on the Seller, the Issuer, or the Subsidiary with respect to any transfer of any right, title and interest to any property (including any payment in respect thereof) except to the extent the Seller, the Issuer, or the Subsidiary has actual knowledge of such property.

4.     Incomplete Transfer. (a) Without limiting the obligation of the parties to use commercially reasonable efforts to promptly cause the sale, transfer, assignment, grant, set-over, deposit, or other conveyance of all Purchaser Assets as provided in Section 3 above, in the event such sale, transfer, assignment, grant, set-over, deposit, or other conveyance has not been effected by the Settlement Date (an "**Incomplete Transfer**"), each party shall continue to use its commercially reasonable efforts after the Settlement Date to cause the sale, transfer, assignment, grant, set-over, deposit, or other conveyance of the Purchaser Assets in the manner provided in Section 3 above. Upon completing the sale, transfer, assignment, grant, set-over, deposit, or other conveyance of all the Purchaser Assets, the Purchaser agrees to provide prompt notice thereof to each of the Issuer, the Subsidiary and the Seller in writing (which notice may be given by email).

(b)     Without limiting the obligations of the parties hereunder, during the period following the Settlement Date for which an Incomplete Transfer has occurred and is continuing in respect of any Purchaser Asset (a "**Participation Period**"), the sale, transfer, assignment, grant, set-over, deposit, or other conveyance in Section 1 above, during such Participation Period, shall be deemed to be the grant and conveyance of an undivided 100% participation interest in and to such Purchaser Asset (a "**Participation Interest**"). Each party agrees to take such further action as may be necessary (or as otherwise reasonably requested by any other party) to effect such participation, including without limitation entering into a participation agreement substantially in the form attached as Exhibit II hereto. Immediately after the commencement of the Participation Period, each of the Issuer, the Subsidiary and the Seller shall use commercially reasonable efforts to cause all amounts owing to the Purchaser as a result of the Participation Interest to be sent directly to the Purchaser or its designee(s); *provided, however*, that if the Seller receives (i) any notice or other document with respect to such Purchaser Asset, then the Seller shall provide such notice or other document to the Purchaser within a reasonable time after receipt thereof or (ii) Payments with respect to such Purchaser Asset, the Seller shall (x) accept and hold such Payment for the account and sole benefit of the Purchaser, (y) have no equitable or beneficial interest in such Payment and (z) deliver such Payment (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law or as may be agreed to by the Seller and the Purchaser) promptly after receipt thereof. If a Payment received by any of the Issuer, the Subsidiary or the Seller includes securities or other non-cash Payment, the applicable party shall, to the extent permitted by law, endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at the Purchaser's sole expense) to assist the Purchaser to cause to be registered in the Purchaser's name, or such name as the Purchaser may direct, and deliver such securities to the Purchaser or to such entity as the Purchaser may direct as soon as reasonably practicable. No adjustment to the Purchase Price paid by the Purchaser hereunder shall be made as result of an Incomplete Transfer.

(c) The Seller shall provide the Purchaser with an irrevocable power of attorney, in a form satisfactory to the Seller in its sole discretion, with respect to the Purchaser Assets for which an Incomplete Transfer has occurred.

5.     Representations of the Purchaser and the Seller. The Purchaser hereby represents and warrants to the Seller, the Issuer and the Subsidiary that:

3

(a)     the Purchaser is qualified under applicable law to become a transferee of the Purchaser Assets;

(b)     the Purchaser acknowledges that no representation, express or implied, is made with respect to the accuracy, adequacy or completeness for its purposes of any information that the Purchaser may have received in connection with any bid on the Purchaser Assets;

(c)     the Purchaser has determined that it satisfies and meets all the necessary qualifications, requirements and other conditions necessary to become a transferee of the Purchaser Assets (other than any necessary third-party consents required to be provided by third-parties under the underlying instruments governing the Purchaser Assets);

(d)     the Purchaser is duly authorized to execute, deliver and perform this Agreement;

(e)     the Purchaser is an entity duly existing under the laws of the United States or the jurisdiction of its organization;

(f)     this Agreement constitutes the legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms (subject to bankruptcy, insolvency and similar laws affecting creditor's rights generally and subject, as to enforceability, to general principals of equity);

(g)     the Purchaser acknowledges that none of the Seller nor any other party connected with the sale of the Assets is a fiduciary or investment advisor to the Purchaser in connection with its purchase of the Purchaser Assets and the Purchaser has not relied upon any advice or recommendation of the Seller or any of its affiliates, and is making its own investment decision based upon its own judgment and upon advice of such professional advisers, either employed or independently retained by the Purchaser, as it has deemed necessary to consult;

(h)     no material consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Purchaser in connection with the execution, delivery or performance by the Purchaser of this Agreement, or the consummation by it of the transactions contemplated hereby;

(i)     the sale of the Purchaser Assets to the Purchaser pursuant to this Agreement will not violate the laws or regulations of any jurisdiction applicable to it, and is permitted under the Purchaser's governing documents and internal policies;

(j)     the Purchaser understands the terms, conditions and risks of the Purchaser Assets and the Purchaser is able to provide the certificates, assignments and other applicable transfer documentation required to effect a sale, transfer, assignment, grant, set-over, deposit, or other conveyance of the Purchaser Assets; and

(k)     the Purchaser acknowledges and agrees that (a) the Seller may obtain or be in possession of non-public information regarding the Purchaser Assets, the obligors under such Purchaser Assets, and the underlying instruments governing the Purchaser Assets, which may not be made available to any Purchaser, (b) the Seller makes no representations with respect to any Purchaser Asset, the obligors under any Purchaser Asset, such underlying instruments governing the Purchaser Assets, or the accuracy or completeness of any information regarding the foregoing, and (c) the Seller will not be obliged to disclose to the Purchaser the existence of or details of any information or documentation relating thereto, including without limitation, any and all non-public information.

The Seller hereby represents and warrants to the Purchaser that:

        (a)      the Seller is duly authorized to execute, deliver and perform this Agreement;

        (b)      the Seller is a national banking association duly existing under the laws of the United States of America; and

        (c)      this Agreement constitutes the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms (subject to bankruptcy, insolvency and similar laws affecting creditor's rights generally and subject, as to enforceability, to general principals of equity).

        6.      <u>Costs</u>. Each party shall bear its own costs and expenses except as provided herein. The Purchaser will pay any commissions due its brokers, the legal fees and expenses of its attorneys, all expenses relating to any review of the Assets performed by the Purchaser and any transfer and assignment fees relating to the sale, transfer, assignment, grant, set-over, deposit, or other conveyance of the Purchaser Assets, including expenses incurred with respect to the gathering of information and the preparation and execution of any documents and instruments necessary to effect such sale, transfer, assignment, grant, set-over, deposit, or other conveyance to the Purchaser.

        7.      <u>Counterparts</u>. The signature pages to this Agreement may be executed by the Seller and the Purchaser, as the case may be, in separate counterparts. Facsimile signatures and signature pages provided in the form of a "pdf" or similar imaged document transmitted by electronic mail shall be deemed original signatures for all purposes hereunder.

        8.      <u>GOVERNING LAW</u>. THIS AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT, OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

        9.      <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN EITHER OF THEM RELATING TO OR INCIDENTAL TO THE RELATIONSHIP BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT.

        10.      <u>NO RECOURSE</u>. THE SALE OF THE PURCHASER ASSETS TO THE PURCHASER WILL BE MADE WITHOUT RECOURSE AND ON AN "AS IS AND WHERE IS" BASIS, WITHOUT ANY REPRESENTATIONS OR WARRANTIES (WHETHER EXPRESSED OR IMPLIED) OF ANY KIND MADE BY THE SELLER (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SELLER OR ANY OTHER PARTY) AND WITHOUT ANY RECOURSE WHATSOEVER AGAINST THE SELLER (OR ANY OTHER PERSON ACTING FOR OR ON BEHALF OF THE SELLER).

11.    <u>Information Provided to Purchaser</u>. Without limiting Section 10 above, the Seller (and any of its officers, directors, employees and agents) (collectively, the "***Information Providers***") shall have any no liability whatsoever for any information or documents provided (or not provided) to the Purchaser, including any information contained in (or omitted from) any materials relating to the Auction of the Assets and any information made available including by access to information on any of the Information Providers' web-sites. The Purchaser acknowledges that the Seller has not made and is not making any representation or warranty as to the Purchaser Assets, including, without limitation, as to the completeness, accuracy or sufficiency thereof or as to the documentation and information relating to the Purchaser Assets.

12.    <u>Indemnity</u>. Upon the sale, transfer, assignment, grant, set-over, deposit, or other conveyance of the Purchaser Assets as contemplated herein, including in Section 1 or Section 3, the Purchaser, its successors and assigns shall at all times indemnify and hold harmless the Seller and each of its directors, officers, employees, counsel, affiliates and agents ("***Indemnified Persons***") from and against any and all claims, actions and suits of others, and from and against any and all liabilities, losses, damages, reasonable costs, reasonable charges, reasonable counsel fees and other reasonable expenses, in each case arising out of the terms of this Agreement, the Purchaser Assets and any agreement related thereto, except to the extent (i) that such arises from such Indemnified Person's gross negligence, willful misconduct or bad faith or (ii) that such arose prior to the date hereof.

13.    <u>Release</u>. The Purchaser, on behalf of itself and any successors and assigns, hereby releases the Seller from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or equity in any way related to this Agreement, the Purchaser Assets and any agreement related thereto, which against the Seller the Purchaser ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing arising directly or indirectly from its execution of this Agreement. Nothing in this Section 13 is intended to release the Purchaser's rights under this Agreement.

14.    <u>Survival</u>. The provisions of Sections 6, 7, 8, 9, 10, 11, 12, 13, 15, 18 and 19 shall survive the termination of this Agreement.

15.    <u>Benefits of Agreement</u>. Nothing in this Agreement, express or implied, shall give to any person, other than the parties hereto, any benefit or any legal or equitable right, remedy or claim hereunder.  The Indemnified Persons are express third-party beneficiaries to this Agreement.

16.    <u>Security Interest</u>. The Purchaser may pledge its rights under this Agreement pursuant to any financing facility to which the Purchaser or any of its affiliates is a party, and each of the Seller, the Issuer, and the Subsidiary hereby consents to any such pledge.

17.    <u>Investor Representations and Confidentiality Agreement</u>.  The parties hereto hereby agree that the Investor Representations and Confidentiality Agreement executed as of December 21, 2016 by the Purchaser shall terminate as of the date of this Agreement and from and after the date of this Agreement shall be of no further force and effect, except with respect to those provisions of such agreement which by their terms survive the termination of such agreement.

18.    <u>Limited Recourse</u>.  No recourse shall be had for the payment of any amount owing under or in respect of any obligation under this Agreement against any officer, member, director, employee, securityholder or incorporator of the Issuer or its successors or assigns.

19.    <u>Non-Petition</u>.  Each party hereby agrees not to cause or join in the filing of a petition in bankruptcy or similar proceeding against the Issuer or the Subsidiary for the non-payment of any amounts provided for under this Agreement until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the day and year first written above.

**U.S. BANK NATIONAL ASSOCIATION,** as Trustee pursuant to the Indenture, as Seller

By:
Name:
Title:

*Scott D. DeRoss*
*Vice President*

**MBIA INSURANCE CORPORATION,** as Purchaser

By:
Name:
Title:

**ZOHAR CDO 2003-1, LIMITED,** as Issuer

**By: U.S. Bank National Association, its attorney-in-fact**

By:
Name:
Title:

*Scott D. DeRoss*
*Vice President*

**ZOHAR CDO 2003-1, LLC,** as Subsidiary

**By: U.S. Bank National Association, its attorney-in-fact**

By:
Name:
Title:

*Scott D. DeRoss*
*Vice President*

[Signature Page to Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the day and year first written above.

**U.S. BANK NATIONAL ASSOCIATION**, as Trustee
pursuant to the Indenture, as Seller

By: _____
Name: _____
Title: _____


**MBIA INSURANCE CORPORATION**, as Purchaser

By: _____
Name: Jonathan C. Harris
Title: Deputy General Counsel

**ZOHAR CDO 2003-1, LIMITED**, as Issuer

**By: U.S. Bank National Association, its attorney-in-fact**

By: _____
Name: _____
Title: _____


**ZOHAR CDO 2003-1, LLC**, as Subsidiary

**By: U.S. Bank National Association, its attorney-in-fact**

By: _____
Name: _____
Title: _____


[Signature Page to Purchase Agreement]

**EXHIBIT I**

| # | Issuer | Issue | Asset Type | Par Amount (as of 11/30/16) | Total Commitment | Coupon (as of 11/30/16) | Maturity Date |
|---|---|---|---|---|---|---|---|
| 1 | 180s, LLC & 180s Canada Corporation | Fully Funded Term B | Delayed Draw Loan | 2,240,328.00 | 2,242,328.00 | 2.53267 | 4/15/2019 |
| 2 | 180s, LLC & 180s Canada Corporation | Tranche A Revolver | Revolving Credit | 16,600,000.00 | 16,600,000.00 | 2.53267 | 4/15/2019 |
| 3 | American Doors, LLC | Term Loan | Term Loan | 115,751.42 | 115,751.42 | 1.03267 | 4/15/2019 |
| 4 | American Doors, LLC | Term Loan C | Term Loan | 8,315,638.01 | 8,315,638.01 | 1.03267 | 4/15/2019 |
| 5 | American LaFrance | Delayed Draw Term Loans | Delayed Draw Loan | 509,019.73 | 509,019.73 | 0.197 | 10/31/2015 |
| 6 | American LaFrance | Fully Funded DD Term Loan A | Term Loan | 1,784,456.80 | 1,784,456.80 | 0.434 | 10/31/2015 |
| 7 | American LaFrance | Revolver | Revolving Credit | 451,290.39 | 451,290.40 | 1 | 10/31/2015 |
| 8 | American LaFrance | Term Loan 1 | Term Loan | 414,121.55 | 414,121.55 | 1 | 10/31/2015 |
| 9 | American LaFrance | Term Loan 2 | Term Loan | 42,240,641.22 | 42,240,641.22 | 1 | 10/31/2015 |
| 10 | Amweld International LLC | Delayed Draw | Delayed Draw Loan | 80,160.09 | 80,160.09 | 0 | 6/28/2016 |
| 11 | Amweld International LLC | Term Loan B | Term Loan | 5,758,739.62 | 5,758,739.62 | 0 | 10/31/2015 |
| 12 | Best Textiles Acquisition, LLC | Revolver | Revolving Credit | 5,000,000.00 | 5,000,000.00 | 2.53267 | 4/15/2019 |
| 13 | Bomar Industries International, Inc. | Revolver 2 | Revolving Credit | 3,200,000.00 | 3,200,000.00 | 0 | 6/30/2013 |
| 14 | Bomar Industries International, Inc. | Tranche A Term Loan | Term Loan | 10,000,000.00 | 10,000,000.00 | 0 | 6/30/2013 |
| 15 | Bomar Industries International, Inc. | Tranche B Term Loan | Term Loan | 3,806,930.16 | 3,806,930.16 | 0 | 6/30/2013 |
| 16 | Croscil Home | Revolver | Revolving Credit | 10,000,000.00 | 10,000,000.00 | 6.53267 | 4/15/2019 |
| 17 | Duro Textiles, LLC | Fully Funded Term Loan G | Delayed Draw Loan | 1,049,259.65 | 1,049,259.65 | 2.03267 | 4/15/2019 |
| 18 | Duro Textiles, LLC | Term B Loan | Term Loan | 7,500,000.00 | 7,500,000.00 | 2.03267 | 4/15/2019 |
| 19 | Duro Textiles, LLC | Term Loan | Term Loan | 8,000,000.00 | 8,000,000.00 | 2.03267 | 4/15/2019 |
| 20 | Duro Textiles, LLC | Term Loan K1 | Term Loan | 1,888,000.99 | 1,888,000.99 | 2.03267 | 4/15/2019 |
| 21 | East Alliance Limited | Term Loan A | Term Loan | 11,928,348.24 | 11,928,348.24 | 2.53267 | 12/31/2016 |
| 22 | Emag Solutions, | Revolver | Revolving | 4,062,500.04 | 4,062,500.04 | 7.53267 | 4/15/2019 |

Exhibit I-1

| | LLC | | Credit | | | | |
|---|---|---|---|---|---|---|---|
| 23 | Fetco Home Decor, Inc. | Exchanged Security | Term Loan | 2,757,727.26 | 2,757,727.26 | 0.1702 | 4/15/2019 |
| 24 | Fetco Home Decor, Inc. | Term Loan | Term Loan | 1,082,661.77 | 1,082,661.77 | 8.53267 | 4/15/2019 |
| 25 | Galey & Lord, LLC | Fully Funded Term Loan | Term Loan | 3,000,000.00 | 3,000,000.00 | 1.53267 | 4/15/2019 |
| 26 | Galey & Lord, LLC | Revolver | Revolving Loan | 1,180,176.25 | 1,180,176.25 | 1.53267 | 4/15/2019 |
| 27 | Galey & Lord, LLC | Term Loan | Term Loan | 25,263,396.84 | 25,263,396.84 | 1.53267 | 4/15/2019 |
| 28 | Galey & Lord, LLC | Term Loan E | Term Loan | 1,600,000.00 | 1,600,000.00 | 1.52722 | 4/15/2019 |
| 29 | Galey & Lord, LLC | Term Loan K | Term Loan | 689,999.01 | 689,999.01 | 1.53267 | 4/15/2019 |
| 30 | Galey & Lord, LLC | Term Loan M | Term Loan | 800,000.00 | 800,000.00 | 1.53267 | 4/15/2019 |
| 31 | Global Automotive Systems, LLC | Term Loan | Term Loan | 9,100,000.00 | 9,100,000.00 | 6.03267 | 4/15/2019 |
| 32 | Global Automotive Systems, LLC | Term Loan A | Term Loan | 21,727,855.40 | 21,727,855.40 | 6.03267 | 4/15/2019 |
| 33 | Hartwell Industries, Inc. | DELAYED DRAW TERM LOAN C | Delayed Draw Loan | 1,500,000.00 | 1,500,000.00 | 3.03267 | 4/15/2019 |
| 34 | Hartwell Industries, Inc. | New Revolver | Revolving Credit | 1,927,636.19 | 1,927,639.96 | 3.03267 | 4/15/2019 |
| 35 | Hartwell Industries, Inc. | New Term Loan 2 | Term Loan | 15,060,304.48 | 15,060,304.48 | 3.02722 | 4/15/2019 |
| 36 | Hartwell Industries, Inc. | Term Loan A-1 | Term Loan | 500,000.00 | 500,000.00 | 3.03267 | 4/15/2019 |
| 37 | Heritage Aviation, Ltd. | Delayed Draw Term Loan A | Delayed Draw Loan | 9,860,000.00 | 9,970,000.00 | 4 | 4/15/2019 |
| 38 | Heritage Aviation, Ltd. | Term Loan | Term Loan | 1,000,000.00 | 1,000,000.00 | 4.52722 | 4/15/2019 |
| 39 | Iconic American Trucks | Iconic American Trucks T/L B | Term Loan | 7,217,681.53 | 7,217,681.53 | | 3/31/2019 |
| 40 | IMG Holdings, Inc. | Fully Funded Term Loan | Term Loan | 555,360.00 | 555,360.00 | 4.53267 | 4/15/2019 |
| 41 | IMG Holdings, Inc. | Revolver A | Revolving Credit | 3,999,999.97 | 4,000,000.00 | 4.53267 | 4/15/2019 |
| 42 | IMG Holdings, Inc. | Revolving Credit C | Revolving Credit | 2,000,000.35 | 2,000,000.35 | 4.53267 | 4/15/2019 |
| 43 | IMG Holdings, Inc. | Term E | Term Loan | 144,640.00 | 144,640.00 | 4.53267 | 4/15/2019 |
| 44 | IMG Holdings, Inc. | Term Loan 1A | Term Loan | 2,004,585.76 | 2,004,585.76 | 4.53267 | 4/15/2019 |
| 45 | IMG Holdings, Inc. | Term Loan 1B | Term Loan | 2,174,795.68 | 2,174,795.68 | 4.53267 | 4/15/2019 |
| 46 | IMG Holdings, Inc. | Term Loan D | Term Loan | 300,000.00 | 300,000.00 | 4.53267 | 4/15/2019 |
| 47 | Intera Group, Inc. | Exchanged Security | Note | 6,374,815.23 | 6,374,815.23 | 0 | 12/31/2016 |

| 48 | Intera Group, Inc. | Fully Funded Term C | Delayed Draw Loan | 2,586,494.53 | 2,586,494.53 | 0 | 10/31/2016 |
|---|---|---|---|---|---|---|---|
| 49 | Intera Group, Inc. | Restructured Term Loan | Term Loan | 869,031.69 | 869,031.69 | 0 | 10/31/2016 |
| 50 | Intera Group, Inc. | Term Loan C | Term Loan | 158,501.65 | 158,501.65 | 0 | 10/31/2016 |
| 51 | Intrepid USA | Intrepid USA R/C | Revolving Credit | 9,280,002.89 | 9,280,002.89 | 8 | 4/15/2019 |
| 52 | Intrepid USA | Term Loan B | Term Loan | 3,860,066.01 | 3,860,066.01 | 6.53267 | 4/15/2019 |
| 53 | LVD Acquisition, LLC | Term Loan | Term Loan | 9,303,993.33 | 9,303,993.33 | 4.53267 | 4/15/2019 |
| 54 | MD Helicopters, Inc. | Sub Note Term Loan | Term Loan | 11,255,271.08 | 11,255,271.08 | 2.4255 | 5/15/2019 |
| 55 | MD Helicopters, Inc. | Term A | Term Loan | 12,873,602.92 | 12,873,602.92 | 3.53267 | 4/15/2019 |
| 56 | MD Helicopters, Inc. | Term Loan | Term Loan | 25,551,724.14 | 25,551,724.14 | 3.53267 | 4/15/2019 |
| 57 | MD Helicopters, Inc. | Term Loan B | Term Loan | 16,116,674.23 | 16,116,674.23 | 3.53267 | 4/15/2019 |
| 58 | MD Helicopters, Inc. | Tranche A-3 | Term Loan | 700,000.00 | 700,000.00 | 3.53267 | 4/15/2019 |
| 59 | MD Helicopters, Inc. | Tranche A-7 | Term Loan | 1,200,000.00 | 1,200,000.00 | 3.53267 | 4/15/2019 |
| 60 | Natura Water, Inc. | Fully Funded Term B | Term Loan | 1,500,000.00 | 1,500,000.00 | 5.53267 | 4/15/2019 |
| 61 | Natura Water, Inc. | Fully Funded Term C | Term Loan | 2,200,000.00 | 2,200,000.00 | 5.53267 | 4/15/2019 |
| 62 | Natura Water, Inc. | Fully Funded Term Loan E | Term Loan | 300,000.00 | 300,000.00 | 5.53267 | 4/15/2019 |
| 63 | NetVersant Acquisition, LLC | Restructured Revolver A | Revolving Credit | 277,490.69 | 277,490.69 | 1.53267 | 4/15/2019 |
| 64 | NetVersant Acquisition, LLC | Restructured Term Loan | Term Loan | 41,585,556.76 | 41,585,556.76 | 1.53267 | 4/15/2019 |
| 65 | NetVersant Solutions, Inc. | Restructured Revolver B | Revolving Credit | 2,102,385.30 | 2,102,385.31 | 1.49565 | 4/15/2019 |
| 66 | Petry Media Corporation | Priming Revolver | Revolving Credit | 9,212,536.60 | 9,219,801.44 | 10 | 10/31/2017 |
| 67 | Petry Media Corporation | Priming Term Loan | Term Loan | 210,397.61 | 210,397.61 | 10 | 10/31/2016 |
| 68 | Petry Media Corporation | Term Loan C | Term Loan | 1,380,775.74 | 1,380,775.74 | 10 | 10/31/2016 |
| 69 | Petry Media Corporation | Term Loan E | Term Loan | 770,092.44 | 770,092.44 | 10 | 10/31/2016 |
| 70 | Rapid Rack Industries, Inc. | Term Loan | Term Loan | 4,121,507.10 | 4,121,507.10 | 0 | 10/31/2015 |
| 71 | Red Shield Acquisition LLC | Revolver 2 | Revolving Credit | 5,000,000.00 | 5,000,000.00 | | 10/31/2016 |
| 72 | Red Shield Acquisition | Term Loan | Delayed Draw | 5,722,548.98 | 5,722,548.98 | | 10/31/2016 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | LLC | | Loan | | | | |
| 73 | Remco Maintenance, LLC | Revolver | Revolving Credit | 2,500,000.00 | 2,500,000.00 | 8.53267 | 4/15/2019 |
| 74 | Remco Maintenance, LLC | Term Loan | Term Loan | 3,362,670.50 | 3,362,670.50 | 8.53267 | 4/15/2019 |
| 75 | RM Acquisition, LLC | Preferred Security | Term Loan | 8,545,250.00 | 8,545,250.00 | 0.53433 | 5/15/2019 |
| 76 | RM Acquisition, LLC | Revolver | Revolving Credit | 2,205,882.33 | 2,205,882.35 | 10 | 4/15/2019 |
| 77 | RM Acquisition, LLC | Term Loan | Term Loan | 5,823,529.41 | 5,823,529.41 | 4.86267 | 4/15/2019 |
| 78 | S.O. Acquisition, LLC | Fully Funded Term A | Term Loan | 4,500,000.00 | 4,500,000.00 | 6.53267 | 4/15/2019 |
| 79 | S.O. Acquisition, LLC | Fully Funded Term Loan C | Term Loan | 350,000.00 | 350,000.00 | 6.53267 | 4/15/2019 |
| 80 | Silverack, LLC | Silverack R/C A | Revolving Credit | 6,000,000.00 | 6,000,000.00 | 2.53267 | 4/15/2019 |
| 81 | Silverack, LLC | Silverack T/L A | Term Loan | 3,395,487.02 | 3,395,487.02 | 2.53267 | 4/15/2019 |
| 82 | Snelling Medical Staffing | Term Loan | Term Loan | 223,000.00 | 223,000.00 | 7.53267 | 4/15/2019 |
| 83 | Transcare Corporation | Tranche B Term Loan | Term Loan | 3,500,000.00 | 3,500,000.00 | 2.53267 | 4/15/2019 |
| 84 | Trim Trends, LLC | Term Loan A | Term Loan | 6,555,380.26 | 6,555,380.26 | 6.02722 | 4/15/2019 |
| 85 | Vulcan Engineering Corporation | Revolver | Revolving Credit | 1, 428,571.43 | 2,000,000.00 | 7.52722 | 4/15/2019 |
| 86 | Xinhua Sports & Entertainment | Additional Term Loan | Term Loan | 2,394,288.89 | 2,394,288.89 | 0.2145 | 10/21/2012 |
| 87 | Xinhua Sports & Entertainment | Convertible Term Loan | Term Loan | 13,060,228.45 | 13,060,228.45 | 0.2145 | 10/21/2012 |
| 88 | Xpient Solutions, LLC | Exchanged Security | Term Loan | 318,427.84 | 318,427.84 | 4.19775 | 11/30/2019 |
| 89 | Zohar SS Acquisition, LLC | Exchanged Security | Term Loan | 2,564,102.60 | 2,564,102.60 | 2 | 5/15/2019 |
| 90 | Zohar SS Acquisition, LLC | Preferred Stock | Term Loan | 256,410.26 | 256,410.26 | 7.53267 | 5/15/2019 |
| 91 | Zohar SS Acquisition, LLC | Term Loan | Term Loan | 7,652,549.20 | 7,652,549.20 | 7.53267 | 4/15/2019 |

| Equity Interest | | | | |
|---|---|---|---|---|
| # | Issuer Name | Type | Amount | |
| 92 | Automated Ductwork Manufacturing Company | Common | 100 | |
| 93 | Felagastyring EHF | Common Stock | 63,100.00 | |
| 94 | Fetco Home Decor, Inc. | Common1 | 51,263.00 | |
| 95 | Fetco Home Decor, Inc. | Common2 | 25,000.00 | |
| 96 | Reserved | | | |
| 97 | Fetco Home Decor, Inc. | Pref 315619ZB5 | 13,488.00 | |

| 98 | Reserved | | | |
| 99 | Fetco Home Decor, Inc. | Preferred | 14,090.00 | |
| 100 | Fetco International Hong Kong Limited | Common | 9,997.00 | |
| 101 | Galey & Lord, Inc. | Common Stock | 687,547.00 | |
| 102 | Galey & Lord, Inc. | Series A Preferred Interest 8/18/2012 | 39,010,000.00 | |
| 103 | Glenoit Universal, Ltd. | Common Stock Class A | 12,967.00 | |
| 104 | Glenoit Universal, Ltd. | Class B Common Stock | 3,527.00 | |
| 105 | Reserved | | | |
| 106 | Reserved | | | |
| 107 | Hartwell Industries, Inc. | Common CL A | 194,512.00 | |
| 108 | HyperActive Technologies, Inc. | Common Stock | 85,334.00 | |
| 109 | IMG Holdings, Inc. | Common Stock | 757 | |
| 110 | Intera Group, Inc. | Preferred Stock | 5,069.42 | |
| 111 | Intera Group, Inc. | Common Stock | 839.09 | |
| 112 | Reserved | | | |
| 113 | MD Helicopters, Inc. | Common Stock | 235 | |
| 114 | Metalforming Technologies, Inc. | Common Stock | 175,889.00 | |
| 115 | Opening Specialties and Supply Inc. | Common | 2,267.00 | |
| 116 | PHC Holding Corp | Class A Common Stock | 83,460.13 | |
| 117 | PHC Holding Corp | Class C Common Stock | 85,880.75 | |
| 118 | PHC Holding Corp | Common | 100 | |
| 119 | PHC Holding Corp | Class B Common Stock | 112,047.09 | |
| 120 | PHC Holding Corp | Preferred Stock | 114,178.19 | |
| 121 | Pleasants Hardware Company | Common CL A | 1,000.00 | |
| 122 | Spectrum International Holdings, Inc. | Common | 286,103,870.07 | |
| 123 | Textile Holdings, Inc. | Common | 400,000.00 | |
| 124 | U.F. Holdings, Inc. | Preferred Stock | 53,810.00 | |
| 125 | UF Holdings Inc. | Common | 196,020.00 | |
| 126 | UI Acquisition Holding Company | Class A Common Stock | TBD | |
| 127 | UI Acquisition Holding Company | Class B Common Stock | TBD | |
| 128 | Vorumerkjastyring EHF | Common Stock | 63,100.00 | |
| 129 | W.W. Holdings, LLC | Common Stock | 4,787.00 | |
| 130 | Western Forest Products, Inc. | Common | 45,327.00 | |
| 131 | W.W. Versat Acquisition Corporation | Common Stock | 100 | |
| 132 | Xinhua Sports & Entertainment Limited | Common | 41,992.00 | |

| Additional Assets | |
|---|---|
| # | |
| 133 | To the extent not identified in Items 1 to 132 above, Item 133 shall consist of all of the Issuer's right, title and interest in and to instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts and investment property and other property and rights subject or intended to be subject to the lien of the Indenture for the benefit of the Secured Parties (as defined in the Indenture) as set forth in the Granting Clauses of the Indenture, including, without limitation, any and all property of any type or nature owned by the Issuer (other than Excluded Property, as defined in the Indenture) and any Equity Securities (as defined in the Indenture) and other securities or obligations owned or acquired by the Issuer and such other right, title or interest to which the Trustee may transfer or sell, including, without limitation (and for avoidance of any doubt), any commercial tort claims; provided, however, that all of the Accounts and all Cash therein (as each such term is defined in the Indenture) shall in no event be included in the Purchaser Assets. | |

**EXHIBIT II**

**FORM OF PARTICIPATION AGREEMENT**

Exhibit II-1

**EXECUTION VERSION**

# MASTER PARTICIPATION AGREEMENT

This Master Participation Agreement (as amended from time to time, this "Agreement"), dated as of January 12, 2017, among Zohar CDO 2003-1, Limited (the "Issuer"), Zohar CDO 2003-1, LLC (the "Zohar Subsidiary"), U.S. Bank National Association, in its capacity as trustee pursuant to the Indenture (the "Seller"), and MBIA Insurance Corporation (the "Participant").

## RECITALS

WHEREAS, reference is hereby made to the indenture, dated as of November 13, 2003 (as amended, supplemented or otherwise modified from time to time, the "Indenture"), by and among the Issuer, as issuer, Zohar CDO 2003-1, Corp., as co-issuer (the "Co-Issuer" and, together with the Issuer, the "Issuers"), the Zohar Subsidiary, the Participant, as credit enhancer, CDC Financial Products Inc., as Class A-1 Note Agent, and the Seller, as trustee;

WHEREAS, the Issuer owns certain loan interests, equity interests, rights, claims and additional property, interests, and assets (the "Assets");

WHEREAS, an "event of default" occurred under the Indenture and the Controlling Party exercised its remedies pursuant to the Indenture by directing the sale and liquidation of the Assets at a public sale;

WHEREAS, such public sale occurred on December 21, 2016;

WHEREAS, pursuant to the terms and conditions of such public sale as set forth in the Seller's Notice of Rescheduling of Public Sale and Fourth Notice of Public Sale and Invitation to Bid, dated December 8, 2016, the Participant was the winning bidder in respect of all of the Assets (the "Purchaser Assets");

WHEREAS, the Seller, the Issuer, the Zohar Subsidiary and the Participant have entered into a purchase agreement, dated as of January 12, 2017 (as amended, supplemented or otherwise modified from time to time, the "Purchase Agreement") in respect of the Purchaser Assets;

WHEREAS, Section 4(b) of the Purchase Agreement provides that, if an Incomplete Transfer (as such term is defined in the Purchase Agreement) occurs in respect of any of the Purchaser Assets, then the Seller, the Issuer, the Zohar Subsidiary and the Participant shall enter into a participation agreement in respect of such Purchaser Assets;

WHEREAS, as of the date hereof, an Incomplete Transfer occurred in respect of each of the Purchaser Assets described in Annex A hereto (the "Participated Assets");

WHEREAS, pursuant to the Indenture, the Purchase Agreement and this Agreement constitute a sale effective to bind the Transferring Parties (as such term is defined herein), the Noteholders and other Secured Parties, and to divest all right, title and interest, whether at law or equity, of each of them in and to the assets sold, and is a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any all persons claiming through or under them;

WHEREAS, the Transferring Parties desire to sell, transfer, assign, grant, set over, deposit with or otherwise convey to the Participant, and the Participant desires to purchase, acquire, assume and accept from the Transferring Parties, legal, record, equitable and beneficial ownership of each Participated Asset, but the consummation of such sale, transfer, assignment, grant, set-over, deposit or other conveyance and purchase, acquisition, assumption and acceptance has not been effected as of the Settlement Date;

WHEREAS, pending consummation of such sale, transfer, assignment, grant, set-over, deposit or other conveyance and purchase, acquisition, assumption and acceptance (as contemplated by Section 3A below), the Participant desires to purchase, acquire, assume and accept from the Transferring Parties, and the Transferring Parties desire to sell, transfer, assign, grant, set over, deposit with or otherwise convey to the Participant, an undivided 100% participation interest (constituting the equitable and beneficial ownership) in each Participated Asset on the terms and conditions set forth below; and

WHEREAS, the parties hereto wish to provide for various matters in connection with the foregoing.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.    Interpretation.

The terms defined in Section 11 will have the meanings therein specified for the purpose of this Agreement.  Capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings ascribed thereto in the Indenture or the Purchase Agreement, as the case may be.

Section 2.    Participations.

(a)    Transfer.  On the terms and conditions set forth herein, effective on and as of the Settlement Date, the Seller hereby sells, transfers, assigns, grants, sets over, deposits with or otherwise conveys to the Participant, and the Participant hereby purchases, acquires, assumes and accepts from the Transferring Parties, with respect to each Participated Asset identified in Annex A hereto, a participation evidencing an undivided 100% equitable and beneficial ownership interest (each, a "Participation") in all of the Transferring Parties' right, title, interest, claims and causes of action in and to such Participated Asset and in all related Transferred Rights.  None of the Transferring Parties shall retain any equitable or beneficial interest in the Participation or any proceeds thereof.  None of the foregoing requirements shall be deemed or interpreted to impose any obligation or liability on the Seller, the Issuer or the Zohar Subsidiary with respect to any transfer of any right, title and interest to any property (including any payment in respect thereof) except to the extent the Seller, the Issuer or the Zohar Subsidiary or their authorized agents or representatives have actual knowledge of such property.

(b)    Payments by Participant.  As consideration for the sale, transfer, assignment, grant, set-over, deposit or other conveyance by the Transferring Parties of each Participation, the Participant has on the date of this Agreement delivered to the Seller the Purchase Price.

Section 3. <u>Security Interest</u>.

(a)    As of the Settlement Date, each of the Transferring Parties hereby pledges to the Participant as security for the performance by each of the Transferring Parties of its obligations under this Agreement, and hereby grants to the Participant a security interest in, each Participated Asset and all distributions and payments on any of the foregoing and all other proceeds of any of the foregoing (collectively, the "<u>Participation Collateral</u>").

(b)    If at any time any Transferring Party shall default in any of its payment obligations owing to the Participant under Section 4 and such default continues for not less than two Business Days, the Participant shall have all of the rights and remedies with respect to the Participation Collateral of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Participation Collateral as if the Participant was the sole and absolute owner thereof (and the Seller agrees to take all such actions as may be appropriate to give effect to such rights).

(c)    The Transferring Parties hereby authorize the Participant to file a financing statement on form UCC-1 with respect to the Participation Collateral (or any category of description including general intangibles) with the Recorder of Deeds of the District of Columbia or any other applicable jurisdiction.

Section 3A. <u>Elevation to Assignment</u>.

(a)    Subject to the terms and provisions of the applicable Participated Assets and of applicable law, each Transferring Party shall consistent with the obligations of such party under the Purchase Agreement use commercially reasonable efforts to assist the Participant in causing the Participant to become the legal and record owner of each Participated Asset that is the subject of a Participation (an "<u>Elevation</u>") as soon as reasonably practicable and, with respect to each such Participated Asset, shall take such action (including the execution and delivery of such transfer certificates, assignments, assignment agreements, endorsements, administrative questionnaires and such other documents or instruments) as shall be requested by the Participant and necessary to effect such Elevation and consistent with the terms of this Agreement and such Participated Assets.  Upon Elevation, each Transferring Party shall deliver such transfer certificates, assignments, assignment agreements, endorsements, administrative questionnaires and such other documents or instruments, and the documentation with respect to the related Participated Asset in its possession to or as directed by the Participant.

(b)    The Participant (or its duly appointed investment manager or other agent) shall be permitted to take any and all action necessary to effect any Elevation and/or finalize the sale, transfer, assignment, grant, set-over, deposit or other conveyance of any Participated Asset, and in furtherance of the foregoing each Transferring Party agrees to provide to the Participant (and any duly appointed investment manager or other agent of the Participant), a limited power of attorney, in form and substance satisfactory to the Transferring Parties, permitting the Participant to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all

documents that the Participant deems appropriate or necessary in connection with any Elevation or finalization of the sale, transfer, assignment, grant, set-over, deposit or other conveyance of any of the Participated Assets.

Section 4.    Payments, Dividends and Other Distributions.

(a)    Directions to Remit.  As long as any Participation shall be outstanding, each Transferring Party agrees to instruct the relevant administrative or paying agent or trustee (or, in the absence of any such agent or trustee, the relevant Underlying Company) to remit directly to or at the direction of the Participant all payments, dividends, and other distributions of any kind required to be made on the related Participated Asset that have accrued and are payable after the date on which such Participation was acquired.

(b)    Payments, Dividends and Other Distributions.  In the event that any account debtor, other Person obligated in respect of, or the related Underlying Company in respect of, any Participated Asset (or any such administrative or paying agent or trustee) makes a payment, issues a dividends, or makes any other distributions of any kind to which the Participant is entitled under Section 4(a) directly to any Transferring Party (instead of making such payment, issuing such dividend, or making such other distribution in accordance with the instruction given by or as directed by such Transferring Party pursuant to Section 4(a)), such payment, dividend or other distribution will promptly be remitted by such Transferring Party to the account of the Participant or its designee(s) set forth in Section 4(a).  Until so remitted, all such payments, dividends or other distributions shall be the Property of the Participant and shall not be commingled with any other funds or Property of such Transferring Party.

(i)    If at any time after an Elevation, any Transferring Party receives a payment, dividend or other distribution of any kind with respect to the related Participated Asset, the Seller or such Transferring Party (A) shall accept and hold such payment, dividend or other distribution for the account and sole benefit of the Participant (for remittance to the account of the Participant set forth in Section 4(a)), (B) shall have no equitable or beneficial interest in such payment, dividend or other distribution, and (C) shall deliver any remaining portion of such payment, dividend or other distribution (free of any withholding, setoff, recoupment, or deduction of any kind) immediately to the account of the Participant or its designee(s) set forth in Section 4(a), in the same form received and, when necessary or appropriate, with such Transferring Party's endorsement, except to the extent prohibited under any applicable law, rule, or order.

(ii)    If any Transferring Party remits any payment, dividend or distribution pursuant to Section 4(b)(i) and such Transferring Party is required under applicable law or otherwise to return to any Person all or any portion of such payment, dividend or distribution, the Participant shall, upon the written request of such Transferring Party, promptly return to such Transferring Party such payment, dividend or distribution required to be so returned or paid and interest thereon at such rate, if any, as such Transferring Party is required to pay thereon.

(c)    Taxes.  The parties acknowledge that the Participant is the sole beneficial owner of any equitable interest in each Participation.  The Participant will report all income, loss,

deduction or credit with respect to any Participation for all tax purposes and no party will take any tax position inconsistent with the foregoing.

Section 5.    Representations and Warranties as to each Participated Asset.    Each Transferring Party hereby represents and warrants to the Participant as follows as to each Participation:

(a)    No Prior Transfer.    Such Transferring Party has not made any prior sale, assignment or other transfer of any related Participated Asset or any related Transferred Rights.

(b)    Description of Participated Asset.    The related Participated Asset is correctly described in Annex A hereto.

Section 6.    Conditions to Transfer.    The effectiveness of any sale and grant by the Seller of a Participation is subject to the delivery to the Seller of the Purchase Price.

Section 7.    No Dissolution or Winding Up.    The parties hereto acknowledge that, pursuant to Section 2(f) of the Collateral Agency Agreement, dated as of January 12, 2017, among the Issuer, the Zohar Subsidiary, the Seller, the Participant and Alvarez & Marsal Zohar Management, LLC, the Issuer and the Zohar Subsidiary have agreed that, so long as any Participation is outstanding, neither the Issuer nor the Zohar Subsidiary will take any action to cause the voluntary dissolution or winding up of such party.

Section 8.    General Representations and Warranties.    Each of the Seller and the Participant hereby represents and warrants to each other party as follows:

(a)    Status.    It is a company or corporation or other legal entity duly incorporated or organized and validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has full corporate or other applicable power and authority to own its assets and to transact the business in which it is currently engaged and as contemplated by this Agreement.

(b)    Powers.    It has full power and authority to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and such other documentation and has taken all necessary action to authorize such execution, delivery and performance; provided, however, that no representation or warranty is made by the Seller in respect of any action that is or may be necessary to authorize any Elevation of any Participated Asset.

(c)    No Violation or Conflict.    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its Property or any contractual restriction binding on or affecting it or any of its Property; provided, however, that no representation or warranty is made by the Seller in respect of any restrictions that are or may be applicable in respect of any Elevation of any Participated Asset.

(d)    Consents.  All governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect, and all conditions of any such consents have been complied with; provided, however, that no representation or warranty is made by the Seller in in respect of any consent or notice that is or may be required in respect of any Elevation of any Participated Asset.

(e)    Obligations Binding.  This Agreement constitutes its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

Section 9.    Further Assurances.  Each party will from time to time execute and deliver such further documents and do such other acts and things as the other party may reasonably request in order to fully effect the purposes of this Agreement.  Without limiting the generality of the foregoing, the Seller shall at all times maintain evidence of the security interest granted pursuant to Section 3 and shall provide evidence of such recordation to the Participant on or prior to the Settlement Date.

Section 10.    [Reserved].

Section 11.    Definitions.  As used herein, the following terms shall have the following respective meanings:

"Property" means any right or interest in or to property of any kind whatsoever, whether real or personal and whether tangible or intangible.

"Purchase Price" has the meaning assigned to such term in the Purchase Agreement.

"Settlement Date" has the meaning assigned to such term in the Purchase Agreement.

"Transferred Rights" means, with respect to any Participated Asset, (i) all of the Transferring Parties' rights in its capacity as a lender, holder, investor or owner, as the case may be, with respect to such Participated Asset and (ii) to the extent relating to the rights set forth in the preceding clause (i) and permitted to be sold, transferred, assigned, granted, set over, deposited with or otherwise conveyed under applicable law, all claims, suits, causes of action and any other right of the Seller in its capacity as a lender, holder, investor or owner, as the case may be, against any Person, whether known or unknown, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity.

"Transferring Party" means each of the Seller, the Issuer and the Zohar Subsidiary.

"Underlying Company" means the obligor, issuer, partnership, limited liability company, joint venture, trust or other form of business entity, as the case may be, under a Participated Asset.

Section 12.    Waivers.  No failure on the part of either party to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this

Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.  The obligations of the parties under this Agreement in respect of any Participated Asset or the related Participation will survive the Elevation of such Participation.

Section 13.    <u>Notices</u>.    All notices and other communications in respect of this Agreement (including any modifications of, or requests, waivers or consents under, this Agreement) shall be given or made in writing (which may be by email or facsimile) to any party hereto as specified below (or such other address as shall be designated by such party in a notice to the other party).  Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given when transmitted by email or facsimile or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

If to the Issuer:                          Zohar CDO 2003-1, Limited
                                           c/o Fund Fiduciary Partners Limited
                                           2nd Floor, Harbour Centre
                                           42 North Church Street
                                           Grand Cayman
                                           Cayman Islands
                                           Attention: The Directors

                                           with a copy (which shall not constitute notice) to:

                                           Alvarez & Marsal Zohar Management
                                           600 Madison Avenue
                                           New York, New York 10022
                                           Attention: Elizabeth LaPuma
                                           Email: elapuma@alvarezandmarsal.com

If to the Zohar Subsidiary:    Zohar CDO 2003-1, LLC
                                           c/o Puglisi & Associates
                                           850 Library Avenue, Suite 204
                                           Newark, Delaware 19711
                                           Attention: Donald J. Puglisi
                                           Facsimile: (302) 738-7210
                                           E-mail: dpuglisi@puglisiassoc.com

                                           with a copy (which shall not constitute notice) to:

                                           Alvarez & Marsal Zohar Management
                                           600 Madison Avenue
                                           New York, New York 10022
                                           Attention: Elizabeth LaPuma
                                           Email: elapuma@alvarezandmarsal.com

If to the Seller:          U.S. Bank National Association
214 N. Tryon Street, 26th Floor
Charlotte, North Carolina 28202
Attention: Global Corporate Trust Services – Zohar CDO 2003-1,
      Limited
Facsimile: (704) 335-4678

If to the Participant:     MBIA Insurance Corporation
1 Manhattanville Road, Suite 301
Purchase, New York 10577
Attention: Insurance Portfolio Management – CDO Group
      (Zohar CDO 2003-1, Limited)
Facsimile: (914) 765-3131
Confirmation: (914) 765-3068
E-mail: ipmcdotrusteereports@mbia.com
      keith.borelli@mbia.com

Section 14.    <u>Amendments; Successors; Assignments</u>.

(a)    No amendment, modification or waiver in respect of this Agreement will be effective unless in writing and executed by each party hereto.

(b)    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

(c)    Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security, merger or otherwise) by any party hereto without the prior written consent of the other parties hereto.  Any purported transfer that is not in compliance with this Section 14(c) will be void.

(d)    The Participant may pledge its rights under this Agreement pursuant to any financing facility to which the Participant or any of its affiliates is a party, and each party hereto hereby consents to any such pledge.

Section 15.    <u>Governing Law; Submission to Jurisdiction; Etc.</u>

(a)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the law of the State of New York.

(b)    <u>Submission to Jurisdiction</u>.  With respect to any Proceeding relating to this Agreement, to the fullest extent permitted by applicable law, each party irrevocably (i) submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and (ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not

have any jurisdiction over such party. Nothing in this Agreement precludes any party from bringing Proceedings in any other jurisdiction, nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

Section 16.    Waiver of Jury Trial.  **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

Section 17.    Execution in Counterparts.  This Agreement may be executed in multiple counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one agreement binding on the parties.  Electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart.

Section 18.    Limited Recourse.  No recourse shall be had for the payment of any amount owing under or in respect of any obligation under this Agreement against any officer, member, director, employee, securityholder or incorporator of the Issuer or its successors or assigns.

Section 19.    Non-Petition.  Each party hereby agrees not to cause or join in the filing of a petition in bankruptcy or similar proceeding against the Issuer or the Zohar Subsidiary for the non-payment of any amounts provided for under this Agreement until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Notes issued under the Indenture.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**ZOHAR CDO 2003-1, LIMITED**

**By: U.S. Bank National Association, as trustee**

By_____
  Name:
  Title:

**ZOHAR CDO 2003-1, LLC**

**By: U.S. Bank National Association, as trustee**

By_____
  Name:
  Title:

**U.S. BANK NATIONAL ASSOCIATION**, as trustee pursuant to the Indenture, as Seller

By_____
  Name:
  Title:

**MBIA INSURANCE CORPORATION**

By_____
  Name:
  Title:

# ANNEX A

## PARTICIPATED ASSETS

| # | Issuer | Issue | Asset Type | Par Amount (as of 11/30/16) | Total Commitment | Coupon (as of 11/30/16) | Maturity Date |
|---|--------|-------|-----------|------------------------------|------------------|-------------------------|---------------|
| 1 | 180s, LLC & 180s Canada Corporation | Fully Funded Term B | Delayed Draw Loan | 2,240,328.00 | 2,242,328.00 | 2.53267 | 4/15/2019 |
| 2 | 180s, LLC & 180s Canada Corporation | Tranche A Revolver | Revolving Credit | 16,600,000.00 | 16,600,000.00 | 2.53267 | 4/15/2019 |
| 3 | American Doors, LLC | Term Loan | Term Loan | 115,751.42 | 115,751.42 | 1.03267 | 4/15/2019 |
| 4 | American Doors, LLC | Term Loan C | Term Loan | 8,315,638.01 | 8,315,638.01 | 1.03267 | 4/15/2019 |
| 5 | American LaFrance | Delayed Draw Term Loans | Delayed Draw Loan | 509,019.73 | 509,019.73 | 0.197 | 10/31/2015 |
| 6 | American LaFrance | Fully Funded DD Term Loan A | Term Loan | 1,784,456.80 | 1,784,456.80 | 0.434 | 10/31/2015 |
| 7 | American LaFrance | Revolver | Revolving Credit | 451,290.39 | 451,290.40 | 1 | 10/31/2015 |
| 8 | American LaFrance | Term Loan 1 | Term Loan | 414,121.55 | 414,121.55 | 1 | 10/31/2015 |
| 9 | American LaFrance | Term Loan 2 | Term Loan | 42,240,641.22 | 42,240,641.22 | 1 | 10/31/2015 |
| 10 | Amweld International LLC | Delayed Draw | Delayed Draw Loan | 80,160.09 | 80,160.09 | 0 | 6/28/2016 |
| 11 | Amweld International LLC | Term Loan B | Term Loan | 5,758,739.62 | 5,758,739.62 | 0 | 10/31/2015 |
| 12 | Best Textiles Acquisition, LLC | Revolver | Revolving Credit | 5,000,000.00 | 5,000,000.00 | 2.53267 | 4/15/2019 |
| 13 | Bomar Industries International, Inc. | Revolver 2 | Revolving Credit | 3,200,000.00 | 3,200,000.00 | 0 | 6/30/2013 |
| 14 | Bomar Industries International, Inc. | Tranche A Term Loan | Term Loan | 10,000,000.00 | 10,000,000.00 | 0 | 6/30/2013 |
| 15 | Bomar Industries International, Inc. | Tranche B Term Loan | Term Loan | 3,806,930.16 | 3,806,930.16 | 0 | 6/30/2013 |
| 16 | Croscil Home | Revolver | Revolving Credit | 10,000,000.00 | 10,000,000.00 | 6.53267 | 4/15/2019 |
| 17 | Duro Textiles, LLC | Fully Funded Term Loan G | Delayed Draw Loan | 1,049,259.65 | 1,049,259.65 | 2.03267 | 4/15/2019 |
| 18 | Duro Textiles, LLC | Term B Loan | Term Loan | 7,500,000.00 | 7,500,000.00 | 2.03267 | 4/15/2019 |
| 19 | Duro Textiles, LLC | Term Loan | Term Loan | 8,000,000.00 | 8,000,000.00 | 2.03267 | 4/15/2019 |
| 20 | Duro Textiles, LLC | Term Loan K1 | Term Loan | 1,888,000.99 | 1,888,000.99 | 2.03267 | 4/15/2019 |

| 21 | East Alliance Limited | Term Loan A | Term Loan | 11,928,348.24 | 11,928,348.24 | 2.53267 | 12/31/2016 |
| 22 | Emag Solutions, LLC | Revolver | Revolving Credit | 4,062,500.04 | 4,062,500.04 | 7.53267 | 4/15/2019 |
| 23 | Fetco Home Decor, Inc. | Exchanged Security | Term Loan | 2,757,727.26 | 2,757,727.26 | 0.1702 | 4/15/2019 |
| 24 | Fetco Home Decor, Inc. | Term Loan | Term Loan | 1,082,661.77 | 1,082,661.77 | 8.53267 | 4/15/2019 |
| 25 | Galey & Lord, LLC | Fully Funded Term Loan | Term Loan | 3,000,000.00 | 3,000,000.00 | 1.53267 | 4/15/2019 |
| 26 | Galey & Lord, LLC | Revolver | Revolving Loan | 1,180,176.25 | 1,180,176.25 | 1.53267 | 4/15/2019 |
| 27 | Galey & Lord, LLC | Term Loan | Term Loan | 25,263,396.84 | 25,263,396.84 | 1.53267 | 4/15/2019 |
| 28 | Galey & Lord, LLC | Term Loan E | Term Loan | 1,600,000.00 | 1,600,000.00 | 1.52722 | 4/15/2019 |
| 29 | Galey & Lord, LLC | Term Loan K | Term Loan | 689,999.01 | 689,999.01 | 1.53267 | 4/15/2019 |
| 30 | Galey & Lord, LLC | Term Loan M | Term Loan | 800,000.00 | 800,000.00 | 1.53267 | 4/15/2019 |
| 31 | Global Automotive Systems, LLC | Term Loan | Term Loan | 9,100,000.00 | 9,100,000.00 | 6.03267 | 4/15/2019 |
| 32 | Global Automotive Systems, LLC | Term Loan A | Term Loan | 21,727,855.40 | 21,727,855.40 | 6.03267 | 4/15/2019 |
| 33 | Hartwell Industries, Inc. | DELAYED DRAW TERM LOAN C | Delayed Draw Loan | 1,500,000.00 | 1,500,000.00 | 3.03267 | 4/15/2019 |
| 34 | Hartwell Industries, Inc. | New Revolver | Revolving Credit | 1,927,636.19 | 1,927,639.96 | 3.03267 | 4/15/2019 |
| 35 | Hartwell Industries, Inc. | New Term Loan 2 | Term Loan | 15,060,304.48 | 15,060,304.48 | 3.02722 | 4/15/2019 |
| 36 | Hartwell Industries, Inc. | Term Loan A-1 | Term Loan | 500,000.00 | 500,000.00 | 3.03267 | 4/15/2019 |
| 37 | Heritage Aviation, Ltd. | Delayed Draw Term Loan A | Delayed Draw Loan | 9,860,000.00 | 9,970,000.00 | 4 | 4/15/2019 |
| 38 | Heritage Aviation, Ltd. | Term Loan | Term Loan | 1,000,000.00 | 1,000,000.00 | 4.52722 | 4/15/2019 |
| 39 | Iconic American Trucks | Iconic American Trucks T/L B | Term Loan | 7,217,681.53 | 7,217,681.53 | | 3/31/2019 |
| 40 | IMG Holdings, Inc. | Fully Funded Term Loan | Term Loan | 555,360.00 | 555,360.00 | 4.53267 | 4/15/2019 |
| 41 | IMG Holdings, Inc. | Revolver A | Revolving Credit | 3,999,999.97 | 4,000,000.00 | 4.53267 | 4/15/2019 |
| 42 | IMG Holdings, Inc. | Revolving Credit C | Revolving Credit | 2,000,000.35 | 2,000,000.35 | 4.53267 | 4/15/2019 |
| 43 | IMG Holdings, Inc. | Term E | Term Loan | 144,640.00 | 144,640.00 | 4.53267 | 4/15/2019 |
| 44 | IMG Holdings, Inc. | Term Loan 1A | Term Loan | 2,004,585.76 | 2,004,585.76 | 4.53267 | 4/15/2019 |
| 45 | IMG Holdings, Inc. | Term Loan 1B | Term Loan | 2,174,795.68 | 2,174,795.68 | 4.53267 | 4/15/2019 |

Annex A-2

| 46 | IMG Holdings, Inc. | Term Loan D | Term Loan | 300,000.00 | 300,000.00 | 4.53267 | 4/15/2019 |
|----|----|----|----|----|----|----|----|
| 47 | Intera Group, Inc. | Exchanged Security | Note | 6,374,815.23 | 6,374,815.23 | 0 | 12/31/2016 |
| 48 | Intera Group, Inc. | Fully Funded Term C | Delayed Draw Loan | 2,586,494.53 | 2,586,494.53 | 0 | 10/31/2016 |
| 49 | Intera Group, Inc. | Restructured Term Loan | Term Loan | 869,031.69 | 869,031.69 | 0 | 10/31/2016 |
| 50 | Intera Group, Inc. | Term Loan C | Term Loan | 158,501.65 | 158,501.65 | 0 | 10/31/2016 |
| 51 | Intrepid USA | Intrepid USA R/C | Revolving Credit | 9,280,002.89 | 9,280,002.89 | 8 | 4/15/2019 |
| 52 | Intrepid USA | Term Loan B | Term Loan | 3,860,066.01 | 3,860,066.01 | 6.53267 | 4/15/2019 |
| 53 | LVD Acquisition, LLC | Term Loan | Term Loan | 9,303,993.33 | 9,303,993.33 | 4.53267 | 4/15/2019 |
| 54 | MD Helicopters, Inc. | Sub Note Term Loan | Term Loan | 11,255,271.08 | 11,255,271.08 | 2.4255 | 5/15/2019 |
| 55 | MD Helicopters, Inc. | Term A | Term Loan | 12,873,602.92 | 12,873,602.92 | 3.53267 | 4/15/2019 |
| 56 | MD Helicopters, Inc. | Term Loan | Term Loan | 25,551,724.14 | 25,551,724.14 | 3.53267 | 4/15/2019 |
| 57 | MD Helicopters, Inc. | Term Loan B | Term Loan | 16,116,674.23 | 16,116,674.23 | 3.53267 | 4/15/2019 |
| 58 | MD Helicopters, Inc. | Tranche A-3 | Term Loan | 700,000.00 | 700,000.00 | 3.53267 | 4/15/2019 |
| 59 | MD Helicopters, Inc. | Tranche A-7 | Term Loan | 1,200,000.00 | 1,200,000.00 | 3.53267 | 4/15/2019 |
| 60 | Natura Water, Inc. | Fully Funded Term B | Term Loan | 1,500,000.00 | 1,500,000.00 | 5.53267 | 4/15/2019 |
| 61 | Natura Water, Inc. | Fully Funded Term C | Term Loan | 2,200,000.00 | 2,200,000.00 | 5.53267 | 4/15/2019 |
| 62 | Natura Water, Inc. | Fully Funded Term Loan E | Term Loan | 300,000.00 | 300,000.00 | 5.53267 | 4/15/2019 |
| 63 | NetVersant Acquisition, LLC | Restructured Revolver A | Revolving Credit | 277,490.69 | 277,490.69 | 1.53267 | 4/15/2019 |
| 64 | NetVersant Acquisition, LLC | Restructured Term Loan | Term Loan | 41,585,556.76 | 41,585,556.76 | 1.53267 | 4/15/2019 |
| 65 | NetVersant Solutions, Inc. | Restructured Revolver B | Revolving Credit | 2,102,385.30 | 2,102,385.31 | 1.49565 | 4/15/2019 |
| 66 | Petry Media Corporation | Priming Revolver | Revolving Credit | 9,212,536.60 | 9,219,801.44 | 10 | 10/31/2017 |
| 67 | Petry Media Corporation | Priming Term Loan | Term Loan | 210,397.61 | 210,397.61 | 10 | 10/31/2016 |
| 68 | Petry Media Corporation | Term Loan C | Term Loan | 1,380,775.74 | 1,380,775.74 | 10 | 10/31/2016 |
| 69 | Petry Media Corporation | Term Loan E | Term Loan | 770,092.44 | 770,092.44 | 10 | 10/31/2016 |
| 70 | Rapid Rack Industries, Inc. | Term Loan | Term Loan | 4,121,507.10 | 4,121,507.10 | 0 | 10/31/2015 |

Annex A-3

| # | | | | | | | |
|---|---|---|---|---|---|---|---|
| 71 | Red Shield Acquisition LLC | Revolver 2 | Revolving Credit | 5,000,000.00 | 5,000,000.00 | | 10/31/2016 |
| 72 | Red Shield Acquisition LLC | Term Loan | Delayed Draw Loan | 5,722,548.98 | 5,722,548.98 | | 10/31/2016 |
| 73 | Remco Maintenance, LLC | Revolver | Revolving Credit | 2,500,000.00 | 2,500,000.00 | 8.53267 | 4/15/2019 |
| 74 | Remco Maintenance, LLC | Term Loan | Term Loan | 3,362,670.50 | 3,362,670.50 | 8.53267 | 4/15/2019 |
| 75 | RM Acquisition, LLC | Preferred Security | Term Loan | 8,545,250.00 | 8,545,250.00 | 0.53433 | 5/15/2019 |
| 76 | RM Acquisition, LLC | Revolver | Revolving Credit | 2,205,882.33 | 2,205,882.35 | 10 | 4/15/2019 |
| 77 | RM Acquisition, LLC | Term Loan | Term Loan | 5,823,529.41 | 5,823,529.41 | 4.86267 | 4/15/2019 |
| 78 | S.O. Acquisition, LLC | Fully Funded Term A | Term Loan | 4,500,000.00 | 4,500,000.00 | 6.53267 | 4/15/2019 |
| 79 | S.O. Acquisition, LLC | Fully Funded Term Loan C | Term Loan | 350,000.00 | 350,000.00 | 6.53267 | 4/15/2019 |
| 80 | Silverack, LLC | Silverack R/C A | Revolving Credit | 6,000,000.00 | 6,000,000.00 | 2.53267 | 4/15/2019 |
| 81 | Silverack, LLC | Silverack T/L A | Term Loan | 3,395,487.02 | 3,395,487.02 | 2.53267 | 4/15/2019 |
| 82 | Snelling Medical Staffing | Term Loan | Term Loan | 223,000.00 | 223,000.00 | 7.53267 | 4/15/2019 |
| 83 | Transcare Corporation | Tranche B Term Loan | Term Loan | 3,500,000.00 | 3,500,000.00 | 2.53267 | 4/15/2019 |
| 84 | Trim Trends, LLC | Term Loan A | Term Loan | 6,555,380.26 | 6,555,380.26 | 6.02722 | 4/15/2019 |
| 85 | Vulcan Engineering Corporation | Revolver | Revolving Credit | 1, 428,571.43 | 2,000,000.00 | 7.52722 | 4/15/2019 |
| 86 | Xinhua Sports & Entertainment | Additional Term Loan | Term Loan | 2,394,288.89 | 2,394,288.89 | 0.2145 | 10/21/2012 |
| 87 | Xinhua Sports & Entertainment | Convertible Term Loan | Term Loan | 13,060,228.45 | 13,060,228.45 | 0.2145 | 10/21/2012 |
| 88 | Xpient Solutions, LLC | Exchanged Security | Term Loan | 318,427.84 | 318,427.84 | 4.19775 | 11/30/2019 |
| 89 | Zohar SS Acquisition, LLC | Exchanged Security | Term Loan | 2,564,102.60 | 2,564,102.60 | 2 | 5/15/2019 |
| 90 | Zohar SS Acquisition, LLC | Preferred Stock | Term Loan | 256,410.26 | 256,410.26 | 7.53267 | 5/15/2019 |
| 91 | Zohar SS Acquisition, LLC | Term Loan | Term Loan | 7,652,549.20 | 7,652,549.20 | 7.53267 | 4/15/2019 |

| Equity Interest | | | |
|---|---|---|---|
| # | Issuer Name | Type | Amount |
| 92 | Automated Ductwork Manufacturing Company | Common | 100 |
| 93 | Felagastyring EHF | Common Stock | 63,100.00 |

Annex A-4

| 94 | Fetco Home Decor, Inc. | Common1 | 51,263.00 | |
| 95 | Fetco Home Decor, Inc. | Common2 | 25,000.00 | |
| 96 | Reserved | | | |
| 97 | Fetco Home Decor, Inc. | Pref 315619ZB5 | 13,488.00 | |
| 98 | Reserved | | | |
| 99 | Fetco Home Decor, Inc. | Preferred | 14,090.00 | |
| 100 | Fetco International Hong Kong Limited | Common | 9,997.00 | |
| 101 | Galey & Lord, Inc. | Common Stock | 687,547.00 | |
| 102 | Galey & Lord, Inc. | Series A Preferred Interest 8/18/2012 | 39,010,000.00 | |
| 103 | Glenoit Universal, Ltd. | Common Stock Class A | 12,967.00 | |
| 104 | Glenoit Universal, Ltd. | Class B Common Stock | 3,527.00 | |
| 105 | Reserved | | | |
| 106 | Reserved | | | |
| 107 | Hartwell Industries, Inc. | Common CL A | 194,512.00 | |
| 108 | HyperActive Technologies, Inc. | Common Stock | 85,334.00 | |
| 109 | IMG Holdings, Inc. | Common Stock | 757 | |
| 110 | Intera Group, Inc. | Preferred Stock | 5,069.42 | |
| 111 | Intera Group, Inc. | Common Stock | 839.09 | |
| 112 | Reserved | | | |
| 113 | MD Helicopters, Inc. | Common Stock | 235 | |
| 114 | Metalforming Technologies, Inc. | Common Stock | 175,889.00 | |
| 115 | Opening Specialties and Supply Inc. | Common | 2,267.00 | |
| 116 | PHC Holding Corp | Class A Common Stock | 83,460.13 | |
| 117 | PHC Holding Corp | Class C Common Stock | 85,880.75 | |
| 118 | PHC Holding Corp | Common | 100 | |
| 119 | PHC Holding Corp | Class B Common Stock | 112,047.09 | |
| 120 | PHC Holding Corp | Preferred Stock | 114,178.19 | |
| 121 | Pleasants Hardware Company | Common CL A | 1,000.00 | |
| 122 | Spectrum International Holdings, Inc. | Common | 286,103,870.07 | |
| 123 | Textile Holdings, Inc. | Common | 400,000.00 | |
| 124 | U.F. Holdings, Inc. | Preferred Stock | 53,810.00 | |
| 125 | UF Holdings Inc. | Common | 196,020.00 | |
| 126 | UI Acquisition Holding Company | Class A Common Stock | TBD | |
| 127 | UI Acquisition Holding Company | Class B Common Stock | TBD | |
| 128 | Vorumerkjastyring EHF | Common Stock | 63,100.00 | |
| 129 | W.W. Holdings, LLC | Common Stock | 4,787.00 | |
| 130 | Western Forest Products, Inc. | Common | 45,327.00 | |
| 131 | W.W. Versat Acquisition Corporation | Common Stock | 100 | |
| 132 | Xinhua Sports & Entertainment Limited | Common | 41,992.00 | |

| Additional Assets | |
|---|---|
| # | |
| 133 | To the extent not identified in Items 1 to 132 above, Item 133 shall consist of all of the Issuer's right, title and interest in and to instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts and investment property and other property and rights subject or intended to be subject to the lien of the Indenture for the benefit of the Secured Parties (as defined in the Indenture) as set forth in the Granting Clauses of the Indenture, including, without limitation, any and all property of any type or nature owned by the Issuer (other than Excluded Property, as defined in the Indenture) and any Equity Securities (as defined in the Indenture) and other securities or obligations owned or acquired by the Issuer and such other right, title or interest to which the Trustee may transfer or sell, including, without limitation (and for avoidance of any doubt), any commercial tort claims; provided, however, that all of the Accounts and all Cash therein (as each such term is defined in the Indenture) shall in no event be included in the Participated Assets. | |